Daniel C. Barr (# 010149)
Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
DBarr@perkinscoie.com
SGonski@perkinscoie.com
DocketPHX@perkinscoie.com

Marc E. Elias (WDC# 442007)
(pro hac vice to be filed)
Bruce V. Spiva (WDC# 443754)
(pro hac vice to be filed)
Elisabeth C. Frost (WDC#1007632)
(pro hac vice to be filed)
Amanda R. Callais (WDC# 1021944)
(pro hac vice to be filed)
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ACallais@perkinscoie.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Feldman; Luz Magallanes; Mercedez Hymes; Julio Morera; Alejandra Ruiz; Cleo Ovalle; Marcia Baker; Former Chairman and First President of the Navajo Nation Peterson Zah; Democratic National Committee; DSCC a.k.a. Democratic Senatorial Campaign Committee; Arizona Democratic Party; Kirkpatrick for U.S. Senate, <br><br> Plaintiffs, <br><br> v. <br><br> Arizona Secretary of State's Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; Maricopa County Board of Supervisors; Denny Barney, in his official capacity as a member of the Maricopa County | No. <br><br> **COMPLAINT** |

Board of Supervisors; Steve Chucri, in his official capacity as a member of the Maricopa County Board of Supervisors; Andy Kunasek, in his official capacity as a member of the Maricopa County Board of Supervisors; Clint Hickman, in his official capacity as a member of the Maricopa County Board of Supervisors; Steve Gallardo, in his official capacity as a member of the Maricopa County Board of Supervisors; Maricopa County Recorder and Elections Department; Helen Purcell, in her official capacity as Maricopa County Recorder; Karen Osborne, in her official capacity as Maricopa County Elections Director; and Mark Brnovich, in his official capacity as Arizona Attorney General,

Defendants.

LESLIE FELDMAN, LUZ MAGALLANES, MERCEDEZ HYMES, JULIO MORERA, ALEJANDRA RUIZ, CLEO OVALLE, MARCIA BAKER, FORMER CHAIRMAN AND FIRST PRESIDENT OF THE NAVAJO NATION PETERSON ZAH, the DEMOCRATIC NATIONAL COMMITTEE, the DSCC a.k.a. DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, the ARIZONA DEMOCRATIC PARTY, and KIRKPATRICK FOR U.S. SENATE (collectively, "Plaintiffs") for their Complaint against the ARIZONA SECRETARY OF STATE'S OFFICE; MICHELE REAGAN, in her official capacity as the Secretary of State of Arizona; the MARICOPA COUNTY BOARD OF SUPERVISORS; DENNY BARNEY, STEVE CHUCRI, ANDY KUNASEK, CLINT HICKMAN, and STEVE GALLARDO, in their official capacities as members of the Maricopa County Board of Supervisors; the MARICOPA COUNTY RECORDER AND ELECTIONS DEPARTMENT; HELEN PURCELL, in her official capacity as Maricopa County Recorder, KAREN OSBORNE, in her official capacity as Maricopa County Elections Director, and MARK BRNOVICH, in his official capacity as Arizona Attorney General (collectively, "Defendants") allege as follows:

## **NATURE OF THE ACTION**

1.      This action is brought pursuant to 42 U.S.C. § 1983 to secure equitable

relief from Defendants' unlawful deprivation of Plaintiffs' (and, in the case of the organizational Plaintiffs, their members' and constituents') rights, privileges, and immunities guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the First Amendment to the United States Constitution, Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the laws of the United States.

2.     "No right is more precious in a free country than that of having a voice in the election of those who make the laws . . . ." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Plaintiffs bring the instant lawsuit to protect that right and to prevent the continued disenfranchisement of thousands of Arizona voters—including specifically Arizona's Hispanic, Native-American, and African-American voters—whose right to vote has been and will continue to be denied or unreasonably infringed upon due to the lack of oversight for Maricopa County's allocation of polling locations; Arizona's practice of not counting provisional ballots cast in a precinct or voting area other than the one to which the voter is assigned; and the State's recent criminalization of the collection of signed and sealed absentee ballots with the passage of H.B. 2023.

3.     In 1975, due to its long history of discrimination against Hispanics, Native Americans, and African Americans, Arizona became a "covered jurisdiction" under Section 5 of the Voting Rights Act. For the next thirty-eight years, Arizona's voters enjoyed protection from disenfranchisement as well as arbitrary and disparate treatment by the State in its elections practices and procedures as a result of the independent oversight provided by the federal government to all covered jurisdictions. Section 5 prohibited covered jurisdictions from making any changes to their election practices or procedures until either the U.S. Department of Justice ("DOJ") or a federal court determined that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or [membership in a language minority group]." 42 U.S.C. § 1973(c).

4.     On June 25, 2013, the United States Supreme Court issued its opinion in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), in which it invalidated the coverage

formula contained in Section 4 of the Voting Rights Act (used to identify covered jurisdictions under Section 5), thereby stripping Arizona's voters of the protection that Section 5 had provided. *Id.* at 2631. Arizona's elections officials became free to make changes to their election laws and procedures without first demonstrating to DOJ or a federal court that those changes were not meant to, and would not result in, denial or abridgement of the right to vote of minority voters.

5.     In the less than three years that have passed since the Court decided *Shelby County*, voters in general and minority voters in particular have not fared well in Arizona. Since being removed from the protection of Section 5, Arizona generally—and Maricopa County specifically—has engaged in "consistent activity that has created a culture of voter disenfranchisement" and abridged and denied the rights of voters across the State and the County. *See* Mayor Greg Stanton's March 23, 2016 Letter to Attorney General Lynch at 2 [hereinafter "Stanton Letter"], *available at* https://www.phoenix.gov/mayorsite/ Documents/Mayor%20Greg%20 Stanton%20Letter%20to%20DOJ.pdf (last visited, Apr. 13, 2016). These burdens on the right to vote have fallen particularly hard on minority voters who Maricopa County election officials readily admit to have stopped considering when enacting changes to their voting practices and procedures.

6.     Just weeks ago, Maricopa County made national headlines when, due to its decision to drastically reduce the number of voting locations for the March 22, 2016 presidential preference election ("PPE"), it forced thousands of voters to wait in lines for upwards of five hours to cast their votes for their preferred presidential nominee. In many cases, voters were unable to wait in the arduous lines and were wholly disenfranchised. The reduction of voting locations was particularly burdensome on Maricopa County's Hispanic and African-American communities, many of which had fewer polling locations than Anglo communities and, in some instances, no voting locations at all.

7.     This fiasco was the direct result of Maricopa County elections officials' decision to focus on cutting the costs of the PPE by severely reducing the number of polling locations, rather than ensuring that there were a sufficient number of polling

locations per eligible voter and that such locations were accessible to minority communities. In particular, when Defendant Helen Purcell, the Maricopa County Recorder, was asked if she made any effort to determine how her plan to allocate vote centers would impact minority populations, she stated that she looked at the County as a whole and did not pay any attention to "specific areas."

8.      Arizona is also arbitrarily and disparately disenfranchising voters at alarming rates through its provisional balloting process, in which the ballots of some voters are rejected where they cast their ballot in the right jurisdiction but in a precinct different than the one to which they are assigned ("out of precinct" voting), while others are counted so long as they vote in any polling location found within the jurisdiction. Effectively, this means the ability of Arizona citizens to have their vote counted in such circumstances depends entirely on the county in which they live. These arbitrary differences cause voter confusion, which is compounded by the fact that some of the jurisdictions that accept out-of-precinct ballots in one election (e.g., Maricopa County in the PPE), may reject them in the next (e.g., Maricopa County in the 2016 general election). It is therefore not surprising that, in 2014, Arizona ranked fifth in the nation for the total number of provisional ballots rejected. The main reason that Arizona refused to count provisional ballots in 2014 was that they were cast in a precinct other than the one to which the voter was assigned. In Maricopa County alone, over 2,800 ballots were rejected for this reason. Upon information and belief, the provisional ballots cast and rejected across the state were disproportionately cast by Hispanic voters.

9.      Minority voters are further likely to be disenfranchised in future elections in Arizona as a result of a new law enacted by the Arizona State Legislature in early March 2016, which makes it a felony to turn a signed and sealed ballot into the county registrar on behalf of another voter. This legislation (referred to hereafter as "H.B. 2023"), was passed over the protests of Arizona's Hispanic, Native-American, and African-American voters, all of which have relied heavily on community members, organizers, and friends to deliver ballots to the registrar's office in past elections, and all of which now are

significantly more likely to have their right to vote abridged or denied in the coming general election.

10.    Together, these policies and practices not only result in the arbitrary and differential treatment of Arizona voters but, moreover, they impose onerous burdens on Arizona voters generally and Maricopa County voters specifically, as they have the purpose and effect of burdening, abridging, and/or denying the right to vote of Arizona citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, Section 2 of the Voting Rights Act, and the laws of the United States.

11.    Most of these harmful policies and practices are already in place and have harmed voters in past elections.[1] Unless the Court acts quickly to preliminarily and permanently enjoin these voting laws, practices, and procedures, Plaintiffs, their members, constituents, and numerous other qualified Arizona voters will find their right to vote severely burdened—and in many cases, wholly denied—in November's upcoming general election.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357, and 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.    This Court has personal jurisdiction over Defendants, all of whom are sued in their official capacities and are either government entities, elected, or appointed officials in Arizona or Maricopa County. All Defendants work or reside in the State of Arizona.

14.    Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and in this division.

---

[1] H.B. 2023 will take effect on July 20, 2016. Thus, the harm it imposes is imminent, and will burden the right to vote of Plaintiffs, their members, constituents, and numerous other Arizona voters in local and statewide elections as early as November 2016.

**PARTIES**

15.     Plaintiff LESLIE FELDMAN is a United States citizen registered to vote in Maricopa County, Arizona. She is registered as a Democrat and ordinarily votes in person. On March 22, 2016, Ms. Feldman endured a nearly five-hour wait to vote in the 2016 PPE. She arrived at her vote center, the Church of the Beatitudes, at approximately 3:20 p.m. Upon arriving, she was forced to park half a mile away from the vote center, and then to walk to the vote center with her three-year-old and twelve-week-old daughters. Ms. Feldman arrived at the line to vote at approximately 3:40 p.m. She then waited in line for nearly four hours before even entering the vote center. This experience was made even more unpleasant and upsetting because the one bathroom at the vote center was overwhelmed and leaked raw sewage onto the sidewalk and into the adjacent grass. After nearly four hours of waiting, Ms. Feldman entered the vote center, only to be informed that the location had run out of Democratic ballots. Ms. Feldman then waited another twenty-five minutes for Democratic ballots to arrive. She voted at 8:05 p.m., nearly five hours after arriving at the location. When she left, there were still hundreds of people remaining in line. While Ms. Feldman was able to cast her vote, she was severely burdened by Defendants' mismanagement of the election, including specifically their failure to allocate a sufficient number of polling locations to reasonably accommodate Maricopa County's voters and their failure to ensure that such locations had an adequate number of ballots. Her experience voting in the 2016 PPE has reduced her confidence in Maricopa County and Arizona's election system, and she fears that she will be burdened by the same elections mismanagement, including in particular inadequate allocation of polling locations, in the upcoming 2016 general election and beyond.

16.     Plaintiff LUZ MAGALLANES is a United States citizen registered to vote in Maricopa County, Arizona. Ms. Magallanes is Hispanic and is registered as a Democrat. Ms. Magallanes is a school teacher and she regularly votes in person so that she can be sure her vote is counted, and so that she can share her voting experiences with her students on Election Day. On March 22, 2016, Ms. Magallanes attempted to vote in

the PPE before work at the American Legion at 2240 W. Chandler Boulevard, but was unable to vote due to the length of the line. After work, Ms. Magallanes returned to her vote center at approximately 6:00 p.m. and was forced to wait in line for nearly five hours in order to cast her vote. Ms. Magallanes left the vote center at approximately 10:50 p.m. While Ms. Magallanes was able to cast her vote, she was severely burdened by Defendants' mismanagement of the election, including specifically their failure to allocate a sufficient number of polling locations to reasonably accommodate Maricopa County's voters. Her experience voting in the 2016 PPE has reduced her confidence in Maricopa County and Arizona's election system, and she fears that she will be burdened by the same elections mismanagement, including in particular the inadequate allocation of polling locations, in the upcoming 2016 general election.

17.     Plaintiff MERCEDEZ HYMES is a United States citizen registered to vote in Maricopa County, Arizona. Ms. Hymes is African American and is registered as a Democrat. She lives in a predominately Hispanic part of Maricopa County. Ms. Hymes first attempted to vote in the 2016 PPE around 6:00 p.m. at the Bell Recreation Center. Upon arriving, she saw that the line wrapped around the block, so she drove to the next closest vote center, the Church of the Advent, in hopes that the line to vote would be shorter. Upon arriving at the Church of the Advent, Ms. Hymes observed that the line at that vote center was even longer than the line at Bell Recreation Center. Therefore, she drove back to the Bell Recreation Center to attempt to vote. Ms. Hymes was unable to find any available parking at Bell Recreation Center, and was still looking for parking at 7:00 p.m. when the line closed. Realizing she would not be able to vote, Ms. Hymes went home without casting a ballot. Ms. Hymes was disappointed that she could not vote in the 2016 PPE and is concerned that she will be similarly disenfranchised in the upcoming 2016 general election. Ms. Hymes was not eligible for early voting because she only recently moved to Maricopa County, and she received her voter registration card the same week as the 2016 PPE. Ms. Hymes was denied her right to vote as a result of Defendants' mismanagement of the election, including specifically their failure to allocate a sufficient

number of polling locations to reasonably accommodate Maricopa County's voters, particularly those in predominately minority communities. Her experience voting in the 2016 PPE has reduced her confidence in Maricopa County and Arizona's election system, and she fears that she will be disenfranchised or otherwise severely burdened by the same elections mismanagement, including, in particular, inadequate allocation of polling locations in the upcoming 2016 general election.

18.     Plaintiff JULIO MORERA is a United States citizen registered to vote in Maricopa County, Arizona. Mr. Morera is Hispanic and is registered as a Democrat. On March 22, 2016, Mr. Morera waited in line for three hours and fifteen minutes before finally being able to cast his ballot in the PPE. Mr. Morera originally planned to vote in the morning before work, but when he arrived at the Tempe Christian Church vote center around 8:00 a.m., the line was too long for him to wait. Instead, Mr. Morera returned after work at approximately 6:00 p.m. and waited in line until 9:15 p.m. The wait was particularly burdensome because there were limited bathroom facilities at the location. Mr. Morera's right to vote was severely burdened as a result of Defendants' mismanagement of the election, including specifically their failure to allocate a sufficient number of polling locations to reasonably accommodate Maricopa County's voters, particularly those in predominately minority communities. He is concerned that he will be similarly harmed in the upcoming 2016 general election and in other future elections.

19.     Plaintiff ALEJANDRA RUIZ is a United States citizen registered to vote in Maricopa County, Arizona. Ms. Ruiz is a registered Democrat. She is Mexican American and voted in a predominately Hispanic neighborhood. Ms. Ruiz recently moved to Maricopa County and could not register for early voting in time for the 2016 PPE, therefore, her only option was to vote in person. Ms. Ruiz first attempted to vote on her lunch break at the only vote center in downtown Phoenix, the Salvation Army on Third Street. Realizing that the line was too long to allow her to return to work before her lunch break ended, she decided to vote after work instead. Accordingly, at approximately 6:30 p.m. she arrived at the vote center at West Thomas Baptist Church. After a nearly six-hour

1  wait, she finally cast her ballot at 12:07 a.m. on March 23, 2016. When she left the vote

2  center, there were at least one hundred voters still waiting in line. Ms. Ruiz's right to vote

3  was severely burdened as a result of Defendants' mismanagement of the PPE, including

4  specifically their failure to allocate a sufficient number of polling locations to reasonably

5  accommodate Maricopa County's voters, particularly those in predominately minority

6  communities. While she is grateful that she was able to endure the wait to vote, she is

7  particularly concerned that friends and family members who rely on public transportation

8  were not able to wait in the lines late into the evening. She fears that she and others in her

9  community will continue to be harmed in future elections by Maricopa County's elections

10  mismanagement, including in particular inadequate allocation of polling locations, in the

11  upcoming 2016 general election and future elections.

12         20.     Plaintiff CLEO OVALLE is a United States citizen registered to vote in

13  Maricopa County, Arizona. Ms. Ovalle is a registered Democrat. She considers herself to

14  be Latina and voted in a predominately Hispanic neighborhood. Ms. Ovalle did not

15  originally plan to vote in person; however, she never received her early ballot in the mail

16  and had to vote in person to make her voice heard in the 2016 PPE. Ms. Ovalle made three

17  separate attempts to vote. First, she visited the Church of the Beatitudes at approximately

18  4:00 p.m., but realized that the line was too long to allow her to vote with sufficient time

19  to pick her son up from school. Therefore, after picking up her son, she dropped him off at

20  her mother's house and drove back to the Church of the Beatitudes, arriving at

21  approximately 5:50 p.m. The line was even longer than it had been before. Ms. Ovalle

22  then proceeded to a second vote center, North Hills Church, where she arrived at

23  approximately 6:00 p.m. There were no available parking spaces. Ms. Ovalle estimates

24  that she spent twenty to thirty minutes looking for parking. By the time she was able to

25  park her car and approach the building, she saw the full extent of the line and realized that

26  she would have to wait several hours in order to vote. Ms. Ovalle needed to be available

27  to care for her son and was not able to wait in the line. Frustrated, Ms. Ovalle left without

28  being able to vote. Ms. Ovalle was denied her right to vote as a result of Defendants'

1   mismanagement of the election, including specifically their failure to allocate a sufficient

2   number of polling locations to reasonably accommodate Maricopa County's voters,

3   particularly those in predominately minority communities. Ms. Ovalle's experience voting

4   in the 2016 PPE has reduced her confidence in Maricopa County and Arizona's election

5   system, and she fears that she will be disenfranchised or otherwise severely burdened by

6   the same elections mismanagement, including in particular inadequate allocation of

7   polling locations, in the upcoming 2016 general election and future elections in Maricopa

8   County.

9           21.     Plaintiff MARCIA BAKER is a United States citizen and has been

10  registered to vote in Maricopa County, Arizona since 1989. She is a registered Democrat,

11  and she waited in line for five hours to cast her vote in the 2016 PPE. Ms. Baker arrived at

12  her vote center, Shiloh Community Church, at approximately 6:15 p.m. She was then

13  forced to wait in line until approximately 11:30 p.m. Upon finally making it to the end of

14  the line, Ms. Baker was told by the poll worker that she was not in the registration

15  database. Accordingly, Ms. Baker was forced to cast a provisional ballot because the poll

16  worker could not locate her in the registration system. The following day Ms. Baker called

17  the Maricopa County Recorder's Office. The person she spoke with at the Maricopa

18  County Recorder's Office readily confirmed that Ms. Baker was a registered Democrat in

19  the County. Ms. Baker is concerned that despite her conversation with the person at the

20  Maricopa County Recorder's Office, her provisional ballot was not or will not be counted.

21  Further, she feels that she was directly discriminated against because her information was

22  not available to the poll worker on Election Day. Ms. Baker's right to vote was severely

23  burdened as a result of Defendants' mismanagement of the election, including specifically

24  their failure to allocate a sufficient number of polling locations to reasonably

25  accommodate Maricopa County's voters. This burden was particularly severe because, as

26  a blue-collar worker, it was difficult for Ms. Baker to take the time to wait in the line to

27  vote. Ms. Baker fears that she will be similarly burdened in the upcoming 2016 general

28  election and future elections in Maricopa County and that, as a result of the limited time

1   that she has to wait, she may be completely disenfranchised.

2       22.     Plaintiff PETERSON ZAH is the former Chairman and First President of

3   the Navajo Nation. Mr. Zah continues to serve in a leadership role in the Navajo Nation

4   and represents the interests of the Navajo Nation's approximately 17,000 members in

5   Maricopa County and over 100,000 members in Arizona. Mr. Zah is a United States

6   citizen registered to vote in Apache County, Arizona. Arizona's policy of not counting

7   provisional ballots cast in a precinct or voting area other than the one to which the voter is

8   assigned and the State's recent criminalization of the collection of signed and sealed

9   absentee ballots with the passage of H.B. 2023 directly harm the members of the Navajo

10  Nation and Arizona's Native-American community by burdening, abridging, and in some

11  cases completely denying them the right to vote. On information and belief, the

12  challenged voting laws, practices, and procedures have disproportionately reduced the

13  turnout of members of the Navajo Nation and Native Americans in Arizona generally and

14  have increased the likelihood that those voters who do turnout will not have their vote

15  counted.

16      23.     Plaintiff the DEMOCRATIC NATIONAL COMMITTEE ("DNC") is a

17  national committee, as that term is defined by and used in 52 U.S.C. § 30101, dedicated to

18  electing local, state, and national candidates of the Democratic Party to public office

19  throughout the United States. The DNC has members and constituents across the United

20  States, including eligible voters in Arizona. To accomplish its mission, among other

21  things, the DNC works closely with Democratic public officials and assists state parties

22  and candidates by contributing money; making expenditures on their behalves; and

23  providing active support through the development of programs benefiting Democratic

24  candidates. The lack of oversight for Maricopa County's allocation of polling locations;

25  Arizona's policy of not counting provisional ballots cast in a precinct or voting area other

26  than the one to which the voter is assigned; and the State's recent criminalization of the

27  collection of signed and sealed absentee ballots with the passage of H.B. 2023 directly

28  harm the DNC, its members, and constituents by disproportionately reducing the turnout

1    of Democratic voters and increasing the likelihood that those voters who do turnout will

2    not have their vote counted. These practices and provisions further decrease the likelihood

3    that the DNC will be successful in its efforts to help elect candidates of the Democratic

4    Party to public office.

5            24.     In particular, among the voters most harmed by Arizona's policies are some

6    of the DNC's core constituencies, including Hispanic, Native-American, and African-

7    American voters, who are more likely to be burdened by the voting laws, procedures, and

8    practices challenged in this lawsuit and, as a result, are less likely to vote or to have their

9    provisional vote counted. Arizona will have a number of competitive Democratic races at

10   both the local and statewide level in the upcoming 2016 general election; as a result, to

11   accomplish its mission the DNC will be forced to divert valuable resources to help its

12   members and constituents overcome the barriers to voting created by the challenged

13   voting laws, practices, and procedures and to ensure that these voters are not

14   disenfranchised. Further, the DNC's members and constituents are also directly harmed

15   by these voting laws, practices, and procedures as they are Arizona voters whose right to

16   vote is burdened, abridged, and denied by the same. The DNC brings this suit on their

17   behalves, as well as in its own right.

18          25.     Plaintiff DSCC a.k.a. Democratic Senatorial Campaign Committee is a

19   Democratic political committee established and maintained by a national political party,

20   as defined by and used in 11 C.F.R. § 110.2(c)(2)(iii) and provided for in 52 U.S.C. §

21   30116(h). The DSCC is dedicated to encouraging the election of Democratic Senate

22   candidates to office and is comprised of sitting Democratic Members of the United States

23   Senate. The DSCC accomplishes its mission by, among other things, contributing money

24   to Democratic Senate candidates; making expenditures on behalf of Democratic Senate

25   candidates; and providing campaign services to Democratic Senate candidates. DSCC also

26   provides assistance to the state Democratic parties in the development and implementation

27   of programs benefitting Democratic candidates for federal, state, and local office, such as

28   get-out-the-vote and generic party efforts undertaken on behalf of the Democratic ticket.

26.     DSCC is directly harmed by the lack of oversight for Maricopa County's allocation of polling locations; Arizona's policy of not counting provisional ballots cast in a precinct or voting area other than the one to which the voter is assigned; and the State's recent criminalization of the collection of signed and sealed absentee ballots with the passage of H.B. 2023. These voting laws, practices, and procedures disproportionately reduce the turnout of Democratic voters and the likelihood that those voters who do turnout will have their vote counted, thereby decreasing the likelihood that DSCC will be successful in its efforts to help elect candidates of the Democratic Party to the Senate as well as federal, state, and local office. In particular, it is DSCC's core constituencies of, among others, Hispanics, Native Americans, and African Americans who are most harmed by Arizona's policies and, as a consequence, are more likely to be burdened and less likely to vote or to have their provisional vote counted. Arizona will be electing a U.S. Senator in 2016, and the challenged voting laws, practices, and procedures will directly affect DSCC's ability to campaign for and have its Senate candidate elected, forcing DSCC to divert resources that it would use for other purposes to assisting Arizona voters with overcoming the barriers created by the challenged voting laws, practices, and procedures to ensure that these voters are not disenfranchised.

27.     Plaintiff ARIZONA DEMOCRATIC PARTY is a state committee, as defined by 52 U.S.C. § 30101(15), dedicated to electing candidates of the Democratic Party to public office throughout the State of Arizona. The Arizona Democratic Party has members and constituents from across Arizona, including many eligible voters who regularly support and vote for candidates affiliated with the Democratic Party. As discussed *infra*, all of these members and constituents risk having their right to vote burdened and/or denied due to the lack of oversight for Maricopa County's allocation of polling locations; Arizona's policy of not counting provisional ballots cast in a precinct or voting area other than the one to which the voter is assigned; and the State's recent criminalization of the collection of signed and sealed absentee ballots with the passage of H.B. 2023. The Arizona Democratic Party brings these claims on their behalves, as well

1     as in its own right.

2          28.     The Arizona Democratic Party is directly harmed by the challenged voting laws, practices, and procedures which disproportionately reduce the turnout of Democratic voters and the likelihood that those voters who do turnout will have their vote counted, thereby decreasing the likelihood that the Arizona Democratic Party will be successful in its efforts to help elect candidates of the Democratic Party to office. In particular, it is the Arizona Democratic Party's core constituencies of, among others, Hispanics, Native Americans, and African Americans who are most harmed by Arizona's policies and, as a consequence, are more likely to be burdened and less likely to vote or to have their provisional vote counted. Moreover, since at least 2002, collecting early-vote ballots has been an integral part of the Arizona Democratic Party's get-out-the-vote strategy and is a key part of the support it provides its Hispanic, Native-American, and African-American members, constituents, and voters, particularly those in Phoenix, Tucson, and the Navajo Nation. Due to the passage of H.B. 2023 and its corresponding criminal penalties, the Arizona Democratic Party will not be able to assist its voters in this way due to the possibility of criminal liability. Accordingly, the Arizona Democratic Party is now foreclosed from associating with its voters in this manner. As a result of all of the challenged voting laws, practices, and procedures, the Arizona Democratic Party will have to devote resources that it otherwise would have spent educating voters about its candidates and issues, to assisting its voters in overcoming the barriers the challenged voting laws, practices, and procedures impose and in protecting their right to vote.

22          29.     Plaintiff KIRKPATRICK FOR U.S. SENATE ("Kirkpatrick Campaign") is an authorized committee, as defined by 52 U.S.C. § 30101(6), dedicated to supporting the election of Democratic U.S. Representative Ann Kirkpatrick to the United States Senate. The Kirkpatrick Campaign regularly works with Democratic activists, organizers, supporters, and voters throughout Arizona to organize and execute direct voter contact programs consisting of activities such as phone banking, door-to-door canvassing, and participating in community events. In addition, the Kirkpatrick Campaign also plans to

organize and execute get-out-the-vote activities in advance of the 2016 general election. The Kirkpatrick Campaign is directly harmed by the lack of oversight for Maricopa County's allocation of polling locations; Arizona's policy of not counting provisional ballots cast in a precinct or voting area other than the one to which the voter is assigned; and the State's recent criminalization of the collection of signed and sealed absentee ballots with the passage of H.B. 2023. These policies and provisions disproportionately reduce the turnout of Democratic voters and the likelihood that those voters who do turnout will have their vote counted, thereby decreasing the likelihood that the Kirkpatrick Campaign will be successful in its efforts to help elect Rep. Ann Kirkpatrick to the U.S. Senate. In particular, it is the Kirkpatrick Campaign's core constituencies of, among others, Hispanics, Native Americans, and African Americans who are most harmed by Arizona's policies and, as a consequence, are more likely to be burdened and less likely to vote or to have their provisional vote counted. As a result, the campaign will have to divert valuable resources from educating voters about its candidate to assisting them with overcoming the barriers posed by these polices in order to accomplish its mission.

30. Defendant the Arizona SECRETARY OF STATE'S OFFICE is established by A.R.S. § 41-121.02. It is directed by the Secretary of State and, among other things, is charged with securing elections in the State of Arizona. *Id.*

31. Defendant Michele REAGAN is the Secretary of State for the State of Arizona ("the Secretary") and is the Chief Elections Officer for Arizona. A.R.S. § 16-142. As Arizona's Chief Elections Officer, the Secretary is responsible for overseeing the voting process in Arizona, and is empowered with broad authority to carry out that responsibility. The Secretary also issues the Arizona Election Procedures Manual ("Manual") (Rev. 2014), which establishes election procedures and administration across Arizona's fifteen counties. A.R.S. § 16-452. The Manual is approved by the Governor and the Arizona Attorney General and carries the force of law. A.R.S. § 16-452(B). The Secretary also has oversight over changes to practices and policies in a PPE. Manual at 96, *available at* https://www.azsos.gov/sites/azsos.gov/files/election_procedure_ manual

1 _2014.pdf. The Secretary is sued in her official capacity for actions taken under color of

2 law.

3    32.    Defendant MARICOPA COUNTY BOARD OF SUPERVISORS ("the

4 Board") is the governing body of Maricopa County. The Board "is charged with overall

5 responsibility of the county election process, except for those functions designated by law

6 to other elected officials." Manual at 100. Among other duties, the Board publicizes

7 election dates and times, adopts election precincts, approves polling locations within

8 Maricopa County, ensures polling places have adequate supplies, and allocates county

9 funds for the elections. A.R.S. §§ 16-214, 16-223, 16-411, 16-511(A). The Board also

10 certifies county election results to the Secretary of State's Office, who then consolidates

11 local data and certifies statewide results. A.R.S. §§ 16-249(C), 16-645(B) & 16-646.

12    33.    Defendants DENNY BARNEY, STEVE CHUCRI, ANDY KUNASEK,

13 CLINT HICKMAN, and STEVE GALLARDO are members of Defendant the

14 MARICOPA COUNTY BOARD OF SUPERVISORS, discussed *supra*. Each Board

15 Member is sued in his official capacity for actions taken under color of law.

16    34.    Defendant MARICOPA RECORDER AND ELECTIONS DEPARTMENT

17 is charged with carrying out election-related activities in Maricopa County. *See, e.g.*,

18 A.R.S. §§ 11-461; 19-121.03; 19-208.02; 16-204; 16-161 (detailing statutory duties of the

19 Recorder, which are carried out by her office within the Elections Department). It is

20 headed by the Recorder, as well as the Elections Director, under the supervision of the

21 Recorder.

22    35.    Defendant HELEN PURCELL is the Maricopa County Recorder. She is

23 responsible for administering elections in Maricopa County. The Recorder reports to the

24 Board of Supervisors. Among other duties, the Recorder is responsible for designating

25 polling locations, registering voters, assigning each registration record to its proper

26 precinct, ensuring appropriate supplies and staffing at poll locations, monitoring wait

27 times and taking steps to reduce long lines, determining whether provisional ballots are

28 acceptable, and conducting public outreach regarding election information. A.R.S. §§ 16-

101, et seq. The Recorder is sued in her official capacity for actions taken under color of law.

36.     Defendant KAREN OSBORNE is the Maricopa County Elections Director. The Elections Director is the head of the Elections Department, which is a department within the Recorder's office. Elections Director Osborne reports directly to Recorder Purcell. The Director is responsible for overseeing the daily operations of the Elections Department, which includes scouting polling locations, allocating resources, training poll workers, monitoring wait times, reducing long lines at polls, and conducting public outreach to the electorate and citizens of Maricopa County. *See* A.R.S. §§ 16-101, et seq. (detailing statutory duties of the Recorder's office, which the Recorder delegates to Karen Osborne as head of the Elections Department). The Elections Director is sued in her official capacity for actions taken under color of law.

37.     Defendant MARK BRNOVICH, is the Arizona Attorney General ("Attorney General") and the chief legal officer of the state of Arizona. A.R.S. § 41-192(A). The Attorney General approves election procedures issued by the Secretary of State. A.R.S. § 16-452. Among other duties, the Attorney General is charged with enforcing state criminal statutes, including H.B. 2023. A.R.S. §§ 41-191 et seq. In particular, the Attorney General is empowered to prosecute election-related offenses under Title 16. A.R.S. § 16-1021. Additionally, the Attorney General has the duty to "[r]epresent the state in any action in a federal court." A.R.S. § 41-193(A)(3). The Attorney General is sued in his official capacity for actions taken under the color of law.

## GENERAL ALLEGATIONS

### Arizona's History of Discrimination Against Racial, Ethnic, and Language Minorities

38.     Arizona has a lengthy history of discrimination against Hispanics, Native Americans, and African Americans, which has directly and substantially hindered their ability to participate in the political process, and which, in 1975, resulted in Arizona becoming a covered jurisdiction subject to federal preclearance for any change to its

1   voting laws, practices, or procedures, under Section 5 of the Voting Rights Act.

2       39.     When Arizona became a state in 1912, Native Americans were excluded

3   from voting.[2] Even after the United States Congress passed the Indian Citizenship Act in

4   1924, recognizing Native Americans as citizens and, thereby, affording them the right to

5   vote, Arizona's Constitution continued to deny Native Americans that right. Indeed, it was

6   not until 1948 when the Arizona Supreme Court found that such treatment was

7   unconstitutional that Native Americans were granted the right to vote in Arizona. *See*

8   *Harrison v. Laveen*, 196 P.2d 456, 463 (Ariz. 1948). Despite being granted the legal right

9   to vote in 1948, Native Americans, as well as Hispanics and African Americans, have

10  continued to face barriers to participation in the franchise.

11      40.     In 1912, Arizona enacted an English literacy test for voting. The test was

12  enacted specifically "to limit 'the ignorant Mexican vote,'" and had the effect of also

13  reducing the ability of African Americans and Native Americans to register and vote, as

14  registrars applied the test to these communities as well. David Berman, *Arizona Politics*

15  *and Government: The Quest for Autonomy, Democracy, and Development* 75 (John

16  Kincaid, *et al eds.*, 1998). Furthermore, well into the 1960's it was also a practice for

17  white Arizonians to challenge these minority voters at the polls by asking them to read

18  and explain literacy cards. *Id.* at 76. In 1970, Congress amended the Voting Rights Act to

19  enact a nationwide ban on literacy tests after finding that they were used to discriminate

20  against voters on account of their race or ethnicity. *Oregon v. Mitchell*, 400 U.S. 112, 118

21  (1970). In reaching that finding, Congress specifically cited evidence which showed "that

22  voter registration in areas with large Spanish-American populations was consistently

23  below the state and national averages." *Id.* at 132. And that, "[i]n Arizona, for example,

24  _____

25      [2] Hispanics were granted the right to vote in Arizona when it became a state in
    1912 by virtue of the Treaty of Guadalupe Hidalgo, which was signed in 1848 at the close

26  of the Mexican-American War. The treaty required that Congress pass legislation
    recognizing all Mexican Americans as full U.S. citizens. Prior to becoming a state,
    Arizona (which was a U.S. territory) did not allow Mexican Americans to vote. Notably,

27  as discussed herein, at the time that it became a state in 1912, Arizona enacted an English
    literacy test which had the effect of preventing these newly enfranchised Mexican

28  Americans (as well as Native Americans and African American) from voting.

only two counties out of eight with Spanish surname populations in excess of 15% showed a voter registration equal to the state-wide average." *Id.* Congress also noted that Arizona had a serious deficiency in Native American voter registrations. *See id.* Rather than comply with the law and repeal its test, Arizona challenged the ban, arguing that it could not be enforced to the extent that it was inconsistent with the State's literacy requirement. *Id.* at 117. The United States Supreme Court upheld Congress's ban. *Id.* at 131-33. Nevertheless, Arizona waited until 1972, two years after the Court's decision, to repeal its literacy test.

41.    Arizona's English literacy test also compounded the effects of the State's long history of discrimination in the education of its Hispanic, Native-American, and African-American citizens. From 1912 until the Supreme Court's decision in *Brown v. Board of Education*, segregated education was widespread throughout Arizona, and sanctioned by both the courts and the state legislature. *See Dameron v. Bayless*, 126 P. 273 (Ariz. 1912); *see also Ortiz v. Jack*, No. Civ-1723 (D. Ariz. 1955) (discontinuing segregation of Mexican children at schools); *Gonzales v. Sheely*, 96 F. Supp. 1004, 1008-09 (D. Ariz. 1951) (enjoining segregation of Mexican school children in Maricopa County). Spanish-speaking students were directly targeted based on their language. Native Americans remained segregated because they attended schools on reservations. The practice of segregation also extended well beyond schools, with it being common place to have segregated public spaces such as restaurants, swimming pools, and theaters. Berman, *supra*, at 14.

42.    Even where schools were not segregated, Arizona enacted restrictions on bilingual education, mandating English-only education in public schools as early as 1919. *See* James Thomas Tucker, et al., *Voting Rights in Arizona: 1982-2006*, 17 Rev. L. & Soc. Justice 283, 284 (2008). Many of these English-only restrictions have remained in effect in some form to the present day, despite the fact that such programs have led to poor educational outcomes for Arizona's students. *See id.* at 339-40 (noting "[t]he available evidence in Arizona reveals that bilingual education programs have been more effective at

raising students' test scores [than English-immersion programs]").

43.     Indeed, as recently as 2000, Arizona banned bilingual education with the passage of Proposition 203. This ballot initiative, which is only the second of its kind to be passed in the United States, is the most restrictive ban on bilingual education in the nation. In addition to severely restricting the educational opportunities of limited English-proficiency students in Arizona, the law has led to widespread confusion and discrimination as well, with reports of students being slapped for speaking Spanish at school and teachers being afraid they will be fired if they communicate with students in Spanish, even when outside of the classroom. *Id.* at 341.

44.     In addition to Arizona's formal prohibitions on bilingual education, the State also has a long record of failing to provide adequate funding to teach its non-English speaking students—which are one of "the largest and fastest-growing segments of the school population in Arizona." *Id.* at 338-39 ("As of 2000, there were almost 140,000 [non-English speaking] students enrolled in Arizona public schools."); *see also id.* at 343. In some instances, the State has reportedly underfunded its programs for non-English speaking students by as much as ninety percent, leading to high illiteracy and dropout rates. Remarkably, this underfunding has taken place despite multiple court orders instructing Arizona to develop an adequate funding formula for its programs, including a 2005 order in which Arizona was held in contempt of court for refusing to provide adequate funding for its educational programs. *Flores v. Arizona*, 405 F. Supp. 2d 1112 (D. Ariz. 2005), *vacated*, 204 Fed App'x 580 (9th Cir. 2006).

45.     Arizona's history of segregation, limitations on bilingual education, and systemic underfunding of education for non-English speaking students not only contribute to educational disparities amongst Arizona's Hispanic and Native American populations but, when combined with Arizona's literacy test, they have had the effect of denying Hispanics and Native Americans the right to vote.

46.     In 2004, Arizona passed another discriminatory ballot initiative, Proposition 200, or the Arizona Taxpayer and Citizen Protection Act, which prohibits persons from

voting and receiving access to state and local public benefits where they cannot prove their citizenship through documentation. In its original form, Proposition 200 specifically required Arizona voters to provide proof of citizenship by presenting at least one of a limited set of documents at the time that they registered to vote. A.R.S. §§ 16-152, 16-166. Between the time that the law was passed and November 2005, "[m]ore than 12,000 applications were rejected because of the new requirements in Pima and Maricopa Counties alone." Tucker, *supra*, at 357. This requirement was (and is) particularly burdensome for many Hispanic, Native-American, and African-American voters who do not have the required forms of identification and face, sometimes insurmountable, burdens in obtaining it. In 2013, the Supreme Court found that Proposition 200's proof of citizenship requirement for voter registration was preempted by the National Voter Registration Act. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S.Ct. 2247, 2260 (2013). In response, rather than end the practice of requiring proof of citizenship for registration, Arizona instead implemented a two track registration system under which individuals may register for federal elections without providing proof of citizenship, but to vote in state and local elections they must provide proof of citizenship. This two track system has added another layer of confusion to Arizona's elections system, particularly for minority voters. As of 2015, Arizona officials reported rejecting over 30,000 voter registrations due to Proposition 200.

47.     In 2007, Maricopa County Sheriff Joseph Arpaio was sued in a class action seeking to stop the Maricopa County Sheriff Office's ("MCSO") policies and practices of intentional and systematic discrimination by conducting illegal stops and detentions of Hispanics and mistreating Hispanic detainees with limited English proficiency. In May 2013, U.S. District Court Judge Murray Snow issued lengthy findings of fact and conclusions of law, finding, among other things, that the MCSO intentionally discriminated against Hispanics. *Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013). Among Judge Snow's findings was "the presence of express racial classification in the policies, practices and procedures followed by the MCSO…." 989 F. Supp. 2d at 901.

1     Judge Snow enjoined MCSO "from using Hispanic ancestry or race as any factor in

2     making law enforcement decisions." 989 F. Supp. 2d at 895. Hispanic activists launched a

3     vigorous campaign to keep Sheriff Arpaio from being reelected to his sixth term in 2012.

4     Nevertheless, Sheriff Arpaio was reelected. In that same election, Maricopa County

5     misprinted the date of the election on over 2000 Spanish language information cards and

6     bookmarks, some of which were distributed into the community.

7         48.     In 2010, the Arizona State Legislature passed SB 1070, which authorized

8     local police to check the immigration status of individuals who they suspected to be in the

9     country illegally. A.R.S. § 11-1051. U.S. District Court Judge Susan Bolton enjoined most

10    of the law from taking effect. *United States v. Arizona*, 703 F. Supp. 2d 980, 1008 (D.

11    Ariz. 2010), *aff'd in part, rev'd in part*, *Arizona v. United States*, 132 S.Ct. 2492, 2510

12    (2012). This injunction was mostly upheld in subsequent stages of the litigation. *See*

13    *Arizona v. United States*, 132 S.Ct. 2492, 2510 (2012).

14        49.     Due to its long history of discrimination, Arizona became a covered

15    jurisdiction under Section 5 of the Voting Rights Act in 1975. In addition to being covered

16    under Section 5, it was one of only three states to be covered under Section 4(f)(4) of the

17    Act for Spanish Heritage. Twelve of its fifteen counties, including Maricopa County, are

18    also covered separately under Section 203, which requires minority language assistance.

19    As a result of its inclusion under the Voting Rights Act, Arizona achieved recognized

20    improvements in the numbers of Hispanics and Native Americans registering and voting

21    as well as in the overall representation of minority elected officials in the State.

22    Nevertheless, only one Hispanic has ever been elected to a statewide office, and Arizona

23    has never elected a Native American or African American to statewide office or the U.S.

24    House of Representatives. Further, no Hispanic, Native American, or African American

25    has ever served as a U.S. Senator representing Arizona, as Attorney General for the State

26    of Arizona, or on the Arizona Supreme Court.

27        50.     Arizona also has a recognized history of racially polarized voting. *Gonzalez*

28    *v. Arizona*, 677 F.3d 383, 407 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal*

*Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013). Such racially polarized voting continues today. In particular, in the most recent redistricting cycle, the Arizona Independent Redistricting Commission found that at least one congressional district and five legislative districts clearly exhibited racially polarized voting. Gary King, et al., *Racially Polarized Voting Analysis (Draft)*, Ariz. Indep. Redistricting Comm'n, 10, 20 (2011), *available at* http://azredistricting.org/Meeting-Info/AZ%20racially%20polarized%20voting%20 analysis%20112911%20-%20DRAFT.pdf.

### The Ongoing Effects of Arizona's History of Discrimination

51.     Arizona's Hispanic, Native-American, and African-American citizens have suffered from, and continue to suffer from, the effects of discrimination in a number of areas, including education, health, housing, employment, income, transportation, and criminal justice.

52.     According to the U.S. Census Bureau's 2010-2014 American Community Survey 5-Year Estimates, Hispanic, African American, and Native American unemployment rates in Arizona exceeded white unemployment rates for the period of 2010 to 2014. Likewise, Hispanic, Native American, and African American poverty rates in Arizona exceeded the white poverty rate for that same time period. As of the 2000 census, compared to whites, Hispanics, Native Americans, and African Americans were all less likely to graduate high school in Arizona. Further, whites were 1.5 times more likely to have a bachelor's degree than African Americans, and as much as three times more likely to have a bachelor's degree than Hispanics and Native Americans in Arizona. As of the 2010 census, whites were also more likely than Hispanics, Native Americans, and African Americans to own a house in Arizona.

53.     As of 2013, Hispanics, Native Americans, and African Americans in Arizona all ranked below whites in relative healthiness, with both Native Americans and African Americans having the poorest rank of overall health status in the State. Ariz. Dep't of Health Servs., *Differences in the Health Status Among Racial/Ethnic Groups, Arizona 2013*, 7 (2015). One report explained that Native American health outcomes were

so poor, that "[i]n 2013, compared to White non-Hispanics, American Indian residents of Arizona were on-average 19 years younger at time of death." *Id.* Further, all three minority groups saw a higher infant mortality rate than whites, with African Americans experiencing an infant mortality rate more than double the rates for whites. *Id.* at 49.

54.     Hispanics, Native Americans, and African Americans are all overrepresented in Arizona jails in comparison to the total population, whereas whites are underrepresented. Prison Policy Initiative, http://www.prisonpolicy.org/profiles/AZ.html (last visited April 13, 2016).

## The Challenged Voting Laws, Practices, and Procedures

## Factual Background: Maricopa County's 2016 PPE

55.     The devastating burdens that the challenged voting laws, practices, and procedures impose upon Arizona voters were amply demonstrated by, and in large part have been exacerbated because of, the Maricopa County 2016 PPE. As virtually every American knows by now, the management of that PPE, which was conducted with an alarmingly inadequate number of voting centers, resulted in severe, inexcusable burdens on voters county-wide, as well as the ultimate disenfranchisement of untold numbers of voters who were unable or unwilling to wait in intolerably long lines to cast their ballot for their preferred presidential candidate.

56.     The PPE was conducted under the authority of Defendant Maricopa County Recorder Helen Purcell, who sought approval from Defendant Maricopa County Board of Supervisors to employ—for the first time in Maricopa County—voting centers rather than a traditional precinct based polling system for the election.

57.     Under Arizona law, when designating polling locations for a primary, general, or PPE, County Boards of Supervisors may use a precinct-based polling system, a voting center system, or some combination of the two. A.R.S. § 16-411(B)(4).

58.     In a precinct-based polling system, voters may only cast their votes at their assigned polling location. *See* A.R.S. § 16-583 (voters whose names are not listed on the

precinct register are redirected to another polling location). In contrast, under a voting center system, any voter in the county—regardless of the precinct in which they live—may vote at any of the available vote centers. A.R.S. § 16-411(B)(4). When implemented correctly, voting centers are often preferred by voters because they afford voters the flexibility to vote anywhere in the county in which they are registered. Vote Centers, Nat'l Conference of State Legislatures, *available at* http://www.ncsl.org/ research/elections-and-campaigns/vote-centers.aspx (stating vote centers are more convenient for voters). As a result, a voter may vote near his or her home, work, or any other convenient location within the jurdiction. This flexibility reduces both time and travel burdens on voters, which in turn leads to increased voter participation. Robert M. Stein at al., *Engaging the Unengaged Voter: Vote Centers and Voter Turnout*, 70 The J. of Pol., 2, 487-97 (2008), *available at* http://bakerinstitute.org/research/engaging-unengaged-voter/ (noting significant evidence vote centers increase voter turnout generally, and among infrequent voters in particular).

59.   Maricopa County's allocation of vote centers in the 2016 PPE was anything but correct.

60.   On February 17, 2016, Ms. Purcell and Defendant Elections Director Karen Osborne submitted their voting center plan to the Board, in which they proposed that sixty voting centers be allocated across Maricopa County for approximately 1.2 million PPE voters.

61.   This was a reduction in voting sites of a shocking magnitude. In the 2008 PPE, Maricopa County had 403 polling locations, 85% more than in 2016. In 2012, which had only one contested primary election, 211 polling locations were available, 70% more locations than in 2016. Yet, in the 2016 PPE only sixty voting centers were made available—one polling place per every 21,000 voters.

62.   In contrast, most other Arizona counties—including those that used vote centers—had enough polling places in the 2016 PPE to average 2,500 or fewer eligible voters per polling site. Pinal County, for example, operated eighty-two polling sites for its

98,000 eligible voters. Pima County had 130 polling places for 300,000 eligible voters. Other less populated counties, such as Apache and Navajo, had about forty polling places each—just twenty fewer than Maricopa—despite having only between 34,000 and 42,000 eligible voters total in the entire jurisdiction.

63.     In presenting her plan to the Board, Ms. Purcell explained that she had determined that sixty vote centers would be sufficient by evaluating the number of eligible voters in the PPE (approximately 1.2 million); the number of voters who had requested to receive an early ballot by mail, including those voters on the permanent early voter list (approximately 897,000); and by evaluating the turnout for the 2008 PPE (projecting that a maximum of 23% of those eligible would vote in the PPE at physical polling locations).

64.     On information and belief, Ms. Purcell's plan did not account for the physical proximity of voters to the vote centers; voters' access to transportation; the ratio of voters to vote centers; contemporaneous reports of increased turnout in neighboring states; or historic data available to Ms. Purcell and Maricopa County which indicated that a substantial number of voters who requested absentee ballots—particularly Hispanic voters—would actually go to a physical polling location to cast their vote. In the 2012 general election, at least 72,185 early voters arrived at physical polling locations and cast provisional ballots rather than mailing in or dropping off their absentee ballot. *See* Maricopa Cnty. Elections Dep't., *Provisional Ballots General 2012*, 29 (2013).

65.     The Board approved Ms. Purcell's proposed allocation of vote centers for Maricopa County's 2016 PPE during the February 17 public meeting. Their vote was unanimous.

66.     Defendant Secretary of State Michele Reagan did not pose any questions about the drastic reduction in voting locations, despite the fact that the Manual specifically requires that a written plan for modifying polling place designations for PPEs be submitted to the Secretary of State and that the total number of polling locations "be reasonable and adequate." Manual at 96.

67.     Despite state mandates to educate voters about changes to polling locations

1   in order to reduce lines, *see* Manual at 136, Ms. Purcell then waited until March 9, 2016—

2   a mere 12 days before the PPE—to inform Maricopa County voters about the change to

3   voting centers and the reduced number of voting locations.

4          68.    The resulting PPE was an unmitigated disaster. Maricopa County was

5   overwhelmed with the number of voters who attempted to vote at vote centers. As

6   Phoenix Mayor Greg Stanton explained in a letter to the Justice Department the day after

7   the PPE took place, "[j]ust after Midnight this morning, more than five hours after the

8   polls closed on Tuesday, the final voters in Maricopa County were at last able to cast their

9   ballots in Arizona's [PPE]. Throughout the county, but especially in Phoenix, thousands

10  of citizens waited in line for three, four, and even five hours to vote. Many more simply

11  could not afford to wait that long, and went home." Stanton Letter at 1. Representative

12  Michelle Ugenti-Rita, chair of the State House Committee on Elections characterized the

13  PPE as a "debacle," and Secretary of State Michele Reagan stated that it was "completely

14  unacceptable."

15         69.    Long lines formed outside many of the polling places, with thousands of

16  Arizona voters still in line after the polls officially closed at 7:00 p.m. At the Salvation

17  Army polling location on Third Avenue in downtown Phoenix, hundreds of people were

18  still in line to vote more than four hours after the polls closed. In twenty other locations—

19  a third of all available—votes were still being cast at 10:00 p.m., a full three hours after

20  the line closed. Plaintiff, Luz Magallanes, who voted in Chandler, cast her vote at

21  approximately 10:40 p.m. One location in Phoenix saw its last voter just two minutes

22  before one o'clock in the morning, *six hours after the line closed*. Fourteen of the twenty

23  sites that had people voting past 10:00 p.m. were in Phoenix or its western suburbs, while

24  six were in the eastern part of the Phoenix metro area.

25         70.    While some voters waited for hours in long lines, other polling locations

26  saw as few as twenty-one voters. On information and belief, there is no indication that

27  Maricopa County officials made any coordinated outreach effort to alleviate lines by

28  informing voters that lines were shorter at other nearby polling places. Nor is there any

1    indication that Ms. Purcell had developed or implemented any contingency plan for

2    addressing long lines, as is required by the Secretary of State's Office. *See* Manual at 139.

3         71.    In addition to long wait times to vote, voters were also burdened by vote

4    centers lacking adequate parking. Plaintiff Mercedez Hymes was unable to vote because

5    she could not find parking in time to get in line before the polls closed at 7:00 p.m.

6    Further, some locations ran out of ballots, and there was ongoing confusion over the use

7    of provisional ballots. In the end, nearly 25,000 provisional ballots were cast. The total

8    number eventually counted was just 4,631. More than 18,000 ballots were rejected.

9         72.    The insufficient number of voting locations had a particular impact on

10   minority populations. In primarily Anglo communities like Cave Creek, there was one

11   polling place per 8,500 residents. In Phoenix, a majority-minority city where 40.8 percent

12   of its 1.5 million residents are Hispanic, there was only one polling place allocated per

13   108,000 residents. Stanton Letter at 1. A wide swath of predominantly minority and

14   lower-income areas in west Phoenix and east Glendale, along with south Phoenix, were

15   particularly lacking in polling sites compared with 2012. Poorer areas of central Mesa

16   lacked polling sites as well, as did south Avondale and much of central Glendale. Arizona

17   State Senator Martin Quezada's predominately Hispanic district only had one polling

18   location. As a result, in this and in other predominately Hispanic parts of the city, not only

19   did people wait well into the night to vote, but Board member Steve Gallardo admitted

20   that "minorities and low income families may have had to drive a lot further, and had less

21   overall access to voting centers."

22        73.    Based on testimony that Ms. Purcell gave at a hearing held by the Arizona

23   State Legislature's House Election Committee after the disastrous 2016 PPE took place, it

24   turns out that this disparate impact on minority voters is also unsurprising, given how

25   voting sites were allocated. In fact, when asked if she made any effort to determine how

26   her plan to allocate vote centers would impact minority populations covered by the Voting

27   Rights Act, Ms. Purcell responded that she looked at the county as a whole and did not

28   pay any attention to "specific areas." In other words, Ms. Purcell made no effort

whatsoever to ensure that her decisions would not disparately disenfranchise minority voters in Arizona. And the result was, predictably, given both the factors that were considered in making the allocation decisions, and Arizona's history of discriminatory practices toward minority voters, that those voters suffered disparate impacts.

74.     In the end, Ms. Purcell and Maricopa County underestimated the total number of voters by half, and failed to account for over 11,500 early voters who had received mail-in ballots but still went to the polls to vote. In testimony after the fact, Ms. Purcell admitted that she made "some horrendous mistakes," but that realization came too late for the thousands of Arizona voters whose right to vote was severely burdened—and in many cases, wholly denied—as a result.

### Maricopa County's Allocation of Polling Locations for the 2016 General Election

75.     Arizona became a covered jurisdiction under Section 5 of the Voting Rights Act in 1975. For the next 38 years, the Maricopa County Recorder's Office, the Board, and the Secretary of State's Office routinely evaluated the impact of changes to Maricopa County's election procedures and practices—such as changes to the allocation of polling locations—on its minority populations, so as to ensure that those changes would meet federal preclearance standards. Ms. Purcell, who has served as Maricopa County Recorder since 1988, directly participated in that process for over 25 of those years.

76.     Nevertheless, the 2016 Maricopa County PPE demonstrates, in stark relief, that despite that experience, not only can Maricopa County not be trusted to use informed and reasoned judgment in the allocating polling locations generally but, importantly, despite the continued mandate of the Voting Rights Act (regardless of Section 5 coverage), Maricopa County no longer evaluates or even considers the impact that changes to its practices and procedures will have on minority voters.

77.     As the facts discussed *supra* demonstrate, neither Ms. Purcell, Ms. Osborne, the Board, nor the Secretary of State gave *any* consideration to the impact that Maricopa County's decision to reduce the number of voting locations in the 2016 PPE would have

on minority voters within the County. As a result, the dramatic reduction in voting locations also had a dramatic and disparate impact on Hispanic and African-American voters in Maricopa County. Upon information and belief, Hispanic and African-American voters had to travel farther than white voters to access the polls; had to wait in long lines in disproportionate numbers; and had fewer polling locations in their communities than white voters. As Arizona Representative Raul Grijalva explained, "[t]he impact[] of undoing the Voting Rights Act ha[s] been dramatically revealed in Arizona, and the result is disenfranchisement plain and clear. Gutting polling locations to save a buck has dismantled a fair election process."

78.     Without limited intervention and oversight from this Court, there is nothing to ensure that Ms. Purcell, Ms. Osborne, and the Board will not continue to dismantle the fair election process in Maricopa County by disenfranchising and disparately burdening Arizona's voters generally, and minority voters in particular, when allocating polling locations for the 2016 general election. Indeed, Ms. Purcell has publically stated that she does not take minority areas into account when making polling determinations and there is simply no reason to believe she will do so in the upcoming general election.

79.     Thus, it is incumbent upon this Court to review and approve Ms. Purcell's and the Board's polling allocation plan for the 2016 general election to ensure its compliance with the Voting Rights Act as well as the Constitution and laws of the United States.

### Arizona's Prohibition On Counting Out-of-Precinct Provisional Ballots

80.     Since 2006, Arizona has rejected over 121,000 provisional ballots, consistently finding itself at or near the top of the list of states that collect and reject the largest number of provisional ballots each election. Ariz. Advocacy Found., et al., *Arizona Shelby Response Project: Modernizing Elections and Maximizing Voter Participation*, 2 (2015) [hereinafter *Shelby Response Project*]. In 2012 alone, nearly 46,000 votes were rejected by the State—meaning that about 2% of all votes cast in the general election did

not count. Brandon Quester, *Rejected Ballots Document Continued Problems in Arizona Elections*, Ariz. Ctr. for Investigative Reporting, *available at* http://azcir.org/rejected-ballots-document-continued-problems-in-arizonas-elections/ (last visited Apr. 13, 2016). Unfailingly, one of the top reasons that ballots are rejected is because they were cast in a polling place other than the one to which the voter is assigned. *See, e.g.,* ACLU of Ariz., *Uncounted Votes: How Arizona Law Impacts Provisional Ballots*, 5 (2010) [hereinafter *Uncounted Votes*] (finding that in 2008, 33.89 percent of all rejected provisional ballots in five counties surveyed were rejected because they were cast in the wrong polling place); *Shelby Response Project* at 9 (finding that in 2014, of thirteen counties surveyed, 46% of all provisional ballots rejected were rejected by they were cast out of precinct).

81.     Although a voter may cast a provisional ballot if he or she attempts to vote at a polling location or voting area other than the one to which he or she has been assigned, Arizona law prohibits such votes from being counted if the voter is voting in a jurisdiction that has chosen to operate under a precinct-based system. A.R.S. § 16-584(B); Manual at 185. Accordingly, even where the voter is otherwise fully qualified to vote for at least some of the candidates on the ballot—President, U.S. Senate, U.S. Representative, Governor—or even where the voter is otherwise fully qualified to vote for all of the candidates on the ballot, their vote is not counted. In contrast, where a voter votes in a jurisdiction that has chosen to operate under a vote center based system, the voter is allowed to go to any polling location in the jurisdiction and cast their vote by regular non-provisional ballot. Thus, their ballot will count in any location in the county.

82.     Maricopa County has one of the highest provisional ballot rejection rates in the state. In 2008, "[o]ne of every 14 Maricopa County voters cast a provisional ballot []. The county then rejected 29,531 provisional ballots, nearly a third of which might have counted had the voter been directed to the correct polling location." *Uncounted Votes* at 6. Likewise, in 2012, the Center for American Progress named Maricopa County as one of the worst counties in Arizona for election performance solely for the high rate of provisional ballots cast in the County. Anna Chu, et al., *Unequal Access: A County-by-*

*County Analysis of Election Administration in Swing States in the 2012 Election*, Ctr. for Am. Progress, 11 (2014). More than 37% of ballots cast on Election Day were provisional ballots—76% higher than the state average. *Id.* The county rejected approximately 18% of those provisional ballots. Maricopa Cnty. Elections Dep't., *Provisional Ballots General 2012*, 17, 32 (2013). Approximately 7500 provisional ballots were not counted solely because they were cast out of precinct. Rob O'Dell, *Despite Progress in Arizona, Early Ballots Again Delay Vote Count*, The Ariz. Republic, Dec. 1, 2014. In 2014, in Maricopa County over 2,800 provisional ballots were cast in the incorrect precinct.

83.     On information and belief, one of the primary causes for the large number of provisional ballots cast out of precinct in Maricopa County specifically and across Arizona generally is voter confusion caused by the large number of changes that Arizona counties make to their polling locations from year to year. *Shelby Response Project* at 8. In Maricopa County alone, between 2006 and 2008 at least 43 percent of polling locations changed from one year to the next. *Uncounted Votes* at 4. Further, one study found that in a statewide survey of voters, of the 15 percent of survey respondents who reported that they cast a provisional ballot because they went to the wrong polling location, at least half of those individuals had correctly voted at the same polling location the year before. *Shelby Response Project* at 8.

84.     Moreover, poll worker error and poor election administration also contribute heavily to this problem. For example, in 2004, Maricopa County sent 8,800 voters election notification cards that listed the wrong voting location. Lillie Coney, *A Call for Election Reform*, 7 J. L. & Soc. Challenges 183, 189 (2005). More recently, despite implementing an electronic poll book system which allows election workers to print a receipt listing a voter's correct polling location and providing directions to that location for voters who arrive at the wrong polling location, over 2,800 voters in Maricopa County still cast out-of-precinct provisional ballots in 2014. The spokesman for the Maricopa County Recorder's office explained that with this system, such ballots "shouldn't have occurred at all." This indicates that, at least in part, some out-of-precinct provisional

1   ballots are cast because poll workers either are not providing the correct polling location

2   information to voters, or they are not explaining that the provisional vote cast at the

3   incorrect location will not be counted.

4       85.   In 2014, eighteen percent of all provisional ballots rejected in Arizona were

5   cast by Hispanic voters despite their comprising only eleven percent of the electorate.

6   *Shelby Response Project* at 13; *see also* Joshua Field, et al., *Uncounted Votes: Racially*

7   *Discriminatory Effects of Provisional Ballots*, Ctr. for Am. Progress, 14 (2014) (finding a

8   statistically significant correlation between high rates of provisional ballots cast and

9   counties covered by Section 203, i.e., counties with a large population of non-English

10   speakers). Similarly, in 2012, Maricopa County found that of the provisional ballots cast

11   in the County, nineteen percent were cast by individuals with Hispanic surnames.

12   Maricopa Cnty. Elections Dep't., *Provisional Ballots General 2012*, 11 (2013). The

13   county found that twenty-one percent of all Hispanic provisional ballots were not counted,

14   which was higher than the County average of eighteen percent. *Id.* at 17. The study also

15   found that Hispanic voters are more likely to go to the wrong polling location. *Id.* at 202.

16       86.   These statistics are unsurprising. Minority voters often have less stable

17   housing than white voters and, as a result, are often more mobile, causing them to change

18   precincts and polling locations more frequently. Likewise, they are less likely to have

19   access to reliable transportation as well as more likely to have inflexible work schedules.

20   Accordingly, where these voters arrive at the wrong polling location, they are more likely

21   to have difficulty traveling to the correct polling location to cast their ballot. In Arizona's

22   Native American community in particular, tribal voting locations often differ from voting

23   locations for state and county elections, causing further confusion and leading Native

24   Americans to cast their votes at the incorrect polling location.

25       87.   Voters whose provisional ballots are rejected because they vote in the

26   incorrect polling location face a severe burden: complete disenfranchisement. Sadly, many

27   of these voters are not even given the option to avoid this burden, as poll worker error (by

28   sending them to the wrong polling location or failing to explain to them the consequences

1   of casting their provisional ballot in the wrong precinct) leads them to erroneously and

2   unknowingly cast an uncountable ballot. Maricopa County's 2016 PPE and the decision to

3   drastically reduce the number of polling locations has exacerbated this burden for

4   Maricopa County voters in the upcoming general election and increased the likelihood

5   that thousands of voters will be disenfranchised.

6       88.    As noted, one of the key factors contributing to the casting of out-of-

7   precinct provisional ballots is the change in the location and number of polling locations.

8   In the 2016 PPE, only sixty voting locations were allotted for Maricopa County voters.

9   Current reports indicate that there could be up to an 1,107% change in the number of

10  polling locations in the upcoming general election which, while plainly necessary to

11  accommodate voters, is virtually certain to create massive confusion among voters as to

12  where they must go in order to cast a countable ballot. Further, in the 2016 PPE voters

13  were able to vote at any voting location, regardless of the precinct in which they were

14  registered. Now Maricopa County voters will once again be forced to vote only in the

15  precinct in which they are registered. Such a drastic change in such a short period of time

16  will assuredly confuse voters and cause many voters to arrive at the wrong polling

17  location to cast their general election ballot. This is particularly true for voters in

18  Maricopa County where, even before the 2016 PPE debacle, there were already systemic

19  problems with the casting of out-of-precinct provisional ballots. Consequently, thousands

20  more Maricopa County voters are likely to be disenfranchised in the upcoming 2016

21  general election if the State's prohibition on counting out-of-precinct ballots remains in

22  place.

23      89.    Thus, Defendants should be enjoined from rejecting provisional ballots cast

24  out-of-precinct during the upcoming November 2016 general election, and be required to

25  count all such ballots cast by otherwise eligible voters. Given that the burden of

26  disenfranchisement is severe, and the likelihood of an increase in the number of voters

27  disenfranchised in the upcoming election is so high, there is simply no legitimate reason

28  for the State not to do so.

90.     Arizona voters will also be subjected to unequal and arbitrary treatment as a result of the State's out-of-precinct provisional ballot policy. In 2016, at least five Arizona counties have announced that they will use a vote center system rather than a traditional precinct-based polling location system. Thus, voters in these counties will be able to vote in any voting location in the county without risking disenfranchisement for mistakenly voting in the incorrect precinct. In contrast, because the State does not permit votes that are cast out of precinct to be counted in traditional precinct-based systems, voters who happen to live in these counties face an arbitrary yet substantial risk of disenfranchisement unequal to similarly situated voters who live in jurisdictions that have chosen to use a vote center system. That risk of disenfranchisement, as discussed *supra*, is significantly increased in jurisdictions such as Maricopa County, where the local elections authorities have declined to settle on one system or the other. Instead, they have chosen to run some elections—such as the most recent 2016 PPE—under a voting center system, and other elections—including the very next major election that Maricopa County voters will participate in, the upcoming November general election—under a precinct-based polling system. This drastic change in approach virtually ensures massive voter confusion that will, at best, result in numerous voters attempting to cast their ballots out of precinct and being arbitrarily disenfranchised.

91.     There is simply no rational basis under which these precinct based voters' fully eligible votes should not also be counted. As a consequence, it is incumbent upon the Court to enter a ruling that that would prevent their disenfranchisement.

### H.B. 2023—Prohibition on the Collection of Early Vote Ballots

92.     For many years it has been the practice of individuals, political parties, and other community organizers in Arizona to maximize voter turnout by assisting voters with casting their mail-in absentee ballots by collecting those ballots *en masse* and hand delivering them to the appropriate elections officials to be counted. This assistance has particularly benefited voters who are homebound and elderly, and in many cases lacking

transportation, as well as voters in the Hispanic, Native-American, and African-American communities in Arizona. For Arizona activists, assisting these minority voters in this fashion is not only a way to combat historically low voter turnout for these populations, it is a way to directly counteract the effects of systemic discrimination that have resulted in burdens disproportionately carried by minority communities such as high poverty rates, lack of access to transportation, and inflexible work schedules, all of which have made it more difficult in general for Arizonians to participate in the franchise.

93.     Arizona law provides that all elections must allow for early voting and that any qualified elector may vote by early ballot. A.R.S. § 16-541. To cast an early ballot, the ballot, together with the signed affidavit, must be enclosed in a self-addressed envelope and delivered or mailed to the county recorder or deposited by the voter or the voter's agent at any polling place in the county by 7:00 p.m. on Election Day. A.R.S. § 16-548. To protect against voter fraud, Arizona law has long provided that any person who knowingly collects voted or unvoted ballots and does not turn those ballots in to an election official, is guilty of a Class 5 felony, which carries a presumptive 1 ½ years of incarceration and a fine up to $150,000 plus surcharges. A.R.S. § 16-1005.

94.     Despite the widespread practice of collecting ballots in minority communities and the well-established protections against fraud, on March 9, 2016, citing voter fraud as its chief concern, the Arizona State Legislature passed H.B. 2023 and Governor Doug Ducey signed it into law, making it a Class 6 felony for an individual to knowingly collect voted or unvoted early ballots from another person. H.B. 2023. In other words, although the prior law already made it a felony for a person to collect ballots but not turn them in to the appropriate elections official, the new law makes the mere *collection* of the ballots—even if the collector delivers those ballots to an elections official in time to be counted—a felony.

95.     While H.B. 2023 does provide limited exceptions for individuals collecting the ballots of family and household members, caregivers, and the election and mail workers who handle ballots by trade, the activists, friends, and neighbors who have

1    provided this assistance to voters for years, as well as political parties and campaigns, will

2    all face criminal penalties if they so much as attempt to assist voters in this way in the

3    2016 general election. *See* H.B. 2023.

4           96.    Upon information and belief, the Republican-controlled Arizona State

5    Legislature passed H.B. 2023 with the purpose and effect of suppressing Democratic votes

6    through the disenfranchisement and abridgement of the right to vote of minority voters in

7    Arizona. Moreover, it is clear that if H.B. 2023 is not enjoined it will do just that.

8           97.    Republican Representative Michelle Ugenti-Rita filed H.B. 2023 on January

9    11, 2016. On January 25, 2016, H.B. 2023 was heard by the House Elections Committee.

10   The Committee heard over two hours of public testimony on the bill, none of which

11   indicated that there was any evidence of fraud in the ballot collection process and much of

12   which indicated that this practice was used heavily by Arizona's minority communities. In

13   fact, State Elections Director Eric Spencer, speaking on behalf of the Secretary of State's

14   Office, admitted that he could not offer specific instances in which an individual spoiled

15   or stole the early ballot of another. Likewise, House Elections Committee member

16   Representative J.D. Mesnard stated that it was irrelevant whether fraud was actually

17   occurring because "what is indisputable is that many people believe it is happening."

18   Nevertheless, the Committee voted to allow H.B. 2023 to move to the floor for a vote. The

19   vote was 4-2 along party lines, with Republicans in favor of the bill.

20          98.    On January 22, 2016, Representative Ken Clark attempted to amend the bill

21   to add a provision that would allow an individual to return another person's ballot to

22   elections officials as long as the voter had signed an affidavit attesting that they had

23   authorized the return. The amendment was rejected by House Republicans.

24          99.    On February 4, 2016, the Arizona House of Representatives passed H.B.

25   2023 with thirty-four voting for the measure and twenty-three voting against. The vote

26   was split along party lines; every Republican supported the bill with one exception, and

27   all Democrats opposed.

28          100.   Upon reaching the Senate, H.B. 2023 was referred to the Senate

Government Committee. On February 24, 2014, the Senate Government Committee voted to allow the bill to proceed to a floor vote. They gave the bill a "do pass" recommendation, with four members voting for the recommendation and three members voting against. Committee Members Martin Quezada-D, Lupe Chavira Contreras-D, and Robert Meza-D voted against the measure. All three are Hispanic.

101. In the Senate, Senator Andrew Sherwood-D moved to reduce the penalty to a misdemeanor, but could not garner sufficient votes. Senator Lynn Pancrazi-D also spoke out against the bill, stating that some rural residents of her district do not receive home delivery of their mail and are therefore unable to rely on mail services to transmit their ballot to and from their home. Sen. Steve Farley-D stated that there had never been a documented case of anyone actually picking up someone else's ballot and then failing to deliver it to elections officials, explaining that "[t]he problem we're solving is that one party is better at collecting ballots than the other one." No concrete evidence of voter fraud was presented.

102. On March 9, 2016, the Arizona Senate passed H.B. 2023, with a party line vote of 17 voting for the measure and 12 voting against. H.B. 2023 Senate Vote Detail.

103. On the same day, Arizona Governor Doug Ducey signed H.B. 2023 into law. H.B. 2023 Chapter 5.

104. H.B. 2023 will go into effect on July 20, 2016. As discussed *supra*, H.B. 2023 will severely burden, abridge, and deny Arizona citizens the right to vote. Further, it will have a disparate impact on Arizona's Hispanic, African-American, and Native-American populations, who rely disproportionately on the collection of ballots to cast their early votes. These populations' reliance on ballot collecting is directly connected to the long history of discrimination that they have been subject to in Arizona, which has left them with less access to transportation; less flexible work schedules; and a higher likelihood of suffering from poor health and disabilities.

105. Moreover, H.B. 2023 also burdens the rights of the members of political parties, organizers, and other activists who assist Arizona voters in submitting their ballot

by threatening them with criminal prosecution, jail time, and large fines. Accordingly, the law will cause these individuals and organizations not to engage in such activities, thereby disrupting their right to associate with voters.

106. For Maricopa County voters, these burdens are exacerbated by the recent 2016 PPE debacle and the cumulative effect of all of the challenged voting laws, practices, and procedures is severe. Not only will voters who typically have their ballot collected no longer be able to utilize that method, but they will face increased risks of being disenfranchised due to the inequitable allocation of polling locations by Maricopa County and the State's restrictive out-of-precinct provisional ballot policy. Organizers, activists, campaigns, and candidates also face additional burdens. Now, on top of increasing their efforts to educate voters about where they can vote in order to combat the inevitable confusion that the 2016 PPE has caused, they will also have to divert more time and energy to arranging for voters who would typically use ballot collecting to cast their ballot either by mail on in person so that those voters may exercise the franchise.

107. Given the severe burdens placed on Arizona voters and the sheer lack of evidence of that fraud has ever occurred, the State cannot show any legitimate interest in the passage and promulgation of this law sufficient to overcome the rights of the Arizona citizens who are burdened by it.

## CAUSES OF ACTION

### COUNT I

**(Violations of Section 2 of the Voting Rights Act Against Defendants Arizona Secretary of State's Office; Michele Reagan; Maricopa County Board of Supervisors; Denny Barney; Steve Chucri; Andy Kunasek; Clint Hickman; Steve Gallardo; Maricopa County Recorder and Elections Department; Helen Purcell; and Karen Osborne)**

108. Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

109. Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed

1   or applied by any State . . . in a manner which results in a denial or abridgement of the

2   right of any citizen of the United States to vote on account of race or color." 52 U.S.C. §

3   10301(a).

4       110.   Maricopa County's allocation of polling locations has had and—if this

5   Court does not institute the remedy that Plaintiffs request—will continue to have, an

6   adverse and disparate impact on Hispanic and African-American citizens of Arizona.

7       111.   As evidenced by the 2016 PPE, now that the County is making these

8   decisions without federal oversight, it does not take into account how its polling location

9   determinations affect Hispanic and African-American voters. Thus, these voters are highly

10   likely to face substantial burdens when voting, as they did in the 2016 PPE, which are

11   more likely to result in their disparate disenfranchisement and a reduction their

12   participation in future elections.

13       112.   Hispanics and African Americans in Arizona have suffered from, and

14   continue to suffer from, discrimination on the basis of race. The ongoing effects of this

15   discrimination include significant and continuing socioeconomic disparities between

16   Hispanic and African Americans and whites in the State.

17       113.   The interaction of Maricopa County's allocation of polling locations with

18   the effects of discrimination against Hispanics and African Americans in Arizona has

19   caused and will continue to cause an inequality in the opportunity of members of these

20   minority communities to vote in Arizona. Under the totality of the circumstances,

21   Hispanics and African Americans in Arizona have had and will continue to have less

22   opportunity than other members of the electorate to participate in the political process and

23   to elect representatives of their choice as a result of Maricopa County's allocation of

24   polling locations. Hispanics and African Americans in Arizona therefore have had and

25   will continue to have their right to vote abridged or denied on account of race due to

26   Maricopa County's discriminatory allocation of polling locations.

27       114.   Arizona's policy of not counting provisional ballots cast out of precinct has

28   had, and if not declared illegal and enjoined, will continue to have an adverse and

disparate impact on Hispanic, African-American, and/or Native-American citizens of Arizona.

115.   These voters are more likely than white voters to attempt to vote in the incorrect precinct and, as a result, are more likely to have their vote rejected. Thus, these voters are highly likely to face substantial burdens when voting, which are more likely to result in their disparate disenfranchisement and a reduction their participation in future elections.

116.   Hispanics, African Americans, and Native Americans in Arizona have suffered from, and continue to suffer from, discrimination on the basis of race. The ongoing effects of this discrimination include significant and continuing socioeconomic disparities between Hispanics, African Americans, Native Americans and whites in the State.

117.   The interaction of Arizona's policy of not counting out-of-precinct provisional ballots with the effects of discrimination against Hispanics, African Americans, and/or Native Americans in Arizona has caused and will continue to cause an inequality in the opportunity of members of these minority communities to vote in Arizona. Under the totality of the circumstances, Hispanics, African Americans, and/or Native Americans in Arizona have had and will continue to have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice as a result of Arizona's policy of not counting out-of-precinct provisional ballots. Hispanics, African Americans, and/or Native Americans in Arizona therefore have had and will continue to have their right to vote abridged or denied on account of race due to Arizona's policy of not counting out-of-precinct provisional ballots.

118.   H.B. 2023, which criminalizes the collection of signed and sealed absentee ballots, if not declared illegal and enjoined, will have an adverse and disparate impact on Hispanic, African-American, and/or Native-American citizens of Arizona.

119.   Hispanics, African Americans, and Native Americans have suffered from,

and continue to suffer from, discrimination on the basis of race. The ongoing effects of this discrimination include socioeconomic disparities between Hispanics, African Americans, Native Americans and whites in Arizona.

120.    The interaction of H.B. 2023 with the effects of discrimination in Arizona will cause an inequality in the opportunity of Hispanics, African Americans, and/or Native Americans to vote in Arizona. Under the totality of the circumstances, Hispanics, African Americans, and/or Native Americans in Arizona have had and will continue to have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice as a result of H.B. 2023. Hispanics, African Americans, and/or Native Americans in Arizona therefore have had and will continue to have their right to vote abridged or denied on account of race due to H.B. 2023.

121.    Under the totality of the circumstances, the voting laws, practices and provisions challenged under Section 2 have resulted and will result in less opportunity for Hispanics, African Americans, and/or Native Americans than for other members of the population in Arizona to participate in the political process and to elect candidates of their choice, and they violate Section 2 of the Voting Rights Act.

## COUNT II

**(Denial of Equal Protection Under the Fourteenth Amendment of the United States Constitution and Violation of 42 U.S.C. § 1983 by Unjustifiably Burdening Voters Against Defendants Arizona Secretary of State's Office; Michele Reagan; Maricopa County Board of Supervisors; Denny Barney; Steve Chucri; Andy Kunasek; Clint Hickman; Steve Gallardo; Maricopa County Recorder and Elections Department; Helen Purcell; and Karen Osborne)**

122.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

123.    Under the Equal Protection Clause, any state election regulation that imposes non-discriminatory restrictions on the right to vote must be justified by an important state regulatory interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Where the restrictions are severe, however, "'the regulation must be narrowly drawn to advance a

state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). In determining severity of the restrictions, the court:

> must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as Justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

124. Unless Plaintiffs are granted the relief requested, there is a strong likelihood that their right to vote, their constituencies' and members' right to vote, and the right to vote of thousands of other Maricopa County residents will be severely burdened in the 2016 general election as a result of Defendants' misallocation of polling locations. As evidenced by the 2016 PPE, now that the County is making these decisions without federal oversight, it not only makes these decisions in a vacuum, where even facially unreasonable reductions in voting sites are apparently rubber stamped by the Board and the Secretary, it has failed entirely to take into account how these decisions are likely to impact Hispanic, Native-American, and African-American communities in particular. Thus, voters residing in such communities in Maricopa County are highly likely to face substantial burdens, just as they did in the 2016 PPE, including having to travel farther distances to reach their polling locations; having to stand in line for longer periods of time to exercise their right to vote; and ultimately, are more likely to be disenfranchised as a result of those burdens. The state has no interest of sufficient importance that outweighs any of these burdens on otherwise eligible members of Arizona's electorate.

125. Plaintiffs' right to vote, their constituencies' and members' right to vote, and the right to vote of thousands of other Arizona voters generally—and Maricopa County voters specifically—are also independently severely burdened by the arbitrary and unjustified rejection of out-of-precinct provisional ballots. Voters who have their provisional ballots rejected are completely disenfranchised, often due to no fault of their own, but rather due to ineffective administration of elections and poll worker error.

1   Minority voters face even greater risks of disenfranchisement and, therefore, greater
2   burdens, as they are more likely to appear to vote at the incorrect precinct through no fault
3   of their own. Moreover, due to the confusion surrounding the 2016 PPE, the dramatic
4   changes in Maricopa County's voting locations from one election to the next, as well as
5   the changes in its voting system, Maricopa County voters specifically face severe burdens
6   on their right to vote and are substantially more likely to vote in the incorrect precinct and,
7   as a result, be disenfranchised. These voters, who are otherwise fully qualified to vote for
8   the candidates on their ballot, should have their votes counted. The State has no sufficient
9   interest that outweighs any of these burdens on otherwise eligible members of Arizona's
10   electorate.

11       126.   Plaintiffs' right to vote, their constituencies' and members' right to vote,
12   and the right to vote of thousands of Arizona citizens is severely and unjustifiably
13   burdened by the criminalization of the collection of absentee ballots. Enacting this
14   prohibition not only interferes with individuals' right to vote but, significantly, denies
15   thousands of eligible voters this fundamental right, particularly the State's Hispanic,
16   African-American, and Native-American voters, who have historically relied on this
17   method of voting to combat Arizona's long history of discrimination. As a result of H.B.
18   2023, thousands of Arizona voters will no longer have any means by which to cast their
19   ballots and, if individuals attempt to assist them, they will risk jail time, a criminal record,
20   and large fines. The state has no interest of sufficient importance that outweighs any of
21   these burdens on otherwise eligible members of Arizona's electorate.

22       127.   Based on the foregoing, Defendants, acting under color of state law, have
23   deprived and will continue to deprive Plaintiffs of equal protection under the law secured
24   to them by the Fourteenth Amendment to the United States Constitution and protected by
25   42 U.S.C. § 1983.

26
27
28

## COUNT III

**(Denial of Equal Protection Under the Fourteenth Amendment of the United States Constitution and Violation of 42 U.S.C. § 1983 Through Disparate Treatment Against Defendants Arizona Secretary of State's Office; Michele Reagan; Maricopa County Board of Supervisors; Denny Barney; Steve Chucri; Andy Kunasek; Clint Hickman; Steve Gallardo; Maricopa County Recorder and Elections Department; Helen Purcell; and Karen Osborne)**

128. Plaintiffs reallege and incorporate by reference by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

129. The Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. Further, the equal right to vote that is protected by the Equal Protection Clause is protected in more than the initial allocation of the franchise; equal protection applies to the manner of its exercise as well. *See Hunter v. Hamilton Cny. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)). A state may not arbitrarily impose disparate treatment on similarly situated voters.

130. By refusing to count ballots cast out of precinct in some Arizona counties, but allowing other counties to employ voting center systems in which a ballot is accepted regardless of where it is cast within the jurisdiction, Arizona treats voters in vote-center counties different from voters in precinct-system counties. As a result, Arizona's policy creates two groups of otherwise similarly situated voters in Arizona—(1) fully eligible Arizona voters who cannot have their ballot counted because they vote outside of their precinct in a precinct-system county, and (2) fully eligible Arizona voters who can have their ballot counted where they vote outside of their precinct in a vote-center county. This disparate treatment of Arizona voters based solely upon the county in which they live is arbitrary, and there is no rational justification for such differentiation. Both groups of voters are qualified electors in Arizona, and there is no legally sufficient reason to distinguish between them.

131.   Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of equal protection under the law secured to them by the Fourteenth Amendment to the United States Constitution and protected by 42 U.S.C. § 1983.

## COUNT IV

**(Violation of the First Amendment to the United States Constitution and 42 U.S.C. § 1983 Against Defendant Arizona Attorney General Mark Brnovich)**

132.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

133.   "It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) (citation omitted). H.B. 2023 is facially unconstitutional because it prohibits speech and expression that is fully protected by the First and Fourteenth Amendments of the United State Constitution, including the right of political parties and their members to organize and engage in legitimate election-related political activity. H.B. 2023, through its complete prohibition on the collection of ballots and imposition of criminal penalties such as jail time and the payment of large fines, imposes real and substantial burdens on political organizations and their members to engage in lawful efforts to assist voters in casting their ballots. As a result, political organizations and their members, including several of the Plaintiffs in this litigation, will be completely foreclosed from associating with voters in this manner, and engaging in protected election activity. Accordingly, H.B. 2023 violates the First Amendment.

## COUNT V

**(Violation of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 Against Defendant Arizona Attorney General Mark Brnovich)**

134.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

135.   Plaintiffs are Democratic voters, campaigns, and party committees whose

First and Fourteenth Amendment rights are impaired as a result of H.B. 2023. In *Carrington v. Rash*, 380 U.S. 89, 94 (1965), a case brought under the Equal Protection Clause, the Supreme Court held that "'[f]encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." Similarly, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).

136.   Upon information and belief, the State, upon enacting H.B. 2023, intended to suppress (that is, fence out), the vote of Democrats because of the way they are expected to vote. Accordingly, H.B. 2023, absent the relief requested, will continue to violate the First Amendment and the Equal Protection Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants as follows:

A.   An order declaring that:

1.   Arizona's prohibition on the counting of out-of-precinct provisional has a disparate effect on Hispanic, Native-American, and African-American voters in violation of Section 2 of the Voting Rights Act;

2.   Arizona's prohibition on the counting of out-of-precinct provisional ballots burdens Arizona voters generally and, specifically, Hispanic, African-American, and Native-American voters as well as voters in Maricopa County without a sufficient state justification for doing so, in violation of the Equal Protection Clause of the Fourteenth Amendment;

3.   Arizona's policy of rejecting provisional ballots cast out of precinct in certain jurisdictions, while allowing for the counting of ballots cast out of precinct in others, violates the Equal Protection Clause of the Fourteenth Amendment;

4.     H.B. 2023 violates Section 2 of the Voting Rights Act, the Equal Protection Clause of the Fourteenth Amendment, and the First Amendment to the United States Constitution; and

5.     The rights and privileges of Plaintiffs will be irreparably harmed without the intervention of this Court.

B.     An order preliminarily and permanently enjoining Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them from:

1.     Allocating polling locations for the 2016 general election in Maricopa County without first submitting the allocation plan to this Court for review and approval to ensure that the plan is in keeping with state and federal law, Section 2 of the Voting Rights Act, and the United States Constitution;

2.     Rejecting provisional ballots solely because they were cast in the wrong precinct or polling location, and requiring that such ballots be counted for all elections in which the elector is eligible to vote;

3.     Implementing, enforcing, or giving any effect to the challenged provisions of H.B. 2023.

C.     An order requiring the Maricopa County Defendants to draft and submit to this Court for review and approval a contingency plan to address and remedy long wait times should they occur in the 2016 general election;

D.     An order awarding Plaintiffs their costs, disbursements and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. §§ 1988, 1973l(e); and

Such other or further relief as the Court deems just and proper.

1

2  Dated: April 15, 2016                          s/ Daniel C. Barr
                                                  Daniel C. Barr (# 010149)
3                                                 Sarah R. Gonski (# 032567)
                                                  PERKINS COIE LLP
4                                                 2901 North Central Avenue, Suite 2000
                                                  Phoenix, Arizona 85012-2788

5                                                 Marc E. Elias (WDC# 442007)
                                                  (pro hac vice to be filed)
6                                                 Bruce V. Spiva (WDC# 443754)
                                                  (pro hac vice to be filed)
7                                                 Elisabeth C. Frost (WDC# 1007632)
                                                  (pro hac vice to be filed)
8                                                 Amanda R. Callais (WDC# 1021944)
                                                  (pro hac vice to be filed)
9                                                 Perkins Coie LLP
                                                  700 Thirteenth Street NW, Suite 600
10                                                Washington, D.C. 20005-3960

11                                                *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          ☒          I hereby certify that on April 15, 2016, I electronically transmitted the

3   attached document to the Clerk's Office using the CM/ECF System for filing.

4                                          s/ S. Neilson