Daniel C. Barr (# 010149)
Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
DBarr@perkinscoie.com
SGonski@perkinscoie.com

*Attorneys for Plaintiffs*

Roopali H. Desai (# 024295)
Andrew S. Gordon (# 003660)
D. Andrew Gaona (# 028414)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Telephone: (602) 381-5478
RDesai@cblawyers.com
AGordon@cblawyers.com
AGaona@cblawyers.com

*Attorneys for Intervenor-Plaintiff*
*Bernie 2016, Inc.*

*[Additional Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Feldman, et al., | No. CV-16-01065-PHX-DLR |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' JOINT MOTION FOR PRELIMINARY INJUNCTION OF H.B. 2023** |
| v. | |
| Arizona Secretary of State's Office, et al., | |
| Defendants. | **(ORAL ARGUMENT ON AUGUST 3, 2016)** |

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF FACTS ........................................................................... 1

    A.   Early Voting and Ballot Collection ............................................... 1

    B.   Communities Served By Ballot Collection .................................... 2

    C.   Legislative Efforts to Restrict Ballot Collection Prior to HB2023 ............. 4

    D.   HB2023 ......................................................................................... 5

II.   ARGUMENT ........................................................................................... 8

    A.   Plaintiffs Are Likely to Succeed on the Merits ............................ 8

        1.   HB2023 Violates Section 2 of the VRA ............................ 8

        2.   HB2023 Violates the 14th Amendment (Anderson/Burdick).......... 11

        3.   HB2023 Violates the 1st and 14th Amendments (Right to Associate) ........................................................ 12

        4.   HB2023 Violates the 1st and 14th Amendments (Intentional Discrimination/Partisan Fencing)..................................... 14

    B.   Plaintiffs Will Suffer Irreparable Harm Absent An Injunction.................. 16

    C.   The Balance Of The Equities Tips Sharply In Plaintiffs' Favor ................ 17

    D.   The Public Interest Favors The Issuance Of A Preliminary Injunction ...... 17

III.  CONCLUSION ...................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ................................................................ 12, 14

*Ass'n of Cmty. Orgs. for Reform Now v. Cox,*
    No. 1:06-CV-1891-JTC, 2006 WL 6866680 (N.D. Ga. 2006) ..................................... 14

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ................................................................ 12, 14

*Carrington v. Rash,*
    380 U.S. 89 (1965) ................................................................ 14

*Crawford v. Marion Cty. Election Bd.,*
    553 U.S. 181 (2008) (Stevens, J., controlling op.) ...................................... 12

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................ 17

*Farrakhan v. Wash.,*
    338 F.3d 1009 (9th Cir. 2003) ........................................................ 8

*League of Women Voters of N.C. v. N.C.,*
    769 F.3d 224 (4th Cir. 2014) ........................................................ 8, 17

*LOWV of Fla. v. Browning,*
    575 F. Supp. 2d 1298 (S.D. Fla. 2008) ................................................ 13

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ........................................................ 17

*Project Vote v. Blackwell,*
    455 F. Supp. 2d 694 (D. Ohio 2006) .................................................. 13, 14

*Shelby County v. Holder,*
    570 U.S. 2 (2013) ................................................................ 4

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ................................................................ 8, 10, 11

*United Food & Commercial Workers Local 99 v. Bennett,*
    934 F. Supp. 2d 1167 (D. Ariz. 2013) ................................................ 17

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
   429 U.S. 252 (1977) ................................................................................. 15, 16

**STATUTES**

U.S.C. § 10301(a) ....................................................................................... 9

A.R.S. § 16-541 .......................................................................................... 1

A.R.S. § 16-542 .......................................................................................... 1

A.R.S. § 16-544 .......................................................................................... 1

A.R.S. § 16-545 ....................................................................................... 1, 2

A.R.S. § 16-547 .......................................................................................... 1

A.R.S. § 16-548 .......................................................................................... 1

A.R.S. § 16-550 .......................................................................................... 6

A.R.S. § 16-1005(a)-(f) .............................................................................. 2

**OTHER AUTHORITIES**

ARIZ. CONST. art. 4, pt. 1, § 1(6)(C), (14) .............................................. 4

The Court should enjoin HB2023, which criminalizes the mere collection of early ballots and will severely burden, abridge, and deny the right to vote of thousands of Arizona citizens in violation of Section 2 of the Voting Rights Act ("VRA") and the First and Fourteenth Amendments. In support, Plaintiffs submit as follows:

# I.   STATEMENT OF FACTS

## A.   Early Voting and Ballot Collection

Arizona has long permitted early voting by mail and, since 2007, voters may join the "Permanent Early Voting List" ("PEVL") and an early ballot will be sent to them 27 days before an election in which they are eligible to vote. A.R.S. §§ 16-541, 16-544, 16-542. Arizona's voters have become increasingly reliant on early voting by mail, which has helped boost the State's historically low turnout. *See* Ex. 2[1] (Expert Report of Dr. Allan J. Lichtman ("Lichtman Rpt.")) 6-8; Ex. 5, slides 2 & 6. In the last presidential election, nearly 1.3 million voters in Maricopa County alone requested early ballots, and 82% of all voted early by mail. Ex. 6 at 21-22. Early voters are sent a ballot, instructions, a return envelope with an affidavit, and—if their county uses one—a secrecy envelope or sleeve. A.R.S. §§ 16-545, 16-547, 16-548; Ex. 7 at 232. Early ballots are rejected if not returned to the recorder or a polling place by 7 p.m. on Election Day, if the affidavit is not signed, if the signature does not match the signature on file, if the ballot is not returned in the envelope provided for that purpose, or if the ballot is not securely sealed. A.R.S. § 16-548; Ex. 7 at 59.

Collection and delivery of early ballots has long been a common practice in Arizona upon which voters have come to rely. Gallardo Decl. ¶¶ 5, 16-17, 21 (ballot collection "enormously beneficial to many voters" including in particular minority voters); Parraz Decl. ¶¶ 2-5 (Latino organization collected 9,000 ballots during 2012 sheriff election); Danley Decl. ¶¶ 3-4, 6, 8-9 (nonpartisan organization's GOTV efforts aimed at Latinos, young people, and women typically collected several thousand ballots);

---

[1] Unless otherwise noted, citations to "Ex." are to exhibits to the Declaration of Elisabeth C. Frost in Support of Plaintiffs' Motions for Preliminary Injunction.

Friend Decl. ¶¶ 3-6, 12 (collected in personal and professional capacity with AFL-CIO through GOTV efforts to increase minority and elderly turnout); Anderson Decl. ¶¶ 3-5, 11 (collected in personal and professional capacity with Alliance of Retired Americans for members who "would … not have been able to vote without our assistance"); Danley Decl. ¶¶ 4, 6 (Latino organization delivers several thousand ballots per election); Chapman Decl. ¶¶ 2-11 (typically collects several thousand ballots in low-income African-American and Latino neighborhoods). *See also* Gillespie Decl. ¶¶ 5, 10; Fernandez Decl. ¶ 8; Healy Decl. ¶ 18, 22; K. Gallego Decl. ¶¶ 8-9, R. Gallego Decl. ¶ 10; Larios Decl. ¶¶ 9-12; Quezada Decl. ¶ 10; Pstross Decl. ¶¶ 3, 4, 6, 8.

Arizona has long made all of the following class 5 felonies: "knowingly mark[ing] a voted or unvoted ballot or ballot envelope with the intent to fix an election"; "receiv[ing] or agree[ing] to receive any consideration in exchange for a voted or unvoted ballot"; possessing another's voted or unvoted ballot with intent to sell; "knowingly solicit[ing] the collection of voted or unvoted ballots by misrepresenting itself [sic] as an election official or as an official ballot repository or . . . serv[ing] as a ballot drop off site, other than those established and staffed by election officials"; "knowingly collect[ing] voted or unvoted ballots and . . . not turn[ing] those ballots in to an election official…or any…entity permitted by law to transmit post," A.R.S. §§ 16-1005(a)-(f). In addition, ballot return envelopes must be "tamper evident when properly sealed." A.R.S. § 16-545.

**B.     Communities Served By Ballot Collection**

Ballot collection has guarded against the disenfranchisement of voters who do not or cannot mail their ballot in time, whatever the reason. This may happen if a voter is confused about the deadline, how to fill out the envelope, or where or how to return a ballot; if a voter waits to make a choice in an important election; or if unexpected personal circumstances make it difficult to deliver the ballot. *See* Parraz Decl. ¶ 6; Gillespie Decl. ¶¶ 5, 6, 10; Pstross Decl. ¶¶ 5-7; Friend Decl. ¶¶ 7, 11, 12; Anderson Decl. ¶¶ 6, 11; Danley Decl. ¶¶ 5-7; Larios Decl. ¶¶ 9-11; Chapman Decl. ¶¶ 2-8; K. Gallego Decl. ¶ 11; Quezada Decl. ¶¶ 11, 12, 15; R. Gallego Decl. ¶ 12; Ex. 8 at 59:9-60:17, 62:4-20, 64:13-

66:5; Ex. 9 at 41:19-43:14, 91:4-21; Ex. 10 at 2:21-3:19. But it has particularly benefited minority voters, many of whom live in communities without secure mailboxes, or without outgoing mail service at all; lack reliable transportation to vote in person or deliver the ballots themselves; or have economic or personal circumstances that make ballot collection particularly important to their exercise of the franchise. *See* Gillespie Decl. ¶ 9 (neighborhoods relying "most heavily on ballot collection . . . [have] high population of Latino residents"); Clark Decl. ¶ 11 ("Constituencies that …. support [Democrats, including Latino voters] rely disproportionately on [ballot collection]"); Fernandez Decl. ¶¶ 9, 10 (in district next to Mexican border ballot collection important to safeguard right to vote); Quezada Decl. ¶¶ 3, 15, 22, 23 (in 80% minority district many lack secure outgoing mailbox); R. Gallego Decl. ¶ 14 ("Latino and African-American neighborhoods . . . rely heavily on" ballot collection); Ex. 8 at 29:11-30:5, 14:18-16:2 (bill problematic for Navajo Nation where mail delivery can be 45 miles away); Ex. 9 at 89:1-91:3 (collection "take[s] place in largely minority Latino, African American neighborhoods" where many lack outgoing mail); Ex. 11 at 28:1-29:10 (there are "over 30,000 people in San Luis" and "over 15,000 people in the city of Somerton, and not one . . . has a mailbox where the mail is delivered to their homes").[2] *See also* Gallardo Decl. ¶¶ 5, 16-18, 21; Parraz Decl. ¶¶ 6, 8; Friend Decl. ¶ 7; Pstross Decl. ¶ 5; Clark Decl. ¶¶ 14, 15; Chapman Decl. ¶¶ 2-8; Larios Decl. ¶¶ 9-11; Gillespie Decl. ¶ 5; K. Gallego Decl. ¶¶ 3, 10; Quezada Decl. ¶ 20; R. Gallego Decl. ¶ 12; Ex. 13 at 74:1-16, 51:7-17, 60:18-61:14; Ex. 14 at 39:2-41:15. Minority and low-income voters are also more likely to lack familiarity with the voting process, and thus be unaware of the deadline or how to complete or submit an early ballot. Parraz Decl. ¶ 6; Gillespie Decl. ¶ 5; Pstross Decl. ¶ 5; Friend Decl. ¶ 7; Chapman Decl. ¶¶ 2-8; Danley Decl. ¶ 5; Ex. 14 at 48:14-18. Ballot collection has also helped protect elderly and disabled voters. Gillespie Decl. ¶ 5; Pstross

---

[2] As of 2010, 95.9% of Somerton's and 98.7% of San Luis's residents were Hispanic or Latino. *See* Ex. 12.

1   Decl. ¶ 5; Friend Decl. ¶ 11; Anderson Decl. ¶¶ 6, 11; K. Gallego Decl. ¶¶ 11, 12, 14;

2   Quezada Decl. ¶ 12; Ex. 13 at 51:14-17; Ex. 9 at 91:4-21; Ex. 10 at 2:21-3:19.

3   **C.    Legislative Efforts to Restrict Ballot Collection Prior to HB2023**

4          Republicans have repeatedly attempted to restrict ballot collection. Gallardo Decl.

5   ¶¶ 6-20; Clark Decl. ¶ 8; Fernandez Decl. ¶ 11; Quezada Decl. ¶ 13; R. Gallego Decl.

6   ¶ 13. Those efforts were first successful in 2011 with the enactment of SB1412. Gallardo

7   Decl. ¶¶ 6-12. At the time, Arizona was still subject to Section 5 of the VRA's

8   preclearance requirements and, after the Department of Justice requested additional

9   information about SB1412's ballot collection restrictions, the law was voluntarily

10   repealed. *Id.* ¶¶ 13-16; *see also* Mot. for PI on Allocation & Provisional Claims 1-2.[3] In

11   2013, the Republican-controlled Legislature enacted HB2305, which banned partisan

12   ballot collection and required all others to complete an affidavit stating they had returned

13   the ballot for the voter. HB2305 (2013).[4] Violation was a class 1 misdemeanor. *Id.*;

14   Gallardo Decl. ¶ 18. Shortly after HB2305's enactment, citizen groups began organizing a

15   ballot referendum for its repeal. Lichtman Rpt. 10. The next session, the Legislature

16   repealed the law on party lines. Clark Decl. ¶ 8; Fernandez Decl. ¶ 11; Quezada Decl.

17   ¶ 13; Gallardo Decl. ¶ 19. Had HB2305 been repealed by referendum, the Legislature

18   could not have enacted related legislation, except on a supermajority vote and to "further[]

19   the purposes" of the referendum. ARIZ. CONST. art. 4, pt. 1, § 1(6)(C), (14). Some

20   legislators, including the current Secretary of State ("SOS") Michele Reagan, admitted

21

22          [3] In 2015, the legislature considered SB1339, which would have limited collection
23   to two ballots per election (with some exceptions) and made violation a class 5 felony.
     SB1339 (2015); Lichtman Rpt. 10. The bill's supporters frequently cited to a blog post by
24   the Maricopa County Republican Party Chair, who claimed the law was justified by a
     video of a Hispanic man returning ballots, who the post repeatedly called a "thug". Ex 16.
25   Ms. Reagan incorporated the same video into a television ad during her SOS campaign,
     playing it in the background while a clip showed her falsely claiming "there is no other
26   state in the country that allows someone to do that." Ex. 17. The HB2023 debates did not
     explicitly reference the blog, but proponents referred to videos that "[y]ou have seen,"
     likely meaning to refer to the same video. *See* Ex. 9 at 84:3-10; Ex. 8 at 56:17-57:10.

27          [4] *Shelby County v. Holder*, 570 U.S. 2 (2013), was decided six days after HB2305
28   was enacted; thus, Arizona did not have to submit it for preclearance.

that the purpose of repeal was to avoid a referendum; she expressed hope that lawmakers would later reintroduce "parts of [HB2305] a la carte." Ex. 15.

**D.     HB2023**

In 2016, Rep. Ugenti-Rita introduced HB2023, making the "knowing[] collect[tion] of voted or unvoted early ballots from another person . . . a class 6 felony." *Id*. The only exceptions are elections held by certain special taxing districts, or ballots collected by a family member, household member, or caregiver of the voter. *Id*. A class 6 felony carries a presumptive sentence of one year of incarceration and a fine of up to $150,000 plus surcharges. *See* Ex. 18.

Rep. Clark repeatedly spoke against HB2023, arguing it "disproportionately affects certain populations and makes it more difficult for those citizens to vote." Clark Decl. ¶¶ 9, 14. Also vocally opposed was Rep. Fernandez, who emphasized the impacts on rural minority communities, urging legislators "to consider voters in places like San Luis," who do not have mail delivery. Fernandez Decl. ¶ 14; *see also id*. ¶¶ 4, 9, 13. She reported that in San Luis there are 12,498 post office boxes, but no home mail delivery, and 1,900 of the Tohono O'odham Nation's members cannot receive home delivery. Fernandez Decl. ¶ 15; *see also id*. at ¶ 17; Ex. 8 at 20:6-19. She further stated HB2023 would hurt these voters "miles and miles away from the post office" who check their boxes "weekly or . . . biweekly." Fernandez Decl. ¶ 15; Ex. 8 at 17:1-22. "[T]hey don't have mass transit [and] [t]here isn't a taxi service. There aren't . . . blue boxes . . . where you can drop your mail." Fernandez Decl. ¶ 15; Ex. 8 at 18:1-6. Sen. Quezada also opposed, largely because of the disparate impact on Latino communities, Quezada Decl. ¶¶ 2, 15, 19, 20, as did several community activists. Clark Decl. ¶ 11; Pstross Decl. ¶ 3; Ex. 9 at 55:8-60:9.

The proponents of HB2023 were unmoved by testimony about the voters whose right to vote would be burdened and in some cases wholly denied as a result of the bill. The lead sponsor's response was simple: "If you can't get it done [i.e., the ballot returned in the mail on time], that is not my problem." Ex. 8 at 32:6-7. When Rep. Fernandez urged members to consider "what it's like to live in a rural, rural area . . . sometimes 40 miles

away from the nearest post office box," and that "over 10,000" voters could be disenfranchised this way, many legislators laughed. Ex. 8 at 35:15-37:18; *see also id.* at 37:6-15 ("The convenience of having a car and taking your kids to school is not afforded to everybody, Ms. Ugenti-Rita…. The convenience of walking to a post office is not afforded to everybody. The fact that you can open your front door … and … leave … mail there and somebody will pick it up is not afforded to everybody. Please understand that it's so different.") (Rep. Fernandez).

At times, proponents claimed HB2023 was needed to combat voter fraud, but they could not identify a single, concrete example of fraud that it could have prevented. *See* Clark Decl. ¶ 12; Anderson Decl. ¶ 10; Quezada Decl. ¶¶ 14, 15, 19; Ex. 8 at 69:1-7, 69:14-70:11, 74:7-12; Ex. 14 at 21:2-15, 27:5-7, 30:13-22, 37:8-38:7, 43:3-13; Ex. 11 at 35:7-15, 37:5-39:1, 43:3-8; Lichtman Rpt. 15-19.[5] Lacking actual evidence, proponents resorted to conspiracy theories, rumors, and rank speculation about people who dropped off ballots. Clark Decl. ¶ 12.[6] Arguments that the fraud could have easily gone undetected ignore the safeguards that made fraud through ballot collection particularly difficult to commit. *See* Gallardo Decl. ¶¶ 9, 11. Voters can check if their ballot was delivered on the Recorder's website, Gillespie Decl. ¶¶ 6, 7; Friend Decl. ¶ 8, or on the Secretary of State's website. And, like all other early ballots, hand delivered ballots are subject to verification by elections officials, their signatures matched as required by Arizona law. *See* A.R.S. § 16-550; Gallardo Decl. ¶ 11; Ex.14 at 42:19-43:2. Many organizations also implemented their own additional security measures. Parraz Decl. ¶¶ 7-9; Gillespie Decl. ¶ 7; Friend Decl. ¶ 8; Chapman Decl. ¶ 10; Anderson Decl. ¶ 10. Ultimately, Ugenti-Rita admitted that the bill "addresses [only] the *collection* of ballots," it "doesn't reference" or "tackle"

---

[5] Public records requests to the attorney general and county attorneys have similarly not procured any relevant records of fraud. Gonski Decl.¶¶ 2-6.

[6] Senator Shooter claimed "the preferred method of alleged fraudsters was to collect early ballots, steam them open in a microwave with a bowl of water, and then discard the ballot if they did not agree with [how it] was voted." Quezada Decl. ¶ 19. A reporter tried to do this with the help of a SOS representative, but found that even after twelve minutes in the microwave, the envelope remained sealed. Lichtman Rpt. 17-18.

"fraud"; instead, it "is about an activity that *could potentially lead to* [fraud]." Ex. 13 at 83:14-18 (emphases added). In a similar vein, another supporter asserted that, "what is indisputable is that many people believe it is happening," and that belief alone is sufficient to enact the law. *Id*. at 125:16-126:1; Clark Decl. ¶ 10; Quezada Decl. ¶ 19.[7]

At the same time, proponents rejected amendments that could have addressed their purported concerns by less burdensome means. They rejected an amendment permitting collection if the voter and collector signed an affidavit affirming the ballot was collected with the voter's permission, it was voted and sealed when collected, and the collector will deliver it on or before Election Day. *See* Ex. 19; Ex. 8 at 7:6-25:10; Clark Decl. ¶ 15; Fernandez Decl. ¶ 16. Another rejected amendment would have permitted collection if the voter was given a tracking receipt. Quezada Decl. ¶ 16; Anderson Decl. ¶ 10; Ex. 19. During the discussion about that amendment, Sen. Quezada asked Rep. Ugenti-Rita whether there have been cases of fraud that the bill would address. She failed to respond specifically, and he pressed: "[T]he answer then is no, there are not any substantive situations that we can point to and say this has happened. You're saying it's a preventative measure to prevent it from happening because there's a possibility that it might happen?" Ex. 9 at 34:12-35:8, 36:3-8. Rep. Ugenti-Rita responded: "Right … being in possession of another person's ballot can lead to fraud…. [HB2023] doesn't directly address fraud…. [B]allot fraud, electoral fraud, is already addressed all over this … statute." *Id*. at 36:9-17. Another proponent said he opposed the amendment because it is the voter's "responsibility to cast their vote…. It's on them … to protect the integrity…. They certainly take care of themselves in other situations, so I don't know why we have to spoon-feed and baby them over their vote." *Id*. at 81:12-82:1. The Senate also rejected, without a single member speaking to explain their opposition, an amendment to make

---

[7] Opposition to the bill also emphasized it created a punishment "disproportionate to" the only "crime" that most individuals it would reach were "guilty" of—that of "attempting to assist voters in delivering their early ballots in time to be counted by elections officials." Clark Decl. ¶ 13. *See also* Quezada Decl. ¶ 21 R. Gallego Decl. ¶ 14; Ex. 8 at 51:10-17; Ex. 14 at 19:4-20:1.

early ballots postmarked on or before Election Day countable. Quezada Decl. ¶ 16; Ex. 11 at 14:11-20:14. Also rejected was a proposal to change the penalty to a misdemeanor. Ex. 11 at 21:4-34:15; Quezada Decl. ¶ 21.

On February 4, 2016, the House passed HB2023 with 34 voting for, 23 against. Ex. 20. The vote was split along party lines; all Republicans save one supported, all Democrats opposed. *Id.* On March 9, it passed the Senate on a party line vote and was signed into law by the Governor hours later. *See* Clark Decl. ¶ 9; Fernandez Decl. ¶ 18; Quezada Decl. ¶ 17. This litigation followed. Compl. (ECF No. 1).

## II.     ARGUMENT[8]

**A.     Plaintiffs Are Likely to Succeed on the Merits**

### 1.     HB2023 Violates Section 2 of the VRA

HB2023 violates Section 2 because the criminalization of ballot collection results in inequality in opportunities of Hispanics, Native Americans, and African Americans as compared to whites to elect their preferred representatives. *Farrakhan v. Wash.*, 338 F.3d 1009, 1016 (9th Cir. 2003) (citing *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986)). Section 2 was meant "to provide … a means of identifying voting practices that have the effect of shifting racial inequality from the surrounding social circumstances into the political process." *Id*. at 1020. Courts consider whether, given the "totality of the circumstances" looking to the Senate Factors, the practice makes voting disproportionately burdensome for minorities. *Gingles*, 478 U.S. at 35-36, 44, 46. *See also* Mot. for PI on Allocation & Provisional Claims 11-13 (Section 2 standard). That test is easily met here.

HB2023 burdens Arizona's minorities disparately, large numbers of whom lack access to a secure outgoing mail box, or—in rural communities where the populations are almost exclusively Native American or Hispanic—have no mail service at all. *See, e.g*., *supra* at 3-4, 5. The severe impact on these voters alone brings HB2023 within Section 2. *See League of Women Voters of N.C. v. N.C.* ("*LOWV*"), 769 F.3d 224, 244 (4th Cir.

---

[8] *See* Mot. for PI on Allocation & Provisional Claims 10 (PI standard).

2014) ("[W]hat matters for purposes of Section 2 is … that 'any' minority voter[] is being denied equal opportunities.") (quoting 52 U.S.C. § 10301(a)). But, even in communities where the burden may not be so severe (e.g., with mail delivery and secure outgoing mail), Arizona's Hispanic, Native American and African-American voters rely on ballot collection to vote for reasons directly related to the Senate Factors, and its criminalization will disproportionately burden those communities, as well. *See, e.g.*, supra at 3-4.

It cannot be reasonably disputed that Arizona has a long, sordid history of racial discrimination, extending into every area of social, political, and economic life, including voting. *See* Mot. for PI on Allocation & Provisional Claims 12, 18-19 (*Senate Factor 1*); Lichtman Rpt. 23-29; Berman Rpt. 3-22. The effects continue to the present day, reflected by disparate poverty rates, higher unemployment rates, lower educational achievement levels, less access to transportation, residential transiency, far worse health indicators, and disparate treatment in criminal justice, including racial profiling. Mot. for PI on Allocation & Provisional Claims 12, 19-21 (*Senate Factor 5*); Lichtman Rpt. 38-42; Berman Rpt. 18-19. These disparities make participation in Arizona's elections more burdensome, both because they contribute to an unfamiliarity with the voting process, *see e.g.*, Parraz Decl. ¶ 6; Gillespie Decl. ¶ 5; Pstross Decl. ¶ 5; Friend Decl. ¶ 7; Chapman Decl. ¶¶ 2-8; Danley Decl. ¶ 5; Ex. 14 at 48:10-18, and because they increase the "cost of voting": for a person working two jobs, or who has significant health problems or caretaking responsibilities, personal delivery of a ballot imposes a greater personal "cost" than for those voters who do not have similar complicating circumstances. Ballot collection has worked to alleviate many of these burdens and made it easier for such voters to exercise their fundamental right to vote. *See, e.g.,* Gillespie Decl. ¶¶ 5, 6, 10; Pstross Decl. ¶¶ 5-7; Friend Decl. ¶¶ 7, 11, 12; Anderson Decl. ¶¶ 6, 11; K. Gallego Decl. ¶¶ 11, 12, 14; Danley Decl. ¶¶ 5-7; Larios Decl. ¶¶ 9-11; Chapman Decl. ¶¶ 2-8; Quezada Decl. ¶¶ 11, 12, 15; R. Gallego Decl. ¶ 12; Ex. 13 at 51:14-17; Ex. 8 at 59:9-60:17, 62:4-20, 64:13-66:5; Ex. 9 at 41:19-43:14, 91:4-21; Ex. 10 at 2:21-3:19. Arizona also continues to maintain practices or procedures "that may operate to lessen the opportunity of

minority voters to elect candidates of their choice," i.e.., that impose "practical impediments" to the voting opportunities of minorities, *Gingles*, 478 U.S. at 39. *See* Mot. for PI on Allocation & Provisional Claims 12, 18-19 (*Senate Factor 3*); Lichtman Rpt. 33-37; Berman Rpt. 19-20.

Arizona's long history of racial discrimination and its continued effects are also reflected in official lack of responsiveness to its minority populations. *See* Mot. for PI on Allocation & Provisional Claims 12, 18-19 (*Senate Factor 8*); Lichtman Rpt. 45-46; Berman Rpt. 20-21. This is illustrated, quite starkly, in the consideration of HB2023. Legislators representing Hispanic, Native-American, and African-American communities repeatedly spoke about the disparate impacts of HB2023, describing in detail how many of their constituents lack access to reliable transportation or a secure outgoing mailbox or to mail service at all. *See supra* at 2-6. The legislators who voted for HB2023 heard this testimony over and over, but dismissed the hardships imposed on these voters as—in the words of the primary sponsor—"not my problem." Ex. 8 at 32:6-7; *see also* Ex. 39 at 5:6-5:10, Ex. 40 at 13:20-14:11. Similarly, several of the bill's proponents repeatedly dismissed these burdens as voters asking to be "babied," Ex. 9 at 81:12-82:1; and abdicating their "responsibility to cast their vote." *Id*; *see also* Ex. 11 at 33:11-34:7; Ex. 9 at 50:16-51:3.

Arizona also has a demonstrated history of racially polarized voting, and politicians have relied and continue to rely on both explicit and subtle appeals to racial prejudice. *See* Mot. for PI on Allocation & Provisional Claims 12, 21-22 (*Senate Factors 2 and 6*); Lichtman Rpt. 29-32, 43-44; Berman Rpt. 16-19. Subtle racial appeals were even a part of the consideration of HB2023 and earlier similar legislation. *See supra* note 3. The effect of this veiled racial animus "is to lessen to some degree the opportunity of [the State's minority populations] to participate effectively in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 40. Given all of this, it is not surprising that the overall rate of Hispanic, Native American and African American electoral success "has been minimal in relation to the percentage of these groups as part of the general

population." *Id.*; *see also* Mot. for PI on Allocation & Provisional Claims 12, 21-22 (*Senate Factor 7*); Lichtman Rpt. 44-45; Berman Rpt. 21.

Finally, the purported justification underlying HB2023 is highly tenuous (*Senate Factor 9*). As discussed at length, despite having pressed for some form of this legislation for years, none of its proponents were able to identify even one concrete example of voter fraud that HB2023 could have guarded against. *See supra* at 6-7. *See also* Lichtman Rpt. 15-19. Lacking actual evidence, proponents resorted to conspiracy theories and rumor, or pivoted, arguing that lack of fraud was unimportant, because the bill was necessary to promote "voter confidence" and "elections integrity," because people believed fraud was occurring or could occur. *See, e.g.*, Ex. 13 at 83:14-18, 125:16-126:1. But this justification is belied by both a similar lack of evidence that there was in fact any widespread public concern in Arizona about the security of the elections system as a result of ballot collection, and by the concerted effort to repeal HB2023's predecessor, HB2305, by referendum, which the majority repealed precisely to avoid a vote of the electorate. *See, e.g.,* Clark Decl. ¶ 8; Fernandez Decl. ¶ 11; Quezada Decl. ¶ 13; Ex. 14 at 25:8-26:11; Ex. 15 (Reagan). It also fails to explain why, if the less strict HB2305 was enacted to do the very same thing, the majority rejected efforts to amend HB2023 to bring it into rough conformity with HB2305, specifically by permitting ballot collection if the collector and voter signed an affidavit, and by reducing the penalty to a misdemeanor. *Compare* HB2305 (2013) *with* HB2023 (2016); *see also* Ex. 8 at 7:6-25:10; Ex. 11  at 21:4-34:15; Clark Decl. ¶ 15; Fernandez Decl. ¶ 16; Quezada Decl. ¶ 21.

### 2.    HB2023 Violates the 14th Amendment (*Anderson/Burdick*)

Plaintiffs are also likely to prevail on their claim that HB2023 (independently and in concert with the other policies, practices and procedures challenged in this action) imposes severe and unjustified burdens on the right to vote in violation of the 14th Amendment. Under the *Anderson/Burdick* balancing test, courts weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against "the precise interests put forward by the State as justifications for

the burden imposed by its rule," considering "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). *See also Burdick v. Takushi*, 504 U.S. 428 (1992). This inquiry is highly fact specific and may not be undertaken by rote. The scrutiny applied depends on the extent of the burden and the nature of the right asserted and, in determining the severity of the burden imposed by a particular measure, the pertinent question is the extent to which it burdens individuals impacted by it. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 201 (2008) (Stevens, J., controlling op.). *See also* Mot. for PI on Allocation & Provisional Claims 24-25 (*Anderson/Burdick* legal standard).

Thus, in this case, the relevant burdens are those imposed on voters who would otherwise have great difficulty in returning their early ballot in time for it to be counted, such as the voters in rural and Native American communities who do not have mail service, as well as those who would exercise their First Amendment right to associate by engaging in ballot collection but for HB2023's making it a felony. Given that the burdens on these individuals are severe, Defendants must proffer sufficiently weighty interests to justify HB2023. As discussed, Defendants' purported interests in preventing voter fraud are entirely unsupported by any concrete evidence, *see supra* at 6-7. Moreover, prior to HB2023's enactment, there were already extensive provisions and safeguards in place to prevent precisely the type of voter fraud that the proponents of the legislation claimed to be addressing. *Supra* at 2, 6; Gallardo Decl. ¶¶ 9, 11. Nor can Defendants plausibly show that, whatever the State's interest, HB2023 is "necessary" to burden the fundamental rights to vote and of free association to this degree. This much is proved by the amendments offered and rejected—each would have reasonably addressed Defendants' purported (though wholly unsubstantiated interests), while reducing the burden imposed by the law in its ultimately enacted form. *See supra* at 7-8.

**3.    HB2023 Violates the 1st and 14th Amendments (Right to Associate)**

Plaintiffs are also likely to succeed on their claim that HB2023 infringes upon the First Amendment associational rights of various groups whose purpose – at least in part –

it is to encourage and facilitate voting through ballot collection. HB2023's criminalization of activity that is a central part of these groups' missions will have a chilling effect on the exercise of their associational rights, a burden that cannot be justified by unsupported claims of fraud or the possibility of future fraud.

While no court has addressed the criminalization of the collection of early ballots such as is the case with HB2023, the Court need not write on a blank slate.  Indeed, it can draw from a series of cases in which Republican-dominated legislatures criminalized or greatly restricted public interest and advocacy groups' efforts to engage in voter registration efforts. Courts confronting this partisan trend have not hesitated to find a First Amendment violation, and there is no principled distinction between criminalizing the collection of voter registration forms and early ballots. Both efforts are aimed at increasing voter participation, especially among minority voters, and broad restrictions or prohibitions on such activity infringe on fundamental rights.

In *Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (D. Ohio 2006), for example, civic organizations challenged changes to Ohio law that, among other things, made it a felony for someone other than the person who registered the voter or the voter herself to submit a voter registration form. The court credited the plaintiffs' claims that the criminalization of their voter registration efforts directly affected speech and associational rights protected by the First Amendment. *Id.* at 700. The court then applied the *Anderson/Burdick* test, and concluded that, imposing the penalty would "severely chill[] participation in the voter registration process." *Id.* at 705.  *See also id.* ("[T]he prospect of being labeled a felon for mere inadvertence, confusion, or innocent mistake weighs heavily upon anyone… an administrative assistant who is asked by his or her superior to handle the return of a voter registration form, or a volunteer … at a senior citizen center who turns over a registration card received from an elderly patient to his or her supervisor because of uncertainty in the procedures for handling patient mail."). Because it found that these burdens were not justified by the state's claims they were necessary to prevent fraud, it enjoined the law. *Id.* at 709; *see also LOWV of Fla. v. Browning*, 575 F. Supp. 2d

1298, 1322 (S.D. Fla. 2008) ("Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity"); *Ass'n of Cmty. Orgs. for Reform Now v. Cox*, No. 1:06-CV-1891-JTC, 2006 WL 6866680, at *7 (N.D. Ga. 2006) (recognizing voter registration deserves "the traditional protection of participation in the political process required by the Constitution").

The principles in *Project Vote* apply with equal force to the facts here. The extreme burden placed on voters and groups that assist them in the exercise of the franchise is not justified by the supposed need to prevent fraud or the possibility of some future fraud.  As discussed, there is no evidence that any such fraud has taken place. At the very least, and as the State Elections Director conceded, HB2023's criminal penalties are not the least restrictive means of preventing fraud or the possibility of fraud; rather mere regulation would have been sufficient to advance the legislation's goals.  Lichtman Rpt. 12. Under these circumstances, the burden on First Amendment rights is "more than slight," and Defendants cannot demonstrate that this burden is "necessary" to address a problem that simply does not exist. *Burdick*, 504 U.S. at 434.

### 4.    HB2023 Violates the 1st and 14th Amendments (Intentional Discrimination/Partisan Fencing)

Plaintiffs are also likely to prove that HB2023 was intended to suppress the vote in violation of the First and Fourteenth Amendments, which prohibit discrimination based on partisan affiliation or viewpoint. *Carrington v. Rash*, 380 U.S. 89, 94 (1965) ("'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible."); *Anderson*, 460 U.S. at 792-93 ("[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status."). The Supreme Court has identified several non-exhaustive factors relevant to a discriminatory purpose analysis: (1) the action's impact and whether it bears more heavily on one group than another; (2) the historical

background; (3) the specific sequence of events leading to the action; (4) departures from normal procedures or substantive conclusions; and (5) relevant legislative or administrative history. *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-68 (1977). Once plaintiffs show a discriminatory purpose motivated the action at least in part, defendants must prove no discriminatory effect, or that the same action would have been undertaken without discriminatory intent. *Id*. at 271 n.21. Plaintiffs prevail if they show any non-discriminatory justifications for the action are pretext. *Id*.

Each of the relevant factors supports finding that HB2023 was intended to discriminate against Democratic voters. *First*, the impact of HB2023 bears more heavily on Arizona's minority voters than its white voters. *See supra* at 3-4, 8-11. Not incidentally, it also bears more heavily on Arizona's Democratic voters than its Republican voters. Clark Decl. ¶ 11, Quezada Decl. ¶ 18; R. Gallego Decl. ¶ 15. Indeed, "minorities as compared to whites are much more likely to back Democratic rather than Republican candidates in Arizona." Lichtman Rpt. 4. *Second*, procedural and substantive deviations marked the background, and enactment of, HB2023. When its predecessor bill HB2305 was introduced in 2013, it was in the waning hours of the legislative session, with little time for consideration and debate. *Id.* at 9; Ex. 15 (describing HB2305 as "a last-minute compilation of several controversial elections measures that lawmakers approved on party-lines in the final hours of the 2013 legislative session). Once enacted, HB2305 was the target of a concerted citizen referendum effort, which gathered over 140,000 petition signatures, more than enough to place HB2305 on the ballot for a vote. Lichtman Rpt. 6. But the bill's proponents repealed their own legislation, mooting referendum, so that they could attempt to re-enact "a la carte." Ex. 15. When the legislation was reintroduced in 2016 as HB2023, the Legislature *increased* the penalty from a misdemeanor to a felony. Lichtman Rpt. 11-12 (noting this change alone is significant; a felony conviction results in the loss of fundamental civil rights, including the right to vote). The substantive restrictions in HB2023 were stricter and the majority rejected amendments that would have brought HB2023 more in line with HB2305. *See*

*supra* at 4, 7. HB2023 was enacted along party lines and garnered strong opposition from Democrats, who believe it was an attempt to suppress Democratic votes. Lichtman Rpt. 10-11. Direct evidence shows that HB2023 was intended to suppress Democratic voters. *See* Lichtman Rpt. 12-15 (SOS CPAC speech and Director of Elections description of HB2023 as "a political imperative among the majority of both houses"); *id.* at 9-10 (predecessor bill promoted as necessary to boost Republican chances in elections).

Finally, HB2023's proponents' claims that the bill was necessary to combat voter fraud are clearly pretextual. As discussed at length above, there is no evidence that any such fraud exists. *See supra* at 6-7; Lichtman Rpt. 15-19. And even the SOS's Elections Director acknowledged that criminalizing ballot collection was not necessary to attain the proponents' purported goals. Ex. 39 at 5:6-5:10; *see Arlington Heights*, 429 U.S. at 267 (departures are considered "[s]ubstantive . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."). Also plainly pretextual are the claims that HB2023 is necessary to promote voter confidence, or to conform Arizona with other states' practice. Lichtman Rpt. 19-21.

**B.    Plaintiffs Will Suffer Irreparable Harm Absent An Injunction**

Absent an injunction, HB2023 will cause Plaintiffs, their members and constituents, and thousands of other citizens irreparable harm, by imposing severe burdens on, and in some cases entirely denying, their fundamental right to vote, as well as by chilling their protected First Amendment right to associate. As discussed, thousands of Arizona's voters, including in particular voters centrally within the organizational and campaign Plaintiffs' core constituencies, *see, e.g.*, Healy Decl. ¶ 4, have come to rely on ballot collection to exercise their fundamental right to vote. Without it, they will suffer unjustified burdens on that right, with some being disenfranchised altogether. *See, e.g.*, Anderson Decl. ¶¶ 5, 9, 11-14; Gillespie Decl. ¶¶ 6, 10, 12-14; Pstross Decl. ¶ 6, 8, 10-11; Friend Decl. ¶¶ 13-14; Larios Decl. ¶ 12; Chapman Decl. ¶¶ 11-12; Quezada Decl. ¶¶ 12, 23-24; Clark Decl. ¶¶ 14, 16; K. Gallego Decl. ¶ 14; Fernandez Decl. ¶¶ 13, 15, 17; R. Gallego Decl. ¶ 16; Danley Decl. ¶ 8. Further, individuals and organizations that would

engage in ballot collection but for HB2023, suffer injury to their First Amendment right to associate. Courts have uniformly recognized that restrictions on the right to vote and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute[] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.). *See also* Mot. for PI on Allocation & Provisional Claims 28.

**C.    The Balance Of The Equities Tips Sharply In Plaintiffs' Favor**

Based on responses to public records requests as of the date that this motion was filed, no County has made plans to either educate its residents on HB2023's new restrictions, or to enforce them. *See generally* Gonski Decl. Nor has the SOS updated its Manual, leaving the counties without any direction as to how to apply it. Ex. 7. And there is no evidence that any kind of voter fraud that HB2023 could potentially prevent is occurring at all, much less in numbers significant enough to outweigh the substantial burdens that the law imposes on the fundamental right to vote of thousands of Arizona's citizens, as well as on the First Amendment right to associate. Thus, the balance of the equities also tips strongly in favor of enjoining HB2023.

**D.    The Public Interest Favors The Issuance Of A Preliminary Injunction**

"It is in the public interest to enjoin laws that violate constitutional rights," *United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1217 (D. Ariz. 2013), particularly "the fundamental political right to vote." *LOWV*, 769 F.3d at 248 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). Moreover, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). As discussed at length, not only will HB2023 severely burden and in some cases deny the fundamental right to vote of thousands of citizens, it was enacted with the intent of suppressing the vote in violation of the First Amendment. The public interest, accordingly, also strongly favors enjoining HB2023.

**III.    CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully submit that the Court enjoin the implementation of HB2023 pending final judgment in this litigation.

1

2    Dated:  June 10, 2016                              *s/ Daniel C. Barr*
                                                     Daniel C. Barr (# 010149)
3                                                    Sarah R. Gonski (# 032567)
                                                     PERKINS COIE LLP
4                                                    2901 North Central Avenue, Suite 2000
                                                     Phoenix, Arizona  85012-2788

5                                                    Marc E. Elias (WDC# 442007)*
                                                     Bruce V. Spiva (WDC# 443754)*
6                                                    Elisabeth C. Frost (WDC# 1007632)*
                                                     Amanda R. Callais (WDC# 1021944)*
7                                                    700 Thirteenth Street N.W., Suite 600
                                                     Washington, D.C. 20005-3960
8                                                    Telephone: (202) 654-6200
                                                     Facsimile: (202) 654-6211
9                                                    MElias@perkinscoie.com
                                                     BSpiva@perkinscoie.com
10                                                   EFrost@perkinscoie.com
                                                     ACallais@perkinscoie.com
11
                                                     *Attorneys for Leslie Feldman; Luz*
12                                                   *Magallanes; Mercedez Hymes; Julio*
                                                     *Morera; Cleo Ovalle; Former Chairman*
13                                                   *and First President of the Navajo Nation*
                                                     *Peterson Zah; Democratic National*
14                                                   *Committee; DSCC a.k.a. Democratic*
                                                     *Senatorial Campaign Committee; Arizona*
15                                                   *Democratic Party, Kirkpatrick for Senate;*
                                                     *and Hillary for America*
16
                                                     Roopali H. Desai (# 024295)
17                                                   Andrew S. Gordon (# 003660)
                                                     D. Andrew Gaona (# 028414)
18                                                   COPPERSMITH BROCKELMAN PLC
                                                     2800 N. Central Ave., Suite 1200
19                                                   Phoenix, AZ 85004

20                                                   Malcolm Seymour*
                                                     GARVEY SCHUBERT BAKER
21                                                   100 Wall Street, 20th Floor
                                                     New York, New York 10005-3708
22                                                   Telephone: (212) 965-4533
                                                     mseymour@gsblaw.com
23
                                                     *Attorneys for Intervenor-Plaintiff*
24                                                   *Bernie 2016, Inc.*

25                                                   *Admitted pro hac vice

26

27

28

1

**CERTIFICATE OF SERVICE**

2     I hereby certify that on June 10, 2016, I electronically transmitted the attached

3 document to the Clerk's Office using the CM/ECF System for filing and a Notice of

4 Electronic Filing was transmitted to counsel of record.

5

6                                   s/ *Daniel R. Graziano*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28