**Leslie Feldman, et al v. Arizona Secretary of State's Office, et al.**

**EXHIBITS TO DECLARATION OF ELISABETH C. FROST
IN SUPPORT OF PLAINTIFFS' JOINT MOTIONS FOR
PRELIMINARY INJUNCTION**

**INDEX**

| | |
|---|---|
| Exhibit 1 | Expert Report of Dr. David R. Berman, dated June 6, 2016 |
| Exhibit 2 | Expert Report of Alan Lichtman, dated June 10, 2016 |
| Exhibit 3 | Expert Report of Jonathan Rodden, dated June 10, 2016 |
| Exhibit 4 | Expert Report of Dr. Muer Yang, dated June 10, 2016 |
| Exhibit 5 | Excerpts from a Maricopa County Elections Department PowerPoint Presentation titled "Early Voting 2008: PEVL.<UOCAVA< & SEB Review" |
| Exhibit 6 | Excerpts from a PowerPoint presentation by the Maricopa County Recorder's Office and Elections Department titled "2014 General Election Review" |
| Exhibit 7 | Excerpts from the Arizona Office of Secretary of State's *State of Arizona Elections Procedures Manual: Setting the Course, Providing Direction*, revised June 2014 |
| Exhibit 8 | Excerpts from a transcript of House Floor Session Part 2, of the Arizona State House of Representatives 52nd Legislature, the Committee of the Whole #1, dated February 04, 2016 |
| Exhibit 9 | Excerpts from a transcript of the Arizona State Senate 52nd Legislature, the Committee on Government, dated February 24, 2016 |
| Exhibit 10 | Excerpts from a transcript of the Senate Floor Session Part 3 of the Arizona State Senate 52nd Legislature, Third Reading #2, dated March 9, 2016 |
| Exhibit 11 | Excerpts from a transcript of the Senate Floor Session Part 1 of the Arizona State Senate 52nd Legislature, Committee of the Whole, dated March 9, 2016 |
| Exhibit 12 | Census data from the from the www.census.gov webpage titled "Quick Facts: San Luis City, Arizona" |
| Exhibit 13 | Excerpts from a transcript of the Arizona State House of Representatives 52nd Legislature, House Elections Committee, dated January 25, 2016 |

| Exhibit 14 | Excerpts from a transcript of House Floor Session Part 3 of the Arizona State House of Representatives 52nd Legislature; Third Reading #1 Calendar, dated February 4, 2016 |
|---|---|
| Exhibit 15 | Article by Hank Stephenson and Ben Giles on the azcapitoltimes.com website titled "Legislators consider preemptive repeal of controversial election bill," dated January 15, 2014 |
| Exhibit 16 | Article from the americanprogress.org website by Joshua Field, Charles Posner, and Anna Chu titled "Uncounted Votes: The Racially Discriminatory Effects of Provisional Ballot, dated October 2014. |
| Exhibit 17 | Video Posted on YouTube by Bette C. Ross titled "Do you need any more evidence, Terry," posted October 22, 2014 |
| Exhibit 18 | Page from the azleg.gov website titled "House of Representatives HB 2023: Overview" |
| Exhibit 19 | Proposed Amendment to HB 2023, dated February 23, 2016 |
| Exhibit 20 | Page from the azleg.gov website titled "Bill Status Votes for HB 2023 - Third Reading" |
| Exhibit 21 | Article posted on the AZCentral.com website, by Rob O'Dell titled "Despite progress in Arizona, early ballots again delay vote count," dated December 1, 2014 |
| Exhibit 22 | Excerpts from a transcript of the Maricopa County Board of Supervisors Meeting regarding Items 11 and 12 - Elections, dated February 17, 2016 |
| Exhibit 23 | Letter from Phoenix Mayor Greg Stanton to Loretta Lynch (U.S. Department of Justice), dated March 23, 2016 |
| Exhibit 24 | Excerpts from a transcript of the Maricopa County Board of Supervisors Special Meeting, dated March 30, 2016. |
| Exhibit 25 | Excel spreadsheet titled "QB Exhibit 20 2016 PPE Closing Time Sorted to Times (Exhibit 20 to the response letter from Helen Purcell to Mr. Herren, dated April 22, 2016) |
| Exhibit 26 | Article posted on the AzCentral.com website, by Rob O'Dell and Caitlin McGlade titled "Map: Areas hardest hit by slim polling options," dated March 28, 2016 |
| Exhibit 27 | Excerpts of transcript of public hearing before the Arizona House of Representatives Elections Committee, dated March 28, 2016 |

| Exhibit 28 | Screenshot of a Tweet by Helen Purcell, dated March 31, 2016 |
|---|---|
| Exhibit 29 | Article by the Arizona Advocacy Foundation, One Arizona and the Inter Tribal Council of Arizona titled "Arizona Shelby Response Project: Modernizing Elections and Maximizing Voter Participation," dated March 31, 2015 |
| Exhibit 30 | Article from Arizona Center for Investigative Reporting website by Brandon Quester titled "Rejected ballots document continued problems in Arizona's elections" |
| Exhibit 31 | Policy paper by the American Civil Liberties Union titled "Uncounted Votes: How Arizona law impacts provisional ballots, dated September 2010 |
| Exhibit 32 | AzCentral.com article by Elvia Diaz titled "Maricopa County election officials writing off voters? You bet," dated March 23, 2016 |
| Exhibit 33 | PowerPoint presentation to Arizona House of Representatives by Helen Purcell and Jennifer Marson titled "2016 Presidential Preference Election," dated March 28, 2016 |
| Exhibit 34 | Excerpts from a PowerPoint presentation at a Community Network Meeting by Maricopa County Elections Department, dated January 30, 2013 |
| Exhibit 35 | Email from Elizabeth Bartholomew to Yvonne Wingett, dated March 23, 2016 |
| Exhibit 36 | Article posted on the AzCentral.com website, by Mary Jo Pitzl titled "Oops! They did it again: County errs on Spanish-language ballot," dated April 22, 2016 |
| Exhibit 37 | Article posted on the AzCentral.com website, by Michelle Ye Hee Lee titled "More Maricopa County election materials have errors," dated October 24, 2012 |
| Exhibit 38 | Article posted on the AzCentral.com website, by Anne Ryman, Rob O'Dell and Ricardo Cano titled "Arizona primary: Maricopa County had one polling site for every 21,000 voters," dated April 22, 2016 |
| Exhibit 39 | Excerpts of a transcript of Voting Rights Forum at Arizona State University titled "Voting: Protecting our Fundamental Right," dated April 21, 2016 |
| Exhibit 40 | Excerpts from a transcript of a presentation at the Arizona State Bar Learning Center titled "Arizona Election Law: The Most Comprehensive Review of Arizona Election Law," dated April 22, 2016 |

# EXHIBIT 1

United States District Court for the District of Arizona

*Feldman, et al. v. Arizona Secretary of State's Office, et al.*

Case No. 16-01065-PHX-DLR

**Expert Report**

**Dr. David R. Berman**

**Arizona State University**

**5932 West Gary Drive**
**Chandler, AZ 85226**

*David Robert Berman*
_____
**David R. Berman, Ph.D.**

6-8-16
_____
**Date**

**TABLE OF CONTENTS**

**Page**

I.  STATEMENT OF PURPOSE ........................................................................ 1

II.  SUMMARY OF OPINIONS ......................................................................... 1

III.  BACKGROUND AND QUALIFICATIONS ................................................ 1

IV.  SOURCES ...................................................................................................... 2

V.  DISCUSSION ................................................................................................ 3

      A.  Overview ............................................................................................ 3

      B.  Early Patterns and Problems ........................................................... 3

      C.  Culture, and Politics, and Race ...................................................... 8

      D.  The Literacy Test .............................................................................. 10

      E.  Discrimination and Intimidation in the 1960s ............................. 13

      F.  Native American Voting ................................................................... 15

      G.  General Developments Since the 1970s .......................................... 16

      H.  The Voting Rights Act, Preclearance, and the Future ........................................ 20

VI.  CONCLUSION .............................................................................................. 22

## I.   STATEMENT OF PURPOSE

I have been retained by plaintiffs in *Feldman, et al. v. Arizona Secretary of State, et al.*, Civil Action No. 16-01065-PHX-DLR, to prepare a report on the history of racial discrimination in Arizona in regard to Hispanics, Native Americans, and African Americans generally, and specifically in regard to voting practices. I am being compensated for my work in this matter at a rate of $175 per hour.

## II.   SUMMARY OF OPINIONS

Based on five decades of my own research, writing and teaching in the area of Arizona political history, the nature of Arizona's governmental system, and policy problems facing the State, and a review of the work of other academics and of public documents and archival information, it is my opinion that:

- Arizona has a long history  of discrimination when it comes to the voting rights of Native Americans, Hispanics, and African Americans;

- This discrimination has been reflected in voting requirements, the management of elections, efforts to intimidate voters, and racial appeals, both subtle and overt, during campaigns;

- Discrimination in voting has also been part of a more general pattern of political, social, and economic discrimination against minority groups which has been reflected in other policy areas such as school segregation, educational funding and programming, equal pay and the right to work, as well as immigration;

- Discrimination, though more marked in some periods than others, has been a continuous problem throughout the State's history;

- The policies and practices challenged in this suit are the latest chapter in this continuing story.

## III.   BACKGROUND AND QUALIFICATIONS

I am a Professor Emeritus of Political Science and a Senior Research Fellow at the Morrison Institute for Public Policy at Arizona State University. As a political science professor I have taught undergraduate survey courses in American Government and Politics, State and Local politics, and Arizona government and politics as well as more specialized courses, including undergraduate seminars on Arizona politics where students interacted with state and local office holders and political participants. I have also taught advanced graduate courses focusing on research methods in these areas.

As a Senior Research fellow with the Morrison Institute, I specialize in research and writing on governance and election issues in the State, including redistricting, direct democracy and campaign finance. I have been a professor at Arizona State University since 1966. My

previous work experience was as a Research Associate at the National League of Cities in Washington, D.C. from 1964-66.

I have authored ten books and over 70 published papers, book chapters, or refereed articles dealing with state and local government, politics, and public policy. My work includes several political history books and refereed journal articles on Mountain States and Arizona in particular, many of which discuss the history of racial discrimination, access to the ballot, and the development of democracy in these states. These books include, among others: *Reformers, Corporations and the Electorate: An Analysis of Arizona's Age of Reform* (University Press of Colorado, 1992); *Arizona Politics and Government: The Quest for Autonomy, Democracy, and Development* (University of Nebraska Press, 1998); *Politics, Labor, and the War on Big Business, The Path of Reform in Arizona*, 1890-1920 (University Press of Colorado, 2012); and *George Hunt, Arizona's Crusading Seven-Term Governor*, (University of Arizona Press, 2015).

I hold a bachelor's degree from Rockford College (now Rockford University) in Rockford, Illinois, and a master's degree and a doctorate in government from American University in Washington, D.C. My work has been funded by contracts with the International City/County Management Association, the National Conference of State Legislatures, and by several research grants, including grants from the United States Information Agency, the Kellogg Foundation, Salt River Pima-Maricopa Indian Community, and the National Endowment for the Humanities. My professional service includes membership on the executive committee of the Federalism and Intergovernmental Relations Section of the American Political Science Association and the Intergovernmental Administration and Management section of the American Society for Public Administration. This is my first time serving as an expert in a litigation.

## IV.    SOURCES

This report draws largely upon my prior books and journal articles, which were created from exhaustive research into primary and secondary sources regarding Arizona's history. Since the late 1970s, I have spent a great deal of time looking through collections, newspapers, official documents, voting returns, census data, and other primary sources in archives across Arizona and several other states to develop a thorough understanding of and expertise in the various political influences and participants in the State as well as Arizona's social and economic conditions that help explain its political development. The various source materials that I have collected are outlined extensively in the bibliographies of those books, which are listed in my *curriculum vitae*, located at Appendix A.

In particular, the instant report draws heavily upon my book *Arizona Politics and Government* which covers events in Arizona's social and political history up to the late 1990s. I have also drawn from the following articles and books to cover topics such as the State Constitution, the history of the Ku Klux Klan in Arizona, and Native American voting rights: *Arizona's Crusading Seven-Term Governor* (Tucson, AZ: University of Arizona Press, 2015); *Politics, Labor, and the War on Big Business* (Boulder, Colorado: University Press of Colorado, 2012); Minority Representation, Resistance, and Public Policy: The Navajos and the Counties," *Publius : The Journal of Federalism* 28, Fall, 1998: 83-104.

For subjects that I had not previously covered or recently covered, I reviewed archival papers and collections, contemporary newspapers, public documents, and appropriate secondary sources in an effort to pull together the best and most reliable information available to me. These sources are cited herein as appropriate.

All of the sources upon which I have relied in preparing this report are the kinds of sources that are regularly and ordinarily relied upon by political scientists and historians conducting work of this kind and, indeed, are of the sort that I regularly and ordinarily rely upon in my work.

## V.     DISCUSSION

### A.     Overview

The purpose of this discussion is to place the above-referenced lawsuit in context by offering historical material regarding discrimination against Native Americans, Hispanics and African Americans in Arizona, primarily as it relates to voting.

This report begins by looking at the different strata of cultures—Native Americans, Hispanics, and Anglos—in Arizona and the general status of these minority groups, plus African Americans, in Arizona's early development as a territory and state. It then offers an overview of how the problems of race were related to the State's cultural development and political trends over the years. This discussion is followed by a focus on the development and implementation of the literacy test, the principal legal tool used to limit the participation of minorities in Arizona elections from its inception until the 1970s; general problems related to race in Arizona elections, including voter intimidation in the 1960s; and the special problems Native Americans have faced in acquiring and using the vote. The report concludes with observations on developments since the 1970s, the impact of the Voting Rights Act on Arizona, and a reflection on what the future might hold for minorities in Arizona.

### B.     Early Patterns and Problems

What is now the state of Arizona was created out of the spoils of the Mexican-American War, which was ended by the Treaty of Guadalupe in 1848, as well as out of territory acquired by the United States in 1854 through the Gadsden Purchase. "Arizona" existed as part of the United States' New Mexico Territory from 1850 to 1863 and as an independent territory of the United States from 1863 to 1912.

Arizona has had a stratum of cultures: an initial base established by Native Americans, which is overlain with a Hispanic strata which, in turn, is topped by an Anglo strata.[1] The Native Americans are the first Arizonans and have a unique history as indigenous settlers. They are thought to have made their way to America from Asia by the way of the Bering Straits at some unknown point in time.

---

[1] Beth Luey & Noel J. Stowe, *Introduction*, to <u>Arizona at Seventy-Five</u> 1-10 (Tempe, AZ: Arizona State University Public History Program and the Arizona Historical Society, 1987).

The Hispanic influence came in the sixteenth century, with the arrival of Spanish explorers, missionaries, soldiers, and settlers in the territory which was then a part of Mexico. Following the Spanish conquest of Mexico in 1521, Arizona became a small and remote part of the Spanish empire until Mexico gained independence from Spain in 1822. After the conclusion of the Mexican-American War, the United States government conferred citizenship on some 100,000 Hispanics living in Arizona at the time. The two countries signed treaties, i.e., Treaty of Guadalupe, to protect the civil and property rights of these Hispanic citizens; however, some scholars have noted these promises have largely been unfulfilled. As a consequence: "Within a generation the Mexican Americans who had been under the ostensible protection of the treaty became a disenfranchised, poverty-stricken minority."[2]

Anglo Americans began moving to Arizona in the 1850s, with the influx of Anglos increasing considerably after the Civil War. These migrants were often from rural areas of the United States and traveled to Arizona to seek out a better life. Once there they commonly engaged in mining, ranching, or farming activities. Their numbers steadily increased so that even before 1900, Anglo-Americans outnumbered Hispanic Americans in the territory.[3]

Settlers from the Eastern and Midwestern U.S. tended to relocate to northern Arizona while those from the South located in the southern part of the state, particularly Tucson. Many European-born workers attracted to mining areas coexisted with these settlers. England, Ireland, and Germany were the leading sources of European immigration. European-born migrants made up about 14 percent of the population in 1880. The percentage fell steadily to about 9 percent in 1900, largely because of an increase in the number of native-born Arizonans and in the number of migrants from other parts of the United States.

Early territorial politicians acted on the belief that it was the "manifest destiny" of the Anglos to triumph in Arizona over the earlier Native American and Hispanic civilizations.[4] With population growth, Anglos, if anything, became more outspokenly hostile and exclusionary in their attitudes toward minorities.[5]

From the point of view of the early Anglo settlers, the "Indian problem" was the most pressing problem they faced. As territorial officials discovered upon their arrival in Arizona, Indian attacks were utmost in the minds of the settlers. One official noted shortly after coming to

---

[2] Richard Griswold Del Castillo, The Treaty of Guadalupe Hidalgo: A Legacy of Conflict 86 (Norman, OK: University of Oklahoma Press, 1990).

[3] Rufus Kay Wyllys, Arizona: The History of a Frontier State 213 (Phoenix, AZ: Hobson and Herr, 1950).

[4] Jay J. Wagoner, Arizona Territory 1863-1912, A Political History 76 (Tucson, AZ: University of Arizona Press, 1970).

[5] See Robert Kim Nimmons, Arizonans Forgotten Past: The Negro in Arizona, 89, 118 (Masters' Thesis, Northern Arizona University, 1971).

the territory that "a miner seems to regard an Indian as he would a rattle snake."[6] The territory's first governor told the legislature in 1864 that the Apache "is a murderer by hereditary descent." But for the Apache, the governor maintained, "mines would be worked, innumerable sheep and cattle would cover these plains, and some of the bravest and most energetic men that were ever the pioneers of a new country, and who now fill bloody and unmarked graves would be living to see their brightest anticipations realized."[7]

The 1850s to the 1880s brought depredations by Native Americans, especially the Apaches, on white settlers, and blood thirsty efforts by whites to either exterminate the Native Americans or confine them to reservations. Out of this rage came the infamous Camp Grant Massacre in 1871—a brutal murder of over 100 Apaches, most of whom were women and children, by a group organized by a white man living in Arizona named William S. Oury. Whites won out after a series of brutal battles. By the late 1880s and the end of these Indian wars, the realities of life for Native Americans in Arizona were confinement to reservations, a continuous loss of resources (water, land, minerals) to settlers, poverty, and pressure to abandon their traditional cultures.[8]

Although Hispanics in the territory's early period commonly held prominent roles in public and political life, as migration continued they were overwhelmed by a flood of Anglo-American and European immigrants.[9] While a small group of Hispanics continued to prosper, particularly those Hispanics belonging to merchant families and business leaders who were well established in cities such as Tucson, most Hispanics toiled as laborers who made less than Anglos even though they performed the same work.[10] The underlying dynamics in Arizona were the same as they were in Texas, California, and New Mexico:

> Everyplace where Anglos became the majority or where they assumed economic dominance, political and social control followed. Because of their different ethnic and cultural background, Mexican Americans found it difficult to receive acceptance or fair treatment in a society that had little tolerance for

---

[6] John Nicholson, *Letter 4, Fort Whipple, February 6, 1864*, in The Arizona of Joseph Platt Allyn 70 (Tucson: University of Arizona Press, 1974).

[7] George C. Kelly, Legislative History: Arizona 1864-1912 9 (Phoenix, AZ: Manufacturing Stationers, Inc. 1926)

[8] Robert Trennert & Noel Stowe, *From the Frontier to the Future*, in Culture and Values in Arizona Life 7-18, 9 (John Stuart Hall & Lawrence D. Mankin eds., Arizona Town Hall, 1987).

[9] Manuel P. Servin, An Awakened Minority: The Mexican-Americans 28-29 (Beverly Hills, CA: Glencoe Press, 2nd ed. 1974).

[10] *See* Trennert & Stowe *supra* note 8.

people of Latin American extraction, and particularly those whose racial make-up included Indian or African blood.[11]

Many Hispanics found themselves employed by mining companies and living in company towns—places where virtually everything – the homes, hospitals, stores—were owned by the mining company. It was common practice for mining companies to pay their employees, most of whom were Mexican, with tokens or checks redeemable only in high-priced company owned stores. Likewise, most mining companies instituted a dual wage system, under which Mexican workers were paid much less than Euro-Americans of comparable skill levels and for doing comparable work. Still many Hispanics needed these jobs and, in this regard, had to worry about losing them because of a strong effort waged by Anglo dominated mining unions for laws requiring that individuals who worked in mines to speak English or that 80 percent of such workers be citizens.

Racism was further reflected in other incidents during that time. One of these incidents, which received considerable national attention at the time, occurred in 1904 when a Catholic priest assigned to the Arizona mining towns of Clifton and Morenci made arrangements with the New York Foundling Hospital to place forty orphaned white children in the homes of some of his Mexican-American parishioners. Within three days of their arrival, Anglo citizens in the community, revolted by the thought of white children being raised by Mexican Americans, formed a vigilante committee, threatened to lynch the priest, drove him out of town, and forcibly took the children away from their Mexican-American foster parents and reassigned them to Anglo families. No criminal charges were ever filed against the vigilantes and the territorial supreme court concluded that the actions taken were in the best interest of the children and that the orphans who were caught up in the action could legally stay with the white families in Arizona who adopted them.[12]

Around the same time as the foundling episode, Arizonans were obsessed with a proposal made in Congress to reunite Arizona and New Mexico and enter the two into the Union as one state. New Mexico had the larger population, and had a large number of Hispanics and Republicans. Arizona politicians warned that the Spanish-speaking population of New Mexico would dominate the new state. Some publically shuddered at the thought of mixing "a pure American strain" with Spanish stock or, as some put it, the "greasers." When the time came in 1906 to vote on joint statehood, the idea was rejected by 84 percent of the Arizona voters.[13]

---

[11] Oscar J. Martinez, "Hispanics in Arizona," in Beth Luey & Noel J. Stowe, <u>Arizona at Seventy-Five</u> 88-89 (Tempe, AZ: Arizona State University Public History Program and the Arizona Historical Society, 1987).

[12] *Orphans Stay in Arizona*, The Arizona Republican, Jan. 22, 1905; *see also* Anthony B. Brophy, <u>Foundlings on the Frontier</u> (Tucson: University of Arizona Press, 1972).

[13] David R. Berman, <u>Reformers, Corporations, and the Electorate: An Analysis of Arizona's Age of Reform</u> 50-51 (Boulder, Colo.: University Press of Colorado, 1992).

Arizona convened its first and only constitutional convention on October 10, 1910 in Phoenix. All of the delegates to the convention were Anglo males, except one Mexican-born male merchant, a conservative Republican from Pima County. By comparison, Hispanics had eight of the 48 seats at the 1849 California constitutional convention and constituted about one-third of the delegates at the 1910 New Mexico constitutional convention. The Hispanic influence is evident in the constitutions of California and New Mexico where one finds, for example, a provision requiring that all state laws be published in Spanish in California's 1849 constitution, and a provision in New Mexico's 1910 constitution requiring the legislature to raise funds for teachers to be trained for instruction in Spanish. In contrast, the Arizona delegates showed little concern for the culture of the large segment of the population of Mexican ancestry in drafting their constitution and even gave serious consideration to provisions restricting the ability of aliens to fill mining and other jobs.[14]

African Americans began showing up in small numbers in the early 1860s.[15] Though less prevalent than Native Americans and Hispanics in Arizona, they were also singled out for discrimination. For example, exclusionary sentiments in the territorial legislature in 1909 led to the passage of the Hampton Education Qualification Bill, which required the separation of "students of the African race" when "a majority of a school districts residents desire such separation."[16] This act passed over the veto and strong objections of Governor Joseph Kibbey, who had been called on by a delegation of African-American citizens to veto the bill.[17] Legislators apparently voted on the basis of long standing viewpoints about race. At the time, African Americans constituted less than two percent of the territory's population.[18]

Likewise, the delegates to the state's constitutional convention came close to approving a provision requiring racial segregation in the schools. This proposal failed on a tie vote, in part, because the delegates felt that separate schools would be too expensive. After Arizona became a state in 1912, however, the first state legislature adopted a school segregation bill that separated African-American children from white children. Writing to Carl Hayden who represented Arizona in the U.S. House of Representatives, state house member Leon Jacobs noted with apparent pride: "I submitted an amendment to the educational bill, making it compulsory to

---

[14] University of Arizona, Arizona's Hispanic Perspective 100-101 38th Arizona Town Hall, (Phoenix, AZ: The Arizona Academy, 1981).

[15] Richard E. Harris, The First 100 Years: A History of Arizona Blacks (Apache Junction, AZ: Relmo Publishers, 1983.

[16] David R. Berman, Politics, Labor, and the War on Big Business 99 (Boulder, Colorado: University Press of Colorado 2012).

[17] Kibbey May Veto Segregation Bill, Arizona Silver Belt, March 14, 1909; Many Bills Sent To The Governor, Tombstone Epitaph, March 14, 1909.

[18] Mary E. Gill & John S. Goff, Joseph Kibbey and School Segregation in Arizona, J. of Ariz. History, Spring 1980, at 411-422.

segregate the skunks in the schools and . . . we put it over. Hoorah for Dixie."[19]One legislator publically called another legislator a "nigger lover" for his opposition to the bill.[20]

This segregation law was even harsher than the 1909 Hampton Education Qualification Bill adopted by the territorial legislature. Under the old law, segregation was optional for local school boards if there were eight or more African-American school-aged children in a district. Under the new law, there was no option—districts had to provide separate schools even if there was but one African-American student. In Bisbee, a separate school had to be provided for the eight African-American children between the ages of 5 and 14 attending school there.[21] School segregation remained a fact of life for black school children to the mid-1950s.

### C.    Culture, and Politics, and Race

As noted *supra*, following the Civil War, many former Confederate soldiers and displaced southerners came to Arizona further shaping the culture of the state. In recounting the history of Arizona's settlement, territorial Governor Myron H. McCord noted in 1897: "It was chiefly from these classes that the early settlers of the Territory were composed. They were worthy and enterprising people inured to hardships, skilled in the use of arms, and did much to subdue the hostile Indians and pave the way for peaceful pursuits of those who were to come after them."[22]

One well-known scholarly work that outlines patterns of political culture in this country makes much of the migration of southerners into Arizona during its formative period. According to Daniel J. Elazar, the influx of southerners gave the state a dominant traditionalistic culture.[23] In this type of culture a small group of privileged people, because of their social or economic standing, takes a prominent role in government and exercises authority in a somewhat paternalistic manner. Government functions essentially to maintain the existing social order. The traditionalistic culture developed with the settlement of southern states and a cotton-plantation-centered economy.

Arizona has shown these traditionalistic roots in its policymaking system in which a small group of influential insiders, including private citizens representing the economic elite,

---

[19] Letter from Leon Jacobs, member of Arizona House of Representatives to Carl Hayden member of U.S. House of representatives from Arizona (April 24, 1912), (in Hayden Papers on file with the Arizona State University).

[20] *Legislative Proceedings*, Weekly Journal Miner, May 12, 1912.

[21] *Bisbee School Anticipated Law*, Bisbee Daily Review, June 28, 1912.

[22] Myron H. McCord, *Report of the Governor of Arizona to the Secretary of the Interior* 8 (Washington, D.C. Government Printing Office,1897).

[23] Daniel J. Elazar, American Federalism: A View From the States (New York, NY: Harper and Row, 3rd, edition, 1984); *see also* John Kincaid, Political Culture, Public Policy, and the American States (Philadephia, ISHI Press, 1982).

have often hammered out legislation behind closed doors. This is also manifested historically through low levels of participation in Arizona's elections. Arizona's traditionalistic culture may also help account for the tendency of the state over much of its history to rank relatively low on social spending, business regulation, and the protection of the rights of minorities.

From roughly 1910 to the entry of the United States into the First World War in 1917 Arizona had a dynamic period of Populist/Progressive reform headed by Democrat George W.P. Hunt, the state's first governor. The reform movement, however, did little to improve the lot of minorities.[24] Native Americans were excluded from participation in public life, including the electoral system. Unlike today, Hispanics and African Americans tended to be Republicans.[25] Despite their number (especially of Hispanic citizens), their party struggled to win elections. Meanwhile, places like Phoenix were not known for their racial tolerance. For example, the city directory of 1920 advertised Phoenix as "a modern town of 40,000 people, and the best kind of people too. A very small percentage of Mexicans, negroes or foreigners."[26]

The 1920s was a decade in which the Ku Klux Klan ("KKK" or "Klan") made a considerable amount of noise in Arizona. The KKK first surfaced in the early 1920s in Phoenix and Tucson and spread to outlying areas. Members typically included prominent politicians (including the mayor of Phoenix at one point), businessmen, newspaper owners and editors, and clergymen. The KKK put much of its effort into anti-Catholic activity, though Jews and Mormons were not neglected, and directed verbal attacks and sometimes violence against racial minorities, especially African Americans.[27]

--------

[24] Berman *supra* note 16.

[25] The tendency of Hispanics and African Americans to vote Republican from the Civil War period reflected, in part, appreciation of that party's concern with civil rights (it was the party of Lincoln, the "Great Emancipator") and the welfare of minorities. Hispanic leaders in Arizona were especially appreciative of Territorial Governor Republican A. P. K. Safford's attempts to improve the educational opportunities for Arizona's Spanish speaking population. Also involved was the perception on the part of Hispanics that the Republican Party was closer to employers and, thus, the party more likely to provide jobs to minority workers. In the 1890s, in Arizona, as in New Mexico, economically prominent Hispanic employers accepted the tenets of the Republican Party and as patrons were able to influence large numbers of Hispanics to vote that way. The tendency of Hispanics to vote Republican began to slowly reverse in the early 1900s but it was not until 1915 and the strong effort made by Democratic Governor George Hunt to defend their rights as workers that they had a major Democratic candidate in which they had confidence. *See* Berman *supra* note 13.

[26] Mary Melcher, *Blacks and Whites Together, Interracial Leadership in the Phoenix Civil Rights Movement*, 32 J. of Ariz. History, Summer, 1991 at 196.

[27] Sue Abbey, *The Ku Klux Klan in Arizona, 1921-1925* 14 J. of Ariz. History 10 (1973); On Phoenix *see* Bradford Luckingham, <u>Minorities in Phoenix</u> 141-142 (Tucson, AZ: The University of Arizona Press, 1994).

Klan members also participated in politics, securing the recall of a judge who opposed them, and getting behind a candidate for governor in 1924 in the Democratic primary. Incumbent governor George Hunt, who was planning to run for re-election, at one time had been accused of being soft on the Klan, but by 1924 was openly opposed to the organization—though seemingly more because of his concern about its attack on religious groups than on racial minority groups.[28] When he ran for re-election in the primary that year against the Klan candidate and another contender, he followed his political instincts, by "campaigning strongly against the Klan in areas where they were very weak and saying nothing about it in areas where they were strong."[29]

During the 1920s Republicans made some gains in statewide politics but these were wiped out with the Great Depression of the 1930s, which brought widespread devastation, cutbacks in mining operations and other industries, and a sharp increase in the number of unemployed. From the 1930s to the early 1960s, Arizona was, in many respects, a traditional one-party southern state. The political system was dominated by conservative Democrats allied with a dominant economic elite commonly identified with "cotton, cattle, and copper." The economic-social system also made life relatively difficult for minorities, particularly Hispanics, Native Americans, and African Americans as there was little civil rights protection. As an observer noted in 1964: "Arizona has no civil rights laws, except one prohibiting discrimination in public employment. There is no public accommodations law, no fair employment practices law, no fair housing law."[30]

Though the state has changed considerably since that time, the economic, social, and political problems faced by minorities, including specifically in voting, have gotten worse when minorities have attempted to assert themselves. Likewise, due to changes in party platforms and values during the Civil Rights movement, Arizona has become far more Republican, making this party the dominant one in the state, while minorities have turned to the Democratic Party.

### D.    The Literacy Test

In 1909, toward the end of Arizona's status as a territory of the United States, the Democratic-controlled territorial legislature passed a measure over the governor's veto that required an "educational test" in English for voter registration. Under the law, a man whose literacy was challenged by a registrar had to "read a section from the Constitution of the United States . . . in such a manner as to show that he is not being prompted or reciting from memory."[31] Democrats aimed the legislation at the Mexican population who, they assumed, had generally voted Republican. Republican leaders, who concurred in this assessment of the propensity of

---

[28] David R. Berman, George Hunt, Arizona's Crusading Seven-Term Governor 149 (Tucson, AZ: University of Arizona Press, 2015).

[29] Abbey *supra* note 27.

[30] Philip Deming (pseudonym), *Goldwater's Arizona*, The Progressive, May, 1964, at 33.

[31] *See* Berman *supra* note 16.

Mexican voters, saw the legislation as an attempt by Democrats to perpetuate their power in Arizona.[32]

In June 1910 citizens in the Arizona territory received permission from the federal government in an enabling act passed by Congress to draft a state constitution which, once it had been approved by Congress, the president, and voters in Arizona, would allow Arizona to become a state. The act also contained various provisions regarding the process of selecting delegates to the constitutional convention and on the qualifications one needed to vote on the adoption of the proposed constitution. In regard to the latter, Congress ignored the territorial law requiring the use of a literacy test. The Republicans in Congress who wrote the legislation, with input from leading Arizona Republicans, saw the literacy or "educational" requirement as a deliberate effort on the part of Democrats to disenfranchise Spanish-speaking voters because they tended to vote Republican. Democrats, on the other hand, condemned the elimination of the test as an obvious effort of Republicans to pursue their own partisan ends.[33]

At the constitutional convention delegates also struggled with the issue of whether to include a literacy test in English for voting in the proposed constitution. On November 22, 1910 the delegates voted in favor of including the educational qualification but reversed themselves the following day. According to one of the delegates, Mulford Winsor, he and other members of the Yuma delegation led the successful fight to get the educational qualification out of the constitution. They insisted that they were neither for or against the qualification but wanted to leave the question open in order to avoid provoking Congressional resentment—Republicans in that body were overwhelmingly opposed to it—and, thus, risk a delay in statehood. They also argued that the matter was properly a legislative rather than constitutional matter and, thus, left to the future legislature. Arizona Republicans contended that the real reason why progressive Democrats removed the qualification was that they feared offending Mexican voters whose support might be needed to secure ratification of the proposed constitution. They also charged that the Democrats planned to abandoned the Mexicans and reinstate the provision after statehood.[34]

Indeed, in 1912 after gaining statehood the first state legislature, controlled by Democrats, adopted an educational restriction much like the law passed by the territorial legislature in 1909 and considered at the convention. Democratic Senator A.A. Worsley of Tucson was one of the few legislators to speak against the literacy provision. He contended that suffrage was a right not a privilege and asked: "In a government where all must obey the laws,

---

[32] *Democrats Agitated*, L. A. Times, March 6, 1909; James McClintock, <u>Arizona: A History of the Youngest State from 1540 to 1915</u> 358 (S.J. Clarke Publishing Co., 1916); Jay Wagoner, <u>Arizona Territory, 1863-1912: A Political History</u> 448 (Univ. of Ariz. Press, 1970). Aggregate data analysis suggests that Republicans from the 1880s to the end of the territorial period did especially well in areas with high numbers of Hispanics. *See* Berman *supra* note 13.

[33] *Senator Frazier Makes Clear Opposition to Terms of Bill*, Bisbee Daily Review, July 3, 1910.

[34] *A Transparent Purpose*, The Arizona Republican, Dec. 5, 1910.

why should not all participate in the making of those laws?"[35] There was, in his view, no just reason why those who did not speak English or were not well educated should be excluded from the electorate. To Worsley, knowing English was not essential for active and effective citizenship and those with little or no formal education were often and perhaps usually better citizens than educated people.

Unmoved by these arguments, legislators and Democratic Governor Hunt gave their approval of the law, which denied the franchise to those unable to "read the Constitution of the United States in the English language in such manner as to show he is neither prompted nor reciting from memory, and to write his name."[36] As indicated by this language, voter registrars had considerable discretion in applying the law. This measure, like its predecessor under the territorial legislature, was aimed primarily at Hispanic voters. A prominent newspaper editor and Democratic leader happily confided to another well-known Democrat that the literacy measure meant the end of "the ignorant Mexican vote" in his county.[37]

In 1912, registrars used the discretion granted to them by the literacy test to deny registration to Hispanics in several counties around the state. In Cochise and Pima Counties the resulting decline in Hispanic voters meant that nearly half of the precincts lacked enough voters to justify holding primary elections in 1912.[38] In Apache County Democrats began recall campaigns against two Republican office holders, in the belief that enough Hispanic voters had been purged from the voting rolls to defeat the incumbents.[39]

As Arizona came into the union, major segments of the adult population were excluded from voting. In particular, meaningful progress in the voting rights of men and women who happened to be Native American, Hispanic, or African American was prolonged and difficult. Native Americans were excluded on the grounds they were not technically U.S. Citizens, *see* discussion *infra*, and once this barrier was overcome were excluded because of the application of the literacy test. From statehood into the 1960s and beyond, registrars applied the literacy test to reduce the ability of African Americans, Native Americans, and Hispanics to register.

In 1965 implementation of provisions of the Federal Voting Rights Act, which was adopted that year, led to the suspension of the literacy test in Apache, Navajo and Coconino counties—places where a majority of the voters were Native Americans and where there was a corresponding history of low voter turnout and use of the literacy test. Nevertheless, the literacy test remained on the books in Arizona until it was repealed in 1972, and this was despite the fact

---

[35] Speech in the Arizona Democrat, June 1912.

[36] *See* Berman *supra* note 16.

[37] Letter from W.B. Kelly, editor and manager of The Copper Era (Bisbee) to Reese Ling, a Democratic activist in Coconino County (August 3, 1912) (on file with the Reese Ling Collection, Box 1, Special Collections, Northern Arizona University, Flagstaff, Arizona).

[38] *Ibid.*

[39] *Item*, Coconino Sun, Sept. 27, 1912.

that Congress banned the use of the test in 1970 through an amendment to the Voting Rights Act which applied to all of Arizona.

Notably, shortly after Congress banned literacy tests, Arizona directly challenged the literacy ban in *Oregon v. Mitchell*. Attorneys for the state argued that the ban could not be enforced where, as in Arizona, it was inconsistent with state law.[40] The U.S. Supreme Court disagreed, finding that the ban could be enforced under the Fourteenth and Fifteenth Amendments to the U.S. Constitution. The court majority, speaking through Justice Hugh Black, noted that Congress had found that the application of the literacy test had significantly lowered the participation rates of minorities.[41] More specifically, evidence indicated "that voter registration in areas with large Spanish-American populations was consistently below the state and national averages."[42] Using Arizona as an example, Black noted "only two counties out of eight with Spanish surname populations in excess of 15% showed a voter registration equal to the state-wide average."[43] In an earlier action against Arizona for its refusal to comply with the Voting Rights Act as amended in 1970, the U.S. Department of Justice estimated that over 73,000 people in the state could not vote because of the literacy test requirement.[44]

E.    **Discrimination and Intimidation in the 1960s**

The civil rights struggle continued in Arizona for African Americans, Hispanics and Native Americans into the 1960s in regard to public accommodations as well as voting rights. Segregated facilities such as restaurants, swimming pools and theaters were common in Phoenix and other places. The town of Winslow, for example, "adopted a policy segregating public swimming pools that allowed only Anglos to use the pool on days it was cleaned, and Mexican Americans, American Indians and African-Americans on other days."[45]

Minorities remained a novelty in elective office and the press singled them out. Cloves C. Campbell in 1966 became the first African American to serve in the Arizona Senate. He had served two terms in the House. Speaking to reporters after his Senate election, Campbell

---

[40] *Oregon v. Mitchell*, 400 U.S. 112, 118 (1970).

[41] James Thomas Tucker, Rodolfo Espino, Tara Brite, Shannon Conley, Ben Horowitz, Zak Walter, and Shon Zelman, *Voting Rights in Arizona*, Southern California Review of Law and Social Justice, Spring 2008 at 286, 287.

[42] *Mitchell*, 400 U.S. at 132.

[43] *Ibid.*

[44] Ken W. Clawson, *U.S. Sues to Test Vote*, The Washington Post, Aug. 18, 1970, at 18.

[45] *See* Tucker *supra* note 41. On Phoenix *see* Bradford Luckingham, Phoenix: The History of A Southwestern Metropolis 116-18 (Tucson, Arizona: The University of Arizona Press, 1989).

expressed the hope "that this year, when I make a remark which appears in the newspapers, that I am identified as a senator and not a Negro senator."[46]

During the 1960s, it was also clear that more than the elimination of the literacy test in some areas was going to be needed to protect minorities. Intimidation of minority-group members—Hispanics, African Americans, as well as Native Americans—who wished to vote was also a fact of life in Arizona. Anglos sometimes challenged minorities at the polls and asked them to read and explain "literacy" cards containing quotations from the U.S. Constitution. These intimidators hoped to frighten or embarrass minorities and discourage them from standing in line to vote. Vote challenges of this nature were undertaken by Republican workers in 1962 in South Phoenix, a largely minority Hispanic and African-American area.[47]

Two years later Arizona Republicans undertook similar activity statewide as part of a national effort by the Republican Party called "Operation Eagle Eye." According to one account:

> The approach was simple: to challenge voters, especially voters of color, at the polls throughout the country on a variety of specious pretexts. If the challenge did not work outright – that is, if the voter was not prevented from casting a ballot (provisional ballots were not in widespread use at this time) – the challenge would still slow down the voting process, create long lines at the polls, and likely discourage some voters who could not wait or did not want to go through the hassle they were seeing other voters endure.[48]

The two year Operation-Eagle Eye program was followed by other Republican ballot security, anti-fraud, and "voter protection" programs which many felt were more properly characterized as "minority suppression" programs. Prior to the 1960s, efforts to suppress the voting rights of people of color had largely been associated with Democrats in the southern wing of the party. Starting in the 1960s, Republicans began pursuing a "southern strategy" hoping to broaden the appeal of the party to white southerners. The price for seeking out the support of white southerners in Arizona, as elsewhere, was to lose support among minority voters. Given these shifts, Arizona Republicans had reason to be more concerned about the vote of Native Americans, Hispanics, and African Americans—from their point of view the minorities were voting the wrong way.[49]

[46] *New Senator Looks Forward*, Phoenix Gazette, Sept. 14, 1966.

[47] Venita Hawthorne James, *Arizona's Legacy of Prejudice*, The Arizona Republic, Jan. 12, 1991; Ed Foster, *Harassing Voters Rare In Arizona*, The Arizona Republic, Nov. 27, 1993; Richard Nilsen, *A Struggle Not Forgotten*, The Arizona Republic, Jan. 15, 2005.

[48] Tova Andrea Wang, <u>The Politics of Voter Suppression</u> 44-45 (Cornell University Press, 2012).

[49] Chandler Davidson, et al., *Republican Ballot Security Programs: Voter Protection or Minority Vote Suppression—Or Both?*, Report to the Center for Voting Rights and Protection (Sept. 2004),http://www.votelaw.com/blog/blogdocs/GOP_Ballot_Security_Programs.pdf.

F.     **Native American Voting**

For much of the State's history, Native Americans faced special barriers to voting. At the time of statehood, federal law did not regard Native Americans on reservations as citizens of the United States. They were, thus, ineligible to participate in federal, state or local elections. Congress changed the law in 1924 to acknowledge Native Americans as citizens. Nevertheless, in a 1928 case, *Porter v. Hall*, the Arizona Supreme Court decided that Native Americans still could not vote in Arizona because they were under federal guardianship. Specifically, the state constitution denied the right to vote to "people under guardianship." The court held that because of the relationship between the tribes and the federal government, Native Americans fell into this category.[50] State officials also used the federal guardianship rationale to deny Native Americans other benefits such as Old Age Assistance programs giving aid to poor elderly people.

In 1948, in a more liberal environment shaped partly by the contributions of Native Americans to the World War II effort, the Arizona Supreme Court expressly overruled the earlier decision.[51] Thus, nearly 24 years after the federal government gave Native Americans the right to vote, they were finally able to access the franchise in Arizona. This decision, however, did not bring about a large influx of new Native American voters. In particular, the English literacy test became a major obstacle to involvement. In 1948 only an estimated 20 percent of Native Americans spoke English.[52] When it banned literacy tests in 1970, *see* discussion *supra*, Congress specifically cited to Arizona, noting that the state had a substantial deficiency in Native American voter registrations.[53]

In addition, voting on reservations was difficult, as it is even today, because physical barriers and geographical isolation required Native Americans to travel long distances to the polls. Perhaps even more important at that time was the fact that many Native Americans were uncertain about what to do with their voting rights. Many had little identification with the non-Native American world. They did not see themselves as participants in the state and national process, and some, as a direct result of intimidation from Anglos, feared involvement. People in the non-Native American community, hoping to keep Native Americans away from the polls, told them that involvement could lead to something detrimental, such as increased taxation, a loss of reservation lands, and an end to their special relationship with the federal government.[54]

The elimination of the literacy test in 1971 stimulated the participation of Native Americans in elections. At the same time, in some places Native Americans seeking to

---

[50] *Porter v. Hall*, 34 Ariz. 308, 312 (1928).

[51] *Harrison v. Laveen*, 67 Ariz 337 (1948).

[52] Patty Ferguson-Bohnee, *The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression,* 47 Ariz. St. L. J. 1099, 1112 (2015).

[53] *Mitchell*, 400 U.S. at 132.

[54] "The History of Arizona Indian Voting Rights," Intertribal Council of Arizona, reprinted in the *Congressional Record,* (May 14, 1986, E1676-7).

participate were met with new legal challenges from whites fearful of changes to the rights of Native Americans to vote and hold office. For example, in 1973 Tom Shirley, a Navajo, was prevented from assuming the office of Supervisor of Apache County Supervisorial District No. 3, by the Superior Court of Apache County when his unsuccessful opponent and three other men challenged the legality of Shirley's taking office citing, among other things, his alleged immunity for service of process on the reservation and the fact that he did not pay taxes.[55] In a landmark decision, the Arizona Supreme Court overturned the lower court and found that Shirley could hold his county office.[56]

Similarly, in some counties breakthroughs in securing Native American representation has required changing from at-large to district elections and redrawing the boundaries of commissioner districts.[57] Over the years, voting participation was and has been further hampered by frequent changes in the number and location of polling places, which seem to some purposely designed to frustrate participation and the lack of language assistance to Native Americans.[58] The history of discrimination against Native Americans in counties where much of this population resides has been well documented in reports of the United States Civil Rights Commission, court cases, and testimonials from Native Americans.[59]

Summing up the progress and obstacles that Native Americans have faced, one authority has concluded: "Arizona Indians have fought not only for the rights to maintain and protect their respective cultures and traditions, they have also fought to protect the freedoms embodied through our representative democracy. Despite their sacrifices, Arizona Indians were denied the right to vote for half a century after they received citizenship. The road to full participation in the electoral process has been long, with roadblocks, detours, and speedbumps. There is still work to be done to ensure equal access for Indian voters."[60]

G.     **General Developments Since the 1970s**

Though the 1960s brought perhaps an unusually sharp and critical focus on problems of racial discrimination in Arizona, issues of this nature remained salient over the next several decades, and have arisen again in full force in recent years.

In 1974, Hispanics took great pride in the election of Democrat Raul Castro as governor. Yet, this victory was not easily achieved, nor was it untainted by racism. In an earlier bid for

---

[55] *Shirley v. Superior Court*, 109 Ariz. 510 (1973).

[56] *Ibid.*

[57] David R. Berman & Tanis Salant, *Minority Representation, Resistance, and Public Policy: The Navajos and the Counties*, 28 Publius: The Journal of Federalism, Fall, 1998, at 83-104.

[58] *See* Tucker *supra* note 41.

[59] *Ibid.*

[60] *See* Ferguson-Bohnee *supra* note 52.

governor in 1970, Castro won 90 percent of the Hispanic vote, but fell short of winning the election because of low voter turnout in Hispanic precincts. As researchers noted, contributing to that low turnout was "a decision by the Republican-dominated legislature to cleanse the voting rolls and have all citizens reregister. This cleaning of the rolls erased years of registration drives in barrios across the state. It seems certain that many Chicanos did not understand that they had to reregister, were confused by this development, and simply stayed away from the polls."[61]

Castro, in his autobiography, noted that two weeks before the end of the 1970 campaign "some very suspicious newspaper errors appeared that cast me in a rather negative light." One reported him as having been murdered in Guatemala, another was a front page picture in an opposing newspaper, *The Arizona Republic*, of Fidel Castro, with a cutline that read "Running for governor of Arizona." As for the latter incident, Castro later told an interviewer: "That stunt infuriated me, but oftentimes politics, especially in Phoenix at that time, was an unfair endeavor."[62] Eyebrows were also raised in the campaign of 1974 when supporters of Castro's opponent, a white man, urged support for the Anglo's candidacy because "he looked like a governor." In defense, Castro argued: "The real question is leadership, not how someone looks."[63] Castro was the first, and thus far the only Hispanic to be elected governor of Arizona.

In the late 1980s, Republican Governor Evan Mecham demonstrated a tendency to insult various ethnic and racial groups. He saw no problem in referring to black children as "pickaninnies."[64] He furthered an image as a bigot by rescinding a state holiday for Martin Luther King shortly after taking office in 1987—an action that prompted several national organizations and public figures, including well-known celebrities, to announce that they would not hold events in Arizona. In 1992, while the battle over the King holiday was still going on, survey research revealed that Arizonans were in general agreement that the state had a race problem: 78 percent of the non-minorities agreed that there was some or a great deal of racism in the state, for minorities, the percentage was 89 percent.[65] Mecham was later impeached and removed from office. Art Hamilton, a black legislator who led the Democrats while the state house was considering impeachment of Mecham later recalled: "I was subject to considerable threats. A couple of letters used the term 'nigger,' and 'Go back to Africa' and 'Who are you to judge our governor?'"[66]

---

[61] F. Chris Garcia & Rudolph O. de la Garza, <u>The Chicano Political Experience</u> 105 (North Scituate, Massachusetts: Duxbury Press, 1977).

[62] Raul H. Castro & Jack L. August, <u>Adversity is My Angel: The Life and Career of Raul H. Castro</u> 86 (TCU Press, 2009).

[63] Gil Johnson, *Gubernatorial candidates trade charges*, Scottsdale Daily Progress, Oct. 25, 1974.

[64] Mark Flatten, *Evan Mecham*, East Valley Tribune, Feb. 23, 2008.

[65] David Fritze & Judy Nichols, *Most Arizonans Feel Racism Alive in State*, The Arizona Republic, July 12, 1992.

[66] Don Harris, *The Arizona Impeachment*, 14 State Legislatures 18, 20 (July 1988).

In 1998 a report submitted to President Clinton as a result of his "initiative on race" which was launched a year earlier and had prompted town hall meetings around the country, including Arizona, highlighted several problems of discrimination in the state in regard to race-relations. The report covered topics such as bilingual education, media stereotyping, racial profiling, and disparate prison terms being much harder on the poor and nonwhite.[67]

Racial profiling was perhaps the hottest topic considered by the commission. In 1997 Arizona's racial profiling of its citizens became headline news following a four-day July "roundup" of undocumented immigrants by Chandler police and federal immigration agents. Peace officers working in downtown areas stopped hundreds of brown-skinned people, including some U.S. born Hispanics, who the officers suspected of being in the country illegally and asked them to prove their citizenship.  Over 300 people who lacked papers, some of whom were actually legal residents, were cuffed and taken into custody. The action prompted civil-rights lawsuits that cost the city over $500,000 in out of court settlements.[68]  This action turned out to be a warning of things to come.

In November 2000 Proposition 203, which called for a ban on bilingual education in the state, was placed on the ballot. Arguing against this measure, and editorial writer for the *Arizona Daily Star* concluded: "If, for no other reason, the ballot proposition to ban bilingual education should be rejected for its divisive qualities. Those not convinced need only consider that Proposition 203 is aimed at one specific ethnic group. While it bans all bilingual education, including programs on the Navajo reservation, the students in Arizona's programs are by and large of Hispanic origin. For Hispanics, this proposition definitely has a punitive feel to it."[69] The voters, however, approved the ban. This was followed several years later by an attack on a non-mandatory Mexican American Studies Program offered as part of an ethnic studies curriculum in the Tucson Unified School District on the grounds that it promoted racial divisiveness and conflict. Defenders see it as a legitimate way for students to learn about Hispanic culture and history.[70]

Over the last several years Arizona has continued to make headlines for a flurry of practices and laws targeting illegal immigrants, which, unsurprisingly, have particularly affected the Hispanic community in Arizona, including legal residents and citizens. In Maricopa County, in 2007 Sheriff Joseph Arpaio made national headlines when he was sued in a class action alleging that he and his department conducted illegal stops and detentions of Hispanics and also mistreated Hispanic detainees.[71] The U.S. Department of Justice also brought suit against Sheriff

---

[67] For local reaction *see* Jill Jorden Spitz, *Many here find report of race panel no surprise*, Arizona Daily Star, Sept., 18, 1998.

[68] Edythe Jensen, *City tries to move past '97 'roundup*, The Chandler Republic, July 14, 2007.

[69] *No on Prop. 203*, The Arizona Daily Star, Oct. 24, 2000.

[70] Tamar Lewin, *Citing Individualism, Arizona Tries to Rein in Ethnic Studies in School*, N.Y. Times, May 14, 2010.

[71] *Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013).

Arpaio for such discriminatory practices. Another prominent example of such discrimination came in 2010 with the passage of SB 1070 which makes it a crime to be an illegal alien in the state and, consistent with Arizona's history of racial profiling, requires law enforcement officers to determine the immigration status of someone they have stopped, detained, or arrested when the officers have a "reasonable suspicion" they are not in the country legally. The legislation, as the *New York Times* put it, turned "all of the state's Latinos, even legal immigrants and citizens, into criminal suspects."[72] The law has led to charges of racial profiling and discrimination against people because of their race or their national origins.

On the voting level, charges of discrimination followed voter adoption of Proposition 200 in 2004 which requires that individuals present proof of citizenship when registering to vote—a requirement which has made it more difficult for minorities to participate in the franchise.[73] Arizona was the first state to make proof of citizenship a requirement. Backers of the proposition declared this was needed to block undocumented immigrants from voting. Election officials, however, stated that cases of voter fraud involving undocumented immigrants were very rare in large part because most people in this category are fearful of exposing their status and risking deportation by attempting to vote.[74] In addition to cracking down on something that does not seem to be much of a problem, the law is making it more difficult for many who are actually citizens, often minorities, to vote. Between 2005 and 2007, approximately 31,000 people in Arizona had their registration forms rejected because they could not provide sufficient documentation of citizenship.[75]

Arizona is currently part of a national movement ostensibly aiming to protect against voter fraud. It has advanced several measures which, while claimed to have some impact on voter fraud (though many feel that voter fraud in general and the type of voter fraud targeted by such measures specifically is largely non-existent), at the same time will make it more difficult for many, including minorities, to register and vote.[76] These include photo ID requirements, limits on early voting, limits on the time allowed for voter registration, proof of citizenship, and revocation of policies restoring the right to vote to people with past felony convictions. As in the past, much of this reform is driven by political partisans, this time by Republicans hoping to maximize their chances of winning elections. Whatever the motivation, the net effects of the measures they propose are likely to do considerable disproportionate damage to the participation of minority voters.

---

[72] *Stopping Arizona*, N.Y. Times, April 30, 2010.

[73] *See* Tucker *supra* note 41.

[74] Daniel Gonzalez, *Election Officials Uncover Little Voter Fraud in State*, The Arizona Republic, Oct. 26, 2004.

[75] Denise Lieberman, *Barriers to the Ballot Box*, 39 Human Rights Magazine 1 (2012) http://www.americanbar.org/publications/human rights magazine home/2012.

[76] *Ibid.*

Likewise, the manner in which officials in Maricopa County, the state's largest county, have administered elections has been of considerable concern to minorities in recent years. In 2016, the decision of Maricopa County officials to use 70 percent fewer polling places for the presidential preference election than used in the 2012 presidential preference election, and the manner in which the places were allocated grabbed headlines around the country when it resulted in extremely long lines of people waiting to vote—some for five hours—and many people leaving the polls, discouraged from voting by the long wait.

There have also been problems in the county in mailing out ballot information. In 2012 County Recorder Helen Purcell, a Republican, admitted her office mailed out a Spanish-language leaflet to Spanish-speaking voters telling them the November 6 election would be held on November 8. No mistake about the date was made in the English version. Although she said it was just a typo, others felt something more of a partisan/racial nature may have been involved.[77] In 2016, just weeks after the ill-fated presidential preference election at issue in this case took place, a similar mistake surfaced. In preparation for the upcoming special election in May, the Maricopa County Recorder's Office sent out ballots in Spanish which provided an incorrect description of a proposition to be voted upon.

In 2012 Purcell had a dispute with Hispanic and Democratic leaders over whether she had made an incorrect public statement concerning the legality of people going from door-to-door collecting ballots and offering to turn them in, a practice Republicans call "ballot harvesting," but which Hispanics and Democrats defend as an effective way of increasing the participation of minorities. Critics contended she had said the practice was illegal when, in fact, it was not. It was further alleged that her statement had a detrimental effect on gathering votes. Purcell denied that she said ballot collection was illegal, asserting this was a commentator's mistaken interpretation of her remarks.[78]

The ballot collection issue is now once again salient. Continuing the line of legislation which proponents declare is necessary to ensure integrity in the casting of ballots, the Republican governor of Arizona in 2016 signed a measure passed by the Republican legislative majority restricting the collection of early ballots—a practice which has repeatedly been linked to minority participation in elections. Again, it is hard to avoid the conclusion that this measure, which by its nature is similar to the voting measures discussed earlier, will do anything but discourage minority voters from participating in elections.

### H.    The Voting Rights Act, Preclearance, and the Future

Because of its long history of discrimination, Arizona became covered by special provisions of the Voting Rights Act when it was amended in 1975 to protect language minorities. The amendment made any state where minorities constituted five percent of the population

---

[77] Evan Wyloge, *Activists call foul on Maricopa County* officials' early ballot warning, Arizona Capitol Times, Oct. 22, 2012.

[78] *Ibid.*

subject to Federal preclearance requirements if it did not have bilingual ballots in 1972 and if voting participation by language minorities was below a certain level.

Under the preclearance provision, Arizona and eight other states, mainly in the South, were required to obtain the approval of the U.S. Department of Justice of any decision regarding elections or voter requirements that affects the voting rights and representation of minorities.

In June 2013 in a 5-4 ruling, however, the U.S. Supreme Court struck down the preclearance provisions in the case of *Shelby County v. Holder*. This decision has been generally praised by Arizona Republicans and generally criticized by Democrats in the state.[79]

In particular, since 1982 the Justice Department had vetoed four statewide redistricting plans that appeared to discriminate against minorities. Moreover, better than 80% of the Justice Department's objections to Arizona's voting practices and procedures since 1982 have involved voting changes that appeared to threaten the turnout of Hispanic and Native American voters with limited English proficiency. An exhaustive recent study indicates the preclearance procedure had been highly useful in helping to prevent the adoption of policies that have adverse effects on the rights of minorities and that, based on the historical record, there is a continued need for such protection.[80]

Looking at the history of abuse and neglect, there is no reason to assume that discrimination in regard to voting and election practices is a relic of the past and that the protections provided by preclearance are not needed in Arizona. If preclearance had been in effect, for example, the long lines of people waiting to vote in the 2016 presidential primary in Maricopa County, for example, may well have been avoided.

When it comes to Arizona's history of discrimination, the effects of both its past and present voting problems are evidenced in the underrepresentation of minorities in the legislature, while some progress has been made, Hispanics, African Americans, and Native Americans continue to remain underrepresented. In January 2016 Hispanics made up 30.5 percent of the state's population, but held only 19 percent of the 90 seats. African Americans, who made up 4.7 percent of the population, had just one member, 1 percent of the total. Native Americans had 4.4 percent of the members and 5.3 percent of the general population.[81] While the gains have been most marked for Hispanics who held only 14 percent of the seats when the legislature went into session in 2003, it has been a struggle for Hispanic legislators and African-American and Native American legislators as well, nearly all of whom are Democrats, to have much of an impact in the Republican dominated legislature.

---

[79] *Shelby Cty., Ala. v. Holder*, 133 U.S. 2612 (2013).

[80] *See* Tucker *supra* note 41.

[81] *How lawmakers, constituents compare*, The Arizona Republic, Jan. 10, 2016.

## VI.    CONCLUSION

Arizona has a long history of discrimination against Native Americans, Hispanics and African Americans when it comes to their voting rights. This discrimination has been reflected in legislation relating to voter requirements, election law and the manner in which elections have been administered, efforts to intimidate voters, and instances of racial appeals, both subtle and not so subtle during campaigns.

Over the years partisan considerations have been a driving force behind laws and activities detrimental to the voting rights of Native Americans, Hispanics, and African Americans. Both parties have been at fault, but the common driving factor has been the disproportionate burden imposed upon the voting rights of Arizona's minority communities. The negative laws and activities, moreover, have reflected a more general pattern of political, social, and economic discrimination which has shown up in other policy areas such as education, law enforcement, and illegal immigration. The laws, policies, and practices challenged in this suit are the latest chapter in this continuing story of discrimination.

APPENDIX A

*Curriculum Vitae of Dr. David R. Berman*

## CONTACT INFORMATION

Home Address:
5932 West Gary Drive
Chandler, AZ
85226-1251
Phone 480-705-7807

Business Address:
Morrison Institute for Public Policy
Mail Code 4220, 411 North Central Avenue,
Phoenix Arizona
Suite 900, 85004-0692
Phone: 602-496-0900
Fax: 602-496-0964

E-Mail: david.berman@asu.edu

## EDUCATIONAL BACKGROUND

- Ph.D. American University, Government, l968.
- M.A.  American University, Government, l963.
- B.A.   Rockford College, Liberal Arts, 1961.

## PROFESSIONAL EXPERIENCE/TRAINING

- Senior Research Fellow, Morrison Institute, Arizona State University, 2003-Present
- Professor Emeritus, Political Science, Arizona State University, 2004-Present
- Professor of Political Science, Arizona State University, 1966-2004
- Assistant Director, Institute of Public Administration, Arizona State University, 1966-69
- Acting Director, Institute of Public Administration, Arizona State University, 1966-67
- Research Associate, National League of Cities, Washington, D.C, 1964-66
- Researcher, Democratic National Committee and American Law Division, Legislative Reference Service, Library of Congress (Internships, Washington, D.C.), 1962-64
- Lecturer, American University, Washington, D.C., 1962-64.

## RESEARCH CONTRACTS, GRANTS, AND AWARDS

- Continuing Research contracts, International City/County Management Association, for studies on state-local relations, 1988-2009.

- Continuing Research contracts/projects with Morrison Institute for Public Policy, Arizona State University on various policy issues involving Arizona, 1984-present.
- Researcher, Arizona Town Hall, (various years).
- Case Study Investigator, Joint Project on Term Limits, National Conference of State Legislators and Council of State Governments, 2003-04.
- Research and writing agreement with United States Information Agency, Washington D.C., for article on state governments and local revenues, 1999.
- Consultant, Office of Government Programs, The University of Arizona on county-tribal relations project, funded by the Kellogg Foundation, 1995-96.
- Arts/Social Sciences/Humanities (ASH) Grant, Arizona State University, for study on political radicalism, 1990-1991.
- Travel to Collections Grant, National Endowment for the Humanities, for project on political culture, 1989.
- Consultant, Salt River Pima-Maricopa Indian Community Council, 1991.
- Research grant from College of Liberal Arts and Sciences, Arizona State University, to collect material on voting in western states, 1987.

## PROFESSIONAL ACTIVITIES AND RECOGNITIONS

- Designated Academic Expert on state government in *The Reporter's Source Book* (various years).
- Member of the Western States Budget Group, Western Political Science Association. (various years).
- Finalist 2015 New Mexico Book Awards, Biography on George Hunt.
- Executive Committee, Section on Intergovernmental Administration and Management (SIAM), American Society for Public Administration, 2000-2003.
- Chair, Distinguished Scholar Committee, Federalism and Intergovernmental Section, American Political Science Association, 1999-2000.
- Member, Charles Redd Award for Best Paper on Politics in the West Committee, Western Political Science Association, 1999-2000.
- Executive Council, Federalism and Intergovernmental Section, American Political Science Association, 1997-2000.
- Board of Editors, State and Local Review, 1998-2000.
- Section Chair, Subnational Politics and Federalism, Southwestern Political Science Association, Annual Meeting, 1999.
- Member Book Award Committee, Federalism and Intergovernmental Section, American Political Science Association, 1998.
- Chair of Committee for Stone Award for Best Student Paper on Intergovernmental Relations, Section on Intergovernmental Administration and Management, American Society for Public Administration, 1996-1997.
- Member Nominating Committee, Federalism and Intergovernmental Relations Section, American Political Science Association, 1996.
- Project Reviewer, National Science Foundation, 1995.
- Extramural Expert Program Review, Department of Political Science, University of Northern Colorado, 1994.
- Member of Committee on County Policy, Policy Studies Organization, 1990-1991.

- ▪ Chair of Ad Hoc Committee on Western Book Award, Western Political Science Association, 1988.
- ▪ Board Member, Arizona Society for Public Administration, 1966-1972.
- ▪ President of the Arizona Society for Public Administration, 1970-1971.
- ▪ Program Chair for the 1971 Southwestern American Society for Public Administration Conference held in Phoenix.

## PUBLICATIONS

### *Books*

*George Hunt: Arizona's Seven-term Crusading Governor.* Tucson, AZ: University of Arizona Press, 2015 (251 pages)

*Politics, Labor and the War on Big Business.* Boulder, Colo.: University of Colorado Press, 2012 (330 pages)

*Radicalism in the Mountain West: Socialists, Populists, Miners and Wobblies.* Boulder, Colo.: University of Colorado Press, 2007 (386 pages).

*Local Government and the States: Autonomy, Politics and Policy.* Armonk, New York: M.E. Sharpe, Inc., 2003 (224 pages).

*State and Local Politics.* Armonk, New York: M.E. Sharpe, Inc., revised ninth edition, 2000, (488 pages). Previous editions: Boston, Hollbrook Press, 1975; Boston: Allyn and Bacon, 1978, 1981, 1984, 1987; Madison, WI.:Wm. C. Brown, 1991, Brown and Benchmark, 1994 and M.E. Sharpe, 1997.

*Arizona Government and Politics: The Struggle for Autonomy, Democracy, and Development.* Lincoln, Nebraska: University of Nebraska Press, 1998 (256 pages). Part of Politics and Governments of the American States series.

*Reformers, Corporations and the Electorate: An Analysis of Arizona's Age of Reform.* Boulder, Colo.: University Press of Colorado, 1992, (304 pages).

*American Government, Politics and Policy Making.* Englewood Cliffs, New Jersey: Prentice-Hall, revised third edition, 1988 (304 pages). Previous editions: Pacific Palisades, Calif.: Palisades Publishers, 1979, 1983.

*County Governments in an Era of Change.* Westport CT: Greenwood Press, Contributions in Political Science Series, editor and contributor, 1993 (167 pages).

*American Government: Ideas and Issues.* Pacific Palisades, Calif.: Palisades Publishers, l981 (315 pages). Editor with John C. Bollens and contributor. Book of readings and original essays.

## Research Papers, Articles, & Book Chapters

"Arizona's Executive Branch: The Plural Executive and the Governor as 'First Among Equals,'" *Arizona Government: The Next Hundred Years* (Phoenix, AZ: Arizona Town Hall, 2010): 39-44.

"State-Local Relations: Authority and Finances," *The Municipal Year Book 2010* (Washington, D.C.: ICMA Press, 2010): 47-57.

"State-Local Relations: Authority and Finances," *The Municipal Year Book 2009* (Washington, D.C.: ICMA Press, 2009): 53-65.

"State-Local Relations: Authority and Finances," *The Municipal Year Book 2008 (Washington,* D.C.: ICMA Press, 2008): 45-55.

"The Effects of Legislative Term Limits in Arizona: More Churning, More Chaos, and a Diminished Institutional Role for Legislators," in Rick Farmer, Christopher Z. Mooney, Richard J. Powell, and John C. Green*, Legislating Without Experience: Case Studies in State Legislative Term Limits* (Lanham, Md.: Lexington Books, 2007): 75-98.

"Legislative Climate," in Kurtz, Karl T., Bruce Cain, and Richard G. Niemi, eds. *Institutional Change in American Politics: The Case of Term Limits,* University of Michigan Press, 2007): 107-118.

"State-Local Relations: Authority and Finances," *The Municipal Year Book 2007* (Washington, D.C: ICMA Press, 2007): 47-58.

"The Legal Foundations of Local Government," in Carl W. Stenberg and Susan Lipman Austin eds., *Managing Local Government Services* (Washington, D.C.: International City/County Management Association, 2007): 29-47.

"State-Local Relations: Authority, Finances, and Restructuring," *Municipal Year Book 2006* (Washington, D.C.: International City/County Management Association, 2006): 41-59.

"State-Local Relations: Partnerships, Conflict, and Authority," *Municipal Year Book 2005* (Washington, D.C.: International City/County Management Association, 2005): 43-61.

"State-Local Relations: Authority, Finances, Takeovers," *Municipal Year Book 2004* (Washington, D.C.: International City/County Management Association, 2004): 45-62.

"State-Local Relations: Authority, Finances, Cooperation," *Municipal Year Book 2003* (Washington, D.C.: International City/County Management Association, 2003): 49-65.

"State-Local Relations: Authority, Finances, Cooperation," *Municipal Year Book 2002* (Washington, D.C.: International City/County Management Association, 2002): 45-61.

"Partnership and Support for Propositions on the Ballot: A State-Level Longitudinal Study," *Social Science Quarterly* 82 (June 2001): 408-419 (With Mike Yawn).

"State-Local Relations: Authority, Finance, Partnerships," *Municipal Year Book 2001* (Washington, D.C.: International City/County Management Association, 2001): 61-75.

"Arizona Government Over Time: The Good, The Bad, And The Ugly," in *Pieces of Power: Governance in Arizona* (Tempe, Arizona: Arizona State University, 2001): 17-32.

"Arizona," in Dale Krane, Platon N. Rigos, and Melvin Hill, eds., *Home Rule in America: A Fifty State Handbook* (Washington, D.C.: Congressional Quarterly Inc., 2000): 41-48 (with Tanis J. Salant). Based in part on paper presented at the 1995 Meeting of the American Political Science Association.

"Age, Ambition, and the Local Charter: A Study in Voting Behavior," *The Social Science Journal* 37(January, 2000): 19-26 (with Ryan M. Johnson).

"State-Local Relations: Authority, Finance, Policies" in *Municipal Year Book 2000* (Washington, D.C.: International City/County Management Association, 2000): 31-41. Reprinted as "The States and the City Governments," in Roger L. Kemp, *How American Governments Work* (Jefferson, North Carolina: McFarland &Company, 2002), pp.250-275.

"Minority Representation, Resistance, and Public Policy: The Navajos and the Counties," *Publius: The Journal of Federalism* 28, No. 4 (Fall 1998): 83-104 (with Tanis J. Salant). Based on a paper given at the 1997 Meeting of the Western Political Science Association.

"State-Local Relations: Authority, Policies, Cooperation," *Municipal Year Book 1999* (Washington, D.C.: International City/County Management Association, 1999): 47-68.

"The Growth Management Challenge In Arizona," *Arizona Policy Choices* (October 1998):113-119.

"State-Local Relations: Authority, Finance, and Regional Cooperation," *Municipal Year Book 1998* (Washington, D.C.: International City/County Management Association, 1998): 62-75.

"State-Local Relations: Devolution, Mandates, and Money," *Municipal Year Book 1997* (Washington, D.C.: International City/County Management Association, 1997): 40-52.

"Ideals, Participation and Direct Democracy in Arizona," in *Building a Community of Citizens for Arizona* (Phoenix, AZ: Arizona Academy, 1997): 79-89.

"Arizona" in Andrew M. Appelton and Daniel S. Ward, eds. *State Party Profiles* (Washington, D.C.: Congressional Quarterly, 1997): 16-23.

"State-Local Relations: Mandates, Money, Partnerships," *Municipal Year Book 1996* (Washington. D.C.: International City/County Management Association, 1996): 33-43.

"The Changing Role of Counties in the Intergovernmental System" in Donald C. Menzel, ed., *The American County: Frontiers of Knowledge* (Tuscaloosa, Alabama: University of Alabama Press, 1996): 19-33 (with Tanis J. Salant).

"Takeovers of Local Governments: An Overview and Evaluation of State Policies," *Publius: The Journal of Federalism* 25 (Summer 1995): 55-70.

"State-Local Relations: Patterns, Problems, and Partnerships," *Municipal Year Book* (Washington, D.C.: International City/County Management Association, 1995): 55-65.

"State-Local Relations: Patterns, Politics, and Problems," *Municipal Year Book* (Washington, D.C.: International City/County Management Association, 1994): 59-67.

"Gender and Issue Voting: The Policy Effects of Suffrage Expansion in Arizona," *Social Science Quarterly* 74 (December, 1993): 838-850.  Based on a paper presented at the 1991 Meeting of the Social Science History Association.

"State-Local Relations: Patterns and Problems," *Municipal Year Book* (Washington, D.C.: International City Management Association, 1993): 87-93.

"Relating To Other Governments: Patterns, Problems, and Responsibilities," in Charldean Newell, ed. *The Effective Local Government Manager* (Washington, D.C.: International City Management Association, 1993): 167-198.

"Arizona," in Leroy Hardy, Alan Heslop, and George Blair editors, *Redistricting in the 1980s* (Claremont, Calif.: The Rose Institute of State and Local Government, 1993): 21-25. Based in part on paper given at the 1990 Meeting of the Western Political Science Association.

"Arizona's Priorities: Public Spending," in Zachary Smith, editor, *Politics and Public Policy in Arizona* (Westport, CT: Praeger, 1993): 77-89 (with Janalee Jordan-Meldrum).

"Counties and the Changing Environment," in David R. Berman, editor, *County Governments in an Era of Change* (Westport CT: Greenwood Press, 1993): 11-19 (introduction, with Kate Lehman).

"Counties and the National Agenda," in David R. Berman, editor, *County Governments in an Era of Change* (Westport CT: Greenwood Press, 1993): 123-134 (with Barbara Greene).

"Counties, Other Governments, and the Future," in David R. Berman, editor, *County Governments in an Era of Change* (Westport CT: Greenwood Press, 1993): 135-142.

"State-Local Relations: Mandates, Money, Partnerships," *Municipal Year Book* (Washington

D.C.: International City Management Association, 1992): 51-57.

"Regime and Party Change: The Arizona Pattern," in Maureen Moakley, ed. *Party Realignment in the American States* (Columbus: Ohio State University Press, 1992): 35-55. Based in part on a paper presented at the 1987 meeting of the Western Political Science Association.

"The New Approach to Economic Development: An Analysis of Innovativeness in the States," *Policy Studies Journal* 20 (1992): 10-21 (with Lawrence L. Martin).

"Financing State and Local Government," in Clive S. Thomas, ed., *Politics and Public Policy in the Contemporary American West* (Albuquerque, New Mexico: University of New Mexico Press, 1991): 305-326.

"State Legislators and Their Constituents: Regulating Arizona Railroads in the Progressive Era," *Social Science Quarterly* 71 (December 1990): 812-823.  Revision of a paper presented at the 1989 meeting of the Pacific Northwest Political Science Association.

"State Actions Affecting Local Governments," *Municipal Year Book* (Washington, D.C.: International City Management Association, 1990): 55-70.

"Environment, Culture, and Radical Third Parties," *The Social Science Journal* 27 (1990): 147-158. Revision of paper presented at meeting of the Pacific Northwest Political Science Association, 1988.

"State Actions Affecting Local Governments: Involvement, Problems, and Relationships," *Municipal Year Book* (Washington, D.C.: International City Management Association, 1989): 129-142.

"Growth Management: Problems of Pursuit, Control, and Adaptation," in Rob Melnick and Deborah Roepke, eds., *Urban Growth in Arizona: A Policy Analysis.* (Morrison Institute for Public Policy, Arizona State University, 1988): 43-58.

"State-Local Relations: An Examination of Local Discretion," *Public Administration Review* 48 (March/April, 1988): 637-641 (with Lawrence L. Martin).

"Political Culture, Issues, and the Electorate: Evidence from the Progressive Era," *The Western Political Quarterly* 41 (March, 1988): 169-180.

"Male Support for Woman Suffrage," *Social Science History* 11 (Fall, 1987): 281-294.

"Political Culture: Change and Continuity," in *Culture and Values in Arizona Life* (Phoenix, AZ.: Arizona Academy, 1987): 115-130.

"Electoral Support for Populism in the Mountain States," *The Social Science Journal* 24 (January, 1987): 43-52.   Revision of paper presented at the 1984 Meeting of the Southwestern Political Science Association.

"Voters, Candidates, and Issues in the Progressive Era," *Social Science Quarterly* 67 (June, 1986): 255-266.

*Parties and Elections in Arizona: 1880-1984* (Tempe, AZ.: Morrison Institute, Arizona State University, 1985): 39 pages.

"County Home Rule: Does Where You Stand Depend on Where You Sit?" *State and Local Review* 17 (Spring, 1985): 232-234 (with Lawrence L. Martin and Laura A. Kajfez). Reprinted in Gary Mattson, ed. *Perspectives on Small City Planning and  Policymaking* (Lexington, Mass.: Ginn, 1987): 61-65.

"Counties in Arizona: Development, Role, Problems," in John Stuart Hall and Albert K. Karnig (eds.), *County Government in Arizona: Challenges of the 1980's* (Phoenix: Arizona Academy, 1985): 32-48 (with Lawrence L. Martin).

"Consumerism and the Regulatory System: Paradigms of Reform," *Policy Studies Review* 1 (February, 1982): 454-462. Based on paper presented at the Symposium on Regulatory Reform, Loyola University, 1979.

"Public Policymaking: An Overview," in David R. Berman and John C. Bollens (eds.), *American Government: Ideas and Issues* (Pacific Palisades, Calif.: Palisades Publishers, l981): 1-15.

"Arizona" in B. Oliver Walter ed., *Politics in the West* (Laramie, Wy: Institute for Policy Research, University of Wyoming, l980): 1-12 (with Bruce D. Merrill). Based on paper presented at the Annual Meeting of the Western Social Science Association, 1979.

"Adolescents, Television, and Support for Government," *Public Opinion Quarterly* 44 (Fall, l980): 330-340 (with John  A. Stookey).

"Citizen Attitudes toward Municipal Reform Institutions: A Testing of Some Assumptions," *The Western Political Quarterly* 29 (June, 1976): 274-283 (with Bruce D. Merrill).

"Law and Order on Campus: Analysis of the Role and Problems of the Security Police," *Journal of Urban Law* 49 (February, 1972): 513-531.

"Speaking for the Cities: An Analysis of State Municipal Leagues," *Public Affairs Bulletin* 9 (1970): 5 pages.  Summary of paper presented at the Annual Meeting of the Western Political Science Association, 1970.

"The Legislative Reapportionment Cases: A Study in the Development of Judicial Relief," *Law and the Social Order* 1 (1970): 519-541. Based on paper presented at the 1968 Meeting of the Western Political Science Association.

*Capital Improvements Programming for Small Cities, Towns, Boroughs and Counties*. Department of Urban Studies, National League of Cities, 1969, 20 pages (with Madeline Baker and Lawrence A. Williams).

"Credit Problems of Small Municipalities," *State and Local   Public Facility Needs and Financing,* Vol. 2, Chapter 16,  published by U.S. Congress, Joint Economic Committee, Sub-Committee on Economic Progress 1965, (with Lawrence A. Williams). Reprinted by Department of Urban Studies, National League of Cities 1967, 24 pages.

*Interstate Compact Commissions: Selected Case Studies*. Washington Center for Metropolitan Studies, Washington, D.C.  1962, 40 pages.

### Remarks, Reports, and Reviews

Review : Vandermeer, "Burton Barr: Political Leadership and the Transformation of Arizona," *Western Historical Quarterly* (November, 2015): 99.

"When Arizona Went Progressive: The Career and Views of Governor George W.P. Hunt," Sharlot Hall Museum, July 15, 2015, http://www.sharlot.org/library-archives/days-past/when-arizona-went-progressive-the-career-and-views-of-governor-george-w-p-hunt.

"Mesa's 'most conservative' title is puzzling," *The Conversation* (October 24, 2014). https://theconversation.com/profiles/david-r-berman-139747

"Dark Money: Pro or con, it's powerful in elections," *The Arizona Republic*, April 6, 2014.

 "Dealing with a Surplus: Budgeting, Taxing, and Spending in Arizona," *California Journal of Politics and Policy*, 5. 3 (July, 2013): 343-359.

"The Teapublican Budget: Budgeting, Taxing, and Spending in Arizona" *California Journal of Politics and Policy*, 4.3 (October, 2012): 39-55.  With Kristin Borns.

"How Open Primaries would affect elections in Arizona," *The Arizona Republic,* June 2, 2012.

Review : McCormick and Sillito, "A History of Utah Radicalism," *Utah Historical Quarterly*, (Volume 80, Number 3, 2012): 279-280.

"Budgeting in Arizona: Hard Decisions for Hard Times," *California Journal of Politics and Policy*, Volume 3 (20111), issue 2, article 5, 14 pages.  With Kristin Borns.

"Morrison Institute tracking where Arizona has been and needs to go," *The Arizona Republic,* January 17, 2010.

App. A
-ix-

"Budgeting, Taxing, and Spending in Arizona," in *Annual Western States Budget Review* (Salt Lake City: Center for Public Policy, April, 2009): 13 pages.

"Arizona," in *Annual Western States Budget Review* (Salt Lake City: Center for Public Policy, April, 2007): 13 pages.

"Arizona" in Carl Mott, ed., *Roundtable: State Budgeting in the 13 Western States* (Salt Lake City: Center for Public Policy, January, 2006): 16 pages.

"Getting Involved: Youth and the Future," *Arizona Republic*, August 21, 2005.

Review: Harrison, "Congress, Progressive Reform, and the New American State," *The Journal of American History* (June 2005): 256-257.

"Arizona" in Carl Mott, ed., *Roundtable: State Budgeting in the 13 Western States* (Salt Lake City: Center for Public Policy and Administration, January 2005): 14 pages.

*Effects of Legislative Term Limits in Arizona*, National Conference of State Legislatures, Joint Project on Term Limits 2004, http://www.ncsl.org.

"Arizona," in *Roundtable: State Budgeting in the 13 Western States* (Salt Lake City, Utah: Center for Public Policy and Administration, University of Utah, May 2004): 13 pages.

"Arizona Government Over Time: The Good, The Bad, And The Ugly," in *Pieces of Power: Governance in Arizona* (Tempe, Arizona: Arizona State University, 2001): 17-32. Background report prepared for 79th Arizona Town Hall.

Review: Coppa, "County Government: A Guide to Efficient and Accountable Government," *Publius: The Journal of Federalism* 31:3 (Summer 2001): 219-220.

"The Powers of Local Government in the United States" *Issues of Democracy* 4 (April 1999): 17-20 (an electronic journal of the U.S. Information Agency).

Review: Iverson, "Barry Goldwater: Native Arizonan," *The Journal of American History* (June, 1998): 319.

"Arizona" in Robert Huefner, F. Ted Herbert, and Carl Mott, eds., *Roundtable: State Budgeting in the Western States* (Center for Public Policy & Administration, University of Utah, October 1997): 23-33.

Contributor to Nancy Weatherly Sharp and James Roger Sharp, eds, *American Legislative Leaders In The West, 1911-1994* Westport, Conn.: Greenwood Press, 1997.

"Arizona," in Robert Huefner, F. Ted Hebert, and Carl Mott, editors, *Roundtable: State Budgeting in the 13 Western States* (Center for Public Policy and Administration, University of Utah, November 1996): 19-23.

"Arizona," in Robert Huefner, F. Ted Hebert, and Carl Mott, compilers, *Roundtable: State Budgeting in the 13 Western States* (Center for Public Policy and Administration, University of Utah, October 1995): 14-21.

"Arizona," in Carl Mott, Daniel Sloan, and Robert Huefner, compilers, *Roundtable: State/Local Budgeting: Politics and Trends in the Western States* (Center for Public Policy and Administration, University of Utah, October 1994): 13-19.

"Arizona," in Carl Mott, Daniel Sloan, and Robert Huefner, compilers, *Roundtable: State/Local Budgeting Issues in the Western States.* (Center for Public Policy and Administration, University of Utah, October 1993): 14-15.

"Arizona," in Carl Mott, Daniel Sloan, and Robert Huefner, compilers, *Roundtable: State/Local Budgeting Challenges in the West* (Center for Public Policy and Administration, University of Utah, December 1992): 8-12.

"Arizona: Redistricting for the 1990's," *Comparative State Politics* 13 (August, 1992): 8-12.

"Arizona," in Robert Huefner and Daniel Sloan compilers, *Roundtable On State-Local Budgeting: Trouble for 1991* (Center for Public Policy and Administration, University of Utah, November 1991): 9-10.

"A Forum in Civics," in Tanis J. Salant, ed., *Mohave County Community Unity Forum: Conference Proceedings* (Tucson, AZ: Office of Community and Public Service, University of Arizona, 1991): 199-205.

"Why We Should Rethink State-County Relations," in Tanis J. Salant, (ed.), *Rethinking State-County Relations* (Tucson, AZ.: Office of Community and Public Service, University of Arizona, 1990): 27-32.

"Reapportionment in Arizona: The Past and Future Prospects," *Comparative State Politics* 2 (June, 1990): 6-12.

"Government Performance," *Sedona Forum V* (Sedona, Az.: Sedona Academy, 1989): 47-56 (with N. Joseph Cayer and Louis Weschler).

"Citizens and Their Government: Citizen Participation, Conflict and Support," in *Sedona Forum V* (Sedona, Az.: Sedona Academy, 1989: 11-31 (with N. Joseph Cayer and Marilyn Dantico).

"Valley Governance," in John S. Hall, ed. *Valley Growth: United or Fragmented* (Tempe, AZ.: Morrison Institute, 1987): 41- 52 (with Lawrence L. Martin).

"The Dynamics of Federalism," *Policy Studies Journal* (June, 1983): 718-721, (with Lawrence Martin).

"The Arizona Lottery," *Comparative State Politics* (April, 1982): 22-23 (with Bruce D. Merrill).

"Sunset in Arizona," *Comparative State Politics* (October, 1980): 5 pages.

Review: Jones and Thomas, "Public Policy Making in a Federal System," *American Political Science Review* 72 (1978): 267-268.

Review: Bollens and Guyer, "Yorty: Politics of a Constant Candidate," *Pacific Historical Review* 43 (1974): 131-132.

"Councils of Government and the Regional Future," *Arizona Government Journal* 1 (1973): 13-15.

"The Housing Cooperative as a Political System," *Cooperative Housing Journal* (Summer/Fall, 1971): 6-7, 14.

"Maricopa County Government:  Meeting the Challenge of Growth," *Public Affairs Bulletin* 7 (1968): 4 pages.

"Small Towns Pay More for Credit," *Nation's Cities* (May, 1967): 23-25.

"Capital Improvements Programming," *Nation's Cities* (March, 1966): 13-15

"Charge of the Blight Brigade," *Nation's Cities* (February, 1965): 19-20.   Reprinted in *Congressional Record* (May 24, 1965): 10954-55.

### *Studies and Reports With Morrison Institute For Public Policy*

"Building and Rebuilding an Election System in Arizona: Where We've Been, Where We're Going," 2016.

"Arizona redistricting process upheld, changes still possible," 2015.

"'First Aid to the Wicked': A Look Back at Penal Reform in Arizona," 2015.

"Dark Money in Arizona; The Right to Know, Free Speech and Playing Whack-a-mole," 2014.

"New Governor, New Directions," 2014.

"Understanding Arizona's Propositions," 2014.

"The Future of Direct Democracy in Arizona:  Petition Circulators, Election Officials and the Law," 2014.

"Initiative Reform in Arizona, Exploring Some Ideas," 2013.

"Citizens' veto is rare, but potentially important," 2013.

"Commission seeks to make voting easier while states make it more difficult," 2013.

"Arizona voters may change way we elect candidates," 2012.

"Proposition 121, Open Elections/Open Government Initiative," 2012.

"Understanding Arizona's Propositions: Prop 115 (merit selection)," 2012.

"Top-Two Proposition: What Nonpartisan Elections Could Mean for Arizona," 2012.

"The Nonpartisan Primary: Is it a Game Changer," 2012.

"Abandoning Merit Selection: A Great Step Backwards," 2011.

"Here We Go Again: Redistricting, Politics and Voter Choice," 2010.

"Campaign Finance: The Clean Elections Quandary," 2010.

"State of Our State: Ballot-box Budgeting," 2010.

"Good Governance: Where We've Been, Where We Are, Where We Might Go," 2009.

"The Arizona Budget," 2008.

"Budgeting, Taxing, and Spending Trends in Arizona," 2005.

"Restrictions, mandates, and the Arizona budget," 2004.

"The effects of legislative term limits in Arizona," 2004. With assistance
       of Suzanne Taylor, Nancy Welch, 2004.

"Can't stand still, issues and ideas for workforce governance in Arizona," 2004.  With Nancy
       Welch.