Brett W. Johnson (#021527)
Sara J. Agne (#026950)
Joy L. Isaacs (#030693)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: bwjohnson@swlaw.com
sagne@swlaw.com
jisaacs@swlaw.com

Timothy A. La Sota (#020539)
TIMOTHY A. LA SOTA, PLC
2198 E. Camelback Road, Suite 305
Phoenix, Arizona 85016
Telephone: 602.515.2649
E-Mail: tim@timlasota.com

*Attorneys for Intervenor-Defendant
Arizona Republican Party*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Feldman, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Arizona Secretary of State's Office, et al., <br><br> Defendants. | No. CV-16-1065-PHX-DLR <br><br> **INTERVENOR-DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND INTERVENOR-PLAINTIFF'S COMPLAINT-IN-INTERVENTION** <br><br> **(Oral Argument Requested)** |

Under Fed. R. Civ. P. 12(b)(1) and (b)(6), Intervenor-Defendant Arizona Republican Party moves to dismiss the Amended Complaint (Doc. 12) and the Complaint-in-Intervention (Doc. 53) in their entirety. As discussed in the Intervenor-Defendant's contemporaneously filed Notice and Certification of Conferral, the parties have conferred and did not agree the pleadings could be cured by permissible amendment.

Plaintiffs seeks to derail the November 8, 2016, general election ("General Election") in three ways: (1) requesting the Court entangle itself in Maricopa County's designation of polling places for the General Election, even though this designation has not yet occurred, and the Amended Complaint itself makes clear that Maricopa County will *not* use the same allocation procedures as it did for the 2016 Presidential Preference Election ("PPE") (Doc. 12, ¶ 89); (2) forcing all Arizona counties, most of which are not parties to this case, to count provisional ballots that are not cast in a voter's designated precinct, even though out-of-precinct ("OOP") votes have been rejected in Arizona for at least a decade; and (3) enjoining enforcement of the not-yet-effective H.B. 2023.

Plaintiffs fail to state any viable claim that would support this broad relief. The Court does not have jurisdiction to adjudicate Plaintiffs' arguments concerning polling-place designation and OOP voting. As for H.B. 2023, Plaintiffs cannot plead any facts to support a plausible claim that the State's tailored prohibition on harvesting early ballots imposes any meaningful burden on voting or the freedom to associate.

The grounds for dismissal are discussed more fully below. In addition, to aid the Court's consideration of this Motion, attached as Exhibit A is a chart illustrating Plaintiffs' five counts and the various reasons each should be dismissed.

### I. Plaintiffs' Claims Suffer from Multiple Jurisdictional Defects.

This Court may not "consider the merits of [Plaintiffs'] claim[s] or the propriety of the relief requested" unless Plaintiffs are "entitled to invoke the judicial process." *Linda R.S. v. Richard D.*, 410 U.S. 614, 616 (1973). Plaintiffs are not so entitled as to many aspects of Counts I-III, which are unaccompanied by actual injury or have simply been asserted at the wrong time.

**A. Plaintiffs Do Not Have Standing to Assert Claims Based on Polling-Place Designation or the Anti-Ballot-Harvesting Law.**

Article III of the United States Constitution limits federal jurisdiction to "cases" and "controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976). To satisfy the "irreducible constitutional minimum of standing," a plaintiff must show (1) an injury in fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs bear the burden to establish each standing element for *each* claim and *each* form of relief sought. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs cannot meet this jurisdictional prerequisite, at least to the extent that Counts I-III are based on arguments concerning polling-place designation or OOP voting.

**1. Plaintiffs' Polling-Place Designation Claims are Speculative.**

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotations omitted). Plaintiffs must show "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007) (citation omitted).

Plaintiffs cannot make such a showing with respect to polling-place designation. Counts I and II assert, at least in part, that Maricopa County's future designation of polling places for the General Election *might* result in long lines or in minority voters having to travel longer distances to their designated location. (*See* Doc. 12, ¶¶ 79, 112, 114, 125.) No Plaintiff can establish that they face an actual or imminent injury from this yet-to-occur event. Plaintiffs instead assert various allegations about long lines at the PPE in Maricopa County, suggesting that the same thing *might* happen in the General Election. (*See, e.g.*, Doc. 12, ¶¶ 69-79, 112, 125.) But that "injury" is entirely hypothetical. *See Lujan*, 504 U.S. at 560. The PPE and general elections are different processes conducted under different statutes, rules, and regulations. *Compare* A.R.S. §§ 16-211 to -214 (general election), *with* A.R.S. §§ 16-241 to -250 (presidential preference election).

Plaintiffs acknowledge the differences between PPEs and general elections, contending the number of polling locations for the General Election will drastically increase as compared to the PPE. (Doc. 12, ¶ 89.) Plaintiffs recognize that while Maricopa County used voting centers for the PPE, it will use precinct-based voting for the General Election, *id.*, ¶ 91, which, as the Court is aware, is how Maricopa County has always conducted general elections except for the March and May 2016 elections. Because Maricopa County will not be using the same procedure for the General Election as it did for the PPE, any challenge to the PPE allocation procedures is moot. *See M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 857 (9th Cir. 2014) ("No justiciable controversy is presented where the question sought to be adjudicated" has become moot); *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) ("[A] case becomes moot when the issues presented are no longer live.") (quotations omitted).[1]

Moreover, Plaintiffs do not allege that Maricopa County has designated polling places for the General Election yet. Counties have until "twenty days before a general or primary election" to "designate one polling place within each precinct where the election shall be held." A.R.S. § 16-411(B). Plaintiffs do not challenge this statute. Therefore, until polling places are actually selected, the individual Plaintiffs can only speculate. Similarly, the associational Plaintiffs can offer nothing more than conjecture that long lines or travel distances might affect their missions or resources.

In addition to being unable to establish injury in fact, Plaintiffs cannot demonstrate the other two elements of Article III standing. They fail to claim that any Defendant has committed *any* act that has caused or will imminently cause long lines or travel distances to General Election polling places. Nor can they show how this Court could redress a non-

---

[1] Plaintiffs' same concerns about the 2016 PPE have already been raised in Maricopa County Superior Court, which held that the claims were improper for a *post*-election challenge. (Apr. 27, 2016 Order in *Brakey v. Reagan et al.*, CV2016-002889 (Maricopa Cty. Super. Ct), at 7–8, copy attached as Ex. B). This order (of which this Court can and should take judicial notice, *see* Fed. R. Evid. 201) further confirms that Plaintiffs' apparent effort to prevent the continued use of practices from the 2016 PPE election is moot.

- 3 -

existent injury. Indeed, Plaintiff's preliminary injunction motion is telling in that it asks for relief requiring Defendants to comply with the law in designating General Election polling places, rather than citing any specific injury to be enjoined. (Doc. 72 at 2.)

Because Plaintiffs fail to claim an actual live case or controversy concerning polling-place designation, they seek an improper advisory opinion on the issue. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (federal courts have no "power to render advisory opinions"). The Court should decline that invitation and instead dismiss the portions of Counts I and II that relate to future allocation for the General Election.[2]

### 2. Plaintiffs Have Failed to Join the Correct Parties for their Claims Related to OOP Voting.

In connection with the OOP voting issue raised in Counts I-III, Plaintiffs seek to enjoin Defendants from "[r]ejecting provisional ballots solely because they were cast in the wrong precinct or polling location." (Doc. 12, at p. 50, Prayer for Relief B.1.) But, Plaintiffs have failed to name the necessary parties to obtain relief on a *statewide* basis, despite being placed on notice of this failure for some time. (*See* Tr. of Proceedings, dated 5/10/16, at 23:23–24:1, relevant excerpts attached as Ex. C.) Without these parties, Plaintiffs cannot satisfy the redressability element of standing. *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (redressability requires that it be "'likely' and not merely 'speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit") (internal citations and quotation marks omitted); *see also* Fed. R. Civ. P. 19(a)(1) (parties are "necessary" if complete relief cannot be accorded in their absence or their interest may be impaired or impeded).

Arizona law makes counties responsible for counting votes after general, primary, and other statewide elections. *See, e.g.*, A.R.S. § 16-531; A.R.S. § 16-601. County officials determine whether to count or reject provisional ballots cast within their jurisdiction. *See* A.R.S. § 16-584(E); *Arizona Election Procedures Manual*, at 182 (Rev.

---

[2] No Plaintiff asserts any direct impact from H.B. 2023. The individual Plaintiffs do not allege any reliance on early ballot collection, and no associational Plaintiff asserts any actual intent to collect early ballots in future elections. (*See generally* Doc 12.)

- 4 -

1. 2014) ("Manual").[3] Aside from Maricopa County, Plaintiffs have not named any other county officials as defendants in this case, despite that one of the individual Plaintiffs hails from Apache County. (Doc. 12, at ¶ 22.) Due to Plaintiffs' failure to include the correct parties, this Court has no ability to order any non-Maricopa counties to count OOP provisional ballots in upcoming elections, as Plaintiffs have requested.

Simply ordering Plaintiffs, under Fed. R. Civ. P. 19(a)(2), to add other counties as defendants will not solve the problem. Those new defendants will not have an adequate opportunity to participate in the preliminary injunction briefing and hearing, even though Plaintiffs' requested OOP relief will directly affect the new parties by forcing them to determine, for the upcoming General Election, how to count OOP votes that for many years have been rejected. (*See* Doc. 12, ¶¶ 81, 83.) This problem is of Plaintiffs' own making and requires dismissal of their related arguments raised in Counts I-III.[4]

### B. Several of Plaintiffs' Arguments are Prudentially Unripe.

Plaintiffs' claims regarding polling place allocation and OOP voting in Counts I-III should be dismissed as prudentially unripe. The "prudential aspect" of ripeness "extends beyond standing's constitutional core." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). Prudential ripeness "focuses on whether there is an adequate record upon which to base effective review." *Id.* In analyzing ripeness, a court considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

#### 1. Plaintiffs' Polling-Place Designation Claims Are Not Ripe.

To the extent that Counts I and II concern Maricopa County's future allocation of polling places, those claims are prudentially unripe. Issues are not fit for decision if they require the Court to "consider[] 'contingent future events that may or may not occur as anticipated, or indeed may not occur at all.'" *Name.Space, Inc. v. Internet Corp. for*

---

[3] The Manual has the force of law, A.R.S. § 16-452, and can be found at: https://www.azsos.gov/sites/azsos.gov/files/election_procedure_manual_2014.pdf.

[4] Because it is not feasible to join other counties as parties at this late stage, dismissal of Plaintiffs' related arguments is also appropriate under Fed. R. Civ. P. 19(b).

- 5 -

*Assigned Names & Numbers*, 795 F.3d 1124, 1132 (9th Cir. 2015) (quoting *Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010)).

Here, until Maricopa County actually designates polling places for the General Election, no one can say whether Plaintiffs' concerns about long lines or travel distances will materialize at all or as Plaintiffs expect. The Maricopa County Elections Department first must select those polling places, which then must be approved by the Maricopa County Board of Supervisors ("Board"). *See* A.R.S. § 16-411(B). Any objections to the future polling places can be raised in the future administrative proceeding before the Board. These elected leaders should be given a full and fair opportunity to address Plaintiffs' concerns before this Court intervenes.

Prudential ripeness "find[s] [its] roots in cases involving administrative agencies and recognize[s] that judicial action should be restrained when other political branches have acted or will act." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670 (9th Cir. 2005.) Otherwise, courts risk "entangling themselves in abstract disagreements *over administrative policies*" that have not been "formalized" or "felt in a concrete way by the challenging parties." *Id.* (quoting *California Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987)); *see also Purcell v. Gonzalez*, 549 U.S. 1, 6 (2006) (per curiam) (Stevens, J., concurring) (allowing election process to proceed to conclusion yields better record for judicial review). Ripeness also "involve[s] the exercise of judicial restraint from unnecessary decision of constitutional issues." *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 138 (1974). The Court would accord with this policy by avoiding premature adjudication of whether future designation decisions *might* violate the Equal Protection Clause, as requested by Plaintiffs in Count II. (*See* Doc. 12, ¶ 125.)

Additionally, Plaintiffs cannot show that withholding judicial review on the polling place allocation issue "would result in direct and immediate hardship." *W. Oil & Gas Ass'n v. Sonoma Cty.*, 905 F.2d 1287, 1291 (9th Cir. 1990) (quotation and citation omitted). As stated, Plaintiffs will be able to raise any objections to polling places

- 6 -

1  designated by the Maricopa County Elections Department with the Board. Plaintiffs could
2  also file suit after the General Election polling places receive final Board approval.[5]

### 2. Plaintiffs' Claim of "Burden" Related to OOP Votes is Not Ripe.

Count II asserts, in part, that not counting votes imposes an unconstitutional, "severe" burden on voters. (*See* Doc. 12, ¶ 126.) Because additional factual development is necessary to assess this purported burden, the argument is unripe. "Voting in the correct precinct merely requires one to become informed of his or her correct precinct and travel to it within the county." *N.C. State Conference of the NAACP v. McCrory*, --- F. Supp. 3d ---, 2016 WL 1650774, at *159 (M.D.N.C. 2016). Thus, for the General Election, the alleged burden cannot be assessed without knowing where the actual polling places will be located or how voters will be notified and educated about their designated locations. But this sort of information is not yet available, nor is it pleaded in the Amended Complaint. The prudential ripeness doctrine applies because it is specifically intended to avoid premature judicial entanglement when other government agencies still need to act, *see Principal Life*, 394 F.3d at 670, as well as unnecessary adjudication of constitutional issues. *See Reg'l Rail Reorganization Act Cases*, 419 U.S. at 138.

Plaintiffs' speculation concerning hypothetical voter confusion only confirms the need for additional factual development. For example, Plaintiffs contend that changes in the polling places from previous elections *could* increase OOP voting. (Doc. 12, at ¶¶ 84, 126.) But, until the polling places are selected, the amount of turnover will not be known. Plaintiffs also allege that Maricopa County distributed inaccurate voter notification cards twelve years[] ago. (*Id.*, ¶ 85.) Speculation that a similar event *might* happen in the future

---

[5] In addition to ongoing administrative proceedings, there is also pending litigation in the Maricopa County Superior Court involving claims and allegations highly similar to those in this matter. *See Huerena, et al. v. Reagan, et al.*, No. CV2016-007890 (Maricopa Cty. Super. Ct.), Complaint and Docket attached as Ex. D. Abstention thus would allow local agencies and courts the initial opportunity to address uniquely local issues. *See Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

does not show that voters *currently* face a severe burden in upcoming elections.[6]

Plaintiffs also cannot establish any direct and immediate hardship from this Court sensibly withholding review. If later developments show that voters face a severe burden in using their correct polling location in the General Election, Plaintiffs could raise their objections with the Board or then attempt to assert an Equal Protection claim in court.

### C. Laches Bars Several Aspects of Plaintiffs' Claims.

The laches doctrine is another jurisdictional bar to several aspects of Plaintiffs claims—specifically, their arguments concerning future polling place allocation (in Counts I and II) and OOP voting (in Counts I-III). "In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice." *Ariz. Libertarian Party v. Reagan*, --- F. Supp. 3d ---, 2016 WL 3029929, at *2 (D. Ariz. May 27, 2016) (quoting *Ariz. Pub. Integrity All. Inc. v. Bennett*, 2014 WL 3715130, at *2 (D. Ariz. June 23, 2014)). As is apparent from the face of the Amended Complaint, there has been unreasonable delay and thus resulting prejudice here.

#### 1. Plaintiffs Have Delayed Too Long to Complain of PPE Practices.

As discussed, Plaintiffs' attempt to claim future injury in the General Election based on the allocation of polling places in the PPE is entirely speculative. But even if the PPE provided a proper basis for future injunctive relief, such claims are barred by laches. Plaintiffs knew or should have known of Maricopa County's polling place designations for the PPE by February 17, 2016, when the Board approved the allocation plan. (Doc. 12, at ¶¶ 61, 66.) Despite their allegation that the allocation was "a reduction in voting sites of a shocking magnitude," *id*., ¶ 62, Plaintiffs—including the campaigns for the two Democrat PPE candidates—chose not to raise any issues with the PPE allocation until *after* that election took place. This delay is without justification and reflects an utter lack

---

[6] Arizona provides various mechanisms for notifying voters about their correct polling place. *See, e.g.*, A.RS. § 16-412; Manual, at 22, 122-23, & 136. Plaintiffs can only speculate that these mechanisms *might* prove ineffective for the General Election.

- 8 -

of "diligence in preparing and advancing [their] case." *Ariz. Libertarian Party v. Reagan*, 2016 WL 3029929, at *2 (discussing factors used "[t]o determine whether delay was unreasonable").

Plaintiffs' unjustified delay has prejudiced Defendants and the administration of justice. "Defendants are entitled to reasonable time to consider and develop their case, including the opportunity to develop and present their own evidence, hire an expert, or prepare their cross-examination." *Id*. at *3 (internal citations and quotations omitted). This right has been severely impacted by Plaintiffs' late filing and the resulting compressed schedule on the preliminary injunction motions.

"To determine whether delay has prejudiced the administration of justice, a court considers prejudice to the courts, candidates, citizens who signed petitions, election officials, and voters." *Id.* Here, by waiting until *after* the PPE to raise their claims, Plaintiffs prejudiced the candidates, citizens who signed petitions, and voters who participated in the PPE. Plaintiffs' delay also prejudices the Court "'by compelling [it] to steamroll through . . . delicate legal issues in order to meet' election deadlines." *Id*. (quoting *Lubin v. Thomas*, 213 Ariz. 496, 497-98, 144 P.3d 510, 512 (2006)). The delay further prejudices election officials who face pending deadlines to designate polling places for the General Election, A.R.S. § 16-411, as these efforts are put in limbo by this litigation.

**2. Plaintiffs Have Delayed too Long to Complain of the OOP Voting Restriction, which has been in Existence for at Least a Decade.**

As noted, Counts I-III raise issues concerning OOP voting and seek injunctive relief that would require all Arizona counties (most of which are not parties) to count provisional ballots cast OOP "for all elections in which the elector is eligible to vote." (Doc. 12, at 50, Prayer for Relief B.2.[7]) The Amended Complaint recognizes, however, that Arizona has rejected OOP ballots since at least *2006*. (*Id*., ¶ 81; *see also id*., ¶¶ 81, 83 (allegations concerning number of OOP ballots rejected in 2008).) And Arizona law has

---

[7] Laches is not inconsistent with the ripeness issue raised in Section B.2 above concerning OOP, but instead provides an alternative basis for dismissal.

- 9 -

allowed counties to choose between voting centers (where OOP votes are counted) or precinct-based systems (where they are not) *since 2011*. 2011 Ariz. Legis. Serv. Ch. 331 (H.B. 2303) (April 29, 2011) (amending A.R.S. § 16-411.)[8]

Plaintiffs have no legitimate basis for sitting on the issue for years and only now seeking expedited injunctive relief, just months before the General Election. The unreasonable delay prejudices Defendants, which, as discussed, have significantly shortened time to "consider and develop their case." *Ariz. Libertarian Party v. Reagan*, 2016 WL 3029929, at *3. It also prejudices the Court since "'[t]he real prejudice caused by delay in election cases is to the quality of decision making in matters of great public importance.'" *Id*. (quoting *Sotomayor v. Burns*, 199 Ariz. 81, 83 ¶ 9, 13 P.3d 1198, 1200 (2000)).

Plaintiffs have prejudiced the election officials who, if Plaintiffs prevail on their arguments, would have very little time to change election practices and procedures that have been in effect and administered for at least a decade. Election officials would be left with little time, for example, to decide how to distinguish between "elections in which the elector is eligible to vote" versus those in which the elector is not eligible on provisional ballots. (Doc. 12, at 50, Prayer for Relief B.2.) They would also have little time to train relevant personnel on the new treatment of provisional ballots. As the Court is aware, this is an extremely expensive proposition at the eleventh hour. "To insist on major revisions" to complex election systems "at such a late date is not fair to [Defendants]." *Sotomayor*, 199 Ariz. at 83, 13 P.3d at 1200; *Purcell*, 549 U.S. at 4-5 ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.').

## II.     Plaintiffs Do Not State any Claim Upon Which Relief Can Be Granted.

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient

---

[8] Because Arizona was subject to Department of Justice ("DOJ") election oversight from 1975 to 2013, both the rejection of ballots and A.R.S. § 16-411(B)(4) were both subject to DOJ review and approval. (*See* Doc. 12, ¶ 3.) Yet, Plaintiffs did not raise any issues with those laws at the time of DOJ approval.

- 10 -

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plaintiffs' claims fail to meet this standard.

### A. Plaintiffs Do Not State a § 2, Voting Rights Act Claim (Count I).

Count I asserts a claim under § 2 of the Voting Rights Act ("VRA") based on Maricopa County's polling-place designation, the restriction on voting, and H.B. 2023. Section 2 states "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(A). Whether Plaintiffs' concerns are considered individually or collectively, they fail to state a § 2 claim.

#### 1. Polling-Place Designation

Plaintiffs contend that Maricopa County's designation of polling places "will continue to cause an inequality in the opportunity of members of these minority communities to vote in Arizona." (Doc. 12, ¶ 114.) Plaintiffs cannot establish the essential elements of a § 2 claim, however, as they fail to identify any "standard, practice, or procedure" that will be used in the General Election and will disproportionately impact minority voters. 52 U.S.C. § 10301(A). To the contrary, Plaintiffs concede that the voting centers used by Maricopa County for the PPE will *not* be used for the General Election. (*See* Doc. 12, ¶ 89.)

#### 2. Out-of-Precinct Voting

Plaintiffs claim that rejecting OOP votes disproportionately impacts minority voters. (*See* Doc. 12, ¶ 115.) But Plaintiffs do not state the essential elements of a § 2 claim in connection with this issue. First, regardless of the facts alleged, the alleged restriction on voting does not deny or abridge a voter's equal opportunity to vote, which is a necessary element of § 2. *See* 52 U.S.C. § 10301(A). Voters can have their vote counted

- 11 -

1  by simply traveling to the correct polling place. Voters who go to the wrong location are
2  not denied an equal opportunity to participate in the political process. *See Lee v. Va. State*
3  *Bd. of Elections*, --- F. Supp. 3d ---, 2015 WL 9274922, at *9 (E.D. Va. 2015) (dismissing
4  § 2 claim when "there is no plausible contention that" election practice that
5  inconvenienced voters "denied the opportunity to vote"); *Frank v. Walker*, 768 F.3d 744,
6  753 (7th Cir. 2014) (rejecting § 2 claim when Wisconsin "extend[ed] to every citizen an
7  equal opportunity to get a photo ID," leaving no "'denial' of anything by Wisconsin, as §
8  2(a) requires").

9        Second, a § 2 plaintiff must allege with sufficient facts a "discriminatory burden"
10 on the ability to participate equally in the political process that is, at least "in part,"
11 "caused by or linked to 'social and historical conditions' that have or currently produce
12 discrimination." *League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224,
13 240 (4th Cir. 2014). Critically, only discrimination *by a state* can give rise to a § 2 claim.
14 *Frank*, 768 F.3d at 753. "That's important, because units of government are responsible
15 for their own discrimination but not for rectifying the effects of other persons'
16 discrimination." *Id.* (citing *Milliken v. Bradley*, 418 U.S. 717 (1974)). Here, Plaintiffs fail
17 to allege facts showing discrimination *by the State of Arizona* caused the alleged higher
18 rates of minority voters showing up at the incorrect polling place. Vague allegations of
19 socioeconomic disparities between minority and majority voters do not establish the
20 necessary causal link and are insufficient to state a § 2 claim. *See id.*

21       **3.    H.B. 2023**

22       Plaintiffs assert that H.B. 2023—a sensible and narrowly tailored law—will
23 disproportionately impact minority voters. *See* Doc. 12, ¶ 119. Plaintiffs fail to plead
24 facts, however, to establish that a limited criminal restriction on ballot harvesting denies
25 or abridges an equal opportunity to vote, as required for a § 2 claim. *See* 52 U.S.C.
26 § 10301(A). All voters can continue to participate in early voting by mailing or turning in
27 the ballot themselves or having a family member, household member, or caregiver do so.
28 *See* Doc. 12, ¶¶ 94, 96. And H.B. 2023 does not restrict any voter from casting their ballot

in person on election day. Allegations that some voters may be inconvenienced by limiting who can collect early ballots does not give rise to a § 2 claim. *See Lee*, 2015 WL 9274922, at *9 (dismissing § 2 claim based on alleged inconvenience to voters).

### B. Plaintiffs Do Not State an Equal Protection Claim Based On a "Severe Burden" (Count II).

Count II alleges that Maricopa County's future polling-place designation, the longstanding restriction on OOP voting, and H.B. 2023 all violate the Equal Protection clause by imposing a "severe" burden on the right to vote. (*See* Doc. 12, ¶¶ 125-28.) Plaintiffs fail to plead sufficient facts to support this assertion.

#### 1. Polling-Place Designation

Plaintiffs' contend that potential "misallocation of polling allocations" in the General Election could severely burden their right to vote, *id.*, ¶ 125, but, as discussed, their arguments rely on pure conjecture. Plaintiffs admit unprompted that Maricopa County has not yet designated General Election polling places and will not be using voting centers as it did in the PPE. (*See id.*, ¶¶ 79, 89.) It is impossible to claim some "severe burden" when the event has not even occurred. Therefore, Plaintiffs' claim here does not rise to the facially plausible standard.

#### 2. Out-of-Precinct Voting

Plaintiffs contend that the rejection of OOP ballots "independently severely burden[s]" the right to vote. (Doc. 12, ¶ 126.) The Court should decline jurisdiction under the Article III standing, prudential ripeness, and laches doctrines. Also, because Plaintiffs' assertions that the voting restriction will severely burden voting in future elections are completely speculative and unripe, Plaintiffs cannot allege a facially plausible Equal Protection claim. Absent factual allegations to support the claimed severe burden, rational basis review applies to the election regulation. *See Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 761 (9th Cir. 1994) ("If the burden [of an election law] is slight, the procedures will survive review as long as they have a rational basis.").

Requiring voters to cast ballots within their designated precinct easily satisfies this

relaxed standard. "The advantages of the precinct system are significant and numerous." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004.) Among other things, the system (1) "caps the number of voters attempting to vote in the same place on election day"; (2) "allows each precinct ballot to list all of the votes a citizen may cast for all pertinent [elections]"; (3) helps prevent election fraud; and (4) "puts polling places in closer proximity to voter residences." *Id.*; *McCrory*, 2016 WL 1650774, at *112 (same). Therefore, as a matter of law, the facts alleged fail to state a claim.

### 3. H.B. 2023

Plaintiffs claim that H.B. 2023 will impose a severe burden on their right to vote. Doc. 12, ¶ 127. Even assuming the Amended Complaint's factual allegations are true, the contention is implausible on its face. H.B. 2023 has no impact whatsoever on voters' ability to vote in person on Election Day. That is significant because, although the right to vote is fundamental, "there is no corresponding fundamental right to vote by absentee ballot." *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1192 (Ill. App. 2005) (quoting *Griffin v. Roupas*, No. 02 C 5270, 2003 WL 22232839, at *3 (N.D. Ill. Sept. 22, 2003)).

Based on the facts alleged, H.B. 2023 does not impose any severe restriction on early voting either. Early ballots still can be returned in a variety of ways, including by mail or by hand delivery to a county recorder's office or a polling place. (*See* Doc. 12, ¶ 96.) Voters can also continue to use household members, family members, and caregivers to assist. *See id*. Given that voters *receive* early ballots by mail, A.R.S. § 16-542(C), requiring that such voters return the ballot in the same manner (or by hand delivery) is not unreasonable. The absence of a severe burden is further illustrated by the fact *not one* individual Plaintiff alleges H.B. 2023 will prevent them from voting. *See Qualkinbush*, 826 N.E.2d at 1199 (concluding that "the burden placed upon absentee voters by the restriction on who may mail an absentee ballot . . . is slight," and furthers "important state interest" in "safeguarding the integrity of the election process").

Because H.B. 2023 does not impose a severe burden, rational basis review applies. *See Munro*, 31 F.3d at 761. H.B. 2023 has such a rational basis. The Legislature identified

important interests to justify the legislation—namely, combating fraud that undermines the public's confidence in the electoral system and the integrity of its results. (*See* Doc. 12, ¶ 95); *see also Purcell*, 549 U.S. at 4 ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government."); *Frank*, 768 F.3d at 750 (courts must accept legislative finding that regulation promotes public confidence in electoral system). As no facts can overcome the State's recognized interest in election integrity, Plaintiffs fail to state a claim.

### C. Plaintiffs Do Not State a "Disparate Treatment" Equal Protection Claim (Count III).

Count III of the Complaint alleges a "disparate treatment" Equal Protection claim, asserting that if some Arizona counties allow OOP voting through voting centers, then *all* counties *must* count votes cast OOP. (*See* Doc. 12, ¶ 131 & at 50, Prayer for Relief B.1.) Yet, Plaintiffs fail to plead sufficient facts to support the essential elements of a "disparate treatment" Equal Protection claim. Plaintiffs reference *Bush v. Gore*, 531 U.S. 98 (2000), in which the Supreme Court held that states "may not, by . . . *arbitrary* and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05 (emphasis added); (*see also* Doc. 12, ¶ 130.) Permitting counties to decide for themselves whether to use vote centers or precinct-based systems is not "arbitrary." This flexibility allows each county to consider its unique (1) registered voter population; (2) population density; (3) geography; (4) available funding, staff, equipment, and other resources; and (5) other factors that will inevitably vary by county.[9]

Nothing in *Bush v. Gore* compels a different conclusion. The Supreme Court in *Bush v. Gore* explained that "[t]he question before the Court is *not* whether local entities, in the exercise of their expertise, may develop different systems for implementing

---

[9] At least several other states allow local governments to decide whether to utilize voting centers or precinct-based systems. *See* Ark. Code § 7-1-113; Ind. Code §§ 3-11-18.1-1 *et seq.*; Tex. Elec. Code § 43.007; Utah Code § 20A-3-703; Wyo. Stat. § 22-1-102(xlix).

- 15 -

elections." *Bush*, 531 U.S. at 109 (emphasis added.) The Court was instead "presented with a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards." *Id.* The Court further stated that its "consideration [was] limited to the present circumstances." *Id.* This case does not involve a statewide recount, and so the Supreme Court's determination that the particular circumstances of *Bush v. Gore* raised Equal Protection concerns has no application here.

### D. Plaintiffs Do Not State a Valid Right to Association Claim (Count IV).

Count IV contends that H.B. 2023 "is facially unconstitutional" because it allegedly infringes on Plaintiffs' freedom of association. Doc. 12, ¶ 134. The claim fails because no Plaintiff alleges that they *actually* collect early ballots. (*See id* ¶¶ 15-30.) Specifically, Plaintiffs only claim it is a part of their "strategy," without claiming *how* they actually are engaged in ballot harvesting, if at all, either directly or indirectly. (*See id.*, ¶ 28.) As such, any alleged impact from H.B. 2023 on freedom of association will *not* be felt *by Plaintiffs*.

Plaintiffs also fail to allege sufficient facts to show that H.B. 2023 imposes any *severe* burden on the right to associate. Plaintiffs instead rely on strained and inapplicable analogies to cases involving restrictions on voter registration activities. (*See* Doc. 85, at 13-14.) Voter registration concerns a central function of a political organization—to ensure that individuals who may support that organization are *eligible* to vote. *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006). By contrast, the act of physically delivering a completed ballot to a mailbox, county recorder's office, or polling place is clerical. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) ("First Amendment protection [extends] only to conduct that is inherently expressive."); *Barrow v. Detroit Election Comm'n*, 854 N.W.2d 489, 502 (Mich. Ct. App. 2014) ("mailing of ballots" by city clerk is a "perfunctory, administrative task[]").

While the practice of ballot harvesting is not similar to voter registration efforts, H.B. 2023 is similar to other Arizona law that reasonably restricts association with

1  individuals actively engaged in the voting process. For example, Arizona law prevents
2  electioneering within 75 feet of a polling place, A.R.S. § 16-515, and only allows one
3  person per voting booth at a time, with limited exceptions. A.R.S. § 16-580. These laws
4  do not violate the First Amendment. *Cf. PG Pub. Co. v. Aichele*, 705 F.3d 91, 113 (3d Cir.
5  2013) ("there is no protected First Amendment right of access to a polling place"); *United*
6  *Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 748 (6th Cir.
7  2004) ("[A] state may require persons soliciting signatures to stand 100 feet from the
8  entrances to polling places without running afoul of the Constitution.").

9  Similarly, because H.B. 2023 does not impose a severe burden on the right to associate, there need only be a rational basis for H.B. 2023. *See Green Party of Ark. v. Daniels*, 733 F. Supp. 2d 1055, 1059-60 (W.D. Ark. 2010). There is such a rational basis here, as the Legislature has indicated that this bill was enacted to combat voter fraud that undermines public confidence in the electoral system. (*See* Doc. 12, ¶ 95.) Plaintiffs have thus failed to state a claim based on the facts alleged.

### E. Plaintiffs Do Not State a Valid "Partisan Fencing" Claim (Count V).

Count V apparently asserts a "partisan fencing" claim, essentially arguing that H.B. 2023 was specifically intended to prevent Democrats from voting. (*See* Doc. 12, ¶¶ 136-37.) However, "partisan fencing" is simply another label sometimes given to the same "severe burden" claim asserted by Plaintiffs in Count II. *See Lee*, 2015 WL 9274922, at *10 ("[T]he term 'partisan fencing' does not create an independent cause of action" but instead "simply provides a different theory of proving [an undue burden on the right to vote] in a slightly different wrapper."). Count V thus fails for the same reasons as Count II—specifically, H.B. 2023 does not impose any severe burden on the ability to vote and has a rational basis, identified by the Legislature, in preventing election fraud.

### *Conclusion*

Plaintiffs' arguments are asserted at the wrong time, against non-joined parties, and are not accompanied by the requisite factual support. The Amended Complaint and the Complaint-in-Intervention should be dismissed in their entirety and with prejudice.

DATED this 17th day of June, 2016.

Respectfully submitted,

SNELL & WILMER L.L.P.

By: */s/ Brett W. Johnson*
Brett W. Johnson
Sara J. Agne
Joy L. Isaacs
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

Timothy A. La Sota
2198 E. Camelback Road, Suite 305
Phoenix, Arizona 85016

*Attorneys for Intervenor-Defendant Arizona Republican Party*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a notice of electronic filing to the EM/ECF registrants.

 */s/  Tracy Hobbs*

24164699

- 19 -