1  Brett W. Johnson (#021527)
   Sara J. Agne (#026950)
2  Colin P. Ahler (#023879)
   Joy L. Isaacs (#030693)
3  SNELL & WILMER L.L.P.
   One Arizona Center
4  400 E. Van Buren, Suite 1900
   Phoenix, Arizona 85004-2202
5  Telephone: 602.382.6000
   Facsimile: 602.382.6070
6  E-Mail: bwjohnson@swlaw.com
           sagne@swlaw.com
7          cahler@swlaw.com
           jisaacs@swlaw.com
8
9  Timothy A. La Sota (#020539)
   TIMOTHY A. LA SOTA, PLC
10 2198 E. Camelback Road, Suite 305
   Phoenix, Arizona 85016
11 Telephone: 602.515.2649
   E-Mail: tim@timlasota.com

12 *Attorneys for Intervenor-Defendants*
   *Arizona Republican Party, Bill Gates, Suzanne*
13 *Klapp, Debbie Lesko, and Tony Rivero*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Feldman, et al., | No. CV-16-1065-PHX-DLR |
| Plaintiffs, | **INTERVENOR-DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ON H.B. 2023** |
| v. | |
| Arizona Secretary of State's Office, et al., | |
| Defendants. | |

Intervenor-Defendants' Motion to Dismiss (Docs. 108, 128) explained why Plaintiffs fail to state a claim under § 2 of the Voting Rights Act ("VRA") or as to the constitutionality of H.B. 2023.[1] Plaintiffs' Motion for a Preliminary Injunction on H.B. 2023 (Docs. 84, 85) (the "Motion") just further confirms that they are unlikely to succeed on the merits of any claim or that they will suffer any harm, much less irreparable harm, after H.B. 2023 takes effect. Their pre-enforcement facial challenge to the law must fail.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). One reason that "[f]acial challenges are disfavored" is because they "rest on speculation." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008). Armed with only speculation, Plaintiffs now seek an extraordinary remedy to enjoin H.B. 2023. But, Plaintiffs have not come close to carrying their heavy burden to justify such extraordinary relief, and so the Motion must be denied.

## I. FACTUAL BACKGROUND

In March 2016, H.B. 2023[2] was passed to prevent fraud and to make the early voting laws consistent with in-person voting laws. *Hearing on H.B. 2023 Before S. Comm. on Gov't*, 2016 Leg., 52nd Leg. 2d Reg. Sess. (Ariz. 2016) (attached as Ex. 1) (statement of E. Spencer, State Election Director ("Mr. Spencer")), at 61:14-16 ("[t]his bill merely catches us up to the evolution in voting practices that our state has experienced in the last 20 years."); *see* Decl. of M. Ugenti-Rita (Ex. 2), ¶ 45. H.B. 2023 provides:

---

[1] The Motion to Dismiss also questioned whether any Plaintiff had standing to bring a pre-enforcement challenge against H.B. 2023. (Doc. 108, at 4 n.2) Plaintiffs' Motion makes their standing even more questionable because, as discussed below, no individual Plaintiff or member of an associational Plaintiff asserts any reliance on ballot collection to vote. Furthermore, Intervenor-Plaintiff Bernie, 2016, Inc., will apparently lose standing altogether in this matter shortly, as the campaign does not represent the presumptive nominee.

[2] H.B. 2023 amended A.R.S. § 16-1005 (Ballot abuse; violation; classification) to add new subsections H and I.

- 1 -

H. A person who knowingly collects voted or unvoted early ballots from another person is guilty of a Class 6 felony. An election official, a United States Postal Service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties.
I. Subsection H of this section does not apply to:
1. An election held by a special taxing district formed pursuant to Title 48 for the purpose of protecting or providing services to agricultural lands or crops and that is authorized to conduct elections pursuant to Title 48.
2. A family member, household member or caregiver of the voter. For the purposes of this paragraph:
    (a) "Caregiver" means a person who provides medical or health care assistance to the voter in a residence, nursing care institution, hospice facility, assisted living center, assisted living facility, assisting living home, residential care institution, adult day health care facility or adult foster care home.
    (b) "Collects" means to gain possession or control of an early ballot.
    (c) "Family member" means a person who is related to the voter by blood, marriage, adoption or legal guardianship.
    (d) "Household member" means a person who resides at the same residence as the voter.

For 25 years, Arizona has early voting by mail.[3] At the same time, State laws regarding in-person voting have not been applied to early voting by mail.[4] *See, e.g.*, A.R.S. § 16-515 (no electioneering within 75 feet of a polling place); A.R.S. § 16-580 (only one person per voting booth at a time with limited exceptions); Ex. 1, at 61:4-6, 9-10 (testimony of Mr. Spencer) ("[T]here is a huge imbalance in the amount of security measures that are in place for polling place voting compared [to] early voting. . . . we have almost no prophylactic security procedures in place to govern that practice.").[5] H.B. 2023 serves to both modernize and make State election laws consistent.

Before H.B. 2023, the Legislature enacted several measures to prevent early voting fraud. Decl. of D. Shooter (Ex. 4), ¶¶ 6-13, 18. These efforts shored "up the integrity of the electoral process in Arizona." *Id.*, ¶ 18. With more Arizonans voting by early ballot, the State enacted H.B. 2023 to deter future fraud. Ex. 1 (statement of Mr. Spencer), at

---

[3] *See* Act of April 30, 1991, ch. 51, § 16-541, 1991 Ariz. Legis. Serv. Ch. 51 (S.B. 1320) (West) (codified at A.R.S. § 16-541).

[4] *See* Depo. of R. Parraz, Ex. 3, at 26:2-28:2 (ballot-harvesting groups had no internal protections such as volunteer background checks or paid workers to prevent fraud).

[5] Such restrictions have repeatedly been upheld as constitutional. *PG Publ'g Co. v. Aichele*, 705 F.3d 91, 113 (3d Cir. 2013); *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 748 (6th Cir. 2004).

61:7-10. Without it, those with nefarious purposes could collect ballots and deliver them—or not—as they saw fit, with no voter recourse. *See* Decl. of S. DiCiccio (Ex. 5), ¶ 12; Ex. 2, ¶¶ 46-47; *see* Decl. of S. Arellano (Ex. 6), ¶ 8; *see also* Decl. of R. Valenzuela (Ex. 7), ¶¶ 18-21 (referencing a ballot harvester impersonating an elections worker); Decl. of C. Bowen (Ex. 8), ¶¶ 9, 11.

H.B. 2023 is a narrowly tailored, prophylactic response to legitimate concerns of election fraud. Ex. 2, ¶¶ 45-47. The law is limited, only penalizing "a person who *knowingly* collects voted or unvoted early ballots from another person." A.R.S. § 16-1005(H) (emphasis added). The *mens rea* required—higher than a reckless or negligence standard—is tailored to further the purpose of deterring ballot harvesting.[6] *See* Ex. 2, ¶ 23 (allowing flexibility in prosecution depending on nature of offense); *Hearing on H.B. 2023 Before H. Comm. on Elections*, 2016 Leg., 52nd Leg. 2d Reg. Sess. (Ariz. 2016) (attached as Ex. 9) (statement of Mr. Spencer), at 14:5-22 (the intent is "to go after large-scale, knowing, massive collection of ballots"). And the law allows reasonable exceptions. A "family member, household member or caregiver of the voter" can assist a voter who may have work obligations or other issues preventing them from personally mailing or delivering a ballot. *See* Decl. of F. Ahmed, Ex. 10, ¶¶ 20-21; *see* Decl. of K. Dang, Ex. 11, ¶ 11. Concerns about voters not having an opportunity to vote without mass ballot collection campaigns are, therefore, unfounded. *See* Ex. 8, ¶¶ 4, 7.

## II. PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.

The Court may only grant Plaintiffs the "extraordinary remedy" of a preliminary injunction if they "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008) ("A preliminary injunction is an

---

[6] *See* A.R.S. § 13-105(10)(B) "'Knowingly' means, with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists."

- 3 -

extraordinary remedy never awarded as of right."). Specifically, related to H.B. 2023:

> preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.

*See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). Plaintiffs are not entitled to such extraordinary relief.

### A. Plaintiffs cannot demonstrate that are likely to succeed on the merits.

#### 1. H.B. 2023 does not violate § 2 of the VRA (Count I).

Plaintiffs fail to establish they are likely to prevail on their VRA claim (Count I). The Intervenor-Defendant's Motion to Dismiss explained that Plaintiffs could not allege any facts to show that any minor inconvenience on voting from a limited criminal restriction on ballot harvesting denies minorities an equal opportunity to vote. (Doc. 108 at 12-13). Now that Plaintiffs have had the opportunity to provide evidence on the issue, their Motion confirms that the § 2 claim is fundamentally flawed.

A § 2 claim has "two critical elements." *Lee v. Va. State Bd. of Elections*, --- F. Supp. 3d ---, 2016 WL 2946181, at *5 (E.D. Va. May 19, 2016) ("*Lee II*"). "First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 240 (4th Cir. 2014) *("LOWV")* (internal quotation marks omitted). "Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.* Here, neither element is supported with evidence.

##### a. Plaintiffs offer no evidence of a discriminatory burden.

Plaintiffs fail to provide evidence that H.B. 2023 will impose a "discriminatory burden" on any minority group. *See id*; *see also Gonzalez v. Ariz.*, 677 F.3d 383, 405 (9th

- 4 -

1  Cir. 2012) (§ 2 claim requires proof of "discriminatory results"). They provide no
2  quantitative evidence to show how many minorities in Arizona actually use early voting,
3  much less any comparison to the number of white voters who vote in this manner. Nor do
4  they provide any quantitative evidence concerning the number of minority or white voters
5  who rely on others to collect their early ballot. *See* Depo. of S. Healy (Ex. 12), 61:6-62:1.
6  And, while Plaintiffs contend that H.B. 2023 will affect voters in rural areas with limited
7  mail, they provide no evidence concerning the racial demographics or the number of
8  voters in these areas who participate in early voting.

9  Rather than providing any evidence to support a disparate impact, Plaintiffs
10  provide speculative and anecdotal declarations from non-experts who contend that they or
11  their organizations have collected early ballots from minority voters. (*See, e.g.*, Doc. 90,
12  Decl. of R. Parraz.) These statements provide no basis, however, for comparing the
13  number of white voters who also have their early ballot collected. And Plaintiffs' experts
14  provide no statistical analysis on the issue. (*See* Doc. 101-1 (Berman Report) & Doc 139-
15  1 (Revised Lichtman Report).) The Court simply cannot determine on the present record
16  whether H.B. 2023 will result in minorities having "less opportunity than other members
17  of the electorate" to vote. *LOWV*, 769 F.3d at 240. It is just as likely that white voters are
18  impacted by H.B 2023 as much as minorities. *See Gonzalez*, 677 F.3d at 406 (affirming
19  decision to deny § 2 claim when plaintiffs failed to show that election regulation had any
20  "statistically significant disparate impact" on Latino voters) (internal quotations and
21  citation omitted). Therefore, Plaintiffs are not likely to prevail on their § 2 claim.

22  **b.   Plaintiffs have provided no evidence of a causal nexus.**

23  Plaintiffs have also failed to produce evidence that the alleged disparate impact on
24  minorities from H.B. 2023 is "caused by or linked to social and historical conditions that
25  have or currently produce discrimination." *Lee II*, 2016 WL 2946181, at *5. Only
26  discrimination *by a state* can give rise to a § 2 claim. *See Frank v. Walker*, 768 F.3d 744,
27  753 (7th Cir. 2014). "That's important, because units of government are responsible for
28  their own discrimination but not for rectifying the effects of other persons'

- 5 -

discrimination." *Id.* (citing *Milliken v. Bradley*, 418 U.S. 717 (1974)).

Here, Plaintiffs have not identified how any past State discrimination will cause H.B. 2023 to have a disproportionate impact on minorities. They do not show, for example, that State discrimination has caused more minorities to live in rural communities with less mail access.[7] Plaintiffs instead attempt (Doc. 85, at 9) to make a causal connection through allegations of socioeconomic disparities in poverty rates, unemployment, education, transportation, transiency, health, and criminal justice treatment. This attempt fails. First, § 2 "does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters." *Frank*, 768 F.3d at 753 (finding that minorities less likely to obtain photo ID to vote "because they have lower income" not sufficient to support § 2 claim).

In addition, Plaintiffs cannot show these alleged socioeconomic disparities *deny* minorities the equal opportunity to vote. *See* Expert Report of S. Trende (Ex. 14) ("Trende Report"), ¶¶ 83-85 (discussing the failure of Plaintiffs' historian to show causation between potential past discrimination and any effect H.B. 2023 may have on voters). Regardless of socioeconomic status, *any* eligible adult may vote in-person or participate in early voting by personally mailing or delivering their ballot or giving it to a family member, household member, or caregiver for delivery. (*See* Doc. 12, ¶¶ 94, 96.) The alleged *inconvenience* imposed by H.B. 2023 is not sufficient to support a § 2 claim. *See Lee v. Va. State Bd. of Elections*, --- F. Supp. 3d ---, 2015 WL 9274922, at *8-9 (E.D. Va. Dec. 18, 2015) ("*Lee I*") (dismissing § 2 claim based on alleged inconvenience to voters of long polling lines); *Jacksonville Coal. for Voter Prot. v. Hood*, 351 F. Supp. 2d 1326, 1335 (M.D. Fla. 2004) ("[I]nconvenience" of driving to early voting site and waiting in line "does not result in a denial of 'meaningful access to the political process.'").

---

[7] Indeed, U.S. census data indicates that many rural communities in Arizona are predominantly white. *See* Ex. 13 (census information for Colorado City, Fredonia, Quartzsite, St. David, Star Valley, and Wickenburg).

### c. Plaintiffs fail to establish the presence of Senate Factors.

Because Plaintiffs fail to provide evidence concerning the two critical elements of a § 2 claim, this Court need not consider the "Senate Factors."[8] Should the Court reach them, however, the Trende Report (Ex. 14) discusses in detail why consideration of them here undermines the alleged need for a pre-enforcement injunction. Plaintiffs' examples related to voting-related discrimination (first factor) are either not contemporary or do not relate to voting, and Plaintiffs and their expert also ignore positive trends in minority voting turnout and consideration of minority interests in the 2011 redistricting process. Depo. of A. Lichtman (Ex. 15), at 84: 6-9; Expert Report of D. Critchlow (Ex. 16), at 13 (redistricting plan protects the "voting strength of Hispanics and minorities" with structural safeguards). Plaintiffs' analysis of the extent voting is racially polarized (second factor) is far too narrow, with no attempt to correlate party affiliation or assess statewide results and ignoring elections not involving a Hispanic candidate. Ex. 14, ¶¶ 96-100; Ex. 15, at 193:12-17, 196:11-15, 296:10-297:21; *see Johnson v. Mortham*, 926 F. Supp. 1460, 1474-75 (N.D. Fla. 1996) (criticizing polarization analysis by Plaintiffs' expert with similar defects). The racial polarization analysis also relies on a draft, incomplete redistricting report. Ex. 14, ¶ 96; Ex. 15, at 189:10-190:5.

Selective examples—completely devoid of acknowledgement of the salutary effects of the most recent redistricting processes for minority voters (*see* Trende Report, Ex. 14, at ¶ 85(b))—hallmark Plaintiffs' assertions as to the 'history of voting practices that tend to enhance the opportunity for discrimination against minority groups' (third factor). Plaintiffs' analysis of the extent to which minorities bear the effects of past discrimination in socioeconomic areas (fifth factor) fails to compare alleged disparities in Arizona to other states. Ex. 15, at 211:19-212:16. Plaintiffs only provide weak examples of alleged racial appeals in campaigns (sixth factor), with just two from campaigns for

---

[8] The Senate Factors are adopted from a 1982 Senate Judiciary Committee Report that accompanied amendments to the Voting Rights Act. Plaintiffs conceded that the fourth factor (slating) is irrelevant. (Doc. 101-4, at 37 (dkt. page 5 of 22).)

- 7 -

1  state office and no consideration of how the candidates actually fared in the pertinent
2  election. *Id.* at 217:6-220:4, 304:1-306:5; Ex. 14, ¶126. Similarly, the extent to which
3  minorities have been elected (seventh factor) is accompanied by a narrow analysis that
4  ignores (1) how many minorities ran for elected office in Arizona; (2) how Arizona fares
5  against other states; (3) the results of county and municipal elections; and (4) the extreme
6  efforts by the Arizona Independent Redistricting Commission in ensuring competitive
7  districts for minority candidates. Ex. 15, at 221:5-222:9, 224:16-227:7, 306:11-307:4.[9]
8  Plaintiffs also fail to recognize other statewide structural protections and assistance, like
9  the Citizens Clean Elections Commission, which funds candidates to create a more
10 diverse slate of candidates and educates voters in a non-partisan manner.[10]

11  Responsiveness to the needs of minorities (eighth factor) is shown in Arizona by a series of legislative enactments, including Medicaid expansion, KidsCare restoration, the independent redistricting process, and the CCEC's efforts. Ex. 14, ¶¶ 130–34. Plaintiffs' expert admitted not considering these events. Ex. 15, at 227:8-229:19; *see also N.C. State Conf. of the NAACP v. McCrory*, --- F. Supp. 3d ---, 2016 WL 1650774, at *141 (M.D.N.C. Apr. 25, 2016) (criticizing same expert for "purposefully exclud[ing] evidence that contradicted his conclusions"). The extent to which policy underlying the State's use of the practice at issue is tenuous (ninth factor) undermines Plaintiffs' § 2 claim because, as discussed below, H.B. 2023 *furthers* the legitimate goal of preventing election fraud.

**2. H.B. 2023 does not severely burden the ability to vote (Count II).**

In response to Count II, the Intervenor-Defendants' Motion to Dismiss explained Plaintiffs could not state a facially plausible claim that H.B. 2023 violates the 14th Amendment by imposing a "severe" and "unjustified" burden on early voting. (Doc. 108 at 14-15). The limited evidence provided in support of Plaintiffs' Motion confirms that

---

[9] Plaintiffs' analysis of factor seven also improperly relies in part on data concerning appointed judges who only undergo retention elections. Ex. 15, at 225:12-226:13.
[10] *See* Citizens Clean Elections Commission, http://www.azcleanelections.gov/en/about-us/what-is-clean-elections (last visited July 19, 2016).

Plaintiffs cannot prevail on this claim.[11] The alleged "severity" of H.B. 2023 is based entirely on conjecture. Plaintiffs have not provided a *single* declarant asserting that H.B. 2023 will prevent him or her from voting or make it substantially more difficult to do so; neither have depositions revealed such persons. Instead, Plaintiffs provide mere speculation from non-parties who suggest that H.B. 2023 "may" disenfranchise them in an unspecified future election should they neglect to mail their early ballot on time. *See* Doc. 87 (Decl. of T. Anderson) ¶ 13; Doc. 88 (Decl. of S. Pstross) ¶ 10; Doc. 89 (Decl. of R. Friend) ¶13; Doc 91 (Decl. of L. Gillespie) ¶ 14; *see also Wash. State Republican Party*, 552 U.S. at 449-50 ("In determining whether a law is facially invalid [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

Plaintiffs reference (Doc. 85, at 12) alleged "voters in rural and Native American communities who do not have mail service," but they have not provided any declarations from anyone living in such a community.[12] Similarly, Plaintiffs speculate (*id*., at 3) about alleged voters who lack access to a "secure mailbox" and "reliable transportation," but again provide no declarations from anyone who states that these conditions will prevent him or her from voting or make voting significantly more difficult.[13] There is simply no way of determining, on the present record, why these unidentified persons could not use public transportation, a ride from a friend, or some other means to vote in person or to deliver (or have their family member, household member, or caregiver deliver) their early

---

[11] Plaintiffs contend (Doc. 85, at 11) that H.B. 2023 works "in concert with the other policies, practices and procedures challenged in this action" to impose a severe burden on voting. At Plaintiffs' request, full briefing on Plaintiffs' motion for a preliminary injunction on those other issues will not occur until after H.B. 2023 becomes effective. They cannot provide grounds for enjoining enforcement of H.B. 2023.

[12] *Compare* Decl. of C. Begay (Ex. 18), ¶¶ 5, 8 (describing partisan practices driving mass ballot collection in rural and tribal communities)

[13] Although State Senator Martin Quezada contends that he lacks access to a secure mailbox at his personal residence, (Doc. 97 ¶ 22), he does not state that he lacks access to reliable transportation or could not drop off his early ballot at or near the Legislature.

ballot.[14] Mere inconvenience does not constitute a *severe* burden. *See Frank*, 768 F.3d at 745 ("inconvenience" of obtaining photo ID "surely does not qualify as a substantial burden on the right to vote"); *Lee I*, 2015 WL 9274922, at *9 ("Inconvenience alone does not qualify as a substantial burden on the right to vote.").

The absence of any severe burden is also confirmed by the undisputable fact that H.B. 2023 only regulates early voting. As courts have repeatedly held, voting by early or absentee ballot is not a fundamental right but a privilege granted by states. *See, e.g.*, *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1238 (M.D. Fla. 2012) ("All parties agree that there is no fundamental right to an early voting option."); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990) ("voting absentee[] is a privilege and convenience").[15]

Plaintiffs are also unlikely to prevail on their argument that the legislation is "unjustified." Only severe burdens on the fundamental right to vote are subject to strict scrutiny and require a narrowly tailored, compelling state interest. *See Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015). By comparison, election regulations imposing slight burdens need only have a rational basis. *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 761 (9th Cir. 1994); *see also Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011) ("voting regulations are rarely subjected to strict scrutiny"). Under this "less exacting review," "a State's important regulatory interests" over elections "will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal quotations omitted); *Schrader v. Blackwell*, 241 F.3d 783, 790-91 (6th Cir. 2001) (party challenging reasonable, nondiscriminatory election regulation bears a "heavy constitutional burden").

---

[14] As stated, Plaintiffs have provided no quantitative evidence that would allow the Court to assess the number of voters who allegedly rely on early ballot collection.

[15] *See also McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 810-11 (1969); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1192 (Ill. App. 2005) (quoting *Griffin v. Roupas*, No. 02 C 5270, 2003 WL 22232839, at *3 (N.D. Ill. Sept. 22, 2003)) ("there is no corresponding fundamental right to vote by absentee ballot").

Here, Plaintiffs do not dispute that the State has a legitimate interest in election integrity and fraud prevention. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government."). And Plaintiffs' own expert admits that absentee ballot fraud is more prevalent than in-person voting fraud. *See* Ex. 15, at 282:16-283:6. Plaintiffs nevertheless argue these interests "are entirely unsupported by any concrete evidence."[16] This is simply not correct. H.B. 2023's legislative history included extensive testimony concerning abuses of the existing early ballot collection process, such as impersonation of election officials and delivery of unsealed ballots. Ex. 2, ¶ 40; Ex. 7 ¶¶ 18-21; Ex. 14, ¶ 74. The Legislature had no obligation to confirm the veracity of these reports before enacting H.B. 2023. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").

Similarly, Plaintiffs provide no authority to support their contention that a state can only enact anti-election-fraud legislation in response to past fraud within the state. "Outlawing criminal activity *before* it occurs is not only a wise deterrent, but also sound public policy." *Lee II*, 2016 WL 2946181, at *26 (emphasis added). This is especially true with respect to H.B. 2023 given the documented incidents in other states in which early or absentee ballots have been tampered with by ballot harvesters. Ex. 2, ¶ 46; Ex. 23, at 9 (criminal indictment in the Superior Court of New Jersey, describing the unsealing of and tampering with voted absentee ballots).[17]

Furthermore, the "public perception that [election fraud is] a legitimate concern," in and of itself, provides a compelling reason to enact "preemptive legislation deterring such criminal activity." *Lee II*, 2016 WL 2946181, at *23; *see also Beatie v. Davila*, 132

---

[16] Members of the Arizona Legislature and others specifically cited voter fraud as the reason for H.B. 2023. *See* Ex. 2, ¶¶ 45-47; Ex. 5, ¶ 12.

[17] *Available at* http://www.nj.gov/oag/newsreleases09/pr20090903d-Small-et-al-Indictment.pdf

Cal. App. 3d 424, 433 (1982) (despite finding no actual fraud, the court stated that "because of the potential for wrongdoing, we suggest the Legislature reexamine the practice of absentee ballot solicitation"). That justification applies here since one of Plaintiffs' experts readily admits that there is a widespread impression among Americans that election fraud is a problem. Ex. 15, at 289:15-18.

Plaintiffs contend (Doc. 85, at 12) that the Legislature could have enacted a weaker version of H.B. 2023 or simply done nothing at all and relied on existing election fraud safeguards. These arguments are irrelevant to rational basis review. *Beach*, 508 U.S. at 313 (rational basis review does not provide "a license for courts to judge the wisdom, fairness, or logic of legislative choices"). It was not unreasonable for the Legislature to believe that, like many other states, Arizona needed legislation to prevent the mass collection of early ballots.[18] Nor was it unreasonable for the Legislature to determine that in light of the State's extensive regulation relating to in-person voting, more regulation of early voting was needed. Ex. 2, ¶¶ 44-45. Lastly, it was not unreasonable for the Legislature to conclude that in order to deter such conduct, criminal penalties were necessary. *See Soules v. Kauaians for Nukolii Campaign Comm.*, 623 F. Supp. 657, 664 (D. Haw. 1985), *judgment aff'd in part, rev'd in part on other grounds*, 849 F.2d 1176 (9th Cir. 1988) ("[E]ven if absentee balloting creates a greater potential for fraud, this does not warrant invalidation of absentee voting . . . especially where other measures, such as criminal laws, exist to protect the integrity of elections."); *see Peterson v. City of San Diego*, 34 Cal. 3d 225, 231 (1983).

Simply, Plaintiffs' second-guessing of the Legislature's wisdom should be directed to the legislative or referendum processes. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012) ("[Legislative] decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them.").

---

[18] *See, e.g.*, Cal. Elec. Code § 3017; C.R.S.A. § 1-7.5-107; Nev. Rev. Stat. §§ 293C.330, 293C.317, 193.130; N.M.S.A. §§ 1-6-10.1, 1-20-7, 3-9-7; Expert Report of M.V. Hood III (Ex. 17), at 9-10.

### 3. H.B. 2023 does not violate the freedom of association (Count IV).

Plaintiffs fail to establish they are likely to prevail on their claim that H.B. 2023 infringes on the freedom of association of those that harvest ballots (Count IV). The Motion to Dismiss explained that this claim is not facially plausible, (Doc 108 at 16-17), and none of the limited evidence in support of Plaintiffs' Motion rebuts this basic flaw.

Plaintiffs admit (Doc. 85, at 13) Count IV is subject to a balancing test, under which election regulations only receive strict scrutiny if they impose a severe burden. *See Ariz. Libertarian Party*, 798 F.3d at 729-30 (every election regulation, "at least to some degree," affects the right to associate, but slight burdens may be justified by state's "important regulatory interests" concerning elections) (internal citations omitted). Plaintiffs must establish H.B. 2023 will impose a *severe* burden on association because, as discussed, H.B. 2023 easily satisfies the rational-basis review applicable to lesser burdens.

Plaintiffs have not provided, and could not possibly provide, any evidence that H.B. 2023 will impose a severe burden on the ability to associate.[19] "First Amendment protection [extends] only to conduct that is inherently expressive." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 66 (2006). There is nothing "inherently expressive" about the actual conduct prohibited by H.B. 2023—the administrative act of physically collecting and delivering a completed early ballot. Nothing in H.B. 2023 prevents an individual or association from (1) asking voters whether they have returned their early ballot or providing reminders; (2) educating voters on how to complete their early ballots or applicable deadlines; or (3) explaining how and where an early ballot may be returned. Ex. 12, at 99:19-103:22. Nor does H.B. 2023 prevent anyone from transporting voters to outgoing mailboxes or polls, helping them register to vote, or otherwise engaging with them as constituents.

Even if the physical collection and delivery of an early ballot was "inherently expressive"—and it is not—Arizona has many laws that reasonably restrict association

---

[19] As discussed in the Motion to Dismiss, because no Plaintiff alleges they actually collect early ballots, (*see* Doc. 12 ¶¶ 15-30), Plaintiffs fail to state any claim that the alleged impact from H.B. 2023 on freedom of association will be felt by them. (Doc. 108, at 16).

- 13 -

with individuals actively engaged in the voting process, as discussed above. These laws do not violate the First Amendment. *See PG Publ'g Co.*, 705 F.3d at 113 ("there is no protected First Amendment right of access to a polling place"); *United Food & Commercial Workers Local 1099*, 364 F.3d at 748 ("[A] state may require persons soliciting signatures to stand 100 feet from the entrances to polling places without running afoul of the Constitution."). Plaintiffs attempt to draw a comparison to cases involving regulations on voter registration, arguing (Doc. 85, at 13) that "there is no principled distinction between criminalizing the collection of voter registration forms and early ballots." Not so. Voter registration forms and *completed* ballots raise different election integrity concerns. By destroying or altering early ballots, a ballot harvester might change an election result. *See* Ex. 14, ¶ 79 (detailing prosecutions for early ballot fraud in other states).

### 4. Plaintiffs' "partisan fencing" theory (Count V) is not an independent claim and is unsupported by evidence.

Plaintiffs' claim that H.B. 2023 was enacted with the intent to discriminate against Democrat voters (Count V) will fail. Importantly, Plaintiffs do not assert any claim that H.B. 2023 was enacted with the intent to discriminate based on *race*. This distinction is critical because, as discussed in the Intervenor-Defendants' Motion to Dismiss (Doc. 108 at 17), "the term 'partisan fencing' *does not* create an independent cause of action." *Lee I*, 2015 WL 9274922, at *10. The term simply provides a "different theory" for proving that an election regulation imposes a severe and unjustified burden on voting or associational rights. *Id.*; *see also Lee II,* 2016 WL 2946181, at *26 (partisan fencing "is somewhat of an aberration;" "Even if the evidence had revealed that partisan advantage was a latent motive in enacting [election regulation], it would not offend the First or Fourteenth Amendment."); *Vieth v. Jubelirer*, 541 U.S. 267, 281 (2004) (political gerrymandering claims are nonjusticiable political questions). The "partisan fencing" claim thus fails for same reasons discussed above concerning Counts II and IV.

Even if "partisan fencing" could stand alone as an independent claim—and it cannot—there is no actual evidence that the motive behind H.B. 2023 was to

disenfranchise Democrats. Plaintiffs primarily rely on Dr. Lichtman, a historian who opines on the intent behind H.B. 2023 based on a selective review of legislative history and without interviewing any legislator who actually voted on it. Ex. 15, at 118:6-122:6, 134:14-137:18. Another court recently rejected Dr. Lichtman's similar attempt to provide a legal opinion on legislative intent. *McCrory*, 2016 WL 1650774, at *140-41 ("Dr. Lichtman's ultimate opinions on legislative intent . . . constituted nothing more than his attempt to decide the ultimate issue for the court . . . The court doubts seriously that this is the proper role for expert testimony."). This Court should do the same.

Dr. Lichtman's legal opinions about H.B. 2023's intent rely on an unsupported determination that the Legislature's interest in preventing election fraud was "pretextual." Ex. 14, ¶¶ 69-70. His opinions are undermined by: (1) the legislative history discussing abuse of the ballot collection system in Arizona (Ex. 4, ¶¶ 7-9, 18-19; Ex. 14, ¶¶ 71-76), and (2) previous incidents in other states involving tampering with early ballots, which Dr. Lichtman admits he did not consider. Ex. 2, ¶¶ 46-47; Ex. 15, at 258:6-13; Ex. 23, at 9. Even had there been no confirmed incidents of fraud, the Legislature has a legitimate and non-partisan interest in preventing fraud before it occurs or in response to public concern. *See Lee II*, 2016 WL 2946181, at *23, 26. As H.B. 2023's sponsor noted: "To be honest, it's important to anyone who cares about maintaining and protecting the integrity of their vote, honestly, *irrespective of their party affiliation*." Ex. 9, at 9:21-10:2 (emphasis added); Ex. 2 ¶ 48.[20]

Plaintiffs' contend (Doc. 85, at 16) they have "direct evidence" that H.B. 2023 was intended to suppress Democrats, but this is not accurate. Plaintiffs have *inferred* from different statements—some made by persons who did *not* vote on H.B. 2023—about what they believe those speakers "really meant," based on their incorrect assumption that the election-fraud justification was "pretextual." For example, Plaintiffs reference (Doc. 85, at

---

[20] Dr. Lichtman's contentions concerning the alleged "irregularity" of the legislative process leading to H.B. 2023 are similarly unavailing. H.B. 2023 followed the normal legislative process. Ex. 4, ¶¶ 6-17; Ex. 14, ¶¶ 40-48.

- 15 -

16) a speech by Secretary Reagan (who did not vote on H.B. 2023) without mentioning that this speech frequently referenced the government's interest in election security and making it "hard to cheat." Doc. 101-2, at 13. Nor do Plaintiffs mention that, in the same speech, Secretary Reagan refuted that the purpose of H.B. 2023 was to suppress legitimate votes. *Id*. Plaintiffs' assertions are unsupported.

### B. **Plaintiffs cannot demonstrate that they will suffer irreparable harm.**

Plaintiffs must demonstrate not only that irreparable harm is "possible" without an injunction, but that it is "likely." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter*, 555 U.S. at 22).[21] This requires "an intensely factual inquiry requiring development of a full record" and *cannot* rely on "declarations from individuals who are not parties to the litigation" who purport to provide evidence the "law severely burdens anyone." *Gonzalez v. Ariz.*, 485 F.3d 1041, 1050 (9th Cir. 2007).[22]

Here, no Plaintiff has shown that they are likely to be irreparably harmed by H.B. 2023. Plaintiffs offer no evidence of a single voter unable to vote because of H.B. 2023, much less any Plaintiff unable to vote. Nor have Plaintiffs offered any evidence that H.B. 2023 will impose any meaningful burden on any expressive conduct protected by the First Amendment. At most, H.B. 2023 may make early voting slightly more inconvenient for some unquantified number of voters who are not parties to this case. This is insufficient to show irreparable harm. "[I]nconvenience does not result in a denial of meaningful access to the political process." *Jacksonville Coal. for Voter Prot.*, 351 F. Supp. 2d at 1335.

Plaintiffs' Motion and subsequent discovery has exposed that Plaintiffs' real issue with H.B. 2023 is that they believe Democrats will lose a partisan advantage. *See* Doc. 86 (Decl. of S. Gallardo), ¶ 18 ("it is well-known that left-leaning advocacy organizations

---

[21] This, of course, assumes that Plaintiffs have shown any injury and have standing to bring their claims, which the Intervenor-Defendants dispute. *See generally* Doc. 108, at 2-5; *see also O'Shea v. Littleton,* 414 U.S. 488, 497 (1974) (plaintiffs lacked standing to complain of speculative injury that only occurs if they "proceed to violate an unchallenged law and if they are charged, held to answer, and tried in any proceedings").

[22] Plaintiffs' declarations are objectionable under the FRE for a variety of reasons. *See* Ex. 21, Chart of Evidentiary Objections.

- 16 -

and Democratic partisan groups use [ballot harvesting] far more effectively than others"). Plaintiffs thus seek—for partisan reasons—to strike down a law implementing reasonable security and integrity measures. *See id.* (admitting that "Democratic-leaning organizations were better at ballot collection than Republicans were"); Ex. 22, Depo. of D. Berman, at 95:5-7 (Plaintiffs' expert admits that primary drivers of concerns regarding H.B. 2023 are partisan issues); Ex. 3, at 32:4-13, 34:5-10 (admitting organization would not collect a ballot if a voter supported the opposing candidate and stating "[t]he extent to which those folks voted or not voted, if they didn't support our candidate, that was on someone else's responsibility"); Ex. 18 at ¶¶ 5, 8.[23] These partisan motives do not constitute irreparable harm, which is "the *sine qua non* for all injunctive relief." *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978).

### C. The balance of the equities favors Defendants.

Granting an injunction would mean speculation prevails over actual data. "Data from actual implementation of an election law are precisely the sort of electoral information that courts are encouraged to consider, because they permit an understanding of the effect of the law based on 'historical facts rather than speculation.'" *McCrory*, 2016 WL 1650774, at *72 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 6 (2006) (Stevens, J., concurring)). No voter is denied the opportunity to vote by H.B. 2023.

### D. Upholding HB 2023 promotes the public interest.

"There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008). H.B. 2023 protects the integrity of elections. *See* Decl. of M. Johnson (Ex. 19), ¶¶ 10, 13; Decl. of L. Landrum-Taylor (Ex. 20), ¶¶ 12, 15. It does not limit the ability to vote, but only regulates early voting by mail similar to in-person voting.

## III. CONCLUSION

The Court should allow H.B. 2023 to take effect.

---

[23] *See also* Decl. of Charlene Fernandez (Doc. 95), ¶¶ 10, 18 (implying that voters who allow her campaign to collect their early ballots and deposit them will vote for her).

DATED this 19th day of July, 2016.

                                           Respectfully submitted,

                                           SNELL & WILMER L.L.P.

By: */s/ Brett W. Johnson*
     Brett W. Johnson
     Sara J. Agne
     Colin P. Ahler
     Joy L. Isaacs
     One Arizona Center
     400 E. Van Buren, Suite 1900
     Phoenix, Arizona  85004-2202

     Timothy A. La Sota
     2198 E. Camelback Road, Suite 305
     Phoenix, Arizona 85016

     *Attorneys for Intervenor-Defendants Arizona Republican Party, Bill Gates, Suzanne Klapp, Debbie Lesko, and Tony Rivero*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a notice of electronic filing to the EM/ECF registrants.

*/s/ Tracy Hobbs*