# EXHIBIT 14

Brett W. Johnson (#021527)
Sara J. Agne (#026950)
Colin P. Ahler (#023879)
Joy L. Isaacs (#030693)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:  602.382.6000
Facsimile:  602.382.6070
E-Mail: bwjohnson@swlaw.com
        sagne@swlaw.com
        cahler@swlaw.com
        jisaacs@swlaw.com

Timothy A. La Sota (#020539)
TIMOTHY A. LA SOTA, PLC
2198 E. Camelback Road, Suite 305
Phoenix, Arizona 85016
Telephone: 602.515.2649
E-Mail: tim@timlasota.com

*Attorneys for Intervenor-Defendants*
*Arizona Republican Party, Bill Gates, Suzanne Klapp,*
*Debbie Lesko, and Tony Rivero*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Feldman, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>Arizona Secretary of State's Office, et al.,<br><br>        Defendants. | No. CV-16-1065-PHX-DLR<br><br>**EXPERT REPORT OF SEAN P. TRENDE** |

Sean Patrick Trende, under penalty of perjury, makes the following declaration:

1.  I am over 18 years of age and am competent to testify regarding the matters discussed in this declaration.

2.  My areas of expertise include political history, United States voting laws and the study of campaigns and elections.

3.  I have been retained in this matter to provide expert testimony relating to the recently enacted Arizona laws on ballot harvesting, also known as H.B. 2023. In particular, I have been asked to respond to the report of Dr. Allan Lichtman. I am compensated at a rate of $300 per hour, excluding travel time. All opinions contained in this declaration are offered to a reasonable degree of professional certainty.

4.  My *curriculum vitae* is attached to this declaration as **Exhibit 1.**

## EXPERT CREDENTIALS

5.  I have studied and followed United States elections on both a part-time and full-time basis for almost two decades.

6.  I received a B.A. from Yale University in 1995, with a double major in history and political science.

7.  I received a J.D. from Duke University in 2001.

8.  I also received an M.A. from Duke University in 2001, in political science. My coursework was entirely at the graduate level, meaning that I was evaluated under the same expectations as Ph.D. students. As part of this coursework, I took two semesters of graduate level statistics.

9.      I will begin coursework as a doctoral student at The Ohio State University in August.  In preparation for my coursework, I discussed my statistical background, including follow-up work I have done in the intervening years, with the department chair and the head of the methodology subspecialty.  Both agreed that I was qualified to bypass the traditional political science methodology coursework, and to pursue coursework in the statistics department that will culminate in the award of a separate Master's Degree in Applied Statistics.

10.     I joined RealClearPolitics in January of 2009 as their Senior Elections Analyst. I assumed a fulltime position with RealClearPolitics in March of 2010.

11.     RealClearPolitics is a company of around 60 employees, with offices in Washington D.C.  It produces one of the most heavily trafficked political websites in the world, which serves as a one-stop shop for political analysis from all sides of the political spectrum and is recognized as a pioneer in the field of poll aggregation. It produces original content, including both data analysis and traditional reporting. It is routinely cited by the most influential voices in politics, including David Brooks of *The New York Times*, Brit Hume of *Fox News*, Michael Barone of *The Almanac of American Politics*, Paul Gigot of *The Wall Street Journal*, and Peter Beinart of *The New Republic*.

12.     My main responsibilities with RealClearPolitics consist of tracking, analyzing, and writing about elections. I also am in charge of rating the competitiveness of House of Representatives races, and collaborate in rating the competitiveness of Presidential, Senate and gubernatorial races. As a part of carrying out these responsibilities, I have studied and written extensively about demographic trends in the country, exit poll data at the state and federal level, public opinion polling, and voter turnout and voting behavior.

13.     I am also a Senior Columnist for Dr. Larry Sabato's "Crystal Ball."  I began writing for the Crystal Ball in January of 2014.

14.     The overarching purpose of my writings, both at RealClearPolitics and the Crystal Ball, is to try to convey more rigorous statistical understandings of elections than are typically found in journalistic coverage of elections for a lay audience.

15.     I am the author of *The Lost Majority: Why the Future of Government is up For Grabs and Who Will Take It.* The book offers a revisionist take on realignment theory. It argues that realignments are a poor concept that should be abandoned. As part of this analysis, it conducts a thorough analysis of demographic and political trends beginning around 1920 and continuing through the modern times.

16.     I also authored a chapter in Dr. Larry Sabato's *Barack Obama and the New America: The 2012 Election and the Changing Face of Politics*, which discussed the demographic shifts accompanying the 2012 elections. I further authored a chapter in Dr. Sabato's forthcoming *The Surge: 2014's Big GOP Win and What It Means for the Next Presidential Election*, which discusses demographics and Electoral College shifts.

17.     I co-authored the 2014 *Almanac of American Politics*. The Almanac is considered the foundational text for understanding congressional districts and the representatives of those districts, as well as the dynamics in play behind those elections. PBS's Judy Woodruff described the book as "the oxygen of the political world," while NBC's Chuck Todd noted that "[r]eal political junkies get two *Almanacs*: one for the home and one for the office." My focus was researching the history of and writing descriptions for many of the newly-drawn districts.

18.     I have spoken on these subjects before audiences from across the political spectrum, including at the Heritage Foundation, the American Enterprise Institute, the CATO

Institute, the Bipartisan Policy Center, and the Brookings Institution.  In 2012, I was invited to Brussels to speak about American elections to the European External Action Service, which is the European Union's diplomatic corps.

19.     It is my policy to appear on any news outlet that invites me, barring scheduling conflicts, and I have appeared on both Fox News and MSNBC to discuss electoral and demographic trends. I have spoken on a diverse array of radio shows such as First Edition with Sean Yoes, the Diane Rehm Show, the Brian Lehrer Show, the John Batchelor Show, the Bill Bennett Show, and Fox News Radio. I have been cited in major news publications, including *The New York Times*, *The Washington Post*, *The Los Angeles Times*, *The Wall Street Journal*, and *USA Today*.

20.     I sit on the advisory panel for the "States of Change: Demographics and Democracy" project.  This three-year project is sponsored by the Hewlett Foundation and involves three premier think tanks: The Brookings Institution, the American Enterprise Institute, and the Center for American Progress. The group takes a detailed look at trends among eligible voters and the overall population, both nationally and in key states, in an attempt to explain the impact of these changes on American politics, and to create population projections, which the Census Bureau abandoned in 1995.

21.     I previously authored an expert report in *Dickson v. Rucho*, No. 11-CVS-16896 (N.C. Super Ct., Wake County), which involved North Carolina's 2012 General Assembly and Senate maps. Although I was not called to testify, it is my understanding that my expert report was accepted without objection.  I also authored an expert report in *Covington v. North Carolina*, Case No. 1:15-CV-00399 (M.D.N.C.), which involved almost identical challenges in a different forum.

4

22.     I authored two expert reports in *NAACP v. McCrory*, No. 1:13CV658 (M.D.N.C.), which involved challenges to multiple changes to North Carolina's voter laws, including the elimination of a law allowing for the counting of ballots cast in the wrong precinct.  I was allowed to testify at trial.

23.     I authored reports in *NAACP v. Husted*, No. 2:14-cv-404 (S.D. Ohio), and *Ohio Democratic Party v. Husted*, Case 15-cv-01802 (S.D. Ohio), which dealt with challenges to a variety of Ohio voting laws. I was allowed to testify at trial.  The judge in the latter case ultimately refused to consider one opinion, which is not relevant to this report.

24.     I authored an expert report in *Whitford v. Nichol*, No. 15-cv-421-bbc, a partisan gerrymandering case.  I was allowed to testify at trial.

25.     Although I do not testify in defense of voter identification laws, I served as a trial consultant in *Lee v. Virginia Board of Elections*, No. 3:15-cv-357.

## OPINIONS

26.     The bulk of my report serves as a response to the Expert Report of Dr. Allan J. Lichtman [hereinafter, "Lichtman Report" or simply "The Report"].  I conclude that the Lichtman Report fails to demonstrate intent to discriminate on the part of the Arizona legislature with respect to the ballot harvesting restrictions at issue in this case.  In addition, it overstates and/or fails to demonstrate the existence of several of the Senate factors that he discusses.  The discussions are often single-minded, conclusory and one-sided, and frequently omit mention of contradictory data or important context. Its account of Arizona's voting laws needs a corrective to be of any use to the Court; this report attempts to provide that.

## Intent and the *Arlington Heights* Factors

27.     The Lichtman Report purports to follow the "methodological guidelines" set out in the *Arlington Heights* case.  This is problematic because regardless of whether or not Dr. Lichtman is really avoiding legal analysis, as he claims, the *Arlington Heights* framework has been refined and applied in subsequent Supreme Court and Court of Appeals cases (3,000, according to a WESTLAW search), all of which are missing from his analysis.  *See* Deposition of Allan J. Lichtman, July 8, 2016 [hereinafter Lichtman Dep. Tr.] at 53:15-54:9.

28.     In other words, it is likely impossible to utilize the *Arlington Heights* framework without engaging in legal analysis, because that framework has been developed and refined over the course of almost forty years of legal decisions.  Any notion of how the *Arlington Heights* framework *ought* to be applied is inseparable from an actual application of that framework.  To the extent that Dr. Lichtman disclaims performing legal analysis, but claims to employ the *Arlington Heights* case as his methodological lodestone, he is operating without any defined methodology at all.

## The Sequence of Events Leading To The Enactment of H.B. 2023, and Procedural/Substantive Departures.

29.     Because of the high degree of overlap between the first two factors discussed in detail by the Lichtman Report, I consider them together.

30.     The *Arlington Heights* Court teaches that

The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plan to erect integrated housing, we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." 429 U.S. at 267.

6

31.     In other words, if there is an arbitrary shift in the rules of the game that helps achieve a discriminatory result, it can be used as evidence that there was intent to discriminate.

32.     The Lichtman Report's description of the sequence of events leading to the enactment of H.B. 2023 begins with the introduction of S.B. 1412 in 2011. But *Arlington Heights* does not ask for a *generalized* inquiry into the events that led up to a decision.  It is narrower, asking courts to consider the *specific* sequence of events leading up to the challenged decision. *Id.* at 269. It is not at all clear why the fate of other bills related to ballot harvesting, some passed almost five years earlier, are relevant to intent in this case.  One could say, in the alternative, that the lengthy history here simply suggests longstanding concern with potential problems related to ballot harvesting and ample debate over the issue.

33.     During its description of the events leading to the passage of S.B. 1412, the Lichtman Report concedes that the bill was subject to the sorts of "public hearings, testimony by authorities or other groups, research into its implications for voting rights of minorities and other citizens, [and] extensive and open legislative debate" that are relevant to the intent inquiry. Compare Allan Lichtman, *Intentional Discrimination Against African Americans in the Adoption of North Carolina's Voter Information Verification Act, S.L. 2013-381* [hereinafter North Carolina Report], at 33 (Exhibit 2), with Lichtman Report at 4-5 [the former report is the source of the quote].  *See also* Allan Lichtman, *Expert Report: Intentional Discrimination*, Dec. 10, 2015 [hereinafter Wisconsin Report] at 47 (finding evidence of intentional discrimination when there was "little time for debate, discussion, and analysis" and that "[e]xamination of transcripts for State Assembly and State Senate sessions also indicates that there was very little debate on these measures") (Exhibit 3).

34.     The Lichtman Report notes that the Department of Justice requested additional information about S.B. 1412 once it was submitted for preclearance, including "[a] detailed description of the manner in which the prohibition will be implemented."  Lichtman Report at 5. This is incomplete. In fact, the Justice Department precleared three of the four provisions in S.B. 1412, related to the security of early ballot envelopes.  Arizona Attorney General Thomas Horne, *Effect of Shelby County on Withdrawn Preclearance Submissions*, (August 29, 2013) ("Horne Op."), available at https://www.azag.gov/sgo-opinions/effect-shelby-county-withdrawn-preclearance-submissions. The Justice Department did ask for additional information regarding a requirement that ballot harvesters provide photographic identification.

35.     The Lichtman Report observes that "Justice only asks for additional information if the state has not convincingly demonstrated that the submitted provision does not have the effect or intent of discriminating against minorities."  Lichtman Report at 5.  Dr. Lichtman concedes, however, that such requests are "not unusual" and "happen[] often."  Lichtman Dep. Tr. at 78:6-9. Moreover, we do not know whether Arizona would have or could have provided this information, how DOJ would have ruled had it been provided, or to what extent its concerns were motivated by what lawyers call "as applied" concerns as opposed to "facial" concerns (the request seems to suggest both were motivating factors to some degree).  For that matter, it could simply be that Arizona's application was incomplete.  Lichtman Dep. Tr. at 79:14-80:3.

36.     Nor do we have any direct evidence in this report as to why Arizona withdrew its submission. It could have been that Arizona was simply operating out of an abundance of caution, given that a denial of preclearance would make Arizona ineligible for taking advantage of the Voting Rights Act's "bailout" provisions, which the Supreme Court had expanded in

*Northwest Austin Municipal Utility District No. 1. v. Holder.* The Report does not consider this possibility.  Lichtman Dep. Tr. at 83:7-84:5.

     37.     It is unusual, on page seven, that the Lichtman Report employs a scaling for the chart running from 48 percent to 64 percent.  This elimination of the baseline serves to exaggerate the difference between Arizona's turnout and the national turnout.  For example, the differences between Arizona's turnout and the national turnout illustrated in Chart 1 are actually smaller in every year than the gap found between non-Hispanic white turnout as a share of CVAP and as a share of the electorate in Chart 2.  The scaling chosen in Chart 1 delivers a different impression.  If we were to reproduce Chart 1 using the scaling employed in Chart 2, by retaining the zero baseline, it would look like this:



     38.     This is not to say that the Report is incorrect in asserting that Arizona's turnout lags behind United States turnout, only that the chart overstates the scale of things.

39.     The Report's specific discussion of the procedural deviations involved in this case is more problematic.  First, as noted above, it is reasonably clear from *Arlington Heights* that the deviations the Court had contemplated there were arbitrary decisions that would give rise to an inference of a desire to discriminate against minority groups.  For example, the *Arlington Heights* Court mentioned a case from the 10th Circuit, *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970), where a developer had planned to build low-income housing, and sought to have the relevant plat of land rezoned as high-density residential property. Notwithstanding the fact that all the surrounding area had been zoned for high-density residential property, and notwithstanding the fact that the former planning director for the city stated that there was no reason the particular plat of land should not be rezoned, the city refused to approve the rezoning. The *Arlington Heights* Court suggested that this sort of flouting of normal practices or procedures in a way that directly impacted nonwhites could be evidence of intent to discriminate.

40.     The four procedural deviations that the Lichtman Report lists do not really fit within this framework, or into the example mentioned above in ¶ 30.  First, and perhaps most importantly, none of these supposed deviations stem directly from the passage of H.B. 2023 itself. Lichtman Dep. Tr. at 105:14-106:4. All of the examples instead relate to earlier provisions passed in different legislative sessions, dealing with both ballot harvesting and other issues; they find their way into this report only because of the methodologically suspect decision to examine earlier attempts to pass various ballot harvesting restrictions in previous years.

41.     Second, at no point does the Report identify any actual deviations from legitimate procedure.  Nothing described is unprecedented, including, by the Report's own terms, the withdrawal of preclearance papers, Lichtman Report at 6; the rules of the game were never

10

changed.  Third, the Report fails to identify any actual instances of the Attorney General's office or the Legislature operating *outside* existing procedural rules.

42.     The first two purported procedural deviations—which are arguably the same deviation—include the state Attorney General's decision to withdraw the preclearance submission for the photographic identification requirement for ballot harvesters, and the subsequent decision of the Legislature to repeal that bill.  But there is no evidence here that any procedures were actually flouted. In fact, the Report suggests that S.B. 1412 went through the normal debate process and was amended multiple times, see Lichtman Report at 5, while supporters considered at least two amendments to H.B. 2305. There is no independent inquiry into the reasons behind the withdrawal of the preclearance submission, nor does the Report look into the legislative history behind the repeal of S.B. 1412.

43.     The third purported deviation is the passage of H.B. 2305 in the "waning hours" of the legislative session, with little time for consideration and debate. Lichtman Report at 11. It is unclear why the passage of legislation in the waning hours of legislative sessions is unusual, as something must, by definition, be the last legislation passed. Perhaps the passage of *major* legislation at the close of a legislative session is unusual in Arizona, but the Report provides no evidence to justify such a belief. It is certainly not unheard of for such legislation to be passed late in the session, given that in both Wisconsin and North Carolina, controversial legislation was introduced "late in sessions" with "little time for debate, discussion, and analysis." *See, e.g.*, Wisconsin Report at 47. Moreover, given that the ballot harvesting regulation had already been the subject of substantial public debate, it is unclear how much of a deviation passing this legislation really represented.  Finally, the Report identifies no actual deviation from procedure: No rules were changed or violated, under the terms of his report.

11

44.     The fourth supposed deviation discussed is the repeal of H.B. 2305 in the face of a public outcry and likely repeal by the electorate as the result of an initiative. First, the actual "rules of the game" do not appear to have been altered or ignored.  Second, legislators were clear (in the sources cited in the Report) that one of their reasons for repealing H.B. 2305 was the unintended consequence of making portions of the state elections code unamendable and limiting their powers to act in the future.  Lichtman Report at 10.  Third, it is hard to see how representatives responding to constituent outcry represents any sort of procedural deviation that would serve as evidence of an intent to discriminate. In fact, this is arguably exactly how a representative democracy ought to work.

45.     Any analysis of H.B. 2023 in the context of H.B. 2305 is further complicated by the fact that the latter bill was an omnibus bill that contained three major provisions in addition to the ballot harvesting regulation: It "tightened requirements for petitions for referenda, initiatives and recalls; made it more difficult for third parties to gain access to ballot positions; and made it easier for election officials to remove voters from the permanent early voter list." Lichtman Report at 9.  Then-Senator Michele Reagan, when discussing the repeal of the bill, was clear that the intent of the Legislature was to proceed with an "a la carte" approach to the legislation, suggesting that from an electoral perspective, some of these provisions were more acceptable than others. Lichtman Report at 10.

46.     The Lichtman Report lists two supposed substantive deviations as well, both of which stem from the fact that H.B. 2023 was a stronger version of earlier bills that had been abandoned. Lichtman Report at 11-12. These do not appear to be deviations at all, much less the sorts of deviations the *Arlington Heights* methodology contemplates, such as an application that would normally be routinely approved being inexplicably denied. Here, ballot harvesting had

been a source of controversy and debate in the Arizona Legislature for five years. According to the Report, Secretary of State Reagan had been active on the issue while in the Legislature and had campaigned on the issue in 2014.  It is unclear why the Legislature pursuing this issue after her victory operates as any sort of substantive deviation.

47.     The Lichtman Report sounds a constant theme that the comparatively harsh penalties found in H.B. 2023 have some sort of significance.  First, the Lichtman Report lacks any cross-state comparison to determine whether or not other states do, in fact, criminalize ballot harvesting; it is a mere assertion. Second, this is puzzling for a voting rights case.  Such provisions are certainly relevant from the *ballot harvester's* standpoint, but not from the voter's standpoint.  From the voter's standpoint, ballot harvesting theoretically ceases to exist regardless of whether there is a misdemeanor or felony penalty attached to it. The only way this could have a substantial impact from the voter's point of view is if ballot harvesters were more likely to break the law with only a misdemeanor penalty attached. Third, as noted earlier, the initial version of S.B. 1412 also contained a criminal provision; the version in H.B. 2023 was not a deviation from how at least some legislators had been thinking about ballot harvesting for quite some time.

48.     In short, the Lichtman Report provides no real evidence of any deviations in the sequence of events leading up to the enactment of H.B. 2023.  Legislative procedures were consistently followed, no rules of the game were changed to achieve a disparate outcome, and the outcome itself was not even all that unusual, especially given that ballot harvesting had apparently been the subject of lengthy debate and campaigning in the state.

Contemporary Statements of Decisionmakers

Secretary Reagan's CPAC Speech

13

49.     For direct evidence of the intent to discriminate, the Lichtman Report points primarily to a speech given by Secretary Reagan in 2016. First, it is noteworthy that there is no evidence of intent to discriminate on the basis of race, which is the primary concern of *Arlington Heights*.

50.     Second, the speech must be placed in context.  It was delivered to the Conservative Political Action Conference, a prominent annual gathering of conservative politicians and activists.  It is a major fundraising and networking opportunity for Republican politicians, and its straw poll marks it as a significant event in the presidential election calendar. Given the strong ideological bent of the attendees, the tone of the speech is unsurprising.

51.     Given this context, it is not entirely clear what is objectionable in Secretary Reagan's speech.  The report includes italicizations of the following snippets:

- A reference to the "radical left" utilizing ballot collection, which the Report asserts is a way conservative Republicans refer to Democrats.

- A claim that "your Republican secretaries of state" were fighting against ballot fraud.

- A quote that "[t]he GOP can nominate the most superior candidates in the country," but will be unable to win without ballot security.

- A request to support "the 28 Republican secretaries of state nationwide" who try to make it "easy to vote and hard to cheat."

52.     In my experience as an elections analyst, conservative Republicans rarely use "radical left" to refer to Democrats wholesale.  The term – which is certainly often applied by Republicans too broadly – is better understood as referring to a broad, amorphous collection of liberal interest groups, politicians and activists.  For that matter, the term is not used exclusively by Republicans to apply to describe the far left of American politics, *e.g.*, Bhaskar Sunkara, "The

Sanders Democrat is Paving the Way for the Radical Left," *Washington Post*, Mar. 25, 2016, https://www.washingtonpost.com/news/in-theory/wp/2016/03/25/the-sanders-democrat-is-paving-the-way-for-the-radical-left/.  Indeed, Maricopa Board of Supervisors Rep. Steve Gallardo agreed with this sentiment, albeit with softer language, and distinguished between left-leaning groups and Democratic groups: "[a]lthough groups from all ideological backgrounds use ballot collection, it is well-known that left-leaning advocacy organizations and Democratic partisan groups use it far more effectively than others." Gallardo Declr. ¶ 18.  Additionally, many of Plaintiffs' own declarants in support of their motion for preliminary injunction specifically self-describe as non-partisan, yet represent organizations that nevertheless seem to exhibit a defined ideological bent.  *See, e.g.*, Declaration of Tory Anderson ¶ 3 (Arizona Alliance of Retired Americans); Declaration of Samantha Pstross ¶ 3 (Arizona Advocacy Network); Declaration of Rebekah Friend ¶ 9 (AZ AFL-CIO); Declaration of Ian Danley ¶ 3 ("One Arizona).

53.     More importantly, as an elections analyst, I instantly recognize this as the sort of boilerplate rhetoric typically offered at meetings of groups like CPAC.  It would be highly unusual for Secretary Reagan *not* to extol the supposed virtues of the Republican Party in such a speech.  Likewise, it would be an odd CPAC speech if she attempted to be fair and balanced with respect to the Democratic Party.  While this does not mean that Secretary Reagan should enjoy a sort of rhetorical "immunity" for comments made at CPAC, it is an important piece of context that any objective analysis must take into account.

54.     Contrary to the Report's assertions, nothing here suggests, explicitly or otherwise, that "prohibitions on this practice were crafted by Republicans in Arizona with the intent to restrict voting by Democrats." In fact, Secretary Reagan implicitly rejects such charges. *See*

Lichtman Report at 13 ("The radical left, who uses ballot harvesting, has blocked our common sense attempts to close this loophole, *citing the oft-used phrase of voter suppression or that we are trying to block access to the polls.*") (emphasis added).

55.     Every sentence that is cited to in the Report is part of a constant refrain from Secretary Reagan that she believes that Democrats are trying to steal elections, and that Republicans are trying to stop them, ensuring that the electorate's true choice emerges.  This continues in snippets that Dr. Lichtman does not cite.  For example, after the line about the "radical left" claiming Republicans are trying to suppress votes or block access to polls, she continues "[f]ar from it.  As Republicans, we proudly believe in greater access to the polls.  We believe that it should be easy to vote.  But we also believe that it should be hard to cheat.  That should be the gold standard that you demand your secretaries of state are fighting for." At another point, she revisits this theme: "It's elected officials like myself around the country who are the ones keeping the process honest by protecting elections from the Progressive [N.B.: could also be "progressive"] efforts to loosen registration requirements." While I believe this speech is of limited utility overall, to the extent that this speech is worth taking at face value, it would suggest that the intent of Secretary Reagan was attempting to stop something she viewed as an opportunity for fraudulent conduct.

56.     The Lichtman Report cites a few other considerations from the speech. For example, it notes that Secretary Reagan failed to offer concrete examples of ballot harvesting that led to fraud. But once again, this overlooks the context of this speech.  It is not testimony to a committee, nor is it a presentation to a think tank – e.g., the sort of occasion where one might expect such detail to be included.  It is a five-minute speech to what is effectively a rally for partisans, most of whom likely already believe that voter fraud is a significant problem. In my

experience as an elections analyst, it would be unusual to include an in depth discussion of the policy in this context.

57.     Second, the Report takes issue with Secretary Reagan's statement that ballot harvesting violates the one-person one-vote principle. But she is not making a legal argument here; she is speaking to an audience of like-minded conservatives about a generalized principle, and making what appears to be a rhetorical flourish.  Additionally, from the point of view of someone who believes ballot harvesting fraud occurs, such fraud would represent a single individual casting multiple votes.  Dr. Lichtman may not believe such fraud occurs – in which case Secretary Reagan has made a bad argument, not provided evidence of intent to discriminate – but Secretary Reagan's speech, if anything, provides evidence that *she* believes ballot harvesting fraud occurs.

58.     Third, the Report claims that Secretary Reagan's expressed desire to make things "easy to vote" is a mere rhetorical flourish, and that Republicans have consistently made it more difficult for Arizonans to vote.  There are two problems with this assertion.  First, it is unclear when rhetoric is to be taken at face value, and when it is simply to be dismissed as rhetoric. Second, the statement that Secretary Reagan and Arizona Republicans have consistently made things more difficult for Arizonans to vote and elect candidates of their choice is simply untrue, and reflects at best a superficial analysis of Arizona's overall voting regime. In fact, the *only* laws the Report seems to consider here are the laws that Plaintiffs challenged in this case.

59.     In fact, Republicans have, on many occasions, helped to expand ballot access in Arizona.  For example, Arizona implemented no-excuse early voting by mail on April 30, 1991. 1991 S.B. 1021 § 1.  At the time, it was only the third state in the nation to do so.  *See* http://moritzlaw.osu.edu/electionlaw/documents/stateelectionreforms.pdf.  The state had a

Republican governor, while Republicans controlled the state House of Representatives at the time. *See* Phil Duncan, *Politics in America 1992*, 52 (1991).

60.     Arizona implemented a twelve-day period of mandatory in person voting on December 31, 1997, making it the 15th state in the nation to do so. *See* http://moritzlaw.osu.edu/electionlaw/documents/stateelectionreforms.pdf; 1997 S.B. 1280. It had a Republican governor at the time, while Republicans controlled the state Senate and state House (the latter by an almost 2-1 margin). *See* Philip D. Duncan & Christine C. Lawrence, *Politics in America 1998*, 39 (1997). It has since extended the early voting period to include 23 days of early voting. Based upon my experience reviewing and analyzing early voting periods, only 11 states have longer periods. Because Arizona Republicans have held at least one house of the Legislature for all of the intervening years (and both houses in all but two), they necessarily approved the extension. *See* Michael J. Dubin, *Party Affiliations in the State Legislatures: A Year by Year Summary*, *1796-2006* (2007); Barone et al, *The Almanac of American Politics 2010*, 80 (2009).

61.     Arizona implemented online voter registration in July of 2002, becoming the first state in the nation to do so. *See Online Voter Registration: Case Studies in Arizona and Washington*, available at http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2010/onlinevoterregpdf.pdf. It had a Republican governor and state House at the time. Brian Nutting & H. Amy Stern, *Politics in America 2002*, 29 (2001).

62.     Arizona implemented permanent no-excuse early voting by mail on May 8, 2007, making it just the fourth state in the nation to do so. 2007 H.B. 2106 § 5. Republicans controlled the state legislature at the time, and Secretary Reagan voted for this bill. *See*

http://www.azleg.gov//FormatDocument.asp?inDoc=/legtext/48leg/1r/bills/hb2106.hfinal.1.asp&
Session_ID=85; Barone, et al., *The Almanac of American Politics 2008*, 90 (2007).

63.     Finally, two pages of the report are dedicated to the fact that, during the March
2016 PPE in Arizona, Secretary Reagan told a gubernatorial staffer that she was available to
accept ballots at the Secretary of State's office, in case anyone had forgotten to mail his or her
ballot. Based upon a handful of news clippings, the report suggests that this is evidence that
Secretary Reagan's opposition to ballot harvesting was merely a partisan attempt to harm
Democrats, rather than a legitimate attempt to prevent fraud.

64.     This is hardly evidence that she is not genuinely concerned about voter fraud,
given that she was breaking no laws (H.B. 2023 had not yet come into effect, as the Report
makes clear) and given that she would have no reason to suspect herself of fraud. Additionally,
while the Report claims that it was a "stretch" to claim that she was acting within her official
duties when waiting to pick up ballots returned to the Secretary of State's offices, it offers no
support for this assertion, which appears not to be based upon either interviews with state
elections officials or legal research into what constitutes the "official duties" of state elections
officials.

65.     In fact, one of the articles that the Report cites includes the Secretary's claim that
she and the others in her office are all "certified as election officials, which allows them to be
around ballots and have access to the counting equipment." *See*
http://tucson.com/news/local/govt-and-politics/elections/arizona-secretary-of-state-defends-
offer-to-collect-unmailed-ballots/article_fa0d9047-cca1-5b9b-84b9-70112f510c91.html. The
Report dismisses Secretary Reagan's statement of the undisputed fact that her office had been in
charge of monitoring, checking and sealing voting equipment with what can only be described as

a *non sequitur:* a reference to the disastrous PPE vote (which occurred after this incident) and the state's history of official discrimination. More importantly, this section is about Secretary Reagan's mindset and intent. The Report never makes clear why she would believe that her office is likely to commit ballot fraud, especially since *someone* from the state has to handle ballots during an election.

66.     Moreover, it appears that other elections officials likewise offered the same service, although they will not do so after the ballot harvesting provisions go into effect. Lichtman Report at 15.  This suggests that Secretary Reagan was not operating in a vacuum here.

67.     Finally, the Report cites a statement by Rep. Michelle Ugenti-Rita that, in her view, the government ought not "baby" people who wanted to vote.  This statement, by one of the lead sponsors of the bill, does not suggest that Rep. Ugenti-Rita is opposed to making it *easy* to vote; it just suggests that she did not, in her words, feel the need to address "every last what if, what, what if, what if."  More importantly, it is altogether unclear why this statement by Rep. Ugenti-Rita would undermine *Secretary Reagan*'s stated belief that it ought to be easy to vote.

68.     Given the foregoing, there exists little, if any, direct evidence of impermissible intent to discriminate under these facts.

Pretextual Statements

69.     The Report goes through four sets of contemporary statements of reasons for the law that it finds to be mere pretexts for the legislators' real goal of disenfranchising Democrats. While it offers reasons that Dr. Lichtman himself does not find the statements to be convincing, it offers no reason why the *legislators* themselves could not have been sincere when making these statements. The worst that can be said in most of these circumstances is that these are statements about which people might disagree.

20

70.     What we see throughout the Report is that Republican legislators in Arizona had expressed concerns for years that ballot harvesting held a potential for fraudulent activity.  The Report, apparently without the benefit of any first-person interviews with any of these legislators, determines that the representatives could not have really believed this.  Such a conclusion is without basis.

71.     For example, the Report cites to Representative Thorpe, arguing that ballot harvesters could opt to discard ballots for one party or the other.  The Report offers no reason why this could not happen, nor, more importantly, does it offer any evidence that this was not, in fact, a concern of Rep. Thorpe.

72.     The Report likewise takes an anecdote from a candidate for the State House that reflects his apparent belief that ballot harvesting was being conducted in a manner such that people were receiving meals and other remuneration in exchange for bringing in ballots.  Again, there is no evidence that the candidate did not, in fact, receive this report, nor is there any explanation as to why a candidate might not legitimately believe this report.

73.     The Report relays the statement from Sherrod Harvey, a Republican Party official, that "hundreds of people" had told him that constituents were made to feel uncomfortable by ballot harvesters showing up at their door, and that they had concerns that harvesters might dispose of these ballots on a partisan basis.  As with the other examples, one is not *compelled* to take this statement at face value. On the other hand, there is no real reason offered *not to*, nor is there any analysis offered as to why a state official could not act in response to concerns expressed by "hundreds" of constituents.

74.     The Report offers a statement made during the course of the debates over H.B. 2023, relating to a videotape of a person carrying in a box of ballots, and expressing concerns

21

that there was potential for fraud here.  Lichtman Report at 16.  This person actually makes a fairly modest claim: not that the person delivering the ballots *was* acting illegally or was stuffing the ballot box, but rather makes a claim that a person *could* do so, and that there was a weakness in the system.

75.     This is different from the more heated rhetoric the Report later relays, coming from a statement from the Maricopa County Republican chair.  This blog post, made two years *before* the debate over H.B. 2023, suggested that the person in the video could have acted illegally and was "a vulgar, disrespectful, violent thug who had no respect for our laws." *Id.* at 17.   Of course, this blog post did not occur in the context of any legislative debate over the law, which is the inquiry that *Arlington Heights* seemingly demands. Nor was it contemporary to those debates. The Report also omits the actual transcript of the conversation, which both suggests that a belief that the individual was, in fact, vulgar and disrespectful was at least supported by evidence, and that there was some cause for concern about the integrity of at least one of the ballots:

The following dialog [sic] occurred:

Person from [Citizens for a Better Arizona]:  "What's your problem?"

A. J. LaFaro:  "I don't have a problem."

Person from CBA: "Stop watching me.  You're annoying me."

I continued to watch.

A. J. LaFaro:  "One of your ballots isn't sealed."

Person from CBA:  "It's none of your business.  What's your name?"

A. J. LaFaro:  "I'm the Chairman of the Maricopa County Republican Party.  What's yours?"

Person from CBA:  "Go f*ck yourself!  I don't have to tell you who I am."

He continued to stuff the ballot box and took a photo of several ballots that he staged in the slot of the ballot box.  He hid behind the ballot box and table as he slipped the unsealed ballot into his brief and left.  He came back with the unsealed ballot that he sealed outside and dropped in [sic] the ballot box.

As he was leaving, he said, "Go f*ck yourself gringo."

76.     While this does not excuse the author's racially tinged speculation as to whether the individual was an "illegal alien" or a "dreamer," if true, it would certainly provide needed context as to why someone might refer to this individual as "vulgar" and "disrespectful," and have concerns about the integrity of at least one ballot.

77.     The Report consistently substitutes the judgment of Dr. Lichtman for what the legislators *must* have believed.  In fact, it does not seem to even grapple with the possibility that legislators *might* have believed their statements. But even assuming that all of the foregoing beliefs are ultimately unfounded – along with the statements in the record that the Report does not refer to – it does not provide proof that all of these representatives are, in fact, merely offering smoke screens for their true intention.

78.     The Report cites to a handful of studies that find no evidence of fraud from ballot harvesters.  But it is not clear from the evidence provided that any of these studies –which *do* report actual evidence of voter fraud occurring in Arizona—actually investigated ballot harvesting.

79.     Moreover, this would not undermine the officials' reported belief that fraud related to ballot harvesting *could* occur, or was occurring on the basis of constituent reporting. This is important because, while many investigations into fraud have occurred in the context of

in-person fraud as a justification for voter identification provisions, experts have testified in those cases that absentee voting is a more likely source of voter fraud.  Report of Dr. Barry Burden, *United States v. McCrory*, at 25 (Exhibit 4).  *See also* Craig R. McCoy, "Last Sentence is Issued in Second District Vote Probe. Craig Cummons Got Probation for his Absentee-ballot Shenanigans.  The State has Rested its Investigation," available at http://articles.philly.com/1996-02-14/news/25657086_1_vote-fraud-absentee-ballot-absentee-ballot; Darryl Isherwood, "Essex Man Convicted of Absentee Ballot Fraud," available at http://politickernj.com/2012/09/essex-man-convicted-of-absentee-ballot-fraud/; Toluse Olorunnipa, "Judge Wants Police to Find 'Queen of Absentee Ballots'," available at http://www.miamiherald.com/news/politics-government/article1943699.html.

80.     The Report likewise dismisses concerns about voter confidence.  It states that no backer of H.B. 2023 could cite evidence of "widespread public concern" regarding ballot harvesting, notwithstanding the fact that the Report cites an official testifying to "hundreds" of constituents expressing concerns about the practice.  It also suggests that the failure of officials to submit H.B. 2305 to a referendum vote suggests that there was no widespread public concern over ballot harvesting.  But once again, the analysis is incomplete; H.B. 2305 was not H.B. 2023. It was an omnibus bill that contained multiple provisions that angered a variety of constituencies. The ballot harvesting ban itself was popular enough that Secretary Reagan, in the Report's own telling, campaigned on the issue, and defeated a high quality Democratic candidate (who had previously served as the state's Attorney General) albeit in a very good Republican year.

81.     The Report also declares that the idea that voters could easily submit early ballots by mail to be a mere pretext, citing two statements from Representatives whose constituents were Native Americans, and who had to travel to mail their ballots.  But the Lichtman Report

24

undermines its own claim that this was a pretextual belief that masks invidious intent by citing evidence from a Representative who favored the bill, who admitted that she was *unfamiliar* with rural voters who had to rely on post office boxes.  While this might go to the Court's inquiry as to the burden presented by the ban on ballot harvesting – and then, based on this evidence, only to a burden on rural Native American voters – it does not inform any analyst as to whether legislators actually believed that ballots would be generally easy to cast after the ban on ballot harvesting was passed.  Dr. Lichtman also fails to account for the fact that the Arizona Democratic Party apparently advises members of the Navajo Nation who lack access to Post Offices or reliable transportation to vote in person on Election Day, rather than attempting to vote early by mail.  *See* Healy Dep Tr. at 62:17-25. (Exhibit 5).

82.     The Report likewise concludes that a desire to achieve conformity with other states is pretextual.  It claims that 31 of 51 voting jurisdictions in the United States, or 61 percent, do not regulate ballot harvesting (the Report calculates the number as 32 of 50, but this ignores the District of Columbia – typically treated as a state in these sorts of investigations – and counts Arizona as a state that does not regulate the practice).  But the Report offers no basis for determining when it becomes reasonable to wish to achieve conformity with other states in the country—46 percent? 50 percent?  Again, the fact that legislators apparently believed that multiple states afforded some type of regulation of ballot harvesting provides evidence that should at least be considered that they believed they were providing a reasonable attempt at ballot security.

83.     Overall, the evidence that the Report presents, when combined with the evidence it does *not* present, provides little evidence of actual intent to discriminate under the *Arlington Heights* methodology.

25

**Senate Factors**

84.     The recitation of the senate factors is likewise one-sided.  While I agree that some of the senate factors likely apply to Arizona, at least to some extent, the report consistently fails to offer important, obvious mitigating considerations that would be relevant to any totality of the circumstances analysis, and refuses to at least consider things from perspectives other than the author's.  This is especially important because many of the Senate Factors are not yes/no propositions, but rather ask courts to evaluate the *degree* to which various factors apply. Perhaps most importantly, any nexus between the factors it lays out and impact of the ballot harvesting law are, at best, asserted in a cursory manner.  Based on this report, it is difficult to see how the Senate factors interact in a meaningful way with the limitation on ballot harvesting.

Factor 1: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.

85.     The Report provides a lengthy list of incidents that it contends impact the ability of members of the minority group to register, vote, or otherwise to participate in the democratic process.

a.  The state was covered by Section 5 of the Voting Rights Act: It is important to observe that the Supreme Court declared that by 2013, the coverage formula had become outdated.  It is unclear whether Arizona would be a covered jurisdiction under a constitutionally valid formula.

b.  DOJ objected to the 1990 and 2000 redistricting plans. The Report neglects to mention that the 2000 redistricting plan was apparently drawn by the state's independent redistricting commission, rather than the Legislature. Moreover, it is difficult to see how this alleged gerrymandering would interact with a ban on ballot harvesting, especially since it is unlikely that any of these plans that drew DOJ objections were ever actually implemented.  Additionally, Dr. Lichtman concedes that these are the *only* DOJ objections ever lodged against Arizona, although this is not included in the Report.  Lichtman Dep. Tr. at 153:21-154:10.

Finally, the Report ignores the 2012 redistricting, which was precleared on the first submission, see Letter from T. Perez to Mary O'Grady, Apr. 26, 2012,

26

available at http://azredistricting.org/News-Releases/docs/LD-Approval-DOJ.pdf, a fact of which Dr. Lichtman was aware. Lichtman Dep. Tr. at 84:13-21. This is exactly the sort of analysis of countervailing factors that the Lichtman Report lacks, which would give the Court the information it needs to accurately assess the Senate factors.

c.   <u>Arizona did not repeal its literacy test law until 1972.</u> It is altogether unclear how a two-year delay in the formal repeal of the state's otherwise-unenforceable literacy test touches upon the right of minority groups to register, vote, or participate in the process at all.  The Report provides no evidence that this law was enforced subsequent to the implementation of the national ban.

Additionally, unenforceable laws sometimes stay on the books for an inexplicably long time; Arizona law still bans the Communist Party from the ballot in the state, despite the law having been declared unconstitutional around the time that the state repealed its literacy test. A.R.S. § 16-805.  Moreover, it is not clear how the state's two-year delay in the formal repeal of its literacy test interacts with a need for ballot harvesting.

Finally, the Report never clarifies why this Court should consider the delay in repealing the literacy test, versus the fact that the literacy test was repealed over forty years ago.  The latter seems more relevant to an inquiry regarding the effects of a law today.

d.   <u>"English Only" Legislation.</u> As the article to which the Lichtman Report cites explains, the federal court referenced struck the act down on First Amendment grounds, rather than racial grounds. *See also* "Court Strikes Language Law," http://www.nytimes.com/1994/12/09/us/court-strikes-language-law.html. Likewise, the state Supreme Court struck the legislation down on free speech grounds and "fundamental freedom" equal protection, rather than as an invidious racial categorization.

Moreover, the article to which the Lichtman Report cites lists some important mitigating considerations for this Court to consider: the state refused to defend the constitutionality of the ballot initiative, and implemented it in the narrowest way it could conceive. While certainly not dispositive, this is important contextual information that an objective observer would provide to a factfinder.

In addition, the truth is that legislation of this sort often involves widespread, cross-racial support.  For example, when Proposition 227 passed in California, which barred bilingual education, exit polling suggested that 67 percent of whites, 48 percent of African-Americans, 57 percent of Asian-Americans, and even 37 percent of Hispanics supported the referendum. http://www.usc.edu/dept/education/CMMR/227/Times227exitpoll.pdf.  Finally, it is unclear how exactly this interacts with a need to maintain ballot harvesting.

27

e.  Prop 200.  This law was struck down under the NVRA of 1993, not under the Voting Rights Act or as invidious racial discrimination under the 14th Amendment.  In addition, since Dr. Lichtman admits that the only Section 5 objections lodged against Arizona in the past 40 years were to redistricting plans, it seems likely that Prop 200 precleared.

f.  English Fluency Requirement. The Report provides a single instance of an individual removed from the ballot because of an inability to speak English adequately. It is unclear how the apparently isolated incident interacts with a need for ballot harvesting.

g.  PPE voting.  The Report references the subject of this litigation as proof that Arizona has a history of discrimination and that the subject of this litigation should be struck down as unconstitutional. This is circular. Moreover, it provides no citation to the "study" finding a disparate impact on minority voters. Presumably, this study will be discussed in the expert reports dealing with those provisions, assuming that it is not the expert reports themselves.

86.     The Report also provides examples of laws that it contends are invidious discrimination that affect the employment and educational opportunities of nonwhite voters, which in turn would affect the ability of minorities to vote.  It is not clear to me that the law contemplates this sort of "house-that-jack-built" approach to causation, nor is it clear why Dr. Lichtman, who is not a sociologist, believes that they affect the ability of minorities to participate in the political process.

a.  The delayed implementation of MLK Holiday.  It is not at all clear, and the Report does not try to explain, why a six-year delay in implementing the law, occurring over twenty years ago, would affect the ability of minorities to participate in the political process, or to need ballot harvesting today.  Moreover, it is not clear why this Court should consider the delay in enacting the holiday, rather than the fact that the state ultimately implemented the law quite some time ago.

b.  Amendments to the Arizona Employment Protection Act. The Report provides no evidence as to how these amendments affect minorities' ability to participate in the political process, interact with the specific provisions in this case, or, for that matter, represent official state-sponsored discrimination.  It also seems noteworthy that federal law likewise limits the scope of the Civil Rights Act to firms employing more than 15 individuals. 42 U.S.C. 2000e(b).

28

c.  Prop 107. The Report provides no evidence as to how a ban on state-sponsored affirmative action constitutes official discrimination, or how it affects minorities' ability to participate in the political process. An objective analysis would at least acknowledge that proponents of such a ban, including at least one Supreme Court justice, view such bans as the removal of state-sponsored discrimination.

d.  Ethnic Studies Ban. The Report provides no evidence how this law, which was struck down on free speech grounds, constituted official discrimination, or impacted the ability of minorities to participate in the political process.

e.  S.B. 1070. The Report once again provides no evidence how this law, which was struck down on Supremacy Clause grounds, not as invidious discrimination, interacts with a need for ballot harvesting.

Moreover, any objective coverage of the law would address the fact that the law at least nominally bans racial profiling in stops. Finally, it is unclear how this law would impact the ability of minorities to participate in the political process.

f.  Consent decree – The Report provides no explanation how this would impact minorities' ability to participate in the political process. If anything, the fact that this litigation is being resolved would seem to indicate progress in the state.

g.  Sheriff Joe Arpaio: While Sheriff Arpaio's techniques are objectionable to many, the Report provides no explanation how they would impact minorities' ability to participate in the political process, or how they would give rise to a need for ballot harvesting.

87.  The Report references another report by the Center for American Progress that suggests Arizona lags behind other states with respect to ballot access. Once again, the Report fails to inform the Court of crucial information. First, while the Center for American Progress is well respected, and I have high regard for many of its scholars, it nevertheless describes itself as an organization that pushes "bold, progressive ideas" and that aims "not just to change the conversation, but to change the country." *See* https://www.americanprogress.org/about/mission/. Again, this does not mean that CAP reports should be disregarded. It does mean that their agenda should at least be *noted*, and that an analyst should at least be somewhat wary when dealing with novel, arbitrary rankings such as these. Dr. Lichtman seems to understand this, as

29

he defended his failure to include A.J. LaFaro's description of the interaction with the ballot harvester above on the grounds that LaFaro suffers from "an interest and bias." Lichtman Dep. Tr. at 286:16-287:7.

88.     Second, the Report neglects to provide needed context on the award of an "F" to Arizona here.  States were not graded on curves where the median state received a "C." A majority of states were awarded a D+ or lower; only 13 states received grades of "B" or better. This is because the report card harshly penalizes states that do not implement all of the laws that CAP recommends adoption of at the end of its report, including pre-registration for voters at age 17 (which only about ten states have adopted), mandatory early voting on weekends (about half of the states do not even permit it; Arizona does offer it, albeit inconsistently), and elimination of any law even *requesting* any sort of identification, photographic or otherwise, before voting. CAP Report at 74.  Moreover, the CAP report does not consider important factors, such as the fact that, although Arizona does not have early voting on weekends, based upon my experience as an elections analyst, it has longer early voting periods and offers more early voting days than most other states.  In other words, it does not purport to be a comprehensive review of voting regimes; it is a review of whether or not states have implemented certain laws that CAP favors.

89.     Third, the Report omits the fact that CAP is engaging in an overall assessment of the state of Arizona's democracy, as well as those of the other 49 states and the District of Columbia. CAP actually rated the health of Arizona's democracy quite high overall, rating it the 12th healthiest democracy in the country.

90.     None of this is to say that it is wrong to reference the CAP report.  It is only to say that any objective assessment would discuss the limitations of the CAP report, rather than taking it at face value.

91.     Finally, the Report discusses the high rate of provisional ballot rejection in the state.  It is not made clear why this is relevant to a process for collecting mail-in early ballots, especially since (according to the EAC, cited by the Report) the most common reason for provisional ballot rejection in Arizona is that the voter was simply not registered in the state of Arizona (which would not be a problem for someone who has already received a mail-in early ballot).

Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.

92.     I would not dispute that there is some degree of racially polarized voting in Arizona, although I use this in the colloquial sense, rather than a legal sense. But this factor is evaluated on a "sliding scale," and Arizona has displayed among the lowest levels of racially polarized voting in the country, utilizing the time constraints that Dr. Lichtman has selected, especially as it relates to African-Americans.  This surprised me.

93.     First, the Report omits important context here.  When reporting elections, it chooses to eliminate elections that are not what it calls landslide elections, defined as elections that are decided by a margin of 20 points or more.  Lichtman Report at 29.  It gives no basis for such a cutoff, and as an elections analyst, I am unfamiliar with any such cutoff; President Obama's 2008 win is routinely described as a landslide, despite his having won by just over seven points.

94.     Moreover, even if there were a basis for calling an election a "landslide," it is a mistake to exclude "landslide" wins, as landslides are evidence of a lack of polarization. To wit, despite its status as a solidly red state, no presidential candidate has won a landslide, as described by Dr. Lichtman, in Mississippi since 1988, precisely because the state is so racially polarized. Even gubernatorial and senate races in Mississippi rarely fall far outside of the Report's

31

definition because Republicans typically win upwards of 80 percent of the white vote, while winning only single digits among African-American voters.

95.     If one examines races in Arizona that the Report excludes, one sees that Sen. John McCain won 74 percent of the Hispanic vote and 62 percent of the "other" vote in 2004. *See* http://www.cnn.com/ELECTION/2004/pages/results/states/AZ/S/01/epolls.0.html. Gov. Jan Brewer won just 28 percent of the Hispanic vote in 2010, but McCain won 40 percent of the Hispanic vote that same year.  *See* http://www.foxnews.com/politics/elections/2014/exit-polls?year=2010&type=senate&filter=AZ.

96.     Moreover, the state exhibits an unusually low level of racial polarization, when placed in a national context.  Republicans rarely receive more than 40 percent of the Hispanic vote in the United States.  In fact, according to my collection of exit polls, which I have provided to counsel, it has happened in only 30 elections since 2004. Four of those took place in Arizona. It is likewise extremely unusual for Republicans to receive more than around ten percent of the African-American vote.  The one exit poll that the Report provides shows Jon Kyl receiving 40 percent of the African-American vote, in a competitive race.  The data presented in Table 3 (taken, apparently, from a report plainly marked "Draft") of the Report shows the Republican candidate routinely winning near-majorities of the African-American vote, which is virtually unheard of in other states; even Dr. Lichtman refers to this as "minimal racial polarization." Lichtman Dep. Tr. at 298:12-20.

97.     To put this in a national context, I collected the exit poll data for 208 statewide races since 2004, where the exit polls reported results for whites and African-Americans.  These included three races from Arizona: the 2006 gubernatorial race, the 2006 senate race, and the 2010 gubernatorial race.  I subtracted the reported white support for the Democratic candidate

from the reported white support for the Republican, and the reported African American support for the Democratic candidate from the reported African American support for the Republican.  I then took the difference between these two numbers.

98.    So, for example, in the race for president in Alabama in 2008, John McCain won 88 percent of the white vote, while Barack Obama won 10 percent, a difference of 78 points. McCain won just two percent of the African American vote, while Barack Obama won 98 percent, a difference of 96 points.  The net difference here is 174 points, the highest degree of racially polarized voting reported by the exit polls.

99.    Of the 208 exit polls I consulted, the average net difference between Republican and Democratic support among African-Americans and whites is 94 points, and the median is 90 points.

100.    Arizona has had three races during this time where results were reported for African Americans and whites: the 2010 gubernatorial race, the 2006 senate race and the 2006 gubernatorial race.  The reported net differences were 68 points, 28 points, and ten points, the 30th lowest, 3rd lowest, and lowest gaps in the country on record.  Of the 35 states that reported at least one exit poll of African-American and white support during this time period, Arizona showed the lowest net polarization of any state.

101.    I am somewhat skeptical of the utility of the results the Report discusses from King and Strasma, which look only at close races in minority-majority districts where candidates had Hispanic surnames and which likely utilize ecological regression to achieve their estimates (which has tended to show a higher degree of Democratic support for Hispanics than exit polling).  In addition, they are taken from unusual races; I would generally not examine "mine inspector" races to draw conclusions about statewide voter tendencies. Regardless, to the extent

that they are useful, they show a gap between African American and white support for

Republican candidates of 45 points.  Only one state – Washington – displayed a smaller net gap

than this in exit polls over the past dozen years.

102.    I performed a similar analysis for the 118 races that reported Hispanic and white

turnout numbers. The results here are more mixed.  Arizona had one race that showed the worst

degree of polarization (2012 President), and the 109th worst (2012 Senate).  It had a middling

result (2010 senate, 89th).  It also, however, had the 11th (2004 senate), 13th (2006 governor),

29th (2006 senate), 36th (2004 president), and 40th (2008 president) least polarized result.

103.    Overall, of the 26 states that reported exit polls for Hispanics and non-Hispanic

whites, Arizona reported an average racial voting gap of 41 points.  This makes it the 9th least

polarized state of the group. These average gaps place Arizona close to the mean (40 points) and

median (45 points) found in the exits.

104.    Again, none of this is to deny that there exists some degree of racially polarized

voting in Arizona, and the 2012 election results suggest that, at least among Hispanics, the

immigration fights may have led to a higher degree of polarization (it would be too early to draw

such a conclusion on the basis of one election).  But, overall, the time period the Report has

selected reveal a relatively low degree of racially polarized voting when placed in a national

context.

105.    The fact that Arizona has relatively non-polarized voting makes it all the more

important to consider other factors, which are missing from Dr. Lichtman's account.  For

example, the polarization between Hispanics and non-Hispanics whites typically reduces

significantly when an analyst controls for ideology and socioeconomic status.  *See* Sean P.

Trende, *The Lost Majority: Why the Future of Government is up for Grabs and Who Will Take It*,

146-49 (2012).  Given that polarization in Arizona is relatively low to begin with, especially for African-American voters, these factors could become particularly important.

> Factor 3: The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

106.     The Report notes that Arizona is a large state, and that the 1st and 2nd districts are large districts. I am skeptical that this is actually what the legal inquiry is intended to get at: It seems more likely that this is meant to capture instances where a state intentionally uses large enough districts that it is impossible to draw majority-majority districts.  For example, if my home state of Ohio were to drop the size of its state Senate to 14 districts, it would likely be impossible to draw any majority minority districts.  This would seemingly be relevant to a Voting Rights Act inquiry.

107.     At the very least, it is unclear how much Arizona "has used" large districts.  The Legislature can, of course, do nothing about the size of the state, nor can it control the fact that districts in the lightly-populated northern half of the state *must* be drawn large, given population densities.  It bears noting, however, that minority-majority and minority-influence districts have increased over the past 25 years, and that the size of the rural districts have (unsurprisingly, given the increased number of districts apportioned to Arizona) grown smaller over the past few decades.

108.     The Report refers to the wait times experienced in Arizona as a "voting practice and procedure." Despite this, the Report points to no actual voting practice or procedure, outside of the 2016 PPE, that would lead to this outcome.

109.     The Report purports to demonstrate disparate wait times through a hypothesis test, a major area of statistics that is covered in introductory coursework and explored throughout

other courses.  The hypothesis test is a process for making a statement about a population as a whole, based upon a sample of that population.  *See, e.g.*, George Casella & Roger L. Berger, Statistical Inference 373 (2002).  Here, Dr. Lichtman is stating that nonwhites wait longer to vote than whites in Arizona's population of voters, based upon a sample of those voters taken through the Cooperative Congressional Election Study, or CCES, a standard source for political science work (more precisely, he states that we would reject the null hypothesis that nonwhites do not wait longer to vote than whites in Arizona's population of voters).

110.    There are three basic sorts of hypothesis tests: the lower-tailed test, the upper-tailed test, and the two-tailed test.  This is a wordy way of making the following common sense observation: You can hypothesize that population A is less than B, that population A is greater than B, or simply that there is some sort of difference between the two (i.e., A is either greater than B or less than B).  As a side note, related to the parenthetical in the preceding paragraph: One does not actually test the hypothesis itself, but rather tests the "null" hypothesis, or the opposite of the hypothesis. In other words, in a two-tailed test, you don't test whether A and B are dissimilar.  You test whether or not we reject the possibility that A and B are the same.

111.    A researcher typically selects the hypothesis and null hypothesis first, followed by the appropriate process for testing.  The researcher then selects the appropriate test statistic.  The test statistic is basically a measurement of how certain we need to be to reject the null hypothesis.  Remember, we are drawing from samples, and all samples have a chance of being mistaken, for a variety of reasons.  The most common expression of this uncertainty is found in elections polling, which usually report error margins with 95 percent confidence.  This correlates to the .05 test statistic, which is the most commonly used test statistic.  Sometimes researchers will utilize the more stringent .01 statistic, while occasionally they will accept the .1 statistic.

36

The Report refers to the Cooperative Congressional Election Study, or CCES, as its source for finding a disparate impact arising from wait times.

112.     I am highly dubious of the methodology employed here. First, Dr. Lichtman's updated expert report is highly problematic. When Dr. Lichtman filed his initial report, he chose .05 as his test statistic.  That is to say, he employed the typical requirement of 95 percent confidence before he would reject the null hypothesis.  This is consistent with his expert report filed in the Virginia voter identification litigation, which likewise looked at differences in wait times between African Americans and non-Hispanic whites (using the same CCES data), and reports the data to the .05 and .01 levels. Allan J. Lichtman, *Intentional Discrimination Against African Americans  the Adoption of Virginia's Voter Photo Identification Law* [hereinafter Virginia Report], at 44 (Exhibit 6).  In his Virginia rebuttal report, he twice refers to .05 as the "standard statistical significance level," Allan J. Lichtman, *Response Report of Dr. Allan J. Lichtman to Reports Submitted by Experts for Defendants* [hereinafter Virginia Rebuttal Report at 23, 33 (Exhibit 7), as well as the "level used in social science," *id.* at 24. He also reports data on the possession of drivers' licenses to the .05 level, Virginia Report at 32, 33, and repeatedly discusses "the standard .05 level used in social science." *Id.* at 33, 46.  *See also* Deposition of Allan J. Lichtman, *Lee v. Virginia State Board of Elections*, 212:15-17 (Exhibit 8) ("And that's even below the standard statistical significance level of .05 and well below the more lenient level of .01").  When looking at the Report's combined calculations for 2008 and 2012 – which are problematic in their own right, as discussed below – Dr. Lichtman found a statistically significant result. He reported that the combined results are "statistically significant at the standard .05 level in social science."  Lichtman Report at 33.

113.     Dr. Lichtman made a mistake in his initial calculations, however.  Upon review of the data, he found that he had incorrectly added the number of white voters in 2008 and 2012. This mistake was small, but consequential. The original combined data were (barely) statistically significant at the .05 level using the approximated p-values obtained through a difference in proportions test (they were not significant, as discussed below, using Fisher's Exact Test). However, once he fixed his arithmetic, he fell outside the 95 percent confidence he had required, falling to p-values of .09 using the difference in proportions test and .093 using Fisher's Exact Test.

114.     Rather than admit that the results were no longer statistically significant, the revised Lichtman Report simply changes the required test statistic.  He abandons the 95 percent confidence interval, and now claims significance at the "standard .1 lower-end level in social science."  While it would not be completely objectionable to utilize the .1 level at the outset, as one does occasionally see that reported, it is objectionable to select the .05 level, then shift the statistic when a researcher realizes that he or she will not get the desired result.

115.     Moreover, Dr. Lichtman seems to claim that the .1 level is "standard" for social science.  This is likely the result of a sloppy edit, but to clarify, .1 is not the "standard" level. Most analysts, including Dr. Lichtman in a one-tailed analysis almost identical to this one, consider .05 to be the standard level.

116.     Second, Dr. Lichtman omits the 2010 and 2014 elections.  While one would not want to conflate midterm elections with presidential elections, it is unusual to overlook them altogether if the data are available.  If one looks at the actual survey response data, available at http://projects.iq.harvard.edu/cces/home, one finds that in 2014, only six respondents in Arizona

38

reported wait times in excess of 30 minutes, four of whom were white and two of whom were of mixed race.  In 2010, they did not appear to ask the "wait times" question.

117.    Third, the Report ignores a related question, which asks the reason why respondents did not vote, if they opted not to vote.  In 2008, one white respondent and one Hispanic respondent reported that they did not vote because the lines at the polls were too long.  In 2010, only one person reported "the lines were two long" as a reason for not voting; that person was white.  Likewise, in 2012, only four respondents claimed that they did not vote because the lines at the polls were too long, two of whom were white, two of whom were Asian-American (one of the latter group of voters also reported being un-registered as a reason for not voting, which is likely the more salient factor).  In 2014, only three people reported not voting because the lines were too long, one of whom was white, one of whom was Hispanic, and one of whom was Asian-American.

118.    In 2008, 686 respondents answered the survey for Arizona.  In 2010 it was 1289.  In 2012, it was 1215. In 2014 it was 1437.  In other words, even if people experienced long lines, only a small share of the population claimed that they did not vote due to the length of the lines; the percentages in each year were .3 percent, .1 percent, .3 percent, and .2 percent, respectively.

119.    Fourth, the small sample sizes in the question that the Report does analyze are problematic, in ways that go beyond normal sampling error.  It is an assumption of polls that the population sampled is broadly representative of the population as a whole.  Yet, for example, the 2008 CCES for Arizona identifies only a single African American respondent who answered the "wait time question."  In other words, the sample here is only 0.4% African-American. The exit polls suggest that the presidential electorate in Arizona is around four percent African American.  In this poll, the entire African-American experience is encapsulated by a single African-

American male homemaker who rarely attended his Methodist church and reported a household income of around $100,000.

120.    Fifth, the Report packs all nonwhite voters into a single "minority" category, in an attempt to achieve statistical significance. This is a problem, because any nuance between groups is lost.  For example, both of the Asian-American voters and both of the Native American voters interviewed in 2008 reported wait times of less than 10 minutes.  In 2012, none one of seven Native American voters reported a wait time in excess of 30 minutes; likewise, none of the four Asian-American voters reported a wait time in excess of 30 minutes.  The small sampling size is clearly a limiting factor here, but it is important to recognize that, by lumping together "nonwhites," the Report loses granularity.  This is especially important because the only actual evidence of a racially disparate impact from the ballot harvesting proposal comes from anecdotes regarding Native Americans.

121.    Sixth, as described above I was unable to replicate the Report's results.  Using Fisher's Exact test, which produces precise confidence intervals, I fail to find statistical significance, even for the combined 2008 and 2012 numbers using the data from Table 4.  For a discussion of the merits of Fisher's Exact test over the chi-square estimates, see Myles Hollander, Douglas A. Wolfe & Eric Chicken, *Nonparametric Statistical Methods*, 511-14 (2014). *See also* John H. McDonald, "Small numbers in chi-square and G-tests," *Handbook of Biological Statistics*, http://www.biostathandbook.com/small.html ("I recommend that you always use an exact test (exact test of goodness-of-fit, Fisher's Exact test) if the total sample size is less than 1000.").

122.    Seventh, the Report's combination of 2008 and 2012, is suspect.  Combining two surveys of two elections, held four years apart, in different contexts, with slightly different

40

question wordings is something I would be reluctant to do. I would be particularly reluctant to do so given that the difference in wait times experienced between the elections could impact the question being examined: 2008 saw a high degree of interest in the historic Barack Obama candidacy, while 2012 saw lower turnout in general; as we see from the data presented, wait times decline across the board from 2008 to 2012. The report is, to some degree, averaging apples and oranges.

123.    The Report once again refers to the citizenship requirement on the state's registration form. But it fails to cite a single example from Arizona of someone who was disenfranchised because of this. More importantly, it is not clear how this requirement, which occurs at the registration phase, would interact with ballot harvesting, which is relevant only to those who have already demonstrated citizenship and registered.

124.    The Report's only other example of a discriminatory practice is Secretary Reagan's failure to send out a voter information guide during a referendum vote, in apparent violation of state law. But the Report offers only a high-level, conclusory analysis as to how this would have affected minority voters; it fails to offer even an anecdote of a minority voter who felt disenfranchised because of the failure to receive a voter information guide.

> Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

125.    I do not dispute the statistics that the Report cites, or that these socioeconomic factors could generally inhibit the ability of minorities to participate in the electoral process. But I see no evidence proffered in this report tying these statistics to Arizona's history of official discrimination. Nor do I see any attempt to account for potential confounding variables, such as Arizona's status as a border state that welcomes a large number of new immigrants. Nor is there

an attempt to tie these factors to a need for ballot harvesting.  With ballot harvesting, we are dealing with a select group of voters: Those who have already successfully navigated the system to request early ballots. It is unclear, and in any event, the Report does not help answer the question, of whether these voters are representative of minority voters as a whole.

Factor 6: Whether political campaigns have been characterized by overt or subtle racial appeals.

126.     It remains an unanswered question what, if any, interaction the anecdotes Dr. Lichtman cites here have with the group of voters who have already obtained early ballots, that would make them less able to vote for the candidate of their choice absent ballot harvesting. Additionally, the Report's commentary misses two pieces of important context.  First, the second set of comments from John Huppenthal do not appear to be made in the context of a political campaign. Second, of the three candidates Dr. Lichtman mentions, one lost in the Republican primary, while another was defeated in the Republican primary in his bid for re-election. In other words, these sort of comments seem to have limited resonance in a Republican primary, to say nothing of a statewide race.  The third comes in the context of a national political campaign; Donald Trump does not seem to target his incendiary comments to any particular state.

Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.

127.     The Report references some data on the number of minority groups elected to public office.  But it omits its own sources here, which provide important context. The Center for American Progress data to which it cites earlier ranks states not only for their voting systems, but also for the strength of minority representation in government. On *this* measure, Arizona receives a grade of "B."

42

128.    More specifically, one of the criteria that CAP utilizes to measure representation is the ratio of the percentage of elected officials who are nonwhite compared to the total population of the state who are nonwhite. So, in Vermont, 7 percent of officeholders are nonwhite, compared to 6 percent of the population.  That gives Vermont the best representation ratio in the country.  The only other state in the country with close to a 1:1 ratio is, perhaps surprisingly, Mississippi, where 42 percent of officeholders are nonwhite, alongside 42 percent of the population.  The three states with the worst ratios?  Oklahoma, New York and Illinois. *See* CAP report at 46.

129.    Nonwhites make up 25 percent of Arizona's elected officeholders, compared to 44 percent of the total population.  This gives it the 16th best representation ratio in the country.  Again, this is not to deny that minorities are disproportionately underrepresented in government. It is simply to point out additional needed context, since the inquiry here regards the *extent* of minority representation: On a national level, the state performs quite nicely.

> Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

130.    The only example of a lack of responsiveness that the Report outlines here, other than those outlined in Factor 1, is the failure of Arizona to provide more funding for students. The only source for this is a report by David Sciarra, of the Education Law Center. Mr. Sciarra is not a Ph.D., nor does he work at a think tank; he is a lawyer, whose legal center advocates for increased school funding.  That does not mean it should be ignored, but only that, just as the report is right to consider Mr. LaFaro's point of view above, it should also consider the Center's point of view.

131.    What makes this truly problematic is that, just in the last legislative session, Arizona took substantial steps to increase education funding.  For example, H.C.R. 2001

increased funding for schools.

http://www.azleg.gov/DocumentsForBill.asp?Bill_Number=HCR2001&Session_ID=116, and

passed the Legislature on a bipartisan vote. This omission is noteworthy, because the Report

elsewhere mentions the failure of Secretary Reagan to circulate a voting guide related to this

vote.  The Legislature also increased school funding on an almost unanimous vote with H.B.

2001, http://www.azleg.gov/DocumentsForBill.asp?Bill_Number=HCR2001&Session_ID=116,

which was follow-up legislation to an earlier ballot initiative from 2000 that increased education

funding.

132.    The Report again brings up the debate over English-only schools, which has been

simmering for decades.  Whether or not this is responsive to minority concerns is difficult to say;

as outlined above, California's ban on bilingual education, passed at about the same time as

Arizona's ban, was passed by a multi-racial coalition, and was even supported by over a third of

the state's Hispanic population.

133.    Overall, the Report appears to include all of the examples of racial controversy

Dr. Lichtman could identify, without making any effort to consider any examples of the state

being *responsive* to minority groups.  For example, the Report could have considered the recent

effort of the Legislature to reduce the backlog in Department of Child Safety cases, which passed

both houses of the Legislature unanimously.

http://www.azleg.gov/DocumentsForBill.asp?Bill_Number=HB2270&Session_ID=115.

134.    One example in particular stands out here: The state's acceptance of Medicaid

funding under the Patient Protection and Affordable Care Act. This was pushed through at the

insistence of the state's Republican governor, Jan Brewer.  Of course, others will point out that

the Legislature is attempting to impose work requirements and lifetime caps on benefits;

Republicans would likely retort that these are similar to the limitations in the Welfare Reform Act of 1996.  It is the type of political debate we've had in this country for almost a century now, and seems unlikely to be resolved in our lifetimes.  Regardless, the expansion of Medicaid is a "critical issue for African Americans," and directly relevant to the responsiveness inquiry. Virginia Report at 64.  The fact that Arizona responded to these minority needs on this critical issue, however imperfectly, should seemingly at least be considered in the state's favor.

### Conclusion

135.    In conclusion, the Report provides a one-sided, single-minded approach to the *Arlington Heights* factors and Senate factors.  This is important, because many of these factors are not yes/no propositions, but operate on more of a sliding scale (e.g., Senate Factor 7: "The *extent* to which members of the minority group have been elected to public office in the jurisdiction." (emphasis supplied)).  When viewed in a fuller context, the case made by the Report for the applicability of the various factors is much weaker and, at times, non-existent. Moreover, it rarely shows the sort of nexus between the factors and the passage of the law at issue that courts have required for vote suppression cases.  Standing alone, it is of limited utility.

This the 19th day of July, 2016.



_____

Sean P. Trende

24498658

# EXHIBIT 1

**SEAN P. TRENDE**
1146 Elderberry Loop.
Delaware, OH 43015
strende@realclearpolitics.com

**EDUCATION**

B.A., Yale University, with distinction, History and Political Science, 1995.

M.A., Duke University, *cum laude*, Political Science, 2001.  Thesis titled *The Making of an Ideological Court: Application of Non-parametric Scaling Techniques to Explain Supreme Court Voting Patterns from 1900-1941*, June 2001.

J.D., Duke University School of Law, *cum laude*, 2001; Duke Law Journal, Research Editor; Moot Court Board.

**PROFESSIONAL EXPERIENCE**

Law Clerk, Hon. Deanell R. Tacha, U.S. Court of Appeals for the Tenth Circuit, 2001-02.

Associate, Kirkland & Ellis, LLP, Washington, DC, 2002-05.

Associate, Hunton & Williams, LLP, Richmond, Virginia, 2005-09.

Associate, David, Kamp & Frank, P.C., Newport News, Virginia, 2009-10.

Senior Elections Analyst, RealClearPolitics, 2009-present.

**BOOKS**

Larry J. Sabato, ed., *The Surge:2014's Big GOP Win and What It Means for the Next Presidential Election*, ch. 12 (2015).

Larry J. Sabato, ed., *Barack Obama and the New America*, ch. 12 (2013).

Barone, Kraushaar, McCutcheon & Trende, *The Almanac of American Politics 2014* (2013).

*The Lost Majority: Why the Future of Government is up for Grabs – And Who Will Take It* (2012).

**REAL CLEAR POLITICS COLUMNS**

Full archives available at http://www.realclearpolitics.com/authors/sean_trende/

**PUBLICATIONS FROM LAST 10 YEARS**

"The GOP and the Latino Vote," *National Review*, June 15, 2012.

"Political Economy," *National Review*, Special 2010 Election Issue.

"It's 1974 All Over Again," *The Weekly Standard*, Apr. 26, 2010.

"Defamation, Anti-SLAPP Legislation, and the Blogosphere: New Solutions for an Old Problem," 44 Duq. L. Rev. 607 (2006).

(with Christian C. Burden), "The Economic Loss Rule and Franchise Attorneys," 27 Franchise L.J., 192 (2008)


**SELECTED PRESENTATIONS AND APPEARANCES**

Panelist, "Independent Experts on Republican Candidates" (with Michael Barone and Josh Kraushaar), American University, Washington, DC, November 2011.

Panelist, "2011 Mortimer Caplin Conference on the World Economy" (with Bill Schneider, John Sides, and Sarah Binder), The National Press Club, Washington, DC, December 2011.

"The State of the Presidential Nominating Process: A Debate" (with Jay Cost), Berry College, December 2011.

"The Lost Majorities: 2008, 2010 and America's Political Future," Bradley Lecture, American Enterprise Institute, January 2012.

Panelist, "Collective Bargaining, Public Pensions and Voters: The Policy and Politics of Public-Sector Employees in the 2012 Elections," (with Karlyn Bowman, Ruy Teixeira, and Henry Olson), American Enterprise Institute, January 2012.

"The People's Money: How Voters Will Balance the Budget and Eliminate the Federal Debt.," (with Michael Barone and Scott Rasmussen), CATO Institute, March 2012.

Panelist, "Republican Primaries: Explaining the Results and Assessing What they Mean for the Future of the GOP," (with Dante Scala and Kate Zernike), Chaire Raoul-Dandurand en Etudes Strategiques et Diplomatiques, Montreal, March 2012

"Obama's Vanished Coalition," (with Lance Tarrance and Emily Ekins), CATO Institute, April 2012.

Panelist, "The Future of Red and Blue," (with Ruy Teixeira), Bipartisan Policy Center, Washington, DC, April 2012.

"The 2012 Elections: Trends, Prognostications and What's at Stake," 3rd Annual Family Office Wealth Management Forum, Greensboro, Georgia, May 2012.

"2012 U.S. Elections Series," with Bruce Stokes and Alexandra de Hoop Scheffer, German Marshall Fund, Brussels, Belgium, Oct. 4, 2012.

Panelist, "The Power of Pundits," (with John Sides, Linda Vavreck, and Melissa Harris-Perry), American Political Science Ass'n, Aug. 29, 2013.

Panelist, "Post-Election Coverage" (with Raul Avillar, Dan Balz, Robert Collins, Jen O'Malley Dillon, Alex Isenstadt, Nathan Klein, Joe Lenski, John McLaughlin, and Patrick O'Connor), University of Kansas, Dec. 11-12, 2014.

Panelist, "Evenwel v. Abbott: What Does One Person, One Vote Really Mean?" (with Andrew W. Grossman and Hans A. von Spakovsky), Heritage Foundation, Sept. 15, 2015.

Appeared in countless radio and television appearances including appearances on Fox News, MSNBC, ABC News Australia, Fox News Radio, Beijing Radio, CNN Radio, NPR, and other outlets.

# EXHIBIT 2

**INTENTIONAL DISCRIMINATION AGAINST AFRICAN AMERICANS IN THE ADOPTION OF NORTH CAROLINA'S VOTER INFORMATION VERIFICATION ACT, S.L. 2013-381**

North Carolina State Conference of the NAACP
v.
McCrory, et al.

United States District Court
Middle District of North Carolina
Case No.: 1:13-cv-00658

**February 12, 2015**

**Allan J. Lichtman, Ph.D.**

# TABLE OF CONTENTS

I.     STATEMENT OF PURPOSE ............................................................ 4

II.    QUALIFICATIONS ........................................................................ 4

III.   EVIDENCE, METHODOLOGY,  AND SUMMARY OF OPINIONS ............................ 6

IV.    IMPACT OF HISTORIC DISCRIMINATION AGAINST AFRICAN AMERICANS IN
       NORTH CAROLINA ....................................................................... 8

V.     SEQUENCE OF EVENTS LEADING TO THE ADOPTION OF S.L. 2013-381 .......... 20

       A.     The Rise of African American Voting Strength in North Carolina, 2004-
              2013 ................................................................................. 20

       B.     Voting Legislation Prior to HB 589 ............................................ 26

       C.     Increased Voter Turnout .......................................................... 28

VI.    PROCEDURAL DEVIATIONS WITH DISCRIMINATORY INTENT ....................... 31

       A.     Pre-*Shelby* HB 589 Process ..................................................... 31

       B.     Post-*Shelby* Process .............................................................. 32

VII.   SUBSTANTIVE DEVIATIONS WITH DISCRIMINATORY INTENT AND
       EFFECT—PHOTO IDS ................................................................ 33

       A.     Voter Photo Identification Eliminated IDs .................................... 34

              1.     Expired IDs ................................................................. 36

              2.     Student IDs ................................................................. 50

              3.     Government Employee IDs .............................................. 52

       B.     Voter Photo Identification Retained By HB 589 .............................. 54

              1.     Driver's Licenses and Non-Operator's IDs ............................ 54

              2.     United States Passports .................................................. 92

       C.     Elimination of Same Day Registration During the One Stop Voting Period ...... 100

              1.     The 2008 General Election ............................................. 101

              2.     The 2010 General Election ............................................. 104

              3.     The 2012 General Election ............................................. 107

       D.     Elimination of the Partial Counting of Provisional Ballots Cast in the
              Wrong Precinct ..................................................................... 109

              1.     The 2008 General Election ............................................. 109

              2.     The 2010 General Election ............................................. 112

              3.     The 2012 General Election ............................................. 114

       E.     Restricting One-Stop Early Voting .............................................. 116

   1. The 2008 General Election ..................................................116

   2. The 2010 General Election ..................................................121

   3. The 2012 General Election ..................................................125

  F. Elimination of Pre-registration of 16- and 17-Year Olds ...................................129

VIII. CONTEMPORANEOUS VIEWPOINTS EXPRESSED BY THE DECISION-MAKERS ................................................................................. 133

  A. Conformity with Other States—Voter Photo ID .................................................133

  B. The Georgia Model ........................................................................................137

  C. Public Support.................................................................................................138

  D. Election Integrity ............................................................................................139

  E. Uniformity and Opportunity in Early One Stop Voting ....................................150

  F. Absence of Justification for Non-Photo ID Provisions of the Post-*Shelby* version of HB 589......................................................................................151

  G. The Minimal Change Case..............................................................................153

  H. The Free Voter ID...........................................................................................154

  I. The Common Sense Analogy ..........................................................................155

IX. CONCLUSIONS....................................................................................... 156

## I.     STATEMENT OF PURPOSE

I have been asked to consider whether certain provisions in the Voter Information Verification Act, S. L. 2013-381 ("VIVA," originally House Bill 589) were enacted with the *intent* to discriminate against African Americans and would-be voters (collectively "African American") in North Carolina. These provisions include both changes in election procedures and the new photographic identification requirements as enacted by the North Carolina State Legislature in 2013 and signed into law by Governor Pat McCrory. My expected fee in this matter is $400 per hour. I have enclosed an updated CV and a table of cases in which I have provided written or oral testimony.

In assessing intentional discrimination, this report focuses on the following consequential provisions of S.L. 2013-381 that potentially affect the opportunities available to African American voters to register and vote in North Carolina.

1. The imposition of a strict photographic identification requirement for persons voting at the polls, either during the One Stop period or on Election Day.

2. The elimination of same day registration during the One Stop voting period.

3. The reduction of the number of days from 17 to 10 days for early voting during the One Stop voting period.

4. The elimination of the prior practice of partially counting provisional ballots cast in the incorrect precinct for countywide or statewide elections.

5. The elimination of the pre-registration of 16- and 17-year olds.

The report also examines the usage of mail-in absentee voting, the only form of early voting that S.L. 2013-381 does not eliminate, restrict in time, or subject to voter identification requirements.

## II.     QUALIFICATIONS

This study draws on my experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 42 years.  Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University.  I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.  My areas of expertise include political history, electoral analysis, and historical and quantitative methodology.

I am the author of numerous scholarly works on quantitative and qualitative methodology

4

in social science. This scholarship includes articles in such academic journals as *Political Methodology, Journal of Interdisciplinary History, International Journal of Forecasting, Journal of Applied Forecasting,* and *Social Science History*, as well as my co-authored book, *Historians and the Living Past*. In addition, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics, La Raza Law Journal, Evaluation Review, Journal of Legal Studies,* and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies published in such academic journals as *The Proceedings of the National Academy of Sciences, The American Historical Review, The International Journal of Forecasting, The International Journal of Information Systems & Social Change,* and *The Journal of Social History*. Quantitative and historical analyses also ground my books, *Prejudice and the Old Politics: The Presidential Election of 1928, The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House, White Protestant Nation: The Rise of the American Conservative Movement,* and *FDR and the Jews* (co-authored with Richard Breitman).

My book, *White Protestant Nation*, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America in 2008. My most recent book, *FDR and the Jews*, was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the *New York Times* in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, and a finalist for Los Angeles Times Book Prize in history.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than eighty voting and civil rights cases. These include several cases in the state of North Carolina. In the U. S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work. I have testified several times for plaintiffs and defendants on the issues of intentional discrimination in the adoption of state redistricting plans and photo identification laws.

The three-judge panel in the District of Columbia in the Section 5 of the Voting Rights Act litigation regarding the 2011 State of Texas redistricting plan also cited my work in support of their finding that the plan intentionally discriminated against minority voters in *Texas v. United States*, 887 F. Supp. 2d 133, 138-39 (D.D.C. 2012). A federal court also cited my work in support of its finding under both Section 2 and the Fourteenth and Fifteenth Amendments that the Texas photo identification law intentionally discriminated against black and Hispanic voters in *United States v. Texas*, 2:13-cv-00193, ECF No. 628 (S.D. Tex. Oct. 9, 2014), consolidated with *Veasey v. Perry*, at 48-50, 128. A three-judge panel in the 2011 State of Illinois redistricting plan also cited my work on behalf of defendants in support of their *rejection* of plaintiff's claim

5

that the plan intentionally discriminated against minority voters in *Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, 2011 US Dist. Lexis 117656 (N. D. Ill. Oct. 12, 2011).

## III.    EVIDENCE, METHODOLOGY,  AND SUMMARY OF OPINIONS

My analysis draws upon the North Carolina State Board of Elections' online data base of registration statistics, as well as the individual voter files provided by the state. It uses this data to analyze changes in voting procedures and to create a file of registered voters and actual voters, matched and unmatched, with the Department of Motor Vehicle database of driver's licenses and non-driver's photo identification. For matched registrants, the analysis will also examine various categories of matching, such as expired and suspended licenses.

The report additionally draws upon other sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic and socio-economic information; election returns; voter registration and turnout data; court opinions, briefs, and reports; government and organizational documents; and scientific surveys and studies. These sources of information will be used both for analyses within North Carolina and for comparisons with other states.

The report closely follows the methodological guidelines of the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In *Arlington Heights*, the Court focused on five distinct factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact; (2) historical background; (3) the sequence of events leading up to the decision; (4) procedural or substantive deviations from the normal decision-making process; and (5) contemporaneous viewpoints expressed by the decision-makers.

The purpose of this report is not to make legal conclusions, but to establish substantive findings about discriminatory intent. The *Arlington Heights* methodology is consistent with standard causal analysis in history, which I have followed in my substantive scholarship and written about in my theoretical work (*see* Section II, above).

My major opinions are summarized briefly below:

- Republicans in the state of North Carolina are dependent in general elections upon the votes of a shrinking white majority of registered voters, compared to a sharply growing African American minority that votes overwhelmingly Democratic.

- Absent any prospects of expanding the relative position of whites among registered voters, the Republican majority in the state legislature intentionally and deliberately through the specific provisions of VIVA sought to impede the opportunities for African Americans to fully participate in the political process in North Carolina and elect candidates of their choice.

6

- After the   United States Supreme Court effectively invalidated the pre-clearance provision of the Voting Rights Act on June 25, 2013 (*Shelby County v. Holder*, 133 S. Ct. 2612 (2013)), the state substantially changed an initial House-passed version of HB 589.

  - **Photo ID Provision:**  with respect to voter photo ID, VIVA *eliminated* from the original version of HB 589 several permissible forms of identification.  I conclude that:

    - Based on information available to it at the time VIVA was passed, the state legislature knew that the elimination of several permissible forms of identification would impose a disparate burden on African American as compared to white voters in North Carolina;

    - The state legislature knew that these subtractions made S.L. 2013-381 not just a generic photo voter ID law, but the most burdensome voter photo identification law enacted by any state in the United States; and

    - The justifications for the photo ID provision itself and the elimination of several permissible forms of identification lack credibility, are contradictory, and are pretextual.

  - **Non-Photo ID Provisions:** with respect to the non-photo ID provisions, VIVA *added* to HB 589 many changes to North Carolina's election procedures outlined in Section I.  I conclude that:

    - Based on information available at the time VIVA was passed, there was evidence that each of these *additional* changes to North Carolina's election procedures, including cuts to early voting, same day registration, out of precinct voting, and pre-registration would impose a disparate burden on African American as compared to white voters in North Carolina.

    - Again, the justifications for these additional changes lack credibility, are contradictory, and are pretextual.

- Based on considerable evidence following the *Arlington Heights* procedures and standard historical causal analysis, the backers of HB 589 deliberately and knowingly crafted omnibus legislation post-*Shelby* that placed disparate burden on the opportunities of African Americans to register and vote in North Carolina. The effects of these burdens are not just individual, but cumulative.

7

## IV.  IMPACT OF HISTORIC DISCRIMINATION AGAINST AFRICAN AMERICANS IN NORTH CAROLINA

The state of North Carolina has a long and well-acknowledged history of discrimination against African Americans, much of which has substantially impacted the opportunity for African Americans to participate fully in the political process and elect candidates of their choice. This history is well documented in the Expert Report of Dr. James L. Leloudis submitted in this litigation.[1]

The lingering effects of the history of discrimination are apparent today in the substantial socio-economic disparities between non-Hispanic African Americans and non-Hispanic whites in North Carolina. As will be demonstrated below, these disparities have a significant impact on the relative ability of African Americans and whites to participate in the electoral process.

Based on information available at the time of the passage of HB 589, Table 1 and Charts 1 and 2 demonstrate a wide gap between African Americans and whites in North Carolina on measures of income, poverty, and unemployment. African American households have median incomes equal to 62 percent of white households. The per capita income of African Americans equals 57 percent of the per capita income of whites. African American poverty rates are well more than double poverty rates of whites, and African American unemployment rates are nearly double unemployment rates for white.

| TABLE 1 INCOME, POVERTY, AND UNEMPLOYMENT RATES FOR AFRICAN AMERICANS AND WHITES, NORTH CAROLINA, 2009-2011 US CENSUS, AMERICAN COMMUNITY SURVEY | | |
|---|---|---|
| | BLACK | WHITE |
| | | |
| MEDIAN HOUSEHOLD INCOME | $31,711 | $51,020 |
| | | |
| PER CAPITA INCOME | $16,636 | $28,940 |
| | | |
| POVERTY RATE FOR INDIVIDUALS | 27.2% | 11.5% |
| | | |
| UNEMPLOYMENT RATE | 18.1% | 9.7% |

---

[1] Report of Dr. James L. Leloudis, *North Carolina State Conference of the NAACP, et al. v. Patrick Lloyd McCrory, et al.*  Civ. No. 1:13-cv-658, 12 February 2014.

8



CHART 1: POVERTY AND UNEMPLOYMENT RATE BY RACE, NORTH CAROLINA



CHART 2: MEDIAN AND PER CAPITA INCOME BY RACE,
NORTH CAROLINA

Table 2 and Chart 3 demonstrate relatively small racial differences on high school graduation rates, but large differences on college graduation rates. The high school graduation rate for African Americans in North Carolina equals 91 percent of the high school graduation rate for whites, whereas the college graduation rate for African Americans equals only 57 percent of the college graduation rate for whites.

| TABLE 2 EDUCATIONAL ATTAINMENT OF BLACKS AND WHITES, NORTH CAROLINA, 2009-2011 US CENSUS, AMERICAN COMMUNITY SURVEY | | |
|---|---|---|
| | BLACK | WHITE |
| | | |
| HIGH SCHOOL GRADUATES AGE 25+ | 80.9% | 88.5% |
| | | |
| BACHLEOR'S DEGREE OR MORE AGE 25+ | 17.2% | 30.1% |

11



CHART 3: EDUCATIONAL ATTAINMENT BY RACE, NORTH CAROLINA

Table 3 and Charts 4 through 6 demonstrate considerable differences between African Americans and whites in North Carolina on home ownership, home values, vehicles available in households, and, to a lesser extent, telephones. The African American home ownership rate is 65 percent of the white home ownership rate, and the value of African American owned homes is equal to two-thirds of the value of white owned homes. African American households are more than three times more likely than white households to lack an available vehicle, and 48 percent more likely to lack telephone service.

| TABLE 3 HOUSING CHARACTERISTICS OF NON-HISPANIC BLACKS, AND NON-HISPANIC WHITES IN NORTH CAROLINA, 2009-2011 US CENSUS, AMERICAN COMMUNITY SURVEY | | |
|---|---|---|
| | BLACK | WHITE |
| | | |
| PERCENT OWNER OCCUPIED | 48.7% | 74.6% |
| | | |
| MEDIAN HOME VALUE | $111,300 | $164,900 |
| | | |
| PERCENT WITH NO VEHICLE AVAILABLE | 14.3% | 4.3% |
| | | |
| PERCENT WITH NO TELEPHONE SERVICE | 3.1% | 2.1% |

13



CHART 4: MEDIAN HOME VALUE BY RACE
NORTH CAROLINA

CHART 5: HOME OWNERSHIP BY RACE, NORTH CAROLINA





CHART 6: VEHICLE AND TELEPHONE AVAILABILITY
IN HOUSEHOLD BY RACE NORTH CAROLINA

Table 4 and Chart 7 demonstrate that a very large gap exists between African Americans and whites in assets, with the net worth of whites in North Carolina exceeding the net worth of African Americans by more than twenty times.

| TABLE 4 NET WORTH OF AFRICAN AMERICANS AND WHITES IN NORTH CAROLINA | | |
|---|---|---|
| | | |
| | BLACK | WHITE |
| | | |
| MEDIAN NET WORTH | $3,000 | $68,441 |
| | | |
| Source: *Racial Wealth Disparity in North Carolina: A Report for the Z. Reynolds Smith Foundation*. Center on Poverty, Work and Opportunity, University of North Carolina, Chapel Hill, September 1, 2010. Source does not separate out Hispanics. | | |

17

**CHART 7: MEDIAN NET WORTH BY RACE NORTH CAROLINA**



As with African Americans, the state of North Carolina has a long and well-acknowledged history of discrimination against Hispanics, much of which has substantially impacted the opportunity for Hispanics to participate fully in the political process and elect candidates of their choice. This history is also documented in the Expert Report of Dr. James L. Leloudis for this litigation and is reflected in the much lower socio-economic standing of Hispanics relative to whites in North Carolina.[2]

Based on information available at the time of the passage of HB 589, a wide gap exists between Hispanics and whites in North Carolina on measures of income, poverty, and unemployment. Hispanics households have median incomes equal to 66 percent of white households. The per capita income of Hispanics equals 41 percent of the per capita income of whites. Hispanic poverty rates are three times the white rate and Hispanic unemployment rates are more than a third higher than white rates.[3]

Similarly, there are substantial differences between Hispanics and whites on high school and college graduation rates. The high school graduation rate for Hispanics in North Carolina equals 60 percent of the white rate and the college graduation rate for Hispanics equals only 37 percent of the white rate.[4]

Considerable differences also exist between Hispanics and whites in North Carolina on home ownership, home values, and vehicles available in households and telephones. The Hispanic home ownership rate is 60 percent of the white rate, and the value of Hispanic owned homes is equal to 75 percent of the value of white owned homes. Hispanic households are 56 percent more likely than white households to lack an available vehicle and 71 percent more likely to lack telephone service.[5]

Although the Hispanic voting population is small, it is growing in numbers and political impact. The Hispanic percentage of registered voters in North Carolina rose from 1.4 percent in January 2004 to 1.8 percent in July 2013, an increase of 29 percent in Hispanic voter strength, for a difference of +0.4 percentage points. Although the numbers of registered voters for Hispanics is much smaller than for African Americans, the 29 percent increase in Hispanic voter strength from 2004 to 2013 exceeds that for African Americans.[6]

In 2012, for the first time exit polls singled out Hispanic voters in the state. The exit poll demonstrates that 68 percent of Hispanics in North Carolina voted for the presidential candidate Barack Obama as compared to only 31 percent of whites, for a gap of 37 percentage points. This

---

[2] Report of Dr. James L. Leloudis, *North Carolina State Conference of the NAACP, et al. v. Patrick Lloyd McCrory, et al.* Civ. No. 1:13-cv-658, 12 February 2014.

[3] 2009-2011 U.S. Census, American Community Survey.

[4] *Ibid.*

[5] *Ibid.*

[6] North Carolina State Board of Elections, *NC Voter Statistics*, http://www.ncsbe.gov/webapps/voter_stats/.

gap is wider than that pertaining to any of the non-racial characteristics of voters examined in the exit poll data reported in Section V, Table 6 above. Thus the same dynamic for African Americans described below also applies to Hispanics in North Carolina.

## V.     SEQUENCE OF EVENTS LEADING TO THE ADOPTION OF S.L. 2013-381

### A.     The Rise of African American Voting Strength in North Carolina, 2004-2013

Critical to understanding the sequence of events leading to adoption of the omnibus election law S.L. 2013-381 in 2013 is a sharp decline in white voting strength relative to African American voting strength since 2004. Also critical is a political realignment in North Carolina such that it is now Republicans, not Democrats, who benefit politically from limitations on the African American vote. These dual realignments of North Carolina's demographic voting base, and its political allegiances, help explain why the Republican dominated state legislature and the Republican governor enacted specific provisions of S.L. 2013-381 that place a disparate burden on African American voters relative to white voters in North Carolina.

According to data reported in Table 5 and Chart 8, obtained from the website of the North Carolina State Board of Elections ("SBOE"), the percentage of registered white voters in North Carolina plunged from 77.9 percent in January 2004 to 71.0 percent in July 2013, when the legislature adopted HB 589. This represented an 8.9 percent drop in white voter strength, for a difference of -6.9 percentage points. In contrast, the percentage of registered African American voters in North Carolina rose from 19.4 percent in January 2004 to 22.5 percent in July 2013, an increase of 18 percent in black voter strength, for a difference of +3.1 percentage points. The 6.9 percentage point decline of white voter strength coupled with the 3.1 percentage point increase in African American voter strength over the decade long period resulted in a shift in African American voter strength relative to white voter strength equal to +10 percentage points.[7]

---

[7] The SBOE reports its data as white voters and African American voters, including Hispanics—*i.e.*, the SBOE's data does not separately break-out Hispanic voters. The elimination of Hispanics into a separate category would slightly widen the gap, because Hispanics self-identify more as white than black in North Carolina. Any change, however, is in the tenths of one percentage point. Henceforth, as in the Census data above, unless otherwise indicated, analysis will focus on non-Hispanic African Americans and non-Hispanic whites. Hispanics are independently affected by VIVA provisions, as is addressed in Section IX of this Report.

| RACIAL GROUP | JAN. 2004 REGIS. TOTAL | JAN. 2004 REGIS. PERCENT OF ALL REGIS. | JULY 2013 REGIS. TOTAL | JULY 2013 REGIS. PERCENT OF ALL REGIS. | PERCENTAGE POINT CHANGE | PERCENT CHANGE |
|---|---|---|---|---|---|---|
| **TABLE 5** <br> **CHANGES IN AFRICAN AMERICAN AND WHITE VOTER REGISTRATION, NORTH CAROLINA, JANUARY 2004 TO JULY 2013** | | | | | | |
| **BLACK** | 972,830 | 19.4% | 1,450,370 | 22.5% | +3.1% | +16% |
| **WHITE** | 3,914,286 | 77.9% | 4,579,829 | 71.0% | -6.9% | -8.9% |
| Source: North Carolina State Board of Elections, *NC Voter Statistics*, http://www.ncsbe.gov/webapps/voter_stats/. | | | | | | |



CHART 8: CHANGES IN WHITE AND BLACK VOTER STRENGTH, NORTH CAROLINA JAN 2004-JULY 2013

This shifting pattern of voter strength is especially consequential in light of the substantial racial polarization that exists in general elections in North Carolina. Of all basic social and economic factors that divide the North Carolina electorate, race is the key factor in voting for Republicans and Democrats. In the 2013 litigation over North Carolina's 2011 redistricting plan, both the expert for plaintiffs, Dr. Ray Block, and the expert for the North Carolina General Assembly, Dr. Thomas Brunell, found substantial patterns of racially polarized voting across North Carolina. The existence of such polarization was a central part of the state's claims in that case.[8]

These findings are confirmed by available exit polling data for elections from 2004 through 2012, as disclosed in Table 6 and Chart 9—data published and available at the time of the adoption of HB 589. The data presented in Table 6 demonstrate the following:

- On average African American voters support Democratic candidates at near unanimous levels, whereas about two-thirds of whites on average support Republican candidates.

- This wide racial divide in partisan voting persists whether the Democratic candidate is African American (Barack Obama in 2008 and 2012) or white (Kerry in 2004 and Hagan in 2008).

- The racial disparity in party voting far exceeds the disparities for other politically salient characteristics of voters, such as sex, age, education and income—*i.e.*, race is by far the greatest indicator.

---

[8] See the opinion of the three judge state court in *Margaret Dickson, et al., vs. Robert Rucho, et al., and North Carolina State Conference Branches of the NAACP, et al. vs. North Carolina*, esp. Appendix A

23

| | BLACK | WHITE | WOMEN | MEN | 18-29 | 65+ | HIGH SCH. ONLY | COLL. GRAD | INC. 50K- | INC. 100K+ |
|---|---|---|---|---|---|---|---|---|---|---|
| **TABLE 6** NORTH CAROLINA EXIT POLLS BY DEMOGRAPHIC CATEGORIES, 2004-2012 | | | | | | | | | | |
| 2004 President Kerry (WD) | 85% | 27% | 46% | 38% | 56% | 44% | 51% | 43% | 55% | 31% |
| 2004 President Bush (WR) | 14% | 73% | 54% | 60% | 43% | 55% | 49% | 56% | 44% | 68% |
| | | | | | | | | | | |
| 2008 President Obama (BD) | 95% | 35% | 55% | 43% | 74% | 43% | 52% | 51% | 58% | 44% |
| 2008 President McCain (WR) | 5% | 64% | 44% | 56% | 26% | 56% | 47% | 49% | 41% | 56% |
| | | | | | | | | | | |
| 2008 Senate Hagan (WD) | 96% | 39% | 55% | 47% | 71% | 45% | 56% | 52% | 58% | 45% |
| 2008 Senate Dole (WR) | 1% | 57% | 41% | 50% | 24% | 53% | 42% | 44% | 38% | 51% |
| | | | | | | | | | | |
| 2012 President Obama (BD) | 96% | 31% | 51% | 45% | 67% | 35% | 50% | 50% | 55% | 44% |
| 2012 President Romney (WR) | 3% | 68% | 49% | 54% | 31% | 64% | 49% | 49% | 44% | 55% |
| **Mean All Dem Cands.** | 93% | 33% | 52% | 43% | 67% | 42% | 52% | 49% | 57% | 41% |
| **Mean All Rep Cands.** | 6% | 66% | 47% | 55% | 31% | 57% | 47% | 50% | 42% | 58% |
| **Diff.** | +87% DEM | +33% REP | +5% DEM | +12% REP | +36% DEM | +15% REP | +5% DEM | +10% REP | +15% DEM | +17% REP |

24



**CHART 9**
**COMPARISON OF DEMOCRATIC VOTING, SOCIAL &**
**ECONOMIC CHARACTERISTICS, NORTH CAROLINA,**
**2004-2012**

The data in Table 6 and Chart 9 also demonstrate that the higher the voting turnout of African Americans relative to whites, the greater the benefits to Democratic candidates. Conversely, the lower the relative voting turnout of African Americans, the greater the benefits to Republican candidates. According to Table 6, the mean Democratic vote is 93 percent for African Americans and 33 percent for whites, which translates to a 60 percentage point racial gap (93%-33%). It follows from these results that, on average, for the statewide elections studied here, the vote for Democratic candidates increased by 6 percentage points, for a 10 percentage point increase in African American relative to white turnout, with a racial difference of 60 percent (0.6) percent multiplied by 10 percentage points.

This large turnout effect was of great political consequence in North Carolina in 2013. In 2008, Barack Obama carried North Carolina by less than one percentage point; in 2012, Mitt Romney carried the state by just 2 percentage points. Both parties in 2013 also anticipated a very close electoral race the following year for the United States Senate seat held by Democrat Kay Hagan.  Ultimately, Hagan lost her incumbent seat by less than 2 percentage points.

Thus, demographic shifts in the North Carolina voter registration base combined with polarized voting indicate that Republicans had much to gain in 2013 by attempting to reduce black registration and voting relative to white registration and voting. No other demographic shift in registration and voting would have nearly the same impact on prospective political gains as indicated in Table 6 and Chart 9 above.

**B.      Voting Legislation Prior to HB 589**

To properly assess the impact of HB 589, it is also necessary to examine legislation enacted in North Carolina from 2001 to 2009 (some with bipartisan support) to expand the options for in-person voting, registration, and the counting of provisional ballots.

In 2001, with bipartisan backing, including a majority of members of both parties in the State Senate, the North Carolina General Assembly established a 17-day One Stop voting period for North Carolinians to vote prior to Election Day. In the Senate, all voting Democrats backed the bill (HB 831), as did all but two Republicans. In the House, all voting Democrats backed the bill, as did four Republicans.

In 2005, the General Assembly enacted (along straight-line party votes in both chambers) Senate Bill 133 to ensure that provisional ballots cast by voters in incorrect precincts would still be counted for all elections in which the voter was eligible to participate (*e.g.*, statewide and countywide elections).  Significantly, the General Assembly also included in the text of this legislation a finding that "of those registered voters who happened to vote provisional ballots outside their resident precincts on the day of the November 2004 General Election, a disproportionately high percentage were African-American."

In 2007, with some bipartisan support, the General Assembly enacted HB 91, which authorized new and updated registrations (same day registration) during the 17-day One Stop

26

voting period. In the Senate, all voting Democrats backed the bill, as did four Republicans. In the House, all voting Democrats backed the bill, as did three Republicans.[9]

In 2009, the North Carolina legislature also passed legislation (HB 908) to authorize the pre-registration of 16- and 17-year olds, who would be enrolled as registered voters upon reaching their 18th birthday. The bill had both Democratic and Republican sponsors and passed both chambers with overwhelming bipartisan support.[10]

Also relevant to the build up to HB 589 were prior partisan disputes over voter photo identification in North Carolina. In 2011, after the 2010 elections in which Republicans gained majorities in both chambers of the General Assembly, the legislature passed a photo identification bill (HB 351) along straight party lines with no Democratic support in either the State House of Representatives or the State Senate. The bill was vetoed by Democratic Governor Beverly Perdue and override votes failed. The bill authorized the following forms of photo identification for voting at the polls either during the One Stop voting period or on Election Day.

(c) As used in this section, "photo identification" means any of the following that contain a photograph of the registered voter:

(1) A North Carolina drivers' license issued under Article 2 of Chapter 20 of the General Statutes, including a learner's permit or a provisional license.

(2) A special identification card for nonoperators issued under G.S. 20-37.7.

(3) An identification card issued by a branch, department, agency, or entity of this State, any other state, or the United States.

(4) A United States passport.

(5) An employee identification card issued by any branch, department, agency, or entity of the United States government, this State, or any county, municipality, board, authority, or other entity of this State.

(6) A United States military identification card.

(7) A tribal identification card.

(8) A North Carolina voter identification card issued under G.S. 163-166.14.11

---

[9] General Assembly of North Carolina, Session 2001, HB 831, *available at* http://www.ncleg.net/gascripts/BillLookUp/BillLookUp.pl?BillID=H831&Session=2001; General Assembly of North Carolina, Session 2005-6, SB 133, *available at* http://www.ncleg.net/gascripts/BillLookUp/BillLookUp.pl?Session=2005&BillID=S133&votesToView=all; General Assembly of North Carolina, Session 2007-8, HB 831, *available at* http://www.ncleg.net/gascripts/BillLookUp/BillLookUp.pl?Session=2007&BillID=h91.

[10] North Carolina General Assembly, House Bill 908, S.L. 2009-541, 2009-2010 Session, *available at* http://www.ncleg.net/gascripts/BillLookUp/BillLookUp.pl?Session=2009%20%20&BillID=h908.

Importantly, HB 351 permitted the use of far more forms of photo ID than are currently allowed under HB 589, including IDs issued by any county, municipality, board, authority, or other entity of the state, and there were no limitations on the use of expired identification.[12]

### C.    Increased Voter Turnout

With the exception of pre-registration, this expansion in opportunities for registration and voting was in effect for the first time in the presidential election of 2008. Prior to 2008, as documented below, North Carolina had been among the lowest quartile of states in the nation in voter turnout. This situation changed substantially beginning in 2008.

Presidential election turnout is most appropriate for cross-state comparison because state-specific factors such as the presence or absence of competitive statewide elections in other years can influence turnout. According to turnout data presented in Chart 10, turnout in presidential elections in North Carolina, which once lagged behind the nation, has far outpaced the national average in the presidential elections of 2008 and 2012. Notably, from 2004 to 2008, North Carolina had the largest increase in turnout of any state in the nation.[13]

---

[12] General Assembly of North Carolina, Session 2011, House Bill 351, Ratified Bill, *available at* http://www.ncleg.net/Sessions/2011/Bills/House/PDF/H351v6.pdf.

[13] Turnout comparisons are based on presidential ballot turnout rather than total turnout at the polls, because a number of states do not keep track of the latter statistic. They are also based on citizen voting age population to exclude from the comparison non-citizens who are not eligible to vote. Turnout data is obtained online from the United States Election Project at George Mason University, http://www.electproject.org/.

**CHART 10**
**PRESIDENTIAL TURNOUT, US AND NORTH CAROLINA BEFORE AND AFTER ADOPTION OF ONE STOP REGISTRATION IN 2007**



As further indicated in Chart 11, prior to adoption of 17-day One Stop voting and same day registration, North Carolina ranked 37th and 38th, respectively, among the states in turnout for the presidential election years of 2000 and 2004. However, in 2008 North Carolina moved up to 22nd, and in 2012, North Carolina rose to 11th in the nation in voter turnout, jumping ahead of 27 states since 2004. This major shift relative to other states cannot be explained by national factors that operate across states. Also, the benefits of same day registration during the One Stop voting period "were achieved with little to no additional costs for local elections officials," given that counties already had to open and staff polls for early voting.[14]

---

[14] Laura Rokoff and Emma Stokking, "Small Investments, High Yields: A Cost Study of Same Day Registration in Iowa and North Carolina, February 2012, *Demos.org*, http://www.demos.org/sites/default/files/publications/SDR-CostStudy-Final.pdf.



**CHART 11**
**NORTH CAROLINA PRESIDENTIAL TURNOUT, RANK AMONG STATES,**
**1=HIGHEST**
**50=LOWEST**
**UNITED STATES ELECTIONS PROJECT**

## VI.   PROCEDURAL DEVIATIONS WITH DISCRIMINATORY INTENT

The procedural deviations involved in the adoption of the final form of HB 589 do not represent violations of law or legislative rules, but nonetheless are significant and indicative of the discriminatory intent of the proponents of HB 589. The sponsors of HB 589 introduced the bill at the beginning of the 2013 Assembly session. The version of HB 589 that the House of Representatives passed in April 2013 included only voter photo identification requirements. It did not address early voting, same day registration, the counting of out-of-precinct provisional ballots, or the pre-registration of 16-17 year olds. Changes related to voting procedure were only added to the bill by the Senate after the release of the *Shelby* decision that invalidated the formula that included 40 North Carolina counties in the Section 5 pre-clearance provision of the Voting Rights Act.

### A.    Pre-*Shelby* HB 589 Process

The sponsors of the initial pre-*Shelby* version of HB 589 bill subjected the proposed legislation to what they lauded as a transparent process and extensive vetting that included public hearings, the testimony of interest groups and authorities in the field, several committee hearings, and two days of debate in the House of Representatives. The bill was also substantially similar to the 2011 legislation (HB 351) passed by the General Assembly, but vetoed by the governor. The sponsors took great pride in this lengthy, open, and in-depth process, which they considered as evidence of the integrity of their approach to legislation with implications for the fundamental right to vote for the citizens of North Carolina. They also claimed that their bill included sufficiently broad provisions for photo identification that they believed balanced concerns about ballot integrity with ensuring access to voting.

In presenting HB 589 to the House Elections Committee on April 10, 2013, one of the bill's primary sponsors, Representative Harry Warren, said:

> "The Voter Information Verification Act, or VIVA, is the result of many months of research and of listening to the people of North Carolina, more than 65 percent of whom have voiced a strong desire for improving the security of the voting process, and by giving careful and thoughtful consideration to the concerns expressed by those opposed to securing the vote. VIVA provides for increased participation of eligible voters through an aggressive, bipartisan program of voter education and voter registration initiatives at the grassroots level across the state over a two-year period. VIVA aggressively addresses allegations of voter suppression and dispels predictions of disenfranchisement."[15]

---

[15] 20130410 *Transcript of the Proceedings N.C. House Elections Committee*, 4-10-13 pp. 36-37, lines 19-25, 1-9.

The-Speaker of the House (now U.S. Senator) Thom Tillis said, "The vote was the result of a 10-month process that included multiple public hearings, hours of testimony by experts and members of the public, and in-depth analysis of voter ID systems in numerous other states." Representative David Lewis, Chairman of the House Elections Committee said, "This has been a fair and open and transparent process, as we committed it would be."[16]

Sponsors of the House-passed version of HB 589 also took efforts to craft the bill in the hopes that it would not be found to discriminate against minorities and could withstand any legal challenge, even though the pre-clearance provision of Section 5 was still in force. Upon the filing of HB 589, Chairman Lewis said, "We are confident that this open process will produce a bill that stands up in a court of law, addresses legitimate concerns, and protects the integrity of the ballot box." After House passage, Speaker Tillis said that, compared to the 2011 bill, "I think it's technically a better bill and a bill that will withstand any challenge that comes to us in the way of the courts."[17]

## B.      Post-*Shelby* Process

The General Assembly fundamentally changed the process for vetting and adopting HB 589 after the U. S. Supreme Court issued its *Shelby* ruling on June 25, 2013. After passage by the House in April, the bill sat in the Senate with no committee or floor action. Immediately after the *Shelby* decision, however, the Senate leadership initiated steps to thoroughly revise and expand HB 589.

On the same day as the *Shelby* ruling, North Carolina State Senator Tom Apodaca, the Chairman of the Senate Rules Committee said, "I guess we're safe in saying this decision was what we were expecting." He added, "So, now we can go with the full bill."  The "full bill" included additional restrictions on voter identification, the elimination of same day registration, the elimination of the partial counting of out-of-precinct provisional ballots, the elimination of pre-registration, and many other new provisions. The *Shelby* decision, Apodaca said, eliminated "legal headaches" in adopting the many revised and new provisions of the "full bill." Previously, the state would have had to prove to the Department of Justice or a federal three-judge panel that the bill did not have the intent or effect of discriminating against minorities. "The ruling," Apodaca said, "should speed things along greatly."[18]

---

[16]   "Voter ID Passes House," 24 April 2013, *News-Herald.com*, http://www.roanoke-chowannewsherald.com/2013/04/24/voter-id-passes-house/; Brian Warner, "N.C. House Passes Voter ID Bill," *Jones Street Chronicles*, 25 April 2013, http://thevoterupdate.com/jones/?p=903#.VLc6uCvF9SI.

[17]   "Republicans to Press Ahead With Voter ID Law," ABC News 7, 5 March 2013, http://abc7news.com/archive/9016023/; "NC House Passes Voter ID Bill, 81-36," *News-Herald.com*, 25 April 2013, http://chowan.countync.us/node/2125.

[18]   "North Carolina Voter Id Bill Moving Ahead With Supreme Court Ruling," *WRAL.com*, 25 June 2013, http://www.wral.com/nc-senator-voter-id-bill-moving-ahead-with-ruling/12591669/; "Swift Impact of Voting Decision, *Durham Herald Sun*, A8 (June 27, 2013), available at http://www.heraldsun.com/opinion/editorials/x1065838772/Swift-impact-of-voting-decision.

Senator Apodaca's comments are not exactly a "smoking gun," but were close. The comments show that the leadership in the General Assembly was waiting for the Supreme Court to strike down pre-clearance in order to introduce the "full bill" with provisions on photo ID, early voting, same day registration, the counting of out-of-precinct provisional ballots, and pre-registration that the legislative body as a whole knew would be difficult to defend as non-discriminatory in intent and effect. Prior to *Shelby*, HB-589's sponsors were not willing to exclude student IDs, IDs issued by state agencies, municipalities, and other entities, or expired IDs as forms of photo identification while the pre-clearance provision of Section 5 remained in effect for North Carolina. The *Shelby* decision gave the supporters of HB 589 the signal they were looking for to eliminate these forms of acceptable voter photo identification—eliminations that in every significant instance made it relatively more difficult for African Americans than whites to possess authorized identification. The "full bill" also cut back on the initiatives for voter education and outreach that Representative Warren had praised in his statement before the Elections Committee.

Despite sweeping new changes in HB 589, the bill's supporters in the General Assembly did not subject the post-*Shelby* version of HB 589 to extensive public input or substantive scrutiny. Rather, sponsors pushed the bill through both chambers of the legislature in two days without public hearings, testimony by authorities or interest groups, research into its implications for the voting rights of minorities and other citizens, or extensive and open legislative debate. The lack of process given to the full bill, an extensive and far reaching legislation dealing with the fundamental right to vote of the citizens of North Carolina, contrasted starkly with the relatively robust process given to the pre-*Shelby* version of the bill.

The Senate and the House passed the post-*Shelby* version of HB 589 on July 25, 2013, two days after it emerged from the Senate Rules Committee and just one day before the end of the legislative session, foreclosing any further opportunity for debate or analysis.[19] The House debate was a pro-forma exercise. The bill's backers did not engage in substantive discussion with critics, but primarily allowed Democrats to vent their opposition, knowing that they had more than enough votes to enact the bill.[20]

## VII.   SUBSTANTIVE DEVIATIONS WITH DISCRIMINATORY INTENT AND EFFECT—PHOTO IDS

In this section, I focus on substantive deviations between the post-*Shelby* version of HB

---

[19] General Assembly of North Carolina, "When is the General Assembly in Session," *available at* http://www.ncga.state.nc.us/gascripts/Help/KnowledgeBase/viewItem.pl?nID=35.

[20] General Assembly of North Carolina, Session 2013-14, House Bill 589, *available at* http://www.ncga.state.nc.us/gascripts/BillLookUp/BillLookUp.pl?Session=2013&BillID=h%20+589&submitButton =Go; 21030725, *Transcript of Proceedings Before the House of Representatives*, 25 July 2013.

589 and both the 2011 legislation (HB 351) and the pre-*Shelby* version of HB 589. I will consider first the elimination of proper forms of identification made in the voter identification section of HB 589.

My analysis demonstrates that the legislature knew based on information available to it well before July 2013, that the changes made to the post-*Shelby* version of HB 589 that was ultimately enacted had the effect of disproportionately burdening the opportunity for African Americans to register and vote in North Carolina.

### A.   Voter Photo Identification Eliminated IDs

Table 7 traces key substantive changes in voter identification provisions of North Carolina bills from HB 351 in 2011 through the ultimately enacted post-*Shelby* version of HB 589 in July 2013. Table 7 shows that the post-*Shelby* bill eliminated many of the significant photo identification options included in both HB 351 and the pre-*Shelby* version of HB 589. Each one of these changes had the effect of imposing disparate burdens on African American voters, information that was available to legislators in North Carolina and to Governor Pat McCrory well before July 2013.

Specifically, the legislature *eliminated* forms of photo identification that were relatively *more accessible to African Americans* and *retained* forms of identification that were relatively *less accessible to African Americans*. In the following analysis I will consider, first, forms of identification eliminated under the enacted version of HB 589, and then, forms of identification retained under the enacted version of HB 589.

| TABLE 7 COMPARISON OF VOTER PHOTO IDENTIFICATION BILLS, NORTH CAROLINA GENERAL ASSEMBLY, 2011 AND 2013 | | | |
|---|---|---|---|
| ID TYPE | 2011 HB 351 | HOUSE PASSED HB 589, 4/24/2013 | POST-*SHELBY* ENACTED HB 589, 7/25/2014 |
| DRIVER'S LICENSE (INCLUDING PERMIT) OR NON-OPERATOR'S ID | YES | YES | YES |
| US PASSPORT | YES | YES | YES |
| TRIBAL ID | YES | YES | YES |
| MILITARY ID | YES | YES | YES |
| VETERAN'S ID | YES | YES | YES |
| VOTER ID CARD | YES | YES | YES |
| OUT-OF-STATE ID | YES | YES | LIMITED* |
| PUBLIC HIGHER ED ID | YES | YES | **NO** |
| EXPIRED ID ACCEPTED | YES | YES | **NO (PARTIAL ELDERLY EXCEPTION)**\*\* |
| GOVT EMPLOYEE ID | YES | YES | **NO** |
| PUBLIC ASSISTANCE  ID | YES | YES | **NO** |
| FIREMAN, POLICE, EMS, HOSPTIAL, ID | YES | YES | **NO** |
| * Accepted for persons registered within 90 days of the election. ** Persons over 70 may use an expired ID that was unexpired on their 70th birthday. | | | |

1.      **Expired IDs**

As compared to all earlier versions of photo identification bills, the post-*Shelby* version of HB 589 eliminated the use of expired driver's licenses (including permits) and non-operator's Department of Motor Vehicles ("DMV") IDs for voting at the polls. There is one limited exception for elderly voters: persons over 70 may use an expired ID that was unexpired on their 70th birthday. Through this change, the legislature subtracted from the pre-*Shelby* version of HB 589 a form of identification to which African Americans have more access than whites. This subtraction is especially significant because DMV IDs are by far the most prevalent form of acceptable voter photo identification under VIVA.

Legislators in favor of HB 589 never, at any time, explored, or at least never publicly disclosed, the implications of eliminating expired DMV IDs from the list of acceptable photo identification for voting on African American voters. This failure came despite the availability of a March 2013 database of registered voters used by the State Board of Elections ("SBOE") to match registered voters to all forms of DMV IDs.[21] Information from the March 2013 database shows that there were substantial racial disparities among registered voters who possessed expired DMV IDs.

David Ely of Compass Demographics, at my instruction, examined the registered voters in the March 2013 database matched to DMV IDs, including expired and unexpired IDs. He compiled results by race for all matched registered voters, active registered voters, and actual 2012 general election voters, respectively, that were matched both to *expired and unexpired DMV IDs.* In the absence of racial disparities the percentages of matched African Americans and whites matched to expired and unexpired IDs respectively should be approximately equal. Racial disparities that imposed disparate burdens on African Americans would emerge if the percentage of African Americans matched to expired IDs was *higher* than the percentage matched to unexpired IDs and the percentage of whites matched to expired IDs was *lower* than the percentage matched to unexpired IDs.

To obtain this racial compilation of registered voters matched to expired and unexpired IDs, Compass Demographics first replicated the SBOE's April 2013 matching procedure using the March database.[22] He then examined the matched records to identify by race all registered voters, active registered voters, and 2012 voters who were matched to expired and unexpired DMV IDs.[23] Compass Demographics came extremely close to replicating exactly the state's matching results. Of some 6,425,820 registered voters in the March 2013 database, the SBOE matched 6,107,177 registered voters to some form of DMV photo identification. Compass

---

[21] North Carolina State Board of Elections, 2013 SBOE-DMV ID Analysis, April 2013, p.1.

[22] *Ibid.*

[23] Compass Demographics did not count as expired IDs, those IDs that fall under the post-*Shelby* exemption for registered voters 70 years or older who's IDs were not expired as of their 70th birthday. Those IDs were counted as unexpired since they are valid for voting under VIVA.

Demographics matched 6,086,227 registered voters, for a difference of just 0.3 percentage points. Compass Demographic's racial percentages are essentially identical to the results reported by the state, with differences of some 0.1 percentage points for unmatched white and African American voters.

Compass Demographics determined that of the 6,086,227 March 2013 registered voters who matched to some form of DMV photo identification, 240,218 of them had expired IDs, not counting exempt 70+ voters. The remainder were matched to an unexpired ID. Both the expired and unexpired IDs include driver's licenses (including permits) and non-operator's IDs.

The results of analyzing African Americans and whites matched to expired and unexpired IDs demonstrates that there are substantial racial disparities among active registered voters and actual 2012 voters (voters most likely to be impacted by photo identification requirements) who possess expired, as opposed to unexpired, DMV identification.[24] That is, African Americans who are matched to DMV IDs are *more* prevalently matched to expired as compared to unexpired IDs, whereas whites are *less* prevalently matched to expired rather than unexpired IDs.

Table 8 and Chart 12 compare by race all matched registered voters, active registered voters, and 2012 general election voters that matched to expired and unexpired DMV IDs.[25] For each category of voter, Table 8 and Chart 12, compare the percentages of blacks and whites among all voters in the category matched to expired IDs. Table 8 and Chart 12 show that there are no significant disparities between the percentages of matched African Americans and whites among *all* registered voters who matched to expired and unexpired DMV registration. Importantly, however, the results reported in Table 8 and Chart 12 demonstrate that racial disparities become quite large and adverse for African Americans when the analysis focuses on active registered voters—eliminating those who remain on the rolls in inactive status[26]—and

---

[24] *See* note 24.

[25] The formulas for compiling the percentages in Table 8 are the same for all categories of registered voters, all registered voters, active registered voters, and 2012 general election voters:

- Percent matched African Americans among those matched to expired ID = matched blacks in category matched to expired IDs/All  matched in category matched to expired IDs;
- Percent matched African Americans among those matched to unexpired ID = matched blacks in category matched to unexpired IDs/All matched in category matched to unexpired IDs;
- Percent matched whites among those matched to expired ID = matched whites in category matched to expired IDs/All matched in category matched to matched expired IDs;
- Percent whites among those matched to unexpired ID = matched whites in category matched to unexpired IDs/All matched in category matched to unexpired IDs.

[26] The SBOE classifies registered voters as inactive according to the following procedure:

"If a county board of elections has not had any contact with a voter for a period of two federal election cycles, then the voter will be sent a non-forwardable no-contact mailing. If the mailing is

actual 2012 general election voters.[27]

As indicated in Table 8 and Chart 12, there are substantial racial disparities among active registered voters who matched to expired DMV identification— African American voters are more likely to have expired IDs than whites. The data demonstrates that African Americans comprised 26.2 percent of the 135,625 matched active registered voters who were matched to *expired* DMV IDs, 21 percent *higher* than the 21.7% of active African American registered voters who matched to *unexpired* IDs, for a difference of +4.5 percentage points. The data further demonstrates that whites comprised 66.7 percent of the active registered voters who were matched to expired DMV IDs, 7 percent *lower* than the 71.8% of active white registered voters matched to unexpired IDs, for a difference of -5.1 percentage points. Thus, African Americans are overrepresented, and whites are underrepresented, among active registered voters who were matched to expired DMV IDs.[28]

---

not returned as undeliverable by the postal system, then the voter will remain an active voter. If the mailing is returned as undeliverable by the postal system, then the voter will be sent a forwardable address confirmation mailing. The voter will be required to return the confirmation mailing within 30 days of the mailing. If the confirmation mailing is not returned by the voter within that time, or the mailing is returned by the postal system as undeliverable, then the voter's record will be marked inactive in the voter registration database."

Inactive registered voters are still eligible to vote, however, they vote at only a small fraction of the levels of active registered voters (9 percent in the general presidential election of 2012, compared to 75 percent for active registered voters). Thus, active registered voters are far more impacted by photo voter identification requirements than are inactive registered voters. *See* Data on voting history from SEIMS Database Voter Registration File and Voter History.

[27] Legislative advocates of voter photo ID in North Carolina were well aware of the importance of active registered voters and actual voters. See, for example, the comments on the April 2013 state matching of DMV records by Representative Ruth Samuelson, a primary sponsor of HB 589, 21030417, *Transcript of Proceedings Before the House Elections Committee*, 17 April 2013, pp. 20-21, lines 20-15, 1-10.

[28] Percentages do not add to 100% because they do not include others such as Asians and American Indians.

38

| TABLE 8 PERCENT OF REGISTERED VOTERS WHO MATCHED TO UNEXPIRED & EXPIRED DMV IDS BY RACE, MARCH 2013 DATABASE | | | |
|---|---|---|---|
| GROUP | PERCENT AMONG REGISTERED VOTERS MATCHED TO UNEXPIRED IDS | PERCENT AMONG REGISTERED VOTERS MATCHED TO EXPIRED IDS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **ALL REGISTERED VOTERS** | | | |
| **WHITE** | 71.5% | 71.3% | <1% LOWER | -0.2 PERCENTAGE POINTS |
| **AFRICAN AMERICAN** | 21.8% | 21.8% | NONE | NONE |
| | | | | |
| **ACTIVE REGISTERED VOTERS** | | | |
| **WHITE** | 71.8% | 66.7% | 7% LOWER | -5.1 PERCENTAGE POINTS |
| **AFRICAN AMERICAN** | 21.7% | 26.2% | 21% HIGHER | +4.5 PERCENTAGE POINTS |
| | | | | |
| **2012 GENERAL ELECTION VOTERS** | | | |
| **WHITE** | 71.9% | 52.2% | 27% LOWER | -19.7 PERCENTAGE POINTS |
| | | | | |
| **AFRICAN AMERICAN** | 22.6% | 40.7% | 80% HIGHER | +18.1 PERCENTAGE POINTS |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File. Matched to expired ID: all registered voters = 240,218, active voters = 135,625, actual 2012 voters = 24,295. | | | |



CHART 12
PERCENT OF REGISTERED VOTERS MATCHED TO UNEXPIRED AND EXPIRED
DMV IDS, MARCH 2013 DATABASE, BY RACE

Table 8 and Chart 12 further demonstrate that racial disparities are even larger for the 24,295 voters who voted in 2012 and who matched to expired IDs. Table 8 and Chart 12 demonstrate that African Americans comprised 40.7 percent of 2012 voters who were matched to expired DMV IDs, 80 percent *higher* than the 22.6 percent of African American voters who matched to unexpired IDs, for a difference of +18.1 percentage points. The data also demonstrates that whites comprised 52.2 percent of 2012 voters who were matched to expired DMV IDs, 27 percent *lower* than the 71.9% of white voters who voted in 2012 and were matched to unexpired IDs, for a difference of -19.7 percentage points. Thus, African Americans are overrepresented, and whites are underrepresented, among 2012 voters who were matched to expired DMV IDs.

Table 9 and Chart 13 reframe the analysis to show the percentages by race of all active registered voters and actual 2012 voter who matched to expired DMV IDs. If the elimination of expired IDs were race neutral, then these percentages should be equal for African Americans and whites. Racial disparities would be indicated by a higher percentage of African Americans than whites matched to expired IDs. Table 9 and Chart 13 also provide the number of active registered African American voters and actual 2012 African American voters impacted by racial disparities who matched expired IDs.[29]

According to the data reported in Table 9 and Chart 13, 2.9 percent of active registered African American voters matched to expired DMV IDs, 26 percent *higher* than the 2.3 percent of active registered white voters matched to expired IDs, for a difference of +0.6 percentage points. In other words, **7,300** additional active registered African American voters would have unexpired DMV photo IDs in the absence of racial disparities.

Table 9 and Chart 13 also show that 1.0 percent of African American voters who participated in the 2012 general election were matched to expired DMV IDs, 150 percent *higher* than the 0.4 percent of white voters who participated in the 2012 general election and who matched to expired IDs, for a difference of +0.6 percentage points. As a result, **5,937** additional African American voters who participated in the 2012 general election would have unexpired DMV photo IDs in the absence of racial disparities.

---

[29] The formulas for compiling the percentages in Table 9 are the same for all categories of registered voters:

- Percent matched African Americans matched to expired IDs = matched blacks in category matched to expired IDs/All matched blacks;
- Percent matched whites matched to expired IDs=matched whites in category matched to expired IDs/All matched whites.

| TABLE 9<br>PERCENT OF ACTIVE REGISTERED VOTERS AND 2012 GENERAL<br>ELECTION VOTERS MATCHED TO EXPIRED DMV IDS, BY RACE<br>MARCH 2013 DATABASE | | | | |
|---|---|---|---|---|
| GROUP | PERCENT MATCHED TO EXPIRED IDS | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES | ADDED AFRICAN AMERICAN REGISTERED VOTERS MATCHED TO EXPRIED IDS FROM DIFFERENCE |
| **ACTIVE REGISTERED VOTERS** | | | | |
| **WHITE** | 2.3% | NA | NA | |
| | | | | |
| **AFRICAN AMERICAN** | 2.9% | 26% HIGHER | +0.6 PERCENTAGE POINTS | **+7,300** |
| | | | | |
| **2012 GENERAL ELECTION VOTERS** | | | | |
| **WHITE** | 0.4% | NA | NA | |
| | | | | |
| **AFRICAN AMERICAN** | 1% | 150% HIGHER | +0.6 PERCENTAGE POINTS | **+5,937** |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File. Numerical impact = percentage point difference times number of African American matched active registered voters (1,216,640) and 2012 voters (989,574) respectively. | | | | |

42

**CHART 13**
**PERCENT OF ACTIVE REGISTERED VOTERS AND 2012 VOTERS MATCHED TO EXPIRED**
**DMV IDS, MARCH 2013 DATABASE, BY RACE**



My analysis next considers the racial effects of the partial exemption regarding expired IDs for elderly voters age 70-years and older. Table 10 and Chart 14 show that white registered voters, white active registered voters, and white voters who participated in the 2012 general election benefit much more from this exemption than do their African American counterparts.

As indicated in Table 10 and Chart 14, 17.6 percent of all African American registered voters matched to expired IDs and can still use these IDs to vote because they qualify for the 70+ exemption. This percentage of exempt African Americans is 30 percent lower than the 25.1 percent of whites registered voters who match to expired IDs and qualify for the 70+ exemption, for a difference of -7.5 percentage points. If there were no racial disparities in the African American and white percentage of exempted registered voters, an additional **4,758** African American registered voters would qualify for the 70+ exemption.[30]

---

[30] The formulas for compiling the percentages in Table 10 are the same for all categories of registered voters:

- Percent African Americans with expired IDs that receive 70+ exemption = African Americans matched to expired IDs receiving 70+ exemption/African Americans matched to both exempt and non-exempt expired IDs;
- Percent whites with expired IDs that receive 70+ exemption = whites matched to expired IDs receiving 70+ exemption/whites matched to both exempt and non-exempt expired IDs.

44

| TABLE 10<br>**PERCENT OF WHITE AND AFRICAN AMERICANS MATCHED TO EXPIRED IDS WHO QUALIFY FOR THE 70+ EXEMPTION AND NUMERICAL IMPACT ON AFRICAN AMERICANS, BY RACE**<br>**MARCH 2013 DATABASE** | | | |
|---|---|---|---|
| GROUP | PERCENT OF EXPIRED IDS THAT RECEIVE 70+ EXEMPTION | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE | NUMERICAL DIFFERENCE WITH WHITES |
| | | | | |
| **ALL REGISTERED VOTERS** | | | | |
| WHITE | 25.1% | NA | NA | |
| | | | | |
| AFRICAN AMERICAN | 17.6% | 30% LOWER | -7.5 PERCENTAGE POINTS | **-4,758** |
| | | | | |
| **ACTIVE REGISTERED VOTERS** | | | | |
| **WHITES** | 31.2% | NA | NA | |
| | | | | |
| **AFRICAN AMERICAN** | 20.1% | 36% LOWER | -11.1 PERCENTAGE POINTS | **-4,928** |
| | | | | |
| **2012 GENERAL ELECTION VOTERS** | | | | |
| **WHITE** | 57.8% | NA | NA | |
| | | | | |
| **AFRICAN AMERICAN** | 32.0% | 45% LOWER | -25.8 PERCENTAGE POINTS | **-3,751** |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File. Numerical impact equal percentage point difference multiplied by African Americans matched to exempt and non-exempt expired IDs: all registered voters = 63,437, active = 44,399, voters = 14,540 | | | | |

45



CHART 14
PERCENT OF WHITE AND AFRICAN AMERICANS MATCHED TO EXPIRED IDS WHO QUALIFY
FOR THE 70+ EXEMPTION  MARCH 2013 DATABASE, BY RACE, NON-HISPANIC

Table 10 and Chart 14 further show that these racial disparities among those under 70 expand for active registered voters and actual 2012 voters.

- For active registered voters, Table 10 and Chart 14 show that 20.1 percent of African Americans matched to expired IDs qualify for the 70+ exemption, 36 percent lower than the 31.2 percent of white active registered voters matched to expired IDs who qualify for the 70+ exemptions, for a difference of -11.1 percentage points. If there were no racial disparities, an additional **4,928** African American active registered voters would qualify for the 70+ exemption.

- For 2012 general election voters, Table 10 and Chart 14 show that 32.0 percent of African Americans matched to expired IDs qualify for the 70+ exemption, 45 percent lower than the 57.8 percent of 2012 general election white voters matched to expired IDs who qualify for the 70+ exemptions, for a difference of -25.8 percentage points. If there were no racial disparities an additional **3,751** African American voters who participated in the 2012 general election would qualify for the 70+ exemption.

These findings are consistent with the age distribution of whites and African Americans in North Carolina according to data available at the time of adoption of HB 589. As indicated in Table 11 and Chart 15, according to the 2010 Census, 8.5 percent of non-Hispanic voting age African Americans were aged 70 or more, 38 percent lower than the 13.6 percent of voting age whites aged 70 or more, for a difference of 5.1 percentage points. In numerical terms if there were no racial disparities in the percentages of this elderly group, an additional **77,171** African Americans would be potentially eligible for the limited 70+ exemption for expired IDs under VIVA.

In sum, this analysis of data on expired IDs, available at the time of the adoption of HB 589 demonstrates the following:

- African Americans are substantially overrepresented, and whites are substantially underrepresented, among active registered voters and 2012 voters who are matched to expired, non-exempt DMV IDs.

- These racial disparities have an impact on substantial number of African Americans.

- The exemption for certain 70+ voters disproportionately benefits white as compared to African American registered voters, active registered voters, and 2012 general election voters.

47

| TABLE 11 | | | |
|---|---|---|---|
| **PERCENT VOTING AGE POPULATION 70 YEARS OF AGE OR OLDER, NORTH CAROLINA, BY RACE, NON-HISPANIC, 2010 US CENSUS** | | | |
| GROUP | **PERCENT OF VOTING AGE POPULATION 70 YEARS OR OLDER** | **PERCENT DIFFERENCE WITH WHITES** | **PERCENTAGE POINT DIFFERENCE WITH WHITES** | **NUMERICAL DIFFERENCE WITH WHITES** |
| **BLACK** | 8.5% | 38% LOWER | -5.1% | **+77,171** |
|  |  |  |  |  |
| **WHITE** | 13.6% | NA | NA |  |
|  |  |  |  |  |
| Numerical difference = .051 multiplied by black voting age population of 1,513,165 | | | |

48

**CHART 15**
**PERCENT OF VOTING AGE POPULATION 70 YEARS OR**
**OLDER, BY RACE, NON-HISPANIC, NORTH CAROLINA, 2010**



###### 2.      Student IDs

As compared to all earlier versions of voter photo identification bills, the post-*Shelby* variant of HB 589 eliminated student photo identification issued by public institutions of higher education in the state.  The elimination of student IDs also demonstrates racial disparities.

Table 12 and Chart 16 draw upon the Fall 2011 enrollment statistics to compile the percentage of African Americans and whites in North Carolina that were enrolled in public institutions of higher education. The data shows that 7.3 percent of voting age African Americans were enrolled in public colleges and universities, 28 percent higher than the 5.7% of enrolled whites, for a difference of +1.6 percentage points. The difference between whites and African Americans student enrollment yields an additional **24,211** African Americans with potential access to student identification based on this percentage point difference. It is also worth noting that North Carolina has five, public four-year Historically Black Colleges and Universities, more than any other state in the nation.

| TABLE 12 | | | |
|---|---|---|---|
| **PERCENT VOTING AGE PUBLIC HIGHER EDUCATION STUDENTS BY RACE, NON-HISPANIC, NORTH CAROLINA, FALL 2011 ENROLLMENTS** | | | |
| GROUP | PERCENT PUBLIC UNIVERSITY STUDENTS, VOTING AGE POPULATION | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES | NUMERICAL DIFFERENCE WITH WHITES |
| | | | | |
| **BLACK** | 7.3% | 28% HIGHER | +1.6% | **+24,211** |
| | | | | |
| **WHITE** | 5.7% | NA | NA | |
| | | | | |
| Numerical difference = African American voting age population (1,513,165) times percentage point difference with whites. Enrollment data is available from the Integrated Postsecondary Education Data System, http://nces.ed.gov/ipeds/IPEDS. Voting Age Population Based on 2010 Census of Population. | | | | |



**CHART 16**
**PERCENT ENROLLED IN PUBLIC COLLEGES AND UNIVERSITIES, BY RACE, NON-HISPANIC FALL 2011, NORTH CAROLINA**

### 3.    Government Employee IDs

As compared to all earlier versions of photo identification bills, the post-*Shelby* bill eliminates all forms of government employee photo identification, including IDs issued by state, local, and federal governments. In so doing, the legislature again eliminated a form of identification for which African Americans have more access than whites.

Table 13 and Chart 17 show the racial distribution of government employees in North Carolina using the U.S. Census 2011 American Community Survey three-year estimates available in 2013. The results reported in Table 13 and Chart 17 demonstrate that 10.9 percent of African Americans are government workers in North Carolina, 21% higher than the 9.0 percent of whites who are government workers, for a gap of +1.9 percentage points. The difference between the percentage of African American and white government workers accounts for an additional **28,750** African Americans of voting age with access to government identification.[31]

| TABLE 13 PERCENT VOTING AGE GOVERNMENT EMPLOYEES BY RACE, NON-HISPANIC, NORTH CAROLINA, 2009-2011, US CENSUS, AMERICAN COMMUNITY SURVEY | | | | |
|---|---|---|---|---|
| GROUP | PERCENT GOVERNMENT EMPLOYEE VOTING AGE POPULATION | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES | NUMERICAL DIFFERENCE WITH WHITES |
| **BLACK** | 10.9% | 21% HIGHER | +1.9% | **+28,750** |
| | | | | |
| **WHITE** | 9.0% | NA | NA | |
| | | | | |
| Numerical difference = black voting age population times percentage point difference with whites. | | | | |

---

[31] The post-*Shelby* version of HB 589 also eliminates photo identification issued for fire, police, EMS, and hospital workers and public assistance IDs. It is not possible to specify the racial composition of the small group falling into photo identification issued for fire, police, EMS, and hospital workers. Separately, North Carolina currently does not require public assistance recipients to have their photo taken for a picture identification card.  Ironically, however, if North Carolina were to follow the lead of other states and require such identification, then recipients could use these cards to draw resources from the government, but not to vote in elections.  Moreover, African Americans are far more likely than whites in North Carolina to be recipients of public assistance and have access to such identification.

**CHART 17**
**PERCENT OF VOTING AGE POPULATION GOVERNMENT**
**WORKERS, BY RACE, NON-HISPANIC**



### B.    Voter Photo Identification Retained By HB 589

Unlike the four forms of eliminated photo IDs in the post-*Shelby* version of HB 589—expired IDs, student IDs, government IDs, and public assistance IDs)—the three most significant forms of acceptable identification retained by HB 589—unexpired driver's licenses, permits, and non-operator's IDS; U.S. passports; and veterans and military IDs—disproportionately benefit whites as compared to African Americans. In other words, African Americans are less likely to have these forms of ID compared to their white counterparts. This analysis is likewise based on information available to the North Carolina General Assembly at the time HB 589 was enacted.

### 1.    Driver's Licenses and Non-Operator's IDs

#### (a) The State Board of Elections' Analysis

In January 2013, the State Board of Elections ("SBOE") conducted a study designed to gauge the number of registered voters who could not be matched to the Department of Motor Vehicles ("DMV") database of North Carolina driver's licenses (including permits) and non-operator photo IDs. The four matching criteria included: exact name plus DMV license or ID number, exact name and date of birth, exact name and social security number, DMV license or ID number and date of birth. The study found that, "A DMV ID match could not be made on a remaining 612,955 registered voters." The unmatched registrants comprised 9.3 percent of total registered voters in the database.[32]

Table 15 and Chart 19, using the January results published by the SBOE, demonstrate that African Americans are substantially overrepresented, and whites are substantially underrepresented, among unmatched registered voters as compared to matched registered voters.

---

[32] North Carolina State Board of Elections, 2013 SBOE-DMV ID Analysis, January 2013, p. 1.

| TABLE 15 REGISTERED VOTERS UNMATCHED IN NORTH CAROLINA DMV DATABASE BY RACE, JANUARY 2013 SBOE STUDY | | | |
|---|---|---|---|
| GROUP | **PERCENT AMONG UNMATCHED REGISTERED VOTERS** | **PERCENT AMONG MATCHED REGISTERED VOTERS** | **PERCENT DIFFERENCE** | **PERCENTAGE POINT DIFFERENCE** |
| **WHITE** | 56.8% | 72.4% | 22% LOWER | -15.6% |
| | | | | |
| **AFRICAN AMERICAN** | 31.2% | 21.6% | 44% HIGHER | +9.6% |
| | | | | |
| Source: North Carolina State Board of Elections, Online Database, *January 2013 SBOE-DMV ID Analysis,* North Carolina State Board of Elections, Online Registered Voters Statistics, January 2013. Total unmatched: 612,955 | | | | |





In April 2013, "at the recent request of legislative leaders and staff," the SBOE and DMV conducted a new and revised matching analysis between DMV records of driver's licenses, permits, and non-operator's IDs.[33]   The revised study used much broader and less stringent procedures that expanded its January matching criteria from 4 to 28.  The SBOE's memo notes, "it had been our usual practice to only identify *exact* name matches" (emphasis in original), which limited the matching to four criteria.  However, with this April 2013 analysis, the SBOE expanded its usual matching process "to allow for additional variation in voters' names and data entry errors on driver license number, social security number or date of birth in either of the databases." According to the deposition of Marc Burris, the Information Technology Director for the SBOE, Ray Starling, the general counsel to House Speaker Thom Tillis participated in the meeting and discussions that led to the use of the expanded April matching process with some 24 additional matching criteria.[34]

The revised April 2013 study found that 318,643 registered voters could not be matched to DMV records despite the new criteria. This was equal to 4.96 percent of 6,425,820 registration records included in the analysis. Thus, despite strenuous matching efforts, the result of the study requested by legislative leaders during the debates over HB 589 still demonstrates that large numbers of registered voters in the state of North Carolina cannot be matched to DMV photo identification. Moreover, although the expanded criteria matched additional registered voters than the matching procedure usually employed by the SBOE, it is also more likely that it generated false matches.

In addition, as demonstrated in Table 16 and Chart 20, using the April 2013 results published by the SBOE, the revised study found even more substantial racial disparities between whites and blacks than the January study. Table 16 and Chart 20 show that African Americans comprised 33.8 percent of unmatched registered voters, 54 percent *higher* than the 21.9 percent of African Americans among all registered voters who matched to an ID, for a disparity of +11.9 percentage points. Whites comprised 54.2 percent of unmatched registered voters, 25 percent *lower* than the 71.0 percent of whites among all registered voters who matched to an ID, for a difference of -17.7 percentage points.

---

[33] North Carolina State Board of Elections, 2013 SBOE-DMV ID Analysis, April 2013, p. 1.
[34] *Ibid.*, p. 5; Apr. 17, 2014 *Deposition of Marc Burris, NAACP v. McCrory, et al.* at 116:24-117:14; 147: 1-11.

| TABLE 16<br>REGISTERED VOTERS UNMATCHED IN NORTH CAROLINA DMV<br>DATABASE BY RACE, REVISED APRIL 2013 STATE STUDY | | | | |
|---|---|---|---|---|
| GROUP | **PERCENT AMONG UNMATCHED REGISTERED VOTERS** | **PERCENT AMONG MATCHED REGISTERED VOTERS** | **PERCENT DIFFERENCE** | **PERCENTAGEPOINT DIFFERENCE** |
| **WHITE** | 54.2% | 71.9% | 25% LOWER | -17.7% |
| | | | | |
| **AFRICAN AMERICAN** | 33.8% | 21.9% | 54% HIGHER | +11.9% |
| | | | | |
| Source: North Carolina State Board of Elections, Online Database, *April 2013 SBOE-DMV ID Analysis,* North Carolina State Board of Elections, Online Registered Voters Statistics, March 2013. Total unmatched: 318,643. | | | | |

**CHART 20**
**REGISTERED VOTERS UNMATCHED IN DMV DATABASE APRIL 2013, BY RACE**



Lawmakers were well aware of this published information on the racial breakdown of unmatched registered voters. Not only was the office of then-Speaker Tillis involved in the matching process that produced the April 2013 compilation of unmatched voters, but the racial disparities disclosed in both the January and April matches were cited in legislative debate, commented upon in public hearings, publicized by advocacy groups, and reported in the press before passage of the final version of HB 589.[35]

Table 17 and Chart 21 reframe data in the SBOE's published report to measure the percentage of all African American and white registered voters that the SBOE could not match to the DMV database. As indicated in Table 17 and Chart 21, 7.4 percent of African American registered voters were unmatched in the SBOE's April 2013 matching procedure, which is 95 percent higher than the 3.8 percent of white registered voters that are unmatched, for a difference of +3.6 percentage points. Table 17 further shows that an additional **52,058** African American registered voters were unmatched to any form of DMV ID above and beyond the numbers of African Americans that would have been unmatched if there were no racial disparities with whites.[36]

---

[35]   July 24, 2013, *Transcript of Senate Debate on HB 589, Day 1*, 38:19-23 (Comments of Senator Robins); Ari Berman, "7 Ways North Carolina Republicans are Trying to Make it Harder to Vote," *The Nation*, 5 April 2013, http://www.thenation.com/blog/173685/7-ways-north-carolina-republicans-are-trying-make-it-harder-vote#;    Press Release, "New Research Shows Impact of Voter ID on Black Voter," Democracy North Carolina, 19 April 2013, http://www.democracy-nc.org/downloads/SBOEDataNoIDApril2013PR.pdf.;   Mar. 12, 2013, *Public Hearing on Voter Identification Transcript*, 166:21-24 (Testimony of Kim Porter); Mar. 13, 2013, *Transcript of Proceedings Before the House Elections Committee*, 9:4-19 (Testimony of Keesha Gaskins).

[36] The SBOE's published data does not isolate non-Hispanic African Americans and whites, although as noted above, the differences are inconsequential.

| TABLE 17 | | | | |
|---|---|---|---|---|
| **DIFFERENCES BETWEEN WHITES AND AFRICAN AMERICANS IN PERCENT OF REGISTERED VOTERS UNMATCHED IN SBOE's APRIL 2013 DMV MATCHING AND NUMERICAL IMPACT ON AFRICAN AMERICANS** | | | | |
| GROUP | PERCENT OF REGISTERED VOTERS THAT ARE UNMATCHED | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES | ADDED UNMATCHED AFRICAN AMERICAN REGISTERED VOTERS FROM DIFFERENCE |
| **WHITE** | 3.8% | NA | NA | |
| | | | | |
| **AFRICAN AMERICAN** | 7.4% | 95% HIGHER | +3.6% | **+52,058** |
| | | | | |
| Source: North Carolina State Board of Elections, Online Database, *April 2013 SBOE-DMV ID Analysis,* North Carolina State Board of Elections, Online Registered Voters Statistics, March 2013. Numerical impact=.036 * number of African American registered voters (1,446,054) | | | | |

**CHART 21**
**PERCENT OF GROUP REGISTERED VOTERS UNMATCHED IN**
**DMV DATABASE, APRIL 2013, BY RACE, NORTH CAROLINA**



*(b) Extended Analysis of Unmatched Registered Voters*

David Ely of Compass Demographics, at my instruction, was able to reconstruct the SBOE's April 2013 matching process using the March 2013 database provided by the Defendants. Through this reconstruction, I extended the analysis of racial disparities in matching to non-Hispanic *active* registered voters and 2012 general election voters.

These racial disparities widen when the analysis focuses on active registered voters and 2012 general election voters. According to results reported in Table 18 and Chart 22, African Americans comprised 34.1 percent of unmatched active registered voters, 56 percent *higher* than the 21.8 percent of African Americans among all matched active registered voters, for a disparity of +12.3 percentage points. Whites, however, comprised 53.0 percent of unmatched active registered voters, 26 percent *lower* than the 71.7 percent of whites among all matched active registered voters, for a disparity of -18.7 percentage points.

Table 18 and Chart 22 further show that among 2012 general election voters, African Americans comprised 35.6 percent of unmatched 2012 voters, 57 percent *higher* than the 22.7 percent of African Americans among all matched voters, for a disparity of +12.9 percentage points. Whites comprised 52.7 percent of unmatched 2012 voters, 27 percent *lower* than the 71.8 percent of whites among all matched voters, for a disparity of -19.1 percentage points.

| TABLE 18<br>REGISTERED VOTERS UNMATCHED IN NORTH CAROLINA DMV MARCH 2013 DATABASE BY RACE, NON-HISPANIC | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG UNMATCHED REGISTERED VOTERS | PERCENT AMONG MATCHED REGISTERED VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **ACTIVE REGISTERED VOTERS** | | | | |
| **WHITE** | 53.0% | 71.7% | 26 PERCENT LOWER | -18.7 |
| | | | | |
| **AFRICAN AMERICAN** | 34.1% | 21.8% | 56 PERCENT HIGHER | +12.3 |
| | | | | |
| **2012 GENERAL ELECTION VOTERS** | | | | |
| | | | | |
| **WHITE** | 52.7% | 71.8% | 27 PERCENT LOWER | -19.1% |
| | | | | |
| **AFRICAN AMERICAN** | 35.6% | 22.7% | 57 PERCENT HIGHER | +12.9% |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File | | | | |

64





Table 19 and Chart 23 reframe the data as the percentage of African Americans and whites among active registered voters and 2012 general elections voters who were unmatched in the SBOE's March 2013 database.

- For active registered voters, Table 19 and Chart 23 indicate that 7.1 percent of African American active registered voters were unmatched under the SBOE's April 2013 matching procedures, which is 103 percent higher than the 3.5 percent of white active registered voters that were unmatched, for a difference of +3.6 percentage points. Table 19 further shows that an additional **+47,154** African American active registered voters are unmatched with any form of DMV ID beyond those African Americans that would be unmatched if there were no racial disparities with whites.

- For 2012 general election voters, Table 19 and Chart 23 indicate that 5.1 percent of African American voters who voted in the 2012 general election were unmatched under the SBOE's April 2013 matching procedures, which is 113 percent higher than the 2.4 percent of white 2012 general election voters who were unmatched, for a difference of +2.7 percentage points. As additionally indicated in Table 19, an additional **+28,149** African American voters who voted in the 2012 election are unmatched with any form of DMV ID beyond those African Americans that would be unmatched if there were no racial disparities with whites.[37]

---

[37] These numerical effects reported in Table 19 resulting from disparities between unmatched African Americans and whites are independent of the effects analyzed above in Table 9 for disparities between African Americans and whites who are matched to DMV photo identification, but are matched to expired IDs.

| GROUP | PERCENT OF REGISTERED VOTERS THAT ARE UNMATCHED | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES | ADDED UNMATCHED AFRICAN AMERICAN REGISTERED VOTERS FROM DIFFERENCE |
|---|---|---|---|---|
| **TABLE 19** PERCENT OF REGISTERED VOTERS, ACTIVE REGISTERED VOTERS, AND 2012 VOTERS UNMATCHED BY RACE, MARCH 2013 DATABASE AND NUMERICAL IMPACT ON AFRICAN AMERICANS | | | | |
| | | | | |
| ACTIVE REGISTERED VOTERS | | | | |
| | | | | |
| **WHITE** | 3.5% | NA | NA | |
| | | | | |
| **AFRICAN AMERICAN** | 7.1% | 103% HIGHER | +3.6% | **+47,154** |
| | | | | |
| 2012 GENERAL ELECTION VOTERS | | | | |
| | | | | |
| **WHITE** | 2.4% | NA | NA | |
| | | | | |
| **AFRICAN AMERICAN** | 5.1% | 113% HIGHER | +2.7% | **+28,149** |
| | | | | |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File Numical impact equals disparity multiplied by African Americans in each group, active = 1,309,831, 2012 voters = 1,042,540 | | | | |

67



**CHART 23**
**PERCENT OF GROUP UNMATCHED, MARCH 2013 DATABASE, BY RACE**

(c)  *Additional Statistics Regarding African American Access to Driver's Licenses*

These racial disparities in unmatched registered voters to any form of DMV ID are consistent with racial differences in the availability of vehicles in North Carolina households. According to data from the 2011 U. S. Census, American Community Survey, which was available at the time of the adoption of HB 589 and is reported in Table 3 and Chart 6 above, 14.3 percent of African American households lack an available vehicle, more than three times the 4.3 percent of white households lacking a vehicle, for a disparity of 10.0 percentage points.[38] This Census data casts light on the inquiry because persons in households with no vehicle available are less likely to possess driver's licenses than persons in households with available vehicles. Even to register a vehicle in North Carolina requires a driver's license.[39]

The presence of unmatched registered voters in North Carolina continues, and likely increases as new registered voters enter the electorate. A memorandum from the North Carolina General Assembly's Fiscal Research Division addressed to the primary sponsors of HB 589, notes that lack of access to DMV identification will be an ongoing issue for registered voters. "It is assumed that there will be a growth of newly registered voters each year without a valid form of identification, in addition to the existing number of registered voters," the analysis concludes. "This analysis projects an average of 420,332 new registrants in each of the next five years based on recent history. Also based on recent history, it presumes that 56 percent of new registrants will sign up through the DMV. That leaves 44 percent of, or 184,946, new registrants per year as potentially lacking in DMV identification."[40]

National survey data also indicates that young persons have much lower rates of license possession than their older counterparts and exhibit especially large racial disparities. Two independent national surveys available in 2013 confirm the low possession rate of driver's licenses generally for young persons and the wide disparities between whites and African Americans. Table 20 and Chart 24 report the results of a national survey of driver's license possession by race for young voting aged persons, 18 to 20 years-old.   The 2012 survey, conducted by the American Automobile Association Foundation for Traffic Safety, found that driver's license possession among this age group was low, particularly for African Americans. The data discloses that 79 percent of white respondents reported possessing a driver's license,

---

[38] DMV.org, "Registering a Vehicle in North Carolina," http://www.dmv.org/nc-north-carolina/car-registration.php#Registering-a-Vehicle-in-North-Carolina.

[39] DMV.org, "Registering a Vehicle in North Carolina," http://www.dmv.org/nc-north-carolina/car-registration.php#Registering-a-Vehicle-in-North-Carolina.

[40] "Fiscal Analysis Memorandum," Lisa Hollowell, Bryce Ball, and Denise Thomas, Fiscal Research Division to Representatives Warren, Murry, T. Moore, and Samuelson, 16 April 2013, http://www.wral.com/asset/news/state/nccapitol/2013/04/18/12355877/Voter_Information_Verification_Act_Fiscal_Memo.pdf.

compared to 55 percent of African American respondents, for a disparity of 24 percentage points. The survey additionally indicated that 63% African Americans did not obtain a driver's license prior to their 18th birthday, compared to 33% percent of non-Hispanic whites.[41]

Substantial and statistically significant disparities between whites and African Americans persist when both driver's licenses and learner's permits are included. According to Table 20 and Chart 24, 89 percent of white respondents reported possessing a driver's license or permit, compared to 78 percent of African American respondents, for a disparity of 11 percentage points.

| GROUP | PERCENT WITH LICENSE | PERCENTAGE POINT DIFFERENCE WITH WHITES | STATISTICAL SIGNIFICANCE OF DIFFERENCE | PERCENT WITH LICENSE OR PERMIT | PERCENTAGE POINT DIFFERENCE WITH WHITES | STATISTICAL SIGNIFICANCE OF DIFFERENCE |
|---|---|---|---|---|---|---|
| **WHITE** | 79% | NA | NA | 89% | NA | NA |
| | | | | | | |
| **AFRICAN AMERICAN** | 55% | 24% | <.0001 | 78% | 11% | <.001 |
| | | | | | | |

**TABLE 20**
**NATIONAL SURVERY OF POSSESSION OF DRIVER'S LICENSES AND LEARNER'S PERMIT BY RACE, AGES 18-20**

Source: American Automobile Association, Foundation for Traffic Safety, National Survey, *Timing of Driver's License Acquisition and Reasons for Delay among Young People in the United States, 2012*, June-July 2012 Survey (July 2013), N=1,039 respondents

---

[41] Results of the Survey were also presented at the Annual Meeting of the Transportation Research Board in January 2013, http://www.youngdriversafety.org/presentations_2013-annual-meeting.cfm.

**CHART 24**
**NATIONAL SURVEY OF POSSESSION OF DRIVER'S LICENSES AND LEARNER'S PERMIT BY RACE, AGES 18-20**



Table 21 and Chart 25 report the results of a national survey of driver's license possession by race for a larger cohort of young voting aged persons, 18 to 29 years-old. This 2012 survey by GfK Knowledge Networks for the Black Youth Project found that 85.1 percent of white respondents reported possessing driver's licenses, compared to 71.2 percent of African American respondents, for a disparity of +13.9 percentage points.

| TABLE 21 NATIONAL SURVEY BY RACE OF POSSESSION OF DRIVER'S LICENSES BY YOUNG PERSONS, 18-29 | | | |
|---|---|---|---|
| GROUP | PERCENT OF 18-29 YEAR-OLDS WITH DRIVER'S LICENSE | PERCENTAGE POINT DIFFERENCE WITH WHITES | STATISTICAL SIGNIFICANCE OF DIFFERENCE |
| **WHITE** | 85.1% | NA | NA |
| | | | |
| **AFRICAN AMERICAN** | 71.2% | 13.9% | <.01 |
| | | | |
| Source: Black Youth Project Quarterly Survey, November 2012, by GfK Knowledge Networks, N = 1,522 respondents. | | | |

**CHART 25**
**NATIONAL SURVEY OF LICENSE POSSESSION BY RACE, AGES 18-29**



The AAA survey of the 18-20 cohort cited above also confirms a very strong correlation between driver's license possession and a person's household income. According to data presented in Table 22 and Chart 26, 81 percent of respondents with household incomes above $40,000 report the possession of a driver's license, compared to 51 percent of respondents with household incomes below $40,000, for a disparity of 30 percentage points. In addition, 93 percent of respondents with household incomes above $40,000 report the possession of a driver's license or a learner's permit, compared to 69 percent of respondents with household incomes below $40,000, for a disparity of 24 percentage points. These income disparities are statistically significant well beyond stringent levels in social science. These socio-economic correlations with license possession are important because African Americans in North Carolina have much lower socio-economic standing than whites, as demonstrated in Tables 1-4.

| TABLE 22<br>NATIONAL SURVEY OF POSSESSION OF DRIVER'S LICENSES<br>AND LEARNER'S PERMIT BY HOUSEHOLD INCOME, AGES 18-20 | | |
|---|---|---|
| HOUSEHOLD INCOME | PERCENT WITH DRIVER'S LICENSE | PERCENT WITH DRIVER'S LICENSE OR LEARNER'S PERMIT |
| **LESS THAN $40,000** | 51% | 69% |
| | | |
| **MORE THAN $40,000** | 81% | 93% |
| | | |
| **DIFFERENCE IN PERCENTAGE POINTS** | 30% | 24% |
| | | |
| **STATISTICAL SIGNIFICANCE** | <.0001 | <.0001 |
| | | |

74

**CHART 26**
**NATIONAL SURVEY OF POSSESSION OF DRIVER'S LICENSES AND LEARNER'S PERMIT**
**BY HOUSEHOLD INCOME, AGES 18-20**



The substantial racial disparities on driver's license and permit possession for young persons is confirmed by an analysis of North Carolina's compilation of registered voters unmatched to the DMV database that is limited to registered voters aged 18 to 20. According to results reported in Table 23 and Chart 27, even though all registered voters are overwhelmingly white, there are more African Americans than whites among young unmatched registered voters 18-20 years old. African Americans comprise a plurality of 41.0 percent of young, unmatched registered voters 18-20 years old, 24 percent higher than the 33.1 percent of African Americans among all unmatched registered voters 21 years or older, for a difference of +7.9 percentage points. Whites comprise only 33.9 percent of young unmatched registered voters 34 percent lower than the 54.6 percent of whites among unmatched registered voters 21 years or older, for a difference of -20.7 percentage points.

| TABLE 23 PERCENT UNMATCHED REGISTERED VOTERS AGED 18-20, BY RACE, MARCH 2013 DATABASE | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG UNMATCHED 18-20 YEARS OLD REGISTERED VOTERS | PERCENT AMONG ALL UNMATCHED 21 YEARS+ REGISTERED VOTERS | PERCENT DIFFERENCE | DIFFERENCE IN PERCENTGE POINTS |
| **WHITE** | 33.9% | 54.6% | 38% LOWER | -20.7 PERCENTAGE POINTS |
| | | | | |
| **AFRICAN AMERICAN** | 41.0% | 33.1% | 24% HIGHER | +7.9 PERCENTAGE POINTS |
| | | | | |
| | | | | |
| Source: North Carolina State Board of Elections, Online Database, *April 2013 SBOE-DMV ID Analysis,* North Carolina State Board of Elections, Online Registered Voters Statistics, April 2013. | | | | |

76

**CHART 27**
**PERCENT UNMATCHED 18-20 YEARS OLD, NON-HISPANIC BY RACE**
**COMPARED TO PERCENTAGE OF ALL UNMATCHED REGISTERED**
**VOTERS**



*(d) Invalid DMV Photo Identification*

There is also a fourth, independent effect on African American voters stemming from the use of DMV photo identification for voting under VIVA. In principle, VIVA authorizes the use of all forms unexpired DMV photo identification.  However, there are many forms of invalid DMV licenses—suspended, revoked, and cancelled IDs—that, in practice, may not be usable for voting. As compared to whites, African Americans are disproportionately represented among registered voters matched to these invalid forms of DMV identifications.

The SBOE reported that in its April 2013 matching protocol that registered voters were matched to "licenses and identification cards that were in active, inactive, cancelled, suspended, revoked, and deceased statuses."[42] According to the compilation of matched registered voters conducted by Compass Demographics under my instruction, there are 10 categories of unexpired DMV IDs to which registered voters were matched by the SBOE in April 2013. These categories of non-expired IDs are listed in Table 24, with the numbers of matched registered voters in each category.

---

[42] North Carolina State Board of Elections, 2013 SBOE-DMV ID Analysis, April 2013, p. 1

| | TABLE 24<br>NUMBERS OF REGISTERED VOTERS<br>MATCHED TO CATEGORIES OF UNEXPIRED<br>DMV PHOTO IDS, MARCH 2013 DATABASE | |
|---|---|---|
| **CATEGORY NUMBER** | **CATEGORY NAME** | **NUMBER OF ALL REGISTERED VOTERS** |
| 1 | NO DESIGNATION | 41,871 |
| 2 | VALID NON DRIVER'S LICENSE ID | 343,907 |
| 3 | ACTIVE LICENSES | 5,163,415 |
| 4 | CANCELLED LICENSES | 1,102 |
| 5 | SUSPENDED LICENSES | 88,537 |
| 6 | 90 DAY LICENSE RENEW DENIED | 70 |
| 7 | LICENSE ELIGIBLE FOR REINSTATEMENT* | 19,771 |
| 8 | LICENSE MED CANCELLATION | 13,410 |
| 9 | DECEASED | 13,626 |
| 10 | INACTIVE LICENSES | 160,300 |
| | **TOTAL OF CATEGORY 4-10** | **296,816** |

Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File.

*Still suspended although currently eligible to be reinstated if the persons so chooses and pays the appropriate fees.

Of the many categories reported in Table 24, only unexpired active driver's licenses and unexpired non-driver's IDs are forms of photo identification that are authorized for voting under VIVA and likely to be available to a voter. Suspended, revoked, inactive, denied, and cancelled licenses are not valid for driving in North Carolina and must be surrendered by the holder to state officials. Although it is possible that some persons may not comply and surrender their invalid ID (which incurs a financial penalty upon reinstatement or even a criminal charge if used for driving), it is reasonable to assume that these persons could be be deterred from presenting such an ID to a public official at the polls, even if the protocol ultimately issued by the SBOE authorizes such invalid licenses for voting.[43] As a matter of caution, the 41,871 matched DMV IDs with no designation are treated as valid for purposes of analysis, although they are overwhelming African American and their inclusion as invalid would substantially widen racial disparities.[44]

As indicated in Table 24, there are 296,816 registered voters matched to licenses that are invalid and must be surrendered to state officials (with some matched to records of deceased persons). This almost equals the number of unmatched registered voters (318,643). Moreover, as indicated in Chart 28, when combined with the 240,218 registered voters matched to expired licenses (excluding 70+ exempt), there is a sum total of 537,034 registered voters matched to either expired or invalid DMV IDs, 69 percent higher than the number of unmatched registered voters. Taken together, 855,677 registered voters are either unmatched, matched to expired IDs, or matched to invalid IDs, equal to some *13.3 percent* of the total of 6,425,820 registered voters in the March 2013 SBOE's database.

---

[43] At the time of writing this report, no guidance, regulations, or rule have been issued by the SBOE with respect to the use of suspended, revoked, inactive, denied, or cancelled licenses as photo identification for voting under VIVA.

[44] According to a January 2006 memo from the DMV, law enforcement officers are authorized to take possession of licenses "determined to be suspended, revoked, or inactive."  George Tatum, Commissioner, DMV, "To all North Carolina Law Enforcement Agencies, 5 January 2006, http://www.ncdot.gov/download/dmv/LT_EnforceAgencyInstruct_DL53A.pdf.  *See also*, North Carolina General Statutes § 20-15 & § 20-30 and Deposition of Barbara Webb [Director, North Carolina, DMV]  *NAACP v. McCrory*, 23 January 2015, p.p. 173, lines 5-14, 176, lines 2-14.



Table 25 and Chart 29 compare the percentages of non-Hispanic African Americans and whites among registered voters, active registered voters, and 2012 general election voters matched to unexpired *invalid* DMV IDs with the percentages matched to unexpired *valid* DMV IDs. This analysis is independent of the analyses above of matches to expired IDs, of matches to exempt expired IDs, and of unmatched African Americans and whites. The results demonstrate that African Americans are overrepresented among all three categories of voters matched to unexpired but *invalid* forms of DMV IDs.  According to results reported in Table 25 and Chart 29, African Americans comprised 37.3 percent of all registered voters matched to unexpired *invalid* DMV IDs, 78 percent *higher* than the 21.8 percent of African Americans among all registered voters matched to unexpired *valid* IDs, for a disparity of +16.3 percentage points. Whites, however, comprised 55.3 percent of all registered voters matched to unexpired *invalid* IDs, 31 percent *lower* than the 72.4 percent of whites matched to unexpired *valid* IDs, for a disparity of -17.1 percentage points.

**TABLE 25**
**PERCENT AMONG REGISTERED VOTERS MATCHED TO UNEXPIRED VALID AND INVALID DMV IDS, BY RACE**
**MARCH 2013 DATABASE**

| GROUP | PERCENT AMONG MATCHED REGISTERED VOTERS MATCHED TO UNEXPIRED VALID IDS | PERCENT AMONG MATCHED REGISTERED VOTERS MATCHED TO UNEXPIRED INVALID IDS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
|---|---|---|---|---|
| **ALL REGISTERED VOTERS** | | | | |
| **WHITE** | 72.4% | 55.3% | 31% LOWER | -17.1 PERCENTAGE POINTS |
| | | | | |
| **AFRICAN AMERICAN** | 21.0% | 37.3% | 78% HIGHER | +16.3 PERCENTAGE POINTS |
| **ACTIVE REGISTERED VOTERS** | | | | |
| **WHITE** | 72.7% | 48.7% | 33% LOWER | -24.0 PERCENTAGE POINTS |
| | | | | |
| **AFRICAN AMERICAN** | 20.8% | 43.7% | 110% HIGHER | +22.9 PERCENTAGE POINTS |
| | | | | |
| **2012 GENERAL ELECTION VOTERS** | | | | |
| | | | | |
| **WHITE** | 72.8% | 32.8% | 55% LOWER | -40.0 PERCENTAGE POINTS |
| | | | | |
| **AFRICAN AMERICAN** | 21.7% | 60.8% | 180% HIGHER | +39.1 PERCENTAGE POINTS |
| | | | | |
| North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File | | | | |

83



Racial disparities among those with invalid IDs further widen for active registered voters and 2012 general election voters. For active registered voters, the results in Table 25 and Chart 29 demonstrate that African Americans comprised 43.7 percent of all active registered voters matched to unexpired, *invalid* DMV IDs, 110 percent *higher* than the 20.8 percent of African Americans among all active registered voters matched to unexpired, *valid* IDs, for a disparity of +22.9 percentage points. Whites comprised 48.7 percent of all active registered voters matched to unexpired, *invalid* IDs, 33 percent *lower* than the 72.7 percent of whites matched to unexpired, *valid* IDs, for a disparity of -24.0 percentage points.

For 2012 general election voters, the results in Table 25 and Chart 29 demonstrate that African Americans comprised 60.8 percent of 2012 voters matched to unexpired, *invalid* DMV IDs, 180 percent *higher* than the 21.7 percent of African Americans among all 2012 voters matched to unexpired, *valid* IDs, for a disparity of +39.1 percentage points. Whites, comprised 32.8 percent of all 2012 voters matched to unexpired, *invalid* IDs, 55 percent *lower* than the 72.8 percent of whites matched to unexpired, *valid* IDs, for a disparity of -40.0 percentage points.

Table 26 and Chart 30 reframe the analysis as the percentages by race of matched registered voters, active registered voters, and 2012 general election voters with unexpired IDs that are matched to invalid unexpired DMV IDs. This format also provides results for the numerical impact on African American of racial disparities among voters who matched to invalid IDs.

According to the data reported in Table 26 and Chart 30, 8.7 percent of African American registered voters with unexpired IDs were matched to unexpired, *invalid* DMV IDs, 123 percent *higher* than the 3.9 percent of white registered voters matched to unexpired, *invalid* IDs, for a difference of +4.8 percentage points. As a result of this racial disparity, **61,260** additional African American registered voters matched to invalid rather than valid unexpired DMV photo IDs than would have if the African American percentages were equal to the lower white percentage.

85

| TABLE 26<br>PERCENT OF REGISTERED VOTERS WITH UNEXPIRED IDS MATCHED<br>TO UNEXPIRED INVALID IDS BY RACE,<br>MARCH 2013 DATABASE AND NUMERICAL IMPACT ON AFRICAN<br>AMERICANS | | | | |
|---|---|---|---|---|
| GROUP | PERCENT OF REGISTERED VOTERS MATCHED TO UNEXPIRED INVALID IDS | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES | ADDED UNMATCHED AFRICAN AMERICAN REGISTERED VOTERS FROM DIFFERENCE |
| ALL REGISTERED VOTERS | | | | |
| WHITE | 3.9% | NA | NA | |
| AFRICAN AMERICAN | 8.7% | 123% HIGHER | +4.8 PERCENTAGE POINTS | +61,260 |
| | ACTIVE REGISTERED VOTERS | | | |
| WHITE | 2.6% | NA | NA | |
| AFRICAN AMERICAN | 7.7% | 196% HIGHER | +5.1 PERCENTAGE POINTS | +60,240 |
| | 2012 GENERAL ELECTION VOTERS | | | |
| WHITE | 1.1% | NA | NA | |
| AFRICAN AMERICAN | 6.2% | 464% HIGHER | +5.1 PERCENTAGE POINTS | +49,964 |
| | | | | |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File. Numerical impact = equals disparity multiplied by all black unexpired matched registered = 1,276,247, all black unexpired matched active = 1,181,168, all black unexpired matched 2012 voters= 979,684 | | | | |

86

**CHART 30**
**PERCENT OF REGISTERED VOTERS WITH UNEXPIRED IDS MATCHED TO**
**UNEXPIRED INVALID IDS, MARCH 2013 DATABASE, BY RACE**



Once again, race disparities widen for active registered voters and 2012 general election voters. According to the data reported in Table 26 and Chart 30, 7.7 percent of African American active registered voters with unexpired IDs were matched to unexpired, *invalid* DMV IDs, 196 percent *higher* than the 2.6 percent of white active registered voters who matched to unexpired, *invalid* IDs, for a difference of +5.1 percentage points. As a result of this racial disparity, **60,240** additional African American active registered voters were matched to invalid, rather than valid, DMV photo IDs than would have if the African American percentages were equal to the lower white percentage.

For 2012 general election voters, the data reported in Table 26 and Chart 30, demonstrate that 6.2 percent of African American voters were matched to unexpired, *invalid* DMV IDs, 464 percent *higher* than the 1.1 percent of white active registered voters matched to unexpired, *invalid* IDs, for a difference of +5.1 percentage points. As a result of this racial disparity, **49,964** additional African American 2012 general election voters were matched to invalid rather than valid DMV photo IDs than would be the case if the African American percentages were equal to the lower white percentage.

In other words, African American voters are triply burdened with respect to the use of DMV photo IDs for voting, which are by far the most readily available acceptable ID under VIVA.

- *First*, African American voters as compared to white voters are overrepresented among those matched to expired DMV identification.

- *Second,* African American voters as compared to white voters are underrepresented among those with expired IDs that qualify for the 70+ exemption.

- *Third*, African American voters as compared to white voters are overrepresented among those not matched to any form of DMV identification.

- *Fourth,* African American voters as compared to white voters are likely to be overrepresented among future registrants lacking any form of DMV identification**.**

- *Fifth*, African American voters as compared to white voters are overrepresented among those matched to unexpired, but invalid forms of DMV identification.

Based on information available at the time of the adoption of HB 589, these independent, cumulative effects create substantial disparate impacts on the opportunities for African Americans to vote under VIVA.

According to data reported in Table 27, if there were no racial disparities in any of these areas of analysis (not counting future registrants), many additional African Americans would have authorized and usable DMV photo identification, including **118,076** African American

registered voters, **119,622** African American active registered voters and **87,801** African American actual 2012 voters.

| TABLE 27 CUMULATIVE NUMERICAL IMPACT ON AFRICAN AMERICANS FROM RACIAL DISPARITIES IN MATCHED AND UNMATCHED DMV IDS, MARCH 2013 DATABASE | | | | | |
|---|---|---|---|---|---|
| **GROUP** | **DISPARITY IN PERCENT MATCHED TO NON-EXEMPT EXPIRED DMV IDS** | **DISPARITY IN PERCENT EXEMPT OF ALL EXPIRED IDS** | **DISPARITY IN PERCENT UNMATCHED TO ANY DMV ID** | **DISPARITY IN PERCENT MATCHED TO INVALID DMV IDS** | **TOTAL** |
| **ALL REGISTERED VOTERS** | 0 | +4,758 | +52,058 | +61,260 | +118,076 |
| **ACTIVE REGISTERED VOTERS** | +7,300 | +4,928 | +47,154 | +60,240 | +119,622 |
| **2012 GENERAL ELECTION VOTERS** | +5,937 | +3,751 | +28,149 | +49,964 | +87,801 |

*(e) Impact of race compared to political party*

Further analysis that holds party constant, but looks at racial differences, shows that the disproportionate impact of VIVA is not based on party differences (Republican vs. Democratic voters), but based on racial differences (white vs. African American voters). African American Democrats are far more impacted by the provisions of VIVA regarding DMV photo identification than are white Democrats. Thus, effect of the new law is primarily upon race, not political party.

Table 28 reports the results of this analysis comparing African American and white Democrats. The analysis focuses on the most politically consequential group of registered voters, those who actually voted in the 2012 general election. Based on the March 2013 database available to lawmakers at the time HB 589 was enacted, Table 28 compares matching results for white and African Americans who are registered Democrats and who voted in the 2012 election. For three categories of analysis—unmatched registered voters, voters matched to expired IDs, and voters matched to invalid IDs—there are very substantial racial disparities between African American and white Democrats.

Table 28 indicates that African Americans comprise 45.5 percent of 2012 voting Democrats who matched to a DMV ID, *7 percent lower* than the white percentage of 49.0 percent, for a percentage point difference of -3.5 percentage points. In contrast, African Americans comprise 54.2 percent of 2012 unmatched voting Democrats, *48 percent higher* than the white percentage of 36.5 percent, for a percentage point difference of +17.7 percentage points. This equals a net percentage point increase of 21.2 percentage points, from the -3.5 base of all matched voters. African Americans also comprise 62.1 percent of 2012 voting Democrats who matched to expired IDs, *96 percent higher* than the white percentage of 31.7 percent, for a percentage point difference of +30.4 percentage points. This represents a net increase of 33.9 percentage points. In addition, African Americans comprise 78.7 percent of 2012 voting Democrats who matched to expired IDs, *392 percent higher* than the white percentage of 31.7 percent, for a percentage point difference of +62.7 percentage points. This represents a net increase of 66.2 percentage points.

| | TABLE 28<br>COMPARISON OF WHITE AND AFRICAN AMERICAN DEMOCRATS,<br>AMONG 2012 VOTERS, BY RACE, NON-HISPANIC<br>UNMATCHED AND MATCHED TO EXPIRED & INVALID DMV IDS | | | |
|---|---|---|---|---|
| | **PERCENT OF ALL MATCHED DEMOCRATIC 2012 VOTERS** | **PERCENT OF ALL UNMATCHED DEMOCRATIC 2012 VOTERS** | **PERCENT OF ALL DEMOCRATIC 2012 VOTERS MATCHED TO EXPIRED** | **PERCENT OF 2012 DEMOCRATIC VOTERS MATCHED TO INVALID ID** |
| | | | | |
| WHITES | 49.0% | 36.5% | 31.7% | 16.0% |
| | | | | |
| AFRICAN AMERICANS | 45.5% | 54.2% | 62.1% | 78.7% |
| | | | | |
| DIFFERENCE IN PERCENT | **7% LOWER** | **48% HIGHER** | **96% HIGHER** | **+392% HIGHER** |
| | | | | |
| DIFFERENCE IN PERCENTAGE POINTS | -3.5 PERCENTAGE POINTS | +17.7 PERCENTAGE POINTS | +30.4 PERCENTAGE POINTS | +62.7 PERCENTAGE POINTS |

91

## 2. United States Passports

Valid United States passports are the second most prevalent form of photo identification after driver's licenses authorized for voting at the polls under North Carolina's new 2013 election law. According to data from the U.S. Department of State, approximately 34 percent of North Carolina residents possess a U.S. passport.

Although there is no direct compilation of passport possession by race in North Carolina, both substantive considerations and the results of statistical analysis clearly demonstrate that African Americans are much less likely than whites to possess valid United States passports. Again, the information that underlies this analysis was available at the time of the passage of HB 589. Passports and foreign travel are expensive and, as demonstrated in Tables 1 through 4, African Americans in North Carolina have substantially less income and assets than whites in the state.

The negative relationship between income and passport ownership is confirmed by survey data for individuals in the United States. Table 29 and Chart 31 report the results of a nationwide survey of passport ownership by Harris Interactive conducted for Expedia in October 2012. The results demonstrate that 38 percent of individuals who report their financial status as poor/fair report owning a valid U.S. passport. This compares to 67 percent of individuals who report their financial status as solid/good, for a difference of 29 percentage points. The self-reported financial status conforms closely to reported income. Those reporting their status as fair/poor had an average mean household income of $59,400, compared to $90,900 for individuals reporting their status as solid/good.  Thus, based on income, this data provides further confirmation of why a relatively low income, high poverty group like African Americans would have substantially lower rates of passport possession than whites in North Carolina.

| TABLE 29 RESULTS OF NATIONAL US SURVEY OF VALID PASSPORT OWNERSHIP BY SELF-REPORTED FINANCIAL STATUS | | | |
|---|---|---|---|
| **FINANCIAL STATUS** | HAVE VALID PASSPORT | DO NOT HAVE VALID PASSPORT | NOT SURE |
| **POOR/FAIR 272 RESPONDENTS** | 38% | 62% | <1% |
| | | | |
| **SOLID/GOOD 228 RESPONDENTS** | 67% | 31% | 2% |
| | | | |
| Statistical Significance of the difference in passport ownership <.0001 | | | |
| | | | |
| Source: *Expedia Vacation Deprivation Survey*, Harris Interactive, 27 October 2012.  31% in Poor/Fair Group reported a household income of $75,000 or more (93% responding) compared to 58% in the Solid/Good group (85 percent responding).  Mean household income of Poor/Fair group = $59,400 compared to $90,900 for Solid/Good group. | | | |

93

**CHART 31**
**PASSPORT POSSESSION, SELF-REPORTED FINANCIAL STATUS US**
**SURVEY**



A national 2012 survey by GfK Knowledge Networks for the Black Youth Project provides direct information on passport possession by race for young persons of voting age, ranging from 18 to 29 years old. Survey results reported in Table 30 and Chart 32 confirm the substantive considerations and evidentiary findings provided above. The percentage of white respondents reporting the possession of a U.S. passport (47.5 percent) was more than double the percentage of African American respondents reporting such passport possession (22 percent). The percentage point difference between reported white and African American possession of passports was 25.5 percentage points, statistically significant at well beyond the most stringent levels in social science.

| TABLE 30 RESULTS OF SURVEY OF PERSONS AGED 18 TO 29, PASSPORT POSSESSION BY RACE, UNITED STATES, 2012 | | | |
|---|---|---|---|
| | HAVE US PASSPORT | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES AND SATISTICAL SIGNIFICANCE |
| **WHITE** | 47.5% | | NA |
| | | | |
| **AFRICAN AMERICAN** | 22% | 54 PERCENT LOWER | -25.5 PERENTAGE POINTS <.0001 |
| | | | |
| Source: Black Youth Project Quarterly Survey, November 2012, by GfK Knowledge Networks, N = 1,522 respondents. | | | |

**CHART 32**
**RESULTS OF SURVEY OF PERSONS AGED 18 TO 29, PASSPORT**
**POSSESSION BY RACE, UNITED STATES, 2012**



### 3.  Veterans and Military Photo Identification

This section examines the racial distribution of access to veteran and military photo identification, which are the third most commonly available forms of acceptable photo identification under VIVA. The examination of North Carolina data available at the time of the adoption of HB 589 demonstrates that, as compared to whites, African Americans are underrepresented among veterans and active military personnel in North Carolina. As a result, minorities will have less access to veteran and military photo identification cards.

Table 31 and Chart 33 draw upon the 2009-2011 U.S. Census, American Community Survey, available at the time of adoption of HB 589, to compile the percentage of African Americans and whites in North Carolina that are either veterans or in active military service. The data demonstrates that veterans and military personnel comprise 12.5 percent of the white voting age population, compared to 10.6 percent of the African American voting age population, which is 15 percent lower, for a difference of 1.9 percentage points.

According to the results reported in Table 31, the lower percentage of African American veterans and military personnel as compared to whites results in **28,750** fewer North Carolina African Americans of voting age with access to these forms of IDs.

| TABLE 31 |||||
| :--- | :--- | :--- | :--- | :--- |
| **DIFFERENCES BETWEEN WHITES AND AFRICAN AMERICANS IN VETERAN AND MILITARY POPULATION AND NUMERICAL IMPACT ON AFRICAN AMERICANS, NORTH CAROLINA** |||||
| GROUP | PERCENT VETERAN OR IN MILITARY VOTING AGE POPULATION | PERCENT DIFFERENCE WITH WHITES | PERCENTAGE POINT DIFFERENCE WITH WHITES | NUMERICAL DIFFERENCE BETWEEN BLACK AND WHITE PERCENTAGES |
| | | | | |
| **WHITE** | 12.5% | NA | NA | |
| | | | | |
| **AFRICAN AMERICAN** | 10.6% | 15% LOWER | -1.9% | **-28,750*** |
| | | | | |
| Source: 2009-2011 US Census, American Community Survey. .019* AA VAP, 2010 Census |||||

**CHART 33**
**PERCENT OF VETERANS AND MILITARY VOTING AGE POPULATION**
**BY RACE NORTH CAROLINA**



### C. Summary of Eliminated and Retained Photo ID Requirements: Post-*Shelby* Enacted Version of HB 589

Table 32 provides a summary of the decisions made by the North Carolina legislature regarding voter photo identification in the revised and enacted post-*Shelby* version of HB 589. The results demonstrate that every significant eliminated form of voter photo identification provided greater access to African American voters than to white voters. In contrast, every significant retained form of voter photo ID provided less access to African American voters than to white voters. Thus, in every important instance, the uniform results of the legislature's post-*Shelby* decision-making had the discriminatory effect of placing disproportionate burdens on African American voters as compared to white voters.[45]

| TABLE 32 RACIAL IMPACT OF VOTER PHOTO IDENTIFICATION PROVISIONS ELIMINATED AND RETAINED IN THE ENACTED POST-SHELBY VERSION OF HB 589 | | | |
|---|---|---|---|
| ELIMINATED PROVISIONS THAT PROVIDE RELATIVELY GREATER ACCESS TO IDS FOR AFRICAN AMERICAN VOTERS | ELIMINATED PROVISIONS THAT PROVIDE RELATIVELY GREATER ACCESS TO IDS FOR WHITE VOTERS | RETAINED PROVISIONS THAT PROVIDE GREATER ACCESS TO IDS FOR AFRICAN AMERICAN VOTERS | RETAINED PROVISIONS THAT PROVIDE GREATER ACCESS TO IDS FOR WHITE VOTERS |
| • Public institutions of higher education (student IDs)<br>• Government employee IDs<br>• Expired IDs<br>• Public assistance IDs | **NONE** | **NONE** | • DMV IDs<br>• Unexpired IDs<br>• Partial exemption for expired IDs for those over 70 years in age<br>• U. S. passports<br>• Veterans and military IDs |

---

[45] The tribal IDs included in the post-*Shelby* version of HB 589 did not impact either African Americans or whites.

**VIII.  Substantive Deviations With Discriminatory Intent and Effect—Opportunities to Register and Vote**

In addition to the elimination of acceptable forms of voter photo identification in VIVA, the post-*Shelby* version of HB 589 added some forty pages of text to what had been a pure voter photo identification bill. Among other changes, these new additions eliminated same day registration during the One Stop Voting Period, eliminated the partial counting of ballots cast outside the voter's resident precinct, reduced the early voting period from 17 to 10 days, and eliminated the pre-registration of 16 and 17 years olds. These changes in registration and voting procedures are independent and cumulative. Further, these changes are also independent and cumulative of the photo ID requirement under VIVA.

I analyze each of these provisions in turn and conclude that data available to legislators at the time VIVA was enacted showed that each provision would impose a disparate burden on the opportunity for African Americans to register and vote in North Carolina. Indeed, during the Senate's debate on the post-*Shelby* version of HB 589, senators pointed out the disparate racial impact of the non-photo ID measures considered in this section.[46] In addition, on July 9, 2013 well before either the Senate or House debates on the post-*Shelby* version of the bill, the advocacy group Lean Left published an analysis of both photo and non-photo provisions that discussed their disparate impact on minorities.[47]

**C.  Elimination of Same Day Registration During the One Stop Voting Period**

The analysis that follows examines the racial composition of new registrants during the One Stop voting periods for the 2008, 2010, and 2012 general elections. For this analysis, I have measured the discriminatory impact of the elimination of same day registration during the One Stop voting period on African Americans.[48]

First, I compute the percentages of African Americans and whites among newly registered voters during the One Stop voting period for the general elections in 2008, 2010, and 2012, respectively.

Second, for each election, I compare these results with the percentage of African American and white voters that would be expected among new registrants if the proportion of each group using One Stop registration were equal to the proportion of group members registered

---

**A.**  [46] See, for example, comments of Senator Josh Stein, 20130724, *Transcript of Senate Debates on HB 589*, Day 1, pp. 16-17, lines 14-25, lines, 1-13, p. 25, lines, 2-17, *Transcript of Senate debates on HB 589*, Day 2, p. 27, lines 20-25

[47] "How the North Carolina Voter Identification Verification Act Was Passed Is Proof That These Voter ID Laws Are Truly Voter Suppression Laws," Lean Left, 6 July 2013, http://leanleft.com/2014/07/09/how-the-north-carolina-voter-identification-verification-act-was-passed-is-proof-that-these-voter-id-laws-are-truly-voter-suppression-laws/.

[48] This analysis only includes persons identified in the state's database as newly registered, not persons who updated a prior registration.

prior to the One Stop voting period in each year.  I obtain this comparison by subtracting from the One Stop registration percentages referenced above, the percentages of each group among prior registered voters. This percentage point difference will be positive if a greater share of group members registered during the One Stop voting period than would be expected from its share of prior registered voters. The difference will be negative if a smaller share of group members registered during the One Stop voting period than would be expected from its share of prior registered voters. For example, if African Americans comprised 20 percent of prior registered voters in 2012, but 25 percent of new One Stop registered voters in 2012, the percentage point difference would be +5.0 percentage points.

Third, for each election, I compute the percentage change, higher or lower, between each group's share of newly registered voters during the One Stop voting period and the share of new One Stop registered voters that would be expected if the proportion of each group using One Stop registration were equal to the proportion of group members registered prior to the One Stop voting period in each year. I obtain this result by dividing the percentage point difference referenced above by each group's percentage of prior registered voters. Following our example, the percentage change for African Americans in 2012 would be 25 percent higher (5%/20% = 25%) than what would be expected if the proportion of African Americans using One Stop registration were equal to the proportion of African Americans registered prior to the One Stop voting period in 2012.

## 1.    The 2008 General Election

Table 33 and Chart 34 report the results of my analysis of the racial composition of persons who newly registered during the One Stop voting period in 2008, using data from the State Board of Elections online database and from individual voter files obtained from the state.[49] The results reported in Table 33 and Chart 34 demonstrate that, compared to the percentage of all registered voters just prior to the beginning of the 17-day One Stop voting period in 2008, African Americans are substantially overrepresented among new One Stop registered voters, whereas whites are substantially underrepresented.  In other words, compared to their share of registered voters, African Americans utilized the One Stop voting period to register to vote at a much higher rate than whites.

---

[49]All information on new and updated registration and early voting during the One Stop voting period are obtained from the individual voter files. So too is information on the casting of provisional ballots and mail-in absentee ballots.

101

| TABLE 33<br>NEW ONE STOP REGISTRATIONS AND ALL PRIOR REGISTERED<br>VOTERS, BY RACE, 2008 GENERAL ELECTION, NORTH CAROLINA<br>TOTAL: 105,141 | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG NEW ONE STOP REGISTRANTS | PERCENT AMONG PRIOR REGISTERED VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 54.3% | 74.3% | 27% LOWER | -20.0% |
| | | | | |
| **AFRICAN AMERICAN** | 35.2% | 21.1% | 67% HIGHER | +14.1% |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File and Voter History One Stop File | | | | |

**CHART 34**
**NEW ONE STOP REGISTRATIONS AND ALL PRIOR**
**REGISTERED VOTERS,BY RACE, 2008 GENERAL ELECTION,**
**NORTH CAROLINA**



According to Table 33 and Chart 34, African Americans comprised 35.2 percent of the 105,141 new One Stop registered voters in 2008, two-thirds larger than the 21.1 percent of African Americans among all prior registered voters in 2008, for a difference of +14.1 percentage points, higher than would be expected if the proportion of African Americans using One Stop registration were equal to the percentage of African Americans registered prior to the One Stop voting period in 2008. Table 33 and Chart 34 report the results of this same analysis for whites. Whites comprised 54.3 percent of the new One Stop registrants, more than quarter lower than the 74.3 percent of whites among all registered voters, for a difference of -20.0 percentage points. This is lower than would be expected if the proportion of whites using One Stop registration were equal to the percentage of whites registered prior to the One Stop voting period in 2008.

## 2.    The 2010 General Election

Although many fewer North Carolinians registered or voted in the midterm elections of 2010 as compared to presidential election years, the analysis still show that African Americans disproportionately made use of same day registration by registering during the One Stop voting period. Table 34 and Chart 35 report the results of my analysis of the racial composition of persons who newly registered during the One Stop voting period in the 2010 midterm elections. These results demonstrate that compared to their percentage of all registered voters just prior to the beginning of the 17-day One Stop voting period in 2010, African Americans are overrepresented among new One Stop registered voters, whereas whites are underrepresented.

According to Table 34 and Chart 35, African Americans comprised 25.7 percent of the 21,432 new One Stop registered voters in 2010, nearly a fifth larger than the 21.6 percent of African Americans among all registered voters, prior to the One Stop voting period in 2010, for a difference of +4.1 percentage points, higher than would be expected if the proportion of African Americans using One Stop registration were equal to the percentage of African Americans registered prior to the One Stop voting period in 2010. Table 34 and Chart 35 additionally disclose that whites comprised 63.6 percent of the new One Stop registrants, 13 percent lower than the 73.2 percent of whites among all prior registered voters, for a difference of -9.6 percentage points. This is lower than would be expected if the proportion of whites using One Stop registration were equal to the percentage of whites registered prior to the One Stop voting period in 2010.

104

| TABLE 34 NEW ONE STOP REGISTRATIONS AND ALL REGISTERED VOTERS, BY RACE, 2010 GENERAL ELECTION, NORTH CAROLINA TOTAL: 21,432 | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG NEW ONE STOP REGISTRANTS | PERCENT AMONG REGISTERED VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 63.6% | 73.2% | 13% LOWER | -9.6% |
| | | | | |
| **AFRICAN AMERICAN** | 25.7% | 21.6% | 19% HIGHER | +4.1% |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File and Voter History One Stop File | | | | |



CHART 35
NEW ONE STOP REGISTRATIONS AND ALL PRIOR
REGISTERED VOTERS,BY RACE, 2010 GENERAL ELECTION,
NORTH CAROLINA

3.        **The 2012 General Election**

In the presidential election year of 2012 as compared to the midterm election year of 2010, the number of voters and new registrants substantially increased. Once again the results of my analysis still show that African Americans newly registered at disproportionately higher rates during the One Stop voting period. Table 35 and Chart 36 report the results of my analysis of the racial composition of persons who newly registered during the One Stop voting period in 2012. The results reported in Table 35 and Chart 36 demonstrate that, compared to their percentage of all prior registered voters, African Americans are overrepresented among new One Stop registered voters, whereas whites are underrepresented.

According to Table 35 and Chart 36, African Americans comprised 33.7 percent of the 97,378 new One Stop registrants in 2012, about 50% higher than the 22.3 percent of African Americans among all prior registered voters, for a difference of +11.4 percentage points.  This is higher than would be expected if the proportion of African Americans using One Stop registration were equal to the percentage of African Americans registered prior to the One Stop voting period in 2010. Table 35 and Chart 36 additionally disclose that whites comprised 53.7 percent of the new One Stop registrants, a quarter lower than the 71.6 percent of whites among all registered voters, for a difference of –17.9 percentage points. This is lower than would be expected if the proportion of whites using One Stop registration were equal to the percentage of whites registered prior to the One Stop voting period in 2012.

| TABLE 35 NEW ONE STOP REGISTRATIONS AND ALL REGISTERED VOTERS, BY RACE, 2012 GENERAL ELECTION, NORTH CAROLINA TOTAL: 97,378 | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG NEW ONE STOP REGISTRANTS | PERCENT AMONG REGISTERED VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 53.7% | 71.6% | 25% LOWER | -17.9% |
| | | | | |
| **AFRICAN AMERICAN** | 33.7% | 22.3% | 51% HIGHER | +11.4% |
| | | | | |
| Source: North Carolina State Board of Elections Online Database; SEIMS Database Voter Registration File and Voter History One Stop File | | | | |

107



**CHART 36**
**NEW ONE STOP REGISTRATIONS AND ALL PRIOR**
**REGISTERED VOTERS, BY RACE, 2012 GENERAL ELECTION,**
**NORTH CAROLINA**

### D.   Elimination of the Partial Counting of Provisional Ballots Cast in the Wrong Precinct

S.L. 2013-381 also abolishes the previous practice of partially counting provisional ballots cast by voters in the incorrect precinct. The analysis below examines the racial composition of voters who cast "wrong precinct" provisional ballots that were ***partially counted*** in the 2008, 2010, and 2012 general elections. The results of this analysis sustain the findings of the legislature in 2005 that procedures for the counting of provisional ballots cast outside the official resident precinct most significantly impact African American voters.

The individual voter files provide information on provisional ballots including wrong precinct ballots that previously have been partially counted in statewide or presidential elections.[50] Most of these ballots include the racial identification of the voter. The number that do not (5 percent or fewer in each election) are too small to affect the analytic results. The analytic procedure used here for assessing the racial impact of eliminating the partial counting of provisional ballots follows precisely the methodology used in the above section for analyzing new One Stop registrations, given that S.L. 2013-381 eliminates entirely both new registrations during the One Stop voting period and the partial counting of provisional ballots cast in the wrong precinct.

### 1.   The 2008 General Election

Table 36 and Chart 37 report the results of my analysis of the racial composition of voters who cast partially counted provisional ballots in the 2008 general election. The results reported in Table 36 and Chart 37 demonstrate that compared to their percentage of all other voters, African Americans are overrepresented among voters who cast provisional ballots in the wrong precinct and whose ballots were partially counted ("out-of-precinct voters"), whereas whites are underrepresented. African Americans comprised 30.1 percent of the 2,388 out-of-precinct voters whose voter files include race identifying information (out of a total of 2,506 partially counted provisional ballots)[51], more than a third larger than the 22.2 percent of African Americans among all other voters in 2008, for a difference of +7.9 percentage points. Table 36 and Chart 37 additionally disclose that whites comprised 59.8 percent of the out-of-precinct voters, nearly a fifth less than the 72.7 percent of whites among all other voters, for a difference of -12.9 percentage points.

---

[50] The voter files contain information identifying provisional ballots as "wrong precinct," as well as those falling into other categories. The files also indicate which wrong precinct ballots were partially counted.

[51] The difference of 118 partially counted provisional ballots (5% of the total) represents the partially counted provisional ballots in 2008 that lack racial identification in the voter files.

| TABLE 36<br>OUT-OF-PRECINCT VOTERS AND ALL OTHER VOTERS BY RACE, 2008<br>GENERAL ELECTION, NORTH CAROLINA. TOTAL: 2,388 OF 2,506 | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG PARTIALLY COUNTED OUT-OF-PRECINCT VOTERS | PERCENT AMONG ALL OTHER VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 59.8% | 72.7% | 18% LOWER | -12.9% |
| | | | | |
| **AFRICAN AMERICAN** | 30.1% | 22.2% | 36% HIGHER | +7.9% |
| | | | | |
| Source: SEIMS Database Provisional Voter File and Voter History File | | | | |

**CHART 37**
**OUT-OF-PRECINCT VOTERS BY RACE, 2008 GENERAL**
**ELECTION, NORTH CAROLINA**



## 2.    The 2010 General Election

Table 37 and Chart 38 report the results of my analysis of the racial composition of out-of-precinct voters who cast partially counted provisional ballots in 2010. The results reported in Table 37 and Chart 38 demonstrate that, compared to their percentage of all other voters, African Americans are overrepresented among out-of-precinct voters, whereas whites are underrepresented. African Americans comprised 56.5 percent of the 2,501 out-of-precinct voters whose voter files include race identifying information (of a total of 2,635)[52,] nearly triple the 20.0 percent of African Americans among all other voters, for a difference of +36.5 percentage points. Table 37 and Chart 38 additionally disclose that whites comprised 34.7 percent of the partially counted provisional ballots, less than half of the 76.4 percent of whites among all other voters, for a difference of -41.7 percentage points.

| TABLE 37 OUT-OF-PRECINCT VOTERS AND OTHER VOTERS BY RACE, 2010 GENERAL ELECTION, NORTH CAROLINA TOTAL 2,501 OF 2,635 | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG PARTIALLY COUNTED OUT-OF-PRECINCT VOTERS | PERCENT AMONG OTHER VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 34.7% | 76.4% | 55% LOWER | -41.7% |
| | | | | |
| **AFRICAN AMERICAN** | 56.5% | 20.0% | 183% HIGHER | +36.5% |
| | | | | |
| Source: SEIMS Database Provisional Voter File and Voter History File | | | | |

---

[52] The difference of 134 partially counted provisional ballots (5% of the total) represents the partially counted provisional ballots in 2010 that lack racial identification in the voter files.

112

**CHART 38**
**OUT-OF-PRECINCT VOTERS AND OTHER VOTERS BY RACE,**
**2010 GENERAL ELECTION, NORTH CAROLINA**



### 3.    The 2012 General Election

Table 38 and Chart 39 report the results of my analysis of the racial composition of out-of-precinct voters who cast partially counted provisional ballots in 2012. The results reported in Table 38 and Chart 39 demonstrate that compared to their percentage of all other voters, African Americans are overrepresented among out-of-precinct voters, whereas whites are underrepresented. African Americans comprised 35.0 percent of the 3,349 out-of-precinct voters in 2012 whose voter files include race identifying information (of a total of 3,417),[53] over 50% more than the 23.0 percent of African Americans among all other voters, for a difference of +12.0 percentage points. Table 38 and Chart 39 additionally disclose that whites comprised 51.9 percent of out-of-precinct voters, more than a quarter fewer than the 70.9 percent of whites among all other voters, for a difference of -19.0 percentage points.

| GROUP | PERCENT AMONG PARTIALLY COUNTED OUT-OF-PRECINCT VOTERS | PERCENT AMONG OTHER VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
|---|---|---|---|---|
| **WHITE** | 51.9% | 70.9% | 27% LOWER | -19.0% |
| | | | | |
| **AFRICAN AMERICAN** | 35.0% | 23.0% | 52% HIGHER | +12.0% |
| | | | | |
| Source: SEIMS Database Provisional Voter File and Voter History File | | | | |

**TABLE 38**
**OUT-OF-PRECINCT VOTERS AND OTHER VOTERS, BY RACE, 2012 GENERAL ELECTION, NORTH CAROLINA TOTAL 3,349 OF 3,417**

---

[53] The difference of 68 partially counted provisional ballots (2% of the total) represents the partially counted provisional ballots in 2012 that lack racial identification in the voter files.

114

**CHART 39**
**OUT-OF-PRECINCT VOTERS AND OTHER VOTERS BY RACE,**
**2012 GENERAL ELECTION, NORTH CAROLINA**



The disproportionately higher African American percentage of partially counted out-of-precinct voters is tied systematically to the lower African American than white educational levels documented in Table 2 above and to the higher African American mobility levels within the same counties of North Carolina. According to the 2011 U.S. American Community Survey three-year estimates, 6.9 percent of non-Hispanic whites moved within a year within the same county of North Carolina, compared to 12.6 percent of non-Hispanic African Americans. In other words, African Americans are more likely to have moved to a new precinct within their county than white voters, increasing the likelihood that they will appear at the incorrect precinct, but correct county on Election Day and be made to cast a provisional ballot. That provisional ballot will no longer be counted for statewide and countywide elections under VIVA.

### E.    Restricting One-Stop Early Voting

S.L. 2013-381 reduces the number of One Stop voting days at the polls from 17 to 10, eliminating the first week and cutting the number of days by 41 percent. As noted in the previous section, although the law purports to require election officials to provide the same number of early voting hours as in prior midterm and general elections, it authorizes counties to seek waivers from the State Board of Elections exempting them for the "total hours" requirement. Therefore, this "total hours" requirement has little to no mitigating effect on the diminution of the number of days for early voting in the counties that have obtained waivers. This reduction of days for early voting also affects African American opportunities to vote in counties that either do not seek or obtain a waiver. The number of counties gaining waivers may also vary from one election to next. Thus, S.L. 2013-381 imposes both an overall restriction on opportunities to vote during the One Stop voting period as well as restrictions that arise from eliminating the first week of early voting, even if there are increased hours in the second and third weeks.

In this section, I examine the racial composition of voters who cast their ballots at any time during the One Stop voting period.  Then I examine the racial composition of voters who cast their ballots during the first week of One Stop voting, as compared to the second and third weeks.

The results of my analysis show that S.L. 2013-381's elimination of the first seven One Stop voting days (combined with a waiver option for the "total hours" requirement) has a disparate impact on African American registered voters.  As compared to whites, African Americans have disproportionately voted early during the One Stop voting period in all three elections studied. They also voted at disproportionately higher rates in the first week of the One Stop voting period in the 2008 and 2012 general elections, both of which had far more One Stop voters than the 2010 general election.

### 1.    The 2008 General Election

Table 39 and Chart 40 report the results of my analysis of the racial composition of persons who voted at the polls during the One Stop voting period in 2008. The results reported in Table 48 and Chart 49 demonstrate that, compared to their percentage share of all voters in 2008,

African Americans are overrepresented among those voting early at the polls, whereas whites are underrepresented. African Americans comprised 28.4 percent of the 2,422,366 One Stop voters at the polls in 2008, which is almost double the 14.6 percent of African Americans among all other voters, for a difference of +13.8 percentage points. Table 39 and Chart 40 additionally disclose that whites comprised 66.7 percent of One Stop voters at the polls, 17 percent lower than the 80.2 percent of whites among all registered voters, for a difference of -13.5 percentage points.

| **TABLE 39**<br>**ONE STOP VOTING AT THE POLLS BY RACE, 2008 GENERAL**<br>**ELECTION, NORTH CAROLINA TOTAL: 2,422,366 (56%)** | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG EARLY VOTERS AT THE POLLS | PERCENT AMONG ALL OTHER VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 66.7% | 80.2% | 17% LOWER | -13.5% |
| | | | | |
| **AFRICAN AMERICAN** | 28.4% | 14.6% | 95% HIGHER | +13.8% |
| | | | | |
| Source: SEIMS Database Voter History File | | | | |

117



**CHART 40**
**EARLY ONE STOP VOTERS AT POLLS & ALL OTHER VOTERS, BY
RACE, 2008 GENERAL ELECTION, NORTH CAROLINA**

Table 40 and Chart 41 report the results of my analysis of the racial composition of persons who voted at the polls during the first week (eliminated by VIVA), as compared to the second and third weeks, of the 2008 One Stop voting period. The results reported in Table 40 and Chart 41 demonstrate that African Americans are overrepresented among One Stop voters during the first week, whereas whites are underrepresented. African Americans comprised 31.8 percent of the first week One Stop voters at the polls in 2008, nearly a fifth larger than the 26.9 percent of African Americans among second and third week One Stop voters, for a difference of +4.9 percentage points. Table 40 and Chart 41 additionally disclose that whites comprised 63.9 percent of the first week One Stop voters, which is 6 percent lower than the 68.0 percent of whites among second and third week voters, for a difference of 4.1 percentage points.

| TABLE 40 ONE STOP VOTERS AT THE POLLS BY DATE, WEEK 1 COMPARED TO WEEKS 2 & 3, BY RACE, 2008 GENERAL ELECTION, NORTH CAROLINA WEEK 1: 702,474, WEEKS 2 & 3, 1,706,569 | | | | |
|---|---|---|---|---|
| GROUP | WEEK 1 PERCENT | WEEK 2 & 3 PERCENT | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 63.9% | 68.0% | 6% LOWER | -4.1% |
| | | | | |
| **AFRICAN AMERICAN** | 31.8% | 26.9% | 18% HIGHER | +4.9% |
| | | | | |
| Source: SEIMS Database Voter History File and Absentee Correspondence File | | | | |

119



CHART 41
EARLY ONE STOP VOTERS AT THE POLLS, WEEK 1 COMPARED TO
WEEKS 2 & 3, BY RACE, 2008 GENERAL ELECTION, NORTH
CAROLINA

### 2.      The 2010 General Election

Table 41 and Chart 42 report the results of my analysis of the racial composition of One Stop voters at the polls in 2010. The results reported in Table 42 and Chart 43 demonstrate that, compared to their percentage of all other voters, African Americans are overrepresented among One Stop voters at the polls, whereas whites are underrepresented. African Americans comprised 21.5 percent of the 906,722 One Stop voters at the polls in 2010, about a tenth larger than the 19.3 percent of African Americans among all other voters in 2010, for a difference of +2.2 percentage points. Table 41 and Chart 42 additionally disclose that whites comprised 75.4 percent of One Stop voters at the polls, 2 percent lower than the 76.8 percent of whites among all other voters, for a difference of -1.4 percentage points.

| TABLE 41 ONE STOP VOTERS AT THE POLLS, BY RACE, 2010 GENERAL ELECTION, NORTH CAROLINA TOTAL: 906,722 (34%) | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG EARLY VOTERS AT POLLS | PERCENT AMONG ALL OTHER VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 75.4% | 76.8% | 2% LOWER | -1.4% |
| | | | | |
| **AFRICAN AMERICAN** | 21.5% | 19.3% | 11% HIGHER | +2.2% |
| | | | | |
| Source: SEIMS Database Voter History File | | | | |



**CHART 42**
**EARLY ONE STOP VOTERS AT THE POLLS & ALL OTHER**
**VOTERS,BY RACE, 2010 GENERAL ELECTION, NORTH**
**CAROLINA**

Table 42 and Chart 43 report the results of my analysis of the racial composition of early voters at the polls during the first week of the 2010 One Stop voting period as compared to the second and third weeks. The results reported in Table 42 and Chart 43 demonstrate that African Americans are underrepresented among One Stop voters during the first week, whereas whites are overrepresented. According to Table 42 and Chart 43, African Americans comprised 17.5 percent of One Stop first week voters in 2010, 23 percent lower than the 22.7 percent of African Americans among all second and third week voters, for a difference of -5.2 percentage points. Table 42 and Chart 43 additionally disclose that whites comprised 79.9 percent of the first week One Stop voters in 2010, 8 percent higher than the 74.2 percent of whites among all second and third week voters, for a difference of +5.7 percentage points.

| TABLE 42 ONE STOP VOTERS AT THE POLLS, BY DATE, WEEK 1 COMPARED TO WEEKS 2 & 3, BY RACE, 2010 GENERAL ELECTION, NORTH CAROLINA WEEK 1: 207,049, WEEKS 2 & 3, 698,110 | | | | |
|---|---|---|---|---|
| GROUP | WEEK 1 PERCENT | WEEK 2 & 3 PERCENT | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 79.9% | 74.2% | 8% HIGHER | +5.7% |
| | | | | |
| **AFRICAN AMERICAN** | 17.5% | 22.7% | 23% LOWER | -5.2% |
| | | | | |
| Source: SEIMS Database Voter History File and Absentee Correspondence File | | | | |



**CHART 43**
**EARLY ONE STOP VOTERS AT THE POLLS, WEEK 1 COMPARED TO WEEKS 2 & 3, BY RACE, 2010 GENERAL ELECTION, NORTH CAROLINA**

### 3.   The 2012 General Election

Table 43 and Chart 44 report the results of my analysis of the racial composition of persons who voted at the polls during the One Stop voting period in 2012. The results reported in Table 43 and Chart 44 demonstrate that, compared to their percentage of all other voters, African Americans are overrepresented among One Stop voters, whereas whites are underrepresented. African Americans comprised 28.8 percent of the 2,558,060 One Stop voters in 2012, 86 percent higher than the 15.5 percent of African Americans among all other voters in 2012, for a difference of +13.3 percentage points. Table 43 and Chart 44 additionally disclose that Whites comprised 65.4 percent of the One Stop voters, 16 percent lower than the 78.0 percent of whites among all other voters, for a difference of -12.6 percentage points.

| TABLE 43 ONE STOP VOTERS, BY RACE, 2012 GENERAL ELECTION, NORTH CAROLINA TOTAL: 2,558,060 | | | | |
|---|---|---|---|---|
| GROUP | PERCENT AMONG ONE STOP VOTERS | PERCENT AMONG ALL OTHER VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 65.4% | 78.0% | 16% LOWER | -12.6% |
| | | | | |
| **AFRICAN AMERICAN** | 28.8% | 15.5% | 86% HIGHER | +13.3% |
| | | | | |
| Source: SEIMS Database Voter History File | | | | |

125



**CHART 44**
**EARLY ONE STOP VOTERS AT THE POLLS AND ALL OTHER**
**VOTERS, BY RACE, 2012 GENERAL ELECTION, NORTH CAROLINA**

Table 44 and Chart 45 report the results of my analysis of the racial composition of persons who voted at the polls during the first week of the 2012 One Stop voting period as compared to the second and third weeks. The results reported in Table 44 and Chart 45 demonstrate that African Americans are overrepresented among One Stop voters during the first week, whereas whites are underrepresented. African Americans comprised 32.8 percent of the first week voters at the polls in 2012, nearly a quarter more than the 26.6 percent of African Americans among all second and third week voters, for a difference of +6.2 percentage points. Table 44 and Chart 45 additionally disclose that whites comprised 62.1 percent of the early first week voters, 8 percent lower than the 67.2 percent of whites among second and third week voters, for a difference of -5.1 percentage points.

| TABLE 44 ONE STOP VOTERS AT THE POLLS BY DATE, WEEK 1 COMPARED TO WEEKS 2 & 3, BY RACE, 2012 GENERAL ELECTION, NORTH CAROLINA WEEK 1: 899,083 WEEKS 2 & 3, 1,657,145 | | | | |
|---|---|---|---|---|
| GROUP | WEEK 1 PERCENT | WEEK 2 & 3 PERCENT | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| **WHITE** | 62.1% | 67.2% | 8% LOWER | -5.1% |
| | | | | |
| **AFRICAN AMERICAN** | 32.8% | 26.6% | 23% HIGHER | +6.2% |
| | | | | |
| Source: SEIMS Database Voter History File and Absentee Correspondence File | | | | |

127



**CHART 45**
**EARLY ONE STOP VOTERS AT THE POLLS, WEEK 1 COMPARED TO WEEKS 2 & 3, BY RACE, 2012 GENERAL ELECTION, NORTH CAROLINA**

**F.      Elimination of Pre-registration of 16- and 17-Year Olds**

Prior to VIVA, citizens aged 16 or 17 could pre-register and then become automatically enrolled on the registration books upon reaching the age of 18. VIVA eliminates this program. Moreover, the elimination of this pre-registration program places a disparate burden on African Americans.

As indicated in Table 45 and Chart 46, according to data from Compass Demographics review of the voter files, more than 82,000 persons registered in North Carolina as of March 2013 initially became registered through a prior pre-registration. Among registered voters who initially preregistered, 26.2 were African American, 17 percent *higher* than the 22.4 percent African American among all registered voters, for a percentage point difference of +3.5 percentage points. Also among the pre-registered, 61.9 were non-Hispanic whites, 12 percent *lower* than the 70.7 percent of whites among all registered voters, for a percentage point difference of -8.8 percentage points. Thus, based upon information available at the time of the adoption of HB 589, the elimination of pre-registration posed a disparate burden on African Americans.

| TABLE 45 REGISTERED VOTERS WHO INITIALLY PRE-REGISTERED, MARCH 2013 DATABASE BY RACE, NON-HISPANIC | | | | |
|---|---|---|---|---|
| **GROUP** | **PERCENT AMONG ALL REGISTERED VOTERS** | **PERCENT AMONG PRE-REGISTERED VOTERS** | **PERCENT DIFFERENCE** | **PERCENTAGE POINT DIFFERENCE** |
| **WHITE** | 70.7% | 61.9% | 12% LOWER | -8.8 PERCENTAGE POINTS |
| | | | | |
| **AFRICAN AMERICAN** | 22.4% | 26.2% | 17% HIGHER | +3.8 PERCENTAGE POINTS |
| | | | | |
| Source: SEIMS Database Voter History File | | | | |

129



**CHART 46**
**REGISTERED VOTERS WHO INITIALLY PRE-REGISTERED, MARCH**
**2013 DATABASE BY RACE, NON-HISPANIC**

       The greater proportional use of pre-registration by African Americans as compared to whites is consistent with the demographic distribution in North Carolina of these two racial groups. As indicated in Table 46 and Chart 47, whether measured as a percentage of the total population or the 16-year-old and older population, a greater percentage of African Americans than whites fall into to the age category of 16 or 17 years old—the ages that were authorized for pre-registration prior to the VIVA ban.

| TABLE 46<br>PERCENT AGED 16-17, OF TOTAL AND 16 YEAR OLD+ POPULATION<br>BY RACE, NON-HISPANIC, NORTH CAROLINA, 2010 | | | |
|---|---|---|---|
| | **PERCENT TOTAL POPULATION AGED 16-17** | **PERCENT DIFFERENCE WITH WHITES** | **PERCENTAGE POINT DIFFERENCE WITH WHITES** |
| WHITE | 2.4% | | NA |
| AFRICAN AMERICAN | 3.5% | 46% HIGHER | +1.1 PERCENTAGE POINTS |
| | **PERCENT POPULATION 16 AND OVER AGED 16-17** | **PERCENT DIFFERENCE** | **PERCENTAGE POINT DIFFERENCE** |
| WHITE | 2.9% | | |
| AFRICAN AMERICAN | 4.6% | 59% HIGHER | +1.7 PERCENTAGE POINTS |
| Source: U. S. Census of Population, 2010 | | | |



**CHART 47**
**PERCENT AGED 16-17, OF TOTAL AND 16 YEAR OLD+ POPULATION**
**BY RACE, NON-HISPANIC, NORTH CAROLINA, 2010**

## VIII.   CONTEMPORANEOUS VIEWPOINTS EXPRESSED BY THE DECISION-MAKERS

The above referenced data demonstrating racially disparate impact was available to lawmakers at the time they passed HB 589. Moreover, viewpoints expressed by decision-makers in support of S. L. 2013-381, sustain the strong evidence of intentional discrimination provided by the procedural and substantive deviations involved in the enactment of this legislation. The justifications for the post-*Shelby* decisions made with respect to the enactment of this legislation are misleading, contradictory, and pretextual. In effect, while some of the arguments made at the time might have applied to the pre-*Shelby* version of HB 589, these arguments did not apply to the post-*Shelby* version that the General Assembly enacted and the governor signed.

### A.       Conformity with Other States—Voter Photo ID

Decision-makers insisted many times that with respect to the voter photo identification provisions of S. L. 2013-381, they were simply bringing North Carolina into conformity with practices in most other states of the union. Senator Robert A. Rucho, Chairman of the Joint Legislative Elections Oversight Committee who shepherded the bill through the Senate, stated, "there are 30 states which currently have a voter ID in place, and 33 states have passed, uh, ID--voter ID laws." Then-Speaker of the House Thom Tillis said shortly after passage of the post-*Shelby* bill, "Our action brought North Carolina in line with the majority of other states that already require voter ID." In explaining his decision to sign the enacted bill, Governor McCrory said, he was "keep[ing] North Carolina in the mainstream of election law, not the fringes." These statements are misleading and pretextual for several reasons.[54]

First, of the 33 states that Rucho cited, about a dozen do not have *photo* identification requirements for voting. Rather, forms of non-photo identification are also acceptable in these states. Many of these non-photo IDs are free and readily available, including, for example, a utility bill, bank statement, or paycheck.[55]

Second, of the states with photo identification requirements, more than half have *non-strict* laws, permitting voters to vote without such identification and without a subsequent demonstration of photo identification after casting a provisional ballot. According to the National Conference of State Legislatures, in some non-strict states, voters without an acceptable photo identification may still be able to cast a regular ballot by signing "an affidavit of identity, or poll workers may be permitted to vouch for the voter." In other non-strict states, "voters who do not show required identification may vote on a provisional ballot. After the close of Election Day,

---

[54] July 24, 2013, *Senate Debate on HB 589*, 33:21-22; "A Message from Speaker Thom Tillis, " nchouse116.com, 26 July 2013, http://nchouse116.com/a-message-from-speaker-thom-tillis/ ; "N.C. Governor: Protect Election Integrity," Office of the Governor, August 28, 2013, http://www.governor.state.nc.us/newsroom/press-releases/20130829/icymi-ncgovernor-protect-election-integrity#sthash.OKeknv1h.dpuf.

[55] National Conference of State Legislatures, *Voter Identification Requirements*, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx; State websites.

election officials will determine (via a signature check or other verification) whether the voter was eligible and registered, and therefore whether the provisional ballot should be counted. *No action on the part of the voter is required*."[56]

In contrast, in strict photo identification states like North Carolina's post-*Shelby* bill, "**voters without acceptable identification must vote on a provisional ballot and also take additional steps after Election Day for it to be counted**. For instance, the voter may be required to return to an election office within a few days after the election and present an acceptable ID to have the provisional ballot counted. If the voter does not come back to show ID, the provisional ballot is not counted" (emphasis in original). In fact, not 33 states, *but only some 10 other states*, had strict photo voter identification laws in place at the time of the enactment of HB 589. Two of those laws, in Pennsylvania and Arkansas, have since been invalidated by courts (see Table 45).

Third, as indicated in Table 47 and Chart 48, the new restrictions inserted into HB 589 after the *Shelby* decision placed North Carolina far outside the mainstream of states with both strict and non-strict voter photo identification laws. According to Table 47, North Carolina and South Carolina were the only photo voter identification states, strict or non-strict, that prohibited government-issued employee IDS, student IDs, and expired ID for voting. North Carolina was the *only* strict photo voter identification state with all three of these prohibitions. Eighteen of all twenty-one photo ID states, authorized two of these three forms of ID for voting. Fourteen of twenty-one states authorized all three of these forms of ID for voting.

*Thus, North Carolina did not bring its voters identification laws into conformity with other states. Rather, it enacted after Shelby provisions that brought its voter photo identification requirements far out of line with other states and which represented the most restrictive photo voter identification law in the nation.*

---

[56] *Ibid*.

| TABLE 47 COMPARISON OF S. L. 2013-381 WITH OTHER STATE LAWS ENACTED THROUGH JULY 2013 | | | | |
|---|---|---|---|---|
| STATE | GOVERNMENT EMPLOYEE ID | PUBLIC STUDENT ID | EXPIRED ID OR ID WITH NO EXPIRATION DATE | "STRICT" OR "NON-STRICT" PHOTO ID STATE *** |
| ALABAMA | YES | YES | YES | NON-STRICT |
| ARKANSAS* | YES | YES | YES | STRICT |
| FLORIDA | NO | YES | YES | NON-STRICT |
| GEORGIA | YES | YES | YES | STRICT |
| HAWAII | YES | YES | YES | NON-STRICT |
| IDAHO | YES | YES | YES | NON-STRICT |
| INDIANA | YES | YES | YES | STRICT |
| KANSAS | YES | YES | YES | STRICT |
| LOUISIANA | YES | YES | YES | NON-STRICT |
| MICHIGAN | YES | YES | YES | NON-STRICT |
| MISSISSIPPI | YES | YES | YES | STRICT |
| NEW HAMPSHIRE | NO | YES | YES | NON-STRICT |
| **NORTH CAROLINA** | **NO** | **NO** | **NO **** | **STRICT** |
| PENNSYLVANIA* | YES | YES | YES | STRICT |
| RHODE ISLAND | YES | YES | NO | NON-STRICT |
| **SOUTH CAROLINA** | NO | NO | NO | **NON-STRICT** |
| SOUTH DAKOTA | YES | YES | YES | NON-STRICT |
| TENNESSEE | YES | NO | YES | STRICT |
| **TEXAS** | **NO** | **NO** | **YES** | **STRICT** |
| VIRGINIA | YES | YES | YES | STRICT |
| WISCONSIN | NO | YES | YES | STRICT |
| | | | | |
| Source: National Conference of State Legislatures (NCSL), Voter Identification Requirements, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx#sd, Individual State Websites * Law struck down by courts. ** With limited exception for elderly voters over 70+, with ID not expired before 70th birthday. | | | | |

135



**CHART 48**
**PHOTO ID STATES : GOVERNMENT ID, STUDENT ID, & AND EXPIRED IDS OR IDS WITH NO EXPIRATION DATE, INCLUDING NORTH CAROLINA**

### B.    The Georgia Model

Legislative backers of the pre-*Shelby* version HB 589 in the legislature drew upon the model of the voter photo identification law in Georgia, to argue that the North Carolina bill could ensure reliable voter identity without deterring turnout of minorities. Republican leaders were sufficiently interested in the Georgia example to invite Brian Kemp the Georgia Secretary of State to testify in committee hearings.

In the House debate on the pre-*Shelby* HB 589, for example, Representative John Blust said,  "But the voter suppression charges -- the same type charges, the same predictions, the same type rhetoric was used in Georgia. And in Georgia, the actual participation -- and this is the problem opponents of this law have. You have an observable situation in Georgia and Indiana where the voting participation rates went up. I don't see how you can maintain still the same arguments you've been maintaining 1 when you've seen it in the reality on the ground."[57]

Backers of HB 589 continued to cite the Georgia precedent even after the many new restrictions on voter ID included in the post-*Shelby* bill rendered the proposal far more strict than Georgia's law. On the Senate floor, Senator Jerry Tillman said, "You need to take a look at what Georgia did when they passed, they're demographically a lot like North Carolina, have a higher minority population than we do, otherwise the demograph, demographics are about the like, right Senator Goolsby? Check what happened after their 2012 [sic] voter ID law. See if it didn't go up. More so for minorities even than the whites. It's a fact. That's not rhetoric. That's not playing to the crowd and the TV cameras." Also on the Senate floor, Senator Thom Goolsby added, "Well, it's something called photo voter ID, which 30 states have in the United States; almost every other state here in the south has it. And the Democrats sure don't want it, and they're using the same talking points that were used in Georgia back in 2005; voter suppression, Jim Crow era, gonna reduce the vote. And we've seen from Georgia that it's not done that at all."[58]

Leaving aside the question of their substantive validity given the many causes of voter turnout, such statements are misleading and pretextual because the photo identification requirements of S. L. 2013-381 are far more restrictive than the requirements of the Georgia law particularly as these requirements impact minority voting opportunities.

Georgia's photo ID law differs in a number of fundamental ways from the post-*Shelby* version of HB 589 that Senators Tillman and Goolsby were defending. Unlike North Carolina, Georgia authorizes for voting "Any valid state or federal government issued photo ID." These would include, for example, public assistance photo identification, and student photo identification issued by public institutions of higher education (nearly 60), all of which are prohibited under North Carolina law. Unlike North Carolina, Georgia also authorizes for voting, a "valid employee photo ID from any branch, department, or agency or entity of the US

---

[57] Apr. 24, 2013, *Transcript of the Proceedings N.C. House Floor Session* at 171:17 - 172:2.

[58] July 24, 2013, *Transcript of Senate Debate on HB 589*, Day 2, at 32:3-10; 43:19-25.

government, Georgia, or any county, municipality, board, authority, or other entity of this state." Again, unlike North Carolina, Georgia imposes no expiration requirement for driver's licenses and does not limit state-issued acceptable photo ID to those issued by the state of Georgia.[59]

## C.     Public Support

Citing poll data, legislative backers of the post-*Shelby* version of HB 589 and Governor McCrory claimed that the people of North Carolina including Democrats overwhelming supported both its photo identification requirement and the entire bill as well. For example, Senator Goolsby told the Senate, "We've even seen polls done by Elon College recently on how many North Carolinians think it's reasonable to have to show an ID when you go into the election booth: 72% of North Carolinians. Over half the Democrats in our state polled said they'd like it. And the people, when they were polled, 97% of those stated they already had an acceptable form of ID."[60]

After passage of S. L. 2013-381, Governor McCrory was queried by reporter Chuck Todd about political motivations behind the bill, and he defended both the photo ID provisions and all other provisions by citing public support:

> Chuck Todd: "This is not political at all? You don't see any political benefit for the Republicans in these more restrictive laws?"
>
> Governor McCrory: "No, actually, if you surveyed, most Democrats also agree with our laws and voter ID. So I think it's common sense laws and much ado about nothing and trying to protect the integrity of the voter booth."[61]

However, the polls regarding photo ID that Senator Goolsby and Governor McCrory cite refer to a generic voter photo ID law, not to the particular restrictive and non-mainstream formulation of North Carolina's photo ID law. Specifically, the question in the Elon University poll reads, "As you may know, the state legislature is considering a law requiring voters to show *some sort of government approved photo identification* before they are allowed to vote . . . do you [support or oppose] such a law?" (emphasis added). Likewise, as cited by Goolsby, when survey respondents claim they possess acceptable IDs, they are referring to "some form of photo

---

[59] Georgia Secretary of State, *Georgia Photo Identification Requirements*,
http://sos.ga.gov/index.php/elections/georgia_voter_identification_requirements2.

[60] July 25, 2013, *Transcript of Senate Debate on HB 589* , Day 2, 44:1-6.

[61] See John Frank, "In National TV Interview, McCrory Defends State's Voter Law," 20 November 2013,
newsobserver.com, http://www.newsobserver.com/2013/11/20/3390083/in-national-tv-interview-mccrory.html for a link to the interview.

identification" in the Elon University poll, which would include prohibiting numerous forms of ID prohibited for voting under S. L. 2013-381.[62]

Also, a North Carolina poll taken in February 2011, during the first debate over voter photo identification legislation, showed that voter fraud and ballot integrity did not register among the most important state problems cited by respondents. In addition, a poll conducted in North Carolina by SurveyUSA in April 2013 found that in contrast to VIVA's strict voter photo ID requirement, *66 percent of North Carolina registered voter respondents would allow persons to vote if they signed an affidavit of identity under penalty of perjury*. The same poll found that 74 percent agreed that "Legislators should show evidence of significant problems, such as real voter fraud, before they pass laws that make voting more difficult."[63]

In addition, Governor McCrory is not correct in claiming that North Carolina residents support the full panoply of laws included within S. L. 2013-381. In fact, polling data available at the time of his interview with Chuck Todd contradicts this claim. A survey by PPD of 600 registered North Carolina voters, released on August 12, 2013, more than two weeks before the governor's interview with Chuck Todd, found that only 39 percent of respondents supported S. L. 2013-381 in its entirety, with 50 percent opposed and 11 percent uncertain. Only 16 percent of Democrats supported the legislation. The poll also found that only 33 percent of voters supported reducing early voting by a week, with 59 percent opposed. The poll did not over-represent Democrats or liberals, with 2012 Romney voters holding a 4 percentage point edge over Obama voters among those surveyed.[64]

Even before passage of HB 589, an Elon University Poll from April 2013 demonstrated that voters in North Carolina opposed reducing early voting by a week. The pollsters found that 59% of respondents opposed such a reduction, compared to 38 percent in favor, results that closely matched the later PPD poll.[65]

### D.  Election Integrity

Defenders of S. L. 2013-381 say that the photo identification parts of the measure were intended not primarily to stop voter fraud, but to increase voter confidence in the integrity of the ballot in North Carolina by ensuring that voters are who they claim to be at the polls. "There is some evidence of voter fraud, but that's not the primary reason for doing this," said Speaker

---

[62] Elon University Poll, March 2013, https://www.elon.edu/docs/e-web/elonpoll/030413_ElonPoll_voterID.pdf.

[63] High Point University Survey Research Center, *Current Issues in the State of North Carolina*, February 2011, www.highpoint.edu; SurveyUSA Market Research Study #20443, Data Collected: 04/11/2013 - 04/14/2013, http://www.surveyusa.com/client/PollPrint.aspx?g=8c5c6269-5692-483a-a5f0-9662c4e5567e&d=0.

[64] Public Policy Polling, "North Carolinians Oppose Voting Bill Signed Today," 12 August 2013, http://www.publicpolicypolling.com/pdf/2011/PPP_Release_NC_812.pdf.

[65] "Elon Poll," *High Country Press*, 17 April 2013, http://www.hcpress.com/news/elon-poll-nc-citizens-oppose-several-state-legislative-proposals-view-results-spanning-various-issues.html.

Tillis. "We call this restoring confidence in government."  During the Senate debates, Senator Rucho called HB 589 a "measure for honesty and integrity in the electoral process, and we believe it'll go a long way to building confidence back in our voters and our citizens."[66]

It is not surprisingly that advocates of photo ID in North Carolina should make their case on the vaguer ground of ballot integrity or confidence in government, because, as more fully described in the expert report of Dr. Lorraine Minnite, the in-person fraud that the photo identification measures are designed to prevent is virtually non-existent in North Carolina. According to a March 2013 compilation by the SBOE in response to inquiries by the House Elections Committee, *from 2000 to 2012 there were only 2 cases* of voter impersonation that the SBOE "believed merited a referral to the district attorney's office." As noted above, this switch from evidence of fraud to the vague notion of election integrity contradicts the views of the vast majority of North Carolina registered voters in the April 2013 SurveyUSA poll who affirm that legislators must show real evidence of voter fraud before passing laws that make voting more difficult, which the provisions of HB 589 clearly do.[67]

Taking at face value the stated goal of ensuring election integrity, it is misleading and contradictory for backers to claim that the many new post-*Shelby* restrictions on photo identification were necessary to achieve this goal. Just a few months earlier, the backers of photo identification law had, with equal conviction, affirmed that the House-passed version of HB 589 had achieved this goal, without the additional restrictions added after *Shelby*. Moreover, backers lauded the House-passed bill as achieving a balance between the goals of ballot integrity with access to the vote. In introducing the pre-*Shelby* version of HB 589 Speaker Tillis said, "We are here to announce that after a deliberate and transparent process, we will be filing a voter ID bill today that protects the integrity of the ballot box and respects the sanctity of the right to vote." After the bill passed the House in April, he said, "This commonsense measure will protect the integrity of the ballot box and restore confidence in our election system." Republican Representative Ruth Samuelson, the pre-*Shelby* bill's primary sponsor, stated that, "This legislation serves a very real purpose in protecting the integrity of every single vote." And Republican Representative Tom Murry, another sponsor, lauded the balance in the bill: "We are going to allow for multiple forms of state issued IDs including driver's licenses, non-operators licenses, student IDs from state institutions, employee IDs from state employees, travel cards, we're also going to be developing a state-wide photo database."[68]

---

[66] Laura Leslie, "Tillis: 'Fraud 'not the Primary Reason' for Voter ID Push," 17 March 2013, WRAL.com, http://www.wral.com/tillis-actual-voter-fraud-not-the-primary-reason-for-voter-id-push-/12231514/.

[67] Apr. 16, 2014, *K. Strach Dep. Ex. 16, Attachment F;* July 24, 2013, *Transcript of Senate Debate on HB 589,* Day 1, 4:2-5.

[68] "The Voter ID Bill," nchouse41.com, http://nchouse41.com/the-voter-id-bill/; Abby Cavenaugh, "State House Passes Voter ID Bill: Next Stop is Senate Approval," *The Anson Record*, 1 May 2013, p. 1A; Jacob Rosenberg, "Voter ID Bill Moves to NC Senate," dailytarheel.com, 04/14/2013, http://www.dailytarheel.com/article/2013/04/voter-id-bill-moves-to-nc-senate.

Two years earlier in 2011, Republican backers of the vetoed voter photo identification bill, which likewise did not include the restrictions of the post-*Shelby* version of HB 589, claimed that it would restore the integrity of the electoral system, "I've done the best that I know how to do to address a concern that many of my fellow citizens have that the integrity of the elections process is at risk," said Republican Representative David Lewis, Chairman of the House Elections Committee. . Republican Phil Berger, Senate President Pro Tem, lauded the 2011 bill as "A measure that ensures voters are who they say they are" and chided Governor Perdue for "playing politics with the integrity of elections."[69]

Governor McCrory also invoked a variant of the election integrity argument to justify the elimination of same day registration during the One Stop Voting period. This abrogation he said was needed to assure "registration integrity."

Neither McCrory, nor any other advocate of the post-*Shelby* version of HB 589, however, cited a single example of registration fraud arising from same day registrations recorded during the One Stop Period. The claim also ignores a highly positive 2009 report by the SBOE on the operation of One Stop registration during the 2008 presidential election that the bill sponsor's did not discuss in the legislative record. The SBOE found no voter fraud and reached the following conclusions:

- In this "first real test of Same Day Registration in North Carolina … The ability to register in-person was a key factor in why the 2008 post-election season was essentially 'uneventful.'"
- "There were no election challenges and voters for the most part were pleased with the process, irrespective of election contests."
- "Despite individual preferences to the outcome of election contests in the 2008 general election, North Carolina citizens were assured that the election process in this state was fair and open to all eligible citizens."
- "Same Day Registration had a positive impact on the election process in a number of key ways: people were generally satisfied with the election process and had fewer complaints than in years past; more people were successfully able to vote – voter turnout for the general election was a record-breaking 70%; and there was a relative decrease in the number of provisional ballots."
- "SDR has greatly benefitted the North Carolina elections process. North Carolina is recognized by other states as model for the conduct of elections."[70]

---

[69] Brian Warner, "N.C. House Passes Voter ID Bill to Vote," *Jones Street Chronicles*, 11 June 2011, http://thevoterupdate.com/jones/?p=404#.VKH4PF4Ag; Gary D. Robertson, "NC Gov Vetoes Voter ID Bill Pushed by Republicans," *Real Clear Politics*, 25 June 2011, http://www.realclearpolitics.com/news/ap/politics/2011/Jun/25/nc_gov_vetoes_voter_id_bill_pushed_by_republicans.html.

[70] SBE00022907, North Carolina State Board of Elections, *Report on Same Day Registration*, 31 March 2009, pp. 1, 5-7.

141

Similarly a March 2013 the SBOE Report on voter fraud found only one case of registration fraud related to residency after adoption of Same Day Registration compared to 2 cases before its adoption. The system is North Carolina was hardly broken at the time of the major overhaul included in the S. L. 2013-381.[71]

Historically, calls for "election integrity" or "ballot security" have been closely tied to efforts to discourage voting by minorities. In the presidential election of 1964, Republicans introduced the so-called "ballot security" program ostensibly designed to discourage voter fraud, but in practice aimed at diminishing turnout in heavily Democratic minority neighborhoods. The goal of the program, dubbed "Operation Eagle Eye" after in a similar effort in Arizona, was to dispatch some 100,000 poll watchers to precincts in 35 selected cities to discourage balloting by more than a million potentially fraudulent voters. In Houston, for instance, handbills circulated in heavily black neighborhoods warned that persons with outstanding parking tickets or convictions for traffic offenses could be arrested if they tried to vote in the election.[72]

This practice of voter suppression became sufficiently widespread that in response to lawsuits in 1982 and again in 1987, the National Republican Party agreed to consent decrees in federal court that prohibited the national party from engaging in anti-fraud activities that targeted minority voters. In 2009, federal Judge Dickinson Debevoise, who had presided over the 1980s lawsuits, denied a Republican National Committee motion to end the consent decree, although he added a presumptive expiration date of seven years hence unless violations were proven. The U.S. Court of Appeals for the Third Circuit upheld his ruling. "Minority voters continue to overwhelmingly support Democratic candidates," Judge Debevoise wrote in his decision. "As long as that is the case, the RNC and other Republican groups may be tempted to keep qualified minority voters from casting their ballots, especially in light of the razor-thin margin of victory by which many elections have been decided in recent years." After reviewing all evidence of alleged voter fraud presented by the Republican National Committee he found that, "In fact, even a cursory investigation of the prevalence of voter intimidation demonstrates that ballot security initiatives have the potential to unfairly skew election results by disenfranchising qualified voters in far greater numbers of than the instances of in-person fraud that may occur during any given race."[73]

However, as more fully described in the expert report of Dr. James Leloudis, state parties and private conservative groups and individuals with no official ties to a political party have continued "ballot security" efforts primarily targeted at minorities. In 1990, when Republican incumbent Senator Jesse Helms was locked in a tight race with African American Democrat

---

[71] North Carolina State Board of Elections, "Documented Cases of Voter Fraud," 11 March 2013.

[72] "Democrats Charge G.O.P. Poll Watch Today Will Harass Negroes and the Poor," *New York Times*, 3 November 1964, 22; Allan J. Lichtman, *White Protestant Nation: The Rise of the American Conservative Movement* (New York: Grove/Atlantic, 2008), pp. 2.

[73] *DNC v. RNC.*, Case 2:81-cv-03876-DRD-MAS Document 84 Filed 12/01/09;  *DNC v. RNC.*, No. 09-4615, United States Court Of Appeals For The Third Circuit, 673 F.3d 192.

Harvey Gant, the North Carolina Republican Party sponsored a ballot security program in which many tens of thousands of postcards were sent into predominantly African-American precincts, without a party label. The cards warned that is a federal crime to give false information to an election officials and incorrectly claiming that voters had to live in the same precinct for thirty days prior to an election. A suit brought against this practice by the United States Department of Justice resulted in a separate consent decree between the state party and the Helms campaign with the federal government.[74]

In 1998, GOP officials in Mecklenburg and Cumberland counties planned to videotape voters in some heavily Democratic precincts, saying it was to prevent voting fraud. State GOP spokesman Richard Hudson said poll-watching programs targeted heavily Democratic voter registration precincts, not minority voters. However, complaints led the Justice Department to send out letters indicating that videotaping minority voters at or near the polls violates the Voting Rights Act.[75]

In North Carolina during the 2012 elections, the state NAACP received some 600 complaints during the early voting period about voter intimidation and suppression. The State Board of Elections found complaints sufficiently credible to issue an official memorandum warning that voters in the early voting period were deliberately being given false and misleading information about the elections. These included voters being told they could vote by phone or online; voters being told that if they are affiliated with a certain political party they must vote on Wednesday, rather than on Election Day Tuesday; voters being told that if they have an outstanding ticket they cannot vote; voters being falsely told that they must reregister in order to vote.[76]

Also in North Carolina, a group called the Voter Integrity Project headed by Jay DeLancy has launched its own ballot security program. According to a CNN profile, DeLancy co-opted his tactics from True the Vote, a well-funded yet controversial conservative group in Texas that prioritizes citizen enforcement of the voter laws." A particular target for the Voter Integrity Project has been Buncombe County, a Democratic majority county that voted 56 percent for Obama in 2012. According to Sarah Zambon, president of Asheville League of Women Voters, "of the 80 precincts in Buncombe County, all of VIP's challenges came from 11 precincts, most

---

[74] *United States v. North Carolina Republican Party, et al*., Civil Action No. 5:92-00161-F (E.D.N.C. Feb. 26, 1992).

[75] Associated Press, "Justice Warns GOP on Videotaping Voters," 3 November 1998, http://usatoday30.usatoday.com/news/e98/e118.htm.

[76] Mariah Blake, "The Ballot Cops," *The Atlantic*, October 2012, Mariah Blake, "The Ballot Cops," The Atlantic, October 2012; Jonathan Carlson, NNACP Calls Upon State to Help Combat Voter Intimidation," WNCN, 5 November, 2012, http://www.wncn.com/story/20949972/naacp-calls-on-state-to-help-combat-voter-intimidation; SBOE Numbered Memo 2012-26, 29 October 2012, http://www.wral.com/asset/news/state/nccapitol/2012/10/29/11715961/2012-26_Maintaining_Order_at_Voting_Sites_2_.pdf.

of them low income or minority -- communities that are more likely to have more people living under one roof. "After three years of work and countless volunteer hours, DeLancy has no cases of fraud to show," CNN reports.[77]

In light of this history, it is worth noting that the post-*Shelby* version of HB 589 expanded the capacity for persons to challenge voters at the polls.  Any North Carolina voter can challenge a voter as not being registered or violating another requirement. Under prior law, a challenger had to be from the voter's precinct. Under the new law, a challenger need only be from the voter's counties, expanding the capacity for expanded challenges and voter harassment.

The claim of upholding election integrity is also contradicted by the special treatment of mail-in absentee ballots. Mail-in absentee ballots are the only form of early voting exempted from the photo ID requirement (with the exception of the rare curbside voting for the severely disabled). As compared to other forms of voting, mail-in absentee voting includes a much larger percentage of whites and a much smaller percentage of African Americans.

As documented in Table 58 and Charts 59 to 61, for the general elections of 2008 to 2012, the white percentage of mail-in absentee voters is 15 percent to 23 percent *higher* than the white percentage of all other voters, for percentage point differences ranging from +11.2 to +16.8 percentage points. In contrast, the African American percentage of mail-in absentee voters is 56 to 68 percent *lower* than the African American percentage of all other voters, for percentage point differences ranging from -11.4 to -15.8 percentage points.

---

[77] Leigh Anne Caldwell, "Vigilante or Vindicator? One Man's Bid to Root Out Voter Fraud," CNN, 8 June 2014, http://www.cnn.com/2014/06/06/politics/north-carolina-voting-fraud/.

| | | | | |
|---|---|---|---|---|
| **TABLE 58**<br>**MAIL-IN ABSENTEE AND ALL OTHER VOTERS BY RACE, 2008**<br>**GENERAL ELECTION, NORTH CAROLINA** | | | | |
| GROUP | PERCENT AMONG ALL MAIL-IN ABSENTEE VOTERS | PERCENT AMONG ALL OTHER VOTERS | PERCENT DIFFERENCE | PERCENTAGE POINT DIFFERENCE |
| | | | | |
| **2008 GENERAL ELECTION: TOTAL MAIL-IN: 228,454** | | | | |
| | | | | |
| **WHITE** | 88.6% | 71.8% | 23 PERCENT HIGHER | +16.8 |
| | | | | |
| **BLACK** | 7.3% | 23.1% | 68 PERCENT LOWER | -15.8 |
| | | | | |
| **2010 GENERAL ELECTION: TOTAL MAIL-IN: 55,954** | | | | |
| | | | | |
| **WHITE** | 87.3% | 76.1% | 15 PERCENT HIGHER | +11.2 |
| | | | | |
| **BLACK** | 8.9% | 20.3% | 56 PERCENT LOWER | -11.4 |
| | | | | |
| **2012 GENERAL ELECTION: TOTAL MAIL-IN: 218,552** | | | | |
| | | | | |
| **WHITE** | 85.6% | 70.2% | 22 PERCENT HIGHER | +15.4 |
| | | | | |
| **BLACK** | 8.6% | 23.7% | 64 PERCENT LOWER | -15.1% |
| | | | | |
| Source: SEIMS Database Voter History File | | | | |

145

**CHART 59
ALL MAIL ABSENTEE VOTERS AND OTHER VOTERS, BY
RACE, 2008 GENERAL ELECTION, NORTH CAROLINA**



**CHART 60**
**ALL MAIL ABSENTEE VOTERS AND OTHER VOTERS, BY**
**RACE, 2010 GENERAL ELECTION, NORTH CAROLINA**





CHART 61
ALL MAIL ABSENTEE VOTERS AND OTHER VOTERS, BY
RACE, 2012 GENERAL ELECTION, NORTH CAROLINA

Advocates of HB 589 claim that it addressed concerns expressed about mail-in absentee voting fraud. In the words of Representative Lewis, "So, to prove that this -- prove that the words and the members and the general public who came forward and expressed concern and offered genuine, constructive input to prove, as a sign of good faith, that their advice and input was heeded, you will find that absentee voters are addressed in this bill."[78]

S. L. 2013-381 does newly require the signatures of two witnesses or a notarized signature and a voter identifying number for mail-in absentee ballots. While these requirements make it more difficult for poor people and people with minimal education to use mail-in ballots, they do not deter those seeking to commit voter fraud. Moreover, under the new law, absentee ballots need not be mailed to the voter's address but could be requested by any "close relative" and sent to their address. For anyone determined to subvert the integrity of the election process the safest, most efficient, and least costly means is through mail-in absentee ballots from untraceable locations. Unlike persons showing up at the polls, moreover, persons committing faceless mail-in absentee ballot fraud need not even approximately resemble the person in whose name they are voting.  The U.S. Election Commission found that "absentee balloting is subject to the greatest proportion of fraudulent acts." Although absentee voting fraud is not inherently easier to detect than voter impersonation, the SBOE compilation cited above identified from 2000 to 2012, 47 referrable cases of absentee voter fraud, compared to 2 voter impersonation cases. Similarly, data collected by News21, a national reporting project made up of 11 universities found that nationwide absentee voting fraud was the most common type of fraud, outnumbering voter impersonation by a ratio of 49 to 1.[79]

Legislative critics noted the contradiction between the treatment of absentee and other ballots. Representative Darren Jackson said in the initial House debates on HB 589, "If integrity of the vote is truly our goal, then all ballots should be screened for voter ID. All ballots should be treated the same, but this bill doesn't do that. Distinctions like this are what lead to allegations that partisan motivations are behind it. Maybe it's just a coincidence that one party enjoys a substantial advantage in absentee ballots. I don't read minds, and so I won't speculate to people's motives." [80]

Representative Deborah Ross similarly noted in the pre-*Shelby* debates that, "There's significantly more voter fraud that is committed with absentee ballots, and that just has not seemed to be a concern when we've talked about this bill. … I'm not saying that we should shut

---

[78] Apr. 24, 2013, *Transcript of House Debate on HB 589*, 43:1-7.

[79] U.S. Election Assistance Commission, *Election Crimes: An Initial Review and Recommendations for Additional Study*, **December 2006, p. 9, http://www.eac.gov/assets/1/workflow_staging/Page/57.PDF; Natasha Khan and Corbin Carson, "**Comprehensive Database Of U.S. Voter Fraud Uncovers No Evidence That Photo Id Is Needed," News21, 12 August 2012, http://votingrights.news21.com/article/election-fraud/**. Wayne Slater, "**Few North Carolina voter-fraud cases would have been prevented by photo ID law, review shows," Dallasnews.com, 8 September 2013, http://www.dallasnews.com/news/politics/headlines/20130908-few-North Carolina-voter-fraud-cases-would-have-been-prevented-by-photo-id-law-review-shows.ece.

[80] Apr. 24, 2013, *Transcript of House Debate on HB 589*, 62:15 - 63:3.

149

down absentee voting. But I'm saying that if you really care about the integrity of the ballot, don't talk about people who show up and try to impersonate other people. It rarely happens."[81]

Representative Warren, a key HB 589 backer, countered such objections with a most revealing argument. He said, "If these impediments are legitimate, and I'm sure there are cases where they are, then it seems reasonable that a person [who lacks proper photo ID] would vote by absentee ballot. And thank heaven that we did not pass Representative Jackson's amendment; otherwise, they would need a photo ID to do that.[82]

What then is the point of a voter photo law that deliberately creates an absentee ballot loophole for those lacking proper ID—or more to the point—those intent upon committing voter fraud but are deterred from in-person fraud by the new ID requirement? In effect, Representative Warren said, if a fraudster wants to get around the photo ID requirement, just go ahead and use mail-in absentee ballots.

Representative Jackson noted this contradiction that split the heart of HB 589: "As I had a constituent tell me in the fall, they said, 'You know, if that voter ID bill passes, you should just start a campaign -- no ID, vote absentee.' And that's exactly what we're creating. We're creating a huge loophole in telling people, don't go to the ballot if you want to commit fraud; just do it through the mail."[83]

In the post-*Shelby* House debates after the "full bill" did not require photo ID for absentee ballots and imposed new restrictions only in-person early voting, Representative Brandon said that these distinctions "make every single argument that you make on the other side, absolutely null and void, absolutely null and void. There is not an argument after that. After you let free voting go on with absolutely no ID, no check, no nothing, open it up to every kind of fraud that you can have, and you make it more accessible?" Thus, the pretextual character of claims regarding "election integrity" was very much the subject of debate in the legislature.[84]

### E.       Uniformity and Opportunity in Early One Stop Voting

Advocates of the post-*Shelby* version of HB 589 claimed that by eliminating what had been the first week of early voting during the One Stop Period while requiring the same number of access hours as in previous midterm and presidential elections they were establishing a strictly uniform system among all counties, in effect treating all voters in the state the same. They also claimed that this system would not reduce the number of hours available for early voting. In the post-*Shelby* Senate debates, Senator Ralph Hise said, "What I have looked for in this bill as far as election regulation is it is time we begin to add uniformity to the system across this state, that

---

[81] *Ibid.*, 72:14-25.

[82] Ibid., 116:9 - 117:1.

[83] *Ibid.*, 65:2-9.

[84] July 25, 2013, *Transcript of House Debate on HB 589*, 102: 4-12.

we are starting to move to a time that, based on which county you're in, doesn't mean what access you have to the polls. And I think we have done great steps in moving forward to make it more uniform across this state for how early voting exists." After passage of VIVA, Governor McCrory responded to critics of cutting back on early voting days by saying, "We didn't shorten early voting. We compacted the calendar, but we're going to have the same hours in which polls are open in early voting and we're going to have more polls available … In fact, the legislation does not shorten the hours for early voting."[85]

These arguments are misleading and pretextual for two reasons. First, VIVA does not require uniformity or consistency across counties in the number of early voting hours. Rather, it requires only that counties do not reduce the total number of hours as compared to the previous midterm or presidential election, respectively. Second, VIVA contains a major loophole that essentially guarantees the number of early voting hours during the One Stop voting period will *not* be uniform among counties and *will be* lower than previous elections in some counties. VIVA authorizing counties to seek waivers from the "total hours" provision of VIVA. The number of counties seeking and obtaining waivers may vary from one election to the next and cannot be predicted in advance. In the 2014 election cycle some 34 counties sought waivers from the "total hours" requirement and 31 received a waiver (91 percent).

## F.    Absence of Justification for Non-Photo ID Provisions of the Post-*Shelby* version of HB 589

Sometimes the absence of words can speak more loudly than a thousand words. This is the case for the absence of justification by legislative backers of the many non-photo ID provisions of the post-*Shelby* version of HB 589 discussed in this Report, including the elimination of new registrations during the One Stop voting period, the elimination of the partial counting of provisional ballots cast in the incorrect precinct, the elimination of the first week early voting, and the elimination of 16- and 17-year-old registration.

As indicated in Section VI above, unlike the voter ID provisions of the pre-*Shelby* version of HB 589, these many new electoral provisions of HB 589 referenced above did not receive extensive scrutiny in committee hearings. They did not gain the benefit of any expert testimony or public input. There was also minimal justification of these provisions by backers during the legislative debates.

The state senate debated only the post-*Shelby* version of HB 589. This was the first time the Senate debated voter photo ID and most of the justifications offered by backers of the bill focused on the ID provisions. To the extent backers sought to justify the other provisions referenced above, they focused on the elimination of the first week of early voting during the One Stop voting period. Backers said that everyone would be treated the same under the bill, particularly given the provision providing for the same number of hours as in previous midterm

---

[85] July 24, 2013, *Transcript of Senate Debate on HB 589*, Day 1,48:8-14; Governor McCrory quoted in Andrew Barksdale, "Early Voting Hours Reduced," *The Fayetteville Observer*, 28 February 2014.

and presidential elections. However, as noted above, this was vitiated by the provision for county waivers from this requirement.

There was virtually no justification by backers of the bill for the other provisions referenced above except to claim that some of these provisions made North Carolina electoral law more consonant with laws in other states. In the words of Senator Rucho: "41 states do not currently have same-day registration. 38 states do not currently offer pre-registration for teenagers, uh, younger than 18 years old. . . . These are all the facts, and these are working in other states."[86]

First, this statement is misleading and incomplete. Prior to VIVA, North Carolina did not have same day registration on Election Day, to which his list of states refers. Rather North Carolina authorized registration during the 17-day One Stop voting period. By eliminating this option, VIVA reverted the registration deadline to 25 days prior to an election. Some 29 states have more extended times for registration than North Carolina under VIVA—that is, a deadline for submission or receipt of a registration to vote closer to the election than 25 days. Moreover, about half the states have early voting periods longer than the 10 day period (down from 17 days) authorized under VIVA. The mean time period for early voting in all 33 states with such provisions is 19 days.[87]

Second, leaving aside accuracy issues, the argument about consistency with other states is clearly pretextual in light of the fact that the changes in the voter photo ID requirements in the post-*Shelby* version of HB 589 moved North Carolina significantly out of line with the voter photo ID laws in virtually every other state of the union. (*See* Tables 10 and 45 above).

The House had three hours, from 7:45 pm to 10:45 pm, on the night of July 25, 2013, to debate and vote on the many post-*Shelby* subtractions from acceptable voter photo IDs and the numerous additions on electoral procedures that added some forty pages to the bill. The debate on the non-photo ID provisions referenced above was even less substantive than the House Debates. Backers of HB 589, Representatives Warren and Lewis, provided a summary of new added provisions, but offered no analysis or justifications.[88] Only some very general remarks by Representative Lewis at the very end of the debate represented the sum of the substantive discussion of these non-photo ID provisions by backers of the bill.[89]

Critics of the post-*Shelby* bill presented to the House their dismay that the House considered such a comprehensive and important bill only during this brief three-hour period of

---

[86] July 24, 2013, *Transcript of Senate Debate on HB 589*, Day 1, 33:22 - 34:2; Long Distance Voter, Voter Registration Rules, 21 June 2014, http://www.longdistancevoter.org/voter_registration_rules#.VMhlxP7F9SI.

[87] National Conference of State Legislatures, *Absentee and Early Voting*, http://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx#a; Individual state websites.

[88] July 25, 2013, *Transcript of Proceedings Before the House of Representatives*, 15:1 - 27:24.

[89] *Ibid*. 116:1 - 120:24.

152

debate. Representative Michael Michaux said, "And one of the reasons I made the motion to call for a Committee of the Whole was so that these matters that have been added to a bill, a simple bill that you passed out for voter identification, could be explained in much more detail than the two or three hours that we've got to do it in tonight." Representative Jackson said, "I can't believe that we can't take one day to debate the 40 additional pages to this bill, a bill this important."[90]

### G.      The Minimal Change Case

The proponents of HB 589 engaged in minimal debate in the House, sufficient for only one of its sponsors, Representative Harry J. Warren, Vice-Chairman of the Government Committee, to summarize the changes made in the photo identification requirements. Warren claimed that "The Senate working on the bill made **very few substantive changes** to the VIVA Act," as passed by the House "with a bipartisan vote" and which took into consideration, "the viewpoints of people who were opposed to the concept of voter ID." (emphasis added) Examination of Representative Warren's statements in support of this minimal change claim demonstrates that it is misleading and pretextual.[91]

Warren first notes that, "There were several categories of acceptable ID's that we had listed in the House. We had a total of 13; they've cut that back to seven. Well, what we lost in that was not really substantial."[92] He says that first the elimination of students IDs was not important because you need a photo ID to get a student ID, "so we're not -- we're practicing redundancy if we -- having the student ID's on there, so it was not a loss in that respect." He fails to note however, that these initial IDs used to obtain student IDs are *not redundant* of the IDs *authorized for voting* under the post-*Shelby* HB 589. For example, in Fall 2011, there were 35,249 out-of-state students at North Carolina public institutions, all potentially eligible to vote in North Carolina. Their out of state IDs would get them a student ID, but not authorization to vote unless they registered within 90 days of the election. Moreover, even identification from North Carolina may expire during a students' tenure—students, for example, may not drive during their college or university years. Moreover, students might to obtain their student ID with forms of North Carolina government issued photo identification that are not acceptable for voting under VIVA.[93]

---

[90] *Ibid*. 28:7-13, 86:22-24.

[91] *Ibid*. 12:17-25, 13:1-2, 13: 6-7.

[92] *Ibid*. 13:14-18.

[93] *Ibid.* 13:19-25; http://aux.uncc.edu/49er (University of North Carolina Charlotte); Jane Stancill, UNC System Looks at its Growing Out of State Student Population," Newsobserver.com, 13 June 2013; http://www.newsobserver.com/2013/06/13/2961131_unc-looks-at-growing-out-of-state.html?rh=1;. Statistical Abstract,of Higher Education (Table 8),  Figure 3. *Statistical Abstract of Higher Education in North Carolina*, 2011-2012,  Table 19, http://www.northcarolina.edu/apps/stat_abstract/index.php?pg=vs&id=12694&added=1

Equally significant are Representative Warren's omissions. He does not mention at all that the post-*Shelby* bill entirely eliminated the use of government-issued employee photo IDs for voting, even though more than 650,000 persons in North Carolina were government employees according to Census data available at the time. He does not mention that the post-*Shelby* bill also eliminated any us of public assistance photo identification cards for voting. He does not mention that the post-*Shelby* bill broadly eliminated the use of expired identification such as driver's licenses and non-operator's IDs, although he does mention the exception for elderly voters. He skips over the elimination of out-of-state identification, except for voters registered within 90 days of the election. Despite omitting most of the key changes in the post-*Shelby* bill regarding voter photo identification, Representative Warren concludes his review of this topic by stating, "Other than that, I don't believe there were anything else that -- that was possible to point out. *Everything else is fine.*"[94] (emphasis added).

In addition, despite the more restrictive voter identification requirements as compared to earlier bills, S. L. 2013-381 actually eliminates voter publicity, education, and public outreach efforts included in prior photo identification bills. Unlike the 2011 bill, S. L. 2013-381 appropriates no funds for these purposes. Unlike the 2011 bill, S. L. 2013-381 makes no reference to using the Judicial Voter Guide for the publication of information about photo identification requirements for voting. Also, S. L. 2013-381 eliminates from the House passed version of HB 589, the provision establishing an Information Verification Advisory Board empowered to advise the State Board of Election about initiatives to educate the public about voter registration and casting a ballot and information about any identification requirements of voting, among other matters. As compared to the House passed version of HB 589, S. L. 2013-381 eliminates the provision for additional staff assistance at the Board of Elections.

### H.      The Free Voter ID

In the House debates on the pre-*Shelby* version of HB 589, backers stressed that the legislation provided free voter IDs to those lacking government issued photo identification. In hearings the House Elections Committee, Representative Warren said, "Part 1, of course, refers to VIVA, the voter information agency. This is a board of three to five members that will be assigned to advise the State Board on a bunch of different outreach programs over a two-year period of outreach and voter registration, voter education, to bring the program and the provisions of the bill to fruition."[95]

Representative Ruth Samuelson, a primary bill sponsor said, "I wanted to point out that, once again, the comparison to another state, South Carolina did not have a phase-in period, and it did not have VIVA. And part of the -- it also didn't have as comprehensive a free ID as we have. But I want to go back to the VIVA thing, and particularly on this amendment. The VIVA is going to be an outreach. It's going to be an outreach to churches. It will be an outreach to 12

---

[94] July 24, 2013, *Transcript of Proceedings Before the House of Representatives*, 14:24-25

[95] Apr. 17, 2013, *Transcript of Proceedings Before the House Elections Committee*, 3:2-8.

community boards of elections. It will be an outreach to schools and other groups, and the kinds of people who are shut in as Representative Glazier mentioned."[96]

However, as noted above, many of the public education and outreach provisions of the pre-*Shelby* version of cited by representative Warren and Samuelson were eliminated in the post-*Shelby* version. The post-*Shelby* bill eliminated from the House passed version of HB 589 the provision establishing an Information Verification Advisory Board empowered to advise the SBOE about initiatives to educate the public about voter registration and casting a ballot and information about any identification requirements of voting, among other matters.

As of late January 2015, after slightly more than a year of operation, the state had issued only 771 free ID cards. Before the courts invalidated Pennsylvania's never implemented photo voter identification law, the state, which conducted an extensive campaign of public education and outreach, issued 16,700 free voter ID cards in the first year and a quarter after adoption of its law.[97]

## I.      The Common Sense Analogy

Proponents of the enacted photo voter identification bill point to it as "common sense" legislation, that brings identification for voting in line with ID requirements for such common activities as flying on an aircraft, purchasing certain types of drugs, or even entering a federal courthouse. In a statement that Governor Pat McCrory released upon signing HB 589, he said, "Common practices like boarding and airplane and purchasing Sudafed require photo ID and we should expect nothing less for the protection of the out right to vote." In fact, the analogy proves the opposite of what Governor McCrory intended. Even though voting, unlike these other activities, is a fundamental right, S. L. 2013-381 actually makes it far more difficult to vote than to board a plane or buy Sudafed, which can be done with a broad range of identification.

Like the eleven "non-strict" photo voter identification states and unlike North Carolina, the Transportation Safety Administration ("TSA") makes accommodations so that persons can board an airplane *without* photo identification. As the following statement of TSA policy makes clear alternative identification can be accepted in lieu of a valid photo ID:

> Passengers who do not have a valid photo ID, such as State-issued driver's license, should bring any ID or documents they have available to assist in verification of identity. Passengers need at least two alternate forms of identification, such as a social security card, birth certificate, marriage license, or credit card. The

---

[96] *House Transcript*, 24 April 2013, p. 113, lines 3-15.

[97] "Pennsylvania Voter ID Law Back in Court: Can it be enforced?" *Christian Science Monitor*, 15 July 2013. Pennsylvania Department of State, http://www.portal.state.pa.us/portal/server.pt/community/voter_registration_statistics/12725.

documents must bear the name of the passenger. Also, one of these documents must bear identification information containing one of the following: photo, address, phone number, social security number, or date of birth. If TSA can confirm the passenger's identity, they may enter the secured area, but they could be subject to additional screening.[98]

Moreover, other TSA accommodations enable passengers to board aircraft without *any* form of identification in their possession. The TSA explains as follows:

> "We understand passengers occasionally arrive at the airport without an ID, because of losing it or inadvertently leaving it at home. If this happens to you, it does not necessarily mean you won't be allowed to fly. If you are willing to provide additional information, we have other ways to confirm your identity, like using publicly available databases, so you can reach your flight."[99]

In addition, persons can purchase Sudafed with forms of photo identification that Republicans in the General Assembly eliminated in the post-*Shelby* version of HB 589. These include, for example, an expired United States passport, a student identification card, and a government employee identification card. Persons can also purchase Sudafed with a government issued identification card that *does not bear a photograph*, as long as "identifying information shall be included such as: name, date of birth, sex, height, color of eyes, and address."[100]

## IX.    CONCLUSIONS

The state of North Carolina has a significant history of discrimination against African Americans, including barriers to the ability of African Americans to participate fully in the political process and elect candidates of their choice. This history has a lingering effect in the form of substantial socio-economic disparities between African Americans and whites with important implications for the provisions of HB 589.

In recent years, African American voting strength has expanded in North Carolina, whereas white voting strength has declined. These changes in the voter registration base have major political implications for Republicans. African Americans vote in near unanimity for Democratic candidates, whereas whites vote in large majorities for Republicans. The polarity between African Americans and whites is by far the most politically consequential of any demographic divide including gender, age, income, and education. Thus, Republicans had much

---

[98] Transportation Security Administration, *Frequently Asked Questions*, http://www.tsa.gov/contact-us.

[99] Transportation Security Administration, *Acceptable IDs*, http://www.tsa.gov/traveler-information/acceptable-ids.

[100] Verification of Identity and Employment Authorization."  *8 CFR 274a.2(b)(1)(v)(A) and 274a.2(b)(1)(v)(B).*

to gain through limitations on the registration and voting of African Americans. The partisan advantages gained through HB 589 were achieved through racially disparate provisions that disproportionately burdened African American voters. The legislation directly impeded African American opportunities to register and vote in North Carolina, not indirectly through its effects on Democrats.

In June 2013 after the House had passed a version of HB 589, the Supreme Court struck down the pre-clearance provisions of Section 5 of the Voting Rights that covered 40 North Carolina counties. The Republican leadership explicitly recognized this decision as a signal to both eliminate forms of photo voter IDs authorized under the House-passed bill and to add numerous new provisions that impeded African Americans opportunities to register and vote in North Carolina. These were eliminations and additions that the leadership were unwilling to prove as non-discriminatory before the U.S. Department of Justice or the D.C. District Court while Section 5 was still in force. The leadership pushed what they called the "full bill" (despite the many subtractions) through the legislature in the waning days of the session.

Based on information available at the time, in every important instance both the subtractions and additions included in the post-*Shelby* version of HB 589 had the effect of substantially burdening African American registration and voting, relative to whites. These discriminatory effects are independent and cumulative. With respect to photo identification the changes bought the post-*Shelby* version of HB 589 far out of line with legislation enacted at the time in other states, including Georgia which backers of the bill cited as a model for the legislation. All significant forms of voter photo identification eliminated from the House-passed HB 589 were authorized for voting in Georgia and nearly every other photo ID state.

In addition, the elimination of new registration during the One Stop voting period, the elimination of the partial counting of provisional ballots, the elimination of same day registration, and the elimination of the first week of early voting (with waivers for the "same hours" requirement) had a disparate impact on African Americans opportunities to register and vote. In contrast, mail-in absentee balloting, the only form of early that the post-*Shelby* version of HB 589 did not burden with restrictions on timing and the only version of voting (with the exception of the severely disabled) not subject to photo identification requirements is disproportionately white in its racial composition. Yet absentee balloting is far more subject to voter fraud than in-person voting according expert analysis and both North Carolina and national data.

The data that I cite in this report document the multiple ways in which the subtractions and additions included in the post-Shelby bill impacted African Americans was available to lawmakers during the legislative process in 2013. The general counsel to Speaker Tillis even participated in the process that led to the SBOE's production in April 2013 of databases of registered voters matched and unmatched to DMV IDs. All other data regarding access by African Americans and whites to forms of photo identification and racially specific data on registration and voting was publically available and readily accessible throughout the legislative

debates. Despite this wealth of hard data at hand, the backers of HB 589 never analyzed the implication of the post-Shelby changes in HB 589 for minority registration or voting—or if they do so, they never publically disclosed any results.

Moreover, viewpoints expressed by decision-makers in support of S. L. 2013-381, sustain the strong evidence of intentional discrimination provided by the procedural deviations and the discriminatory substantive deviations involved in the enactment of the post-Shelby version of this legislation. The justifications for the post-*Shelby* decisions made with respect to the enactment of this legislation are misleading, contradictory, and pretextual. Some of these contemporary justifications made at the time might have applied to the pre-Shelby version of HB 589 and the process followed by the House prior to enactment. The justifications did not, however, apply to the fundamentally altered post-*Shelby* version that the General Assembly hastily enacted and the governor signed.

In sum, a wealth of evidence all points in the same direction. Through fundamental changes in HB 589 after the *Shelby* decision, the backers of HB 589 in the legislature knowingly and deliberately imposed disparate burdens on the opportunities for African Americans to register and vote in North Carolina.

**APPENDIX A**

**Curriculum Vitae**

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

**EDUCATION**

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

**PROFESSIONAL EXPERIENCE**

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

**Expert witness in more than 80 redistricting, voting rights and civil rights cases**

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

**HONORS AND AWARDS**

Outstanding Teacher, College of Arts and Sciences, 1975-76

159

Outstanding Scholar, College of Arts and Sciences, 1978-79

Outstanding Scholar, The American University, 1982-83

Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000 meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500 meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

 Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Texas Congressional redistricting case *LULAC v. Perry* (2006)

Finalist for the 2008 National Book Critics Circle Award in general nonfiction for WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT.

Interviews nominated by the Associated Press for the Edward R. Murrow Award for broadcasting excellence.

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

FDR AND THE JEWS designated for Belknap Imprint of the Harvard University Press, reserved for works of special distinction and lasting value; *New York Times* editors choice book for 2013, submitted for Pulitzer Prize 2013,, winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History,

## SCHOLARSHIP

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, , with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

161

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books Edition, 2005)

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).


Monograph:

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001


B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds., POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D. C.: American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History:`Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow, 1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?," SOCIAL EDUCATION  60 (1996)

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

 "What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT

(Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT; THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of," ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House:  A Preliminary Forecast for 2012" INTERNATIONAL JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010) REF

 "The Keys to the White House:  Forecast for 2012," FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

 "The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973) REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons, `The Substance of Inherency,`" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert 2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted:
LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES
Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February 17, 1982)

"How to Bet in 1984.  A Presidential Election Guide," WASHINGTONIAN MAGAZINE (April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6, 1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page, (December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All, (May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page, (April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in 1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?," WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May, 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)

"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op Ed (June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of the Right," NEWSDAY, (August 7, 2005)

 "Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO ( June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPOTER (October 17, 2008)

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

"Why Democrats Need Hillary Clinton in 2016," THE HILL, June 11, 2014

"How Corporations Buy Our Government," THE HILL, July 1, 2014

"Who Rules America," THE HILL, August 12, 2014

"The End of Civil Discourse?" THE HILL, September 10, 2014

"Pass the Ache Act and Stop Destroying Appalachia?" THE HILL, October 28, 2014

(Regular contributor to THE HILL)

Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 - 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.


**TEACHING**

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth Century, United States Economic History, Historiography, Major Seminar in History, Graduate Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), **Historians and the Living Past for Honors Students**, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, **Government and the Citizen (Honors Program),** Introduction to Historical Quantification, Public Policy in U. S. History, **Honors Seminar in U.S. Presidential Elections**, America's Presidential Elections, What Is America?, **Honors Seminar on FDR, Jews, and the Holocaust**.


**TELEVISION APPEARANCES**

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally, including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

169

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

**RADIO SHOWS**

I have participated in more than 2000 radio interview and talk shows broadcast nationwide, in foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

**PRESS CITATIONS**

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia Inquirer, Time, Newsweek, Business Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES**

Invited participant and speaker, Bostick Conference on Fogel and Engerman`s TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the

American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History, October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930`s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

171

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

172

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyer's Committee for Civil Rights Under Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April, 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April, 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November, 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February, 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August, 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

Testimony Presented Before the Texas State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Texas State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting,

June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2013

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, **"Election 2008: What Happened and Why?" Boston, February 2009**

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, **"The Keys for 2012" Chicago, April 2010**

175

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October, 2010, 2011

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forun, Krynica, Poland, 2013

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department
of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social
Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History,
1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University,
1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

177

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle States Accreditation Review 1992-1994

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

**OTHER POSITIONS**

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:
1. Directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.

2. Chairing a public session at the Smithsonian on how to do the history of one's own family.
3. Helping to direct the Sixth International Smithsonian Symposium on Kin and Communities in America (June 1977).
4. Editing the volume of essays from the symposium.

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential Candidates." This document was a major component of Anderson's legal arguments against restrictive ballot laws that ultimately prevailed in the Supreme Court (Anderson v. Celebreeze 1983). According to Anderson's attorney: "the basis for the majority's decision echoes the themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition techniques to their work on the recovery of communities from the effects of such natural disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.

# APPENDIX B

## Reliance Materials[101]

North Carolina State Board of Elections Online Database Files, *available* at
http://www.ncsbe.gov/ncsbe/data-statistics

U.S. Census Bureau (2012), *5-year American Community Survey*.

Data files extracted from the North Carolina State Election Information Management System, produced by the North Carolina State Board of Elections on February 3, 2014.

"Expanding Democracy," *Charlotte Observer*, 8/27/2007

Laura Rokoff and Emma Stokking, "Small Investments, High Yields: A Cost Study of Same Day Registration in Iowa and North Carolina," Demos.org, *available at* http://www.demos.org/sites/default/files/publications/SDR-CostStudy-Final.pdf

Andrew Barksdale, "Early Voting Hours Reduced," The Fayetteville Observer, *available at* http://m.fayobserver.com/news/local/article_e571bf35-80f0-5dc7-893e-f4edaa92e3a9.html?mode=jqm

Scott Mooneyham, "Despite the Talk, Early Voting Hours Get Trimmed," The Courier Times, *available at* http://www.personcountylife.com/news/2014-0308/Editorial/Despite_the_talk_early_voting_hours_get_trimmed.html

---

[101] Reliance Materials also includes all materials cited in the footnotes of this Report.

## APPENDIX C

### List of Expert Testimony

*Newton, et al. vs. Alabama* (U. S. District Court, Alabama) 2013

*North Carolina NAACP v. North Carolina* (State Superior Court, North Carolina) 2013

*Texas v. United States* (Voter ID) (U. S. District Court, District of Columbia) 2012

*Texas v. United States* (Redistricting) (U.S. District Court, District of Columbia) 2012

*Coalition for Equity and Excellence in Higher Education v. Maryland Higher Education Committee, et al.* (U.S. District Court, Maryland) 2012

*Radogno, et al. v. Illinois State Board of Elections, et al.* (U.S. District Court, Illinois) 2011

*Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al.* (U.S. District Court, Illinois) 2011

*Perez, et al. v. Perry, et al.* (U. S. District Court, Texas) 2011

*United States vs. Demario James Atwater* (U. S. District Court, North Carolina) 2010

*Boddie v. Cleveland School Board, Mississippi* (U.S. District Court, Mississippi) 2010

# EXHIBIT 3

*One Wisconsin Institute, Inc. et al.*
*v.*
*Judge Gerald C. Nichol, et al.*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
Case No.: 15-cv-324

**December 10, 2015**

**EXPERT REPORT: INTENTIONAL DISCRIMINATION**

**ALLAN J. LICHTMAN**

---------------------------------------------
Allan J. Lichtman

## I.     STATEMENT OF PURPOSE

I have been asked to consider whether a series of laws adopted by the Wisconsin State Legislature that affects access to voting and registration was enacted with the *intent* to discriminate against African American and Hispanic voters and would-be voters. My expected fee in this matter is $400 per hour. I have enclosed an updated CV and a table of cases in which I have provided written or oral testimony.

In particular this report will examine the following enactments regarding voting and registration in Wisconsin since 2011:

### 1. Act 23 (2011)

- Imposed a photo voter identification requirement.
- Reduced the early voting period from 30 to 12 days.
- Eliminated one person's vouching for the residence of another to prove residence for the purpose of registering to vote (corroboration).
- Limited the opportunity for students to use a college ID as proof of residence for registering to vote.
- Increased the in-state residency requirement for voting for offices other than president and vice president from 10 to 28 days before an election, and required that persons who move within the state later than 28 days before an election vote at their previous ward or election district.
- Eliminated straight-ticket voting on the official ballot.
- Eliminated the Government Accountability Board's authority to appoint special registration deputies with the authority to register voters on a statewide basis.

### 2. Act 75 (2011)

- Eliminated the faxing and emailing of absentee ballots to all absentee voters except statutory overseas and military voters.

### 3. Act 227 (2011)

- Limited the circumstances in which municipal clerks can return to voters absentee ballots to fix mistakes.
- Required a copy of a photo ID for absentee ballots.

### 4. Act 240 (2011)

- Eliminated the requirement that special registration deputies be appointed at public high schools.

1

**5. Act 76 (2013)**

- Overturned a city ordinance in Madison that required landlords to provide voter registration forms to new tenants.

**6. Act 177 (2013)**

- Required that observation areas be placed between three and eight feet from the table at which voters provide their name and address for ballots and register to vote.

**7. Act 182 (2013)**

- Required all voters other than overseas and military voters to provide documentary proof of residence for registration. This changed the prior law which required only those who registered less than 20 days before an election to present documentary proof.

**8. Act 146 (2014)**

- Eliminated early voting on weekends.
- Limited the times for early voting to the period from 8 a.m. to 7 p.m.

The report will also consider bills that the majority in the state legislature rejected relating to voting and registration from 2011 to 2015.

## II.     QUALIFICATIONS

This study draws on my experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 42 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my B.A. in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, and historical and quantitative methodology.

I am the author of numerous scholarly works on quantitative and qualitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, *Journal of Applied Forecasting*, and *Social Science History*, as well as my co-authored book, *Historians and the Living Past*. In addition, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation*

*Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies published in such academic journals as *The Proceedings of the National Academy of Sciences*, *The American Historical Review*, *The International Journal of Forecasting*, *The International Journal of Information Systems & Social Change*, and *The Journal of Social History*. Quantitative and historical analyses also ground my books, *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman).

My book, *White Protestant Nation*, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America in 2008. My most recent book, *FDR and the Jews*, was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the *New York Times* in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, the winner of the Tikkun Olam Award in Holocaust Studies, and a finalist for the Los Angeles Times Book Prize in history.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than eighty voting and civil rights cases. These include several cases in the State of Wisconsin. In the U.S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work. I have testified several times for plaintiffs and defendants on the issues of intentional discrimination in the adoption of state redistricting plans and photo identification laws. A three-judge panel in litigation challenging the 2011 State of Illinois redistricting plan also cited my work on behalf of defendants in support of the panel's *rejection* of plaintiffs' claim that the plan intentionally discriminated against minority voters in *Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, 2011 U.S. Dist. Lexis 117656 (N.D. Ill. Oct. 12, 2011).

## III. EVIDENCE, METHODOLOGY, AND SUMMARY OF OPINIONS

My analysis draws upon the Wisconsin Government Accountability Board's (GAB) database. The report additionally draws upon other sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic and socio-economic information; election returns; voter registration and turnout data; court opinions, briefs, and reports; government and organizational documents; and scientific surveys and studies. These sources of information will be used both for analyses within Wisconsin and for comparisons with other states.

The report closely follows the methodological guidelines of the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In *Arlington Heights*, the Court focused on five distinct factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact; (2) historical background; (3) the sequence of events leading up to the challenged action; (4) procedural or substantive

deviations from the normal decision-making process; and (5) contemporaneous viewpoints expressed by the decision-makers.

The purpose of this report is not to make legal conclusions, but to establish substantive findings about discriminatory intent. The *Arlington Heights* methodology is consistent with standard causal analysis in history, which I have followed in my substantive scholarship and written about in my theoretical work (*see* Section II, above).

My major opinions are summarized briefly below:

- Wisconsin has a history of discrimination against African Americans and Hispanics that is reflected in current racial disparities on such socio-economic measures as income, unemployment, poverty, education, housing, the availability of vehicles and telephones, and health.

- This information was available to the legislature at the time of the enactment of the voting and registration measures analyzed in this report.

- Wisconsin is one of the most unequal states in the nation as gauged by disparities between African Americans and whites on socio-economic measures.

- Socio-economic disparities have implications for the opportunities of minorities relative to whites to vote and register in Wisconsin.

- The increase in the minority share of the vote in Wisconsin threatens Republicans' electoral prospects.

- Absent any prospects of expanding the relative position of whites in the electorate, the Republican majority in the state legislature intentionally and deliberately through some 15 restrictive measures sought to impede the opportunities for African Americans and Hispanics to fully participate in the political process in Wisconsin and elect candidates of their choice.

- The majority adopted these measures even though at the time Wisconsin had an exemplary electoral system. It was a national leader in voter turnout and the administration of elections.

- The voter photo ID provision adopted in 2011 in Wisconsin was the most restrictive identification law in the nation at that time.

- The Republican majority adopted this legislation despite information presented regarding the disparate impact of the law on minorities and despite a virtual absence of voter impersonation in the state.

4

- The legislature rejected all amendments designed to alleviate the disparate burdens of the voter photo ID law on minorities, including provisions in place in other voter photo ID states.

- Other actions taken by the legislature further indicate the discriminatory intent of the voter photo ID law.

- The legislature adopted numerous other restrictions on registration and voting in Wisconsin, such as limitations on early voting and tightened residency requirements, that based on information available at the time would most likely have a disparate impact of African American and Hispanic voters and potential voters.

- Wisconsin's adoption of a voter photo ID law in 2011 was consistent with decision-making by Republicans in other states faced with similar problems of declining white voter strength and racial polarization in the voting of whites and minorities.

- Wisconsin, however, exceeded all other states in the number of new restrictive voting and registration measures enacted between 2011 and 2014.

- There is rare direct evidence from a Republican decision-maker who initially voted for Act 23 that his Republican colleagues enacted this law and other measures discussed in this report to limit the voting opportunities for minorities in Wisconsin.

- Other justifications for this legislation presented by decision-makers are misleading, contradictory, and pretextual.

- Based on considerable evidence, and following the *Arlington Heights* procedures and standard historical causal analysis, I conclude that the majority Republicans deliberately and knowingly enacted a voter photo ID requirement and numerous other legislative measures that placed disparate burdens on the opportunities for African Americans and Hispanics to register and vote in Wisconsin.

## IV.   IMPACT OF HISTORIC DISCRIMINATION AGAINST AFRICAN AMERICANS IN WISCONSIN

The State of Wisconsin has a long and well-acknowledged history of discrimination against African Americans, much of which has substantially impacted the opportunity for African Americans to participate fully in the political process and elect candidates of their choice. This history is well documented in the Expert Report of Dr. Barry Burden submitted in this litigation.

The lingering effects of the history of discrimination are apparent today in the substantial socio-economic disparities between non-Hispanic African Americans, Hispanics, and non-Hispanic whites in Wisconsin. As will be demonstrated below, these disparities have a significant impact on the relative ability of African Americans and Hispanics as compared to whites to participate in the

5

electoral process.

Based on information available at the time of decision-making by the Wisconsin Legislature and governor, Table 1 and Charts 1 and 2 demonstrate a wide gap between African Americans and Hispanics as compared to whites in Wisconsin on measures of income, poverty, and unemployment. The median household income of whites is nearly double that of African Americans and 44% higher than the median household income of Hispanics. The per capita income of African Americans and Hispanics is less than half the per capita income of whites. The poverty rate for African American families is more than five times the poverty rate for white families and the poverty rate for Hispanic families is more than four times the rate for white families. The poverty rate for African American persons is nearly four times the poverty rate for white persons and the poverty rate for Hispanic persons is more than two and a half times the rate for white persons. The unemployment rate for African American persons is nearly triple the unemployment rate for whites and the unemployment rate for Hispanics is nearly double the rate for white persons.

**TABLE 1**
**INCOME, POVERTY, AND UNEMPLOYMENT MEASURES BY RACE, WISCONSIN,**
**US CENSUS, 2010 AMERICAN COMMUNITY SURVEY, 3-YEAR ESTIMATES**

| Measure | NH Black | Hispanic | NH White |
|---|---|---|---|
| | | | |
| MEDIAN HOUSEHOLD INCOME | $27,425 | $36,751 | $53,062 |
| | | | |
| PER CAPITA INCOME | $13,482 | $13,271 | $28,540 |
| | | | |
| POVERTY RATE FOR PERSONS | 35.8% | 24.6% | 9.1% |
| | | | |
| POVERTY RATE FOR FAMILIES | 32.4% | 23.2% | 5.7% |
| | | | |
| UNEMPLOYMENT RATE | 18.4% | 11.8% | 6.3% |
| | | | |

6

**CHART 1**
**MEDIAN HOUSEHOLD AND PER CAPITA INCOME BY RACE, WISCONSIN, DATA FROM TABLE 1**



**CHART 2**
**POVERTY, UNEMPLOYMENT & ASSET POVERTY RATE BY RACE, WISCONSIN, DATA FROM TABLE 1**



7

Table 2 and Charts 3 and 4 demonstrate substantial racial differences on education measures. The percentage of whites graduating high school is 16 percent higher than the African American percentage and 53 percent higher than the Hispanic percentage. The percentage of whites graduating college is 92 percent higher than the African American percentage and more than double the Hispanic percentage. The percent of African Americans falling below basic proficiency in 8th grade math scores is nearly four times greater than the white percentage and the percent of Hispanics falling below basic proficiency is more than two and a half times greater than the white percentage. The high school graduation rate for whites is 45 percent higher than the rate for African Americans and 22 percent higher than the rate for Hispanics. The high school dropout rate is six times higher for African Americans than for whites and nearly four times higher for Hispanics than for whites.

## TABLE 2
## EDUCATIONAL ATTAINMENT FOR AFRICAN AMERICANS, HISPANICS, AND WHITES, WISCONSIN

| Measure | NH Black | Hispanic | NH White |
|---|---|---|---|
| | | | |
| **HIGH SCHOOL GRADUATES AGE 25+ *** | 79.3% | 60.2% | 92.0% |
| | | | |
| **BACHELOR'S DEGREE OR MORE AGE 25+ *** | 14.0% | 11.1% | 26.9% |
| | | | |
| **PERCENT BELOW BASIC, 8TH GRADE MATH **** | 57% | 40% | 15% |
| | | | |
| **GRADE 9-12 GRADUATE RATE ***** | 66.0% | 78.1% | 95.6% |
| | | | |
| **GRADE 9-12 DROPOUT RATE ***** | 7.5% | 4.6% | 1.2% |
| | | | |

\* US Census, 2010 American Community Survey, 3-Year Estimates; ** National Center for Educational Statistics, Mathematics, 2011, http://nces.ed.gov/nationsreportcard/pdf/main2011/2012458.pdf; *** National Center for Educational Statistics, State Dropout and Completion File, 2009-2010, https://nces.ed.gov/ccd/drpcompstatelvl.asp.

8

**CHART 3**
**EDUCATIONAL ATTAINMENT BY RACE, WISCONSIN, DATA FROM TABLE 2**



**CHART 4**
**EDUCATION MEASURES, BY RACE, WISCONSIN, DATA FROM TABLE 2**



9

Table 3 and Charts 5 and 6 demonstrate considerable differences between African Americans and Hispanics as compared to whites in Wisconsin on home ownership, home values, and vehicles and telephones available in households. The white percentage of home owners is more than double the African American percentage and 64 percent higher than the Hispanic home ownership percentage. The value of white owned homes is 42 percent higher than the value of African American owned homes and 23 percent higher than Hispanic owned homes. African American households are more than four times more likely than white households to lack an available vehicle and Hispanic households are 58 percent more likely than white households to lack an available vehicle. African American households are 65 percent more likely than white households to lack telephone service and Hispanic households are 82 percent more likely than white households to lack telephone service.

**TABLE 3**
**HOUSING CHARACTERISTICS BY RACE, WISCONSIN, US CENSUS, 2010**
**AMERICAN COMMUNITY SURVEY, 3-YEAR ESTIMATES**

| Measure | NH Black | Hispanic | NH White |
|---|---|---|---|
|  |  |  |  |
| PERCENT OWNER OCCUPIED | 32.2% | 44.5% | 73.0% |
|  |  |  |  |
| MEDIAN HOME VALUE | $121,700 | $140,800 | $173,300 |
|  |  |  |  |
| PERCENT WITH NO VEHICLE AVAILABLE | 23.1% | 8.7% | 5.5% |
|  |  |  |  |
| PERCENT WITH NO TELEPHONE SERVICE | 2.8% | 3.1% | 1.7% |

10

**CHART 5**
**MEDIAN HOME VALUE BY RACE, WISCONSIN, DATA FROM TABLE 3**



**CHART 6**
**HOME OWNERSHIP, VEHICLE AND TELEPHONE AVAILABILITY BY RACE, WISCONSIN, DATA FROM TABLE 3**



11

Table 4 and Charts 7 and 8 demonstrate considerable differences between African Americans and whites on health measures, with a more mixed picture for Hispanics. The percentage of African Americans without health insurance is 78 percent higher than the white percentage, and the Hispanic percentage is more than triple the white percentage. The life expectancy of African Americans is six years lower than the white life expectancy, whereas the Hispanic life expectancy is 5.7 years higher. The low birth weight rate of African American infants is more than double the white rate, whereas the Hispanic rate is the same as the white rate. The infant death rate for African American infants is more than double the white rate, and the infant death rate for Hispanic infants is 19 percent higher than the white rate.

## TABLE 4
## HEALTH INDICATORS BY RACE, WISCONSIN

| Measure | NH Black | Hispanic | NH White |
|---|---|---|---|
| | | | |
| **PERCENT WITH NO HEALTH INSURANCE\*** | 13.2% | 26.8% | 7.4% |
| | | | |
| **LIFE EXPECTANCY IN YEARS\*\*** | 74.0 | 86.0 | 80.3 |
| | | | |
| **LOW WEIGHT BIRTHS PER 1,000 BIRTHS\*\*\*** | 13.0 | 6.3 | 6.3 |
| | | | |
| **INFANT DEATH RATE PER 1,000 BIRTHS\*\*\*** | 13.8 | 7.0 | 5.9 |
| | | | |
| Sources: *US Census, American Community Survey, 2010, 3-Year Estimates; **Kaiser Family Foundation, Life Expectancy at Birth, by State, 2010, http://kff.org/other/state-indicator/life-expectancy-by-re/; ***Wisconsin Department of Health Services, "Births and Infant Deaths," November 2009, https://www.dhs.wisconsin.gov/publications/p4/p45364-08.pdf. | | | |

**CHART 7**
**LIFE EXPECTANCY IN YEARS BY RACE, WISCONSIN, DATA FROM TABLE 4**



**CHART 8**
**HEALTH INSURANCE, LOW BIRTH WEIGHT, & INFANT DEATH RATE BY RACE, WISCONSIN, DATA FROM TABLE 4**



13

Table 5 reports the results of a study that ranks the states according to the black-to-white ratio of various socio-economic measures. On most measures Wisconsin ranks at or near the bottom of the states. Wisconsin is worst in black/white disparities in high school dropout rates, and second worst in high school graduation percentages, 8th grade math scores, and family poverty rates. It is third worst in black/white disparities in high school graduation rates and in unemployment. It is fifth worst in median incomes and ninth worst in insurance coverage.

**TABLE 5**
**SOCIO-ECONOMIC DISPARITIES, BLACK AND WHITE, WISCONSIN RANK AMONG STATES**

| Measure | Rank, First Is Worst |
|---|---|
| | |
| MEDIAN HOUSEHOLD INCOME | 5 |
| | |
| POVERTY RATE, FAMILIES | 2 |
| UNEMPLOYMENT RATE | 3 |
| | |
| PERCENT HIGH SCHOOL GRADUATES | 2 |
| AVERAGE EIGHTH GRADE MATH SCORES | 2 |
| | |
| GRADES 9-12 GRADUATION RATES | 3 |
| | |
| DROPOUT RATES | 1 |
| | |
| INDIVIDUALS WITH NO HEALTH INSURANCE | 9 |
| | |
| Source: Center on Wisconsin Strategy (COWS), University of Wisconsin Madison, "Wisconsin's Extreme Racial Disparity," December 2013, http://www.cows.org/_data/documents/1571.pdfhttp://www.cows.org/_data/documents/1571.pdf. | |

14

## V.      SEQUENCE OF EVENTS

### A.      The Fall of White Voting Strength in Wisconsin

Critical to understanding the sequence of events leading to policies adopted and not adopted in Wisconsin during the last several years is the declining voting strength of non-Hispanic whites relative to African Americans and Hispanics. It is Republicans in Wisconsin who are disadvantaged by this shift in the relative voting strength of whites and minorities and would therefore benefit from limitations on minority voting, especially African Americans and Hispanics who constitute the largest minority voting blocs in Wisconsin and are well-documented Democratic voters. These features of turnout and voting patterns in Wisconsin help explain the panoply of restrictive voter legislation enacted by the Republican-controlled legislature and the Republican governor after the elections of 2010 in Wisconsin. Given the high degree of electoral competition in Wisconsin, even small changes in the relative turnout of whites and minorities can influence the outcomes of elections.

As indicated in Table 6, the white share of turnout in Wisconsin in recent presidential election years fell by 4 percentage points from 90 percent in 2004 to 86 percent in 2012. During the same period both the African American and Hispanic share of turnout in Wisconsin rose by 2 percentage points. Thus, the white share of the voter turnout is declining, whereas the African American and Hispanic share of the turnout is rising. Population changes in Wisconsin further demonstrate that white voting strength is likely to decline even more in future years. According to US Census data, from 2010 to 2014 the white percentage of the voting age population in Wisconsin had already declined by -1.3 percent, for a -1.1 percentage point decline in just 4 years. The African American percentage of the voting age population during this period increased by +3.5 percent, for a +0.2 percentage point increase. The Hispanic percentage of the voting age population during this period increased by +8.7 percent, for a +0.4 percentage point increase. According to population projections for Wisconsin, this falling white voting age population percentage and rising minority percentage is expected to continue well into the future of the state.[1]

---

1 Urban Institute, "Wisconsin, 2010 to 2030," http://apps.urban.org/features/mapping-americas-futures/#map.

**TABLE 6**
**COMPOSITION OF VOTER TURNOUT BY RACE AND ETHNICITY, WISCONSIN,**
**PRESIDENTIAL ELECTIONS 2004 – 2012**

| Election | White | Black | Hispanic | Others |
|---|---|---|---|---|
| **2004 President, Kerry (WD) v. Bush (WR)** | 90% | 5% | 2% | 3% |
| **2008 President, Obama (BD) v. McCain (WR)** | 89% | 5% | 3% | 3% |
| **2012 President, Obama (BD) v. Romney (WR)** | 86% | 7% | 4% | 3% |

WD = White Democrat, WR = White Republican, BD = Black Democrat. Exit polling conducted after each election by Edison Research, http://www.edisonresearch.com/election-polling/, available through CNN, television networks and New York Times.

**TABLE 7**
**RACIAL GROUP PERCENTAGE OF VOTING AGE POPULATION,**
**CHANGE 2010 TO 2014, WISCONSIN, US CENSUS DATA**

| Population | NH Whites | NH Blacks | Hispanics |
|---|---|---|---|
| **2010 Voting Population Percent** | 86.3% | 5.7% | 4.6% |
| **2014 Population Estimate** | 85.2% | 5.9 % | 5.0% |
| **Percent Change** | -1.3% | +3.5% | +8.7% |
| **Percentage Point Change** | **-1.1 Percentage Points** | **+0.2 Percentage Points** | **+.4 Percentage Points** |

Source: US Census, Complete Enumeration 2010, American Community Survey, 2014, 1-Year Estimates.

16

Exit poll data demonstrates that Republican electoral success in Wisconsin turns in part on the white voter turnout relative to minority turnout. As indicated in Table 8, there is a 41 percentage point gap between the mean 51 percent white voter support for Republican statewide candidates and the mean 10 percent black voter support for these candidates. There is also a 14 percentage point gap between the mean 51 percent white voter support for Republican statewide candidates and the mean 37 percent Hispanic voter support for these candidates. As additionally indicated in Table 9, the black/white racial disparity in Republican voting is far larger than disparities represented by other demographic and socio-economic factors such as gender, age, income, and education. The Hispanic/white disparity is larger than all other disparities with the exception of income.

Thus, demographic shifts in the Wisconsin voter base and projections of sharply declining white population relative to minority population in Wisconsin, combined with racially polarized voting, indicate that Republicans had much to gain by limiting black and Hispanic voting relative to white voting. No other demographic shift in voter turnout would have nearly the same impact on prospective political gains for the Republican majority in Wisconsin.

17

**TABLE 8**
**PERCENTAGE VOTE FOR REPUBLICAN CANDIDATES BY RACE, WISCONSIN, STATEWIDE ELECTIONS 2004 – 2014, EXIT POLL RESULTS**

| Election | White | Black | Hispanic | Republican Victory in State |
|---|---|---|---|---|
| **2004 President, Kerry (WD) v. Bush (WR)** | 52% | 14% | 47% | NO |
| **2004 US Senate, Feingold (WD) v. Michels (WR)** | 47% | 17% | NA | NO |
| **2006 Governor, Doyle (WD) v.Green (WR)** | 46% | 8% | NA | NO |
| **2008 President, Obama (BD) v. McCain (WR)** | 45% | 9% | NA | NO |
| **2010 US Senate, Feingold (WD) v. Johnson (WR)** | 55% | 14% | NA | YES |
| **2010 Governor, Barrett (WD) v. Walker (WR)** | 55% | 13% | NA | YES |
| **2012 President, Obama (BD) v. Romney (WR)** | 51% | 6% | 31% | NO |
| **2012 US Senate, Baldwin (WD) v. Thompson (WR)** | 50% | 7% | 33% | NO |
| **2012 Governor Recall, Barrett (WD) v. Walker (WR)** | 57% | 5% | NA | YES |
| **2014 Governor, Burke (WD) v. Walker (WR)** | 56% | 10% | NA | YES |
| **Mean All Elections** | **51%** | **10%** | **37%** | |

Exit polling conducted after each election by Edison Research, http://www.edisonresearch.com/election-polling/, available through CNN, television networks and New York Times.

18

**TABLE 9**
**SUPPORT FOR REPUBLICAN CANDIDATES BY NON-RACIAL DEMOGRAPHY, EXIT POLLS, WISCONSIN, 2004 – 2014**

| Election | Women | Men | 18-29 | 65+ | High School Only | College Grad | Income 50k- | Income 100k+ |
|---|---|---|---|---|---|---|---|---|
| **2004 President** | 46% | 52% | 50% | 46% | NA | NA | 44% | 60% |
| **2004 Senate** | 42% | 48% | 42% | 43% | NA | NA | 41% | 53% |
| **2006 Governor** | 40% | 48% | 38% | 43% | 44% | 40% | 34% | 48% |
| **2008 President** | 39% | 46% | 35% | 50% | 39% | 42% | 35% | 51% |
| **2010 US Senate** | 48% | 56% | 46% | 54% | 55% | 47% | 46% | 61% |
| **2010 Governor** | 48% | 57% | 45% | 56% | 56% | 48% | 48% | 57% |
| **2012 Governor Recall** | 47% | 59% | 47% | 56% | 55% | 49% | 43% | 63% |
| **2012 US Senate** | 41% | 51% | 39% | 50% | 46% | 45% | 36% | 59% |
| **2012 President** | 42% | 51% | 37% | 52% | 44% | 46% | 37% | 59% |
| **2014 Governor** | 45% | 60% | 47% | 53% | 54% | 50% | 45% | 60% |
| **Mean All Elections** | 44% | 53% | 43% | 50% | 49% | 46% | 41% | 57% |
| **Mean Difference** | -9% REP | | -7% REP | | +3% REP | | -16% REP | |

Exit polling conducted after each election by Edison Research,
http://www.edisonresearch.com/election-polling/, available through CNN, television networks and New York Times.

## B.      Decision-Making: Voter Identification

The sequence of events leading to Wisconsin's adoption in 2011 of a voter photo ID bill and numerous other measures limiting access to voting extends back more than a decade. Of critical importance in understanding the 2011 legislation are efforts by Republicans to enact a voter photo ID bill after John Kerry defeated George W. Bush in the 2004 presidential election in Wisconsin. In the wake of Kerry's Wisconsin victory, Republicans charged that the election in Wisconsin had been fraught with voter fraud.[2] Immediately after the election Republican Assembly Speaker John Gard charged that Milwaukee Mayor Tom Barrett "has got to be embarrassed about what happened in Milwaukee. You've got thousands of addresses they know don't exist." The Speaker said that "Democrats and Republicans alike should be concerned about the incredible problems we had across this state."[3]

Yet even before investigators for the U.S. Attorney and the FBI had the opportunity to confirm or refute charges of rampant fraud, Republicans in the Wisconsin State Legislature pushed ahead and passed a voter photo ID bill on June 24, 2005. Democratic Governor Jim Doyle then vetoed the legislation on August 12, 2005.[4]

By the end of 2005 investigators had debunked charges of widespread voter fraud in the 2004 presidential election in Wisconsin. In a letter to Rick Riley, Executive Director of the Republican Party of Wisconsin, U.S. Attorney Steven N. Biskupic reported that all nine referrals of alleged double voting in Milwaukee and in other states had been found to be of no merit. Six of the nine individuals named did not vote in Milwaukee, and the other three only voted in Milwaukee.[5] Ultimately in 2005 only 14 out of 2.9 million voters in the 2004 general election were charged with voter fraud. *None involved voter impersonation at the polls, the only type of voter fraud targeted by voter identification laws.* Ten of the 14 cases involved illegal voting by felons and the remaining 4 involved double voting. None of the double-voting cases resulted in a conviction.[6] Nonetheless Republicans in the State Legislature continued their push for voter photo ID requirements. In March of 2006 the State Legislature passed Assembly Joint Resolution 36, a constitutional amendment that required a photo ID for voting.[7] However, to take effect it needed to pass in another session and then be passed by the voters, which did not occur.[8]

---

2 In 2003 Republicans had pushed through the legislature a voter photo ID bill that the governor successfully vetoed. Government Accountability Board, "A Brief History of Recent Voter ID Legislation in Wisconsin," http://www.gab.wi.gov/node/1590.
3 Steve Schultze,"GOP Wants to Tighten Voter Laws," *Milwaukee Journal Sentinel*, 4 November 2004, http://freerepublic.com/focus/f-news/1270231/posts.
4 Wisconsin State Legislature, 2005-2006, Senate Bill 42, http://docs.legis.wisconsin.gov/2005/proposals/sb42.
5 Letter from Steven N. Biskupic (by Richard G. Frohling, Deputy Criminal Chief & District Election Officer) to Rick Riley, Executive Dir. of Republican Party of Wis., 22 August 2005, http://www.wispolitics.com/1006/050822dblvoting.pdf.
6 Steven H. Huefner, Daniel P. Tokaji, Edward B. Foley, and Nathan A. Cemenska, *From Registration to Recounts: The Election Ecosystems of Five Midwestern States* (The Ohio State University Moritz College of Law: 2007), p. 121, http://moritzlaw.osu.edu/electionlaw/projects/registration-to-recounts/book.pdf.
7 Wisconsin State Legislature, 2005-2006, Assembly Joint Resolution 36, http://docs.legis.wisconsin.gov/2005/proposals/ajr36.
8 Fair Elections Wisconsin, AJR 36, http://www.fairelectionswi.com/legislation/leg2005-6.html.

The next sequence of events leading to Wisconsin's adoption of measures limiting access to voting begins in 2008 when Democratic presidential candidate Barack Obama defeated Republican candidate John McCain in Wisconsin. As compared to George W. Bush's 14 percent share of the African American vote in Wisconsin in 2004, McCain's share of the African American vote slipped to 9 percent. In 2004 Bush had won 47 percent of the Hispanic vote in Wisconsin, close to his national average of 44 percent. Although exit poll data on Hispanic voting is not available for Wisconsin in 2008, nationally McCain won only 31 percent of the Latino vote, down 13 percentage points from Bush in 2004.[9]

Then in 2010, a good Republican year nationally, Republicans gained control over the governorship and State Legislature in Wisconsin. Faced with the political realities described above, the Republican majority in 2011 adopted a new strict voter identification law along with some 10 other new laws or provisions that limited access to voting and registration. In 2013 and 2014 Wisconsin adopted 4 additional measures that further limited access to voting and registration.

These 15 measures cannot be justified by any objective change in the occurrence of voter fraud or in the administration of elections in Wisconsin. The only change was unified Republican control over government that enabled the party to enact and implement legislation that politically benefitted Republicans regardless of Democratic opposition. Wisconsin's electoral system was not broken and in need of repair in 2011. *To the contrary, the system was functioning extremely well with essentially no voter impersonation, high turnout rates, and efficient administration of elections.*

Wisconsin had not experienced problems with voter impersonation prior to 2011. As indicated in the discussion of 2004 above, the lack of documented cases of voter impersonation was not for a lack of effort to uncover such fraud. According to a 2007 report by researchers at the Ohio State University Law School that examined voter fraud in Wisconsin and four other Midwestern states, "There are few states in which allegations of voter fraud have received greater scrutiny than Wisconsin – and few municipalities in which they have received greater attention than the City of Milwaukee."[10] After discussion with the Milwaukee District Attorney and state and local election officials, the researchers found: "State prosecutors in Milwaukee have documented *no case* of anyone going to the polls pretending to be someone else, and no prosecutions on these grounds appear to have been brought anywhere in the state in recent memory. There is no evidence from which to conclude that Wisconsin faces a widespread or concerted effort to commit voting fraud."[11] Of the voter fraud cases filed after this 2007 report and before 2011 – so the cases would be available to the legislature prior to its 2011 session – *only one involved a charge of voter impersonation.*[12]

---

9 In the 2012 presidential election, the Republican candidate Mitt Romney won only 31 percent of the Hispanic vote in Wisconsin and in the 2012 senatorial election in Wisconsin the Republican candidate Tommy Thompson won only 33 percent of the Hispanic vote. These results also closely paralleled national averages for Hispanic voters.
10 *Op Cit*., fn. 6, p. 120.
11 *Ibid*., p. 121 (emphasis added).
12 News21, "Election Fraud in America: Wisconsin," 21 August 2012, http://votingrights.news21.com/interactive/election-fraud-database/index.html; Republican National Lawyer's

In a December 2006 public report available to the legislature, the United States Election Assistance Commission explained why voter impersonation at the polls is so rare. Among authorities in the field, the Commission found, "Many asserted that impersonation of voters is probably the least frequent type of fraud because it is the most likely type of fraud to be discovered, there are stiff penalties associated with this type of fraud, and it is an inefficient method of influencing an election."[13] To cast a single vote at the polls, the impersonator would risk being apprehended if the impersonated voter has already voted or is recognizable to any local election official. This latter point is not insignificant. According to the 2008 Survey of the Performance of American Elections (SPAE), a standard source for political analysis that was available at the time of the adoption of the 2011 photo voter ID law, 19.5 percent of voters in Wisconsin (nearly 1 out of 5 voters) said that they knew the person who checked them in at the polls.

In recent elections prior to 2011 Wisconsin was a national leader in the turnout of voters. As indicated in Chart 9, based on calculations from the National Election Project,[14] in each general election year from 2000 to 2008 the percentage of potentially eligible adult citizens in Wisconsin participating in the election far exceeded national averages. In each of those presidential election years, Wisconsin ranked among the top three states in voter turnout.

Similarly, in recent years Wisconsin has achieved an exemplary record in the administration of elections. In 2008 and 2010 the Pew Charitable Trusts ranked the states on 17 indices of electoral performance. In 2008 Wisconsin ranked second best among all states and in 2010 it ranked fourth best.[15] A Big Ten Battleground Poll following the 2008 election found that voters in Wisconsin were more satisfied with their voting experience than voters in other states. Poll results demonstrated that 90 percent of Wisconsin voters were very satisfied with their voting experience compared to 85 percent in other Big Ten states, a difference that is statistically significant at the stringent .01 level. Only 2 percent of Wisconsin voters were "not too satisfied" or "not satisfied at all."[16]

---

Association, *Voter Fraud Survey*, http://www.rnla.org/survey.asp#wi.

13 U.S. Election Assistance Commission, *Election Crimes: An Initial Review and Recommendations for Additional Study*, December 2006, p. 9, http://www.eac.gov/assets/1/workflow_staging/Page/57.PDF.

14 Potentially eligible adults is the number of US citizens not statutorily barred from voting (ineligible felons). Data obtained from United States Election Project, "State Turnout Rates, 2000-2014," http://www.electproject.org/home/voter-turnout/voter-turnout-data.

15 http://www.pewtrusts.org/en/multimedia/data-visualizations/2014/elections-performance-index#state-WI.

16 For poll results see Barry C. Burden, Wisconsin Voter Experiences in the 2008 General Election," http://electionadmin.wisc.edu/btpsummary.pdf.

**CHART 9**
**PERCENT OF ELIGIBLE ADULTS TURNING OUT TO VOTE IN PRESIDENTIAL GENERAL ELECTIONS, WISCONSIN COMPARED TO THE UNITED STATES, 2000-2008**



Despite the lack of voter impersonation fraud and exemplary voter turnout and election administration, Republicans in 2011 enacted a strict voter photo ID law and, through 2014, 14 other measures that limited citizens' opportunities to vote and register in Wisconsin. Based on information available at the time of enactment, it was clear that many of these measures would have a disparate impact on minority opportunities to vote and register relative to opportunities for whites.

The first and most far-reaching of these new laws was Act 23, enacted by the legislature and signed by the governor in May 2011. Enactment followed closely along party lines, although 3 white Democrats joined the Republican majority in voting for the bill. Among other provisions, Act 23 established a photo identification requirement for voting. Prior to enactment of Act 23, a voter at the polls only had to provide proof of residence, which could be satisfied by a photo or non-photo ID. In addition, a registered voter unable to provide such documentation could still vote if her or his registration information was corroborated by another qualified elector residing in the same municipality.[17]

Act 23 eliminated the option to present a non-photo ID at the polls and the option to vote through corroboration of registration information by another qualified elector. The photo ID requirement extends beyond voting at the polls. Voters requesting an absentee ballot must provide a copy of a photo identification. Under this legislation, with certain exceptions, voters must verify their identity by presenting one of the following types of photo identification:

IDs that must be unexpired or expired after the date of the last general election:

     o A Wisconsin DOT-issued driver's license, even if driving privileges are revoked or suspended;

     o A Wisconsin DOT-issued identification card;

     o Military ID card issued by the U.S. Uniformed Services; and

     o A U.S. passport book or card

IDs that must be unexpired:

     o A certificate of naturalization (that was issued not earlier than two years before the date of the election);

     o An identification card issued by a federally recognized Indian tribe in Wisconsin;

     o A driver's license receipt issued by Wisconsin DOT (valid for 45 days from

---

17 BallotPedia, Wisconsin Voter ID Requirements and History,
http://ballotpedia.org/Wisconsin_Voter_ID_requirements_and_history.

date issued);

o An identification card receipt issued by Wisconsin DOT (valid for 45 days from date issued); and

o A photo identification card issued by a Wisconsin accredited university or college that contains the date of issuance, a signature of the student, and an expiration date no later than two years after date of issuance. The university or college ID must be accompanied by a separate document that proves enrollment.[18]

Such IDs must be presented at the polls for voting or, under later legislation, a copy submitted with an application for an absentee ballot. Active military and permanent overseas voters can vote by absentee ballot without submitting a photo ID, but must present an acceptable photo ID if voting in person. Other registered voters exempted from the photo ID requirement include "confidential electors" who "have presented a court order, a letter from law enforcement, a letter from the staff of a domestic abuse shelter, or the staff of an agency assisting victims of domestic abuse," and "indefinitely confined voters or voters in special care facilities." Persons with a genuine religious objection to being photographed can vote with a non-photo ID card issued by the Wisconsin Department of Transportation. Voters who have surrendered their driver's licenses due to a citation or notice of intent to revoke or suspend the license who present a copy of the citation or notice are also exempted.[19]

Individuals who lack an acceptable photo ID for voting under Act 23 can apply for a Wisconsin state ID card at the Wisconsin Division of Motor Vehicles ("DMV"). Although the cost for such cards is $18.00, individuals can request on the application that the card be issued free for voting purposes. To obtain such a card the applicant must appear in person at a DMV service center to submit an application and be photographed. The applicant must also provide original identifying documents including:

- Proof of name and date of birth, for example, a certified U.S. birth certificate, valid passport or certificate of naturalization. (See Document Verification Petition Process if fees arise in order to obtain free ID card for voting).
- Proof of identity (usually a document with a signature or photo).
- Proof of Wisconsin residency.
- Proof of U.S. citizenship, legal permanent resident status, legal conditional resident status or legal temporary visitor status.
- Social security number.[20]

---

18 Wisconsin, Government Accountability Board, "Wisconsin Act 23,"
http://www.gab.wi.gov/sites/default/files/publication/137/voter_id_complete_packet_10_24_11_pdf_75187.pdf.
19 *Ibid*.
20 Wisconsin Department of Transportation, "Obtaining an Identification (ID) Card,"
http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/id-card.aspx.

The photograph on an ID used for voting "must reasonably resemble the elector," and "the elector's name must conform to the name on their voter registration; conform does not mean that the name must be identical to the name on the voter registration." The ID need not include the elector's current address.[21]

In enacting Act 23, the Wisconsin Legislature established a "strict" photo identification law. According to the National Conference of State Legislatures, in some non-strict states voters without an acceptable photo identification may still be able to cast a regular ballot by signing "an affidavit of identity, or poll workers may be permitted to vouch for the voter." In other non-strict states, "voters who do not show required identification may vote on a provisional ballot. After the close of Election Day, election officials will determine (via a signature check or other verification) whether the voter was eligible and registered, and therefore whether the provisional ballot should be counted. *No action on the part of the voter is required*."[22]

In contrast, in strict photo identification states like Wisconsin, "voters without acceptable identification must vote on a provisional ballot and also take additional steps after Election Day for it to be counted."[23] In Wisconsin voters must present an acceptable photo ID "to the poll workers by 8:00 p.m. on Election Day or the municipal clerk by 4:00 p.m. of the Friday following the election."[24]

The Wisconsin State Legislature enacted this voter photo ID law in 2011 despite considerable evidence at the time that the law would have a disparate impact on African Americans and Hispanics in Wisconsin. The evidence showed that African Americans and Hispanics were less likely than whites to possess the two most common forms of photo identification under Act 23: driver's licenses and passports.

A 2005 study by John Pawasarat of the Employment and Training Institute, University of Wisconsin-Milwaukee, found that in Milwaukee County for voting age females, 74 percent of whites possessed a Wisconsin driver's license compared to 56 percent of African Americans and 40 percent of Hispanics. In the rest of the state for voting age females he found that 87 percent of whites had Wisconsin driver's licenses compared to 71 percent of African Americans and 48 percent of Hispanics. For voting age males he found that in Milwaukee County 80 percent of whites possessed a Wisconsin driver's license compared to 61 percent of African Americans and 59 percent of Hispanics. In the rest of the state for voting age males he found that 91 percent of whites had Wisconsin driver's licenses compared to 59 percent of African Americans and 70 percent of Hispanics.[25] He additionally found that "Statewide, an estimated 11 percent of African

---

21 Wisconsin, Government Accountability Board, "Wisconsin Act 23,"
http://www.gab.wi.gov/sites/default/files/publication/137/voter_id_complete_packet_10_24_11_pdf_75187.pdf.
22 National Conference of State Legislatures, *Voter Identification Requirements*,
http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx (emphasis added).
23 *Ibid*.
24 Wisconsin Government Accountability Board, "Provisional Voting," http://www.gab.wi.gov/clerks/provisional-ballots.
25 John Pawasarat, "The Driver License Status of the Voting Age Population in Wisconsin," pp. 6-7,

American adults and 8 percent of Hispanic adults have a license with a current revocation or suspension, compared to 4 percent of whites."[26] Although under Act 23 electors can still vote with a revoked or suspended license or proof of suspension or revocation, such licenses cannot be renewed (and thus meet the expiration date requirements of Act 23) without the holder's paying all fines and fees. If drivers fail to renew their licenses and the licenses remain expired for more than a year, the license cannot be used for voting in Wisconsin. This poses a disparate burden on African Americans and Hispanics given their much lower incomes and much higher poverty rates as compared to whites in Wisconsin.

Pawasarat's study received widespread publicity in Wisconsin prior to adoption of Act 23. Among other things, Governor Jim Doyle cited the findings of the study on the limited possession of driver's licenses by elderly residents as part of his message in vetoing the 2005 voter photo identification law passed by the General Assembly.[27]

Additional data available at the time of adoption of Act 23 similarly shows racial disparities in the possession of driver's licenses. As indicated in Table 10's results from the 2008 SPAE, available at the time of the enactment of Act 23, white registered voters have substantially higher rates of driver's license possession than African Americans and Hispanics.[28] Nationwide, 96.9 percent of white registered voters reported that they possessed driver's licenses, compared to 87.9 percent of African American and Hispanic registered voters, for a disparity of -9.0 percentage points. In Wisconsin and bordering states the racial disparities in driver's license possession are larger yet. For these states, 96.2 percent of white registered voters reported that they possessed driver's licenses, compared to 77.6 percent of African American and Hispanic registered voters, for a disparity of -18.6 percentage points. Both of these results are statistically significant at the stringent .01 level.

---

http://www.brennancenter.org/sites/default/files/legacy/d/download_file_50902.pdf.
26 *Ibid*., p. 3.
27 Governor Jim Doyle, Veto Message, SB 42, 12 August 2005,
https://docs.legis.wisconsin.gov/2005/related/veto_messages/sb42.pdf.
28 Survey available at https://dataverse.harvard.edu/dataverse/SPAE.

**TABLE 10**
**DRIVER'S LICENSE POSSESSION OF REGISTERED VOTERS, SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008**

| NATIONWIDE | | | |
|---|---|---|---|
| Possess Driver's License | Whites | African Americans & Hispanics | Difference With Whites |
| | 9738 of 10,051 **96.9%** | 1136 of 1292 **87.9%** | **-9.0 Percentage Points \*** |
| | | | |
| WISCONSIN AND BORDERING STATES | | | |
| | | | |
| Possess Driver's License | Whites | African Americans & Hispanics | Difference With Whites |
| | 1032 of 1073 **96.2%** | 66 of 85 **77.6%** | **-18.6 Percentage Points \*** |
| | | | |
| *Statistically significant at .01 level. | | | |

28

Other studies available at the time also demonstrated substantial racial disparities in the possession of the second most common form of identification under the 2011 law, US passports. As indicated in Table 11's results from the 2008 SPAE, white registered voters are far more likely to possess US passports than African Americans and Hispanics. Nationwide, 44.6 percent of white registered voters reported that they possessed US passports, compared to 29.9 percent of African American and Hispanic registered voters, for a disparity of -14.7 percentage points. In Wisconsin and bordering states, passport possession was lower for both whites and minorities but the disparities were slightly larger. In these states, 40.2 percent of white registered voters reported that they possessed US passports, compared to 18.8 percent of African American and Hispanic registered voters, for a disparity of -21.4 percentage points. Both these results are statistically significant at the stringent .01 level.

## TABLE 11
## PASSPORT POSSESSION OF REGISTERED VOTERS SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008

| NATIONWIDE | | |
|---|---|---|
| Possess US Passport | Whites | African Americans & Hispanics | Difference With Whites |
| | 4,476 of 10,029 **44.6%** | 384 of 1,285 **29.9%** | **-14.7 Percentage Points *** |
| | | | |
| **WISCONSIN AND BORDERING STATES** | | |
| | | | |
| Possess US Passport | Whites | African Americans & Hispanics | Difference With Whites |
| | 431 of 1073 **40.2%** | 16 of 85 **18.8%** | **-21.4 Percentage Points *** |
| | | | |
| *Statistically significant at .01 level. | | | |

29

The State Legislature also enacted the strict voter photo ID provisions of Act 23 despite information available at the time that, as compared to whites, African Americans and Hispanics were substantially more likely to be deterred from voting because they lacked the requisite identification. As indicated in Table 12, 18.4 percent of African American and Hispanic registrants reported not voting in the 2008 general election because they lacked the right kind of identification, more than double the 8.0 percent of white registrants who reported this reason for not voting, for a difference 10.4 percentage points. These results are statistically significant at the stringent .01 level.

**TABLE 12**
**REGISTERED VOTERS WHO REPORTED NOT VOTING BECAUSE THEY BELIEVED THEY LACKED THE RIGHT KIND OF IDENTIFICATION, SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008**

| NATIONWIDE | | | |
|---|---|---|---|
| **Believed They Lacked Right ID** | **Whites** | **African Americans & Hispanics** | **Difference With Whites** |
| | 36 of 448 **8.0%** | 18 of 98 **18.4%** | **+10.4 Percentage Points*** |
| | | | |
| *Statistically significant at .01 level. Includes respondents who cited a lack of ID as a major or minor factor. | | | |

Voter confusion about ID laws and the required identification has an important deterrent effect on voting. Researchers from Rice University, for example, studied non-voting by registered voters in the 2014 general election in Congressional District 23 in Texas. This is a majority Hispanic district and one of a very few competitive congressional districts in the state, and it featured a tight contest in 2014 that typically draws a high voter turnout. The researchers found that 5.8 percent of 400 registered voters studied gave as their principal reason for not voting a lack of acceptable identification under Texas' voter photo ID law which had been in place since 2013. A larger 12.8 percent cited a lack of acceptable ID as one reason for non-voting. Yet the researchers found that based on what they reported to the survey takers, the vast majority of these non-voters actually possessed an acceptable photo ID under Texas law and that confusion about the law's requirements accounted for their non-voting. The researchers concluded:

"This study suggests that the most significant impact of the Texas voter photo ID law on voter participation in CD-23 in November 2014 was to discourage turnout among registered voters who did indeed possess an approved form of photo ID,

but through some combination of misunderstanding, doubt or lack of knowledge, believed that they did not possess the necessary photo identification."[29]

Information about racial disparities in photo ID possession was presented to the legislature through a January 4, 2011 letter to GAB Director and General Counsel Kevin J. Kennedy from four professors at the UW-Madison Department of Political Science and La Follette School of Public Affairs. The professors wrote that, "The most consistent finding from academic studies is that voter ID requirements disproportionately affect several subpopulations: ethnic and racial minorities, high school and college students, senior citizens and disabled, women, and those with low incomes. Minority groups are at particular risk for not having ID." The professors additionally noted that, "[a]lthough most studies find that overall voter turnout is little affected by voter ID, vulnerable populations such as those with lower incomes are less likely to participate when voter ID is implemented. As a consequence, African American, Latinos, and other groups with lower incomes are less apt to vote under voter ID."[30]

The Wisconsin GAB also presented to the legislature an extensive critique of the proposed photo voter ID legislation. According to election law expert and Ohio State University Law School professor Daniel P. Tokaji, for overseeing elections, "The best American model is Wisconsin's Government Accountability Board, which consists of retired judges selected in a way that is designed to promote impartiality."[31]

In testimony submitted to the legislature in January 2011, and in a subsequent May 2011 letter submitted to members of the Assembly Committee on Elections and Campaign Reform, Director Kennedy provided an extensive critique of the proposed voter ID bill. In his January testimony Director Kennedy noted that only three other states, Georgia, Indiana, and Oklahoma, required picture IDs for voting at the polls and that "based on our research, it appears that no state requires an absentee voter, who casts a ballot by mail to provide a copy of any required photo identification." He critiqued the proposed bill for a too restrictive list of photo IDs and warned that it will be very difficult for election clerks to inform absentee voters in a timely manner that their ballots must be counted as provisional if a copy of proper ID was not included with the ballot. He further noted the difficulty of obtaining a free photo voter ID to correct a provisional ballot on or shortly after Election Day because "there are very few DMV offices open full-time outside large population centers." Kennedy also said that the availability of DMV offices poses a more general problem for persons seeking free photo IDs given his understanding that in a state of 72 counties "approximately 30 DMV branches are open five days a week throughout the State, and that the remainder of the State is served by travel teams that serve

---

29 University of Houston, Hobby Center for Public Policy and Rice University, Baker Institute for Public Policy. "The Texas Voter ID Law and the 2014 Election: A Study of Texas's 23rd Congressional District," August 2015, quotation on p. 1, http://www.uh.edu/class/hcpp/_docs/voteridcd23.pdf.
30 Letter from Professors Barry C. Burden, David T. Canon, Kenneth R. Mayer, Donald P. Moynihan to Kevin J. Kennedy, 4 January 2011, Re: Research on Voter Identification Laws, http://www.gab.wi.gov/sites/default/files/story/uw_voter_id_memo_pdf_15200.pdf (footnote omitted).
31 Wisconsin Government Accountability Board, "Introduction to the G.A.B.," http://www.gab.wi.gov/about/introduction.

counties or regions on a regular schedule, such as once a week or once a month."[32]

In a May 2011 letter to members of the Assembly Committee on Elections and Campaign Reform, Kennedy additionally noted that although the legislature had modified its legislation to include student photo IDs, it had adopted criteria for such forms of identification such that "Presently no student identification card meets the standards proposed in the bill: current address, date of birth and signature of the student. It is highly unlikely that universities and colleges will adopt these standards because of student security concerns."[33]

In his January and May 2011 communications to the legislature, Director Kennedy, on behalf of the GAB, made many recommendations that the legislature failed to adopt in its final photo voter identification legislation, including the following:

1. Eliminate the requirement for providing a copy of photo identification or a signed statement for absentee voting by mail or through special voting deputies;

2. Use an affidavit of identity for voters without the required identification instead of provisional ballots;

3. Address the issues related to the Department of Transportation (e.g, problems arising from lack of access to DMV offices explained in the GAB submissions to the legislature);

4. Authorize the use of other identification cards issued by the Wisconsin government, a Wisconsin governmental subunit or the United States government.

5. Authorize the use of a benefits card issued to armed services veterans by the U.S. Department of Veteran Affairs.

6. Conform the requirements of student ID cards to fit the actual cards issued by public universities in the state.

All of these recommendations would have eased the burdens on minorities who, as the professors' letter and the above-cited studies indicated, were disproportionately impacted by voter photo ID requirements. In failing to follow these recommendations the Wisconsin State Legislature adopted a voter photo identification bill that was more restrictive than the laws in Indiana, Georgia, or Oklahoma. The greater the restrictions, the greater the burdens on minorities

---

32 Remarks by Kevin J. Kennedy, to Wisconsin Senate Committee on Transportation and Elections, 26 January 2011,
http://www.gab.wi.gov/sites/default/files/publication/65/kennedy_senate_committee_testimony_1_26_11_pdf_12141.pdf
33 Kevin J. Kennedy, Letter to Members of the  Assembly Committee on Elections and Campaign Reform, 3 May 2011, p. 1,
http://www.gab.wi.gov/sites/default/files/publication/65/letter_to_assembly_elections_committee_5_3_11_pdf_18642.pdf.

who relative to whites are less likely to possess the two most common forms of photo identification, driver's licenses and passports. Unlike the laws in these three other states, Wisconsin's law did not generally authorize the use of photo identification issued by governmental entities in the state or the federal government. Wisconsin imposed more restrictions on the use of student identification cards issued by public institutions than did the three other states. And unlike Oklahoma, Wisconsin did not permit a provisional ballot to be verified by a statement of identity.[34]

Minority members of the State Legislature and representatives of advocacy groups also presented to decision-makers the adverse effects of Act 23 on African Americans and Hispanics in Wisconsin. For example, Representative Tamara Grigsby, an African-American Representative from Milwaukee (18th Assembly Dist.), said at one hearing that, "[t]o be candid, this bill targets people like me and the constituents I represent." She added, "Everyone sitting in this room knows what this bill does and knows who it will harm."[35] Testimony presented by the Milwaukee Branch of the NAACP noted that, "[t]here is no dispute of the fact that the number of African Americans who lack a valid Wisconsin driver's license is very disproportionate to the percentage of African Americans in the population. So, based on statistics, it is certain that the law will have a disproportionate impact on minority populations."[36]

Proponents of Act 23 enacted the voter photo ID provision despite additional available information from the 2008 SPAE that nationally "2.2 million registered voters were excluded [from voting] for lack of voter identification."[37] As documented above, minorities were much more likely than whites to report the lack of such identification.

Five other elements of decision-making on photo voter identification provide additional indications of discriminatory intent by the legislature. First, the Republican majority in the State Legislature rejected all amendments designed to alleviate the effects of the voter ID law on African Americans and Hispanics. These included, for example, amendments to expand authorized IDs to include "any document issued by the United States, this state, or a local governmental unit" (Substitute Amendment 2 by Democratic Representative Peter Barca), to allow voting by affidavit, to waive fees for birth certificates, and to provide extended hours for DMV offices. Yet the legislature did adopt amendments to alleviate the effects of Act 23 on other groups such as seniors who live in nursing homes.[38]

Second, with respect to the availability of free voter identification cards under Act 23, the

---

34 National Conference of State Legislatures, "Voter Identification Requirements," http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx#Ftn 4.
35 Tamara Grigsby, Testimony Before the Senate Committee On Transportation and Elections (Jan. 26, 2011).
36 Testimony of NAACP-Milwaukee Branch in Opp'n of S. Bill 6 at 1 (Jan. 26, 2011), https://legis.wisconsin.gov/lc/comtmats/old/11files/sb0006_20110127104538.pdf at 16-17).
37 R. Michael Alvarez, et al., *2008 Survey of the Performance of American Elections: Final Report*, p. 59, http://votingtechnologyproject.org/sites/default/files/Final%20report20090218.pdf.
38 See, for legislative history, Wisconsin State Legislature, Assembly Bill 7, https://docs.legis.wisconsin.gov/2011/proposals/ab7. See also, the trial testimony of Hispanic Democratic Representative Jocasta Zamarripa, *Frank v. Walker*, Transcript of Court Trial, 11/4/2013, esp. pp. 787-795.

documentation required for such cards imposed costs on voters lacking such documents as birth certificates to prove citizenship. These costs imposed a disparate burden on minorities who have substantially lower income and assets and much higher poverty rates than whites as documented in Table 1. Based on information available at the time, African Americans lagged behind whites in their possession of US passports and birth certificates. According to a 2006 survey, 8.9 percent of adult African Americans lacked either a US passport or a birth certificate, compared to 5.5 percent of whites. Adults with low incomes or limited education – which correlate with race for African Americans and Hispanics – were also relatively unlikely to possess either a birth certificate or US passport. The survey found that 8.1 percent of respondents with incomes below $25,000 lacked either document, compared to 4.6 percent of respondents with incomes above $25,000. It also found that 9.2 percent of non-high school graduates lacked either document, compared to 5.1 percent of respondents who had graduated high school.[39]

It is telling that Wisconsin only provided a mechanism by which voters can obtain a "free" photo ID in 2014 after being forced to do so by a Wisconsin Supreme Court decision that made no-cost documentation a condition of the implementation of the voter photo ID law.[40] Under the new rules prompted by the Supreme Court decision, a voter without the required documentation could obtain a free ID card through a "Document Verification Petition Process" which is available if:

1. The applicant is unable to provide documents for proof of name and date of birth as required by Wis. Admin. Code § Trans 102.15(3)(a) but which require a fee to a government agency to obtain. This includes documentation needed for proof of legal name change; or
2. The applicant is unable to provide documents for proof of United States citizenship as required by Wis. Admin. Code § Trans 102.15(3m) but which require a fee to a government agency to obtain.

Applicants using this process to obtain an ID must:

- Apply at a DMV customer service center;
- Complete a Wisconsin Identification Card Application form MV3004 and include their social security number on that application;
- Complete a Document Verification Process (DMV Administrator Petition) form MV3012; and
- Present documents to prove identity and Wisconsin residency (where the applicant lives in Wisconsin).[41]

---

39 Survey commissioned by the Center on Budget and Policy Priorities, conducted by the Opinion Research Corporation, http://www.cbpp.org//archiveSite/1-26-06health.pdf.
40 Marge Pitroff, "Walker Approves New Rules for Obtaining Voter ID, While Court Considers Law's Status," *WUVM Milwaukee*, 12 September 2014, http://wuwm.com/post/walker-approves-new-rules-obtaining-voter-id-while-court-considers-laws-status#stream/0.
41 Wisconsin Department of Transportation, "Document Verification Petition Process for A Wisconsin Identification Card for Voting Purposes," http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/petition-

Third, the Wisconsin Assembly's recent passage of a comparable photo ID requirement for FoodShare recipients, and its refusal to authorize the use of that ID for voting, further demonstrates the pretextual character and discriminatory intent of the voter ID requirement. Assembly Bill 222 was introduced in May 2015 by a sponsoring group of some two dozen Republican members of the State Assembly to require photos on the identification used for the receipt of FoodShare benefits. (FoodShare is the food assistance program in Wisconsin. FoodShare benefits are federally funded and the program is included under the federal supplemental nutrition assistance program (SNAP).[42]) The sponsors of this bill have offered the same rationale regarding system integrity that has been used for the voter ID requirement. According to Republican Representative Jesse Kremer, one of the sponsors of AB 222, "We're trying to maintain integrity of the [FoodShare] system."[43] Moreover, the proof requirements for qualifying for FoodShare and obtaining a card from which to draw benefits are more stringent than for driver's licenses in Wisconsin.

Given that the articulated purposes of the FoodShare photo ID and the voter photo ID are identical and that the requirements for obtaining FoodShare benefits are stricter than those for obtaining a driver's license, we would expect—if the rationale offered for the voter ID law is not pretextual—that the State Assembly would approve the use of FoodShare IDs for voting. And in fact, Democratic representative Andy Jorgenson introduced an amendment that would have allowed precisely that. Yet Republicans in the State Assembly voted the amendment down along party lines before going on to pass the FoodShare photo ID requirement (which is not pending in the State Senate).[44]

The distinguishing feature of FoodShare IDs, as compared to other photo IDs that are authorized for voting, reveals the legislative majority's discriminatory intent. Food benefits are limited to low income persons,[45] and are disproportionately received by minorities by overwhelming margins. Table 13 and Chart 10 show that, based on Census data available at the time the legislature rejected the amendment to authorize the use of FoodShare photo IDs for voting, 45.6 percent of African American households received food aid in Wisconsin, more than four times greater than the 9.8 percent of white households receiving such assistance, for a gap of 23.6 percentage points. In addition, 33.4 percent of Hispanic households received food aid in Wisconsin, more than four and a half times greater than the 9.8 percent of white households receiving such assistance, for a gap of 35.8 percentage points. Thus, the program includes large numbers of persons in Wisconsin, especially minorities. Low income minority persons are also

process.aspx.

42 Wisconsin Legislative Fiscal Bureau, "FoodShare Wisconsin," January 2013, p. 1, http://legis.wisconsin.gov/lfb/publications/Informational-Papers/Documents/2013/52_FoodShare%20Wisconsin.pdf.

43 Amy Beck, "Assembly Backs Off Requiring FoodShare Recipients to Show Photo ID to Buy Food," *Wisconsin State Journal*, 16 September 2015, http://host.madison.com/wsj/news/local/govt-and-politics/assembly-committee-backs-off-requiring-foodshare-recipients-to-show-photo/article_eb975061-972b-5aab-9967-9a5a5c9d0da5.html. As this article explains, Wisconsin cannot under federal law require food aid recipients to show a photo ID to buy food without obtaining a special waiver.

44 Wisconsin State Legislature, Assembly Bill 222, http://docs.legis.wisconsin.gov/2015/proposals/ab222.

45 Income limits are $48,500 for a family of four, Benefits.gov, "FoodShare Wisconsin," http://www.benefits.gov/benefits/benefit-details/1592.

less likely than other persons to have other forms of authorized IDs.

**TABLE 13**
**PERCENT HOUSEHOLDS RECEIVING FOOD ASSISTANCE BY RACE,**
**WISCONSIN, 2013 US CENSUS, AMERICAN COMMUNITY SURVEY, 3-YEAR**
**ESTIMATES**

| Group | Percent Households With Food Assistance | Percent Difference With Whites | Percentage Point Difference With Whites |
|---|---|---|---|
| NH BLACK | 45.6% | **365% HIGHER** | **+35.8 PERCENTAGE POINTS** |
| HISPANIC | 33.4% | **241% HIGHER** | **+23.6 PERCENTAGE POINTS** |
| NH WHITE | 9.8% | **NA** | **NA** |

**CHART 10**
**PERCENT HOUSEHOLDS RECEIVING FOOD ASSISTANCE BY RACE,**
**WISCONSIN, DATA FROM TABLE 13**



36

Fourth, rather than acting affirmatively to help voters obtain free IDs cards, DMV official Steve Krieser, then DMV's operations chief for field services, told employees not to alert voters to this opportunity. "While you should certainly help customers who come in asking for a free ID to check the appropriate box [on a DMV form], you should refrain from offering the free version to customers who do not ask for it," Krieser wrote shortly after adoption of Act 23 in a memo obtained by the *Milwaukee Journal Sentinel*. Republican State Representative Jeff Stone, a leading sponsor of the voter photo ID law defended this 'don't tell' policy. "This is an attempt to try to make an issue out of nothing," he said. "All they have to do [to get a free ID] is ask for it and it's given to them."[46]

Fifth, although allowing photo student IDs from institutions of higher education, Act 23 imposed important restrictions on the use of such IDs. As indicated above, the student ID card must be issued by a Wisconsin accredited university or college that contains the following: -- Date of Issuance -- Signature of Student -- Expiration date no later than two years after date of issuance. The card must not be expired and the university or college ID must be accompanied by a separate document that proves enrollment. The legislature imposed these requirements even though most Wisconsin student IDs did not conform to these standards, which were not present in any other state voter photo ID law at the time. Act 23 also does not include IDs from the state's technical colleges.

The practical obstacles to using a student ID for voting have the greatest impact on African Americans and Hispanics in Wisconsin, who are less likely than whites to possess other forms of identification. African Americans, moreover, are more likely than whites to be enrolled in postsecondary institutions in Wisconsin. As indicated in Table 14, 12.5 percent of voting age African Americans were enrolled in postsecondary institutions, 39 percent higher than the percentage of voting age whites enrolled. The percentage of enrolled Hispanics was 3 percent less than the percentage of enrolled whites, for a difference of 0.3 percentage points.

**TABLE 14**
**ENROLLMENT BY RACE IN WISCONSIN COLLEGES AND UNIVERSITIES,**
**PERCENT OF VOTING AGE POPULATION ENROLLED**

| Racial Group | Percent Difference With Whites | Percentage Point Difference With Whites |
|---|---|---|
| Whites | | |
| 9.0% | NA | NA |
| African Americans | | |
| 12.5% | +39% | +3.5% |
| Hispanics | | |
| 8.7% | -3% | -0.3% |
| Source: Postsecondary enrollment from US Census, American Community Survey, 2010, 3-year estimates. Voting age population from US Census, Complete Population, 2010. | | |
| | | |

---

[46] Patrick Marley, "DMV employees told not to volunteer information on free IDs," *Milwaukee Journal Sentinel*, 7 September 2011, http://www.jsonline.com/news/statepolitics/129400013.html.

The exclusion of postsecondary technical schools is particularly burdensome for African Americans and Hispanics who are disproportionately represented in technical school enrollment in Wisconsin. As indicated in Table 14A, the white enrollment in technical colleges was 7 percent below the white percentage of the Wisconsin voting age population, for a difference of -6.3 percent points. The African American enrollment in technical colleges was 58 percent above the African American percentage of the voting age population, for a difference of 3.3 percentage points. The Hispanic enrollment in technical colleges was 9 percent above the Hispanic percentage of the voting age population, for a difference of 0.4 percentage points.

**TABLE 14A**
**TECHNICAL COLLEGE ENROLLMENT IN WISCONSIN BY RACE, 2010**

| Percent of Racial Group Among Technical College Students | Voting Age Population Percentage | Percent Difference | Percentage Point Difference |
|---|---|---|---|
| Whites | | | |
| 80% | 86.3% | **-7%** | **-6.3%** |
| African Americans | | | |
| 9% | 5.7% | **+58%** | **+3.3%** |
| Hispanics | | | |
| 5% | 4.6% | **+9%** | **+.04%** |
| | | | |
| National Alliance for Partnership in Equity, Wisconsin, Career Technical Education Profile, FY 2012, http://www.napequity.org/nape-content/uploads/Wisconsin-2014-Fact-Sheet_Final_3-28-14.pdf. | | | |

## C.    Decision-Making: Voter Registration

In 2011 and 2013 the state legislature adopted and the Republican governor signed a series of measures that created new barriers to the registration of voters. Information available at the time these measures were enacted demonstrated that they imposed a disparate burden on potential African American and Hispanic voters relative to potential white voters in Wisconsin. These measures are detailed below.

### Act 23 (2011)

- Eliminated one person's vouching for the residence of another to prove residence for the purpose of registering to vote (corroboration).
- Limited the opportunity for students to use a college ID as proof of residence for registering to vote.

38

- Eliminated Government Accountability Board's authority to appoint special registration deputies with the authority to register voters on a statewide basis.

**Act 240 (2011)**

- Eliminated the requirement that special registration deputies be appointed at public high schools.

**Act 182 (2013)**

- Required all voters other than overseas and military voters to provide documentary proof of residence for registration. This changed the prior law which required only those who registered less than 20 days before an election to present documentary proof.

**Act 76 (2013)**

- Overturned a city ordinance in Madison that required landlords to provide voter registration forms to new tenants.

Taken together these many restrictions on options to register to vote impose disproportionate burdens on African Americans and Hispanics who as compared to whites are less affluent, less well educated, less healthy, have less access to automobiles, and move more frequently (see Table 15 below). The following are examples of specific disparate impacts on potential African American and Hispanic voters from particular measures.

The measure eliminating corroboration had a significant impact on the opportunity for citizens to register to vote in Wisconsin. Until abolished in Act 23 corroboration provided a substantial number of Wisconsin citizens the opportunity to register to vote. According to internal GAB emails, a total of 35,332 Wisconsin citizens had registered through corroboration from 2006 through October 2012.[47] Although statistics are not available by race, corroboration is most likely to benefit homeless persons and persons who recently moved and may not yet have the documentation necessary to prove residence. Homelessness is correlated with socio-economic status which in turn is correlated with race as demonstrated in Tables 1 to 3 above. In addition, African Americans and Hispanics in Wisconsin have higher mobility rates than whites. As indicated in Table 15, 26.2 percent of African Americans lived in a different house from the prior year, more than double the 12.5 percent of whites who lived in a different house, for a difference of 13.7 percentage points. As also indicated in Table 15, 19.5 percent of Hispanics lived in a different house from the prior year, 56 percent greater than the white percentage, for a difference of 7.0 percentage points.

---

47 David J. Meyer to Ann Oberle, Sarah Whitt, and Brian Bell, October 18, 2012.

**TABLE 15**
**ONE-YEAR MOBILITY RATES BY RACE, WISCONSIN, US CENSUS, 2010**
**AMERICAN COMMUNITY SURVEY, THREE YEAR ESTIMATES**

| PERCENT LIVING IN DIFFERENT HOUSE PRIOR YEAR | | |
|---|---|---|
| Whites | Percent Difference With Whites | Percentage Point Difference With Whites |
| 12.5% | NA | NA |
| African Americans | | |
| 26.2% | +110% | +13.7 |
| Hispanics | | |
| 19.5% | +56% | +7.0% |
| | | |

Act 182 passed in 2013 makes more onerous the elimination of corroboration by expanding the universe of potential voters required to present proof of residence when voting. As explained by the Wisconsin Legislative Council, this Act "eliminates the exemption for voters who register prior to the close of registration from having to provide proof of residence. Under prior law, a voter who registered before the close of registration (third Wednesday preceding an election) generally was not required to provide proof of residence when registering to vote. Act 182 requires all voters, except a military or overseas voter, to provide such proof of residence when registering. Under the Act, the requirement to provide proof of residence no longer depends upon the date an individual registers to vote."[48]

The elimination of the requirement that special registration deputies be appointed at public high schools likewise has a specific disparate impact on potential African American and Hispanic voters. As indicated in Table 16, given their younger ages and lower incomes, members of these minority groups have a higher enrollment in public high schools in Wisconsin than do whites. According to Table 16, 77.2 percent of Wisconsin public high school students were white, 7 percent and 6.1 percentage points lower than the white percentage of the population. In contrast, 10.1 percent of Wisconsin public high school students were African American, 49 percent and 3.3 percentage points higher than the African American percentage of the population. Likewise, 7.1 percent of Wisconsin public high school students were Hispanic, 20 percent and 1.2 percentage points higher than the Hispanic percentage of the population.

---

48 Wisconsin Legislative Council, 2013 Wisconsin Act 182,
http://docs.legis.wisconsin.gov/2013/related/lcactmemo/act182.

40

**TABLE 16**
**PUBLIC HIGH SCHOOL ENROLLMENT IN WISCONSIN BY RACE, 2010, PERCENT OF STUDENT ENROLLMENT**

| Percent of Racial Group Among All Public HS Students | Total Population Percentage | Percent Difference | Percentage Point Difference |
|---|---|---|---|
| Whites | | | |
| 77.2% | 83.3% | **-7%** | **-6.1%** |
| African Americans | | | |
| 10.1% | 6.8% | **+49%** | **+3.3** |
| Hispanics | | | |
| 7.1% | 5.9% | **+20%** | **+1.2%** |
| | | | |
| US Census, American Community Survey, 2010, 5-Year Estimates; US Census 2010, Complete Enumeration. | | | |

In addition, restrictions on registration by college and university students have a specific disparate impact on potential African American voters. As indicated in Table 14 above, African Americans are overrepresented among college and university students.

Also, the abrogation of the ordinance in Madison for distributing registration forms to renters has a disparate impact on African Americans and Hispanics. According to Table 17, the percentage of African Americans renting rather than owning homes in Madison was 85 percent higher than the percentage of white renters, for a difference of 36.2 percentage points. The percentage of Hispanics renting rather than owning homes in Madison was 46 percent higher than the percentage of white renters, for a difference of 19.5 percentage points.

**TABLE 17**
**PERCENT RENTERS BY RACE, MADISON WISCONSIN, AMERICAN COMMUNITY SURVEY 2010, 5-YEAR ESTIMATES**

| Racial Group | Percent Difference With Whites | Percentage Point Difference With Whites |
|---|---|---|
| Whites | | |
| 42.7% | **NA** | **NA** |
| African Americans | | |
| 78.9% | **+85%** | **+36.2%** |
| Hispanics | | |
| 62.2% | **+46%** | **+19.5%** |
| | | |

41

D. **Decision-Making: Early Voting**

**Act 23 (2011)**

- Reduced the early voting period from 30 to 12 days.

**Act 146 (2014)**

- Eliminated early voting on weekends.

Wisconsin provides a particular form of early voting, authorizing no-excuse absentee voters to cast their votes in person during an early voting period prior to Election Day. Such early voting is a significant component of Wisconsin's elections. According to GAB data, 514,398 absentee votes were filed in election offices in 2012, 17 percent of the total voter turnout that year.[49] Wisconsin enacted these new restrictions on early voting despite evidence that early voting was used disproportionately by African Americans and Hispanics. SPAE and CCES surveys between 2008 and 2012 asked whether respondents voted early. As indicated in Table 18, summing the results to increase sample size, the combined surveys show that 22.4 percent of African American and Hispanic Wisconsin voters voted early, 41 percent and 6.5 percentage points higher than the 15.9 percent of whites who voted early. The results are statistically significant at the standard .1 level. Also, all of the individual surveys beginning in 2008 found a similar pattern of differences in early voting between whites and the two minority groups, although the minority samples are small. In addition, the SPAE researchers in their report on the 2008 survey concluded that nationwide more African Americans and Hispanics availed themselves of early voting than did whites.[50]

**TABLE 18**
**PERCENT OF EARLY VOTERS BY RACE WISCONSIN, SPAE 2008, 2012 AND CCES 2008, 2010 AND 2012, SURVEYS COMBINED**

| PERCENT OF VOTERS VOTING EARLY | | |
|---|---|---|
| **Whites** | **Percent Difference With Whites** | **Percentage Point Difference With Whites** |
| 15.9% (396 of 2,485) | **NA** | **NA** |
| African Americans & Hispanics | | |
| 22.4% (28 of 125) | **+41%** | **+6.5%** |
| Results statistically significant at .1 level. | | |

---

[49] Wisconsin GAB, Post-Election Update, http://www.gab.wi.gov/node/3451.

[50] R. Michael Alvarez, et al.., "2008 Survey of the Performance of American Elections: Final Report," http://votingtechnologyproject.org/sites/default/files/Final%20report20090218.pdf.

Act 146 in 2014 (Senate Bill 324), which eliminated early voting on weekends, passed the legislature in a form that was even more restrictive than the enacted version. It included a provision to limit the total amount of time for early voting to 45 hours in any given city. The legislature also rejected legislation that would allow Milwaukee and other municipalities more than a single voting center for early voting. Milwaukee with some 310,000 registered voters had only one early voting center as did municipalities with just a very small fraction of Milwaukee's registered voter numbers.[51]

The failure to deal with electoral issues in Milwaukee is especially significant given that voters in Milwaukee County, which includes a substantial share of the state's minority population, have experienced much longer waiting times at the polls than the rest of the state. In addition, African American and Hispanic voters across Wisconsin have experienced much longer waiting times than white voters. The 2008 and 2012 CCES surveys include results for Milwaukee County, although not for the city separately. As indicated in Table 19, for the 2008 and 2012 general elections combined, 15.5 percent of Milwaukee County voters experienced wait times of 31 minutes or more, 260 percent higher than the non-Milwaukee percentage of 4.3 percent, for a difference of 11.2 percentage points. Similar patterns apply for the 2008 and 2012 surveys individually. The difference is statistically significant at the .01 level. As indicated in Table 20, for the 2008 and 2012 general elections combined, 16.4 percent of African American and Hispanic voters experienced wait times of 31 minutes or more, 215 percent higher than the white percentage of 5.2 percent, for a difference of 11.2 percentage points. Similar patterns apply for the 2008 and 2012 surveys individually. The difference is statistically significant at the .01 level. The elimination of straight-ticket voting in Act 23 also has an adverse impact on waiting time since it makes voting lengthier for those who would otherwise use this option.

---

51 Jason Stein and Don Walker, "Scott Walker signs early-voting bill; partial veto extends voting hours," *Milwaukee Wisconsin Journal Sentinel*, 27 March 2014, http://www.jsonline.com/news/statepolitics/scott-walker-signs-asbestos-lawsuit-bill-b99234687z1-252672541.html; Wisconsin State Legislature, 2013-2014, Senate Bill 324, https://docs.legis.wisconsin.gov/2013/proposals/sb324.

**TABLE 19**
**WAITING TIMES AT POLLS IN MILWAUKEE COUNTY COMPARED TO REST OF THE STATE COOPERATIVE CONGRESSIONAL ELECTION STUDY (CCES), 2008 AND 2012, WISCONSIN**

| 2008 General Presidential Election | | | | |
|---|---|---|---|---|
| Total Milwaukee Respondents | Milwaukee Voters Waiting 31 Minutes+ | % Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 70 | 14 | **20.0%** | **+14.8 Points *** | **+285%** |
| Total Non-Milwaukee Respondents | Non-Milwaukee Voters Waiting 31 Minutes+ | % Non- Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 427 | 22 | **5.2%** | **NA** | **NA** |
| 2012 General Presidential Election | | | | |
| Total Milwaukee Respondents | Milwaukee Voters Waiting 31 Minutes+ | % Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 124 | 16 | **12.9%** | **+9.2 Points *** | **+249%** |
| Total Non-Milwaukee Respondents | Non-Milwaukee Voters Waiting 31 Minutes+ | % Non- Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 672 | 25 | **3.7%** | **NA** | **NA** |
| 2008 & 2012 General Presidential Elections Combined | | | | |
| Total Milwaukee Respondents | Milwaukee Voters Waiting 31 Minutes+ | % Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 194 | 30 | **15.5%** | **+11.2 Points *** | **+260%** |
| Total Non-Milwaukee Respondents | Non-Milwaukee Voters Waiting 31 Minutes+ | % Non-Milwaukee Voters Waiting 31 Mins+ | Percentage Point Difference With Non-Milwaukee Voters | Percent Difference With Non-Milwaukee Voters |
| 1,099 | 47 | **4.3** | **NA** | **NA** |
| * Statistically Significant at the .01 level. | | | | |

44

**TABLE 20**
**WAITING TIMES AT POLLS BY RACE, COOPERATIVE CONGRESSIONAL ELECTION STUDY (CCES), 2008 AND 2012, WISCONSIN,**

| 2008 General Presidential Election | | | | |
|---|---|---|---|---|
| Total Black & Hispanic Respondents | Black & Hispanic Voters Waiting 31 Mins+ | % Black & Hispanic Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 18 | 4 | **22.2%** | **+15.9 Points \*** | **+252%** |
| Total White Respondents | White Voters Waiting 31 Mins+ | % White Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 462 | 29 | **6.3%** | **NA** | **NA** |
| 2012 General Presidential Election | | | | |
| Total Black & Hispanic Respondents | Black & Hispanic Voters Waiting 31 Mins+ | % Black & Hispanic Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 49 | 7 | **14.3%** | **+9.8 Points \*** | **+218%** |
| Total White Respondents | White Voters Waiting 31 Mins+ | % White Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 727 | 33 | **4.5%** | NA | |
| 2008 and 2012 General Presidential Elections Combined | | | | |
| Total Black & Hispanic Respondents | Black & Hispanic Voters Waiting 31 Mins+ | % Black & Hispanic Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 67 | 11 | **16.4%** | **+11.2 Points\*** | **+215%** |
| Total White Respondents | White Voters Waiting 31 Mins+ | % White Voters Waiting 31 Mins+ | Percentage Point Difference With Whites | Percent Difference With Whites |
| 1,189 | 62 | **5.2%** | **NA** | **NA** |
| \*Statistically Significant at .01 level. | | | | |

45

### E. Decision-Making: Residency Requirements

**Act 23 (2011)**

- Increased the in-state residency requirement for voting for offices other than president and vice president from 10 to 28 days before an election and required persons who move within the state later than 28 days before an election to vote at their previous ward or election district.

This increase in the residency requirement has a disparate effect on African Americans and Hispanics, who are more likely than whites to move into Wisconsin from another state. As indicated in Table 21, 2.1 percent of African Americans moved into Wisconsin from another state during the prior year, 31 percent and 0.5 percentage points higher than the 1.6 percent of whites moving into the state. For Hispanics, 2.4 percent moved into Wisconsin from another state during the past year, 50 percent and 0.8 percentage points higher than the 1.6 percent of whites moving into the state. Similarly, the greater mobility of African Americans and Hispanics as compared to whites also indicates that the requirement that recent movers must only vote at their previous ward or election district places a disparate burden on members of these minority groups.

**TABLE 21**
**PERSONS MOVING INTO WISCONSIN FROM ANOTHER STATE BY RACE, WISCONSIN, US CENSUS, 2010 AMERICAN COMMUNITY SURVEY, 3-YEAR ESTIMATES**

| Percent Living In Different House Prior Year | | |
|---|---|---|
| Whites | Percent Difference With Whites | Percentage Point Difference With Whites |
| 1.6% | NA | NA |
| African Americans | | |
| 2.1% | +31% | +0.5% |
| Hispanics | | |
| 2.4% | +50% | +0.8% |
| | | |

46

### F. Decision-Making: Absentee Ballots

**Act 227 (2011)**

- Limited the circumstances in which municipal clerks can return absentee ballots to voters to fix mistakes.

By limiting options to correct an absentee ballot, Act 227 also places a disparate burden on African American and Hispanic voters, who have much lower levels of education and educational attainment in Wisconsin than do whites, as indicated in Table 2 above. This problem is especially acute for Wisconsin Hispanics. According to the US Census American Community Survey 2010, 3-Year Estimates, 33.2 percent of Hispanics in Wisconsin speak English "less than very well."

## VI. PROCEDURAL AND SUBSTANTIVE DEVIATIONS

Given unified Republican control of the legislature and governorship from 2011 to 2014 Republicans did not have to violate procedural rules to enact the many limitations on voting described and analyzed above. Nonetheless along with the many substantive changes in voting and registration analyzed above, procedural deviations have occurred.

First, Republicans in the legislature introduced legislation late in sessions with little time for debate, discussion, and analysis. In its letter to the State Assembly regarding Act 23 in 2011 the GAB reported that, "This draft [of the bill] was first available for review late on Friday of last week. There has been no time for the careful evaluation and vetting needed to ensure the best options for voters and election officials are enacted."[52] Republican State Senator Dale Schultz, a legislator for several decades and former Republican leader in the Senate, said in 2014 of the election bills, "These bills came up rather swiftly at the end of the session here. I don't think we gave people adequate opportunity to comment on them."[53]

Examination of transcripts for State Assembly and State Senate sessions also indicates that there was very little debate on these measures which affected the fundamental right to vote. For the most part Republicans in the legislature let Democrats express their opposition while very rarely engaging in substantive debate.

Second, the sheer magnitude of 8 Acts and some 15 measures limiting access to registration and voting is unprecedented nationwide. This spate of legislation exceeds in magnitude even of the voting and registration legislation adopted by North Carolina in 2013 that made national headlines.[54] Unlike Wisconsin, moreover, North Carolina revised its voter photo

---

[52] Op Cit., fn. 33, p. 2.

[53] Interview with Radio 92.1, audio at http://www.themic921.com/onair/the-devils-advocates-47215/state-senator-dale-schultz-on-sd-12150295/.

[54] For a summary of North Carolina's legislation see Democracy North Carolina, "Summary of NC's New Voting Law," http://www.democracy-nc.org/downloads/NewVotingLawSummaryAug2013.pdf.; Ari Berman, "North Carolina Passes Country's Worst Voter Suppression Law," *The Nation*, 28 July 2013,

ID from strict to non-strict by providing voters lacking an acceptable photo ID the opportunity to vote through an affidavit citing a "reasonable impediment" to obtaining such identification.[55]

Third, the key event leading Wisconsin to the adoption of a new photo ID law and numerous other measures was the midterm election of 2010, which gave Republicans unified control of state government. Nationwide Republicans also gained ground in state government in the 2010 midterms. In addition, the decline in white voting strength documented for Wisconsin is a national phenomenon. Thus not just Wisconsin but other Republican controlled states in 2011 adopted new electoral measures that limited opportunities to register and vote, notably new voter photo ID laws, which previously had been limited to a very few states. As demonstrated by the national data shown in Chart 11, in midterm elections, the white share of the electorate declined from 82 percent in 2002 to 78 percent in 2010 and 77 percent in 2014. In presidential elections the white share of the electorate declined from 79 percent in 2004 to 76 percent in 2008 and 74 percent in 2012. Likewise the nationwide exit polls reported in Table 22 for the past two presidential elections demonstrate that Republicans nationally are dependent on white voters, with polarization numbers similar to those found in Wisconsin.[56] As in Wisconsin, the polarization was not limited to elections in which Barack Obama competed, but was also evident in the 2004 presidential election, which involved two white candidates.

---

http://www.thenation.com/article/north-carolina-passes-countrys-worst-voter-suppression-law/.
55 General Assembly of North Carolina, 2015 Session, SESSION LAW 2015-103 HOUSE BILL 836,
http://www.ncleg.net/EnactedLegislation/SessionLaws/PDF/2015-2016/SL2015-103.pdf.
56 Reliable national data on voter polarization is available only for presidential elections given that all states do not have comparable races in midterm years.

**CHART 11**
**CHANGES IN THE WHITE COMPONENT OF VOTERS, UNITED STATES**
**ELECTION PROJECT**
**(http://www.electproject.org/home/voter-turnout/demographics)**



**TABLE 22**
**SUPPORT FOR REPUBLICAN CANDIDATES BY RACE AND ETHNICITY, UNITED STATES PRESIDENTIAL ELECTIONS, EXIT POLLS, 2004 – 2012**

| Election | Racial Group | | | | |
|---|---|---|---|---|---|
|  | White | Black | Hispanic | Asian | Others |
|  |  |  |  |  |  |
| **2004 President** | 58% | 11% | 44% | 44% | 40% |
|  |  |  |  |  |  |
| **2008 President** | 55% | 4% | 31% | 35% | 31% |
|  |  |  |  |  |  |
| **2012 President** | 59% | 6% | 27% | 26% | 38% |
|  |  |  |  |  |  |
| **Mean** | **57%** | **7%** | **34%** | **35%** | **36%** |
|  |  |  |  |  |  |
| **Mean Difference With Whites** | **NA** | **-50 Percentage Points** | **-23 Percentage Points** | **-22 Percentage Points** | **-21 Percentage Points** |
|  |  |  |  |  |  |
| Exit polling conducted after each election by Edison Research, http://www.edisonresearch.com/election-polling/, available through CNN, television networks and New York Times. | | | | | |

Consistent with the fall in relative white turnout and the dependence of Republicans on white votes, not only Wisconsin but other Republican controlled states enacted new voter photo ID laws from 2010 to 2013. As indicated in Table 23, in 2011 and 2013 some 13 states adopted new voter photo identification laws. As also indicated in Table 23, Republicans controlled the state legislature and the governorship in 9 of the 13 states. In two of the four remaining states – Arkansas and New Hampshire – Republican legislators enacted the voter photo ID laws by overriding the veto of a Democratic governor. In another state – Mississippi – voters enacted the voter photo ID law in a statewide referendum backed by Republicans. That leaves only the State of Rhode Island, which enacted a voter photo ID law with a Democratic legislature and an independent governor.

50

**TABLE 23**

**PARTISAN CONTROL OF STATES ADOPTING VOTER PHOTO ID LAWS 2011-2013**

| State | State Legislature | Governor |
|---|---|---|
| ALABAMA 2011 | REPUBLICAN | REPUBLICAN |
| ARKANSAS 2013 | REPUBLICAN | DEMOCRATIC |
| KANSAS 2011 | REPUBLICAN | REPUBLICAN |
| MISSISSIPPI 2011 | DEMOCRATIC | REPUBLICAN |
| NEW HAMPSHIRE 2012 | REPUBLICAN* | DEMOCRATIC |
| NORTH CAROLINA 2013 | REPUBLICAN | REPUBLICAN |
| PENNSYLVANIA 2012 | REPUBLICAN | REPUBLICAN |
| RHODE ISLAND 2011 | DEMOCRATIC | INDEPENDENT |
| SOUTH CAROLINA 2011 | REPUBLICAN | REPUBLICAN |
| TENNESSEE 2011 | REPUBLICAN | REPUBLICAN |
| TEXAS 2011 | REPUBLICAN | REPUBLICAN |
| VIRGINIA 2013 | REPUBLICAN | REPUBLICAN |
| WISCONSIN 2011 | REPUBLICAN | REPUBLICAN |
| | | |
| National Conference of State Legislature, "Voter ID History," http://www.ncsl.org/research/elections-and-campaigns/voter-id-history.aspx; NCSL, "State Partisan Composition, http://www.ncsl.org/research/about-state-legislatures/partisan-composition.aspx#Timelines. Individual state websites. | | |

## VII. CONTEMPORANEOUS VIEWPOINTS BY DECISION-MAKERS AND OTHER RELEVANT PARTIES

As recognized by the Supreme Court in the *Arlington Heights* case, unambiguous statements of discriminatory intent are rare. However, long-serving Republican State Senator Dale Schultz, who had earlier voted for Act 23, later said that this Act and other measures limiting voting and registration adopted by his Republican colleagues were aimed at suppressing votes not deterring fraud or serving any other good-government purpose. In a March 2014 interview on Radio 92.1, Schultz said, "In the spirit of the champion of the 1957 Voting Rights Act, I have been trying to send a message that we are not encouraging voting, we are not making voting easier in any way, shape or form with these bills. Back in 1957 with the leadership of Dwight Eisenhower, Republicans were doing that. And that makes me sad, frankly." He said, "I'm just not willing to defend them anymore … It's just sad when a political party has so lost faith in its ideas that it's pouring all of its energy into election mechanics. We should be pitching as political parties our ideas for improving things in the future rather than mucking around in the mechanics and making it more confrontational at the voting sites and trying to suppress the vote."[57]

---

[57] Op Cit., fn. 53.

With respect to the voter photo ID bill for which he had voted, Schultz said, "It's all predicated on some belief there is a massive fraud or irregularities, something my colleagues have been hot on the trail for three years and have failed miserably at demonstrating."[58]

Statements by Republican backers of Act 23 and other voting and registration legislation are also misleading, contradictory, and pretextual. Examples follow below.

### A.      The Common Sense Argument

Proponents of the voter ID bill in Wisconsin claimed that it just brought voting in line with other activities that require a photo ID. According to Republican Senator Frank Lasee, "Well, in today's society, what do we need a photo identification for today? Check out a library book in Milwaukee County, to rent a movie, to buy beer or liquor, to fly in an airplane, to get married, drive a car, sign a contract, cash a check, apply for welfare benefits."[59]

This claim does not withstand scrutiny. Even though voting, unlike these other activities, is a fundamental right, the 2011 photo voter ID law in Wisconsin actually makes it far more difficult to vote than to conduct any of these other activities. All of the alleged photo ID requirements listed by Senator Lasee could be satisfied for example with various forms of government-issued photo IDs that are not acceptable for voting in Wisconsin such as a veteran's benefits card or a government employee ID.

In addition, nearly all the activities listed by Senator Lasee could be conducted without any form of photo ID:

- **Checking out a book in a Milwaukee County library**. To obtain full library privileges an individual must present IDs that establish name and address. However, these can be non-photo IDs such as a signed social security card, a birth certificate, a rental lease agreement, a utility bill, postmarked mail, a paycheck stub, a recent school report card or school schedule, a pre-printed personal check, or a vehicle registration.[60]

- **Renting a movie**. There are numerous Redbox locations throughout Wisconsin where you can rent a movie without an ID. You can also sign up online for a Redbox account.[61]

- **Buying beer or liquor**. IDs are required only if a purchaser appears to be under the legal drinking age of 21.[62]

---

58 *Ibid*.
59 Transcript of State Senate Meeting, 19 May 2011, p. 27, lns. 4-11.
60 Milwaukee, CountyCat Help Center, Getting a Library Card, https://countycat.mcfls.org/help#.
61 http://www.redbox.com/locations/wisconsin; http://www.wikihow.com/Rent-Movies-from-Redbox; https://www.redbox.com/Register?ReturnUrl=%2faccount.
62 Wisconsin Department of Revenue, "Wisconsin Alcohol Beverage and Tobacco Laws for Retailers," p. 7, http://www.darlingtonwi.org/Pub_302_Guide_For_Wisc._Alcohol_Bev.pdf.

- **Flying in an airplane.** Unlike Wisconsin's strict voter photo ID law, the Transportation Safety Administration (TSA) makes accommodation so that persons can board an airplane *without* photo identification. As the following statement of TSA policy makes clear, alternative identification can be accepted in lieu of a valid photo ID:

> "In the event you arrive at the airport without proper ID, because it is lost or at home, you may still be allowed to fly. By providing additional information, TSA has other ways to confirm your identity, like using publicly available databases, so you can reach your flight."[63]

Moreover, other TSA accommodations enable passengers to board aircraft without *any* form of identification in their possession. The TSA explains as follows:

> "In the event you arrive at the airport without valid identification, because it is lost or at home, you may still be allowed to fly. The TSA officer may ask you to complete a form to include your name and current address, and may ask additional questions to confirm your identity. If your identity is confirmed, you will be allowed to enter the screening checkpoint. You may be subject to additional screening."[64]

- **Getting married**. Although county practices may vary, under Wisconsin state law a birth certificate, but not a photo ID, is required for obtaining a marriage license.[65]

- **Signing a contract**. There is no legal requirement in Wisconsin for a photo ID to sign a contract. Consumers sign contracts all the time without presenting photo ID. As indicated above even a marriage contract does not require a photo ID. A person with power of attorney can sign a contract for another person; a contract may be executed and signed electronically.[66]

- **Cashing a check**. Individuals can cash a check at payday check cashing services in Wisconsin without photo ID and even without an ID through their verification process.[67]

- **Applying for welfare benefits**. As indicated above an applicant for FoodShare in Wisconsin need not submit a photo ID and FoodShare benefit cards do not (currently) include a photo. The Social Security administration also indicates that an applicant for Social Security/Medicare need not submit a photo identification in order to receive benefits.[68]

---

63 Transportation Security Administration, *Frequently Asked Questions*, https://www.tsa.gov/travel/frequently-asked-questions.
64 Transportation Security Administration, *Acceptable IDs*, http://www.tsa.gov/traveler-information/acceptable-ids.
65 Wisconsin Statutes, 765.08, http://docs.legis.wisconsin.gov/statutes/statutes/765/08.
66 Wisconsin Statutes, Subchapter II, 137.11-26.
67 http://www.paydaycheckcashingwi.com/payday-advance-services.
68 Social Security, Official Social Security Website, "Retirement Planner: What Documents Will You Need When You Apply?" https://www.ssa.gov/planners/retire/applying5.html.

### B.    Election Integrity and Confidence

Absent documented examples of voter impersonation at the polls, backers of Wisconsin's voter photo ID law said that the bill was needed to uphold voter confidence in the integrity of the ballot in Wisconsin. In support of Act 23, Republican State Senator Joe Leibham said, "the reason behind this photo ID bill and the bill in general is to move forward constitutionally sound provisions relating to photo ID and other election reform measures that are going to do just that. They are going to add additional reasonable safeguards to our election process that will ensure the integrity of the votes that take place here in the state of Wisconsin while instilling a greater degree of confidence in the state of Wisconsin."[69]

Yet neither Senator Leibham nor any other backer of Act 23 could cite a crisis of confidence regarding elections in Wisconsin or a lack of election integrity. To the contrary, as indicated above, Wisconsin was a national leader in voter turnout and the administration of elections. As indicated above, the post-2008 Battleground poll found near universal satisfaction among Wisconsin voters about their voting experience. The poll also showed that 87 percent of Wisconsin voters were very confident that their ballot was counted as intended, compared to 82 percent in other Big Ten states (statistically significant at .01). Only 2 percent of Wisconsin respondents were not too confident or not confident at all about the integrity of their vote.[70]

Backers of Act 23 also failed to show a relationship between the enactment of such laws and public confidence in ballot integrity. To the contrary, a study by then-MIT professor Stephen Ansolabehere and then-Columbia University professor Nathaniel Persily – available at the time of enactment of Wisconsin's voter photo ID law – found that there was no relationship between the adoption of stricter voter ID laws and public beliefs about the existence of fraud in the election system. The two analysts concluded that:

> "The use of photo identification requirements bears little correlation to the public's beliefs about the incidence of fraud. The possible relation of such beliefs to participation appears even more tenuous. This lack of empirical support leads us to conclude that, at least in the context of current American election practices and procedures, public perceptions do not provide a firm justification for voter identification laws."[71]

Indeed, far from building public confidence in the integrity of Wisconsin's electoral process, there are good reasons to believe the photo voter ID requirement has precisely the opposite effect. African Americans, Hispanics, students, the poor, and other groups who are disproportionately burdened by the ID requirement and in many instances deterred from voting as a result are likely to have less rather than more confidence in the fairness of Wisconsin

---

69 Transcript of State Senate Meeting, 9 May 2011,   p. 36, lns. 20-22, p. 37, lns. 1-7.
70 Op Cit., fn. 16.
71 Stephen Ansolabehere and Nathaniel Persily, "Vote Fraud in The Eye Of The Beholder: The Role of Public Opinion in The Challenge to Voter Identification Requirements," *Harvard Law Review* 121 (2008). p. 1760, http://www.harvardlawreview.org/wp-content/uploads/pdfs/ansolabehere_persily.pdf.

elections. Moreover, the unjustified claims of widespread voter fraud used to justify the voter ID requirement are likely to cause voters to distrust the integrity of the election system when there is no basis for doing so. In response to claims by some Wisconsin legislators of significant voter fraud, GAB Director and General Counsel Kevin Kennedy emphasized that, "Speaking frankly on behalf of our agency and local election officials, absent direct evidence, I believe continued unsubstantiated allegations of voter fraud tend to unnecessarily undermine the confidence that voters have in election officials and the results of the election. I hope that, as elected officials, you would agree that there is little benefit in promoting unsupported allegations questioning the credibility of the election process and the work of local clerks and election inspectors."[72]

Historically, calls for "election integrity" or "ballot security" have been closely tied to efforts to discourage voting by minorities. In the presidential election of 1964, Republicans introduced the so-called "ballot security" program ostensibly designed to discourage voter fraud, but in practice aimed at diminishing turnout in heavily Democratic minority neighborhoods. The purported goal of the program, dubbed "Operation Eagle Eye" after a similar effort in Arizona, was to dispatch some 100,000 poll watchers to precincts in 35 selected cities to discourage balloting by more than a million potentially fraudulent voters. In Houston, for instance, handbills circulated in heavily black neighborhoods warned that persons with outstanding parking tickets or convictions for traffic offenses could be arrested if they tried to vote in the election.[72]

This practice of voter suppression became sufficiently widespread that in response to lawsuits in 1982 and again in 1987, the National Republican Party agreed to consent decrees in federal court that prohibited the national party from engaging in anti-fraud activities that targeted minority voters. In 2009, federal Judge Dickinson Debevoise, who had presided over the 1980s lawsuits, denied a Republican National Committee motion to end the consent decree, although he added a presumptive expiration date of seven years hence unless violations were proven. The U.S. Court of Appeals for the Third Circuit upheld his ruling. "Minority voters continue to overwhelmingly support Democratic candidates," Judge Debevoise wrote in his decision. "As long as that is the case, the RNC and other Republican groups may be tempted to keep qualified minority voters from casting their ballots, especially in light of the razor-thin margin of victory by which many elections have been decided in recent years." After reviewing all evidence of alleged voter fraud presented by the Republican National Committee he found that, "In fact, even a cursory investigation of the prevalence of voter intimidation demonstrates that ballot security initiatives have the potential to unfairly skew election results by disenfranchising qualified voters in far greater numbers than the instances of in-person fraud that may occur during any given race."[73]

In light of this history, it is worth noting that in 2013 the legislature and governor expanded the capacity for persons to challenge voters at the polls. Under Act 177 the state required an area for election observers to be set within three to eight feet of the table where persons sign in and obtain their ballots. Prior to this law, observers were required, pursuant to

---

72 Letter from Kevin J. Kennedy to State Assembly Speaker Jeff Fitzgerald. July 13, 2012.
73 *DNC v. RNC*, Case 2:81-cv-03876-DRD-MAS, Document 84, Filed 12/01/09; *DNC v. RNC*, No. 09-4615, United States Court of Appeals for the Third Circuit, 673 F.3d 192.

GAB policy, to maintain a six-foot distance from voters. In a flier on "Voter Rights and Responsibilities" issued in July 2012, shortly after the Wisconsin gubernatorial recall election, GAB Director Kevin Kennedy noted, "Our system of open, transparent elections depends on members of the public serving as observers at polling places. . . . However, in recent elections we have received disturbing reports and complaints about unacceptable, illegal behavior by observers. Voters expect a calm setting in which to exercise their right to vote."[74]

### C.      Public Support

Legislative backers of voter ID claimed substantial public support for this measure. According to Republican State Representative Robin Vos (later voted Speaker), "I think this is common sense … this is a 75 to 80 percent issue and I think it's about time that Wisconsin finally says in order to vote you just got to prove who you are and specially in this amendment say that you are a citizen."[75] Yet the photo ID bill does not establish citizenship since some forms of authorized IDs such as driver's licenses can be possessed by non-citizens. Moreover, polls showing public support for voter ID bills reference generically government-issued photo identification, not the very restrictive list of photo IDs that are included in Act 23.

This public support justification is also inconsistent because legislators cannot claim public support by the electorate for other measures adopted, including restrictions on registration, the curtailment of early voting to 12 days, and the elimination of weekend voting. According to the 2012 SPAE 75.5 percent of registered voters in Wisconsin favored greatly expanding voter registration by automatically registering all citizens when they turn 18 years of age. This is actually higher than the 68.5 percent of Wisconsin registered voters who favored a voter photo ID requirement in the poll. The SPAE survey also found that rather than making it more difficult for voters who moved to vote, 70.5 percent of registered voters in Wisconsin favored making "it so that when a registered voter moves, he or she is automatically registered to vote at the new home." A Marquette Law School Poll in March 2014 conducted after the state restricted early voting to 12 days and then eliminated weekend early voting found that 66 percent supported a two or three week period of early voting with at least one weekend of early voting.[76]

### D.      Burdens on Election Officials

In attempting to justify the elimination of the requirement for registration at high schools, one of the backers of this measure, Republican State Representative Patricia Strachota (later elected Assembly Majority Leader) said, "I just wanted to inform the body that the reason that this bill came forward was that I was -- became a co-sponsor of this bill is because when I was doing office hours in my district, one of the town clerks came to me and, basically, said that they were required now to go into each of the high schools and register a designated person to register

---

74 "GAB Issues Flier on Voter Rights and Responsibilities," 12 July 2012, http://www.gab.wi.gov/node/2437.
75 Transcript of State Assembly Meeting, 9 May 2011, p. 5, lns. 15- 20.
76 Marquette Law School Poll, 26 March 2014, https://law.marquette.edu/poll/wp-content/uploads/2014/03/MLSP20Toplines.pdf.

voters in that high school and she thought it was going to be a very cumbersome process."[77] This explanation is pretextual because in many other measures the Republican majority actually increased the burdens on election officials. Under new measures election officials also have to verify that an increased number of late movers are voting at the prior precinct and not at their new precinct and officials no longer have the option of faxing or emailing absentee ballots to most voters. A new measure also eliminates the exemption for voters who register prior to the close of registration from having to provide proof of residence, placing yet another requirement on election officials. (Acts 23, 211, 182).

In addition, Republicans enacted a complex photo voter ID bill with particular kinds of government-issued photo IDs – such as student IDs that do not meet particular criteria and government employee IDs – not permitted for voting. The law also requires election officials to issue provisional ballots to voters who lack the requisite IDs. As the GAB warned prior to enactment of Act 23, "The expanded use of provisional ballots for individuals lacking the required identification also places an unnecessary strain on the administration of elections. Provisional voting delays the resolution of elections and will require changing the meeting dates of county and local canvassing boards."[78] Although the GAB noted that the draft of Act 23 was introduced so late that it did not have time for a full evaluation, it concluded that in addition to issues with voter IDs and provisional ballots, "There are numerous other provisions in the bill which will significantly alter the administration of elections and put additional stress on an already overburdened system."[79] Later in 2012 after the state enacted Act 23 and other new measures, the GAB concluded, "These fundamental changes have already caused, and will continue to cause, increased responsibilities for all of us. The significance of these legislative changes have strained your and our limited resources and resulted in more frequent communications from the G.A.B., revised or created new procedures, revised forms, revised manuals, new training, teleconferences, and webinars in an effort to support all of us."[80]

## E.        Conformity With Other States

Decision-makers insisted many times that with respect to reducing early voting from 30 to 12 days they were simply bringing Wisconsin into conformity with practices in most other states of the union. Yet Wisconsin had achieved distinction in voter turnout and election administration by not simply conforming to practices in other states. For example, Wisconsin was one of very few states at the time to provide voters the option for same day registration. In addition, Wisconsin's new voter photo ID law brought the state far out of line with every other state in the nation. At the time of Wisconsin's enactment of its voter photo identification law, only two other states had in place strict voter ID measures – Georgia and Indiana. In addition, unlike Georgia and Indiana, Wisconsin in 2011 did not broadly authorize for voting the use of government issued IDs. Instead, it excluded or restricted various categories of government-issued IDs, such as government employee IDs, making it unique among all states. In addition, at

---

77 Transcript of Wisconsin State Assembly Meeting, 14 March 2012,  p. 9, l. 13-22.
78 Op Cit., fn. 33.
79 *Ibid*., p. 2.
80 Wisconsin GAB, "Acts 227 and 240," 20 April 2012, http://www.gab.wi.gov/node/2335.

the time of its adoption of the 2011 law no other state had in place a requirement that a copy of a photo identification must be submitted with an absentee ballot application.[81]

Backers of legislation that eliminated weekend early voting and restricted voter hours in early voting claimed that this was an effort to achieve uniformity given that small municipalities lacked the resources to provide such opportunities. "This bill is equality across the state," said its Assembly author, Representative Duey Stroebel.[82] However, such opportunity could have been provided by giving the small municipalities the resources to maintain larger early voting opportunities rather than imposing new restrictions. In addition, this argument ignores the fact that large cities serve vastly more voters than small municipalities and the alleged uniformity actually creates significant inequities. As noted in Table 19 above, voters in Milwaukee face significantly greater waiting times at the polls than do voters elsewhere in the state.

The author of the bill restricting the number of days of early voting, Republican State Senator Glenn Grothman, also indicated that the intent was not to achieve uniformity but to make sure that opportunities available in Milwaukee and Madison did not spread to other areas. Grothman declared he wanted to "nip this in the bud" before extended early voting made available in Milwaukee and Madison spread elsewhere.[83]

## VIII. CONCLUSIONS

The history of discrimination against African Americans and Hispanics in Wisconsin has its legacy today in major socio-economic disparities between these minority groups and white residents of the state. These socio-economic disparities have important implications for the measures analyzed in this report, which make it more difficult than it was before the enactment of those measures for those of lower socio-economic standing to register and vote in Wisconsin. In recent years minority voting strength and grown in Wisconsin, corresponding to a decline in white voting strength. This shift in the composition of the electorate poses challenges to Republicans in this competitive state. African Americans in Wisconsin vote overwhelmingly for Democratic candidates and Hispanics vote in large measure for Democratic candidates. Thus Republican rely upon the voting strength of whites in Wisconsin.

Prior to 2011 Wisconsin was a national leader in voter turnout and the excellent administration of elections. Charges of widespread voter impersonation in the state proved unfounded despite vigorous investigations, a finding confirmed by outside studies that included an analysis conducted by the Republican National Lawyers' Association. Yet when Republicans gained unified control of government they enacted the most stringent voter photo identification bill in the nation at that time, while rejecting all amendments to ameliorate its effects on minority voters. Republicans in the State Assembly also rejected an amendment that would make food assistance IDs eligible for voting under pending legislation to add photographs to FoodShare

---

81 Long Distance Voter, "2015 Voter ID Laws," http://www.longdistancevoter.org/voter-id-laws#.VmTdSriDGko.
82 Bob Hague, "Mayors Seek Voting Restrictions Veto," *Wisconsin Radio Network*, 24 March 2014, http://www.wrn.com/2014/03/mayors-seek-voting-restrictions-veto/.
83 *Ibid*.

IDs. Unlike IDs authorized for voting under Act 23, African Americans and Hispanics disproportionately possessed FoodShare IDs by overwhelming margins.

The voter photo ID provision of Act 23 and numerous other measures in Act 23 and other legislation enacted through 2014 restricted access to voting and registration in Wisconsin, especially for minorities. Taken together these many laws, some with multiple provisions, comprised the largest set of restrictive electoral measures enacted anywhere in America in recent years. The adoption of these measures cannot be attributed to any objective change in Wisconsin's voter turnout, the administration of elections, or voter impersonation.

The plausible explanation for these many restrictive measures is the partisan gains that Republicans can achieve through provisions that disproportionately burden African American and Hispanic voters and potential voters. Virtually every measure enacted from 2011 to 2014 directly impeded African American and Hispanic opportunities to register and vote as compared to white opportunities. As Republican State Senator Dale Schultz, a former Senate Republican leader who voted for Act 23 said, "We [Republicans] should be pitching as political parties our ideas for improving things in the future rather than mucking around in the mechanics and making it more confrontational at the voting sites and trying to suppress the vote" (quoted above).

Alternative explanations offered by decision-makers for Act 23 and other measures analyzed here were misleading, contradictory, and pretextual, including claims that a photo ID was necessary for such commonplace activities as boarding a plane, checking out a library book, or renting a movie.

In sum, based on standard historical methods of analysis, the analysis of quantitative information, and my 45 years of experience in analyzing voting and elections, I reach the following conclusion: After Republicans achieved unified control of Wisconsin state government in 2011, the majority in the legislature enacted Act 23 and other measures relating to voting and registration with the intent and purpose of achieving partisan advantage through the limitation of African American and Hispanic voting and registration opportunities as compared to opportunities for whites in Wisconsin.

59

# EXHIBIT 1

# Curriculum Vitae

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

## EDUCATION

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

## PROFESSIONAL EXPERIENCE

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

**Expert witness in more than 80 redistricting, voting rights and civil rights cases**

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

## HONORS AND AWARDS

Outstanding Teacher, College of Arts and Sciences, 1975-76

Outstanding Scholar, College of Arts and Sciences, 1978-79

Outstanding Scholar, The American University, 1982-83

Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000 meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500 meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Texas Congressional redistricting case *LULAC v. Perry* (2006)

Finalist for the 2008 National Book Critics Circle Award in general nonfiction for WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT.

Interviews nominated by the Associated Press for the Edward R. Murrow Award for broadcasting excellence.

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

FDR AND THE JEWS designated for Belknap Imprint of the Harvard University Press, reserved

for works of special distinction and lasting value; *New York Times* editors choice book for 2013, submitted for Pulitzer Prize 2013,, winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History,

## SCHOLARSHIP

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books Edition, 2005)

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

THE KEYS TO THE WHITE HOUSE, 2016 EDITION (forthcoming, 2016, Lanham: Rowman

& Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).

Monograph:

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001

B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds., POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D. C.: American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History:`Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow,

1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?," SOCIAL EDUCATION 60 (1996)

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

"What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT (Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT; THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of,"
ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with
Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House:  A Preliminary Forecast for 2012" INTERNATIONAL
JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010)
REF

 "The Keys to the White House:  Forecast for 2012," FORESIGHT: THE INTERNATIONAL
JOURNAL OF APPLIED FORECASTING (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

 "The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE
AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973)
REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons,
`The Substance of Inherency,`" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION
(with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC
ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION
(with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC
ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC
ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC
ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald
Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert
2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with
Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in
Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED

DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted: LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February 17, 1982)

"How to Bet in 1984.  A Presidential Election Guide," WASHINGTONIAN MAGAZINE (April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6, 1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page, (December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All, (May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page, (April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in 1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?," WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May, 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)

"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op

Ed (June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of

the Right," NEWSDAY, (August 7, 2005)

"Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO ( June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPOTER (October 17, 2008)

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

"Why Democrats Need Hillary Clinton in 2016," THE HILL, June 11, 2014

"How Corporations Buy Our Government," THE HILL, July 1, 2014

"Who Rules America," THE HILL, August 12, 2014

"The End of Civil Discourse?" THE HILL, September 10, 2014

"Pass the Ache Act and Stop Destroying Appalachia?" THE HILL, October 28, 2014

Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 - 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.


**TEACHING**

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth Century, United States Economic History, Historiography, Major Seminar in History, Graduate Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), **Historians and the Living Past for Honors**

**Students**, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, **Government and the Citizen (Honors Program),** Introduction to Historical Quantification, Public Policy in U. S. History, **Honors Seminar in U.S. Presidential Elections**, America's Presidential Elections, What Is America?, **Honors Seminar on FDR, Jews, and the Holocaust**.

## TELEVISION APPEARANCES

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally, including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

## RADIO SHOWS

I have participated in more than 2000 radio interview and talk shows broadcast nationwide, in foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

## PRESS CITATIONS

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia*

*Inquirer, Time, Newsweek, Business Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

## SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES

Invited participant and speaker, Bostick Conference on Fogel and Engerman`s TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History, October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930`s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyer's Committee for Civil Rights Under Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April, 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April, 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November, 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February, 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August, 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

Testimony Presented Before the Texas State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Texas State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2013

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, **"Election 2008: What Happened and Why?" Boston, February 2009**

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, **"The Keys for 2012" Chicago, April 2010**

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October, 2010, 2011

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forun, Krynica, Poland, 2013

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department
of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social
Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History,
1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University,
1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle
States Accreditation Review 1992-1994

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

**OTHER POSITIONS**

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:

    1. directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.
    2. chairing a public session at the Smithsonian on how to do the history of one's own family.
    3. helping to direct the Sixth International Smithsonian Symposium on Kin and Communities in America (June 1977).
    4. editing the volume of essays from the symposium.

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential Candidates." This document was a major component of Anderson's legal arguments against restrictive ballot laws that ultimately prevailed in the Supreme Court (Anderson v. Celebreeze 1983). According to Anderson's attorney: "the basis for the majority's decision echoes the themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition techniques to their work on the recovery of communities from the effects of such natural disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.

# EXHIBIT 2

# ALLAN J. LICHTMAN, CASES (DATES APPROXIMATE)
## DEPOSITION, AFFIDAVIT, OR ORAL TESTIMONY

League of Women Voters v. Detzner, (Circuit Court for the Second Judicial Circuit, Leon County) 2015

North Carolina State Conference of the NAACP v. McCrory (United States District Court Middle District of North Carolina) 2015

Veasey v. Perry (U. S. District Court, Southern District of Texas, Corpus Christi Div.) 2014

Newton, et al. vs. Alabama (U. S. District Court, Alabama) 2013

North Carolina NAACP v. North Carolina (State Superior Court, North Carolina) 2013

Texas v. United States (Voter ID) (U. S. District Court, District of Columbia) 2012

Texas v. United States (Redistricting) (U. S. District Court, District of Columbia) 2012

Coalition for Equity and Excellence in Higher Education v. Maryland Higher Education Committee, et al. (U. S. District Court, Maryland) 2012

Radogno, et al. v. Illinois State Board of Elections, et al. (U.S. District Court, Illinois) 2011

Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al. (U.S. District Court, Illinois) 2011

Perez, et al. v. Perry, et al. (U. S. District Court, Texas) 2011

United States vs. Demario James Atwater (U. S. District Court, North Carolina) 2010

Boddie v. Cleveland School Board, Mississippi (U.S. District Court, Mississippi) 2010

Esther V. Madera Unified School District (Superior Court, California) 2008

Negron v. Bethlehem Area School District (U.S. District Court, Pennsylvania) 2008

Farley v. City of Hattiesburg (U.S. District Court, Mississippi) 2008

Jamison v. City of Tupelo (U.S. District Court, Mississippi) 2005

Session v. Perry (U.S. District Court, Texas) 2003

Rodriguez v. Pataki (U.S. District Court, New York) 2003

Boddie v. Cleveland, Mississippi (U.S. District Court, Mississippi) 2003

Levy v. Miami-Dade County (U.S. District Court, Florida) 2002

Martinez v. Bush (U.S. District Court, Florida) 2002

Curry v. Glendening (Maryland, State Court) 2002

O'Lear v. Miller (U.S. District Court, Michigan) 2002

Campuzano v. Illinois Board of Election (U.S. District Court, Illinois) 2002

Vieth v. Commonwealth of Pennsylvania (U.S. District Court, Pennsylvania) 2002

Leroux v. Miller (Michigan, State Supreme Court) 2002

Balderas v. State of Texas (U.S. District Court, Texas) 2001

Del Rio v. Perry (Texas, State Court) 2001

Page V. Bartels (U.S. District Court, New Jersey) 2001

West v. Gilmore (Virginia, State Court), 2001

U.S. v. City of Santa Paula (California, U.S. District Court) 2001

NAACP v. Fordice (Mississippi, U.S. District Court) 2000

Voting Integrity Project v. Marc Fleisher (Arizona, U.S. District Court) 2000

Packingham v. Metropolitan Dade County (U.S. District Court, Florida) 1999

Houston v. Lafayette County (U.S. District Court, Northern District of Mississippi, Western District) 1991, 1998

Citizens to Establish a Reform Party in Arkansas v. Sharon Priest (U.S. District Court, Eastern District of Arkansas) 1996

National Coalition v. Glendening (U.S. District Court, Maryland) 1996

Vecinos de Barrio Uno v. Holyoke (U.S. District Court, Massachusetts), 1996

Scott v. Florida Senate (U.S. District Court, Middle District of Florida) 1995

King v. Board of Elections (U.S. District Court, Northern District of Illinois) 1995

Vera v. Richards (U.S. District Court, Southern District of Texas) 1994

United States v. Jones (U.S. District Court, Southern District of Alabama) 1994

Johnson v. Miller (U.S. District Court, Southern District of Georgia, Augusta Division) 1994

Hays v. Louisiana (U.S. District Court, Western District of Louisiana, Shreveport Division) 1993

People Who Care v. Rockford Board of Education (U.S. District Court, Northern District of Illinois, Eastern Division) 1993

Republican Party of North Carolina v. Hunt (U.S. District Court, Eastern District of North Carolina, Raleigh District) 1993

Shaw v. Hunt (U.S. District Court, Eastern District of North Carolina, Raleigh District) 1993

Neff v. Austin (State of Michigan, Supreme Court) 1992

Terrazas v. Slagle (U.S. District Court, Western District of Texas, Austin Division) 1992

Gonzalez v. Monterey County (U.S. District Court, Northern District of California) 1992

DeGrandy v. Wetherell (U.S. District Court, Northern District of Florida, Tallahassee Division) 1992

NAACP v. Austin (U.S. District Court, Eastern District of Michigan, Eastern Division) 1992

Good v. Austin (U.S. District Court, Eastern District of Michigan, Southern Division) 1992

Ortiz v. City of Philadelphia (U.S. District Court, Eastern District of Pennsylvania) 1991-1993

FAIR v. Weprin (U.S. District Court, Northern District, of New York) 1992

Davis v. Chiles (U.S. District Court, Northern District of Florida) 1991

McDaniels v. Mehfoud (U.S. District Court, Eastern District of Virginia) 1991

Rollins v. Dallas County Commission (U.S. District Court, Southern District of Alabama) 1991-1992

Ward v. Columbus County (U.S. District Court, Eastern District of North Carolina) 1991

Republican Party State Committee v. Michael J. Connolly (U.S. District Court, Massachusetts) 1991

Jenkins v. Red Clay Consolidated School District (U.S. District Court, District of Delaware) 1991

<u>Watkins v. Mabus</u> (U.S. District Court, Southern District of Mississippi) 1991

<u>Mena v. Richards</u> (Hidalgo County Texas District Court) 1991

<u>Republican Party of Virginia v. Wilder</u> (U.S. District Court, Western District of Virginia) 1991

<u>Nipper v. Chiles</u> (U.S. District Court, Middle District of Florida) 1991-1994

<u>Smith v. Board of Superivsors of Brunswick County</u> (U.S. District Court, Eastern District of Virginia) 1991-1992

<u>New Alliance Party v. Hand</u> (U.S. District Court, Alabama) 1990

<u>Concerned Citizens v. Hardee County</u> (U.S. District Court, Florida) 1990

<u>United Parents Association v. NYC Board of Elections</u> (U.S. District Court, New York) 1990

<u>Garza v. County of Los Angeles</u> (U.S. District Court, California) 1990

<u>Person v. Moore County</u> (U.S. District Court, Middle District of North Carolina, Rockingham Division) 1989

<u>Ewing v. Monroe County</u> (U.S. District Court, Northern District of Mississippi) 1989

<u>White v. Daniel</u> (U.S. District Court, Eastern District of Virginia) 1989

<u>Gunn v. Chickasaw County</u> (U.S. District Court, Mississippi) 1989

<u>SCLC v. State of Alabama</u> (U.S. District Court, Middle District of Alabama, Northern Division) 1989-1995

<u>Bradford County NAACP v. City of Starke</u> (U.S. District Court, Middle District of Florida) 1988

<u>PUSH v. Allain</u> (U.S. District Court, Mississippi) 1988

<u>Baltimore Neighborhoods, Inc. v. C.F. Sauers</u> (U.S. District Court, Maryland) 1988

<u>United States v. Wicomico County</u> (U.S. District Court, Maryland) 1988

<u>Metropolitan Pittsburgh Crusade v. City of Pittsburgh</u> (U.S. District Court, Western District of Pennsylvania) 1987

<u>McNeil v. City of Springfield</u> (U.S. District Court, Central District of Illinois) 1987

<u>Harper v. City of Chicago Heights</u> (U.S. District Court, Northern District of Illinois) 1987-1993

Robinson v. City of Cleveland (U.S. District Court, Delta District of Mississippi) 1987

Martin v. Allain (U.S. District Court, Southern District of Mississippi) 1987

Smith v. Clinton (U.S. District Court, Eastern District of Arkansas) 1987

Burrell v. Allain (U.S. District Court, Southern District, of Mississippi) 1986

United States v. Dallas County (U.S. District Court, Southern District of Alabama) 1986

United States v. Marengo County (U.S. District Court, Southern District of Alabama) 1986

Jordan v. City of Greenwood (U.S. District Court, Mississippi) 1984

Johnson v. Halifax County (U.S. District Court, Eastern District of North Carolina) 1984

Anderson v. Celebreeze (U.S. District Court, Ohio) 1980

# EXHIBIT 4

# EXPERT REPORT

*North Carolina State Conference of the NAACP*
*v.*
*McCrory, et al.*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Case No.: 1:13-cv-00658-TDS-JEP (M.D.N.C.)
Judge Thomas D. Schroeder
Magistrate Judge Joi Elizabeth Peake

**February 12, 2015**

**Barry C. Burden, Ph.D.**

## TABLE OF CONTENTS

I.  SUMMARY OF OPINIONS ................................................................................ 1

II.  BACKGROUND AND QUALIFICATIONS .................................................... 2

III.  MATERIALS REVIEWED .............................................................................. 2

IV.  DISCUSSION ................................................................................................... 3

    A.  The Calculus of Voting ......................................................................... 3

    B.  The Effect of Habit ............................................................................... 4

    C.  The Senate Factors ................................................................................ 6

    D.  Lack of Responsiveness on the Part of Elected Officials ................... 15

    E.  Tenuousness of the Policy .................................................................. 16

    F.  The 2014 Election ............................................................................... 29

V.  CONCLUSION ............................................................................................... 30

## I.  SUMMARY OF OPINIONS

I closely monitored the development and implementation of North Carolina House Bill 589, the Voter Information Verification Act, which became Session Law (SL) 2013-381 in August 2013.  The law made multiple significant changes to state election law.  Among other changes, SL 2013-381 imposed a new requirement that residents show specific photo identification (ID) to vote in person, reduced the early in-person voting period from 17 days to at most 10 days (including the elimination of the final Sunday before Election Day), eliminated same day voter registration, ended pre-registration of 16 and 17-year olds, expanded the number of people who can challenge ballots, and ended the practice of "out-of-precinct" voting, or the counting of provisional ballots from individuals who appear to vote in the wrong precinct.

The federal Voting Rights Act (VRA) bears directly on SL 2013-381.  Passed in 1965, the VRA's Section 2 prohibits voting practices that discriminate on the basis of race, color, or language group.  Unlike some other portions of the VRA, Section 2 is permanent.

The VRA was modified in 1982 with overwhelming votes in both chambers of Congress and was signed into law by President Ronald Reagan.  The amendments made clear that discriminatory intent was not necessary for the law to be violated; only discriminatory results are necessary.

The U.S. Senate Committee on the Judiciary issued a report at the time, declaring that the law would be violated if the "totality of the circumstances of the local electoral process" had the effect of denying equal opportunities to participate in the political process.  The committee report identified an illustrative list of seven "Senate factors" and two unenumerated factors for courts to consider when evaluating the "totality of the circumstances."  I have spent considerable time examining the Senate factors, drawing upon my expertise and training as a scholar of electoral politics.

It is my considered opinion that elements of SL 2013-381 in North Carolina, both individually and jointly, implicate the Senate Report factors in ways that demonstrate how the state's black and Latino voters are more likely to be deterred or prevented from voting by the new law.  The dramatic disruption of voting practices induced by SL 2103-381 is likely to negatively affect minority voters more than white voters.[1]

This is precisely what happened in Florida – another politically competitive battleground state with a sizeable minority population – when early voting was restricted there.[2]  SL 2013-381, which is far more sweeping than the changes in Florida, or any other state in recent memory, will disproportionately harm black and Latino voters because, among other grounds, of the concrete costs it imposes on them in terms of the alternative and additional measures they will now need to undertake in order to attempt to vote and because of the chilling effect of the message it sends to minority voters in North Carolina.

---

[1]  I use the terms Hispanic and Latino interchangeably in this report.  Wherever possible the terms white and black refer to non-Hispanic whites and blacks.

[2]  Michael C. Herron and Daniel A. Smith. 2014."Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election." *Political Research Quarterly* 67:646-65.

The following sections outline how SL 2013-381 interacts with social and economic conditions affecting racial minorities in North Carolina in a way that disproportionately deprives them of the ability to participate in the political process and to influence the outcome of elections.

## II.    BACKGROUND AND QUALIFICATIONS

I am a Professor of Political Science at the University of Wisconsin-Madison. I earned my Ph.D. at The Ohio State University in 1998. From 1999 to 2006 I was a faculty member in the Department of Government at Harvard University. I have been on the faculty as a full-time professor at the University of Wisconsin-Madison since 2006. A copy of my curriculum vitae is attached. I am being compensated $250 per hour for my effort.

My expertise lies generally in American politics with a focus on elections and voting, public opinion, representation, partisanship, and research methodology. I teach courses on these topics at both the undergraduate and graduate levels. I am author of the book *Personal Roots of Representation* (2007 Princeton University Press), co-author of *Why Americans Split Their Tickets* (2002 University of Michigan Press), and co-editor of *The Measure of American Elections* (2014 Cambridge University Press). I have also published articles in respected scholarly peer-reviewed journals such as the *American Political Science Review*, *American Journal of Political Science*, *Electoral Studies*, *Public Opinion Quarterly*, *Legislative Studies Quarterly*, *Public Administration Review*, *Election Law Journal*, and *Political Analysis*. I serve on the editorial boards of *Electoral Studies* and *Election Law Journal*, and have served as a manuscript reviewer for many academic journals. I am a member of the American Political Science Association and have been active in the profession, giving presentations at many conferences and universities. My research has been supported by grants won from sources including the Pew Charitable Trusts, National Science Foundation, and Dirksen Congressional Center.

I have particular expertise in elections and election administration. I am the co-founder of the Election Administration Project at the University of Wisconsin-Madison. This collaboration has produced research on election administration around the country. I have testified before state officials and the bipartisan Presidential Commission on Election Administration. I conducted the first independent evaluation of the Electronic Registration Information Center (ERIC), an initiative launched by seven states to modernize voter registration systems. I am frequently contacted by journalists and civic organizations to speak about election administration. In recent years I have been quoted in several national media outlets such as *USA Today*, *The Wall Street Journal*, and *The New York Times*.

## III.    MATERIALS REVIEWED

To establish an expert opinion in this case, I reviewed a variety of materials from academic, governmental, legal, and media sources. Building on my existing knowledge, expertise, and experience, I consulted scholarly research on the general causes and effects of changes in state election laws. My review also included data sources and statutes made available by agencies in the North Carolina government and the federal government. I also reviewed news

coverage of HB 589 and SL 2013-381.  The sources on which I relied are cited in footnotes and listed together in the appendix to this document.

## IV.    DISCUSSION

### A.    The Calculus of Voting

The likely effects of SL 2013-381 may be understood using the "calculus of voting."  The "calculus of voting" is the dominant theoretical framework used by scholars to study voter turnout.  Dating back at least to Anthony Downs's seminal 1957 book, *An Economic Theory of Democracy*, researchers typically view the likelihood of voting as a formula.  A person votes if the probability of one's vote determining the outcome multiplied by the net psychological benefit of seeing one's preferred candidate win is greater than the "costs" of voting.  These costs include the effort needed to become informed about the candidates and issues.  But they also include the time, resources, and activity needed to overcome the administrative requirements and other barriers to registering to vote and successfully casting a ballot.[3]  These are costs controlled by the state administering the vote.

This "calculus of voting" framework suggests that for many individuals the decision to vote is made "on the margins."  Small changes in benefits or costs may alter the likelihood of voting dramatically.  The decision to vote is sensitive enough to costs that even Election Day weather has been shown to depress turnout.[4]  Costs are especially consequential for individuals with less education and non-habitual voters for whom the complications of registering, finding the correct polling place, and making the time to vote are frequently quite costly.  In general, disruptions to voting habits raise costs and deter participation.  It is little surprise, then, that a modest change to election procedures is enough to deter voting.[5]  A more significant change or a series of changes would have even greater potential to raise the costs for voting.

SL 2013-381 increases an array of voting costs.  The changes I consider in this report include:

- requiring approved government identification to vote for those voting in person who are no older than 70,
- shortening of the early voting period by seven days,
- eliminating pre-registration of 16 and 17 year olds,
- preventing counting of ballots cast out of precinct, and

---

[3]  Some formulations add a "duty" term to indicate the positive effect of norms supporting the democratic system.  Aldrich shows that this is not necessary because the cost term can be viewed as the net costs that encompass one's sense of duty.  *See* John H. Aldrich (1993), "Rational Choice and Turnout," *American Journal of Political Science* 37:246-78.

[4]  Thomas G. Hansford and Brad T. Gomez (2010), "Estimating the Electoral Effects of Voter Turnout," *American Political Science Review* 104:268-88.

[5]  Henry E. Brady and John E. McNulty (2011): "Turnout Out to Vote: The Costs of Finding and Getting to the Polling Place," *American Political Science Review* 105:1-20.  John E. McNulty, Conor M. Dowling, and Margaret H. Ariotti (2009), "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters," *Political Analysis* 17:435-55.  Moshe Haspel and H. Gibbs Knotts (2005), "Location, Location, Location: Precinct Placement and the Costs of Voting," *Journal of Politics* 67:560-73.

- eliminating same day registration,

each of which imposes disproportionate costs on racial and ethnic minorities.  The law is likely to exacerbate differences in political participation of whites on the one hand and, black and Latino residents on the other because blacks and Latinos have fewer of the socioeconomic resources necessary to navigate restrictions imposed on the voting process.

Scholarly research has demonstrated how increasing the costs of voting depresses voter turnout.  These negative effects are usually greater for racial and ethnic minorities who frequently benefit from fewer socioeconomic resources and have shorter histories of electoral participation upon which to support their continued voting habit.  For example, a study of the 2000 election showed that increasing the costs of voting by shortening polling hours and not mailing sample ballots decreased turnout by 4 percentage points among whites, 4.8 points among blacks, and 6.8 points among Latinos.[6]  This is an example of how SL 2013-381 can be understood using the "calculus of voting" and how underlying differences across racial and ethnic groups create a disparate effect on minority residents in North Carolina.  What may appear to be "equal" costs imposed by a restriction on voting practices are in fact more acute for black and Latino voters.  These minority groups are doubly burdened because they possess fewer of the resources needed to overcome those costs as a result of ongoing effects of historical discrimination in the state.

### B.    The Effect of Habit

Political science research demonstrates that voting participation is largely a product of habit.  As long as the habit is not disrupted, voting in an election makes voting in the next election more likely.  Once a person becomes a voter, he or she tends to remain a regular voter, at least in major federal elections.[7]  The power of habit comes in part from the fact that once having voted, the costs of participating again are much lower.  A successful voter has already figured out where, how, and when to register and where, how, and when to cast a ballot.  If one of these parameters is altered, it is a disruption that adds new and unexpected costs to the voting calculus.  Following this logic, it is unsurprising that people who relocated recently are significantly less likely to vote, in part because it entails updating or initiating a new registration.[8]  Changing polling places has been shown to decrease turnout by several percentage points.[9]  Mandating (rather than simply offering) vote-by-mail has been shown to reduce

---

[6]  Raymond E. Wolfinger, Benjamin Highton, and Megan Mullin (2005), "How Postregistration Laws Affect the Turnout of Citizens Registered to Vote," *State Politics & Policy Quarterly* 5:1-23.

[7]  Alan S. Gerber, Donald P. Green, and Ron Shachar (2003), "Voting May Be Habit-Forming: Evidence from a Randomized Field Experiment," *American Journal of Political Science* 47:540-50.  Eric Plutzer (2002), "Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood," *American Political Science Review* 96:41-56.

[8]  Peverill Squire, Raymond E. Wolfinger, and David P. Glass (1987), "Residential Mobility and Voter Turnout," *American Political Science Review* 81:45-65.  Richard J. Timpone (1998), "Structure, Behavior, and Voter Turnout in the United States," *American Political Science Review* 92:145-58.

[9]  Brady and McNulty (2011). McNulty, Dowling, and Ariotti (2009). Hapsel and Knott (2005).

turnout. [10]   Implementing   new   registration   <u>requirements</u>   deters   turnout. [11]   Drawing   new legislative district lines also depresses voter participation. [12]

This pattern highlights an asymmetry in the effects of election laws.  Research by myself and others has shown that introducing additional convenience for registering or voting has mixed effects on turnout. [13]  This is largely because voting behavior is habitual and slow to respond to new opportunities.  In contrast, the studies cited in the previous paragraph demonstrate that <u>removing</u>   options   consistently   reduces   participation,   especially   among   those   with   fewer resources to navigate the disruption.

As Green and Shachar's study of the voting habit explains, the foreignness of the voting experience can itself deter participation.  They explain that, "[t]he registered non-voter may regard going to the polls with a certain amount of apprehension.  Will I know how to work the voting machine? Will the poll workers treat me respectfully? Will I know where to go and which line to stand in?" [14]  There would be a similar set of concerns for a potential voter interested in registering to vote.  Apprehension is lowered if the voting process is predictable, allowing the "costs" paid in the past to facilitate participation in the future.  Changes in voting processes naturally inhibit the reliance on habit and sunk costs.

The wide range of election law changes in SL 2013-381 is targeted at practices that are used more by blacks and Latinos than by whites.  A recent statistical analysis by political scientists Michael Herron and Daniel Smith provides a careful and comprehensive understanding of how the law will affect black and white political participation in North Carolina.  Their report concludes the following:

> Our study indicates that [SL 2013-381] will have disparate effects
> on black voters in North Carolina.  Specifically, we find that in
> presidential   elections   the   state's   black   early   voters   have
> traditionally cast their ballots disproportionately often in the first
> week of early voting, a week eliminated by [SL 2013-381]; that
> blacks   disproportionately   have   registered   to   vote   during   North

---

[10]  Elizabeth Bergman and Philip A. Yates (2011), "Changing Election Methods: How Does Mandated Vote-By-Mail Affect Individual Registrants?," *Election Law Journal* 10:115-27.

[11]  Barry C. Burden and Jacob R. Neiheisel (2013), "Election Administration and the Pure Effect of Voter Registration on Turnout," *Political Research Quarterly* 66:77-90.

[12]  Danny Hayes and Seth C. McKee (2009), "The Participatory Effects of Redistricting," *American Journal of Political Science* 53:1006-23.

[13]  Adam J. Berinsky (2005), "The Perverse Consequences of Electoral Reform in the United States," *American Politics Research* 33:471-91.  Barry C. Burden, David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan (2014), "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform," *American Journal of Political Science* 58:95-109.  Melanie J. Springer (2012), "State Electoral Institutions and Voter Turnout in Presidential Elections, 1920-2000," *State Politics & Policy Quarterly* 12:252-83. I note that the Burden et al. (2014) study does not focus on North Carolina specifically or analyze differences across racial and ethnic groups.

[14]  Donald P. Green and Ron Shachar (2000), "Habit Formation and Political Behaviour: Evidence of Consuetude in Voter Turnout," *British Journal of Political Science* 30:561-73, p. 570.

> Carolina's early voting period and in the run-up to Election Day, something now prohibited by [SL 2013-381]; that VIVA's photo identification provision falls disproportionately on registered blacks in North Carolina; that the special identification dispensation for North Carolina voters who are at least 70 years old disproportionately benefits white voters; and, that prior to the implementation of [SL 2013-381] young blacks were disproportionately more likely than whites to avail themselves of the opportunity to preregister to vote.[15]

A new set of more restrictive election rules would not necessarily implicate the Senate factors. For example, new election laws could impose additional costs of voting in a way that meets state interests and that also fall somewhat equally across racial and ethnic groups. A package of reforms might have been enacted in North Carolina that created additional burdens for white voters in one aspect but for minority voters in some other aspect. As I elaborate below, SL 2013-381 is not of this sort. Herron and Smith's summary of their analysis makes clear that all or nearly all of the changes in election law instigated by SL 2013-381 generated more significant costs for blacks and Latinos than for whites. These lopsided costs cumulate across the various provisions to create hurdles that are more significant for blacks and Latinos.[16]

### C.     The Senate Factors

Considering the "calculus of voting" and related research on how election practices affect turnout among blacks and Latinos in particular, several of the "Senate factors" indicate how SL 2013-381 will predictably and disproportionately depress black and Latino voting. What follows is a discussion of several Senate factors and the two additional, unenumerated factors that inform my analysis of the effect of SL 2013-381 on black and Latino voters.

As background, it is important to understand that black and Latino voter turnout in North Carolina has long lagged behind that of whites. While Latino registration and turnout rates continue to be far below that of other groups, black turnout has only recently approached parity with whites as black voters have made use of same day registration and early voting opportunities in North Carolina. SL 2013-381 puts new restrictions on these practices that have over time facilitated greater minority participation.

Turnout rates for each racial and ethnic group can be computed by dividing the number of votes cast by size of the population eligible to vote. For the eligible population, I use the Citizen Voting Age Population (CVAP) as estimated by data from the U.S. Census Bureau.[17] Other reliable measures show similar patterns. The data are reported in Table 1.

---

[15]  Michael C. Herron and Daniel A. Smith (2014), "Race, *Shelby County*, and the Voter Information Verification Act in North Carolina," manuscript, version 2 dated February 12, 2014, p. 44.

[16]  *See also* Expert Report of Allan Lichtman, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015.

[17]  For the 2000, 2002, and 2004 elections, CVAP is drawn from the 2000 Census Special Tabulation STP-76. For the 2006, 2008, 2010, and 2012 elections, CVAP is drawn from the American Community Survey 1 Year table B050003. Because 2014 CVAP is not yet available, turnout in the 2014 election is based on the 2013 ACS. For

**Table 1. Voter Turnout by Racial and Ethnic Groups in
Recent Federal Elections in North Carolina**

| | Presidential Elections | | | | |
| | 2000 | 2004 | 2008 | 2012 | **Average** |
|---|---|---|---|---|---|
| White | 54.9% | 63.5% | 65.6% | 64.4% | 62.1% |
| Black | 43.1% | 55.0% | 69.3% | 67.8% | 58.8% |
| Latino | 3.3% | 15.0% | 31.2% | 28.8% | 19.6% |
| | Midterm Elections | | | | |
| | 2002 | 2006 | 2010 | 2014 | **Average** |
| White | 43.9% | 35.6% | 42.0% | 43.1% | 41.2% |
| Black | 33.7% | 23.8% | 36.8% | 40.0% | 33.6% |
| Latino | 3.3% | 5.8% | 8.3% | 11.3% | 5.1% |

The table indicates that white turnout exceeds black turnout in every election but the last two presidential elections.  White turnout surpasses black turnout by an average of 3.3 percentage points in presidential elections and 7.6% in midterm elections. White turnout far exceeds Latino turnout in every federal election, with an average disparities of 42 percentage points in presidential elections and 35 points in midterm elections.  Blacks and especially Latinos have yet to establish voting habits that are as robust as those of whites.

Of the eight elections examined in the table, black turnout surpassed white turnout only in 2008 and 2012.  This is a combination of two factors.  One is surely the candidacy of Barack Obama, the first black candidate to be nominated for President by a major political party.  The other factor is that black turnout has been steadily approaching levels of white turnout in North Carolina.  This has been possible in part because black residents have made increasing and disproportionate use of early voting and same day registration.  I characterize the recent parity in black and white turnout in presidential elections as fragile, dependent on the particular candidates and issues as well as increasing adoption of voting practices offered by the state that are under threat of disruption under SL 2013-381.

1.      History of Official Voting-Related Discrimination

Senate Factor One considers whether there is history in the jurisdiction of "official voting-related discrimination."[18]  Because this issue overlaps considerably with the criteria in Factor Three, it will be discussed there.

2.      Racial Polarization

Senate Factor Two addresses whether voting is "racially polarized."[19]  Following the standard established by the U.S. Supreme Court in *Thornburg v. Gingles* (1986), racial

---

years in which turnout is reported by race, the North Carolina State Board of Elections reports somewhat higher turnout rates, but gaps between blacks and whites are similar to those apparent in my calculations.

[18]  Senate Committee on the Judiciary, S. Rep. 417, 97th Cong., 2nd Sess. (1982).

[19]  Senate Committee on the Judiciary, S. Rep. 417, 97th Cong., 2nd Sess. (1982).

polarization may be defined as a "consistent relationship between [the] race of the voter and the way in which the voter votes."

Racial polarization in voting patterns is easily observed in North Carolina.  Media exit polls from the 2012 presidential election indicated that 96% of black voters in North Carolina voted for the Democratic presidential ticket while only 31% of whites did so, a gap of 65 percentage points.[20]  Similar patterns exist in other recent presidential elections in North Carolina  The gap between blacks and whites was 60 points in 2008, 58 points in 2004, and 59 points in 2000.  It is also apparent in midterm federal elections: the racial gap was 63 points in 2014.[21]  These large disparities far exceed other demographic comparisons including income, education, and sex.  Moreover, because the voting patterns were apparent back in 2000 and 2004, polarization is not simply an artifact of the 2008 and 2012 elections in which one of the major party candidates was black.

It is important to note that racially polarized voting is more than a simple reflection of partisanship.  Evidence from Democratic primary elections demonstrates this.  In the 2008 Democratic presidential primary in North Carolina, exit polls showed that 91% of blacks voted for Barack Obama while 37% of whites did so.[22]  This 54-point gap between blacks and whites dwarfs other demographic differences and mimics the polarization observed in general elections where partisanship is a major factor.[23]

### 3. Enhanced Opportunity for Discrimination

Senate Factor Three concerns whether voting practices have "enhanced the opportunity for discrimination" against minority groups.  As more fully discussed in the expert report of James Leloudis, North Carolina has a long and pronounced history of election practices that facilitate discrimination.[24]  These patterns of discrimination are addressed in detail in the reports of other experts, and are so widely known and documented that they require only brief reference here as reminder of their widespread use.

Following the Civil War and emancipation of most black slaves, passage of the 15th Amendment to the U.S. Constitution in 1870 promised voting rights regardless of race.  During the Reconstruction period that ensued, the federal government installed officials in North Carolina and other former Confederacy states in part to facilitate electoral participation of black men.  Like other southern states, North Carolina was required to give blacks the right to vote as one of the terms for readmission to the Union.  As a result, under Republican control by the late

---

[20]  Exit polls are conducted by the National Election Poll (NEP), a consortium of major television networks and the Associated Press. Latinos were judged to be too small of a group for exit pollsters to produce reliable estimates of voting patterns.

[21]  Exit polls were not conducted in North Carolina in 2010.

[22]  The survey contained too few Latinos to provide reliable statistics for that group.

[23]  See Expert Report of Allan Lichtman, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015, at Section VI, for a discussion of polarized voting in North Carolina.

[24]  *See* Expert Report of James Leloudis, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015.

1800s, North Carolina saw ample voting by black men and had "probably the fairest and most democratic election law in the post-Reconstruction South."[25]

Around the turn of the century, backlash to this success led white Democrats to impose new restrictions to deter black voters. These included changing the date of Election Day to August, allowing registrars to exclude voters, and introducing other complications such as multiple ballot boxes to confuse black voters.[26] These restrictions were part of a larger, explicit "white supremacy" campaign by the party as it settled in to long-term control of state government.[27] The Raleigh *News and Observer* argued at the time that the state legislature should "make it impossible for any element of white voters to appeal to the Negro voters upon any question."[28] Indeed, in 1899 the state's voters approved a "suffrage amendment" to the Constitution that added a literacy test for registration and poll tax for voting. The literacy test, which required that "[e]ach person presenting himself for registration shall be able to read and write any section of the Constitution in the English language," was ratified by the state legislature the following year.[29] The provision was used selectively by vote registrars to discriminate against blacks.[30] In response to these changes and the violence used to enforce them, black turnout fell from 87% in 1896[31] to "the complete elimination of black turnout over an eight-year period, between the Presidential elections of 1900 and 1904."[32] It would take decades to recover. Governor Charles Aycock bragged in a 1903 speech that, "I am proud of my State…because there we have solved the negro problem…We have taken him out of politics and have thereby secured good government under any party."[33]

The poll tax lasted until 1920 but the literacy test remains on the books to this day. The literacy test persisted even after the VRA was passed in 1965 and literacy tests were explicitly banned nationwide by congressional amendment five years later. To implement the amended VRA in 1970, a statewide referendum was put on the ballot asking voters to remove the literacy test from the state constitution. That referendum failed, and the provision remains in the North

---

[25]  J. Morgan Kousser (1974), *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910*. New Haven, CT: Yale University Press, p. 187.

[26]  Kousser (1974).

[27]  The white supremacy movement in late 19th Century North Carolina has been widely documented. For a representative portrayal, see Eric Anderson (1981), *Race and Politics in North Carolina, 1872-1901*, Baton Rouge, LA: Louisiana State University Press or James Beeby (2008), *Revolt of the Tar Heels: The North Carolina Populist Movement*, Jackson, MS: University Press of Mississippi.

[28]  Kousser (1974), p. 190.

[29]  N.C. Const. art VI, § 2.

[30]  William R. Keech and Michael P. Sistrom (1994), "North Carolina," in *Quiet Revolution in the South: The Impact of the Voting Rights Act 1965-1990*, ed. Chandler Davidson and Bernard Grofman, Princeton, NJ: Princeton University Press.

[31]  Jeffrey J. Crow and Robert Franklin Durden (1977), *Maverick Republican in the Old North State*, Baton Rouge, LA: Louisiana State University.

[32]  Richard H. Pildes (2000), "Democracy, Anti-Democracy, and the Canon," *Constitutional Commentary* 17:295-319, 302.

[33]  Learn NC, Governor Aycock on "the Negro Problem," *available at* http://www.learnnc.org/lp/editions/nchist-newsouth/4408 (last visited March 24, 2014).

Carolina Constitution.  A bill (HB 311) to repeal the provision was introduced in the state legislature in 2013.  Despite incorporating a long list of other election-related changes in HB 589, the State Senate did not even bring this measure up for a vote.

Since the passage of the VRA in 1965, there continue to be incidents in which black and Latino residents are intimidated or potentially deterred from voting by administrative actions.[34] Between 1971 and 2012, the U.S. Department of Justice (DOJ) issued 64 "objection letters" to officials in the 40 North Carolina counties that had been required to get preclearance under Section 5 of the VRA.[35]  Because of the U.S. Supreme Court ruling in *Shelby County v. Holder*,[36] actions that would have been stopped in advance by the DOJ because of their discriminatory effect may now proceed.

The North Carolina legislature moved hastily to pass new voting restrictions after the *Shelby County* decision.  The decision was issued on June 25, 2013; less than a month later, the legislature quickly moved a radically different form of HB 589.  As a local television station reported, "House Bill 589 sat idle for three months since the House approved it before undergoing an extreme makeover in recent days" after which "[t]he Senate Rules Committee passed the bill on a hasty voice vote before members rushed off to a floor session."[37]  HB 589 was ratified by the state legislature on July 26, 2013 and signed into law on August 12, 2013.  The resulting law may be the most dramatic example of a state rushing to implement new policies once inhibited by the preclearance requirement.  In a review of recent election laws adopted across the country, the *Washington Post* editorial board described SL 2013-381 as an "especially draconian bill" that differs from restrictions in other states because of "how much further it goes."[38]

>    4.    Effects of Discrimination on Minority Group Members and Participation
>          in Electoral Process[39]

Senate Factor Five assesses the extent to which "minority group members bear effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process."[40]  Stemming in large part from historic legacies of unequal treatment, segregation, and discrimination, blacks, Latinos, and whites experience markedly different outcomes in these areas.  The state's history of racial discrimination and

---

[34]   *See* "Voting Rights in North Carolina 1982-2006," a report of RenewtheVRA.org prepared by staff at the University of North Carolina Center for Civil Rights, *available at* http://www.protectcivilrights.org/pdf/voting/NorthCarolinaVRA.pdf (last visited March 24, 2014).

[35]   Lawyers' Committee for Civil Rights under Laws, "Voting Rights Act: Objections and Observers," *available at* http://www.lawyerscommittee.org/projects/section_5/ (last visited March 25, 2014).

[36]   *Shelby County v. Holder*, 570 U.S. ___ (2013).

[37]   WRAL, "Elections Changes Advance in Senate," *available at* http://www.wral.com/elections-changes-advance-in-senate/12693772/.

[38]   "A Tar Heal Travesty," *Washington Post*, August 16, 2013, p. A16.

[39]   Analysis regarding Senate Factor 4 (the exclusion of minority groups from the candidate slating process) is not included in this Report, as this strategy is no longer used in North Carolina.

[40]   Senate Committee on the Judiciary, S. Rep. 417, 97th Cong., 2nd Sess. (1982).

disparities bears directly on the impact that voting practices have on the ability of minority voters to participate in the political process and influence the outcomes of elections. As the U.S. Supreme Court explained in *Thornburg*, Section 2 of the VRA is violated when a voting practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[41] That is exactly how SL 2013-381 affects minority voting in North Carolina. Following the logic of the "calculus of voting," the greater voting costs imposed on blacks and Latinos by their socioeconomic disadvantages continue to inhibit their political participation. These disadvantages are pervasive and enduring. Only a sampling is offered here to indicate their prevalence.

Employment data from the U.S. Census Bureau indicates that racial and ethnic disparities in unemployment are sizable in North Carolina. Estimated unemployment rates for the third quarter of 2014 were 5.3% for whites, 10.3% for blacks, and 8.1% for Latinos.[42]

Experiences with poverty are sharply differentiated between whites and minorities in North Carolina. A report based on U.S. Census Bureau data shows that poverty rates, defined as those living below the federal poverty level in 2013, were 12% for whites, 27% for blacks, and 43% for Latinos.[43]

Educational attainment varies significantly by race and ethnicity in North Carolina. Standardized test scores compiled for fourth and eighth graders shows that blacks and Latinos in North Carolina have lower scores in both reading and mathematics.[44] These tests show, for example, that for fourth grade reading scores, 81% of white students were deemed to meet "basic" standards in 2013 while only 55% of blacks and 56% of Latinos met those standards.[45] Compared to whites, high school dropout rates during the 2012 to 2013 academic year were 41% higher for blacks and 65% higher for Latinos.[46] Data reported by the state's Department of Public Instruction show that long-term suspensions for Latino students were 1.9 times those of whites and the rate of long-term suspensions for black students was 4.2 times that of whites.[47]

---

[41] *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

[42] Valerie Wilson, Economic Policy Institute, "Virginia Boasts Smallest Gaps in Unemployment Rates by Race in Third Quarter, but No State Leads in Race to Recovery for All Groups," October 27, 2014.

[43] The Henry J. Kaiser Family Foundation, "State Health Facts," *available at* http://kff.org/other/state-indicator/poverty-rate-by-raceethnicity/ (last visited December 31, 2014).

[44] *Achievement Gaps: How Black and White Students in Public Schools Perform in Mathematics and Reading on the National Assessment of Educational Progress*, 2014, U.S. Department of Education. *Achievement Gaps: How Hispanic and White Students in Public Schools Perform in Mathematics and Reading on t he National Assessment of Educational Progress*, 2014, U.S. Department of Education.

[45] *Achievement Gaps* reports, cited in previous footnote.

[46] State Board of Education, Department of Public Instruction, Consolidated Data Report, 2012-2013, April 15, 2014. Figure D6. The dropout rates were 2.07 for whites, 2.92 for blacks, and 3.42 for Latinos.

[47] State Board of Education, Department of Public Instruction, Consolidated Data Report, 2012-2013, April 15, 2014. Figure S11. The long-term suspension rates per 100,000 pupils were 47 for whites, 199 for blacks, and 89 for Latinos.

The National Center for Education Statistics reports that for the 2011-2012 cohort high school graduation rates in North Carolina were 85% for whites, 75% for blacks, and 73% for Latinos.[48] Another report shows that although 71% of white male students graduated from high school in North Carolina in 2009-2010, the rates were 58% for black males and 50% for Latino males.[49] Unsurprisingly, an analysis of Census Bureau's 2009-2011 American Community Survey reports that 43% of whites held two- or four-year college degrees, while only 27% of blacks and 16% of Latinos held such degrees.[50] The November 2012 Current Population Survey indicates that bachelor's degrees (or their equivalent) were attained by 28% of North Carolina whites but only 17% by blacks and 10% by Latinos.

Numerous studies have shown that educational attainment is often the single best predictor of whether an individual votes.[51] This is largely because education lowers the "costs" of voting by providing language skills, direct information about the electoral process, and a sense of confidence of efficacy that facilitate participation even when the rules are changed.[52] Income also affects voter participation. Individuals with lower household incomes are significantly less likely to vote because it is comparably more burdensome for them to make time to do so.[53] A majority of states, for instance, require employers to give employees time off from work to vote. Most of those states also mandate that the employee must be paid for time taken to vote.[54] North Carolina does neither. Education and income are, therefore, predictive in large part because they lower the "costs" of voting when the voting habit is interrupted.

There are also widespread disparities between whites and blacks and Latinos in terms of health outcomes. On an array of official state health indicators that include such diverse measures as infant deaths, heart disease, and homicides, blacks and Latinos routinely fare worse than whites. More general measures such as the rate at which groups are rated as having "fair" or "poor" overall health show the same patterns. The "fair" and "poor" categories apply to only 16% of whites in North Carolina, as compared to 24% of blacks and 29% of Latinos.[55] Finally,

---

[48] http://www.governing.com/gov-data/education-data/state-high-school-graduation-rates-by-race-ethnicity.html, (last visited December 31, 2014).

[49] Schott Foundation for Public Education, *The Urgency of Now*, Cambridge, MA, 2012 report using data from the U.S. Department of Education's National Center for Education Statistics.

[50] Lumina Foundation, "A Stronger North Carolina through Higher Education," June 2013.

[51] Steven J. Rosenstone and John Mark Hansen (1993), *Mobilization, Participation and Democracy in America*, Macmillan. Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995), *Voice and Equality: Civic Volunteerism in American Politics*, Harvard University Press. Rachel Milstein Sondheimer and Donald P. Green (2010), "Using Experiments to Estimate the Effects of Education on Voter Turnout," *American Journal of Political Science* 54:174-89.

[52] For example, see Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995), *Voice and Equality: Civic Volunteerism in American Politics*, Cambridge, MA: Harvard University Press.

[53] See references in previous footnotes.

[54] See the League of Women Voters Education Fund web site, vote411.org, *available at* http://www.vote411.org/search-by-topic?topics_tid%5B%5D=60#.U0QVPq1dVhl (last visited April 9, 2014).

[55] For example, *see* North Carolina Department of Health and Human Services, "Racial and Ethnic Health Disparities in North Carolina: 2010 Report Card," June 2010; "North Carolina Vital Health Facts: Population and Health Data by Race and Ethnicity," *available at* http://www.schs.state.nc.us/schs/pdf/NCPopHealthDatabyRaceEthDec2012.pdf (last visited March 28, 2014).

recent research shows that health influences voter participation.  For example, a disability makes the average person approximately 20 points less likely to vote, mostly because it increases the burdens and costs associated with voting.[56]

Blacks and Latinos also suffer from unequal treatment by the criminal justice system.  An analysis by Brennan and Spohn finds that of those convicted for drug offenses in North Carolina in 2000, white offenders received less severe punishments than blacks and especially Hispanics.[57]  Similarly, analysis of data on all traffic stops in the state between 2000 and 2011 also shows substantial racial disparities.  Blacks and Latinos were far more likely to be searched and arrested.[58]  Compared to white motorists who were stopped, blacks were 77% more likely to be searched and Latinos were 96% more likely to be searched.

Data from the National Prison Statistics, collected under the auspices of the U.S. Department of Justice, show glaring disparities in incarceration among these same racial and ethnic groups.  In 2011, the last year for which annual data are publicly available, whites accounted for only 35% of those under custody in North Carolina while blacks were 56% and Latinos were 6%.  U.S. Census Bureau data show that blacks and Latinos make up 22% and 9% of the North Carolina population in 2012.  A Prison Policy Institute analysis shows that North Carolina Latinos are incarcerated at a rate of 1.4 times that of whites; blacks are incarcerated at a rate of 4.7 times that of whites.[59]

Criminal justice is an area where discrimination has the most immediate effects on political participation.  Felon disenfranchisement laws in North Carolina, which prohibit voting by inmates, parolees, and probationers, disproportionately remove voting rights for blacks relative to whites.  One recent report indicates that such laws disenfranchise over 46,000 black residents, or 2.84% of the black voting age population.  The disenfranchisement rate was only .68% for the rest of the population of the state (*i.e.*, all non-blacks).[60]  Research shows that ex-felons are further discouraged from voting even after they are "off paper" due to the social stigma of a criminal record, financial consequences of incarceration, and lack of support from the state in reactivating their voting rights.[61]

---

[56]  Lisa Schur, Todd Shields, Douglas Kruse, and Kay Schriner (2002), "Enabling Democracy: Disability and Voter Turnout," *Political Research Quarterly* 55:167-90.

[57]  Pauline K. Brennan and Cassia Spohn (2008), "Race/Ethnicity and Sentencing Outcomes among Drug Offenders in North Carolina," *Journal of Contemporary Criminal Justice* 24:371-98.

[58]  Frank R. Baumgartner and Derek Epp, "North Carolina Traffic Stop Statistics Analysis," Final Report to the North Carolina Advocates for Justice Task Force on Racial and Ethnic Bias, February 1, 2012.

[59]  Prison Policy Initiative, "North Carolina," *available at* http://www.prisonpolicy.org/profiles/NC.html (last visited December 31, 2014).

[60]  Christopher Uggen, Sarah Shannon, and Jeff Manza, (2012), "State-Level Estimates of Felon Disenfranchisement in the United States, 2010," report for The Sentencing Project, Washington, DC.  The non-black disenfranchisement rate was computed by taking the differences between Table 3 and Table 4.  Data on Latinos were not provided in the report.

[61]  Jeff Manza and Christopher Uggen (2006), *Locked Out: Felon Disenfranchisement and American Democracy*, New York, NY: Oxford University Press.  Erika Wood and Rachel Bloom (2008), *De Facto Disenfranchisement*, American Civil Liberties Union and Brennan Center for Justice.

These glaring disparities in outcomes have a direct bearing on the impact of state election laws on minority voting rates. Decades of political science research show that voter participation is significantly affected by the very demographic characteristics that so strongly separate whites from minorities in North Carolina. As a result, although the limits on voting practices imposed by SL 2013-381 appear to be uniform, they are in fact more consequential for black and Latino residents because the restrictions interact with disparities in education, employment, and health.

In summary with regard to Senate Factor Five, North Carolina displays substantial and enduring racial disparities in areas such as education, income, employment, criminal justice, and health. These are highly relevant to Section 2 of the VRA. Demographic markers such as these are strongly associated with the likelihood of an individual being deterred from voting by a burdensome voting practice, much less multiple new practices that all fall more heavily on those same groups. Because they bear the effects of discrimination in the very domains that contribute to voting participation, blacks and Latinos in North Carolina are more likely than whites to be deterred from voting by the restrictions imposed by SL 2013-381.

5.      Extent of Minority Election to Public Office in Jurisdiction[62]

Senate Factor Seven evaluates the extent to which members of the minority group have been elected to public office in the jurisdiction."[63]   Blacks and Latinos have long been underrepresented in North Carolina. Blacks have only recently approached parity with their prevalence in the electorate. Latinos continued to be significantly underrepresented.

Blacks have not been well represented in North Carolina public life. As of late 2014, the North Carolina Legislative Black Caucus had 10 members in the State Senate and 23 in the House of Representatives.[64]  This corresponds to 20% of the Senate and 19% of the House. Between 1900 and 1968, there were no black members of the General Assembly. As recently as 1989, blacks comprised only 8% of the Senate and 11% of the House.[65]   The state's congressional delegation has two black members out of 13 (15%). During the twentieth century, no blacks had been elected to Congress or statewide office until 1992. Election of black representatives that year was a direct consequence of the VRA.[66]  Among its nine statewide constitutional officers and two U.S. senators, only one has been black in the 225-year history of the state (State Auditor Ralph Campbell, 1993-2005). This level of representation is particularly

---

[62]  Senate Factor 6 (the use of overt or subtle racial appeals in political campaigns) is not analyzed in this Report, but continues today. *See* Expert Report of James Leloudis, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015.

[63]  Senate Committee on the Judiciary, S. Rep. 417, 97th Cong., 2nd Sess. (1982).

[64]  North Carolina Legislative Black Caucus, http://nclbc.com/about-us/members/ (last visited December 31, 2014).

[65]  Milton C. Jordan (1989), "Black Legislators: From Political Novelty to Political Force," *North Carolina Insight* December: 40-58.

[66]  Daniel P. Tokaji (2008), "Representation and Raceblindness: The Story of *Shaw v. Reno*," in *Race Law Stories*, ed. Rachel F. Moran and Devon W. Carbado. New York, NY: Foundation Press.

notable considering North Carolina's status as one of the states with the largest share of black residents.[67]

Latinos have also been unrepresented.   The National Hispanic Caucus of State Legislators reports just one member in the General Assembly.[68]  Latinos thus make up just 2% of the state Senate and 0% in the House.  No Latinos have been elected to statewide office in North Carolina.  No Latinos have been elected to Congress from North Carolina.

It is not surprising that in recent years black voter turnout and black representation in the state legislature have risen in tandem.  Academic research has shown that blacks are more likely to vote when their state legislatures have larger percentages of black representatives, and that Latinos are more likely to vote when their state legislatures have more Latino representatives.  The two trends (increased voter turnout and increased representation in the legislature) reinforce each other.[69]  To the degree that SL 2013-381 deters minority voter participation, black and Latino representation among elected officials will be inhibited as well.  The state's history of underrepresentation of these groups has contributed to their lower levels of electoral participation and contributes to the likelihood that adding burdens to the voting process will more likely deter blacks and Latinos from voting because the perceived benefits of voting are not as high as they would be if minority-preferred candidates enjoyed greater electoral success.

### D.      Lack of Responsiveness on the Part of Elected Officials

The first additional, unenumerated factor the Senate report is whether "there is a lack of responsiveness on the part of elected officials to the particularized needs of minority group members."[70]  Evidence for a lack of responsiveness is provided in the discussion of Senate Factor Five and elsewhere in this document.  Blacks and Latinos suffer severe and enduring disparities in education, health, employment, income, and criminal justice in part due to state policies.  The legislative debate over HB 589 made clear that blacks and Latinos would be disproportionately affected and that the legislation could have been altered to respond to their particularized use of existing election practices.

There is also social science evidence that local election officials in North Carolina are less responsive to minority constituents seeking information about how to participate in state elections.  A study by Ariel White, Noah Nathan, and Julie Faller of Harvard University provides

---

[67]  Historic data from the U.S. Census Bureau indicate that over the past century the black share of the population has ranged between about 22% and 30%.

[68]  The member listed as Hispanic is State Senator Tom Apodaca, but his status as a Latino is ambiguous.  After winning election to the State Senate in 2002, he explained that "I am probably the only half-Mexican in the state who speaks very, very little Spanish" and "I've never considered myself Hispanic. But I've never considered myself not Hispanic" (as quoted in David Rice, "Hispanic Legislators May Be Pacesetters," *Winston-Salem (NC) Journal*, December 13, 2002).

[69]  Christopher J. Clark (2014), "Collective Descriptive Representation and Black Voter Mobilization in 2008," *Political Behavior* 36:315-33.  Rene R. Rocha, Caroline J. Tolbert, Daniel C. Bowen, and Christopher J. Clark (2010), "Race and Turnout: Does Descriptive Representation in State Legislatures Increase Minority Voting?," *Political Research Quarterly* 63:890-907; Kenny J. Whitby (2007), "The Effect of Black Descriptive Representation on Black Electoral Turnout in the 2004 Elections," *Social Science Quarterly* 88:1010-23.

[70]  Senate Committee on the Judiciary, S. Rep. 417, 97th Cong., 2nd Sess. (1982).

an empirical demonstration of this using a randomized field experiment.[71]  The researchers sent an email to each of North Carolina's county election boards in September 2012 to assess the responsiveness of election administrators to the public.  The email messages all contained the following text: "Hello, I've been hearing a lot about voter ID laws on the news.  What do I need to vote?  Thank you."[72]  Following this text, the messages were randomly signed by someone with a name that was putatively white and non-Latino (i.e., "Greg Walsh" or "Jake Mueller") or a name that was putatively Latino (i.e., "José Martinez" or "Luis Rodriquez").  Because this was a randomized field experiment, each county election board received only one or the other message, and boards were not informed that they were participating in an experiment.

The authors' analysis found that equivalent messages sent to county boards were 5.6 percentage points less likely to get a response if they were signed by Latino names.[73]  This suggests that even a law that applies uniformly to the population is likely to be more costly for minority voters because they are less likely to receive official assistance in navigating election processes.

The VRA appears to mitigate unequal treatment of constituents.  In an analysis of the same experiment conducted nationwide, the authors found that jurisdictions covered by Section 5 or Section 203 of the VRA showed no bias in response rates between white and non-Latino names.  In contrast, officials in jurisdictions not subject to these VRA sections were about five percentage points less likely to respond to messages signed by Latino names.  The U.S. Supreme Court's decision in *Shelby County v. Holder*, less than one year after the authors' experiment, removes this protection from 40 counties in North Carolina that had been subject to pre-clearance under Sections 4 and 5 of the VRA.

### E.    Tenuousness of the Policy

The second additional, unenumerated factor identified in the Senate report is whether the policy is "tenuous."  Footnote 117 of the Senate Report explains further:

> If the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact.  But even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process.[74]

SL 2013-381 is an abrupt departure from voting practices in North Carolina.  The massive scope of the law indicates its tenuousness.  As election law expert and University of

---

[71]  Ariel R. White, Noah L. Nathan, and Julie K. Faller (forthcoming), "What Do I Need To Vote? Bureaucratic Discretion and Discrimination by Local Election Officials," *American Political Science Review*.

[72]  A random half of county boards received this message.  The other half received a "control" question about voting in a primary that serves as a baseline for the voter ID question.

[73]  This estimate is statistically significantly different from zero.  See panel B of Figure SI.5 in the Supplemental Information file accompanying the article.

[74]  Senate Committee on the Judiciary, S. Rep. 417, 97th Cong., 2nd Sess. (1982).

16

California-Irvine Chancellor's Professor of Law and Political Science Richard Hasen explained, SL 2013-381 is "the most sweeping anti-voter law in at least decades." As he explains in measured terms, "I'm not big on using the term 'voter suppression,' which I think is overused and often inaccurate, but it is hard to see this law as justified on anti-fraud, public confidence, or efficiency grounds.  The intent here is to make it harder for people – especially non-white people and those likely to vote Democratic – to register or cast a vote that will be counted."[75]

All evidence indicates that SL 2013-381 was enacted primarily for strategic gain and not because of a compelling state interest such as enhancing security of the election system, reducing costs, or alleviating the administrative burden on election officials[76].  An extensive statistical analysis by Bentele and O'Brien shows that recent state-level restrictions on voting such as those in SL 2013-381 are primarily a response by office holders to rising or high minority voter turnout rather than to genuine concern for improving the electoral system.[77]  By disrupting the very aspects of the state's electoral system that are most used by black and Latino voters, it is as if the new restrictions imposed by SL 2013-381 were selected precisely to disproportionately disrupt the voting habits of minority voters.

For instance, SL 2013-381 eliminates same day registration (SDR) as part of the early voting process, and effectively removes 7 days of early voting (also known as one-stop absentee voting).  Both SDR and early voting were disproportionately used by racial and ethnic minorities in North Carolina.  The law does require the same number of hours for early voting as in prior general elections but concentrates those hours in a smaller number of days.  In addition, a county may reduce the number of early voting hours if the county board votes unanimously to do so and is granted a waiver by the State Board of Elections.  Even setting aside these waivers, this redistribution of early voting time still leads to the elimination of early voting on the Sunday before Election Day, which has been more heavily used by minority voters.[78]

In this section I argue that SL 2013-381 is highly tenuous.  Specifically, I find that elements of the law: (1) are unnecessarily strict, (2) arbitrarily create two classes of voters, and (3) lack a factual rationale.

1.      SL 2013-381 is Unnecessarily Strict

SL 2013-381 implements a photo ID requirement for in-person voters.  The law generally requires that a voter show one of the following forms of government-issued ID to receive a ballot: North Carolina driver's license, state ID card, U.S. passport, military ID card, veterans ID card, tribal ID card, or driver's license from another state if the person registered to vote within 90 days of the election.[79]  The ID must include a photograph that reasonably resembles the voter,

---

[75] Election Law Blog entry, July 25, 2013. < http://electionlawblog.org/?p=53461>

[76] *See* Expert Report of Allan Lichtman, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015, at Section IX.

[77] Keith G. Bentele and Erin E. O'Brien (2013), "Jim Crow 2.0? Why States Consider and Adopt Restrictive Voter Access Policies," *Perspectives on Politics* 11:1088-116.

[78] *See* Figure 2 and 3 in Herron and Smith (2014).

[79] Limited exceptions to the law are for curbside voters with disabilities, voters with religious objections, and voters who suffer from declared natural disasters within 60 days of election day.

include a printed date of expiration that has not yet passed, and be issued no more than eight years before the date of voting.[80]

A voter who does not present an acceptable form of ID is permitted to cast a provisional ballot. That ballot generally will only be counted if the voter travels to the county board of elections to present valid ID by noon on the day before the county election canvass, which creates an effective deadline of six or seven days after Election Day.[81]

Two studies by the State Board of Elections (SBOE) indicate that blacks are less likely than whites to possess the required ID, even though the analysis was limited to those who are already registered. Where blacks comprise about 22% of registered voters, the two SBOE analyses found that they comprise 31% to 34% of those who could not be matched with Department of Motor Vehicle records, and are thus more apt to lack ID.[82] When compared to their shares of registered voters, this implies that registered blacks are twice as likely as whites to lack proper ID. As Professor Allan Lichtman's expert report demonstrates, this disparity holds despite the fact that the SBOE analysis included expired IDs in its matching algorithm, even though such IDs are not permissible under SB 2013-381. When expired IDs are excluded, the disparity between blacks and whites is larger than the SBOE analysis indicated.[83] In addition, Lichtman's report shows that replicating the SBOE analysis with more recent data from 2014 produces nearly identical results as the earlier analysis.

These studies showing differential possession of ID for voting are consistent with other facts. Blacks and Latinos are less likely to possess the IDs need to vote as a result of other activities in their lives such as driving, flying, or banking. These activities have been mentioned to argue that requiring ID to vote does not impose much additional burden. When it comes to driving, a recent study by AAA shows that while 79% of whites aged 18 to 20 have driver's licenses, only 55% of blacks and 57% of Latinos do.[84] There is little reason to believe that these disparities would differ significantly in North Carolina. In terms of flying, one national academic survey indicates that 46% of whites had flown by plane in the past 12 months, but only 30% of blacks had done so.[85] Finally, a report by the Federal Deposit Insurance Corporation (FDIC) found that 8.4% of North Carolina households are "unbanked," that is, they lack both savings and checking accounts.[86] However, the rate is a mere 4.4% for whites but is 17.8% for

---

[80]  Voters who are at least 70 years old maybe present expired IDs as long as those IDs were not expired at the time the voter turned 70. Military, veterans, and tribal ID cards need not include printed expiration dates.

[81]  *See* §163-182.5 for details. Two of those days fall on a weekend when the board of elections is expected to be closed.

[82]  *See* summary in Table 6 in Herron and Smith (2014). The SBOE reports did not provide data for Latinos.

[83]  *See* Expert Report of Allan Lichtman, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015, at Section VIII.A.1.

[84]  AAA Foundation for Traffic Safety, "Timing of Driver's License Acquisition and Reasons for Delay among Young People in the United States, 2012," July 2013.

[85]  Analysis of the American National Election Study 2008-2009 Panel Study.

[86]  Federal Deposit Insurance Corporation, 2013 FDIC National Survey of Unbanked and Underbanked Households, Washington, DC, October 2014. Appendix Table G-1.

blacks and 18.4% for Latinos.[87]  In sum, blacks and Latinos bear a heavier burden than whites to meet the voter ID requirements of SL 2013-381 both because they are less likely to possess acceptable government IDs in the first place and because they face more costs and less ability to pay them in order to procure IDs.

The Department of Transportation (DOT) issues special non-operator voter ID cards for voting purposes.  The DOT will not charge a fee for the card if the applicant is registered to vote and signs a declaration stating that they lack ID.  To obtain the card, a person must appear at a DOT office with appropriate underlying documentation and information.  The applicant must first verify his or her identity.  The documents must display a full name and date of birth.  DOT outlines 12 acceptable document types.  These include a certified birth certificate, original Social Security card, tax forms, school transcript, and immigration documents. They also include forms of ID that are accepted directly for voting – such as a U.S. passport and military ID – that would almost certainly not be used to obtain a separate state ID.[88]  The applicant must also provide a Social Security Number (or documentation if the DOT is unable to verify it).  The applicant must also provide proof of citizenship and residency.   There are 10 acceptable forms of documentation.  Finally, the person must also sign a declaration stating that he lacks an ID acceptable for voting.  If all of these requirements are met, the person is given a receipt and mailed an ID card, which may take up to 10 days to arrive.  The receipt may not be used for identification or voting.[89]  Acquiring a DOT ID may entail significant costs in terms of the time to gather documents, the legal or state fees required to obtain them (e.g., birth certificates), and the travel necessary to appear at a DMV office.

A study by Harvard University researcher Richard Sobel finds that the cost of obtaining ID to vote in a state with a strict voter ID requirement can be substantial.[90]  Based on real examples from Pennsylvania, South Carolina, and Texas, he estimates the expense of obtaining an ID based on costs due to travel, purchase of underlying documents, and lost wages due to the time required for travel and interacting with government agencies.  Setting aside potential legal fees, he finds that the cost for nine different individuals falls between $75.00 and $175.00.  Even accounting for inflation, these costs are far above the poll taxes ended by Constitutional amendment and U.S. Supreme Court rulings.

There is little reason to believe that the costs would be substantially lower to obtain ID for voting in North Carolina.  For example, a standard birth certificate request requires a

---

[87]  Federal Deposit Insurance Corporation, Unbanked and Underbanked for North Carolina, 2013 by Selected Household Characteristics.

[88]  DL-231 (revised November 18, 2014), *available at* http://www.ncdot.gov/download/dmv/DMV_voter_id_list.pdf.  The DOT indicates that other types of documents might be acceptable and will be reviewed.

[89]  Non-operator ID cards, Voter ID, and No-Fee ID Card, *available at* http://www.ncdot.gov/dmv/driver/id/ (last visited January 2, 2015).

[90]  Richard Sobel (2014), "The High Cost of 'Free' Photo Voter Identification Cards," Charles Hamilton Houston Institute for Race and Justice, Harvard University Law School.

payment of $24.00 to the Department of Health and Human Services.[91]  Travel to a DMV office may be challenging for many voters.  Most counties have just one DMV location—and some counties have no DMV offices.  The average county has a land area of 486 square miles and could thus require lengthy, inconvenient, costly, or difficult travel to acquire an ID even if the underlying documents were readily available at no cost.  Mobile DMV units may be helpful in mitigating these costs, but the limited availability of this ameliorative provision renders it an inadequate remedy.  Travel by public transportation comes with a financial cost and may be time-consuming.  Blacks and Latinos are less likely than whites to live in households where a vehicle is readily available.[92]  Traveling to multiple agencies to acquire underlying documents required by the DMV naturally compounds the burden placed on individuals.  Blacks and Latinos have fewer of the financial and other resources needed to overcome these burdens.

The unnecessary strictness of SL 2013-381 is apparent when comparing it with other states that have somewhat similar voter ID laws.  The National Conference of State Legislatures (NCSL) lists seven other states as having "strict photo ID" laws and three other states as having "strict non-photo ID laws."[93]  The NCSL listing also suggests that Alabama could be labeled as a "strict photo ID" state.  To this list I add South Carolina because its law also enumerates a limited set of acceptable photo IDs for voting and New Hampshire because its strict voter ID law goes into effect in 2015.[94]  This results in a set of 13 state voter ID laws that might be seen as comparable to SL 2013-381.

Reviewing the details of the laws in these 13 states reveals that most of them have adopted provisions to mitigate the harsh impact that a strict ID law might otherwise have on voters. These states demonstrate that it is possible to have a strict voter ID regime that meets purported state interests while also being much more accommodating of the costs of voting. North Carolina legislators must have been aware of these ameliorative options but chose to exclude nearly all of them. Professor Allan Lichtman's expert report provides a summary of specific provisions that were retained in the final version of SB 2013-381, each of which imposes greater costs on black voters than white voters.[95]

SL 2013-381 enumerates specific forms of ID that may be used for voting.  Some states with strict voter ID laws instead prescribe requirements for acceptable IDs, rather than limiting voters to a small, enumerated set.  For example, Arizona, Indiana, Mississippi, Ohio, and

---

[91]  DHHS states that the request may take up to five weeks to be fulfilled.  This requires individuals without a birth certificate on hand to act well in advance of the election to procure ID in time to vote.  Faster service is available for an additional $15.00 fee.

[92]  For example, the 2005 American Community Survey reports that the share of North Carolina households lacking a motor vehicle was 3.8% for whites, 6.6% for Latinos, and 15.5% for blacks.  *See* Expert Report of Allan Lichtman, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015, at Section IV, for statistics.

[93]  National Conference of State Legislatures, "Voter Identification Requirements," *available at* http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx  (last visited January 5, 2015).

[94]  See later discussion of how the "reasonable impediment" provision in South Carolina makes its voter ID requirement much less strict.

[95]  *See* Table 33 in the Expert Report of Allan Lichtman, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015.

Virginia require only that the photo ID be issued by the federal government or the state government.  Tennessee allows any photo ID card issued by the state or the federal government or an employee ID with a photograph issued by the federal government, the State, or any county, municipality, board, authority or other entity of the state.  Alabama, Kansas, and Georgia go further and allow voters to present IDs issued by other states.  Arizona allows for use of two non-photo IDs with the name and address of the voter instead of a photo ID.  SL 2013-381 allows none of these options.

SL 2013-381 does not permit student IDs for purposes of voting, even those issued by public colleges and universities in the state.  This prohibits use of IDs certain to be held by a large group of residents enrolled in postsecondary institutions.  In contrast, several other strict ID states allow student IDs.  Strict voter ID states such as Georgia and Indiana allow IDs from state colleges and universities.  Alabama, Arkansas, Kansas, Mississippi, and Virginia allow student IDs from both public and private universities.[96]  SL 2013-381 does not allow any of these forms of IDs.

SL 2013-381 generally requires that IDs have not expired.  Other strict ID states tend to be more forgiving.  Alabama only requires that IDs have not expired more than four years before the election.  Mississippi allows IDs to be expired up to 10 years.  Georgia and Tennessee allow IDs to be indefinitely expired. SL 2013-381 does not allow for any of these alternatives.

The law lacks a clear and consistent rationale for requiring that the ID not be expired.  In fact, SL 2013-381 allows two forms of ID that do not include expiration dates.  Other states with strict voter ID laws allow for IDs that are either expired or lack expiration dates.  For example, Alabama only requires that IDs have not expired more than four years before the election. Mississippi allows IDs to be expired up to 10 years.  Georgia and Tennessee allow IDs to be indefinitely expired.  Kansas does not require that IDs include expiration dates at all.  Other states have recognized that, if the purpose of the voter ID law is to establish a voter's identity, then the name and photo on the ID should be adequate.

Several strict ID states permit an even wider range of IDs for voting.  Virginia allows use of employee ID cards from private employers.  In Kansas a voter may present a public school district employee ID, public high school student ID, city library card, emergency management card, or municipal pool pass.[97]  Missouri and Ohio permit a voter to show a utility bill, bank statement, or government paycheck.  SL 2013-381 does not allow any of these alternative means to establish identity.

South Carolina allows a voter who faced a "reasonable impediment" to obtaining an acceptable photo ID to vote after signing an affidavit.[98]  This provision allows a voter to cast a ballot without ID due to any "reasonable" reason including illness, lack of transportation, work

---

[96]  Note that the law in Arkansas was struck down by the state's Supreme Court in October 2014.

[97]  "Photographic Identification Frequently Asked Questions," *available at* http://www.gotvoterid.com/pdf/FAQs_for_PhotoID.pdf (last visited June 10, 2014).

[98]  The voter technically casts a provisional ballot.  The ballot will be counted along with regular ballots as long as the voter presents a registration card and the county election commission does not deem the affidavit as false.

conflicts, and lack of underlying documents such as a birth certificate. It essentially removes the ID requirement for voters who face difficulty obtaining the resources to obtain ID. It was only after this ameliorative provision was added that South Carolina's law was deemed not to be racially retrogressive. Indiana and Tennessee also have exemptions for voters who cannot obtain ID because they are indigent.[99] SL 2013-381 does not allow for these options.

Exclusion of many reasonable ameliorative provisions that exist in other state's voter ID laws increases the costs that SL 2013-381 imposes on voters, especially blacks and Latinos, but does so without a firm factual rationale.

Most North Carolinians are unlikely to view the new requirements and restrictions in SL 2013-381 as unreasonably burdensome. But that is not the standard that the VRA Senate Factors establishes, which instead focuses on unequal abridgement of the right to participate. As an example of this distinction, consider the study conducted by professors Alvarez, Hall, and Llewellyn.[100] The researchers asked the public directly in a nationally representative survey how difficult it was to register to vote. Respondents answered on a continuum ranging from 1 ("very hard") to 7 ("very easy"). The majority indicated that registering was relatively easy, with 65% choosing point 7 and a total of 86% choosing values above the midpoint of 4. Only 10.0% choose answers of 4 or below. But that average disguised important differences across demographic groups. Only 9.6% of whites reported that registering to vote was difficult, but that percentage was 16.1% among blacks and 18.8% among "other" races (which presumably includes most Latinos). Alvarez, Hall, and Llewellyn concluded that while "most voters find it relatively easy to register to vote," the perception of difficultly among minorities "suggests that the legacy of disenfranchising minority voters…continue[s] to exist," and "just because the barriers seem low to policy makers, the barriers may be a relative problem, with certain voters still finding the barriers to be quite high, oppressive, and disheartening."[101] The restrictions on voter registration and other new requirements each fall more heavily on blacks and Latinos, but also cumulate into an overall message that is especially discouraging to minority voters.

The design of SB 2013-381 is likely to dissuade participation among blacks and Latinos more than whites. However, detecting the effects of the law on voter turnout is more challenging than it might initially seem. In particular, simply comparing the levels of turnout among racial and ethnic groups between elections before and after the law took effect will not be conclusive. As I explain later in the report, a multitude of factors influence voter turnout, so isolating the effect of the law from other elements on the electoral environment is challenging. Without an appropriate research design, it is inappropriate to reason backward from levels of turnout to reach conclusions about the relative burden placed on voters by an election law.

Most academic studies of the effect of voter ID on turnout are uninformative. This is because they were conducted at a time when only a small number of states had strict ID laws and

---

[99] In both states, the voter casts a provisional ballot, but the ballot will be counted if the voter returns to the election board and executes an affidavit to this effect.

[100] R. Michael Alvarez, Thad E. Hall, and Morgan Llewellyn (2007), "How Hard Can It Be: Do Citizens Think It Is Difficult to Register to Vote?," *Stanford Law and Policy Review* 18:382-409.

[101] Alvarez, Hall, and Llewellyn (2007), p. 406.

all such laws were treated as equivalent despite important differences among them. This limited the ability of researchers to draw firm inferences from the data available.[102] The most recent study of voter ID's effects on voter turnout that minimizes these liabilities was conducted by the U.S. Government Accountability Office.[103] The study drew careful quasi-experimental comparisons between otherwise similar states with and without strict voter ID laws. This allowed the researchers to avoid the problem of lumping together different types of laws and to sidestep the complications of other state-specific factors that influence turnout. The study found that strict ID laws in Kansas and Tennessee decreased overall voter turnout among registrants by two to three percentage points. Moreover, the depressive effects were 1.5 to 3.7 percentage points larger among blacks than among whites. Although the GAO report is not the final word on the subject, the sophistication and recency of the study strongly suggest that strict voter ID laws and new restrictions on voting such as those in SB 2013-381 can be seen to reduce turnout disproportionately among black voters once other factors are held constant.

## 2.      SL 2013-381 Arbitrarily Creates Two Classes of Voters

SL 2013-381 only requires photo ID of in-person voters. People who wish to vote absentee by mail generally need to provide only a driver's license number or the last four digits of a Social Security number.[104] This creates an inequality in how absentee voters and in-person voters are treated. This inequality runs counter to the state's purported interest in reducing election fraud and imposes a heavier burden on minority voters.

Because the rate of voting by mail is greater among whites, the seemingly race-neutral imposition of ID requirements for in-person voters falls more heavily on blacks and Latinos. The Current Population Survey (CPS) shows that whites were generally more likely than blacks or Latinos to vote by mail in federal elections from 2000 to 2012, particularly in presidential election years.[105] Official data from the State Board of Elections confirms these differences. Table 2 presents mail voting rates for whites, blacks, and Latinos in the past four federal elections in North Carolina. The rate of voting by mail is higher for whites than for minorities in all four elections. On average whites voted by mail at a rate that was roughly twice that of blacks and 70% more than Latinos. A larger proportion of black and Latino voters are thus compelled to comply with the strict ID requirements in SL 2013-381.

---

[102]  Robert S. Erikson and Lorraine C. Minnite (2009), "Modeling Programs in the Voter Identification-Voter Turnout Debate," *Election Law Journal* 8:85-101.

[103]  United States Government Accountability Office (September 2014), "Issues Related to State Voter Identification Laws," Report to Congressional Requesters, GAO-14-634, Washington, D.C.

[104]  Section 303(b) of the federal Help America Vote Act (HAVA) requires that a first-time voter who did not provide a driver's license number of last four digits of a Social Security number when registering to vote must provide a copy of an ID when voting. Acceptable forms of ID are current photo ID, utility bill, bank statement, government check, paycheck, or other government document showing the name and address of the voter.

[105]  The CPS is a large-scale national survey administered by the U.S. Census Bureau. In November of even numbered years it includes a supplement focused on voting and registration. The 2014 CPS data were not yet publicly available at the time this report was submitted. Because these are survey estimates, each is accompanied by a different statistical margin of error. As a result, not all group differences will be statistically significant by conventional standards. See also Exhibits 6 and 7, which show similar patterns despite employing a different weighting scheme than the standard CPS weights offered in the Expert Report of Paul Gronke, *League of Women Voters of North Carolina, et al. v. The State of North Carolina, et al.*, Civ. No. 1:13-cv-660. 11 April 2014.

**Table 2. Mail Voting Rates by Racial and Ethnic Groups in
Recent Federal Elections in North Carolina**

|         | 2008 | 2010 | 2012 | 2014 | **Average** |
|---------|------|------|------|------|-------------|
| White   | 6.4% | 2.4% | 5.8% | 3.0% | 4.4%        |
| Black   | 1.7% | 1.8% | 3.0% | 2.3% | 2.2%        |
| Latino  | 3.1% | 1.8% | 3.0% | 2.3% | 2.6%        |

The unequal treatment of in-person and mail voters under SL 2013-381 compounds underlying differences in the degree to which minority voters hold the IDs needed to vote in person. Both because they are more likely to vote in person and because they are less likely to have an appropriate ID in advance, larger shares of black and Latino voters will need to take actions to secure ID under SL 2013-381, despite the fact that they have less in the way of resources to do so. As a result, the arbitrary design of the voter ID law has a compound effect on minority voters.

The exemption for voters who are aged 70 and above further exaggerates the differential burden placed on minority voters. This is because the white population in North Carolina is older than the minority population in North Carolina. Data indicate that the share of registered voters that is white is 9 to 11 percentage points higher among those who are aged 70 and above. Black registrants on average are about 5 years younger than white registrants.[106] The median age for each group in North Carolina is 42.3 for whites, 34.4 for blacks, and 24.4 for Latinos.[107] This provision of the law thus places a heavier burden on black voters who are more likely to be required to acquire ID for voting because of their younger ages.

SB 2013-381 also removes pre-registration opportunities for 16 and 17 year olds. Because of the differing age distributions of white and minorities in North Carolina, the pre-registration provision had disproportionately benefitted blacks and Latinos. The share of each group who are citizens under age 18 is 19.5% for whites, 25.9% for blacks, and 57.9% for Latinos.

3.  SL 2013-381 is Not Well Reasoned and Will Have Little Effect on Election Fraud

SL 2013-381 is not well designed if its aim is to address the state's purported interest in reducing voter fraud or to boost public confidence in elections. Advocates of the law have not explained how elimination of same day registration or reducing the early voting period will reduce fraud. As explained above, by limiting the law's voter ID requirement to in-person votes, it counter-intuitively imposes new burdens on the form of voting that is least susceptible to fraud.

---

[106] Herron and Smith (2014). The report did not include comparable data for Latinos, but all evidence indicates that Latinos are also less likely than whites to be aged 70 or older. The median age for Latinos is the youngest of the three groups. Although standard reports from the 2013 American Community Survey 3-year averages do not specifically isolate those 70 years or older, the reports are informative based on isolating those 65 or older and 75 or older. The data indicate that among Latinos in North Carolina only 2.4% are 65 or older and only .9% are 75 or older. Among whites the percentages are 17.1% are 65 or older and 7.5% are 75 or older.

[107] Data are 3-year averages from the 2013 American Community Survey.

The voter ID requirement focuses on an extremely rare form of election crime while ignoring where vote fraud more frequently occurs: through mail ballots.  Studies of voting system security routine express greater concerns about mail ballots than in-person ballots.[108] Political scientist John Fortier, now at the Bipartisan Policy Center, summarizes the prevailing view among political scientists and policy analysts.  His summary of this issue is worth quoting at length:

> While there will always be disagreement over the seriousness of election fraud in general, both sides to this argument agree on one important matter: The most likely avenue for voter fraud is absentee balloting, which offers more opportunities for it than the traditional polling place. . . . At a polling place today, the ballot is secure. Voters must present themselves and at least declare who they are in person. In many states, they may have to show a form of identification. The ballot is not to be handled by poll workers, other voters, party officials, spouses, relatives, or companions of the voter. The voter casts or deposits the ballot without assistance, in a privacy booth or curtained stall that allows him or her to do so in complete secrecy. No one can influence the voter while voting, not see the completed ballot. . . . Absentee ballots have none of these protections. [109]

The unequal treatment of mail and in-person ballots under SL 2013-381 runs counter to professional understandings of where vote fraud is mostly likely to occur and thus imposes heavier burdens on black and Latinos voters without a compelling rationale.

SL 2013-381 restricts the counting of provisional ballots cast in the incorrect precinct. Before the law, ballots cast in the wrong precinct were still counted for non-precinct-specific elections.  Under SL 2013-381 this is no longer permitted.  As Professors Allan Lichtman and Charles Stewart have documented in their expert reports, in the 2008, 2010, and 2012 general elections, blacks were twice as likely as whites to cast provisional ballots in the wrong precinct.[110]  This is compounded by the fact that blacks have been found on average to change residences more frequently than whites.[111]

---

[108]  *See* R. Michael Alvarez, Dustin Beckett, and Charles Stewart III (2012), "Voting Technology, Vote-by-Mail, and Residual Votes in California, 1990-2010," *Political Research Quarterly* 66:658-70.  Martha Kropf (2013), "North Carolina Election Reform Ten Years After the Help America Vote Act," *Election Law Journal* 12:179-89. Charles Stewart III (2010), "Losing Votes by Mail," *NYU Journal of Legislation and Public Policy* 13:573-602.

[109]  John C. Fortier (2006), *Absentee and Early Voting: Trends, Promises, and Perils*, Washington, DC: The AEI Press.

[110]  *See* Tables 38, 39 and 40 in the Expert Report of Allan Lichtman, *North Carolina State Conference of the NAACP, et al. v. Patrick McCrory, et al.*, Civ. No. 1:13-cv-658. 12 February 2015.  *See* Table 14 of the Expert Report of Charles Stewart III, *United States of America, et al. v. The State of North Carolina, et al.*, Civ. No. 1:13-cv-861. 2 May 2014.

[111]      *See, e.g.,* U.S. Census Bureau, *Geographic Mobility: 2012 to 2013*, *available at* http://www.census.gov/hhes/migration/data/cps/cps2013.html.

Compounding these additional bureaucratic hurdles is that minority voters are warier of interacting with the election system.  It is unsurprising that a minority population disenfranchised from voting by violence until at least the 1960s and still feeling defensive about modern practices around redistricting and voting procedures would be more easily deterred from a novel and burdensome voter ID requirement.  A set of election reforms that imposed additional costs on voters would not necessarily send a discouraging message to blacks and Latinos in North Carolina if some of those costs happen to fall more heavily on minorities while others fall more heavily on whites.  Instead, SL 2013-381 contains an array of new restrictions that almost uniformly levy the new costs of voting disproportionately on blacks and Latinos.

In short, SL 2013-381 imposes restrictions on precisely those key elements of the state's electoral system that black and Latino voters have disproportionately adopted in recent years. The law's major provisions end the right to vote without a list of approved government photo IDs, to use same day registration, to have ballot counted that is cast out of precinct, and to pre-register as a 16 or 17 year old.  The abrupt withdrawal or curtailing of the options represents a more acute disruption in the habits of black and Latino voters and will thus deter their participation to a larger degree.  On their own, each imposes more costs on minority voters than white voters.  This leads to a more significant cumulative burden that disproportionately falls on the minority population in North Carolina.

A sharp break with existing election law might be acceptable if the state had compelling reasons for imposing new, dramatic restrictions.  The benefit to the state of such a dramatic change in law appears to be minimal.  Indeed, it is not even clear that key elected officials were aware of the full contents of the bill that became law.  After he "praised the bill" in a July 26, 2013 press conference, Governor McCrory was asked about specific provisions.  His answers indicated that he was unaware of much of the content of the bill he was about to sign into law. When questioned about new restrictions on pre-registration of 16 and 17-year olds, he responded, "I don't know enough. I'm sorry, I haven't seen that part of the bill."[112]  He also stated that limits on same day registration were not problematic because "[t]here is plenty of opportunity for voter registration – online, offline, through many methods" despite the fact that North Carolina still does not permit online registration.[113]  In multiple interviews touting the law, McCrory repeatedly stated that under SL 2013-381: "[w]e have every political precinct open the week before election" and "[w]e have two weeks of early voting and we changed some of the rules where every precinct has to be open."  Ten days is not the same as "two weeks," and under §25.3 of SL 2013-381 a county may in fact reduce the number of hours if the county board votes unanimously to do so and obtains a waiver from the State Board of Elections.  In addition, only early voting locations – not the more numerous local precinct polling places – are open during early voting.[114]

---

[112]  Governor Patrick McCrory on CNN's "Crossfire," as quoted in Gary D. Roberton, "N.C. Counties Reduce Early Voting Hours for Primary," *The (Elizabeth City) Daily Advance*, February 27, 2014.

[113]  Michael Biesecker, "McCrory Not Familiar with All of Bill He's to Sign," *The (Raleigh) News & Observer*, July 27, 2013.  Several bills that would have introduced online registration in North Carolina were defeated in 2013.  See http://www.ncsl.org/research/elections-and-campaigns/electronic-or-online-voter-registration.aspx

[114]  Mark Binder, "Precincts Versus Early Voting Locations," August 13, 2013, WRAL, *available at* http://www.wral. com/precincts-versus-early-voting-locations/12772554/.

McCrory appeared to hold the same erroneous beliefs even months after the law was adopted. In February 2014, McCrory elaborated more recently that "[w]e didn't shorten early voting. We compacted the calendar, but we're going to have the same hours in which polls are open in early voting and we're going to have more polls available." Over 30 of the state's 100 counties had already received approval from the SBOE to reduce hours when these statements were made. This continuing misinformation suggests that the law was not thoughtfully crafted to meet compelling state interests, but rather was rushed through the legislative process. This points to the tenuous nature of the law.

State legislators seemed uninformed about whether SL 2013-381 actually resembled voter ID laws in other states. Governor McCrory and multiple state legislators in favor of the bill stated that 30 to 35 states had voter ID laws in mid 2013.[115] It is not clear where this number originates and it surely includes states with voter ID laws that would not be regarded as strict, requiring a photo ID, or even requiring an ID at all.[116] As explained above, there are arguably 13 states that could be viewed as having comparable strict voter ID laws, and many of those have accommodating provisions that were purposely excluded from SL 2013-381.

The state's rationale for the restrictions in SL 2013-381 as a means to combat election fraud is also tenuous at best.[117] A thorough analysis of voter fraud allegations by the News21, an investigative reporting project based at Arizona State University, shows little evidence of criminal activity by potential voters. They found 22 allegations of fraud of various kinds in North Carolina between 2000 and 2012. Of these, only 15 implicated voters rather than campaign or election officials; just two cases were settled by plea and none led to conviction.[118] This compares to the millions of votes cast without criminal charges during that time.

Following the logic of the "calculus of voting," the "costs" of these crimes are high because they come with legal penalties. The "benefit" of casting a ballot and "probability" of being decisive in most elections are comparatively low.

Another rationale offered by legislative proponents of the bill was that a voter ID law would help to improve public confidence in the state's election system. However, political science research shows that there is no relationship between the strictness of state voter ID laws and voter confidence. Based on a systematic nationwide analysis, Professor Stephen Ansolabehere concluded that an individual's "Belief in the frequency of election fraud is uncorrelated with the propensity to vote."[119] He explains further:

---

[115] See Matthew Burns, "Senate Backs Sweeping Elections Bill, WRAL, July 24, 2013. Statement by State Senator Jerry Tillman, Senate Debate on House Bill 589, July 24, 2013 (p. 77, line 7). "N.C. Gov. Pat McCrory Defends New Voter ID Law," WUNC, August 13, 2013.

[116] See http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.

[117] Lorraine C. Minnite (2010), *The Myth of Voter Fraud*, Cornell University Press. See also Ray Christensen and Thomas J. Schultz (2014), "Identifying Election Fraud Using Orphan and Low Propensity Voters," *American Politics Research* 42:311-337.

[118] *See* votingrights.news21.com.

[119] Stephen Ansolabehere (2009), "Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day," *PS: Political Science & Politics* 42:127-130, p. 129.

> ID laws will have little or no effect on the confidence in the electoral system or the belief in the incidence of fraud. Those beliefs, wherever they come from, are no different when a stricter ID law in in place and enforced than when less invasive voter-authentication methods are used.[120]

Related research conducted with law Professor Nathaniel Persily similarly finds that:

> [T]here is little or no relationship between beliefs about the frequency of fraud and electoral participation. . . . Nor does it appear to be the case that universal voter identification requirements will raise levels of trust in the electoral process.[121]

Voter confidence is affected by factors other than ID laws. The most relevant of these is whether a person voters by mail or in person. Research by Professor Paul Gronke shows that rather than being influenced by voter ID laws, voter confidence is improved when a voter's preferred candidate won the election, when polling places appear to be well-run, and—importantly for SB 2013-381—when a voter votes in person rather than by mail.[122] Research by Professors Michael Alvarez, Thad Hall, and Morgan Llewellyn also finds that mail voters are less confident than polling place voters that their ballots are counted properly.[123] This again indicates that a law designed to increase voter confidence in the security of election systems should focus on mail ballots rather than in-person voting.

Moreover, the voter ID provision only hinders one of the least common crimes that might be committed at a polling place: voter impersonation. An analysis by the SBOE of the most meritorious voter fraud allegations shows that voter impersonation accounted for only two cases out of hundreds investigated between 2000 and 2012.[124] Much more common concerns such as voting by felons or absentee fraud are not addressed by SB 2013-381.

The legislative history of HB 589 makes clear that the black and Latino communities opposed the law on the grounds that it would impose a disproportionate burden on minority electors. Black and Latino legislators spoke out directly against the legislation. For example, members of the Legislative Black Caucus expressed alarm that what was originally a voter ID

---

[120]  Ansolabehere (2009), p. 130.

[121]  Stephen Ansolabehere and Nathaniel Persily (2008), "Vote Fraud in the Eye of the Beholder: The Role of Public Opinion in the Challenge to Voter Identification Requirements," *Harvard Law Review* 121:1737-1774, p. 1759.

[122]  Paul Gronke (2014), "Voter Confidence as a Metric of Election Performance," in Barry C. Burden and Charles Stewart III, eds., *The Measure of American Elections,* New York, NY: Cambridge University Press.

[123]  R. Michael Alvarez, Thad E. Hall, and Morgan H. Llewellyn (2008), "Are Americans Confident Their Ballots Are Counted?," *Journal of Politics* 70:754-66.

[124]  North Carolina State Board of Elections. "Documented Cases of Voter Fraud in North Carolina." March 13, 2013. This table lists investigated cases that were referred to district attorneys, so the actual number in which formal charges were files or convictions happened is smaller.

law had become a "voter suppression" tool.[125]  Legislators would have been well aware of these concerns in minority communities when the bill was passed.

### F.      The 2014 Election

The 2014 general election was the first federal election in which SL 2013-381 (aside from the voter ID requirement) was in effect.  It is tempting to examine the voter turnout rates of whites, blacks, and Latinos in that election with the previous midterm election in 2010 to assess the effects of the law.  Such an approach can be misleading.  As explained above in the context of voter ID laws, simply comparing the 2010 and 2014 elections in North Carolina will reveal little about the effects of SB 2013-381 on voter turnout because other changing factors over-determine the conclusions.  Turnout is known to be affected by a multitude of factors including important factors such the number, kind, and intensity of races being contested.  As a result, turnout itself is not a measure of the legal burden placed on voters.

Section 2 of the VRA prohibits use of a law that would "deny or abridge" the right to vote "on account of race or color."  The Senate Report makes clear that a law, in combination with the totality of the circumstances, should not prevent "equal opportunities to participate."  The degree to which members of a racial or ethnic group actually vote in a specific election will naturally reflect many factors beyond the law, including such things as activities of candidates, political parties, and other interested groups.  These actors might help groups of voters pay the costs of voting, but voting rates themselves do not indicate whether the law is valid or not.  To make an analogy to an earlier time in North Carolina elections, poll taxes were deemed to be unconstitutional even though some black residents managed to pay them and vote.  That some blacks overcame the burden did not make the poll tax valid.

It is not surprising that black turnout in the 2014 election was robust, despite the presence of SL 2013-381 (again, minus the voter ID law).  The U.S. Senate race between Kay Hagan and Thom Tillis was one of the most intense in the country.  The election was decided by just 1.5 percentage points. This contrasts with the 2010 Senate election in North Carolina, which was far less competitive and was decided by almost 12 percentage points.  The 2014 Senate election in North Carolina saw over $111 million spent, it was by most accounts the costliest Senate campaign in U.S. history.[126] The amount of spending dwarfed the approximately $15 million spent in the 2010 Senate election in North Carolina.[127]  Campaign spending in 2014 funded the airing 69,349 television ads between September 1 and election day.  This compares to just 8,916 ads in the less intense 2010 Senate race.[128]  That is, the volume of campaign spending and

---

[125]   Annalise Frank, "Voter ID Turns into 'Voter Suppression,' Says Legislative Black Caucus," *The News & Observer*, Under the Dome blog, July 24, 2013 (last visited March 28, 2014).

[126]   Grace Wallack and John Hudak, "How Much Did Your Vote Cost? Spending Per Voter in the 2014 Senate Races," Brookings Institution FixGov blog, *available at* http://www.brookings.edu/blogs/fixgov/posts/2014/11/07-spending-per-voter-2014-midterm-senate-wallack-hudak (last visited January 6, 2015).

[127]   http://www.opensecrets.org/races/summary.php?id=NCS2&cycle=2010 (last visited January 6, 2014).

[128]   Wesleyan Media Project.

advertising was roughly seven times as great in 2014 as it was in 2010.  Political science demonstrates that campaign effort of this type increases voter turnout.[129]

Journalists covering the campaign pointed to the significant efforts aimed at turning out the black vote, with the NAACP dispatching organizers across the state,[130] groups running racially charged ads on black-dominated media,[131] and members of the Congressional Black Caucus visiting the state as well.[132]   Efforts to turn out black voters relied in part on a negative backlash against voting restrictions imposed by SL 2013-381.[133]   Those mobilization efforts appear to have buoyed turnout in Democratic areas of the state, which are disproportionately black.[134]   Given the unprecedented campaign activity in North Carolina, much of it aimed at black voters, it is unsurprising that black voter turnout increased between 2010 and 2014 despite the imposition of most of the elements of SL 2013-381.[135]

## V.     CONCLUSION

I conclude that SL 2013-381 has a disproportionate negative impact on voting participation by blacks and Latinos in North Carolina.  The law increases the costs of voting more sharply for minority voters, for whom voting is already significantly more costly with fewer perceived benefits.  Individual elements of the law impose greater burdens on minority voters and cumulatively they interact for greater effect.  For all of the reasons outlined above, it is my opinion that SL 2013-381 will result in minority voters being denied an equal opportunity to participate in, and influence the outcome of, elections in North Carolina.

---

[129]   For example, see Paul Freedman, Michael Franz, and Kenneth Goldstein (2004), "Campaign Advertising and Democratic Citizenship," *American Journal of Political Science* 48:723-41.

[130]   Wesley Lowery, "Black Voters Could Be Key to North Carolina Race," *Washington Post*, November 2, 2014.

[131]   Jeremy W. Peters, "In Democratic Election Ads in South, a Focus on Racial Scars" *The New York Times*, October 29, 2014.  Renee Schoof, "Democrats Say Black Turnout Key to North Carolina Senate Contest," *The News & Observer*, September 19, 2014.

[132]   S.A. Miller, "Democrats Microtarget Blacks in South in Effort to Keep Senate," *Washington Times*, July 6, 2014.

[133]   William Selway, Mark Niquette, and Greg Stohr, "Republicans Set to Gain From Laws Requiring Voter IDs," Bloomberg News, October 21, 2014, *available at* http://www.bloomberg.com/politics/articles/2014-10-22/republicans-set-to-gain-from-laws-requiring-voter-ids (last visited February 11, 2015).

[134]   Nate Cohn, "For Democrats, Turnout Efforts Look Successful (Though Not Elections)," *The New York Times*, November 14, 2014.

[135]   Calculations produced by Professor Michael McDonald indicate that overall turnout rose from 39.8% in 2010 to 41.2% in 2014.  See http://www.electproject.org/home/voter-turnout/voter-turnout-data (last visited January 6, 2015).

**APPENDIX A**
**Curriculum Vitae**

# Barry C. Burden

## 1. Contact

University of Wisconsin-Madison           bcburden@wisc.edu
Department of Political Science           http://faculty.polisci.wisc.edu/bcburden
1050 Bascom Mall                          Twitter: @bcburden
301 North Hall                            phone: 608-263-6351
Madison, WI 53706-1316                    fax: 608-265-2663

## 2. Academic Positions

Professor of Political Science, University of Wisconsin-Madison (2006-present)

      Founding Director, Elections Research Center (2015-present)

      Associate Chair/Director of Graduate Studies (2007-2012)

Associate Professor of Government, Harvard University (2003-2006)

Assistant Professor of Government, Harvard University (1999-2003)

Assistant Professor of Political Science, Louisiana State University (1998-1999)

## 3. Education

Ph.D.   The Ohio State University (1998)

B.A.    Wittenberg University (1993)

## Authored or Co-Authored Books

Burden, Barry C. 2007. *Personal Roots of Representation*. Princeton, NJ: Princeton University Press. [Reviewed in *Choice*, *Democratization*, *Journal of Politics*, *Legislative Studies Section Newsletter*, *Political Studies Review*, & *Polity*]

Burden, Barry C., and David C. Kimball. 2002. *Why Americans Split Their Tickets: Campaigns, Competition, and Divided Government*. Ann Arbor, MI: The University of Michigan Press. [Reviewed in *Campaigns & Elections Magazine*, *Choice*, *Journal of Politics*, *Legislative Studies Section Newsletter*, *National Journal*, *Party Politics*, *Perspectives on Politics*, *Political Science Quarterly*, *Public Choice*, & *VOX POP*.]

## Edited Books

Burden, Barry C., and Charles Stewart III, eds. 2014. *The Measure of American Elections*. New York, NY: Cambridge University Press.

Hershey, Marjorie R. (editor), Barry C. Burden (associate editor), and Christina Wolbrecht (associate editor). 2014. *Guide to Political Parties*. Thousand Oaks, CA: Sage Publications.

Burden, Barry C., editor. 2003. *Uncertainty in American Politics*. New York, NY: Cambridge University Press. [Reviewed in *Choice*, *Perspectives on Political Science*, *Political Studies Review*, & *Public Choice*.]

## Refereed Journal Articles

Burden, Barry C. Forthcoming. "Economic Accountability and Strategic Calibration in Japan's Liberal Democratic Party." *Party Politics*.

Burden, Barry C., and Jeffrey Milyo. Forthcoming. "The Quantities and Qualities of Poll Workers." *Election Law Journal*.

Burden, Barry C., and Brian J. Gaines. Forthcoming. "Absentee and Early Voting: Weighing the Costs of Convenience." *Election Law Journal*.

Burden, Barry C., and Amber Wichowsky. 2014. "Economic Discontent as a Mobilizer: Unemployment and Voter Turnout." *Journal of Politics* 76:887-98.

Burden, Barry C., Bradley M. Jones, and Michael S. Kang. 2014. "Sore Loser Laws and Congressional Polarization." *Legislative Studies Quarterly* 39:299-325. [Featured in *The New York Times* column by Mickey Edwards, Mischiefs of Faction blog, and *Washington Monthly* Ten Miles Square blog]

Burden, Barry C. David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2014. "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science* 58:95-109. [Featured in a variety of outlets including *The Atlantic* Wire, *The New York Times*. Pew Research Center FactTank, The Huffington Post, *The Deseret News*, National Review Online, *The Baltimore Sun*, and *Orlando Sentinel*]

Burden, Barry C., David T. Canon, Stéphane Lavertu, Kenneth R. Mayer, and Donald P. Moynihan. 2013. "Selection Methods, Partisanship, and the Administration of Elections." *American Politics Research* 41:903-36.

Burden, Barry C., and Jacob R. Neiheisel. 2013. "Election Administration and the Pure Effect of Voter Registration on Turnout." *Political Research Quarterly* 66:77-90.

Burden, Barry C. David T. Canon, Kenneth R. Mayer, Donald P. Moynihan. 2012. "The Effect of Administrative Burden on Bureaucratic Perception of Politics: Evidence from Election Administration." *Public Administration Review* 72:741-51.

Neiheisel, Jacob R., and Barry C. Burden. 2012. "The Impact of Election Day Registration on Voter Turnout and Election Outcomes." *American Politics Research* 40:636-64. [Featured on the *Wall Street Journal's* Ideas Market blog]

Burden, Barry C. David T. Canon, Kenneth R. Mayer, Donald P. Moynihan. 2011. "Early Voting

and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10:89-102.

Berry, Christopher R., Barry C. Burden, and William G. Howell. 2010. "The President and the Distribution of Federal Spending." *American Political Science Review* 104:783-99.

Berry, Christopher R., Barry C. Burden, and William G. Howell. 2010. "After Enactment: The Lives and Deaths of Discretionary Programs." *American Journal of Political Science* 54:1-14.

Burden, Barry C. 2009. "The Dynamic Effects of Education on Voter Turnout." *Electoral Studies* 28:540-9.

Burden, Barry C., and D. Sunshine Hillygus. 2009. "Opinion Formation, Polarization, and Presidential Reelection." *Presidential Studies Quarterly* 39:619-35.

Burden, Barry C. 2009. "Candidate-Driven Ticket Splitting in the 2000 Japanese Elections." *Electoral Studies* 28:33-40.

Burden, Barry C., and Gretchen Helmke. 2009. "The Comparative Study of Split-Ticket Voting." *Electoral Studies* 28:1-7. [Introduction to a Special Issue co-edited with Gretchen Helmke.]

Burden, Barry C. 2008. "The Social Roots of the Partisan Gender Gap." *Public Opinion Quarterly* 72:55-75.

Burden, Barry C. 2007. "Ballot Regulations and Multiparty Politics in the States." *PS: Political Science & Politics* 40:669-73.

Burden, Barry C. 2006. "A Tale of Two Campaigns: Ralph Nader's Strategy in the 2004 Presidential Election." *PS: Political Science and Politics* 39:871-4.

Burden, Barry C., and Casey A. Klofstad. 2005. "Affect and Cognition in Party Identification." *Political Psychology* 26:869-86.

Burden, Barry C. 2005. "Institutions and Policy Representation in the States." *State Politics and Policy Quarterly* 5:373-93.

Burden, Barry C. 2005. "Minor Parties and Strategic Voting in Recent U.S. Presidential Elections." *Electoral Studies* 24:603-18.

Burden, Barry C. 2005. "Ralph Nader's Campaign Strategy in the 2000 U.S. Presidential Election." *American Politics Research* 33:672-99.

Burden, Barry C., and Tammy M. Frisby. 2004. "Preferences, Partisanship, and Whip Activity in the House of Representatives." *Legislative Studies Quarterly* 29:569-90.

Burden, Barry C. 2004. "A Technique for Estimating Candidate and Voter Positions." *Electoral Studies* 23:623-39.

4.   Burden, Barry C. 2004. "Candidate Positioning in U.S. Congressional Elections." *British Journal of Political Science* 34:211-27.

Burden, Barry C., and Anthony Mughan. 2003. "The International Economy and Presidential Approval." *Public Opinion Quarterly* 67:555-78.

Burden, Barry C., and Joseph Neal Rice Sanberg. 2003. "Budget Rhetoric in Presidential Campaigns from 1952 to 2000." *Political Behavior* 25:97-118.

Burden, Barry C. 2003. "Internal and External Effects on the Accuracy of NES Turnout." *Political Analysis* 11:193-5.

Burden, Barry C. 2002. "When Bad Press is Good News: The Surprising Benefits of Negative Campaign Coverage." *Harvard International Journal of Press/Politics* 7:76-89.

Burden, Barry C. 2002. "United States Senators as Presidential Candidates." *Political Science Quarterly* 117:81-102. [Featured in David S. Broder's *Washington Post* column.]

Burden, Barry C. 2000. "Voter Turnout and the National Election Studies." *Political Analysis* 8:389-98.

Burden, Barry C., Gregory A. Caldeira, and Tim Groseclose. 2000. "Measuring the Ideologies of U.S. Senators: The Song Remains the Same." *Legislative Studies Quarterly* 25:237-58. [Reprinted in Carl Grafton and Anne Permaloff, ed. 2005. *The Behavioral Study of Political Ideology and Public Policy Formation*, Lanham, MD: University Press of America.]

Burden, Barry C., and Steven Greene. 2000. "Party Attachments and State Election Laws." *Political Research Quarterly* 53:57-70.

Burden, Barry C., and Anthony Mughan. 1999. "Public Opinion and Hillary Rodham Clinton." *Public Opinion Quarterly* 63:237-50. [Featured in *The Chronicle of Higher Education* and Richard Morin's *Washington Post National Weekly Edition* column.]

Burden, Barry C., and Marni Ezra. 1999. "Calculating Voter Turnout in U.S. House Primary Elections." *Electoral Studies* 18:89-99.

Lacy, Dean, and Barry C. Burden. 1999. "The Vote-Stealing and Turnout Effects of Ross Perot in the 1992 U.S. Presidential Election." *American Journal of Political Science* 43:233-55.

Burden, Barry C., and David C. Kimball. 1998. "A New Approach to the Study of Ticket Splitting." *American Political Science Review* 92:533-44. [Reprinted in Richard G. Niemi and Herbert F. Weisberg, ed. 2001. *Controversies in Voting Behavior*, 4th ed. Washington, DC: CQ Press.]

Burden, Barry C. 1997. "Deterministic and Probabilistic Voting Models." *American Journal of Political Science* 41:1150-69.

## Book Chapters

Burden, Barry C., and Logan Vidal. Forthcoming. "How Resources, Engagement, and Recruitment are Shaped by Election Rules." In *Resources, Engagement, and Recruitment: New Advances in the Study of Civic Volunteerism*, ed. by Casey A. Klofstad. Philadelphia, PA: Temple University Press.

Vidal, Logan, and Barry C. Burden. Forthcoming. "Voter Registration." In *American Governance*, ed. Stephen L. Schechter. Farmington Hills, MI: Cengage Learning.

Burden, Barry C., and Charles Stewart III. 2014. "Introduction to the Measure of American Elections." In *The Measure of American Elections*, eds. Barry C. Burden and Charles Stewart III. New York, NY: Cambridge University Press.

Burden, Barry C. 2014. "Registration and Voting: A View from the Top." In *The Measure of*

*American Elections*, eds. Barry C. Burden and Charles Stewart III. New York, NY: Cambridge University Press.

Hillygus, D. Sunshine, and Barry C. Burden. 2013. "Mass Polarization During the Bush Presidency." In *Taking the Measure: The Presidency of George W. Bush*, ed. Donald R. Kelley and Todd G. Shields. College Station, TX: Texas A&M University Press.

Burden, Barry C. 2013. "The Nominations: Ideology, Timing, and Organization." In *The Elections of 2012*, ed. Michael Nelson. Washington, DC: CQ Press.

Berry, Christopher R., Barry C. Burden, and William G. Howell. 2012. "The Lives and Deaths of Federal Programs, 1971-2003." In *Living Legislation: Political Development and Contemporary American Politics*, ed. Jeffrey A. Jenkins and Eric M. Patashnik. Chicago, IL: University of Chicago Press.

Burden, Barry C., and Amber Wichowsky. 2010. "Local and National Forces in Congressional Elections." In *The Oxford Handbook of American Elections and Political Behavior*, ed. Jan E. Leighley. New York, NY: Oxford University Press.

Burden, Barry C. 2009. "The Puzzle of the Japanese Gender Gap in LDP Support." In *Political Changes in Japan: Electoral Behavior, Party Realignment, and the Koizumi Reforms*, ed. Steven Reed, Kenneth Mori McElwain, and Kay Shimizu. Stanford, CA: Shorenstein Asia-Pacific Research Center.

Burden, Barry C., and Philip Edward Jones. 2009. "Strategic Voting in the USA." In *Duverger's Law of Plurality Voting: The Logic of Party Competition in Canada, India, the United Kingdom, and the United States*, ed. Bernard Grofman, André Blais, and Shaun Bowler. New York, NY: Springer.

Burden, Barry C. 2009. "The Nominations: Rules, Strategy, and Uncertainty." In *The Elections of 2008*, ed. Michael Nelson. Washington, DC: CQ Press.

Burden, Barry C. 2008. "Multiple Parties and Ballot Regulations." In *Democracy in the States: Experiments in Elections Reform*, ed. Bruce E. Cain, Todd Donovan, and Caroline J. Tolbert. Washington, DC: Brookings Institution Press.

Burden, Barry C. 2005. "Laws Governing Suffrage." In *Guide to Political Campaigns in America*, ed. Paul S. Herrnson. Washington, DC: CQ Press.

Burden, Barry C. 2005. "Family Feud in Massachusetts: How Intraparty Dynamics Influence Redistricting." In *Redistricting in the New Millennium*, ed. Peter F. Galderisi. Lanham, MD: Lexington Books.

Burden, Barry C. 2005. "The Nominations: Technology, Money, and Transferable Momentum." In *The Elections of 2004*, ed. Michael Nelson. Washington, DC: CQ Press.

Burden, Barry C. 2003. "Minor Parties in the 2000 Presidential Election" In *Models of Voting in Presidential Elections: The 2000 U.S. Election*, ed. Herbert F. Weisberg and Clyde Wilcox. Stanford, CA: Stanford University Press.

Burden, Barry C. 2003. "Everything but Death and Taxes: Uncertainty and American Politics." In *Uncertainty in American Politics*, ed. Barry C. Burden. New York, NY: Cambridge University Press.

Burden, Barry C. 2001. "The Polarizing Effects of Congressional Primaries." In *Congressional Primaries in the Politics of Representation*, ed. Peter F. Galderisi, Michael Lyons, and Marni Ezra. Lanham, MD: Rowman and Littlefield.

Mughan, Anthony, and Barry C. Burden. 1998. "Hillary Clinton and the President's Reelection." In *Reelection 1996: How Americans Voted*, ed. Herbert F. Weisberg and Janet M. Box-Steffensmeier. Chatham, NJ: Chatham House Publishers.

Burden, Barry C., and Aage R. Clausen. 1998. "The Unfolding Drama: Party and Ideology in the 104th House." In *Great Theatre: The American Congress in the 1990s*, ed. Herbert F. Weisberg and Samuel C. Patterson. New York, NY: Cambridge University Press.

Mughan, Anthony, and Barry C. Burden. 1995. "The Candidates' Wives." In *Democracy's Feast: Elections in America*, ed. Herbert F. Weisberg. Chatham, NJ: Chatham House.

## Book Reviews

Burden, Barry C. 2014. Review of *Getting Primaried: The Changing Politics of Congressional Primary Challenges* by Robert G. Boatright. Ann Arbor, MI: University of Michigan Press. *Congress & the Presidency* 41:132-4.

Burden, Barry C. 2009. Review of *Minority Report: Evaluating Political Equality in America* by John D. Griffin and Brian Newman. Chicago, IL: University of Chicago Press. *Public Opinion Quarterly* 73:590-2.

Burden, Barry C. 2009. Review of *The American Voter Revisited*, ed. Michael S. Lewis-Beck, William G. Jacoby, Helmut Norpoth, and Herbert F. Weisberg. Ann Arbor, MI: University of Michigan Press. *Political Science Quarterly* 124:344-6.

Burden, Barry C. 2003. Review of *Learning by Voting: Sequential Choices in Presidential Primaries and Other Elections* by Rebecca B. Morton and Kenneth C. Williams. *Public Choice* **114**:248-51.

Burden, Barry C. 2002. Review of *Elements of Reason: Cognition, Choice, and the Bounds of Rationality*, ed. Arthur Lupia, Mathew D. McCubbins, and Samuel L. Popkin. *Journal of Economic Literature* 40:928-9.

## Reports

Bland, Gary, and Barry C. Burden. 2013. "Electronic Registration Information Center: Stage 1 Evaluation." Report to the Pew Charitable Trusts. December 10.

Burden, Barry C., and Brian J. Gaines. 2013. "Administration of Absentee Ballot Programs." Testimony and report to the Presidential Commission on Election Administration. Hearing in Denver, CO. August 8.

Burden, Barry C., and Jeffrey Milyo. 2013. "The Recruitment and Training of Poll Workers." Testimony and report to the Presidential Commission on Election Administration. Hearing in Cincinnati, OH. September 20.

Burden, Barry C. 2010. *Polling Place Incidents in the November 2008 General Election*. Report to the Wisconsin Government Accountability Board.

Burden, Barry C., David T. Canon, Stéphane Lavertu, Kenneth R. Mayer, and Donald P. Moynihan. 2009. *2008 Wisconsin Election Data Collection Grant Program Evaluation Report*. Report to the Wisconsin Government Accountability Board.

Burden, Barry C., and Janet M. Box-Steffensmeier. 1998. "Vote Likelihood and Institutional Trait Questions in the 1997 NES Pilot Study." Report to American National Election Study Board of Overseers.

## Other Publications

Burden, Barry C., David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2014. "Keep Hands off the GAB." *Milwaukee Journal Sentinel*. October 15.

Burden, Barry C. 2014. "How Political Scientists Informed the President about Election Reform." The Monkey Cage blog. January 23.

Burden, Barry C., and Kevin J. Kennedy. 2013. "State Ranks High on Election Performance." *Milwaukee Journal Sentinel*. February 7.

Burden, Barry C., David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2012. "Election-Day Registration Works Here." *Milwaukee Journal Sentinel*. December 26.

Burden, Barry C. 2012. "A Portrait of the Wisconsin Municipal Clerk." *The Municipality*. Volume 106, Number 5.

Burden, Barry C. 2011. "Polarization, Obstruction, and Governing in the Senate." *The Forum*. Volume 9, Issue 4.

Burden, Barry C., and Kenneth R. Mayer. 2010. "Voting Early, but Not So Often." *The New York Times*, October 25.

Burden, Barry C. 2009. "Representation as a Field of Study." In *The Future of Political Science: 100 Perspectives*, ed. Gary King, Kay Lehman Schlozman, and Norman Nie. New York, NY: Routledge.

Burden, Barry C. 2004. "An Alternative Account of the 2004 Presidential Election." *The Forum*. Volume 2, Issue 4.

Burden, Barry C. 2003. "Chronology of the 2000 Presidential Campaign." In *Models of Voting in Presidential Elections: The 2000 U.S. Election*, ed. Herbert F. Weisberg and Clyde Wilcox. Stanford, CA: Stanford University Press.

Burden, Barry C. 1998. "Chronology of the 1996 Presidential Campaign." In *Reelection 1996: How Americans Voted*, ed. Herbert F. Weisberg and Janet M. Box-Steffensmeier. Chatham, NJ: Chatham House Publishers.

5.   Burden, Barry C. 1995. "Chronology of the 1992 Presidential Campaign." In *Democracy's Feast: Elections in America*, ed. Herbert F. Weisberg. Chatham, NJ: Chatham House Publishers.

## Honors and Awards

Vilas Associates award (2014-2016)

Robert H. Durr Award – *given by the Midwest Political Science Association for the best paper applying quantitative methods to a substantive problem in political science* – "Election Laws and Partisan Gains: The Effects of Early Voting and Same Day Registration on the Parties' Vote Shares," with David Canon, Kenneth Mayer, and Donald Moynihan (2014)

H. I. Romnes Faculty Fellow, UW Graduate School (2010-2015)

Licking Valley Schools "Wall of Pride" Award (2009) – *given annually to alumni who distinguished themselves professionally or made notable contributions to society*

Hamel Family Faculty Fellow, UW College of Letters and Science (2008-2013)

University Residence Hall Favorite Instructor Award (2007)

Nominated for Harvard University Everett Mendelsohn Excellence in Graduate Mentoring Award (2006)

Emerging Scholar Award (2005) – *given by the Political Organizations and Parties section of APSA for significant research by a scholar receiving her or his doctorate within the past seven years*

Wittenberg University Outstanding Young Alumnus Award (2002) – *given to a graduate of the last decade to recognize professional achievement*

Council of Graduate Schools/University Microfilms International Distinguished Dissertation Award (2000) – *given to recognize best dissertation completed nationwide in the social sciences between 1998 and 2000*

Nominated for Harvard University Joseph R. Levenson Memorial Teaching Prize (2000)

ΑΛΔ Award for superior instruction of freshman students (1999)

OSU Presidential Fellow (1998)

Francis R. Aumann Award for best OSU graduate student conference paper (1996 & 1997)

Malcolm Jewell Award (1996) – *best graduate student paper presented at the 1995 Southern Political Science Association meeting*

Ohio Board of Regents Fellow (1993-1995)

ΦΒΚ (1993)

Wittenberg University Student Leader of the Year (1992-1993)

Jeffrey Y. Mao Alumni Award in Political Science (1992)

## Grants

6.

Vilas Associates award, "The Genetic, Personality, and Health Origins of Political Participation" (2015-2017)

UW Graduate School Research Committee, "Political Participation among Older Americans" (2014-2015, co-PI with Moynihan)

Center for Demography of Health and Aging, "Political Participation of Older Americans: The Role of Social and Genetic Factors" (co-PI with Jason M. Fletcher and Donald P. Moynihan, 2013-2014)

Pew Charitable Trusts, $46,400 for "Measuring Elections Performance Project," (with head PI Charles Stewart III, 2012-2013)

Wisconsin Government Accountability Board, $43,234 for "Analysis of Polling Place Incident Logs" (head PI with Canon, Mayer, and Moynihan, 2011-2012)

UW Graduate School Research Committee, "The Consequences of Electing Election Officials" (2009-2010)

Pew Center on the States, Making Voting Work: $49,400 for "Early Voting and Same Day Registration in Wisconsin and Beyond" (head PI with Canon, Mayer, and Moynihan, 2008-2009)

U.S. Election Assistance Commission, Election Data Collection Grant Program: responsible for $212,442 of $2,000,000 grant to the Wisconsin Government Accountability Board (head PI with Canon, Mayer, and Moynihan, 2008-2010)

UW Graduate School Research Committee: "The Puzzling Geography of Federal Spending," (2007-2008)

UW Graduate School Research Committee: "The Political Economy of the Japanese Gender Gap" (2006-2007)

CAPS faculty research conference: $36,500 for "Democracy, Divided Government, and Split-Ticket Voting" (2006)

Joseph H. Clark fund award: "The Limits of Representation" (2004-2006)

Reischauer Institute of Japanese Studies: "Accountability, Economics, and Party Politics in Japan" (2004-2006)

Time-sharing Experiments in the Social Sciences: "Affect and Cognition in Party Identification" (with Casey A. Klofstad, 2004)

Harvard Faculty of Arts & Sciences Course Innovation Funds: "The Practice of Political Science" (2003)

Dirksen Congressional Center Congressional Research Award: "The Discharge Rule and Majoritarian Politics in the House of Representatives" (2002-2003)

Reischauer Institute of Japanese Studies Curriculum Enrichment Grant: "Electoral Politics in America and Japan" (2002)

CBRSS research program grant: "Affect and Cognition in Party Identification" (2001)

Joseph H. Clark fund award: "Affect and Cognition in Party Identification" (2001-2002)

Joseph H. Clark fund award: "Ideology in Congressional Elections" (2000-2001)

National Science Foundation Doctoral Dissertation Improvement Grant: "Candidates' Positions in Congressional Elections" (1997)

## Teaching and Advising

Undergraduate courses:
>Introduction to American Politics
>Elections and Voting Behavior
>Political Behavior
>American Public Opinion
>Election Reform in America
>The Politics of Congress/The Legislative Process/U.S. Congress
>Techniques of Political Analysis
>Electoral Politics in America and Japan
>The Practice of Political Science Research

Graduate courses:
>American Politics Field Seminar
>Mass Political Behavior/American Electoral Politics
>Congressional Politics
>Readings on Advanced Statistical Methods
>Quantitative Research Design/Empirical Methods of Political Inquiry
>American Political Institutions
>Readings on Interest Group Politics
>American Politics Workshop
>Political Science as a Discipline and Profession

Advising of doctoral students (year and placement):
>Danna Basson (2007 Mathematica Policy Research)
>Amy Bree Becker, Journalism & Mass Communication (2010 Towson University & Loyola University Maryland)
>Deven Carlson (2012 University of Oklahoma)
>Amnon Cavari (2011 Interdisciplinary Center–IDC Israel)
>  *George C. Edwards III Dissertation Award for best dissertation in presidency research*
>Meghan Condon (2012 Loyola University Chicago)
>  *APSA section on Experimental Research best dissertation award*
>Benjamin Deufel (2006 Greenberg Quinlan Rosner Research)
>Jack Edelson (ABD)
>William Egar (ABD)
>Erika Franklin Fowler (2006 RWJ Scholar in Health Policy & Wesleyan University)
>Tammy M. Frisby (2006 Stanford University-Lane Center)
>Hannah Goble (2009 Texas Christian University)
>Matthew Holleque, *chair* (2012 Obama for America)
>Bradley Jones, *chair* (ABD)

Michael Kang (2009 Emory University-School of Law)
Andrew Karch (2003 University of Texas & University of Minnesota)
Dimitri Kelly, *chair* (2013 Linfield College)
Yujin Kim, *chair* (2014)
Casey A. Klofstad (2005 University of Miami)
Paul Lachelier, Sociology (2007 Stetson University)
Ruoxi Li (ABD)
Jeremy Menchik (2011 Stanford Shorenstein Center post-doc & Boston University)
Daniel Metcalf
Jacob Neiheisel, *chair* (2013 Denison University & University of Buffalo)
Joel Rivlin (ABD MSHC Partners & Pivot)
Rajen Subramanian (2008 Abt Associates)
Benjamin Toff (ABD)
Robert Van Houweling (2003 University of Michigan & UC-Berkeley)
   *Carl Albert Dissertation Award for best dissertation in legislative studies*
Logan Vidal
Amber Wichowsky, *chair* (2010 Yale CSAP Fellowship & Marquette University)
   *Carl Albert Dissertation Award for best dissertation in legislative studies*

## Reviewing Activities

Journal manuscript reviews:
   *Acta Politica*, *American Journal of Political Science*, *American Political Science Review*, *American Politics Quarterly*, *American Politics Research*, *American Review of Politics*, *British Journal of Political Science*, *Comparative Political Studies*, *Congress & the Presidency*, *Election Law Journal*, *Electoral Studies*, *European Journal of Political Research*, *International Journal of Forecasting*, *International Organization*, *Journal of Law, Economics, and Organization*, *Journal of Politics*, *Journal of Theoretical Politics*, *Journal of Women, Politics, & Policy*, *Legislative Studies Quarterly*, *Party Politics*, *Perspectives on Politics*, *Political Analysis*, *Political Behavior*, *Political Communication*, *Political Psychology*, *Political Research Quarterly*, *Political Science Quarterly*, *Politics & Gender*, *Politics and Policy*, *Presidential Studies Quarterly*, *PS: Political Science & Politics*, *Public Administration Review*, *Public Choice*, *Public Opinion Quarterly*, *Rationality and Society*, *Research and Politics*, *Quarterly Journal of Political Science*, *Social Science Quarterly*, *Sociological Forum*, *Sociological Methods and Research*, *State Politics & Policy Quarterly*, *Statistical Science*, and *World Politics*

Book manuscript reviews:
   Addison Wesley Longman, Atomic Dog Publishing, Brookings Institution Press, Cambridge University Press, CQ Press, Oxford University Press, Palgrave, and University of Chicago Press

Tenure and promotion reviews:

Dartmouth College, Florida State University, Fordham University, Louisiana State University, Princeton University, Rutgers University, Temple University, Texas Tech University, Tulane University, University of British Columbia, University of California-Berkeley, University of California-Riverside (twice), University of Chicago (public policy), University of Colorado, University of Houston, University of Massachusetts-Dartmouth, University of Maryland (twice), University of Missouri-Columbia, University of Missouri-St. Louis, University of North Carolina at Charlotte, University of Notre Dame, University of Pennsylvania, University of Texas-Dallas, Washington State University, and Washington University in St. Louis

External review committee, Union College Department of Political Science (*chair*, 2010)

Other reviews:

Canada Research Chair College of Reviewers, Radcliffe Institute Fellows, National Science Foundation, Robert Wood Johnson Scholars in Health Policy, Time-sharing Experiments in the Social Sciences (TESS)

## Professional and University Service

Journal editorial boards:

*Election Law Journal* (2013-present)
*Electoral Studies* (2011-present)
*Political Research Quarterly* (2014-present)
*Legislative Studies Quarterly* (2011-2013)

Other boards and councils:

Election Performance Index Advisory Board, Pew Center on the States (2010-2014)
Elections, Public Opinion, and Voting Behavior organized section Communications Director (2012-2015)
Legislative Studies organized section council (2009-2011)
Political Organizations and Parties organized section council (2005-2007)
APSA Ad Hoc Committee on Member Communications (2013)
Project Vote Smart Advisory Board (2007-present)

Conference program organizer:

Political Organizations and Parties, APSA annual meeting (2006)
Political Methodology, SPSA annual meeting (2001)

Award committees:

Elections, Public Opinion, and Voting Behavior organized section graduate student travel award committee (2013-2015)
Political Organizations and Parties organized section /*Party Politics* award committee for the best paper presented at the 2006 APSA annual meeting (*chair*, 2007)
Political Organizations and Parties organized section Emerging Scholar Award committee (*chair*, 2013)

Campus presentations:

      Dartmouth College, Northwestern University, Stanford University, SUNY-Stony Brook, University of Houston, University of Minnesota, University of Missouri-Columbia, University of Notre Dame, University of Rochester, University of Texas at Austin, Utah State University (twice), Wittenberg University, & Yale University (twice)

Public and community presentations:

      Boston Museum of Science, Brookings Institution, Civitas, National Legislative Program Evaluation Society, Newton Center for Lifetime Learning, Reach Out Wisconsin, Senior Summer School, UW-Extension College Days, Vantage Point, Wisconsin Academy of Sciences, Arts, & Letters, Wisconsin Department of Revenue, and university events in Wisconsin and New York City

Affiliations:

      Elections Research Center (*founding director*, 2015-present)
      Election Administration Project (*co-founder*, 2008-present)
      Wisconsin Advertising Project team (2008-2010)
      La Follette School of Public Affairs, Faculty Associate (2007-present)
      Center for Demography of Health and Aging (2013-present)
      Political Behavior Research Group (2006-present)
      Institute for Quantitative Social Science, Faculty Associate (1999-2006)
      Political Psychology and Behavior Workshop (*co-founder*, 2000-2006)
      Center for American Political Studies, Executive Committee (2001-2006) & Steering
            Committee (2003-2004)
      Program on US-Japan Relations, Faculty Affiliate (2004-2006)
      Weatherhead Center for International Affairs, Faculty Associate (2005-2006)
      Harvard Kennedy School, Mid-Career MPA Summer Program (2001-2005 & 2007-2012)
      Summer Institute in Political Psychology (1995 & 1997)

Wisconsin Department of Political Science service:

      Associate Chair/Director of Graduate Studies (2007-2012)
            Graduate Admissions and Fellowships, *chair*
            Graduate Program Committee, *chair*
            Teaching Assistant Evaluation Committee, *chair*
      Faculty Recruitment Committee (2013-2014)
            American Politics Search Committee, *chair*
      Preliminary Examination Appeals Committee (2013-2014)
      Graduate Program Committee (2014-2015)
      Budget and Development Committee (2014-2015)

Other Wisconsin service:

      Faculty Senate (2006-2007)
      L&S Teaching Fellow Anniversary Symposium Planning Committee (2009-2010)
      L&S C-GRS Faculty Executive Committee (2009-2010)
      Graduate School Social Studies Fellowships Committee (2010-2013)

Social Studies Divisional Executive Committee (2013-2017)
Hilldale Award subcommittee (2014-2015)

Harvard service:
American Politics Faculty Search (1998-1999, 2001-2002, 2002-2003, & 2005-2006)
Graduate Admissions (1999-2000)
Government Concentration/Board of Senior Examiners (2000-2001 & 2004)
Teaching Fellow Coordinator (2003-2004)
American Politics Field Coordinator (2005-2006)
Center for Government and International Studies, Subcommittee on Teaching and
Conference Spaces (2003)
Truman Scholarship Nomination (2000-2001)
Eben Fiske Studentship Nomination (2004-2005)
Political Communication Faculty Search, Kennedy School of Government (2004-2005)

Occasional source for media coverage of politics including abcnews.com, *Atlanta Journal-Constitution*, Associated Press, *The Baltimore Sun*, *The Baton Rouge Advocate*, Bloomberg News, *The Boston Herald*, cbsnews.com, *Campaigns & Elections Magazine*, *Chicago Tribune*, *Christian Science Monitor*, *Cleveland Plain Dealer*, *Congressional Quarterly Weekly Report*, The Daily Caller, *Dallas Morning News*, *Des Moines Register*, forbes.com, Fox News, *Glamour*, *The Globe and Mail* (Canada), *The Guardian* (UK), *The Harvard Crimson*, *Harvard Political Review*, *The Hill*, *International Herald Tribune*, *Kansas City Star*, *Los Angeles Times*, *The London Times*, *Le Monde*, *The New Orleans Times-Picayune*, *National Journal*, *The New Republic*, *New Scientist*, *New York Post*, *The New York Times*, *Newsday*, *Newsweek*, *el Nuevo Herald*, *Omaha World Herald*, *PBS NewsHour*, *Pittsburgh Post-Gazette*, Politico.com, Reuters, Salon.com, States News Service, *USA Today*, *Veja* (Brazil), *The Wall Street Journal*, *The Washington Post*, *The Washington Times*, *Wisconsin Law Journal*, *Yomiuri Shimbun*, *Greater Boston* on WGBH, NECN, *Nitebeat with Barry Nolan*, *Odyssey* on Chicago Public Radio, and many local television, radio, and newspaper outlets

Featured in *An Unreasonable Man*, an independent documentary film about the life and career of Ralph Nader (2006)

## Expert Consulting

Research consultant, via Research Triangle International Institute and the Pew Charitable Trusts, for evaluation of the Electronic Registration Information Center (2012-2014)

Expert witness (testifying), *League of United Latin American Citizens of Wisconsin et al. v. Judge David G. Deininger* et al., case 12-cv-00185, U.S. District Court, Eastern District of Wisconsin (2013)

Expert witness (testifying), *North Carolina State Conference of the NAACP et al. v. Patrick Lloyd McCrory et al.*, case 13-CV-658, U.S. District Court, Middle District of North Carolina (2014)

Expert witness (non-testifying), *Ohio State Conference of the NAACP et al. v. Jon Husted et al.*,

case 13-cv-00404, U.S. District Court, Southern District of Ohio (2014)

Expert witness (testifying), *United States of America v. State of Texas*, case 13-cv-00263, Southern District of Texas (2014)

Academic researcher, Presidential Commission on Election Administration, established by presidential Executive Order 13639 (2013)

# APPENDIX B
# Reliance Materials

## Books and Articles

Michael C. Herron and Daniel A. Smith (forthcoming) "Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election." *Political Research Quarterly*.

John H. Aldrich (1993), "Rational Choice and Turnout," *American Journal of Political Science* 37:246-78.

Thomas G. Hansford and Brad T. Gomez (2010), "Estimating the Electoral Effects of Voter Turnout," *American Political Science Review* 104:268-88.

Henry E. Brady and John E. McNulty (2011), "Turnout Out to Vote: The Costs of Finding and Getting to the Polling Place," *American Political Science Review* 105:1-20.

John E. McNulty, Conor M. Dowling, and Margaret H. Ariotti (2009), "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters," *Political Analysis* 17:435-55.

Moshe Haspel and H. Gibbs Knotts (2005), "Location, Location, Location: Precinct Placement and the Costs of Voting," *Journal of Politics* 67:560-73.

Raymond E. Wolfinger, Benjamin Highton, and Megan Mullin (2005), "How Postregistration Laws Affect the Turnout of Citizens Registered to Vote," *State Politics & Policy Quarterly* 5:1-23.

Alan S. Gerber, Donald P. Green, and Ron Shachar (2003), "Voting May Be Habit-Forming: Evidence from a Randomized Field Experiment," *American Journal of Political Science* 47:540-50.

Eric Plutzer (2002), "Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood," *American Political Science Review* 96:41-56.

Peverill Squire, Raymond E. Wolfinger, and David P. Glass (1987), "Residential Mobility and Voter Turnout," *American Political Science Review* 81:45-65.

Richard J. Timpone (1998), "Structure, Behavior, and Voter Turnout in the United States," *American Political Science Review* 92:145-58.

Elizabeth Bergman and Philip A. Yates (2011), "Changing Election Methods: How Does Mandated Vote-By-Mail Affect Individual Registrants?," *Election Law Journal* 10:115-27.

Barry C. Burden and Jacob R. Neiheisel (2013), "Election Administration and the Pure Effect of Voter Registration on Turnout," *Political Research Quarterly* 66:77-90.

Danny Hayes and Seth C. McKee (2009), "The Participatory Effects of Redistricting," *American Journal of Political Science* 53:1006-23.

Adam J. Berinsky (2005), "The Perverse Consequences of Electoral Reform in the United States," *American Politics Research* 33:471-91.

Barry C. Burden, David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan (2014), "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform," *American Journal of Political Science* 58:95-109.

Melanie J. Springer (2012), "State Electoral Institutions and Voter Turnout in Presidential Elections, 1920-2000," *State Politics & Policy Quarterly* 12:252-83.

Donald P. Green and Ron Shachar (2000), "Habit Formation and Political Behaviour: Evidence of Consuetude in Voter Turnout," *British Journal of Political Science* 30:561-73, p. 570.

Michael C. Herron and Daniel A. Smith (2014), "Race, *Shelby County*, and the Voter Information Verification Act in North Carolina," manuscript, version 2 dated February 12, 2014, p. 44.

J. Morgan Kousser (1974), *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910*. New Haven, CT: Yale University Press, p. 187.

Eric Anderson (1981), *Race and Politics in North Carolina, 1872-1901*, Baton Rouge, LA: Louisiana State University Press.

James Beeby (2008), *Revolt of the Tar Heels: The North Carolina Populist Movement*, Jackson, MS: University Press of Mississippi.

William R. Keech and Michael P. Sistrom (1994), "North Carolina," in *Quiet Revolution in the South: The Impact of the Voting Rights Act 1965-1990*, ed. Chandler Davidson and Bernard Grofman, Princeton, NJ: Princeton University Press.

Jeffrey J. Crow and Robert Franklin Durden (1977), *Maverick Republican in the Old North State*, Baton Rouge, LA: Louisiana State University.

Richard H. Pildes (2000), "Democracy, Anti-Democracy, and the Canon," *Constitutional Commentary* 17:295-319, 302.

Learn NC, Governor Aycock on "the Negro Problem," *available at* http://www.learnnc.org/lp/editions/nchist-newsouth/4408 (last visited March 24, 2014).

"A Tar Heal Travesty," *Washington Post*, August 16, 2013, p. A16.

Economic Policy Institute (2013), "Ongoing Joblessness in North Carolina," Issue Brief  No. 359, May 16.

*Education Week* and the Editorial Projects in Education Research Center, *Diplomas Count – Second Chances: Turnout Dropouts into Graduates*, June 6, 2013.

Lumina Foundation, "A Stronger North Carolina through Higher Education," June 2013.

Steven J. Rosenstone and John Mark Hansen (1993), *Mobilization, Participation and Democracy in America*, Macmillan. Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995).

*Voice and Equality: Civic Volunteerism in American Politics*, Harvard University Press. Rachel Milstein Sondheimer and Donald P. Green (2010).

"Using Experiments to Estimate the Effects of Education on Voter Turnout," *American Journal of Political Science* 54:174-89.

Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995), *Voice and Equality: Civic Volunteerism in American Politics*, Cambridge, MA: Harvard University Press.

The League of Women Voters Education Fund web site, vote411.org, *available at* http://www.vote411.org/search-by-topic?topics_tid%5B%5D=60#.U0QVPq1dVhl (last visited April 9, 2014).

Schott Foundation for Public Education, *The Urgency of Now*, Cambridge, MA, 2012 report using data from the U.S. Department of Education's National Center for Education Statistics.

Lisa Schur, Todd Shields, Douglas Kruse, and Kay Schriner (2002), "Enabling Democracy: Disability and Voter Turnout," *Political Research Quarterly* 55:167-90.

Pauline K. Brennan and Cassia Spohn (2008), "Race/Ethnicity and Sentencing Outcomes among Drug Offenders in North Carolina," *Journal of Contemporary Criminal Justice* 24:371-98.

Frank R. Baumgartner and Derek Epp, "North Carolina Traffic Stop Statistics Analysis," Final Report to the North Carolina Advocates for Justice Task Force on Racial and Ethnic Bias, February 1, 2012.

Prison Policy Initiative, "North Carolina," *available at* http://www.prisonpolicy.org/articles/northcarolina.html (last visited March 25, 2014).

Christopher Uggen, Sarah Shannon, and Jeff Manza, (2012), "State-Level Estimates of Felon Disenfranchisement in the United States, 2010," report for The Sentencing Project, Washington, DC.

Jeff Manza and Christopher Uggen (2006), *Locked Out: Felon Disenfranchisement and American Democracy*, New York, NY: Oxford University Press.

Erika Wood and Rachel Bloom (2008), *De Facto Disenfranchisement*, American Civil Liberties Union and Brennan Center for Justice.

The Henry J. Kaiser Family Foundation, "State Health Facts," *available at* http://kff.org/other/state-indicator/poverty-rate-by-raceethnicity/ (last visited March 25, 2014).

Milton C. Jordan (1989), "Black Legislators: From Political Novelty to Political Force," *North Carolina Insight* December: 40-58.

Daniel P. Tokaji (2008), "Representation and Raceblindness: The Story of *Shaw v. Reno*," in *Race Law Stories*, ed. Rachel F. Moran and Devon W. Carbado. New York, NY: Foundation Press.

David Rice, "Hispanic Legislators May Be Pacesetters," *Winston-Salem (NC) Journal*, December 13, 2002.

Rene R. Rocha, Caroline J. Tolbert, Daniel C. Bowen, and Christopher J. Clark (2010), "Race and Turnout: Does Descriptive Representation in State Legislatures Increase Minority Voting?," *Political Research Quarterly* 63:890-907;

Kenny J. Whitby (2007) "The Effect of Black Descriptive Representation on Black Electoral Turnout in the 2004 Elections," *Social Science Quarterly* 88:1010-23.

Keith G. Bentele and Erin E. O'Brien (2013), "Jim Crow 2.0? Why States Consider and Adopt Restrictive Voter Access Policies," *Perspectives on Politics* 11:1088-116.

R. Michael Alvarez, Dustin Beckett, and Charles Stewart III (2012), "Voting Technology, Vote-by-Mail, and Residual Votes in California, 1990-2010," *Political Research Quarterly* 66:658-70.

Martha Kropf (2013), "North Carolina Election Reform Ten Years After the Help America Vote Act," *Election Law Journal* 12:179-89.

Charles Stewart III (2010), "Losing Votes by Mail," *NYU Journal of Legislation and Public Policy* 13:573-602.

Gary D. Roberton, "N.C. Counties Reduce Early Voting Hours for Primary," *The (Elizabeth City) Daily Advance*, February 27, 2014.

Michael Biesecker, "McCrory Not Familiar with All of Bill He's to Sign," *The (Raleigh) News & Observer*, July 27, 2013.

Mark Binder, "Precincts Versus Early Voting Locations," August 13, 2013, WRAL <http://www.wral.com/precincts-versus-early-voting-locations/12772554/>

Lorraine C. Minnite (2010), *The Myth of Voter Fraud*, Cornell University Press.

Ray Christensen and Thomas J. Schultz (forthcoming), "Identifying Election Fraud Using Orphan and Low Propensity Voters," *American Politics Research*.

Annalise Frank, "Voter ID Turns into 'Voter Suppression,' Says Legislative Black Caucus," *The News & Observer*, Under the Dome blog, July 24, 2013 (last visited March 28, 2014).

WRAL, "Elections Changes Advance in Senate." http://www.wral.com/elections-changes-advance-in-senate/12693772/

**Cases**

*Shelby County v. Holder*, 570 U.S. ___ (2013).

*Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

**Government Documents**

N.C. Const. art VI, § 2.

Senate Committee on the Judiciary, S. Rep. 417, 97th Cong., 2nd Sess. (1982).

*Achievement Gaps: How Black and White Students in Public Schools Perform in Mathematics and Reading on the National Assessment of Educational Progress*, 2014, U.S. Department of Education. *Achievement Gaps: How Hispanic and White Students in Public Schools Perform in Mathematics and Reading on the National Assessment of Educational Progress*, 2014, U.S. Department of Education.

State Board of Education, Department of Public Instruction, Data Report, 2011-2012, March 15, 2013. Figure D5.

State Board of Education, Department of Public Instruction, Consolidated Data Report, 2011-2012, March 15, 2013. Figure S11.

North Carolina Department of Health and Human Services, "Racial and Ethnic Health Disparities in North Carolina: 2010 Report Card," June 2010.

"North Carolina Vital Health Facts: Population and Health Data by Race and Ethnicity," *available at* http://www.schs.state.nc.us/schs/pdf/NCPopHealthDatabyRaceEthDec2012.pdf (last visited March 28, 2014).

U.S. Census Bureau, *Geographic Mobility: 2012 to 2013*, *available at* http://www.census.gov/hhes/migration/data/cps/cps2013.html

## **Other**

Election Law Blog entry, July 25, 2013. < http://electionlawblog.org/?p=53461>

Lawyers' Committee for Civil Rights under Laws, "Voting Rights Act: Objections and Observers," *available at* http://www.lawyerscommittee.org/projects/section_5/ (last visited March 25, 2014).

votingrights.news21.com.

"Voting Rights in North Carolina 1982-2006," a report of RenewtheVRA.org prepared by staff at the University of North Carolina Center for Civil Rights, *available at* http://www.protectcivilrights.org/pdf/voting/NorthCarolinaVRA.pdf (last visited March 24, 2014).

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

LESLIE FELDMAN, et al.,          )
                                 )
                                 )
          Plaintiffs,            )
                                 )
                                 )
          vs.                    ) No. CV-16-1065-PHX-DLR
                                 )
                                 )
ARIZONA SECRETARY OF             )
STATE'S OFFICE, et al.,          )
                                 )
                                 )
                                 )
          Defendants.            )
_____  )


DEPOSITION OF SHEILA HEALY

Phoenix, Arizona
July 14, 2016
9:01 a.m.


Prepared by:                     CARRIE REPORTING, LLC
MICHAELA H. DAVIS                Certified Reporters
Registered Professional Reporter 4032 North Miller Road
Certified Realtime Reporter      Suite A-100
Certified LiveNote Reporter      Scottsdale, AZ 85251
AZ CR No.  #50574                (480) 429-7573


(COPY)

1      A.     I can't recall.

2      Q.     I'm going to turn back to Exhibit 1 to your

3  deposition.  It's paragraph 21 on page 7 that we were

4  looking at previously.

5      A.     Yes.

6      Q.     At the bottom of the page there, second

7  sentence, you state:  "For example, some voters,

8  particularly those in underprivileged and rural areas,

9  lack access to home mail delivery and must drive to a post

10 office to receive or send mail."

11             Did I read that directly?

12     A.     Yes.

13     Q.     And so those voters that you're discussing there

14 must drive to a post office to receive their early voting

15 ballot in the mail?

16     A.     Yes.

17     Q.     And the party still encourages those voters to

18 remain on or join the permanent early voting list?

19     A.     It depends on the area that they live.  For

20 example, on the Navajo Nation where folks do not have

21 reliable transportation or access to a post office or a

22 service to receive mail, we do not encourage them to sign

23 up for the permanent early voter list.

24     Q.     What do you encourage those voters to do?

25     A.     Typically to vote early in person.

# EXHIBIT 6

December 14, 2015

**United States District Court for the Eastern District of Virginia**

*Barbara H. Lee, et al. v. Virginia State Board of Elections*, et al.

**Case No. 3:15-CV-357**

**Expert Report of Dr. Allan J. Lichtman**

**Distinguished Professor of History**
**American University**
**Washington, DC**

**INTENTIONAL DISCRIMINATION AGAINST AFRICAN AMERICANS IN THE ADOPTION OF VIRGINIA'S VOTER PHOTO IDENTIFICATION LAW (SB1256)**

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒
Allan J. Lichtman

# TABLE OF CONTENTS

**Page**

I.      STATEMENT OF PURPOSE ........................................................................1

II.     QUALIFICATIONS.....................................................................................1

III.    EVIDENCE, METHODOLOGY, AND SUMMARY OF OPINIONS ........................2

IV.    IMPACT OF HISTORIC DISCRIMINATION AGAINST AFRICAN AMERICANS IN VIRGINIA ................................................................5

V.     *ARLINGTON HEIGHTS* CRITERION; SEQUENCE OF EVENTS LEADING TO ADOPTION OF SB1256 ..................................................16

     A.     The Decline of White Voting Strength in Virginia ..........................16

     B.     Decision-Making by the Virginia General Assembly and Governor: Voter Identification .................................................23

     C.     Discriminatory Intent of the New 2013 Voter Photo ID Law ........................27

     D.     Decision-Making by the State Board of Elections and Interference by One of the Chief Sponsors of the Bill ................................38

VI.    WAITING TIMES AT THE POLLS .......................................................41

VII.   PROCEDURAL AND SUBSTANTIVE DEVIATIONS ...........................................49

VIII.  CONTEMPORANEOUS VIEWPOINTS BY DECISION-MAKERS AND THEIR BACKERS..................................................................52

     A.     The Common Sense Argument ....................................................53

     B.     Justification for the Rapid Transition from a Non-Photo Voter ID to a Photo Voter ID Law ................................................55

     C.     Allegations of Voter Impersonation ...............................................56

     D.     Election Integrity.................................................................57

     E.     The Carter-Baker Commission: Access to the Vote ......................58

     F.     The Georgia Model .................................................................59

IX.    SENATE FACTORS ...............................................................59

X.     CONCLUSION ....................................................................67

## TABLE OF CHARTS AND TABLES

**Page**

TABLE 1     INCOME, POVERTY, AND UNEMPLOYMENT RATES BY RACE, VIRGINIA, 2009-2011 US CENSUS, AMERICAN COMMUNITY SURVEY ................................................................................................ 6

CHART 1     MEDIAN HOUSEHOLD AND PER CAPITA INCOME BY RACE, VIRGINIA, BASED ON DATA IN TABLE 1 ............................................. 7

CHART 2     POVERTY, UNEMPLOYMENT & ASSET POVERTY RATE BY RACE, VIRGINIA, BASED ON DATA IN TABLE 1 .................................................. 8

TABLE 2     EDUCATIONAL ATTAINMENT FOR AFRICAN AMERICANS AND WHITES, VIRGINIA ......................................................................... 9

CHART 3     EDUCATIONAL ATTAINMENT BY RACE, VIRGINIA, BASED ON DATA IN TABLE 2 .......................................................................... 10

CHART 4     EDUCATIONAL PROFICIENCY AND DROP-OUT RATES BY RACE, VIRGINIA, BASED ON DATA IN TABLE 2 .................................................. 11

TABLE 3     HOUSING CHARACTERISTICS OF AFRICAN AMERICANS AND WHITES, VIRGINIA, 2009-2011 US CENSUS, AMERICAN COMMUNITY SURVEY ......................................................................... 12

CHART 5     MEDIAN HOME VALUE BY RACE, VIRGINIA, BASED ON DATA IN TABLE 3 ...................................................................................... 13

CHART 6: HOME OWNERSHIP AND VEHICLE AND TELEPHONE AVAILABILITY BY RACE, VIRGINIA, BASED ON DATA IN TABLE 3 ........................... 13

TABLE 4     HEALTH INDICATORS FOR OF AFRICAN AMERICANS AND WHITES, VIRGINIA ......................................................................... 14

CHART 7     LIFE EXPECTANCY BY RACE, VIRGINIA, BASED ON DATA IN TABLE 4 ...................................................................................... 15

CHART 8     HEALTH INSURANCE, LOW BIRTH WEIGHT, & INFANT DEATH RATE BY RACE, VIRGINIA, BASED ON DATA IN TABLE 4 ............... 16

TABLE 5     VOTER TURNOUT BY RACE AND ETHNICITY, VIRGINIA, SENATE AND GUBERNATORIAL ELECTIONS 2006 – 2014 ................................. 18

TABLE 6     VOTER TURNOUT BY RACE AND ETHNICITY, VIRGINIA, PRESIDENTIAL ELECTIONS 2004 – 2012 ................................................. 19

TABLE 7     SUPPORT FOR REPUBLICAN CANDIDATES BY RACE AND ETHNICITY, EXIT POLLS VIRGINIA, 2004 – 2014 ................................... 20

CHART 9     MEAN SUPPORT FOR REPUBLICAN CANDIDATES BY RACE AND ETHNICITY, VIRGINIA, 2004 – 2014, BASED ON DATA IN TABLE 7 . 21

TABLE 8     SUPPORT FOR REPUBLICAN CANDIDATES BY NON-RACIAL DEMOGRAPHY, EXIT POLLS VIRGINIA, 2004 – 2014 ........................... 22

TABLE 9     NUMBER OF VOTERS USING AN AFFIRMATION OF IDENTITY WHEN NON-STRICT VOTER ID WAS IN EFFECT, GENERAL ELECTIONS 2008-2010 ................................................................. 27

## TABLE OF CHARTS AND TABLES
### (continued)

Page

TABLE 10     DRIVER'S LICENSE AND PASSPORT POSSESSION, BY RACE, OF REGISTERED VOTERS SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008, VIRGINIA.................................................31

TABLE 11     DRIVER'S LICENSE AND PASSPORT POSSESSION, BY RACE, OF OBAMA VOTERS ONLY, SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008, VIRGINIA..............................................32

TABLE 12     DRIVER'S LICENSE AND PASSPORT POSSESSION OF REGISTERED VOTERS, BY AGE, SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008, VIRGINIA .....................................33

CHART 10     ACCESS TO FORMS OF PHOTO ID BY RACE, VIRGINIA...................34

CHART 11     CHANGES IN THE WHITE COMPONENT OF VOTERS, UNITED STATES ELECTION PROJECT.....................................................36

TABLE 13     SUPPORT FOR REPUBLICAN CANDIDATES BY RACE AND ETHNICITY, UNITED STATES PRESIDENTIAL ELECTIONS, EXIT POLLS, 2004 – 2012........................................................................37

TABLE 14     PARTISAN CONTROL OF STATES ADOPTING VOTER PHOTO ID LAWS AFTER THE 2008 PRESIDENTIAL ELECTION ............................38

TABLE 15     MEAN WAITING TIMES AT THE POLLS, 2008 AND 2012 GENERAL ELECTIONS, BY STATE ...........................................................42

TABLE 16     WAITING TIMES AT POLLS BY RACE, COOPERATIVE CONGRESSIONAL ELECTION STUDY (CCES), 2008 AND 2012, VIRGINIA..........................................................................44

TABLE 17     WAITING TIMES AT POLLS BY RACE, OBAMA VOTERS ONLY, COOPERATIVE CONGRESSIONAL ELECTION STUDY (CCES), 2008 AND 2012, VIRGINIA ................................................................45

TABLE 18     STATE RANKINGS, ACCESS TO THE BALLOT....................................50

TABLE 19     STATES WHICH HAVE NOT EXPANDED MEDICAID AS OF NOVEMBER 2015, ADOPTION OF VOTER PHOTO ID LAW.................65

## I.      STATEMENT OF PURPOSE

I have been asked by Plaintiffs' counsel to consider whether voter identification laws adopted and implemented by the Commonwealth of Virginia were enacted with the *intent* to discriminate against African American voters and would-be voters. I have also been asked to consider the "Senate Factors" detailed in a report that accompanied the 1982 renewal of the Voting Rights Act (the "VRA") by the Senate Committee on the Judiciary, which are relevant to the Court's consideration of the impact of these measures in light of the "totality of the circumstances" analysis applicable under Section 2 of the VRA.[1] I am being compensated for my work in this matter at the rate of $400 per hour. I have attached an updated CV and a table of cases in which I have provided written or oral testimony.

## II.     QUALIFICATIONS

This study draws on my experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 42 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my B.A. in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, and historical and quantitative methodology.

I am the author of numerous scholarly works on quantitative and qualitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, *Journal of Applied Forecasting*, and *Social Science History*, as well as my co-authored book, *Historians and the Living Past*. In addition, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data. I have also published articles specifically on the application of social science analysis to civil rights issues. This work includes articles in such

---

[1] These factors are: (1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;" (2) "the extent to which voting in the elections of the state or political subdivision is racially polarized;" (3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;" (4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process;" (5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;" (6) "whether political campaigns have been characterized by overt or subtle racial appeals;" and (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (quoting S. Rep. No. 97-417, at 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07) (internal quotation marks omitted). Additional factors include: (1) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" and (2) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.* (internal quotation marks omitted).

1

journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies, including articles published in such academic journals as *The Proceedings of the National Academy of Sciences*, *The American Historical Review*, *The International Journal of Forecasting*, *The International Journal of Information Systems & Social Change*, and *The Journal of Social History*. Quantitative and historical analyses also ground my books, *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman).

My book, *White Protestant Nation*, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America in 2008. My most recent book, *FDR and the Jews*, was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the *New York Times* in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, the winner of the Tikkun Olam Award in Holocaust Studies, and a finalist for Los Angeles Times Book Prize in history.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than eighty voting and civil rights cases. These include several cases in the state of Virginia. In the U. S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work. I have testified several times for plaintiffs and defendants on the issues of intentional discrimination in the adoption of state redistricting plans and photo identification laws.

The three-judge panel in the District of Columbia in the Section 5 of the Voting Rights Act litigation regarding the 2011 State of Texas redistricting plan also cited my work in support of their finding that the plan intentionally discriminated against minority voters in *Texas v. United States*, 887 F. Supp. 2d 133, 138-39 (D.D.C. 2012). A federal court also cited my work in support of its finding under both Section 2 and the Fourteenth and Fifteenth Amendments that the Texas photo identification law intentionally discriminated against black and Hispanic voters in *United States v. Texas*, 2:13-cv-00193, ECF No. 628 (S.D. Tex. Oct. 9, 2014), consolidated with *Veasey v. Perry*, at 48-50, 128. A three-judge panel in the 2011 State of Illinois redistricting plan also cited my work on behalf of defendants in support of their *rejection* of plaintiff's claim that the plan intentionally discriminated against minority voters in *Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, 2011 US Dist. Lexis 117656 (N. D. Ill. Oct. 12, 2011).

## III.   EVIDENCE, METHODOLOGY, AND SUMMARY OF OPINIONS

My analysis draws upon the Virginia Department of Elections' database produced in discovery by the Defendants, as well as other sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic and socio-economic information; election returns; voter registration and

turnout data; court opinions, briefs, and reports; government and organizational documents; and scientific surveys and studies. These sources of information are used both to inform my analyses within Virginia and my comparisons of Virginia with other states.

My report closely follows the methodological guidelines of the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In *Arlington Heights*, the Court focused on five distinct factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact; (2) historical background; (3) the sequence of events leading up to the decision; (4) procedural or substantive deviations from the normal decision-making process; and (5) contemporaneous viewpoints expressed by the decision-makers. The purpose of this report is not to make legal conclusions, but to establish substantive findings about discriminatory intent. The *Arlington Heights* methodology is consistent with standard causal analysis in history, which I have followed in my substantive scholarship and written about in my theoretical work (*see* Section II, above). After discussing intent, I turn to the Senate Factors (*see* Section I, above).

My major opinions are summarized briefly below:

- Virginia has a long and ongoing history of discrimination against African Americans.

- This history has a present-day manifestation in substantial socio-economic disparities between white and African Americans in Virginia. These disparities are reflected in statistics pertaining to income, poverty, unemployment, education, housing, availability of vehicles and telephones, and measures of medical insurance and health.

- Virginia politics in recent years have been marked by declining white turnout and sharply polarized voting between whites and African Americans as well as whites and other minorities.

- Virginia politics has also become highly competitive between Republicans and Democrats in recent years, with declining white support for Republicans and declining support for Republicans among young voters.

- These patterns of turnout and voting demonstrate that Republicans in Virginia stand to gain politically from any disparate burdens placed on African Americans relative to white voting opportunities.

- The adoption of Virginia's 2013 voter photo identification law (SB1256) followed a sequence of events in which Republicans pushed for and enacted voter identification legislation.

3

- The adoption of SB1256 followed by less than a year the adoption of another non-photo, but strict identification law.

- Evidence available at the time of the adoption of SB1256 in 2013 indicated an absence of voter impersonation fraud in Virginia.

- Evidence available at the time of the adoption of SB1256 indicated that the law would impose disparate burdens on African American voter opportunities relative to white opportunities.

- This disparate impact on African Americans is directly based on racial differences, not on party differences.

- Evidence available at the time of adoption of SB1256 also indicated that the law was likely to impose disparate burdens on young voters compared to older voters.

- Based on considerable evidence, and following the *Arlington Heights* procedures and standard historical causal analysis, I conclude that the backers of SB1256 deliberately and knowingly crafted legislation through which they intended to place disparate burdens on the opportunities of African Americans to vote in Virginia.

- The Virginia General Assembly allocated a limited budget for voter outreach regarding SB1256 and has issued only a small number of free voter ID cards relative to the numbers of registered voters who lack authorized photo identification.

- The adoption of SB1256 in Virginia was consistent with similar legislation enacted in other states controlled by Republicans.

- Republican legislators in Virginia also killed in Committee, without the opportunity for floor votes and debates, proposed bills to alleviate Virginia's especially long waiting times at the polls, which also had a disparate impact on African American relative to white voters.

- Statements by decision-makers and backers of the voter photo identification law disclose the discriminatory motivations behind the adoption of SB1256 and the resistance to taking steps to alleviate long lines at the polls.

- Contemporary explanations and justifications for the adoption of SB1256 were pretexual and misleading.

4

- Nearly all of the Senate Factors are present in Virginia.

## IV.    IMPACT OF HISTORIC DISCRIMINATION AGAINST AFRICAN AMERICANS IN VIRGINIA

The Commonwealth of Virginia has a long and indisputable history, and an ongoing practice, of discrimination against African Americans, much of which has substantially impacted the opportunity for African Americans to participate fully in the political process and elect candidates of their choice. This history is well documented in the Expert Report of John Douglas Smith submitted in this litigation.

The lingering effects of this history of discrimination are apparent today in the substantial socio-economic disparities between non-Hispanic African Americans and non-Hispanic whites in Virginia. As will be demonstrated below, these disparities have a significant impact on the relative ability of African Americans and whites to participate in the electoral process.

Based on information available at the time the Virginia General Assembly and Governor were considering enacting a strict voter identification law, Table 1 and Charts 1 and 2 demonstrate a wide gap between African Americans and whites in Virginia on measures of income, poverty, unemployment, and asset poverty. African American households have median incomes equal to 63 percent of white households. The per capita income of African Americans equals 57 percent of the per capita income of whites. African American poverty rates are well more than double the poverty rates of whites, and African American unemployment rates are double the unemployment rates for whites. The asset poverty rate of non-whites is about 2.8 times the rate for whites.

5

| TABLE 1<br>**INCOME, POVERTY, AND UNEMPLOYMENT RATES BY RACE, VIRGINIA, 2009-2011 US CENSUS, AMERICAN COMMUNITY SURVEY** | | |
|---|---|---|
| | | |
| MEASURE | BLACK | WHITE |
| | | |
| **MEDIAN HOUSEHOLD INCOME** | $42,731 | $67,841 |
| | | |
| **PER CAPITA INCOME** | $21,261 | $37,494 |
| | | |
| **POVERTY RATE FOR PERSONS INDIVIDUALS** | 19.2% | 8.3% |
| | | |
| **UNEMPLOYMENT RATE** | 12.4% | 6.2% |
| | ALL OTHERS* | WHITE |
| **ASSET POVERTY** | 31.7% | 11.4% |
| * Asset poverty is the lack of sufficient net worth to subsist at the poverty level for three months without access to income. Unlike the other comparisons in this table, the asset poverty data compares non-Hispanic whites with all non-whites. Source: Corporation for Enterprise Development, *Asset Poverty By Race 2010*, Virginia, scorecard.assetsandopportunities.org/2013/measure/asset-poverty-by-race. | | |

**CHART 1**

**MEDIAN HOUSEHOLD AND PER CAPITA INCOME BY RACE, VIRGINIA, BASED ON DATA IN TABLE 1**



**CHART 2**

**POVERTY, UNEMPLOYMENT & ASSET POVERTY RATE BY RACE, VIRGINIA, BASED ON DATA IN TABLE 1**



Table 2 and Charts 3 and 4 demonstrate that, in Virginia, the high school graduation rate for whites is 11 percent higher than the rate for African Americans and the college graduate rate for whites is 90 percent higher than the rate for African Americans. The percentage of African Americans scoring below basic proficiency in 8th grade math is nearly triple the percentage of whites scoring below proficiency. The high school dropout rate for African Americans is more than double the rate for whites.

| TABLE 2<br>EDUCATIONAL ATTAINMENT FOR<br>AFRICAN AMERICANS AND WHITES, VIRGINIA | | |
|---|---|---|
| MEASURE | BLACK | WHITE |
| **HIGH SCHOOL GRADUATES AGE 25+ *** | 81.4% | 90.0% |
| **BACHELOR'S DEGREE OR MORE AGE 25+ *** | 19.8% | 37.7% |
| **PERCENT BELOW BASIC, 8TH GRADE MATH ** ** | 42% | 15% |
| **GRADE 9-12 DROPOUT RATE *** ** | 3.0% | 1.4% |
| * US Census, American Community Survey, 3-Year Estimates, 2009-2011.<br>** National Center for Educational Statistics, Mathematics, 2011, http://nces.ed.gov/nationsreportcard/pdf/main2011/2012458.pdf.<br>*** National Center for Educational Statistics, State Dropout and Completion File, 2009-2010, https://nces.ed.gov/ccd/drpcompstatelvl.asp. | | |

9

**CHART 3**

**EDUCATIONAL ATTAINMENT BY RACE, VIRGINIA, BASED ON DATA IN TABLE 2**



**CHART 4**

**EDUCATIONAL PROFICIENCY AND DROP-OUT RATES BY RACE, VIRGINIA, BASED ON DATA IN TABLE 2**



Table 3 and Charts 5 and 6 demonstrate considerable differences between African Americans and whites in Virginia in terms of home ownership, home values, vehicles available in households, and telephone services. The African American home ownership rate is 67 percent of the white home ownership rate, and the median value of African American owned homes is equal to 73 percent of the value of white owned homes. African American households are about three times more likely than white households to lack an available vehicle, and twice as likely to lack telephone service.

11

| TABLE 3 HOUSING CHARACTERISTICS OF AFRICAN AMERICANS AND WHITES, VIRGINIA, 2009-2011 US CENSUS, AMERICAN COMMUNITY SURVEY | | |
|---|---|---|
| MEASURE | BLACK | WHITE |
| | | |
| **PERCENT OWNER OCCUPIED** | 50.1% | 74.4% |
| | | |
| **MEDIAN HOME VALUE** | $184,400 | $254,300 |
| | | |
| **PERCENT WITH NO VEHICLE AVAILABLE** | 13.1% | 4.4% |
| | | |
| **PERCENT WITH NO TELEPHONE SERVICE** | 4.0% | 2.0% |

**CHART 5**

**MEDIAN HOME VALUE BY RACE, VIRGINIA, BASED ON DATA IN TABLE 3**



**CHART 6**

**HOME OWNERSHIP AND VEHICLE AND TELEPHONE AVAILABILITY BY RACE, VIRGINIA, BASED ON DATA IN TABLE 3**



13

Table 4 and Charts 7 and 8 demonstrate considerable differences between African Americans and whites in Virginia on measures of health. The percentage of African Americans lacking health insurance is 78 percent higher than the percentage of whites lacking health insurance. African American life expectancy is 3.6 years lower than the life expectancy of whites. The percentage of African American babies with low birth weights is 88 percent higher than the percentage of white babies with low birth weights. The infant death rate for African American infants is 146 percent above the rate for white infants.

| TABLE 4 HEALTH INDICATORS FOR OF AFRICAN AMERICANS AND WHITES, VIRGINIA | | |
|---|---|---|
| MEASURE | BLACK | WHITE |
| | | |
| **PERCENT WITH NO HEALTH INSURANCE** | 15.5% | 8.7% |
| | | |
| **LIFE EXPECTANCY IN YEARS** | 76.2 | 79.8 |
| | | |
| **LOW WEIGHT BIRTHS PER 1,000 BIRTHS** | 12.4 | 6.6 |
| | | |
| **INFANT DEATH RATE PER 1,000 BIRTHS** | 12.8 | 5.2 |
| | | |
| Sources: 2009-2011 US Census, American Community Survey; Virginia Department of Health, Reports and Statistics, 2011, https://www.vdh.virginia.gov/healthstats/stats.htm. | | |



**CHART 7**
**LIFE EXPECTANCY BY RACE, VIRGINIA, BASED ON DATA IN TABLE 4**





**CHART 8**

**HEALTH INSURANCE, LOW BIRTH WEIGHT, & INFANT DEATH RATE BY RACE, VIRGINIA, BASED ON DATA IN TABLE 4**



## V.  *ARLINGTON HEIGHTS* CRITERION; SEQUENCE OF EVENTS LEADING TO ADOPTION OF SB1256

### A.    The Decline of White Voting Strength in Virginia

Important to understanding the sequence of events leading to voter identification legislation in Virginia is the declining voting strength of non-Hispanic whites relative to minorities in the Commonwealth. Critically, it is Republicans in Virginia who are disadvantaged by this decline in the relative voting strength of whites and minorities. Republicans would therefore benefit from limitations on minority voting, especially African Americans who constitute by far the largest minority voting bloc in Virginia and the most steadfast of Democratic voters. These core elements of turnout and voting patterns in Virginia help explain policies of the Republican-controlled General Assembly, the former Republican Governor and the previously Republican-controlled State Board of Elections that have placed a disparate burden on African American voters relative to white voters in Virginia.

According to exit poll data reported in Table 5, the percentage of white voters among those participating in statewide Senate and Gubernatorial elections in Virginia has declined sharply in recent contests. For U.S. Senate elections, the data reported in Table 5 indicates that from a peak of 78 percent in 2006, the white component of participating voters declined to 70 percent in 2012, whereas the black component increased from 16 percent to 20 percent, with

16

the remainder of the increase among Asian, Hispanic, and other voters. The results for 2014 show that the white turnout component remains at 70 percent, with African American turnout little changed at 19 percent.[2]

For Virginia's Gubernatorial elections, the data reported in Table 5 indicates a similar pattern to that of U.S. Senate contests. From 2009 to 2013, the white component of participating voters declined from 78 percent to 72 percent. The African American component of the gubernatorial turnout correspondingly rose from 16 percent to 20 percent, with the remainder of the increase among Asian, Hispanic, and other voters.

According to exit poll data reported in Table 6, the percentage of white voters among those participating in Presidential elections in Virginia has also recently declined, although less sharply than in Senate and Gubernatorial elections. The data reported in Table 6 indicates that from a peak of 72 percent in 2004, the white component of participating voters declined to 70 percent in 2008 and 2012, with the minority increase among Asian, Hispanic, and other voters. Republicans won the 2004 presidential election, but lost both the 2008 and 2012 elections with lower white turnout levels than in 2004. Considering all three types of elections reported in Tables 5 and 6 – U.S. Senate, Governor, and President – Republicans won two of three elections with the higher level of white turnout for each election type and lost all other elections with relatively lower levels of white turnout for each election type.

---

[2] There were no exit polls available for the 2005 Virginia gubernatorial election.

17

# TABLE 5

## VOTER TURNOUT BY RACE AND ETHNICITY, VIRGINIA, SENATE AND GUBERNATORIAL ELECTIONS 2006 – 2014

|  | White | Black | Hispanic | Asian | Others | Republican Victory in State |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| **2006 US Senate Webb (WD) v. Allen (WR)** | 78% | 16% | 2% | 3% | 2% | No |
| **2008 US Senate Warner (WD) v. Gilmore (WR)** | 70% | 20% | 5% | 3% | 2% | No |
|  |  |  |  |  |  |  |
| **2009 Governor Deeds (WD) v. McDonnell (WR)** | 78% | 16% | NA | NA | NA | Yes |
|  |  |  |  |  |  |  |
| **2012 US Senate Kaine (WD) v. Allen (WR)** | 70% | 20% | 5% | 3% | 2% | No |
|  |  |  |  |  |  |  |
| **2013 Governor McAuliffe (WD) v. Cuccinelli (WR)** | 72% | 20% | 4% | 1% | 2% | No |
|  |  |  |  |  |  |  |
| **2014 US Senate Warner (WD) v. Gillespie (WR)** | 70% | 19% | 5% | 3% | 2% | No |
|  |  |  |  |  |  |  |
| WD = White Democrat<br>WR = White Republican<br>BD = Black Democrat<br>Exit polling for this and all other tables, conducted after each election by Edison Research, http://www.edisonresearch.com/election-polling/, available through CNN, television networks, and New York Times. | | | | | | |

**TABLE 6**

**VOTER TURNOUT BY RACE AND ETHNICITY, VIRGINIA, PRESIDENTIAL ELECTIONS 2004 – 2012**

| | White | Black | Hispanic | Asian | Others | Republican Victory in State |
|---|---|---|---|---|---|---|
| | | | | | | |
| **2004 President Kerry (WD) v. Bush (WR)** | 72% | 21% | 3% | 2% | 2% | Yes |
| | | | | | | |
| **2008 President Obama (BD) v. McCain (WR)** | 70% | 20% | 5% | 3% | 2% | No |
| | | | | | | |
| **2012 President Obama (BD) v. Romney (WR)** | 70% | 20% | 5% | 3% | 2% | No |
| | | | | | | |

The white and minority voting patterns explain why Republican political fortunes in what has become a highly competitive swing state are so heavily dependent on maintaining a high white turnout and why Republicans would benefit from a lower minority – especially African American – turnout. According to data reported in Table 7 and Chart 9, for nine statewide elections between 2004 and 2014, white voters provided a mean of 59 percent support for Republican candidates. In sharp contrast, black voters only provided a mean of 9 percent support for these Republican candidates, 50 percentage points lower than the white backing for these candidates.

Hispanic voters provided only 33 percent support for the Republican candidates, 27 percentage points lower than the white backing. Asian voters likewise provided only 33 percent support for the Republican candidates, 27 percentage points lower than the white backing.

19

**TABLE 7**

**SUPPORT FOR REPUBLICAN CANDIDATES BY RACE AND ETHNICITY, EXIT POLLS VIRGINIA, 2004 – 2014**

| Election | Group | | | | |
|---|---|---|---|---|---|
| | **White** | **Black** | **Hispanic** | **Asian** | **Others** |
| **2004 President** | 68% | 12% | NA | NA | NA |
| **2008 President** | 60% | 8% | 34% | NA | NA |
| **2012 President** | 61% | 6% | 33% | 32% | NA |
| **2006 US Senate** | 58% | 15% | NA | 32% | NA |
| **2008 US Senate** | 43% | 7% | 29% | 32% | NA |
| **2012 US Senate** | 60% | 8% | 38% | 34% | NA |
| **2014 US Senate** | 60% | 9% | NA | NA | NA |
| **2009 Governor** | 67% | 9% | NA | NA | NA |
| **2013 Governor** | 56% | 8% | 29%* | 34%* | NA |
| **Mean** | **59%** | **9%** | **33%** | **33%** | NA |
| **Mean Difference With Whites** | NA | **-50 Percentage Points** | **-27 Percentage Points** | **-27 Percentage Points** | NA |
| * The exit polls did not survey the Latino or the Asian vote in Virginia, these results are from an election eve poll by Latino Decisions that surveyed both Latino and Asian voting in 2013: http://www.latinodecisions.com/blog/2013/11/06/new-race-politics-and-the-virginia-election/. The results are fully consistent with exit polling of these two groups in other elections. | | | | | |

20

**CHART 9**

**MEAN SUPPORT FOR REPUBLICAN CANDIDATES BY RACE AND ETHNICITY, VIRGINIA, 2004 – 2014, BASED ON DATA IN TABLE 7**



The exit poll data presented in Table 8 demonstrate that these racial differences in party support are far greater than differences based on other demographic factors, including gender, age, education, and income. The results also show that among these other factors, age is the most important with Republicans lagging behind Democrats in backing from young voters, especially in recent elections.

**TABLE 8**

**SUPPORT FOR REPUBLICAN CANDIDATES BY NON-RACIAL DEMOGRAPHY, EXIT POLLS VIRGINIA, 2004 – 2014**

|  | Women | Men | 18-29 | 65+ | High School Only | College Grad | Income 50k- | Income 100k+ |
|---|---|---|---|---|---|---|---|---|
| **2004 President** | 50% | 59% | 46% | 49% | NA | NA | 48% | 59% |
| **2008 President** | 46% | 47% | 39% | 53% | 43% | 48% | 38% | 52% |
| **2012 President** | 45% | 51% | 36% | 54% | 50% | 46% | 38% | 51% |
| **2006 Senate** | 45% | 55% | 48% | 50% | 54% | 49% | 51% | 47% |
| **2008 Senate** | 32% | 36% | 26% | 36% | 29% | 35% | 24% | 39% |
| **2012 Senate** | 44% | 51% | 37% | 51% | 49% | 46% | 38% | 52% |
| **2014 Senate** | 43% | 53% | 39% | 54% | 45% | 44% | 42% | 45% |
| **2009 Governor** | 54% | 62% | 54% | 60% | 64% | 54% | 50% | 58% |
| **2013 Governor** | 48% | 42% | 40% | 51% | 50% | 42% | 37% | 43% |
| **Mean** | 45% | 51% | 41% | 51% | 48% | 46% | 41% | 50% |

22

Thus, demographic shifts in the Virginia voter base, combined with polarized voting, indicate that Republicans had much to gain by limiting minority voting generally and black voting in particular relative to white voting, as well as voting by young voters relative to older voters. These basic facts of recent Virginia politics could not have been lost on the Republican majority that has controlled the General Assembly since 2012 and controlled the governorship from 2011 through 2013.

## B.  Decision-Making by the Virginia General Assembly and Governor: Voter Identification

Voter identification laws are generally categorized as "strict" or "non-strict." Under a strict identification law, a voter must present a prescribed form of identification in order for his or her ballot to be counted.  If a voter appears at the polls to cast a ballot without one of the prescribed forms of identification, the voter generally is required to vote a provisional ballot, and then has a prescribed period of time after the election to present or submit one of the accepted forms of identification to elections authorities if the provisional ballot is to be counted. Under a non-strict law, a voter's ballot will still be counted even if he or she presents at the polls without one of several accepted forms of identification. Such a voter may generally either vote a regular ballot (which will be counted in the ordinary course with all other ballots) by signing an affidavit of identity, or cast a provisional ballot which will be counted without the voter taking any additional action.[3] In the latter case, elections authorities will often note that the voter cast a ballot without presenting identification, but the lack of that identification will not disenfranchise the voter.

In 1996, Virginia adopted a non-strict voter identification law. The 1996 law was not exclusively a photo identification law; among the several forms of acceptable identification that the law endorsed for voting at the polls were both photo and non-photo IDs (e.g., a voter registration card, a social security card, a Virginia driver's license, a government ID, or a photo ID issued by an employer). If a voter showed up to the polling place and was unable to present one of the forms of ID listed by the law, he or she could still cast a regular ballot that would be counted in the ordinary course by signing a statement that he or she was the voter he or she claimed to be.[4]

In subsequent legislative sessions, Republican legislators sought to make this law more stringent by introducing bills that would require voters without certain forms of prescribed ID to cast a provisional ballot rather than establish identity by affirmation, or to eliminate all forms of non-photo identification from the list of prescribed IDs and only permit the use of photo identification. For example, HB 498, introduced in the 2010 Legislative Session, would have both required a photo ID and eliminated the option to vote a regular ballot through an

---

[3] See, National Conference of State Legislators, *Voter Identification Requirements*,
http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx; state websites with voter ID requirements.
[4] VA. CODE ANN. § 24.2-643 (Repl. Vol. 2011)

23

affirmation of identity.[5] However, a Democratic majority in the Senate Privileges and Elections Committee consistently defeated these proposed changes.[6]

In 2009, however, Virginia elected a Republican governor and, in 2012, Republicans gained effective control of both chambers of the General Assembly. This partisan shift would result in major changes to the existing 1996 law. These changes did not occur all at once but evolved over time, ultimately making Virginia's voter identification requirements much more stringent than before. The changes correlated with the change in partisan control in Virginia, not with any new evidence regarding the inability of prior law to deter voter impersonation at the polls – the only type of voter fraud affected by Virginia's voter ID laws.

In 2012, the same year that Republicans achieved control of both the governor's mansion and the General Assembly, Republicans implemented the first of two legislative changes to the 1996 law. In the 2012 session, Republican legislators introduced two new voter identification bills. The two bills that emerged – HB 9 and SB 1 – were supported on near-straight party lines and moved Virginia's voter ID requirement from non-strict to strict. Although the bills expanded the list of acceptable forms of identification that could be used for voting, they eliminated the opportunity to vote a regular ballot with a statement of identity. Unless the voter presented one of the authorized forms of identification or was "recognized and acknowledged by an officer of election to be the person that he claims to be," the voter could not cast a regular ballot.  Instead, the voter would only be permitted to cast a provisional ballot and would then have to subsequently present a form of authorized ID to elections officials within a prescribed period, or else the ballot would not be counted.[7]

Thus, for the very first time, the bills made possession and presentment of one of certain types of identification a pre-requisite to voting in person in Virginia elections.  SB 1, the voter ID bill that was ultimately enacted in law (Chapter 839) stated in relevant part:

> An officer of election shall ask [each voter who presents at a precinct to vote] . . . to present any one of the following forms of identification: his Commonwealth of Virginia voter registration card, his social security card, his valid Virginia driver's license, or any other identification card issued by a government agency of the Commonwealth, one of its political subdivisions, or the United States; *any valid student identification card issued by any four-year institution of higher education located in the Commonwealth of Virginia;* any valid employee identification card containing a photograph of the voter and issued by an employer of the voter in the ordinary course of the employer's business; *or a copy of a current utility bill, bank statement,*

---

[5] Virginia's Legislative Information System, 2010 Session HB 498, https://lis.virginia.gov/cgi-bin/legp604.exe?101+sum+HB498.

[6] Christopher R. Nolen and Jeff Palmore, "Election Law," *University of Richmond Law Review* 181 (2012), pp. 183-184.

[7] Virginia's Legislative Information System, 2012 Session, SB 1, https://lis.virginia.gov/cgi-bin/legp604.exe?121+ful+SB1ER2.

*government check, or paycheck that shows the name and address of the voter.*

*Any voter who does not show one of the forms of identification specified in this subsection, and who is not recognized and acknowledged by an officer of election to be the person that he claims to be, shall be offered a provisional ballot . . . . The State Board of Elections shall provide an ID-ONLY provisional ballot envelope that requires no follow-up action by the registrar or electoral board other than matching submitted identification documents from the voter for the electoral board to make a determination on whether to count the ballot.*[8]

Governor Bob McDonnell returned the bills to the General Assembly with several proposed amendments. These included adding community college IDs, allowing a provisional ballot to count through comparison by election officials of the signature on the provisional ballot envelope with the signature on file with the registrar, providing voters without a prescribed ID additional time to present ID to the electoral board, and removing the personal recognition provision. The General Assembly approved most of these recommendations but specifically rejected the amendment to include the signature comparison, the most important element in making the bill less strict.[9]

Governor McDonnell signed SB1 in May 2012 with an accompanying executive order that required the Board of Elections to issue new registration cards before the election of 2012. The order called for a voter outreach campaign and the collection of statistics regarding provisional ballots. It also called for regulations clarifying that local registrars could contact voters who voted provisionally to remind them of the law's requirements.[10]

Under the Governor's executive order, local registers could remind provisional voters of the need to return with an acceptable ID to have their vote counted. However, there was no legal requirement for them to do so, creating potential inconsistency across the state in the application of the new voter ID law.[11]

In its final form, the 2012 legislation changed the non-strict 1996 ID law to a strict ID law, without both the statement of identity and the signature comparison options. Thus voters could not cast a regular ballot without an authorized ID and could not have their provisional ballot counted without subsequently presenting an authorized ID. However, the new legislation did expand the list of acceptable IDs, including such readily available non-photo IDs as utility bills, bank statements, government checks, or paychecks (all of which are deemed acceptable forms of identification by the federal government for registration purposes under the Help America Vote Act, 52 U.S.C. § 21083(b)(2)(A)(i)(II)). Also, separately in 2012, the General Assembly added concealed handgun permits to the list of acceptable IDs for voting. The law

---

[8] *Ibid.* (italics indicate new language and are found in the bill as reproduced on the General Assembly's website).
[9] Nolen and Palmore, "Election Law," pp. 184-185.
[10] *Ibid.*
[11] Minutes, State Board of Elections Meeting, 5 June 2012, p. 5, Document DOE0000335.

was precleared by the U.S. Department of Justice on August 20, 2012.[12]

This did not settle the matter of voter ID for the General Assembly. Less than a year after the governor signed this new voter ID into law, and less than half a year after its preclearance by the Department of Justice, Republican legislators introduced and then enacted a much more stringent, strict voter ID law in 2013. This time, the General Assembly eliminated as acceptable IDs all forms of non-photo IDs. Under the new 2013 law, which is now in effect, to vote in-person at the polls Virginia voters must present one of the following forms of identification:

- Valid Virginia Driver's License or Identification Card;
- Valid Virginia DMV issued Veteran's ID card;
- Valid United States Passport;
- Other government-issued photo identification cards (must be issued by U.S. Government, the Commonwealth of Virginia, or a political subdivision of the Commonwealth);
- Valid college or university student photo identification card (must be from an institution of higher education located in Virginia);
- Employee identification card containing a photograph of the voter and issued by an employer of the voter in the ordinary course of the employer's business; or
- Virginia Voter Photo ID Card obtained through a local general registrar's office (available for no cost if the voter does not have one of the other forms of photo identification listed above).

Voters who do not have or fail to present one of these forms of photo identification at the polls are only permitted to cast a provisional ballot, which will only be counted if a voter submits or presents an acceptable ID no more than three days after the election to the local electoral board.[13]

The Virginia General Assembly did not include in the new law the provision for voting a regular ballot through an affirmation of identity. It adopted a strict voter photo ID law even though, when the earlier non-strict voter ID law was in effect prior to the 2012 general election, many voters had utilized the affirmation option. According to a State Board of Elections memo dated 31 October 2012 – before adoption of the 2013 law – "On average for the past several Virginia elections, ¼ of 1% of total voters did not present acceptable identification and completed an affirmation of identity at the polling place."[14]

---

[12] Nolen and Palmore, "Election Law," pp. 184-186.

[13] Virginia Department of Elections, *In-Person Voting*, http://elections.virginia.gov/casting-a-ballot/in-person-voting/. Beginning in 2016 student IDs can include those issued by private as well as public institutions. 2015 Va. Laws Ch. 571 (HB 1653).

[14] Nikki Sheridan (SBE) to Perry Stein, 31 October 2012, via email, obtained by Plaintiffs through FOIA request.

26

Although this may seem like a small percentage, it actually amounts to a substantial number of voters, especially when contrasted with the total lack of evidence that a single Virginia voter has committed voter impersonation at the polls in recent elections as documented below.

Table 9 applies the average number of voters that the State Board of Elections identified as previously voting based on an affirmation of identity to the general elections in Virginia of 2008 and 2010. The Table demonstrates that based on the State Board's average, the number of persons lacking photo ID who voted a regular ballot through an affirmation of identity ranged from approximately 5,536 in the mid-term general election of 2010 to 9,382 in the presidential general election of 2008.

### TABLE 9

### NUMBER OF VOTERS USING AN AFFIRMATION OF IDENTITY WHEN NON-STRICT VOTER ID WAS IN EFFECT, GENERAL ELECTIONS 2008-2010

| Election | Number of Voters Turning Out | Number of Voters Using Affirmation of Identity (Based on .25% Average) |
|---|---|---|
| | | |
| 2008 General | 3,752,858 | 9,382 |
| | | |
| 2010 General | 2,214,503 | 5,536 |
| | | |
| Source: Virginia State Board of Elections, Summary of Virginia Registration & Turnout Statistics, http://elections.virginia.gov/resultsreports/registration-statistics/registrationturnout-statistics/; Average from Nikki Sheridan (SBE) to Perry Stein, 31 October 2012, via email, obtained by Plaintiffs through FOIA request. | | |

### C.       Discriminatory Intent of the New 2013 Voter Photo ID Law

As noted above, in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the U.S. Supreme Court outlined several factors that it identified as relevant to ascertaining whether legislation was enacted with intentional discriminatory intent: (1) discriminatory impact; (2) historical background; (3) the sequence of events leading up to the decision; (4) procedural or substantive deviations from the normal decision-making process; and (5) contemporaneous viewpoints expressed by the decision-makers. In addition to the sequence of events examined above through 2012, below I additionally address these factors as they apply to the new 2013 voter photo ID law, enacted by the Republican-

controlled General Assembly.

- **Timing of the 2013 Law.**

The Governor signed the 2012 legislation on May 20, 2013. The U.S. Department of Justice precleared the law in August 2012. Less than 6 months later, on January 1, 2013, Republicans introduced the new legislation eliminating non-photo identification from the list of acceptable IDs for voting in Virginia (SB1256). The law passed the General Assembly in February 2013 in essentially the same form as introduced and was signed by the Governor on March 25, 2013, less than a year after he had signed the 2012 bill and about eight months after the Department of Justice had precleared the 2012 law.[15] The most plausible explanation for this extraordinarily rapid transformation of Virginia's voter identification laws is found in Republican setbacks in the elections of 2012. In that year Barack Obama was re-elected as President and won Virginia for the second consecutive election. Not since 1948 had Democratic presidential candidates prevailed in Virginia in two consecutive elections. Also, in 2012 former Democratic Governor Tim Kaine defeated former Republican Governor and U.S. Senator George Allen for an open U.S. Senate seat.   Kaine defeated Allen by some 6 percentage points, 53 percent to 47 percent of the vote.  In addition, the Senate results showed the turnout of white voters declining from 78 percent of participants in 2006 to 70 percent in 2012, according to readily available exit polls at the time (see Table 5 above). The elections of 2012 further disclosed that Republicans were losing overwhelmingly among young voters. According to the exit polls reported in Table 8 above, Republican presidential candidate Mitt Romney won 36 percent of the 18-29 year-old vote and Republican Senatorial candidate Allen won only 37 percent of this vote (see Table 8 above).

- **Lack of evidence of voter impersonation at the polls.**

The introduction and enactment of the new photo voter ID law in 2013 did not follow from the release of any new information demonstrating a problem with voter impersonation at the polls in Virginia, the only type of fraud affected by the new voter photo ID law. To the contrary, new information about voter fraud in Virginia, including studies by a Republican group, demonstrated the *absence* of voter impersonation in Virginia.

A state-by-state study by the Republican National Lawyer's Association (RNLA) released in November 2011 was specifically aimed at dispelling findings that there is a lack of voter fraud across the nation, including in Virginia. The study covered the broad period broad from 2000 to 2010 when persons could vote in Virginia with only a statement of identity and were not required to present either photo or non-photo ID. It examined both voter fraud prosecutions and convictions. During this ten-year-plus time period, the RNLA was unable to unearth a single instance of voter impersonation fraud in Virginia. Nationally, in some 19 states in which persons could vote without presenting any form of photo or non-photo ID, the study

---

[15] Virginia's Legislative Information System, Bill Tracking for SB1256, 2013 Session, https://lis.virginia.gov/cgi-bin/legp604.exe?131+sum+SB1256.

found a combined four cases of voter impersonation out of many hundreds of millions of ballots cast in these 19 non-ID states over the course of a decade.[16]

Also before enactment of SB1256, in August 2012 a state-by-state study conducted by News21, a national reporting project made up of 11 universities, similarly demonstrated a lack of voter impersonation fraud in Virginia. The study, which covered the period since 2000, found that, although officials had reported 35 allegations (not charges or convictions) of voter fraud in Virginia, not a single case involved voter impersonation at the polls. Nearly all of the cases of fraud involved registration fraud or ineligible voters casting a ballot, types of fraud that would not be prevented by a voter photo ID law.[17] The study also confirmed the findings of the 2011 RNLA study, likewise uncovering only a handful of voter impersonation allegations among the many states that required neither a photo nor non-photo ID for voting at the polls.[18]

- **Contemporary Evidence of Discriminatory Effects on African Americans**

At the time of the enactment of Virginia's 2013 strict photo ID law, voter identification laws had become the subject of heated and well-publicized controversy across the nation, with critics charging that African Americans and other minorities had less access than whites to such common forms of photo identification as driver's licenses and U.S. passports. In March 2012, for example, marchers in Alabama made national headlines when they reenacted the historic 1965 voting rights march from Selma to Montgomery in protest of the state's new voter identification and immigration laws.[19] Numerous studies had documented racial disparities in the possession of driver's licenses and passports. Courts had blocked the implementation of voter ID laws in Pennsylvania and Texas.[20]

---

[16] RNLA, *Voter Fraud Survey*, http://www.rnla.org/survey.asp#va.

[17] News21, "Electoral Fraud in America: Virginia," http://votingrights.news21.com/interactive/election-fraud-database/index.html.

[18] Natasha Khan and Corbin Carson, "Comprehensive Database Of U.S. Voter Fraud Uncovers No Evidence That Photo ID Is Needed," News21, 12 August 2012, http://votingrights.news21.com/article/election-fraud/; Election Fraud in America: Virginia, News21, 12 August 2012, http://votingrights.news21.com/interactive/election-fraud-database/.

[19] Sari Horwitz, "Eric Holder Vows to Aggressively Fight Voter ID Laws," Washington Post, 11 July 2012, https://www.washingtonpost.com/world/national-security/eric-holder-vows-to-aggressively-challenge-voter-id-laws/2012/07/10/gJQApOASbW_story.htmlhttp://www.lexisnexis.com.proxyau.wrlc.org/hottopics/lnacademic/; Bill Maxwell, "A Chilling Blast From the Past," Tampa Bay Times, 7 October 2012, 2012 WLNR 21452339http://www.lexisnexis.com.proxyau.wrlc.org/hottopics/lnacademic/.

[20] See, for example, Brennan Center for Justice, "Citizens Without Proof," November 2006, http://www.brennancenter.org/sites/default/files/legacy/d/download_file_39242.pdf; Gabriel R. Sanchez, Stephen A. Nuño, and Matt A. Barreto, "The Disproportionate Impact of Photo-ID Laws on the Minority Electorate," *Latino Decisions*, 24 May 2011, http://www.latinodecisions.com/blog/2011/05/24/the-disproportionate-impact-of-stringent-voter-id-laws/; R. Michael Alvarez, et al., Final Report of the 2008 Survey of the Performance of American Elections" (SPAE), http://www.latinodecisions.com/blog/2011/05/24/the-disproportionate-impact-of-stringent-voter-id-laws/. See also, the analysis below for Virginia specific information from the 2008 SPAE about both racial and age disparities in photo ID possession; Adriane De Vogue, "Pennsylvania Voter ID Law Blocked," ABC News, 2 October 2012, http://abcnews.go.com/blogs/politics/2012/10/pennsylvania-judge-blocks-voter-id-requirement/; Sari Horwitz, "Texas Voter ID Law is Blocked," *Washington Post*, 30 August 2012,

There was also substantial Virginia-specific information available at the time of the adoption of the 2013 strict voter photo ID law regarding both the lack of the most commonly available forms of photo ID – driver's licenses and U.S. passports – and racial disparities in the possession of such IDs. A study by the Virginia State Board of Elections, completed in February 2012, indicated that approximately 577,000 registered voters in Virginia (including nearly 365,000 active and 212,000 inactive voters) lacked Department of Motor Vehicles-issued photo identification.[21]

Although the State Board did not attempt to analyze the racial composition of registered voters lacking DMV photo identification, other Virginia-specific information available at the time of the adoption of the 2013 bill documented racial disparities within Virginia in the possession both of driver's licenses and U.S. Passports. For instance, Table 10 reports the results of the 2008 Survey of the Performance of American Elections (SPAE), a standard source in election analysis, on the possession of driver's licenses and passports by registered voters in Virginia. These results were available well before debates began over the 2013 law at the beginning of that year. Table 10 discloses major disparities in Virginia between the possession of driver's licenses and passports by whites and African Americans. According to the results reported, 98.1 percent of whites in Virginia possessed driver's licenses compared to 84.6 percent of African Americans. This amounts to a difference of -13.5 percentage points for African Americans as compared to whites, which is statistically significant at the stringent .01 level used in social science.[22]

---

https://www.washingtonpost.com/world/national-security/texas-voter-id-law-struck-down/2012/08/30/4a07e270-f2ad-11e1-adc6-87dfa8eff430_story.html.

[21] **VIRGINIA VOTERS WITH IDENTIFICATION CARDS SUMMARY, FEBRUARY 2, 2012, VSBE0000546.**

[22] Survey available at https://dataverse.harvard.edu/dataverse/SPAE.

**TABLE 10**

**DRIVER'S LICENSE AND PASSPORT POSSESSION, BY RACE, OF REGISTERED VOTERS SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008, VIRGINIA**

|  | Whites | Blacks | Difference With Whites |
|---|---|---|---|
| **Possess Driver's License** | 157 of 160 **98.1%** | 22 of 26 **84.6%** | **-13.5 Percentage Points *** |
|  |  |  |  |
| **Possess US Passport** | 84 of 159 **52.8%** | 5 of 26 **19.2%** | **-33.6 Percentage Points *** |
|  |  |  |  |
| * Statistically significant at .01 level.  (Statistical significance depends on the size of the sample and the magnitude of the difference.  Sometimes results are statistically significant at different levels and sometimes not statistically significant.) | | | |

These large racial disparities in driver's license possession are consistent with the substantial gap between African Americans and whites in the availability of vehicles within households. As indicated in Table 3, Census data available at the time of the enactment of the 2013 voter ID law shows that 13.1 percent of African Americans lacked an available vehicle, compared to 4.4 percent of whites. These disparities are also consistent with the much higher poverty rate and much lower incomes of African Americans relative to whites in Virginia (as indicated in Table 1), given that a driver's license costs $32 for a four-year period.

With respect to U.S. passports, the results reported in Table 10 indicate that, as of 2008, 52.8 percent of whites and 19.2 percent of African Americans in Virginia possessed a U.S. passport. This amounts to a difference of -33.6 percentage points for African Americans as compared to whites, which is statistically significant at the stringent .01 level used in social science. These disparities are also consistent with the much higher poverty rate and much lower incomes of African Americans relative to whites in Virginia, given the cost of international travel and that a U.S. passport costs $110.

As indicated in Table 11 the disparate impact in driver's license and passport possession is directly based on racial differences, not on party differences (Republican vs. Democratic voters). When holding party constant by looking only at SPAE respondents who voted for Barack Obama in 2008, the racial differences in driver's license and passport possession are essentially the same as reported in Table 10 for all registered voters. The disparate burdens that the voter photo ID law imposes on Democrats are thus a function of the fact that African American voters overwhelmingly vote for Democratic candidates.

## TABLE 11
### DRIVER'S LICENSE AND PASSPORT POSSESSION, BY RACE, OF OBAMA VOTERS ONLY, SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008, VIRGINIA

|  | White Obama Voters | Black Obama Voters | Difference With Whites |
|---|---|---|---|
| Possess Driver's License | 69 of 71 **97.2%** | 19 of 23 **82.6%** | **-14.6 Percentage Points *** |
|  |  |  |  |
| Possess US Passport | 35 of 70 **50.0%** | 4 of 23 **17.4%** | **-32.6 Percentage Points **** |
|  |  |  |  |
| * Statistically significant at the .05 level.<br>** Statistically significant at the .01 level. |  |  |  |

32

In sum, statistically significant Virginia-specific results from a standard survey, well-respected in social science, that was available in January 2013 document the substantial discriminatory effects of the 2013 strict photo voter ID law as it relates to the most commonly possessed forms of voter identification.

Results from the 2008 SPAE reported in Table 12 also demonstrate substantial difference in driver's license possession between registered voters of ages 18-29 and registered voter of ages 30+. According to the results reported, 97.7 percent of age 30+ registered voters in Virginia possessed driver's licenses, compared to 87.0 percent of age 18-29 registered voters. This amounts to a difference of -10.7 percentage points for younger as compared to older voters, which is statistically significant at the standard .05 level used in social science. With respect to passport possession the results demonstrate that younger voters are slightly less likely to possess passports than older voters, but the differences are not statistically significant.[23]

**TABLE 12**

**DRIVER'S LICENSE AND PASSPORT POSSESSION OF REGISTERED VOTERS, BY AGE, SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008, VIRGINIA**

|  | Age 30+ | Age 18-29 | Difference With Age 30+ |
|---|---|---|---|
| **Possess Driver's License** | 173 of 177 **97.7%** | 20 of 23 **87.0%** | **-10.7 Percentage Points *** |
|  |  |  |  |
| **Possess US Passport** | 86 of 176 **48.9%** | 11 of 23 **47.8%** | **-1.1 Percentage Points **** |
|  |  |  |  |
| * Statistically significant at .05 level. ** Not statistically significant. | | | |

---

[23] The sample sizes are too small to isolate only Obama voters.

33

It is also highly likely, and could have been reasonably inferred from data available at the time the law was being considered and enacted, that whites had higher rates of possession of employer IDs, whether issued by private or government employers. Based on information available in 2013 from the 2011 U.S. Census, American Community Survey, the African American unemployment rate of 12.4 percent was about twice that of the rate for whites (6.2 percent). Although African Americans are more likely than whites to hold government jobs, the difference is relatively small, 14.3 percent of voting age African Americans compared to 13.3 percent of voting age whites according to the 2011 American Community Survey.

According to this American Community Survey data, the percentage of voting age African Americans attending institutions of higher education in Virginia is slightly higher than whites, at 12.5 percent versus 9.6 percent, and the percentage of veterans among African Americans of voting age veterans in Virginia is slightly lower than the white percentage at 12.8 percent versus 13.2 percent. (See Chart 10).

It also should be noted that unlike the data for possession of driver's licenses and passports, the data for all other forms of photo IDs simply indicate that voting age persons in Virginia potentially have *access* to such IDs. The data does not establish that persons actually possess such IDs (e.g., not all government workers have an employee photo ID).

## CHART 10
## ACCESS TO FORMS OF PHOTO ID BY RACE, VIRGINIA



Thus, on balance African Americans are far less likely than whites to possess the most common forms of photo identification – driver's licenses and U.S. passports. It is also highly likely that African Americans have less access than whites to employer photo IDs due to the disparities in unemployment rates described in Table 1. With respect to other IDs, with comparatively low possession rates, African Americans are slightly more likely than whites to have access to government employee and student photo IDs and slightly less likely to have access to veteran's photo IDs.

- **Voter Outreach and Free Voter IDs**

Although the General Assembly provided funding for a campaign of voter outreach to explain the provisions of SB1256 and the availability of free voter ID cards, that budget totaled only $200,000 per year through 2017.[24] According to a database created by the Commonwealth, as of September 24, 2015, and over a more than two-year period, there were only 4,622 free voter IDs printed or pending.[25]

- **Consistency with other Republican-controlled states.**

The decline in white voting strength documented for Virginia is a national phenomenon. As demonstrated by the national data shown in Chart 11, in midterm elections, the white share of the electorate declined from 82 percent in 2002 to 78 percent in 2010 and 77 percent in 2014. In presidential elections the white share of the electorate declined from 79 percent in 2004 to 76 percent in 2008 and 74 percent in 2014. Likewise the nationwide turnout reported in Table 13 for the past three presidential elections demonstrates that Republicans nationally are dependent on white voters, with polarization numbers similar to those found in Virginia.[26] As in Virginia, moreover, the polarization was not limited to elections in which Barack Obama competed, but was also evident in the 2004 presidential election, which involved two white candidates.

---

[24] Minutes, State Board of Elections Meeting, 2 December 2013, p. 11,
http://elections.virginia.gov/Files/Media/Agendas/20131202Minutes.pdf.
[25] VSBE0008491_AEO csv.
[26] Reliable national data on voter polarization is available only for presidential elections given that states do not all have comparable races in midterm years.

35

**CHART 11**

**CHANGES IN THE WHITE COMPONENT OF VOTERS, UNITED STATES ELECTION PROJECT**
**(http://www.electproject.org/home/voter-turnout/demographics)**



**TABLE 13**

**SUPPORT FOR REPUBLICAN CANDIDATES BY RACE AND ETHNICITY, UNITED STATES PRESIDENTIAL ELECTIONS, EXIT POLLS, 2004 – 2012**

| Election | Group | | | | |
|---|---|---|---|---|---|
| | White | Black | Hispanic | Asian | Others |
| **2004 President** | 58% | 11% | 44% | 44% | 40% |
| **2008 President** | 55% | 4% | 31% | 35% | 31% |
| **2012 President** | 59% | 6% | 27% | 26% | 38% |
| **Mean** | **57%** | **7%** | **34%** | **35%** | **36%** |
| **Mean Difference With Whites** | **NA** | **-50 Percentage Points** | **-23 Percentage Points** | **-22 Percentage Points** | **-21 Percentage Points** |

Consistent with the fall in relative white turnout and the dependence of Republicans on white votes, not only Virginia but many other Republican controlled states have adopted new voter photo ID laws since 2008. As indicated in Table 14, after 2008 and through 2013 some 14 states adopted new voter photo identification laws, more than double the number of laws enacted in all prior years. As also indicated in Table 14, Republicans controlled the state legislature and the governorship in 10 of the 14 states. In two of the remaining states – Arkansas and New Hampshire – Republican legislators enacted the voter photo ID laws by overriding the veto of a Democratic governor. In another state – Mississippi – voters enacted the voter photo ID law in a statewide referendum. That leaves only the state of Rhode Island which enacted a voter photo ID law with a Democratic legislature and an independent governor.

**TABLE 14**

**PARTISAN CONTROL OF STATES ADOPTING VOTER PHOTO ID LAWS AFTER THE 2008 PRESIDENTIAL ELECTION**

| State | State Legislature | Governor |
|---|---|---|
| ALABAMA 2011 | REPUBLICAN | REPUBLICAN |
| ARKANSAS 2013 | REPUBLICAN | DEMOCRATIC |
| IDAHO 2010 | REPUBLICAN | REPUBLICAN |
| KANSAS 2011 | REPUBLICAN | REPUBLICAN |
| MISSISSIPPI 2011 | DEMOCRATIC | REPUBLICAN |
| NEW HAMPSHIRE 2012 | REPUBLICAN | DEMOCRATIC |
| NORTH CAROLINA 2013 | REPUBLICAN | REPUBLICAN |
| PENNSYLVANIA 2012 | REPUBLICAN | REPUBLICAN |
| RHODE ISLAND 2011 | DEMOCRATIC | INDEPENDENT |
| SOUTH CAROLINA 2011 | REPUBLICAN | REPUBLICAN |
| TENNESSEE 2011 | REPUBLICAN | REPUBLICAN |
| TEXAS 2011 | REPUBLICAN | REPUBLICAN |
| VIRGINIA 2013 | REPUBLICAN | REPUBLICAN |
| WISCONSIN 2011 | REPUBLICAN | REPUBLICAN |
| National Conference of State Legislature, "Voter ID History," http://www.ncsl.org/research/elections-and-campaigns/voter-id-history.aspx; NCSL, "State Partisan Composition, http://www.ncsl.org/research/about-state-legislatures/partisan-composition.aspx#Timelines. Individual state websites. | | |

**D.     Decision-Making by the State Board of Elections and Interference by One of the Chief Sponsors of the Bill**

Virginia's 2013 strict photo ID law lists several forms of identification that a voter may use only if they are "valid," but does not specify what constitutes a "valid" photo voter ID in these circumstances. Because of the lack of any statutory definition of the term, the task of defining "valid" for these purposes fell upon the State Board of Elections in 2014 at a time when it had a Republican majority. In defining what counts as a valid ID the Board went through a multiple stage process, which was notably marked by the intervention of Senator Mark Obenshain, the chief sponsor of the photo voter ID law.

Initially, on June 10, 2014, the State Board of Elections issued a regulation defining the term "valid" as it was used in the voter ID law to mean a document "containing the name and

38

photograph of the voter [and] appearing to be genuinely issued by the agency or issuing entity appearing upon the document." The Board further determined that "[o]ther data contained on the document, including but not limited to expiration date, shall not be considered in determining the validity of the document."[27]

Six days later, in a letter directed to then-Secretary of the Board Donald Palmer, Senator Obenshain (a Republican who, as noted, was the chief sponsor of the strict photo ID law) objected to this interpretation of the meaning of a "valid" ID. He wrote that, "Given the significance of this issue and the clear tension between elements of this rule and provisions of state election law, I would urge the Board of Elections to revisit this matter immediately and to open any subsequent action to public comment."[28]

Eight days later, on June 24, the Board responded by proposing that valid identification be interpreted to include current IDs and IDs that had not expired more than 30 days before. The Board sought an opinion on this approach from Democratic Attorney General Mark R. Herring (D) (who had defeated Obenshain in 2013 for this position), and Herring responded that a 30-day expiration limit could be applied inconsistently.[29] The Board then sought public comment on the issue.

Finally, on August 6, 2014, by a 2-0 vote of Republican appointed members (the lone Democratic appointed member was not present and did not vote but wrote a letter in opposition), the Board announced that the definition of "valid" for purposes of the voter ID law would be interpreted to mean "(i) the document appears to be genuinely issued by the agency or issuing entity appearing upon the document, (ii) the bearer of the document reasonably appears to be the person whose photograph is contained thereon, and (iii) the document shall be current or have expired *within the preceding 12 months*."[30]

There was no indication from the Board that it took into account the potential discriminatory impact on African Americans and other minorities of prohibiting use of IDs that had been expired for more than 12 months. The Board also did not indicate why it mattered for the purpose of confirming a voter's identity whether an ID had been expired for more than 12 months. The Board further did not explain the inconsistency between rejecting the use of drivers' licenses and passports that had been expired for 12 or more months, while other photo IDs listed as acceptable voter ID under the law that do not include an expiration date may be used for voting regardless of how long ago they were issued.

The provisions of SB1256 and the interpretations of the State Board of Elections have created considerable confusion over what counts as a "valid" photo ID for voting. To master what counts and does not count as acceptable identification under the new law, potential voters

---

[27] 30 Va. Reg. Regs. 2516 (June 30, 2014).
[28] Letter from State Sen. Mark Obenshain to Donald Palmer, Secretary, Virginia State Board of Elections, 16 June 2014, VSBE0030198, available at http://markobenshain.com/images/uploads/Obenshain_SBE_Letter.pdf.
[29] 30 Va. Reg. Regs. 2770 (Aug. 25, 2014).
[30] 30 Va. Reg. Regs. 2770 (Aug. 25, 2014) (emphasis added).

must be apprised of the "correct" answers to the following questions, some of which have created substantial challenges and even confusion among those with responsibility for implementing the new law:[31]

- Which IDs are unacceptable if expired?
- What is the length of the expiration period?
- Can a voter use a revoked, suspended or cancelled driver's license?
- Can a voter use a learner's permit?
- What counts as a "valid" employer ID?
- Can an ID be used if it does not contain an expiration date?
- Can voters use a government-issued ID that is not explicitly on the list of authorized IDs?
- Must the voter's name on the ID match the voter's name on the registration rolls?
- Must the ID contain an address and must this address be current?

The issue of voter confusion is significant because it can deter potential voters – even those with valid IDs – from participating in elections. Researchers from Rice University, for example, studied non-voting by registered voters in the 2014 general election in Congressional District 23 in Texas. This is a majority Hispanic district and one of a very few competitive congressional districts in Texas, and it featured a tight contest in 2014 that typically draws a high voter turnout. The researchers found that 5.8 percent of 400 registered voters studied gave as their principal reason for not voting a lack of acceptable identification under Texas' voter photo ID law, which had been in place since 2013. A larger 12.8 percent cited a lack of acceptable ID as one reason for non-voting. Yet, the researchers in fact found that, based on what they self-reported to the survey takers, the vast majority of these non-voters whose decision not to vote was a belief that they lacked acceptable voter ID under the law actually possessed at least one form of legally sanctioned voter ID. The researchers concluded:

"This study suggests that the most significant impact of the Texas voter photo ID law on voter participation in CD-23 in November 2014 was to discourage turnout among registered voters who did indeed possess an approved form of photo ID, but through some combination of misunderstanding, doubt or lack of knowledge, believed that they did not possess the necessary photo identification."[32]

The researchers also found that Latinos in CD23 were substantially more likely than Anglos to cite the lack of an acceptable photo ID as a reason for non-voting and that this

---

[31] See, for example, Email from Edgardo Cortes, Commissioner, Division of Elections to Commonwealth Registrars, 14 August 2014, received by plaintiffs from subpoena to Alexandria County Board of Elections; Unsigned, undated memo to Edgardo Cortes, PLS0000195

[32] University of Houston, Hobby Center for Public Policy and Rice University, Baker Institute for Public Policy. "The Texas Voter ID Law and the 2014 Election: A Study of Texas's 23rd Congressional District," August 2015. quotation on p. 1, http://www.uh.edu/class/hcpp/_docs/voteridcd23.pdf.

relationship between race and the deterrent effect of the ID law was statistically significant. "Latino non-voters," the researchers concluded, "were significantly more likely than Anglo non-voters to strongly agree or agree that a lack of photo ID was a reason that they did not cast a ballot in the November 4 contest." The researchers also found that Latino non-voters were substantially more likely to report that they lacked any acceptable photo ID, but the sample size was too small to establish statistical significance. The number of African Americans in this sample drawn from a Hispanic majority district was too small to sustain any findings.[33]

The investigators also found that, by wide margins, the non-voters who cited a lack of acceptable ID as a reason for not voting preferred the Democratic candidate Pete Gallego over the Republican candidate Will Hurd in the tight CD23 congressional election. Non-voters who cited a lack of acceptable ID as a reason for non-voting preferred Gallego over Hurd by a margin of more than four to one, and those who cited a lack of acceptable ID as the principal reason for non-voting preferred Gallego by a margin of nearly six to one. The researchers concluded, "In sum, while the results of this survey do not allow us to conclude that Gallego would have been re-elected in the absence of the voter photo ID law, they do indicate that the law did have a disproportionate impact on his supporters, and therefore may have possibly cost him the election."[34]

## VI.   WAITING TIMES AT THE POLLS

Further evidence of the General Assembly's discriminatory intent in enacting 2013's strict photo voter ID law is provided by actions of Republican legislators in burying measures to alleviate waiting times at the polls. This decision-making by legislators is relevant to assessing intent because waiting times at polling places in Virginia and their disparate impact on African American voters has long been an issue in Virginia. Just prior to the presidential election of 2008, for example, the Virginia NAACP filed suit against the state alleging that it was unprepared to deal with the predicted large turnout at the upcoming election. The complaint sought such remedial measures as allocating more voting machines to precincts likely to experience long waiting lines, keeping polls open beyond the 7 p.m. deadline, and using paper ballots in some cases.[35] A Federal District Judge dismissed the suit after a brief hearing.[36]

As the NAACP predicted, the problem of long waiting lines emerged in the 2008 presidential election, with a disparate impact on African American voters. As indicated in Table 15 the average waiting time at the polls in Virginia according to the SPAE survey and the Cooperative Congressional Election Study (CCES) – another standard source for election analysis – was 28 minutes. That tied Virginia with the District of Columbia for the fourth longest average waiting times among all 49 U.S. jurisdictions that offered voting at the polls in

---

[33] *Ibid.*, p. 8-9.
[34] *Ibid.*, p. 12.
[35] *Virginia State Conference of the NAACP v. Kaine*, Case 3:08-cv-00692-RLW, 27 October 2008.
[36] Anita Kumar, "NAACP Suit Unsuccessful in Virginia," *Washington Post*, 4 November 2008, http://www.washingtonpost.com/wp-dyn/content/article/2008/11/03/AR2008110301184.html.

the presidential election (two states voted only by mail). As additionally indicated in Table 16 these long waiting times had a disparate impact on African American as compared to white voters. Thus, the legislature's failure to accept measures to alleviate lines at the polls exacerbated the disparate burden placed on African Americans and additionally impeded the opportunities for members of this minority group relative to whites to vote in elections.

Immediately after the next general presidential election in 2012, numerous reports emerged in the media that Virginia had again suffered from the problem of excessively long lines at the polls.  These reports were again confirmed by scientific surveys. As indicated in Table 15, the average waiting time at the polls in Virginia in 2012 was 25 minutes, leaving Virginia again tied (with South Carolina) for the fourth longest average waiting times in the nation. Once again, as indicated in Table 16, these long waiting times in 2012, as with 2008, had a disparate impact on African American as compared to white voters.

## TABLE 15
## MEAN WAITING TIMES AT THE POLLS, 2008 AND 2012 GENERAL ELECTIONS, BY STATE

| State | 2008 Mean Wait Time | 2008 Rank | State | 2012 Mean Wait Time | 2012 Rank |
|---|---|---|---|---|---|
| South Carolina | 56 | **49** | Florida | **39** | **49** |
| Georgia | 40 | **48** | District of Columbia | 37 | **48** |
| Florida | 31 | **47** | Maryland | 36 | **47** |
| District of Columbia | 28 | **45** | **Virginia** | 25 | **45** |
| **Virginia** | 28 | **45** | South Carolina | 25 | **45** |
| Maryland | 24 | **44** | Michigan | 19 | **44** |
| Indiana | 22 | **42** | Oklahoma | 17 | **43** |
| Oklahoma | 22 | **42** | Georgia | 16 | **41** |
| Arkansas | 21 | **40** | Louisiana | 16 | **41** |
| Alabama | 21 | **40** | Indiana | 13 | **37** |
| Michigan | 20 | **38** | Arkansas | 13 | **37** |
| Missouri | 20 | **38** | North Carolina | 13 | **37** |
| Ohio | 19 | **35** | Tennessee | 13 | **37** |
| Tennessee | 19 | **35** | Illinois | 12 | **34** |
| North Carolina | 19 | **35** | Montana | 12 | **34** |
| Louisiana | 16 | **34** | New York | 12 | **34** |
| Arizona | 15 | **33** | Kansas | 11 | **28** |
| Pennsylvania | 14 | **31** | Missouri | 11 | **28** |

42

| West Virginia | 14 | **31** | West Virginia | 11 | **28** |
|---|---|---|---|---|---|
| Utah | 13 | **29** | Texas | 11 | **28** |
| Texas | 13 | **29** | Rhode Island | 11 | **28** |
| Illinois | 12 | **25** | New Hampshire | 11 | **28** |
| Kentucky | 12 | **25** | Alabama | 10 | **24** |
| New Mexico | 12 | **25** | Ohio | 10 | **24** |
| Delaware | 12 | **25** | Utah | 10 | **24** |
| California | 11 | **23** | North Dakota | 10 | **24** |
| Mississippi | 11 | **23** | Pennsylvania | 8 | **17** |
| Kansas | 10 | **18** | Arizona | 8 | **17** |
| Nevada | 10 | **18** | Nevada | 8 | **17** |
| Colorado | 10 | **18** | Colorado | 8 | **17** |
| Connecticut | 10 | **18** | Kentucky | 8 | **17** |
| Nebraska | 10 | **18** | Idaho | 8 | **17** |
| New York | 9 | **16** | Wisconsin | 8 | **17** |
| Minnesota | 9 | **16** | Mississippi | 7 | **12** |
| Wisconsin | 8 | **15** | Connecticut | 7 | **12** |
| New Jersey | 7 | **14** | California | 7 | **12** |
| Montana | 6 | **10** | Massachusetts | 7 | **12** |
| Idaho | 6 | **10** | Hawaii | 7 | **12** |
| New Hampshire | 6 | **10** | New Mexico | 6 | **9** |
| Massachusetts | 6 | **10** | Minnesota | 6 | **9** |
| Rhode Island | 5 | **4** | Iowa | 6 | **9** |
| North Dakota | 5 | **4** | New Jersey | 5 | **8** |
| Hawaii | 5 | **4** | Nebraska | 4 | **4** |
| Iowa | 5 | **4** | Delaware | 4 | **4** |
| Wyoming | 5 | **4** | Wyoming | 4 | **4** |
| Alaska | 5 | **4** | Maine | 4 | **4** |
| Maine | 4 | **2** | Alaska | 3 | **2** |
| South Dakota | 4 | **2** | South Dakota | 3 | **2** |
| Vermont | 2 | **1** | Vermont | 2 | **1** |
|  |  |  |  |  |  |
| Source: Charles Stewart, III and Steven Ansolabehere. "Waiting in Line to Vote," Caltech/MIT Voting Technology Project, p. 21, http://vote.caltech.edu/sites/default/files/WP%20114.pdf. CCES available at http://projects.iq.harvard.edu/cces/home and SPAE at https://dataverse.harvard.edu/dataverse/SPAE. | | | | | |

**TABLE 16**

**WAITING TIMES AT POLLS BY RACE, COOPERATIVE CONGRESSIONAL ELECTION STUDY (CCES), 2008 AND 2012, VIRGINIA**

| 2008 General Presidential Election | | | |
|---|---|---|---|
| **Total White Voters At Polls** | **White Voters Waiting 31 Mins+** | **White % Waiting 31 Mins+** | **Difference With Whites** |
| 432 | 116 | 26.9% | NA |
| **Total Black Voters At Polls** | **Black Voters Waiting 31 Mins+** | **Black % Waiting 31 Mins+** | **Difference With Whites** |
| 78 | 31 | 39.7% | **+12.8 Percentage Points \*** |
| 2012 General Presidential Election | | | |
| **Total White Voters At Polls** | **White Voters Waiting 31 Mins+** | **White % Waiting 31 Mins+** | **Difference With Whites** |
| 821 | 221 | 26.9% | NA |
| Total Black Voters At Polls | Black Voters Waiting 31 Mins+ | Black % Waiting 31 Mins+ | Difference With Whites |
| 126 | 46 | 36.5% | **+9.6 Percentage Points \*** |
| 2008 & 2012 General Presidential Elections Combined | | | |
| **Total White Voters At Polls** | **White Voters Waiting 31 Mins+** | **White % Waiting 31 Mins+** | **Difference With Whites** |
| 1,253 | 337 | 26.9% | NA |
| **Total Black Voters At Polls** | **Black Voters Waiting 31 Mins+** | **Black % Waiting 31 Mins+** | **Difference With Whites** |
| 204 | 77 | 37.7% | **+10.8 Percentage Points \*\*** |
| * Statistically Significant at the .05 level, ** Statistically Significant at the .01 level. | | | |

As with results for driver's license and passport possession, the disparate impact of excessive waiting times at the polls is directly based on racial differences, not simply on party differences (Republican vs. Democratic voters). As indicated in Table 17, when holding party constant by looking only at CCES respondents who voted for Barack Obama in 2008, the racial differences waiting times show the same pattern as reported in Table 16 for all registered voters.

## TABLE 17

## WAITING TIMES AT POLLS BY RACE, OBAMA VOTERS ONLY, COOPERATIVE CONGRESSIONAL ELECTION STUDY (CCES), 2008 AND 2012, VIRGINIA

| 2008 General Presidential Election | | | |
|---|---|---|---|
| Total White Obama Voters At Polls | White Obama Voters Waiting 31 Mins+ | White % Obama Voters Waiting 31 Mins+ | Difference With Whites |
| 170 | 58 | 34.1% | NA |
| Total Black Obama Voters At Polls | Black Obama Voters Waiting 31 Mins+ | Black % Obama Voters Waiting 31 Mins+ | Difference With Whites |
| 72 | 29 | 40.3% | **+6.2 Percentage Points *** |
| 2012 General Presidential Election | | | |
| Total White Voters At Polls | White Obama Voters Waiting 31 Mins+ | White % Waiting 31 Mins+ | Difference With Whites |
| 358 | 91 | 25.4% | NA |
| Total Black Voters At Polls | Black Voters Waiting 31 Mins+ | Black % Waiting 31 Mins+ | Difference With Whites |
| 116 | 41 | 35.3% | **+9.9 Percentage Points **** |
| 2008 & 2012 General Presidential Elections Combined | | | |
| Total White Obama Voters At Polls | White Obama Voters Waiting 31 Mins+ | White % Waiting 31 Mins+ | Difference With Whites |
| 528 | 149 | 28.2% | NA |
| Total Black Obama Voters At Polls | Black Obama Voters Waiting 31 Mins+ | Black % Waiting 31 Mins+ | Difference With Whites |
| 188 | 70 | 37.2% | **+9.0 Percentage Points **** |
| * Not Statistically Significant, ** Statistically Significant at .05 level. | | | |

45

Long waiting times at the polls have serious consequences both for voters and for the political system. First, excessive waiting times can discourage some persons from voting. One academic study, for example, found through a direct observation field study a positive correlation between long waiting times and persons abandoning their efforts to vote. In 2008, researchers Douglas M. Spence and Zachary S. Markovits dispatched 120 observers to collect data on waiting times and the responses of voters on line at 30 polling places across three counties in the California presidential primary. They published the results of the Election Law Journal. The observers at the three polling places witnessed 225 persons who abandoned the line and left without voting. This amounted to 1.89 percent of their sample of 11,858 persons showing up at the polls. This nearly 2 percent attrition rate of voters, moreover, occurred despite the waiting times at the polls for this primary being quite short, especially as compared to wait times regularly experienced by voters in general elections in Virginia. The researchers report that less than 1 percent of observed voters waited in line for more than 10 minutes.[37] In contrast, Table 16 demonstrates that in the 2008 general election, 26.6 percent of white voters in Virginia and 39.7 of black voters waited *31 minutes or more at the polls*. Similarly, Table 16 demonstrates that, in the 2012 general election, 26.9 percent of white voters in Virginia and 37.7 of black voters waited 31 minutes or more at the polls.

Survey data also establishes that long waiting times in Virginia deterred people from voting. Although the samples are very small, perspective on this deterrence can be gained by combining survey results from the general elections of 2008 and 2012, and from the CCES and SPAE surveys. According to these surveys, 8.2 percent of Virginians who were eligible to but did not vote cited long lines at the polls as a major or minor reason for not voting (SPAE), or as the main or second reason for not voting (CCES). These percentages indicate that, in fact, very large numbers of registered voters in Virginia have been deterred by long lines at the polls, given the substantial number of registered voters who did not vote in 2008 (1,201,802) and who did not vote in 2012 (1,531,987).

Long waiting times at the polls also undermine confidence in the electoral system. For the first time in 2012 the SPAE asked voters how confident they were that votes in their state were counted as intended. Only 12.5 percent of voters who waited in line for an hour or more were very confident of this proposition. This compares to 44.6 percent of all other voters who said they were very confident of this proposition. Thus, voters who waited in line for less than an hour were 32.1 percentage points and 355 percent more likely than those who waited an hour or more to be very confident of the integrity of the ballot in their state. This difference is statistically significant at the standard .05 level in social science.

Ironically, the same Republican majority that adopted a strict voter photo ID law ostensibly to promote voter confidence in the electoral system categorically resisted legislation introduced to reduce lines at the polls, even though there is a statistically significant correlation in Virginia between long lines and confidence in the state's electoral system. In contrast, research shows *no* relationship between voter ID laws and voter confidence.

---

[37] Douglas M Spencer and Zachary S Markovits, "Long Lines at Polling Stations? Observations from an Election Day Field Study," *Election Law Journal* 9, no. 1 (2010).

Examples of how the Republican majority buried measures aimed at reducing long lines follow below:

- On January 1, 2013, the Republican-controlled Senate Committee on Privileges and Elections killed legislation that would extend the close of polling hours in Virginia from 7 p.m. to 8 p.m.[38] This bill would have kept the polls open for 14 hours, following the lead of several other states including Connecticut, Iowa, Louisiana, and New Jersey. To compare Virginia's average wait time with the wait times in those states, Virginia had an average wait time of 28 minutes in 2008 and 25 minutes in 2012; Connecticut had average wait times of 10 minutes and 7 minutes for the two elections; Iowa had average wait times of 5 minutes and 6 minutes, respectively; Louisiana had average wait times of 16 minutes for both elections; and New Jersey had average wait times of 7 minutes and 5 minutes. Senator Obenshain, the lead sponsor of the voter identification bill, was the Chair of this Committee at this time. Together with the seven other Republican members of the Committee he voted, on strict party lines, to defeat the proposal in Committee.[39]

- Also on January 1, 2013, the same Committee killed another bill that would have required "each electoral board to develop a plan to ensure that no voter waits for more than one hour to cast his vote on election day."[40] As demonstrated by the analysis above, an hour is an exceedingly long time to wait in line to cast one's ballot. Even so, the Republican-controlled Committee was unwilling to even let such a matter be considered by the Chamber as a whole. Once again, the proposal was killed by a vote in which Senator Obenshain, joined by only Republican members, acted against it.[41]

- On January 18, 2013, the same Committee killed an omnibus bill designed to improve access to the polls. The bill included extended poll hours, early voting, and an extended deadline for registration prior to an election. It also would have established a pilot program to allow members of the military on active duty and their spouses, citizens residing outside of the United States, and military voters with disabilities or injuries to vote

---

[38] General Assembly of Virginia," SB 964 Elections; extension of polling hours from 7 p.m. to 8 p.m.," http://leg1.state.va.us/cgi-bin/legp504.exe?131+sum+SB964.

[39] General Assembly of Virginia, http://lis.virginia.gov/cgi-bin/legp604.exe?131+vot+S08V0031+SB0964.

[40] General Assembly of Virginia, "SB 1150 Elections; minimizing voting lines," http://leg1.state.va.us/cgi-bin/legp504.exe?131+ful+SB1150+pdf.

[41] General Assembly of Virginia, https://lis.virginia.gov/cgi-bin/legp604.exe?131+vot+S08V0035+SB1150.  The vote in Committee split almost precisely on party lines, with seven Republican voting in favor of passing the bill by indefinitely, killing the bill, and four Democrats, joined by a single Republican, voting against.  *See id.*

absentee by secure electronic means or other new technologies. It would have required the State Board of Elections to implement a system to accept absentee ballot applications electronically, to create a written plan addressing the continuity of operations of elections in the event of an emergency, and to perform periodic reviews of the conduct of elections and, based on the findings of such reviews, develop a written plan for minimizing the amount of time a voter has to wait to cast his vote on election day.[42]   Again, Senator Obenshain and his seven Republican colleagues voted to pass the proposal by indefinitely, killing the legislation.[43]

- On February 3, 2015, the Republican controlled Senate Committee on Privileges and Elections killed a bill that would have authorized Virginia's registered voters to vote absentee in person without an excuse. The bill would have established minimum times for casting an absentee-in-person ballot and would have included an option for expanding locations beyond election offices.[44] Twenty-seven states plus the District of Columbia currently offer no-excuse absentee voting.[45]   Senator Obenshain remained a member of the Committee and voted, together with his seven Republican colleagues, to defeat the proposed legislation.[46] On January 20, 2015 a House Subcommittee of General Government and Capital Outlay killed a bill that would have extended the deadline for applying other than in person to vote absentee from the seventh day before the election to the eleventh day before the election.[47]

In short, the Republican majority—often led by the strict voter identification law's chief sponsor and advocate—consistently blocked every measure to ease long lines at the polls, despite available evidence from well-established surveys and numerous press reports that Virginia was among the worst states in the nation for waiting times at the polls and that such lines disproportionately burdened African American voters. The legislative majority continued this resistance despite additional evidence that Virginia generally ranked near the bottom of the states in overall accessibility to voting.

---

[42] General Assembly of Virginia, "SB 1062 Elections; reforms to improve voter access to polls," http://lis.virginia.gov/cgi-bin/legp604.exe?131+sum+SB1062.

[43] General Assembly of Virginia, http://lis.virginia.gov/cgi-bin/legp604.exe?131+vot+S08V0034+SB1062.

[44] General Assembly of Virginia, "SB 677 Absentee voting; persons eligible to vote absentee in person," https://lis.virginia.gov/cgi-bin/legp604.exe?151+sum+SB677.

[45] National Conference of State Legislatures, Absentee and Early Voting, http://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx#no_excuse.

[46] General Assembly of Virginia, http://lis.virginia.gov/cgi-bin/legp604.exe?151+vot+S08V0076+SB0677.

[47] General Assembly of Virginia, "SB 747 Absentee voting; application for ballot," https://lis.virginia.gov/cgi-bin/legp604.exe?151+sum+SB747.

48

## VII.   PROCEDURAL AND SUBSTANTIVE DEVIATIONS

Given majority Republican control of the Virginia General Assembly since 2012 and control over the governorship from 2010 through 2013, formal procedural deviations were not necessary to enact a strict photo voter ID law or to block measures to alleviate extreme waiting times at the polls in Virginia. Nonetheless, it is highly unusual for a state legislature to enact a voter photo identification law just months after it had enacted a previous and quite different identification law. Examination of the enactment process in other states indicates no comparable deviation from common practice with such a quick turnabout.   In candor, Republican Lieutenant Governor Bill Bolling, who cast an important tie-breaking vote in the State senate in enacting the 2013 voter ID bill, said that while he believed HB1256 protected election integrity, he was also concerned that "we just changed Virginia's voter ID requirements in 2012, and we cannot change these requirements every year.  I am concerned that this would create unnecessary confusion among voters about what forms of ID are required at the polls."[48]

In addition, there was very little debate on the floor of either the state house or state senate on the 2013 voter photo ID bill, with Republicans, knowing full well that they had the votes to enact the legislation, letting Democrats talk against the bill. The measures proposed for alleviating excessive waiting times at the polls never came up for debate at all on the floor of either chamber given that they were all killed in committees controlled by the Republican majority.

Substantively the General Assembly adopted a strict voter photo ID measure without any evidence that would indicate that the voter ID law already in place was vulnerable to voter fraud or causing voters to have diminished confidence in Virginia's elections process.   Indeed, the Republican majority enacted the law despite widely available evidence (even a study prepared by a Republican organization, as detailed above) that there is no problem with voter impersonation at the polls. And they enacted the law even though the relevant research shows that voter ID has no effect on confidence in the electoral process.[49] At the same time, the Republican majority—often acting through a Committee chaired by the chief sponsor and proponent of the strict voter identification law—blocked all proposed measures to ease lines at the polls, despite evidence from both the 2008 and 2012 elections demonstrating a major problem with excessive waiting times. The majority blocked these measures even though, unlike voter ID laws, excessive wait times at the polls *do* diminish voter confidence in the electoral system. What knits these two sets of decision together is that both have the effect of imposing a disparate burden on voting by African Americans, which redounds to the political benefit of the Republicans responsible for the passage of the voter ID laws and the failure of

---

[48] Morgan Whitaker, Republicans Pass New Voter ID Restriction, MSNBC, 10 February 2013, http://www.msnbc.com/politicsnation/virginia-republicans-pass-new-voter-id-restri.
[49] Stephen Ansolabehere and Nathaniel Persily, "Vote Fraud in The Eye Of The Beholder: The Role of Public Opinion in The Challenge to Voter Identification Requirements," *Harvard Law Review* 121 (2008). p. 1760, http://www.harvardlawreview.org/wp-content/uploads/pdfs/ansolabehere_persily.pdf.

the other measures designed to alleviate Virginia's documented historical problem with long wait times at the polls.

Moreover, Virginia took these actions to restrict access to voting even though another study available at the time concluded that the state ranked near the bottom nationwide in access to voting. According to a study by the Center for American Progress, reported in Table 18, Virginia received a grade of F for access to the ballot and ranked tied for 44th among the 50 states and the District of Columbia.

## TABLE 18
## STATE RANKINGS, ACCESS TO THE BALLOT

| State | Ranking | Grade |
|---|---|---|
| Mississippi | 51 | F |
| Tennessee | 50 | F |
| Alabama | 48 | F |
| Michigan | 48 | F |
| North Carolina | 47 | F |
| **Virginia** | 44 | F |
| Pennsylvania | 44 | F |
| Texas | 44 | F |
| Missouri | 43 | F |
| Arkansas | 41 | F |
| Kentucky | 41 | F |
| South Carolina | 40 | F |
| Arizona | 39 | F |
| Georgia | 37 | F |
| Ohio | 37 | F |
| Kansas | 36 | D |
| New York | 34 | D |
| South Dakota | 34 | D |
| Indiana | 33 | D |
| Rhode Island | 32 | D |
| Alaska | 31 | D |
| Oklahoma | 30 | D+ |
| New Jersey | 29 | D+ |
| Louisiana | 28 | D+ |
| North Dakota | 27 | D+ |
| New Hampshire | 26 | D+ |
| Montana | 25 | C |
| Massachusetts | 24 | C |
| Connecticut | 23 | C |

| Idaho | 22 | C |
|---|---|---|
| West Virginia | 21 | C |
| Nevada | 20 | C |
| Wisconsin | 19 | C |
| Illinois | 18 | C |
| Nebraska | 17 | C |
| New Mexico | 16 | C+ |
| Washington | 15 | C+ |
| Vermont | 14 | C+ |
| Wyoming | 13 | B |
| Iowa | 12 | B |
| Florida | 11 | B |
| Colorado | 10 | B |
| California | 9 | B |
| Delaware | 8 | B |
| Maine | 7 | B |
| Maryland | 6 | B+ |
| District of Columbia | 5 | A |
| Utah | 4 | A |
| Hawaii | 3 | A |
| Minnesota | 2 | A |
| Oregon | 1 | A |
| Source: Lauren Harmon, et al., "The Health of State Democracies, "Center for American Progress Fund, July 2015, https://cdn.americanprogress.org/wp-content/uploads/2015/07/HSD-report-FINAL.pdf. | | |

## VIII.   CONTEMPORANEOUS VIEWPOINTS BY DECISION-MAKERS AND THEIR BACKERS

As recognized by the Supreme Court in the *Arlington Heights* case, unambiguous statements of discriminatory intent are rare. However, Republican consultant Scott Tranter provided such a statement in reference to voter photo ID laws and Virginia's long waiting times at the polls. Tranter is one of a few named partners in the Republican consulting firm of Optimus, based in Washington, D.C. The firm advertises on its website that it has worked for the Republican Senatorial Campaign Committee, the Republican National Committee, the Marco Rubio for President Campaign, and the National Republican Congressional Committee.[50] Optimus also prepared a strategic plan in Virginia for Republican Senatorial candidate Ed Gillespie in 2014.[51] The firm specializes in the sophisticated analysis of electoral data so its principals are in an excellent position to know what politically benefits Republican candidates and why. In a forum sponsored by the Pew Center on the States on 10 December 2012, Tranter said that as a campaign professional he knows that Republicans gain political advantage from both voter ID laws and long lines at the polls: "A lot of us are campaign professionals and we want to do everything we can to help our sides. Sometimes we think that's voter ID, sometimes we think that's longer lines, whatever it may be."[52]

Just a few months after making these comments, Tranter received a memorandum from Foursquare Report on the results of their "I Voted" national project for 2012 that the author billed "as the most comprehensive data yet collected on when people vote on Election Day across the country."[53] The memo confirmed what backers of measures to improve voter access in Virginia had been saying about alleviating long waiting times at the polls. After analyzing their comprehensive data, Foursquare Report reached the following conclusions:

> "These numbers speak to the need to lengthen Election Day voting hours to at least 14 hours per day, or 6 a.m. to 8 p.m. - 9 p.m., providing ample time on both sides of the work day. Because so much voting is concentrated in these few hours, these numbers show that an additional hour tacked on at the beginning or end of each day can make a significant difference, extending the number of voters each polling place can comfortably process by around 10% (equivalent to the peak percentage of votes cast in one hour in most states). More absentee and early voting options would also help lessen the crush of Election Day voters."[54]

Nonetheless, as Tranter explained from the perspective of a Republican consultant, easing waiting times at the polls would not be in the interest of Republicans.

---

[50] "Who We've Worked With," http://Optimus.com/.

[51] "Battleground Virginia: Handicapping the '14 Senate Race," http://Optimus.com/resources/battleground-virginia-handicapping-the-14-senate-race/.

[52] Video available at https://www.youtube.com/watch?v=-4KUj_hB2lA.

[53] Patrick Ruffini to Scott Tranter, email, 14 March 2013, obtained by plaintiffs from subpoena to Non-Parties Optimus Consulting and Scott Tranter.

[54] *Ibid.*, enclosure, Foursquare "I Voted" Report, p. 8.

Such strategic thinking about limiting the vote is not new. In 1980, during the campaign to elect Ronald Reagan, prominent Republican strategist Paul Weyrich of Fairfax, Virginia, a founder of the contemporary conservative movement, criticized what he called the "goo-goo syndrome – good government. They want everybody to vote." He said, "I don't want everybody to vote.  Elections are not won by a majority of people... as a matter of fact our leverage in the elections quite candidly goes up as the voting populace goes down."[55]

### A.        The Common Sense Argument

Proponents of SB1256 point to it as common sense legislation that brings identification for voting in line with photo ID requirements for such activities receiving social security, Medicare or Medicaid, or even filling a prescription. According to Delegate Miller, "And if they don't have an ID to vote, let's look at some of the other things that those Virginians also can't do. They can't receive Medicare. They can't receive Medicaid. They can't receive Social Security. They can't even get prescriptions if they don't have a valid photo ID, Mr. Speaker."[56]

This claim does not withstand scrutiny. Even though voting, unlike these other activities, is a fundamental right, the 2013 strict photo voter ID law in Virginia actually makes it far more difficult to vote than to receive these government benefits or obtain a prescription. The Social Security Administration indicates that an applicant for Social Security/Medicare need not submit a photo identification in order to receive benefits. The following documents are needed, none of which require at photograph:

- Your Social Security card (or a record of your number);
- Your original birth certificate or other proof of birth (You may also submit a copy of your birth certificate certified by the issuing agency);
- Proof of U.S. citizenship or lawful alien status if you were not born in the U.S. We can accept most documents that show you were born in the U.S.
- A copy of your U.S. military service paper(s) (e.g., DD-214 - Certificate of Release or Discharge from Active Duty) if you had military service before 1968; and
- A copy of your W-2 form(s) and/or self-employment tax return for last year.[57]

Similarly, to apply for Medicaid in Virginia it is not necessary to establish one's identity with a photo ID that would be approved for voting in Virginia – or any photo ID at all,

---

[55] Video available at, https://www.youtube.com/watch?v=QFIYS8xb-QY. On the importance of Weyrich, see American National Biography Online, http://www.anb.org/articles/07/07-00849.html.
[56] Meeting, Virginia House of Delegates Transcript, 20 February 2013, p. 11, l. 19-22, p. 12, l. 1-3.
[57] Social Security, Official Social Security Website, "Retirement Planner: What Documents Will You Need When You Apply?" https://www.ssa.gov/planners/retire/applying5.html.

for that matter. As indicated by the Virginia Department of Social Services, an applicant for Medicaid may establish identity with photo identification that would not qualify for voting under Virginia's 2013 photo voter ID law. These documents include an expired U.S. Passport, with no limitation on the time of expiration, or a driver's license issued not only by Virginia, but by any other state or U.S. territory as well. In addition, an applicant for Medicaid may satisfy identification requirements with an "[i]dentification card issued by federal, state, or local government with the same information included on driver's licenses." There is no stipulation that this ID card must include a photo.[58]

Medicaid in Virginia also includes very broad exceptions to the requirements for proof of identity or citizenship:

> "Individuals who receive Social Security Disability Insurance benefits, current recipients of Supplemental Security Income (SSI), individuals who have Medicare, individuals who were born to mothers who were enrolled in Medicaid or Children's Health Insurance Program (CHIP) on the date the individual was born, and children in foster care or who are receiving Title IV-E Adoption Assistance payments *do not have to provide proof of citizenship or identity.*"[59]

Finally, it is not necessary to present a photo ID in order to obtain a prescription in Virginia. Under Virginia law, for numerous prescription drugs listed in "Schedules III through V, a pharmacist *may* require proof of identity" (emphasis added, form of proof unspecified). The provision does not say (as Virginia's strict voter photo ID law essentially does) either that the pharmacist must require proof of identity before he or she may fulfill the prescription, or that only photo IDs would satisfy that requirement. For other drugs "listed on Schedule II," the pharmacist "*shall* require proof of identity." (emphasis added). However, the proof requirement is waived if the person seeking the prescription "is known to the pharmacist or his agent" – mirroring a provision of Virginia's voter identification law that did not survive the General Assembly's amendments in 2013. Moreover, the statute refers to *any* government issued photo ID to satisfy the Schedule II requirement, and does not preclude including expired IDs or out of state IDs.[60]

---

[58] Virginia Department of Social Services January 2011, Proof of U.S. Citizenship and Identity for Medicaid, http://www.dss.virginia.gov/files/division/bp/medical_assistance/intro_page/more_facts/proof_ of_citizenship__01-25-11.pdf. Applicants must also prove US citizenship, which can be done through a birth certification and other forms of non-photo IDs.  See also Virginia's response to a survey which indicates that the state does not require photo identification to obtain Medicaid benefits: Kansas Health Policy Authority, Report of the Potential Impact of a Medicaid Photo ID Requirement, 1 January 2007, survey results on p.5, http://www.kdheks.gov/hcf/legislative/download/2007Testimony/12-29-06KHPAPotentialImpactMedicaidPhotoID-Final.pdf.

[59] *Ibid*. (emphasis added).

[60] Annotated Code of Virginia, 54.1, Chapter 34, Article 1, § 54.1-3420.1. Identification required for filling prescriptions.

B.      **Justification for the Rapid Transition from a Non-Photo Voter ID to a
        Photo Voter ID Law**

As documented above, well under a year after the enactment of Virginia's 2012 non-photo ID law, the Republican controlled General Assembly and the Republican governor enacted a new strict photo voter ID law. Such a rapid transition is unprecedented in any state in the nation. Furthermore, this shift occurred *after* Republican sponsors of the 2012 law had affirmed that this 2012 law protected the integrity of the ballot and ensured that no qualified voter would be disenfranchised.[61]

The only specific justification offered for this shift by backers of the 2013 law was reference to a video which allegedly called into question the security of a specific form of non-photo IDs – i.e., utility bills. According to the strict photo voter ID bill's main sponsor, Senator Obenshain, "One of the most highly publicized, of course, was a video that was recorded in Northern Virginia that raised serious questions about some of the forms of identification, the adequacy of some of the forms of identification that we required or permitted to be utilized last year in passing our voter identification legislation."[62]

In fact, the cited video did nothing of the kind. This was an entrapment video in which a Democratic campaigner Patrick Moran was induced by someone posing as an Obama supporter into loose and foolish speculation about the possibility of forging one specific form of ID – utility bills. However, Moran is not an expert in document or ballot security and provided no new information about utility bills that would not have been available to the General Assembly in 2012. Moran also noted how difficult it would be to forge other non-photo IDs under the 2012 law, noting specifically bank statements. He did not even speculate about government checks or paychecks. Thus, at most this video might provide some justification for questioning the use of utility bills, but not any other form of non-photo ID.[63]

Even this limited conclusion is highly implausible. Moran was not reporting any known instances of voter fraud and no voter fraud (or any other illegal activity) resulted from this conversation, although Moran did promptly resign his position. The full context of the discussion also demonstrates how difficult, if not impossible, it is to engineer voter impersonation at the polls, even using utility bills. You would first have to find an operative willing to risk felony prosecution and conviction for forgery. You would have to make sure the forgery is bullet-proof and that you have the funds to pay for such a forgery operation for each voter targeted for impersonation. You would then have to find targeted registered voters for impersonation, with information about the name and address and the proper utility. You would then have to make sure the impersonated voters were not voting on their own, an essentially impossible task since you could not ask them directly without alerting them to the scheme. You would then have to find numerous operatives willing to risk felony prosecution and conviction

---

[61] *See* discussion *infra*, Section VIII.D., pps. 56-57.
[62] Meeting, Virginia Senate, Transcript, 5 February 2013, p. 155, l. 9-15.
[63] Video available at http://www.theguardian.com/world/video/2012/oct/25/voter-fraud-democratic-congressmans-son-patrick-moran-video.

for voter fraud on the thin hope that the voter being impersonated has not voted and is not recognizable to any election official. This latter point is not insignificant. According to the 2008 SPAE reports – available at the time of the adoption of the 2013 photo voter ID law – 13.1 percent of respondents in Virginia (between 1 out of 7 and 1 out of 8 voters) said that they knew the person who checked them in at the polls.[64] As Mr. Moran noted in the taped conversation, the individual would be better off spending his time, effort, and money on getting out the vote efforts rather than trying to concoct an implausible voter fraud scheme.

For similar reasons, in a December 2006 public report available to the General Assembly at the time it enacted the voter photo ID law, the United States Election Commission did not find that voter impersonation at the polls ranked among the acts subject to significant voter fraud. Among authorities in the field, the Commission found, "Many asserted that impersonation of voters is probably the least frequent type of fraud because it is the most likely type of fraud to be discovered, there are stiff penalties associated with this type of fraud, and it is an inefficient method of influencing an election."[65]

### C.      Allegations of Voter Impersonation

When challenged to provide examples of voter impersonation at the polls, backers of the 2013 voter photo ID law failed to cite any documented examples of this type of fraud for any election at any time in Virginia. Instead they cited only a very few unproven and uncheckable anecdotes.

When asked for examples of voter impersonation, Delegate Bell said, "So I asked my local registrar – excuse me, local electoral board. And here is what she said. I said, 'Do you have an example?' She said, 'Yes.' She said, 'In the last election that a young man who had voted earlier in the day with his voter card, the same man showed up a little later in the day, was challenged by one of the election officials as somebody who had already voted and off he ran.'"[66] Delegate Bell additionally said, "A lady came and testified on my bill, which is not the bill before us, but it's a photo ID bill, that she discovered that she had voted when she was out of the state and had not voted. That is different than someone who presents at the polls and votes, but I think they both accomplish the same end."[67]

Not only are these anecdotes unsubstantiated and unprovable, but the first illustrates the implausibility of voter impersonation efforts, given the grave risk of being recognized as a fraudster at the polls. Nor is it clear that the first anecdote even purportedly involved voter impersonation.

---

[64] *Ibid.*

[65] U.S. Election Assistance Commission, *Election Crimes: An Initial Review and Recommendations for Additional Study*, December 2006, p. 9, http://www.eac.gov/assets/1/workflow_staging/Page/57.PDF.

[66] Meeting, Virginia House of Delegates, Transcript, 20 February 2013, p. 19, l. 11-20.

[67] *Ibid.*, p. 23, l. 15-22.

The RNLA survey, moreover, discussed above and available at the time of adoption of SB1256, failed to uncover a single example of voter impersonation in Virginia, even though the survey covered a period when photo IDs were not required to vote and a voter without any form of acceptable ID could vote with a statement of identity (no forgery required). Again, examining some 19 states that did not require *any form of identification, photo or non-photo*, to vote during the period investigated, the RNLA study identified some 4 allegations of voter impersonation out of many hundreds of millions of ballots cast. The News 21 study discussed above found no examples of voter impersonation in Virginia and confirmed the findings of the 2011 RNLA study, likewise uncovering only a handful of voter impersonation allegations among the hundreds of millions of ballots cast in the many states that required neither a photo nor a non-photo ID for voting at the polls.[68]

### D.    Election Integrity

Absent documented examples of voter impersonation at the polls, backers of SB1256 argued that a voter photo ID bill was needed to increase voter confidence in the integrity of the ballot in Virginia. According to Republican backer Delegate Miller, "We are trying to uphold the integrity of the system by making sure that those who vote are allowed to vote and that people are not cheating the system. That is a simple concept."[69] Similarly citing the report of the Carter-Baker Commission on Federal Election Reform (see below), Senator Obenshain recommended adoption of SB 1256 "in order to raise American confidence, public confidence in the integrity of our election system."[70]

Yet, just a few months before, the Republican backers of the 2012 non-photo ID bill had made precisely this *same* claim, while at the same time explicitly affirming that the law did not disenfranchise any legitimate voter given the extensive list of acceptable photo and non-photo IDs. For example, Delegate Cole said of the 2012 bill, "It treats all people equally under the eyes of the law and is intended to ensure the integrity of the voting process and will not deny anyone their constitutional right to vote."[71] Similarly, Delegate Hugo said, "What we are attempting to do is to protect the integrity of the ballot, to protect the integrity of the vote. We are not trying to disenfranchise anybody. We just want to make sure every proper vote is counted."[72]

In its submission to the U.S. Department of Justice for preclearance of the 2012 bill, the Attorney General's office likewise affirmed that the legislation was adopted "in an effort to increase the integrity and reliability of the electoral process." The submission further affirmed that, "The list of acceptable identification is expanded by this change in the law to make it easier for eligible voters to comply with Virginia's existing identification requirement. Another

---

[68]  Natasha Khan and Corbin Carson, "Comprehensive Database Of U.S. Voter Fraud Uncovers No Evidence That Photo ID Is Needed," News21, 12 August 2012, http://votingrights.news21.com/article/election-fraud/; Election Fraud Database: Virginia, http://votingrights.news21.com/interactive/election-fraud-database/.

[69] Meeting, Virginia House of Delegates, Transcript, 20 February 2013, p. 11 l. 8-13.

[70] Meeting, Virginia Senate, Transcript, 5 February 2013, p. 157, l.18-20.

[71] Meeting, Virginia House of Delegates Transcript, 31 January 2012, p. 8, l. 4-8.

[72] *Ibid*., p. 19, l. 17-22.

purpose of the legislation is to synchronize Virginia identification requirements with federal HAVA [Help American Vote Act] identification requirements."[73]

In August 2012, after the Justice Department precleared the 2012 law and just five months prior to the introduction of SB 1256 in the Virginia General Assembly Governor McDonnell praised the precleared law for "Protecting against voter fraud and making sure our elections are secure are critical for confidence in our democracy. The legislation I signed into law is a practical and reasonable step to make our elections more secure while also ensuring access to the ballot box for all qualified voters."[74]

Backers of the 2013 photo voter ID law also failed to show a relationship between the enactment of such laws and public confidence in ballot integrity. To the contrary, a study by then MIT professor Stephen Ansolabehere and Columbia University professor Nathaniel Persily – available at the time of enactment of SB1256 – found that there was no relationship between the adoption of stricter voter ID laws and public beliefs about the existence of fraud in the election system. The two analysts found that,

> "The use of photo identification requirements bears little correlation to the public's beliefs about the incidence of fraud. The possible relation of such beliefs to participation appears even more tenuous. This lack of empirical support leads us to conclude that, at least in the context of current American election practices and procedures, public perceptions do not provide a firm justification for voter identification laws."[75]

### E.    The Carter-Baker Commission: Access to the Vote

As noted earlier, in support of SB1256, Senator Obenshain cited the recommendation of the Carter-Baker Commission on Electoral Reform for photo identification.[76] Although the Carter-Baker Commission on Federal Election Reform does recommend the use of certain forms of photo identification for voting, it notes, that "each state would also decide whether to require voters to present an ID at the polls."[77] The Commission includes a number of recommendations for "expanding access to elections" as well. It considered reforms to achieve universal registration and other measures for expanding access an essential complement to a photo ID requirement. Such reforms are not included in SB1256 or other measures other

---

[73] Commonwealth of Virginia's Submission for Chapter 839 of 2012 Acts of Assembly for Preclearance, p. 1, SKM 754e15111911571.pdf.

[74] Office of Governor Bob McDonnell, "Statement on Preclearance of Virginia's Voter ID Law by the Department of Justice, 20 August 2012, full text available at, http://www.davidramadan.com/statement-of-governor-bob-mcdonnell-on-preclearance-of-virginias-voter-id-law-by-the-u-s-department-of-justice/.

[75] Stephen Ansolabehere and Nathaniel Persily, "Vote Fraud in The Eye Of The Beholder: The Role of Public Opinion in The Challenge to Voter Identification Requirements," *Harvard Law Review* 121 (2008). p. 1760, http://www.harvardlawreview.org/wp-content/uploads/pdfs/ansolabehere_persily.pdf.

[76] Meeting, Virginia Senate, Transcript, 5 February 2013, p. 157, l.18-20.

[77] Commission on Federal Election Reform, *Final Commission Report: Building Confidence in US Elections*, p. 19, http://www.eac.gov/assets/1/AssetManager/Exhibit%20M.PDF.

measured enacted by General Assembly. The Commission report notes, "The Commission's proposals for a new electoral system contain elements to assure the quality of the list and the integrity of the ballot. But to move beyond the debate between integrity and access, specific and important steps need to be taken to assure and improve access to voting."[78] Yet the legislative majority in Virginia that adopted the 2013 voter photo ID law while invoking the Carter-Baker Commission has resisted efforts to expand access to voting as also recommended by the Commission. This selective use of the findings of the Carter-Baker Commission is strong evidence that the General Assembly's purported reliance on those findings was a pretext for other motives.

### F.    The Georgia Model

During the House debates on SB1256, Delegate Bell said that "This bill is closely modeled on the Georgia model."[79] But when the Virginia State Board of Elections banned the use of driver's licenses that were expired for more than a year – as a direct result of advocacy by SB1256's chief sponsor Senator Obenshain – it abandoned the "Georgia model." There is no such requirement in Georgia, which explicitly authorizes for voting using expired driver's licenses.[80] Nor is it clear why Georgia – which, like Virginia, received a grade of F for access to the ballot (see Table 18) – would provide a model in this context.

## IX.    SENATE FACTORS

In a report that accompanied the 1982 renewal of the Voting Rights Act, the Senate Committee on the Judiciary suggested several factors for courts to consider in assessing whether within the totality of the circumstances, an electoral system discriminates against minorities. The examination of these factors demonstrates that the totality of the circumstances in Virginia interacts with the restrictions imposed by HB1256 to diminish African Americans opportunities to participate fully in the political process and elect candidates of their choice.

Nearly all of the Senate Factors are present in Virginia. African Americans are burdened by a long history of racial discrimination, some aspects of which continue on into the present, including as reflected by significant modern-day disparities with regard to income, unemployment, poverty, education, housing, health care, and the availability of vehicles and telephones.  These socio-economic disparities bear directly on the ability to meet the voter ID requirements of Virginia's strict 2013 law.  Elections in Virginia are highly polarized between whites and African Americans, two groups with fundamentally different political preferences in Virginia, as reflected by historical elections data.  Virginia ranks near the bottom of the American states generally in access to voting. Political campaigns in Virginia have been marked by racial appeals that have been not subtle, but overt and offensive.  African Americans in Virginia have gained public office far below rough proportionality in citizen's voting age

---

[78] *Ibid.*, p.33.
[79] Meeting, Virginia House of Delegates Transcript, 20 February 2013, p. 20, l. 2-3.
[80] Georgia Secretary of State, Georgia Voter Identification Requirements,
http://sos.ga.gov/index.php/elections/georgia_voter_identification_requirements2.

population or other established measures and Virginia, under Republican government, has not been responsive to the particularized needs of African Americans.  At best, there is tenuous justification for Virginia's strict voter ID law, either to deter impersonation at the polls or to increase confidence in the electoral system.

**Factor 1: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.**

The report of Dr. Smith documents the extensive history of discrimination against African Americans that impacts their ability to participate in the democratic process in Virginia. Although such discrimination extended well into the history of Virginia, it is persistent and ongoing even in the contemporary era. This history of discrimination also directly affects African American opportunities to participate fully in the political process and elect candidates of their choice in Virginia.

For example, in 2014 a three-judge federal court for the Eastern District of Virginia found that Virginia's post-2010 congressional redistricting was unconstitutional because it needlessly packed African American voters into a single district, diminishing their political influence elsewhere in the state. The Court found: "that plaintiffs have shown race predominated. We find that the Third Congressional District cannot survive review under the exacting standard of district scrutiny. While compliance with Section 5 was a compelling state interest when the General Assembly acted, their districting plan was not narrowly tailored to further that interest. Accordingly, we are compelled to hold that the challenged Third Congressional District violates the Equal Protection Clause of the Fourteenth Amendment."[81] This finding was reaffirmed by the district court panel a second time after the Supreme Court remanded the matter for further consideration following its decision in *Alabama Legislative Black Caucus v. Alabama*.[82]

**Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

As indicated in Table 7, voting is highly polarized along racial lines between whites and African Americans in Virginia. Elections in Virginia are also marked by polarization between whites and other minority groups in Virginia. In every election examined, blacks voted overwhelmingly for Democratic candidates as did a substantial majority of Hispanics and Asians in elections for which data is available for those smaller minority groups. In contrast, with the exception of the landslide U.S. Senate election in 2008, a substantial majority of whites voted for the Republican candidate. Race is the most significant determinant of the vote in Virginia, surpassing other demographic factors such as age, gender, income, and education.

**Factor 3: the extent to which the state or political subdivision has used unusually**

---

[81] *Page v. Virginia State Board of Elections*, 58 F. Supp. 3d 533 (E.D. Va. 2014).
[82] *Page v. Virginia State Board of Elections*, No. 3:13CV678, 2015 WL 3604029, at *6 (E.D. Va. June 5, 2015).

**large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

Virginia is one of only 14 states to offer voters neither early voting nor no-excuse absentee ballots. Virginia ranked fourth from the bottom among the states in the duration of waiting times at the polls in both the general elections of 2008 and 2012 (Table 15). In overall access to voting, Virginia ranks 44th among the states according to the study by the Center for the American Progress (Table 18). As indicated above, the legislators that adopted Virginia's strict voter photo ID law while invoking the Carter-Baker Commission has also resisted efforts to expand access to voting as also recommended by the Commission, despite its record of excessive waiting times at the polls.

**Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

The lingering effects of such discrimination are substantially demonstrated in the deficient socio-economic position of African American people in Virginia. These disparities with regard to income, unemployment, poverty, education, housing, and health care are documented in Tables 1-4 and Charts 1-8.

**Factor 6:  Whether political campaigns have been characterized by overt or subtle racial appeals**.

Virginia political campaigns have been marked in recent years by overt racial appeals. In the 2006 campaign for U.S. Senate, incumbent Republican candidate and former Governor George Allen called a volunteer of East Indian descent for his Democratic opponent Jim Webb a "macaca." This racial slur occurred at a rally for Allen, where the volunteer S.R. Sidarth said, "I was the only person of color there." Pointing at Sidarth, Allen said:

> "This fellow here, over here with the yellow shirt, macaca, or whatever his name is. He's with my opponent. He's following us around everywhere. And it's just great," … "Let's give a welcome to macaca, here. Welcome to America and the real world of Virginia."[83]

The word *macaca* sounds like and refers to a monkey.  After Allen's remarks stirred controversy, his campaign manager dismissed the matter saying, Allen had "nothing to apologize for."  Later, however, Allen did apologize saying, "I would never want to demean him as an individual. I do apologize if he's offended by that. That was no way the point." This was not the first time, however, that Allen acted in a way offensive to minorities. For example,

---

[83] Tim Craig and Michael D. Shear, "Allen Quip Provokes Outrage, Apology," *Washington Post*, 15 August 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/08/14/AR2006081400589.html.

as Governor, Allen had issued a proclamation noting the South's celebration of Confederate History Month without any mention of slavery.[84] In 2010, Governor Bob McDonnell reignited this controversy by again issuing a Confederate History proclamation without any mention of slavery.[85]

On Halloween 2011, shortly before the general election, the Republican Party of Loudon County Virginia circulated via email a photo montage showing President Barack Obama with a bullet in his head and various Obama supporters as grotesque zombie figures (reproduced below). The image was condemned by the statewide Virginia Republican Party and the Loudon County Republican Chair Mark Sell issued an apology saying, "[We] deeply and sincerely apologize to the president and anyone who viewed the image if that was the impression that was left. The LCRC deplores any effort to display, suggest or promote violence against the president or any other political figure."[86]

Even after the controversy over the Loudon GOP montage, during the run-up to the 2012 general election, the Republican Party of Mecklenburg County Virginia posted on its Facebook page images of President Obama as a witchdoctor, a caveman, and a thug. Once again the state Republican Party condemned the images, but the head of the Mecklenburg Republicans, R. Wallace Mullins, refused to back down. He said, "If that group is that sensitive, I'm sorry, they're just not human," he said, chuckling. "It's not American. If they've got a problem with it, we're not going to change what we do."[87]

---

[84] Video available at https://www.youtube.com/watch?v=r90z0PMnKwI.

[85] Anita Kumar and Rosalind S. Helderman, "McDonnell's Confederate History Month Proclamation Irks Civil Rights Leaders," *Washington Post*, 7 April 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/04/06/AR2010040604416.html.

[86] Tim Mack, "GOP Group Blasted for Obama Image," *Politico*, 1 November 2011, http://www.politico.com/story/2011/11/gop-group-blasted-for-obama-image-067315.

[87] Laura Vozella, "Va. GOP Orders Affiliate to Remove "Offensive" Obama Images," *Washington Post*, 25 September 2012, https://www.washingtonpost.com/local/dc-politics/va-gop-orders-affiliate-to-remove-offensive-obama-photos/2012/09/25/8c17d62c-0741-11e2-858a-5311df86ab04_story.html.

**Loudon County Republican Party Halloween Emailed Image, 2011**
(Source Politico, 1 November 2011)



**Factor 7: the extent to which members of the minority group have been elected to public office in the jurisdiction**.

No African American has been elected to any statewide office or a U.S. Senate position in Virginia since Douglas Wilder won the governorship in 1989. Moreover, African Americans are substantially underrepresented in the Virginia General Assembly. African Americans comprise 13 percent of the State Senate, which amounts to just 64 percent of the African American citizen voting age population of 19.6 percent.[88] This disparity is about equal to three State Senate seats. Similarly, African Americans comprise 13 percent of the State House of Delegates, equaling just 66 percent of the African American citizen voting age population. This disparity is about equal to seven State House seats. According to data compiled in the American Bar Association's National Database on Judicial Diversity in State Courts, as of 2010, African Americans comprised only 10.7% of judges in Virginia's general jurisdiction trial courts, appellate level courts, and courts of last resort, equaling just 56 percent of the African American citizen voting age population. This disparity is equivalent to 15 judgeships. No member of another minority group holds one of these compiled judgeships in Virginia. The total minority disparity is equivalent to 49 judgeships.[89]

---

[88] U.S. Census, Voting Age Population by Citizenship and Race (CVAP), 2009-2013; American Community Survey 5 year estimates,
https://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html. Includes multiracial African Americans. Actual CVAP percentage is likely closer to 19.8% for African Americans, given their inclusion in multiracial categories that do not specify the races of the respondents. The disparities in representation would be greater when using total population.
[89] National Commission on Voting Rights, "State Profiles: Virginia,"
http://votingrightstoday.org/ncvr/resources/state-pages; American Bar Association, National Database on Judicial Diversity in State Courts, http://apps.americanbar.org/abanet/jd/display/national.cfm.

**Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group**.

Several examples illustrate the General Assembly's lack of responsiveness to the particularized needs of African American Virginians. As discussed above, despite many years of advocacy by the Virginia NAACP to address Virginia's near-worst-in-the-nation record on waiting times at the polls, the Republican majority in the General Assembly has repeatedly buried in Committee measures to alleviate long lines at the polls.

Another critical issue for African Americans in Virginia is the expansion of Medicaid coverage. As document above, the percentage of African American lacking medical insurance is 78 percent higher than the percentage of whites lacking such insurance. Virginia is one of only ten states with more uninsured children in 2014 than 15 years ago. It has experienced the 4th largest drop nationally in worker health insurance coverage during the past 15 years. It ranks 44th among the states in the coverage of low income working parents. Its eligibility requirements for such parents also ranks 44 among the states. Virginia ranks 31st among the states in income eligibility in state-sponsored children's health coverage and 48th among the states in per capita Medicaid expenditures.[90] Given the low incomes and high poverty rates of African Americans, their low insurance rates, and their health care disabilities relative to whites, this minority would benefit disproportionately and substantially from Medicaid expansion. According to the Kaiser Foundation, of the 525,449 uninsured Virginians in 2011 at or below 138 percent of the federal poverty line, 147,092, or 28.0 percent, are African American, 47 percent higher than the 19 percent of Virginia's adults that are African American.[91]

Despite support from Democratic Governor Terry McAuliffe, the Virginia General Assembly has blocked Medicaid expansion.[92] There is also an extremely high correlation between states that are not expanding Medicaid as of September 2015 and the adoption of voter photo identification laws. As indicated in Table 19, among the 20 states identified by the Advisory Board study referenced above that have not expanded Medicaid, 14 or 70 percent have adopted voter photo ID laws. Among the 31 states and the District of Columbia that have already expanded Medicaid, only 7, or 23 percent, have adopted voter photo ID laws.

With respect to Medicaid expansion, the federal government would cover 100 percent of the costs of Medicaid expansion in the first three years and 90 percent thereafter. The state would also cover its share of costs through savings from such expansion, according to a study by the Commonwealth Institute. The Institute concluded that "savings from Medicaid

---

[90] Health Care for all Virginians, *Health Insurance Coverage: A Virginia Scorecard*, www.msv.org/DocumentVault/PDFs/Health-Insurance-Coverage-A-Virginia-Scorecard-PDF.aspx.
[91] Kaiser Commission on Key Facts, "Medicaid and the Uninsured," April 2013, p. 4, https://kaiserfamilyfoundation.files.wordpress.com/2013/04/8435_b_pdf. This is the income level for Medicaid eligibility, National Conference of State Legislators, "Medicaid and the Affordable Care Act," June 2011, p. 1, https://www.ncsl.org/documents/health/HRmedicaid.pdf.
[92] The Advisory Board Company, "Where the States Stand on Medicaid Expansion," 23 November 2015, https://www.advisory.com/daily-briefing/resources/primers/medicaidmap.

expansion would offset all of the costs, ease state budget pressures, and provide funding for unmet health needs in Virginia."[93]

During the debate over using federal funds to expand Medicaid under the Affordable Care Act to expand coverage for low income Virginians, a Republican State Senator referred to the use of federal funds for this purpose as a "tar baby," a racial slur for which he later apologized.[94]

| TABLE 19 | |
|---|---|
| **STATES WHICH HAVE NOT EXPANDED MEDICAID AS OF NOVEMBER 2015, ADOPTION OF VOTER PHOTO ID LAW** | |
| **STATES NOT EXPANDING MEDICAID** | **ADOPTED VOTER PHOTO ID LAW** |
| ALABAMA | YES |
| FLORIDA | YES |
| GEORGIA | YES |
| IDAHO | YES |
| KANSAS | YES |
| LOUISIANA | YES |
| MAINE | NO |
| MISSOURI | NO |
| MISSISSIPPI | YES |
| NEBRASKA | NO |
| NORTH CAROLINA | YES |
| OKLAHOMA | NO |
| SOUTH CAROLINA | YES |
| SOUTH DAKOTA | YES |
| TENNESSEE | YES |
| TEXAS | YES |
| UTAH | NO |
| VIRGINIA | YES |
| WISCONSIN | YES |
| WYOMING | NO |
| Sources: Advisory Board Company for Medicaid Expansion, fn. 72; National Conference of State Legislatures, "Voter Identification Requirements," http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx#sd; Individual State Websites. | |

---

[93] Massey Whorley and Michael J. Cassidy, "Medicaid Expansion Would Pay for Itself," The Commonwealth Institute, August 2013, www.thecommonwealthinstitute.org/wp-content/uploads/2013/08/medex_pays_for_itself.pdf.

[94] Updated: Va. Senator Likens Health Care Law to a "Tar Baby," Virginia Pilot, 18 May 2014, http://www.pilotonline.com/news/government/politics/local/pilot-on-politics/updated-va-senator-likens-health-care-law-to-tar-baby/article_8770c510-6e8b-5cdc-8b92-6a505c9cf785.html.

65

**TABLE 19 CONTINUED**
**STATES AND DC THAT HAVE EXPANDED MEDICAID AS OF**
**NOVEMBER 2015, ADOPTION OF VOTER PHOTO ID LAW**

| STATES THAT HAVE EXPANDED MEDICAID | ADOPTED VOTER PHOTO ID LAW |
|---|---|
| ALASKA | NO |
| ARIZONA | NO |
| ARKANSAS | YES * |
| CALIFORNIA | NO |
| COLORADO | NO |
| CONNECTICUT | NO |
| DELAWARE | NO |
| DC | NO |
| HAWAII | YES |
| ILLINOIS | NO |
| INDIANA | YES |
| IOWA | NO |
| KENTUCKY | NO |
| MARYLAND | NO |
| MASSACHUSETTS | NO |
| MICHIGAN | YES |
| MINNESOTA | NO |
| MONTANA | NO |
| NEVADA | NO |
| NEW HAMPSHIRE | YES |
| NEW JERSEY | NO |
| NEW MEXICO | NO |
| NEW YORK | NO |
| NORTH DAKOTA | NO |
| OHIO | NO |
| OREGON | NO |
| PENNSYLVANIA | YES * |
| RHODE ISLAND | YES |
| VERMONT | NO |
| WASHINGTON | NO |
| WEST VIRGINIA | NO |
| | |

*Adopted but struck down by court.
Sources: Advisory Board Company for Medicaid Expansion, fn. 72; National Conference of State Legislators, "Voter Identification Requirements,"  http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx#sd;Individual State Websites.

**Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.**

The policy underlying the imposition of a photo voter identification requirement in Virginia is tenuous at best. As documented above and analyzed fully in the expert report of Dr. Lorraine Minnite, there are essentially no incidents of voter impersonation at the polls in Virginia and there are clear substantive reasons for the absence of such voter fraud. In addition, as indicated above, scholars have found no correlation between a voter photo ID requirement and voter confidence in the election system. And, rather than enhance the orderly conduct of elections by alleviating Virginia's problem with long lines at the polls, a photo voter ID requirement imposes an additional burden on voters and election officials.

## X.    CONCLUSION

Following the *Arlington Heights* guidelines, using standard methods of historical analysis and drawing on documentary and quantitative evidence, this report has examined the intent behind adoption of Virginia's strict voter photo identification law in 2013. Virginia has a long history of discrimination against African Americans. The weight of this history is felt by African Americans today who trail far behind whites in on standard measures of socio-economic standing that bear directly on access to the ballot under SB1256. Persons lacking economic means have diminished access to the photo IDs now authorized as voter ID under Virginia law, some of which like U.S. passports can be quite costly. Persons with lesser education also confront special challenges in navigating the complex and confusing requirements of this law.

Adoption of SB1256 followed a sequence of events that did not include any documented evidence of voter impersonation at the polls in Virginia. Rather the sequence included declining voter strength among the white voters upon whom Republicans depend for victory in Virginia, the achievement of unified control of state government by Republicans and Republican setbacks in the elections of 2012. The new Republican majority introduced SB1256 less than five months after the U.S. Department of Justice had precleared a very different identification bill, a turnabout so rapid that it concerned even the Republican Lieutenant governor of the Commonwealth.  Backers of the 2012 non-photo ID law as well as the State's pre-clearance submission to the U.S. Department of Justice affirmed that this law met all the objectives they later claimed to the 2013 photo ID law, without any concomitant risk of disenfranchising legitimate voters.

The Virginia General Assembly enacted and the governor signed SB1256 despite information available at the time that many persons in the Commonwealth lacked photo identification and that the bill would in particular impose a disparate burden on African American opportunities to vote in Virginia. The political advantages accruing to Republicans in what had become a highly competitive swing state was also directly based on racial differences, not on party differences. Evidence available at the time of adoption of SB1256 also

67

indicated that the law was likely to impose disparate burdens on young voters compared to older voters. The adoption of a voter photo ID law in Virginia also occurred in parallel with similar initiatives in other states by Republicans facing a similar nationwide problem of declining white voter strength. As part of the context explaining enactment of SB1256 lawmakers in Virginia also rejected without floor consideration measures to alleviate Virginia's excessive waiting times at the polls, which rank among the longest in the country.

Republican strategists have made clear the advantages accrued to their party through voter photo ID laws and long lines at the polls. The allegedly non-racial and politically neutral explanations for enactment of SB1256 offered at the time were pretextual and misleading. Scrutiny of the so-called the "Senate Factors" further demonstrates the how SB1256 interacts with the totality of circumstances in Virginia to impede African Americans opportunities in the Commonwealth to participate fully in the political process and vote to elect candidates of their choice to public office.

In sum, analysis of historical and quantitative evidence, including the history of racial discrimination in Virginia and its lingering effects, the predictably discriminatory effects of the 2013 voter photo ID law, the sequence of events leading to its adoption, and the actions and statements of Republican leadership involved in enacting SB1256 redistricting all point to discriminatory intent in the adoption of this strict voter photo ID law. Based upon this analysis, my more than forty-years' of experience as a historian, and my work in more than 80 voting rights cases, I conclude that Virginia General Assembly has sought political advantage for Republicans by following an intentional strategy of discrimination against minorities in its voter photo ID law. In other words, although racially neutral on its face, this law was passed 'because of race, not despite race.'

# EXHIBIT 7

**January 19, 2016**

**United States District Court for the Eastern District of Virginia**

***Barbara H. Lee, et al. v. Virginia State Board of Elections*, et al.**

**Case No. 3:15-CV-357**

**Response Report of Dr. Allan J. Lichtman to Reports Submitted by Experts for Defendants**

**Distinguished Professor of History**
**American University**
**Washington, DC**

Allan J. Lichtman

--------------------------------------------------
Allan J. Lichtman

## I. SUMMARY OF OPINIONS

In this report I respond to reports submitted by experts for defendants. These include in turn the reports of Karen L. Owen, Daniel J. Palazzolo, Janet R. Thornton, and Jesse T. Richman. This report will focus on the report of Dr. Owen which directly addresses my report of December 14, 2015 on the issue of intent. It will also consider more briefly other reports submitted by experts for defendants.

After examining these declarations I conclude that these declarations do not refute my quantitative empirical findings regarding the intentional discrimination of the Commonwealth of Virginia in enacting and implementing its strict 2013 photo voter identification law (SB 1256). Although several of the reports attempt to deal with the issue of intentional discrimination, none of the authors of these reports has demonstrated expertise in causal historical analysis. In addition, in attempting to provide alternative explanations for adoption of the strict voter photo ID law, none of the reports follow the methodology for analyzing intent established by the Supreme Court in its *Arlington Heights* decision or follow any standard historical procedure for assessing the intent of public policy decisions. These reports also exhibit consequential errors and include findings that are contradicted in other non-litigation contexts by the authors of the reports themselves.

## II. OWEN REPORT

### 1. Overview of the Owen Report

This report directly engages the issue of intentional discrimination and attempts to offer an alternative explanation for adoption of SB 1256: that it was enacted in response to public demands for a voter photo ID law. However, Dr. Owen's report does not follow the *Arlington Heights* guidelines or establish any other methodology for systematically assessing the intent of political decision-makers. Dr. Owen does not analyze the history of racial discrimination in the Commonwealth of Virginia. She does not follow the critical sequence of events leading up to legislative enactment of SB 1256. She does not assess the procedural and substantive deviation involved in fundamentally changing the Commonwealth's 2012 non-photo voter ID law less than a year after its enactment and just a few months after its preclearance by the U. S. Department of Justice. She does not examine contemporary statements by decision-makers.

Instead, Dr. Owen relies heavily on the flawed argument that proof of intentional discrimination requires *direct statements* by decision-makers of an intent to discriminate. She also claims that the legislature was responding to public opinion in enacting the voter photo ID law without conducting the requisite causal inquiry or demonstrating that a response to public opinion was mutually exclusive with intentional racial discrimination. Finally Dr. Owen offers criticisms of the analysis in my December 14, 2015 report. However, these criticisms do not withstand scrutiny. The following sections examine in detail Dr. Owen's report.

### 2. Direct Evidence of Discriminatory Intent

Dr. Owen criticizes my report for not providing direct evidence of discriminatory intent in the statements of decision-makers.  However, she fails to note that neither the *Arlington*

*Heights* decision nor any other ruling of the U. S. Supreme Court requires direct statements of discriminatory purpose as proof of discriminatory intent by decision makers. The reason is simple. Political leaders are careful to avoid statements directly indicating such invidious and obvious unconstitutional racially discriminatory motives. Even in the days of "Massive Resistance" to the *Brown v. Board of Education* decision outlawing segregation in public schools political leaders typically framed their oppositions in ostensibly racially-neutral terms. For example, the most important political statement of Massive Resistance is the "Southern Manifesto" signed by 19 southern U.S. Senators and 82 southern U.S. representatives. This manifesto carefully avoids any statement indicative of racially discriminatory intent and instead couches its defense of segregation in such racially neutral terms as the rights of states and the overreach of the Supreme Court.[1]

In the era since the passage of the Voting Rights Act of 1965 and extensive litigation on voting rights there is yet greater incentive than before to avoid direct statements of discriminatory purpose. Indeed, guidelines for the Section 5 preclearance section explicitly indicate that "a change affecting voting, such as a redistricting plan, may not be used by a covered jurisdiction unless that jurisdiction can show that the change has neither a discriminatory purpose nor will have a discriminatory effect."[2] Virginia was still covered by Section 5 at the time of the enactment of its 2013 voter photo ID law.

After enactment of the Voting Rights Act, courts were quick to recognize that political leaders were highly unlikely to provide direct "smoking gun" evidence of discriminatory intent. In *Lodge v. Buxton*, 639 F.2d 1358, 1363 (5th Cir. 1981), for example, the Court found that, "In a voting dilution case in which the challenged system was created at a time when discrimination may or may not have been its purpose, it is unlikely that plaintiffs could ever uncover direct proof that such a system was being maintained for the purpose of discrimination.… Quite simply, there will be no 'smoking gun.'" Similarly, in *McMillan v. Escambia County*, 638 F.2d 1239, 1246 n.15 (5th Cir. 1981), the Court noted that "People have become more subtle and more careful in hiding their motivations when they are racially based." As an historian working in the field for more than 40 years I also know that practitioners typically rely on circumstantial evidence of intent, particularly in reference to such sensitive matters as racial, ethnic, religious, or gender discrimination. For example, historians agree that despite its ostensibly race-neutral language, the Southern Manifesto had the racially discriminatory purpose of keeping African Americans segregated in under-funded schools.[3]

The Republicans responsible for SB 1256 were not unsophisticated and it is not surprising that they did not state publicly that they intended, through the enactment of the strict photo ID requirement, to suppress minority votes. However, recently available emails and deposition testimony do provide direct evidence that the Republican legislators responsible for the bill were attempting to erect barriers to voting in Virginia wholly unjustified by the

---

[1] For the text of the Southern Manifesto, see https://kdentify.wordpress.com/texas-am-university-commerce-academics/rhetoric-race-and-the-digital-humanities-2/the-southern-manifesto-text-and-signatories/.
[2] United States Department of Justice, "Section 5 of the Voting Rights Act," http://www.justice.gov/crt/redistricting-information.
[3] See, for example, John Kyle Day, *The Southern Manifesto: Massive Resistance and the Fight to Preserve Segregation* (University Press of Mississippi: 2014).

explanations they offered publicly for the law.  The two crucial decision-points in the adoption and implementation of SB 1256 at which this is most evident are: (1) the decision to introduce new legislation that shifted Virginia's voter ID law from non-photo to photo ID, and (2) pressure put on the State Board of Elections to change its regulations implementing the new strict photo voter ID law to eliminate the most common forms of IDs (driver's licenses and passports) as acceptable forms of voter ID if the expiration date on the ID had passed. These changes in law and policy followed statewide victories for Democrats in 2012, including the first consecutive victories by Democrats in presidential elections in Virginia since 1948. The elections also showed declining white turnout in Virginia, as compared to minority turnout.  These changes in Virginia's voter ID laws and efforts to ensure that the laws were implemented so as to exclude as many voters as possible from the process were initiated primarily by Republican Senator Mark Obenshain.[4]

As the following email exchanges demonstrate, high-level officials in the Governor's office disapproved of Senator Obenshain's efforts to pass strict photo voter ID in 2013, because they recognized that the 2012 non-photo ID law was working effectively as intended—i.e., to deter voter fraud without disenfranchising voters. On January 18, 2013, at 9:51 a.m., Tucker Martin, Governor McDonnell's Communications Director, sent the following email to six other members of the Governor's staff:

> I'm trying to get some stats from Lisa real quick on how rare any irregularities were last year. *Last thing we want is to be involved in any "republicans tighten voter restrictions" mess.* I think all we want to say, but word carefully, is note last year's legislation, the absence of any real issues during this recent extremely  high turnout election, and *the Governor believes Virginia's  system as currently constructed has strong safeguards against any voter fraud and he supports it in its current form.* Shoot something around along those lines.

(emphasis added). (VSBE0066815).

A follow-up email expressly recognized that the non-photo ID law passed in 2012 was working to prevent voter fraud and to ensure that all legitimate votes were counted:

> Following last year's expansion of voter identification laws to protect the integrity of the electoral process upon which our democratic ideals were founded, Virginians turned out in high numbers this year to vote in the presidential election. *It was a successful test of our system.* With the expanded acceptable forms of voter identification, the instances of citizens having to file provisional ballots were miniscule with only 300???? provisional ballots filed statewide. *The system worked as designed to prevent voter fraud, and to ensure that registered*

---

[4] Obenshein ran for Attorney General in November 2013. His loss by 165 votes validated the importance of very small differences in both voter turnout and the laws that govern a voter's eligibility to participate in an election, even at the state level. *See* Virginia Department of Elections, General Election, November 5, 2013, http://elections.virginia.gov/Files/Electionresults/2013/November-5/electionresults.virginia.gov/resultsSWde2d.html?eid=7&type=SWR&map=CTYState.

*voters were able to cast their ballots and have their vote counted. The governor believes Virginia's system as currently constructed has strong safeguards against any voter fraud* and has proven successful, and therefore he supports it in its current form.

(color text in original) (italicized emphasis added) (VSBE06814).

A later email from Lisa Hicks-Thomas, the Governor's Secretary of Administration and a former Deputy Attorney General, indicates that any new laws or regulations should be focused on the *registration* process, not on imposing additional and more burdensome identification requirements for voting at the polls: "If there's any area left where we need to tighten up against voter fraud, its at the point of registration." (VSBE0132962).

Despite these assessments from the executive, which has the ultimate responsibility for administering and implementing election law, Senator Obenshain went ahead and pushed SB 1256 through the General Assembly, almost entirely along party lines. The Governor ultimately signed the bill after releasing a public statement that followed, in less decisive wording, a draft release discussed in the January 18, 2016 email reproduced above.[5]

The deposition of Myron McClees, a policy analyst for the State Board of Elections, in 2013 provides insight into how the political intervention of Senator Obenshain overrode the judgment of the members of the State Board of Elections to tighten the photo ID requirements under SB 1256. The story is complex, but needs telling in full to reveal the subterranean political maneuvers, unrelated to the substance of the issue, that led the Republican majority on the Board to shift from authorizing *all* expired photo IDs for voting (as in Georgia in that state's implementation of its voter ID law), to eliminate the use of licenses and passports that have been expired for more than a year.[6]

McClees testified that the State Board had initially requested staff to draft regulations that authorized expired IDs for voting:

Q.     When you drafted this, why did you include the language that included that an ID would *not be invalid due to its* -- an elapsed expiration date?

A.     The Board made it clear that they wished for that to appear in regulation.[7]

(emphasis added).

Initially, Board Chair Charles Judd defended this decision as consistent with the law's purported goal of verifying a voter's *identity*: "What we are after is to find out if this person

---

[5] Kenric Ward, Virginia Passes Photo ID Voting Requirement: McDonnell Weighs His Options," *New York Times*, 20 February 2013, http://watchdog.org/70389/virginians-want-photo-id-law-mcdonnell-weighs-his-options/. The positive assessment from the governor's office came long after the release of the Moran video discussed in my initial report and revisited briefly below.
[6] Georgia authorizes the use of expired IDs: National Conference of State Legislatures, Voter Identification Requirements, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.
[7] Lee v. Virginia State Board of Elections, *Deposition of Myron McClees*, January 13, 2016, p. 117, l. 20-24.

representing themselves at the polls is who they say they are. Then we have achieved what we need to achieve."[8] As recounted in my initial report, however, Senator Obenshain wrote an open letter to the Board demanding that it reconsider this decision. Although there was no such express limitation in the law, Senator Obenshain's position was that no IDs that were past their expiration date should be allowed to be used for voter identification purposes. Ultimately the Board said publicly it would await results of a 21-day comment period ending August 4, 2014. However, in his deposition, McClees provided evidence that, at the prompting of Senator Obenshain, the Board had already decided to eliminate from the list of acceptable identification IDs expired for more than 12 months. This decision came long before the end of the public comment period in the first week of August 2014, indicating that efforts to examine the issue objectively were pretextual:

> Q.   Okay. And did they indicate why they wanted to change the language regarding the expiration date?

> A.   I was told that Charlie had been approached by somebody, and they did not like what had -- the definition he had made, and then that Charlie then, therefore, wanted to change his position on it.

> Q.   Who told you that?

> A.   I believe Susan did. I mean, there was a lot of other members of the -- I remember in the department were joking about it, joking to me about it, so yeah.

> Q.   And you said that Charlie Judd had been approached by somebody. Who was that somebody?

> A.   I don't know who it was specifically. I don't know for a fact. I know who they told me it was.

> Q.   Who did they tell you it was?

> A.   They told me Obenshain's people.

> Q.   And when was that?

> A.   Had to have been late June or early July of 2014, because that's when I was in Brazil.[9]

Finally, McClees indicates that there was insufficient time between the end of the comment period and the Board's meeting to vote on the issue of expired IDs to sift through and

---

[8] Markus Schmidt, "Virginia board's authority on ID statuses in question," Roanoke Times, 24 June 2014, http://www.roanoke.com/news/politics/virginia-board-s-authority-on-id-statuses-in-question/article_d612b818-fc23-11e3-9e2f-001a4bcf6878.html
[9] *Ibid.*, p. 119, l. 4-21.

analyze the public input.  This provides further evidence that the process for public comment and review was pretextual, and that the Board was simply altering its original, reasoned position, due to public pressure from Senator Obenshain, a legislator who has a repeated and demonstrated history of pushing through unnecessary election laws that will make it harder for voters to cast their ballots at the polls, while at the same time killing measures in committee that would help alleviate some of the demonstrated burdens that have plagued Virginia's voters at the polls for multiple elections cycles:

> Q.      So if I understand correctly, normally after a public comment period, you would be the person who would take those comments and perhaps turn it into a format that would be easier for the members of the Board to review?
>
> A.      If it was my regulation, yes.
>
> Q.      And in this instance you just simply didn't have time to do that?
>
> A.      That is correct.[10]

### 3. The Political Impact on Republicans of Declining of White Voting Strength in Virginia

Dr. Owen also attempts to question my finding that Republicans in Virginia, who are dependent for political success on the turnout and support of white voters, have been disadvantaged in recent years by declining white voter strength in the Commonwealth. Dr. Owen does not deny that voting in Virginia is highly polarized along racial lines, with whites far more likely to vote Republican in general elections than African Americans, Asians, and Hispanics. She does not deny that the polarization is especially wide between whites and African Americans, the state's largest minority group.

Rather, Dr. Owen's critique is focused on challenging the finding that white voter strength in Virginia has recently declined. Dr. Owen does not offer any analysis of her own to counter this finding.  Instead, she argues that my report makes apples to oranges comparisons among different types of statewide elections and election years. In fact, the report only makes apples to apples comparisons. It only compares presidential elections to presidential elections: "the data reported in table 6 [which includes presidential elections from 2004 to 2012] indicates that from a peak of 72 percent in 2004, the white component of participating voters declined to 70 percent in 2008 and 2012, with the minority increase among Asian, Hispanic, and other voters."[11]

The report likewise only compares senatorial elections to senatorial elections:  "For U.S. Senate elections, the data reported in Table 5 indicates that from a peak of 78 percent in 2006, the white component of participating voters declined to 70 percent in 2012, whereas the black component increased from 16 percent to 20 percent, with the remainder of the increase among Asian, Hispanic, and other voters. The results for 2014 show that the white turnout component

---

[10] *Ibid.*, p. 122, l. 18-25, p. 123, l. 1.
[11] Expert Report of Alan Lichtman, Dec. 14, 2015 ("Lichtman Rpt."), p. 17.

remains at 70 percent, with African American turnout little changed at 19 percent."[12] Dr. Owen correctly notes that the comparison includes Senate elections from the midterm year of 2006 and the presidential year of 2012. However, she fails to note that the comparison also includes the midterm year of 2014 when the white component of the electorate was no different than in 2012.

Finally, the analysis separately compares gubernatorial elections to gubernatorial elections: "For Virginia's Gubernatorial elections, the data reported in Table 5 indicates a similar pattern to that of U.S. Senate contests. From 2009 to 2013, the white component of participating voters declined from 78 percent to 72 percent. The African American component of the gubernatorial turnout correspondingly rose from 16 percent to 20 percent, with the remainder of the increase among Asian, Hispanic, and other voters."[13]

Thus, the following findings on turnout remain unrefuted by Dr. Owens' report:

- White turnout in presidential elections declined from 72 percent in 2004 to 70 percent in 2012.

- White turnout in senatorial elections declined more sharply from 78 percent in 2006 to 70 percent in 2014.

- White turnout in gubernatorial elections also declined sharply from 78 percent in 2009 to 72 percent in 2013.

### 4. The Effect of Voter Photo ID on Turnout.

Dr. Owen additionally claims that the effect on turnout from voter ID is small and therefore not a means for limiting minority turnout. She states that fewer than 800 voters had to cast a provisional ballot in 2014 for a lack of acceptable ID and fewer than 450 had to cast a provisional ballot in 2015 for a lack of acceptable ID. Dr. Owen provides no source for these statistics. However, state statistics indicate that voters cast 773 no-ID provisional ballots in 2014.[14]

Although Dr. Owen attempts to minimize this number, even taking her analysis at face value (which it should not be, for the reasons discussed below), she concedes that well more than a thousand voters could not cast a regular ballot in 2014 and 2015 because of Virginia's voter photo ID law. The attempt to minimize this number reveals the conceit behind the claim by advocates of the voter photo ID law that even a *single* fraudulent vote is too many. Apparently, the actual and demonstrated risk that thousands of voters may be disenfranchised (and that is only counting voters that actually turned out to the polls -- as discussed in my report, the true measure of voter suppression must include voters who are discouraged from turning out to vote at all) is justified by indefensible assertions that the law is somehow protecting Virginia's elections from voter fraud. This stark imbalance between real voter suppression and suspected (but never proven) in-person voter fraud is particularly unsettling, given that even the Republican National Lawyer's Association was unable, when it attempted to, identify a single case of voter impersonation in Virginia over more than a ten year span.

---

[12] *Ibid.*, p. 16.

[13] *Ibid.*, p. 17.

[14] Virginia Department of Elections, Post-Election Update, Local Canvass Information, November 6, 2014, https://elections.virginia.gov/Files/Media/ELECTPressRelease-11-6-2014-PostElectionUpdate.pdf.

The statistics for 2014 and 2015 presented by Dr. Owen also cover only a midterm election year and an off-year election. Yet even Dr. Owen acknowledges in her report that those elections are not accurate measures of voter turnout, in particular of minority voters: "Political scholars have long noted the mid-term elections dropoff in voter participation *especially among minorities*.[15] Regarding off-year gubernatorial elections, she similarly notes that, "Turnout figures published by the Commonwealth of Virginia show that state elections held in odd-numbered years usually have lower turnout than in the adjacent presidential or mid-term elections."[16]

Another expert for defendants, Dr. Daniel Palazzolo, is equally emphatic about the turnout differences between presidential and other elections: "Of course, the number of voters coming to the polls for the 2016 presidential election will be much larger than the number who turned out in the 2014 midterm elections. If previous history is an indication, over 1.7 million more voters will turnout in 2016 compared with 2014."[17] Dr. Palazzolo critically adds an important distinction between midterm and presidential voters: "In addition, midterm elections turn out a larger percentage of regular and highly informed voters; the presidential election, on the other hand, will attract less informed and less habitual voters."[18] These marginal presidential election voters are precisely the kinds of voters most likely to be impacted by a voter photo ID law.

Despite recognizing these distinctions, Dr. Owen fails to report that the 773 no-ID provisional ballots cast in the general election of 2014 substantially exceed the 543 no-ID provisional ballots cast in the prior federal general election of 2012 when the state's non-photo voter ID law was in effect. As illustrated in Table 1, **42 percent** more no-ID provisional ballots were cast in 2014 as compared to 2012. The increase in no-ID provision balloting between 2012 and 2014 is far more striking when considering that 2012 was a presidential election year with much higher turnout than in 2014 and many more provisional ballots cast overall. As indicated in Table 2 as a percentage of all provisional ballots cast, no-ID provisional ballots in 2014 were well *more than four times as great* as no-ID provisional ballots in 2012.

---

[15] Expert Report of Karen Owen, Jan. 8, 2016 ("Owen Rpt."), p. 5 (emphasis added).
[16] *Ibid.*, p. 6.
[17] Expert Report of Daniel Palazzolo, Jan, 8, 2016 ("Palazzolo Rpt."), p. 29.
[18] *Ibid.*

**Table 1**
**Provisional Ballots Cast Because of a Lack of Acceptable ID at the Polls, General Elections of 2012 and 2014 Compared**

| No-ID Provisional Ballots Cast 2012 | No-ID Provisional Ballots Cast 2014 | Percent Difference |
|---|---|---|
| | | |
| 543 | 773 | +42% |
| | | |
| Source: Commonwealth of Virginia, Election Night Provisional Counts, 2012 November General, https://www.documentcloud.org/documents/516301-va-provisional-count.html; Commonwealth of Virginia, Election Night Provisional Counts, 2014 November General. Virginia Department of Elections, Post-Election Update, Local Canvass Information, November 6, 2014, https://elections.virginia.gov/Files/Media/ELECTPressRelease-11-6-2014-PostElectionUpdate.pdf. | | |

**Table 2**
**Provisional Ballots Cast Because of a Lack of Acceptable ID at the Polls As Percentage of all Provisional Ballots, General Elections of 2012 and 2014 Compared**

| General Election | No-ID Provisional Ballots Cast | All Provisional Ballots Cast | No-ID Provisional Ballots as Percent of All Provisional Ballots | Percent Difference With 2012 |
|---|---|---|---|---|
| | | | | |
| 2012 | 543 | 10,958 | 5.0% | NA |
| | | | | |
| 2014 | 773 | 3,622 | 21.3% | +326% |
| | | | | |

Dr. Owen also states that it is relatively easy for provisional ballot voters to have their votes count: "a significant point in the Virginia voter photo ID law is that voters who cast a provisional ballot and do not have an acceptable voter ID can go to their county or city's Voter Registration Office (*e.g.* Election Registrar) and apply for a free voter ID that day. All the voter must do is complete a free photo ID application, sign the form before an election official, and take his/her photograph. This voter is then given a temporary voter photo ID card, and s/he can present this to the election official within three days in order to have the provisional ballot counted."[19]

It is precisely this significant feature of SB 1256 that provides additional evidence of the intent of the Virginia legislature to make voting more difficult, especially for minorities—rather than to simply assure each voter's identity so as to prevent in-person voter fraud. Given that a registered voter can obtain a free ID card without any documentation of their identity—instead, they simply need to sign an affirmation that confirms they are who they claim to be—it is plain that all that SB 1256 does is create additional burdens for voters who are less likely to have one of the forms of acceptable ID in order to vote on Election Day.  There is no rational reason why, if an affirmation of identity safeguards the process sufficiently to provide the basis for issuance of a free voter ID card, the same affirmation of identity could be provided by a voter directly at the polls at the same location and at the same time that the voter casts their ballot. And, indeed, Virginia law provided for just such a process, under which a voter could make an affirmation of identity at the polls, for the general elections of 2008 and 2010 (prior to adoption of the 2012 voter ID law) and many thousands of voters took advantage of this opportunity to establish their identity.[20]  Not a single case of voter impersonation was uncovered for either of these years by state officials or by the independent groups that studied voter fraud in the states. Rather than relying on this efficient past practice of affirmation at the polls SB 1256 requires a voter to take *two additional steps*. The voter must first travel to the registration office to obtain the free ID card and then submit that ID card to election officials within three days, meaning that this activity must take place during the work week. These gratuitous requirements place special burdens on African Americans who, as a group, have far less access to vehicles than whites and much lower incomes, which means greater hardships from missing any work time.[21]

Although the procedures in Virginia place a burden on honest voters, especially minorities, they do nothing to deter fraudsters (if any exist in Virginia).  In fact, if anything, Virginia's law makes it *easier* to commit in person voter fraud. A fraudster would only have to sign an affirmation at the central registrar's office to obtain a free ID. This is a safer venue than the local precinct where signing an affirmation would call attention to the voter who may be identified by a local official as not being the person he or she claims to be. In addition, an affirmation at the polls does not provide a photo ID that can be used for voting in multiple elections, but an affirmation made to obtain a free voter ID results in a photo ID that the person obtaining it could then use in multiple later elections.

Thus, there is a contradiction at the heart of the state's defense of SB 1256. On the one hand, the state says that the provision for non-documentation free voter ID guards against the

---

[19] Owen Rpt., p. 6.
[20] See Lichtman Rpt., Table 9.
[21] *Ibid.*, pp. 5-8.

11

disenfranchisement of legitimate voters. On the other hand, the state says that SB 1256 will prevent fraudsters from attempting voter impersonation at the polls. Yet as indicated above, SB 1256 actually imposes new barriers to legitimate voters while presenting no obstacle to fraudsters. As compared to the 2012 law, SB 1256 actually provides less of safeguard against fraud given that fraudsters could obtain an ID that would unquestioned at the polls.

Moreover, statistics on provisional voters vastly understate the numbers of voters likely impacted by Virginia's voter photo ID law, particularly for minority voters. Dr. Owen's numbers do not take into account registered voters who may have walked away from the polls when told they lacked an acceptable ID rather than bothering to cast provisional ballots. Most importantly her statistics on no-ID provisional ballots do not consider registered voters who did not show up to vote because they either lacked acceptable IDs or were confused about whether they lacked acceptable IDs. Dr. Owen's report fails even to mention the study of the 2014 general election in Congressional District 23 in Texas cited in my report. This is the most recent, specific and detailed study of the deterrent effect of voter photo ID laws. The researchers found that 5.8 percent of 400 registered non-voters studied in District 23 cited a lack of an acceptable photo ID as their principal reason for not voting and 12.8 percent cited the lack of an acceptable voter photo ID as one reason for not voting. Moreover, the vast majority of these non-voters "did indeed possess an approved form of photo ID, but through some combination of misunderstanding, doubt or lack of knowledge, believed that they did not possess the necessary photo identification."[22] In addition, the researchers found that the deterrent effect of the voter photo ID law disproportionately impacted minorities, in this case Hispanics in Texas. They also conclude that this deterrent effect was great enough to have possibly tipped the election in favor of the Republican congressional candidate, demonstrating that voter photo ID laws can have significant political effects.

Rather than addressing this recent and important study, Dr. Owen cites a finding from an 8 to 10 year old study which shows that a lack of voter ID nationwide accounted for only a small fraction of non-voters. However, Dr. Owen fails to note the caveats stated by the authors of the study. The authors note that the study covered only the 2006 midterm elections and the 2008 primary elections and did not include a high-turnout presidential election. More importantly, the authors note that at the time of their study only two states required photo identification for voting.[23]

Dr. Owen also does not acknowledge that the study upon which she relies was updated for the most recent midterm election of 2014, by which point many more states, including Virginia, required photo identification for voting.[24] The 2014 Survey of the Performance of American Elections asked of non-voters whether the lack of identification was a "non-factor," a "major factor," or a "minor factor" in their failure to vote. The results of this updated study

---

[22] Lichtman Rpt., p. 40; University of Houston, Hobby Center for Public Policy and Rice University, Baker Institute for Public Policy. "The Texas Voter ID Law and the 2014 Election: A Study of Texas's 23rd Congressional District," August 2015. quotation on p. 1, http://www.uh.edu/class/hcpp/_docs/voteridcd23.pdf.

[23] Stephen Ansolabehere, "Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day," *PS: Political Science and Politics,* 42(1) (2009), p.128, http://alt.coxnewsweb.com/shared-blogs/austin/investigative/upload/2009/03/voter_id_will_the_law_suppress_voter_turnout/Ansolabehere2009.pdf.

[24] See Lichtman Rpt., Table 19.

demonstrates that a perceived lack of identification (whether actual or believed) impacted non-voting by many orders of magnitude as compared to the earlier study. The survey results showed that, of 1,538 registered non-voters, some 4.5 percent cited the lack of ID as a "major factor" for non-voting. Using the projection methodology in the study cited by Dr. Owen for those non-voters citing the lack of an ID as a "major factor," the authors found that *3.1 million votes* were lost nationwide[25] because voters believed (rightly or wrongly) that they lacked acceptable identification.[26] This number of lost votes would almost certainly have been much higher if all states had strict voter ID laws like Virginia's current law. The nationwide data sample is also large enough to distinguish between whites and African Americans who cited a lack of ID as a "major factor" in not voting. The survey demonstrates that the black percentage of 7.0 percent (16/229) was more than two-thirds higher than the white percentage of 4.1 percent (49/1188). The results are statistically significant at the .1 level and barely misses statistical significance at the .05 level (probability = .055).

An additional analysis of states with strict voter photo ID laws in 2014 demonstrates a higher level of lost votes for both whites and blacks, with the rate for blacks again substantially higher than the rates for whites. The survey of these states demonstrates that the black percentage of 10.9 percent (7/64) is about 79 percent higher than the white percentage of 6.1 percent (15/247). The small samples, however, preclude a finding of statistical significance in this instance.

Although the sample of 38 Virginia non-voters is small in the 2014 study, nonetheless, a full 7.9 percent cited the lack of acceptable ID as a "major factor" for not voting. No respondents in Virginia cited the lack of ID as a "minor factor." Projected to the 3,086,665 registrants on the rolls in Virginia who did not vote in 2014, the 7.9 percent amounts to 243,847 lost votes in Virginia due to a lack of photo identification.[27] Of course, given the small sample in Virginia, the actual number of lost votes due to a reported lack of acceptable ID could be substantially higher or lower than this result. Projecting the lower nationwide 4.5 percent of registered voters citing a lack of ID as a "major factor" for not voting would still amount to 138,900 lost votes in Virginia due to a lack of voter identification.

Dr. Owen also fails to note two other findings of the earlier study cited in her report, both of which undermine the rationale for strict voter identification laws. These findings are that voter identification laws do not increase confidence in the electoral system or diminish voters' beliefs about the incidence of voter fraud. The authors conclude:

---

[25] The states are Georgia, Indiana, Kansas, Mississippi, North Dakota, Tennessee, Texas, and Virginia, along with Alabama, which technically is a non-strict state but which has such a limited window for non-provisional voting by non-photo ID holders that the National Conference of State Legislatures indicates could be classified as strict. See National Conference of State Legislatures, Voter Identification Requirements, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx and individual state websites.

[26] Charles Stewart III, "The 2014 Survey of the Performance of American Elections: Final Report," 5 February 2015, pp. 30-31, https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/28979.

[27] The number of registered non-voters in Virginia in the general election of 2014 is obtained from Virginia Department of Elections, Registration/Turnout Statistics, 2014, http://elections.virginia.gov/resultsreports/registration-statistics/registrationturnout-statistics/index.html.

13

"These twin findings reveal that ID laws will have little or no effect on the confidence in the electoral system or the belief in the incidence of fraud. Those beliefs, wherever they come from, are no different when a stricter ID law is in place and enforced than when less invasive voter-authentication methods are used. These findings also call into question the assumptions underlying the majority's opinion in Crawford. People may think voter fraud occurs often, but that belief appears disconnected from the likelihood that someone engages with politics and elections."[28]

Dr. Owen next attempts to minimize the effect of voter photo ID on turnout by citing a nationwide Pew poll from September 2012 in which 98 percent of registered voters indicate that they are confident that they possess the IDs needed to vote in their state.[29] However, she fails to note that this finding cannot be projected to a strict voter photo ID state like Virginia (after 2013) because as the authors of the study indicate, at the time, "just four states (Georgia, Indiana, Kansas, and Tennessee) have strict photo identification requirements in effect for the 2012 election."[30] Thus, the overwhelmingly majority of registered voters studied by Pew in 2012 do not reside in states with strict voter photo ID laws. Moreover, while 2 percent of registered voters who are not confident they possess the requisite IDs for voting may seem insignificant it amounts to some 109,000 of 5,428,833 registered voters in Virginia in 2012. Moreover, as indicated the 2014 SPAE survey of actual non-voters – at a time when more states had voter photo ID requirements – large numbers were deterred by their lack of acceptable identification.

In addition, and contrary to Dr. Owen's claim, the 2012 Pew study showed considerable confusion among voters about the identification requirements in their state. Nine percent of registered voters in states with strict voter photo ID laws either did not believe or did not know whether their state required photo identification for voting.[31] A much larger 24 percent of registered voters in states with non-strict photo voter identification laws did not believe or did not know that their state required photo identification for voting.[32] The survey did not delve into the question of the specific photo IDs that were acceptable for voting. In Virginia, issues such as whether, to be acceptable for voting, a photo ID requires an expiration date, whether expired IDs may be used, and if so whether there was some time limit after which they may not be used, and whether the voter's name had to be the same on the ID and the registration were sufficiently unclear in the law so as to confuse even the election officials who are tasked with enforcing the law.

## 5. Discriminatory Intent In Adopting Virginia's Strict Voter Photo ID Law in 2013

Dr. Owen addressed my finding that since 2008 virtually every voter photo ID law was adopted in Republican-controlled states and that nationwide Republicans were facing the same dynamic as in Virginia of racially polarized voting between whites and minorities and

---

[28] Ansolabehere, "Effects of Identification Requirements," p. 130
[29] Owen Rpt., p. 7.
[30] Pew Research Center, "Broad Support for Photo ID Voting Requirements" Oct. 11, 2102, p. 2, http://www.people-press.org/2012/10/11/broad-support-for-photo-id-voting-requirements/
[31] *Ibid.*, p. 3.
[32] *Ibid.*

declining white voter strength. Dr. Owen does not challenge the validity of these findings, but only their interpretation. She states first that, "Support for Professor Lichtman's logic requires that states in which Republicans passed photo ID laws have Black populations roughly equal to or greater than that  of Virginia."[33]

In fact, I make no such claim in my report and the logic of my analysis does not indicate that Republicans benefit from limiting African American votes only in states with African American populations equal to or greater than Virginia's. The political benefits to Republicans derive at every level of black population. Moreover, similar dynamics that apply to African Americans also apply to other minorities. So African American population alone is not an accurate indicator of the motivations behind voter photo ID law. For example, Texas is listed by Dr. Owen as 11.7 percent black and 74.6 percent white.[34] However, because such a large component of the white population in Texas is Hispanic, Texas is actually a *majority-minority* state, with non-Hispanic whites comprising only 43.5 percent of its population in 2014.[35]

Next Dr. Owen argues that most of the states adopting voter photo ID laws lacked motivation to suppress minority votes because their presidential elections were not competitive. This argument is fatally flawed for two independent reasons.

First, even if one party achieves what Dr. Owen regards as a non-competitive presidential victory in one year, that is not guarantee of a repeat in subsequent years. The states of Pennsylvania, Indiana, and Wisconsin provide instructive examples. In 2008, Obama won Pennsylvania by what Dr. Owen would regard as a non-competitive margin of 14 percentage points. However, Pennsylvania is typically a swing state and Republicans believed that their prospects for a presidential victory in 2012 were sufficiently bright for State House Republican leader Mike Turzai to say in June 2012 that the state's new voter photo ID law, "is gonna allow Governor Romney to win the state of Pennsylvania."[36] Indiana actually adopted its voter photo ID law after the 2004 presidential election, which Republican George W. Bush won by 12 percentage points. Yet four years later in 2008, Barack Obama prevailed in Indiana.

Most critically, political advantage to Republicans in limiting the heavily Democratic minority turnout does not only accrue in presidential elections. There are many other important competitive elections – for Congress, Senate, governor, and state legislature among others – in states that would seem otherwise non-competitive if one were simply looking at presidential elections. For example, Republicans have won recent presidential elections in Texas by wide margins, but Congressional District 23 is sufficiently competitive that the study of non-voting in this districts cited above found that the state's voter photo ID law could have tipped the 2014 election to the Republicans. Likewise, in solidly red Kansas (which John McCain won overwhelmingly in 2008), one of the state's four congressional seats that same year fell into Dr. Owen's very competitive range with a margin of victory of less than 5 percentage points. About

---

[33] Owen Rpt., p.8.
[34] *Ibid.*, p. 9, Table 2.
[35] National Conference of State Legislatures, Voter Identification Requirements,
http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.
[36] MacKenzie Weinger, "Pa Pol: Voter ID Helps GOP Win State," Politico, 25 June 2012,
http://www.politico.com/story/2012/06/pa-pol-voter-id-helps-gop-win-state-077811.

a dozen of the state's House and Senate seats (arguably the seats most important to decision-makers in the state legislature) also fell into this highly competitive range, with many more falling into Dr. Owen's competitive range with a margin of victory of less than 10 percentage points. On the flip side, Democrats have won Wisconsin presidential elections by fairly large margins in recent elections, but U.S. Senate and gubernatorial elections have been highly competitive. For example, in the 2010 U. S. Senate election, Republican Ron Johnson prevailed with 51.9 percent of the vote, but two years later in 2012 Democrat Tammy Baldwin won the other Wisconsin Senate seat with 51.4 percent of the vote. In the 2006 gubernatorial election Democrat Jim Doyle prevailed with 52.7 percent of the vote, but Republican Scott Walker won the next gubernatorial election in 2010 with 52.3 percent of the vote.

Dr. Owen next questions the importance of Democratic gains in the elections of 2008 and 2012 for Virginia politics, saying that the state has a much longer history of competitive politics. Yet this longer history is decidedly not true of presidential elections in Virginia as noted by another expert for the state of Virginia, Dr. Daniel Palazzolo of the University of Richmond in a 2012 interview. In this interview Dr. Palazzolo also highlights the importance of minority voters in producing new patterns of politics in Virginia.

The interviewer asked Dr. Palazzolo, "Has Virginia always been a swing state?"  Dr. Palazzolo responded, "No. Absolutely not. It was one of the most solidly Republican states in the country from 1964 until 2008." Dr. Palazzolo then explained that until 2008 no Democratic presidential candidate, including southerners, had won the state since 1964. One reason for this recent shift he says is that, "The demography of the state changed it became a little bit more diverse in terms of the racial and ethnic background of voter." When asked "how Virginia differs from other swing states, he responded, "The main difference between Virginia and other battleground states, Virginia has more African Americans."[37]

Moreover, not just 2008, but also 2012 marked an important development in Virginia politics. As noted in my December 2015 report, in 2012 for the first time since 1948, Democrats won two consecutive presidential elections in Virginia, and the Democrats won an open U.S. Senate seat by six percentage points.[38] It is also important to understand that to enact a strict photo voter ID bill in Virginia, Republicans needed unified control of the State House, the State Senate, and the governorship, which occurred after the 2011 elections.[39]

Dr. Owen offers as a "possible alternative explanation" that Republicans in Virginia were simply responding "to popular demands." In support of this proposition she quotes John Kingdon in his book, *Agendas, Alternatives, and Public Policies.*[40] There are several major problems with Dr. Owen's presentation of this alternative explanation.

First, the source that Dr. Owen cites to establish the connection between public opinion and policy, John Kingdon, sharply qualifies his assessment of this connection. Dr. Owen quotes Kingdon as saying, "Government officials may make some rather general judgments about the

---

[37] Need to Know on PBS, "Web Extra: Virginia's Special Swing" Sept. 20, 2012,
http://needtoknow.vc2.wnet.org/wnet/need-to-know/web-extra/web-extra-virginias-unique-swing/15000/.
[38] Lichtman Rpt., p. 28.
[39] *Ibid.*, p. 67.
[40] Owen Rpt., p. 12.

state of public opinion that affect their policy agendas…there might be instances in which they feel the public at large virtually directs them to pursue a course of action." However, the ellipses conceal and distort what Kingdon actually says. Left out from this quotation are the first two words of the second sentence where Kingdon says, "*At most*, there might be instances in which they feel the public at large virtually directs them to pursue a course of action." In support of this qualifier, Kingdon found that in his case studies of policy "general public opinion" is found to be important in only "6 of the 23 case studies." (26 percent).[41]

Kingdon further qualifies the effect of public opinion by saying, "It might thrust some items onto the government agenda because the vast number of people interested in the issue would make it popular for vote-seeking politicians." Dr. Owen presents no evidence to demonstrate that even a small number of Virginians are sufficiently interested in the issue of photo voter ID to make it a voting issue for them. In addition, Kingdon concludes that public opinion is more likely to *prevent* government action rather than to prompt government action: "Public opinion may sometimes direct government to do something, but it more often constrains government *from* doing something."[42]   He concludes that, "Public opinion acts more as a constraint on what is possible than as a promoter of a particular item."[43]

Second, even assuming that Dr. Owen's analysis establishes the response to public opinion as an explanation for the enactment (which as indicated below it does not), this motive is not mutually exclusive with a motivation to achieve political benefits by imposing a disparate burden on voting opportunities of African Americans in Virginia. Historians are well aware of the existence of multiple motivation in human decisions. So, too, was the U. S. Supreme Court in the *Arlington Heights* opinion where it indicated that a finding of discriminatory intent need not establish such intent as the sole motive of decision-makers:

> "*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified."[44]

Dr. Owen's source John Kingdon also makes clear that decision-makers usually have more than a single motive for their actions. Kingdon concludes that in examining policy formation, "attempting to pinpoint a single origin is futile." He found that "even when we were

---

[41] John Kingdon, *Agendas, Alternatives, and Public Policies* (Longman: 2003), p. 65 (emphasis added).
[42] *Ibid.*
[43] *Ibid.*, p. 68
[44] *Village of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265–266 (1977).

considering the president himself, probably the most important single actor in the system, we were impressed by multiple causation."[45]

Third, Dr. Owen does not provide the searching practical analysis needed to assess intent according to standard historical methodology or the Supreme Court's guidelines in *Arlington Heights* that establish multiple levels of analysis needed to assess intent. In claiming that a response to public demand was a motive for the enactment of Virginia's strict voter photo ID law, Dr. Owen does not examine the sequence of events leading to its adoption. She does not examine substantive or procedural changes. She does not assess the contemporary statements of decision-makers and their supporters. The only Virginia-specific evidence for her alternative explanation is a February 2013 Quinnipiac University poll showing widespread public support for a voter photo ID law.[46] She also cites a 2013 SurveyUSA poll from North Carolina with similar results. Dr. Owen says that the North Carolina results can be applied to Virginia because they derive from "a neighboring state to Virginia with similar black population percentages and partisan competitiveness, legislators are hearing of voter support for a voter photo ID law."[47]

Dr. Owen's reliance on these polls is problematic for several reasons. For one, the timing of these polls cannot account for the enactment of SB 1256, which was presented to the Virginia Senate on January 1, 2013, well before release of the Quinnipiac poll on February 21, 2013 or the North Carolina poll on April 23, 2013.[48]

In addition, the same February Quinnipiac Virginia poll that Dr. Owen cites so prominently in her report actually demonstrates that the enactment of SB 1256 cannot be solely attributed to public support for voter photo ID. The reason is that the poll also shows vast public support for the automatic enfranchisement of former felons in Virginia. As demonstrated in Table 3, substantial majorities of all respondents as well as Republicans, Democrats and Independents, blacks and whites, young people and older people, backed the automatic enfranchisement of former felons in Virginia. Even among Republicans support for ex-felon enfranchisement is 23 percentage points higher than opposition to this measure. Yet in the same legislative session in which the Republican majority of the General Assembly enacted SB 1256, a Republican dominated subcommittee killed by voice vote, SJ 266, a constitutional amendment for the restoration of voting rights to just non-violent former felons.[49]

Moreover, the SurveyUSA poll taken in April 2013 and cited by Dr. Owen as applicable to Virginia delved into considerable depth in its questions about voter photo ID laws. The survey found that the public response to such laws was substantially qualified in ways that contradict both the enactment and the substance of SB 1256 in Virginia. The survey found that 74 percent of registered voters agreed that "Legislators should show evidence of significant problems, such as real voter fraud, before they pass laws that make voting more difficult." Yet Dr. Owen does not dispute the finding of my initial report that not a single backer of SB 1256 presented a single credible example of voter fraud in more than a decade in Virginia that would have been

---

[45] Kingdon, p. 76.
[46] Owen Rpt., pp. 12–13.
[47] *Ibid.*, p. 13.
[48] Virginia's Legislative Information System, 2013 Session, SB 1256, https://lis.virginia.gov/cgi-bin/legp604.exe?131+sum+SB1256.
[49] Virginia's Legislative Information System, 2013 Session, SJ 266, https://lis.virginia.gov/cgi-bin/legp604.exe?ses=131&typ=bil&val=sj266

prevented by a voter photo ID law. In addition, the poll found that 66 percent of registered voters *would allow persons to vote if they signed an affidavit of identity under penalty of perjury.*[50] This was precisely the non-strict option that Virginia rejected in favor of its strict photo voter ID law. It is also noteworthy that shortly before a trial on the merits of its strict voter photo ID law North Carolina modified the law to authorize regular ballot voting for persons without a photo ID upon affirmation of a range of "reasonable impediments" to obtaining such ID.[51]

**Table 3**
**Quinnipiac Poll on Felon Disenfranchisement,**
**February 21, 2013**

|  | All | Reps | Dems | Indeps | Blacks | Whites | Age 18-34 | Age 55+ |
|---|---|---|---|---|---|---|---|---|
| **% Support Automatic Ex-Felon Enfranchisement** | 71% | 58% | 83% | 73% | 90% | 67% | 78% | 70% |
| **% Oppose Automatic Ex-Felon Enfranchisement** | 23% | 35% | 12% | 22% | 8% | 27% | 17% | 24% |
| **% Don't Know** | 6% | 7% | 5% | 5% | 1% | 6% | 5% | 6% |
|  |  |  |  |  |  |  |  |  |

---

[50] SurveyUSA Market Research Study #20443, Data Collected: 04/11/2013 - 04/14/2013, http://www.surveyusa.com/client/PollPrint.aspx?g=8c5c6269-5692-483a-a5f0-9662c4e5567e&d=0.
[51] National Conference of State Legislatures, Voter Identification Requirements, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.

Finally, a response to public opinion cannot explain the unprecedented action of the Virginia legislature in adopted SB 1256 less than a year after it had adopted another voter ID law that Republicans had lauded as meeting the objective of ensuring election integrity. Dr. Owen presents no evidence of public dissatisfaction with the earlier 2012 law. Neither can it explain the political intervention of Senator Obenshain into State Board of Elections' consideration of its policy on expired IDs.

It is also noteworthy in assessing the motivations behind voter photo ID laws to consider the views of the well-respected conservative 7th Circuit Judge Richard Posner (appointed by President Ronald Reagan), who is the most cited legal scholar of the 20th century according to the *Journal of Legal Studies*.[52] Judge Posner, who wrote the 7th Circuit opinion upholding the Indiana law in *Crawford, has* since had serious second thoughts after the spate of recent voter photo ID laws enacted almost exclusively by Republican-controlled state governments. In a recent book *Reflections on Judging*, Posner said "I plead guilty to having written the majority opinion" in the *Crawford* case and added that the Indiana law is "a type of law now widely regarded as a means of voter suppression rather than of fraud prevention." In an interview Judge Posner explained how the political context in the United States had changed in recent years: "There's always been strong competition between the parties, but it hadn't reached the peak of ferocity that it's since achieved … One wasn't alert to this kind of trickery, even though it's age old in the democratic process."[53]

In his dissenting opinion regarding the 7th Circuit's 5-5 vote against holding a full court review of the challenge to Wisconsin's voter photo ID law (it takes a majority to trigger a full court rehearing) Judge Posner offered the following common-sense general assessments of such laws:[54]

> "There is only one motivation for imposing burdens on voting that are ostensibly designed to discourage voter-impersonation fraud, if there is no actual danger of such fraud, and that is to discourage voting by persons likely to vote against the party responsible for imposing the burdens."

> "The authors' overall assessment is that 'voter ID laws don't disenfranchise minorities or reduce minority voting, and *in many instances enhance it'* [emphasis added]. In other words, the authors believe that the net effect of these laws is to increase minority voting. Yet if that is true, the opposition to these laws by liberal groups is senseless. If photo ID laws increase minority voting, liberals should rejoice in the laws and conservatives deplore them. Yet it is conservatives who support them and liberals who oppose them. Unless conservatives and liberals are masochists, promoting laws that hurt them, these laws must suppress minority voting and the question then becomes whether there are offsetting social benefits—the evidence is that there are not." (emphasis in original)

---

[52] Fred R. Shapiro "The Most-Cited Legal Scholars". *Journal of Legal Studies* 29, 1 (2000): 409–426.

[53] John Schwartz, "Judge in Landmark Case Disavows Support for Voter ID," *New York Times*, 15 October 2013, http://www.nytimes.com/2013/10/16/us/politics/judge-in-landmark-case-disavows-support-for-voter-id.html?_r=0.

[54] See *Frank v. Walker* 773 F.3d 783, 796–797 (7th Cir. 2014).

**6. The Context of Enacting Voter Photo ID in Virginia: Waiting Times at the Polls**

Dr. Owen also attempts to address the context of the legislative decision to enact voter photo ID while repeatedly killing every effort to take action against Virginia's excessively long waiting times at the polls. Rather than directly addressing the Virginia context she picks out two other jurisdictions with long waiting times at the polls that are predominantly Democratic: Maryland and the District of Columbia. The District of course is not comparable to any of the 50 states since it is an entirely dense urban area and such areas generally have substantially higher waiting times at the polls than other areas.[55] What Dr. Owen does not disclose is that, even counting DC, in both 2008 and 2012 the vast majority of states with the longest waiting times at the polls in either 2008 or 2012 are predominantly Republican (Table 4).

**Table 4**
**Fifteen States Including DC With Longest Waiting Times at the Polls: Predominant Party Control of State Government**

| State | 2008 Mean Wait Time | Predominant Party Control | State | 2012 Mean Wait Time | Predominant Party Control |
|---|---|---|---|---|---|
| South Carolina | 56 | **Republican** | Florida | **39** | **Republican** |
| Georgia | 40 | **Republican** | DC | 37 | **Democrat** |
| Florida | 31 | **Republican** | Maryland | 36 | **Democrat** |
| DC | 28 | **Democrat** | **Virginia** | 25 | **Republican** |
| **Virginia** | 28 | **Democrat** | South Carolina | 25 | **Republican** |
| Maryland | 24 | **Democrat** | Michigan | 19 | **Republican** |
| Indiana | 22 | **Republican** | Oklahoma | 17 | **Republican** |
| Oklahoma | 22 | **Republican** | Georgia | 16 | **Republican** |
| Arkansas | 21 | **Republican** | Louisiana | 16 | **Republican** |
| Alabama | 21 | **Republican** | Indiana | 13 | **Republican** |
| Michigan | 20 | **Democrat** | Arkansas | 13 | **Republican** |
| Missouri | 20 | **Republican** | North Carolina | 13 | **Republican** |
| Ohio | 19 | **Republican** | Tennessee | 13 | **Republican** |
| Tennessee | 19 | **Republican** | Illinois | 12 | **Democrat** |
| North Carolina | 19 | **Republican** | Montana | 12 | **Republican** |

---

[55]David C. Kimball, "Why are Voting Lines Longer for Urban Voters," Paper Presented at the Southwestern Social Science Association annual conference, New Orleans, March 29, 2013, http://www.umsl.edu/~kimballd/SSSA13-Kimball.pdf.

21

Dr. Owen is also incorrect in claiming that Maryland has not taken action to deal with long waiting times at the polls. After 2012, Maryland has mandated an increase in both early voting hours and in the number of early voting centers for early voting in an effort to reduce polling lines, especially among large jurisdictions.[56] Maryland now requires the following numbers of voting centers for early voting:

- Counties with fewer than 125,000 registered voters must have 1 early voting center.
- Counties with more than 125,000 but fewer than 300,000 registered voters must have 3 early voting centers.
- Counties with more than 300,000 registered voters but fewer than 450,000 registered voters must have 5 early voting centers.
- Counties with more than 450,000 registered voters must have 8 early voting centers.

### 7. Justification for Photo Voter ID: Election Integrity

Dr. Owen claims that preserving election integrity was a legitimate reason for enacting SB 1256. Her report, however, fails to address the key point that just a few months earlier the decision-makers in Virginia had made this very same claim quite emphatically about the 2012 non-photo ID bill. Thus, her argument at best relates only to a generic adoption of a voter photo ID law, not the extraordinary shift in policy-making on this issue that occurred in Virginia.

In addition, while Dr. Owen correctly notes that there is a widespread impression among Americans (whether correct or not) that voter fraud exists, she fails to take the next essential step of demonstrating that adoption of a voter photo ID law is a remedy to perceptions of voter fraud. To the contrary, as demonstrated in my initial report, scholars who have studied this issue, including the scholars cited in Dr. Owen's own report, have found no correlation whatsoever between the adoption of voter photo ID laws and either perceptions of voter fraud or beliefs in the integrity of elections.

Dr. Owen says in her report that, "Nonetheless, some evidence indicates that voter photo identification requirements can enhance public confidence in states' voting systems and elections and that a properly administered voter identification requirement does not impair the right or ability of any legitimate voter from casting a ballot."[57] Yet she provides not a single source for this assertion and as indicated above the sources that do exist present clear findings to the contrary.

An updated analysis based on the 2014 Survey of the Performance of American Elections demonstrates that the adoption of strict voter photo identification laws does not increase voter confidence in the integrity of elections as indicated in Table 5. This Table discloses three important results. First, there is not a crisis in voter confidence in the United States. Only 8.3 percent of respondents nationwide were not too confident or not confident at all that votes in their city or county would be fairly counted. Second, there is a *negative not a positive*

---

[56] Maryland State Board of Elections, "Early Voting," (Senate Bill 279 and House Bill 224, 2013) http://www.elections.state.md.us/voting/early_voting html.
[57] Owen Rpt., p. 17.

*relationship* between the adoption and implementation of strict voter ID laws and voter confidence. Of 8 states that have adopted and implemented such laws by 2014, voters in 7 states had *less confidence* than the national average that votes their city or county would be fairly counted. Although the individual state samples are too small to establish one-by-one statistical significance, the odds of obtaining by chance 7 of 8 strict photo voter ID states with less voter confidence in election integrity than the national average is only .03, which is below the standard statistical significance level of .05. Adding in Alabama, which as indicated above is arguably a strict state, the ratio increases to 8 of 9. Moreover, the only strict voter photo ID state with more voter confidence than the national average is the very lightly populated state of North Dakota. Third, Virginia was one of the strict voter photo ID states where voters had *less confidence* than the national average in election integrity. In Virginia, 10.1 percent of respondents were not too confident or not at all confident that votes their city or county would be fairly counted, 1.8 percentage points higher than the national average.

### 8. Studies of Voter ID and Turnout

Dr. Owen attempts to demonstrate that studies of the effects of voter ID do not reduce voter turnout. However, she relies almost entirely on obsolete studies that do not reflect the current reality of voter identification laws. In support of her position Dr. Owen cites five studies using data from the Current Population Survey and one study using data from the Cooperative Congressional Election Survey.[58] Two of these studies examined turnout in the general election of 2004 when not a single state in the union had a strict voter photo ID law. One of those two studies was actually a report of preeminent Republican think tank, the Heritage Foundation, which has a long-established position in favor of voter photo ID laws. The remaining four studies are national studies that only cover the period through 2006 when only one state – Indiana – with a relatively small minority population had implemented a strict voter photo ID law.[59] Today there are 8 such states, (plus Alabama) most of which have more substantial minority populations.

Dr. Owen in her report cites only one post-2006 study, an analysis by M. V. Hood III and Charles S. Bullock III, which examines voter turnout in Georgia between the general elections 2004 and of 2008 when the state first implemented its voter photo ID law. Dr. Owen says this study did find that the new photo voter ID law depressed turnout in Georgia by an estimated 16,642 voters. She also claims that the study shows that "Whites, and not minorities, were the groups most likely to lack an acceptable, government-issued photo ID." Both of these characterizations of the Hood and Bullock study are incorrect. First, the study found that the number of suppressed votes resulting from the new voter photo ID law was 50 percent higher than the number cited by Dr. Owen.  On p. 409 on their article the authors concluded that the new law had the effect of  "producing a difference of 24,692" voters, not the 16,642 claimed by Dr. Owen.[60] Second, nowhere in their article did the authors claim that whites were less likely to possess an acceptable ID than minorities. In fact, ID possession by race did not even figure in

---

[58] *Ibid.*, p. 17–18.
[59] According to the 2010 U. S. Census, African Americans (including multi-race) comprised 8.7 percent and Hispanics comprised 4.8 percent of Indiana's voting age population.
[60] M. V. Hood, III, and Charles S. Bullock, III, "Much Ado about Nothing:  An Empirical Assessment of the Georgia Voter Identification Statute."  *State Politics and Policy Quarterly* 12 (2012), p 409.

their analysis. Rather their study was based on predicted hypothetical turnout rates by race for 2004 and 2008, rates that did not comport with actual turnout statistics.

The fact that the study did not include estimates of ID possession by race is established by the deposition testimony of the lead author, Dr. M. V. Hood III, in the North Carolina voting rights litigation:

> Q.   But the rate of possession and the differences  in rates of possession by race --
>
> A.   That's not what --
>
> Q.   -- was not a factor that you used in  calculating your results in this paper, right, Dr. Hood?
>
> A.   That's fair. Table 3 is based off of predicted 24 turnout rates for these groups.[61]

Although the Hood and Bullock study did not estimate racial differences in driver's license possession by race, data from the 2008 Survey of the Performance of American Elections documents substantial disparities in the possession of both driver's licenses and passports by race. According to results reported in Table 6, 99.0 percent of whites in Georgia possessed driver's licenses, as compared to 88.9 percent of African Americans. This amounts to a difference of -10.1 percentage points for African Americans as compared to whites, which is statistically significant at the stringent .01 level used in social science. Table 5 also indicates that 42.6 percent of whites in Georgia possessed passports compared to 28.8 percent of African Americans. This amounts to a difference of -13.8 percentage points for African Americans as compared to whites, which is statistically significant at the .05 level used in social science.

---

[61] *North Carolina State Conference of the NAACP v. Patrick Lloyd McCrory*, Case No: 1:13-CV-658, Deposition of M. V. Hood III, p. 148, l. 17-24.

**Table 5**
**Percent of Registered Voters Not too Confident or Not at all Confident That Votes in Their County or City Will be Counted as Intended, Survey of the Performance of American Elections, 2014: Nation Compared With States With Strict Voter ID Laws**

| Nation | Percentage Not too Confident or Not at all Confident | Percentage Point Difference With Nation |
|---|---|---|
| | **8.3%** | NA |
| **State** | **Percentage Not too Confident or Not at all Confident** | **Percentage Point Difference With Nation** |
| GEORGIA | 10.1% | +1.8% |
| INDIANA | 9.4% | +1.1% |
| KANSAS | 10.1% | +1.8% |
| MISSISSIPPI | 15.8% | +7.5% |
| NORTH DAKOTA | 7.3% | -1.0% |
| TENNESSEE | 10.1% | +1.8% |
| TEXAS | 10.8% | +2.5% |
| VIRGINIA | 10.1% | +1.8% |
| Source: Individual state websites. National Conference of State Legislatures, Voter Identification Requirements, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx. Does not count small numbers with answers of I don't know. | | |

**TABLE 6**
**DRIVER'S LICENSE AND PASSPORT POSSESSION, BY RACE, OF REGISTERED VOTERS SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS, 2008, GEORGIA**

| | Whites | Blacks | Difference With Whites |
|---|---|---|---|
| **Possess Driver's License** | 287 of 290 **99.0%** | 72 of 81 **88.9%** | **-10.1 Percentage Points \*** |
| | | | |
| **Possess US Passport** | 123 of 289 **42.6%** | 23 of 80 **28.8%** | **--13.8 Percentage Points \*\*** |
| | | | |
| **\*** Statistically significant at .01 level.  \*\* Statistically significant at the .05 level. Sample sizes are large in Georgia because this was one of the states that the survey conducted additional interviews. | | | |

26

The article by Hood and Bullock that Dr. Owen cites in her report also contains several findings that contradict defendants' defense of Virginia's strict voter photo ID law. Contrary to Dr. Owen's focus on provisional ballots, this study, like the study of Congressional District 23 in Texas, indicates that provisional ballots do not fully capture the effects of voter photo ID laws on the voter suppression:

> "Although studying provisional ballots is one method of trying to gauge the effect of photo ID laws, this metric does not capture voter suppression that may be associated with implementation of such a statute. In other words, provisional ballots are only a measure of those registrants who may have shown up to the polls lacking proper photo ID. Those lacking photo ID who may have been deterred from attempting to cast an in-person ballot are not captured by this measure."[62]

Hood and Bullock also acknowledge that voter photo ID laws may deter from voting even those who possess IDs, and that as a result their study likely underestimated the reduction in turnout produced by Georgia's law:

> "Again, we acknowledge the possibility that some registrants who previously possessed photo ID may have been deterred from voting in 2008. Our calculation is based solely on turnout rates pre- and post-implementation for those registrants identified as lacking photo ID. Given this, four-tenths of a percentage point decline in turnout we attribute to implementation of the new law can be viewed as a conservative estimate of voter suppression."[63]

Hood and Bullock also indicate that in focusing on in person voter fraud rather than absentee ballot fraud, the Georgia voter photo ID law may have targeted the wrong type of fraud:

> "In Georgia, the stated legislative intent among Republican lawmakers who crafted the legislation was the reduction of in-person voting fraud. It is unclear, however, just how much voter fraud, much less the in-person variety, has been committed in Georgia lately. In the *Common Cause* proceedings, Cathy Cox testified that during her tenure as Secretary of State (1997–2007) no cases of in-person voter fraud had been reported to her office. In addition, to make the statute more legally palatable, the state implemented no-excuse absentee voting by mail in 2007. The small body of scholarly research conducted on voter fraud indicates that mail absentee balloting is more susceptible to fraud than in-person voting methods. In summation, the statute strengthens controls over voting methods not as prone to contemporary fraud, while relaxing standards over an area currently more susceptible to malfeasance."[64]

---

[62] Hood III and Bullock III, "Much Ado," p. 410-411 n. 6.
[63] *Ibid.*, p. 412 n.17. Based on the finding of the Texas study of Congressional District 23 that underestimate of the suppressive effect of Georgia's voter photo ID law was likely very substantial.
[64] *Ibid.*, p. 409.

In another co-authored article, Professor Hood deployed a methodology that he said was designed "to detect the possibility of election fraud even in the absence of allegations or reports of such activity." The study focused on the 2006 general election in Georgia – *before* the implementation of voter photo ID in that state. They examined a common charge regarding voter fraud: that fraudsters were voting in the name of dead persons. Through the examination of public records they found that 66 deceased persons apparently voted in the election.  However, 62 of the 66 votes were cast by absentee ballot and only 4 were cast in person. They found that all of these 4 in-person votes "were cleared as being mistakes." In 3 cases officials recorded the wrong person as having voted and in one case there was an error in the Vital Records. Thus of 2.1 million votes cast in Georgia's 2006 with no ID requirement in place, not a single vote was cast in-person in the name of a deceased person.[65]

Other comprehensive investigations of voter fraud have failed to uncover cases of voter impersonation at the polls, whether in the name of dead people, prison inmates, ineligible felons, or people who moved out of the state. I was personally involved in one such investigation in the state of Maryland, which like North Carolina prior to VIVA, has no documentary voter identification requirements, either photo or non-photo. In 1994, Republican gubernatorial candidate Maryland Ellen Sauerbrey alleged that fraudulent votes cast in the name of such persons listed above accounted for the 5,993 vote victory of Democrat Parris Glendening. As the state of Maryland's consultant on voting rights I was asked by Attorney General Joseph Curran to determine whether there was any truth to Sauerbrey's claims. My own work uncovered some unintentional errors by election officials, *but not a single fraudulent vote among the 1.4 million ballots cast in the election*. Likewise several weeks of judicial discovery and a trial in State District Court failed to uncover any illegal voters. The trial judge Raymond G. Thieme, who said in open court that he voted for Sauerbrey, dismissed her lawsuit. Similarly, many months-long investigations by the State Prosecutor, the U. S. Attorney, and the FBI found only a "few irregularities" that were "the result of faulty voting machines that didn't record votes, election judges' failure to check off voters and people voting in the wrong precinct because they failed to change their addresses."[66]

Similarly, in 2008 in Minnesota government officials and both political parties conducted an extensive post-election investigation of a contested U.S. Senate election. Like Maryland, Minnesota has no documentary voter identification requirements; it also permitted voters to register *on Election Day* at the same time that they go to cast their ballots. The investigations failed to come up with cases of voter impersonation fraud among some 2.9 million ballots cast. A subsequent 18-month investigation by Minnesota Majority, a conservative watchdog group, also failed to allege voter impersonation, although it made charges (disputed) that several hundred felons had voted in the election. No criminal charges were filled as a result of the election. The survey of voter fraud in Minnesota by the Republican National Lawyer's Association likewise

---

[65] M. V. Hood III and William Gillespie "They Just Don't Vote Like They Used To: A Methodology to Empirically Assess Election Fraud." *Social Science Quarterly 93(1)* (2012),pp. 76-94.

[66] Jane Bowling, "Federal, State Investigations Close Governor's Race Probe" *The Daily Record*, 24 August 1995, p. 9.

filed to uncover a single instance of voter impersonation.[67]

In Wisconsin after John Kerry defeated George W. Bush in the state, Republicans charged that the election in Wisconsin had been fraught with voter fraud. Immediately after the election Republican Assembly Speaker John Gard charged that Milwaukee Mayor Tom Barrett "has got to be embarrassed about what happened in Milwaukee. You've got thousands of addresses they know don't exist." The Speaker said that "Democrats and Republicans alike should be concerned about the incredible problems we had across this state."[68] Ultimately in 2005, only 14 out of 2.9 million voters in the 2004 general election were charged with voter fraud. *None involved voter impersonation at the polls.* Ten of the 14 cases involved illegal voting by felons and the remaining 4 involved double voting. None of the double-voting cases resulted in a conviction.[69]

The most sophisticated and updated study of voter impersonation, using a methodology that does not depend on investigations of allegations of voter fraud (thus answering the claim of those who say that such fraud is hard to detect or verify)  reaches several critical conclusions.[70]

- The authors found, "no evidence of voter impersonation in the 2012 election."

- The authors also found "no difference between states with and without same day voter registration (where fraud is again alleged to be easiest) and no difference between states with and without strict voter ID requirements (where it should be hardest)."

- The authors conclude that, "the proportion of the population reporting voter impersonation is indistinguishable from that reporting abduction by extraterrestrials. Based on this evidence, strict voter ID requirements address a problem that was certainly not common in the 2012 U.S. election. Effort to improve American election infrastructure and security would be better directed toward other initiatives."

Not only does Dr. Owen focus primarily on studies from 2006 or earlier that do not reflect current realities, she also ignores more up-to-date studies demonstrating that voter ID laws suppress voter turnout, especially among minorities. As noted above, the 2014 Survey of the Performance of American Elections found a turnout reduction of 3.2 million votes nationwide because voters believed that they lacked acceptable identification. The study also found substantial racial differences among those who said that the lack of an acceptable ID was a major reason for not voting: 2.9 percent of white non-voters, 4.8 percent of African American

---

[67] Eric Schroek, "Conservative Media Hype 'Not Accurate' Report To Suggest Franken's Election Was "An Illegal Victory" 13 July 2010, *Media Matters*, http://mediamatters.org/research/2010/07/13/conservative-media-hype-not-accurate-report-to/185985.

[68] Steve Schultze, "GOP Wants to Tighten Voter Laws," *Milwaukee Journal Sentinel*, 4 November 2004, http://freerepublic.com/focus/f-news/1270231/posts.

[69] Steven H. Huefner, Daniel P. Tokaji, Edward B. Foley, and Nathan A. Cemenska, *From Registration to Recounts: The Election Ecosystems of Five Midwestern States* (The Ohio State University Moritz College of Law: 2007), p. 121;Republican National Lawyer's Association, Voter Fraud Study: Minnesota, http://www.rnla.org/survey.asp#mn.

[70] John S. Ahlquist, Kenneth R. Mayer, and Simon Jackman, "Alien Abduction and Voter Impersonation in the 2012 Presidential Election: Evidence From a Survey List Experiment, Election Law Journal 13 (2014), quotations below on pp. 473 461 and 460.

non-voters and 11.3 percent of Hispanic non-voters.[71] As also noted above, the 2014 study of Congressional District 23 in Texas found that a minimum of 5.8 percent of non-voters did not vote because they believed they lacked acceptable IDs.[72] In CD 23 in 2014, 271,005 registered voters did not vote in the congressional election. Multiplying this number by .058 amounts to 15,718 suppressed votes in just one congressional district in one state, with lost voters disproportionately concentrated among Hispanics.

Dr. Owen also ignores the most recent, comprehensive, and sophisticated study of the effect of strict voter photo ID laws on turnout in individual states. This is a 2014 study by the respected, non-partisan U.S. Government Accountability Office (GAO) that provides information and analyses to the Congress. Unlike other studies, the GAO study also includes scientific controls by including both states that require photo identification (such as Kansas and Tennessee) and states that do not (including Alabama, Arkansas, Delaware, and Maine) in its analysis. This comparative study found that photo ID laws suppressed turnout overall. Furthermore, the study found that these laws disproportionately suppressed turnout for African Americans. They found a decline for African Americans of 3.7 percentage points as compared to whites in Kansas and of 1.5 percentage points as compared to whites in Tennessee. The study also found that such laws suppressed turnout to a greater extent among young voters.[73]

Dr. Owen also returns to her analysis of provisional ballots, although this time the numbers of provisional ballots cast in the general election of 2014 have shrunk as compared to her earlier discussion. On page 6 of her report Dr. Owen says that in 2014 "fewer than 800 had to cast a provisional ballot because they did not present an acceptable ID." Yet on page 18 of her report, Dr. Owen cites the number of no-ID provisional ballots cast in 2014 as "494 votes." The actual number reported by the state is 773. And these no-ID provisional ballots, which are the tip of the iceberg of voters impacted by photo ID laws, establish that many hundreds of Virginians have been disenfranchised by SB 1256 compared to *no* incidents of the voter impersonation that the law is ostensibly designed to deter.

Dr. Owen also claims that comparisons of aggregate turnout, do not indicate that SB 1256 suppresses turnout. However, given the many factors that influence turnout simple comparisons of aggregate turnout cannot establish the independent effect of voter photo ID laws. Nonetheless, although turnout remained about the same when comparing the very low turnout off-year elections of 2011 and 2015, turnout did decline substantially when comparing the higher midterm election years of 2010 and 2014. Between these two years, the turnout of registered voters in Virginia declined from 44.01 percent in 2010 to 41.6 percent in 2014, a decline of 2.4 percentage points. If 2014 turnout had been equal to 2010 turnout, an additional 126,744 Virginians would have voted in 2014 (.024*5,281,011 registered voters in 2014).[74] This decline

---

[71] The difference between the whites and the two minority groups combined is statistically significant at the .01 level.

[72] University of Houston, Hobby Center for Public Policy and Rice University, Baker Institute for Public Policy. "The Texas Voter ID Law and the 2014 Election: A Study of Texas's 23rd Congressional District," August 2015. quotation on p. 1, http://www.uh.edu/class/hcpp/_docs/voteridcd23.pdf

[73] United States Government Accountability Office, Report to Congressional Requesters, *Issues Related to State Voter Identification Laws*, September 2014, p. 52 http://www.gao.gov/assets/670/665966.pdf.

[74] Turnout statistics from Virginia Department of Elections, Registration/Turnout Statistics, http://elections.virginia.gov/resultsreports/registration-statistics/registrationturnout-statistics/index.html.

occurred even though, in 2010, Virginia had no Senate election at the top of the ballot, whereas in 2014, Virginia had the closest U.S. Senate race in the nation, which was ultimately decided by less than one percentage point.

### 9. Comparisons Between Virginia and Other States

On page 19 of her report, Dr. Owen presents a table comparing Virginia's voter photo ID law with such laws in five other states: Georgia, Indiana, Texas, South Carolina, and North Carolina. This table, she says demonstrates that "Virginia's 2013 voter photo ID law has more acceptable IDs than other states with similar strict voter requirements." This statement is incorrect and misleading. As noted in the National Conference of State Legislatures compendium of state ID laws, neither South Carolina nor North Carolina have strict voter photo ID laws. In fact, in both states a registered voter without a photo ID law can still cast a regular ballot through an affirmation that they had "a 'reasonable impediment' to obtaining a photo ID." [75] In Texas, contrary to what Dr. Owen says in her report, both a District Court and the 5th Circuit Court of Appeals found that the state's voter photo ID law violated Section 2 of the Voting Rights Act because it had a disparate impact on minority voters: "We AFFIRM the district court's finding that SB 14 violates Section 2 of the Voting Rights Act through its discriminatory effects." [76] The Court of Appeals remanded the case back to the District Court not to reconsider this voting rights violation but only for reconsideration of its finding that that the law was also enacted with discriminatory intent and for purposes of fashioning a remedy. [77]

With respect to the final two comparisons with Indiana and Georgia, there are other errors in Dr. Owen's table. The table indicates that in Virginia, unlike Indiana and Georgia, a person could use a concealed carry permit to vote. This is incorrect because Virginia's concealed carry permit for residents of the state does not include a photograph. The table also indicates that Indiana does not authorize the use of expired IDs. This is also incorrect. Indiana authorizes expired IDs for voting provided that they have not expired prior to the last general election, which provides a two-year window for expiration compared to a one year window in Virginia. [78]

Finally, this chart does not address the crucial issue of voter confusion about ID requirements. As documented in my initial report, the especially complex nature of Virginia's voter photo ID law creates confusion even among election officials.

### 10. Racial Disparities in Virginia in Possession of the Most Common Photo IDs

Using individual survey data I found in my report that, as compared to white registered voters, African American registered voters were substantially less likely to possess the two most common forms of photo ID acceptable as voter ID under Virginia's strict voter ID law: driver's licenses and U. S. Passports. I also found that, as compared to older registered voters, younger registered voters aged 18-29 were substantially less likely to possess the two most

---

[75] National Conference of State Legislatures, "Voter Identification Requirements," http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.
[76] *Veasey v. Abbott*, 796 F.3d 487, 513 (5th Cir. 2015). (emphasis added).
[77] *Ibid.*, at 520.
[78] Indiana Election Division, "Photo ID Law," http://www.in.gov/sos/elections/2401.htm.

31

common forms of photo ID.  Dr. Owen offers several responses to these findings, none of which holds up to examination. First, she says my findings, "are for all adults of voting age; they are not for registered voters so they bear only indirectly on the issue at hand, *i.e.* that a disproportionate share of Democrats and especially African Americans are being kept from voting."[79] This is incorrect. My findings are from the 2008 Survey of the Performance of American Elections (SPAE), which surveys *only registered voters*, not all adults. As indicated in the Survey's 2008 Report: "This study is based on the responses to an Internet survey of 200 registered voters in each of the 50 states, for a total of 10,000 observations overall."[80]

Dr. Owen also challenges my findings that racial and age differentials in driver's license possession were not only large in magnitude, but also statistically significant – that there was a very low probability of obtaining such differentials in the SPAE's sample by chance. Dr. Owen claims that, "The reason that Lichtman shows a statistically significant difference between black and white holders of driver's licenses in Tables 10 and 11 is that he does not consider sample size." [81]

This claim about sample size by Dr. Owen demonstrates a fundamental misunderstanding of statistical significance testing, which is one of the most commonly-used procedures in the analysis of quantitative data. A basic and elementary concept in statistics is that significance tests *always* take into account sample size. As I noted in my initial report, "Statistical significance depends on the size of the sample and the magnitude of the difference." (Table 10)

Thus, the statistical significance tests that I conducted for the differences between two sample percentages (e.g., the percentage of blacks and the percentage of whites possessing driver's licenses) depend *both* on the magnitude of the difference between the two proportions and the size of each sample. As Bruce Thompson explains in his article on "The Concept of Statistical Significance Testing," computations of statistical significance "must (and do) take sample influences into account."[82] Thus, taking into account the relatively small sample of blacks, differences with whites in driver's license possession were still of sufficient magnitude for a finding of statistical significance at the stringent level used in social science. Appendix I replicates the formula I used for the difference for my statistical tests, which demonstrates that the formula takes into account both the magnitude of the difference between blacks and whites (or younger and older persons) in their possession of driver's licenses and the sizes of the samples of each racial group.

Dr. Owen also challenges my findings of statistically significant racial and age differences in driver's license (but not passport) possession through the use of overlapping confidence intervals for the different racial and age groups. Specifically, she computes 95% confidence intervals for the percentage of blacks in the sample possessing driver's licenses and the percentage of whites in the sample possessing driver's licenses. Such intervals mean that the

---

[79] Owen Rpt., p. 20.
[80] R. Michael Alvarez, et al., "2008 Survey of the Performance of American Elections: Final Report," p. i, http://vote.caltech.edu/sites/default/files/Final%20report20090218.pdf
[81] Dr. Owen does not challenge the statistical significance of my findings on passport possession, even though the sample sizes are the same. Owen Rpt., p. 20.
[82] Bruce Thompson, "The Concept of Statistical Significance Testing," *Practical Assessment, Research & Evaluation* 4(5) (1994), online, http://pareonline.net/getvn.asp?v=4&n=5

probability is 95 percent that the actual population value (if we had data for every black and white registered voter in the state) lies within the lower and upper bounds of the interval. She then says that because these confidence intervals overlap – that is the upper bound of the black confidence interval overlaps with the lower bound of the white confidence intervals – there is "no significant difference." Dr. Owen conducts the same analysis for racial differences in license possession among Obama voters only and for age differences in license possession. She does not challenge the finding of a statistically significant racial difference in passport possession.

This effort to assess statistical significance not directly by conducting a test of statistical significance but indirectly by examining overlapping confidence intervals represents a classic statistical fallacy that authorities in the field warn against committing. These authorities stress that an overlap in confidence intervals *does not* demonstrate a lack of statistical significance, but represents a misuse of confidence intervals. With two confidence intervals of 95 percent, the probability is well under .05 that there will be some overlap between them. That is why it is necessary to direct conduct a test of statistical significance rather than visually inspect confidence intervals.

It is worth considering this issue in some depth because the issue of racial and age disparities in Virginia driver's license possession is an important one and because Dr. Owen's misuse of overlapping confidence intervals goes to the credibility of her report overall. The Statistical Consulting Unit at Cornell University has directly addressed the question of using overlapping confidence bands to assess statistical significance. The Group warns that if two sample measures "have overlapping confidence intervals, it is not necessarily true that they are not significantly different." They present a detailed example demonstrating mathematically that the difference between two sample measures are statistically significant below the standard .05 level even though the 95 percent confidence intervals overlap. The Group concludes by saying,

> "Generally, when comparing two parameter estimates, it is always true that if the confidence intervals do not overlap, then the statistics will be statistically significantly different. **However, the converse is not true.** That is, it is erroneous to determine the statistical significance of the difference between two statistics based on overlapping confidence intervals." (emphasis in original)[83]

Nathaniel Schenker and Jane F. Gentleman issue a similar warning in their article on overlapping confidence intervals in the prestigious journal, *The American Statistician.* They write: "Although the method of examining overlap is simple and especially convenient when lists or graphs of confidence intervals have been presented, we conclude that it should not be used for formal significance testing unless the data analyst is aware of its deficiencies and unless the information needed to carry out a more appropriate procedure is unavailable." (which is not the case here).[84] Similarly, John H. McDonald of the University of Delaware

---

[83] Cornell University, Cornell Statistical Consulting Unit, StatNews # 73 October 2008, Overlapping Confidence Intervals and Statistical Significance,
https://www.cscu.cornell.edu/news/statnews/stnews73.pdf.
[84] Nathaniel Schenker and Jane F. Gentleman, "On Judging the Significance of Differences by Examining the Overlap Between Confidence Intervals," *The American Statistician,* 55 2001, p. 182,
https://ecf.oknd.uscourts.gov/cgi-bin/DisplayPDF.pl?dm_id=880975&dm_seq=3.

notes in his online statistical text that, "There is a myth that when two means have confidence intervals that overlap, the means are not significantly different (at the *P*<0.05 level)." He adds, "it is easy for two sets of numbers to have overlapping confidence intervals, yet still be significantly different," and thus advises "*Don't try compare two means by visually comparing their confidence intervals*, *just use the correct statistical test*." (emphasis added).[85]

Dr. Owen also speculates—without any documentation—that African American Virginia voters who lack the most common forms of photo ID may possess another photo ID such as a student or employer ID. The Virginia sample is much too small to comb through various scenarios for racial differences in the possession of various forms of racial identification. Moreover, the mere possession of a driver's license, U. S. passport or any other form of photo ID does not guarantee that the ID is valid for voting in Virginia. As discussed, under the regulations issued by the State Board of Elections (arrived at following political pressure by Senator Obenshain) licenses and passports cannot be used for voter ID if they are expired for more than 12 months.  Moreover, to be used as voter ID, the name on any form of ID must be identical or "substantially similar" to the name on the voter rolls. Student IDs also must have an expiration date and cannot be expired for more than 12 months.  In other words, simply "matching" a registered voter on the voter rolls to a voter with a DMV record, or even a voter with a student ID or a photo ID issued by their employer (none of which these things does Dr. Owen even attempt) is likely to undercount the number of Virginia voters that in fact have photo ID that will be deemed acceptable for voting purposes under its strict voter photo ID law.[86]

### 11. Senate Factors

Of the nine so-called Senate factors examined in my report, Dr. Owen challenges my findings only with respect to two of those factors. These are factors 3 and 7.

- **Senate Factor 3: Voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

I cite two such practices in Virginia: the combination of the lack of early voting and no-excuse absentee ballots and excessive waiting times at the polls. I also cite a study showing that Virginia ranked 44th among the states in access to the ballot. Dr. Owen does not deny any of these findings.

Instead, she claims first that many of the states with a lack of early voting were not necessarily states initially covered by Section 5 or Republican-controlled states. I made no such claim in my report and Senate Factor 3 requires no such comparison. The existence of such practices elsewhere does not mitigate against these practices imposing burdens on African Americans in Virginia. Moreover, my analysis focused on the combination of the lack of early

---

[85] John H. McDonald, *Handbook of Biological Statistics* online at
http://www.biostathandbook.com/confidence.html.
[86] Virginia Department of Elections, Voter Identification Chart,
http://elections.virginia.gov/Files/CastYourBallot/VotingInPerson/VoterIdentificationChart.pdf; Virginia's
Legislative Information System, 2015 Session, HB 1538, https://lis.virginia.gov/cgi-
bin/legp604.exe?151+sum+HB1538.

voting *and* the lack of no-excuse absentee balloting, not on these factors individually. According to the National Conference of State Legislatures, Virginia is only one of 13 states with no early voting and an excuse required for absentee voting. Of these states, 9 are entirely or predominantly controlled by Republicans in state government (Alabama, Kentucky, Michigan, Mississippi, Missouri, New Hampshire, Pennsylvania, South Carolina, and Virginia).

Dr. Owen also claims incorrectly that the states ranking lowest are not controlled by Republicans. As indicated in Table 7, the 15 worst states in the study, *all* are entirely or predominantly controlled by Republicans in their state government. As noted above, states do not have to be competitive at the presidential or state-level to be competitive in elections for state legislature and local offices. However, the 15 worst states include many of the most crucial national swing states in the nation such as Michigan, North Carolina, Ohio, Pennsylvania, and Virginia.

- **Senate Factor 7: Voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

Dr. Owen does not challenge my finding that African Americans in Virginia are substantially under-represented in office-holding relative to their percentage of the citizen voting age population (CVAP) in the state. Instead, she cherry-picks the single state of Maryland for comparison, claiming that Maryland is even worse than Virginia in the election of African Americans to public office. Beyond its dubious relevance this comparison is based on incomplete and inaccurate information.

Dr. Owen focuses her comparison on the number of African Americans in the state legislature. Dr. Owen says that the percentage of African Americans in the Maryland General Assembly is 19.5 percent compared to a citizen voting age population of 29.5 percent. However, as indicated in Table 8, there are actually 44 African American members of the Maryland General Assembly out of 188 seats for a percentage of 23.5. This equals 80 percent of the 29.5 percent of Maryland's African American CVAP, 14 percentage points and 21 percent higher than the comparable percentage in Virginia. For Congress, Table 8 indicates that in Maryland, 25 percent of its congressional delegation is African American (2 of 8), equal to 85 percent of the state's African American CVAP, 29 percentage points and 52 percent higher than the comparable Virginia percentage. For judges, Table 8 indicates that in Maryland, 19 percent of judges are African American equal to 64 percent of the state's African American CVAP, 8 percentage points and 14 percent higher than the comparable Virginia percentage. Dr. Owen notes that Virginia elected Douglas Wilder as an African American governor, but that was several decades ago and no African American has been elected statewide since then.

**Table 7**
**Partisan Control of 15 States With Worst Ranking on Access to the Ballot**

| State | Ranking | Predominant Party Control* |
|---|---|---|
| Mississippi | 51 | **Republican** |
| Tennessee | 50 | **Republican** |
| Alabama | 48 | **Republican** |
| Michigan | 48 | **Republican** |
| North Carolina | 47 | **Republican** |
| **Virginia** | 44 | **Republican** |
| Pennsylvania | 44 | **Republican** |
| Texas | 44 | **Republican** |
| Missouri | 43 | **Republican** |
| Arkansas | 41 | **Republican** |
| Kentucky | 41 | **Republican** |
| South Carolina | 40 | **Republican** |
| Arizona | 39 | **Republican** |
| Georgia | 37 | **Republican** |
| Ohio | 37 | **Republican** |
| Kansas | 36 | **Republican** |
| | | |

*Defined as control of both chambers of the state legislature and the governor, or both chambers of the state legislature but not the governor, or one chamber of the state legislature and the governor. With the exceptions of Pennsylvania and Virginia which recently elected Democratic governors, all other states fit into the first category of complete Republican control. Data from state websites.

**Table 8**
**Comparison of Black Elected Officials in Virginia and Maryland**

| State & Public Office | Percent of Black Office-Holders | Office-Holders as Percent of Black CVAP | Percentage Point Difference With Virginia | Percent Difference With Virginia |
|---|---|---|---|---|
| | | | | |
| Virginia: State Legislature | 13% | 66% | **NA** | |
| Maryland: State Legislature | 23.5% | 80% | **+14 Percentage Points** | **+21 Percent** |
| | | | | |
| Virginia: Congress | 11% | 56% | **NA** | |
| Maryland: Congress | 25% | 85% | **+29 Percentage Points** | **+52 Percent** |
| | | | | |
| Virginia: Judiciary | 11% | 56% | **NA** | |
| Maryland: Judiciary | 19% | 64% | **+ 8 Percentage Points** | **+14%** |
| | | | | |
| | | | | |

### III. PALAZZOLO REPORT

#### 1. Overview

Although Dr. Palazzolo does not directly address my initial report, there are relevant elements of his analysis that will be examined below. Before considering the details of Dr. Palazzolo's report, it is important to note that the credibility of this report is called into question by its heavy reliance on a paper by a undergraduate student, Adam Kuegler of the University of Connecticut. The paper relies on interviews with persons recommended by Dr. Palazzolo, and it interviews three academics: Dr. Palazzolo and two of his colleagues at the University of Richmond. Dr. Palazzolo says that, "As far as I know, it is the only academic study of Virginia's photo identification law."[87] However, this student paper is not a serious academic study. It is a pastiche of interview comments, with no quantitative analysis and no examination of primary source materials such as debates in the Virginia General Assembly. It is not based on any reliable scientific or historical methodology for assessing the influences on the enactment of SB 1256. In my more than 40 years as a university professor and more than 30 years as an expert witness and consultant in voting rights cases I have never before seen a report that relies so heavy on such a source.[88]

#### 2. Racially Polarized Voting In Virginia

In his discussion of racially polarized voting in Virginia, Dr. Palazzolo does not challenge my finding that Republicans in Virginia are heavily dependent upon white voters. He first attempts to demonstrate that polarization between whites and African Americans in Virginia is consistent with polarization elsewhere in America. That assessment is also consistent with the findings of my initial report and helps explain why recent photo voter ID laws have been adopted almost exclusively by Republican dominated state governments. Moreover, the existence of similar polarization patterns elsewhere does not refute my conclusion that Republicans in Virginia benefit politically by limiting the voting of minorities, especially African Americans. Republican strategist Scott Tranter, whose consulting firm Optimus specializes in the sophisticated analysis of electoral data and prepared a strategic plan in Virginia for Republican Senatorial candidate Ed Gillespie in 2014, made this interest clear as recently as December 2012, shortly before enactment of SB 1256. As I noted in my initial report, Tranter said that as a campaign professional he knows that Republicans gain political advantage from both voter ID laws and long lines at the polls: "A lot of us are campaign professionals and we want to do everything we can to help our sides. Sometimes we think that's voter ID, sometimes we think that's longer lines, whatever it may be."[89] Dr. Palazzolo simply ignores this evidence linking voter ID laws with political advantage for Republicans. Dr. Palazzolo also ignores the evidence in my report showing that the motivating factor for Virginia Republicans as regards minority voting was not just racial polarization but also substantial declines in recent years in white versus minority voting strength.

---

[87] Palazzolo Rpt., p. 24.
[88] Dr. Palazzolo devotes more than four pages of his report to a discussion of the Kuegler student paper (Palazzolo Rpt., pp. 23-27).
[89] Lichtman Rpt., p. 52.

Although Dr. Palazzolo attempts to downplay Republican political interests in the enactment of strict voter photo ID laws, he told a very different story in his co-authored article on "Election Reform After HAVA: Voter Verification in Congress and the States."[90] In that article Dr. Palazzolo directly tied support for such laws in Congress with Republican political interests, even at the expense of their purported principles:

> "Yet, scholars have found that Republican presidents and Republican members of Congress ignore basic principles of institutional federalism in order to advance policy goals or political interests. . . . This pattern seems to typify election reform politics. Most Republicans prefer to leave election administration to state and local officials, yet they do not consistently apply this principle to all election reform issues."[91]

The article then connects this analysis of political interests directly to Republican support for voter photo ID laws:

> "In debates over election reform shortly after the 2000 elections, Republicans accused Democrats of trying to "nationalize" elections and maintained that any federal election reforms should include guidelines or voluntary standards rather than federal mandates. Congressional Republicans saw state and local government organizations as natural allies, whereas Democrats shared the interests of civil rights organizations, which traditionally distrusted state governments (Palazzolo and McCarthy 2005). Yet, federalist principles involving the broad outlines of election administration have given way to political interests and policy preferences on specific issues. During the debate over HAVA, Republicans, led by Senator Christopher "Kit" Bond (R-MO), spearheaded federal legislation (S. 528) to require voters to present a photo id at the polling place. Since HAVA was enacted, Republicans have sponsored seven bills requiring photo ids, two that increased penalties for voter registration fraud, four that regulated voter registration, and two that prohibited use of HAVA funds for public communications."[92]

### 3. Recent History of Racial Discrimination

Dr. Palazzolo argues that racial discrimination against African Americans in Virginia is distant history and does not reflect the behavior of Republicans in recent years. He cites support for the Voting Rights Act's renewal in 2006 from Virginia's congressional delegation as one proof of this change. However, by the time of the final vote when passage was a foregone conclusion nearly every Senator and House member voted for the final bill. Dr. Palazzolo does not disclose that the bill followed a tortuous path to final approval because of objections from Southern Republicans. He also does not disclose that Virginia's Republican representatives have failed to back legislation to restore the protections of Section 5 to minority voters after the U. S. Supreme Court in the *Shelby County* decision invalidated the formula for Section 5 preclearance.

---

[90] Daniel J. Palazzolo, Vincent G. Moscardelli, Meredith Patrick, and Doug Rubin, "Election Reform After HAVA: Voter Verification in Congress and the States." *Publius: The Journal of Federalism,* 38 (2008): 515-537

[91] *Ibid.*, p. 518.

[92] *Ibid.*

Dr. Palazzolo additionally claims that "seven years prior to the passage of SB 1256 in the Virginia General Assembly, not a single Republican voted to suppress voting rights for African Americans."[93] Although race relations in Virginia today do not mirror the Jim Crow era, Dr. Palazzolo's rosy picture of Republicans and race in recent Virginia history ignores the following.

- In the seven years prior to passage of SB 1256 Republicans introduced several bills to make more restrictive the state's 1996 non-strict, non-photo voter ID law. These bills would have made it more difficult to vote in Virginia, especially for minorities, by requiring voters without certain forms of prescribed ID to cast a provisional ballot rather than establish identity by affirmation, or to eliminate all forms of non-photo identification from the list of prescribed IDs and only permit the use of photo identification.

- In 2010, just three years prior to enactment of SB 1256, seven Republican sponsors introduced HB 498 which would have both required a photo ID and eliminated the option to vote a regular ballot through an affirmation of identity. Every Republican on the Virginia House Committee on Privileges and Elections voted to recommend the bill from Committee and every Democrat voted against this recommendation. Nearly every Republican voted for the bill in the full House, whereas nearly every Democrat voted against it.[94]

- In 2012 Republicans enacted closely along party lines two bills that moved Virginia's voter ID requirement from non-strict to strict. Although the bills expanded the list of acceptable forms of identification that could be used for voting, they eliminated the opportunity to vote a regular ballot with a statement of identity. For the first time in Virginia, the bills made possession and presentment of one of certain types of identification a pre-requisite to voting in person in Virginia elections.

- In 2012, Republicans in the General Assembly voted down an amendment that would have allowed a provisional ballot to count through comparison by election officials of the signature on the provisional ballot envelope with the signature on file with the registrar.

- The post-2010 congressional redistricting plan adopted by Republicans diminished African American political influence in Virginia by packing African Americans into a single district at levels well above that needed to elect a candidate of their choice.

- Despite evidence that long waiting times at the polls disproportionately impact African Americans, Republicans in the General Assembly killed without floor votes all measures designed to alleviate this problem.

- The analysis of Senate Factor 6 in my initial report (unchallenged by any report by a defendants' expert) documents several recent examples of racial slurs against African

---

[93] Palazzolo Rpt., p. 11.
[94] Virginia's Legislative Information System, 2010 Session, HB 498, https://lis.virginia.gov/cgi-bin/legp604.exe?101+cab+HC10203HB0498+BRREF.

Americans by Republican leaders in Virginia, not just George Allen's "macaca" slur that Dr. Palazzolo discounts.

### 4. Legislative Intent and the Enactment of Photo Voter ID Law in Virginia

Dr. Palazzolo's report says that "In order to verify the cause of some effect, three conditions need to be met: (1) the cause must be related to the effect; (2) the cause must occur before the effect; and (3) all other possible causes need to be ruled out."[95] He then focuses on efforts to counteract this third factor regarding the intent behind enactment of SB 1256. There is a serious problem with this approach: as discussed above, scholars and the U. S. Supreme Court have recognized that decision-makers may have more than a single motive for their actions. An analysis that demonstrates racially discriminatory intent as a motive or even a primary motive behind legislative action need not rule out all other possible motives. Even taking all of Dr. Palazzolo's arguments at face value he cannot rule out the suppression of Democratic-base minority voters as a motive for enactment of SB 1256. His primary alternative motivation of concern about voter fraud is certainly not mutually exclusive with Republicans' political interest in limiting voting opportunities by heavily Democratic minorities. Dr. Palazzolo's analysis also has serious deficiencies.

First, Dr. Palazzolo posits that deterrence of voter fraud could have been a motivation for enactment of SB 1256, rather than Obama's second consecutive victory in Virginia and the decline in white voter strength, which confirmed Dr. Palazzolo's own findings that Virginia had become a swing state at least in part because of a greater African American presence. Most of Palazzolo's argument is focused on generic reasons why Republicans would be concerned about voter fraud, which cannot explain the unprecedented scrapping of Virginia's 2012 non-photo ID law shortly after the 2012 election. Indeed, the email evidence presented above indicates that sponsors of SB 1256 had decided to introduce a voter photo ID bill in December 2012, a month after the election. That email evidence, moreover, discloses that, even with all the evidence before them of experience in 2012 election (including the Moran video discussed below), high level staffers in the governor's office believed that non-photo ID had been fully effective in deterring voter fraud and ensuring election integrity. Of course, it is the executive not the legislature that is responsible for the administration of elections.

Dr. Palazzolo concedes that no instances of documented or even plausible voter fraud emerged in the 2012 elections. The only argument that Dr. Palazzolo offers for voter fraud as even a cause for the new 2013 strict voter photo ID law was the entrapment video of Democratic campaign worker Moran. Even taken at face value, this video of a fantastical scheme for widespread voter impersonation, the sort of which has not taken place in Virginia or in any other state – including those with no voter ID laws of any kind – in recent history, would hardly outweigh fundamental changes in political competition in the state. As explained in my initial report, the full context of this video actually demonstrates how difficult, if not impossible, it is to engineer voter impersonation at the polls, even using utility bills.

Neither Dr. Palazzolo nor the author of the student paper upon which Dr. Palazzolo heavily relies also do not take into account the political intervention in the decision-making of

---

[95] Palazzolo Rpt., p. 17.

the State Board of Elections on the implementation of SB 1256. As explained in my initial report, this intervention resulted in the Board's changing its policy on the use of expired driver's licenses and passports and eliminating the use of such IDs for voting if they had been expired for more than one year. This went further than the Georgia law upon which Virginia's voter ID law was ostensibly based.  Neither the Board nor Senator Obenshain explained how this departure from the Georgia model or the practices in most other photo ID states relates to establishing the identity of the voter. This is no periphery issue: the GAO study of the effects of photo voter ID laws on turnout emphasizes that possession of driver's licenses among registered voters declines sharply when expired licenses are excluded.[96]

Dr. Palazzolo finally claims that provisions of the Virginia photo ID law do not suggest a motivation to suppress minority votes. This section of his report relies primarily on the Kuegler student paper, which for reasons specified above does not meet the standards of an academic study. Drawing on Kuegler's paper, Palazzolo suggests that the provisions of Virginia's voter photo ID law are less stringent than in most other states. Yet both Kuegler and Palazzolo miss the point that there are only 7 other states in the union with a "strict" voter photo ID that has not been struck down by the courts. All of these states are Republican controlled states. They also miss the point that only 5 of these 7 states have less restrictive rules on authorizing expired IDs than Virginia (the exceptions are Kansas and North Dakota, although Kanas authorizes the use of expired IDs for all voters aged 65-years or more). They also fail to note Virginia has arguably the most confusing voter ID law in the nation, with complex and conflicting definitions of what constitutes a "valid" ID that daunt even election officials.

Kuegler and Dr. Palazzolo also point to the provision of Virginia law that authorizes a registered voter to obtain a free voter ID card without documentation, upon nothing more than the voter's sworn affirmation of their identity. However, if the concern of the law was deterring voter fraud rather than making it more difficult to vote for minorities who are disproportionately poor, low income, and lacking in available automobiles this affirmation could have been accomplished at the polling place, a practice that would have been consistent with the practice of many other states as well as with earlier practice in Virginia—which did not result in any known instances of voter fraud. The GAO study of voter photo ID that Dr. Palazzolo cites in his report notes that in photo ID states "that allow all voters without ID to cast a regular ballot by affirming their own identity at the polling place … there would be no cost to the voter in this situation."[97]

Kuegler and Dr. Palazzolo also claim that Virginia among the 20 states that enacted photo ID laws since 2002, only Virginia and two other states authorize non-government issued photo IDs for voting. This claim is erroneous. The great majority of these 20 states – 13 – authorize some form of non-governmental ID for voting.[98]

---

[96] GAO, "Report to Congressional Requesters," p. 26.

[97] GAO, "Report to Congressional Requesters," p. 109.

[98] These states are Alabama, Arkansas, Idaho, Florida, Kansas, Louisiana, Mississippi, New Hampshire, North Dakota, Rhode Island, South Dakota, Virginia, and Wisconsin, as indicated by state websites and National Conference of State Legislature, Voter Identification Requirements.

### 5. Effects of the Photo Identification Law

Although Dr. Palazzolo claims to have studied the effects of the voter photo ID law, he conducts no systematic analysis of this issue and does not challenge the findings of my report or that of Dr. Rodden. He also ignores the findings of the GAO study that he otherwise quotes extensively that voter photo ID laws in Kansas and Tennessee had the effect of disproportionately suppressing the turnout of African Americans.

Dr. Palazzolo's main contention is that very few Virginians lack authorized photo IDs under SB 1256 because so few have received free voter IDs from the state, with just 3,199 applications filed through November 2015.[99] However, a more plausible interpretation of these meager results of the free ID program is that Virginia's outreach program has not been effective in reaching its target population. In contrast, the state of Indiana "issued 257,100 free identification cards" in the first 16 months after adoption of its strict voter photo ID law, between January 1, 2007, and May 6, 2008. It is highly implausible that Indiana would have had such orders of magnitude greater numbers of potential voters lacking acceptable IDs.[100]

## IV. Thornton Report

### 1. Overview

This report only deals in small part with my initial report. However, insofar as it considered issues addressed in my initial report, the response by Dr. Thornton misunderstands the nature of an intent analysis and also includes other errors and misinterpretations.

### 2. The Databases Examined

Dr. Thornton criticizes my report for its alleged failure to include individual data from "the Department of State for identifying those with U.S. passports, the Department of Defense and the Department of Veterans Affairs for identifying those with military IDs, and from the Virginia State employee databases and the Federal government databases for identifying those who likely have a government employee photo ID."[101] There are several problems with this critique.

First and foremost, Dr. Thornton fundamentally misunderstands the goal of my report—which was designed to "consider whether voter identification laws adopted and implemented by the Commonwealth of Virginia were enacted with the *intent* to discriminate against African American voters and would-be voters."[102]  (Lichtman Report, p. 1)  As I explained in my prior report, my goal was to scrutinize information *available at the time of adoption of SB 1256* for purposes of assessing intent.  Failing to understand this, Dr. Thornton criticizes my analysis for not taking into account at the individual-level the information listed above, which was not

---

[99] Palazzolo Rpt. p. 28.
[100] Michael J. Pitts and Matthew D. Neumann,  "Documenting Disenfranchisement: Voter Identification During Indiana's 2008 General Election ," *Journal of Law & Politics 25* (2009), p. 344.
[101] Expert Report of Janet Thornton, Jan. 8, 2016 ("Thornton Rpt."), pp. 4, 13
[102] Lichtman Rpt. p 1.

available to any decision-maker or advocate at the time of the adoption of SB 1256.

Second, despite criticizing me for failing to request and analyze this information, Dr. Thornton makes no effort to demonstrate whether such personal information from the federal government and the Commonwealth of Virginia is available to private entities as opposed to governmental bodies. In the voting rights litigation in North Carolina, in which I was an expert witness, only the U.S. Department of Justice had access to governmental individual-level records. Experts like myself for private parties had no access to such records.

Third, Dr. Thornton does not dispute my finding that African Americans are substantially less likely than whites to possess the two most common forms of IDs under SB 1256, Virginia driver's licenses and U. S. passports.

Fourth, Dr. Thornton does not dispute my finding that the disparate impact on driver's license and passport possession in Virginia is directly based on racial differences, not on party differences.

Fifth, Dr. Thornton does not dispute my finding that the possession of government employment IDs, student IDs, and veterans' IDs are small relative to licenses and passports and have much less racial differentials.

Sixth, Dr. Thornton does not dispute my finding that given the much higher unemployment rate of African Americans whites are much more likely to hold private employer government IDs.

### 3. Photo ID Requirements in Contexts Other Than Voting

In my initial report I refuted the claim of decision-makers who backed SB 1256 that photo IDs are required in other contexts, specifically receiving Medicare, Medicaid, and Social Security or getting prescriptions. Dr. Thornton does not challenge my analysis of any of these claims. Instead, she presents yet another claim that a photo ID is required to qualify for the Supplemental Nutrition Assistance Program (SNAP). This claim is incorrect and misleading.

In support of her claim regarding SNAP assistance Dr. Thornton asserts that, "applicants for the Supplemental Nutrition Assistance Program (SNAP) are required to submit to an interview where 'proof of identity (driver's license or picture I.D.), residence, income, resource and shelter expenses will be required,."[103] citing a page on the website of the Virginia Department of Social Services. Dr. Thornton fails to note that the same page indicates that any applicant can obtain a waiver exempting him or her from the interview and that the criteria for such a waiver are extremely broad:

"Waiver: A face-to-face interview is required unless the local agency agrees to conduct the interview by telephone or a prearranged home visit. Waiver of the face-to-face interview is determined on a case by case basis depending on the household's circumstances that include but are not limited to: illness, prolonged

---

[103] Thornton Rpt., p. 25.

severe weather, transportation difficulties, or work hours during normal agency office hours."[104]

In addition, Dr. Thornton fails to note that the Virginia SNAP program is the state-level subset of the federal SNAP program and is covered by federal law. Under federal law there are many ways to establish identity for applicants lacking a photo ID and no applicant can be denied benefits because he or she lacks a particular form of identification:

> "Identity may be verified through readily available documentary evidence, or if this is unavailable, through a collateral contact. Examples of acceptable documentary evidence which the applicant may provide include, but are not limited to, a driver's license, a work or school ID, an ID for health benefits or for another assistance or social services program, a voter registration card, wage stubs, or a birth certificate. Any documents which reasonably establish the applicant's identity must be accepted, and no requirement for a specific type of document, such as a birth certificate, may be imposed."[105]

Similarly, the Food Research and Action Center offers the following advice to SNAP applicants who may not have access to photo IDs:

> "The SNAP/Food Stamp caseworker is required to verify your identity. 7 CFR 273.2(f). There are many ways, however, that you may verify your identity. A photo ID is only one way. You should not be denied SNAP/Food Stamps simply because you do not have a photo ID. To prove who you are, you can use such things as a work or school ID, an ID for health benefits, an ID from another social services program such as TANF, wage stubs, a birth certificate, or a voter registration card. The SNAP/Food Stamp caseworker can also verify your identity by calling a "collateral contact" who can confirm you who are."[106]

Dr. Thornton also says that applying for welfare is more complex than applying for a voter ID card, which does not refute the fact that the voter photo ID still poses a disparate burden on those who lack such IDs. The two activities are also not commensurate. Putting food on the table or obtaining medical care is essential to basic survival. Unlike voting, moreover, welfare assistance is not a fundamental right and also amounts to a claim on government resources. In addition, the burden of obtaining a voter ID card can be greater because it requires a personal appearance that can waived for welfare applicants. Welfare applicants may also designate a personal representative to both apply for welfare and administer the benefits:

---

[104] "SNAP – Screening for Eligibility & Applying," Virginia Department of Social Services, http://www.dss.virginia.gov/benefit/snap.cgi. Waiver information at drop-box accessed at https://www.dss.virginia.gov/division/pa/search_tooltips.cgi?rm=Read;id=75.

[105] 7 CFR 273.2 – F(VII) "Identity" https://www.law.cornell.edu/cfr/text/7/273.2.

[106] Food Research Action Council, SNAP/Food Stamp Program Rights for People Experiencing Homelessness," http://frac.org/federal-foodnutrition-programs/snapfood-stamps/homeless-persons-rights-under-the-snapsnapfood-stamp-program/.

"Designating a Representative to Act on Your Behalf

A spouse, adult member of your household, trusted friend, relative or neighbor can be designated representative. This person may:

- Apply for SNAP for your household
- Receive a Virginia EBT Card that can access your SNAP account
- Use your SNAP benefits for you at the grocery store
- Receive copies of your SNAP notices and correspondence."[107]

Finally, Dr. Thornton's statistics demonstrating that minorities are heavily overrepresented among recipients of Medicaid and food assistance does not prove that minorities are better able than whites to complete applications. This data rather confirms the applicability of the Senate Factors to Virginia by showing that minorities must resort to governmental programs for food and health care to a much greater extent than whites.

### 4. Enumeration the Number of African-Americans Without an Acceptable Form of Identification

Dr. Thornton attempts to criticize my report for failing to enumerate the number of African Americans lacking an acceptable ID under SB 1256. Dr. Thornton also misunderstands that the purpose of my report was not to measure the total number of registered voters or potential registered voters who lack acceptable photo identification under SB 1256. Rather my purpose with respect to data on ID possession was to assess racial disparities between African Americans and whites. Possession of a Virginia photo ID, moreover, does not guarantee an opportunity to vote. The most common forms of IDs are not useable if expired for more than 12 months and any ID may not be usable if the name does not "substantially match" the name on the registration rolls.

Dr. Thornton claims incorrectly that I gauge racial disparities among voters in possession of various IDs under SB 1256 by inference from the lower socio-economic status of African Americans. It is true that the substantially lower socio-economic standing of African American relative to whites is important is assessing the predictable disparate impact on African Americans of SB 1256. However, it is not true that my measures of racial disparities are inferences from differences in socio-economic standing. I directly measure through survey data racial disparities in the most common form of photo IDs – Virginia driver's licenses and U. S. Passports. I use census data to measure access to other forms of photo IDs such as student IDs, government employee IDs, and veteran's IDs. The only measurement that depends on socio-economic standing is the inference that, because of their higher unemployment rate Africans Americans most likely have less access to private employer-issued photo IDs. It is feasible, however, to test that inference directly by examining the percentage of African Americans and whites of voting age who are employed in non-government work. According to the 2011 American Community Survey, available at the time of the adoption of SB 1256, 47.2 percent of whites of voting age in Virginia were employed in non-governmental jobs as compared to 44.2 percent of African

---

[107] "SNAP – Designating a Representative to Act on Your Behalf," Virginia Department of Social Services, http://www.dss.virginia.gov/benefit/snap.cgi.

Americans.

### 5. Provisional Voting

Dr. Thornton claims that the small number of no-ID provisional votes cast in 2014 and 2015 is indicative of a small number of registered voters who lack IDs. As indicated above, provisional votes cannot be taken as indicative of the numbers of voters lacking IDs. Moreover, as also indicated above, no-ID provisional ballots spiked substantially in Virginia after the implementation of SB 1256.

## V. Richman Report

### 1. Overview

Although the state claims that SB 1256 was motivated by concerns regarding election fraud and election integrity, Dr. Richman's report on these issues focuses on a form of electoral fraud that is not addressed by a voter photo ID law: non-citizen voting. Even taking all of his findings about non-citizen voting at face value, Dr. Richman himself has previously recognized that voter photo ID laws are "strikingly ineffective" as a remedy for non-citizen voting.[108] In Virginia, specifically, non-citizens can obtain all forms of IDs that are deemed acceptable voter ID under the Virginia law except U.S. passports.

Aside from these fundamental issues, Dr. Richman's report is fatally flawed for a number of additional reasons.

### 2. The Carter-Baker Commission

Dr. Richman misrepresents the findings of the Carter-Baker Commission and their relevance to assessing SB 1256 in Virginia. Although the section of the Commission's report on voter ID is not put adjacent to the section on expanding access to the ballot, the report clearly recommends both of these actions. Dr. Richman (and the Virginia general assembly, to the extent it relied on the Carter-Baker Commission to justify its enactment of photo voter ID) thus cherry-pick one aspect of the report and ignore its full context. I am quite familiar with the work of the Commission which was housed at my institution, American University. I sat in on deliberations of the Commission's Academic Advisory Committee and discussed its work extensively with its Director and my American University colleague, Professor Robert Pastor. Not surprisingly, as in all bipartisan Commissions, its recommendations were a compromise between Secretary Baker's advocacy of voter identification and President Carter's advocacy of expanded access to voting. Moreover, a joint Op Ed published by Secretary Baker and President Carter after publication of the Commission's report makes clear that they viewed voter identification and increased access to voting inseparable recommendations: "a free and fair election requires *both* ballot security and full access to voting."[109] (emphasis added). Thus, while the Commission recommended

---

[108] Jesse Richman and David Earnest, "Could Non-Citizens Decide the November Election?" *Washington Post*, 20 October 2014, https://www.washingtonpost.com/blogs/monkey-cage/wp/2014/10/24/could-non-citizens-decide-the-november-election/.

[109] Jimmy Carter and James A. Baker III, "A Clearer Picture on Voter ID," *New York Times*, 3 February 2008,

photo ID, it also recommended, for example, that eligible voters should also have to only register once in their lifetime with their voter registration updating automatically every time they move; that voters should not have to wait long at polling sites before voting; and that states should adopt nonpartisan election administration. Virginia's general assembly has not only not implemented these recommendations, as detailed in my original report, the same Republican-majority that promulgated the strict photo voter ID law (including specifically Senator Obenshain), repeatedly killed measures to address Virginia's historic problem with long lines on Election Day.

Dr. Richman also says that the Commission recommended an indication of citizenship on IDs authorized for voting. "It is clear that the commission envisioned a photo-identification requirement as a protection against multiple violations of election law including not merely impersonation fraud but also illegal voting by non-citizens,"[110] Richman writes. However, there is no such indication on the forms of IDs authorized for voting under SB 1256 or generally in voter ID laws across America. Thus Dr. Richman says in his *Washington Post* article—but not in his report to the Court—that voter photo ID laws (including necessarily Virginia's, which does not include such a requirement) are "striking ineffective" in protecting against non-citizen voting.

Dr. Richman additionally mentions that, according to the Carter-Baker Commission, photo voter ID laws provide some protection against "absentee ballot fraud," but none of his quotations from the Commission refers to absentee ballot fraud.[111] Moreover, SB 1256 does not require voter photo ID for mail-in absentee voting. Likewise, if we assume *en arguendo* that there are fraudsters committing voter impersonation in Virginia and that SB 1256 deters such fraud, it will only encourage fraudsters to turn to absentee ballot fraud, which the United States Election Commission has identified as a much more cost-efficient and less risky form of voter fraud than in-person voter impersonation fraud—the only type of voter fraud that a voter ID law could theoretically be useful in preventing (and a type of voter fraud of which there has been no evidence to have taken place in Virginia in recent history).[112]

Dr. Richman also quotes the Heritage Foundation as speculating that photo voter ID could discourage double-voting in two states. But no evidence is presented showing that such double-voting takes place or, if so, that it is less prevalent in states with strict voter photo IDs laws than those without such laws.[113]

Dr. Richman additionally quotes the Carter-Baker Commission for the proposition that even a small amount of fraud can turn elections.[114] However, he fails to note that even a small number of suppressed votes can also turn elections. Even if we take no-ID provisional ballots as a minimal estimate of suppressed votes in Virginia, those numbers are larger by many orders of

---

http://www.cartercenter.org/news/editorials_speeches/voter_id.html.

[110] Expert Report of Jesse Richman, Jan. 8, 2016 ("Richman Rpt."), p. 5.

[111] *Ibid.*

[112] The material from the Heritage Foundation that Dr. Richman attaches to his report, which reviews cases of alleged fraud over many decades, includes very few examples of voter impersonation at the polls and many more examples of absentee ballot fraud and registration issues.

[113] Richman Rpt., p. 6.

[114] *Ibid.*, p. 7.

magnitude than any measure of voter fraud in the Commonwealth, whether uncovered by state officials, by the News21 study, by the Republican National Lawyers' Association Study, or by any data presented in any of the expert reports submitted by defendants.

### 3. Studies of Turnout Effects of Photo Voter ID Laws

Dr. Richman claims in his report that political science studies demonstrate that "voter identification requirements including a requirement a voter provide a photo identification to validate their eligibility to cast a ballot does not correspond with any reduction in minority participation in elections."[115] He cites three studies in support of this proposition, ignoring other studies that do show turnout suppression generally and particularly among minorities, including the 2014 GAO study, the 2014 Texas study, and the findings of the 2014 Survey of the Performance of American Elections. Moreover, one of the studies upon which he relies focuses on 2006, when only Indiana had a strict voter photo ID law and even then it does not conclude that voter ID laws do not produce "any reduction" in minority turnout, but only that the "numbers are small," without defining the precise magnitude of those numbers. A second study upon which Dr. Richman relies focused on Tennessee and Virginia, but at a time when Virginia did not have a voter photo ID law. This study did not measure the effect of voter ID laws on minority turnout, but instead gauged the effect of various Get Out the Vote ("GOTV") messages on *mitigating* the turnout effects of voter ID laws. In other words, the study started from the position that voter photo ID laws *do* suppress turnout; the question the authors examined was whether GOTV efforts could materially mitigate that suppression. The authors provide the following concluding assessment of voter ID laws, which explains their focus on mitigating messages:

> "Election reform is back on the front burner in American politics. Some changes, such as the liberalization of absentee voting procedures, early voting, and later registration deadlines are designed to make voting easier. State voter ID laws, which have been at the center of partisan controversy for nearly a decade, stand in contrast to such reforms. Not only do they make voting more difficult; these laws also present tactical challenges to campaigns seeking to mobilize low-propensity voters."[116]

The third study upon which Dr. Richman relies, although up-to-date, did not distinguish between states with non-strict voter photo ID laws and states with strict photo voter ID laws.[117]

### 4. Non-citizen Voting and Voter Photo ID Laws

The substance of Dr. Richman's report is devoted to his study of non-citizen voting, which was also the subject of an academic article that he jointly published with Gulshan A.

---

[115] *Ibid.*, p. 14.

[116] Citrin Jack, Green Donald P., and Levy Morris. 2014. *Election Law Journal: Rules, Politics, and Policy. 13(2)* (2014), pp. 228-242. doi:10.1089/elj.2013.0209, quotation on p. 236.

[117] 20Rocha, Rene R., and Tetsuya Matsubayashi. "The Politics of Race and Voter ID Laws in the States: The Return of Jim Crow?" *Political Research Quarterly*, 67 (3) (2014) 666-679.

Chatta and David Earnest.[118] Dr. Richman's report makes the unique claim that voter ID laws are useful in deterring non-citizen voting, a conclusion that Dr. Richman himself previously rejected both in his Washington Post article and his academic study. In his academic article, but not in his report to this Court, Dr. Richman says that efforts to thwart non-citizen voting should be focused not on photo voter ID laws, but rather on the registration process. Ironically, in the January 2013 email chain reported above, Governor McDonnell's Secretary of Administration, Lisa Hicks-Thomas, also said that electoral changes in Virginia should focus on registration, a recommendation that the legislature ignored. It is also worth emphasizing that the General Assembly did not focus on fears about non-citizen voting in order to justify switching from a voter non-photo ID law to SB 1256 in 2013.

As for Dr. Richman's conclusion (previously published in the above-referenced academic article) that non-citizen voting is an actual problem, several prominent academics in the field have written articles detailing how his methodology is seriously flawed. An article in *Electoral Studies*, for example, scrutinized Dr. Richman's article and found that his results on non-citizen voting "are completely accounted for by very low frequency measurement error; further, *the likely percent of non-citizen voters in recent US elections is 0*." (emphasis added). The three authors of this article included Stephen Ansolabehere of Harvard University, the principal investigator of the Cooperative Congressional Election Study (CCES) upon which Dr. Richman relies for his data, Samantha Luks of YouGov, the organization that administers the CCES, and Brian F. Schaffner of the University of Massachusetts, Amherst, co-principle investigator of the CCES.[119]

The authors explain that even if the CCES on which Dr. Richman relies is 99.9 percent accurate, in such a large sample survey, the number of citizens incorrectly classified as non-citizens who voted would be enough to account for Dr. Richman's finding that non-citizen voting has taken place. To demonstrate the errors that can arise with samples of non-citizen voters, the authors examine the CCES panel study that includes the same group of respondents in 2010 and 2012. The authors demonstrate 20 respondents who reported non-citizenship in the 2012 CCES survey had earlier reported in the 2010 CCES survey that they were U.S. citizens. These respondents represent examples of the reporting error that can creep into very large survey samples. In effect, this group represents a minimal estimate of the reporting error which infects Dr. Richman's study. This reporting error, the authors show is highly consequential. Of this group of 20 misclassified non-citizens, 3 or 15 percent were validated voters. In comparison, the group least likely to be misclassified as non-citizens in 2012 were those who also reported being non-citizens in 2010. Of this group, 0 were validated voters in 2012. Based on reporting error alone the authors indicate that the number of incorrectly classified voting non-citizens in very large samples is at least as great as the number of non-citizen voters that Richman found in his study.

Professor Ansolabehere and his colleagues conclude that Dr. Richman cannot draw from his study any predicted overall rate of non-citizen voting in the United States: "Our analysis

---

[118] Jesse Richman, Gulshan A. Chattha, and David Earnest, "Do Non-Citizens Vote in U. S. Elections," *Electoral Studies*, 36 (2014), 147-154.

[119] Stephen Ansolabehere, Samantha Lucks, and Brian F. Schaffner, The Perils of Cherry Picking Low Frequency Events in Large Sample Surveys," *Electoral Studies* 40 (2015), 409-410, quotation on p. 409.

indicates that all of those cases [of non-citizen voting purportedly identified by Dr. Richman] are nearly certainly citizen voters who are misclassified as being non-citizens. Hence, their predicted vote rates of non-citizens in fact reflect the behavior of citizens." These authors—who include the persons most knowledgeable about the CCES—also warn that "the survey was not designed to sample non-citizens," and thus, "misclassified people can readily account for the observed vote among those who reported that they are non-citizens." The authors ultimately caution that, "in very large sample surveys, classification errors in a high-frequency category can readily contaminate a low-frequency category, such as noncitizens. As a result, researchers may draw incorrect inferences concerning the behavior of relatively rare individuals in a population when there is even a very low level of misclassification."[120]

In a response to a Fact Checker analysis (but again, not included in the report that he prepared for the Court in this case), Dr. Richman acknowledges the serious questions that academics have raised about his study and cautions against drawing conclusions from his study without additional validation. Richman said "we agree with your rating of a 4 from the Fact Checker." He added, "science is a process of finding, validation, replication and rebuttal. We are at the very beginning of the process. Colleagues have raised reasonable questions about the data we used--problems that we acknowledge in both the study and the Monkey Cage. It will take some time and additional research to increase confidence in our findings."[121]

There are many other methodological problems with Dr. Richman's report. For example, he attempts to show that persons self-identified as non-citizens in the 2010 CCES had different attitudes from citizens. However, I could not replicate his results. In addition, he makes the wrong comparison. The proper comparison should have been with immigrants who are naturalized citizens, given that the CCES offers respondents the choice of saying, "I am an immigrant to the USA and a naturalized citizen," or "I am an immigrant to the USA but not a citizen."[122]

More critically, there are serious errors and misrepresentations in Dr. Richman's attempt in his report to transform photo voter ID from a "strikingly ineffective" remedy for non-citizen voting to an effective remedy. First, Dr. Richman looks at non-voting, non-citizens who identify a lack of voter ID as a reason for not voting. He says that in 2008, 2010, and 2012 the CCES reported the number of "self-identified non-citizen respondents said they did not vote because 'I did not have the correct form of identification.'" However, the CCES did not ask the question in this form. Rather they asked whether the lack of a correct ID was the "main reason" for not voting or, in a separate question, whether the lack of a correct ID was a second reason for not voting. Those citing a lack of correct ID as the main reason for not voting should constitute the group of non-citizens most clearly stopped from voting by photo voter ID laws. It is these results

[120] *Ibid.*, p. 410.
[121] Mark Robison, "Fact Checker Update: Will Non-Citizen Voters Help Democrats," 24 October 2014, http://www.rgj.com/story/news/politics/2014/10/29/fact-checker-noncitizen-voters-swing-senate/18131029/.
[122] Stephen Ansolabehere, Guide to the 2008 CCES, August 10, 2011, p. 35. The racial distribution of reported non-citizens in the 2010 CCES, which is 45 percent Hispanic and Asian, does not remotely match the U. S. Census Bureau's estimate of the racial composition of non-citizens of voting age, which is more than three-quarters Hispanic and Asian, https://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html.

that according to Dr. Richmond demonstrate that enactment of voter photo ID laws will stop at least some non-citizens from voting.

In fact, results from the 2008, 2010, and 2012 CCES show quite the opposite as indicated in Table 8 and Summary Table 9. First, the numbers of non-citizens reporting the lack of a correct ID as a main reason for not voting is extremely low and likely reflects measurement error: 2 in 2008, 7 in 2010, and 5 in 2012, for a total of 12 over three elections. Second, virtually none of these alleged non-citizens who reported that the lack of an ID as the main reason for not voting resided in a photo voter ID state, whether strict or non-strict. In 2008, 0 of 2 of these respondents resided in a photo ID state, in 2010 1 of 7, and in 2012 0 of 5. For all three elections combined 1 of 14 non-citizens (7%) who cited the lack of an acceptable ID as a reason for not voting resided in a photo ID state.

Dr. Richman mentions as another reason for the alleged efficacy of photo ID in deterring non-citizen voting a result showing that "Only 7 (25.9%) [of non-citizens] indicated that they were not allowed to vote after showing identification." I was unable, however, to replicate these results. I found only 4 of 35 (11.4%) non-citizens asked to present picture ID at the polls were not allowed to vote in 2008. Moreover, as indicated in Table 11, none of these non-citizens who reported being asked for voter ID and did not vote were from photo voter ID states.

**Table 9**
**Number of Non-Citizens Citing Lack of a Correct ID as Main Reason for Not Voting,**
**CCES 20008-2012, State of Residence of Each Citizen**

| 2008 CCES | | |
|---|---|---|
| **State** | **# of Non-Citizens in State Citing Lack of ID as Main Reason for Not Voting** | **Photo ID State*** |
| | | |
| **Colorado** | **1** | **NO** |
| **Washington** | **1** | **NO** |
| | | |
| **2010 CCES** | | |
| **State** | **# of Non-Citizens in State Citing Lack of ID as Main Reason for Not Voting** | **Photo ID State*** |
| | | |
| **California** | **2** | **NO** |
| **Florida** | **1** | **YES** |
| **New York** | **1** | **NO** |
| **North Carolina** | **1** | **NO** |
| **Ohio** | **2** | **NO** |
| | | |
| **2012 CCES** | | |
| **State** | **# of Non-Citizens in State Citing Lack of ID as Main Reason for Not Voting** | **Photo ID State*** |
| | | |
| **California** | **3** | **NO** |
| **Connecticut** | **1** | **NO** |
| **New York** | **1** | **NO** |
| | | |
| * Includes both strict and non-strict photo ID states at the time of the survey. | | |

**Table 10**
**Summary: Number of Non-Citizens Citing Lack of a Correct ID as Main Reason for Not Voting,   CCES 20008-2012, State of Residence of Each Citizen**

| 2008 CCES | | |
|---|---|---|
| | | |
| **Total # of Non-Citizens in Citing Lack of ID as Main Reason for Not Voting** | **Number in Photo ID States** | **Percent in Photo ID States** |
| | | |
| **2** | **0** | **0%** |
| | | |
| 2010 CCES | | |
| **Total # of Non-Citizens in Citing Lack of ID as Main Reason for Not Voting** | **Number in Photo ID States** | **Percent in Photo ID States** |
| | | |
| **7** | **1** | **20%** |
| 2012 CCES | | |
| **Total # of Non-Citizens in Citing Lack of ID as Main Reason for Not Voting** | **Number in Photo ID States** | **Percent in Photo ID States** |
| | | |
| **5** | **0** | **0%** |
| | | |
| 2008-2012 CCES Combined | | |
| **Total # of Non-Citizens in Citing Lack of ID as Main Reason for Not Voting** | **Number in Photo ID States** | **Percent in Photo ID States** |
| | | |
| **14** | **1** | **8%** |

54

**Table 11**
**Non-Citizens Reporting Being Asked to Show Photo ID and Not Voting, CCES 2008, State of Residence of Each Citizen**

| 2008 CCES | | |
|---|---|---|
| | | |
| **State** | **# of Non-Citizens in State Who Reported Being Asked for Photo ID and Not Voting** | **Photo ID State** |
| | | |
| **California** | **1** | **NO** |
| **North Carolina** | **1** | **NO** |
| **New York** | **1** | **NO** |
| **Nevada** | **1** | **NO** |
| | | |

55

# EXHIBIT 8

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF VIRGINIA

 3                  RICHMOND DIVISION

 4

 5    - - - - - - - - - - - - - - X

 6    BARBARA LEE,                   :

 7         Plaintiff,                :

 8              v.                   :   Case No.

 9    VIRGINIA STATE BOARD OF        :   3:15-CV-357-HEH

10    ELECTIONS, et al.,             :

11         Defendants.               :

12    - - - - - - - - - - - - - - X

13

14              Continued videotaped deposition of

15    ALLAN J. LICHTMAN, Ph.D., a witness herein, called

16    for examination by counsel for Defendants in the

17    above-entitled matter, pursuant to notice, the

18    witness being duly sworn by ANGELA K. MCCULLOUGH,

19    RPR, a Notary Public in and for the District of

20    Columbia, taken at the offices of Arent Fox LLP, 1717

21    K Street, NW, Washington, DC, at 3:13 p.m., Monday,

22    February 1, 2016, and the proceedings being taken

23    down by Stenotype by ANGELA K. MCCULLOUGH, RPR, RPR.

24

25    PAGES 164 - 231
```

                                        Page 164

1    APPEARANCES:

2

3        On behalf of the Plaintiff:

4                BRUCE V. SPIVA, ESQ.

5                Perkins Coie, LLP

6                700 13th Street, NW, Suite 600

7                Washington, DC  20005

8                (202) 654-3960

9                BSpiva@perkinscoie.com

10

11

12        On behalf of the Defendants:

13                KIRSTEN A. HART, ESQ.

14                Arent Fox LLP

15                555 West 5th Street, 48th Floor

16                Los Angeles, California  90013

17                (213) 629-7400

18                kirsten.hart@arentfox.com

19

20

21        ALSO PRESENT:  Kim Johnson, Videographer

22

23

24

25

                                    Page 165

1                    C O N T E N T S

2    WITNESS                    EXAMINATION BY COUNSEL FOR

3    ALLAN J. LICHTMAN, Ph.D.      DEFENDANTS

4      By Ms. Hart                   168

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                    Page 166

```
 1              P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  My name is Kim Johnson
 3   representing Veritext.  The date today is February
 4   1st, 2016.  The time is 3:13.  This deposition is
 5   being held at Arent Fox located at 1717 K Street,
 6   Northwest, Washington, DC and is being taken by
 7   counsel for the defendants.
 8              The caption of this case is Barbara Lee,
 9   et al., versus Virginia State Board of Elections, et
10   al.  This case is filed in the US District Court of
11   Eastern Virginia, Case No. 3:15-CV-357.  And the name
12   of the witness is Allan Lichtman.
13              At this time, the attorneys will identify
14   themselves and state whom you represent.
15          MS. HART:  My name is Kirsten Hart, and I
16   represent the defendants in this action.
17          MR. SPIVA:  My name is Bruce Spiva, and I
18   represent the plaintiffs and the witness here today.
19          THE VIDEOGRAPHER:  Our court reporter,
20   Angela McCullough, representing Veritext will swear
21   in the witness, and we can proceed.
22   Whereupon,
23              ALLAN J. LICHTMAN, Ph.D.,
24   called as a witness by counsel for the Defendants,
25   and having been duly sworn by the Notary Public, was
```

Page 167

1  examined and testified as follows:

2          EXAMINATION BY COUNSEL FOR DEFENDANTS

3  BY MS. HART:

4      Q.    Dr. Lichtman, thank you for joining us

5  once again to conclude your deposition.

6          During your prior deposition, we marked as

7  Exhibit 1 your notice of deposition.  Because we

8  spoke with your counsel about it, we didn't re-notice

9  your deposition.  But do you understand that you're

10  here today pursuant to that same notice?

11      A.    I do.

12      Q.    And that you continuingly have an

13  obligation under oath to tell the truth?

14      A.    I understand that.

15      Q.    Excellent.  I -- as we've already

16  discussed, I don't anticipate that your deposition

17  will take more than an hour or two.  But any breaks

18  that you need, just let me know, and we'll try and

19  wrap this up --

20      A.    I appreciate that.

21      Q.    -- shortly.

22          At your last deposition, we marked your

23  original expert report as Exhibit 3, your rebuttal

24  report as Exhibit 4, the Baker Commission report as

25  Exhibit 5, and the American University report as

Veritext Legal Solutions
866 299-5127

1    Exhibit 6.  Do you generally remember that?

2         A.    I do.  I don't remember actually looking

3    at Exhibit 6.  I think we stopped as we were just

4    about to get to it.

5         Q.    Fair enough.  I'm not going to remark the

6    exhibits since they've already been marked.  But I

7    brought a copy with me so that you can reference them

8    throughout the deposition.

9              So I'm going to pass those out now.

10        A.    That sounds fair.

11        Q.    All right.  I guess we will start with

12   Exhibit 6, the American University report.

13             MR. SPIVA:  Thank you.

14   BY MS. HART:

15        Q.    Here is Exhibit 3, your report.

16        A.    Great.

17             MR. SPIVA:  And I have a copy of the

18   report, so you don't need to give me one.  Thanks

19   though.

20   BY MS. HART:

21        Q.    Exhibit 4 is your rebuttal report.

22        A.    Thank you.

23             MR. SPIVA:  Yeah.  I'm good.

24   BY MS. HART:

25        Q.    And Exhibit 5 is the Carter-Baker

                                        Page 169

1   Commission.

2       A.      Right.

3               MR. SPIVA:   That I might need an extra.

4   Thanks.

5   BY MS. HART:

6       Q.      All right.   During your last deposition, I

7   believe you testified that it is your opinion that

8   voter fraud in Virginia is essentially nonexistent;

9   is that right?

10      A.      I think I talked specifically about voter

11  impersonation fraud as being essentially nonexistent.

12      Q.      Are there other forms of fraud that you

13  believe do exist, voter fraud specifically, in

14  Virginia?

15      A.      I haven't made a specific study of other

16  types.   But my recollection is any type of voter

17  fraud in Virginia is extremely rare.   I recall

18  looking at a couple of surveys, one by News21,

19  consortium of universities, and the other by the

20  Republican National Lawyers Association which

21  explicitly was trying to find fraud, trying to

22  undermine the argument that fraud was essentially

23  nonexistent.   And I don't recall seeing any voter

24  impersonation fraud.   And with tens of millions of

25  ballots cast over the broad period they looked at, I

Page 170

1    recall very little fraud of any kind.

2        Q.    And while it is your opinion, based upon

3    the studies and surveys that you've reviewed, that

4    voter fraud in Virginia is extremely rare, do you

5    also acknowledge that there are other people such as

6    the drafters of the Baker -- excuse me -- the

7    Carter-Baker report and American University report

8    who disagree?

9        A.    Well, first --

10            MR. SPIVA:  Objection.

11            But you can answer.

12            THE WITNESS:  Yeah.  First of all, that

13   report is now 11 years old.  So I don't think it's up

14   to date on the situation over the last decade with

15   respect to voter fraud.  Two, it's not

16   Virginia-specific.

17            Three, my recollection of the report --

18   and I know it pretty well, but it was 11 years ago --

19   is that they did not really cite any specific

20   evidence of widespread voter fraud of any kind, but

21   rather kind of generalizations mostly from advocates.

22   BY MS. HART:

23       Q.    All right.  Let's go to Exhibit 5 then,

24   the Carter-Baker Commission.

25       A.    Okay.

                                        Page 171

1      Q.    If you could please turn to page 45.

2      A.    All right.

3      Q.    I'd like to draw your attention to 5.1 on

4  page 45.  Could you please read out loud the first

5  two paragraphs under 5.1.

6      A.    Certainly.  "While election fraud is

7  difficult to measure, it occurs.  The US Department

8  of Justice has launched more than 180 investigations

9  into election frauds since October 2002.  These

10 investigations have resulted in charges for multiple

11 voting, providing false information on the felon

12 status, and other offenses against 89 individuals and

13 in convictions of 52 individuals.  The convictions

14 related to a variety of election fraud offenses from

15 vote buying to submitting false voter registration

16 information, and voter-related offenses by

17 noncitizens."

18            And there's a footnote 54, which I suppose

19 I should read, too.

20     Q.    If you can find it, go right ahead.

21     A.    If I can't find it is right.

22     Q.    You know, I think it's enough that you

23 have noted that there is a footnote 54.

24     A.    Yeah.  I don't know what it says, you

25 know, and how it qualifies this, but -- wait.  I

                                          Page 172

1   think I found it.  It just says U.S. Department of

2   Justice press release.

3          "In addition to the federal investigation,

4   state attorneys general and local prosecutors handle

5   cases of election fraud.  Other cases were never

6   pursued because of the difficulty in obtaining

7   sufficient evidence for prosecution or because of the

8   low priority given election fraud cases.  One

9   district attorney, for example, explained that he did

10  not pursue allegations of fraudulent voter

11  registration because it is a victimless and

12  nonviolent crime."

13         And there's a footnote 55, which refers to

14  a US government accountability report.

15     Q.    Thank you, Dr. Lichtman.

16         Would you agree that a possible

17  explanation for surveys showing a low incident of

18  voter fraud could be because those crimes go

19  unprosecuted?

20     A.    No.  I don't agree with that at all.  And

21  if you want to know the reasons, I can explain it.

22     Q.    I would love to know the reasons.  Thank

23  you.

24     A.    Because, as I note -- I believe it's in my

25  rebuttal report.  In fact, there have been very

                                          Page 173

1    extensive after-the-fact investigations of

2    allegations of voter fraud, particularly allegations

3    of voter impersonation, and extensive investigation

4    involving all of those allegations have failed to

5    show up either systematic voter fraud of any kind and

6    certainly no voter impersonation of any significant

7    degree.

8              I conducted one of those investigations

9    personally, and that was after the -- I believe it

10   was the 1992 gubernatorial election in the State of

11   Maryland.  And that is, the losing candidate,

12   Ellen Sauerbrey lost by about a few thousand votes,

13   sued on the grounds that voter fraud accounted for

14   the victory of her opponent, Parris Glendening.

15             I was asked at the time by the attorney

16   general, a very respected national figure who served

17   for many years as Maryland attorney general, Joe

18   Curran, to investigate the situation.  And Joe Curran

19   told me quite specifically if there's voter fraud

20   happening in my state, I want to know about it.  He

21   didn't say, you know, we want you to debunk these

22   allegations or anything like -- like -- like that.  I

23   think it was actually -- I might have misspoken.  I

24   think it was after the 1994 election that this

25   occurred.

```
 1              And we looked at every single allegation
 2    of voter fraud brought up by Ms. Sauerbrey.  My own
 3    work uncovered some unintentional errors.  There are
 4    always clerical errors.  But not a single fraudulent
 5    vote among 1.4 million ballots cast in the election.
 6    I even wrote a column called "When the Dead Walk"
 7    showing how unfounded these allegations of voter
 8    impersonation were.  People -- particularly people
 9    impersonating dead voters was a major allegation.
10              A trial was held in Maryland courts,
11    Maryland District Court.  And Judge Raymond Thieme,
12    who said in open court that he voted for
13    Ms. Sauerbrey, dismissed the case because there was
14    no evidence of voter fraud.  And I never even had to
15    testify.
16              Similarly, subsequent investigations were
17    conducted by the US Attorney, the FBI, and the state
18    prosecutor, and they did not find any evidence of
19    voter fraud.
20              And Maryland is a state where there's no
21    ID requirements whatsoever.  You show up at the
22    polls.  You tell them you're Allan Lichtman, and you
23    get to vote.
24              Similarly, an extensive investigation -- I
25    wasn't involved in this one -- in Minnesota was
```

Page 175

1    conducted after that very, very tight election for US

2    Senate.  And no -- not a single instance of voter

3    impersonation or any widespread voter fraud was

4    uncovered.

5              There are also studies that don't rely

6    upon prosecutions or allegations, including one

7    conducted by Dr. Hood, one of the experts cited in

8    the report of defendants' expert, Dr. Owen, as well

9    as other studies that don't rely upon allegations or

10   investigations.  And they found no evidence of voter

11   fraud and certainly no evidence of voter

12   impersonation.  So it is not because it's hard to

13   detect.

14        Q.    Dr. Lichtman, I believe you pointed out

15   that the Carter-Baker Commission report is 11 years

16   old.  Would you agree that it is at least as reliable

17   as your study conducted in 1994?

18        A.    No.  Not at all.

19        Q.    Why is that?

20        A.    Because my study was a detailed study of

21   every single allegation of voter fraud.  We took

22   seriously every allegation, and we conducted many,

23   many weeks of investigation looking specifically at

24   each allegation.

25              What you had me read from the Carter-Baker

                                              Page 176

1    Commission was not any --

2             MR. SPIVA:  Page 45.  Page 45 if you were

3    looking for it.

4             THE WITNESS:  Yeah.  I'm looking for that.

5    Thank you.

6             -- was not any investigation conducted by

7    the Carter-Baker Commission or its staff itself, but

8    was simply a citation of statistics from the

9    Department of Justice.  And that's 52 individuals

10   over a three-year span involving a presidential

11   election, numerous midterm elections, hundreds of

12   thousands of ballots literally being cast, and 52

13   convictions.

14            Moreover, none of these convictions in

15   either paragraph or even allegations mentions voter

16   impersonation.  They talk about voter registration,

17   noncitizens, and felons, and multiple voting.  But

18   not one of them discusses anything about voter

19   impersonation.

20   BY MS. HART:

21       Q.    So would you agree that the reliability of

22   this report and your own work as well is independent

23   of its age?

24       A.    Not entirely.  I think it's relevant to

25   have recent data available if you're making, you

Page 177

1    know, allegations about a policy adopted in, what,

2    2013.

3            Moreover, I had Virginia-specific

4    information.  There was no Virginia-specific

5    information in the 2005 study because the

6    Carter-Baker Commission did not have available to it

7    either the Republican National Lawyers Association

8    study or the News21 study, the Hood study, or the

9    other recent study of voter fraud that did not rely

10   on allegations, prosecutions, or convictions.

11       Q.    Still on page 45, could you please read

12   the last full paragraph on that page starting with

13   "Investigation."

14            MR. SPIVA:  Objection to the extent the

15   document speaks for itself.

16            But you can -- you can read it.

17            THE WITNESS:  I'm happy to read it.

18            "Investigation and prosecution of election

19   fraud should include those acts committed by

20   individuals, including election officials, poll

21   workers, volunteers, challengers, or other nonvoters

22   associated with the administration of elections and

23   not just fraud by voters."

24   BY MS. HART:

25       Q.    Do you agree with that definition of voter

                                          Page 178

1  fraud?

2      A.    I don't see a definition of voter fraud

3  here.  It just says election fraud, whatever it is,

4  however they define it, should include whatever acts

5  they're talking about committed by election

6  officials, poll workers, volunteers, challengers, or

7  other nonvoters.  I don't see a specific definition

8  of election fraud in that paragraph.

9      Q.    Does your definition of election fraud

10 include acts committed by individuals, including

11 election officials, poll workers, volunteers,

12 challengers, or other nonvoters associated with the

13 administration of elections?

14     A.    I do believe some of these types could be

15 committing election fraud; that is, illegal

16 activities associated with elections.

17     Q.    Let's turn to page 18 of the same report.

18     A.    Okay.

19     Q.    Page 18 starts at 2.5, Voter

20 Identification.

21           Dr. Lichtman, could you please read the

22 second full paragraph on that page.

23     A.    The one that says, "There is no evidence"?

24     Q.    Yes.

25     A.    "There is no evidence of extensive fraud

Page 179

1    in US elections or of multiple voting.  But both

2    occur and it could affect the outcome of a close

3    election."

4              And then there's another note, 19, which

5    we'll get to.

6              "The election" -- "electoral system cannot

7    inspire public confidence if no safeguards exist to

8    deter or detect fraud or to confirm the identity of

9    voters.  Photo IDs currently are needed to board a

10   plane, enter federal buildings, or cash a check.

11   Voting is equally important."

12             Let me see what note 19 says.

13             MR. SPIVA:  It's on page 73.

14             THE WITNESS:  A lawyer who's helpful.

15             MR. SPIVA:  A rarity.  I know.

16             THE WITNESS:  Details were provided in

17   section 1.1.  I'm looking at section 1.1.  I don't

18   see any additional evidence of voter fraud in there.

19   BY MS. HART:

20        Q.    All right.  So on page 18, the first

21   sentence you read says, "There's no evidence of

22   extensive fraud in US elections or of multiple

23   voting.  But both occur, and it could affect the

24   outcome of a close election."

25             Do you agree with that?

Page 180

1          A.    Oh, here's -- here's -- let me see what

2    they have here.  They actually have a paragraph on

3    fraud in section 1.1.

4               Yeah.  I think this evidence is not

5    correct at all because I looked at the Milwaukee,

6    Wisconsin situation, and I think it's referenced in

7    my report.  And there is no clear evidence of fraud,

8    including 2,000 cases of voting illegally, 100 people

9    who voted twice, used fake names.  None of that that

10   is mentioned in that paragraph proved to be true.

11   Those were allegations that did not hold up.

12              And that's typical of this whole voter

13   fraud area, that lots of allegations are made,

14   particularly by interest groups interested in, you

15   know, this issue one way or the other.  And when

16   investigated like we did in Maryland, like they did

17   in Minnesota, and like they did in Wisconsin, these

18   allegations did not prove to be correct.  And I know

19   personally, because I've looked at it, these

20   statements about Milwaukee, Wisconsin were not

21   correct.

22              And there's another allegation here about

23   dead people voting.

24              THE WITNESS:  Footnote 4, do you know

25   where that is?

Page 181

```
 1              MR. SPIVA:  I'll have to check.
 2              THE WITNESS:  That was the subject of the
 3    investigation in my example in Maryland and
 4    Dr. Hood's investigation.  There were allegations of
 5    66 supposed dead people voting, and it turned out
 6    none of them had any validity.  These were people who
 7    either were mistakenly listed as dead, as we found in
 8    Maryland, or who had voted absentee and subsequently
 9    died.  And so this notion of dead people voting, when
10    those allegations are made, they don't hold up.
11              MR. SPIVA:  Page --
12              THE WITNESS:  What page?
13              MR. SPIVA:  Page 72 is where --
14              THE WITNESS:  Let me see what the sources
15    for all of these dead folks.
16              And this is footnote 4?
17              MR. SPIVA:  Mm-hmm.
18              THE WITNESS:  Newspaper report, not a
19    serious investigation.
20    BY MS. HART:
21         Q.   Well, Dr. Lichtman, just to stay on point
22    with what this study says, it says, "There is no
23    evidence of extensive fraud in US elections or of
24    multiple voting.  But both occur, and it could affect
25    the outcome of a close election."
```

Page 182

1            Are you disputing the idea that either

2    election fraud or multiple voting occurs at all?

3        A.    No.  I'm not saying it doesn't occur at

4    all.  But I --

5        Q.    Okay.

6        A.    Let me finish.  But I think all -- and

7    remember, this is not a study.  You keep referring to

8    the Carter-Baker Commission study.

9            Carter-Baker Commission did not do any

10   study of voter fraud.  It's simply citing allegations

11   by others, many of which are unfortunately highly

12   unreliable.

13           Of course I'm not saying it never happens.

14   I am saying it is incredibly rare and that voter

15   impersonation, which voter ID is allegedly designed

16   to stop, is even rarer.  So rare as to be almost

17   nonexistent.

18           And in Virginia, there is no evidence

19   whatsoever of any voter impersonation over tens of

20   millions of ballots cast over more than a ten-year

21   period.  And I don't see any evidence here that voter

22   fraud turned any election.

23           And I do know of one example.  I think it

24   occurred in -- in a town in Florida, Miami Beach

25   maybe.  And that was all absentee ballot fraud.  And

Page 183

1    this is what's so interesting about the voter ID law

2    in Virginia.  Does nothing with respect to absentee

3    ballots.  It only deals with voting at the polls.

4         Q.    Would you nonetheless agree that to the

5    extent that there are any incidents of fraud in US

6    elections or multiple voting, that it could affect

7    the outcome of a close election?

8         A.    Anything is possible.  I mean, one vote

9    could affect the outcome of a close election.  But I

10   have never seen any examples of voter impersonation

11   affecting the outcome of an election.

12            Moreover, on balance, particularly in

13   Virginia, given the essential nonexistence of voter

14   impersonation, you've got to weigh that against the

15   large numbers of persons who either have to cast

16   provisional ballots or deterred from going to the

17   polls.  The balance is overwhelmingly on one side.

18   And the voter deterrence of voter ID laws is far more

19   likely to swing a close election.

20            Indeed, I cited the study in Texas where

21   they found a deterrence effect in something like the

22   20,000 vote range in one congressional district.  And

23   while you can't prove it would've turned the

24   election, the authors say it may well have.

25            If you put all the allegations together or

Page 184

1    all the documentation together over the past dozen

2    years of voter fraud everywhere in the country, it

3    would not add up to the number of deterred votes in

4    one election in one congressional district in Texas.

5        Q.    The second sentence that you read under

6    2.5 is, "The electoral system cannot inspire public

7    confidence if no safeguards exist to deter or detect

8    fraud or to confirm the identity of voters."

9            Do you agree with that?

10       A.    I'm sorry.  Which -- which page are we on?

11   I've been jumping back and forth with the footnotes.

12       Q.    Of course.  Page 18, section 2.5, the

13   second full paragraph.

14       A.    Let me unpack that because there's a lot

15   in there.

16            First of all, it says, "If no safeguards

17   exist."  Obviously, there are safeguards in every

18   single state against fraud, including the State of

19   Maryland where we don't have any kind of

20   identification at the polls, and there's been no

21   detection of voter impersonation.  There are other

22   safeguards.

23            Secondly, there is no relationship

24   whatsoever between public confidence and elections

25   and the adoption of voter ID laws.

Veritext Legal Solutions
866 299-5127

1    Q.    Why is it that you believe there's no
2  correlation between public confidence and the
3  occurrence of voter ID laws?
4    A.    It's not something I believe.  It's
5  something that's been confirmed by the studies.  And
6  I cite the studies and cite the results in my report.
7    Q.    Could you cite for me today some of these
8  studies --
9    A.    Certainly.
10    Q.    -- or reports that confirm there's no
11  correlation between public confidence and voter ID
12  laws?
13    A.    Yeah.  I've got to find them in my report.
14  Just give me a little bit of time.  I don't want to
15  do this from memory.
16          On page 22 and 23 of my rebuttal report, I
17  present evidence from The Survey of the Performance
18  of American Elections showing not only is there no
19  relationship between voter ID laws and voter
20  confidence, but there's a negative relationship; that
21  is, overwhelmingly voters in states that have adopted
22  strict voter ID laws have less confidence than the
23  national average that votes in their city or county
24  would be fairly counted.
25          There's also a study in my original report

                                        Page 186

1    from Dr. Ansolabehere who found, looking at the

2    relationship and surveys between voter ID laws and

3    voter confidence, that there was no correlation.

4    Adopting voter ID laws did not improve voter

5    confidence.

6         Q.    Taking voter ID laws specifically out of

7    it, do you nonetheless agree that it is important to

8    have safeguards in place to deter or detect fraud in

9    order to enhance public confidence in the electoral

10   process?

11        A.    I don't think that's what the Carter-Baker

12   Commission report said.  It said, "if no safeguards

13   exist."  And there are safeguards everywhere.  But I

14   think you've got to balance so-called safeguards and

15   what they're trying to safeguard against their

16   effects on the ability of voters to be able to go to

17   the polls and vote without impediments.

18             It's interesting that the next sentence on

19   that Carter-Baker Commission report says, "Photo ID

20   is needed to board a plane, enter federal buildings,

21   and cash a check."  As I showed in my report, that's

22   not true.  And moreover, none -- none of these are

23   fundamental rights like voting.

24             So when you're dealing with peoples' most

25   fundamental right, something the Supreme Court says

                                        Page 187

1    is kind of the basis of all other rights, you've got

2    to be really, really careful that you have a real

3    problem that you're dealing with if you're going to

4    impose, quote, unquote, "safeguards" that have an

5    impact on peoples' ability to exercise their most

6    important and their most fundamental of rights.

7          Q.    And I'm just trying to understand your

8    position on the existence of safeguards to deter or

9    detect fraud.

10          And so is it your position that it is not

11    important to have safeguards in place to deter or

12    detect fraud in order to enhance public confidence in

13    the electoral process?

14          A.    Leaving aside voter IDs?  Because we just

15    said voter IDs do not enhance public confidence.

16          Q.    You said that.  Yes.

17          A.    The studies show that.  It wasn't just my

18    opinion.  I mean, we can discuss the studies if you

19    want.  But it wasn't just an opinion.  It was based

20    on studies.

21          Secondly, I didn't give you a blanket

22    statement that there should be no safeguards.  There

23    are safeguards in place in every state.  And they've

24    been very effective in deterring voter fraud because

25    it's so minimal and nearly 100 percent effective in

Page 188

1    deterring voter impersonation for reasons I explain

2    in my report.

3              So if you're going to adopt any new

4    safeguards, A, you've got to make sure they're

5    dealing with a real problem, and B, that you've got

6    to balance that against their effects on the

7    participation of voters.

8              And when you balance with respect to voter

9    ID, you're balancing essentially no voter

10   impersonation against significant effects on voter

11   access.

12        Q.   So you would agree that safeguards that

13   deter or detect fraud enhance public confidence in

14   the electoral process.

15        A.   Not as a blanket statement.  No.

16        Q.   I'd like to turn next to Exhibit 6.

17        A.   Sure.

18        Q.   The American University report.

19        A.   Absolutely.  So we're going to spend the

20   next hour reading this 62 pages or something.

21        Q.   If you'd like.

22        A.   It's your time.

23        Q.   All right.  My colleague introduced

24   Exhibit 6 during your prior deposition here.

25              And before we get into it specifically,

Page 189

1    you were aware of this American University report

2    before your last deposition; is that right?

3        A.    That is correct.  I haven't reviewed it

4    because we haven't gotten into it, but I was

5    certainly aware of it, and I have seen it.

6        Q.    Have you reviewed it ever before your

7    deposition?

8        A.    Yes.  I have seen it, you know,

9    when -- when it came out.  And I've probably reviewed

10   it since then because, you know, I've been involved

11   in other cases involving voter ID, but not in -- not

12   in -- not in great depth.

13       Q.    Would you agree that the American

14   University study is credible literature?

15       A.    What does it mean by "credible

16   literature"?

17       Q.    Literature cited by academics who are

18   intent on studying the efficacy of voter ID laws in

19   the United States.

20       A.    That I can't --

21           MR. SPIVA:  Objection.

22           But you can answer.

23           THE WITNESS:  Yeah.  I can't say one way

24   or the other who cited this.

25   BY MS. HART:

                                            Page 190

1      Q.    If you were aware of this report prior to
2  this case, why is it that you didn't reference it in
3  your expert report or rebuttal report?
4      A.    It's -- it's an old study, and it has no
5  Virginia information.
6            There are lots of studies that don't have
7  Virginia information that I didn't reference.  I
8  tried to focus on studies proximate to the time when
9  the law was adopted and that had Virginia-specific
10  information.
11            Were I to reference this, it would
12  support, at least for the states it's looking at,
13  disparate impact of voter ID laws.
14            (Cellphone interruption.)
15            MR. SPIVA:  Not me.
16            THE WITNESS:  Just let it go.
17            MR. SPIVA:  Okay.
18            MS. HART:  Do you want to go off the
19  record for a minute?
20            We're off the record.
21            (Discussion off the record.)
22            MS. HART:  All right.  Back on the record.
23  BY MS. HART:
24      Q.    Dr. Lichtman, would it be fair to say that
25  for a variety of reasons listed in your report, your

Page 191

1    conclusion is that black people are less likely than

2    white people to possess a valid photo ID?

3         A.    That's correct based on information

4    available to the state legislature at the time they

5    adopted SB 1256 and, I think, confirmed by subsequent

6    information.

7         Q.    So is it also your conclusion that as a

8    result, black people are more likely to be

9    disenfranchised by Virginia's voter ID law than white

10   people?

11        A.    I think that would be something that

12   someone could reasonably conclude at the time based

13   on the information available at the time.

14        Q.    Okay.  I'd like to turn to page 5 of the

15   American University report.  In the middle of the

16   second full paragraph on page 5, it states, "In

17   Georgia, numerous estimates have been made."

18             Are you aware that there's also a somewhat

19   controversial voter ID law in Georgia?

20        A.    Yes.

21        Q.    It goes on --

22        A.    I don't know what you mean by "somewhat

23   controversial," but there is a voter ID law in

24   Georgia.  Yes.

25        Q.    "The governor said that 300,000 state

                                          Page 192

```
 1    residents lacked ID," the footnote to 13.  "Although
 2    the US Department of Justice, when it cleared
 3    Georgia's 2005 voter ID law under the Voting Rights
 4    Act, contended that the number of voters without the
 5    required ID was quote, 'extremely small,' end quote,
 6    and blacks were more likely to have ID cards than
 7    whites," with a cite to footnote 14, which is a
 8    letter from the Assistant Attorney General
 9    William E. Moschella, M-O-S-C-H-E-L-L-A, to US
10    Senator Christopher S. Bond, B-O-N-D.
11         A.    Are you asking me a question or --
12         Q.    I'm about to.
13         A.    Oh, okay.
14         Q.    Does this Georgia analysis of the actual
15    incidence of black people possessing a photo ID
16    change your opinion in any way as to the disparate
17    impact of a voter photo ID law on black people in
18    Virginia?
19         A.    I don't see an analysis here.  I see a
20    reference to a letter.  And I'd have to see what
21    analysis underlay that letter.
22              The data I have seen from Georgia based on
23    the SPAE, The Survey of the Performance of American
24    Elections, the standard survey, indicates that -- if
25    I remember correctly -- blacks were more
```

Veritext Legal Solutions
866 299-5127

1  likely -- less likely to have ID cards than whites.

2  And I believe I put those -- that data in my report.

3          So I don't know how in the world this

4  person -- this assistant attorney general, what his

5  basis for claiming that blacks are more likely to

6  have IDs than whites.

7          So it's not a study.  You keep -- you keep

8  referring to these studies, but I don't see any study

9  here.  I see a reference to a letter.

10     Q.    Well, assuming the assistant attorney

11  general were correct, and in fact in Georgia, more

12  black people than white people had photo IDs as of

13  the enactment of their voter photo ID law, would that

14  impact your analysis of the likely rate of black

15  people to white people having photo IDs in Virginia?

16     A.    That's a pure hypothetical.  As I said,

17  I'd have to look at what the basis was --

18     Q.    Well, you're an --

19     A.    -- for that conclusion.  And I don't

20  believe there's a solid basis for that from

21  everything I know about voter IDs in Georgia.

22     Q.    Well, you're an expert.  I'm allowed to

23  ask you hypothetical questions.

24          And my hypothetical is that in Georgia,

25  black people were found to have a photo ID at a

Page 194

```
 1    higher rate than white people.  If that were the
 2    case, would that impact your conclusions and
 3    assumptions about the rate of black people in
 4    Virginia having a photo ID compared to whites?
 5                 MR. SPIVA:  Objection to form.
 6                 But you can answer.
 7                 THE WITNESS:  Yeah.  I understand you can
 8    ask me a hypothetical, but that's an impossible
 9    hypothetical because I'd have to look at what the
10    basis of the study was.  You'd have to tell me for
11    your hypothetical how they were able to come up with
12    that particular conclusion because I am familiar with
13    the evidence from Georgia and would like to know on
14    what that was based.  Then I could possibly answer a
15    hypothetical.
16    BY MS. HART:
17        Q.    Okay.  Well, let's stick with Virginia
18    then.  You previously testified that the Virginia
19    voter ID law has a direct effect in that it
20    disparately burdens minority voters, particularly
21    African Americans.
22        A.    Yes.
23        Q.    Is that correct?
24        A.    Yes.
25        Q.    Assume that it doesn't.  Assume that the
```

Page 195

```
 1   turnout of minority voters in Virginia since 2004 has

 2   not decreased at all.  Would that change your

 3   conclusion about the disparate intent of the

 4   legislature in passing the law?

 5        A.     Absolutely not.

 6               MR. SPIVA:  Objection to form.

 7               But --

 8               THE WITNESS:  Absolutely not.

 9               First of all, you're talking about 2004.

10   The law was passed, what, in 2013.  So I don't

11   understand why 2004 would be a relevant reference

12   point.

13               Secondly, you cannot judge the

14   impact -- the disparate impact of a law by aggregate

15   voter turnout.  This was a huge mistake that was

16   made, you know, after the first round of voter ID

17   laws saying, look, black turnout went up.  Well, yes,

18   it did.  It went up everywhere because of other

19   effects.

20               There are numerous effects on turnout.

21   And you can't just look at gross turnout as a means

22   and mechanism for judging whether or not this law has

23   a disparate burden on African Americans.

24               Let's say, hypothetically, it

25   disenfranchised 10,000 African Americans and zero
```

Page 196

1    whites.  That wouldn't necessarily -- because the

2    numbers are so large when it comes to turnout,

3    hundreds of thousands, wouldn't necessarily have a

4    discernible impact on aggregate turnout because other

5    factors would be bigger.  But you're talking about

6    10,000 to zero.

7    BY MS. HART:

8         Q.    I just want to make sure that you're

9    answering the question I ask.  And I may not have

10   been clear in mine.

11             I didn't mean to put as a benchmark the

12   year 2004.  I'm asking you to assume that the turnout

13   of minority voters in Virginia since 2014, in other

14   words, since the passage of the photo voter ID law,

15   since that time, the voter turnout has not decreased.

16             Would that change your conclusion about

17   the disparate intent of the law by the legislature?

18        A.    No.  Because as I explained, you can't

19   measure disparate impact by looking at aggregate

20   turnout because there are so many different effects

21   on turnout.

22             I just gave you an example of a law that

23   was 10,000 to zero.  That might not necessarily be

24   detectible in aggregate turnout.

25        Q.    Is it your opinion that legislative intent

Page 197

1   is independent of the impact of a law specific to the

2   disparate intent and impact of the voter photo ID law

3   in Virginia?

4           MR. SPIVA:  Objection.

5           But you can answer.

6           THE WITNESS:  Yeah.  I'm not sure

7   I -- that seemed like a multiple-part question.  If

8   you could break it down, I --

9   BY MS. HART:

10      Q.   So --

11      A.   -- I'll try to answer it.

12      Q.   I'm wondering whether if we were to assume

13  that there was no disparate impact on African

14  Americans or other minorities in Virginia, whether

15  that evidence would impact your opinion that the

16  legislature had a disparate intent in passing their

17  voter photo ID law.

18      A.   Not necessarily.  Because, you know, they

19  were basing their intent not on what they didn't

20  know, but on -- but upon what they did know at the

21  time.

22           And there's only been a very brief period

23  since passage of the law, and there has not been a

24  presidential election.  And as we know, in midterm

25  elections and off-year elections, it's the

Page 198

1    experienced more habitual type of voters who come

2    out, the type who are much less likely to be

3    affected, and minority turnout tends to be lower, as

4    your own experts attest to, in midterm and off-year

5    elections.  So without a test in a presidential

6    election, I would not put too much stock in what's

7    happened in 2014 and 2015.

8              But we know some people were

9    disenfranchised.  But unfortunately, Virginia does

10   not keep registration records by race, so we can't

11   parse that out.

12      Q.    So if the results in a presidential

13   election year of a state that has passed a voter

14   photo ID law show that there is no disparate impact

15   on minority voters, would that impact your opinion

16   that the legislatures of those states had a disparate

17   intent in passing those voter photo ID laws?

18      A.    How would you know that it had no

19   disparate impact?

20      Q.    One method would be to look at minority

21   turnout.

22      A.    I -- but we already discussed that.  And

23   as I said, there are so many influences on minority

24   turnout that you cannot tell just from minority

25   turnout alone.  Plus you're talking about, you know,

Page 199

1    a very large number of voters.

2            It always strikes me as interesting that

3    the advocates of voter ID law say one fraudulent vote

4    is too many, but seem quite willing to tolerate

5    thousands and certainly many hundreds of deterred

6    votes.

7            So you can't tell from aggregate turnout.

8    Plus, you'd have to compare black and white turnout.

9    You can't just look at African-American turnout

10   alone.

11       Q.    What indicators would you look at to

12   assess the impact of a voter photo ID law, the actual

13   impact?

14       A.    Well, we have surveys -- and I cite them

15   in my studies, in my reports -- showing that, in

16   fact, people are deterred from going to the polls

17   because of voter ID laws.  And those studies parse it

18   out by race, and they do show that minorities,

19   specifically African Americans as well as other

20   minorities, are disproportionately burdened by photo

21   ID laws.

22            And we have them for 2014, and so we do

23   have some indication even post-passage of this law

24   that in fact it does have a disparate impact upon

25   minorities and African Americans in particular.  And

                                        Page 200

1    that is not necessarily capturable by aggregate

2    turnout rates.

3         Q.    So in terms of reliable methodologies, it

4    is your opinion that an after-the-fact survey as to

5    whether an individual surveyed did or did not vote is

6    more reliable than, say, an assessment of actual

7    minority voter turnout after that same election.

8         A.    I never said that at all.  I said several

9    things that were not that.

10              I said, first of all, you can't just look

11   at aggregate minority turnout.  You can do a much

12   more sophisticated study trying to tease out the

13   effects of a voter ID law by looking at trends and

14   patterns over time, comparing minorities with whites,

15   comparing elections with heavily contested statewide

16   contest, with lightly contested presidential years,

17   with non-presidential years.  You could do some

18   fairly sophisticated analyses that go far beyond

19   aggregate that might give you some indication.  But

20   just looking at aggregate turnout does not.

21              And secondly, I wasn't simply saying you

22   look at surveys to see who wasn't voting.  I was

23   saying you look at surveys to see specifically the

24   impact of voter ID laws on whether someone turned out

25   or not.  That's a very, very different kind of study

Page  201

1    that pinpoints the effect of voter ID laws and does

2    not rely on simply aggregate turnout by race.

3         Q.    So in my hypothetical situation, if you

4    had at your disposal sophisticated analysis on the

5    impact of voter ID laws on minorities, and they

6    showed no disparate impact on minority voters

7    post-passage of a voter photo ID law, would that

8    impact your conclusions about the legislative intent

9    in passing that voter photo ID law?

10        A.    No.   Because as I explained, we haven't

11   had enough time or the right kinds of elections to

12   assess the impact of voter ID laws on -- on

13   minorities.  And the evidence we do have suggests

14   quite the opposite.

15        Q.    What would be a sufficient period of time

16   for you to form an opinion as to whether if no

17   disparate impact, there was also no disparate intent?

18             MR. SPIVA:  Objection.

19             But you can answer.

20             THE WITNESS:  I think I already said that

21   subsequent to the decision-making is different from

22   the information available at the time.

23             In other words, legislatures did not

24   know -- let me -- let me put it another way.

25             Legislatures could not know what the

Page 202

1   results of a study taken after the adoption of this

2   law.  But based on the information available at the

3   time, I believe there is more than sufficient

4   evidence of legislative intent.

5           If in fact over a midterm, an off-year, a

6   presidential year studies showed no impact on

7   minorities -- which they don't, we already have

8   studies -- that wouldn't necessarily undermine a

9   finding of intent at the time.  It wouldn't be

10  irrelevant, but it certainly wouldn't undermine the

11  finding.

12      Q.    I'd like to go back to Exhibit 5, the

13  Carter-Baker report.

14      A.    Sure.  Are we talking about the survey or

15  the report now?

16      Q.    Exhibit 5, the Carter-Baker --

17      A.    Oh, the report.  Okay.

18      Q.    -- report.

19      A.    Yeah.

20      Q.    Could you please turn to page 20.

21      A.    I'm there.

22      Q.    Could you please read the second full

23  paragraph through the forth line from the bottom.

24      A.    Second full paragraph?

25      Q.    Yeah.

Page  203

1          A.     "The introduction of voter ID requirements

2     has raised concerns that they may present a barrier

3     to voting particularly by traditionally marginalized

4     groups such as the poor and minorities, some of whom

5     lack a government-issued photo ID.  They may also

6     create obstacles for highly mobile groups of

7     citizens.  Part of these concerns are addressed by

8     assuring that government-issued identification is

9     available without expense to any citizen, and second,

10    by government efforts to ensure all voters are

11    provided convenient opportunities to obtain a real ID

12    or EAC template ID card.  As explained in section

13    4.1, the commission recommends that states play an

14    affirmative role in reaching out with mobile offices

15    to individuals who do not have a driver's license or

16    other government-issued photo ID to help them

17    register to vote and obtain an ID card."

18          Q.     Do you agree that providing a free

19    government-issued photo ID and the convenient

20    opportunity to obtain such an ID assuages concerns

21    that requiring a voter to present a photo ID in order

22    to vote could present a barrier to voting?

23          A.     That's not what this says.

24          MR. SPIVA:  Objection.

25          But you can answer.

Page  204

1            THE WITNESS:  It says, "part of these

2    concerns."  It doesn't say it alleviates, resolves

3    these concerns.

4            Nor do I see, again, any study backing up.

5    This is just an assertion with all due respect, and

6    there was a lot of controversy about a lot of these

7    assertions.  And as I explained in the last

8    deposition, you know, a lot of this represented a

9    compromise between some pretty divergent views on

10   that commission.

11   BY MS. HART:

12        Q.    Do you agree that providing a free

13   government-issued photo ID and the convenient

14   opportunity to obtain such an ID assuages some

15   concerns that requiring a voter to present a photo ID

16   in order to vote could present a barrier to voting?

17        A.    I think it's a lot better than if you

18   didn't have it.  But I don't think it resolves the

19   issue.

20        Q.    Why not?

21        A.    For a host of reasons.  One, the very

22   kinds of people who are not likely to have IDs are

23   also the very same kinds of people who are less

24   likely to have transportation, who are less likely to

25   be able to take off work, who are less internet-savvy

Page 205

1    and likely to receive information from the

2    government, likely to be more suspicious of the

3    government, and it still requires additional steps to

4    vote.

5            And one thing we know, anytime you require

6    an additional -- and we talked about this in the

7    previous day -- an additional step to vote, that has

8    an impact upon voters.  And if the impact is

9    disparate, then it's going to have an impact more on

10   certain types of voters as they say here, the poor

11   and minorities in particular.

12           So it's better to have that.  But does it

13   resolve the problem?  Absolutely not.  As -- and it

14   doesn't at all deal with the problem of voter

15   confusion, which is particularly acute in Virginia.

16           MS. HART:  I don't have a watch on me.

17   Are you ready for a break, or do you want to keep

18   going?

19           THE WITNESS:  I'm good.

20           MR. SPIVA:  I'm fine if you are.  Yeah.

21   BY MS. HART:

22      Q.    Okay.  Let's go back to Exhibit 6, the

23   American University report.

24      A.    Absolutely.

25      Q.    I know you haven't reviewed this report in

Page 206

1    great detail recently.  But in general, the report

2    does touch on the idea that statistical

3    discrepancies, including margin of error,

4    oversampling of particular groups, and failure to

5    adjust estimates to account for such oversampling

6    could account for the discrepancies in the rate of

7    photo ID among various groups, including whites and

8    nonwhites.

9              Do you agree that these statistical

10   discrepancies have an impact on the rate of

11   assumptions about black and minority ownership of

12   photo IDs and non-minority ownership of photo IDs?

13        A.    I'd have to see what particular studies

14   they're referring to, what oversamplings they're

15   talking about, and the ways in which those

16   oversamplings are being corrected because you can

17   re-weight to deal with oversamplings, for example.

18   Plus, if you don't oversample, you're in grave danger

19   of picking up a very unrepresentative sample of

20   minorities.

21             And moreover, this study does show that,

22   in fact, minorities are two and a half times -- two

23   and a half times, not two and a half percent -- two

24   and a half times more likely than whites not to have

25   photo IDs of any kind.  So it doesn't in that sense

                                        Page  207

1    contradict other studies.

2          Moreover, this study has -- they point out

3    has large margins of errors.

4          Q.    Do you consider such statistical

5    discrepancies when choosing the studies upon which

6    you rely in your analyses?

7          A.    My studies are standard studies broadly

8    utilized by scholars in the field.  Such as I rely

9    heavily on one of the most respected and a continued

10   study, The Survey of the Performance of American

11   Elections.

12         Another thing about this study, it's one.

13   They did it once.  SPAE does it in every election.

14   And so we have the advantage of a study using the

15   same methodologies over a period of time surveying

16   the electorate.  Any one study can be off, obviously.

17   But when you have a series of studies, it is much

18   more reliable than having a single study of this

19   nature.

20         Moreover, as I said, this study does not

21   contradict, at least in terms of discrepancies, other

22   studies.  In addition, other studies look much more

23   broadly than at just Maryland, Virginia, and

24   Mississippi.  And other studies have

25   Virginia-specific information, which this study does

Page  208

1    not, and other studies are more proximate to the

2    adoption of SB 1256.

3        Q.   I'd like to turn to page 31 of your

4    report, Exhibit 3.

5        A.   Did I get it right?  Is it SB or HB?  I

6    always get those little --

7        Q.   SB.

8        A.   Okay.  So I did get it right.  I'm a

9    little dyslexic on that.

10        MR. SPIVA:  You're going to the initial

11    report, the December 14th?

12        MS. HART:  Yes.

13        MR. SPIVA:  Yeah.

14        THE WITNESS:  Okay.

15    BY MS. HART:

16        Q.   I believe it's Exhibit 3, page 31.

17        A.   All right.

18        Q.   Okay.  In your report, you cite and

19    include as a table a report -- or rather, a survey

20    that relies on the answers of 26 total black people.

21        A.   Correct.

22        Q.   Do you consider a sample size of 26 to be

23    an adequate sample size to draw conclusions about the

24    rate of driver's license ownership among all black

25    people in Virginia?

Page 209

1        A.    It's not a meaningful question.  There is

2   no given sample size.  Rather, measures of

3   statistical significance, as I explained in great

4   depth in my report, depend upon, yes, the sample

5   size, but also the magnitude of the difference

6   between the two samples.

7              And when you do a test of statistical

8   significance, that is, do these differences -- are

9   they likely to do by chance, or do they represent

10  real differences?  You take into account both the

11  sample size of both the whites and the blacks and the

12  difference in the magnitude between the two of them.

13  And when I did that -- and that's right there in the

14  table.  And when I did that test, I found these

15  differences were statistically significant at the

16  most stringent level used in social science, the .01

17  level.

18             So when you take into account everything

19  you need to know to see if there's a statistically

20  significant difference, it is statistically

21  significant at stringent levels.

22       Q.    How is the statistical significance of a

23  sample size of 26 reflected in your conclusions in

24  table 10?

25       A.    It's right there.  It says, "For this

                                           Page  210

```
 1    sample size" -- remember, there are two sample sizes.

 2    It's not just the 26.  The sample size for whites is

 3    160, and the sample size for blacks is 26.  So a

 4    statistical test asks what is the probability of

 5    drawing a sample of 160 and finding 98 percent of

 6    them have a certain characteristic -- in this case,

 7    possess a driver's license -- and then drawing a

 8    sample of 26 and having 84.6 percent of them have

 9    that same characteristic.

10           And so the statistical test takes into

11    account all of the relevant information as I say

12    right there in the table.  And my statistical

13    significance level takes into account these four

14    elements.  They're all right in the formula.  The

15    sample size of whites, the percentage of whites

16    possessing a particular characteristic, the sample

17    size of blacks, and the percentage of blacks having a

18    particular characteristic.

19           You can have one sample well lower than 26

20    and still have statistical significance.  There is no

21    cutoff point at which a sample size -- you know,

22    unless you're getting close to zero -- a sample size

23    is too small on one of two samples to find

24    statistical significance.

25           We could have a sample of ten, for
```

Page  211

1    example, and if none of them had driver's licenses,

2    it would probably be statistically significantly

3    different than the sample of whites.

4         Q.   Do you have any opinion as to the margin

5    of error as to your conclusions in this study?

6         A.   It's right there.  It's statistically

7    significant at the .01 level.  That means the odds

8    are less than one in a hundred -- less than one in a

9    hundred of obtaining these results by chance or

10   random factors.

11        In other words, if in reality whites and

12   blacks possess driver's licenses at the same rates,

13   what is the probability simply by chance of getting

14   these differences for these sample sizes.  And it's

15   less than one in a hundred.  And that's even below

16   the standard statistical significance level of .05

17   and well below the more lenient level of .01.

18        Q.   Going back to Exhibit 6, the American

19   University study, would you please flip to page 9.

20   In the second paragraph from the bottom on page 9, it

21   says, "Who does not have photo IDs?  In our survey,

22   registered voters without photo IDs tended to be

23   female, African American, and Democrat.  This

24   explains the opposition to voter ID laws.  However,

25   the total number of cases in our survey without photo

Page 212

1    ID was just 24, which is too small to draw a

2    definitive conclusion."

3              Do you agree with that assessment, that 24

4    responders with no photo ID is too small to draw a

5    conclusion as to the rate of individuals without

6    photo ID?

7         A.    Not necessarily.  It shows they don't

8    understand the nature of statistical testing.

9              As I just explained to you, it all depends

10   on the -- not just on the sample size, but on the

11   magnitude of the difference.  And I see nothing here

12   that performs a proper statistical test.

13             And whether or not it's statistically

14   significant, I don't know since they don't do it.

15   Nonetheless, the results they have are absolutely

16   consistent with every other survey that I've seen,

17   and that is the rates without IDs are much higher for

18   minorities than they are for non-minorities.

19             And I looked at the SPAE for this in 2008

20   to check on this.  And I found the same thing, that

21   in these three states, those without voter IDs tended

22   to be very disproportionately -- also by -- in this

23   case, by I think better than three to one.  Here it

24   was a two and a half to one margin blacks as compared

25   to whites.

Page  213

1            And so when you put together all the
2     surveys showing the same thing, you, you know, have a
3     much larger sample.
4            You know, there's an old saying.  If it
5     looks like a duck, swims like a duck and quacks like
6     a duck, it's probably a duck.
7         Q.    I've heard that one.
8         A.    You probably have.
9            MR. SPIVA:  I've heard that if three
10    people tell you that you're drunk, you might as well
11    go lie down.
12           THE WITNESS:  There are so many variations
13    on that old saying.
14           MS. HART:  Equally effective.
15    BY MS. HART:
16        Q.    Dr. Lichtman, in your reports, when you
17    evaluated the rate of photo ID versus non-photo ID
18    ownership of registered voters in Virginia, how did
19    you account for Virginia's definition of a valid ID
20    under its 2013 legislation?
21        A.    Well, that's a really good question
22    because any assessment of the levels at which folks
23    don't have voter ID is clearly an underestimation of
24    those who don't have voter IDs.  So all these
25    statistics are underestimating the extent to which

                                          Page 214

```
1    either registered voters or people who might become
2    registered voters -- you can't rule them out -- don't
3    have valid photo IDs.
4            Obviously, some who have driver's licenses
5    are going to have driver's licenses expired for more
6    than a year.  Some who have passports are going to
7    have passports expired for more than a year.  And
8    while, obviously, we don't have definitive evidence
9    on that, at least circumstantial evidence suggests
10   they're more likely to be minorities because it takes
11   a lot of money to renew a passport.  It takes money
12   to renew a license.  And if you're license has fines
13   on it -- and lots of licenses do -- it costs even
14   more money to renew your license.
15           Plus student IDs have to be valid.  And,
16   you know, I did a little bit of looking at websites
17   of student IDs in Virginia, and I didn't -- I didn't
18   see expiration dates on those IDs.  So they wouldn't
19   be valid for voting even if they had IDs under
20   Virginia law.  I looked at my AU ID, and I'm not a
21   student, but it didn't have any expiration on it.
22   Q.    So it's your understanding reflected in
23   your expert analysis that student IDs without an
24   expiration date are not valid forms of ID for
25   purposes of voting in Virginia?
```

Page 215

```
 1        A.    That's my understanding.  But the Virginia
 2   law is so confusing that even the state election
 3   officials aren't sure about exactly what counts.
 4             That's one of the big problems with
 5   Virginia law that makes it so confusing.  And voter
 6   confusion, as we saw in the Texas study, can affect
 7   many, many tens of thousands of voters.  It's hard to
 8   know what is a valid and what isn't a valid ID
 9   because some have certain requirements.  Others have
10   other requirements.  Different kinds of IDs have
11   different requirements.
12             And how in the world Virginia would expect
13   the average voter to navigate their way through this
14   complex maze of voter ID laws that daunt even
15   election officials is very difficult to understand
16   and adds to my assessment of intent.
17        Q.    Did you make any effort to account for the
18   alternative forms of acceptable photo ID?  And by
19   "alternative," I mean alternative to the DMV-issued
20   IDs, alternative to passports, and alternative to
21   student IDs?
22        A.    I did.
23        Q.    How so?
24        A.    I think there's a table in my report and a
25   statement in my rebuttal report dealing with that.
```

Page  216

```
 1              First, in my rebuttal report -- I'm not
 2    going to try to find the exact page, but I remember
 3    basically what I said.  I was looking at one of the
 4    things that makes Virginia law a little bit
 5    different.  And that is private employer IDs.  And
 6    what I found was racially -- racially disparate rates
 7    at which -- obviously you can't do registered
 8    voters -- but persons of voting age were privately
 9    employed in Virginia, and it was higher for whites
10    than it was for African Americans.
11              Now, obviously, we don't know whether
12    these folks have picture IDs issued in the regular
13    course of business.  But again, we also know that
14    whites as compared to African Americans tend to be
15    more white collar, more professional, the kinds of
16    people who might be more likely to have photo IDs.
17    But at any rate, there is a disparate impact there.
18              And then I did have a table dealing
19    with -- in my initial report -- dealing with other
20    forms of ID.  It's on page 34.  And there's not a
21    huge disparate impact there.
22              The big disparate impact occurs with the
23    most common forms of IDs, driver's licenses and US
24    passports, and with a novel form of ID in Virginia,
25    regularly issued employee IDs.  There's not huge
```

Page  217

1   differences one way or the other in these other forms

2   of IDs.

3           And with respect to student IDs, I said,

4   you know, I'm not sure they're valid.  And I'm not

5   sure how a student would know they're valid.

6       Q.    I think we touched on this earlier, but I

7   want to make sure I understand your answer.

8       A.    Sure.

9       Q.    What is your understanding of the term

10  "aggregate data sources"?

11      A.    Yes.  There are two kinds of data roughly.

12          One is an individual data like a survey.

13  So I will ask you questions.

14          The other is data collected for political

15  units like wards, precincts, counties, congressional

16  districts, states as a whole.

17          And you can also -- by the way, I just

18  want to be made clear.  You can have individual data

19  that isn't survey data.  You can have individual data

20  on driver's licenses, for example.

21      Q.    Do you agree that surveys showing a low

22  percentage of voters with photo ID maybe flawed due

23  to their use of aggregate data sources such as

24  driver's license rolls, voter registration rolls?

25      A.    I don't understand the question.  Surveys

Page  218

1    are individually based data.

2              So in other words, if you say you don't

3    have a photo ID, it's not based on aggregate data.

4    It's based on your response.

5         Q.   So an aggregate data source such as

6    driver's license numbers, all driver's license

7    numbers from the State of Virginia.  Do you believe

8    that an analysis of just that aggregated data source

9    could be flawed because of the data itself?

10        A.   It's not an aggregated data source.  If I

11   understand what you're saying is you're looking at

12   individual data.  You're looking at each individual

13   person who has an ID with the DMV.  So it's not an

14   aggregate data source.  It's an individual data

15   source.  You can then aggregate it, obviously, to

16   look at groups, but the base data as opposed to, say,

17   if you're looking at the base data for turnout in the

18   State of Virginia, the base data for DMV record is an

19   individual data.

20        Q.   So do you think the aggregated analysis of

21   the percentage of individuals in, say, Virginia

22   without a DMV-issued ID is reliable considering the

23   only source data is a driver's license number roll?

24             MR. SPIVA:  Objection.

25             THE WITNESS:  Yeah.  I don't understand

                                              Page 219

1    the -- what's a driver's license number roll?  I

2    don't get it.

3    BY MS. HART:

4         Q.    So data from the Department of Motor

5    Vehicles of the State of Virginia showing all

6    driver's license numbers current --

7         A.    I believe that's not all they show.  I

8    believe they show other things as well such as names,

9    dates of birth.

10              I mean, I didn't do that analysis.  But my

11   general understanding is in the DMV records, it's

12   more than driver's license numbers.  And you wouldn't

13   be matching just on one thing as far as I know.  I

14   didn't do the analysis, but the matching as I've seen

15   don't match on it -- on just a single point.  And

16   from what I've seen, they underestimate those who

17   don't have valid IDs because they don't account for

18   expired IDs.

19              And we haven't even gotten into a whole

20   other category, which is probably very, very large,

21   cancelled, revoked, and suspended IDs.

22        Q.    Why is it that you believe that the

23   DMV-produced data does not illustrate who does and

24   does not have an expired ID?

25        A.    I asked the assistant to -- I think

Page 220

1    Dr. Roden is his name -- about that, and he said when
2    you match to a DMV ID, it does not indicate which IDs
3    are -- are expired.
4         Q.    But if you could tell -- if you could tell
5    whether the ID issued by the DMV was expired or not,
6    how would that affect your level of certainty as to
7    whether the voting age individual associated with
8    that ID had a valid form of ID?
9         A.    It would improve it, you know.  And
10   remember, it's not just expired.  It's got to be
11   expired for a year.
12            If in fact you could assess that, that
13   would make your judgment of those who did not possess
14   valid DMV IDs more reliable, not less.
15            In addition, there are other elements to
16   valid IDs that a generic match would not assess.  For
17   example, as I understand the Virginia law -- and
18   again, it's pretty confusing -- your name has to
19   either be identical or substantially similar,
20   whatever that may mean.  And we don't know for those
21   who have a match to a DMV record whether that DMV
22   record matches the registration record in terms of,
23   you know, substantially similar name.  It may or may
24   not since we don't know what substantially similar
25   means.

Page 221

 1          Q.    Let's go back to the American University

 2     report at pages -- at page 9.

 3          A.    Page 9?

 4               MR. SPIVA:  Did you need more water or

 5     Coke?

 6               THE WITNESS:  I'd love some more Coke.

 7     Why don't we take a break.  This would be a good

 8     time.  We've been going a while.

 9               THE VIDEOGRAPHER:  We're off the record at

10     4:28.

11               (Recess.)

12               THE VIDEOGRAPHER:  We're back on the

13     record at 4:36.

14     BY MS. HART:

15          Q.    Let's turn back to the American University

16     report at page 9.

17          A.    Page 9.  I'm there.

18          Q.    Could you please read the paragraph at the

19     bottom of page 9 that continues on to page 10.

20          A.    "The new stat survey also included a

21     number of questions aimed to assess the public's

22     confidence with the electoral process, trust in the

23     US election system, and support for or opposition to

24     photo identification.  Overall, more than 25 percent

25     of respondents were not confident that their votes

                                        Page 222

1   would be counted accurately.  And only 57 percent

2   were confident.

3            "For a country with more than 200 years of

4   elections, the lack of confidence by one quarter of

5   registered voters is very serious and disconcerting.

6   The perception of voter fraud is much higher among

7   the general public than among experts.  Seventeen

8   percent said they saw or heard of voter fraud at

9   their own polling place.  And 60 percent saw or heard

10  it at other polling places."

11      Q.    Do you agree that the general public's

12  confidence in the electoral process is a matter of

13  concern?

14      A.    I found, looking at later surveys and ones

15  that just didn't limit it to particular states, there

16  wasn't much of a confidence -- a crisis of

17  confidence.  And as we've already seen, voter ID laws

18  do nothing to improve confidence.  And there may be

19  even a negative relationship.

20            Now, it may sound counterintuitive to

21  think that voters are less confident in

22  photo -- strict photo ID laws.  But there's a reason

23  for that.

24      Q.    Why is that?

25      A.    Because there's such a drumbeat in those

Page  223

1    states of allegations and claims about voter fraud to

2    justify voter photo IDs laws.  As unsubstantiated as

3    those claims are, you know, the public is not attuned

4    to filter through all this.  So they're subject in

5    these states to a drumbeat of claims about voter

6    fraud and the need for photo voter ID.

7            So I don't think it's just an accident

8    that voters in strict photo ID laws are less

9    confident about the electoral system than voters

10   elsewhere.

11       Q.   So you believe that assessment of public

12   confidence postdates the enactment of voter photo ID

13   laws?

14       A.    I can't answer that because I looked at

15   states that had voter photo ID laws.

16       Q.    And you compared it to states that don't

17   and found that those states only -- those states with

18   photo -- photo ID laws only assess public opinion

19   after they enacted voter photo ID laws?

20       A.    Oh, no.  I never that said.  What I said

21   was I looked at states which had strict photo voter

22   ID laws, and it actually enacted it, that it actually

23   put these things into place.  And according to those

24   who were trying to justify those laws, that was

25   supposed to enhance voter confidence in the electoral

Page  224

1   system.  And I found the opposite effect.

2       Q.    Did you compare the public's confidence in

3   the electoral system in those states prior to and

4   after the enactment of those photo ID laws?

5       A.    No.  I just looked at it -- those who had

6   the laws.  But let's not forget the drumbeat starts

7   before the laws are enacted.

8       Q.    So you were only comparing data between

9   states that did and did not have voter photo ID laws

10  to conclude that those states that had voter ID laws,

11  the public confidence in the electoral process was

12  lower?

13      A.    That's what you -- that's what you would

14  look at to conclude that.  If you wanted to

15  compare -- to conclude that voter confidence was

16  lower in states that had strict photo voter ID laws

17  as compared to other states, you'd compare those two

18  sets of states.

19      Q.    And that's what you did.

20      A.    Yes.

21      Q.    During your last deposition, you explained

22  your view on strict versus not strict --

23      A.    Yes.

24      Q.    -- voter ID laws.  And I think you also

25  touched on your view of registration requirements as

Page  225

1  well; is that right?

2       A.    I don't recall registration requirements.

3  I do recall strict versus non-strict.

4       Q.    Do you have an opinion as to registration

5  requirements in the strict versus non-strict context?

6       A.    I'm not sure what you mean by

7  "registration requirements."

8       Q.    So, for example, states that require you

9  to register before you can vote as opposed to

10  same-day registration and voting.

11      A.    Ah, I see.  Did I do a study that

12  compares, for example, same-day registration with

13  states that have strict photo voter ID laws?  I don't

14  believe I did a specific study of that.

15      Q.    If you were to look at a state that did

16  not allow same-day voter registration and voting,

17  would you consider that to be a strict registration

18  law?

19      A.    Run that by me again.

20      Q.    If you were to compare states that had

21  laws that required no same-day voter registration and

22  voting, would you consider that state's law to be a

23  strict registration law?

24      A.    I think the term "strict" applies to voter

25  ID laws, not to registration laws because they

Page  226

1    specifically have to do with your ability to have

2    your ballot counted.  Registration, those are a

3    little bit different.  But -- that answers your

4    question.

5         Q.    So you don't have an opinion as to the

6    impact of states' registration requirements in the

7    context of this case?

8         A.    I didn't say that.  I simply said you

9    don't apply the term "strict" and "non-strict" to

10   registration requirements.

11            Didn't mean that I had no opinion about

12   registration requirements, and I can't answer

13   questions about it.  I just answered your specific

14   question.

15        Q.    Okay.  What is your opinion of

16   registration requirements in states that do not allow

17   same-day registration and voting?

18        A.    I think same-day registration --

19            MR. SPIVA:  Sorry.  Let me just say you

20   can answer.

21            But objection in that I think this is

22   outside the scope of his opinion and outside the

23   scope of the case.

24            But you can answer.

25            THE WITNESS:  Yeah.  I do have an opinion

Page  227

1    about it, though I agree it is outside the scope, but

2    I'm willing to answer.

3            If by same-day registration, you mean you

4    can show up on election day and register and vote

5    like in Minnesota --

6    BY MS. HART:

7        Q.    Yes.

8        A.    Yes.  Generally, studies show that those

9    states provide more access to registration than

10   states that don't do that.

11       Q.    Do you know of any person in the State of

12   Virginia who you can identify by name who has been

13   disenfranchised by Virginia's photo ID law in the

14   past.

15       A.    I haven't looked into that, so I can't

16   answer that.

17       Q.    Do you know of any person who you can

18   identify by name in the State of Virginia who will be

19   disenfranchised by Virginia's photo ID law?

20       A.    Same answer.  I haven't looked into that.

21            MS. HART:  All right.  I have no further

22   questions.

23            Do you have any questions?

24            MR. SPIVA:  No questions.  Thank you

25   though.

Page 228

1            MS. HART:  All right.  Thank you,

2   Dr. Lichtman.

3            THE WITNESS:  Thank you.

4            THE VIDEOGRAPHER:  This concludes the

5   videotaped deposition of Allan Lichtman.

6            We're off the record at 4:44.

7            (Whereupon, at 4:44 p.m., the taking of

8   the instant deposition ceased.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                   Page  229

1          I declare under penalty of perjury

2    under the laws that the foregoing is

3    true and correct.

4

5          Executed on _____ , 20___,

6    at _____, _____.

7

8

9

10

11          _____

12              ALLAN J. LICHTMAN, Ph.D.

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 230

1            CERTIFICATE OF REPORTER

2    UNITED STATES OF AMERICA   ) ss:

3    DISTRICT OF COLUMBIA        )

4         I, ANGELA K. MCCULLOUGH, RPR, the officer before

5    whom the foregoing proceedings were taken, do hereby

6    certify that the foregoing transcript is a true and

7    correct record of the proceedings; that said

8    proceedings were taken by me stenographically to the

9    best of my ability and thereafter reduced to

10   typewriting under my supervision; and that I am

11   neither counsel for, related to, nor employed by any

12   parties to this case and have no interest, financial

13   or otherwise, in its outcome.

14

15

16                      _____

17                      Notary Public in and for

18                      The District of Columbia

19

20   My commission expires:  01/31/2020

21

22

23

24

25

                                        Page  231

**[01 - aggregate]**

| 0 |
|---|
| **01**   210:16 212:7,17 |
| **01/31/2020**   231:20 |
| **05**   212:16 |

| 1 |
|---|
| **1**   164:22 168:7 |
| **1.1.**   180:17,17 181:3 |
| **1.4**   175:5 |
| **10**   210:24 222:19 |
| **10,000**   196:25 197:6 |
|   197:23 |
| **100**   181:8 188:25 |
| **11**   171:13,18 176:15 |
| **1256**   192:5 209:2 |
| **13**   193:1 |
| **13th**   165:6 |
| **14**   193:7 |
| **14th**   209:11 |
| **160**   211:3,5 |
| **164**   164:25 |
| **168**   166:4 |
| **1717**   164:20 167:5 |
| **18**   179:17,19 180:20 |
|   185:12 |
| **180**   172:8 |
| **19**   180:4,12 |
| **1992**   174:10 |
| **1994**   174:24 176:17 |
| **1st**   167:4 |

| 2 |
|---|
| **2,000**   181:8 |
| **2.5**   179:19 185:6,12 |
| **20**   203:20 230:5 |
| **20,000**   184:22 |
| **200**   223:3 |
| **20005**   165:7 |
| **2002**   172:9 |
| **2004**   196:1,9,11 |
|   197:12 |
| **2005**   178:5 193:3 |
| **2008**   213:19 |
| **2013**   178:2 196:10 |
|   214:20 |

**2014**   197:13 199:7
  200:22
**2015**   199:7
**2016**   164:22 167:4
**202**   165:8
**213**   165:17
**22**   186:16
**23**   186:16
**231**   164:25
**24**   213:1,3
**25**   222:24
**26**   209:20,22 210:23
  211:2,3,8,19

| 3 |
|---|
| **3**   168:23 169:15 |
|   209:4,16 |
| **300,000**   192:25 |
| **31**   209:3,16 |
| **34**   217:20 |
| **357**   164:9 167:11 |
| **3:13**   164:21 167:4 |
| **3:15**   164:9 167:11 |

| 4 |
|---|
| **4**   168:24 169:21 |
|   181:24 182:16 |
| **4.1**   204:13 |
| **45**   172:1,4 177:2,2 |
|   178:11 |
| **48th**   165:15 |
| **4:28**   222:10 |
| **4:36**   222:13 |
| **4:44**   229:6,7 |

| 5 |
|---|
| **5**   168:25 169:25 |
|   171:23 192:14,16 |
|   203:12,16 |
| **5.1**   172:3 |
| **5.1.**   172:5 |
| **52**   172:13 177:9,12 |
| **54**   172:18,23 |
| **55**   173:13 |
| **555**   165:15 |

**57**   223:1
**5th**   165:15

| 6 |
|---|
| **6**   169:1,3,12 189:16 |
|   189:24 206:22 |
|   212:18 |
| **60**   223:9 |
| **600**   165:6 |
| **62**   189:20 |
| **629-7400**   165:17 |
| **654-3960**   165:8 |
| **66**   182:5 |

| 7 |
|---|
| **700**   165:6 |
| **72**   182:13 |
| **73**   180:13 |

| 8 |
|---|
| **84.6**   211:8 |
| **89**   172:12 |

| 9 |
|---|
| **9**   212:19,20 222:2,3 |
|   222:16,17,19 |
| **90013**   165:16 |
| **98**   211:5 |

| a |
|---|
| **ability**   187:16 188:5 |
|   227:1 231:9 |
| **able**   187:16 195:11 |
|   205:25 |
| **absentee**   182:8 |
|   183:25 184:2 |
| **absolutely**   189:19 |
|   196:5,8 206:13,24 |
|   213:15 |
| **academics**   190:17 |
| **acceptable**   216:18 |
| **access**   189:11 228:9 |
| **accident**   224:7 |
| **account**   207:5,6 |
|   210:10,18 211:11 |
|   211:13 214:19 |
|   216:17 220:17 |

**accountability**
  173:14
**accounted**   174:13
**accurately**   223:1
**acknowledge**   171:5
**act**   193:4
**action**   167:16
**activities**   179:16
**acts**   178:19 179:4,10
**actual**   193:14
  200:12 201:6
**acute**   206:15
**add**   185:3
**addition**   173:3
  208:22 221:15
**additional**   180:18
  206:3,6,7
**addressed**   204:7
**adds**   216:16
**adequate**   209:23
**adjust**   207:5
**administration**
  178:22 179:13
**adopt**   189:3
**adopted**   178:1
  186:21 191:9 192:5
**adopting**   187:4
**adoption**   185:25
  203:1 209:2
**advantage**   208:14
**advocates**   171:21
  200:3
**affect**   180:2,23
  182:24 184:6,9
  216:6 221:6
**affirmative**   204:14
**african**   195:21
  196:23,25 198:13
  200:9,19,25 212:23
  217:10,14
**age**   177:23 217:8
  221:7
**aggregate**   196:14
  197:4,19,24 200:7
  201:1,11,19,20

Page 1

[aggregate - black]

202:2 218:10,23
219:3,5,14,15
**aggregated** 219:8,10
219:20
**ago** 171:18
**agree** 173:16,20
176:16 177:21
178:25 180:25
184:4 185:9 187:7
189:12 190:13
204:18 205:12
207:9 213:3 218:21
223:11 228:1
**ah** 226:11
**ahead** 172:20
**aimed** 222:21
**al** 164:10 167:9,10
**allan** 164:15 166:3
167:12,23 175:22
229:5 230:12
**allegation** 175:1,9
176:21,22,24
181:22
**allegations** 173:10
174:2,2,4,22 175:7
176:6,9 177:15
178:1,10 181:11,13
181:18 182:4,10
183:10 184:25
224:1
**allegedly** 183:15
**alleviates** 205:2
**allow** 226:16 227:16
**allowed** 194:22
**alternative** 216:18
216:19,19,20,20
**america** 231:2
**american** 168:25
169:12 171:7
186:18 189:18
190:1,13 192:15
193:23 200:9
206:23 208:10
212:18,23 222:1,15

**americans** 195:21
196:23,25 198:14
200:19,25 217:10
217:14
**analyses** 201:18
208:6
**analysis** 193:14,19
193:21 194:14
202:4 215:23 219:8
219:20 220:10,14
**angela** 164:18,23
167:20 231:4
**angeles** 165:16
**ansolabehere** 187:1
**answer** 171:11
190:22 195:6,14
198:5,11 202:19
204:25 218:7
224:14 227:12,20
227:24 228:2,16,20
**answered** 227:13
**answering** 197:9
**answers** 209:20
227:3
**anticipate** 168:16
**anytime** 206:5
**appearances** 165:1
**applies** 226:24
**apply** 227:9
**appreciate** 168:20
**area** 181:13
**arentfox.com**
165:18
**argument** 170:22
**aside** 188:14
**asked** 174:15 220:25
**asking** 193:11
197:12
**asks** 211:4
**assertion** 205:5
**assertions** 205:7
**assess** 200:12
202:12 221:12,16
222:21 224:18

**assessment** 201:6
213:3 214:22
216:16 224:11
**assistant** 193:8
194:4,10 220:25
**associated** 178:22
179:12,16 221:7
**association** 170:20
178:7
**assuages** 204:20
205:14
**assume** 195:25,25
197:12 198:12
**assuming** 194:10
**assumptions** 195:3
207:11
**assuring** 204:8
**attention** 172:3
**attest** 199:4
**attorney** 173:9
174:15,17 175:17
193:8 194:4,10
**attorneys** 167:13
173:4
**attuned** 224:3
**au** 215:20
**authors** 184:24
**available** 177:25
178:6 192:4,13
202:22 203:2 204:9
**average** 186:23
216:13
**aware** 190:1,5 191:1
192:18

**b**

**b** 189:5 193:10
**back** 185:11 191:22
203:12 206:22
212:18 222:1,12,15
**backing** 205:4
**baker** 168:24
169:25 171:6,7,24
176:15,25 177:7
178:6 183:8,9

187:11,19 203:13
203:16
**balance** 184:12,17
187:14 189:6,8
**balancing** 189:9
**ballot** 183:25 227:2
**ballots** 170:25 175:5
177:12 183:20
184:3,16
**barbara** 164:6
167:8
**barrier** 204:2,22
205:16
**base** 219:16,17,18
**based** 171:2 188:19
192:3,12 193:22
195:14 203:2 219:1
219:3,4
**basically** 217:3
**basing** 198:19
**basis** 188:1 194:5,17
194:20 195:10
**beach** 183:24
**behalf** 165:3,12
**believe** 170:7,13
173:24 174:9
176:14 179:14
186:1,4 194:2,20
203:3 209:16 219:7
220:7,8,22 224:11
226:14
**benchmark** 197:11
**best** 231:9
**better** 205:17
206:12 213:23
**beyond** 201:18
**big** 216:4 217:22
**bigger** 197:5
**birth** 220:9
**bit** 186:14 215:16
217:4 227:3
**black** 192:1,8
193:15,17 194:12
194:14,25 195:3
196:17 200:8

**[black - consortium]**

207:11 209:20,24
**blacks** 193:6,25
  194:5 210:11 211:3
  211:17,17 212:12
  213:24
**blanket** 188:21
  189:15
**board** 164:9 167:9
  180:9 187:20
**bond** 193:10
**bottom** 203:23
  212:20 222:19
**break** 198:8 206:17
  222:7
**breaks** 168:17
**brief** 198:22
**broad** 170:25
**broadly** 208:7,23
**brought** 169:7 175:2
**bruce** 165:4 167:17
**bspiva** 165:9
**buildings** 180:10
  187:20
**burden** 196:23
**burdened** 200:20
**burdens** 195:20
**business** 217:13
**buying** 172:15

**c**

**c** 166:1 167:1 193:9
**california** 165:16
**called** 164:15
  167:24 175:6
  187:14
**cancelled** 220:21
**candidate** 174:11
**caption** 167:8
**capturable** 201:1
**card** 204:12,17
**cards** 193:6 194:1
**careful** 188:2
**carter** 169:25 171:7
  171:24 176:15,25
  177:7 178:6 183:8,9

187:11,19 203:13
  203:16
**case** 164:8 167:8,10
  167:11 175:13
  191:2 195:2 211:6
  213:23 227:7,23
  231:12
**cases** 173:5,5,8
  181:8 190:11
  212:25
**cash** 180:10 187:21
**cast** 170:25 175:5
  177:12 183:20
  184:15
**category** 220:20
**ceased** 229:8
**cellphone** 191:14
**certain** 206:10
  211:6 216:9
**certainly** 172:6
  174:6 176:11 186:9
  190:5 200:5 203:10
**certainty** 221:6
**certificate** 231:1
**certify** 231:6
**challengers** 178:21
  179:6,12
**chance** 210:9 212:9
  212:13
**change** 193:16
  196:2 197:16
**characteristic** 211:6
  211:9,16,18
**charges** 172:10
**check** 180:10 182:1
  187:21 213:20
**choosing** 208:5
**christopher** 193:10
**circumstantial**
  215:9
**citation** 177:8
**cite** 171:19 186:6,6
  186:7 193:7 200:14
  209:18

**cited** 176:7 184:20
  190:17,24
**citing** 183:10
**citizen** 204:9
**citizens** 204:7
**city** 186:23
**claiming** 194:5
**claims** 224:1,3,5
**clear** 181:7 197:10
  218:18
**cleared** 193:2
**clearly** 214:23
**clerical** 175:4
**close** 180:2,24
  182:25 184:7,9,19
  211:22
**coie** 165:5
**coke** 222:5,6
**collar** 217:15
**colleague** 189:23
**collected** 218:14
**columbia** 164:20
  231:3,18
**column** 175:6
**come** 195:11 199:1
**comes** 197:2
**commission** 168:24
  170:1 171:24
  176:15 177:1,7
  178:6 183:8,9
  187:12,19 204:13
  205:10 231:20
**committed** 178:19
  179:5,10
**committing** 179:15
**common** 217:23
**compare** 200:8
  225:2,15,17 226:20
**compared** 195:4
  213:24 217:14
  224:16 225:17
**compares** 226:12
**comparing** 201:14
  201:15 225:8

**complex** 216:14
**compromise** 205:9
**concern** 223:13
**concerns** 204:2,7,20
  205:2,3,15
**conclude** 168:5
  192:12 225:10,14
  225:15
**concludes** 229:4
**conclusion** 192:1,7
  194:19 195:12
  196:3 197:16 213:2
  213:5
**conclusions** 195:2
  202:8 209:23
  210:23 212:5
**conducted** 174:8
  175:17 176:1,7,17
  176:22 177:6
**confidence** 180:7
  185:7,24 186:2,11
  186:20,22 187:3,5,9
  188:12,15 189:13
  222:22 223:4,12,16
  223:17,18 224:12
  224:25 225:2,11,15
**confident** 222:25
  223:2,21 224:9
**confirm** 180:8 185:8
  186:10
**confirmed** 186:5
  192:5
**confusing** 216:2,5
  221:18
**confusion** 206:15
  216:6
**congressional**
  184:22 185:4
  218:15
**consider** 208:4
  209:22 226:17,22
**considering** 219:22
**consistent** 213:16
**consortium** 170:19

[contended - division]

**contended** 193:4
**contest** 201:16
**contested** 201:15,16
**context** 226:5 227:7
**continued** 164:14
208:9
**continues** 222:19
**continuingly** 168:12
**contradict** 208:1,21
**controversial**
192:19,23
**controversy** 205:6
**convenient** 204:11
204:19 205:13
**convictions** 172:13
172:13 177:13,14
178:10
**copy** 169:7,17
**correct** 181:5,18,21
190:3 192:3 194:11
195:23 209:21
230:3 231:7
**corrected** 207:16
**correctly** 193:25
**correlation** 186:2,11
187:3
**costs** 215:13
**counsel** 164:16
166:2 167:7,24
168:2,8 231:11
**counted** 186:24
223:1 227:2
**counterintuitive**
223:20
**counties** 218:15
**country** 185:2 223:3
**counts** 216:3
**county** 186:23
**couple** 170:18
**course** 183:13
185:12 217:13
**court** 164:1 167:10
167:19 175:11,12
187:25

**courts** 175:10
**create** 204:6
**credible** 190:14,15
**crime** 173:12
**crimes** 173:18
**crisis** 223:16
**curran** 174:18,18
**current** 220:6
**currently** 180:9
**cutoff** 211:21
**cv** 164:9 167:11

**d**

**d** 167:1 193:10
**danger** 207:18
**data** 177:25 193:22
194:2 218:10,11,12
218:14,18,19,19,23
219:1,3,5,8,9,10,12
219:14,14,16,17,18
219:19,23 220:4,23
225:8
**date** 167:3 171:14
215:24
**dates** 215:18 220:9
**daunt** 216:14
**day** 206:7 226:10,12
226:16,21 227:17
227:18 228:3,4
**dc** 164:21 165:7
167:6
**dead** 175:6,9 181:23
182:5,7,9,15
**deal** 206:14 207:17
**dealing** 187:24
188:3 189:5 216:25
217:18,19
**deals** 184:3
**debunk** 174:21
**decade** 171:14
**december** 209:11
**decision** 202:21
**declare** 230:1
**decreased** 196:2
197:15

**defendants** 164:11
164:16 165:12
166:3 167:7,16,24
168:2 176:8
**define** 179:4
**definition** 178:25
179:2,7,9 214:19
**definitive** 213:2
215:8
**degree** 174:7
**democrat** 212:23
**department** 172:7
173:1 177:9 193:2
220:4
**depend** 210:4
**depends** 213:9
**deposition** 164:14
167:4 168:5,6,7,9
168:16,22 169:8
170:6 189:24 190:2
190:7 205:8 225:21
229:5,8
**depth** 190:12 210:4
**designed** 183:15
**detail** 207:1
**detailed** 176:20
**details** 180:16
**detect** 176:13 180:8
185:7 187:8 188:9
188:12 189:13
**detectible** 197:24
**detection** 185:21
**deter** 180:8 185:7
187:8 188:8,11
189:13
**deterred** 184:16
185:3 200:5,16
**deterrence** 184:18
184:21
**deterring** 188:24
189:1
**died** 182:9
**difference** 210:5,12
210:20 213:11

**differences** 210:8,10
210:15 212:14
218:1
**different** 197:20
201:25 202:21
212:3 216:10,11
217:5 227:3
**difficult** 172:7
216:15
**difficulty** 173:6
**direct** 195:19
**disagree** 171:8
**discernible** 197:4
**disconcerting** 223:5
**discrepancies** 207:3
207:6,10 208:5,21
**discuss** 188:18
**discussed** 168:16
199:22
**discusses** 177:18
**discussion** 191:21
**disenfranchised**
192:9 196:25 199:9
228:13,19
**dismissed** 175:13
**disparate** 191:13
193:16 196:3,14,23
197:17,19 198:2,13
198:16 199:14,16
199:19 200:24
202:6,17,17 206:9
217:6,17,21,22
**disparately** 195:20
**disposal** 202:4
**disproportionately**
200:20 213:22
**disputing** 183:1
**district** 164:1,2,19
167:10 173:9
175:11 184:22
185:4 231:3,18
**districts** 218:16
**divergent** 205:9
**division** 164:3

Veritext Legal Solutions
866 299-5127

**[dmv - fact]**

**dmv** 216:19 219:13
219:18,22 220:11
220:23 221:2,5,14
221:21,21
**document** 178:15
**documentation**
185:1
**dozen** 185:1
**dr** 168:4 173:15
176:7,8,14 179:21
182:4,21 187:1
191:24 214:16
221:1 229:2
**drafters** 171:6
**draw** 172:3 209:23
213:1,4
**drawing** 211:5,7
**driver's** 204:15
209:24 211:7 212:1
212:12 215:4,5
217:23 218:20,24
219:6,6,23 220:1,6
220:12
**drumbeat** 223:25
224:5 225:6
**drunk** 214:10
**duck** 214:5,5,6,6
**due** 205:5 218:22
**duly** 164:18 167:25
**dyslexic** 209:9

**e**

**e** 166:1 167:1,1
193:9,9
**eac** 204:12
**earlier** 218:6
**eastern** 164:2
167:11
**effect** 184:21 195:19
202:1 225:1
**effective** 188:24,25
214:14
**effects** 187:16 189:6
189:10 196:19,20
197:20 201:13

**efficacy** 190:18
**effort** 216:17
**efforts** 204:10
**either** 174:5 177:15
178:7 182:7 183:1
184:15 215:1
221:19
**election** 172:6,9,14
173:5,8 174:10,24
175:5 176:1 177:11
178:18,20 179:3,5,8
179:9,11,15 180:3,6
180:24 182:25
183:2,22 184:7,9,11
184:19,24 185:4
198:24 199:6,13
201:7 208:13 216:2
216:15 222:23
228:4
**elections** 164:10
167:9 177:11
178:22 179:13,16
180:1,22 182:23
184:6 185:24
186:18 193:24
198:25,25 199:5
201:15 202:11
208:11 223:4
**electoral** 180:6
185:6 187:9 188:13
189:14 222:22
223:12 224:9,25
225:3,11
**electorate** 208:16
**elements** 211:14
221:15
**ellen** 174:12
**employed** 217:9
231:11
**employee** 217:25
**employer** 217:5
**enacted** 224:19,22
225:7
**enactment** 194:13
224:12 225:4

**enhance** 187:9
188:12,15 189:13
224:25
**ensure** 204:10
**enter** 180:10 187:20
**entirely** 177:24
**entitled** 164:17
**equally** 180:11
214:14
**error** 207:3 212:5
**errors** 175:3,4 208:3
**esq** 165:4,13
**essential** 184:13
**essentially** 170:8,11
170:22 189:9
**estimates** 192:17
207:5
**et** 164:10 167:9,9
**evaluated** 214:17
**evidence** 171:20
173:7 175:14,18
176:10,11 179:23
179:25 180:18,21
181:4,7 182:23
183:18,21 186:17
195:13 198:15
202:13 203:4 215:8
215:9
**exact** 217:2
**exactly** 216:3
**examination** 164:16
166:2 168:2
**examined** 168:1
**example** 173:9
182:3 183:23
197:22 207:17
212:1 218:20
221:17 226:8,12
**examples** 184:10
**excellent** 168:15
**excuse** 171:6
**executed** 230:5
**exercise** 188:5
**exhibit** 168:7,23,24
168:25 169:1,3,12

169:15,21,25
171:23 189:16,24
203:12,16 206:22
209:4,16 212:18
**exhibits** 169:6
**exist** 170:13 180:7
185:7,17 187:13
**existence** 188:8
**expect** 216:12
**expense** 204:9
**experienced** 199:1
**expert** 168:23 176:8
191:3 194:22
215:23
**experts** 176:7 199:4
223:7
**expiration** 215:18
215:21,24
**expired** 215:5,7
220:18,24 221:3,5
221:10,11
**expires** 231:20
**explain** 173:21
189:1
**explained** 173:9
197:18 202:10
204:12 205:7 210:3
213:9 225:21
**explains** 212:24
**explanation** 173:17
**explicitly** 170:21
**extensive** 174:1,3
175:24 179:25
180:22 182:23
**extent** 178:14 184:5
214:25
**extra** 170:3
**extremely** 170:17
171:4 193:5

**f**

**fact** 173:25 174:1
194:11 200:16,24
201:4 203:5 207:22
221:12

Veritext Legal Solutions
866 299-5127

[factors - heh]

| | | | |
|---|---|---|---|
| **factors** 197:5 212:10 | **footnote** 172:18,23 | 203:22,24 | 205:13 206:2,3 |
| **failed** 174:4 | 173:13 181:24 | **fundamental** 187:23 | **governor** 192:25 |
| **failure** 207:4 | 182:16 193:1,7 | 187:25 188:6 | **grave** 207:18 |
| **fair** 169:5,10 191:24 | **footnotes** 185:11 | **further** 228:21 | **great** 169:16 190:12 |
| **fairly** 186:24 201:18 | **foregoing** 230:2 | | 207:1 210:3 |
| **fake** 181:9 | 231:5,6 | **g** | **gross** 196:21 |
| **false** 172:11,15 | **forget** 225:6 | **g** 167:1 | **grounds** 174:13 |
| **familiar** 195:12 | **form** 195:5 196:6 | **general** 173:4 | **groups** 181:14 204:4 |
| **far** 184:18 201:18 | 202:16 217:24 | 174:16,17 193:8 | 204:6 207:4,7 |
| 220:13 | 221:8 | 194:4,11 207:1 | 219:16 |
| **fbi** 175:17 | **forms** 170:12 | 220:11 223:7,11 | **gubernatorial** |
| **february** 164:22 | 215:24 216:18 | **generalizations** | 174:10 |
| 167:3 | 217:20,23 218:1 | 171:21 | **guess** 169:11 |
| **federal** 173:3 | **formula** 211:14 | **generally** 169:1 | **h** |
| 180:10 187:20 | **forth** 185:11 203:23 | 228:8 | **h** 193:9 |
| **felon** 172:11 | **found** 173:1 176:10 | **generic** 221:16 | **habitual** 199:1 |
| **felons** 177:17 | 182:7 184:21 187:1 | **georgia** 192:17,19 | **half** 207:22,23,23,24 |
| **female** 212:23 | 194:25 210:14 | 192:24 193:14,22 | 213:24 |
| **field** 208:8 | 213:20 217:6 | 194:11,21,24 | **handle** 173:4 |
| **figure** 174:16 | 223:14 224:17 | 195:13 | **happened** 199:7 |
| **filed** 167:10 | 225:1 | **georgia's** 193:3 | **happening** 174:20 |
| **filter** 224:4 | **four** 211:13 | **getting** 211:22 | **happens** 183:13 |
| **financial** 231:12 | **fox** 164:20 165:14 | 212:13 | **happy** 178:17 |
| **find** 170:21 172:20 | 167:5 | **give** 169:18 186:14 | **hard** 176:12 216:7 |
| 172:21 175:18 | **fraud** 170:8,11,12 | 188:21 201:19 | **hart** 165:13 166:4 |
| 186:13 211:23 | 170:13,17,21,22,24 | **given** 173:8 184:13 | 167:15,15 168:3 |
| 217:2 | 171:1,4,15,20 172:6 | 210:2 | 169:14,20,24 170:5 |
| **finding** 203:9,11 | 172:14 173:5,8,18 | **glendening** 174:14 | 171:22 177:20 |
| 211:5 | 174:2,5,13,19 175:2 | **go** 171:23 172:20 | 178:24 180:19 |
| **fine** 206:20 | 175:14,19 176:3,11 | 173:18 187:16 | 182:20 190:25 |
| **fines** 215:12 | 176:21 178:9,19,23 | 191:16,18 201:18 | 191:18,22,23 |
| **finish** 183:6 | 179:1,2,3,8,9,15,25 | 203:12 206:22 | 195:16 197:7 198:9 |
| **first** 171:9,12 172:4 | 180:8,18,22 181:3,7 | 214:11 222:1 | 205:11 206:16,21 |
| 180:20 185:16 | 181:13 182:23 | **goes** 192:21 | 209:12,15 214:14 |
| 196:9,16 201:10 | 183:2,10,22,25 | **going** 169:5,9 | 214:15 220:3 |
| 217:1 | 184:5 185:2,8,18 | 184:16 188:3 189:3 | 222:14 228:6,21 |
| **flawed** 218:22 219:9 | 187:8 188:9,12,24 | 189:19 200:16 | 229:1 |
| **flip** 212:19 | 189:13 223:6,8 | 206:9,18 209:10 | **hb** 209:5 |
| **floor** 165:15 | 224:1,6 | 212:18 215:5,6 | **heard** 214:7,9 223:8 |
| **florida** 183:24 | **frauds** 172:9 | 217:2 222:8 | 223:9 |
| **focus** 191:8 | **fraudulent** 173:10 | **good** 169:23 206:19 | **heavily** 201:15 |
| **folks** 182:15 214:22 | 175:4 200:3 | 214:21 222:7 | 208:9 |
| 217:12 | **free** 204:18 205:12 | **gotten** 190:4 220:19 | **heh** 164:9 |
| **follows** 168:1 | **full** 178:12 179:22 | **government** 173:14 | |
| | 185:13 192:16 | 204:5,8,10,16,19 | |

Veritext Legal Solutions
866 299-5127

**[held - know]**

held   167:5 175:10
help   204:16
helpful   180:14
higher   195:1 213:17
  217:9 223:6
highly   183:11 204:6
hmm   182:17
hold   181:11 182:10
hood   176:7 178:8
hood's   182:4
host   205:21
hour   168:17 189:20
huge   196:15 217:21
  217:25
hundred   212:8,9,15
hundreds   177:11
  197:3 200:5
hypothetical   194:16
  194:23,24 195:8,9
  195:11,15 202:3
hypothetically
  196:24

**i**

idea   183:1 207:2
identical   221:19
identification
  179:20 185:20
  204:8 222:24
identify   167:13
  228:12,18
identity   180:8 185:8
ids   180:9 188:14,15
  194:6,12,15,21
  205:22 207:12,12
  207:25 212:21,22
  213:17,21 214:24
  215:3,15,17,18,19
  215:23 216:10,20
  216:21 217:5,12,16
  217:23,25 218:2,3
  220:17,18,21 221:2
  221:14,16 224:2
illegal   179:15

illegally   181:8
illustrate   220:23
impact   188:5 191:13
  193:17 194:14
  195:2 196:14,14
  197:4,19 198:1,2,13
  198:15 199:14,15
  199:19 200:12,13
  200:24 201:24
  202:5,6,8,12,17
  203:6 206:8,8,9
  207:10 217:17,21
  217:22 227:6
impediments   187:17
impersonating
  175:9
impersonation
  170:11,24 174:3,6
  175:8 176:3,12
  177:16,19 183:15
  183:19 184:10,14
  185:21 189:1,10
important   180:11
  187:7 188:6,11
impose   188:4
impossible   195:8
improve   187:4
  221:9 223:18
incidence   193:15
incident   173:17
incidents   184:5
include   178:19
  179:4,10 209:19
included   222:20
including   176:6
  178:20 179:10
  181:8 185:18 207:3
  207:7
incredibly   183:14
independent   177:22
  198:1
indicate   221:2
indicates   193:24
indication   200:23
  201:19

indicators   200:11
individual   201:5
  218:12,18,19
  219:12,12,14,19
  221:7
individually   219:1
individuals   172:12
  172:13 177:9
  178:20 179:10
  204:15 213:5
  219:21
influences   199:23
information   172:11
  172:16 178:4,5
  191:5,7,10 192:3,6
  192:13 202:22
  203:2 206:1 208:25
  211:11
initial   209:10
  217:19
inspire   180:7 185:6
instance   176:2
instant   229:8
intent   190:18 196:3
  197:17,25 198:2,16
  198:19 199:17
  202:8,17 203:4,9
  216:16
interest   181:14
  231:12
interested   181:14
interesting   184:1
  187:18 200:2
internet   205:25
interruption   191:14
introduced   189:23
introduction   204:1
investigate   174:18
investigated   181:16
investigation   173:3
  174:3 175:24
  176:23 177:6
  178:13,18 182:3,4
  182:19

investigations   172:8
  172:10 174:1,8
  175:16 176:10
involved   175:25
  190:10
involving   174:4
  177:10 190:11
irrelevant   203:10
issue   181:15 205:19
issued   204:5,8,16,19
  205:13 216:19
  217:12,25 219:22
  221:5

**j**

j   164:15 166:3
  167:23 230:12
joe   174:17,18
johnson   165:21
  167:2
joining   168:4
judge   175:11 196:13
judging   196:22
judgment   221:13
jumping   185:11
justice   172:8 173:2
  177:9 193:2
justify   224:2,24

**k**

k   164:18,21,23
  167:5 231:4
keep   183:7 194:7,7
  199:10 206:17
kim   165:21 167:2
kind   171:1,20,21
  174:5 185:19 188:1
  201:25 207:25
kinds   202:11 205:22
  205:23 216:10
  217:15 218:11
kirsten   165:13
  167:15
kirsten.hart   165:18
know   168:18 171:18
  172:22,24,25

Page 7

[know - method]

173:21,22 174:20
174:21 178:1
180:15 181:15,18
181:24 183:23
190:8,10 192:22
194:3,21 195:13
196:16 198:18,20
198:20,24 199:8,18
199:25 202:24,25
205:8 206:5,25
210:19 211:21
213:14 214:2,4
215:16 216:8
217:11,13 218:4,5
220:13 221:9,20,23
221:24 224:3
228:11,17

**l**

**l** 193:9,9
**lack** 204:5 223:4
**lacked** 193:1
**large** 184:15 197:2
200:1 208:3 220:20
**larger** 214:3
**launched** 172:8
**law** 184:1 191:9
192:9,19,23 193:3
193:17 194:13
195:19 196:4,10,14
196:22 197:14,17
197:22 198:1,2,17
198:23 199:14
200:3,12,23 201:13
202:7,9 203:2
215:20 216:2,5
217:4 221:17
226:18,22,23
228:13,19
**laws** 184:18 185:25
186:3,12,19,22
187:2,4,6 190:18
191:13 196:17
199:17 200:17,21
201:24 202:1,5,12

212:24 216:14
223:17,22 224:2,8
224:13,15,18,19,22
224:24 225:4,6,7,9
225:10,16,24
226:13,21,25,25
230:2
**lawyer** 180:14
**lawyers** 170:20
178:7
**leaving** 188:14
**lee** 164:6 167:8
**legislation** 214:20
**legislative** 197:25
202:8 203:4
**legislature** 192:4
196:4 197:17
198:16
**legislatures** 199:16
202:23,25
**lenient** 212:17
**letter** 193:8,20,21
194:9
**level** 210:16,17
211:13 212:7,16,17
221:6
**levels** 210:21 214:22
**license** 204:15
209:24 211:7
215:12,12,14
218:24 219:6,6,23
220:1,6,12
**licenses** 212:1,12
215:4,5,13 217:23
218:20
**lichtman** 164:15
166:3 167:12,23
168:4 173:15
175:22 176:14
179:21 182:21
191:24 214:16
229:2,5 230:12
**lie** 214:11
**lightly** 201:16

**limit** 223:15
**line** 203:23
**listed** 182:7 191:25
**literally** 177:12
**literature** 190:14,16
190:17
**little** 171:1 186:14
209:6,9 215:16
217:4 227:3
**llp** 164:20 165:5,14
**local** 173:4
**located** 167:5
**look** 194:17 195:9
196:17,21 199:20
200:9,11 201:10,22
201:23 208:22
219:16 225:14
226:15
**looked** 170:25 175:1
181:5,19 213:19
215:20 224:14,21
225:5 228:15,20
**looking** 169:2
170:18 176:23
177:3,4 180:17
187:1 191:12
197:19 201:13,20
215:16 217:3
219:11,12,17
223:14
**looks** 214:5
**los** 165:16
**losing** 174:11
**lost** 174:12
**lot** 185:14 205:6,6,8
205:17 215:11
**lots** 181:13 191:6
215:13
**loud** 172:4
**love** 173:22 222:6
**low** 173:8,17 218:21
**lower** 199:3 211:19
225:12,16

**m**

**m** 193:9
**magnitude** 210:5,12
213:11
**major** 175:9
**making** 177:25
202:21
**margin** 207:3 212:4
213:24
**marginalized** 204:3
**margins** 208:3
**marked** 168:6,22
169:6
**maryland** 174:11,17
175:10,11,20
181:16 182:3,8
185:19 208:23
**match** 220:15 221:2
221:16,21
**matches** 221:22
**matching** 220:13,14
**matter** 164:17
223:12
**maze** 216:14
**mccullough** 164:18
164:23 167:20
231:4
**mean** 184:8 188:18
190:15 192:22
197:11 216:19
220:10 221:20
226:6 227:11 228:3
**meaningful** 210:1
**means** 196:21 212:7
221:25
**measure** 172:7
197:19
**measures** 210:2
**mechanism** 196:22
**memory** 186:15
**mentioned** 181:10
**mentions** 177:15
**method** 199:20

Veritext Legal Solutions
866 299-5127

[methodologies - outside]

**methodologies**
201:3 208:15
**miami** 183:24
**middle** 192:15
**midterm** 177:11
198:24 199:4 203:5
**million** 175:5
**millions** 170:24
183:20
**milwaukee** 181:5,20
**mine** 197:10
**minimal** 188:25
**minnesota** 175:25
181:17 228:5
**minorities** 198:14
200:18,20,25
201:14 202:5,13
203:7 204:4 206:11
207:20,22 213:18
213:18 215:10
**minority** 195:20
196:1 197:13 199:3
199:15,20,23,24
201:7,11 202:6
207:11,12
**minute** 191:19
**mississippi** 208:24
**misspoken** 174:23
**mistake** 196:15
**mistakenly** 182:7
**mm** 182:17
**mobile** 204:6,14
**monday** 164:21
**money** 215:11,11,14
**moschella** 193:9
**motor** 220:4
**multiple** 172:10
177:17 180:1,22
182:24 183:2 184:6
198:7

**n**

**n** 166:1,1 167:1
193:10

**name** 167:2,11,15
167:17 221:1,18,23
228:12,18
**names** 181:9 220:8
**national** 170:20
174:16 178:7
186:23
**nature** 208:19 213:8
**navigate** 216:13
**nearly** 188:25
**necessarily** 197:1,3
197:23 198:18
201:1 203:8 213:7
**need** 168:18 169:18
170:3 210:19 222:4
224:6
**needed** 180:9
187:20
**negative** 186:20
223:19
**neither** 231:11
**never** 173:5 175:14
183:13 184:10
201:8 224:20
**new** 189:3 222:20
**news21** 170:18
178:8
**newspaper** 182:18
**non** 201:17 207:12
213:18 214:17
226:3,5 227:9
**noncitizens** 172:17
177:17
**nonexistence** 184:13
**nonexistent** 170:8
170:11,23 183:17
**nonviolent** 173:12
**nonvoters** 178:21
179:7,12
**nonwhites** 207:8
**northwest** 167:6
**notary** 164:19
167:25 231:17
**note** 173:24 180:4
180:12

**noted** 172:23
**notice** 164:17 168:7
168:8,10
**notion** 182:9
**novel** 217:24
**number** 185:3 193:4
200:1 212:25
219:23 220:1
222:21
**numbers** 184:15
197:2 219:6,7 220:6
220:12
**numerous** 177:11
192:17 196:20
**nw** 164:21 165:6

**o**

**o** 166:1 167:1 193:9
193:10
**oath** 168:13
**objection** 171:10
178:14 190:21
195:5 196:6 198:4
202:18 204:24
219:24 227:21
**obligation** 168:13
**obstacles** 204:6
**obtain** 204:11,17,20
205:14
**obtaining** 173:6
212:9
**obviously** 185:17
208:16 215:4,8
217:7,11 219:15
**occur** 180:2,23
182:24 183:3
**occurred** 174:25
183:24
**occurrence** 186:3
**occurs** 172:7 183:2
217:22
**october** 172:9
**odds** 212:7
**offenses** 172:12,14
172:16

**officer** 231:4
**offices** 164:20
204:14
**officials** 178:20
179:6,11 216:3,15
**oh** 181:1 193:13
203:17 224:20
**okay** 171:25 179:18
183:5 191:17
192:14 193:13
195:17 203:17
206:22 209:8,14,18
227:15
**old** 171:13 176:16
191:4 214:4,13
**once** 168:5 208:13
**ones** 223:14
**open** 175:12
**opinion** 170:7 171:2
188:18,19 193:16
197:25 198:15
199:15 201:4
202:16 212:4
224:18 226:4 227:5
227:11,15,22,25
**opponent** 174:14
**opportunities**
204:11
**opportunity** 204:20
205:14
**opposed** 219:16
226:9
**opposite** 202:14
225:1
**opposition** 212:24
222:23
**order** 187:9 188:12
204:21 205:16
**original** 168:23
186:25
**outcome** 180:2,24
182:25 184:7,9,11
231:13
**outside** 227:22,22
228:1

Veritext Legal Solutions
866 299-5127

[overall - problem]

overall  222:24
oversample  207:18
oversampling  207:4
  207:5
oversamplings
  207:14,16,17
overwhelmingly
  184:17 186:21
owen  176:8
ownership  207:11
  207:12 209:24
  214:18

**p**

p  167:1
p.m.  164:21 229:7
page  172:1,4 177:2
  177:2 178:11,12
  179:17,19,22
  180:13,20 182:11
  182:12,13 185:10
  185:12 186:16
  192:14,16 203:20
  209:3,16 212:19,20
  217:2,20 222:2,3,16
  222:17,19,19
pages  164:25 189:20
  222:2
paragraph  177:15
  178:12 179:8,22
  181:2,10 185:13
  192:16 203:23,24
  212:20 222:18
paragraphs  172:5
parris  174:14
parse  199:11 200:17
part  198:7 204:7
  205:1
participation  189:7
particular  195:12
  200:25 206:11
  207:4,13 211:16,18
  223:15
particularly  174:2
  175:8 181:14

184:12 195:20
  204:3 206:15
parties  231:12
pass  169:9
passage  197:14
  198:23 200:23
  202:7
passed  196:10
  199:13
passing  196:4
  198:16 199:17
  202:9
passport  215:11
passports  215:6,7
  216:20 217:24
patterns  201:14
penalty  230:1
people  171:5 175:8
  175:8 181:8,23
  182:5,6,9 192:1,2,8
  192:10 193:15,17
  194:12,12,15,15,25
  195:1,3 199:8
  200:16 205:22,23
  209:20,25 214:10
  215:1 217:16
peoples  187:24
  188:5
percent  188:25
  207:23 211:5,8
  222:24 223:1,8,9
percentage  211:15
  211:17 218:22
  219:21
perception  223:6
performance  186:17
  193:23 208:10
performs  213:12
period  170:25
  183:21 198:22
  202:15 208:15
perjury  230:1
perkins  165:5
perkinscoie.com
  165:9

person  194:4 219:13
  228:11,17
personally  174:9
  181:19
persons  184:15
  217:8
ph.d.  164:15 166:3
  167:23 230:12
photo  180:9 187:19
  192:2 193:15,17
  194:12,13,15,25
  195:4 197:14 198:2
  198:17 199:14,17
  200:12,20 202:7,9
  204:5,16,19,21
  205:13,15 207:7,12
  207:12,25 212:21
  212:22,25 213:4,6
  214:17,17 215:3
  216:18 217:16
  218:22 219:3
  222:24 223:22,22
  224:2,6,8,12,15,18
  224:18,19,21 225:4
  225:9,16 226:13
  228:13,19
picking  207:19
picture  217:12
pinpoints  202:1
place  187:8 188:11
  188:23 223:9
  224:23
places  223:10
plaintiff  164:7 165:3
plaintiffs  167:18
plane  180:10 187:20
play  204:13
please  172:1,4
  178:11 179:21
  203:20,22 212:19
  222:18
plus  199:25 200:8
  207:18 215:15
point  182:21 196:12
  208:2 211:21

220:15
pointed  176:14
policy  178:1
political  218:14
poll  178:20 179:6,11
polling  223:9,10
polls  175:22 184:3
  184:17 185:20
  187:17 200:16
poor  204:4 206:10
position  188:8,10
possess  192:2 211:7
  212:12 221:13
possessing  193:15
  211:16
possible  173:16
  184:8
possibly  195:14
post  200:23 202:7
postdates  224:12
precincts  218:15
present  165:21
  186:17 204:2,21,22
  205:15,16
presidential  177:10
  198:24 199:5,12
  201:16,17 203:6
press  173:2
pretty  171:18 205:9
  221:18
previous  206:7
previously  195:18
prior  168:6 189:24
  191:1 225:3
priority  173:8
private  217:5
privately  217:8
probability  211:4
  212:13
probably  190:9
  212:2 214:6,8
  220:20
problem  188:3
  189:5 206:13,14

**[problems - report]**

| | | | |
|---|---|---|---|
| **problems** 216:4 | 224:23 | **real** 188:2 189:5 | 221:22 225:25 |
| **proceed** 167:21 | **q** | 204:11 210:10 | 226:2,4,7,10,12,16 |
| **proceedings** 164:22 | | **reality** 212:11 | 226:17,21,23,25 |
| 231:5,7,8 | **quacks** 214:5 | **really** 171:19 188:2 | 227:2,6,10,12,16,17 |
| **process** 187:10 | **qualifies** 172:25 | 188:2 214:21 | 227:18 228:3,9 |
| 188:13 189:14 | **quarter** 223:4 | **reason** 223:22 | **regular** 217:12 |
| 222:22 223:12 | **question** 193:11 | **reasonably** 192:12 | **regularly** 217:25 |
| 225:11 | 197:9 198:7 210:1 | **reasons** 173:21,22 | **related** 172:14,16 |
| **produced** 220:23 | 214:21 218:25 | 189:1 191:25 | 231:11 |
| **professional** 217:15 | 227:4,14 | 205:21 | **relationship** 185:23 |
| **proper** 213:12 | **questions** 194:23 | **rebuttal** 168:23 | 186:19,20 187:2 |
| **prosecution** 173:7 | 218:13 222:21 | 169:21 173:25 | 223:19 |
| 178:18 | 227:13 228:22,23 | 186:16 191:3 | **release** 173:2 |
| **prosecutions** 176:6 | 228:24 | 216:25 217:1 | **relevant** 177:24 |
| 178:10 | **quite** 174:19 200:4 | **recall** 170:17,23 | 196:11 211:11 |
| **prosecutor** 175:18 | 202:14 | 171:1 226:2,3 | **reliability** 177:21 |
| **prosecutors** 173:4 | **quote** 188:4 193:5,5 | **receive** 206:1 | **reliable** 176:16 |
| **prove** 181:18 184:23 | **r** | **recess** 222:11 | 201:3,6 208:18 |
| **proved** 181:10 | | **recollection** 170:16 | 219:22 221:14 |
| **provide** 228:9 | **r** 167:1 | 171:17 | **relies** 209:20 |
| **provided** 180:16 | **race** 199:10 200:18 | **recommends** 204:13 | **rely** 176:5,9 178:9 |
| 204:11 | 202:2 | **record** 191:19,20,21 | 202:2 208:6,8 |
| **providing** 172:11 | **racially** 217:6,6 | 191:22 219:18 | **remark** 169:5 |
| 204:18 205:12 | **raised** 204:2 | 221:21,22,22 222:9 | **remember** 169:1,2 |
| **provisional** 184:16 | **random** 212:10 | 222:13 229:6 231:7 | 183:7 193:25 211:1 |
| **proximate** 191:8 | **range** 184:22 | **records** 199:10 | 217:2 221:10 |
| 209:1 | **rare** 170:17 171:4 | 220:11 | **renew** 215:11,12,14 |
| **public** 164:19 | 183:14,16 | **reduced** 231:9 | **report** 168:23,24,24 |
| 167:25 180:7 185:6 | **rarer** 183:16 | **reference** 169:7 | 168:25 169:12,15 |
| 185:24 186:2,11 | **rarity** 180:15 | 191:2,7,11 193:20 | 169:18,21 171:7,7 |
| 187:9 188:12,15 | **rate** 194:14 195:1,3 | 194:9 196:11 | 171:13,17 173:14 |
| 189:13 223:7 224:3 | 207:6,10 209:24 | **referenced** 181:6 | 173:25 176:8,15 |
| 224:11,18 225:11 | 213:5 214:17 | **referring** 183:7 | 177:22 179:17 |
| 231:17 | 217:17 | 194:8 207:14 | 181:7 182:18 186:6 |
| **public's** 222:21 | **rates** 201:2 212:12 | **refers** 173:13 | 186:13,16,25 |
| 223:11 225:2 | 213:17 217:6 | **reflected** 210:23 | 187:12,19,21 189:2 |
| **pure** 194:16 | **raymond** 175:11 | 215:22 | 189:18 190:1 191:1 |
| **purposes** 215:25 | **reaching** 204:14 | **register** 204:17 | 191:3,3,25 192:15 |
| **pursuant** 164:17 | **read** 172:4,19 | 226:9 228:4 | 194:2 203:13,15,17 |
| 168:10 | 176:25 178:11,16 | **registered** 212:22 | 203:18 206:23,25 |
| **pursue** 173:10 | 178:17 179:21 | 214:18 215:1,2 | 207:1 209:4,11,18 |
| **pursued** 173:6 | 180:21 185:5 | 217:7 223:5 | 209:19 210:4 |
| **put** 184:25 194:2 | 203:22 222:18 | **registration** 172:15 | 216:24,25 217:1,19 |
| 197:11 199:6 | **reading** 189:20 | 173:11 177:16 | 222:2,16 |
| 202:24 214:1 | **ready** 206:17 | 199:10 218:24 | |

[reporter - sorry]

**reporter** 167:19
231:1
**reports** 186:10
200:15 214:16
**represent** 167:14,16
167:18 210:9
**represented** 205:8
**representing** 167:3
167:20
**republican** 170:20
178:7
**require** 206:5 226:8
**required** 193:5
226:21
**requirements**
175:21 204:1 216:9
216:10,11 225:25
226:2,5,7 227:6,10
227:12,16
**requires** 206:3
**requiring** 204:21
205:15
**residents** 193:1
**resolve** 206:13
**resolves** 205:2,18
**respect** 171:15
184:2 189:8 205:5
218:3
**respected** 174:16
208:9
**respondents** 222:25
**responders** 213:4
**response** 219:4
**result** 192:8
**resulted** 172:10
**results** 186:6 199:12
203:1 212:9 213:15
**reviewed** 171:3
190:3,6,9 206:25
**revoked** 220:21
**richmond** 164:3
**right** 169:11 170:2,6
170:9 171:23 172:2
172:20,21 180:20
187:25 189:23

190:2 191:22
202:11 209:5,8,17
210:13,25 211:12
211:14 212:6 226:1
228:21 229:1
**rights** 187:23 188:1
188:6 193:3
**roden** 221:1
**role** 204:14
**roll** 219:23 220:1
**rolls** 218:24,24
**roughly** 218:11
**round** 196:16
**rpr** 164:19,23,23
231:4
**rule** 215:2
**run** 226:19

**s**

**s** 166:1 167:1 193:9
193:10
**safeguard** 187:15
**safeguards** 180:7
185:7,16,17,22
187:8,12,13,14
188:4,8,11,22,23
189:4,12
**sample** 207:19
209:22,23 210:2,4
210:11,23 211:1,1,2
211:3,5,8,15,16,19
211:21,22,25 212:3
212:14 213:10
214:3
**samples** 210:6
211:23
**sauerbrey** 174:12
175:2,13
**savvy** 205:25
**saw** 216:6 223:8,9
**saying** 183:3,13,14
196:17 201:21,23
214:4,13 219:11
**says** 172:24 173:1
179:3,23 180:12,21

182:22,22 185:16
187:19,25 204:23
205:1 210:25
212:21
**sb** 192:5 209:2,5,7
**scholars** 208:8
**science** 210:16
**scope** 227:22,23
228:1
**second** 179:22 185:5
185:13 192:16
203:22,24 204:9
212:20
**secondly** 185:23
188:21 196:13
201:21
**section** 180:17,17
181:3 185:12
204:12
**see** 179:2,7 180:12
180:18 181:1
182:14 183:21
193:19,19,20 194:8
194:9 201:22,23
205:4 207:13
210:19 213:11
215:18 226:11
**seeing** 170:23
**seen** 184:10 190:5,8
193:22 213:16
220:14,16 223:17
**senate** 176:2
**senator** 193:10
**sense** 207:25
**sentence** 180:21
185:5 187:18
**series** 208:17
**serious** 182:19
223:5
**seriously** 176:22
**served** 174:16
**sets** 225:18
**seventeen** 223:7
**shortly** 168:21

**show** 174:5 175:21
188:17 199:14
200:18 207:21
220:7,8 228:4,8
**showed** 187:21
202:6 203:6
**showing** 173:17
175:7 186:18
200:15 214:2
218:21 220:5
**shows** 213:7
**side** 184:17
**significance** 210:3,8
210:22 211:13,20
211:24 212:16
**significant** 174:6
189:10 210:15,20
210:21 212:7
213:14
**significantly** 212:2
**similar** 221:19,23,24
**similarly** 175:16,24
**simply** 177:8 183:10
201:21 202:2
212:13 227:8
**single** 175:1,4 176:2
176:21 185:18
208:18 220:15
**situation** 171:14
174:18 181:6 202:3
**size** 209:22,23 210:2
210:5,11,23 211:1,2
211:3,15,17,21,22
213:10
**sizes** 211:1 212:14
**small** 193:5 211:23
213:1,4
**social** 210:16
**solid** 194:20
**somewhat** 192:18
192:22
**sophisticated**
201:12,18 202:4
**sorry** 185:10 227:19

Page 12

[sound - talk]

sound  223:20
sounds  169:10
source  219:5,8,10
  219:14,15,23
sources  182:14
  218:10,23
spae  193:23 208:13
  213:19
span  177:10
speaks  178:15
specific  170:15
  171:16,19 178:3,4
  179:7 191:9 198:1
  208:25 226:14
  227:13
specifically  170:10
  170:13 174:19
  176:23 187:6
  189:25 200:19
  201:23 227:1
spend  189:19
spiva  165:4 167:17
  167:17 169:13,17
  169:23 170:3
  171:10 177:2
  178:14 180:13,15
  182:1,11,13,17
  190:21 191:15,17
  195:5 196:6 198:4
  202:18 204:24
  206:20 209:10,13
  214:9 219:24 222:4
  227:19 228:24
spoke  168:8
ss  231:2
staff  177:7
standard  193:24
  208:7 212:16
start  169:11
starting  178:12
starts  179:19 225:6
stat  222:20
state  164:9 167:9,14
  173:4 174:10,20
  175:17,20 185:18

185:18 188:23
  192:4,25 199:13
  216:2 219:7,18
  220:5 226:15
  228:11,18
state's  226:22
statement  188:22
  189:15 216:25
statements  181:20
states  164:1 186:21
  190:19 191:12
  192:16 199:16
  204:13 213:21
  218:16 223:15
  224:1,5,15,16,17,17
  224:21 225:3,9,10
  225:16,17,18 226:8
  226:13,20 227:6,16
  228:9,10 231:2
statewide  201:15
statistical  207:2,9
  208:4 210:3,7,22
  211:4,10,12,20,24
  212:16 213:8,12
statistically  210:15
  210:19,20 212:2,6
  213:13
statistics  177:8
  214:25
status  172:12
stay  182:21
stenographically
  231:8
stenotype  164:23
step  206:7
steps  206:3
stick  195:17
stock  199:6
stop  183:16
stopped  169:3
street  164:21 165:6
  165:15 167:5
strict  186:22 223:22
  224:8,21 225:16,22
  225:22 226:3,3,5,5

226:13,17,23,24
  227:9,9
strikes  200:2
stringent  210:16,21
student  215:15,17
  215:21,23 216:21
  218:3,5
studies  171:3 176:5
  176:9 186:5,6,8
  188:17,18,20 191:6
  191:8 194:8 200:15
  200:17 203:6,8
  207:13 208:1,5,7,7
  208:17,22,22,24
  209:1 228:8
study  170:15 176:17
  176:20,20 178:5,8,8
  178:8,9 182:22
  183:7,8,10 184:20
  186:25 190:14
  191:4 194:7,8
  195:10 201:12,25
  203:1 205:4 207:21
  208:2,10,12,14,16
  208:18,20,25 212:5
  212:19 216:6
  226:11,14
studying  190:18
subject  182:2 224:4
submitting  172:15
subsequent  175:16
  192:5 202:21
subsequently  182:8
substantially  221:19
  221:23,24
sued  174:13
sufficient  173:7
  202:15 203:3
suggests  202:13
  215:9
suite  165:6
supervision  231:10
support  191:12
  222:23

suppose  172:18
supposed  182:5
  224:25
supreme  187:25
sure  189:4,17 197:8
  198:6 203:14 216:3
  218:4,5,7,8 226:6
survey  186:17
  193:23,24 201:4
  203:14 208:10
  209:19 212:21,25
  213:16 218:12,19
  222:20
surveyed  201:5
surveying  208:15
surveys  170:18
  171:3 173:17 187:2
  200:14 201:22,23
  214:2 218:21,25
  223:14
suspended  220:21
suspicious  206:2
swear  167:20
swims  214:5
swing  184:19
sworn  164:18
  167:25
system  180:6 185:6
  222:23 224:9 225:1
  225:3
systematic  174:5

| t |
|---|

t  166:1,1
table  209:19 210:14
  210:24 211:12
  216:24 217:18
take  168:17 205:25
  210:10,18 222:7
taken  164:20,22
  167:6 203:1 231:5,8
takes  211:10,13
  215:10,11
talk  177:16

[talked - victimless]

talked   170:10 206:6

talking   179:5 196:9
  197:5 199:25
  203:14 207:15

tease   201:12

tell   168:13 175:22
  195:10 199:24
  200:7 214:10 221:4
  221:4

template   204:12

ten   183:20 211:25

tend   217:14

tended   212:22
  213:21

tends   199:3

tens   170:24 183:19
  216:7

term   218:9 226:24
  227:9

terms   201:3 208:21
  221:22

test   199:5 210:7,14
  211:4,10 213:12

testified   168:1 170:7
  195:18

testify   175:15

testing   213:8

texas   184:20 185:4
  216:6

thank   168:4 169:13
  169:22 173:15,22
  177:5 228:24 229:1
  229:3

thanks   169:18 170:4

thieme   175:11

thing   206:5 208:12
  213:20 214:2
  220:13

things   201:9 217:4
  220:8 224:23

think   169:3 170:10
  171:13 172:22
  173:1 174:23,24
  177:24 181:4,6
  183:6,23 187:11,14

192:5,11 202:20
  205:17,18 213:23
  216:24 218:6
  219:20 220:25
  223:21 224:7
  225:24 226:24
  227:18,21

thousand   174:12

thousands   177:12
  197:3 200:5 216:7

three   171:17 177:10
  213:21,23 214:9

tight   176:1

time   167:4,13
  174:15 186:14
  189:22 191:8 192:4
  192:12,13 197:15
  198:21 201:14
  202:11,15,22 203:3
  203:9 208:15 222:8

times   207:22,23,24

today   167:3,18
  168:10 186:7

told   174:19

tolerate   200:4

total   209:20 212:25

touch   207:2

touched   218:6
  225:25

town   183:24

traditionally   204:3

transcript   231:6

transportation
  205:24

trends   201:13

trial   175:10

tried   191:8

true   181:10 187:22
  230:3 231:6

trust   222:22

truth   168:13

try   168:18 198:11
  217:2

trying   170:21,21
  187:15 188:7

201:12 224:24

turn   172:1 179:17
  189:16 192:14
  203:20 209:3
  222:15

turned   182:5 183:22
  184:23 201:24

turnout   196:1,15,17
  196:20,21 197:2,4
  197:12,15,20,21,24
  199:3,21,24,25
  200:7,8,9 201:2,7
  201:11,20 202:2
  219:17

twice   181:9

two   168:17 171:15
  172:5 207:22,22,23
  207:23 210:6,12
  211:1,23 213:24
  218:11 225:17

type   170:16 199:1,2

types   170:16 179:14
  206:10

typewriting   231:10

typical   181:12

**u**

u.s.   173:1

uncovered   175:3
  176:4

underestimate
  220:16

underestimating
  214:25

underestimation
  214:23

underlay   193:21

undermine   170:22
  203:8,10

understand   168:9
  168:14 188:7 195:7
  196:11 213:8
  216:15 218:7,25
  219:11,25 221:17

understanding
  215:22 216:1 218:9
  220:11

unfortunately
  183:11 199:9

unfounded   175:7

unintentional   175:3

united   164:1 190:19
  231:2

units   218:15

universities   170:19

university   168:25
  169:12 171:7
  189:18 190:1,14
  192:15 206:23
  212:19 222:1,15

unpack   185:14

unprosecuted
  173:19

unquote   188:4

unreliable   183:12

unrepresentative
  207:19

unsubstantiated
  224:2

use   218:23

utilized   208:8

**v**

v   164:8 165:4

valid   192:2 214:19
  215:3,15,19,24
  216:8,8 218:4,5
  220:17 221:8,14,16

validity   182:6

variations   214:12

variety   172:14
  191:25

various   207:7

vehicles   220:5

veritext   167:3,20

versus   167:9 214:17
  225:22 226:3,5

victimless   173:11

[victory - years]

**victory**  174:14
**videographer**
165:21 167:2,19
222:9,12 229:4
**videotaped**  164:14
229:5
**view**  225:22,25
**views**  205:9
**virginia**  164:2,9
167:9,11 170:8,14
170:17 171:4,16
178:3,4 183:18
184:2,13 191:5,7,9
193:18 194:15
195:4,17,18 196:1
197:13 198:3,14
199:9 206:15
208:23,25 209:25
214:18 215:17,20
215:25 216:1,5,12
217:4,9,24 219:7,18
219:21 220:5
221:17 228:12,18
**virginia's**  192:9
214:19 228:13,19
**volunteers**  178:21
179:6,11
**vote**  172:15 175:5
175:23 184:8,22
187:17 200:3 201:5
204:17,22 205:16
206:4,7 226:9 228:4
**voted**  175:12 181:9
182:8
**voter**  170:8,10,13,16
170:23 171:4,15,20
172:15,16 173:10
173:18 174:2,3,5,6
174:13,19 175:2,7
175:14,19 176:2,3
176:10,11,21
177:15,16,18 178:9
178:25 179:2,19
180:18 181:12
183:10,14,15,19,21

184:1,10,13,18,18
185:2,21,25 186:3
186:11,19,19,22
187:2,3,4,4,6
188:14,15,24 189:1
189:8,9,10 190:11
190:18 191:13
192:9,19,23 193:3
193:17 194:13,21
195:19 196:15,16
197:14,15 198:2,17
199:13,17 200:3,12
200:17 201:7,13,24
202:1,5,7,9,12
204:1,21 205:15
206:14 212:24
213:21 214:23,24
216:5,13,14 218:24
223:6,8,17 224:1,2
224:5,6,12,15,19,21
224:25 225:9,10,15
225:16,24 226:13
226:16,21,24
**voters**  175:9 178:23
180:9 185:8 186:21
187:16 189:7 193:4
195:20 196:1
197:13 199:1,15
200:1 202:6 204:10
206:8,10 212:22
214:18 215:1,2
216:7 217:8 218:22
223:5,21 224:8,9
**votes**  174:12 185:3
186:23 200:6
222:25
**voting**  172:11
177:17 180:1,11,23
181:8,23 182:5,9,24
183:2 184:3,6
187:23 193:3
201:22 204:3,22
205:16 215:19,25
217:8 221:7 226:10
226:16,22 227:17

**w**

**wait**  172:25
**walk**  175:6
**want**  173:21 174:20
174:21 186:14
188:19 191:18
197:8 206:17 218:7
218:18
**wanted**  225:14
**wards**  218:15
**washington**  164:21
165:7 167:6
**watch**  206:16
**water**  222:4
**way**  181:15 190:23
193:16 202:24
216:13 218:1,17
**ways**  207:15
**we've**  168:15 222:8
223:17
**websites**  215:16
**weeks**  176:23
**weigh**  184:14
**weight**  207:17
**went**  196:17,18
**west**  165:15
**whatsoever**  175:21
183:19 185:24
**white**  192:2,9
194:12,15 195:1
200:8 217:15
**whites**  193:7 194:1
194:6 195:4 197:1
201:14 207:7,24
210:11 211:2,15,15
212:3,11 213:25
217:9,14
**widespread**  171:20
176:3
**william**  193:9
**willing**  200:4 228:2
**wisconsin**  181:6,17
181:20

**witness**  164:15,18
166:2 167:12,18,21
167:24 171:12
177:4 178:17
180:14,16 181:24
182:2,12,14,18
190:23 191:16
195:7 196:8 198:6
202:20 205:1
206:19 209:14
214:12 219:25
222:6 227:25 229:3
**wondering**  198:12
**words**  197:14
202:23 212:11
219:2
**work**  175:3 177:22
205:25
**workers**  178:21
179:6,11
**world**  194:3 216:12
**would've**  184:23
**wrap**  168:19
**wrote**  175:6

**x**

**x**  164:5,12

**y**

**yeah**  169:23 171:12
172:24 177:4 181:4
186:13 190:23
195:7 198:6 203:19
203:25 206:20
209:13 219:25
227:25
**year**  177:10 183:20
197:12 198:25
199:4,13 203:5,6
215:6,7 221:11
**years**  171:13,18
174:17 176:15
185:2 201:16,17
223:3

**[zero - zero]**

| z |
|---|
| **zero**  196:25 197:6<br>197:23 211:22 |

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.