# EXHIBIT 16

United States District Court for the District of Arizona

Feldman, et al; v Arizona Secretary of State's Office et al

Case No. CV-16-1065-PHX-DLR

Expert Report

Donald T. Critchlow

Arizona State University

4242 N. 56th St.

Phoenix, AZ 85018

## I.      Statement of Purpose

During the past four years, I have not testified as an expert, either at trial or by deposition. I was retained by the Defendants in *Feldman, et al v. Arizona Secretary of State's Office, et al,* to examine the relationship between the complex history of alleged racial discrimination and the complex nature of voting in Arizona. I have expertise in these subjects as an expert in Arizona and American political history. I was retained by Defendants to conduct this review, and my rate of compensation is $300.00 per hour. For additional information, my C.V. is attached.

## II.     Summary of Opinions

The conclusions and supporting evidence in this report are scholarly in intent and in nature. They are grounded in my experience and expertise as a frequently published scholar; editor of a major academic quarterly, *Journal of Policy History* (Cambridge University Press); and History Faculty member and Director of the Center for Political Thought and Leadership at Arizona State University.

I offer the Court the following major conclusions based on my examination of historical records, including court opinions, newspaper articles, and archival material, as well as research into a large body of scholarly literature on Hispanic immigration; the history of voting rights, access, and participation; and racial discrimination in the state of Arizona, especially in regard to Hispanics, Native Americans, and African Americans:

1.      Historical analysis of discrimination against Hispanics, African Americans, and Native Americans, especially in Arizona, is a complex story and any conclusion that finds a linear trajectory of past discrimination to current legislation concerning voting and

assignment of polling places in the Presidential Preference Election ("PPE") in 2016 is a misuse of historical interpretation.

2.      To conclude from history that there has been a linear and continuous history of discrimination against Hispanics, Native Americans, and African Americas—as stated in the Plaintiffs' Complaint and in the David R. Berman Report (9/8/16, pp. 1 and 24)— creates a misleading and monochromatic narrative that denies the great advancements made in Arizona to end discriminatory practices and grant wider and greater access to voting and political participation. These advancements have come about through active civil rights activism, court actions, and legislative reforms.

3.      Racial discrimination, where it occurred in Arizona, was largely the result of a one-party controlled state—the Democratic Party—until the 1960s when Arizona became a two-party state with the revival of the Republican Party. From the early 1930s through the mid-1960s, Arizona was a one-party state. Discriminatory practices, where they existed, and although not continuous, occurred under Democratic leadership.

4.      In the state of Arizona, Democrats controlled the state Legislature, the Governor's mansion, and the congressional delegation throughout most of this period. John Rhodes was the first Republican elected to Congress in the state's history when he won office in 1952.

5.      While the Democrats controlled the state, Republican Party voter registration peaked in 1928 at 33%, but had declined to 12% by 1940. Republicans did not win a single seat in the State Senate between 1933 and 1951, and reached a high of only 11 out of 72 seats in the State House in this period. Democrats controlled the governorship and state appointments throughout the 1930s and 1940s.

3

6.      The history of race relations in the nation and the state of Arizona is a story of advancements in social integration. Tucson and Phoenix desegregated their two segregated schools *before* the U.S. Supreme Court ruled school segregation unconstitutional.

7.      Residential integration of Hispanics into neighborhoods with majority white populations is apparent in Arizona's two largest cities, Phoenix and Tucson, as evidenced by statistics produced by the U.S. Census Bureau. Ethnic residential integration qualifies, if not denies, discretionary political discrimination.

8.      Voting regulation is determined by state legislatures under the U.S. Constitution, under Article II, to best determine open and fair elections.

9.      Greater access to voting and political involvement by Hispanics is evidenced by increased registration and turnout of Hispanic voters.

10.     Greater access to voting and political involvement by Hispanic voters is evidenced in the increased number of Hispanic representatives within the state Legislature.

11.     Through a process of reform initiated by court orders, legislative involvement, and citizen participation, Native Americans have become more involved and have greater access to political participation in local, state, and national elections.  This is evidenced in the large voter turnout of Native Americans in the election regarding the 2002 gaming act and subsequent state and local elections.

12.     Native American voting participation in Arizona remained low after Native Americans were awarded citizenship in congressional legislation enacted in 1924, but Native American involvement in politics was focused on tribal elections as a result of voluntary behavior and not necessarily restrictive legislation.

4

14. The long waiting lines found in locations in Phoenix during the 2016 PPE were not a result of intentional discrimination against voters, but a result of projections based on past voter turnout. Projections and placement of polling places in the 2016 PPE were based on low voter turnout in the 2012 presidential election. Total voter turnout in the Arizona primary in 2012 was zero for Democrats (who did not hold a primary) and 511,239 for Republicans. In 2016, Democratic turnout was 468,461 and Republican was 625,740.

15. Long voter lines were a national phenomenon—not unique to Phoenix or the state. Plaintiffs maintain that these long lines reflect the state's consistent history of ethnic and racial discrimination, but unexpectedly high voter turnout occurred in many primary states leading to long lines, including "Red" states such as Oklahoma and Wisconsin, as well as North Carolina, a "purple" state. Overall in 2012, participation in statewide primaries for president, governor, and the U.S. Senate slumped to its lowest level since presidential primaries proliferated in 1972. Based on an analysis of 41 states that held primaries for both parties, turnout in 2012 was 17.3% of eligible citizens; in 2016, the turnout, as estimated by Pew Research Center, was 29%, an unexpected increase of more than 10%.

16. The history of voter restriction, ballot access, and political participation in the United States, and Arizona, is exceptionally complex, but the Court should bear in mind that even as the electorate expanded and voters were given greater access to voting in the 20th and 21st centuries, Americans voted in higher percentages—sometimes reaching 70 or 80% turnout—in local, state, and national elections in the 19th century, even though voter restrictions regarding access to polling stations were much greater. Increased political

involvement by citizens remains a largely cultural and socio-economic issue, beyond the purview of the Court to address.

17.    The relational link between the state's political and social history, long polling lines in the 2016 PPE, and H.B. 2023, is historically specious.


### III.    Background and Qualifications

I serve as Director of the Center for Political Thought and Leadership at Arizona State University, where I am also a professor of History. I grew up in Phoenix, where I graduated from Maryvale High School. I hold a B.A. from San Francisco State University and an M.A. and Ph.D. from the University of California, Berkeley.

I am the author and editor of more than thirty books, including monographs published by Harvard University Press, Cambridge University Press, Princeton University Press, Oxford University Press, University of Pennsylvania Press, St. Martin's Press, as well as other academic and commercial presses. I have won two fellowships from the Woodrow Wilson International Scholars Center in Washington, D.C., and served as a Guest Scholar at the Brookings Institution in Washington, D.C. and a Distinguished Lecturer for the U.S. Department of State. I have taught at the University of Notre Dame, Hong Kong University, and Warsaw University. I have lectured throughout Europe, China, and Australia.

My most recent books in the last five years include *Future Right: Forging a New Republican Majority* (St. Martin's Press, 2016); *American Political History: A Short Introduction* (Oxford University Press, 2015); *When Hollywood Was Right: How Movie Moguls, Film Stars, and Big Business Remade American Politics* (Cambridge University Press, 2013);

*The Conservative Ascendancy: How the Republican Right Rose to Power in Modern America* (University Press of Kansas, 2011, second edition, revised and expanded; originally Harvard University Press, 2008); *Parallel Lives: Presidential Character and Politics* to be published in 2017 by the University of Pennsylvania. I am the co-editor of *Oxford Encyclopedia of Political and Legal History* in two volumes (Oxford University Press, 2012); and co-editor of the *Oxford Handbook of American Political and Policy History* (in press, Oxford University Press).

See the attached Resume for more information and a complete list of publications.

**IV.    Sources**

Sources for this report include government reports, newspapers, archival materials, and scholarly monographs and articles.  (See Bibliography).

**V.    General Observations**

**A.    Nature of History and Related Analysis**

Historical analysis is not an objective natural science in which a hypothesis is stated and then tested in a laboratory. Instead, historical analysis is by nature interpretative and ongoing. There are such things as historical facts: there was a war between Great Britain and the United States in 1812, Abraham Lincoln was elected President of the United States in 1860, and there was a Civil War in the United States from 1861-65. Why there was the War of 1812, why Lincoln was elected in 1860, and the causes of the Civil War continue to be debated. Those and similar questions are the subject of historical analysis.

Nineteenth-century American history was largely dominated by what is called the Anglo-Saxon interpretation, in which historians maintained older traditions of direct democracy, trial by

juries, and unwritten ancient constitutions that influenced and shaped American history. This interpretation was challenged in the 1920s and 1930s by historians who posited an economic-determinist interpretation of American history, in which economic factors were foremost in shaping it. For example, some have argued that the U.S. Constitution was primarily an economic document written to protect wealthy northern merchants and southern planters. This interpretation fell into disrepute in the 1950s with detailed empirical studies. Since the 1990s, the study of American history has been dominated by a "race and gender" interpretation, generally framing American history as a story of the oppression of women and racial and ethnic minorities by privileged white men. While still pervasive, this interpretation is increasingly being challenged by historians who knew women and ethnic minorities as active agents in society and not simply as objects of oppression. Moreover, many historians have begun to move beyond categories of race and gender to include other forces in American history, including the importance of ideas, cultural traditions, and the role of the national and international influences in shaping American history.

Good historians understand that historical analysis is, by definition, interpretative. This understanding of historical interpretation is important for any understanding of legal analysis. Not all historical interpretation is of the same quality, but the larger issue is that historical argument within legal analysis often makes an argument from analogy and becomes a false case for causation: *cum hoc, ergo propter hoc*. For example, just because Phoenix Unified Schools had one high school that was legally segregated in 1952, we may not conclude that that fact led to polling stations being absent in Phoenix in 2016 or that it caused the state Legislature to enact legislation to ensure open and fair voting practices. One may conclude that more voting places should be available or disagree with a specific law regarding voting practices, but making a

8

claim that there is a necessary continuity in historical motivation is a misuse of history and a logical fallacy.  What history should provide is a context for understanding current events and a backdrop to recognize that advances have been made increasing greater access to voting, ending legal segregation, and improving racial relations.

The Plaintiffs and their experts argue that "discrimination, though more marked in some periods than others, has been a continuous problem throughout the State's history." (Report of David Berman ("Berman"), p. 4). The Plaintiffs claim that "discrimination in voting has been part of a more general pattern of political, social, and economic discrimination against minority groups which has been reflected in other policy areas such as school segregation, educational funding and programming, equal pay and the right to work, as well as immigration" (Berman, pp. 1 and 22).

This report presents a history of Hispanic settlement, immigration, wage discrimination, school desegregation, residential integration of Hispanics in Phoenix and Tucson, and increases in Hispanic voter registration, actual voting, and elected representation. It also includes the history of desegregation in the state, racial advances in political and legal rights for minorities, and the history of Native American political participation.  The purpose of this report is not to deny past discrimination, but to offer a more complex and complete story that shows empirically the advance of political and legal rights for minorities in the state, thereby challenging both the view of history offered by the Plaintiffs and the unsounded assertion of any a causal link between history and the voting discrimination.

**B.     History of Hispanic Immigration and Related Analysis**

This history of Hispanic immigration and settlement in the Southwest and the related analysis present a complicated story.  In his report for the Plaintiffs, David R. Berman claims that discrimination was evident in the origins of the Arizona territory and early state history and that it set a pattern for later political, social, and economic discrimination toward Hispanics. He writes, "Arizona has had a stratum of cultures: an initial base established by Native Americans, which is overlain with a Hispanic strata which, in turn, is topped by an Anglo strata." (p. 3) He claims that "After the conclusion of the Mexican-American War, the United States government conferred citizenship on some 100,000 Hispanics living in Arizona at the time." (p. 5)  Recent historical scholarship of the Southwest, however, shows that Spanish and Mexican settlement in the Southwest (including Arizona-New Mexico, Colorado, and Texas) was actually extremely sparse. The Spanish, and later Mexicans, were unable to establish settlements in the Southwest largely because of resistance by Native Americans—primarily Apaches in Arizona and Comanche in Texas and New Mexico. Indeed, so powerful were the Comanche in Texas and New Mexico that one prize-winning historian, Pekka Hamalainen, entitled his study, *Comanche Empire.*  Scholars agree that the Hispanic presence in the Southwest was minimal. (Blackhawk, 2008; Brooks, 2002; DeLay, 2008, Hamalainen, 2009)

The claim by the Plaintiffs' expert that Arizona had 100,000 Hispanics at the time is unsupported and shows a lack of familiarity with recent scholarship. The Arizona Territory, following the Mexican-American War, was sparsely settled and contained very few Hispanics. The Hispanic population, or Mexicans, in Arizona is estimated by demographers to have been a few hundred people. Mexicans had been unable to establish settlements or a sizeable population in the territory, as they had in other parts of the Southwest, because of Indian resistance. (Gratton/Merchant, 2015)

10

The large-scale migration of Mexicans into the state began only in the late 19th century and only increased in sizeable numbers in the first two decades of the 20th century. The U.S. Census Bureau and later historians and demographers such as Gratton and Merchant characterize this migration as circular, with immigrants coming to Arizona and then returning to their home countries. An estimated forty percent (40%) of these immigrants did not stay in the state to establish permanent residence. (Gratton/Merchant, 2015, pp. 523-25)  For this reason, these immigrants took little interest in the political life of the state. Demographers note that these immigrants, while better educated than their cohorts in Mexico, were mostly illiterate. Hispanics who were settled permanently in the state generally focused on improving their material lives through economic activity and took little interest in politics until the late 1960s. The small population of African Americans remained Republican voters until the 1930s. Native Americans in Arizona, even after the Indian Citizenship Act of 1924 (which passed Congress with no dissenting votes), focused their political activities in their own tribal lands throughout most of the 20th century.

### C.      The History of Voter Exclusion and Related Analysis

Under Article II of the U.S. Constitution, states were determined to be the best political entities to establish voter requirements. Voting requirements were by their nature exclusionary at first. Many states required property ownership as a qualification to vote. Six states barred Roman Catholics and Jews from voting or holding office. None of the original states, with the exception of New Jersey, granted voting rights to women, and even this limited suffrage ended in 1807.  By 1825, voting restriction based on property had been swept away in all but three states. By 1825, free blacks held voting privileges in only eight of the 24 states, and the number

11

continued to decline in the following decades. Restrictions on female and free black voting coincided with the rise of white male suffrage for those not owning property.  The expansion of the electorate in the nineteenth century led to high rates of voter turnout in 19th century. An estimated 83% of the northern electorate went to the polls, for example, in the presidential election of 1856.  Election Days turned into great festivals.  Eligible voters (white males) voted in high numbers in local, state, and national elections (Critchlow, 2015). During the 48-month duration of the Civil War, Americans went to the polls for local, state, and national elections in at least half of those months.

The 20th century saw the further expansion of the electorate to include women, with the ratification of the Nineteenth Amendment, and African American voters through civil rights activism. One of the great ironies in the expansion of the electorate and the inclusion of women and racial and ethnic minorities is that voter turnout declined steadily throughout the 20th century and into the 21st century.  Historians and political scientists have engaged in a lively scholarly discussion about this decline. This debate revolves around the breakdown of political machines and their ability to mobilize voters, a general decline in civic culture, or institutional restrictions. The key point relevant to the *Feldman* case is that voter turnout has declined dramatically in the 20th and 21st centuries even while constitutional rulings have significantly expanded the electorate. To claim that voter participation has declined because of voter suppression belies the high voter turnouts in 19th century elections when most voters had *less* access to polling stations.

### D.    Racial and Ethnic Social Discrimination and Related Analysis

The history of ethnic, racial, and religious social discrimination offers an illustration of how often American ideals of equality and human rights have failed to be practiced. The promise of liberty at times remained unfulfilled. Practice did not always fit aspiration. Yet because Americans aspired to these ideals, they are being realized.  The natural right to life, liberty, and the pursuit of happiness, whether or not actually endowed by a creator as our Declaration of Independence posits, was believed by Americans. This belief in "inalienable" rights enabled Americans over the course of the next 200 years to produce a democracy unparalleled in human history.  Although Arizona history can be presented as an Iliad of racial discrimination, the state's history offers as well an Odyssey of uneven advancement within the American political tradition founded upon principles of liberty and justice. For example, it is true that Arizonans once allowed racially segregated schools; but we must also recognize that the one legally segregated high school in the state, Carver High in Phoenix, was ruled illegal in December 1952, some 17 months before the U.S. Supreme Court ruling against school segregation in *Brown v. Topeka Board of Education* in May 1954. In Tucson, Dunbar School, a middle school for black students who would attend the integrated Tucson High School, was ruled illegal three years before *Brown*.

Furthermore, recent changes brought about by the Arizona Independent Redistricting Commission have added structural safeguards for minority voters in the state. The Commission's Proposed Congressional Plan "maintains two majority-Hispanic districts . . . and protects the voting strength of Hispanics and minorities in each of these two districts." (AIRC 2011 Report, p. 38) The Commission also acknowledged that "a comprehensive analysis of the 2004, 2006, 2008 and 2010 statewide elections shows a consistent ability of minority voters to elect their candidates of choice in these districts and no evidence of retrogression." (AIRC 2011 Report, p.

13

38) As discussed later, the Commission asked for input from Native Americans and established a district "derived from proposals made by Native American communities." (AIRC Report, p. 44)

The aspirations of these minority groups have been taken into account by the state in creating voting districts that solidify minority interests and voting strength. Minority voting strength has increased over the past several elections, and the trend appears to be continuing rather than having minority voters be disenfranchised due to historical discrimination.

**VI.    Hispanic Immigration and Social Discrimination in Arizona**

Any discussion of claimed political discrimination of Hispanics in Arizona should be framed within the context of the nature of Mexican immigration into the state.  The Plaintiffs' understanding of and expert's report on the history of Mexican immigration to the state, however, is belied by more recent scholarship on Mexican/Hispanic immigration that has emerged in the last decade by leading historians in the field.

The small community of Mexicans in the Arizona territory in 1850 grew during the late 19th century because of greater security under U.S. jurisdiction (Gratton/Merchant, 2015). Immigration of Hispanics increased significantly after 1920 because of immigration quotas placed on Europeans and exclusion of Chinese people. Migration from Mexico was circular, as many Mexicans immigrants came to Arizona to work because of high wage differentials with Mexico, but many of these immigrants returned on their own accord to their native country. Before 1930, this pattern of repatriation to Mexico was not compelled by American employers or the state and, indeed, was encouraged by Mexican government policies and a natural desire to return to their native country. During the Depression, many of Mexican origin returned to Mexico in even larger numbers, some through deportation or coerced policies. But also

14

following conventional immigrant activity, many Mexican immigrants returned to their home country. Those of Mexican origin who remained, many of whom were native born in the United States, experienced extraordinary socio-economic gains through upward mobility, family farms, and rising political activity that resembled previous immigrant communities.

Although the Southwest United States has had a Spanish presence for more than 400 years, Arizona and the Southwest region only developed a large permanent Hispanic population in the early 20th century. (Gratton/Merchant, 2015, p. 521) Before the Mexican-American War, indigenous Native Americans dominated the area, preventing any meaningful Hispanic settlement in the state. The failure of Hispanic settlement in this region resulted from the ability of indigenous people to restrain and even reverse Hispanic colonization.  Greater physical security offered by the U.S. military led to a modest expansion of the Hispanic population. Before the Southwest became American territories, small Hispanic settlements existed in northern New Mexico and south Texas. In Arizona, the numbers of Hispanics were "vanishingly small," even after Mexico gained its independence in 1821.  (Gratton/Merchant, 2015, p. 522) Using data based on birthplace, language, and surname variables, identification of persons of Mexican origin from 1850 on can be traced specifically. The first census of 1850 of the Southwestern states and territories reveals only 83,727 people of Mexican-origin heritage in the territories of Arizona-New Mexico, Texas, California, and Colorado (contrary to the estimate made by David Berman in his report on behalf of the Plaintiffs of 100,000 Hispanics in Arizona alone). (Berman, at 3) This population of 83,727 people constitutes a yielding populating density of less than 0.12 persons per square mile.

By 1900 the Mexican-origin population, growing within the American jurisdiction, was 50% larger than in 1880, largely due to a military campaign against the indigenous population.

This increase in the Mexican-origin population was largely due to reproduction in the resident population rather than immigration, which suggests that people of Mexican-origin found Arizona and the Southwest an environment conducive for settlement.  Statistically, based on the U.S. Census by state, 1850-1950, the Hispanic population grew from less than 1% statistically in 1850 to 29% of the total population in 1900 (119,545 people of Mexican origin). These precise figures are calculated in detail by recent scholars including Gratton and Merchant.

The great migration of Mexicans to Arizona and the Southwest began in 1900 and increased throughout the decade of the 1920s. The primary drive for immigration to Arizona was economic. The U.S. Census Bureau estimated that in 1907, the wage differentials for railroad section work, cotton picking, and mining were in excess of 2 to 1 between what a Mexican worker could earn in Mexico and what could be earned in the United States. This economic gain for workers of Mexican-origin suggests that immigrants to the state found Arizona a land of opportunity and not a land of continued discrimination. Although wage differentials were apparent between native-born and Mexican-born workers, as noted by the U.S. Census, these differentials reflected length of time in the country and literacy rates. For the first decade of the twentieth century, Lawrence Cardoso estimated a wage differential of 3 to 1, but wages in America were 3 to 10 times higher in the United States, with no difference in the cost of living between the United States and Mexico. (Cardoso, 1980)

As Cardoso, Gratton/Merchant, and other recent scholars conclude in detailed quantitative studies, Mexican immigration to the United States, specifically the Southwest and Arizona, increased in the 1920 concordant with economic expansion in the Southwest and the decline of immigration from Europe with World War I and restrictionist legislation in this period. Southwestern economic powers in the agriculture, railroad, and mining industries exerted

16

influence in Congress and with the Secretary of Labor to exclude literacy, contract labor, and head tax provisions on Mexican workers entering the United States—measures that discriminated against *other* immigrants and privileged, in effect, Mexican immigrant workers. Initially, most of the Mexican workers were young males who followed the conventional strategy of European and Canadian immigrants to work in the United States, accumulate savings, and return to their home countries. Mexican-born females began to arrive in larger numbers, so the ratio between the sexes fell from 182 Mexican born men for every 100 women in 1910 to 131 males to 100 females by 1930. American-born children under 21 years of age made up 29% of the Mexican-origin communities by 1930, further suggesting that they found a better life in the Southwest and Arizona, not one of intense discrimination. Intermarriage between native-born Anglos and Mexicans increased dramatically in this period, further suggesting that there was not rampant racial discrimination. Furthermore, the number of Mexican-born people living in cities (54%) was equal to the native population living in cities. Wages in cities were 25% higher than in rural areas.

Work for Mexican immigrants was not confined to stoop labor in the field; Mexican-born workers found jobs in railroad construction and manufacturing. Mexican women working in factories increased from 3 to 20% between 1910 and 1930.  In mines, it should be noted, investigators found discrimination in two Arizona mining companies against "Mexicans and North Italians" because of lower wages paid to them than native born and North European-born workers. (Gratton/Merchant, 2015, p. 534)  Mexicans in the Southwest also had the shortest tenure of any immigrant group in the United States, as they moved back and forth through the border of northern Mexico. And they had less work experience, as did many Northern Italians. (In particular, see Gratton/Merchant, 2015.)

17

One of the major problems in correcting wage differentials was resistance by organized labor, represented by the American Federation of Labor (AFL).  Throughout the late 19th century and the first decades of the 20th century, unions stood as one of the major proponents of immigration restriction.  AFL unions in mining towns insisted on restricting Mexican workers to job categories that limited their wages and denied opportunities for advancement.

The Mexican government was aware of the poor labor conditions for Mexican workers in the Southwest, including Arizona, in this period. In the early 1920s, Los Angeles Consul Eduardo Ruiz undertook an inspection of labor conditions of Mexican workers throughout the Southwest, especially in Arizona.  He concluded from his report to undertake to organize Mexican self-help societies with the aid of local public-private agencies. He created the Comisiones Honorifica Mexicana (Comisiones) and the Brigada de la Cruz Azul Mexicana. Included in this effort was an effort to work with officials and business leaders in Phoenix. He formed commissions in California, Arizona, New Mexico, Colorado, Oklahoma, and Texas. The purpose of these private sector-Mexican consul partnership efforts was to expand protective services for Mexican workers. These efforts proved remarkably successful, revealing a positive side to Arizona's history. In a report made by Renato Cantu Lara, the Mexican consul in Phoenix, "a Mexican community in rural Arizona was over-joyed not only at the creation of its new *Comision,* but also because none of them had ever seen a representative of the Mexican government in person." (Aguila, 2007, p. 238)

Nonetheless, studies at the time showed that Mexican laborers spent money for education and recreation, and soon succeeded in owning property, automobiles, and common household appliances such as refrigerators. (Gratton/Merchant, 2015). In short, the history of Mexican immigration was more similar to that of the Irish, Italians, and Poles who entered the United

18

States voluntarily for a better life and made gains that would not have been possible in their native lands. America presented a land of opportunity, not oppression.

The Great Depression of the 1930s ignited nativist sentiment in the United States, as it did in Europe and Mexico. Canada and Mexico during this period instituted severe restrictions on immigration beginning in 1931. In Mexico there was a violent, government-aided expulsion of the Chinese from northwestern Mexico in 1931 and 1932. Many Mexican immigrants returned to Mexico aided by mutual aid societies and the Mexican government, which provided funds for transportation. Repatriation and deportation are found in this period. Current demographic scholarship shows that approximately 355,000 persons returned to Mexico during this period, with approximately 34,000 more of these who were deported by government officials. This new scholarship challenges older scholarship that more than one million Mexican-born workers in America were forced (deported) or returned (repatriated) to Mexico.

This migratory return to Mexico in the 1930s followed a general pattern of circular migration found in the earlier 1900-1930 era. The voluntary returning of Mexican workers to their home country was encouraged by the Mexican government. From 1876 on, the Mexican government, through various leaders, implemented policies and programs to encourage the return of Mexican workers, mostly young males, to their homeland. In 1907, Mexican leader Porfirio Diaz assisted Mexican immigrants seeking to return from the United States. After the revolution, from 1920-1922, Presidents Adolfo de la Huerta and Alvaro Obregon financed repatriation for Mexican workers in the United States (Aguila, 2007, pp. 2209-10). This Mexican policy reflected a sense of patriotic responsibility, but was necessary to implement state-building agendas. Mexican statistics, which are more reliable than U.S. figures, reveal that 853,038 Mexican emigrants entered the United States during the 1920-1930 period. In the 1930s, the

19

Mexican Committee of Repatriation collected relief funds for repatriates. Private organizations in the United States, including many Catholic charities and Mexican-American mutual-aid societies organized direct assistance from consular offices of the Mexican government to repatriate Mexican workers to their native land.  The decline of work opportunities in the United States and offers of free transportation back to Mexico encouraged many Mexicans to return.

There was legal deportation for approximately 34,000 Mexicans. These deportations "under warrant" occurred after formal hearings determined that the alien was subject to removal. The return was carried out at government expense.  Legal deportation included Mexicans as well as Canadians.  Like Mexicans, Canadians had been excluded from restrictive quotas, but some Mexican and Canadians had circumvented official entry points to avoid visa fees and literacy tests. Between 1930 and 1940, 62,608 Mexicans and 21,546 Canadians were legally deported (Gratton/Merchant, 2013, p. 954).

The general conclusions reached by most recent scholars about deportation of Mexicans in the 1930s, which challenge the narrative presented by the Plaintiffs, are these: (1) state-led forcible expulsion of Mexicans has been overestimated, (2) most Mexicans returning to Mexico did so voluntarily, and (3) state involvement in the exodus of Mexican workers to their homeland was limited.

One of the great ironies of Mexican immigration is that during the bracero program (1940-1964), a Mexican government and United States government program to create legal entry for Mexican agricultural workers, undocumented immigration increased, with the result that legal deportation increased.  A large number of Mexican workers for various reasons circumvented the legal entry into the United States. INS raids and apprehensions, it should be noted, regularly angered growers eager to maintain their workforces.  In addition, the INS

usually used voluntary deportation to clear the market of unemployed, undocumented workers and legalization to supply it. (Gratton/Merchant, 2015, p. 267)

During this period, Mexican-born and Hispanic-Americans made socio-economic gains. In 1940, only 29% of Mexican-origin people ages 20-24 had gone beyond the eighth grade.  By 1950, education beyond the eighth grade had increased to include 41% of native-born Hispanics aged 20-24.

Educational attainment was reflected in occupational advancement. The share of craftsmen of Mexican-origin workers doubled in this period, representing nearly 40% of all jobs in the second and third generations. The percentage of Mexican-origin workers in managerial and professional jobs was more modest but increased dramatically.

The absolute economic status of Mexican-origin persons rose sharply in this period, including a 53% improvement in individual wage income and a 90% increase in family income; for their children, income more than doubled with individual and family earning rising 132% and 171%, respectively. These gains exceed those of non-Hispanic, native-born whites despite substantial improvement for them as well. (These figures eliminate all persons on farms to avoid under-selection and statistical error.)  The increases are dramatic.  In real wages, native-born men of Mexican origin more than doubled their real income from 1940 through 1950. (Gratton/Merchant, 2015, pp. 540-41)

These economic gains translated into political activism beginning in the 1930s. One of the first signs of political activism among Hispanics was the formation of the League of United Latin American Citizens (LULAC), founded in 1928 to further civil and human rights for Hispanic Americans. LULAC sought to further social integration of Hispanic Americans. The 1930 U.S. Census classified 1.4 million persons as of the Mexican "race" in America. Nearly a

fifth of this population was native born and had native-born parents. Many Hispanics resented

this racial categorization, especially in northern New Mexico and Colorado, where there was a

politically effective population of Hispanics, many born in the U.S. to U.S.-born parents.

Through LULAC, joined by the Spanish-language press and local-state Hispanic political

organizations, the U.S. Census Bureau was pressured to drop the category "Mexican" from the

U.S. Census. Although taking great pride in their national origins of Mexicans, they were

insulted to be linked in official statistics or the public mind as *raza de color*, especially with

African-Americans.  As a result, they undertook a well-organized lobbying effort through their

elected representatives in Congress to pressure the U.S. Census Bureau to eliminate the racial

category of "Mexican" from data collection in 1930.  The racial category of "Mexican" had been

included in the 1930 U.S. Census. It had drawn strong reactions especially in New Mexico,

where Hispanic voters objected to any connection to Mexicans. The leading Spanish-language

newspaper in New Mexico, *El Nuevo Mexicano*, published an editorial in 1930 advising its

Hispanic readers to inform Census gatherers that they were "Americans and nothing less than

Americans, the same as and equal to any other element of our citizenry" and to request not to be

classified as Mexicans. (Gratton/Merchant, forthcoming 2016) This editorial was reprinted in

other Spanish-language newspapers.  Spanish-language newspapers joined a protest that

classified Hispanics as Mexican, or "persons of color."  In the late 1920s and into the 1930s,

Spanish-language newspapers had reported on protests in Los Angeles and San Bernardino,

California; Miami, Arizona; Galveston, Lockhard, and Austin, Texas; and Indiana Harbor,

Illinois protesting segregating Hispanics into African-American sections in movie theaters,

hospitals, and schools. Civil protests by Hispanics that they were "white" and not "persons of

color" led LULAC to call on its chapters to lobby their elected officials to pressure the U.S.

Census Bureau and its parent agency, the Commerce Department, to drop the racial category of "Mexican." The result of these efforts were that the Mexican racial category was dropped in 1940 by the U.S. Census Bureau in its data collection and would disappear until 1970 U.S. Census Bureau data, when it brought the term back in response to pressure from Hispanic activists demanding that the category be reinserted. (Gratton/Merchant, forthcoming 2016)

World War II and the postwar era increased political activism among Hispanics. The war for democracy against fascism inspired Hispanics to demand their democratic rights at home. In 1941, LULAC in Arizona held its first state convention, hosting chapters throughout the state at a convention in Phoenix.  LULAC chapters became involved in local and state efforts to overcome discrimination toward Hispanics. Returning Hispanic veterans joined in organizing efforts to overcome employment discrimination.  For example, at the start of the war, Hispanic workers began demanding that the three major copper mining companies in Miami, Arizona address dual wage and employment discrimination against Hispanic workers. Critical to this effort was ensuring that Hispanics could be reclassified from their typical "laborer" job category. They met major resistance from the AFL who refused to allow Hispanics to get jobs as shovel operators, truck and bulldozer drivers, electricians, or machine operators. Finally, the state intervened at the request of Hispanic workers and in 1944, the U.S. Non-Ferrous Metals Commission ordered the three companies to cease basing their wage rates on race and ethnicity. (Marin, 2005, pp. 205-213)

Political activism among Hispanics in Arizona increased again in the 1960s, coincident with the black civil rights movement.  Hispanic involvement with the black civil rights movement in Phoenix, however, was minimal and tensions were evident between the leadership and general population of African Americans and Hispanics. Hispanic leaders resented, for

23

example, that they did not receive a greater proportion of resources that were directed largely to the black community through city-established programs such as Leadership and Education Advancement for the Advancement of Phoenix (LEAP), established in 1964 with city and private funds, and federal funds directed for educational, employment, and community improvement. (VanderMeer, 2010, p. 160)  Brad Luckingham, an academic scholar who studied the history of minorities in Phoenix, concludes that few Mexican Americans joined local sit-ins and marches, and Mexican-American leaders persuaded followers not to march with blacks. Indeed, in many instances, Mexican Americans supported racial segregation. In July 1963, the Hispanic owners of El Rey Café refused to serve four African American youth. This resulted in citywide protests and led the city to establish a Human Relations Commission, which adopted a policy in 1965 "to eliminate discrimination against any person on account of his race, color, creed, or national origins." (VanderMeer, 2010, p. 160; and Brad Luckingham, 1982)

Hispanic activists pursued a separate political path in the 1960s. The Phoenix LULAC chapter continued to focus on social activities and self-improvement for their community, but also joined a lawsuit against school desegregation, encouraged voter registration and supported political leaders in the city council, including Adam Diaz (1954-56) and Val Cordova (1956-1960). Cordova later served as a county and federal district judge. In addition, LULAC supported Manuel Pena who served in the state legislature from 1966-96 and city councilman Frank Benites (1966-70).

As recounted by historians Philip VanderMeer and Brad Luckingham, young Hispanic political activists became involved in the Chicano Movement. In 1968, Chicano students at Arizona State University held sit-ins and forced the administration not to renew its contract with a laundry company that was accused of wage discrimination by a local union.  In 1969, Joe

Eddie Lopez joined student leader Alfredo Gutierrez to organize Chicanos Por La Causa (CPLC), which was aided by a $22,000 grant from the Southwest Council of La Raza.

This new organization became involved in the fall of 1970s in issues regarding abuse by African American students toward Hispanic students at Phoenix Union High, and about the educational failings of Hispanic students. The outbreak of inter-racial violence between African Americans and Hispanics lead CPLC to organize a month-long boycott of Phoenix Union High.

An initial grant from the Ford Foundation in 1972 and federal government anti-poverty funds enabled CPLC to develop its own social services, including housing, education, and job training, as well as small business programs. It also established its own credit union. These services sought to address problems of generally poor, uneducated immigrants mostly from Mexico. Hispanics on public assistance stood in 1970 at 9.1%, half that of African Americans. Unemployment in 1970 for Hispanics in Phoenix, the largest concentration of Mexican-Americans in the state, stood at a low of 3.7% in 1970, although it rose in 1980, during an economic recession, to 8.9%. High school graduation rates during the next decade increased from 35 to 45%. (VanderMeer, 2015 pp. 262-63)

Hispanic leaders associated with CPLC emerged as leading local and state political leaders. Rosendo Gutierrez became involved in the Urban League and the Community Council and became chair of LEAP in the mid-1960s. He was elected to the city council in 1973 and elected vice-mayor in 1976.  Alfredo Gutierrez won election to the state senate in 1972, defeating African American incumbent Cloves Campbell in the primary. In the state senate Gutierrez remained in office until 1986, moving into senate leadership. Joe Eddie Lopez, another Chicano activist, won election to the county board and later the state legislature. Ronnie Lopez became chief of staff for Governor Bruce Babbitt.

25

**VII.    Hispanic Political Achievements after the 1970s**

Hispanics since the 1970s have made great gains in political representation nationally and in Arizona.  As of 2015, there were a total of 302 representatives in state legislatures nationally. The state legislature of Arizona has one of the highest numbers of elected Hispanic representatives in the nation (http://www.s143989.gridserver.com/downloads/2015/Latinos-StateLegislatures.pdf.)  As of 2015, Arizona was represented by 20 Hispanic elected officials, only slightly smaller than the number of Hispanic representatives in California, which has a much larger Hispanic population, with 23 representatives.  These gains in Arizona reflect the mobilization and increased registration of Hispanic voters in the state. Figure 1 and Figure 2 chart the increased number of Hispanic registered voters and increased Hispanic voter turnout in Arizona in presidential elections from 1984 through 2012.

Figure 1

| CENSUS ANALYSIS - HISPANIC VOTING AND REGISTRATION IN PRESIDENTIAL ELECTIONS 1984-2012 | | | | |
|---|---|---|---|---|
| YEAR | CITIZEN VOTING AGE POPULATION | REGISTERED VOTERS | TURNOUT | |
| 2012 | 989,000 | 516,000 | 400,000 | |
| 2008 | 796,000 | 410,000 | 291,000 | |
| 2004 | 629,000 | 354,000 | 296,000 | |
| 2000 | 616,000 | 304,000 | 247,000 | |
| 1996 | 397,000 | 230,000 | 163,000 | |
| 1992 | n/a | 197,000 | 156,000 | |
| 1988 | n/a | 145,000 | 119,000 | |
| 1984 | n/a | 88,000 | 70,000 | |
| | | | | |
| SOURCE: William C. Velasquez Institute with data from the US Census Bureau, Current Population Reports: Voting and Registration in Elections, 1984, 1988, 1992, 1996, 1998, 2000, 2004, 2008, 2012 | | | | |

Figure 2.

26



As One Arizona, a non-partisan coalition of 15 organizations dedicated to Latino voter registration, immigration, economic justice and education, reported in their 2014 State of Arizona's Latino Voters, "This boon in the Latino population [in Arizona], combined with concerted and wide-ranging efforts to increase Latino voter registration and participation, have begun to shape the results the [sic] local, state and national elections." The 2014 report states that there is "evidence year-after-year of steady increases in Latino voter registration and participation, and as a consequence, a growing impact on the results of Arizona elections." The report further maintains that "the role and influence of Arizona's Latino voters is steadily growing and will continue to expand in 2014 and over the course of the next several elections."

27

The report finds two major factors causing this increase in influence, population growth and increased registration. The report is worth quoting at length:

a) *The population of Arizona Latinos is growing and will continue to grow rapidly*. Since 1990, **the state's Latino population nearly tripled from 688,338 to 1.93 million, and it's expected to double again in the next 20 years**, according to U.S. Census figures. At the current population growth rate, Latinos are predicted be [sic] a majority of Arizona's population by 2035.  Most of that population growth is related to native births and not immigration. The number and proportion of voting age Latinos is also growing. According to Pew Hispanic Research, more than 65,000 Latinos in the United States turn 18 every month.

b) *The number of registered Latino voters who have signed up for **Arizona's Permanent Early Voting List (PEVL)** has more than tripled since 2010 from about **94,000 to more than 300,000 registered voters***. Voters on the PEVL can cast their ballots early by mail or in person. According to election experts, people on the PEVL are more likely to vote than non-PEVL voters. While signing up to PEVL is a growing trend among all voters, Arizona's Latino voters are signing up at a rate 30 percent faster than non-Latinos . . . ."

http://www.onearizona.org/2014_state_of_latino_electorate

In addition, Hispanic voters in the state's two major cities are widely disbursed residentially, as indicated by the U.S. Census Bureau. This pattern of Hispanics living in racially mixed areas is a national pattern. See Figure 3 and 4 from the 2010 U.S. Census Bureau on residential living patterns in Phoenix and Tucson.

Figure 3

## HISPANIC OR LATINO ORIGIN – PHOENIX AREA – 2010 CENSUS



Figure 4.

**Hispanic or Latino Origin – Tucson Area – 2010 Census**



As one of the leading academics of urban Arizona, Philip Vandermeer, maintains, Hispanics in Phoenix and Tucson experienced less discrimination than did the small African American population in the state, mostly found in urban centers of Phoenix and Tucson. Vandermeer declares that partly because the Hispanic population was "larger and racially diverse, and partly because Anglo-American racial attitudes were more accepting of nonblacks, more Mexican Americans were able to live outside of South Phoenix to achieve greater economic success." (VanderMeer, 2010, p. 160) He concludes that Mexican Americans were

able to overcome discrimination and segregation in socioeconomic areas in which African Americans lagged behind in the 1960s.

## VIII.   Educational and Social Advancements for Minorities

The Plaintiffs claim that historical roots of discrimination can be found in a "traditionalist" southern culture rooted in the state's early settlement by southern Confederate veterans. Citing two studies not specifically focused on Arizona, David R. Berman claims in his report that "the influx of southerners gave the state a dominant traditionalist culture." He concludes, "The traditionalist culture developed with the settlement of southern states and a cotton-plantation-centered economy." (Berman, p. 3) Yet in his *Arizona Politics and Government* (1998), he maintains that this "traditionalist" culture was subsumed by two other political cultural trends, "moralist" and "individualist." (Berman, 1998)  He writes that these two other political-cultural trends, moralist and individualist, arrived from Mormon and Midwestern immigrants that outgrew the early Southern settlers. Although not noted in his report, he writes in his book, "The second largest group of whites to come to the state were the Mormons, who came down from Utah as part of the effort of the Mormon leadership to expand their empire beyond the confines of that state. They settled in northern Arizona and brought with them a variant of Yankee culture distinct from that of the Southerners." (p. xiii) In addition, he claims that a powerful, if not pervasively individualistic culture, derived from the Far Western tradition of the state, emerged, reinforced by the large migration of Midwesterners to the state. He concludes, "After World War II most of the settlers seem to have come from the middle states east of the Mississippi River, not only changing previously established patterns but complicating them immensely." (p. xiii)

31

The inconsistencies in Berman's report and his *Arizona Politics* reveals his selective use of history in his report for two other more important reasons: (1) He shows in his book that the political culture in Arizona changed over time; and (2) the individualistic culture, grounded in the fiscal conservatism in the state, was reflected in efforts by conservative businessmen and conservative Republicans to challenge school segregation in the post-Second World War period. Further, he maintains that the initial voter opposition to making Martin Luther King Day a paid holiday did not reflect voters' racism but their fiscal conservatism that opposed giving state employees an additional state paid holiday.

At the state constitutional convention in 1910, dominated by labor and Democratic Party delegates, a proposal to include racially segregated schools into the constitution was defeated only because it was feared that a dual school system might be too expensive. (Berman, 2009, p. 34)  In deciding not to include mandatory school segregation in the state constitution because it might be too expensive, this "individualist" fiscal conservative political culture overrode Southern "traditionalist" culture.

State policy, instituted when Arizona was a territory, allowed separate schools for whites and blacks in grade schools and restricted high school districts from segregating races unless the black population was 25% or more of the entire student population. In 1951 the state Legislature, under pressure from civil rights groups, made segregation at all levels an option. This was soon challenged in the courts.

The African American population in Arizona remained exceptionally small until the postwar period.  In the 1880 U.S. Census, only 0.3% of the population was listed as African American. This population increased to 3.0% and today stands at only 4.1% of the entire Arizona population. Although Arizona allowed segregated schooling for blacks, most towns and cities

lacked a large enough black student population to segregate. Segregated schools in Phoenix and Tucson existed, but they were few in number.

Public accommodations were segregated, but overtly racist organizations, such as the Ku Klux Klan, exerted little influence in the state. Berman spends many pages in his report (p. 2, pp. 9-10) arguing for the heavy influence of the KKK in the Arizona politics. Although there is not an extensive literature of KKK activities in the state in the 1920s, scholars who have studied the KKK activities in the state reach two major conclusions: (1) KKK influence was minimal and short-lived, and (2) KKK activities were predominately aimed at enforcing alcohol prohibition and gambling as a major goal of reinforcing Protestant white culture. In their attempts to organize chapters in Phoenix, Prescott, and Yuma, the KKK attempted to organize primarily around the prohibition of alcohol and gambling. The example of the attempt to organize the Prescott KKK serves as an example of the impotency of the left.  Local historian Parker Anderson examines the Ku Klux Klan in Prescott in the 1920s. He finds that the KKK arrived in Prescott on October 23, 1923 (http://www.sharlot.org/library-archives/days-past/a-brief-history-of-the-ku-klux-klan-in-prescott-2/). He finds that the KKK "did not exert much influence in the town. . . . The African American population was fairly small. So the Klan resorted to circulating pamphlets extolling its organization and what they perceived as laxity on the part of Yavapai County law enforcement in enforcing Prohibition laws." From a Klan pamphlet: "To the bootlegger and the dope peddler we have this to say, we are here to stay and Yavapai County is not large enough for all of us, so you may just as well make up your minds to leave or secure honest employment and to be a real man or we shall do all in our power to see that you have free board and lodging with someone to watch you while you sleep."  Parker maintains that "undoubtedly frustrated by the lack of attention, [the Prescott KKK] decided to do something

33

flamboyant." They marched into the First Baptist Church while services were going on and gave a large white envelope to the pastor to help the building fund."   Similarly, an attempt to form a KKK chapter in Yuma in 1924 had completely crashed due to lack of membership in 1925. Klan chapters in Tucson and Phoenix were active, but when they turned violent, there were large and public resignations from the Klan. In some rural and mining towns, the Klan formed chapters, but their major activities were aimed most often at what they saw as moral reform, the prohibition of alcohol and gambling, and fostering Protestant Christianity by warning against the growing influence of Roman Catholics in the state. (Abbey, 1973,  pp. 20-21) For example, in the mining towns, as the leading scholar of the Arizona KKK writes, "The major emphasis [of the KKK] was placed on the law-and-order issue with special attention to bootleggers and gamblers." (Abbey, 1973, p. 20) In Bisbee, the local chapter of the KKK gave a check to a Protestant preacher during a religious service announcing that it would be glad to help him clean out the gamblers in the area." (Abbey, 1973, p. 20) In Holbrook, the local Klan announced in the local newspaper it would "fight any and all law violators." (Abbey, 1973, p. 20)  In Pinal County, the Klan tried, but failed, to recall a judge who they believed to be soft on crime. In response to reports of a Klan organization, the local newspaper tried to discover who was joining the Klan, but when the newspaper failed to secure a membership list, it concluded that the Klan membership included mine supervisors who were anti-Hispanic. Hispanics were largely Roman Catholic.

Klan activities did turn violent at times, but the state of Arizona responded by enacting anti-Klan legislation. When local members of the KKK, however, attacked a Phoenix principal, Rolin P. James, because of charges of moral misconduct, the KKK received hostile publicity in 1922. This attack drew widespread condemnation throughout the state. Further bad publicity

34

came when the Phoenix KKK was alleged to be responsible for attacks on three blacks and on a Catholic store proprietor in Phoenix. Shortly after these revelations there were numerous resignations from the KKK, a grand jury convened to investigate the Klan, and the state legislature enacted anti-Klan legislation. In 1923, anti-Klan feelings ran high in the state. In March 1923, the Arizona State Legislature passed anti-Klan legislation that was especially harsh. The legislation made it a felony to wear a mask or personal disguise to annoy or intimidate any person or for the purpose of escaping detection or identification in the commission of any public act. The bill passed the state Legislature with only four negative votes, leading Sue Watson Abbey, the leading historian of the Arizona Klan, to conclude, that this overwhelming support for the bill showed "a strong indication that the legislature felt a need to curb the activities of the Ku Klux Klan." When the incumbent governor George W. P. Hunt, who was seeking reelection vetoed the bill, the Legislature overrode his veto. In the 1924 election, the Klan tried to organize to support candidates who opposed this legislation. Both political parties in Arizona incorporated strong anti-Klan plants into their platforms. As Abbey concludes, "Election results around the state showed the defeat of alleged Klan candidates in every area." (Abbey, 1973, p. 46)

After the election, the Klan seemed to fade into the background. Within a year the KKK was a rump organization. In 1928, KKK members demonstrated against the Goldwater Department Store in Prescott. Photographs of this demonstration reveal seven hooded members parading around the store. The Goldwater owners had so little concern that they took the day off to go golfing. (Abbey, 1973 p. 12; Southwest Jewish History, 1993)

The Plaintiffs spend considerable time in their Complaint and expert report on the history of social and educational school segregation in Arizona. (See Berman, pp. 13-17) The Complaint and supporting expert report completely ignores the role enlightened business leaders and

35

political leaders such as Barry Goldwater played in ending racial segregation in the state. The involvement of enlightened commercial and Republican politicians such as Goldwater in bringing social and educational integration to the state has been given scholarly attention by a number of historians, however, including African-American historian, Quintard Taylor, *In Search of the Racial Frontier: African Americans in the American West* (New York: Norton Press, 1999).

In the early 1950s, civil rights advocates in the state began to challenge legal school segregation in Arizona. Especially active in this effort was Barry Goldwater, then a member of the Phoenix City Council and a member of the Phoenix Chapter of the National Association for the Advancement of Colored People. As a businessman of the leading department store in Phoenix, he desegregated his store. When the state Legislature began considering making segregation voluntary in public schools, Goldwater began lobbying behind the scenes to pass this legislation. He organized a group of well-known white conservative leaders to join his effort. The group relied heavily on the advice of Lincoln and Eleanor Ragsdale, who had experienced racism when they had moved into a white neighborhood in Phoenix, following Lincoln's service as a Tuskegee Airman during World War II. The Ragsdales worked with the local NAACP and the Arizona Council for Civic Unity/Greater Phoenix Council for Civic Union to fight segregation in restaurants, theaters, and public venues in Phoenix. In their efforts, Barry Goldwater contributed funds to this effort and became personal friends with the Ragsdales. The NAACP also initiated suits on the behalf of Mexican American students. (Taylor, 1999; Williamson, 2013) A 1951 decision had outlawed segregating Hispanic students in the Tolleson School District. With the support of Goldwater and others, the NAACP sponsored rallies, protests, and fundraising efforts to bring suit against school segregation. While litigation was

36

being pursued, a parallel successful lobbying effort in the state Legislature enabled legislation to make school integration voluntary if a school district so determined. The consequences of these legislative and legal efforts paid off in the integration of Tucson and Phoenix unified districts, years before the U.S. Supreme Court ruled school segregation illegal.

In 1913, Tucson opened its first segregated school, Dunbar Middle School for black students, who then attended the integrated Tucson School. The Dunbar Elementary and Middle Schools opened in January 1918 with two rooms. In 1941, the Tucson Unified School District hired Robert Morrow as its Superintendent.  He was intent on integrating Dunbar, the city's only black segregated school. When the state Legislature on March 30, 1951, made desegregation an option, Morrow worked with private citizens and the Tucson School Board to integrate Dunbar school. Three years before the U.S. Supreme Court ruled school desegregation unconstitutional in May 1954,  Tucson schools were completely integrated. The transition went smoothly as parents were convinced not to withdraw their children from public schools.

Shortly afterwards in a court case, *Phillip v. Phoenix Union Unified School District* (1953), State Superior Judge Fred C. Struckmeyer, Jr. granted a permanent injunction restraining Phoenix Union High Schools and Junior College Board from segregating black students at the only black school in Phoenix. Phoenix College, the community college, did not segregate its students. Members of the Phoenix School Board welcomed the decision. For example, Mrs. F. A. Bons, a member of the board, told The *Arizona Republic* (February 10, 1943, p. 1) that "I am delighted with the decision. I've always favored desegregation." Her favorable response to the desegregation of the 483-pupil school was joined by Dr. Trevor Browne, board president, and Frank Haze Burch. The order only applied to Carver High, but in the following years black segregated elementary schools, with approximately 1550 students at Booker T. Washington,

Dunbar, and Mary Bethune schools, were desegregated.  School desegregation in Arizona

occurred before the U.S. Supreme Court ruled on the subject.

The *Arizona Republic* in a May 29, 1958, article headlined, "City Held Improving?",

reported on the success of school integration in Phoenix.  The article—not found in the

Plaintiff's expert report—declared, "'Phoenix has improved greatly in desegregation of public

accommodations,' observed Franklin H. Williams, San Francisco secretary-counsel of the

National Association for the Advancement of Colored People, West Coast region yesterday."

The article reported that the "education system seems well-integrated."  Williams felt that the

employment discrimination needed further improvements, but Phoenix had become a model for

desegregation in the South, and I quote him, "showing that desegregation can work if enforced

by authorities."

Information on segregation of Hispanics in Arizona schools is largely anecdotal and lacks

a developed scholarly literature.  One of the few studies that includes a discussion of Hispanic

school segregation is found in a doctoral dissertation by Christine Marin who looks at Mexican

Americans in Miami, Arizona from 1909-1951.  In 1921, Miami's town population was

approximately 12,000 people. In 1923, city founder Cleve W. Van Dyke formed the first Miami

school board. The new school board decided that segregation of Mexican children was in the best

interest of the children.  The new superintendent of the board, Charles Ralph Tupper, established

a separate elementary school for the 450 Mexican children, out of an elementary school

population of 1,500 students. Concerned about students' low achievement in this segregated

school, two years later Tupper reduced the number of children in classes from thirty-five to

thirty. Teachers with less than two years' training and teaching experience were removed, and

teacher salaries were increased to attract better teachers. When these measures did not improved

38

scores, Tupper sought to "determine methods of cutting down this important human and financial waste." (Marin, 2005, p. 42-44) A new elementary school was built in 1924 at a cost of $125,000, with new facilities and an expansive playground. Children received English-language instruction.  Students from this elementary school graduated to an integrated high school. Social mixing between the Hispanic and white populations remained rare in the city's churches and playgrounds.  The turn in culture came in 1951 when the Miami High School basketball team, with two of its leading players being Hispanic, won the state championship.

Ending de facto segregation of schools in Tucson and Phoenix has been difficult. In 1973 the US Department of Health, Education, and Welfare reported that the Tucson Unified School District was racially unbalanced.  In 1974, the school district was ordered to eliminate minority-identifiable schools with more than 50 percent minority-population students. In 1978, the school board in a consent agreement set up a three-phase program to end de facto segregation.  The state Legislature allowed school districts to raise property tax levies above their statutory limits to facilitate this integration effort and help cover desegregation costs. In 2004 the school board petitioned to end court oversight, and in April 2008, U.S. District Judge David Bury lifted the desegregation order.

In this struggle to end legal segregation and to create educational opportunities for minority students, there is clear evidence of progress, contrary to the Plaintiffs' allegation of continued discriminatory intent on the part of state public officials and white citizens of Arizona. Hispanic students today account for 44% of all students in Arizona and account for 36% of students in public charter schools. Although white students make up 40% of the school-age population, and account for 48% of all charter students, the ratio between Hispanic and white students in charter schools is decreasing.  Minority representation in the state's higher education

system has made immense progress.  Arizona State University, the largest university in the

country in terms of student population, prides itself as being, as it states, "a top destination for

minority students." In 1985, minority students, including African Americans and Asians

accounted for only 10% of the student body. In 2005, about 18% of Sun Devils were Hispanic.

By 2015, under the leadership of President Michael Crow Hispanic and minority student

enrollment has increased, with Hispanics now accounting for 20% of the entire student body.

https://www.asu.edu/news/stories/200510/20051005_minorityenrollment.htm.

http://www.collegedata.com/cs/data/college/college_pg01_tmpl.jhtml?schoolId=1096.

In 1964, the City of Phoenix and its political leaders realized that social and economic

problems related to South Phoenix, where many black residents lived, needed to be addressed. In

November 1964, the city council created Leadership and Education Advancement for the

Advancement of Phoenix (LEAP)—a private commission—to address numerous social

problems. The city council funded the project with $50,000 and an additional $25,000 was

funded from private donors. City leaders proclaimed that this was a new and innovative approach

to the problems of poverty in which the entire community, especially South Phoenix, would

"provide much of the initiative and leadership," instead of "existing agencies working in semi-

isolation." (VanderMeer, 2010, p. 258) LEAP gained funds from the federal government through

its Community Action Agency. More than $1.3 million federal funds and $250,000 local funds

were provided to LEAP to administer Head Start and Youth Corps job programs. Community

neighborhood organizations were organized to provide park and street improvement, clothing

distribution, legal-aid funding, and a small-business loan program. Although it was the 1970

period of stagnant economic growth for the nation important gains were made by African

Americans. The percentage of high school graduates among blacks nearly doubled reaching

55.7%, compared with 77% for whites. Median income for blacks nearly doubled, although it was less than for whites. Unemployment remained a problem, and in 1980, it reached 10.6%, nearly double of that for whites. Nonetheless, occupational advancements were made as large numbers of blacks moved into white-collar jobs. During this decade, a third of black South Phoenix residents had moved north into other areas of the city.  Visible gains were made politically, with the election of Calvin Goode to the city council (1972-1994) and Clovis Campbell and Art Hamilton in the state legislature.

In 1992, voters of Arizona approved  Proposition 300 to recognize a Martin Luther King, Jr. Day as a paid holiday for state employees.  The Plaintiffs focus on Governor Evan Mecham's opposition to Martin Luther King Day as another example of alleged consistent racism experienced by minorities in the state's history.  Berman, the Plaintiff's historical expert locates this opposition within a context of a Republican "southern strategy" to win white votes. Berman writes in his report, "Starting in the 1960s, Republicans began pursuing 'a southern strategy' hoping to broaden the appeal of the party to white southerners." (p. 14) Berman implies that this strategy was largely racially motivated. This statement presents many problems for a serious historian. First, this statement ignores a large scholarly—and heated—debate over the intentions of Republicans in seeking to win control of the Democratic controlled South. But more importantly, Berman's suggestion that Arizona Republicans were pursuing a racial strategy is not supported or even explored in his report.  In fact, his discussion of the Martin Luther King holiday debate denies that voters were primarily motivated by race.

Prior to this, in 1986, Governor Bruce Babbitt used an executive order to establish a holiday for employees in the executive office honoring Martin Luther King, Jr. Babbitt's action came after the state Legislature's failure to enact such a holiday.  His successor, Governor Evan

Mecham, canceled this holiday upon taking office the next year in 1987. In 1989, under pressure

from Arizona businessmen, the state Legislature created a paid King holiday, but eliminated

Columbus Day as a paid holiday. This drew protests from Governor Mecham and Italian

American organizations. As a result, two King proposals came forward: Proposition 301, which

made King Day a paid holiday and Columbus Day an unpaid holiday, and Proposition 302,

making both paid  holidays.  Both measures were defeated in the General Election, with

Proposition 302 failing by fewer than 7,000 votes, with a percentage difference of 50.8% against

49.2%. Race does not seem to be the primary motivation of voters. Instead, the two measures

were confusing to voters and there was opposition to giving state employees another paid

holiday.  Berman, a retired political scientist, concludes in his examination of the vote, "Many of

those who rejected the King holiday appeared hostile to the notion of giving state employees any

kind of paid holiday, no matter who it was intended to honor." (Berman, 1998, p. 89)  A new

proposition, 300, established a paid state holiday for King by 61% to 30%.


## IX.    Progress in Native American Voting Rights

The history of Native American voting rights in Arizona has been extremely contentious

and remains so today, but a close examination of the historical record reveals that this history has

not been one of uniform persistent discrimination.

The United States Constitution recognized Native American tribes as sovereign entities

and considers tribes to be extra-jurisdictional. The United States Supreme Court distinguished

tribal nations from foreign sovereigns and deemed them to be domestic dependent nations. This

legal distinction prevented tribal peoples from voting in state and federal elections. In 1924, the

Indian Citizenship Act was passed by Congress, granting Native Americans the right to

participate in elections. This legislation was passed by Congress in an act of consent, in which

the entire Congress consented to this act, including the Arizona congressional delegation,

without a dissenting vote. States, as allowed under the U.S. Constitution, established regulations

and voting procedures. In Arizona, state regulations including poll taxes and literacy tests that

discouraged Native Americans from voting. Native Americans, especially Navajo, took little

interest in state and national politics and focused primarily on tribal politics that affected their

lives the most.  Furthermore, state and local public officials believed that because the state

lacked jurisdiction in Native American lands, polling places were not established on reservations

in this period. The great exception to this was in Apache County, with the highest proportion of

Indian voters, where Apache attorney Levi Udall argued that polling places should be

established, but he was opposed by other county attorneys. (Ferguson-Bohnee, 2015, p. 1107)

This situation remained unresolved as the 1928 state election approached. Governor

George Hunt, a Democrat, fearing that Apache County with its large population might vote

Republican in recognition of the Republican Congress and a Republican President enacting the

citizenship act, sought to limit Indian access to voting. The governor was especially concerned

that the Republican Party would register the approximately 1,500 Navajos in the county.

Governor Hunt was advised to challenge Native American election rights. The Republican Party

filed a legal challenge against the registration of Native American voters in Apache County.

Finally, the Arizona Court held in *Porter v. Hall in 1928* that "all Indian reservations in Arizona

are within the political and governmental, as well as geographical boundaries of the state," but

the language suggested that county officials could reject voting registration forms. (Quoted in

Ferguson-Bohnee, 2015, p. 1108)

In *Harrison v. Laveen* (1948), the Court affirmed that Native Americans could not be denied access to the ballot. The most significant handicap that Native Americans faced was due to a literacy requirement that limited registration and voting to those who could read the U.S. Constitution in English and write his/her name. Congress passed the Voting Rights Act in 1965, which included provisions, some of which were temporary, that included language assistance, preclearance, and the use of federal poll observers.  In *Apache County, Navajo County and Coconino County, and the State of Arizona v. United States*, the District of Columbia ruled in favor of the state of Arizona using literacy tests in a non-discriminatory manner. The court's ruling is worth quoting at length because it shows that the court accepted the state's contention that literacy tests were not being specifically aimed at suppressing the Native American vote:

> We have before us a large number of exhibits submitted by the Plaintiffs to the Justice Department in February 1966, and submitted to us in support of Plaintiffs' motion for summary judgment. These include affidavits and letters of voting officials in the three Plaintiff counties, stating that they have not applied the literacy test in a discriminatory matter. These submissions are not bald conclusory assertions, but include materials and comment purporting to account for the phenomenon of low voter registration among the Indians and detailing increased efforts to provide Indians with more, and more conveniently located, registration facilities, notably efforts to provide more deputy registrars on the reservation.

([http://law.justia.com/cases/federal/district-courts/FSupp/256/903/2349455/](http://law.justia.com/cases/federal/district-courts/FSupp/256/903/2349455/)). The purpose in restating this decision is not to reargue the case, but to affirm that a federal court held that the state of Arizona and county officials were making good will efforts to fulfill legal obligations to ensure Native American voting rights. In 1970, Congress adopted a national prohibition on literacy tests for a five-year period.

In 1976, Tom Shirley, a Navajo, won office as Supervisor in District 3 of the Apache County Board of Supervisors.  The Arizona Supreme Court quashed a legal challenge to his election, reaffirming the right of Native Americans to vote and to be eligible to seek office. An

attempt to redistrict supervisor districts was overturned by a three-judge federal court. Native American turnout continued to remain low among Navajo, Apache, and Hopi tribes. In response to legal actions, Navajo, Apache, and Coconino counties consented to establish the Navajo Language Election Information Program, which included the employment of outreach workers to assist Native American voters.

Redistricting within the state has been equally contentious, especially for the Navajo Nation, which comprises more than 300,000 members and occupies approximately 25,000 square miles of trust lands within Arizona, New Mexico, and Utah. In 2000, through Proposition 106, an Arizona Independent Redistricting Commission was established. In redistricting efforts, as noted by Patty Ferguson-Bohnee, who served as director of the Indian Legal Program, "Tribes actively participated in the most recent redistricting process," which adopted districts to "strengthen the ability of Native Americans to elect their candidates of choice. The district includes the Navajo Nation, Hopi, Havasupai, Hualapai, Kaibab-Paiute, San Carolos Apache, White Mountain Apache, and Zuni reservations. (Ferguson-Bohnee. 2015, p. 1121)

In 2000 and 2002, Native Americans elected candidates of choice for all the state legislative positions. Native American voting participation increased in record numbers when Proposition 202, the Indian Gaming Preservation and Self-Reliance initiative appeared on the ballot in 2002. The Arizona Indian Gaming Association and member tribes undertook a vigorous get-out-the-vote campaign. The proposition won an easy majority.  In the 2004 Flagstaff state senate race, Ann Kirkpatrick defeated the incumbent Sylvia Laughter. Flagstaff was in the only majority-minority voting district in the state. Native American activists have argued that Kirkpatrick's election represents an example of discrimination against Native Americans. (Ferguson-Bohnee, 2015, pp. 1122-23)  Kirkpatrick accused Laughter, a Democrat, of siding too

45

often with Republicans in Congress and not representing her district constituents well

(http://azdailysun.com/laughter-not-best-medicine-for-dems/article_e2d54d46-fbc4-503e-8a7e-c6ba4f7a5375.html).

The 2004 election approved Proposition 200, the "Arizona Taxpayer and Citizen Protection Act."  This proposition required in-person voting procedures including certain identification. The issue of voter ID remains an especially divisive issue nationally. In 2008, in *Crawford v. Marion County Election Board*, the U.S. Supreme Court upheld Indiana's voter ID requirement. Following this decision, Indiana Plaintiffs who had filed suit against the new ID law agreed to revised Procedures for Proof of identification required at the polls. The procedures were attended to make voting easier for tribal voters.  The use of voter ID for Native Americans remains a divisive issue in that many Navajo and other tribal people lack driver licenses, residential identification documents, utility bills, or other forms of identification.  Furthermore, they lack internet services to download ballots or voter information.  The Plaintiffs claim that voter ID requirements discriminate specifically against Native Americans, as indicated by low voter turnout of Native American voters.

James Thomas Tucker undertook extensive interviews with Native American and Hispanic voters to support a claim of political discrimination toward minority voters in "Voting Rights in Arizona, 1982-2006," *The Review of Law and Social Justice* (2006). The essay affirms, however, that the Voting Rights Act of 1965 and subsequent legislation has increased Hispanic and American Indian voter registration and that these groups are registering and voting in record numbers in Arizona. Furthermore, the interviews suggest other reasons for low voter turnout among some Hispanic and Native American voters. These interviews are worth quoting at length

46

because they suggest progress and actual other reasons for why some eligible voters are disinterested in politics:

*Harold Noble, Navajo (pp. 300-02):

"In the 1950s, the Navajo were not voting. . . . Although there are still problems, things are getting better. Because of the efforts of the outreach office, the Navajo are finally talking about their current situation and the issues facing them."

This statement suggests greater voter interest because of voter outreach efforts.

*Felicia Tsosie, Navajo (pp. 303-04):

"Tsosie says that people she knows pay more attention to local government than the larger elections. This is not just because they believe the local government has more of an impact on their lives, but also because tribal governments make much more of an effort to reach out to local residents."

This statement suggests that local elections are of greater interest to Navajo people than state or national elections.

*Stella Begay, Navajo (pp. 303-04):

"In general, however, Begay states that in the past ten years, elections have been getting better . . . more people have been showing up to cast a ballot. Additionally, more Navajo have been running for office. This includes women, a practice that was formally severely frowned upon."

This statement affirms that progress has been made.

47

*Alfred Lee Kahn, Sr., Navajo (pp. 307-08):

"Political disillusionment is also a problem. Every election season candidates will come to the local chapter houses and ask members to vote for them in return for the candidate keeping promises. However, this is the only time the tribe will see candidates. Despite this disillusionment over candidates, more Navajo are participating in politics than ever before."

This statement suggests that disillusionment with politicians is shared by Navajo, although people continue to vote.


*Manuel "Manny" Herrera, Apache (pp. 309-10):

"While obstacles for language minority voters have decreased overall, Herrera says the media portrays candidates negatively, so many people do not want to vote."

This statement affirms that language assistance at voting has improved, but many voters simply dislike the choice of candidates.


*Alex Rodriquez, Hispanic (pp. 310-11):

"Rodriquez says there is a general lack of outreach to less wealthy, minority communities because the candidates have less at stake in their communities. Rodriquez also maintains that the voters have less at stake in the political process. 'The higher a person's income, the higher their propensity to vote because people have economic interests at stake in the political process.'"

Mr. Rodriquez's observation affirms that many voters, especially low income voters, simply do not think they have a stake in the process and this explains why many low-income voters are not voting.

48

## X.     Conclusions

Allegations that the state of Arizona reveals an unbroken record of social, economic, and political discrimination against ethnic and racial minorities are based on a spurious reading of the state's history and advances made in ending discrimination.

Allegations that there has been a continuous and consistent record of motivation and intentionality of state leaders to discriminate against ethnic and racial minorities belies the complexity of Arizona history and is contrary to actual historical evidence.

Allegations that discrimination has resulted in low voter turnout in Arizona and particularly for ethnic minorities are incorrect. As Berman himself writes, "Voter turnout in Arizona has consistently been lower than in most other states. At one time, this could be attributed to discriminatory practices. *The relatively low rate, however, has persisted in spite of regime changes, the removal of many barriers to voting, and the efforts of the federal and state government to encourage participation.*" (Berman, 1997, p. 90) (emphasis added).

49

## Bibliography

"2014 State of Latino Electorate." *One Arizona*. Accessed June 30, 2016.
    http://www.onearizona.org.

"A History of Segregation and Desegregation in Tucson." *Tucson.com*. Jan. 31, 2010.
    http://tucson.com/news/local/education/precollegiate/a-history-of-segregation-and-
    desegregation-in-tucson/article_5cc619da-9dec-5eef-ae04-7e3490ac89f9.html.

Abbey, Sue Wilson. "The Ku Klux Klan in Arizona, 1921-1925." *Journal of Arizona History* 14
    (1) (1973): 10-30

Aguila, Jaime. "Mexican/U.S. Immigration Policy prior to the Great Depression." *Diplomatic
    History* 31 (2) (2007): 207-225.

Anderson, Parker. "A Brief History of the Ku Klux Klan in Prescott." *Sharlot Hall Library and
    Archives*, Feb. 19, 2011. http://www.sharlot.org/library-archives/days-past/a-brief-history-
    of-the-ku-klux-klan-in-prescott-2/.

"Arizona Latino Voter Statistics." *William Velasquez Institute*. Accessed June 30, 2016.
    http://wcvi.org/latino_voter_research/latino_voter_statistics/az_lv.html.

"ASU a Top Destination for Minority Students." *ASU News*, October 5, 2005.
    http://www.asu.edu/news/stories.

Berman, David R. *Arizona Politics and Government: The Quest for Autonomy, Democracy, and
    Development* (Lincoln and London: University of Nebraska Press, 1998).

Blanton, Carlos Kevin. "The Citizenship of Sacrifice: Mexican Americans, the Saunders-
    Leonard Report, and the Politics of Immigration, 1951-1952." *Western Historical
    Quarterly* 40 (3) (2009): 299-320.

Blackhawk, Ned (2008) *Violence over the Land: Indians and Empires in the Early American
    West*. Cambridge, MA: Harvard University Press.

Bloch, Louis. "Facts about Mexican Immigration before and Since the Quota Restriction Laws."
    *Journal of the American Statistical Association* 24 (165) (1929): 50-60.

Brooks, James F. (2002) *Captives and Cousins: Slavery, Kinship, and Community in the
    Southwest Borderlands.* Chapel Hill: University of North Carolina Press.

Cardoso, Lawrence A. *Mexican Emigration to the United States, 1897-1933* (Tucson, University
    of Arizona Press, 1980).

51

Carter, Susan B. "Labor." In *The Historical Statistics of the United States, Millennial Edition*. Edited by Susan B. Carter, Scott S. Gartner, Michael Haines, Alan Olmstead, Richard Sutch, and Gavin Wright. New York: Cambridge University Press, 2004.

Cavanaugh, Wade. "Indian Tribal Council to Study Problems of Voter Registration." *Arizona Republic*, July 23, 1964. https://newspapers.com/image/118425135.

"City Held Improving." *Arizona Republic*, May 29, 1958. https://www.newspapers.org/image/117632025.

DeLay, Brian (2008) War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War. New Haven, CT: Yale University Press.

Doolen, Dina L. "A Half Century of Desegregation." *Tucson Citizen*, Mar. 6, 2002. http://tucsoncitizen.com/.

"Education Not Halted In Services." *Arizona Republic*, Feb. 10, 1953. https://www.newspapers.com/image/116712029.

Feliciano, Zadia M. "The Skill and Economic Performance of Mexican Immigrants from 1910 to 1990." *Explorations in Economic History* 38 (2001): 386-409.

Ferguson-Bohnee, Patty. "The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression." *Arizona State Law Journal* 48 (4) (2015): 1099-1144.

Gonzalez, Gilbert G. and Raul Fernandez. "Empire and the Origins of Twentieth-Century Migration from Mexico to the United States." *Pacific Historical Review* 71 (1) (2002): 19-57.

Gratton, Brian and Myron P. Gutmann. "Hispanics in the United States, 1850-1990: Estimates of Population Size and National Origin." *Historical Methods* 33 (3) (2000): 137-153.

Gratton, Brian and Emily Merchant. "An Immigrant's Tale: the Mexican American Southwest 1850 to 1950." *Social Science History* 39 (4) (2015): 521-550.

---------. "Immigration, Repatriation, and Deportation: The Mexican-Origin Population in the United States, 1920-1950." *International Migration Review* 47 (4) (2013): 944-975.

---------. "La Raza: Mexicans in the United States Census." *Journal of Policy History* (2016): (Forthcoming).

"The Goldwaters: An Arizona Story and a Jewish History As Well." *Southwest Jewish History* 1 (3) 1993. http://swja.arizona.edu/content/goldwaters.

Hämäläinen, Pekka (2009) *The Comanche Empire*. New Haven, CT: Yale University Press.

Harrod, W.R. "Ruling Due for Appeal, Board Hint." *Arizona Republic*, Feb. 10, 1953. http://ww.newspapers.comg/image/116711987.

Hirschman, Charles and Ellen Percy Kraly. "Racial and Ethnic Inequality in the United States, 1940 and 1950: The Impact of Geographic Location and Human Capital." *International Migration Review* 24 (1) (1990); 4-33.

"Hispanic Vote Arizona – 2008-2012." *One Arizona*. Accessed June 30, 2016. http://www.onearizona.org/latino_electorate.

"Latinos in States Legislatures." *NALEO Educational Fund*. Accessed June 30, 2016. http://www.naleo.org.

Lopez, Gustavo and Renee Stepler. "Latinos in the 2016 Election: Arizona." *Pew Research Center*. January 19, 2016. http://www.pewhispanic.org/fact-sheets/2016-state-election-fact-sheets/latinos-in-the-2016-election-arizona/.

Luckingham, Bradford. *Minorities in Phoenix: A Profile of Mexican American, Chinese America, and African American Communities, 1860-1992* (Tucson: University of Arizona Press, 1994).

Marin, Christine. "Always a Struggle: Mexican Americans in Miami, Arizona, 1909-1951." PhD Dissertation, Arizona State University, December 2005.

Nimmons, Robert Kim, "Arizona's Forgotten Past: The Negro in Arizona, 1539-1965," (MA Thesis, Northern Arizona University, 1971).

Taylor, Quintard, *In Search of the Racial Frontier: African Americans in the American West* (New York: Norton Press, 1999).

Tucker, James Thomas and Rodolfo Espino. "Voting Rights in Arizona: 1982-2006." *RenewtheVRA.org*. March 2006. http://www.civilrights.org/voting-rights/vra/states.html.

Tucker, James Thomas, Rodolfo Espino, Tara Brite, Shannon Conley, Ben Horowitz, Zak Walter, and Shon Zelman. "Voting Rights in Arizona: 1982-2006." *Review of Law and Social Justice* 17 (2) (2008): 283-365.

"Race and Hispanic or Latino Origin: Phoenix." *United States Census Bureau: American Fact Finder*. Access June 30, 2016. http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

"Race and Hispanic or Latino Origin: Tucson." *United States Census Bureau: American Fact Finder*. Access June 30, 2016. http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

53

VanderMeer, Philip. *Desert Visions and the Making of Phoenix, 1960-2009* (Albuquerque, University of New Mexico Press, 2010).

"Voting and Registration by Race in Arizona (1996-2014)." *Current Population Survey*. Accessed June 30, 2016. http://thedataweb.rm.census.gov/TheDataWeb_HotReport2/voting/voting.hrml?GESTFIPS =4&INSTANCE=Nov+2014.

Weber, John. "Homing Pigeons, Cheap Labor, and Frustrated Nativists: Immigration reform and the Deportation of Mexicans from South Texas in the 1920s." *Western Historical Quarterly* 44 (2) (2013): 167-186.

Williamson, Kevin D. "Desegregation, before Brown: Barry Goldwater and the Forgotten Campaign in Phoenix." *National Review*, April 29, 2013. http://www.nationalreview.com/node/346881/print.

Resume

Donald T. Critchlow

Business Address: Faculty of History, Arizona State University,

　　　Coor Hall, 4th Floor, 975 S. Myrtle Avenue, Tempe, AZ 85287-4302

Home Address:  7931 Gannon Avenue, University City, Missouri 63130

Telephone: cell: 369-8455; Email Address: dcritchlow@sbcglobal.net

Present Position: Director, Center for Political Thought and Leadership; Professor of History, Arizona State University;  Founding editor, *Journal of Policy History*; General editor, "Cambridge Essential Histories," (Cambridge University Press).

**EDUCATION**

Ph.D.   University of California, Berkeley, 1978 (History)

M.A.   University of California, Berkeley, 1972 (History)

B.A.   San Francisco State University, 1970 Magna Cum Laude

**TEACHING FIELDS**

United States History

20th Century American History

History of Public Policy

American Political History

## HONORS/APPOINTMENTS/GRANTS

Founding President, Institute for Political History, (Endowed Public Non-Profit Foundation to promote the study of American history and graduate education, (501C) (2001-present)

External Reviewer, Teaching History, Stillman College History Academy for Hale County

Panelist, National Humanities Endowment, Year-Fellowship Program (2004)

Fellow, Fulbright Scholars Program, University of Hong Kong (1997-98)

Fellow, Woodrow Wilson International Center for Scholars (l996-97)

USIA grant for a five volume history of the U. S. published in Polish (1995)

University Faculty Exchange Program, University of Warsaw (1988-1989)

USIA, AmParts Distinguished Lecturer (1988-1989)

Panel, Employment and Technology, National Academy of Sciences (l986)

Guest Scholar, Woodrow Wilson International Center for Scholars (l984)

Rockefeller Summer Fellow (l983) (l994)

NEH Summer Fellow (1980)

Guest Scholar, The Brookings Institution (l976-l977)

## PUBLICATIONS

Books (Monographs):

*Future Right: Forging a New Republican Majority* (New York: St Martins, 2016).

*Parallel Lives: Presidential Character and Temperament*

     *Nixon, Rockefeller, Goldwater and Reagan* (Philadelphia: University of Pennsylvania Press,

expected 2017).

*A Very Short Introduction to American Political History* (New York: Oxford University

     Press January 2015)

*When Hollywood Was Right: How Movie Moguls, Celebrities, and Big Business Remade American*

*Politics* (New York: Cambridge University Press, 2013) 224 pp.

*The Conservative Ascendancy: How the GOP Right Made Political History*

     (Harvard University Press, 2007; University Press of Kansas, 2011 pap.) 315 pp.

*Phyllis Schlafly and the Republican Right: A Woman's Crusade*

     (Princeton University Press, 2005) 422 pp.

*Intended Consequences:  Birth Control, Abortion and the Federal Government in Modern America*

     (Oxford University Press, 1999; paperback edition, 2001).

*Studebaker: The Life and Death of an American Corporation, 1852-1963*

(Indiana University Press, l997) 272 pp. 304 pp.


*The Brookings Institution, 1916-1952 Expertise and the Public Interest in a Democratic Society*

(Northern Illinois University Press, 1985) 242 pp.


*In Progress:*


Co-editor with Paula Baker, *Oxford Handbook of American Political History,* (under contract with

Oxford University Press, manuscript due September 2015).


Books (Textbooks and Edited):


Co-editor-in-chief with Philip VanderMeer *Oxford Encyclopedia of American Political and Legal*

*History* (New York, Oxford University Press, 2012), part of a five volume project

Encyclopedia of American History, Paul Boyer, general editor.


Co-authored/edited with Nancy MacLean, *Debating the Conservative Movement* (Washington, D.C.

Rowman and Littlefield, 2009).

Co-edited with Emilie Raymond, *Hollywood and Politics: A Documentary History* (New York:

Routledge, 2009).

Co-edited, *American Conspiracy Revealed: From the Founding to Today (*Indiana University Press,

2007).

Co-authored with Paula Baker and William Rorabaugh, *America's Promise* (Revised and expanded

edition) (Rowman and Littlefield Press, 2003); initially published as

*America!: A Concise History* with William Rorabaugh, (Belmont, CA: Wadsworth

Publishing, 1993).

Co-edited with Agnieszka Critchlow, *Enemies of the State: Personal Stories of Survival in the*

*Gulag*  (Chicago: Ivan Dee Publishers, 2002; paper 2003).

*Encyclopedia of American History*, *Volume X, 1968 to the Present,* Volume editor, Donald T.

Critchlow, Gary Nash, general editor, (New York: Facts on File, 2002).

Co-edited with Charles Parker, *With Us Always: Private Charity and Public Welfare in Historical*

*Perspective* (Lantham, MD: Rowman & Littlefield, 1998).

Edited, *The Politics of Abortion and Birth Control in Historical Perspective* (University Park, PA:

Pennsylvania State University Press, l996).

Edited, *A History of the United States, I-V*, a five volume history including with essays

> contributed by thirty Polish and American scholars (Warsaw, Poland: Polish Academic

> Press, 1995).

Co-edited with Ellis Hawley, *Poverty and Public Policy in Modern America* (Belmont, CA:

> Wadsworth Publishing, 1989)

Co-edited with Ellis Hawley, *Federal Social Policy: The Historical Dimension*

> (University Park, PA: Penn State University Press l989)

Edited, *Socialism in the Heartland: The Midwestern Experience, 1890-1920* An anthology of eight

> original essays (Notre Dame, Indiana: University of Notre Dame Press, 1986)

Articles/Chapters/Essays:

In Print:

"The Rise of Conservative Republicans: A History of Fits and Starts," in Iwan Morgan and Robert

Mason, *Seeking a New Majority: The Republican Party and American Politics*, *1960-1980 Revival,*

(Nashville, TN., Vanderbilt University Press).

"On a Darkling Plain," *Historically Speaking* (Spring, 2001)


"Rethinking American Conservatism: Towards a New Narrative," *Journal of American History* (December 2011).



"Reconsidering ERA: Social Mobilization, Public Opinion, and State Ratification," *Journal of Policy History*, Special Issue, Julian Zelizer and Bruce Schulman, (Fall 2008)


"Mobilizing Women: The Social Issues and the Reagan Presidency," The *Reagan Presidency*, edited Hugh Graham and Elliot Brownlee, (Lawrence: University of Kansas Press,  2003).


"Phyllis Schlafly and Reconsidering Postwar American Conservatism," *Conservatism in the 1960s,* edited David Farber, (London: Peter Lang, 2003).


"Conservatives in Congress," *Congress: An Historical Perspective*, edited Julian Zelzer, (New York: Houghton Mifflin, 2004).


"Innovation in the Classroom: Teaching Policy History," *The History Teacher*, 31, (August, 1999), 469-476.

"Implementing Family Planning Policy in Postwar America," in Charles Parker and Donald T. Critchlow, eds., *With Us Always: Private Charity and Public Welfare in Historical Perspective* (Lantham, Md., 1998), 211-241.


"Birth Control, Population Control, and Family Planning: An Overview," *Journal of Policy History*, 7,  (March l995), 1-21.


"Think Tanks, Antistatism, and American Democracy," in Michael Lacey and Mary Furner, eds., *Knowledge and Social Science Research* (Cambridge University Press, 1993), 279-322.


"A Prognosis of Policy History: Stunted--Or Deceivingly Vital?" *The Public Historian*, 15, (Fall l993), 51-61.


"The Presidential Commission on Employment and Technology, 1966: An Historical Perspective," in National Academy of Sciences Panel on *Employment and Technology Employment and Technology in the United States* (N. Y.  Ballinger, December 1988).  Reprints of essay on file at the National Academy of Sciences.


"Robert S. Brookings: The Man and His Vision," *Review of Politics*, 46, (October, 1984), 561-580.


"Wheels of Fortune: Studebaker in the Early Years," *Timeline*, 4,  (March/April 1987), 16-30.

"Industrial Relations at Studebaker, 1905-1935, Paternalism and Corporate Identity Within An Auto Company," *American Studies*, 11,  (1991), 83-95.

"Communist Unions and Racism: A Comparative Study of Responses of the United Electrical Radio and Machine Workers and the National Maritime Union to the Black Question During World War II," *Labor History* 17, (Spring 1976), 230-244; also see August Meier and Elliot Rudwick, "Communist Unions and the Black Community," *Labor History* (Spring 1982).

"Lewis Meriam, Expertise, and Indian Reform," *The Historian*, 23, (Spring, 1981), 325-344.

"The Political Control of the Economy: Deficit Spending as Political Belief, 1932-1952," *The Public Historian,* 3, (Fall, 1981), 5-22.

Selected Review Essays/Encyclopedia Articles

"Policy Knowledge: Non-Profit Institutions," *International Encyclopedia of the Social and Behavioral Sciences*," Neil J. Smelser and Paul B. Balters, editors, (Oxford, England: Elsevier Science, 2002) 5000 word essay.

"Government," Encyclopedia of American and Intellectual History, edited Mary Kupiec Cayton and Peter W. Williams, (N.Y.: Charles Scribner's Sons, 2001) 5000 word essay.

"Galling Wasp: Sexual Misbehavior in the Human Scientist," *Reviews in American History* (October, 1999 ).

"What's In and What's Out," *Reviews in American History* (September 1997).

"*Liberty and Sexuality: The Right to Privacy and the Making of Roe v. Wade* by David Garrow," extended review essay *Journal of American History (*March, l995).

"Keeping the Life Stream Pure," *Reviews in American History* (1992).

"Knowledge for What? Private Philanthropy in American History," *Reviews in American History* (l991).

Other book reviews (see Appendix)

## INVITED ADDRESSES AND LECTURES/CONFERENCE PAPERS

Invited Lectures *The Conservative Ascendancy:*  George McGovern Center, South Dakota;  North Carolina History Forum, Raleigh, North Carolina, public lectures in Washington, D.C., New York City, Portland, Oregon, and Gainsville, Florida,

Invited Lectures for *Phyllis Schlafly and Grassroots Conservatism* book tour: Seattle Town Hall Lecture Series; University of Washington, Seattle; George Washington University; Fordham University; Henry Salvatori Distinguished Lecture Series, Claremont College; Public Lecture, La Jolla, California

Selected Invited University Lectures: University of London (2009); University of  Missouri Public Lecture (2007);  Iowa State University College Distinguished Lecture Series, (2004); University of Arkansas College Lecture Series (2003); Oxford University and Cambridge University, June, 2001; Keynote Address, "Family Planning Policy: Successes and Failures," Title X Federal Family Planning Regional Conference, Lake Geneva, WI, 2000; Beijing Foreign Language University (2000); University of Oregon (2000); University of Virginia (2000); Vanderbilt University (2000); Dartmouth College (1999).

USIA Am Parts Program, "Think Tanks and the Washington Establishment in Historical Perspective," Lectures at United States Embassies in Barcelona, Madrid, Rome, Bonn, Frankfurt, Helsinki, and Luxemburg,  1988-1989.

"American Conspiracy Revealed," State of the Field panel, Organization of American Historians Meeting, April 2008.

"What's Wrong with the New Conservative History?" State of the Field panel, Organization of American Historians Meeting, March 2007

65

"The New History of Conservatism," American Historical Association Meeting, January 2007

"Reconsidering the History of Postwar Conservatism: Phyllis Schlafly and the Grassroots," American Historical Association Meeting, January 2001

"Integrating Social History and Policy History in the Classroom," Organization of American Historians Meeting, April l996

"The Quiet Revolution: Family Planning Policy in the l960s," Organization of American Historians Meeting, April l995

"The Current State of Political History," Western Political Science Meeting, March l995

"The Work Ethic and Welfare Reform in Modern America," American Historical Meeting, December 1987

"Social Policy as History," Organization of American Historians Annual Meeting, April 1986.

"The Emergence of Think Tanks in Modern America: Antistatism and Expertise in a Democratic Society, 1916-present," American Historians Association Annual Meeting, December 1985.

"The Evolution of the Studebaker Company, 1900-1920 from a Wagon Company to an Automobile Corporation," the Organization of American Historians Annual Meeting, April 1985,

"Think Tanks, Anti-Statism, and American Public Policy," Evening Dialogue, Woodrow Wilson Center for International Scholars, December 17, 1984.

"Robert S. Brookings: The Man, His Vision and His Institution," American Historical Association Annual Meeting, 1983.

"American Businessmen, Class-Consciousness, and the State, 1941-1976," Organization of American Historians Annual Meeting, April, 1983.

"Fear of the Leviathan: Anti-Statist Thought in Corporate Political Consciousness," Pacific Historical Conference, August, 1982.

"Harold G. Moulton, Keynes, and the Public Interest," Missouri Valley Historical Conference, March, 1982.

"Science, Morality, and Prostitution: Public Policy During World War II," Brown Conference, University of Alabama, December, 1981.

"Economic Public Policy Formulation: The Political Control of the Economy, 1932-Present," the Organization of American Historians Annual Meeting, Detroit, April, 1981

"Leo Pasvolsky, Bureaucracy, and the Founding of the United Nations," Society of American Historians of Foreign Relations Annual Meeting, Lawrence, Kansas, August, 1979.

## PROFESSIONAL ACTIVITIES

Founding President, Institute for Political History (501c educational foundation), 2004-

Editor, *Journal of Policy History*.

Organizer, Policy History Conference for St. Louis 2002; 2004; University of Virginia, 2006; St. Louis 2008. (This conference draws approximately 350-400 participants from History, Political Science, Sociology, and Law.

Member of Board of Directors, Truman Library Institute, 1991-1996.

Series Editor, "Critical Issues in European and American History," Rowman & Littlefield Press.

Reader for Cambridge University Press; Columbia University Press; Johns Hopkins University Press: Cornell University Press: Kansas University Press; Princeton University Press; Northern

Illinois University Press; Temple University Press; Bedford-St. Martins Press;  Pennsylvania State University Press;  and Houghton-Mifflin, *Journal of American History* and *Review of Politics*.

Member of Planning Committee, National Public Policy Conference, Bowling Green State University, Bowling Green, Ohio, August, 1997.

Program Co-Director, Conference on Private Charity and Public Welfare, Saint Louis University, St. Louis, Missouri, June, 1996.

Program Co-Director, Conference on the Evolution of Federal Social Policy, University of Notre Dame, South Bend, Indiana, October, 1985.

Program Chairman, Conference on the History of the Small Town, North Central College, Naperville, Illinois, April 1981.

Member of Illinois Steering Committee, OAH Conference on the Promotion of History held at Wesleyan University, Bloomington, Illinois, April, 1980.

Faculty Advisor, Phi Alpha Theta, University of Dayton, Dayton, Ohio.

Faculty Advisor, Phi Alpha Theta, University of Notre Dame, Notre Dame, Indiana.

**DIRECTED DISSERTATIONS**

Mariann Scholte, "The Political Economy of Banking Reform: The Monetary and Banking Acts of 1980 and 1982," University of Notre Dame, Department of Economics (l988).

David Hay, "The Military-Intellectual Complex: The U.S. Army Air Forces and the Ascendancy of Quantitative Management Control, 1940-1946" University of Notre Dame, Department of History (1993).

Thomas F. Curran, "The Weapons of our Warfare are not Carnal: The  Ideological Origins of Pacifism in the Civil War Era," University of Notre Dame, Department of History (l993).

John Korasick, "Imaging Africa: The Collection of African Art in America and the Failure of Postcolonial Theory," Saint Louis University, Department of History, (2004).

Aharon Zorea, "RICO:  From Organized Crime to Terrorism," Saint Louis University, Department of History, (2004).

Stephen Randall, "Public Health, Epidemics, and Civil Liberties in Chicago, 1950-1920," (in progress).

Matthew Sherman, "Protecting the President: From Abraham Lincoln through Theodore "Roosevelt," (in progress).

Cindy Stachecki, "ERA Ratification in Illinois," (in progress).

Amy Wallhermfechtel, Cecile B. DeMille and the Right-to-Work Campaign," (in progress).

**DISSERTATION**

"The Brookings Institution: The Early Years, 1916-1952: Expertise and Influence in a Democratic Society" (University of California 1978).

Professor Samuel Haber, Chairman

Professor Charles G. Sellers, Reader

Dr. Clark Kerr, Reader

**Ph.D. EXAMINATION FIELDS**

United States History

History of Science

Political Science

71

**TEACHING AND RESEARCH EXPERIENCE**

1992-09  Professor, Department of  History, Saint Louis University

1983-91   Assistant/Associate Professor (1987), Department of  History, University of Notre Dame

1981-83   Assistant Professor, Department of History, University of Dayton

1978-81   Assistant Professor, Department of History, North Central College, Naperville, Illinois

1977      Acting Instructor, Environmental Studies, University of California, Berkeley

1976      Acting Instructor, Department of History, San Francisco State University

1975      Research Assistant, Institute of Industrial Relations, University of California

1974      Teaching Assistant, Department of History, University of California, Berkeley

*For additional biographical information see *Who's Who in America; Who's Who in the World*

**APPENDIX**

Selected Book Reviews:

*The American Religious Debate over Birth Control, 1907-1937* by Kathleen Tobin, *Journal of American History*. (June, 2003).

*More Than They Promised: The Studebaker Story by Thomas E. Bonsall,* (Stanford University Press, 1999), *Business History Review* (Summer, 2002).

*Sexual Chemistry: A History of the Contraceptive Pill by Lara V. Marks,* (Yale University Press, 2001), *American Historical Review*, (December 2002) .

*Coping with Sickness, Medicine, Law, and Human Rights--Historical Perspectives,* edited by John Woodward and Robert Jutte, (Association of European History of Medicine, 2001), *Isis,* (June, 2002).

*Bold Relief: Institutional Politics and the Origins of American Social Policy* by Edwin Amenta, *American Historical Review*, (February, 2001)..

"*Socializing Security: Progressive-Era Economists and the Origins of American Social Policy* by David A. Moss,"  *Business History Review* (Autumn, 1998).

"*Minneapolis Teamsters Strike of l934* by Philip Korth," *Journal of American History* (September 1996).

"*Losing Time* by Otis Graham," *Business History* (February l994).

"*The Transformation of American Politics* by David Ricci," *American Historical Review* (October l994).

"*The Politics of Immigrant Workers: Labor Activism and Migration in the World Economy since 1830*  by Camille Guerin-Gonzales and Carl Strikwerda,"  *Journal of American History* (September l994).

"*Red or Rackets? The Making of Radical and Conservative Unions on the Waterfront* by Howard Kimeldorf," *Labor History* (Fall, l994).

"*American Automobile Workers, 1900-1933* by Joyce Shaw Peterson," *Journal of American History* (November l988).

"*Auto Slavery: The Labor Process in the American Automobile Industry, 1897-1950* by David Gartman," *Journal of American History* (March, 1985).

"*Union Power and American Democracy: The UAW and the Democratic Party, 1935-72* by Dudley W. Buffa," *Journal of American History* (March, 1985).

"*Corporate Liberalism: The Origins of Modern American Political Theory, 1890-1920* by R. Jeffrey Lustig," *Public Historian* (Spring, 1985).

"*Model Research: The National Advisory Committee for Aeronautics Vol. I and II* by Alex Roland," *Science* (November 29, 1985).

"*Workingmen's Democracy: The Knights of Labor and American Policies* by Leon Fink," *The Journal of Economic History* (September, 1984).

"*Unrepentant Radical: An American Activist's Account of His Five Turbulent Decades* by Sidney Lens," *Labor History* (Summer, 1984).

"*The Business Response to Keynes* by Robert M. Collins," *The Public Historian* (Summer, 1983).

"*The Dynamics of Business--Government Relations, 1893-1921* by William H. Becker," *Journal of Economic History* (September, 1982).

"*Basic Rights: Subsistence, Affluence, and U.S. Foreign Policy* by Henry Shue," *Annals of the Academy of American Political and Social Science* (March, 1983).

"*The Office of Management and Budget and the Presidency, 1921-1979* by Larry Berman," *Business History Review* (Autumn, 1982).

"*Political Control of the Economy* by Edward Tufte," *Labor History* (Winter, 1982).

"*The Speculator: Bernard M. Baruch in Washington, 1917-1965* by Jordan M. Schwarz," *The Journal of Economic History* (December, 1981).

"*The American Establishment* by Leonard and Mark Silk," *Annals of the Academy of American Political and Social Science* (Fall, 1981).

"*Friend and Foe in the U.S. Senate* by Ross K. Baker," *Annals of American Political and Social Science* (November, 1980).

"*James M. Landis: Dean of Regulators* by Donald A. Ritchie," *American Historical Review* (October, 1981).

"*Henry Cabot Lodge and the Search for An American Foreign Policy* by William C. Widenor," *Annals of the Academy of American Political and Social Science* (June 1981).

"*Herbert Hoover, The Great War and its Aftermath, 1914-1923* by Lawrence E. Gelfand," *Business History* (Winter, 1980).

"*Edwin G. Nourse: Economist for the People* by Joseph G. Knapp," *American Historical Review* (December, 1980).

76

"*Mexican Workers in the United States: Historical and Political Perspective*, edited by George C. Kiser," *The Journal of Economic History* (December 9, 1979).

24495206

Donald T. Critchlow

Business Address: Faculty of History, Arizona State University,
        Coor Hall, 4th Floor, 975 S. Myrtle Avenue, Tempe, AZ 85287-4302
Home Address:  7931 Gannon Avenue, University City, Missouri 63130
Telephone: cell: 369-8455; Email Address: dcritchlow@sbcglobal.net

Present Position: Director, Center for Political Thought and Leadership; Professor of History, ,Arizona State University;  Founding editor, *Journal of Policy History*; General editor, "Cambridge Essential Histories," (Cambridge University Press).

**EDUCATION**

Ph.D.   University of California, Berkeley, 1978 (History)
M.A.    University of California, Berkeley, 1972 (History)
B.A.    San Francisco State University, 1970 Magna Cum Laude

**TEACHING FIELDS**

United States History
20th Century American History
History of Public Policy
American Political History

**HONORS/APPOINTMENTS/GRANTS**

Founding President, Institute for Political History, (Endowed Public Non-Profit Foundation to
        promote the study of American history and graduate education, (501C) (2001-present)
External Reviewer, Teaching History, Stillman College History Academy for Hale County
Panelist, National Humanities Endowment, Year-Fellowship Program (2004)
Fellow, Fulbright Scholars Program, University of Hong Kong (1997-98)
Fellow, Woodrow Wilson International Center for Scholars (l996-97)
USIA grant for a five volume history of the U. S. published in Polish (1995)
University Faculty Exchange Program, University of Warsaw (1988-1989)
USIA, AmParts Distinguished Lecturer (1988-1989)
Panel, Employment and Technology, National Academy of Sciences (l986)
Guest Scholar, Woodrow Wilson International Center for Scholars (l984)
Rockefeller Summer Fellow (l983) (l994)
NEH Summer Fellow (1980)
Guest Scholar, The Brookings Institution (l976-l977)

**PUBLICATIONS**

1

Books (Monographs):

*A Very Short Introduction to American Political History* (New York: Oxford University
        Press, in press, January 2015)

*When Hollywood Was Right: How Movie Moguls, Celebrities, and Big Business Remade American
        Politics* (New York: Cambridge University Press, 2013) 224 pp.

*The Conservative Ascendancy: How the GOP Right Made Political History*
        (Harvard University Press, 2007; University Press of Kansas, 2011 pap.) 315 pp.

*Phyllis Schlafly and the Republican Right: A Woman's Crusade*
        (Princeton University Press, 2005) 422 pp.

*Intended Consequences:  Birth Control, Abortion and the Federal Government in Modern America*
        (Oxford University Press, 1999; paperback edition, 2001).

*Studebaker: The Life and Death of an American Corporation, 1852-1963*
        (Indiana University Press, l997) 272 pp. 304 pp.

*The Brookings Institution, 1916-1952 Expertise and the Public Interest in a Democratic Society*
        (Northern Illinois University Press, 1985) 242 pp.

*In Progress:*

*Seismic Change: Social Trends and the Future of American Politics* (under contract Palgrave
Publishers, manuscript due August 2015..

*Strange Bedfellows: Political Character and Leadership* (under contract University of Pennsylvania
Press, manuscript due January 2016)

Co-editor with Paula Baker, *Oxford Handbook of American Political History,* (under contract with
        Oxford University Press, manuscript due September 2015).


Books (Textbooks and Edited):

Co-editor-in-chief with Philip VanderMeer *Oxford Encyclopedia of American Political and Legal
        History* (New York, Oxford University Press, 2012), part of a five volume project
        Encyclopedia of American History, Paul Boyer, general editor.


Co-authored/edited with Nancy MacLean, *Debating the Conservative Movement* (Washington, D.C.
        Rowman and Littlefield, 2009).

2

Co-edited with Emilie Raymond, *Hollywood and Politics: A Documentary History* (New York: Routledge, 2009).


Co-edited, *American Conspiracy Revealed: From the Founding to Today (*Indiana University Press, 2007).

Co-authored with Paula Baker and William Rorabaugh, *America's Promise* (Revised and expanded edition) (Rowman and Littlefield Press, 2003); initially published as *America!: A Concise History* with William Rorabaugh, (Belmont, CA: Wadsworth Publishing, 1993).

Co-edited with Agnieszka Critchlow, *Enemies of the State: Personal Stories of Survival in the Gulag*  (Chicago: Ivan Dee Publishers, 2002; paper 2003).

*Encyclopedia of American History*, *Volume X, 1968 to the Present,* Volume editor, Donald T. Critchlow, Gary Nash, general editor, (New York: Facts on File, 2002).

Co-edited with Charles Parker, *With Us Always: Private Charity and Public Welfare in Historical Perspective* (Lantham, MD: Rowman & Littlefield, 1998).

Edited, *The Politics of Abortion and Birth Control in Historical Perspective* (University Park, PA: Pennsylvania State University Press, l996).

Edited, *A History of the United States, I-V*, a five volume history including with essays contributed by thirty Polish and American scholars (Warsaw, Poland: Polish Academic Press, 1995).

Co-edited with Ellis Hawley, *Poverty and Public Policy in Modern America* (Belmont, CA: Wadsworth Publishing, 1989)

Co-edited with Ellis Hawley, *Federal Social Policy: The Historical Dimension* (University Park, PA: Penn State University Press l989)

Edited, *Socialism in the Heartland: The Midwestern Experience, 1890-1920* An anthology of eight original essays (Notre Dame, Indiana: University of Notre Dame Press, 1986)


Articles/Chapters/Essays:

In Print:

"The Rise of Conservative Republicans: A History of Fits and Starts," in Iwan Morgan and Robert Mason, *Seeking a New Majority: The Republican Party and American Politics*, *1960-1980 Revival,*

3

(Nashville, TN., Vanderbilt University Press).

"On a Darkling Plain," *Historically Speaking* (Spring, 2001)

"Rethinking American Conservatism: Towards a New Narrative," *Journal of American History* (December 2011).

"Reconsidering ERA: Social Mobilization, Public Opinion, and State Ratification," *Journal of Policy History*, Special Issue, Julian Zelizer and Bruce Schulman, (Fall 2008)

"Mobilizing Women: The Social Issues and the Reagan Presidency," The *Reagan Presidency*, edited Hugh Graham and Elliot Brownlee, (Lawrence: University of Kansas Press,  2003).

"Phyllis Schlafly and Reconsidering Postwar American Conservatism," *Conservatism in the 1960s,* edited David Farber, (London: Peter Lang, 2003).

"Conservatives in Congress," *Congress: An Historical Perspective*, edited Julian Zelzer, (New York: Houghton Mifflin, 2004).

"Innovation in the Classroom: Teaching Policy History," *The History Teacher*, 31, (August, 1999), 469-476.

"Implementing Family Planning Policy in Postwar America," in Charles Parker and Donald T. Critchlow, eds., *With Us Always: Private Charity and Public Welfare in Historical Perspective* (Lantham, Md., 1998), 211-241.

"Birth Control, Population Control, and Family Planning: An Overview," *Journal of Policy History*, 7,  (March l995), 1-21.

"Think Tanks, Antistatism, and American Democracy," in Michael Lacey and Mary Furner, eds., *Knowledge and Social Science Research* (Cambridge University Press, 1993), 279-322.

"A Prognosis of Policy History: Stunted--Or Deceivingly Vital?" *The Public Historian*, 15, (Fall l993), 51-61.

"The Presidential Commission on Employment and Technology, 1966: An Historical Perspective," in National Academy of Sciences Panel on *Employment and Technology Employment and Technology in the United States* (N. Y.  Ballinger, December 1988).  Reprints of essay on file at the National Academy of Sciences.

"Robert S. Brookings: The Man and His Vision," *Review of Politics*, 46, (October, 1984), 561-580.

"Wheels of Fortune: Studebaker in the Early Years," *Timeline*, 4,  (March/April 1987), 16-30.

4

"Industrial Relations at Studebaker, 1905-1935, Paternalism and Corporate Identity Within An Auto Company," *American Studies*, 11, (1991), 83-95.

"Communist Unions and Racism: A Comparative Study of Responses of the United Electrical Radio and Machine Workers and the National Maritime Union to the Black Question During World War II," *Labor History* 17, (Spring 1976), 230-244; also see August Meier and Elliot Rudwick, "Communist Unions and the Black Community," *Labor History* (Spring 1982).

"Lewis Meriam, Expertise, and Indian Reform," *The Historian*, 23, (Spring, 1981), 325-344.

"The Political Control of the Economy: Deficit Spending as Political Belief, 1932-1952," *The Public Historian,* 3, (Fall, 1981), 5-22.

Selected Review Essays/Encyclopedia Articles

"Policy Knowledge: Non-Profit Institutions," *International Encyclopedia of the Social and Behavioral Sciences*," Neil J. Smelser and Paul B. Balters, editors, (Oxford, England: Elsevier Science, 2002) 5000 word essay.

"Government," Encyclopedia of American and Intellectual History, edited Mary Kupiec Cayton and Peter W. Williams, (N.Y.: Charles Scribner's Sons, 2001) 5000 word essay.

"Galling Wasp: Sexual Misbehavior in the Human Scientist," *Reviews in American History* (October, 1999).

"What's In and What's Out," *Reviews in American History* (September 1997).

"*Liberty and Sexuality: The Right to Privacy and the Making of Roe v. Wade* by David Garrow," extended review essay *Journal of American History (*March, l995).

"Keeping the Life Stream Pure," *Reviews in American History* (1992).

"Knowledge for What? Private Philanthropy in American History," *Reviews in American History* (l991).

Other book reviews (see Appendix)

## INVITED ADDRESSES AND LECTURES/CONFERENCE PAPERS

Invited Lectures *The Conservative Ascendancy:*  George McGovern Center, South Dakota;  North Carolina History Forum, Raleigh, North Carolina, public lectures in Washington, D.C., New York City, Portland, Oregon, and Gainsville, Florida,

Invited Lectures for *Phyllis Schlafly and Grassroots Conservatism* book tour: Seattle Town Hall Lecture Series; University of Washington, Seattle; George Washington University; Fordham University; Henry Salvatori Distinguished Lecture Series, Claremont College; Public Lecture, La Jolla, California

Selected Invited University Lectures: University of London (2009); University of Missouri Public Lecture (2007); Iowa State University College Distinguished Lecture Series, (2004); University of Arkansas College Lecture Series (2003); Oxford University and Cambridge University, June, 2001; Keynote Address, "Family Planning Policy: Successes and Failures," Title X Federal Family Planning Regional Conference, Lake Geneva, WI, 2000; Beijing Foreign Language University (2000); University of Oregon (2000); University of Virginia (2000); Vanderbilt University (2000); Dartmouth College (1999).

USIA Am Parts Program, "Think Tanks and the Washington Establishment in Historical Perspective," Lectures at United States Embassies in Barcelona, Madrid, Rome, Bonn, Frankfurt, Helsinki, and Luxemburg, 1988-1989.

"American Conspiracy Revealed," State of the Field panel, Organization of American Historians Meeting, April 2008.

"What's Wrong with the New Conservative History?" State of the Field panel, Organization of American Historians Meeting, March 2007

"The New History of Conservatism," American Historical Association Meeting, January 2007

"Reconsidering the History of Postwar Conservatism: Phyllis Schlafly and the Grassroots," American Historical Association Meeting, January 2001

"Integrating Social History and Policy History in the Classroom," Organization of American Historians Meeting, April l996

"The Quiet Revolution: Family Planning Policy in the l960s," Organization of American Historians Meeting, April l995

"The Current State of Political History," Western Political Science Meeting, March l995

"The Work Ethic and Welfare Reform in Modern America," American Historical Meeting, December 1987

"Social Policy as History," Organization of American Historians Annual Meeting, April 1986.

"The Emergence of Think Tanks in Modern America: Antistatism and Expertise in a Democratic Society, 1916-present," American Historians Association Annual Meeting, December 1985.

6

"The Evolution of the Studebaker Company, 1900-1920 from a Wagon Company to an Automobile Corporation," the Organization of American Historians Annual Meeting, April 1985,

"Think Tanks, Anti-Statism, and American Public Policy," Evening Dialogue, Woodrow Wilson Center for International Scholars, December 17, 1984.

"Robert S. Brookings: The Man, His Vision and His Institution," American Historical Association Annual Meeting, 1983.

"American Businessmen, Class-Consciousness, and the State, 1941-1976," Organization of American Historians Annual Meeting, April, 1983.

"Fear of the Leviathan: Anti-Statist Thought in Corporate Political Consciousness," Pacific Historical Conference, August, 1982.

"Harold G. Moulton, Keynes, and the Public Interest," Missouri Valley Historical Conference, March, 1982.

"Science, Morality, and Prostitution: Public Policy During World War II," Brown Conference, University of Alabama, December, 1981.

"Economic Public Policy Formulation: The Political Control of the Economy, 1932-Present," the Organization of American Historians Annual Meeting, Detroit, April, 1981

"Leo Pasvolsky, Bureaucracy, and the Founding of the United Nations," Society of American Historians of Foreign Relations Annual Meeting, Lawrence, Kansas, August, 1979.

## PROFESSIONAL ACTIVITIES

Founding President, Institute for Political History (501c educational foundation), 2004-

Editor, *Journal of Policy History*.

Organizer, Policy History Conference for St. Louis 2002; 2004; University of Virginia, 2006; St. Louis 2008. (This conference draws approximately 350-400 participants from History, Political Science, Sociology, and Law.

Member of Board of Directors, Truman Library Institute, 1991-1996.

Series Editor, "Critical Issues in European and American History," Rowman & Littlefield Press.

Reader for Cambridge University Press; Columbia University Press; Johns Hopkins University

Press: Cornell University Press: Kansas University Press; Princeton University Press; Northern Illinois University Press; Temple University Press; Bedford-St. Martins Press;  Pennsylvania State University Press;  and Houghton-Mifflin, *Journal of American History* and *Review of Politics*.

Member of Planning Committee, National Public Policy Conference, Bowling Green State University, Bowling Green, Ohio, August, 1997.

Program Co-Director, Conference on Private Charity and Public Welfare, Saint Louis University, St. Louis, Missouri, June, 1996.

Program Co-Director, Conference on the Evolution of Federal Social Policy, University of Notre Dame, South Bend, Indiana, October, 1985.

Program Chairman, Conference on the History of the Small Town, North Central College, Naperville, Illinois, April 1981.

Member of Illinois Steering Committee, OAH Conference on the Promotion of History held at Wesleyan University, Bloomington, Illinois, April, 1980.

Faculty Advisor, Phi Alpha Theta, University of Dayton, Dayton, Ohio.

Faculty Advisor, Phi Alpha Theta, University of Notre Dame, Notre Dame, Indiana.


**DIRECTED DISSERTATIONS**


Mariann Scholte, "The Political Economy of Banking Reform: The Monetary and Banking Acts of 1980 and 1982," University of Notre Dame, Department of Economics (l988).

David Hay, "The Military-Intellectual Complex: The U.S. Army Air Forces and the Ascendancy of Quantitative Management Control, 1940-1946" University of Notre Dame, Department of History (1993).

Thomas F. Curran, "The Weapons of our Warfare are not Carnal: The  Ideological Origins of Pacifism in the Civil War Era," University of Notre Dame, Department of History (l993).

John Korasick, "Imaging Africa: The Collection of African Art in America and the Failure of Postcolonial Theory," Saint Louis University, Department of History, (2004).

Aharon Zorea, "RICO:  From Organized Crime to Terrorism," Saint Louis University, Department of History, (2004).

Stephen Randall, "Public Health, Epidemics, and Civil Liberties in Chicago, 1950-1920," (in progress).

Matthew Sherman, "Protecting the President: From Abraham Lincoln through Theodore "Roosevelt," (in progress).

Cindy Stachecki, "ERA Ratification in Illinois," (in progress).

Amy Wallhermfechtel, Cecile B. DeMille and the Right-to-Work Campaign," (in progress).

**DISSERTATION**

"The Brookings Institution: The Early Years, 1916-1952: Expertise and Influence in a Democratic Society" (University of California 1978).

Professor Samuel Haber, Chairman
Professor Charles G. Sellers, Reader
Dr. Clark Kerr, Reader


**Ph.D. EXAMINATION FIELDS**

United States History
History of Science
Political Science


**TEACHING AND RESEARCH EXPERIENCE**

1992-09  Professor, Department of History, Saint Louis University

1983-91   Assistant/Associate Professor (1987), Department of History, University of Notre Dame

1981-83   Assistant Professor, Department of History, University of Dayton

1978-81   Assistant Professor, Department of History, North Central College, Naperville, Illinois

1977      Acting Instructor, Environmental Studies, University of California, Berkeley

1976      Acting Instructor, Department of History, San Francisco State University

1975      Research Assistant, Institute of Industrial Relations, University of California

1974      Teaching Assistant, Department of History, University of California, Berkeley

*For additional biographical information see *Who's Who in America; Who's Who in the World*

**APPENDIX**

Selected Book Reviews:

*The American Religious Debate over Birth Control, 1907-1937* by Kathleen Tobin, *Journal of American History*. (June, 2003).

 *More Than They Promised: The Studebaker Story by Thomas E. Bonsall,*  (Stanford University Press, 1999), *Business History Review* (Summer, 2002).

 *Sexual Chemistry: A History of the Contraceptive Pill by Lara V. Marks,* (Yale University Press, 2001),  *American Historical Review*, (December 2002) .

*Coping with Sickness, Medicine, Law, and Human Rights--Historical Perspectives,* edited by John Woodward and Robert Jutte, (Association of European History of Medicine, 2001), *Isis,* (June, 2002).

*Bold Relief: Institutional Politics and the Origins of American Social
Policy* by Edwin Amenta, *American Historical Review*, (February, 2001)..

"*Socializing Security: Progressive-Era Economists and the Origins of American Social Policy* by David A. Moss,"  *Business History Review* (Autumn, 1998).

"*Minneapolis Teamsters Strike of l934* by Philip Korth," *Journal of American History* (September 1996).

"*Losing Time* by Otis Graham," *Business History* (February l994).

"*The Transformation of American Politics* by David Ricci," *American Historical Review* (October l994).

"*The Politics of Immigrant Workers: Labor Activism and Migration in the World Economy since 1830*  by Camille Guerin-Gonzales and Carl Strikwerda," *Journal of American History* (September l994).

"*Red or Rackets? The Making of Radical and Conservative Unions on the Waterfront* by Howard Kimeldorf," *Labor History* (Fall, l994).

"*American Automobile Workers, 1900-1933* by Joyce Shaw Peterson," *Journal of American History* (November l988).

"*Auto Slavery: The Labor Process in the American Automobile Industry, 1897-1950* by David Gartman," *Journal of American History* (March, 1985).

10

"*Union Power and American Democracy: The UAW and the Democratic Party, 1935-72* by Dudley W. Buffa," *Journal of American History* (March, 1985).

"*Corporate Liberalism: The Origins of Modern American Political Theory, 1890-1920* by R. Jeffrey Lustig," *Public Historian* (Spring, 1985).

"*Model Research: The National Advisory Committee for Aeronautics Vol. I and II*  by Alex Roland," *Science* (November 29, 1985).

"*Workingmen's Democracy: The Knights of Labor and American Policies* by Leon Fink," *The Journal of Economic History* (September, 1984).

"*Unrepentant Radical: An American Activist's Account of His Five Turbulent Decades* by Sidney Lens," *Labor History* (Summer, 1984).

"*The Business Response to Keynes* by Robert M. Collins," *The Public Historian* (Summer, 1983).

"*The Dynamics of Business--Government Relations, 1893-1921*  by William H. Becker," *Journal of Economic History* (September, 1982).

"*Basic Rights: Subsistence, Affluence, and U.S. Foreign Policy* by Henry Shue," *Annals of the Academy of American Political and Social Science* (March, 1983).

"*The Office of Management and Budget and the Presidency, 1921-1979* by Larry Berman," *Business History Review* (Autumn, 1982).

"*Political Control of the Economy* by Edward Tufte," *Labor History* (Winter, 1982).

"*The Speculator: Bernard M. Baruch in Washington, 1917-1965*  by Jordan M. Schwarz," *The Journal of Economic History* (December, 1981).

"*The American Establishment* by Leonard and Mark Silk," *Annals of the Academy of American Political and Social Science* (Fall, 1981).

"*Friend and Foe in the U.S. Senate* by Ross K. Baker," *Annals of American Political and Social Science* (November, 1980).

"*James M. Landis: Dean of Regulators* by Donald A. Ritchie," *American Historical Review* (October, 1981).

"*Henry Cabot Lodge and the Search for An American Foreign Policy* by William C. Widenor," *Annals of the Academy of American Political and Social Science* (June 1981).

"*Herbert Hoover, The Great War and its Aftermath, 1914-1923* by Lawrence E. Gelfand," *Business History* (Winter, 1980).

"*Edwin G. Nourse: Economist for the People* by Joseph G. Knapp," *American Historical Review* (December, 1980).

"*Mexican Workers in the United States: Historical and Political Perspective*, edited by George C. Kiser," *The Journal of Economic History* (December 9, 1979).

12