# EXHIBIT 17

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| |
|---|
| **Feldman,** *et al.***,** |
| **Plaintiffs,** |
| **v.** |
| **Arizona Secretary of State's Office,** *et al.***,** |
| **Defendants.** |

**Civil Action No. 16-01065-PHX-DLR**

## <u>REBUTTAL DECLARATION OF M.V. HOOD III</u>

I, M.V. Hood III, affirm the conclusions I express in this report are provided to a reasonable degree of professional certainty. In addition, I do hereby declare the following:

**I. INTRODUCTION AND BACKGROUND**

My name is M.V. (Trey) Hood III, and I am a tenured professor at the University of Georgia with an appointment in the Department of Political Science where I have been a faculty member since 1999. I also serve as the Director of the School of Public and International Affairs Survey Research Center. I am an expert in American politics, specifically in the areas of electoral politics, racial politics, election administration, and Southern politics. I teach courses on American politics, Southern politics, and research methods and have taught graduate seminars on the topics of election administration and Southern politics.

I have received research grants from the National Science Foundation and the Pew Charitable Trust. I have also published peer-reviewed journal articles specifically in the area of election administration. My academic publications are detailed in a copy of my vita that is attached to the end of this document. Currently, I serve on the editorial boards for *Social Science Quarterly* and *Election Law Journal*. The latter is a peer-reviewed academic journal focused on the area of election administration.

During the preceding five years, I have offered expert testimony in fifteen cases, *State of Florida v. United States* (No. 11-1428, D.D.C.), *NAACP v. Walker* (11-CV-5492, Dane County Circuit Court), *Jones v. Deininger* (12-CV-00185-LA), *Frank v. Walker* (2:11-CV-01128-LA), *South Carolina v. United States* (12-203, D.D.C), *Rios-Andino v. Orange County* (6:12-cv-1188-orl-22KRS), *Veasey v. Perry* (2:13-cv-193, NGR), *United States v. North Carolina* (1:13-CV-861), *Bethune-Hill v. Virginia State Board of Elections* (3:14-cv-00852-REP-GBL-BMK), *The Ohio Democratic Party v. Husted* (2:15-cv-1802), *The Northeast Ohio Coalition v. Husted* (2:06-CV-00896), *One Wisconsin Institute v. Nichol* (3:15-CV-324), *Covington v. North Carolina* (1:15-cv-00399), and *Green Party of Tennessee v. Tre Hargett* (3:11-692).

In assisting the Defendants in analyzing Arizona's absentee ballot return statute (HB 2023), I am receiving $300 an hour for this work and $300 an hour for any testimony associated with this work.  In reaching my conclusions, I have drawn on my training, experience, and knowledge as a social scientist who has specifically conducted research in the area of election administration.

## II. SCOPE AND OVERVIEW

I have been asked by counsel for the Defendants to respond generally to the expert reports of Professor Allan Lichtman and Professor David Berman and, specifically, to their opinions regarding HB 2023 which relates to the return of early-voting ballots in Arizona. Section III provides an overview of the voting process in Arizona along with the changes brought about by HB 2023. The following section (IV) compares HB 2023 to absentee ballot statutes across the remaining forty nine states. Sections V and VI contain critiques of the analyses and methodology presented by Professors Berman and Lichtman respectively. The final section of my report (VII) provides a synopsis of my overall conclusions in this case.

## III. THE ARIZONA ELECTORAL CONTEXT

Citizens in Arizona must be registered to vote 29 days prior to an election in which they would like to participate. Potential electors can register by a variety of methods including in-person, (at their county recorder's office or an Arizona Motor Vehicle Services office) or through the mail. Arizona is also one of a growing number of states that provides voter registration via the internet.[1]

Arizona voters can cast a ballot in one of three ways: early by mail; early in-person; or in-person at their precinct on election-day. Early voting, either in-person or by mail, does not require an excuse.[2] In Arizona, voting an early ballot is analogous to the term absentee voting in other states. A voter can request to be place on the Permanent Early Voter List (PEVL). By doing so they will be mailed an early (absentee) ballot for each election in which they are eligible to vote.[3]

For the 2016 general early voting will begin on October 12th and run through November 4th, for a total of 24 days.[4] On election-day voters can vote at their precinct from 6:00 a.m. to 7:00 p.m. or they could also drop off a voted early ballot at any precinct within their county of residence (without waiting in line).[5] The deadline to drop off an early ballot in person is 7:00 p.m. on election-day. Likewise, an early ballot returned through the mail must also be received by the close of the polls on election-day.[6]

It is evident that the State of Arizona has fashioned an electoral environment that is highly convenient for voters, providing multiple options for casting a ballot across a time period that spans four weeks. In some states no-excuse mail balloting or early in-person voting are not available options for voters. Even where early in-person voting is an option, most states have a much shorter time period than does Arizona. For example, in 2014 the average early in-person voting period across states equated to 15 days with a median of only 12 days. Arizona's early voting period in 2016, at 24 days, far outstrips most other states on this metric.[7]

---

[1] "Register to Vote." Arizona Secretary of State. (http://www.azsos.gov/elections/voting-election/register-vote-or-update-your-current-voter-information). See also Arizona Election Code § 16-134.

[2] See Arizona Election Code § 16-541.

[3] Voters do not have to provide postage for an early ballot returned through the mail. See "Permanent Early Voting." Arizona Secretary of State. (http://www.azsos.gov/elections/voting-election) and Arizona Election Code § 16-544.

[4] A voter facing an emergency that will prevent them from appearing at the polls on election-day can vote absentee (early). This provision covers the gap between the close of early in-person voting and election-day (Arizona Election Code § 16-542(H).) See also "Elections Calendar." Arizona Secretary of State (http://www.azsos.gov/elections/elections-calendar-upcoming-events#ec).

[5] Voters can also drop off their early ballot at any early voting site in their county during the early voting period. Again, in these instances the voter need not wait. "Voting in the Election." Arizona Secretary of State (http://www.azsos.gov/elections/voting-election). See also Arizona Election Code § 16-565.

[6] One argument from the plaintiffs concerns access to postal services to return a voted absentee ballot. One must assume, however, that if a voter is capable of receiving an absentee ballot through the mail then the same voter should be able to return their voted ballot through the mail as well.

[7] See Declaration of M.V. Hood III. *Ohio NAACP v. Husted* (2:14-cv-404). August 28, 2015. Pages 13-16.

So, what exactly about voting in Arizona did HB 2023 alter? Prior to passage of HB 2023, a voter could allow any individual to collect and return their voted early ballot. Following implementation of HB 2023, any voter can still return their early ballot through the mail or in person. Additionally, a family or household member or an individual serving as a caregiver may also return an early ballot on behalf of the voter. Outside of these exceptions, individuals are not allowed to collect and return another voter's early ballot.[8] HB 2023 in no then way altered in-person early voting or precinct voting on election-day. In reference to by-mail early voting process specifically, HB 2023 did not modify the procedures for requesting a ballot or those related to the receipt of the ballot, only the process for returning a voted early ballot.[9]

---

[8]Arizona Election Code § 16-1005(H).

[9]Even with HB 2023, if a bulk collection of early ballots were dropped off at a county recorder's office these ballots would be processed and counted just like any other early ballot. Under HB 2023 county recorders are not required to issue a receipt or other documentation when an early ballot is returned.

## IV. HB 2023 IN CONTEXT

In this section I would like to respond specifically to Professor Lichtman's assertion that HB 2023 places Arizona outside the mainstream of most states. In reference to this claim, however, he makes no attempt to perform a comparative state analysis of provisions relating to the collection of absentee ballots. Instead, Professor Lichtman simply relies on a summary number reported by Arizona election officials that 18 states (excluding Arizona) had prohibitions in place concerning absentee ballot collection. He then cites a media report that argues the correct number of states is actually somewhere below this figure.[10]

In order to determine the extent to which states place prohibitions on the return of absentee ballots I conducted my own analysis of all fifty states on this point. In carrying out this study it is important to note the various components of the absentee by mail process. These include making an absentee ballot request, returning the absentee ballot request, obtaining an absentee ballot, and finally returning a voted absentee ballot. It is important to note that these are four distinct processes, or steps, and that states may regulate the entire process or only specific components thereof. For example, the State of Florida stipulates the exact manner in which an absentee ballot may be requested and the receipt of the absentee ballot, but does not explicitly prohibit the method by which a voted absentee ballot may be returned.[11]

The comparative state analysis I present concentrates solely on the regulation of the manner in which a voted absentee ballot may be <u>returned</u>. In order to conduct this analysis I relied on information posted by state agencies charged with the conduct of elections (e.g. the Secretary of State's Office or the State Election Board). Many state websites contained detailed documentation concerning the absentee by mail balloting process, with some including a step-by-step instruction guide for voters. After an initial sweep of documentation posted on such sites I then located and read statutes applicable to the absentee ballot return process in state election codes. If any ambiguity remained after accessing these information sources I contacted election officials so that I could correctly classify the state on this question. Out of an abundance of caution if a state's election code was silent on the manner in which an absentee mail ballot could be returned the state in question was coded as having no specific prohibition on who could return a ballot.

Following the process outlined above, each state is categorized based on the presence or absence of a prohibition regarding the return of a voted absentee by mail ballot. The results of this analysis are detailed in Figure 1. Table A in the appendix to this report contains the detailed results of my analysis including a categorization based on the requirement for an excuse to vote absentee by mail and the presence of restrictions regarding to the return of a voted absentee ballot. The table also includes a short description of the process by which an absentee by mail ballot may be returned, including any applicable prohibitions. Finally, specific state election webpages accessed and applicable provisions in state election code are also documented in this table.

---

[10]See page 20 of the Expert Report of Professor Allan J. Lichtman. *Feldman v. Arizona Secretary of State's Office* (16-01065-PHX-DLR). June 10, 2016.
[11]See Fla. Stat. § 101.62 and Fla. Stat. § 101.65.

As displayed in Figure 1, 28 states (including Arizona) have some stipulation in place relating to the manner in which early voting by mail ballots may be returned. This finding places Arizona in the mainstream, as more than half (56%) of states place some prohibition on this component of absentee balloting. Conversely, a minority of states (44%) do not limit the manner in which a voter may return their absentee ballot to election officials. The panel to the right in Figure 1 further classifies states based on the absentee return prohibitions and whether an excuse is required to vote absentee by mail. Although four states place no prohibition on return of absentees, the pool of electors able to use this form of voting is greatly restricted as a reason such as illness or disability must be stipulated. This leaves only about a third of the states (18) that fall into the no-excuse, no-return prohibition category. Contrary to Professor Lichtman's assertion that HB 2023 places Arizona in a decided minority of states, the analysis presented indicates, in fact, the exact opposite is the case.



In this same section of his report Professor Lichtman also draws a number of additional cross-state comparisons. One of these comparisons involves the criminal sanction associated with the prohibited collection of absentee ballots. He states, California *does not impose any criminal or civil penalties for gathering and delivering ballots.*[12] However, Section 18403 of California's Election Code states:

> Any person other than an elections official or a member of the precinct board who receives a voted ballot from a voter or who examines or solicits the voter to show his or her voted ballot is punishable by a fine not exceeding ten thousand dollars ($10,000), by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for 16 months or two or three years, or in a county jail not exceeding one year, or by both that fine and imprisonment. This section shall not apply to persons returning a vote by mail ballot pursuant to Sections 3017 and 3021 or persons assisting a voter pursuant to Section 14282.

Outside of exceptions for the return of an absentee ballot by immediate family or a household member (§ 3017) or special circumstances relating to illness or disability (§ 3021) this provision clearly states that the return of an absentee ballot by anyone except the voter is prohibited. Referencing the penal code it is also clear that the sanction levied in § 18403 is a felony. On this point then the California statute is essentially the same as HB 2023.[13]

To the east of Arizona, neighboring state New Mexico also imposes a criminal penalty for the improper collection of absentee ballot. In New Mexico a voter may return the absentee ballot in person or through the mail to their county clerk. In addition to the voter, the absentee ballot can also be returned by immediate family or caregiver.[14] The penalty for being in possession of an absentee ballot outside of these circumstances is a fourth degree felony in New Mexico.[15]

Professor Lichtman's report also cites a media report (previously referenced) which states, outside of seeking monetary compensation, the State of Texas does not impose any criminal sanction related to the collection of absentee ballots.[16] However, Section 86.006(f) of the Texas Election Code states: *A person commits an offense if the person knowingly possesses an official ballot or official carrier envelope provided under this code to another.* Depending on the number of ballots possessed this offense could be a Class A or B misdemeanor in Texas.[17] As with the assertions I analyzed regarding sate prohibitions on the collection of absentee ballots, Professor Lichtman's statements on this metric do not appear to comport with reality.

---

[12] See page 21 of the Expert Report of Professor Allan J. Lichtman. *Feldman v. Arizona Secretary of State's Office* (16-01065-PHX-DLR). June 10, 2016.

[13] Like California, HB 2023 also makes exceptions for the return of an absentee mail ballot by a family member, a household member, or caregiver.

[14] See New Mexico Election Code § 1-6-9 and § 1-6-10.1.

[15] See New Mexico Election Code § 1-20-7.

[16] See pages 20-21 of the Expert Report of Professor Allan J. Lichtman. *Feldman v. Arizona Secretary of State's Office* (16-01065-PHX-DLR). June 10, 2016.

[17] Texas Election Code § 86.006(f). The statute does make exceptions for immediate family, household members, election officials, or an individual depositing the ballot in the mail subject to provisions in § 86.0054(b).

Finally, although HB 2023 and California's election code are substantially similar Professor Lichtman argues that the ballot return deadline *greatly lessens the impact* of absentee return policy in California.[18] In Arizona the absentee return deadline is 7:00 p.m. on Election Day,[19] while in California the absentee ballot only needs to be postmarked by Election Day (even under this stipulation ballots  must be received within three days following the election).[20] Professor Lichtman also contends that Arizona voters assume that as long as their absentee ballot is mailed by election-day it will be counted.

---

[18]See page 21 of the Expert Report of Professor Allan J. Lichtman. *Feldman v. Arizona Secretary of State's Office* (16-01065-PHX-DLR). June 10, 2016.
[19]Arizona Election Code § 16-548.
[20]California Election Code § 403.

One point to be made is that elections, by nature, must contain hard deadlines. Just as a voter cannot show up in person at their precinct to vote the day after the election, there are deadlines for the return of absentee ballots. Arizona has determined that absentee voters must ensure their ballots are physically at the county recorder's office by the close of election-day which comports with the close of in-person voting on election-day at 7:00 p.m.[21]  Given that early balloting will begin 24 days prior to election-day for the 2016 general, this requirement does not appear unreasonable.[22] Absentee ballot affidavit forms are also required to contain instructions to voters including the following statement: *In order to be valid and counted, the ballot and affidavit must be delivered to the office of the county recorder or other officer in charge of elections or may be deposited at any polling place in the county no later than 7:00 p.m. on election day.*[23] Given this, there should be no voter confusion in Arizona regarding the return deadline for absentee ballots.

In summary, my own analyses of state procedures regarding the return of absentee by mail ballots leads me to a different set of conclusions from those proffered by Professor Lichtman. In my opinion HB 2023 does not place Arizona outside the mainstream—more than a majority of states regulate the return of absentee ballots in their election codes. Further, it is also not uncommon for criminal penalties to be associated with the violation of such provisions, with some states classifying such violations as felony matters. Finally, any state conducting early voting by mail balloting must set a deadline for receipt of such ballots. The fact that Arizona's deadline is election-day certainly does not make it an outlier compared to other states. Neighboring states New Mexico and Nevada, in fact, impose the same deadline for receipt of absentee ballots.[24] As noted in Table A, these two states also restrict the third-party collection of voted absentee ballots.

## V. PROFESSOR BERMAN'S EXPERT REPORT

Professor David R. Berman submitted an expert report in this case documenting Arizona's history of racial/ethnic discrimination. While I have no reason to doubt the veracity of the examples Professor Berman documents, many of these are in no way contemporary. For example, Arizona ended its literacy test in 1971—forty-five years ago. The question then becomes how relevant are such examples to uncovering a pattern of recent discriminatory voting practices on the part of Arizona?

---

[21]Arizona Election Code § 16-548.
[22]See "Elections Calendar." Arizona Secretary of State (http://www.azsos.gov/elections/elections-calendar-upcoming-events#ec).
[23]Arizona Election Code § 16-547(C).
[24]New Mexico Election Code § 1-6-10(B) and Nevada. Rev. Stat. § 293.317.

Many of the more recent examples Professor Berman highlights have only a limited or tangential relationship to minority voting rights. For example, the issue of the MLK holiday in Arizona which is symbolic in nature. While these types of issues do illicit strong opinions, they do not directly impact the ability of minorities in Arizona to participate in the political process. Professor Berman also makes note of voter ID requirements in the state, an issue that is certainly relevant to electoral participation. Arizona's voter ID law, however, only applies to electors voting at their precinct on election-day. Any voter can avoid this requirement by simply voting early (by mail or in-person). Further, voters can use a wide variety of both photo and non-photo identification. In fact, a voter can comply using non-photo documentation alone.[25] Arizona is not alone is passing a voter ID requirement, many states have done so recently. Its statute, however, is in no way as strict as those states which require a government issued photo ID to cast a ballot. Professor Berman's report fails to adequately document some of the positive trends in Arizona over the last half-century, such as the increase levels of minority political participation and officeholding. As well, no mention is made of the overtime expansion in the number of options available to Arizona citizens to register and cast a ballot (see again Section III).

Arizona does not keep official registration and turnout statistics by race and ethnicity. We can estimate these quantities from the Census Bureau's Current Population Surveys of Voting and Registration. The latest survey covers the 2014 general election. As the name implies, these are surveys and should be viewed in that light. It is important to note that these surveys conducted by the Census Bureau do not undergo any type of vote validation process. Because these estimates are based on survey data and because such surveys are prone to specific biases (vote over-reporting) it is important that these turnout estimates be used in conjunction with measures of uncertainty. A range, where the *true* measure is located, should also be provided.

In Table 1 below I provide a margin of error which can be used to calculate a 90% confidence interval.[26]  Looking at the table below it is estimated that 65.2% of Anglos in Arizona were registered to vote in 2014 compared with 60.3% of Blacks. It appears that Anglo turnout is higher than Black turnout, however, when making such a comparison it is important to determine if the confidence intervals for these estimates overlap. For this comparison that is the case. Because of this one cannot say with any degree of statistical certainty that the actual rate of registration for Anglos is higher than that for Blacks—they are indistinguishable from one another. The same could be said for Anglo and Hispanic registration rates. In terms of voter turnout, Black and Anglo rates are likewise statistically indistinguishable from one another. Hispanic turnout does lag behind Anglo turnout in 2014 as the confidence intervals produced do not overlap (The Voting and Registration Surveys do not provide estimates for Native American participation at the state-level). From these data then some evidence exists that in contemporary Arizona registration and turnout rates across races and ethnicities have equalized.

---

[25]Arizona Election Code § 16-579(A).

[26]Table 4b.  Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States: November 2014. U.S. Census Bureau. (www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html).

Table 1. Arizona Registration and Turnout Rates by Race/Ethnicity, 2014

| Race | Citizen Registration | Confidence Interval | Citizen Turnout | Confidence Interval |
|------|----------------------|---------------------|-----------------|---------------------|
| Anglo | 65.2% [2.8] | 62.4%-68.0% | 46.4% [2.9] | 43.5%-49.3% |
| Black | 60.3% [12.7] | 47.6%-73.0% | 33.1% [12.2] | 20.9%-45.3% |
| Hispanic | 60.0% [6.9] | 53.1%-66.9% | 31.8% [6.5] | 25.3%-38.3% |

Source: U.S. Census Bureau.
Notes: Entries are percentage estimates of turnout by race/ethnicity with 90% margin of error in brackets. For each estimate a 90% confidence interval is presented in the *confidence interval* column.

Other sources report that registration and turnout rates for Native Americans have greatly increased over the last several decades. For example, [t]*urnout among American Indians in Navajo County increased by 120 percent between 1972 and 1990, while Apache County, Arizona experienced an 88% increase during the same period.* Increased levels of political participation have produced concomitant increases in officeholding for both Native Americans and Hispanics. For both these groups the greatest increase in officeholding has come at the local level. It should be noted, however, that Hispanics have been elected to every officeholding level in the state.[27] Currently, two members (22%) of Arizona's nine-member congressional delegation are Hispanic. Across local, state legislative, congressional, and state constitutional offices Hispanic representation increased 62% over a twenty-year period (from 230 in 1985 to 373 in 2005).[28] While this evidence is not conclusive, it is an indication that the capacity of racial/ethnic minorities to participate in the political process in Arizona has been on a positive trajectory over the last several decades.

Professor Berman's twenty-two page report devotes only a single paragraph directly to HB 2023. On this matter he asserts that the collection of absentee ballots *has repeatedly been linked to minority participation in elections.* He concludes that HB 2023 will *discourage minority voters from participating in elections.*[29] Professor Berman, however, fails to provide any support for the assertion and the conclusion that follows. There is certainly no empirical evidence that racial/ethnic minorities would be disproportionately affected by the provision in HB 2023. Further, the extent to which racial/ethnic minorities rely on early voting by mail balloting has also not been established.

---

[27]Raul Castro was elected as governor in 1974.
[28]James Thomas Tucker, Rodolfo Espino, Tara Brite, Shannon Conley, Ben Horowitz, Zak Walter, and Shon Zelman. 2008. "Voting Rights in Arizona: 1982-2006." *Review of Law and Social Justice* 17(2): 283-365. Quoted material from page 361.
[29]Expert Report of Professor David R. Berman. *Feldman v. Arizona Secretary of State's Office* (16-01065-PHX-DLR). June 18, 2016. Page 20.

<u>Any</u> voter has multiple options for casting a ballot in Arizona. If voting early by mail a voter can return the ballot by mail or in-person or ask a family/household member to carry out this function on their behalf. The early voting period spans 24 days and voters have until 7:00 p.m. on election-day to return their ballot. While voter discrimination is certainly part of Arizona's past, one cannot simply draw a line between that history and any future effects of HB 2023. In my opinion the plaintiffs have certainly not produced any empirical evidence to indicate that prohibiting the third party collection of absentee ballots will produce a disparate impact on minority voters in Arizona.

## VI. PROFESSOR LICHTMAN'S EXPERT REPORT

Professor Allan J. Lichtman also submitted an expert report in the case presently under discussion. His report deals primarily with an analysis of the Senate Factors and, second, an analysis of intentional discrimination related specifically to HB 2023.[30]

First, I would like to respond to Professor Lichtman's analysis of the Senate factors and its bearing on the legality of HB 2023. In a manner of speaking Professor Lichtman puts the cart before the horse.  The first step in a Section 2 claim should be to demonstrate that a <u>causal</u> connection can be established whereby the election practice(s) in question is/are denying racial (or language) minorities *an equal opportunity to participate in the political process*.[31] In a standard vote dilution claim related to a redistricting plan, one needs to demonstrate that the minority candidate of choice is typically defeated by a majority white voting bloc.[32] The vote dilution <u>effect</u> must, therefore, be established before an analysis of additional elements (e.g. Senate Factors) is warranted. Professor Lichtman's report makes no attempt to empirically determine if HB 2023 would disproportionately affect racial/ethnic minorities in Arizona. Even one step removed from this question, Professor Lichtman does not attempt to determine if minority voters in Arizona utilize by-mail early balloting at higher rates than do Anglos.

As with Professor Berman's historical analysis of racial discrimination, I have no reason to doubt that socio-economic disparities exist in Arizona and that such disparities can be documented. Again, the real question becomes the degree to which any such socio-economic disparities may interact with HB 2023 to hamper political participation on the part of racial minorities in Arizona.[33] As things stand now there simply is no evidence to support the supposition that HB 2023 will cause a diminishment in the ability of minorities to participate in the political process in Arizona. With no evidence that HB 2023 will create a negative effect, Professor Lichtman's effort to widen the scope of inquiry to the Senate Factors is, therefore, unwarranted.

---

[30]Professor Lichtman's report also discusses the topics of precinct allocation in Maricopa County and out-of-precinct provisional ballots. As my rebuttal declaration focuses on HB 2023 I am not responding to those matters.
[31]U.S. Department of Justice. "Section 2 of the Voting Rights Act" found at https://www.justice.gov/crt/section-2-voting-rights-act.
[32]Minority vote dilution is determined by applying the three prongs of the *Gingles* test. See 478 US 30 (1986).
[33]See 52 U.S.C. § 10301.

Professor Lichtman also claims that HB 2023 will have a disproportionate effect on Democratic partisans.  As with the claim made concerning racial/ethnic minorities he fails to conduct any empirical analysis to demonstrate that HB 2023 would disproportionately affect Democratic voters? In addition, he also fails to examine whether Democratic vote-by-mail usage rates are different from other partisans in Arizona. As with racial/ethnic minorities, Professor Lichtman does not bring any evidence to bear on the claim of partisan fencing.

Finally, in reference to the Senate Factors I would like to make one other observation. In formulating a list of factors to be considered in making a judgment regarding a totality of the circumstances in reference to a Section 2 violation, the Senate made it clear that this set of factors is *neither exclusive nor comprehensive*.[34] I would argue that other relevant factors bearing on HB 2023 should also be considered.

HB 2023 is a piece of election-related legislation and, as such, one must consider its relationship to the conduct of elections in Arizona. State Election Director Eric Spencer testified before the Government Committee in the Arizona Senate stating:

> First of all, there is a huge imbalance in the amount of security measures that are in place for polling place voting compared [to] early voting.  Over the last 20 years, early voting has now become about 77% of all the votes cast in Arizona, and we have almost no prophylactic security procedures in place to govern that practice.  Whereas, at the polling place where only 23% of the votes are taking place, we have every security measure in the world.  So, this bill merely catches us up to the evolution in voting's practices that our state has experienced the last 20 years.[35]

---

[34]U.S. Department of Justice. "Section 2 of the Voting Rights Act" found at https://www.justice.gov/crt/section-2-voting-rights-act.

[35]Testimony of Mr. Eric Spencer. Government Committee, Arizona Senate. February 24, 2016.

Viewed in this light then HB 2023 is designed to increase security for early ballots, which comprise a significant share of the votes cast in the state. Unlike voting at the polling place, by-mail early voting can raise concerns related to chain-of-custody for the ballot. On the early ballot's return trip HB 2023 strengthens the chain-of-custody between the voter and the county recorder's office. Only the voter, a family or household member, or caregiver can transmit the voted ballot in-person or via the mail. Other individuals or groups are no longer permitted to be involved in this step of the early voting process. Limiting the method of transmittal to the voter or a trusted individual acts to strengthen the chain-of-custody, thereby ensuring that a voter's early ballot makes it to election authorities in the same state as it left the voter's hand.

Professor Lichtman reports that Arizona legislators were unable to *offer a single example of voter fraud or abuse committed through the collection and delivery of early-voted ballots*.[36] Fraud prevention measures, however, do not have to be justified solely on the grounds that fraud is present and has been proven. Anti-fraud measures can also be forward looking. Whether past election fraud related to absentee ballot collection in Arizona can be proven then does not prevent the State Legislature from implementing changes in the election code designed to prevent future instances of fraud. Even in the absence of evidence for election fraud the U.S. Supreme Court has concluded in *Crawford et al. v. Marion County Election Board* that the states should be able to implement reasonable requirements to safeguard against future occurrences of voter fraud.[37] In addition, Article VII, section 12 or the Arizona Constitution charges the Legislature with enacting *registration and other laws to secure the purity of elections and guard against abuses of the elective franchise*.[38] As explained in the previous paragraph, HB 2023 helps meet this goal.

I would also like to respond to Professor Lichtman's intentional discrimination analysis. According to the *Arlington Heights Factors* such an analysis should examine the question of discriminatory impact.[39] On this point Professor Lichtman's report references his analysis of Senate Factor 1 and the Expert Report of Professor Berman as well. The analysis Professor Lichtman presents on this point focuses almost solely on the history of discrimination in Arizona. Professor Berman's report as well examines election discrimination from an historic prospective. As I noted earlier, neither report provides any direct evidence concerning the manner in which HB 2023 will produce a disproportionate burden on minority voters (or Democratic voters) in Arizona. In short, making an inference concerning discriminatory impact should include providing evidence to that effect.  In the case of Professor Lichtman's intent analysis, this factor appears absent.

---

[36]Expert Report of Professor Allan J. Lichtman. *Feldman v. Arizona Secretary of State's Office* (16-01065-PHX-DLR). June 10, 2016. Page 16.

[37]In this case the Court upheld the constitutionality of Indiana's voter ID law, in part, based on this logic (553 U.S. 181, 128 S. Ct. 1610).

[38]Arizona Constitution (http://www.azleg.gov/Constitution.asp).

[39]See 429 U.S. 252 (1977).

In the *Arlington Heights* case the Court highlights several other factors that can be considered. One of these involves procedural deviations in the legislative process. Professor Lichtman's report makes the case that passage of HB 2023 was characterized by four procedural deviations. None of these occurrences he cites, however, deal with the passage of HB 2023 during the 2016 legislative session. The legislative process that characterized HB 2023 appears to have followed normal procedures from bill introduction through final passage. It was assigned to committees in both the House and Senate, the minority party was able to offer testimony, amendments were offered in both chambers (including amendments by Democrats), and the bill underwent the typical three readings in both the House and Senate. Once passed by the Arizona House the bill, following normal protocol, was then transmitted to the Senate. The first reading in the House, where HB 2023 was introduced, occurred on January 11, 2016. The final legislative action related to the bill involved the floor vote in the Senate on March 9, 2016. So, about two months elapsed between introduction and passage. It should be noted as well that this was not a last minute effort—the Arizona Legislature adjourned on May 7, 2016.[40]

Professor Lichtman's intent analysis also examines contemporary statements made by legislators concerning HB 2023.[41] I have examined the record as well and in my opinion it is clear that majority legislators offer a number of non-discriminatory justifications for passage of HB 2023. Bill sponsor Representative Michelle Ugenti-Rita made it clear that the intent of the bill is about *maintaining and protecting the integrity* of the process and that this includes *all voters*, regardless of party affiliation.[42] Representative Mesnard likewise stated, *this bill is about maintaining the integrity of the elections process.*[43] Speaking on the House floor, Representative Montenegro also notes that HB 2023 is *about elections integrity.*[44] In reference to HB 2023 other legislators also mention ballot chain-of-custody,[45] voter confidence and trust in government,[46] and ballot security.[47] In summary, contrary to the conclusions proffered in Professor Lichtman's report on this point, there appear to be quite a few statements made by legislators that justify the reasoning behind HB 2023 on a number of non-discriminatory grounds.

---

[40] See Bill Status Overview of HB 2023 at:
http://www.azleg.gov/DocumentsForBill.asp?Bill_Number=HB2023&Session_ID=115.
[41] See Section III of this report which examines in-depth the degree to which HB 2023 conforms to other states. Professor Lichtman raises this issue in Section IV.d. of his report.
[42] Testimony of Rep. Ugenti-Rita. Elections Committee, Arizona House of Representatives. January 25, 2016.
[43] Testimony of Rep. J.D. Mesnard. Floor Session, Arizona House of Representatives. February 4, 2016.
[44] Testimony of Rep. Steve Montenegro. Floor Session, Arizona House of Representatives. February 4, 2016.
[45] Testimony of Rep. Bob Thorpe. Floor Session, Arizona House of Representatives. February 4, 2016.
[46] Testimony of Rep. Steve Montenegro. Floor Session, Arizona House of Representatives. February 4, 2016 and Testimony of Rep. J.D. Mesnard. Floor Session, Arizona House of Representatives. February 4, 2016.
[47] Testimony of Rep. Vince Leach. Floor Session, Arizona House of Representatives. February 4, 2016.

## VII. OVERALL CONCLUSIONS

In my opinion, the State of Arizona provides voters with a highly convenient election scheme. Electors can vote using one of three methods: early by-mail, early in-person, or at their precinct on election-day. At issue in this case is HB 2023, which placed limits on who may return a voted early ballot. By statute, return is now limited to the voter, family member, household member, or a caregiver. It should be noted that HB 2023 did not alter any other component of the procedures that govern early voting (or election-day voting) in Arizona.

In this report I have analyzed and responded to the opinions of Professors Berman and Lichtman as they relate specifically to HB 2023. These reports reach the conclusion that HB 2023 will disproportionately impact the ability of minority (Berman and Lichtman) and Democratic (Lichtman) voters to participate in the political process. Neither expert, however, provides any empirical test to verify this claim. Having failed to establish a causal linkage that HB 2023 will negatively affect minority voting in Arizona, I disagree with Professor Lichtman's analysis of additional elements (i.e. Senate Factors) in regard to this issue. Further, I also disagree with Professor Lichtman's conclusion that H.B. 2023 was passed with the intent to discriminate against racial minorities in Arizona.

Professor Lichtman asserts that HB 2023 places Arizona outside the mainstream of most states in regard to the manner in which early (absentee) ballots may be returned. After performing my own comparative state analysis on the question of (early) absentee ballot procedures, I have reached a different conclusion. HB 2023 places Arizona with a majority of states that do regulate the return of early (absentee) ballots. As well, other states have similar receipt deadlines and impose comparable criminal penalties for violators.

In summary, I can think of no reason that would lead me to believe that the election change under challenge in this case will have a detrimental impact on the ability of Arizona voters to cast a ballot in the 2016 presidential election, including minority voters.

## VIII. DECLARATION

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on July 15, 2016.

_____

M.V. (Trey) Hood III
Department of Political Science
School of Public and International Affairs
The University of Georgia
104 Baldwin Hall
Athens, GA 30602
Phone: (706) 583-0554
FAX: (706) 542-4421
E-mail: th@uga.edu

19

Table A. State Comparison of Absentee Ballot Return Provisions, 2016

| State | Excuse Required | Prohibition on Collection | Who Can Return an Absentee Ballot? | Applicable Statutes |
|---|---|---|---|---|
| Alabama[1] | Yes | Yes | Returned by voter in person or via mail. A designee can be used only in case of medical emergency. | Alabama Code § 17-11-18 |
| Alaska[2] | No | No | Can be returned by mail or electronically. Return by someone other than the voter is not specifically prohibited. | Alaska § 15.20.081 |
| Arizona[3] | No | Yes | Returned by voter in person or via mail. Can also be returned by election official; U.S. postal worker; family member; household member; or caregiver. | A.R.S. § 16-1005 |
| Arkansas[4] | Yes | Yes | Returned by voter in person or via mail. A designated bearer can be used for medical reasons. Bulk returns prohibited except from residential care facilities. | Arkansas Code § 7-5-403 and § 7-5-411 |
| California[5] | No | Yes | Returned by voter in person or via mail. Can also be returned by family member person residing in same household. Provisions also allow ill or disabled voters to designate, in writing, an authorized representative to return their absentee ballot. | California Election Code § 3017, § 3021, and § 18403 |

---

[1] "Absentee Voting Information." Alabama Secretary of State: (https://www.alabamavotes.gov/AbsenteeVotingInfo.aspx?m=voters and http://18jc.alacourt.gov/absenteerules.aspx).

[2] "Absentee Voting." State of Alaska, Division of Elections: (https://www.elections.alaska.gov/vi_ea_ev_ip.php).

[3] "Voting in this Election." Arizona Secretary of State: (http://www.azsos.gov/elections/voting-election).

[4] "Absentee Voting." Arkansas Secretary of State: (http://www.sos.arkansas.gov/elections/pages/absenteevoting.aspx).

[5] "Voting by Mail." California Secretary of State: (http://www.sos.ca.gov/elections/voter-registration/vote-mail/#vote-by-mail).

| | | | | |
|---|---|---|---|---|
| Colorado[6] | No | Yes | Colorado is a vote-by-mail state. Returned by voter in person or via mail. A voter may authorize another individual to return their ballot. Outside of authorized election officials, no individual can collect more than 10 ballots per election. | C.R.S.A. § 1-7.5-107 |
| Connecticut[7] | Yes | Yes | Returned by voter in person or via mail. A designee can also be used for medical reasons. Ballots can also be returned by immediate family members. | Connecticut Election Code Ch. 145 Sec. 9-140b |
| Delaware[8] | Yes | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | Delaware Code Title 15, Ch. 55 § 507 |
| Florida[9] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | Fla. Stat. § 101.65 |
| Georgia[10] | No | Yes | Returned by voter in person or via mail. Voters with a physical disability may have ballot returned by immediate family or a person residing in the same household. | Georgia § 21-2-385. |
| Hawaii[11] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | Hawaii § 15-9 |
| Idaho[12] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | Idaho § 34-1105 |
| Illinois[13] | No | No | Returned by voter in person or via mail. A voter | 10 ILCS 5/19-6 |

---

[6]"Voting by Mail FAQs." Colorado Secretary of State: (http://www.sos.state.co.us/pubs/elections/FAQs/VotingByMailFAQ.html).

[7]"Absentee Voting." Connecticut Secretary of State: (http://ct.gov/sots/cwp/view.asp?a=3179&q=533084).

[8]"Absentee Voting." Delaware State Election Commissioner: (http://elections.delaware.gov/services/voter/absentee/citizen.shtml).

[9]"Vote-by-Mail." Florida Department of State: (http://dos.myflorida.com/elections/for-voters/voting/vote-by-mail/).

[10]"Absentee Voting in Georgia." Georgia Secretary of State: (http://sos.ga.gov/index.php/Elections/absentee_voting_in_georgia).

[11]"Voting by Mail." Hawaii Office of Elections: (http://elections.hawaii.gov/frequently-asked-questions/voting-by-mail/).

[12]"Absentee Registration and Voting." Idaho Secretary of State: (http://www.idahovotes.gov/absentee.shtml).

| | | | may authorize another individual to return their ballot. | |
|---|---|---|---|---|
| Indiana[14] | Yes | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family members. Return by other individuals is prohibited. | IC 3-11-10-1 |
| Iowa[15] | No | No | Returned by voter in person or via mail. A voter may authorize another individual to return their ballot. | Iowa 53.17 |
| Kansas[16] | No | No | Returned by voter in person or via mail. A voter may authorize, in writing, another individual to return their ballot. | Kansas 25-1124 and 25-1128 |
| Kentucky[17] | Yes | No | Returned by voter through mail. Return by someone other than the voter is not specifically prohibited. | Kentucky 117.086 |
| Louisiana[18] | Yes | Yes | Returned by voter in person or via mail. A voter may authorize another individual to return their ballot, but outside of immediate family a designee can only return one ballot. | Louisiana RS 18 § 1308 |

[13]"Voting by Mail in Illinois." Illinois State Board of Elections: (https://www.elections.il.gov/Downloads/ElectionInformation/PDF/votebymail.pdf).

[14]"Absentee Voting." Indiana Secretary of State: (http://www.in.gov/sos/elections/2402.htm).

[15]"Absentee Voting by Mail." Iowa Secretary of State: (https://sos.iowa.gov/elections/electioninfo/absenteemail.html).

[16]"Advance Voting." Kansas Secretary of State: (http://www.kssos.org/elections/elections_registration_voting.html).

[17]"Absentee Voter Information." Kentucky State Board of Elections: (http://elect.ky.gov/voterinfo/pages/absenteevoterinformation.aspx).

[18]"Vote by Mail." Louisiana Secretary of State: (http://www.sos.la.gov/electionsandvoting/vote/votebymail/pages/default.aspx).

| | | | | |
|---|---|---|---|---|
| Maine[19] | No | Yes | Returned by voter in person or via mail. A voter may authorize another individual (outside of immediate family) to return their ballot. This individual must be the same individual who was designated in writing to pick up the ballot on behalf of the voter. An individual designated as an agent can only return up to five absentee ballots. | Maine 21A § 753-A, § 753-B, and § 754-A |
| Maryland[20] | No | No | Returned by voter in person or via mail. A voter may authorize an agent to return their ballot. | Maryland § 9-307 |
| Massachusetts[21] | Yes | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family members. | Massachusetts Ch. 54 § 92 |
| Michigan[22] | Yes | Yes | Returned by voter in person or via mail. Ballots can also be returned family members, someone residing in same household, or election officials. Return by other individuals is prohibited. | Michigan § 168.764a |
| Minnesota[23] | No | Yes | Returned by voter in person or via mail. Voters may allow an agent to return their ballot. Agents can only act on behalf of three other voters per election cycle. Voters in specific categories (nursing homes) may authorize an agent to pick up and return their ballot. This service requires completion of a form. | Minnesota § 203B.08 and § 203B.11 |
| Mississippi[24] | Yes | Yes | Returned by voter by mail. Absentee ballots cannot be returned in person. | Miss. Code Ann. § 23-15-719 |

---

[19]"Absentee Voting Guide." Maine Department of the Secretary of State: (http://www.maine.gov/sos/cec/elec/voter-info/absenteeguide.html).

[20]"Absentee Voting." Maryland State Board of Elections: (http://www.elections.state.md.us/voting/absentee.html).

[21]"Absentee Ballot Information." Secretary of the Commonwealth of Massachusetts: (https://www.sec.state.ma.us/ele/eleifv/howabs.htm).

[22]"What You Need to Know about Absentee Voting." Michigan Department of State: (http://www.michigan.gov/sos/0,8611,7-127-1633-21037--,00.html).

[23]"Vote Early by Mail." Minnesota Secretary of State: (http://www.sos.state.mn.us/elections-voting/other-ways-to-vote/vote-early-by-mail/).

[24]"2016 County Election Handbook." Mississippi Secretary of State: (http://www.sos.ms.gov/Elections-Voting/Documents/2016%20County%20Election%20Handbook%20REV.pdf).

| Missouri[25] | Yes | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family members. Return by other individuals is not allowed. | Missouri §115.291 |
|---|---|---|---|---|
| Montana[26] | No | No | Returned by voter in person or via mail. A voter may authorize an agent to return their ballot. | M.C.A § 13-19-306 |
| Nebraska[27] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not prohibited, nor is bulk collection. | Nebraska  § 32-949 |
| Nevada[28] | No | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family members. Return by anyone except voter or immediate family is specifically prohibited. The only exception involves the use of a designee for an emergency (hospitalization). | NRS § 293.330 and § 293.316 |
| New Hampshire[29] | No | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family members. | New Hampshire RSA § 657:17 |
| New Jersey[30] | No | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family members. A voter may authorize a bearer to return their ballot, but an individual may not act as a bearer for more than three voters in an election-cycle. | New Jersey Statutes § 19:63-27 and § 19:63-16 |
| New Mexico[31] | No | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family or a | New Mexico § 1-6-9, § 1-6-10.1, and § 1-20-7 |

---

[25]"How to Vote." Missouri Secretary of State: (http://www.sos.mo.gov/elections/goVoteMissouri/howtovote#absentee).

[26]"How to Vote by Absentee Ballot." Montana Secretary of State: (http://sos.mt.gov/elections/Absentee/index.asp).

[27]"Absentee Voting." Nebraska Secretary of State. (http://www.sos.ne.gov/elec/absentee_page.html).

[28]"Absentee Voting." Nevada Secretary of State. (http://nvsos.gov/index.aspx?page=77).

[29]"How to Register to Vote in New Hampshire." New Hampshire Secretary of State: (http://sos.nh.gov/nhsos_content.aspx?id=26190).

[30]"Vote by Mail Ballot." New Jersey Department of State: (http://www.state.nj.us/state/elections/voting-information-vote-by-mail.html).

[31]"Absentee and Early Voting." New Mexico Secretary of State: (http://www.sos.state.nm.us/Voter_Information/Absentee_and_Early_Voting.aspx).

| | | | caregiver. | |
|---|---|---|---|---|
| New York[32] | Yes | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | New York § 8-410 and § 8-412 |
| North Carolina[33] | No | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family. | North Carolina § 163-231 |
| North Dakota[34] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | North Dakota § 16.1-07-09 |
| Ohio[35] | No | Yes | Returned by voter in person or via mail. Ballots can also be returned by immediate family. Return by other individuals is not allowed. | Ohio § 3509.05 |
| Oklahoma[36] | No | Yes | Ballot must be returned by voter through mail. No provision located for in person return except in the case of an emergency absentee request where a voter may designate an agent to return their ballot. | 26 OK Stat § 14-108 and § 14-115.1 |
| Oregon[37] | No | No | Oregon is a vote-by-mail state. Returned by voter in person or via mail. Return by someone other than the voter is not prohibited, nor is bulk collection. | ORS § 254.470 |

---

[32]"Absentee Voting." New York Board of Elections: (http://www.elections.ny.gov/VotingAbsentee.html).

[33]"Absentee Voting by Mail." North Carolina State Board of Elections: (https://www.ncsbe.gov/absentee-voting-mail).

[34]"Absentee Voting." North Dakota Secretary of State: (https://vip.sos.nd.gov/pdfs/Portals/Voting-MailBallotAbsentee.pdf).

[35]"Voting Absentee by Mail." Ohio Secretary of State: (http://www.sos.state.oh.us/SOS/elections/Voters/votingAbsenteeByMail.asp).

[36]"Absentee Voting in Oklahoma." Oklahoma State Election Board: (https://www.ok.gov/elections/Voter_Info/Absentee_Voting/).

[37]"Voting in Oregon." Oregon Secretary of State: (http://sos.oregon.gov/voting/Pages/voteinor.aspx).

| Pennsylvania[38] | Yes | Yes | Returned by voter in person or via mail. A disabled absentee voter or those qualified to vote an alternative ballot may designate an individual to return their ballot. An individual may serve as a designee for only one voter. | 25 P.S. § 3146.6 and 25 P.S. § 3146.6a |
|---|---|---|---|---|
| Rhode Island[39] | Yes | No | Returned by voter in person or via mail. Return by someone other than the voter is not prohibited, nor is bulk collection. | Rhode Island § 17-20-1 |
| South Carolina[40] | Yes | Yes | Returned by voter in person or via mail. A voter can designate a representative to return their ballot. In such cases ballot must be accompanied by an authorization form. | South Carolina § 7-15-310 and § 7-15-385 |
| South Dakota[41] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not prohibited, nor is bulk collection. In the case of illness or disability a voter can designate an authorized messenger to return their ballot. Authorization must be in writing. If an individual is an authorized messenger for more than one voter they must notify election officials. | South Dakota § 12-19-7, § 12-19-2.1, and § 12-19-2.2 |
| Tennessee[42] | Yes | Yes | Ballot must be returned by voter through mail. No provision located for in person return. | Tennessee § 2-6-202 |

---

[38]"Voting by Absentee Ballot." Pennsylvania Department of State: (http://www.votespa.com/en-us/voting-and-elections/types-of-voting/Pages/Absentee-Ballot.aspx).
[39]"Vote by Mail." Rhode Department of State: (http://www.sos.ri.gov/divisions/elections/Voters/vote-by-mail).
[40]"Absentee Voting." South Carolina State Election Commission: (http://www.scvotes.org/2009/10/15/absentee_voting).
[41]"Absentee Voting." South Dakota Secretary of State: (https://sdsos.gov/elections-voting/voting/absentee-voting.aspx).
[42]"Absentee Voting." Tennessee Secretary of State: (http://sos.tn.gov/products/elections/absentee-voting).

| | | | | |
|---|---|---|---|---|
| Texas[43] | Yes | Yes | Returned by voter in person or via mail. Only the voter can return their ballot in person. Another individual may place the voter's absentee ballot in the mail, but they must record certain information to this effect on the absentee ballot carrier envelope. | Texas § 86.006 and § 86.0051 |
| Utah[44] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | Utah § 20A-3-310 |
| Vermont[45] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not prohibited, nor is bulk collection. If an emergency absentee ballot is issued due to illness or disability then the ballot must be delivered and returned via justice of the peace. | 17 V.S.A. § 2540 |
| Virginia[46] | Yes | Yes | Returned by voter in person or via mail. A voter cannot designate another individual to return their ballot. Only in the case of an emergency absentee application can a voter designate a representative to receive and deliver the ballot. An authorization form to use a representative is required. | Virginia § 24.2-707 and § 24.2-705 |
| Washington[47] | No | No | Washington is a vote-by-mail state. Ballots can be returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | RCW § 29A.40.091 |
| West Virginia[48] | Yes | Yes | Returned by voter in person or via mail. For a given election, no individual may deliver more | West Virginia § 3-3-5 |

[43]"Helpful Hints on Voting Early by Mail." Texas Secretary of State: (http://www.votetexas.gov/voting/when/#helpful-hints-on-voting-early-by-mail).
[44]"Absentee Voting Information." Utah Lieutenant Governor: (https://vote.utah.gov/vote/menu/absentee.html).
[45]"Absentee Voting." Vermont Secretary of State: (https://www.sec.state.vt.us/elections/voters/absentee-voting.aspx).
[46]"Absentee Voting." Virginia Department of Elections: (http://elections.virginia.gov/casting-a-ballot/absentee-voting/).
[47]"Frequently Asked Questions on Voting by Mail." Washington Secretary of State: (https://www.sos.wa.gov/elections/faq_vote_by_mail.aspx).
[48]"Regular Absentee by Mail." West Virginia Secretary of State: (http://www.sos.wv.gov/elections/Vote/absentee/Pages/Absentee-by-Mail.aspx).

| | | | than two absentee ballots in person. | |
|---|---|---|---|---|
| Wisconsin[49] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | Wisconsin § 6.87 |
| Wyoming[50] | No | No | Returned by voter in person or via mail. Return by someone other than the voter is not specifically prohibited, nor is bulk collection. | Wyoming § 22-9-113 |

---

[49]"I Want to Vote Absentee." Wisconsin Government Accountability Board: (http://www.gab.wi.gov/voters/absentee).

[50]"Absentee Voting." Wyoming Secretary of State: (http://soswy.state.wy.us/Elections/AbsenteeVoting.aspx).

Curriculum Vitae
(July 2016)

M.V. (Trey) Hood III

**Contact Information:**

Department of Political Science
School of Public and International Affairs
104 Baldwin Hall
The University of Georgia
Athens, GA 30602

Office Phone: (706) 583-0554
Dept. Phone: (706) 542-2057
FAX: (706) 542-4421
E-mail: th@uga.edu

**Academic Positions**

University of Georgia
    Professor, 2013-present
        Director, SPIA Survey Research Center, 2016-present.
        Director of Graduate Studies, 2011-2016.
    Associate Professor, 2005-2013
    Assistant Professor, 1999-2005.
Texas Tech University
    Visiting Assistant Professor, 1997-1999.

**Education**

| | | | |
|---|---|---|---|
| Ph.D. | Political Science | Texas Tech University | 1997 |
| M.A. | Political Science | Baylor University | 1993 |
| B.S. | Political Science | Texas A&M University | 1991 |

**Peer-Reviewed Books**

*The Rational Southerner: Black Mobilization, Republican Growth, and the Partisan Transformation of the American South*. 2012. New York: Oxford University Press. (Quentin Kidd and Irwin L. Morris, co-authors). [Softcover version in 2014 with new Epilogue]

**Peer-Reviewed Publications**

"Race, Class, Religion and the Southern Party System: A Field Report from Dixie." 2016. *The Forum* 14(1): 83-96.

"*Black Votes Count*: The 2014 Republican Senate Nomination in Mississippi." 2016. *Social Science Quarterly*. (Seth C. McKee, coauthor).

i

"Sunshine State Dilemma: Voting for the 2014 Governor of Florida." 2015. *Electoral Studies* 40: 293-299. (Seth C. McKee, co-author).

"Tea Leaves and Southern Politics: Explaining Tea Party Support Among Southern Republicans." 2015. *Social Science Quarterly* 96(4): 923-940. (Quentin Kidd and Irwin L. Morris, co-authors).

"True Colors: White Conservative Support for Minority Republican Candidates." 2015. *Public Opinion Quarterly* 79(1): 28-52. (Seth C. McKee, co-author).

"Race and the Tea Party in the Old Dominion: Split-Ticket Voting in the 2013 Virginia Elections." 2015. *PS: Political Science and Politics* 48(1):107-114. (Quentin Kidd and Irwin L. Morris, co-authors).

"The Damnedest Mess: An Empirical Evaluation of the 1966 Georgia Gubernatorial Election." Forthcoming 2014. *Social Science Quarterly* 96(1):104-118. (Charles S. Bullock, III, co-author).

"Candidates, Competition, and the Partisan Press: Congressional Elections in the Early Antebellum Era." 2014. *American Politics Research* 42(5):670-783. (Jamie L. Carson, co-author).
[Winner of the 2014 Hahn-Sigelman Prize]

"Strategic Voting in a U.S. Senate Election." 2013. *Political Behavior* 35(4):729-751. (Seth C. McKee, co-author).

"Unwelcome Constituents: Redistricting and Countervailing Partisan Tides." 2013. *State Politics and Policy Quarterly* 13(2):203-224. (Seth C. McKee, co-author).

"The Tea Party, Sarah Palin, and the 2010 Congressional Elections: The Aftermath of the Election of Barack Obama." 2012. *Social Science Quarterly* 93(5):1424-1435. (Charles S. Bullock, III, co-author).

"Much Ado About Nothing?: An Empirical Assessment of the Georgia Voter Identification Statute." 2012. *State Politics and Policy Quarterly* 12(4):394-314.  (Charles S. Bullock, III, co-author).

"Achieving Validation: Barack Obama and Black Turnout in 2008." 2012. *State Politics and Policy Quarterly* 12:3-22. (Seth C. McKee and David Hill, co-authors).

"They Just Don't Vote Like They Used To: A Methodology to Empirically Assess Election Fraud." 2012. *Social Science Quarterly* 93:76-94. (William Gillespie, co-author).

"An Examination of Efforts to Encourage the Incidence of Early In-Person Voting in Georgia, 2008." 2011. *Election Law Journal* 10:103-113. (Charles S. Bullock, III, co-

author).

"What Made Carolina Blue? In-migration and the 2008 North Carolina Presidential Vote."
2010. *American Politics Research* 38:266-302. (Seth C. McKee, co-author).

"Stranger Danger: Redistricting, Incumbent Recognition, and Vote Choice." 2010.
*Social Science Quarterly* 91:344-358. (Seth C. McKee, co-author).

"Trying to Thread the Needle: The Effects of Redistricting in a Georgia Congressional District."
2009. *PS: Political Science and Politics* 42:679-687. (Seth C. McKee, co-author).

"Citizen, Defend Thyself: An Individual-Level Analysis of Concealed-Weapon Permit Holders."
2009. *Criminal Justice Studies* 22:73-89. (Grant W. Neeley, co-author).

"Two Sides of the Same Coin?: Employing Granger Causality Tests in a Time Series Cross-
Section Framework." 2008. *Political Analysis* 16:324-344. (Quentin Kidd and Irwin L.
Morris, co-authors).

"Worth a Thousand Words? : An Analysis of Georgia's Voter Identification Statute."
2008. *American Politics Research* 36:555-579. (Charles S. Bullock, III, co-author).

"Gerrymandering on Georgia's Mind: The Effects of Redistricting on Vote Choice in the 2006
Midterm Election." 2008. *Social Science Quarterly* 89:60-77 (Seth C. McKee, co-
author).

"Examining Methods for Identifying Latino Voters." 2007. *Election Law Journal* 6:202-208.
(Charles S. Bullock, III, co-author).

"A Mile-Wide Gap: The Evolution of Hispanic Political Emergence in the Deep South."
2006.  *Social Science Quarterly* 87:1117-1135. (Charles S. Bullock, III, co-author).

"Punch Cards, Jim Crow, and Al Gore:  Explaining Voter Trust in the Electoral System in
Georgia, 2000." 2005. *State Politics and Policy Quarterly* 5:283-294. (Charles S. Bullock,
III and Richard Clark, co-authors).

"When Southern Symbolism Meets the Pork Barrel: Opportunity for Executive Leadership."
2005. *Social Science Quarterly* 86:69-86. (Charles S. Bullock, III, co-author).

"The Reintroduction of the *Elephas maximus* to the Southern United States: The Rise of
Republican State Parties, 1960-2000." 2004.  *American Politics Research* 31:68-101.
(Quentin Kidd and Irwin Morris, co-authors).

"One Person, [No Vote; One Vote; Two Votes…]: Voting Methods, Ballot Types, and
Undervote Frequency in the 2000 Presidential Election." 2002. *Social Science Quarterly*
83:981-993. (Charles S. Bullock, III, co-author).

"On the Prospect of Linking Religious Right Identification with Political Behavior:

Panacea or Snipe Hunt?" 2002. *Journal for the Scientific Study of Religion* 41:697-710. (Mark C. Smith, co-author).

"The *Key* Issue: Constituency Effects and Southern Senators' Roll-Call Voting on Civil Rights." 2001. *Legislative Studies Quarterly* 26: 599-621. (Quentin Kidd and Irwin Morris, co-authors).

"Packin' in the Hood?: Examining Assumptions Underlying Concealed-Handgun Research." 2000. *Social Science Quarterly* 81:523-537. (Grant Neeley, co-author).

"Brother, Can You Spare a Dime? Racial/Ethnic Context and the Anglo Vote on Proposition 187." 2000. *Social Science Quarterly* 81:194-206. (Irwin Morris, co-author).

"Penny Pinching or Politics?  The Line-Item Veto and Military Construction Appropriations." 1999. *Political Research Quarterly* 52:753-766. (Irwin Morris and Grant Neeley, co-authors).

"Of Byrds[s] and Bumpers: Using Democratic Senators to Analyze Political Change in the South, 1960-1995." 1999. *American Journal of Political Science* 43:465-487. (Quentin Kidd and Irwin Morris, co-authors).

"Bugs in the NRC's Doctoral Program Evaluation Data: From Mites to Hissing Cockroaches." 1998. *PS* 31:829-835. (Nelson Dometrius, Quentin Kidd, and Kurt Shirkey, co-authors).

"Boll Weevils and Roll-Call Voting: A Study in Time and Space." 1998. *Legislative Studies Quarterly* 23:245-269.  (Irwin Morris, co-author).

"Give Us Your Tired, Your Poor,...But Make Sure They Have a Green Card: The Effects of Documented and Undocumented Migrant Context on Anglo Opinion Towards Immigration." 1998. *Political Behavior* 20:1-16. (Irwin Morris, co-author).

"¡Quedate o Vente!: Uncovering the Determinants of Hispanic Public Opinion Towards Immigration." 1997. *Political Research Quarterly* 50:627-647. (Irwin Morris and Kurt Shirkey, co-authors).

"¿Amigo o Enemigo?: Context, Attitudes, and Anglo Public Opinion toward Immigration." 1997. *Social Science Quarterly* 78: 309-323. (Irwin Morris, co-author).


## Invited Publications

"Race and the Ideological Transformation of the Democratic Party: Evidence from the Bayou State." 2005. *American Review of Politics* 25:67-78.


## Book Chapters

"The Participatory Consequences of Florida Redistricting." 2015. In *Jigsaw Puzzle*

*Politics in the Sunshine State*, Seth C. McKee, editor. Gainesville, FL: University of Florida Press. (Danny Hayes and Seth C. McKee, co-authors).

"Texas: Political Change by the Numbers." 2014. In *The New Politics of the Old South, 5th ed.*, Charles S. Bullock, III and Mark J. Rozell, editors. New York: Rowman and Littlefield Publishers, Inc. (Seth C. McKee, co-author).

"The Republican Party in the South." 2012. In *Oxford Handbook of Southern Politics*, Charles S. Bullock, III and Mark J. Rozell, editors. New York: Oxford University Press. (Quentin Kidd and Irwin Morris, co-authors).

"The Reintroduction of the *Elephas maximus* to the Southern United States: The Rise of Republican State Parties, 1960-2000." 2010. In *Controversies in Voting Behavior*, 5th ed., David Kimball, Richard G. Niemi, and Herbert F. Weisberg, editors. Washington, DC: CQ Press. (Quentin Kidd and Irwin Morris, co-authors).
[Reprint of 2004 *APR* article with Epilogue containing updated analysis and other original material.]

"The Texas Governors." 1997. In *Texas Policy and Politics*, Mark Somma, editor. Needham Heights, MA: Simon & Schuster.


## Other Publications

"Provisionally Admitted College Students: Do They Belong in a Research University?" 1998. In *Developmental Education: Preparing Successful College Students*, Jeanne Higbee and Patricia L. Dwinell, editors. Columbia, SC: National Resource Center for the First-Year Experience & Students in Transition (Don Garnett, co-author).

NES Technical Report No. 52. 1994. "The Reliability, Validity, and Scalability of the Indicators of Gender Role Beliefs and Feminism in the 1992 American National Election Study: A Report to the ANES Board of Overseers." (Sue Tolleson-Rinehart, Douglas R. Davenport, Terry L. Gilmour, William R. Moore, Kurt Shirkey, co-authors).


## Grant-funded Research (UGA)

Co-Principal Investigator. "An Examination of Non-Precinct Voting in the State of Georgia." Budget: $47,000. October 2008-July 2009. (with Charles S. Bullock, III). Funded by the Pew Charitable Trust.

Co-Principal Investigator. "The Best Judges Money Can Buy?: Campaign Contributions and the Texas Supreme Court." (SES-0615838) Total Budget: $166,576; UGA Share: $69,974. September 2006-August 2008. (with Craig F. Emmert). Funded by the National Science Foundation. REU Supplemental Award (2008-2009): $6,300.

Principal Investigator. "Payola Justice or Just Plain 'Ole Politics Texas-Style?: Campaign Finance and the Texas Supreme Court." $5,175. January 2000-Januray 2001. Funded by the University of Georgia Research Foundation, Inc.

## Curriculum Grants (UGA)

Learning Technology Grant: "Converting Ideas Into Effective Action: An Interactive Computer and Classroom Simulation for the Teaching of American Politics." $40,000. January-December 2004. (with Loch Johnson). Funded by the Office of Instructional Support and Technology, University of Georgia.

## Dissertation

"Capturing Bubba's Heart and Mind: Group Consciousness and the Political Identification of Southern White Males, 1972-1994."

Chair: Professor Sue Tolleson-Rinehart

## Papers and Activities at Professional Meetings

"Racial Resentment and the Tea Party: Taking Regional Differences Seriously." (with Quentin Kidd an Irwin L. Morris). 2015. Poster presented at the Annual Meeting of the American Political Science Association. San Francisco, CA.

"Race and the Tea Party in the Palmetto State: Tim Scott, Nikki Haley, Bakari Sellers and the 2014 Elections in South Carolina." (with Quentin Kidd an Irwin L. Morris). 2015. Presented at the Annual Meeting of the Southern Political Science Association. New Orleans, LA.

Participant. Roundtable on the 2014 Midterm Elections in the Deep South. Annual Meeting of the Southern Political Science Association. New Orleans, LA.

"Race and the Tea Party in the Old Dominion: Split-Ticket Voting in the 2013 Virginia Elections." (with Irwin L. Morris and Quentin Kidd). 2014. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Race and the Tea Party in the Old Dominion: Down-Ticket Voting and Roll-Off in the 2013 Virginia Elections." (with Irwin L. Morris and Quentin Kidd). 2014. Paper presented at the Annual Meeting of the Southern Political Science Association. New Orleans, LA.

"Tea Leaves and Southern Politics: Explaining Tea Party Support Among Southern Republicans." (with Irwin L. Morris and Quentin Kidd). 2013. Paper presented at the Annual Meeting of the Southern Political Science Association. Orlando, FL.

"The Tea Party and the Southern GOP." (with Irwin L. Morris and Quentin Kidd). 2012. Research presented at the Effects of the 2012 Elections Conference. Athens, GA.

"Black Mobilization in the Modern South: When Does Empowerment Matter?" (with Irwin L. Morris and Quentin Kidd). 2012. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"The Legislature Chooses a Governor: Georgia's 1966 Gubernatorial Election." (with Charles S. Bullock, III). 2012. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"One-Stop to Victory? North Carolina, Obama, and the 2008 General Election." (with Justin Bullock, Paul Carlsen, Perry Joiner, and Mark Owens). 2011. Paper presented at the Annual Meeting of the Southern Political Science Association. New Orleans.

"Redistricting and Turnout in Black and White." (with Seth C. McKee and Danny Hayes). 2011. Paper presented the Annual Meeting of the Midwest Political Science Association. Chicago, IL.

"One-Stop to Victory? North Carolina, Obama, and the 2008 General Election." (with Justin Bullock, Paul Carlsen, Perry Joiner, Jeni McDermott, and Mark Owens). 2011. Paper presented at the Annual Meeting of the Midwest Political Science Association Meeting. Chicago, IL.

"Strategic Voting in the 2010 Florida Senate Election." (with Seth C. McKee). 2011. Paper Presented at the Annual Meeting of the Florida Political Science Association. Jupiter, FL.

"The Republican Bottleneck: Congressional Emergence Patterns in a Changing South." (with Christian R. Grose and Seth C. McKee). Paper presented at the Annual Meeting of the Southern Political Science Association. New Orleans, LA.

"Capturing the Obama Effect: Black Turnout in Presidential Elections." (with David Hill and Seth C. McKee) 2010. Paper presented at the Annual Meeting of the Florida Political Science Association. Jacksonville, FL.

"The Republican Bottleneck: Congressional Emergence Patterns in a Changing South." (with Seth C. McKee and Christian R. Grose). 2010. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Black Mobilization and Republican Growth in the American South: The More Things Change the More They Stay the Same?" (with Quentin Kidd and Irwin L. Morris). 2010. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Unwelcome Constituents: Redistricting and Incumbent Vote Shares." (with Seth C. McKee). 2010. Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta, GA.

"Black Mobilization and Republican Growth in the American South: The More Things Change the More They Stay the Same?" (with Quentin Kidd and Irwin L. Morris). 2010. Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta, GA.

"The Impact of Efforts to Increase Early Voting in Georgia, 2008." (With Charles S. Bullock, III).  2009. Presentation made at the Annual Meeting of the Georgia Political Science Association. Callaway Gardens, GA.

"Encouraging Non-Precinct Voting in Georgia, 2008." (With Charles S. Bullock, III).  2009. Presentation made at the Time-Shifting The Vote Conference. Reed College, Portland, OR.

"What Made Carolina Blue? In-migration and the 2008 North Carolina Presidential Vote." (with Seth C. McKee). 2009. Paper presented at the Annual Meeting of the Florida Political Science Association. Orlando, FL.

"Swimming with the Tide: Redistricting and Voter Choice in the 2006 Midterm." (with Seth C. McKee). 2009. Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"The Effect of the Partisan Press on U.S. House Elections, 1800-1820." (with Jamie Carson). 2008. Paper presented at the Annual Meeting of the History of Congress Conference. Washington, D.C.

"Backward Mapping: Exploring Questions of Representation via Spatial Analysis of Historical Congressional Districts." (Michael Crespin). 2008. Paper presented at the Annual Meeting of the History of Congress Conference. Washington, D.C.

"The Effect of the Partisan Press on U.S. House Elections, 1800-1820." (with Jamie Carson). 2008. Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"The Rational Southerner: The Local Logic of Partisan Transformation in the South." (with Quentin Kidd and Irwin L. Morris). 2008. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Stranger Danger: The Influence of Redistricting on Candidate Recognition and Vote Choice." (with Seth C. McKee). 2008. Paper presented at the Annual Meeting of the Southern Political Science Association. New Orleans.

"Backward Mapping: Exploring Questions of Representation via Spatial Analysis of Historical Congressional Districts." (with Michael Crespin). 2007. Paper presented at the Annual Meeting of the American Political Science Association. Chicago.

"Worth a Thousand Words? : An Analysis of Georgia's Voter Identification Statute." (with

Charles S. Bullock, III). 2007. Paper presented at the Annual Meeting of the Southwestern Political Science Association. Albuquerque.

"Gerrymandering on Georgia's Mind: The Effects of Redistricting on Vote Choice in the 2006 Midterm Election." (with Seth C. McKee). 2007. Paper presented at the Annual Meeting of The Southern Political Science Association. New Orleans.

"Personalismo Politics: Partisanship, Presidential Popularity and 21st Century Southern Politics." (with Quentin Kidd and Irwin L. Morris). 2006. Paper presented at the Annual Meeting of the American Political Science Association. Philadelphia.

"Explaining Soft Money Transfers in State Gubernatorial Elections." (with William Gillespie and Troy Gibson). 2006. Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"Two Sides of the Same Coin?: A Panel Granger Analysis of Black Electoral Mobilization and GOP Growth in the South, 1960-2004." (with Quentin Kidd and Irwin L. Morris). 2006. Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC.

"Hispanic Political Emergence in the Deep South, 2000-2004." (With Charles S. Bullock, III). 2006. Paper presented at the Citadel Symposium on Southern Politics. Charleston.

"Black Mobilization and the Growth of Southern Republicanism: Two Sides of the Same Coin?" (with Quentin Kidd and Irwin L. Morris). 2006. Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"Exploring the Linkage Between Black Turnout and Down-Ticket Challenges to Black Incumbents." (With Troy M. Gibson). 2006. Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"Race and the Ideological Transformation of the Democratic Party: Evidence from the Bayou State." 2004. Paper presented at the Biennial Meeting of the Citadel Southern Politics Symposium. Charleston.

"Tracing the Evolution of Hispanic Political Emergence in the Deep South." 2004. (Charles S. Bullock, III).  Paper presented at the Biennial Meeting of the Citadel Southern Politics Symposium. Charleston.

"Much Ado about Something? Religious Right Status in American Politics." 2003. (With Mark C. Smith). Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"Tracking the Flow of Non-Federal Dollars in U. S. Senate Campaigns, 1992-2000." 2003.

(With Janna Deitz and William Gillespie). Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"PAC Cash and Votes: Can Money Rent a Vote?" 2002. (With William Gillespie). Paper presented at the Annual Meeting of the Southern Political Science Association. Savannah.

"What Can Gubernatorial Elections Teach Us About American Politics?: Exploiting and Underutilized Resource." 2002. (With Quentin Kidd and Irwin L. Morris). Paper presented at the Annual Meeting of the American Political Science Association. Boston.

"I Know I Voted, But I'm Not Sure It Got Counted." 2002. (With Charles S. Bullock, III and Richard Clark.  Paper presented at the Annual Meeting of the Southwestern Social Science Association. New Orleans.

"Race and Southern Gubernatorial Elections: A 50-Year Assessment." 2002. (With Quentin Kidd and Irwin Morris). Paper presented at the Biennial Southern Politics Symposium. Charleston, SC.

"Top-Down or Bottom-Up?: An Integrated Explanation of Two-Party Development in the South, 1960-2000." 2001. Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"Cash, Congress, and Trade: Did Campaign Contributions Influence Congressional Support for Most Favored Nation Status in China?" 2001. (With William Gillespie).  Paper presented at the Annual Meeting of the Southwestern Social Science Association.  Fort Worth.

"Key 50 Years Later: Understanding the Racial Dynamics of 21st Century Southern Politics" 2001. (With Quentin Kidd and Irwin Morris). Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"The VRA and Beyond: The Political Mobilization of African Americans in the Modern South." 2001.  (With Quentin Kidd and Irwin Morris). Paper presented at the Annual Meeting of the American Political Science Association. San Francisco.

"Payola Justice or Just Plain 'Ole Politics Texas Style?: Campaign Finance and the Texas Supreme Court." 2001.  (With Craig Emmert).  Paper presented at the Annual Meeting of the Midwest Political Science Association.  Chicago.

"The VRA and Beyond: The Political Mobilization of African Americans in the Modern South." 2000. (With Irwin Morris and Quentin Kidd). Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"Where Have All the Republicans Gone? A State-Level Study of Southern Republicanism." 1999. (With Irwin Morris and Quentin Kidd). Paper presented at the Annual Meeting of the Southern Political Science Association. Savannah.

"Elephants in Dixie: A State-Level Analysis of the Rise of the Republican Party in the Modern South." 1999. (With Irwin Morris and Quentin Kidd).  Paper presented at the Annual Meeting of the American Political Science Association. Atlanta.

"Stimulant to Turnout or Merely a Convenience?: Developing an Early Voter Profile."  1998. (With Quentin Kidd and Grant Neeley).  Paper presented at the Annual Meeting of the Southern Political Science Association. Atlanta.

"The Impact of the Texas Concealed Weapons Law on Crime Rates: A Policy Analysis for the City of Dallas, 1992-1997." 1998. (With Grant W. Neeley). Paper presented to the Annual Meeting of the Midwest Political Science Association. Chicago.

"Analyzing Anglo Voting on Proposition 187: Does Racial/Ethnic Context Really Matter?" 1997. (With Irwin Morris). Paper presented to the Annual Meeting of the Southern Political Science Association. Norfolk.

"Capturing Bubba's Heart and Mind: Group Consciousness and the Political Identification of Southern White Males, 1972-1994." 1997. Paper presented at the Annual Meeting of the Midwest Political Science Association. Chicago.

"Of Byrds[s] and Bumpers: A Pooled Cross-Sectional Study of the Roll-Call Voting Behavior of Democratic Senators from the South, 1960-1995." 1996. (With Quentin Kidd and Irwin Morris). Paper presented to the Annual Meeting of the Southern Political Science Association. Atlanta.

"Pest Control: Southern Politics and the Eradication of the Boll Weevil." 1996. (With Irwin Morris). Paper presented to the Annual Meeting of the American Political Science Association. San Francisco.

"Fit for the Greater Functions of Politics: Gender, Participation, and Political Knowledge." 1996. (With Terry Gilmour, Kurt Shirkey, and Sue Tolleson-Rinehart). Paper presented to the Annual Meeting of the Midwest Political Science Association. Chicago.

"¿Amigo o Enemigo?: Racial Context, Attitudes, and White Public Opinion on Immigration." 1996. (With Irwin Morris). Paper presented to the Annual Meeting of the Midwest Political Science Association. Chicago.

"¡Quedate o Vente!: Uncovering the Determinants of Hispanic Public Opinion Towards Immigration." 1996. (With Irwin Morris and Kurt Shirkey). Paper presented to the Annual Meeting of the Southwestern Political Science Association. Houston.

"Downs Meets the Boll Weevil: When Southern Democrats Turn Left." 1995. (With Irwin Morris). Paper presented to the Annual Meeting of the Southern Political Science Association. Tampa.

"¿Amigo o Enemigo?: Ideological Dispositions of Whites Residing in Heavily Hispanic Areas." 1995. (With Irwin Morris). Paper presented to the Annual Meeting of the Southern Political Science Association. Tampa.

Chair. Panel titled "Congress and Interest Groups in Institutional Settings." 1995. Annual Meeting of the Southwestern Political Science Association. Dallas.

"Death of the Boll Weevil?: The Decline of Conservative Democrats in the House." 1995. (With Kurt Shirkey). Paper presented to the Annual Meeting of the Southwestern Political Science Association. Dallas.

"Capturing Bubba's Heart and Mind: The Political Identification of Southern White Males." 1994.  (With Sue Tolleson-Rinehart). Paper presented to the Annual Meeting of the Southern Political Science Association. Atlanta.

**Other Professional Presentations**

"Much Adieu About Nothing?: An Empirical Assessment of Georgia's Voter Identification Statute." 2010. Presentation made to the Department of Political Science, Texas Tech University. Lubbock, TX.

"Report on the Aftermath of the 2010 Midterm Elections." 2010. Presentation made to the Oconee County Republican Party. Watkinsville, GA.

"Non-Precinct Voting in Georgia-A Survey of Voters from the 2008 Election." 2010. Presentation made to the Jeannette Rankin Foundation Program: The Life and Legacy of Jeannette Rankin: Championing Election Reform. Athens, GA.

"Non-Precinct Voting in Georgia, 2008." (With Charles S. Bullock, III). Presentation made at the Annual Meeting of the Georgia Election Officials Association. Savannah.

**Areas of Teaching Competence**

American Politics: Behavior and Institutions
Public Policy
Scope, Methods, Techniques

**Teaching Experience**

University of Georgia, 1999-present.
    Graduate Faculty, 2003-present.
    Provisional Graduate Faculty, 2000-2003.
    Distance Education Faculty, 2000-present.

Texas Tech University, 1993-1999.
    Visiting Faculty, 1997-1999.

Graduate Faculty, 1998-1999.
Extended Studies Faculty, 1997-1999.
Teaching Assistant, 1993-1997.

Courses Taught:
Undergraduate:
American Government and Politics, American Government and Politics (Honors), Legislative Process, Introduction to Political Analysis, American Public Policy, Political Psychology, Advanced Simulations in American Politics (Honors), Southern Politics, Southern Politics (Honors)
Graduate:
Election Administration and Related Issues, Political Parties and Interest Groups, Legislative Process, Seminar in American Politics, Southern Politics; Publishing for Political Science

## Editorial Boards

*Social Science Quarterly*. Member. 2011-present.

*Election Law Journal*. Member. 2013-present.

## Institutional Service (University-Level)

University Program Review Committee, 2009-2011.
   Chair, 2010-2011
   Vice-Chair, 2009-2010.

Graduate Council, 2005-2008.
   Program Committee, 2005-2008.
   Chair, Program Committee, 2007-2008.

University Libraries Committee, 2004-2014.

Search Committee for University Librarian and Associate Provost, 2014.