**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Leslie Feldman, et al.,

         Plaintiffs,

v.

Arizona Secretary of State's Office, et al.,

         Defendants.

No. CV-16-01065-PHX-DLR

**ORDER**

      Plaintiffs are Leslie Feldman, Luz Magallanes, Mercedez Hymes, Julio Morera, and Cleo Ovalle, Democrats and registered voters in Maricopa County, Arizona; Peterson Zah, former Chairman and First President of the Navajo Nation, and a registered voter in Apache County, Arizona; the Democratic National Committee; the Democratic Senatorial Campaign Committee; the Arizona Democratic Party (ADP); Kirkpatrick for U.S. Senate, a committee supporting the election of Democratic United States Representative Ann Kirkpatrick to the United States Senate; and Hillary for America, a committee supporting the election of Democratic candidate Hillary Clinton as President of the United States. Plaintiff-Intervenor is Bernie 2016, Inc., a committee that supported the election of former Democratic candidate Bernie Sanders as President of the United States. The Court will refer to these parties collectively as "Plaintiffs."

      Defendants are the Arizona Secretary of State's Office; Arizona Secretary of State Michele Reagan, in her official capacity; the Maricopa County Board of Supervisors;

Denny Barney, Steve Chucri, Andy Kunasek, Clint Hickman, and Steve Gallardo, members of the Maricopa County Board of Supervisors, in their official capacities; the Maricopa County Recorder and Elections Department; Maricopa County Recorder Helen Purcell, in her official capacity; Maricopa County Elections Director Karen Osborne, in her official capacity; and Arizona Attorney General Mark Brnovich, in his official capacity.  Defendant-Intervenor is the Arizona Republican Party (ARP).[1]

At issue is Plaintiff's Motion for Preliminary Injunction of H.B. 2023.  (Doc. 84.) Also before the Court is the Motion to Strike Portions of Plaintiffs' Reply Memorandum and Reply Exhibits filed jointly by Defendants and the ARP.  (Doc. 167.)  The motions are fully briefed, and the Court heard oral argument on August 3, 2016.  For the following reasons, both motions are denied.

## BACKGROUND

In addition to voting at polling places on Election Day, Arizona permits both in-person and absentee early voting during the 27 days before an election. A.R.S. § 16-541. For those who prefer to vote in person, all Arizona counties operate at least one on-site early voting location.  (Doc. 153-1 at 9, ¶ 15.)  Arizonans may also vote early by mail either by requesting an early ballot on an election-by-election basis or by joining the Permanent Early Voting List (PEVL).  A.R.S. §§ 16-542, 16-544.  Permanent early voters automatically receive early ballots for every election by mail no later than the first day of the early voting period.  To be counted, an early ballot must be received by the county recorder by 7:00 pm on Election Day.  A.R.S. § 16-548.  Voters may return their early ballot by mail at no cost, but they must mail it early enough to ensure that it is received by this deadline.  Additionally, some counties provide special drop boxes for early ballots, and voters in all counties may return their ballots in person at any polling place without waiting in line. (Doc. 153-1 at 10, ¶¶ 16-17.)

In 2016, Arizona enacted H.B. 2023, now codified at A.R.S. § 16-1005(H)-(I),

---

[1] Arizona lawmakers Debbie Lesko and Tony Rivero, Phoenix City Councilman Bill Gates, and Scottsdale City Councilwoman Suzanne Klapp also intervened as Defendants, but did not participate in the instant motion.  (Doc. 151.)

which limits who may possess another's early ballot.  H.B. 2023 provides:

> H.  A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony.  An election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties.
>
> I.  Subsection H of this section does not apply to:
>
> 1. An election held by a special taxing district formed pursuant to title 48 for the purpose of protecting or providing services to agricultural lands or crops and that is authorized to conduct elections pursuant to title 48.
>
> 2.  A family member, household member or caregiver of the voter.  For the purposes of this paragraph:
>
> (a)  "Caregiver" means a person who provides medical or health care assistance to the voter in a residence, nursing care institution, hospice facility, assisted living center, assisted living facility, assisted living home, residential care institution, adult day health care facility or adult foster care home.
>
> (b)  "Collects" means to gain possession or control of an early ballot.
>
> (c)  "Family member" means a person who is related to the voter by blood, marriage, adoption or legal guardianship.
>
> (d)  "Household member" means a person who resides at the same residence as the voter.

A.R.S. § 16-1005(H)-(I).  Subsequently, Plaintiffs brought this lawsuit challenging H.B. 2023 under the Voting Rights Act (VRA) of 1965 and the First and Fourteenth Amendments to the United States Constitution.  (Doc. 12; Doc. 53.)  Specifically, they argue that H.B. 2023 violates § 2 of the VRA because it disparately burdens the electoral opportunities of Hispanic, Native American, and African American voters as compared to white voters.  (Doc. 85 at 12-15.)  They also argue that H.B. 2023 violates the First and Fourteenth Amendments by unjustifiably burdening voting, generally, and the associational rights of organizations that collect ballots as part of their get-out-the-vote (GOTV) efforts.  (*Id.* at 15-18.)  Finally, Plaintiffs argue that H.B. 2023 violates the First and Fourteenth Amendments under a "partisan fencing" theory because the law allegedly was intended to suppress Democratic voters.  (*Id.* at 18-20.)  Plaintiffs now move to preliminarily enjoin Arizona from enforcing the law pending the outcome of this

litigation.  (Doc. 84.)

**THRESHOLD ISSUES**

**I. Standing**

As a threshold matter, the ARP argues that Plaintiffs lack standing to challenge H.B. 2023 because "no individual Plaintiff or member of an associational Plaintiff asserts any reliance on ballot collection to vote."  (Doc. 152 at 2, n.1.)  Standing derives from Article III of the United States Constitution, which limits federal courts to resolving "Cases" and "Controversies."  To have standing, a plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* --- U.S. ---, 134 S. Ct. 1377, 1386 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Only one plaintiff needs to have standing when only injunctive relief is sought.  *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7 (2008).

The ADP alleges that collecting early ballots has been an integral part of its GOTV strategy since at least 2002 and that, as a result of H.B. 2023, it "will have to devote resources that it otherwise would have spent educating voters about its candidates and issues, to assisting its voters in overcoming the barriers the challenged voting laws, practices, and procedures impose[.]"  (Doc. 12, ¶ 28; Doc. 157, ¶¶ 6-9.)  Additionally, the ADP alleges that H.B. 2023 will reduce the likelihood that its voters will timely return their ballots, thereby reducing the likelihood that the ADP will be successful in electing Democratic candidates.  (Doc. 12, ¶ 28; Doc. 157, ¶ 5.)  These allegations are sufficient to establish a concrete and particularized injury in fact that is fairly traceable to H.B. 2023 and likely to be redressed by a favorable ruling on Plaintiffs' preliminary injunction motion.  *See Crawford*, 472 F.3d at 951 ("Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."); *One*

*Wisconsin Inst., Inc. v. Nichol*, --- F. Supp. 3d ---, No. 15-CV-324-JDP, 2016 WL 2757454, at *6 (W.D. Wis. May 12, 2016) (finding expenditure of resources for educating voters about how to comply with new state voter registration requirements sufficient to establish standing).   Because the ADP has standing to challenge the validity of H.B. 2023, it is unnecessary to assess whether the other Plaintiffs have standing.

**II.  Motion to Strike**

Defendants and the ARP have moved to strike portions of Plaintiffs' reply memorandum and reply exhibits.  (Doc. 167.)  Specifically, they have moved to strike: (1) portions of the rebuttal report of Plaintiffs' expert Dr. Allan Lichtman; (2) declarations from Sheila Healy, Steven Begay, Ernesto Teran, and Carmen Arias; (3) the Department of Justice (DOJ) preclearance file for S.B. 1412, an early effort by Arizona to regulate ballot collection; and (4) those portions of Plaintiffs' reply memorandum that rely on the offending exhibits.  (*Id.* at 2.)  Having reviewed the objected-to portions of Dr. Lichtman's rebuttal report, the Court finds that they respond to arguments raised by the ARP's expert witnesses.  Likewise, the additional declarations respond to the ARP's standing arguments.  Finally, Plaintiffs have shown good cause for the delayed disclosure of the DOJ preclearance file.  Despite requesting a copy of the file through a Freedom of Information Act (FOIA) request, Plaintiffs did not receive a readable version until the day before the response briefs were due.  Although Defendants and the ARP fault Plaintiffs for not disclosing the file at that time, they fail to explain how they have been prejudiced by the delay.  Neither Defendants nor the ARP articulate what they would or could have done differently had they received the DOJ file the day before their response brief was due.  Moreover, oral argument provided Defendants and the ARP with an opportunity to respond to this new evidence.  Lastly, the Court must assess the likelihood that Plaintiffs with succeed on the merits of their claims.  It would disserve that end for the Court to blind itself to evidence that eventually would be presented in a summary judgment motion or at trial.  For these reasons, the motion to strike is denied.

## MOTION FOR PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.

## I. Likelihood of Success on the Merits

### A. Section 2 of the VRA

Section 2 prohibits states from imposing any voting qualification, prerequisite, standard, practice, or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"  52 U.S.C. § 10301(a). "A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by racial minorities, in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

> Although proving a violation of § 2 does not require a showing of discriminatory intent, only discriminatory results, proof of a causal connection between the challenged voting practice and a prohibited result is crucial.  Said otherwise, a § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected.

*Gonzales v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (internal quotations and citations omitted).

In *Thornburg v. Gingles*, the Supreme Court cited a list of non-exhaustive factors that courts should consider when determining whether, under the totality of the circumstances, a challenged voting practice interacts with social and historical conditions to cause a disparity between the electoral opportunities of minority and white voters.[2]

---

[2] These factors are sometimes called the "Senate Factors" because they derive from the Senate Report accompanying the 1982 amendments to the VRA.

478 U.S. 30 (1986).  These factors include:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

> 6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]

> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417, at 28-29 (1982)).  Courts also may consider "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group," and "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."  *Id.*  "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *Id.* at 45.

Accordingly, a § 2 claim has two essential elements:  (1) the challenged voting practice must impose a disparate burden on the electoral opportunities of minority as compared to white voters, and (2) "that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class."  *League of Women Voters of N. C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (internal quotations and citations omitted).  "The first part of this two-prong framework inquires about the nature of the burden imposed and

whether it creates a disparate effect[.]"  *Veasey v. Abbott*, --- F.3d ---, No. 14-41127, 2016 WL 3923868, at *17 (5th Cir. July 20, 2016).  Drawing on the Supreme Court's guidance in *Gingles*, "[t]he second part . . . provides the requisite causal link between the burden on voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both."  *Id.*  Stated otherwise, "the second step asks not just whether social and historical conditions 'result in' a disparate impact, but whether the challenged voting standard or practice causes the discriminatory impact as it interacts with social and historical conditions."  *Ohio Democratic Party v. Husted*, --- F.3d ---, No. 16-3561, 2016 WL 4437605, at *14 (6th Cir. Aug. 23, 2016) (alterations omitted); *see Gingles*, 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives.")  The court need not reach the *Gingles* factors and totality-of-the-circumstances inquiry, however, unless the plaintiff proves the existence of a relevant disparity between minority and white voters at step one.  *See Ohio Democratic Party*, 2016 WL 4437605, at *13 ("If this first element is met, the second step comes into play, triggering consideration of the 'totality of the circumstances,' potentially informed by the 'Senate Factors' discussed in '*Gingles*.'").

Based on the current record, the Court finds Plaintiffs are not likely to succeed on their § 2 claim because there is insufficient evidence of a statistically relevant disparity between minority as compared to white voters.  H.B. 2023 is facially neutral.  It applies to all Arizonans regardless of race or ethnicity.  Nonetheless, Plaintiffs argue that H.B. 2023 disparately burdens Hispanic, Native American, and African American voters as compared to white voters because these groups disproportionately rely on others to collect and return their early ballots.  Plaintiffs, however, provide no quantitative or statistical evidence comparing the proportion of minority versus white voters who rely on others to collect their early ballots.  To the contrary, Sheila Healy, Executive Director of

the ADP, testified that she has "no way of knowing if and how many voters could be impacted by [the ADP's] inability to offer to mail their ballot for them."  (Doc. 153-1 at 79-80.)   The Court is aware of no case—and Plaintiffs cite none—in which a § 2 violation has been found without quantitative evidence measuring the alleged disparity between minority and white voters.

Plaintiffs argue quantitative evidence is not needed because no case has expressly held that such evidence is necessary to prove a § 2 violation.  (Doc. 156 at 9.)   The standards developed for analyzing § 2 cases, however, strongly suggest that proof of a relevant statistical disparity is necessary at step one, even though it is not alone sufficient to prove a § 2 violation because of the causation requirement at step two.  *See Gonzales*, 677 F.3d at 405; s*ee also Veasey*, 2016 WL 3923868, at *17 (noting that "courts regularly utilize statistical analyses to discern whether a law has a discriminatory impact"). Further, in other contexts courts have "recognized the necessity of statistical evidence in disparate impact cases."  *Budnick v. Town of Carefree*, 518 F.3d 1109, 1118 (9th Cir. 2008) (Fair Housing Act); *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003) (Age Discrimination in Employment Act); *Cooper v. S. Co.*, 390 F.3d 695, 716 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) (Title VII); *Rollins v. Alabama Cmty. Coll. Sys.*, No. 2:09-CV-636-WHA, 2010 WL 4269133, at *9 (M.D. Ala. Oct. 25, 2010) (Equal Pay Act); *Davis v. City of Panama City, Fla.*, 510 F. Supp. 2d 671, 689 (N.D. Fla. 2007) (Title VII and 42 U.S.C. § 1983). Plaintiffs offer no compelling reason why the method by which the Court determines whether a relevant disparity exists should change simply because this case arises under the VRA.

Disparate impact analysis necessarily is a comparative exercise.  To determine whether a voting practice disparately impacts minorities, the Court must know approximately:  (1) how many voters will be impacted by the law, and (2) the racial and ethnic composition of those voters.  Without this information, the Court cannot compare the impact of the law on different demographic populations, nor can it determine whether

the differences, if any, are statistically relevant.[3]

Assuming, *arguendo*, that a § 2 violation could be proved using non-quantitative evidence, Plaintiffs' evidence is not compelling.   In lieu of quantitative evidence, Plaintiffs offer anecdotal observations from Arizona Democratic lawmakers and representatives of organizations that have collected and returned ballots in past elections. These non-expert declarants claim, based on their experiences, that Hispanic, Native American, and African-American communities rely most on ballot collection.  (Doc. 86, ¶¶ 5, 18; Doc. 90, ¶ 8; Doc. 91, ¶ 9; Doc. 92, ¶¶ 3-4; Doc. 93, ¶¶ 2-4, 10; Doc. 95, ¶¶ 4, 8-9; Doc. 96, ¶¶ 3, 14-15; Doc. 97, ¶¶ 3, 10, 20; Doc. 98, ¶¶ 3, 11, 14; Doc. 99, ¶¶ 3, 10; Doc. 100, ¶¶ 4, 20, 23; Doc. 127-1, ¶¶ 3-4; Doc. 158, ¶¶ 3-5.)  But these declarants predominately are Democratic partisans and members of organizations that admittedly target their GOTV efforts at minority communities.  The Court has no way of knowing whether the experiences of these declarants are attributable to their selective targeting or to statewide ballot collection trends.[4]

Notably, many types of voters can benefit from ballot collection.  According to Healy:

> There are many barriers that impede voters from being able to return a ballot in time.  For example, some voters—particularly those in underprivileged and rural areas—lack access to home delivery and must drive to a post office to receive or send mail.  In underprivileged neighborhoods, it is common for residents to receive incoming mail in a centralized location in the community but to lack access to an outgoing

[3] Plaintiffs assert that H.B. 2023's impact cannot be quantitatively measured because Arizona does not collect the necessary data, but they do not explain why Arizona bears that burden. (Doc. 156 at 9.)  Nor may Plaintiffs avoid their burden of proof simply because surveying the relevant population might be difficult.  *See* Daniel P. Tokaji, *Applying Section 2 to the New Vote Denial*, 50 Harv. C.R.-C.L. L. Rev. 439, 476 (2015) ("It can be difficult to document the racial composition of those who use a voting opportunity . . . , given that election and other public records often do not include racial or ethnic data.  There is no getting around this problem.  But given that § 2 forbids the denial or abridgement of the vote on account of race, it is reasonable that plaintiffs be required to make a threshold showing they are disproportionately burdened by the challenged practice, in the sense that it eliminates an opportunity they are more likely to use or imposes a requirement they are less likely to satisfy.").

[4] Although there is some evidence that Democratic-leaning organizations use ballot collection more effectively, it is undisputed that "groups from all ideological backgrounds use ballot collection." (Doc. 86, ¶ 18.)

mailbox, which makes returning early ballots a challenge.  Many voters prefer to wait until Election Day to decide who to vote for, particularly in elections of national importance like the presidential election.  Others lack the physical mobility to put their ballot in the mailbox, and must rely on caretakers, family, friends, or volunteers to ensure that their ballot is postmarked in time or taken to the polls.  Many voters mistakenly assume that the ballot is timely if it is postmarked by Election Day rather than actually received.  Many of our voters work two or three jobs, take care of a family, and travel to work on public transportation.

(Doc. 100, ¶ 21.)   Many of these circumstances apply equally to minority and white voters.  There is no evidence, for example, that minority voters are more likely to be elderly or homebound, to prefer to wait until Election Day to cast consequential votes, or to forget to mail their ballots.  Plaintiffs highlight the challenges faced by voters in rural areas without home mail delivery and reliable transportation, but both minority and white voters live in rural areas.  As of 2010, the rural communities of Somerton and San Luis were 95.9% and 98.7% Hispanic or Latino, respectively.   (Doc. 101-12 at 2.) Conversely, the rural communities of Colorado City, Fredonia, Quartzite, St. David, Star Valley, and Wickenburg were 99.5%, 89.1%, 92.5%, 92.1%, 91.4%, and 90.5% white, respectively.  (Doc. 152-14 at 2-7.)  Although Plaintiffs provide evidence that Somerton and San Luis residents lack home mail delivery, (Doc. 95, ¶¶ 15, 17), they offer no comparable evidence for rural white communities.  Nor do they provide evidence of the number of voters in communities like Somerton and San Luis who choose to vote early by mail, despite the lack of mail service.[5]

Plaintiffs also cite legislative testimony from the debates on H.B. 2023, but the testimony provides no new information.  Several Democratic lawmakers who spoke out against H.B. 2023 during the legislative debates also submitted declarations in support of Plaintiffs' motion, and the remaining legislative testimony is largely duplicative.  For example, many lawmakers expressed concerns that H.B. 2023 would impact rural communities, working families, and the elderly.  (Doc. 101-9 at 6-7, 13-14; Doc. 101-10 at 29-30; Doc. 101-11 at 17-18; Doc. 101-12 at 7, 9-11.)  As noted, however, there are

---

[5] The Court also notes that, to the extent some voters rely on caretakers or family members to deliver their early ballots, H.B. 2023 has no impact.

rural communities that are predominately minority and rural communities that are predominately white, there is no evidence that minorities are disproportionately elderly, and both white and minority voters can have multiple or time consuming jobs.

Next, Plaintiffs argue that certain declarations submitted by the ARP effectively concede that minority voters disproportionately rely on ballot collection. Plaintiffs, however, take portions of these declarations out of context. For example, they cite to the declaration of Kevin Dang, President of the Vietnamese Community of Arizona, who stated that minority groups are "especially vulnerable to manipulation by groups who harvest ballots. Those who want to manipulate the system can take advantage of minorities like the Vietnamese who do not speak English and who do not understand the process." (Doc. 152-12, ¶¶ 3, 8.) Likewise, Sergio Arellano, President of the Tucson Chapter of the Arizona Latino Republican Association, declared that "[m]any people in the Latino population, particularly the elderly, are being taken advantage of by groups that collect ballots and misrepresent themselves as government or election officials. Many of the people that these groups target do not speak English and are particularly vulnerable to such groups." (Doc. 152-7, ¶¶ 3, 5.) These are not admissions that minority voters disproportionately rely on ballot collection. Instead, these declarations reflect the lay opinions of two individuals who believe ballot collection creates an opportunity for fraud, and that minorities are targeted by ballot collectors with nefarious purposes because they are less educated about the process and often do not speak or understand English well.

Lastly, Plaintiffs cite portions of the DOJ preclearance file for S.B. 1412. Assuming that the DOJ preclearance file is admissible for purposes of the instant motion,[6] it does not prove a relevant disparity between minority and white voters. The DOJ file contains what appear to be summaries of telephone conversations between a DOJ attorney and various persons concerning S.B. 1412. For example, an unknown

---

[6] Defendants and the ARP object to the admissibility of this evidence on the basis that it contains multiple levels of hearsay, lacks foundation, and has not been authenticated.

Yuma County Recorder's Office employee reportedly said that, in her experience, Yuma County:

> does not experience a great deal of traffic from persons returning large numbers of vote by mail ballots by mail in groups of ten or more. That could be, of course, because people just put the ballots in the mailbox and no one notices. The exception to that is the City of Marin, where people do tend to bring up vote by mail ballots in groups. It is a smaller city of about 15,000 persons, but it is near the border with Mexico and almost everyone is Hispanic.

(Doc. 161-1 at 104.)   Notably absent is similar information about ballot collection in Arizona's other counties. That most Yuma County residents relying on ballot collection might be Hispanic does not mean that most Arizonans relying on ballot collection are minorities. Moreover, the employee discussed only persons returning ten or more ballots at once and said nothing about the delivery of smaller quantities of early ballots.[7]

Additionally, then-Arizona Elections Director Amy Bjelland reportedly said that "S.B. 1412 was targeted at voting practices in predominately Hispanic areas in the southern portion of the state near the Arizona border," and Senator Don Shooter, the bill's sponsor, was "mainly concerned about practices in San Luis, which is a border town in Yuma County[.]" (*Id.* at 111.) Plaintiffs isolate this quote, but ignore the context in which it was made. Bjelland elaborated that:

> [t]he event that spurred [S.B. 1412] involved a dispute that arose in San Luis, a small city in Yuma County located in what is called "south county," on the border with Mexico. A large majority of the population of the city [is] Hispanic[]. Two Hispanic women who had previously worked on campaigns together had a bitter falling out. One of the women wrote a letter to a local council member named David Luna, in which she accused the other woman of engaging in voter fraud, and admitted doing so herself when they worked together. Luna forwarded the complaint . . . to the Secretary of State's office, who forwarded it on to the FBI.
>
> Both the FBI and the Secretary of State's office looked into the matter and found no evidence of wrongdoing. . . . However, the allegations were picked up by Tea Partiers and Republican candidates in the area, and the issue received a lot of press attention.

---

[7] Evidence shows that not all ballot collectors deliver large quantities of ballots. (*See* Doc. 88, ¶ 8 (three to four ballots collected and delivered).)

(*Id.*)  The DOJ summary then reports:

> [Bjelland] does not know how widespread the problem is, but in her opinion "it is part of life in San Luis of how things have been run for years."  She thinks the problem may result "from the different way that Mexicans do their elections."  She says that there is corruption in the government and the voting process in Mexico, and that people who live close to the border are more impacted by that.

(*Id.* at 111-12.)  In context, this report describes the "practice" targeted by S.B. 1412 not as ballot collection, generally, but as voter fraud perpetrated through ballot collection, which Bjelland believed was more prevalent along the border because of perceived "corruption in the government and the voting process in Mexico," and the fact that "people who live close to the border are more impacted by that."  (*Id.*)

In sum, Plaintiffs are not likely to succeed on their § 2 claim because they have provided insufficient evidence of a cognizable disparity between minority and white voters.  The current record shows that certain civic organizations collect ballots as part of their GOTV efforts, that some selectively target minority communities, and that some minority voters give their ballots to collectors.  But there is no evidence quantifying the number of voters who rely on ballot collection or comparing the proportion of those voters that are minorities to the proportion that are white.  Because Plaintiffs are not likely to carry their burden at step one, it is unnecessary to reach the second step causation inquiry regarding H.B. 2023's interaction with social and historical conditions.  *See Ohio Democratic Party*, 2016 WL 4437605, at *14 (concluding that the second step causal inquiry was immaterial because plaintiffs failed to meet their burden of proving a disparate impact at step one); *Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014) (resolving § 2 vote denial claim at step one).

## B.  First and Fourteenth Amendments

Although the Constitution empowers states to regulate the times, places, and manner of elections, U.S. Const. art. I, § 4, cl. 1, this power is not absolute.  It is "subject to the limitation that [it] may not be exercised in a way that violates other . . .  provisions of the Constitution."  *Williams v. Rhodes*, 393 U.S. 23, 29 (1968); *see Washington State*

*Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008).  As relevant here, the First and Fourteenth Amendments protect against unjustified burdens on voting and associational rights.  *See Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

Not all election regulations, however, raise constitutional concerns.  "[A]s a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974).  Moreover, all elections regulations "invariably impose some burden upon individual voters."  *Burdick*, 504 U.S. at 433.  Thus, when an election law is challenged a court must weigh the nature and magnitude of the burden imposed by the law against state's interests in and justifications for it.  *See Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008).  This framework is commonly referred to as the *Anderson-Burdick* test, named after the two Supreme Court cases from which it derives.

When applying *Anderson-Burdick*, the court considers the state's election regime as a whole.  *See Ohio Democratic Party*, 2016 WL 4437605, at *5.  "[T]he severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court."  *Nader*, 531 F.3d at 1034.  A law that severely burdens the right to vote is subject to strict scrutiny, meaning it must be narrowly tailored to serve a compelling state interest.  *Id.* at 1035.  On the other hand, a state's important regulatory interests are generally sufficient to justify laws that impose lesser burdens.  *See Washington State Grange*, 552 U.S. at 452; *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010).  Laws that do not significantly increase the usual burdens of voting do not raise substantial constitutional concerns.  *See Crawford*, 553 U.S. at 198.

Plaintiffs bring a facial challenge to H.B. 2023.  "Facial challenges are disfavored for several reasons."  *Washington State Grange*, 552 U.S. at 450.  First, "[c]laims of facial invalidity often rest on speculation.  As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records."  *Id.*

- 15 -

(internal quotations and citation omitted).   Such claims "also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is applied." *Id.* (internal quotations and citations omitted).   Lastly, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.   Thus, Plaintiffs "bear a heavy burden in demonstrating a substantial likelihood of success[.]" *League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298, 1314 (S.D. Fla. 2008); *see also Crawford*, 553 U.S. at 200 ("Given the fact that petitioners have advanced a broad attack on the constitutionality of [the election regulation], seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion.").

### i. Voting Rights

H.B. 2023 does not significantly increase the usual burdens of voting.   It does not eliminate or restrict any method of voting, it merely limits who may possess, and therefore return, a voter's early ballot.   Early voters may return their own ballots, either in person or by mail, or they may entrust their ballots to family members, household members, or caregivers.   It is unlawful, however, for a person who does not fall into one of these categories to possess another's early ballot.   Thus, the burden imposed by H.B. 2023 is simply the burden of returning an early ballot personally or through a family member, household member, or caregiver.

Plaintiffs argue that this burden is more severe for "voters who would otherwise have great difficulty in returning their early ballot in time for it to be counted, such as the voters in rural and Native American communities who do not have mail service[.]"  (Doc. 85 at 16.)   They also highlight the challenges faced by elderly, homebound, and disabled voters, as well as those who work multiple jobs.   Arizona's election regime, however, alleviates many of the burdens H.B. 2023 might impose on the types of voters Plaintiffs

have described.

First, voters who have great difficulty timely returning their early ballots need not vote by mail.  These voters may vote in person at polling places on Election Day or at an on-site early voting location during any one of Arizona's 27 early voting days.  In fact, when asked whether the ADP encourages voters in rural areas without reliable transportation or access to secure outgoing mail services to nonetheless sign up for the PEVL, Healy explained:  "It depends on the area that they live.  For example, on the Navajo Nation where folks do not have reliable transportation or access to a post office or a service to receive mail we do not encourage them to sign up for the [PEVL]."  (Doc. 152-13 at 4.)  Instead, the ADP encourages these voters to vote in person.  (*Id.*)

Arizona also accommodates disabled voters and those who work on Election Day. All counties must provide special election boards for voters who cannot travel to a polling location because of an illness or disability.  A.R.S. § 16-549.  If an ill or disabled voter timely requests an accommodation, the county recorder must arrange for a special election board to deliver a ballot to the voter in person.  For working voters, Arizona law requires employers to give an employee time off to vote if the employee is scheduled to work a shift on Election Day that provides fewer than three consecutive hours between either the opening of the polls and the beginning of the shift, or the end of the shift and the closing of the polls.  A.R.S. § 16-402.  An employer is prohibited from penalizing an employee for exercising this right.  If voters nonetheless feel uncomfortable requesting time off, they have a 27-day window to vote in person at an on-site early voting location. Finally, voters may entrust their ballots to family members, household members, or caregivers.[8]

Evidence indicates that many voters who entrust their ballots to collectors do so not out of necessity, but for convenience or because they prefer a trusted volunteer to deliver their ballots.  (*See, e.g.,* Doc. 100, ¶ 21.)  Voters' minimization of the value of

---

[8] Several of Plaintiffs' declarants erroneously contend that H.B. 2023 will prevent them or others from delivering ballots on behalf of family members, despite the law's clear language to the contrary.  (*See* Doc. 88, ¶¶ 8, 11; Doc. 89, ¶ 12; Doc. 91, ¶ 10.)

their votes also plays a role.  Plaintiffs submitted a declaration from Randy Parraz, co-founder and former president of Citizens for a Better Arizona (CBA), a non-profit organization that operated from 2011 to 2014 with a special focus on GOTV efforts, who discussed CBA's ballot collection activities.  (Doc. 90.)  When asked during his deposition why voters typically failed to return their early ballot by mail, Parraz testified:

> One, they didn't think their vote mattered.  Two, [it] was inconvenient.  Three, they would forget.  Those are some of the main reasons they did it.  But I think the primary thing was that they didn't feel their vote mattered.  So whether mail-in ballot or going to show up at the polls, the election didn't have much meaning to them.

(Doc. 153-1 at 222.)  For these voters, H.B. 2023's impact results from a matter of preference or choice rather than a state-created obstacle, and therefore is not a substantial burden.  *Frank*, 768 F.3d at 749.  Moreover, the Constitution does not demand "recognition and accommodation of such variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain identifiable segments of the voting public."  *Ohio Democratic Party*, 2016 WL 4437605, at *7.  Nor does the Constitution prohibit Arizona from regulating the manner in which early ballots may be returned simply because some voters are disengaged and choose not vote unless a third party convinces them to do so and delivers the ballot for them.

Plaintiffs also argue that H.B. 2023 will burden voters who forget or are mistaken about the relevant deadlines.  For example, Ernesto Teran, a Maricopa County Democrat, stated that he voted by mail in the last two elections.  (Doc. 159, ¶ 3.)  During the last election, volunteers from the ADP came to his house and asked if he had mailed in his early ballot.  (*Id.*, ¶ 4.)  He told the volunteers that he "was certain that [he] had done so," but decided to check again to confirm.  (*Id.*)  He then discovered that he had forgotten to mail his ballot it.  (*Id.*)  He thought about delivering the ballot himself, but decided instead to entrust it with the ADP volunteers.  (*Id.*)  Carmen Arias, another Maricopa County Democrat, stated that she votes by mail and typically is able to mail in her ballot before Election Day.  (Doc. 160, ¶¶ 2, 4.)  Sometimes, however, she "has forgotten to do so before it's too late," and in those situations she has entrusted her ballot to an ADP

- 18 -

volunteer.  (*Id.*, ¶ 4.)  The Constitution, however, does not require states to prioritize voter convenience above all other regulatory considerations.  *Ohio Democratic Party*, 2016 WL 4437605, at *6 ("It's as if plaintiffs disregard the Constitution's clear mandate that the states (and not the courts) establish election protocols, instead reading the document to require all states to maximize voting convenience.").  To the extent H.B. 2023 places a greater imperative on remembering relevant election deadlines, it "does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198.

Given the severe burdens Plaintiffs allege H.B. 2023 will place on rural voters without reliable transportation or access to secure outgoing mail, it is telling that they have not produced a single declaration from a voter who fits this profile.[9]  Such voters might exist, but Plaintiffs have not provided sufficient evidence that these voters (1) choose to vote early by mail despite the difficulties they face; (2) lack family members, household members, or caregivers who can deliver a ballot for them; and (3) cannot avail themselves of the many other voting opportunities and accommodations Arizona provides.  It therefore "is not possible to quantify either the magnitude of the burden on this narrow class of voters or the proportion of the burden imposed on them that is fully justified." *Crawford*, 553 U.S. at 200.  Accordingly, the Court finds that H.B. 2023 imposes only minor burdens not significantly greater than those typically associated with voting.

Because H.B. 2023 imposes only minimal burdens, Arizona must show only that it serves important regulatory interests.  *Washington State Grange*, 552 U.S. at 452.  Arizona advances two justifications for H.B. 2023.  First, it claims that H.B. 2023 is a prophylactic measure intended to prevent absentee voter fraud by creating a chain of custody for early ballots and minimizing the opportunities for ballot tampering.  Second, Arizona argues that H.B. 2023 eliminates the perception of fraud, thereby preserving

---

[9] State Senator Martín Quezada stated that he lacks access to a secure mailbox at his personal residence, but he did not claim to have difficulty either voting in person or returning an early mail ballot.  (Doc. 97, ¶ 22.)

public confidence in the integrity of elections.  (Doc. 153 at 12-13.)  Fraud prevention and preserving public confidence in election integrity are important state regulatory interests.  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Confidence in the integrity of our electoral process is essential to the functioning of our participatory democracy.  Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government."); *see also Crawford*, 553 U.S. at 195 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. . . . While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.").  Plaintiffs do not argue otherwise.  Instead, they argue that H.B. 2023 is unjustified because there is no evidence of verified absentee voter fraud perpetrated by ballot collectors, or of widespread public perception that ballot collection leads to fraud.  (Doc. 156 at 23.)

Many courts, however, have recognized that absentee voting presents a greater opportunity for fraud.  *See Crawford*, 553 U.S. at 225 (noting that "absentee-ballot fraud . . . is a documented problem in Indiana"); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("Voting fraud . . . is facilitated by absentee voting."); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1197 (Ill. App. Ct. 2004) ("It is evident that the integrity of the vote is even more susceptible to influence and manipulation when done by absentee ballot.").  Moreover, Arizona "need not show specific local evidence of fraud in order to justify preventative measures."  *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013).  For example, *Crawford* upheld Indiana's voter identification requirement as a measure designed to prevent in-person voter fraud even though "[t]he record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history."  553 U.S. at 195.  Similarly, in *Munro v. Socialist Workers Party*, the Supreme Court upheld a Washington law requiring all minor party candidates for partisan office to receive at least 1% of all votes cast during the primary election in order to appear on the general election ballot.  479 U.S. 189 (1986).  Washington argued that the law prevented voter confusion from ballot overcrowding by ensuring candidates appearing on the general election ballot

had sufficient community support.  *Id.* at 194.  In upholding the law, the Supreme Court explained: "We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidates prior to the imposition of reasonable restrictions on ballot access."  *Id.* at 194-95. Rather, "[l]egislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively[.]"  *Id.* at 195; s*ee also Lee v. Virginia State Bd. of Elections*, -- F. Supp. 3d --, No. 3:15CV357-HEH, 2016 WL 2946181, at *26 (E.D. Va. May 19, 2016) ("Outlawing criminal activity before it occurs is not only a wise deterrent, but also sound public policy.").

In sum, Arizona has proffered two important state regulatory interests that are rationally served by H.B. 2023.  Though Plaintiffs argue that there are no verified cases of absentee voter fraud perpetrated by ballot collectors in Arizona, the Court must scrutinize Arizona's justifications less severely because Plaintiffs have not shown H.B. 2023 imposes more than minimal burdens on voting.  Accordingly, Plaintiffs are not likely to succeed on their Fourteenth Amendment challenge.

### ii. Associational Rights

Plaintiffs also argue that H.B. 2023 burdens the associational rights of groups that encourage and facilitate voting through ballot collection.  (Doc. 85 at 16-17.)   The *Anderson-Burdick* framework applies to Plaintiff's First Amendment claims.  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  As the party invoking the First Amendment's protection, however, Plaintiffs bear the additional, threshold burden of proving that it applies.  *Voting for Am.*, 732 F.3d at 388.

The First Amendment extends "only to conduct that is inherently expressive." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). Relying on *Project Vote v. Blackwell*, Plaintiffs argue that ballot collection is expressive activity.  455 F. Supp. 2d 694 (N.D. Ohio 2006).  In that case, civic organizations challenged certain Ohio regulations on voter registration that, among other things, made it a felony for someone other than the person who registered the voter or the voter herself

to submit a voter registration form.  *Id.* at 702, 705-06.  The court concluded that "participation in voter registration implicates a number of both expressive and associational rights which are protected by the First Amendment."  *Id.* at 700.  Finding that the challenged Ohio regulation "severely chills participation in the voter registration process," and served no legitimate state interest, the court concluded that it likely violated the First Amendment rights of those who participate in voter registration drives.  *Id.* at 705-06.  Plaintiffs argue that there is no principled distinction between returning voter registration forms and returning early ballots.

Defendants rely on *Vote for America v. Steen*, which reached the opposite conclusion.  That case involved a challenge to various Texas laws that regulated the receipt and delivery of completed voter registration applications.  *Vote for Am.*, 732 F.3d at 385-86.  The Fifth Circuit rejected the argument that collecting and delivering voter registration applications were inherently expressive activities protected by the First Amendment.  *Id.* at 392.  In doing so, the court agreed that "some voter registration activities involve speech—'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters fill out their forms; and 'asking' for information to verify registrations were processed successfully."  *Id.* at 389.  It found, however, that "there is nothing inherently expressive about receiving a person's completed [voter registration] application and being charged with getting that application to the proper place."  *Id.* at 392 (internal quotation and citation omitted).

The Court finds the Fifth Circuit's analysis more persuasive.  Though many GOTV activities involve First Amendment protected activity, there is nothing inherently expressive or communicative about receiving a voter's completed early ballot and delivering it to the proper place.  Thus, Plaintiffs are not likely to succeed on their First Amendment claim because they have not shown that ballot collection is protected First Amendment activity.

Assuming, *arguendo*, that H.B. 2023 implicates protected associational rights, it does not impose severe burdens.  Nothing in H.B. 2023 prevents Plaintiffs or other civic

organizations from encouraging, urging, or reminding people to vote, informing them of relevant election deadlines, helping them fill out early ballots or request special election boards, or arranging transportation to on-site early voting locations, post offices, county recorder's offices, or polling places.  *See Vote for Am.*, 732 F.3d at 393 (noting that voter registration volunteers remained "free to organize and run the registration drive, persuade others to register to vote, distribute registration forms, and assist others in filling them out"); *League of Women Voters*, 575 F. Supp. 2d at 1322 ("[The challenged law] does not place any restrictions on who is eligible to participate in voter registration drives or what methods or means third-party voter registration organizations may use to solicit new voters and distribute registration applications.  Instead, [it] simply regulates an administrative aspect of the electoral process—the handling of voter registration applications by third-party voter registration organizations after they have been collected from applications.").  H.B. 2023 merely regulates who may possess, and therefore return, another's early ballot.  In light of the minimal burdens H.B. 2023 imposes on GOTV activities, Arizona's aforementioned regulatory interests in preventing absentee voter fraud and preserving public confidence in elections are sufficient justifications.

### iii.  Partisan Fencing

Lastly, Plaintiffs argue that H.B. 2023 "was intended to suppress the vote in violation of the First and Fourteenth Amendments, which prohibit discrimination based on partisan affiliation or viewpoint."  (Doc. 85 at 18.)  This so-called "partisan fencing" theory derives from *Carrington v. Rash*, in which the Supreme Court found unconstitutional a Texas law prohibiting any member of the armed forces who moves her home to Texas during the course of military duty from voting.  380 U.S. 89, 95-96 (1965).  In striking down the law, the Supreme Court explained that "'[f]encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible."  *Id.* at 94.  The theory found renewed support decades later in Justice Kennedy's concurring opinion in *Vieth v. Jubelirer*, a case in which the Supreme Court held that political gerrymandering claims are nonjusticiable.  541 U.S.

- 23 -

267 (2004).  Writing only for himself, Justice Kennedy wrote "[i]f a court were to find a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest."  *Id.* at 315.

Since these decisions, however, no special framework for analyzing partisan fencing claims has developed.   Plaintiffs urge the Court to adopt the framework established in *Village of Arlington Heights v. Metropolitan Housing Development Corporation* for analyzing claims of invidious racial discrimination.   429 U.S. 252 (1977).  Under the *Arlington Heights* framework, the Court first examines whether the challenged law was motivated by an "invidious discriminatory purpose."  *Id.* at 266.  In doing so, the Court considers factors such as (1) whether the law has a disparate impact on a particular group; (2) the historical background and sequence of events leading to enactment; (3) substantive or procedural departures from the normal legislative process; and (4) relevant legislative history.  *Id.* at 266-68.  If the Court concludes that the law was intended, at least in part, to discriminate against a particular group, the burden shifts to the state to prove either that the challenged law has no discriminatory effect, or that it would have been enacted even without the discriminatory motive.  *Id.* at 270 n.21.

Recent cases, however, have approached partisan fencing claims skeptically.  In *Lee v. Virginia State Board of Elections*, the district court concluded that "[a] careful reading of the *Carrington* opinion would seem to reveal that the term 'partisan fencing' does not create an independent cause of action aside from a typical First Amendment and Equal Protection Clause claim."   155 F. Supp. 3d 572, 584 (E.D. Va. 2015); *see also Ohio Org. Collaborative v. Husted*, --- F. Supp. 3d ---, No. 2:15-CV-1802, 2016 WL 3248030, at *48 (S.D. Ohio May 24, 2016), *reversed on other grounds by Ohio Democratic Party*, 2016 WL 4437605 ("*Carrington* and its progeny do not, however, appear to create a separate equal protection cause of action to challenge a facially neutral law that was allegedly passed with the purpose of fencing out voters of a particular political affiliation.").  Instead of applying to party affiliation "the level of scrutiny that

the Constitution requires for laws that discriminate on the basis of race or any other suspect class," *One Wisconsin*, 2016 WL 2757454, at *12, these courts analyzed partisan fencing claims under the *Anderson-Burdick* framework.

The Court finds these cases persuasive, especially considering the dearth of authority for treating party affiliation as a suspect class. Accordingly, the Court will apply the *Anderson-Burdick* balancing framework to determine whether the burdens imposed by H.B. 2023 are justified.[10] For substantially the same reasons the Court articulated in its analysis of Plaintiffs' other constitutional claims, H.B. 2023 places only minor burdens on voting and associational rights. Because H.B. 2023 does not impose severe burdens, the Court's scrutinizes Arizona's justifications less severely. Arizona's important regulatory interests in preventing absentee voter fraud and preserving public confidence in elections are sufficient to justify H.B. 2023 under this less exacting standard.

## II.  Irreparable Harm

Because Plaintiffs are not likely to succeed on the merits of their claims, they have not shown that H.B. 2023 will likely cause them irreparable harm. *See Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986). Moreover, at this juncture Plaintiffs' belief that H.B. 2023 will prevent certain people from voting is speculative, as representatives of the ADP admit that they have no way of knowing if any voters will be impacted by the limitation on ballot collection. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

---

[10] The Court also notes that Plaintiffs have not provided evidence that H.B. 2023 will have a cognizable disparate impact on Democrats as compared to voters of other political affiliations. As the Court explained in its analysis of Plaintiffs' § 2 claim, the anecdotal observations of Plaintiffs' declarants are not sufficient to prove a disparate impact. Thus, even if the Court were to apply the *Arlington Heights* framework, Plaintiffs have not shown that H.B. 2023 likely will impose greater burdens on Democrats as compared to similarly situated voters of other political affiliations.

**III.  Balance of Hardships/Public Interest**

Some authority indicates that a state "suffers a form of irreparable injury" whenever it "is enjoined from effectuating statutes enacted by representatives of its people[.]"  *Maryland v. King*, --- U.S. ---, 133 S. Ct. 1, 3 (2012) (internal quotations and citations omitted).  Moreover,

> the issue of likelihood of success on the merits has subsumed within it the other relevant factors.  In other words, if the Court concludes that the regulations challenged by Plaintiffs unduly impinge upon constitutionally protected rights, the Court also can easily conclude that the public interest is served by an injunction prohibiting such impingement.  Similarly, if the Court concludes that the challenged regulations fail to further any legitimate state interest, or are not sufficiently narrowly tailored in their effort to do so, the Court also can easily conclude that the balance of hardships tips in favor of the injunction Plaintiffs seek.

*Project Vote*, 455 F. Supp. 2d at 702.  Accordingly, because Plaintiffs are not likely to succeed on their claims, the balance of hardships and public interest weigh against preliminary injunctive relief.

## CONCLUSION

For these reasons, and based on the current record, Plaintiffs have not shown that H.B. 2023 likely will disparately impact minority voters.  Nor have they shown that the law more than minimally burdens voting and associational rights.  Deference to the judgments made by Arizona's elected representatives in exercising their constitutionally prescribed authority to regulate elections is, therefore, required.

**IT IS ORDERED** that the Joint Motion to Strike Portions of Plaintiffs' Reply Memorandum and Reply Exhibits filed by Defendants and the ARP, (Doc. 167), is **DENIED**.

//

//

//

//

//

//

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction of H.B. 2023, (Doc. 84), is **DENIED**.

Dated this 23rd day of September, 2016.

Douglas L. Rayes
United States District Judge