**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Feldman, et al., <br> Plaintiffs, <br> v. <br> Arizona Secretary of State's Office, et al., <br> Defendants. | No. CV-16-01065-PHX-DLR <br><br> **ORDER** |

Plaintiffs are Leslie Feldman, Luz Magallanes, Mercedez Hymes, Julio Morera, and Cleo Ovalle, Democrats and registered voters in Maricopa County, Arizona; Peterson Zah, former Chairman and First President of the Navajo Nation, and a registered voter in Apache County, Arizona; the Democratic National Committee; the Democratic Senatorial Campaign Committee; the Arizona Democratic Party (ADP); Kirkpatrick for U.S. Senate, a committee supporting the election of Democratic United States Representative Ann Kirkpatrick to the United States Senate; and Hillary for America, a committee supporting the election of Democratic candidate Hillary Clinton as President of the United States. Plaintiff-Intervenor is Bernie 2016, Inc., a committee that supported the election of former Democratic candidate Bernie Sanders as President of the United States. The Court will refer to these parties collectively as "Plaintiffs." Defendants are the Arizona Secretary of State's Office; Arizona Secretary of State Michele Reagan, in her official capacity; the Maricopa County Board of Supervisors; Denny Barney, Steve Chucri, Andy

Kunasek, Clint Hickman, and Steve Gallardo, members of the Maricopa County Board of Supervisors, in their official capacities; the Maricopa County Recorder and Elections Department; Maricopa County Recorder Helen Purcell, in her official capacity; Maricopa County Elections Director Karen Osborne, in her official capacity; and Arizona Attorney General Mark Brnovich, in his official capacity.  Defendant-Intervenors are the Arizona Republican Party (ARP), Arizona state lawmakers Debbie Lesko and Tony Rivero, Phoenix City Councilman Bill Gates, and Scottsdale City Councilwoman Suzanne Klapp. At issue is Plaintiff's Motion for Preliminary Injunction on Provisional Ballot Claims. (Doc. 72.)  The motion is fully briefed, and the Court heard oral argument on September 2, 2016.  For the following reasons, the motion is denied.[1]

## BACKGROUND

Since at least 1970, Arizona has required voters to cast ballots in their assigned precinct and has enforced this system by counting only those ballots cast in the correct precinct.  (Doc. 180-2 at 115-16); A.R.S. §§ 16-122, 16-584.  Because elections involve many different overlapping jurisdictions, this precinct-based system ensures that each voter receives a ballot reflecting only the races for which that person is entitled to vote based on his or her residential address.  (Doc. 177-1 at 10.)  If a voter arrives at a precinct but does not appear on the precinct register, Arizona allows the voter to cast a provisional ballot.  A.R.S. §§ 16-135, 16-584.  This may occur, for example, if a voter recently moved but did not notify the county recorder of the change of address before the election.

---

[1] The ARP argues that Plaintiffs have not named the necessary parties to obtain the statewide relief they seek because Arizona law delegates responsibility for counting provisional ballots to the individual counties, yet Plaintiffs have only named Maricopa County and its elections officials in this lawsuit. (Doc. 178 at 6-7.)  Plaintiffs, however, argue that there is no reason to believe that county elections officials will ignore an injunction issued by the Court because Secretary Reagan is charged with issuing the Arizona Election Procedures Manual, which includes instructions on how to determine the validity of provisional ballots. (Doc. 192.)  This issue also has been raised in the ARP's motion to dismiss, (Doc. 108), and Secretary Reagan and Attorney General Brnovich's opposition to Plaintiffs' Joint Motion to Dismiss County Defendants, (Doc. 207).  Because the Court denies Plaintiffs' preliminary injunction motion, it need not decide for purposes this order whether all Arizona counties must be joined as defendants in order for Plaintiffs to obtain statewide relief.  Instead, the Court will address this issue after further briefing on the pending motions to dismiss.

- 2 -

If the voter's current address is determined to be within the precinct, the provisional ballot is counted. Arizona does not, however, count provisional ballots cast out of the voter's correct precinct (OOP ballots).

In 2011, Arizona amended its elections code to allow counties to use vote centers if deemed appropriate. A.R.S. § 16-411(B). Vote centers are equipped to print a specific ballot for each voter that includes all races for which that person is eligible to vote based on his or her residential address. (Doc. 178-2, ¶ 13; Doc. 180-1 at 126; Doc. 180-2 at 3-4.) Thus, under a vote center system, voters may cast their ballots at any vote center in the county in which they reside and receive the appropriate ballot. A.R.S. § 16-411(B)(4). Maricopa County experimented with a vote center system during the 2016 Presidential Preference Election. (Doc. 178-3, ¶ 17.) The only other Arizona counties that have used vote centers for countywide elections are Graham, Yavapai, and Yuma. (Doc. 180-2 at 8.)

Plaintiffs brought this lawsuit in April 2016 challenging Arizona's rejection of OOP ballots under the Voting Rights Act of 1965 (VRA) and the Fourteenth Amendment to the United States Constitution. (Doc. 12; Doc. 53.) Specifically, Plaintiffs argue that Arizona's rejection of OOP ballots violates § 2 of the VRA because it disparately impacts the electoral opportunities of Hispanic, Native American, and African American voters as compared to white voters, and violates the Fourteenth Amendment by unjustifiably burdening voting rights. (Doc. 73.) They also argue that Arizona arbitrarily treats similarly situated voters differently based solely on whether they reside in a county that administers elections under a precinct-based system as opposed to a vote center model. (*Id.*) Plaintiffs have moved to preliminarily enjoin Arizona from rejecting OOP ballots in their entirety. (Doc. 72.) They do not seek an order requiring all counties to use vote centers or to count OOP ballots for all races. Rather, Plaintiffs seek a mandatory preliminary injunction preventing Arizona from rejecting OOP ballots for the races in which the voter is eligible to vote. (Doc. 192 at 7.)

**LEGAL STANARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. These elements may be balanced on a sliding scale, whereby a stronger showing of one element may offset a weaker showing of another. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134-35 (9th Cir. 2011). However, the sliding-scale approach does not relieve the movant of the burden to satisfy all four prongs for the issuance of a preliminary injunction. *Id.* at 1135. When "a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite*, courts should be extremely cautious about issuing a preliminary injunction." *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984). Generally, "mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases[.]" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation and citation omitted).

**DISCUSSION**

**I. Likelihood of Success on the Merits**

    **A. Section 2 of the VRA**

Section 2 prohibits states from imposing any voting qualification, prerequisite, standard, practice, or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). "A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by racial minorities, in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

> Although proving a violation of § 2 does not require a showing of discriminatory intent, only discriminatory results, proof of a causal connection between the challenged voting practice and a prohibited result is crucial. Said otherwise, a § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected.

*Gonzales v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (internal quotations and citations omitted).

In *Thornburg v. Gingles*, the Supreme Court cited a list of non-exhaustive factors that courts should consider when determining whether, under the totality of the circumstances, a challenged voting practice interacts with social and historical conditions to cause a disparity between the electoral opportunities of minority and white voters.[2] 478 U.S. 30 (1986). These factors include:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]
>
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417, at 28-29 (1982)). Courts also

---

[2] These factors are sometimes called the "Senate Factors" because they derive from the Senate Report accompanying the 1982 amendments to the VRA.

- 5 -

may consider "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group," and "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.* "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45.

Accordingly, a § 2 claim has two essential elements: (1) the challenged voting practice must impose a disparate burden on the electoral opportunities of minority as compared to white voters, and (2) "that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *League of Women Voters of N. C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (internal quotations and citations omitted). "The first part of this two-prong framework inquires about the nature of the burden imposed and whether it creates a disparate effect[.]" *Veasey v. Abbott*, --- F.3d ---, No. 14-41127, 2016 WL 3923868, at *17 (5th Cir. July 20, 2016). Drawing on the Supreme Court's guidance in *Gingles*, "[t]he second part . . . provides the requisite causal link between the burden on voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both." *Id.* Stated otherwise, "the second step asks not just whether social and historical conditions 'result in' a disparate impact, but whether the challenged voting standard or practice causes the discriminatory impact as it interacts with social and historical conditions." *Ohio Democratic Party v. Husted*, --- F.3d ---, No. 16-3561, 2016 WL 4437605, at *14 (6th Cir. Aug. 23, 2016) (alterations omitted).

Maricopa County accounts for 61% of Arizona's population and almost 70% of all OOP ballots. (Doc. 177-1 at 43; Doc. 180-1 at 100.) Thus, Plaintiffs' expert, Dr. Jonathan Rodden, examined the relationship between race and OOP voting using the 2012 general election in Maricopa County as a case study. Because Arizona does not

track the race of voters, Dr. Rodden used two methods to estimate the racial composition of OOP voters in Maricopa County.  First, Dr. Rodden superimposed 2010 census block group data on a map noting the location of OOP voters.[3]  He determined that OOP voting is more concentrated in areas with higher Hispanic and African American populations and less common in predominately white suburban neighborhoods. (Doc. 177-1 at 32.) Second, Dr. Rodden estimated the race of OOP voters using surname data. (*Id.* at 34.) "This approach makes use of the frequency of specific last names in the population, which can be determined from past individual-level Census data, and the frequency of racial groups in local areas according to the United States Census Department." (*Id.* at 35.)  Under this approach, Dr. Rodden also found that minorities are over-represented among those casting OOP ballots in Maricopa County. (*Id.* at 37.)  Dr. Rodden concluded that white voters accounted for only 56% of OOP ballots, despite casting 70% of all in-person voters. (*Id.* at 37.)  In contrast, African American and Hispanic voters made up 10% and 15% of in-person voters, but accounted for 13% and 26% of OOP ballots, respectively. (*Id.*)  Dr. Rodden analyzed comparable data from Pima County and found that the results were similar to those in Maricopa County. (*Id.* at 43.)  In his rebuttal report, he analyzed data from Arizona's non-metro counties and found similar disparities among in-person voters. (Doc. 192-2 at 60.)

The Court credits Dr. Rodden's assignment of race to OOP voters for purposes of this order, but finds that his analysis paints an incomplete picture of the impact of OOP voting.  "No state has exactly equal registration rates, exactly equal turnout rates, and so on, at every stage of its voting system." *Frank v. Walker*, 768 F.3d 744, 754 (7th Cir. 2014).  Because some degree of disparity is inevitable, not every statistical disparity between minority and white voters is cognizable under the VRA.  Rather, a cognizable disparity results "in an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *See Gingles*, 478 U.S. at 47.  Thus, in the

---

[3] A census block group is the smallest unit of census geography for which such data is available. (Doc. 177-1 at 31 n.21.)

- 7 -

1  context of this case, the Court views the relevant question as whether Arizona's rejection
2  of OOP ballots meaningfully reduces the likelihood that minority as compared to white
3  voters will cast ballots that ultimately are counted.

4  In Arizona, 2,323,579 ballots were cast during the 2012 general election, only
5  10,979—or 0.5%—of which were cast OOP. (Doc. 180-1 at 100; Doc. 177-1 at 26.) Dr.
6  Rodden's report shows that the percent of minority OOP ballots is higher than minority
7  representation in the number of *in-person ballots* cast. However, an analysis based only
8  on in-person voting is incomplete because in-person voting is not the only method by
9  which Arizonans vote. Arizona also permits absentee voting. During the 2012 election,
10 1,542,855 voters submitted absentee ballots, over 99% of which were counted. (*Id.* at 90,
11 92; Doc. 177-1 at 17.) This represents two-thirds of the total votes cast in that election.
12 By focusing only on in-person votes, or about only one-third of the votes cast, Dr.
13 Rodden's analysis distorts the practical effect of the observed disparities in OOP voting
14 on the overall electoral opportunities enjoyed by minority as compared to white voters.
15 Put in perspective, OOP ballots cast by white voters accounted for only 0.3% of all votes
16 cast during the 2012 election, whereas OOP ballots cast by Hispanic and African
17 American voters accounted only for 0.13% and 0.07%, respectively.[4] (Doc. 180-1 at
18 101.) Considering OOP ballots represent such a small fraction of the overall votes cast
19 in any given election, the Court finds that OOP ballot rejection likely has no meaningful
20 impact on the opportunities of minority as compared to white voters to elect their
21 preferred representatives.

22 Even if the disparities observed by Dr. Rodden are cognizable under § 2, Plaintiffs
23 have not shown that challenged practice, itself, likely causes those disparities. Plaintiffs
24 argue that:

25  voters cast OOP ballots due to the systemic problems in Arizona's
    administration of elections; specifically, voter confusion caused by the
26

---

27  [4] Notably, absentee voting steadily has been increasing. For example, in 2008,
28 35.6% of all registered voters submitted absentee ballots; in 2012, that figure grew to
41.4%. (Doc. 180-1 at 90.) Thus, the proportion of the electorate that votes OOP likely
will decline as absentee voting continues to increase.

- 8 -

>       large number of changes in polling locations from election to election; the
>       inconsistent election regimes used by and within counties; poor placement
>       of polling locations; and other faulty election administration procedures.

(Doc. 73 at 12-13.) Notably, however, Plaintiffs do not challenge any of these "systemic problems" or "faulty election administration procedures" in this lawsuit.[5] Instead, Plaintiffs have challenged Arizona's requirement that only ballots cast in the correct precinct be counted. But it is circular to argue that minority votes are disproportionately rejected for being cast OOP because Arizona rejects OOP ballots. In other words, Arizona's requirement that voters cast ballots in their assigned precincts is not the reason it is difficult or confusing for some voters to find or travel to their correct precinct.

Moreover, Plaintiffs have only loosely linked the observed disparities in minority OOP voting to social and historical conditions that have produced discrimination. Plaintiffs argue that "voters cast OOP ballots due to their high rates of residential mobility, a factor that is inextricably linked to the State's long history of discrimination." (Doc. 73 at 7.) Although Plaintiffs provide evidence supporting the first part of this statement—that minorities are more likely to rent, less likely to own homes, and have greater rates of residential mobility, (Doc. 139-1 at 41; Doc. 177-1 at 11, 31-32)—they have not shown that racial discrimination is a substantial cause of these disparities. For example, Plaintiffs cite no evidence of private or state-sponsored discrimination in housing. Instead, they contend that historical discrimination in employment, income, and education has had lingering effects on the socioeconomic status of racial minorities. These disparities, in turn, lead to lower rates of homeownership and higher rates of residential mobility among minorities, which then leads minorities to experience greater confusion about their correct polling place location.

The Court does not discount Arizona's history of racial discrimination or the

---

[5] Plaintiffs initially challenged Maricopa County's polling place allocation plans for the upcoming general election, but the parties later settled all polling place allocation claims. (Doc. 202.) Additionally, although Plaintiffs argue that the inconsistent use of vote centers and precincts raises Equal Protection concerns, they do not challenge the validity of A.R.S. § 16-411(B), nor do they argue that all counties must use the same voting system.

lingering effects on the socioeconomic status of minorities. But if the requisite causal link under § 2 could be established primarily by pointing to socioeconomic disparities between minorities and whites, then nearly all voting regulations could conceivably violate the VRA because nearly all costs of voting are heavier for socioeconomically disadvantaged voters. (*See* Doc. 139-1 at 39 ("Decades of research has demonstrated that socio-economic standing significantly impacts the ability to fully participate in the political process.").) Taken to its logical conclusion, Plaintiffs' causation theory would allow a plaintiff to successfully challenge any aspect of a state's election regime in which there is not perfect racial parity simply by noting that the costs of voting fall heavier on minorities due to their socioeconomic status. The Court doubts that such a loose approach to causation is consistent with the text or purposes of the VRA, particularly in light of the Ninth Circuit's repeated emphasis on the importance of a "causal connection between the challenged voting practice and a prohibited discriminatory result." *Smith v. Salt River Project Agr. Imp. & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997) (internal quotations and citation omitted).

In sum, the Court finds that Plaintiffs are not likely to succeed on their § 2 claim because they have not shown that Arizona's rejection of OOP ballots results in a cognizable disparity between the electoral opportunities of minority voters compared to white voters, nor have they adequately linked the observed disparities to the challenged practice, itself, or to historical discrimination in Arizona.

### B. Fourteenth Amendment

Although the Constitution empowers states to regulate the times, places, and manner of elections, U.S. Const. art. I, § 4, cl. 1, this power is not absolute. It is "subject to the limitation that [it] may not be exercised in a way that violates other . . . provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968); *see Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008). As relevant here, the Fourteenth Amendment protects against unjustified burdens on voting and arbitrary disparate treatment of similarly situated persons. *See Burdick v. Takushi*, 504

1  U.S. 428, 433-34 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

### i. *Anderson-Burdick*

All elections regulations "invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. "[A]s a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Thus, when an election law is challenged a court must weigh the nature and magnitude of the burden imposed by the law against state's interests in and justifications for it. *See Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008). "[T]he severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." *Nader*, 531 F.3d at 1034. A law that severely burdens the right to vote is subject to strict scrutiny, meaning it must be narrowly tailored to serve a compelling state interest. *Id.* at 1035. On the other hand, a state's important regulatory interests are generally sufficient to justify laws that impose lesser burdens. *See Washington State Grange*, 552 U.S. at 452; *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010). Laws that do significantly increase the usual burdens of voting do not raise substantial constitutional concerns. *See Crawford*, 553 U.S. at 198. This framework is commonly referred to as the *Anderson-Burdick* test, named after the two Supreme Court cases from which it derives.

Plaintiffs identify two burdens that Arizona's rejection of OOP ballots allegedly imposes. First, voters must locate their correct precinct. Second, if voters mistakenly arrive at the wrong precinct, they must find and timely travel to their correct precinct. (Doc. 201 at 27:13-17.) But Arizona's rejection of OOP ballots does not make it any more difficult for voters to locate their correct precinct. Plaintiffs do not argue that it will be easier for voters to identify their correct precinct if Arizona eliminated its prohibition on counting OOP ballots. Instead, Plaintiffs cite evidence that "voter confusion caused by the large number of changes in polling locations from election to election is one of the primary factors causing voters to cast OOP ballots." (Doc. 73 at 31; Doc. 177-1.)

1  Additionally, "[p]olling location placement, inconsistent election regimes used by and
2  within counties, and procedural errors are also contributing causes." (Doc. 73 at 32.)
3  Thus, the difficulties experienced by some voters in locating their correct precinct are
4  caused primarily by the relocation of polling places from election to election, which is
5  not the practice challenged here. Though Arizona's rejection of OOP ballots might make
6  it more imperative for voters to correctly identify their precinct, it does not increase the
7  burdens associated with doing so.

8  Notably, Arizona employs a variety of methods to educate voters about their
9  correct precincts. The Secretary of State's Office operates several websites with polling
10 place information, responds to voter inquiries, and mails a publicity pamphlet to voters
11 that includes information on how to locate their correct precinct. (Doc. 180-1 at 29.)
12 Counties and the Arizona Citizens Clean Elections Commission operate online polling
13 place locators. (*Id.* at 30, 45, 52.) County Recorders also spread awareness through news
14 and social media. (*Id.* at 45, 52.) This information is communicated in both English and
15 Spanish. (*Id.*) Additionally, poll workers are trained to tell voters if they are at the
16 wrong polling place and to give voters information about their correct polling place. (*Id.*
17 at 54, 64-65.) Given the many ways in which Arizona voters can learn their correct
18 polling place location, the Court finds that the rejection of OOP ballots likely imposes no
19 more than minimal burdens not substantially greater than those typically associated with
20 voting. *See Colorado Common Cause v. Davidson*, No. 04CV7709, 2004 WL 2360485,
21 at *14 (Colo. Dist. Ct. Oct. 18, 2004) ("[I]t does not seem to be much of an intrusion into
22 the right to vote to expect citizens, whose judgment we trust to elect our government
23 leaders, to be able to figure out their polling place."); *see also Serv. Employees Int'l
24 Union Local 1 v. Husted*, 698 F.3d 341, 344 (6th Cir. 2012) (explaining that voters cannot
25 be absolved "of all responsibility for voting in the correct precinct or correct polling place
26 by assessing voter burden solely on the basis of the outcome—i.e., the state's ballot
27 validity determination").

28 Because Plaintiffs have demonstrated only minimal burdens on voters caused by

rejecting OOP ballots, Arizona need show only that this practice serves important regulatory interests. *Washington State Grange*, 552 U.S. at 452.

> The advantages of the precinct system are significant and numerous: it caps the number of voters attempting to vote in the same place on election day; it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies; it allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing; it makes it easier for election officials to monitor votes and prevent election fraud; and it generally puts polling places in closer proximity to voter residences.

*Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004). Even Dr. Rodden acknowledges that "precincts must be created, and ballots printed, so that the residential address of every voter is connected to the right bouquet of local elected officials." (Doc. 177-1 at 10.) Arizona's prohibition on counting OOP ballots is one mechanism by which Arizona enforces and administers this precinct-based system and, therefore, is sufficiently justified in light of the minimal burdens imposed.[6]

### ii. Equal Protection

Finally, Plaintiffs do not advance a coherent Equal Protection theory. They argue that Arizona's:

> policy of rejecting OOP ballots in jurisdictions that opt to run an election under a precinct-based system, while other jurisdictions holding the same election under a vote center based system count ballots voted anywhere in the county, further violates the [Fourteenth] Amendment's Equal Protection Clause because it treats similarly situated voters differently without sufficient justification for doing so.

(Doc. 73 at 32.) For example, "voters in a county such as Yuma or Yavapai, which ordinarily use a vote center model, have a significantly better probability of having their vote counted than voters in counties such as Maricopa and Pima, which ordinarily use precinct-based systems." (*Id.* at 32-33.) But Arizona's rejection of OOP ballots does not cause this differential treatment. Instead, the discrepancy is the result of some counties administering elections using vote centers and others precincts. Stated otherwise, if all

---

[6] Indeed, more than two dozen other states enforce precinct-based systems by rejecting OOP ballots. (Doc. 180-1 at 10-20.)

1 counties used the same voting system, Arizona's rejection of OOP ballots would affect
2 voters equally regardless of the county in which they reside.

3 Plaintiffs, however, do not challenge A.R.S. § 16-411(B), which allows Arizona
4 counties to choose between precinct-based and vote center models, nor do they seek an
5 injunction requiring all counties to use the same voting system. During oral argument,
6 the Court asked whether it was Plaintiffs' position that "Arizona can't use both precinct
7 and voter center models; they can have one or the other but not both," to which counsel
8 responded no. (Doc. 201 at 29:4-7.)

9 Moreover, Plaintiffs' requested injunction would not remedy the inequities they
10 have identified. Plaintiffs seek an order requiring counties to partially count OOP ballots
11 by accepting votes for races in which the voter is eligible to vote and rejecting votes for
12 races in which the voter is not. But under this framework, voters in counties that
13 administer elections under a vote center model still would be treated more favorably than
14 voters in counties that use precincts. In a vote center county, voters may show up at any
15 vote center and receive a ballot reflecting all races in which they are eligible to vote. But
16 a voter in a precinct county cannot show up at any precinct and receive the appropriate
17 ballot. Even under Plaintiffs' proposed regime that voter will be partially
18 disenfranchised.

19 Accordingly, the Court finds that Plaintiffs are not likely to succeed on their Equal
20 Protection challenge because they have not advanced a coherent theory, and because the
21 relief they seek does not remedy the inequality they have identified.

22 **II.  Irreparable Harm**

23 Because Plaintiffs are not likely to succeed on the merits of their claims, they have
24 not shown that Arizona's rejection of OOP ballots will cause them irreparable harm. *See*
25 *Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986). Moreover, Arizona has
26 required voters to cast ballots in their assigned precinct since at least 1970, and all parties
27 agree that OOP provisional ballots have been rejected since at least 2006. Arizona
28 authorized counties to use vote centers in 2011. Yavapai and Yuma counties have used

vote centers since 2012. Despite this lengthy history, Plaintiffs waited until April of 2016—an election year—to bring this lawsuit and did not request mandatory preliminary injunctive relief until June. The only explanation Plaintiffs have provided for this delay is that "not all election laws appear troublesome at first glance," and that strong data of substantial disenfranchisement was not previously available. (Doc. 192 at 31; Doc. 201 at 32-33.) This explanation, however, is belied by the fact that Dr. Rodden relies on data from the 2008, 2010, 2012, and 2014 elections to draw his conclusions concerning the impact of OOP ballot rejection on minority voters. (Doc. 177-1.) Plaintiffs fail to explain why they waited until mere months before the 2016 general election to challenge this practice, and their "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

### III. Balance of Hardships/Public Interest

Finally, the Court finds that neither the balance of hardships nor the public interest supports the issuance of a mandatory preliminary injunction. Defendants provide evidence that requiring counties to develop procedures for counting OOP ballots in the upcoming general election would be significantly burdensome. After a general election, Arizona counties have twenty days to complete their canvass, which includes tallying votes for each candidate and providing vote totals to the Secretary of State's Office. (Doc. 180-1 at 30.) The Secretary then has until the fourth Monday following the general election to verify the information from the canvass. (*Id.*) According to Arizona Elections Director Eric Spencer, "instituting a new vote counting procedure would likely delay the canvass process, and therefore likely put the counties and the state past the statutory deadlines." (*Id.*) Further, "the elections budgets for counties are likely already set and do not necessarily include funds to cover the additional labor and duplicate ballots that would be required to count OOP ballots." (*Id.*)

Indeed, Pima County Elections Director Brad Nelson explained that counting votes "for some offices cast by a person voting on an incorrect ballot would take

additional time, manpower, and financial resources." (*Id.* at 55.) To partially count OOP ballots, counties likely would use a manual approach similar to the method for counting damaged ballots. (*Id.*) Under this process:

> the correct ballot for that precinct would need to be accessed and a team of two election workers would create a new ballot. One worker would read the voter's selections for the races appearing on both the voted [OOP] ballot and the correct ballot for the voter's assigned precinct. Once those votes have been marked, the new ballot is printed[.]
>
> The newly-marked ballot for the correct precinct then would be put together with the original ballot and provided to a different two-person team for proofing. The second team would verify that the votes marked on the duplicate ballot matched the votes on the original ballot.

(*Id.*) Nelson estimated that this process could take up to fifteen minutes per OOP ballot. (*Id.*) Thus, requiring county election officials to institute a new procedure for counting OOP ballots for the upcoming general election would impose substantial costs on elections officials and could heighten the risk of human error in vote tabulation. On balance, the Court finds that mandatory injunctive relief is inappropriate.

## **CONCLUSION**

For these reasons, Plaintiffs have not satisfied their heavy burden for obtaining a mandatory preliminary injunction. Plaintiffs have not shown that Arizona's rejection of OOP ballots likely results in a cognizable disparity in the electoral opportunities of minority as compared to white voters. Nor have they shown that the practice more than minimally burdens voting rights. Further, Arizona has required voters to cast ballots in their correct precinct since at least 1970, and the data upon which Plaintiffs rely has been available since at least 2008. Plaintiffs delay in challenging the practice implies a lack of urgency and undermines the need for immediate mandatory injunctive relief during the waning months of an election year.[7]

---

[7] The Court previously denied Plaintiffs' motion to preliminarily enjoin enforcement of H.B. 2023, after which Plaintiffs moved under Federal Rule of Civil Procedure 62(c) for a stay of the order pending appeal. (Docs. 204, 210.) The Court denied this request. (Doc. 213.) The Court anticipates that Plaintiffs likewise will appeal this order. Although under Federal Rule of Appellate Procedure 8(a)(1), "[a] party must ordinarily move first in the district court for . . . a stay of the judgment or order . . . pending appeal," the Court is mindful of the time constraints imposed by the upcoming

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction on Provisional Ballot Claims, (Doc. 72), is **DENIED**.

Dated this 11th day of October, 2016.

                                                   _____
                                                   Douglas L. Rayes
                                                   United States District Judge

---

general election.  Accordingly, the Court informs the parties now that it is not inclined to grant a stay of this order pending appeal.  Plaintiffs may seek relief directly from the Ninth Circuit Court of Appeals pursuant to Federal Rule of Appellate Procedure 8(a)(2).