1   Daniel C. Barr (# 010149)
    Sarah R. Gonski (# 032567)
2   PERKINS COIE LLP
    2901 North Central Avenue, Suite 2000
3   Phoenix, Arizona 85012-2788
    Telephone: (602) 351-8000
4   Facsimile: (602) 648-7000
    DBarr@perkinscoie.com
5   SGonski@perkinscoie.com

6   Marc E. Elias (WDC# 442007)*
    Bruce V. Spiva (WDC# 443754)*
7   Elisabeth C. Frost (WDC# 1007632)*
    Amanda R. Callais (WDC# 1021944)*
8   PERKINS COIE LLP
    700 Thirteenth Street NW, Suite 600
9   Washington, D.C. 20005-3960
    Telephone: (202) 654-6200
10  Facsimile: (202) 654-6211
    MElias@perkinscoie.com
11  BSpiva@perkinscoie.com
    EFrost@perkinscoie.com
12  ACallais@perkinscoie.com

13  Joshua L. Kaul (WI# 1067529)*
    PERKINS COIE LLP
14  One East Main Street, Suite 201
    Madison, Wisconsin  53703
15  Telephone:  (608) 663-7460
    Facsimile:  (608) 663-7499
16  JKaul@perkinscoie.com

17  *Attorneys for Plaintiffs*

18  *Admitted pro hac vice*

19                  UNITED STATES DISTRICT COURT

20                     DISTRICT OF ARIZONA

21

| | |
|---|---|
| 22  Arizona Democratic Party; Democratic National Committee; and DSCC a.k.a. Democratic Senatorial Campaign Committee, | No. CV-16-01065-PHX-DLR |
| 24                Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| 25          v. | |
| 26  Arizona Secretary of State's Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; and Mark Brnovich, in his official capacity as Arizona Attorney General, | |

28

Defendants.

The ARIZONA DEMOCRATIC PARTY, DEMOCRATIC NATIONAL COMMITTEE, and DSCC a.k.a. DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE (collectively, "Plaintiffs"), for their Complaint against the ARIZONA SECRETARY OF STATE'S OFFICE, MICHELE REAGAN, in her official capacity as the Secretary of State of Arizona, and MARK BRNOVICH, in his official capacity as Arizona Attorney General (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 to secure equitable relief from Defendants' unlawful deprivation of Plaintiffs' and their members' and constituents' rights, privileges, and immunities guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the First and Fifteenth Amendments to the United States Constitution, Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the laws of the United States.

2.      "No right is more precious in a free country than that of having a voice in the election of those who make the laws . . . ." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Plaintiffs bring the instant lawsuit to protect that right and to prevent the continued disenfranchisement and unjustified burdens imposed on the right to vote of thousands of Arizona voters—including specifically Arizona's Hispanic, Native-American, and African-American voters—due to Arizona's (1) practice of not counting provisional ballots cast in a precinct other than the one to which the voter is assigned, and (2) recent criminalization of the collection of signed and sealed absentee ballots with the passage of H.B. 2023 (collectively, the "challenged practices").

3.      In 1975, due to its long history of discrimination against Hispanics, Native Americans, and African Americans, Arizona became a "covered jurisdiction" under Section 5 of the Voting Rights Act. For the next thirty-eight years, Arizona's voters

enjoyed protection from disenfranchisement as well as arbitrary and disparate treatment by the State in its elections practices and procedures as a result of the independent oversight provided by the federal government to all covered jurisdictions. Section 5 prohibited covered jurisdictions from making any changes to their election practices or procedures until either the U.S. Department of Justice ("DOJ") or a federal court determined that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or [membership in a language minority group]." 42 U.S.C. § 1973(c).

4.     On June 25, 2013, the United States Supreme Court issued its opinion in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), in which it invalidated the coverage formula contained in Section 4 of the Voting Rights Act (used to identify covered jurisdictions under Section 5), thereby stripping Arizona's voters of the protection that Section 5 had provided. *Id.* at 2631. Arizona's elections officials became free to make changes to their election laws and procedures without first demonstrating to DOJ or a federal court that those changes were not meant to deny or abridge, and would not result in denial or abridgement of, the right to vote of minority voters.

5.     In the three and a half years that have passed since the Court decided *Shelby County*, voters in general and minority voters in particular have not fared well in Arizona. Since being removed from the protection of Section 5, Arizona citizens have been subject to "consistent activity that has created a culture of voter disenfranchisement" and abridged and denied the rights of voters across the State. *See* Phoenix Mayor Greg Stanton's March 23, 2016 Letter to Attorney General Lynch at 2 [hereinafter "Stanton Letter"], *available at* https://www.phoenix.gov/mayorsite/Documents/Mayor%20Greg%20 Stanton%20Letter%20to%20DOJ.pdf (last visited, Apr. 13, 2016). The challenged provisions at issue in this action disparately and impermissibly burden the right of all Arizonans to vote, but their impacts fall particularly hard on the State's minority voters.

6.     Arizona collects and rejects provisional ballots in breathtaking numbers. Since 2006, Arizona has rejected over 121,000 provisional ballots. Doc. 177-1, Expert

Report of Dr. Jonathan Rodden ("Rodden Rpt.") 26-29. In 2012 alone, "[m]ore than one in every five [in person] voters … was asked to cast a provisional ballot, and over 33,000 of these—more than 5 percent of all in-person ballots cast—were rejected. No other state rejected a larger share of its in-person ballots in 2012." Rodden Rpt. 24-25. The most common reason that provisional ballots are rejected in Arizona is because they are cast in the incorrect precinct. *See, e.g.*, Rodden Rpt. 26-29.

7.     In 2014, Arizona ranked fifth in the nation for the total number of provisional ballots rejected. The main reason that Arizona refused to count provisional ballots was that they were cast in a precinct other than the one to which the voter was assigned. In Arizona's most populous county—Maricopa County—alone, over 2,800 ballots were rejected as a result of the County's application of the state policy of not counting OOP ballots. In the 2016 general election, again, nearly 2,200 voters were disenfranchised for casting a ballot in a precinct other than the one to which they were assigned due to Maricopa County's application of the state's policy rejecting OOP ballots.

8.     The provisional ballots cast and rejected across the state are disproportionately cast by Hispanic, African American, and Native American voters. For example, in 2012, in Maricopa County (which accounts for three quarters of all OOP ballots cast in Arizona) 70% of in-person voters were white, but "only 56 percent of those casting out-of-precinct ballots were white." Rodden Rpt. 37. In contrast, only "10 percent of those casting votes at polling places were African American," but 13% of the ballots cast OOP were by African American voters. *Id.* A full 26% of OOP ballots were cast by Hispanics, despite the fact that only 15% of in-person voters were Hispanic. *Id.* Similarly, "[t]he rate at which in-person ballots are [rejected because they were cast OOP] is 80 percent higher for Hispanics, 34 percent higher for African Americans, and 26 percent higher for Native Americans than for whites." Rodden Rpt. 38-40.

9.     Minority voters are also disproportionately likely to be disenfranchised in future elections in Arizona as a result of H.B. 2023, enacted by the Arizona State Legislature in early March 2016, which makes it a felony to turn a signed and sealed

ballot into the county registrar on behalf of another voter. This legislation was passed over the protests of Arizona's Hispanic, Native-American, and African-American voters, communities in which voters have relied heavily on community members, organizers, and friends to deliver ballots to registrars' offices in past elections, and all of whom now are significantly more likely to have their right to vote abridged or denied as a result of H.B. 2023.

10.     Together, the challenged provisions impose onerous burdens on Arizona voters, as they have the purpose and effect of burdening, abridging, and/or denying the right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, the Fifteenth Amendment, Section 2 of the Voting Rights Act, and the laws of the United States.

11.     Unless the Court preliminarily and permanently enjoins the challenged provisions, Plaintiffs, their members, constituents, and numerous other qualified Arizona voters will find their right to vote severely burdened—and in many cases, wholly denied—in future elections.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357, and 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     This Court has personal jurisdiction over Defendants, all of whom are sued in their official capacities and are either government entities or elected officials in Arizona. All Defendants work or reside in the State of Arizona.

14.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and in this division.

## PARTIES

15.     Plaintiff the DEMOCRATIC NATIONAL COMMITTEE ("DNC") is a national committee, as that term is defined by and used in 52 U.S.C. § 30101, dedicated to

electing local, state, and national candidates of the Democratic Party to public office throughout the United States. The DNC has members and constituents across the United States, including eligible voters in Arizona. To accomplish its mission, among other things, the DNC works closely with Democratic public officials and assists state parties and candidates by contributing money; making expenditures on their behalves; and providing active support through the development of programs benefiting Democratic candidates. Arizona's policy of not counting provisional ballots cast in a precinct other than the one to which the voter is assigned in any given election, and the State's recent criminalization of the collection of signed and sealed absentee ballots with the passage of H.B. 2023 directly harm the DNC, its members, and constituents by disproportionately burdening and/or reducing the turnout of Democratic voters and increasing the likelihood that those voters who do turnout will not have their vote counted. These challenged practices further decrease the likelihood that the DNC will be successful in its efforts to help elect candidates of the Democratic Party to public office.

16.     In particular, among the voters most harmed by the challenged practices are some of the DNC's core constituencies, including Hispanic, Native-American, and African-American voters, who are disproportionately likely to be burdened by the voting laws, procedures, and practices challenged in this lawsuit and, as a result, are less likely than other voters to vote or to have their provisional vote counted. To accomplish its mission, the DNC will be forced to divert valuable resources to help its members and constituents overcome the barriers to voting created by the challenged voting laws, practices, and procedures and to ensure that these voters are not disenfranchised. Further, the DNC's members and constituents are directly harmed by the challenged practices as they are Arizona voters whose right to vote is burdened, abridged, and/or denied by the same. The DNC brings this suit on their behalves, as well as in its own right.

17.     Plaintiff DSCC a.k.a. Democratic Senatorial Campaign Committee is a Democratic political committee established and maintained by a national political party, as defined by and used in 11 C.F.R. § 110.2(c)(2)(iii) and provided for in 52 U.S.C. §

30116(h). DSCC is dedicated to encouraging the election of Democratic Senate candidates to office and is comprised of sitting Democratic Members of the United States Senate. DSCC accomplishes its mission by, among other things, contributing money to Democratic Senate candidates; making expenditures on behalf of Democratic Senate candidates; and providing campaign services to Democratic Senate candidates. DSCC also provides assistance to the state Democratic parties in the development and implementation of programs benefiting Democratic candidates for federal, state, and local office, such as get-out-the-vote and generic party efforts undertaken on behalf of the Democratic ticket.

18.     DSCC is directly harmed by Arizona's policy of not counting OOP provisional ballots and the State's recent criminalization of the collection of signed and sealed absentee ballots with the passage of H.B. 2023. The challenged practices disproportionately burden and/or reduce the turnout of Democratic voters and the likelihood that those voters who do turnout will have their vote counted, thereby decreasing the likelihood that DSCC will be successful in its efforts to help elect candidates of the Democratic Party to the Senate as well as federal, state, and local office. In particular, it is DSCC's core constituencies of, among others, Hispanics, Native Americans, and African Americans who are most harmed by the challenged practices and, as a consequence, are more likely to be burdened and less likely to vote or to have their provisional vote counted. The challenged practices will directly affect DSCC's ability to campaign for and have its Senate candidates elected, forcing DSCC to divert resources that it would use for other purposes to assisting Arizona voters with overcoming the barriers created by the challenged practices to ensure that these voters are not disenfranchised.

19.     Plaintiff ARIZONA DEMOCRATIC PARTY is a state committee, as defined by 52 U.S.C. § 30101(15), dedicated to electing candidates of the Democratic Party to public office throughout the State of Arizona. The Arizona Democratic Party has members and constituents from across Arizona, including many eligible voters who regularly support and vote for candidates affiliated with the Democratic Party. As

discussed *infra*, members and constituents of the Democratic Party risk having their right to vote burdened and/or denied due to the challenged practices. The Arizona Democratic Party brings these claims on their behalves, as well as in its own right.

20.     The Arizona Democratic Party is directly harmed by the challenged practices which disproportionately burden and/or reduce the turnout of Democratic voters and the likelihood that those voters who do turnout will have their vote counted, thereby decreasing the likelihood that the Arizona Democratic Party will be successful in its efforts to help elect candidates of the Democratic Party to office. In particular, it is the Arizona Democratic Party's core constituencies of, among others, Hispanics, Native Americans, and African Americans who are most harmed by Arizona's policies and, as a consequence, are more likely to be burdened and less likely to vote or to have their provisional vote counted. Moreover, since at least 2010, the Arizona Democratic Party has turned in ballots for voters during prior elections. Collecting early-vote ballots has been an integral part of the Arizona Democratic Party's get-out-the-vote strategy and is a key part of the support it provides its Hispanic, Native-American, and African-American members, constituents and voters, particularly those in Phoenix, Tucson, and tribal communities throughout the state. Additionally, the Arizona Democratic Party's members and constituents both collect ballots to help other voters and themselves vote via ballot collection. Due to the passage of H.B. 2023 and its corresponding criminal penalties, the Arizona Democratic Party will not be able to assist its voters in this way due to the possibility of criminal liability, nor will its members and constituents be able to associate with the Arizona Democratic Party through ballot collection. Accordingly, the Arizona Democratic Party is now foreclosed from associating with its voters in this manner. As a result of all of the challenged voting laws, practices, and procedures, the Arizona Democratic Party will have to devote resources that it otherwise would have spent educating voters about its candidates and issues, to assisting its voters in overcoming the barriers the challenged practices impose and in protecting their right to vote.

21.     Defendant the Arizona SECRETARY OF STATE'S OFFICE is established

by A.R.S. § 41-121.02. It is directed by the Secretary of State and, among other things, is charged with overseeing elections in the State of Arizona. *Id.*

22.     Defendant Michele REAGAN is the Secretary of State for the State of Arizona ("the Secretary") and is the Chief Elections Officer for Arizona. A.R.S. § 16-142. As Arizona's Chief Elections Officer, the Secretary is responsible for overseeing the voting process in Arizona, and is empowered with broad authority to carry out that responsibility. The Secretary also issues the Arizona Election Procedures Manual ("Manual") (Rev. 2014), which establishes election procedures and administration across Arizona's fifteen counties. A.R.S. § 16-452. The Manual is approved by the Governor and the Arizona Attorney General and carries the force of law. A.R.S. § 16-452(B). The Secretary is sued in her official capacity for actions taken under color of law.

23.     Defendant MARK BRNOVICH, is the Arizona Attorney General ("Attorney General") and the chief legal officer of the State of Arizona. A.R.S. § 41-192(A). The Attorney General approves election procedures issued by the Secretary of State. A.R.S. § 16-452. Among other duties, the Attorney General is charged with enforcing state criminal statutes, including H.B. 2023. A.R.S. §§ 41-191 et seq. In particular, the Attorney General is empowered to prosecute election-related offenses under Title 16. A.R.S. § 16-1021. Additionally, the Attorney General has the duty to "[r]epresent the state in any action in a federal court." A.R.S. § 41-193(A)(3). The Attorney General is sued in his official capacity for actions taken under the color of law.

## GENERAL ALLEGATIONS

### Arizona's History of Discrimination Against Racial, Ethnic, and Language Minorities

24.     Arizona has a lengthy history of discrimination against Hispanics, Native Americans, and African Americans, which has directly and substantially hindered their ability to participate in the political process, and which, in 1975, resulted in Arizona becoming a covered jurisdiction subject to federal preclearance for any change to its voting laws, practices, or procedures, under Section 5 of the Voting Rights Act.

25.     When Arizona became a state in 1912, Native Americans were excluded from voting.[1] Even after the United States Congress passed the Indian Citizenship Act in 1924, recognizing Native Americans as citizens and, thereby, affording them the right to vote, Arizona's Constitution continued to deny Native Americans that right. Indeed, it was not until 1948 when the Arizona Supreme Court found that such treatment was unconstitutional that Native Americans were granted the right to vote in Arizona. *See Harrison v. Laveen*, 196 P.2d 456, 463 (Ariz. 1948). Despite the Arizona Supreme Court's recognition of the legal right to vote in 1948, Native Americans, as well as Hispanics and African Americans, have continued to face barriers to participation in the franchise.

26.     In 1912, Arizona enacted an English literacy test for voting. The test was enacted specifically "to limit 'the ignorant Mexican vote,'" and had the effect of also reducing the ability of African Americans and Native Americans to register and vote, as registrars applied the test to these communities as well. Doc. 101-1, Expert Report of Dr. David Berman ("Berman Rpt.") 12. Furthermore, well into the 1960s it was also a practice for white Arizonans to challenge these minority voters at the polls by asking them to read and explain literacy cards. *Id.* at 12-13. In 1970, Congress amended the Voting Rights Act to enact a nationwide ban on literacy tests after finding that they were used to discriminate against voters on account of their race or ethnicity. *Oregon v. Mitchell*, 400 U.S. 112, 118 (1970). In reaching that finding, Congress specifically cited evidence which showed "that voter registration in areas with large Spanish-American populations was consistently below the state and national averages." *Id.* at 132. Congress found that, "[i]n Arizona, for example, only two counties out of eight with Spanish surname populations in excess of

---

[1] Hispanics were granted the right to vote in Arizona when it became a state in 1912 by virtue of the Treaty of Guadalupe Hidalgo, which was signed in 1848 at the close of the Mexican-American War. The treaty required that Congress pass legislation recognizing all Mexican Americans as full U.S. citizens. Prior to becoming a state, Arizona (which was a U.S. territory) did not allow Mexican Americans to vote. Notably, as discussed herein, at the time that it became a state in 1912, Arizona enacted an English literacy test which had the effect of preventing these newly enfranchised Mexican Americans (as well as Native Americans and African American) from voting.

15% showed a voter registration equal to the state-wide average." *Id.* Congress also noted that Arizona had a serious deficiency in Native American voter registrations. *See id.* Rather than comply with the law and repeal its test, Arizona challenged the ban, arguing that it could not be enforced to the extent that it was inconsistent with the State's literacy requirement. *Id.* at 117. The United States Supreme Court upheld Congress's ban. *Id.* at 131-33. Nevertheless, Arizona waited until 1972, two years after the Court's decision, to repeal its literacy test.

27.    Arizona's English literacy test also compounded the effects of the State's long history of discrimination in the education of its Hispanic, Native-American, and African-American citizens. From 1912 until the Supreme Court's decision in *Brown v. Board of Education*, segregated education was widespread throughout Arizona, and sanctioned by both the courts and the state legislature. *See Dameron v. Bayless*, 126 P. 273 (Ariz. 1912); *see also Ortiz v. Jack*, No. Civ-1723 (D. Ariz. 1955) (discontinuing segregation of Mexican children at schools); *Gonzales v. Sheely*, 96 F. Supp. 1004, 1008-09 (D. Ariz. 1951) (enjoining segregation of Mexican school children in Maricopa County). Spanish-speaking students were directly targeted based on their language. Native Americans remained segregated because they attended schools on reservations. The practice of segregation also extended well beyond schools, with it being common place to have segregated public spaces such as restaurants, swimming pools, and theaters. Berman Rpt. at 13.

28.    Even where schools were not segregated, Arizona enacted restrictions on bilingual education, mandating English-only education in public schools as early as 1919. *See* James Thomas Tucker, et al., *Voting Rights in Arizona: 1982-2006*, 17 Rev. L. & Soc. Justice 283, 284 (2008). Many of these English-only restrictions have remained in effect in some form to the present day, despite the fact that such programs have led to poor educational outcomes for Arizona's students. *See id.* at 339-40 (noting "[t]he available evidence in Arizona reveals that bilingual education programs have been more effective at raising students' test scores [than English-immersion programs]").

29.     Indeed, as recently as 2000, Arizona banned bilingual education with the passage of Proposition 203. This ballot initiative, which is only the second of its kind to be passed in the United States, is the most restrictive ban on bilingual education in the nation. In addition to severely restricting the educational opportunities of limited English-proficiency students in Arizona, the law has led to widespread confusion and discrimination, with reports of students being slapped for speaking Spanish at school and teachers being afraid they will be fired if they communicate with students in Spanish, even when outside of the classroom. *Id.* at 341.

30.     In addition to Arizona's formal prohibitions on bilingual education, the State also has a long record of failing to provide adequate funding to teach its non-English speaking students—one of "the largest and fastest-growing segments of the school population in Arizona." *Id.* at 338-39 ("As of 2000, there were almost 140,000 [non-English speaking] students enrolled in Arizona public schools."); *see also id.* at 343. In some instances, the State has reportedly underfunded its programs for non-English speaking students by as much as ninety percent, leading to high illiteracy and dropout rates. Remarkably, this underfunding has taken place despite multiple court orders instructing Arizona to develop an adequate funding formula for its programs, including a 2005 order in which Arizona was held in contempt of court for refusing to provide adequate funding for its educational programs. *Flores v. Arizona*, 405 F. Supp. 2d 1112 (D. Ariz. 2005), *vacated*, 204 Fed. App'x 580 (9th Cir. 2006).

31.     Arizona's history of segregation, limitations on bilingual education, and systemic underfunding of education for non-English speaking students contribute to educational disparities amongst Arizona's Hispanic and Native American populations. The challenged provisions interact with, accommodate and amplify this history and its ongoing effects to infringe on and, in some cases wholly deny, Arizona's minority voters the right to vote.

32.     In 2004, Arizona passed another discriminatory ballot initiative, Proposition 200, or the Arizona Taxpayer and Citizen Protection Act, which prohibits persons from

voting and receiving access to state and local public benefits where they cannot prove their citizenship through documentation. In its original form, Proposition 200 specifically required Arizona voters to provide proof of citizenship by presenting at least one of a limited set of documents at the time that they registered to vote. A.R.S. §§ 16-152, 16-166. Between the time that the law was passed and November 2005, "[m]ore than 12,000 applications were rejected because of the new requirements in Pima and Maricopa Counties alone." Tucker, *supra*, at 357. This requirement was (and is) particularly burdensome for many Hispanic, Native-American, and African-American voters who do not have the required forms of identification and face sometimes insurmountable burdens in obtaining them. In 2013, the Supreme Court found that Proposition 200's proof of citizenship requirement for voter registration was preempted by the National Voter Registration Act. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2260 (2013). In response, rather than end the practice of requiring proof of citizenship for registration, Arizona implemented a two track registration system under which individuals may register for federal elections without providing proof of citizenship, but to vote in state and local elections they must provide proof of citizenship. This two track system has added another layer of confusion to Arizona's elections system, particularly for minority voters. As of 2015, Arizona officials reported rejecting over 30,000 voter registrations due to Proposition 200.

33.    In 2007, Maricopa County Sheriff Joseph Arpaio was sued in a class action seeking to stop the Maricopa County Sheriff Office's ("MCSO") policies and practices of intentional and systematic discrimination by conducting illegal stops and detentions of Hispanics and mistreating Hispanic detainees with limited English proficiency. In May 2013, U.S. District Court Judge Murray Snow issued lengthy findings of fact and conclusions of law, finding, among other things, that the MCSO intentionally discriminated against Hispanics. *Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013). Among Judge Snow's findings was "the presence of express racial classification in the policies, practices and procedures followed by the MCSO…." *Id.* at 901. Judge Snow

enjoined MCSO "from using Hispanic ancestry or race as any factor in making law enforcement decisions." *Id.* at 895. In 2016, Sherriff Arpaio was held in civil contempt of court for continuing racially discriminatory law enforcement practices in violation of Judge Snow's order. In October 2016, DOJ launched a federal criminal contempt investigation against Sherriff Arpaio. Hispanic activists launched a vigorous campaign to keep Sheriff Arpaio from being reelected to his sixth term in 2012. Nevertheless, Sheriff Arpaio was reelected. In that same election, Maricopa County misprinted the date of the election on over 2,000 Spanish language information cards and bookmarks, some of which were distributed into the community.

34.     In 2010, the Arizona State Legislature passed S.B. 1070, which authorized local police to check the immigration status of individuals whom they suspected to be in the country illegally. A.R.S. § 11-1051. U.S. District Court Judge Susan Bolton enjoined most of the law from taking effect. *United States v. Arizona*, 703 F. Supp. 2d 980, 1008 (D. Ariz. 2010), *aff'd in part, rev'd in part*, *Arizona v. United States*, 132 S. Ct. 2492, 2510 (2012). This injunction was mostly upheld in subsequent stages of the litigation. *See Arizona v. United States*, 132 S. Ct. 2492, 2510 (2012).

35.     In 2016, elections officials in Arizona's most populous county, Maricopa County, made national headlines when, due to their decision to drastically reduce the number of voting locations for the March 22 presidential preference election ("PPE"), they forced thousands of voters to wait in lines for upwards of five hours to cast their votes for their preferred presidential nominee. In many cases, voters were unable to wait in the arduous lines and were wholly disenfranchised. The reduction of voting locations was particularly burdensome on Maricopa County's Hispanic and African-American communities, many of which had fewer polling locations than Anglo communities and, in some instances, no voting locations at all.

36.     For example, in primarily Anglo communities like Cave Creek, there was one polling place per 8,500 residents. In Phoenix, a majority-minority city where 40.8 percent of its 1.5 million residents are Hispanic, there was only one polling place allocated

per 108,000 residents. Stanton Letter at 1. A wide swath of predominantly minority and lower-income areas in west Phoenix and east Glendale, along with south Phoenix, were particularly lacking in polling sites compared with 2012. Poorer areas of central Mesa lacked polling sites as well, as did south Avondale and much of central Glendale. Arizona State Senator Martin Quezada's predominately Hispanic district only had one polling location. As a result, in this and in other predominately Hispanic parts of the city, not only did people wait well into the night to vote (with some waiting as long as six hours to cast their ballots), but Maricopa County Board member Steve Gallardo admitted that "minorities and low income families may have had to drive a lot further, and had less overall access to voting centers." When Helen Purcell, the Maricopa County Recorder, was asked if she made any effort to determine how her plan to allocate vote centers would impact minority populations, she stated that she looked at the County as a whole and did not pay any attention to "specific areas." In other words, Ms. Purcell made no effort to ensure that her decisions would not disparately disenfranchise minority voters in Arizona. And the result was, predictably, given both the factors that were considered in making the allocation decisions, and Arizona's history of discriminatory practices toward minority voters, that those voters suffered disparate impacts.

37.    As noted, due to its long history of discrimination, Arizona became a covered jurisdiction under Section 5 of the Voting Rights Act in 1975. In addition to being covered under Section 5, it was one of only three states to be covered under Section 4(f)(4) of the Act for Spanish Heritage. Twelve of its fifteen counties, including Maricopa County, are also covered separately under Section 203, which requires minority language assistance. As a result of its inclusion under the Voting Rights Act, Arizona achieved recognized improvements in the numbers of Hispanics and Native Americans registering and voting as well as in the overall representation of minority elected officials in the State. Nevertheless, only one Hispanic and African American have ever been elected to statewide office, and Arizona has never elected a Native American to statewide office. No Native American or African American has ever been elected to the U.S. House of

1   Representatives. Further, no Hispanic, Native American, or African American has ever
2   served as a U.S. Senator representing Arizona, as Attorney General for the State of
3   Arizona, or on the Arizona Supreme Court.

4   38.   Arizona also has a recognized history of racially polarized voting. *Gonzalez*
5   *v. Arizona*, 677 F.3d 383, 407 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal*
6   *Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013). Such racially polarized voting continues
7   today. In particular, in the most recent redistricting cycle, the Arizona Independent
8   Redistricting Commission found that at least one congressional district and five legislative
9   districts clearly exhibited racially polarized voting. Gary King, et al., *Racially Polarized*
10  *Voting Analysis (Draft)*, Ariz. Indep. Redistricting Comm'n, 10, 20 (2011), *available at*
11  http://azredistricting.org/Meeting-Info/AZ%20racially%20polarized%20voting%20
12  analysis%20112911%20-%20DRAFT.pdf.

13  ### The Ongoing Effects of Arizona's History of Discrimination

14  39.   Arizona's Hispanic, Native-American, and African-American citizens have
15  suffered from, and continue to suffer from, the effects of discrimination in a number of
16  areas, including education, health, housing, employment, income, transportation, and
17  criminal justice.

18  40.   According to the U.S. Census Bureau's 2010-2014 American Community
19  Survey 5-Year Estimates, Hispanic, African American, and Native American
20  unemployment rates in Arizona exceeded white unemployment rates for the period of
21  2010 to 2014. Likewise, Hispanic, Native American, and African American poverty rates
22  in Arizona exceeded the white poverty rate for that same time period. As of the 2000
23  census, compared to whites, Hispanics, Native Americans, and African Americans were
24  all less likely to graduate high school in Arizona. Further, whites were 1.5 times more
25  likely to have a bachelor's degree than African Americans, and as much as three times
26  more likely to have a bachelor's degree than Hispanics and Native Americans in Arizona.
27  As of the 2010 census, whites were also more likely than Hispanics, Native Americans,
28  and African Americans to own a house in Arizona.

41.     As of 2013, Hispanics, Native Americans, and African Americans in Arizona all ranked below whites in relative healthiness, with both Native Americans and African Americans having the poorest rank of overall health status in the State. Ariz. Dep't of Health Servs., *Differences in the Health Status Among Racial/Ethnic Groups, Arizona 2013*, 7 (2015). One report explained that Native American health outcomes were so poor, that "[i]n 2013, compared to White non-Hispanics, American Indian residents of Arizona were on-average 19 years younger at time of death." *Id.* Further, all three minority groups saw a higher infant mortality rate than whites, with African Americans experiencing an infant mortality rate more than double the rates for whites. *Id.* at 49.

42.     Hispanics, Native Americans, and African Americans are all overrepresented in Arizona jails in comparison to the total population, whereas whites are underrepresented. Prison Policy Initiative, http://www.prisonpolicy.org/profiles/AZ.html (last visited April 13, 2016).

43.     Decades of research have demonstrated that deficiencies in socio-economic standing, such as those described above, significantly impact an individual's ability to fully participate in the political process and the interaction between these deficiencies and the challenged practices is no different.

44.     There is a clear causal link between Arizona's history of discrimination and the likelihood that a voter will cast an OOP ballot and be disenfranchised by Arizona's policy of wholesale rejection.    For example, Arizona's history of language-based discrimination, including in particular, educational discrimination and disparities—as well as a recent history of errors in Spanish-language voting materials—makes it far more likely for Spanish-speaking voters to be misinformed about voting rules, such as the need to keep their voter registration current, the location of their precinct's voting location, and the necessity of voting only in their assigned precinct. Expert Report of Dr. Allan Lichtman ("Lichtman Rpt."), Doc. 139-1 at 38; Expert Report of Dr. Jonathan Rodden ("Rodden Rpt."), Doc, 177-1 at 8-12. As a direct result of a history of and ongoing discrimination, minority voters in Arizona have disproportionately higher rates of

residential mobility, thus must continuously renew their voter registration forms and reeducate themselves about their new voting location, making it more likely that they unknowingly present at the wrong precinct in any given election. Rodden Rpt. at 4, 9-11. Even short distance moves within the same neighborhood may unwittingly put a voter out of the precinct in which they have previously voted or where the majority of their neighbors vote.

45.     Further, due to the significant disparities that persist as a result of systemic, historical discrimination, when Arizona's minority voters arrive at the wrong precinct, they are less likely to be able to remedy the error (assuming they are even informed of it) because they are significantly less likely to have reliable access to vehicles and are more likely to hold less flexible, working-class jobs than their white counterparts, making it more difficult for them to travel to a second polling location if needed. Rodden Rpt. at 9, 65. Likewise, substantial disparities in homeownership and increased transience, both linked to systemic, historical racial and language-based discrimination in Arizona, means that minority voters are more likely to experience frequent change in polling locations and are more likely to be disenfranchised as a result of the State's OOP policy. Rodden Rpt. 18 n.17.

46.     Similarly, Arizona's long history of discrimination is also tied to the factors that lead minority voters to disproportionately rely on ballot collection to vote. As a result of discrimination, minority voters are more likely to live in lower-income and tribal communities, many of which lack secure outgoing mailboxes, which makes it more difficult to return a voted early ballot. *See* Lichtman Rpt. 33. The disparate lack of reliable access to transportation also makes minority voters less able to access a sometimes far-flung post office or outgoing mail box. *See* Rodden Rpt. at 65. Language barriers, and lower levels of literacy and educational attainment resulting from historical discrimination also render minority voters more likely to be "low-information" voters who are not aware that a ballot must be *received* (not postmarked) by Election Day to be valid, and are disenfranchised if they wait to choose a candidate until the final days of the election, after

the mail-in deadline has already passed. *See* Lichtman Rpt. at 25, 33. Additionally, the evidence shows that some voters in the Hispanic community in particular distrust returning their voted ballot via mail, particularly in low-income communities where mail theft is common. These factors all directly contribute to and make it more likely that a voter may need to rely upon ballot collection as a method of voting, or else encounter significant burdens, which in some cases results in disenfranchisement.

47.     Thus, the on-going effects of Arizona's history of discrimination are directly linked to the challenged practices and the burdens that these practices place on Arizona's voters.

## **The Challenged Provisions**

### **Arizona's Wholesale Rejection of Out-of-Precinct Provisional Ballots**

48.     Under Arizona law, County Boards may choose to run each election in their jurisdiction using a precinct-based system, a vote center system, or some combination of the two. A.R.S. § 16-411(B)(4).

49.     In a precinct-based polling system, voters may only cast their votes at their assigned polling location. *See* A.R.S. § 16-583 (voters whose names are not listed on the precinct register are supposed to be redirected to another polling location). In contrast, under a vote center system, any voter in the county—regardless of the precinct in which they live—may vote at any of the available vote centers. A.R.S. § 16-411(B)(4). When implemented correctly, vote centers are often preferred by voters because they afford voters the flexibility to vote anywhere in the county in which they are registered. Vote Centers, Nat'l Conference of State Legislatures, *available at* http://www.ncsl.org/research/elections-and-campaigns/vote-centers.aspx (stating vote centers are more convenient for voters). As a result, a voter may vote near his or her home, work, or any other convenient location within the jurisdiction. This flexibility reduces both time and travel burdens on voters, which in turn leads to increased voter participation. Robert M. Stein et al., *Engaging the Unengaged Voter: Vote Centers and Voter Turnout*, 70 The J. of

Pol., 2, 487-97 (2008), *available at* http://bakerinstitute.org/research/engaging-unengaged-voter/ (noting significant evidence vote centers increase voter turnout generally, and among infrequent voters in particular).

50.     Between 2006 and 2015, Arizona rejected over 121,000 provisional ballots state-wide, consistently finding itself at or near the top of the list of states that collect and reject the largest number of provisional ballots each election. Ariz. Advocacy Found., et al., *Arizona Shelby Response Project: Modernizing Elections and Maximizing Voter Participation*, 2 (2015) [hereinafter *Shelby Response Project*]. In 2012 alone, nearly 46,000 votes were rejected by the State—meaning that about 2% of all votes cast in the general election did not count. Brandon Quester, *Rejected Ballots Document Continued Problems in Arizona Elections*, Ariz. Ctr. for Investigative Reporting, *available at* http://azcir.org/rejected-ballots-document-continued-problems-in-arizonas-elections/ (last visited Apr. 13, 2016). Unfailingly, one of the top reasons that ballots are rejected is because they were cast in a polling place other than the one to which the voter is assigned. *See, e.g.*, ACLU of Ariz., *Uncounted Votes: How Arizona Law Impacts Provisional Ballots*, 5 (2010) [hereinafter *Uncounted Votes*] (finding that in 2008, 33.89 percent of all rejected provisional ballots in five counties surveyed were rejected because they were cast in the wrong polling place); *Shelby Response Project* at 9 (finding that in 2014, of thirteen counties surveyed, 46% of all provisional ballots rejected were rejected by they were cast out of precinct).

51.     Although a voter may cast a *provisional* ballot if he or she attempts to vote at a polling location other than the one to which he or she has been assigned, Arizona law prohibits such ballots from being counted if the voter is voting in a jurisdiction that has chosen to operate under a precinct-based system. A.R.S. § 16-122, § 16-135, § 16-584; Manual at 185. Accordingly, even where the voter is otherwise fully qualified to vote for at least some of the candidates on the ballot—e.g., President, U.S. Senate, U.S. Representative, Governor—or even where the voter is otherwise fully qualified to vote for *all* of the candidates on the ballot, their vote is not counted. In contrast, where a voter

votes in a jurisdiction that has chosen to operate under a vote center based system, the voter is allowed to go to any polling location in the jurisdiction and cast their vote by regular non-provisional ballot. Thus, their ballot will count in any location in the county.

52.     Maricopa County—home to six out of ten Arizonans, and by far the State's most populous county—has one of the highest provisional ballot rejection rates in the state. In 2008, "[o]ne of every 14 Maricopa County voters cast a provisional ballot []. The county then rejected 29,531 provisional ballots, nearly a third of which might have counted had the voter been directed to the correct polling location." *Uncounted Votes* at 6. Likewise, in 2012, the Center for American Progress named Maricopa County as one of the worst counties in Arizona for election performance solely for the high rate of provisional ballots cast in the County. Anna Chu, et al., *Unequal Access: A County-by-County Analysis of Election Administration in Swing States in the 2012 Election*, Ctr. for Am. Progress, 11 (2014). More than 37% of ballots cast on Election Day were provisional ballots—76% higher than the state average. *Id.* The county rejected approximately 18% of those provisional ballots. Maricopa Cnty. Elections Dep't., *Provisional Ballots General 2012*, 17, 32 (2013). Approximately 7,500 provisional ballots were not counted solely because they were cast out of precinct. Rob O'Dell, *Despite Progress in Arizona, Early Ballots Again Delay Vote Count*, The Ariz. Republic, Dec. 1, 2014. In 2014, in Maricopa County over 2,800 provisional ballots were cast in the incorrect precinct. In the 2016 general election, Maricopa County rejected just under 2,200 OOP ballots.

53.     One of the primary causes for the large number of provisional ballots cast out of precinct in Maricopa County specifically and across Arizona generally is voter confusion caused by the large number of changes that Arizona counties make to their polling locations from year to year. *Shelby Response Project* at 8; Rodden Rpt. at 4. In Maricopa County alone, between 2006 and 2008 at least 43 percent of polling locations changed from one year to the next. *Uncounted Votes* at 4. Further, one study found that in a statewide survey of voters, of the 15 percent of survey respondents who reported that they cast a provisional ballot because they went to the wrong polling location, at least half

of those individuals had correctly voted at the same polling location the year before. *Shelby Response Project* at 8. "African Americans and Hispanics are substantially more affected by this than whites. In particular, the impact of precinct consolidation, while statistically significant for all groups, is more than twice as large for Hispanics and African Americans as for non-Hispanic whites." Rodden Rpt. at 4.

54.     Poll worker error and poor election administration also contribute heavily to this problem. For example, in 2004, Maricopa County sent 8,800 voters election notification cards that listed the wrong voting location. Lillie Coney, *A Call for Election Reform*, 7 J. L. & Soc. Challenges 183, 189 (2005). More recently, despite implementing an electronic poll book system which allows election workers to print a receipt listing a voter's correct polling location and providing directions to that location for voters who arrive at the wrong polling location, over 2,800 voters in Maricopa County still cast out-of-precinct provisional ballots in 2014, and almost 2,200 did so in the general election in 2016. A spokesman for the Maricopa County Recorder's office explained that with the electronic poll book system, such ballots "shouldn't have occurred at all." This indicates that, at least in part, some out-of-precinct provisional ballots are cast because poll workers either are not providing the correct polling location information to voters, or they are not explaining that the provisional vote cast at the incorrect location will not be counted; and, indeed, voters who cast OOP provisional ballots are often never made aware that their ballots will not be counted.

55.     In 2014, eighteen percent of all provisional ballots rejected in Arizona were cast by Hispanic voters despite their comprising only eleven percent of the electorate. *Shelby Response Project* at 13; *see also* Joshua Field, et al., *Uncounted Votes: Racially Discriminatory Effects of Provisional Ballots*, Ctr. for Am. Progress, 14 (2014) (finding a statistically significant correlation between high rates of provisional ballots cast and counties covered by Section 203, i.e., counties with a large population of non-English speakers). Similarly, in 2012, Maricopa County found that, of the provisional ballots cast in the County, nineteen percent were cast by individuals with Hispanic surnames.

Maricopa Cnty. Elections Dep't., *Provisional Ballots General 2012*, 11 (2013). The county further found that twenty-one percent of all Hispanic provisional ballots were not counted, which was higher than the County average of eighteen percent. *Id.* at 17. The study also found that Hispanic voters are more likely to go to the wrong polling location. *Id.* at 202.

56.     Similarly, expert analysis of OOP ballots cast in the 2012 general election in Maricopa County reveals that, although 70% of in-person voters in that election were white, "only 56 percent of those casting out-of-precinct ballots were white." Rodden Rpt. 37. In contrast, African American voters cast 13% of OOP ballots, despite compromising only 10% of in-person voters. *Id.* A full 26% of OOP ballots were cast by Hispanics, despite the fact that only 15% of in-person voters were Hispanic. *Id.* Similarly, "[t]he rate at which in-person ballots are [rejected because they were cast OOP] is 80 percent higher for Hispanics, 34 percent higher for African Americans, and 26 percent higher for Native Americans than for whites." Rodden Rpt. 38-40.

57.     These statistics are unsurprising. Minority voters often have less stable housing than white voters and, as a result, are often more mobile, causing them to change precincts and polling locations more frequently. Likewise, they are less likely to have access to reliable transportation as well as more likely to have inflexible work schedules, and more likely to rely on income from hourly wage jobs. Accordingly, where these voters arrive at the wrong polling location, they are more likely to have difficulty traveling to the correct polling location or taking additional time away from their jobs to cast their ballot. In Arizona's Native American community in particular, tribal voting locations often differ from voting locations for state and county elections, causing further confusion and leading Native Americans to cast their votes at the incorrect polling location.

58.     Voters whose provisional ballots are rejected because they vote in the incorrect precinct face a severe burden: complete disenfranchisement. Sadly, many of these voters are not even given the option to avoid this burden, as poll worker error (by

sending them to the wrong polling location or failing to explain to them the consequences of casting their provisional ballot in the wrong precinct) leads them to erroneously and unknowingly cast an uncountable ballot.

**Prohibitions on the Collection of Early Vote Ballots**

59.     For many years it has been the practice of individuals, political parties, and other community organizers in Arizona to maximize voter turnout by assisting voters with casting their mail-in absentee ballots by collecting those ballots and hand delivering them to the appropriate elections officials to be counted. Ballot collection efforts are often part of the formal get-out-the-vote efforts of Arizona's advocacy organizations, but ballot collection also occurs on an ad-hoc, individual basis. This assistance has particularly benefited voters who are homebound and elderly, and in many cases lacking transportation, as well as voters in the Hispanic, Native-American, and African-American communities in Arizona, where the socioeconomic disparities and circumstances resulting from a long history of discrimination can make it more difficult for members of these communities to personally return their voted early ballots in time to be counted. For Arizona activists, assisting voters in this fashion is not only a way to combat historically low voter turnout for these populations, it is a way to directly counteract the effects of systemic discrimination that have resulted in burdens disproportionately carried by minority communities such as high poverty rates, lack of access to transportation, and inflexible work schedules, all of which have made it more difficult in general for Arizonans to participate in the franchise, in particular with regard to vote by mail, the means by which the vast majority of Arizonans now vote.

60.     Arizona law provides that all elections must allow for early voting and that any qualified elector may vote by early ballot. A.R.S. § 16-541. In recent years, Arizona has strongly encouraged voting by early mail-in ballot, including by establishing a Permanent Early Voting List ("PEVL"), which voters may join to have an early ballot automatically sent to them 27 days before any election in which they are eligible to vote.

A.R.S. §§ 16-541, 16-544, 16-542. To cast an early ballot, the ballot, together with a signed affidavit, may be deposited in the mail or at any polling place in the county. The ballot must be *received* by 7:00 p.m. on Election Day to be valid; a postmark is not sufficient to render a mailed ballot timely. A.R.S. § 16-548. To protect against voter fraud, Arizona law has long provided that any person who knowingly collects voted or unvoted ballots and does not turn those ballots in to an election official is guilty of a Class 5 felony, which carries a presumptive 1½ years of incarceration and a fine up to $150,000 plus surcharges. A.R.S. § 16-1005. Tampering with voted absentee ballots, as well as other types of fraud conceivably related to ballot collection, was already a crime. *See* A.R.S. §§ 16-1005(A)-(F); *see also* A.R.S. § 16-545. There is no evidence that fraud in connection with ballot collection has ever occurred in Arizona.

61.     As early voting has become the predominant means by which Arizonans vote, thousands of voters have come to rely upon neighbors, friends, organizers, activists, and campaigns to collect and hand deliver their voted early ballots, to ensure that they safely arrive by 7 p.m. on Election Day, as required by Arizona law. A.R.S. § 16-548. Ballot collection and delivery has been particularly critical for minority voters, many of whom live in urban areas where they receive mail but lack secure outgoing mailboxes, or in rural areas—in particular, reservations or border towns with Hispanic populations of over 95%—with no mail service. These voters are disproportionately likely to have economic or personal circumstances—including, but not limited to, lack of access to secure outgoing mail, lack of reliable transportation to vote in person or deliver the ballots themselves, or difficulties in taking time off to do the same (a difficulty that becomes exacerbated when voters, by no fault of their own, do not receive their ballots in the mail until close to a week before the election is scheduled to take place, requiring that the voter return the ballot personally, rather than by mail, to ensure that the ballot arrives by the deadline, a problem that has been reported in recent elections), or a lack of access to incoming mail, requiring them to travel regularly substantial distances to both pick up and return their mail-in ballot, something that may not be possible within the designated time

frame. Each of these burdens are directly linked to Arizona's long history of discrimination, the effects of which are enhanced and exacerbated by H.B. 2023's prohibition on ballot collection and delivery, a means of voting that has been crucial to the state's minority populations having an equal opportunity to participate in the political process and to elect representatives of their choice.

### Attempts to Restrict Ballot Collection

62.     As ballot collection and delivery has become increasingly popular among Arizona's minority voters, Republican legislators have repeatedly tried to restrict the practice. The first attempt was in 2011, when the Arizona Legislature passed Senate Bill 1412 ("S.B. 1412").

63.     S.B. 1412 attempted to criminalize the personal delivery of another voter's ballot. S.B. 1412 was sponsored by Senator Don Shooter, a Republican from Yuma. During legislative hearings at the Judiciary Committee on February 14, 2011, Senator Shooter stated that he had proposed the bill in the aftermath of his narrow reelection victory in the 2010 general election, when he was upset to learn that his opponent had deployed union volunteers to help voters sign up for the PEVL in the heavily Hispanic, Democratic-leaning towns of San Luis and Somerton. Senator Shooter claimed that union members delivered "six or seven thousand early ballot requests [PEVL sign-up forms]" during the 2010 general election. Although he offered no link between PEVL sign-up forms and ballots themselves—and no evidence of fraud of any kind—he declared that that ballot collection should be prohibited to stop "people from Pittsburgh" flying in to stuff "six thousand ballots in [their] trunks."

64.     At the meeting of the Judiciary Committee that followed that legislative session, several election officials spoke against the bill. Jennifer Marson of the Arizona Association of Counties questioned the link between the targeted behavior and the law ostensibly designed to restrict it; she pointed out that Senator Shooter had referenced early ballot sign-up *forms* rather than actual early ballots, and there was no connection between the two. Ms. Marson also expressed concern that the limited exception for family

1    members would clog lines at polling locations on Election Day, because it would require
2    poll workers to verify identification for persons dropping off ballots for others.

3        65.    Maricopa County Elections Director Karen Osborne also testified that the
4    bill was "unnecessary" and expressed concerns about enforcement, noting that over
5    100,000 ballots are dropped off to the polls on Election Day in Maricopa County alone.
6    Ms. Osborne stated "the concern for us is what do we do with the people who traditionally
7    come to the polls and drop off the ballots? Or the people who would take them to the post
8    office for another member of their community?" Ms. Osborne emphasized that the
9    Recorder's office already takes numerous precautions against ballot fraud in connection
10   with the collection of early ballots by, for instance, signature matching, visual inspection,
11   and contacting the voter if a ballot appears to have been tampered with. Osborne testified
12   that issues were "very, very rare" but that the Recorder's office "has processes in place to
13   deal with ballots that look like they have been tampered with." Nonetheless, the Senate
14   Judiciary Committee gave S.B. 1412 a "do pass" recommendation to the Committee of the
15   Whole (the entire legislative body), by a vote of 6-2, with all six Republicans voting for
16   the bill and the only two Democrats voting against.

17       66.    Once the bill was out of committee, it was amended several times in
18   response to concerns expressed by both legislators and citizens. On February 28, 2011,
19   S.B. 1412 was amended to permit ballot collection but to place a cap of six ballots per
20   collector, with any additional ballots subjecting the collector to punishment for a Class 5
21   felony. On March 21, 2011, the cap was raised to ten ballots, although a person who
22   delivered more than ten early ballots was required to provide a copy of their photo
23   identification to the elections official. If a person could not produce a copy of their photo
24   identification, the elections official was directed to record the information directly from
25   the identification that the voter had on their person. Within 60 days of each election, the
26   amendment required the Secretary of State to compile a public statewide report listing the
27   identities and personal information of ballot collectors. This "public shaming" provision
28   replaced the criminal penalties that had initially been proposed with the bill. This

amendment was adopted and became the final form of the bill. With these substantial modifications, the bill was enacted and subsequently became law on April 13, 2011, after which it was codified as A.R.S. § 16-1005(D).

67.  In 2011, when A.R.S. § 16-1005(D) became law, Arizona was still subject to preclearance under Sections 4 and 5 of the Voting Rights Act. Accordingly, the provisions of A.R.S. § 16-1005(D) could not go into effect until the law had been precleared by DOJ or a federal court.

68.  The Arizona Attorney General submitted A.R.S. § 16-1005 for preclearance on May 18, 2011.  On June 27, 2011, DOJ precleared all other provisions of A.R.S. § 16-1005 *except* for the provision regulating ballot collection in subsection (D). As to that provision, DOJ stated that "the information sent [wa]s insufficient to enable us to determine that the proposed changes have neither the purpose nor the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group." The letter then asked for detailed information and stated that "if no response is received within sixty days of this request, the Attorney General may object to the proposed changes."

69.  DOJ kept a detailed file containing information on Arizona's efforts to preclear S.B. 1412, including records of interviews conducted with legislators and state officials. The preclearance file is revealing. State Elections Director Amy Bjelland (who worked with Secretary of State ("SOS") staff and the bill sponsor, Sen. Don Shooter, to draft S.B. 1412) admitted to DOJ that S.B. 1412's ballot collection restrictions were "targeted at voting . . . in predominantly Hispanic areas" near the border and "[m]any in the [SOS]'s office were worried about the § 5 review[.]" She also stated that the bill addresses a problem that "may result 'from the different way that Mexicans do their elections.'" A Yuma County Recorder's Office employee similarly reported the bill would impact a border town where "almost everyone is Hispanic" and "where people . . . tend to bring up vote by mail ballots in groups."

70.  Rep. Ruben Gallego provided further context to the law and insight into its

purpose, explaining to DOJ that "[t]he percentage of Latinos who vote by mail exploded" in 2010 because "municipalities . . . reduced their number of polling places and physical early voting locations" and "[t]his sudden increase in the Hispanic community's use" of vote by mail "caused Republicans to raise accusations of voter fraud," though the claims were revealed to be "baseless." He also stated that S.B. 1412 was "meant to target Hispanic voters who are less familiar with the vote by mail process and are more easily intimidated due to the anti-Latino climate in the state." Rep. Gallego described "the atmosphere in Arizona [as] scary" and advised that "[a]nti-immigrant and anti-Latino sentiment is stronger than ever." He explained, "since Hispanics have come to voting by mail later . . . they are less comfortable with the process and more likely to be dissuaded from using it than others," and "[g]iven that Latinos often do not have as easy access to transportation . . .  minority voters who are negatively affected by this law will not be able to mitigate its effects as easily [as] others." He also advised S.B. 1412 could hurt Native American voters.

71.     Rather than respond to DOJ's request for more information, the Attorney General chose to voluntarily withdraw the submission regarding ballot collection on August 4, 2011. The law was not enforceable without preclearance. In 2012, Republican Representative Kimberly Yee introduced H.B. 2033, an omnibus bill that included a quiet repeal of A.R.S. § 16-1005(D). The repeal passed in the waning days of the legislative session, on April 30, 2012. It was signed into law by Governor Brewer on May 15, 2012.

72.     In 2013, Republican legislators again tried to restrict ballot collection. That year, the Legislature enacted H.B. 2305, banning partisan ballot collection and requiring other ballot collectors to complete an affidavit stating they returned the ballot. Violation was a misdemeanor. Shortly after enactment, citizen groups organized a referendum effort and collected more than 140,000 signatures to place H.B. 2305 on the ballot for a straight up-or-down vote. To avoid referendum, Republican legislators again repealed their own legislation along party lines, admitting publicly that their goal was to break the bill into smaller pieces and reintroduce individual provisions "a la carte." This they did in the 2015

legislative session, although that effort to restrict ballot collection died in committee.

**The Passage of H.B. 2023**

73.     Republican Representative Michelle Ugenti-Rita introduced H.B. 2023 to the Arizona House of Representatives on January 11, 2016. H.B. 2023 imposes harsher penalties than its predecessors, making the "knowing[] collect[tion] of voted or unvoted early ballots from another person … a class 6 felony," punishable by up to a year in jail and $150,000 fines.

74.     H.B. 2023 provides limited exceptions for individuals collecting the ballots of family and household members, caregivers, and the election and mail workers who handle ballots by trade, but the activists, friends, and neighbors who have provided this assistance to voters for years, as well as political parties and campaigns, will all face criminal penalties if they so much as attempt to assist voters in this way in future elections. *See* H.B. 2023. Although Arizona law already made it a felony for a person to collect ballots but not turn them in to the appropriate elections official, H.B. 2023 makes the mere *possession* of the ballots—even if the collector delivers those ballots to an elections official in time to be counted—a felony.

75.     On January 25, 2016, H.B. 2023 was heard by the House Elections Committee. The Committee heard over two hours of public testimony on the bill, none of which indicated that there was any evidence of fraud in the ballot collection process and much of which indicated that this practice was used heavily by Arizona's minority communities. In fact, State Elections Director Eric Spencer, speaking on behalf of the Secretary of State's Office, admitted that he could not offer specific instances in which an individual spoiled or stole the early ballot of another. Likewise, House Elections Committee member Representative J.D. Mesnard stated that it was irrelevant whether fraud was actually occurring because "what is indisputable is that many people believe it is happening." Despite the total lack of evidence that criminalizing ballot collection was necessary or rational, the Committee voted to allow H.B. 2023 to move to the floor for a vote. The vote was 4-2 along party lines, with Republicans in favor of the bill.

76.     On January 22, 2016, Representative Ken Clark attempted to amend the bill to add a provision that would allow an individual to return another person's ballot to elections officials as long as the voter had signed an affidavit attesting that they had authorized the return. The amendment was rejected by House Republicans.

77.     On February 4, 2016, the Arizona House of Representatives passed H.B. 2023 with thirty-four voting for the measure and twenty-three voting against. The vote was split along party lines; every Republican supported the bill with one exception, and all Democrats opposed.

78.     Upon reaching the Senate, H.B. 2023 was referred to the Senate Government Committee. On February 24, 2016, the Senate Government Committee voted to allow the bill to proceed to a floor vote. They gave the bill a "do pass" recommendation, with four members voting for the recommendation and three members voting against. Committee Members Martin Quezada-D, Lupe Chavira Contreras-D, and Robert Meza-D voted against the measure. All three are Hispanic.

79.     In the Senate, Senator Andrew Sherwood-D moved to reduce the penalty to a misdemeanor, but could not garner sufficient votes. Senator Lynn Pancrazi-D also spoke out against the bill, stating that some rural residents of her district do not receive home delivery of their mail and are therefore unable to rely on mail services to transmit their ballot to and from their home. Sen. Steve Farley-D stated that there had never been a documented case of anyone actually picking up someone else's ballot and then failing to deliver it to elections officials, explaining that "[t]he problem we're solving is that one party is better at collecting ballots than the other one." No concrete evidence of voter fraud was presented.

80.     Upon information and belief, the Republican-controlled Arizona State Legislature passed H.B. 2023 with the purpose and effect of suppressing the votes of Hispanic, Native American, and African-American—and thus overwhelmingly Democratic—voters. Moreover, it is clear that if H.B. 2023 is not enjoined it will do just that.

81.     Representatives of minority communities argued forcefully against the bill throughout the legislative process, making the case that it would disproportionately burden minority voters. They testified about its impacts on urban communities, where minority voters may lack access to a secure outgoing mailbox, as well as specific rural minority communities, urging the Legislature to consider "[the predominantly Hispanic community of] San Luis" and the Tohono O'odham Nation, which both lack home mail delivery. Rep. Ugenti-Rita dismissed these concerns as "not my problem." When a representative of Native American communities described "what it's like to live … sometimes 40 miles away from the nearest post office box," and advised that "over 10,000" voters could be disenfranchised, many legislators *laughed*. H.B. 2023 proponents repeatedly characterized these voters as lazy, desiring "special treatment," or not taking "responsibility": Rep. Ugenti-Rita stated that "[t]hey certainly take care of themselves in other situations, so I don't know why we have to spoon-feed and baby them over their vote."

82.     Although some claimed H.B. 2023 was needed to combat fraud, no one identified a single, concrete example it could have prevented. Rep. Ugenti-Rita admitted H.B. 2023 "doesn't … tackle" "fraud": it "is about an activity that could potentially lead to [fraud]." Yet, several amendments that could have addressed concerns of fraud by less burdensome means were rejected.

83.     On February 4, the House passed H.B. 2023 by a 34-23 vote. All but one Republican supported, all Democrats opposed. It passed the Senate on party lines on March 9, and was signed into law that day.

84.     On March 9, 2016, the Arizona Senate passed H.B. 2023, with a party line vote of 17 voting for the measure and 12 voting against.

85.     Just hours later, Governor Ducey signed H.B. 2023 into law.

86.     H.B. 2023 went into effect on August 6, 2016. As discussed *supra*, H.B. 2023 will severely burden, abridge, and in some cases wholly deny Arizona citizens the right to vote. Further, it will have a disparate impact on Arizona's Hispanic, African-

American, and Native-American populations, who rely disproportionately on the collection of ballots to cast their early votes. These populations' reliance on ballot collection is directly connected to the long history of discrimination that they have been subject to in Arizona, which has left them, relative to white Arizonans, with less access to transportation; less flexible work schedules; and a higher likelihood of suffering from poor health and disabilities. The legislators who enacted H.B. 2023 were aware that this would be the law's likely impact, and in fact intended to make it more difficult for Arizona's minority voters—in particular, Hispanic and Native American voters—to participate in elections.

87.     Moreover, H.B. 2023 also burdens the rights of the members of political parties, organizers, and other activists who assist Arizona voters in submitting their ballot by threatening them with criminal prosecution, jail time, felony convictions impeding their own right to vote, and large fines. Accordingly, the law causes these individuals and organizations not to engage in such activities, thereby disrupting their right to associate with voters, and chilling this protected activity.

88.     Given the severe burdens imposed on Plaintiffs and Arizona voters in general—including in particular Plaintiffs' core constituencies, membership, supporters and adherents, many of whom belong to Arizona's minority communities—and the lack of evidence that fraud has ever occurred in connection with ballot collection, much less evidence that could justify the criminalization of a means of voting relied upon by thousands of Arizona voters each election cycle, the State cannot show any legitimate interest in the passage and promulgation of this law sufficient to overcome the rights of the Arizona citizens who are burdened by it.

## CAUSES OF ACTION

## COUNT I

*Against Defendants Arizona Secretary of State's Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; and Mark Brnovich, in his official capacity as Arizona Attorney General*

**Arizona's Rejection of Out-of-Precinct Provisional Ballots Under A.R.S. § 16-122, § 16-135, and § 16-584 Violates Section 2 of the Voting Rights Act - Effect Prong**

89.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

90.     Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A Section 2 claim can be proven *either* by demonstrating that the challenged standard, practice or procedure was adopted with the intent to discriminate *or* by showing that it has discriminatory results. *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012), *aff'd sub nom. Ariz. v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013).

91.     Arizona's policy of not counting OOP provisional ballots has had and, if not declared illegal and enjoined, will continue to have, an adverse and disparate discriminatory impact on Hispanic, African-American, and Native-American citizens of Arizona—voters who are among Plaintiffs' core membership, constituency, adherents, and supporters.

92.     Due to disparities caused by a long history of discrimination and the ongoing effects of that discrimination, these voters are more likely than white voters to cast OOP provisional ballots, and be entirely disenfranchised as a result. The same disparities interact with the OOP policy to impose substantially greater burdens on the right to vote of the same communities when compared with Arizona's white voters, even short of disenfranchisement, making it more costly and difficult for the former to navigate the relevant (and often unnecessary complicated) elections processes to present at their assigned precinct in any given election, or to correct if they mistakenly attempt to vote in the wrong precinct.

93.     The disparate burdens imposed by the OOP policy on the Hispanic, African American, and Native American communities in Arizona are directly linked to the long

history of discrimination that these communities have suffered from, and continue to suffer, as a result of their race or language. The ongoing effects of this discrimination include significant and continuing socioeconomic disparities between Hispanics, African Americans, Native Americans and whites in the State, which the OOP policy serves to accommodate and amplify, to the consistent and substantial disparate detriment of these minority communities. The resulting disparate disenfranchisement is thus directly linked to Arizona's long history of discrimination and, absent the relief requested, the interaction of Arizona's policy of not counting OOP provisional ballots with the effects of discrimination against Hispanics, African Americans, and Native Americans in Arizona will continue to cause an inequality in the opportunity of members of these minority communities to participate in the political process in Arizona and to elect representatives of their choice.

94.     Thus, Arizona's wholesale rejection of OOP ballots violates the effect prong of Section 2 of the Voting Rights Act.

## COUNT II

***Against Defendants Arizona Secretary of State's Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; and Mark Brnovich, in his official capacity as Arizona Attorney General***

**Arizona's Rejection of Out-of-Precinct Provisional Ballots Under A.R.S. § 16-122, § 16-135, and § 16-584 Violates the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983 - *Anderson-Burdick***

95.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

96.     Under the First and Fourteenth Amendments, any state election regulation that imposes non-discriminatory restrictions on the right to vote must be justified by an important state regulatory interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The applicable "*Anderson-Burdick*" test, developed by the U.S. Supreme Court, is a balancing test, that commands courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put

forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Where the restrictions are severe, "'the regulation must be narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "However slight th[e] burden [on voting] may appear, … it must be justified by relevant and []legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (controlling op.) (quotation marks omitted).

97.    Plaintiffs' and their constituencies', members' and adherents' First and Fourteenth Amendment rights are severely burdened by the unjustified rejection of OOP provisional ballots. Voters who have their OOP ballots rejected are completely disenfranchised, often due to no fault of their own. Minority voters face even greater risks of disenfranchisement and, therefore, greater burdens, as they are more likely to appear to vote at the incorrect precinct through no fault of their own and less likely to be able to travel to the correct precinct, assuming they are informed that their ballot will not count unless they cast it in their assigned precinct. These voters, who are otherwise fully qualified to vote for many (and sometimes all) of the candidates and issues on the ballot distributed to voters at that precinct, should not have their ballots rejected in their entirety, resulting in their total disenfranchisement. The State has no interest that outweighs this severe burden on otherwise eligible members of Arizona's electorate.

98.    Based on the foregoing, Arizona's OOP policy violates the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

## COUNT III

***Against Defendants Arizona Secretary of State's Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; and Mark Brnovich, in his official capacity as Arizona Attorney General***

### H.B. 2023 Violates Section 2 of the Voting Rights Act - Purpose and Effect Prongs

99.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this

1    Complaint and the paragraphs in the counts below as though fully set forth herein.

2        100.   H.B. 2023, which criminalizes the collection of signed and sealed absentee

3    ballots, was enacted with the intent to discriminate against Hispanic and Native American

4    voters—voters who are among Plaintiffs' core membership, constituency, adherents, and

5    supporters. Further, if not declared illegal and enjoined, H.B. 2023 will in fact make it

6    more difficult for members of Arizona's Hispanic, African American and Native

7    American communities in particular, as compared to white voters, to participate in the

8    political process and to elect representatives of their choice.

9        101.   Hispanics, African Americans, and Native Americans in Arizona have

10   suffered from, and continue to suffer from, discrimination on the basis of race. The

11   ongoing effects of this discrimination include socioeconomic disparities between

12   Hispanics, African Americans, Native Americans and whites in Arizona. H.B. 2023

13   accommodates and directly amplifies this history and its ongoing effects, resulting in

14   disparate burdens on Arizona's minority communities. In particular, disparities in access

15   to vehicles, reliance on inflexible hourly-wage employment, educational attainment, and

16   other disparities resulting at least in part from the State's long history of discrimination

17   against these communities all cause ballot collection to be more important for Arizona's

18   minority voters than for white voters to have fair and equal access to the franchise and an

19   opportunity to elect their candidates of choice.

20       102.   H.B. 2023 was also enacted with the intention of suppressing voting by

21   Hispanic and Native American voters. The historical background of H.B. 2023, the

22   sequence of events leading up to the enactment of H.B. 2023, the legislative history, and

23   history of discrimination in Arizona against Hispanics and Native Americans collectively

24   indicate that race was a motivating factor in the law's enactment. Indeed, the Arizona

25   Legislature had before it evidence and testimony that a disproportionate number of

26   Hispanic and Native American voters relied on both formal and informal methods of

27   ballot collection to exercise the franchise, and enacted H.B. 2023 with full knowledge and

28   intent that such actions would affect Hispanic and Native American voters

disproportionately.

103.    Thus, H.B. 2023 violates both the purpose and effect prongs of Section 2 of the Voting Rights Act.

## COUNT IV

***Against Defendants Arizona Secretary of State's Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; and Mark Brnovich, in his official capacity as Arizona Attorney General***

**H.B. 2023 Violates the Fifteenth Amendment to the United States Constitution and 42 U.S.C. § 1983**

104.    Plaintiffs reallege and incorporate all prior paragraphs of this Complaint. The Fifteenth Amendment to the United States Constitution prohibits the federal and state governments from denying a citizen the right to vote based on that citizen's race or color.

105.    As detailed herein, H.B. 2023 was enacted with the intention of suppressing voting by Hispanic and Native American voters—voters who are among Plaintiffs' core membership, constituency, adherents, and supporters. The historical background of H.B. 2023, the sequence of events leading up to the enactment of H.B. 2023, the legislative history, and history of discrimination in Arizona against Hispanics and Native Americans collectively indicate that race was a motivating factor in the law's enactment. Indeed, the Arizona Legislature had before it evidence and testimony that a disproportionate number of Hispanic and Native American voters relied on both formal and informal methods of ballot collection to exercise the franchise, and enacted H.B. 2023 with full knowledge and intent that such actions would affect Hispanic and Native American voters disproportionately.

106.    In implementing and enforcing the provisions of H.B. 2023, Defendants will be acting under the color of state law.

107.    Defendants' actions in implementing and enforcing the provisions of H.B. 2023 will deprive Plaintiffs and other individuals in Arizona of rights, privileges, or immunities granted under the Fifteenth Amendment of the U.S. Constitution.

108.    In implementing and enforcing the provisions of H.B. 2023, Defendants will

be discriminating against the Plaintiffs due to their race, or the racial composition of their membership, in violation of the Fifteenth Amendment of the U.S. Constitution.

<u>COUNT V</u>

***Against Defendants Arizona Secretary of State's Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; and Mark Brnovich, in his official capacity as Arizona Attorney General***

**H.B. 2023 Violates the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983 - *Anderson-Burdick***

109.    Plaintiffs' constitutional rights under the Equal Protection Clause and the First Amendment, their constituencies' and members' right to vote and associate, and the right to vote of thousands of Arizona citizens is severely and unjustifiably burdened by the criminalization of the collection of absentee ballots in violation of the First and Fourteenth Amendments.

110.    As discussed, the applicable *Anderson-Burdick* balancing test commands courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).Where the restrictions are severe, "'the regulation must be narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Reed*, 502 U.S. at 289). "However slight th[e] burden [on voting] may appear, … it must be justified by relevant and []legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (controlling op.) (quotation marks omitted).

111.    H.B. 2023's criminalization of a means of voting relied upon by thousands of Arizona voters—including, in particular, Plaintiffs' members, constituents, adherents, and supporters—substantially burdens the right to vote without sufficient justification. As a result of H.B. 2023, thousands of voters will have their right to vote unduly burdened,

and anyone attempting to assist them in simply delivering their voted ballot to ensure that it arrives in time to be counted will risk jail time, a felony criminal record (which will effectively strip them of their own right to vote), and large fines. The State has no interest of sufficient importance that outweighs any of these burdens on otherwise eligible members of Arizona's electorate.

112.   H.B. 2023 further infringes upon the First Amendment associational rights of Plaintiffs, whose purpose – at least in part – is to encourage and facilitate voting. H.B. 2023's criminalization of ballot collection, a means of voting relied on in particular by its members, constituents and adherents (and indeed was specifically intended to make it more difficult for Democrats in particular to get out the vote), thus negatively impacts a central part of these groups' missions and will have a chilling effect on the exercise of their associational rights, a burden that cannot be justified by unsupported claims of fraud or the possibility of future fraud.

113.   "It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) (citation omitted); *see also* LOWV of Fla. v. Browning, 575 F. Supp. 2d 1298, 1322 (S.D. Fla. 2008) ("Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity"); *Ass'n of Cmty. Orgs. for Reform Now v. Cox,* No. 1:06-CV-1891-JTC, 2006 WL 6866680, at *7 (N.D. Ga. 2006) (recognizing voter registration deserves "the traditional protection of participation in the political process required by the Constitution").

114.   H.B. 2023 is unconstitutional because it prohibits speech and expression that is fully protected by the First and Fourteenth Amendments of the United State Constitution, including the right of political parties and their members to organize and engage in legitimate election-related political activity.

115.   H.B. 2023, through its complete prohibition on the collection of ballots and imposition of criminal penalties such as jail time and the payment of large fines, imposes

real and substantial burdens on political organizations and their members to engage in lawful efforts to assist voters in casting their ballots. As a result, Plaintiffs and their members, constituents and adherents will be completely foreclosed from associating with voters in this manner, and engaging in protected First Amendment activity.

116.   Based on the foregoing, H.B. 2023 violates the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants as follows:

A. An order declaring that:

    a.  Arizona's prohibition on the counting of OOP provisional ballots has a disparate effect on Hispanic, Native American, and African American voters in violation of Section 2 of the Voting Rights Act;

    b.  Arizona's prohibition on the counting of OOP provisional ballots burdens Arizona voters generally and, specifically, Hispanic, African American, and Native American voters, without a sufficient state justification for doing so, in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment;

    c.  H.B. 2023 violates both the purpose and effect prongs of Section 2 of the Voting Rights Act, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution; and

B. An order preliminarily and permanently enjoining Defendants Arizona Secretary of State's Office; Michele Reagan, in her official capacity as Secretary of State of Arizona; and Mark Brnovich, in his official capacity as Arizona Attorney General, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them from:

a.  Implementing, enforcing, or giving any effect to A.R.S. § 16-122, § 16-135, or § 16-584 to the extent that they require Defendants to reject provisional ballots in their entirety solely because they were cast in the wrong precinct;

b.  Requiring Defendants to count OOP ballots for races for which the voter was otherwise eligible to cast a vote;

c.  Implementing, enforcing, or giving any effect to H.B. 2023.

C.  An order awarding Plaintiffs their costs, disbursements and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. §§ 1988, 1973l(e); and Such other or further relief as the Court deems just and proper.

Dated: December 28, 2016

*s/ Marc E. Elias*
Daniel C. Barr (# 010149)
Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788

Marc E. Elias (WDC# 442007)*
Bruce V. Spiva (WDC# 443754)*
Elisabeth C. Frost (WDC# 1007632)*
Amanda R. Callais (WDC# 1021944)*
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 600
Washington, D.C.  20005-3960

Joshua L. Kaul (WI# 1067529)*
PERKINS COIE LLP
One East Main Street, Suite 201
Madison, Wisconsin  53703

*Attorneys for Plaintiffs Leslie Feldman, Luz Magallanes, Mercedez Hymes, Julio Morera, Cleo Ovalle, Former Chairman and First President of the Navajo Nation Peterson Zah, the Democratic National Committee, the DSCC, and the Arizona Democratic Party*

*Admitted pro hac vice*

-42-

1

**CERTIFICATE OF SERVICE**

2      ☒      I hereby certify that on December 28, 2016, I electronically transmitted the

3  attached document to the Clerk's Office using the CM/ECF System for filing.

4                                    s/ *Sarah Gonski*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28