Daniel C. Barr (# 010149)
Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788
Telephone:  (602) 351-8000
Facsimile:  (602) 648-7000
DBarr@perkinscoie.com
SGonski@perkinscoie.com

Marc E. Elias (WDC# 442007)*
Bruce V. Spiva (WDC# 443754)*
Elisabeth C. Frost (WDC# 1007632)*
Amanda R. Callais (WDC# 1021944)*
Alexander G. Tischenko (CA# 304743)*†
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ACallais@perkinscoie.com
ATischenko@perkinscoie.com

Joshua L. Kaul (WI# 1067529)*
PERKINS COIE LLP
One East Main Street, Suite 201
Madison, Wisconsin  53703
Telephone:  (608) 663-7460
Facsimile:  (608) 663-7499
JKaul@perkinscoie.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice
† Not yet admitted in Washington, D.C.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Michele Reagan, et al.,<br><br>    Defendants. | No. CV-16-01065-PHX-DLR<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL** |

# TABLE OF CONTENTS

**Page**

I.   The FIRST AMENDMENT PROTECTS THE DOCUMENTS
     FROM COMPELLED DISCLOSURE. ...................................................................... 1

     A.   Disclosure would infringe on Plaintiffs' First Amendment rights. ..................... 2

     B.   The State has not met the heightened relevancy showing required
          to compel disclosure of First Amendment-protected documents. ........................ 5

     C.   Plaintiffs have not waived the applicable First Amendment protections. ............. 7

     D.   Fairness requires strict application of the privilege to protect
          ADP's confidential materials. .......................................................................... 9

II.  ADP HAS SATISFIED ITS OBLIGATIONS UNDER RULE 30(B)(6). ............. 11

     A.   The transcripts flatly refute the State's contention that four of the
          30(b)(6) topics were not addressed ................................................................... 11

     B.   The State's failure to specify discrete unanswered questions leaves
          both ADP and the Court unable to adequately understand what
          specific relief is requested. ............................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AFL-CIO v. Federal Election Commission*,
  333 F.3d 168 (D.C. Cir. 2003) .................................................................. 3, 4

*Anderson v. Nixon*,
  444 F. Supp. 1195 (D.D.C. 1978) ................................................................. 7

*Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*,
  171 F.R.D. 135 (S.D.N.Y. 1997) ................................................................ 12

*Bittaker v. Woodford*,
  331 F.3d 715 (9th Cir. 2003) ........................................................................ 7

*Chevron Corp. v. Pennzoil Co.*,
  974 F.2d 1156 (9th Cir. 1992) ...................................................................... 7

*Doubt v. NCR Corp.*,
  No. C 09–5917 2011 WL 5914284, at *1–3 (N.D. Cal. Nov. 28, 2011) ..................... 16

*Driscoll v. Morris*,
  111 F.R.D. 459 (D. Conn. 1986).................................................................... 7

*Equal Employment Opportunity Commission v. American International
  Group., Inc.*,
  No. 93 CIV. 6390(PKL)RLE, 1994 WL 376052 (S.D.N.Y. July 18,
  1994) ............................................................................................................. 13

*Goldberg v. Amgen, Inc.*,
  123 F. Supp. 3d 9, 15 (D.D.C. 2015) ............................................................ 8

*Great American Insurance Co. of N.Y. v. Vegas Construction Co.*,
  251 F.R.D. 534 (D. Nev. 2008).................................................................... 13

*In re von Bulow*,
  828 F.2d 94 (2d Cir. 1987)............................................................................ 9

*Independant Inst. v. Gessles*,
  No. 10-CV-00609-PAB-MEH, 2011 WL 809781 (D. Colo. Mar. 2,
  2011) .............................................................................................................. 7

*Independent Products. Corp. v. Loew's, Inc.*,
   22 F.R.D. 266 (S.D.N.Y. 1958) ................................................................ 8

*International Action Center v. United States*,
   207 F.R.D. 1 (D.D.C. 2002) ...................................................................... 7

*International Society for Krishna Consciousness, Inc. v. Lee*,
   No. 75 Civ 5388 (MJL), 1985 WL 315 (S.D.N.Y. Feb. 28, 1985) ........................ 2, 4

*Kress v. Pricewaterhouse Coopers, LLP*,
   No. 2:08-CV-0965 LKK AC, 2013 WL 2421704 (E.D. Cal. June 3,
   2013) ................................................................................................... 13

*Miller v. York Risk Services Group.*,
   No. CV-13-01419-PHX-JWS, 2014 WL 11514555 (D. Ariz. July 7,
   2014) ..................................................................................................... 2

*Moore v. Computer Associates. International, Inc.*,
   653 F. Supp. 2d 955 (D. Ariz. 2009) ......................................................... 14

*Ohio Organization Collaborative v. Husted*,
   No. 2:15-CV-01802, 2015 WL 7008530 (S.D. Ohio Nov. 12, 2015) .................... 4, 7

*Perry v. Schwarzenegger*,
   591 F.3d 1126 (9th Cir. 2009) ........................................................... passim

*S.F. County. Democratic Central Commission v. Eu*,
   826 F.2d 814 (9th Cir. 1987) ..................................................................... 2

*Salazar v. Basic*,
   No. CV 05-283-TUC-FRZ, 2006 WL 3802094 (D. Ariz. Dec. 22, 2006) ................. 7

*Sierra Club v. BNSF Ry. Co.*,
   No. 75 Civ 5388 (MJL), 2016 WL 4528452 (W.D. Wash. Aug. 30,
   2016) ..................................................................................................... 5

*Smithkline Beecham Corp. v. Apotex Corp.*,
   No. 98 C 3952, 2000 WL 116082 (N.D. Ill. 2000) ......................................... 16

*Starlight International, Inc. v. Herlihy*,
   186 F.R.D. 626 (D. Kan. 1999) ................................................................. 11

*Valle del Sol v. Whiting*,
   No. CV-10-01061-PHX-SRB, 2013 WL 12098752 (D. Ariz. Dec. 11,
   2013) .................................................................................................. 8, 9

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 37(a)(1) .............................................................................. 1

Federal Rule of Civil Procedure 26(b)(1) .......................................................................... 3

Defendants the Arizona Attorney General and Secretary of State (together, "the State") seek to compel production of 1,776 internal strategic political documents and the testimony of a *third* Arizona Democratic Party ("ADP") 30(b)(6) witness, but their motion to compel is not supported by either the facts or well-established, governing case law. Its request for compelled production fails because the documents it seeks are privileged pursuant to the First Amendment and the State has not and cannot meet the standard for compelled disclosure required by the Ninth Circuit. *See Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2009). Further, the vast majority of the documents were not the subject of any meet and confer. The State's demand to compel additional 30(b)(6) testimony fails, because the record flatly refutes the its claim that the two designated witnesses who already testified left 30(b)(6) topics "unaddressed," and the State has been unable to identify with specificity where in the record the alleged defects lie. The motion should be denied in its entirety.

## I.   THE FIRST AMENDMENT PROTECTS THE DOCUMENTS FROM COMPELLED DISCLOSURE.

The State seeks to compel production of 1,776 internal, confidential documents, central to Plaintiffs' strategic interests. In a ten-line footnote, the State lists *nineteen* separate categories of documents plus a catch-all request for "any additional documents not otherwise noted that include voter demographic information." Doc. 317 at 4 n.3; Ex. 1 (Chart of Challenged Documents). As a threshold matter, the State has failed to satisfy its obligation to meet and confer as to all but sixteen of the documents it now seeks;[1] its

---

[1] Under Fed. R. Civ. P. 37(a)(1), a movant must have "in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." *See also* LRCiv. 7.2(j) (requiring "personal consultation and sincere efforts to … satisfactorily resolve the matter" before a discovery motion is filed). Until filing the motion, Defendants had only challenged Plaintiffs' assertion of privilege over sixteen documents labeled "Incident Data" contained in ADP's June 5 privilege logs. *See* Doc. 317-1 at 5:7-17 (at June 6 status conference, counsel for ARP challenged privilege with respect to "incident data" documents logged in privilege logs disclosed "yesterday"); Declaration of Joshua Kaul ("Kaul Decl.") ¶¶ 8-9 (meet-and-confer pertained only to sixteen Incident Data documents); Doc. 317-1 at 328 (during June 12 status conference, State did not identify any additional categories of documents they would be challenging in motion to compel). In none of the parties' discussions did any of the Defendants raise the wide-ranging discovery the State now seeks.

1    request for the remaining is raised for the first time in its motion and should be denied on

2    that basis alone. *See, e.g.*, *Miller v. York Risk Servs. Grp.*, No. CV-13-01419-PHX-JWS,

3    2014 WL 11514555, at *2 (D. Ariz. July 7, 2014) (summarily denying motion to compel

4    where party failed to satisfy meet-and-confer requirement).

5         In any event, Plaintiffs brought this lawsuit to vindicate their constitutional rights.

6    The law does not require that, in vindicating those rights, Plaintiffs must forfeit *other*

7    constitutional rights. Here, the State[2] seeks information that goes to the core of the First

8    Amendment's protections. Indeed, the State implicitly concedes that the First Amendment

9    protects these documents in the first instance, arguing only that Plaintiffs have waived the

10   privilege. *See* Doc. 317 at 4-8 (no challenge to initial application of the privilege). At the

11   same time, the State has not shown, and cannot show, that the documents at issue are

12   likely to play an important, much less *highly relevant*, role in the claims or defenses

13   asserted in this case. *See Perry*, 591 F.3d at 1139. Plaintiffs have not used the documents

14   the State seeks in _any way_ in this litigation, and the State does not claim otherwise. On the

15   other hand, compelled disclosure of this sensitive information—particularly to Plaintiffs'

16   direct political opponents, including Republican elected officials—would undeniably chill

17   Plaintiffs' ability to exercise their First Amendment rights by disclosing internal strategy,

18   communications, and the identity of their supporters.

19        **A.    Disclosure would infringe on Plaintiffs' First Amendment rights.**

20        The "'right of individuals to associate for the advancement of political beliefs' is

21   fundamental." *S.F. Cnty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 827 (9th Cir.

22   1987) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)); *see also Int'l Soc'y for*

23   *Krishna Consciousness, Inc. v. Lee*, No. 75 Civ. 5388 (MJL), 1985 WL 315, at *8

24   (S.D.N.Y. Feb. 28, 1985) ("[T]he right of associational privacy [applies to] compelled

25   _____

26   [2] While the State filed this motion, it was Intervenor-Defendant Arizona
     Republican Party ("ARP") that first challenged Plaintiffs' assertion of the privilege with
     respect to the Incident Data. Doc. 317-1 at 6. ARP, however, has asserted the First

27   Amendment privilege far more broadly than Plaintiffs, *see infra* Section I(D), and despite
     raising a challenge to the privilege initially, now declines to participate in the briefing,

28   Doc. 317 at 2 n.1.

1    disclosure of the identity of an association's members or sympathizers ...."). "Implicit in

2    the right to associate with others to advance one's shared political beliefs is the right to

3    exchange ideas and formulate strategy and messages, and to do so in private." *Perry*, 591

4    F.3d at 1142. "The Supreme Court has long recognized that compelled disclosure of

5    political affiliations and activities can impose just as substantial a burden on First

6    Amendment rights as can direct regulation." *AFL-CIO v. Fed. Election Comm'n*, 333 F.3d

7    168, 175–76 (D.C. Cir. 2003). Accordingly, the "First Amendment protects political

8    association as well as political expression ..." *Perry*, 591 F.3d at 1139.

9        An assertion of the First Amendment privilege is analyzed under a two-part

10   framework. *Id.* at 1140. First, the party asserting the privilege must make a prima facie

11   showing of "arguable first amendment infringement"—i.e., that compelled discovery will

12   result in "consequences which objectively suggest an impact on, or 'chilling' of, the

13   members' associational rights." *Id.* (quoting *Brock v. Local 375, Plumbers Int'l Union of

14   Am.*, 860 F.2d 346, 349–50 (9th Cir. 1988)). Once this showing is made, the burden shifts

15   and the question becomes "whether the party seeking the discovery has demonstrated an

16   interest in [that discovery] … sufficient to justify the deterrent effect on the free exercise

17   of the constitutionally protected right of association." *Id.* at 1141 (quotation marks and

18   alterations omitted). The Court balances these interests, taking into account the

19   importance of the litigation, how important the information sought is to the case, whether

20   there are less obtrusive ways to obtain the information, and the "substantiality of the First

21   Amendment interests at stake[.]" *Id.* The Ninth Circuit has stressed: "Importantly, the

22   party seeking the discovery *must* show that the information sought is *highly relevant* to the

23   claims or defenses in the litigation—a more demanding standard of relevance than that

24   under Federal Rule of Civil Procedure 26(b)(1)." *Id.* (emphases added).

25       Here, the State's sweeping request for compelled disclosure includes 1,776

26   documents containing highly sensitive internal information that has little—if any—

27   relevance to this case. The twenty categories of documents at issue include precinct-by-

28   precinct voter analyses, Latino vote plans, post-election analyses, call logs from voters

facing issues in prior elections, and the vague catch-all "*any* additional documents not otherwise noted that include voter demographic information."   Doc. 317 at 4 n.3 (emphasis added); *see also* Ex. 1 (containing full descriptions and privilege basis explanations for each of the twenty identified categories).

The sixteen documents from ADP's second and third privilege logs categorized as "Incident Data"—the only documents subject to a meet and confer and thus properly at issue in the motion, *see supra* 1 n.1—as well as 399 similar documents listed in the DNC's privilege log addendum, Doc. 317 at 4 n.3, provide a case study on the types of documents the First Amendment protects from compelled disclosure. These documents are a series of call logs created by party volunteers and staffers to keep records of voters and election observers who called the party to report various issues on Election Day. The documents in the DNC's privilege log date as far back as 2008, and overwhelmingly detail events outside Arizona that have no relation to this case. While largely irrelevant to this litigation, these documents are highly critical to Plaintiffs' internal political operations. They contain information that was called in from election observers, revealing the location of precincts that Democrats strategically targeted, Declaration of Alexis Tameron ("Tameron Decl.") ¶ 7; internal discussions between volunteers regarding application of confidential training materials; and information about individual voters, including sensitive information such as names, addresses, contact history with Plaintiffs, and the preferred candidates of the voters. *Id.* ¶ 6. This information is at the heart of the First Amendment privilege. *See AFL-CIO*, 333 F.3d at 177 (D.C. Cir. 2003) (compelling disclosure of political organization's internal planning materials would have chilling effect on First Amendment rights); *Ohio Org. Collaborative v. Husted*, No. 2:15-CV-01802, 2015 WL 7008530, at *3-4 (S.D. Ohio Nov. 12, 2015) (First Amendment privilege prevented compelled disclosure of strategic information); *Int'l Soc'y for Krishna Consciousness, Inc.*, 1985 WL 315, at *8 (First Amendment protects against "compelled disclosure of the identity of an association's members or sympathizers").

Other documents the State seeks likewise contain information that, while unhelpful

to the litigation, are highly sensitive and strategic political materials. The categories of documents labeled 2012 Demographic Canvass Report, 2014 Post Election Analysis, 2012 Voted Report–Arizona, both the 2012 and 2014 Congressional District Voted Reports, 2012 and 2014 Legislative District Voted Reports, and AZ Early Ballot Report all contain proprietary assessments of demographic characteristics and likely voting behavior, strategies and targets for voter outreach, and internal assessments regarding the success of such efforts. Tameron Decl. ¶ 6. Others—such as documents labeled RE: 2012 demographics, Fwd: Data on Native Vote in Arizona, RE: Precinct by precinct voter analysis, and Fwd: Latino vote plan update—contain communications with strategic partners regarding political and messaging strategies and confidential analysis of voting behavior. *Id.* ¶ 5. Documents labeled HB 2305 Walk List contain names and addresses of voters whom ADP targeted for outreach in the 2013 referendum campaign, revealing how ADP models voter behavior and allocates volunteer resources to target strategic locations. *Id*. For all the above, compelled disclosure would inhibit Plaintiffs' ability to effectively communicate and organize internally and would chill strategic partners' and voters' willingness to communicate or associate with Plaintiffs to further their goals. *See id*. ¶ 3–9 (describing information sought and impact and chilling effect of disclosure).

Plaintiffs therefore have established the prima facie case for First Amendment protection. *See Perry*, 591 F.3d at 1143 (prima facie case met when declaration "creates a reasonable inference that disclosure would have the practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression"); *Sierra Club v. BNSF Ry. Co.*, No. 75 Civ. 5388 (MJL), 2016 WL 4528452, at *2 (W.D. Wash. Aug. 30, 2016) (prima facie showing was made that information subpoenaed infringed on First Amendment right of free association by encompassing a wide range of internal strategies and affairs).

### B. The State has not met the heightened relevancy showing required to compel disclosure of First Amendment-protected documents.

The State cannot make the crucial showing that the documents it seeks are "highly

relevant" to the litigation. *Perry*, 591 F.3d at 1141. It appears to acknowledge this standard, but offers no more than conclusory statements that the documents "may include highly relevant demographic information" and, broadly, that "[a]ny information reflecting the impact of the challenged laws is relevant, if not crucial, to the outcome of the case." Doc. 317 at 4, 6. The State's failure to explain how the information in the privileged documents is relevant, much less *highly* relevant, to litigation in which it has played no role whatsoever,[3] precludes it from obtaining this sensitive material.

Even assuming that the State had met its burden to show that the documents were highly relevant, and acknowledging the unquestioned importance of the litigation, the remaining *Perry* factors tip the scale against compelled disclosure. *See Perry*, 591 F.3d at 1141. Any demographic information that the State apparently hopes to obtain is widely available from other public sources, including from the State itself—in fact, the publicly available information is what *Plaintiffs themselves*, and their experts, used to make their case. *See* Kaul Decl. ¶¶ 3-4. Many of the documents the State requests contain public voter information overlaid with internal predictive modeling of voter characteristics and likely voting behavior. Plaintiffs use such modeled data—which is highly confidential and created at considerable expense—to develop their message, plan their outreach activities, and evaluate whether they have reached their goals. *See* Tameron Decl. ¶ 5.  The State now asks to see both the data generated by Plaintiffs' internal modeling, as well as the political plans and strategy that Plaintiffs have developed using such data. But Plaintiffs have not relied on data generated through such modeling in this case. The State has no legitimate need to see Plaintiffs' internal documents, particularly where any information relevant to this litigation is obtainable through other, less constitutionally troubling,

---

[3] Plaintiffs have not relied on the challenged documents to make their case, nor have they attempted to introduce them in any way. Kaul Decl. ¶ 3. Plaintiffs' experts likewise relied on publicly available information, all of which was promptly and timely disclosed to the State. *Id.* at ¶¶ 4-6. Plaintiffs did not provide any privileged internal data to their experts, both because that type of information is not typically used by experts assessing the impact of challenged voting laws and because Plaintiffs did not want to place any of their First Amendment-protected information at issue. *Id.* ¶ 6.

means. Upholding the privilege in this case comports with *Perry*, where the Ninth Circuit—despite finding that the information sought there was undeniably relevant to plaintiffs' constitutional claims—recognized the significance of the First Amendment interests at stake and upheld the privilege. 591 F.3d at 1164-65. As in *Perry*, the State simply cannot meet the heightened showing required to overcome Plaintiffs' core First Amendment right to keep their internal documents private and confidential.

**C.    Plaintiffs have not waived the applicable First Amendment protections.**

The State's argument that Plaintiffs have waived their First Amendment privilege by attempting to use it as "both a sword and a shield," Mot. to Compel at 5, is also ill-founded. Boiled down, the State's position is that, for Plaintiffs to vindicate their rights through litigation, they must sacrifice other constitutional rights. That cannot be—and isn't—the law. *See, e.g.*, *Int'l Action Ctr. v. United States*, 207 F.R.D. 1 (D.D.C. 2002) (upholding First Amendment privilege asserted by plaintiffs alleging violations of their constitutional rights); *Ohio Org. Collaborative*, 2015 WL 7008530, at *1, 4 (upholding First Amendment privilege asserted by plaintiffs bringing suit challenging voting laws); *Indep. Inst. v. Gessles*, No. 10-CV-00609-PAB-MEH, 2011 WL 809781, at *1-2 (D. Colo. Mar. 2, 2011) (upholding First Amendment privilege of plaintiff challenging constitutionality of statute); ); *cf. Perry*, 591 F.3d at 1152, 1165 (proponents of proposition intervened in suit to defend it, yet retained their First Amendment privilege).

The State's "sword and shield" argument omits a vital distinction: unlike the majority of the cases that the State cites, Plaintiffs have not relied upon any of the privileged information to which the State seeks access.[4] *See* Kaul Decl. ¶¶ 3–6. Had

---

[4] *See Bittaker v. Woodford*, 331 F.3d 715, 722 (9th Cir. 2003) (adopting "narrow waiver rule" with respect to privilege when petitioner asserted ineffective assistance of counsel claims); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162–63 (9th Cir. 1992) (finding privilege waived as to topic on which party asserted advice of counsel defense); *Anderson v. Nixon*, 444 F. Supp. 1195, 1199 (D.D.C. 1978) (holding that journalist's claim of conspiracy that sought to retaliate against his sources required journalist to disclose identity of sources); *Driscoll v. Morris*, 111 F.R.D. 459, 463 (D. Conn. 1986) (holding that journalist's claim that defendant's wrongful conduct affected his ability to use confidential sources required journalist to disclose identity of sources). Nor do the other cases cited by the State support their argument. *See Salazar v. Basic*, No. CV 05-283-TUC-FRZ, 2006 WL 3802094, at *3 (D. Ariz. Dec. 22, 2006) (finding California

1    Plaintiffs sought to use some documents reflecting their internal modeling but selectively

2    denied access to other such documents, legitimate questions could potentially be raised

3    regarding waiver of the privilege. But as set forth *supra* at 6 n.3, Plaintiffs have not used

4    the documents in this litigation, and the State has not explained how any of the documents

5    it seeks are necessary to its defense—indeed, they were not necessary to make Plaintiffs'

6    claims in the first place. In other words, Plaintiffs are not using privileged information as

7    a sword; they are not using it *at all*, and the State fails to establish otherwise.

8         The State also argues that ADP waived its privilege over high-level demographic

9    data when it disclosed certain conclusions and graphs to a reporter for inclusion in an

10   *Arizona Republic* article. Importantly, as with the challenged documents above, Plaintiffs

11   have not relied upon any of the information provided in the article to support any claims

12   in this litigation. Plaintiffs do not seek to shield information that was included in the

13   article, but the State's broad assertion that Plaintiffs have waived *all* documents that may

14   have informed the limited conclusions relayed to the reporter—whether or not those

15   documents themselves were actually disclosed to the reporter—goes far beyond what the

16   law permits. Moreover, communications with a reporter are also protected under the First

17   Amendment pursuant to the reporter's privilege. *See, e.g.*, *Goldberg v. Amgen, Inc.*, 123 F.

18   Supp. 3d 9, 15 (D.D.C. 2015) ("The Court of Appeals has long recognized that, in civil

19   cases, journalists enjoy a qualified privilege against compelled disclosure of their First

20   Amendment activities.").

21        The State's reliance on *Valle del Sol v. Whiting*, No. CV-10-01061-PHX-SRB,

22   2013 WL 12098752 (D. Ariz. Dec. 11, 2013), is not well founded. In *Valle del Sol*, the

23   party seeking discovery sought *communications with public officials*, not internal

24   modeling and strategy that merely informed communications with private individuals. *Id.*

25   at *2 ("Movants do not cite, and the Court is unaware of, any law that protects from

26   _____

27   privilege against disclosing tax returns waived when it was "utterly inconsistent with the
     gravamen of [plaintiffs'] claim"); *Indep. Prods. Corp. v. Loew's, Inc.*, 22 F.R.D. 266, 276

28   (S.D.N.Y. 1958) (applying standard inconsistent with *Perry*).

1   public view communications with public officials in their official capacity about a matter

2   of public concern."). In finding the privilege did not apply to those facts, the Court

3   observed: "*Perry* and its progeny have all dealt with the disclosure of either the identity of

4   association members or internal communications—not communications with third parties,

5   let alone public officials." *Id.* at *3.

6          Given the concerns that give rise to the First Amendment privilege—protecting the

7   right to associate to advance shared political beliefs, including the right to privately

8   exchange ideas and formulate strategy and messages, *Perry*, 591 F.3d at 1142—it would

9   seriously undermine constitutional protections if a political organization engaging in

10  protected activity risked compelled disclosure of protected information by advancing a

11  highly curated portion of its message to the public outside the context of litigation. In such

12  a case, a broad finding of waiver would be clearly inappropriate. *Cf. In re von Bulow*, 828

13  F.2d 94, 103 (2d Cir. 1987) ("But where, as here, disclosures of privileged information are

14  made extrajudicially and without prejudice to the opposing party, there exists no reason in

15  logic or equity to broaden the waiver beyond those matters actually revealed.").

16         **D.    Fairness requires strict application of the privilege to protect ADP's confidential materials.**

17         The showing above is more than enough to demonstrate that the First Amendment

18  privilege applies to the documents at issue. But two factors make the case for the

19  applicability of the privilege particularly forceful here. First, both the current Secretary of

20  the State and the Attorney General—the State Defendants—are Republicans and they

21  have been extensively aided and assisted in this litigation by the ARP, which voluntarily

22  inserted itself into this litigation as an intervenor-defendant. The Republican Party is,

23  obviously, ADP's direct political competitor. That the State and ARP could benefit

24  competitively from disclosure of the information means that the harm to ADP from

25  disclosure would be exacerbated. None of the cases the State cites involved an analogous

26  situation, where political rivals are demanding the disclosure of highly sensitive political

27  information from their opponents. Compelled disclosure of the proprietary data at issue

28

here would inflict a First Amendment injury far out of proportion to the needs of this case.

Second, ARP, *in this case*, has asserted the First Amendment privilege far more broadly than ADP has.[5] *See, e.g.*, Ex.2 (Deposition Transcript of Robert Graham) at 20:18–21:6 (asserting privilege in response to question regarding activities engaged in to get out the vote), 22:13–24:17 (asserting privilege and instructing witness not to answer question asking "Did any of the people that you were working with on the precinct committee engage in ballot collection activities?"), 61:23–62:1 (ARP: "any information that is collected in regard to strategy or other type of techniques or data about voter trends, et cetera, is protected by the First Amendment."); *see also* Ex. 3 (Response of ARP to Requests for Production) at 3 (ARP made detailed First Amendment objection to various basic information). ARP even refused to allow a former Chair to answer basic questions on the party's outward facing engagements with the general public—an application of the privilege with no clear legal basis at all. Ex. 2 (Deposition Transcript of Robert Graham) at 20:18-21:6 (PLAINTIFFS: …[W]hat kind of activities did you engage in in order to try to get out the vote? ARP: I am going to object based off of First Amendment privilege and direct him not to answer the question. PLAINTIFFS: Well, I just asked him what kind of activities he engaged in. I didn't ask him about conversations or anything like that. ARP: True. I think that goes to strategy as well as other activities of the internal workings of the Republican Party, and I think that is privileged under the First Amendment.)

This inequity of position—ARP broadly invoking the privilege for itself while challenging Plaintiffs' more limited assertion of the privilege—is accentuated by ARP's last-minute decision to foist responsibility for this motion on the State, despite having previously led the charge on challenging Plaintiffs' First Amendment assertions. *See* Ex. 4 (Transcript of June 6 Telephonic Status Conference) 4:12-16 (ARP: We expect to have some areas of challenge to that privilege [assertion], and we expect to need to brief those

---

[5] That ARP, unlike ADP, does not bear the burden of proof in this case is not a distinguishing factor, because ADP is not trying to use the privileged information to meet its burden. The privilege discussion is thus the same regardless of the party's posture.

issues before the Court.); *id.* 5:4-17. Plaintiffs' objection to this disingenuousness is not just tiresome squabbling between litigating parties. Fundamental fairness provides that the First Amendment protections should apply equally to all parties participating in the case.

## II.   ADP HAS SATISFIED ITS OBLIGATIONS UNDER RULE 30(B)(6).

Rule 30(b)(6) provides that an entity may designate one or more individuals to testify on its behalf "as to the matters known or reasonably available to the organization." There is "a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter." *Starlight Int'l, Inc. v. Herlihy*, 186 F.R.D. 626, 639 (D. Kan. 1999). Plaintiffs have more than complied with these requirements.

During discovery, the State noticed a 30(b)(6) deposition for ADP and provided a list of nine general categories of topics, each containing multiple subtopics. Def's. Ex. M. In response, ADP designated two individuals: Spencer Scharff, the 2016 Voter Protection Director, who testified as to topics covering ADP's voter-centric activities during the 2016 general election, Ex. 5 (Deposition Transcript of Alexis Tameron) at 57:14-60:15, and Alexis Tameron, the Chair of ADP, who testified to the remainder of the topics. *Id*. Contrary to the State's assertion, the record reflects that both were knowledgeable 30(b)(6) witnesses who were fully prepared to answer—and *did* answer—all questions posed to them within their designated topics. The State's request to compel further 30(b)(6) deposition testimony should be wholly denied.

### A.   The transcripts flatly refute the State's contention that four of the 30(b)(6) topics were not addressed.

The State's claim that four of the nine 30(b)(6) topics "remain unaddressed" after the two 30(b)(6) depositions, Mot. to Compel at 13, is clearly refuted by the transcripts, which establish that both witnesses offered extensive testimony on all four topics.

- **Topic 2. Demographic information the ADP maintains regarding ... voting patterns, use of mail-in ballots (including any increase in use by specific groups of minority voters), [and] access to mail service ....**

The State's assertion that, "Ms. Tameron was unable to provide any type of

information about the demographic makeup of ADP members or Democratic voters, even when asked basic questions," Mot. to Compel at 11, is demonstrably false.[6] *E.g.*, Ex. 5 92:14-18 (STATE: … do you know how many of your members are Hispanic or Latino? MS. TAMERON: …26, 27 percent of registered Democrats are Latino); 96:21-97:4 (STATE: … what percentage of registered Democrats on the [PEVL] are African-American? MS. TAMERON: It was less than – it was about 2 percent. STATE: And what percent of…registered Democrats on the [PEVL] are Asian-Pacific Islander? MS. TAMERON: It was less than…1 percent.); *see also id.* at 24:13-31:23 (general demographic information); 34:4-41:4 (demographic information on ballot collection); 64:25-67:3 (demographic information on access to mail service and ballot collection); 73:13-75:5 (demographic information on 2016 voting patterns as compared to other years); 82:17-83:13 (comparison of voting registration and voting patterns between 2016 and previous cycles); 91:10-18 (use of early voting in 2016 compared to previous years); 92:1-97:12 (demographic information on overall membership and electorate statistics); 102:19-106:23 (demographic information on voting patterns among minorities); 163:8-164:20 (demographic information of voters who have had ballots collected).

The State's citations in support of their claim that Ms. Tameron "was unable to provide *any* type of [demographic] information," Mot. to Compel at  11, refer to early portions of Ms. Tameron's deposition, during which she was asked to recall granular statistical and demographic data beyond the level of detail that a reasonably prepared witness would be expected to know. Exs. 5, 6 (asking for, *inter alia*, the percentage of ADP's membership that identify as belonging to two or more races, are Pacific Islander, and/or speak Yaqui). It is well established that Rule 30(b)(6) is "not designed to be a memory contest." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D.

---

[6] Ms. Tameron's testimony to demographic data does not constitute waiver, nor does the State argue as much. Ms. Tameron testified to general or aggregated data, but did not provide any information concerning internal modeling or strategy. *See* Ex. 5 104:10-106:7 (ADP's counsel permitting Ms. Tameron to testify as to general conclusions but noting objection to questions regarding internal modeling and projections).

135, 150 (S.D.N.Y. 1997). *Equal Employment Opportunity Comm'n v. Am. Int'l Grp., Inc.*, No. 93 CIV. 6390(PKL)RLE, 1994 WL 376052, at \*3 (S.D.N.Y. July 18, 1994) ("It is not reasonable to expect any individual to remember every fact" in a 30(b)(6) deposition). The noticed 30(b)(6) topics are broad and cover large swaths of information, Defs.' Ex. M; and the witnesses "cannot be faulted for not knowing every fact that could possibly come within the scope of a particular topic." *Kress v. Pricewaterhouse Coopers, LLP*, No. 2:08-CV-0965 LKK AC, 2013 WL 2421704, at \*5 (E.D. Cal. June 3, 2013).

In fact, when informed of the State's concerns that Ms. Tameron had not provided sufficiently detailed answers, ADP was immediately responsive. Here, State counsel omits an important fact: during the deposition, State counsel provided via email two written lists of demographic data they sought from Ms. Tameron. Exs. 5, 6. *see also* Defs.' Ex. N at 30:14-23; *see also id.* at 70:24-72.  Ms. Tameron obtained the requested information during the break and answered *all* the State's listed demographic questions.[7] Ex. 5 92:1-97:12. The document she reviewed to refresh her memory was also produced to the State.[8]

_____

[7] Ms. Tameron's initial lack of recall of granular details of demographic data is not indicative of whether she was fully prepared under Rule 30(b)(6). "It is not reasonable to expect any individual to remember every fact" in a 30(b)(6) deposition. *Equal Employment Opportunity Comm'n*, 1994 WL 376052, at \*3 (S.D.N.Y. July 18, 1994). Nor, as the State argues, is the situation similar to that in *Great Am. Ins. Co. of N.Y. v. Vegas Const. Co.*, 251 F.R.D. 534, 536 (D. Nev. 2008), in which case the deponent "admitted on the record that he had done nothing to prepare for the deposition and had not even read the subjects of deposition contained in the notice," was "unable to recall many of the documents [his organization] had produced relating to the topics of examination" and was ultimately unable to offer *any* testimony on 16 of 23 designated topics. *Id.* In contrast, Ms. Tameron testified to her extensive preparations for her deposition, Ex. 5 166:17-174:24, and stated that she was prepared to testify on all of the noticed topics, with the exception that Mr. Scharff would testify to ADP's voter-facing activities in the 2016 general election, *id.* 55:1-64:13. And although the State's questions on demographics went beyond the level of detail that a Rule 30(b)(6) deponent is reasonably expected to memorize, ADP nevertheless offered to—and promptly did—seek out answers for all specific questions from the State.

[8] The State now argues that it needs to depose Ms. Tameron further on this document. But she has testified already as to its contents and its origin, and the State has the document itself in its possession. Ex. 5 173:9-174:8 (discussing origin of document); 92:1-97:12 (discussing data contained in document). Re-opening the deposition to ask additional questions is unwarranted, particularly where the State could have asked any and all follow-up questions to Ms. Tameron at her deposition. *See Equal Employment Opportunity Comm'n v. Am. Int'l Grp., Inc.*, No. 93 CIV. 6390(PKL)RLE, 1994 WL 376052, at \*3 (S.D.N.Y. July 18, 1994) (although 30(b)(6) deponent initially could not recall details of lengthy document, defendants had no "legitimate need" to reopen 30(b)(6)

1  Def's. Ex. O.

2      Having provided an answer to every deposition question posed on this topic *and*

3  every question posed in the two written lists provided by the State, ADP more than

4  fulfilled its 30(b)(6) obligations on this topic. Accordingly, ADP was under no obligation

5  to simultaneously prepare Mr. Scharff to answer the same set of questions at his

6  deposition three weeks later. *See Moore v. Comput. Assocs. Int'l, Inc.*, 653 F. Supp. 2d

7  955, 960 (D. Ariz. 2009) (one of the benefits of Rule 30(b)(6) is relieving an entity of

8  burden and expense of preparing multiple witnesses to testify to the same set of facts).

9      • **Topic 4. Any differences in early voting for Democratic voters between**
10     **2016 and previous elections in Arizona, including any anecdotal or**
       **statistical evidence about party members who do not have a qualified**
11     **person who could return an early ballot under HB 2023, differences in**
       **the number of minority voters who used mail-in ballots from 2016**
12     **compared to other years, complaints from party members about the**
       **early voting process compared to earlier years.**
13

14     Ms. Tameron answered all questions on this topic that Defendants posed. *See*

15  Tameron Tr. 73:13-75:5 (demographic information about 2016 voting patterns compared

16  to other years); 82:17-83:13 (comparison of voting registration and voting patterns

17  between 2016 and previous cycles); 91:10-18 (early voting patterns from 2016 compared

18  to previous years). Mr. Scharff offered additional testimony. *See* Ex. 6 (Deposition

19  Transcript of Spencer Scharff) at 63:17 (voters who attempted to give ballots to ADP

20  personnel); 79:8-23 (voters who contacted ADP because HB2023 blocked them from

21  returning ballot); 99:8-20 (voters reporting problems with not receiving early ballot);

22  128:1-129:4 (voters who gave their ballots to Mr. Scharff to return). ADP is unable to

23  identify which portions of the transcripts contain unanswered questions about this topic.

24  In their meet and confer email, ADP asked the State for clarification. *See infra* 15 n.9,

25  Def's. Ex. B at 2. The State did not respond.

26     • **Topic 6. Research … relating to voting patterns of Native American,**
       **Latino, African American, and all other minority voters in Arizona.**
27

28  deposition where opposing party produced document itself).

Ms. Tameron affirmed that she was ADP's designated 30(b)(6) witness on this topic. Ex. 5 161:4-13. She answered in full the only questions she was posed. *Id.* 28:11-20. ADP is unable to identify any questions asked on this topic that she did not answer, and the State has not responded to repeated requests to identify them. *See infra* 15 n.9.

- **Topic 7. Information concerning the [PEVL] including the number and demographics of Democratic voters who use PEVL, ADP's outreach to sign-up Democratic voters to PEVL, public outreach regarding PEVL, and volunteer and staff training on communicating to voters ….**

Ms. Tameron was asked about the PEVL only in a few instances and answered all questions posed to her. *See* Ex. 5 at 96:6-97:12 (demographic information of PEVL voters); 151:20-153:21 (PEVL outreach to Navajo voters); 155:5-20 (PEVL outreach to Navajo voters); 54:3-9 (ballot collection usage increased after PEVL implementation); 111:22-112:2 (PEVL outreach). Mr. Scharff likewise answered many additional questions about the number and demographics of PEVL voters, public outreach regarding PEVL, and PEVL-related training. Ex. 6 95:7-101:13. ADP is unable to identify any questions posed to either witness on this topic that went unanswered, and the State again did not respond to ADP's requests to identify them. *See infra* 15 n.9.

**B.** **The State's failure to specify discrete unanswered questions leaves both ADP and the Court unable to adequately understand what specific relief is requested.**

As the transcript makes apparent, the State's assertion that the four enumerated topics remain "unaddressed," Mot. to Compel at 13, is flatly contradicted by the record. ADP is left to guess what, specifically, the State wants to know. Moreover, ADP's counsel requested this information at every turn: at Ms. Tameron's deposition, again at Mr. Scharff's deposition, and again in the meet and confer emails.[9] During Ms. Tameron's

---

[9] *See* Ex. 5 176:17-22 (PLAINTIFFS: If there's specific things that you have concerns about… I can't know what those are unless you let me know, to know if we have a dispute about something or whether or not we can make sure Mr. Scharff is prepared about it.); s*ee also id.* 58:19-60:14 (PLAINTIFFS: … If you are unable to get your questions answered today, we will …take note, we'll make sure [we get the answer]. Unless I have a question, I can't be specific. STATE: Okay.); Ex. 6 161:20-163:3 (PLAINTIFFS: If you feel that there are items on the 30(b)(6) notice that have not been addressed or that neither witness could address, please write us a letter and tell us what those items are…STATE: There's already an order from the court. PLAINTIFFS: Okay.

deposition, the State provided written lists of outstanding demographic questions—and ADP answered *every one* of them. Ex. 7 (Email from Joseph LaRue), Ex. 8 (Email from Joseph LaRue); Ex. 5 92:1-97:12. The State nonetheless maintained that they had unanswered questions; but when ADP asked what they were, the only response was silence.[10] And now, after pages of briefing, *ADP still does not know what questions the State has*.

The State's failure to provide either Plaintiffs or the Court with a discrete set of disputed issues leaves both to wade through entire deposition transcripts and attempt to guess which topics the State *wanted* to ask about, but did not. It has also deprived ADP of the opportunity to cure any alleged defects without requiring briefing and Court intervention; a full three weeks passed between Ms. Tameron's deposition and Mr. Scharff's, ample time to have prepared Mr. Scharff to answer any specific questions left unaddressed by Ms. Tameron. Lastly, as a practical matter, the State's vagueness seriously impedes ADP's ability to proffer and appropriately prepare the requested additional 30(b)(6) witness.[11] *Smithkline Beecham Corp. v. Apotex Corp.*, No. 98 C 3952, 2000 WL 116082, at *9 (N.D. Ill. 2000) ("[T]he recipient of a Rule 30(b)(6) request is not required to have its counsel muster all of its factual evidence to prepare a witness to be able to testify regarding a defense or claim.") (internal citation omitted); *see also Doubt v. NCR Corp.*, No. C 09–5917 SBA, 2011 WL 5914284, at *1–3 (N.D. Cal. Nov. 28, 2011).

---

At some point inform us of what those areas are. That would have to be part of any sort of meet and confer anyway. STATE: Well, there's an order from the judge ordering a third 30(b)(6) deposition. PLAINTIFFS: Well, and as part of the meet and confer, you will have to inform us of what those items are you claim have not been fully addressed.); Def's. Ex. B at 1-3 (In response to each contested topic, stating that Plaintiffs' counsel is unable to identify any posed questions that went unanswered and asking for clarification).

[10] The State's unwillingness to respond to ADP's requests for clarification during the meet and confer period also deprives both parties of the "meaningful" opportunity to resolve the dispute that the Local Rules require. *See supra* at 1 n.1.

[11] The only hint the State has given the Court as to how to satisfy its request for relief is a request that the third 30(b)(6) designee be Sam Almy, ADP's Data Director. What the State seems to desire is not the opportunity to have specific questions answered, but rather the opportunity to depose a certain individual. But a 30(b)(6) deposition is topic-based, not witness-based; it is ADP's prerogative to designate the appropriate witnesses. In any event, as Plaintiffs have explained, Sam Almy is outside the state hiking the Appalachian trail and will be unavailable through trial. Ex. 4 22:23- 23:16.

1

2

3    Dated:  July 6, 2017                           s/ Sarah R. Gonski
                                              Daniel C. Barr (# 010149)
4                                             Sarah R. Gonski (# 032567)
                                              PERKINS COIE LLP
                                              2901 North Central Avenue, Suite 2000
5                                             Phoenix, Arizona  85012-2788

6                                             Marc E. Elias (WDC# 442007)*
                                              Bruce V. Spiva (WDC# 443754)*
7                                             Elisabeth C. Frost (WDC# 1007632)*
                                              Amanda R. Callais (WDC# 1021944)*
8                                             Alexander G. Tischenko (CA# 304743)†
                                              PERKINS COIE LLP
9                                             700 Thirteenth Street N.W., Suite 600
                                              Washington, D.C.  20005-3960
10

11                                            Joshua L. Kaul (WI# 1067529)*
                                              PERKINS COIE LLP
12                                            One East Main Street, Suite 201
                                              Madison, Wisconsin  53703
13
                                              *Attorneys for Plaintiffs the Arizona*
14                                            *Democratic Party, the DSCC, and the*
                                              *Democratic National Committee*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2017, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

*s/ Michelle DePass*