MARK BRNOVICH
Attorney General
Firm Bar No. 14000

Kara Karlson (029407)
Karen J. Hartman-Tellez (021121)
Joseph E. La Rue (031348)
Assistant Attorneys General
1275 W. Washington Street
Phoenix, AZ  85007
Telephone (602) 542-4951
Facsimile (602) 542-4385
Kara.Karlson@azag.gov
Karen.Hartman@azag.gov
Joseph.Larue@azag.gov
*Attorneys for State Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Arizona Democratic Party, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Michele Reagan, et al.,<br><br>Defendants. | Case No. CV-16-01065-PHX-DLR<br><br>**STATE DEFENDANTS' MOTION TO COMPEL AND MOTION FOR RECONSIDERATION** |

Pursuant to Fed. R. Civ. P. 7 and 37 and LRCiv Rules 7.2 and 37.1and this Court's July 31, 2017 Order, Doc. 334, Defendants Secretary of State Michele Reagan and Attorney General Mark Brnovich (collectively, the "State Defendants") move for an order compelling Plaintiff Arizona Democratic Party ("ADP") to answer the questions submitted pursuant to this Court's Order. (*See* Doc. 323.) The State Defendants also ask the Court to reconsider its July 25, 2017 Order, Doc. 329, which denied the State Defendants' earlier motion to compel, Doc. 317. These Motions are supported by the following Memorandum of Points and Authorities and exhibits, including Ex. 2, *Rule 37.1 Statement of Questions, Responses, and Deficiencies*.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

In the telephonic conference on July 14, 2017, this Court noted that the ADP's 30(b)(6) witnesses "said they couldn't answer" deposition questions. (Ex. 3, Reporter's Trans. of Proceedings, July 14, 2017, at 18:16-18.) The witnesses instead mentioned another witness who could answer them. (*Id*. at 18:18-19.) But that particular witness was hiking the Appalachian Trail and not available. (*Id*. at 16:7-21, 18:19.) Nonetheless, the Court recognized that "there have been some questions posed to 30(b)(6) deponents that they just couldn't answer" that should be answered. (*Id*. at 18:20-22.) The Court ordered the Defendants to "identify for the Plaintiffs the specific questions that they seek to be answered." (Doc. 323.) The Court also ordered Plaintiffs to "answer those questions . . . if possible[.]" (*Id.*)

The State Defendants submitted their questions to Plaintiffs. (Ex. 4, State D.s' 2d Set of Interrog. to Ariz. Dem. Pty. (July 19, 2017).) After the Parties negotiated, the State Defendants narrowed their questions. (Ex. 5, State D.s' Rev. 2d Set of Interrog. to Ariz. Dem. Pty. (July 21, 2017) ("Revised Interrogatories").) Both times, they provided Plaintiffs with the same two corresponding exhibits. (Ex. 6, Electoral Breakdown; Ex. 7, Ronald J. Hansen, "What we know about Arizona early voting in 5 charts," *The Arizona Republic*, Nov. 2, 2016.)

1

1  Plaintiffs responded.  (Ex. 8, Ariz. Dem. Party's Resp. to State D.s' Rev. 2d
2  Interrogatories.)  But Plaintiffs' response is inadequate, and does not comply with this
3  Court's July 14, 2017 Order.  Rather, Plaintiffs assert a First Amendment privilege in
4  response to more than half the questions.  (*Id*.)  Plaintiffs also assert that many of the
5  questions go beyond the scope of a 30(b)(6) deposition.  (*Id*.)  But, they do not.  *See*
6  *infra*, at Part III.  And the First Amendment privilege is inapplicable because the
7  information sought is not the type that is protected by the privilege.  *See infra*, at Part I.
8  Even if that were not so, the privilege would yield to the State Defendants' discovery,
9  which is necessary to their defense.  *See infra*, at Part II.  Accordingly, this Court should
10 grant the Motion to Compel.
11    The State Defendants also respectfully ask the Court to reconsider its July 25,
12 2017 Order, Doc. 329.  *See infra*, Part IV.

### Argument

**I. The Revised Interrogatories Do Not Implicate the First Amendment Privilege.**

15    The First Amendment privilege is designed to prevent "(1) harassment,
16 membership withdrawal, or discouragement of new members, or (2) other consequences
17 which objectively suggest an impact on, or 'chilling' of, the members' associational
18 rights."  *Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349-50 (9th Cir.
19 1988).  The privilege also applies to protect from disclosure "an association's
20 confidential internal materials" that might give an advantage to its opponents.  *Am.*
21 *Fed'n of Labor & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d
22 168, 177 (D.C. Cir. 2003).
23    The State Defendants do not seek that type of information.  Rather, the Revised
24 Interrogatories mainly seek demographic information about Arizona's voters.  Plaintiffs
25 assert that Arizona's ban on ballot harvesting and counting votes cast out of precinct
26 have a disparate impact on minority-race voters and so are both unconstitutional and also
27 violate the Voting Rights Act.  (*See generally*, Pl.s' Second Am. Compl., Doc. 233.)
28 Information about the demographics of Arizona's voters is thus at the heart of Plaintiffs'

2

1 claims and is vital to the State Defendants' defense.

2 None of the State Defendants' questions create the harms that the First
3 Amendment privilege was designed to prevent. (*See generally*, Ex. 2.) Allowing the
4 ADP to claim the privilege as to the Revised Interrogatories would be like allowing a car
5 accident victim to refuse to disclose medical records related to a preexisting back injury,
6 when she has alleged in her lawsuit that the other driver is liable for injuries to her back.
7 As this Court recognized, an accident victim cannot rely on the physician-patient
8 privilege as to "any evidence pertaining to that particular claim regarding [the victim's]
9 back" when the victim herself has placed that issue squarely into legal contention and so
10 the information is central to the other driver's defense. (Ex. 3 at 7:25-8:1.)

11 It is important to clarify that the State Defendants do not assert "that Plaintiffs
12 have implicitly waived their First Amendment privilege *simply by bringing this lawsuit*."
13 (Doc. 329 at 6-7 (emphasis added).) Political parties do not surrender their First
14 Amendment rights when they bring lawsuits. But political parties may not claim the
15 First Amendment privilege to hide information to which no privilege applies. *See, e.g.*,
16 *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, No. A-15-CV-134-RP,
17 2016 WL 5922315, at *8 (W.D. Tex. Oct. 11, 2016) (holding that party asserting First
18 Amendment privilege failed to show "an objectively reasonable fear of 'threats,
19 harassment or reprisal from either government officials or private parties' flowing from
20 disclosure of the communications," so the privilege did not apply).

21 It is also important to clarify that the State Defendants do not seek "proprietary
22 predictive modeling and strategic communications." (Doc. 329 at 8.) The State
23 Defendants seek only the racial demographic information of Arizona's voters that is held
24 by ADP, along with a general understanding of how ADP arrived at its conclusions
25 about the voters' race. And the information that the State Defendants seek is only
26 backward-looking, involving elections that have already occurred. The State Defendants
27 have not asked for, and do not want, information about the ADP's future strategic plans.
28 Tellingly, Plaintiffs did not raise a First Amendment objection to similar

questions during the 30(b)(6) deposition of Alexis Tameron, the Chair of the ADP. The State Defendants asked Ms. Tameron questions concerning the racial demographics of the members of the ADP. (Ex. 9, Excerpts of the Deposition of Alexis Tameron, at 92:13-93:19.) ADP's counsel made no First Amendment objection to those questions. (*Id.*) Ms. Tameron likewise attempted to answer questions about the race of ADP members registered for the Permanent Early Voter List, again with no First Amendment objection from counsel. (*Id.* at 96:6-97:12.) She attempted to answer questions about the ADP's knowledge of the racial demographics of all Arizona voters, again with no First Amendment objection from counsel. (*Id.* at 95:7-96:5.)

The ADP also provided a chart describing its understanding of the racial demographics of voters in the 2016 general election. (Doc. 317-1, Ex. O, Email from Amanda Callais, counsel for the ADP, May 19, 2017, and accompanying chart (breaking down the 2016 election by racial demographics).)[1] Ms. Tameron used that document to refresh her recollection at her deposition. (*Id.*) The Defendants asked for that information. (Ex. 9, at 172:20-174:8.) And the ADP did not raise a First Amendment objection when it provided a copy of the document to Defendants nine days later.[2]

Revealing the ADP's understanding of the racial make-up of the membership of the ADP does not implicate First Amendment concerns for the ADP. Likewise, acknowledging the ADP's understanding of the racial make-up of the voting portion of the electorate in the 2016 general election does not implicate First Amendment concerns

---

[1] This chart (without the authenticating email from Ms. Callais) was provided to the Plaintiffs as one of the exhibits to the Revised Interrogatories, and is included by itself as Ex. 6 to this motion.

[2] At Ms. Tameron's 30(b)(6) deposition, the ADP's counsel did lodge a First Amendment objection when she grew concerned that the questions were approaching "some modeling and projections that the [ADP] performs to project turnout for various demographic groups" because "that's highly strategic, protected information." (Ex. 7, 104:10-21 (full context at 103:17-106:7).) But that is not the type of information that the Revised Interrogatories seek. Instead, State Defendants seek information like what was disclosed by the ADP in the chart included in Doc. 317-1, Ex. O, which is Ex. 6 to this motion.

1 for the ADP. It cannot be the case that communicating basic demographic information
2 for prior elections will implicate First Amendment concerns, because aggregate facts
3 relating the composition of a group—unlike revealing information that identifies specific
4 individuals—cannot produce the chilling effect Plaintiffs must demonstrate to bring the
5 information the State Defendants seek within the ambit of the First Amendment
6 privilege. Because Plaintiffs cannot make out the required "prima facie showing of
7 arguable first amendment infringement[,]" *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th
8 Cir. 2010) ("*Perry I*") (internal citation omitted), the ADP's claim of First Amendment
9 privilege must fail.

**II. Even If the First Amendment Privilege Applied, It Must Yield In This Instance.**

11 The First Amendment privilege would not bar the Revised Interrogatories, even if
12 the privilege applied to the information sought. When the party asserting the privilege
13 makes the necessary prima facie showing, the party seeking discovery must show "an
14 interest in obtaining the disclosures it seeks which is sufficient to justify the deterrent
15 effect on the free exercise of the constitutionally protected right of association." *Perry I*,
16 591 F.3d at 1161 (internal ellipses and brackets omitted). This requires "careful
17 consideration of the need for such discovery, but not necessarily to preclude it." *Id*.
18 Courts apply a balancing test to determine whether the interest in disclosure outweighs
19 the harm to First Amendment associational rights. *Id*. Factors that courts consider may
20 include (a) the importance of the litigation, (b) the centrality of the information to the
21 claims or defenses, (c) the existence of less intrusive means to acquire the information,
22 and (d) the substantiality of the First Amendment interests. *Id*. Applying those factors
23 leads to the conclusion that the ADP must answer the Revised Interrogatories.

24 **A.     The Current Litigation Is Important.**

25 Plaintiffs seek to strike state laws that prescribe procedures related to casting
26 ballots. States have "important regulatory interests" in such laws. *Weber v. Shelley*, 347
27 F.3d 1101, 1106 (9th Cir. 2003). And Plaintiffs, who allege that their constitutional
28 rights are being violated, would no doubt agree that the litigation is important. Perhaps

5

1  only in capital cases are the stakes higher than when citizens assert that the government
2  is depriving them of the right to participate equally in the electoral process.  This
3  litigation is important.

**B.     The Information Is Central to State Defendants' Defense.**

The information sought is central to the State Defendants' defense.  It relates to the racial demographics of Arizona voters and whether the use of mail-in ballots by racial minorities has changed after the enactment of the challenged law, HB 2023.  This information goes directly to the heart of Plaintiffs' Section 2 and constitutional claims involving alleged disparate impact.  When a plaintiffs' First Amendment interests clash "with his responsibilities as a plaintiff, and where the information sought to be protected goes to the heart of the defense, the privilege must give way." *Anderson v. Nixon*, 444 F. Supp. 1195, 1200 (D.D.C. 1978).

**C.     The Information Is Not Otherwise Available.**

There is no other way for the State Defendants to acquire the information. Inervenor-Defendant Arizona Republican Party does not compile racial demographics. (Ex. 10, Ariz. Repub. Pty.'s Resp.s to Pl.s' 1st Set of Requests for Prod., at RFP Nos. 4 and 7.)  Nor do the State Defendants.  (Ex. 11, Resp.s and Objections to Pl.s' 1st Requests for Prod., at RFP Nos. 2, 5, 11, 12, 16, and 17.)

Plaintiffs may suggest *The Arizona Republic* as a possible source for at least some of the information.  The *Republic* published an article that purported to rely on the ADP's data.  (*See*, Doc. 317, at 7 (providing documentation that the article claimed to rely on data "tabulated by Arizona's Democratic Party").)  But two days ago, on August 2, 2017, Plaintiffs' counsel informed the State Defendants by email that "it was now" Plaintiffs' counsels' understanding that ADP did not authorize anyone to provide its data to the *Republic*.  (Ex. 12, Kaul Email (Aug. 2, 2017).)  Accordingly, "ADP does not know precisely what document(s) or data were provided to the reporter."  *Id.*[3]

---

[3] The email further states that "[s]hortly after publication of the article," which happened on November 2, 2016, "an ADP representative called the author of the article

6

1    Regardless, the State Defendants cannot acquire the information from the
2  *Republic* because it holds the First Amendment reporter's privilege.[4]  The Ninth Circuit
3  explained this privilege in *Shoen v. Shoen*, 5 F.3d 1289 (9th Cir. 1993) ("*Shoen I*").  The
4  plaintiffs in that case sought a journalist's notes concerning his conversations with the
5  defendant.  *Id.* at 1290-91.  The court explained that a First Amendment privilege
6  protects "facts acquired by a journalist in the course of gathering the news."  *Id.* at 1292;
7  *accord U.S. v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980) (explaining that "[w]e do
8  not think that the privilege can be limited solely to protection of sources" because "[t]he
9  compelled production of a reporter's resource materials can constitute a significant
10 intrusion into the newsgathering and editorial processes").[5]  The reporter's privilege
11 extends to all such facts, irrespective of whether the source demanded confidentiality.
12 *Shoen I*, 5 F.3d at 1295.  To overcome that privilege, one seeking information belonging
13 to a journalist or news organization must "[a]t a minimum," demonstrate "that the

---

and objected to the *Republic*'s mis-attribution of the data to ADP."  The State Defendants have sought the information that they believed the ADP had supplied to the *Republic* since at least the deposition of Spencer Scharff, one of the ADP's 30(b)(6) deponents.  Although that deposition was noticed for May 17, 2017, a death in Mr. Scharff's family caused it to be postponed until June 6, 2017.  The debate over whether ADP should produce these documents to the Defendants has consumed time and expense for all Parties since then, and ultimately resulted in motion practice before this Court.  Doc. 317.  But all the while, the ADP knew that it had not supplied the *Republic* with the documents.  The State Defendants object to this type of gamesmanship, which only serves to drive up litigation costs and waste the Court's and the parties' time.

[4] In addition, without leave of Court, Defendants cannot issue new discovery requests because fact discovery closed on May 26, 2017.

[5] Some courts have considered the effect of state laws that provide protection only against revealing sources, not information.  *See, e.g.*, *Simon v. Nw. Univ.*, No. 1:15-CV-1433, 2017 WL 1197097, at *3 (N.D. Ill. Mar. 31, 2017), *reconsideration denied in part*, No. 1:15-CV-1433, 2017 WL 2653075 (N.D. Ill. June 20, 2017) ("Under Illinois state statute, reporters have a qualified privilege that protects them from being compelled to disclose their sources").  Regardless, the First Amendment provides a reporter's privilege independent from any state-law privilege.  *See Phoenix Newspapers, Inc. v. Reinstein*. 381 P.3d 236, 241-43, ¶¶ 19-25 (Ariz. Ct. App. 2016) (applying the First Amendment reporter's privilege, even though the Media Shield Law, A.R.S. § 12-2237, did not protect the information sought).

7

information sought is not obtainable from another source." *Id*. at 1296. Because the plaintiffs had not done so by deposing the defendant, the court quashed the subpoena to the journalist. *Id.* at 1296-97.

The State Defendants obviously cannot make that showing. The ADP has the information the State Defendants need, a fact implied by ADP's counsel when he stated that the ADP "did not authorize any individual to release the information to the *Republic*." (Ex. 10.) Because they are the ones who brought the lawsuit that caused the need for the State Defendants to acquire the information, the ADP should have to provide the data, not the *Republic*. In short, the racial demographic information that goes to the heart of this matter is not available from any other source.

**D.     Any First Amendment Interest in the Data Is Slight.**

If Plaintiffs have a First Amendment interest in the information sought, it is slight. As explained above, the First Amendment privilege does not apply to the information sought by the Revised Interrogatories. The membership of the ADP is known to all the parties, as it includes all of those who are registered to vote in Arizona who have chosen to register as Democrats. Disclosing demographic information as gathered and calculated by the ADP, without including voters' personally-identifying information or proprietary information (which the State Defendants do not seek), will not chill anyone's associational rights. Besides, as noted above, the Plaintiffs did not assert a First Amendment objection when their 30(b)(6) deponent, Alexis Tameron, provided similar racial demographic information.

The First Amendment privilege is not absolute. *Shoen I*, 5 F.3d at 1292 . It yields when the interests of justice require. *Carey v. Hume*, 492 F.2d 631, 634-39 (D.C. Cir. 1974). If it exists in this instance at all, it should yield to the State Defendants' overwhelming need for the information sought.

**III. The Revised Interrogatories Are Consistent With 30(b)(6) Depositions.**

Plaintiffs claim that many of the Revised Interrogatories "seek a level of detail far beyond what a 30(b)(6) deponent would be expected to answer in a deposition." (Ex. 2

8

at Nos. 3, 5, 9-16, 21-23.)  But that contention is wrong.  The questions are the exact ones that the State Defendants either asked or intended to ask during the 30(b)(6) depositions, but were prevented from asking by the deponents' obvious lack of knowledge and lack of preparation for entire topic areas that were included in the 30(b)(6) Notice.

**A.        Deponents Must Prepare to Answer Questions About Noticed Topics.**

A 30(b)(6) witness must be adequately prepared to answer questions about the organization because he or she is testifying not about what he or she knows or recalls, but what is within the knowledge of the organization.  *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 37 (D. Mass 2001).  The ADP's counsel said numerous times at Ms. Tameron's 30(b)(6) deposition that such depositions are not meant to be memory tests.  (*See, e.g.*, Doc. 317-1, Ex. N, at 26:15-19, 71:2-7.)  The State Defendants' counsel responded that, while she did not intend to make the deposition a memory test, 30(b)(6) deponents are expected to be able to testify concerning the subject matters that have been noticed in the notice of deposition.  (*Id*. at 71:25-72:7.)

The State Defendants' counsel was right.  As another court in this district has explained, "a party meets its Rule 30(b)(6) burden by (1) producing a deponent 'knowledgeable on the subject matter identified as the area of inquiry;' (2) designating 'more than one deponent if it would be necessary to do so in order to respond to the relevant areas of inquiry that are specified with reasonable particularity;' (3) preparing a designated witness to testify 'on matters not only known by the deponent, but those that should be reasonably known by the designating party;' and (4) substituting 'an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry.'"  *E.E.O.C. v. Boeing Co.*, No. CV 05-03034-PHX-FJM, 2007 WL 1146446, at *1 (D. Ariz. Apr. 18, 2007) (*quoting Alexander v. FBI*, 186 F.R.D. 137, 141 (D.D.C.1998)).  Failing to produce a prepared witness can be considered a failure to appear and lead to sanctions.  *Id*. at *4.

Rule 30(b)(6) requires parties to produce witnesses who are prepared to testify as

9

to the noticed subjects.[6] The noticing party provides specific topic areas of inquiry, and the deponent must come prepared to provide insight into those topics. *Reilly*, 181 F.3d at 268. "[T]he purpose behind Rule 30(b)(6) undoubtedly is frustrated in the situation in which a corporate party produces a witness who is unable and/or unwilling to provide the necessary factual information on the entity's behalf." *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 304 (3d Cir. 2000). Unprepared deponents are "no more present for the deposition than would be a deponent who physically appears for the deposition but sleeps through it." *Id.* Failure to produce a prepared witness is thus tantamount to failing to appear and is sanctionable conduct. *Id.*

## B.   Deponents Should Refresh Recollection When Needed.

Depositions, including 30(b)(6) depositions, are *not* memory tests. But that does not mean that 30(b)(6) deponents are excused from answering questions. When deponents cannot recall (or do not know) answers to questions that are within topic areas that were noticed in the 30(b)(6) deposition, the proper action is for the deponent to refresh her recollection. *See, e.g.*, *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 265 F.R.D. 235, 242 (D. Md. 2010) (explaining that deponents may refresh recollection with documents or other materials). Such refreshing can take place at the deposition, or afterwards, which is one of the purposes for keeping depositions open (as the State

---

[6] *See, e.g.*, *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (explaining duty of organizations subject to a 30(b)(6) deposition to fully prepare their deponents "to the extent matters are reasonably available, whether from documents, past employees, or other sources"); *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (explaining that "[t]o satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf" (internal quotations omitted)); *King v. Pratt & Whitney, a Div. of United Techs. Corp.*, 161 F.R.D. 475, 476 (S.D. Fla. 1995), *aff'd sub nom. King v. Pratt & Whitney*, 213 F.3d 646 (11th Cir. 2000), *and aff'd sub nom. King v. Pratt & Whitney*, 213 F.3d 647 (11th Cir. 2000) (holding that "Rule 30(b)(6) obligates the responding corporation to provide a witness who can answer questions regarding the subject matter listed in the notice"); *see also* Adv. Comm. Notes (1970) ("[The Rule 30(b)(6) amendments] will curb the 'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to it.")

10

1 Defendants did with the ADP's 30(b)(6) depositions).

2 The ADP did not fulfill its duty to adequately prepare its deponents to answer
3 questions related to the properly-noticed topics of inquiry. This is evidenced by all of
4 the deposition questions that went unanswered, as this Court recognized. (Ex. 3 at
5 18:20-22 (the Court noted that "there have been some questions posed to 30(b)(6)
6 deponents that they just couldn't answer").) The ADP also has not fulfilled its duty to
7 have its deponents refresh their recollection and respond. Thus, the fact that the State
8 Defendants need to ask additional questions is a product of the ADP's creation. The
9 ADP should not be allowed to complain that the Revised Interrogatories are more
10 detailed than the type of questions that might be asked at a deposition when they twice
11 failed to provide an adequately prepared witness. They should be instructed to answer
12 the questions.

13 Besides, the Revised Interrogatories are not more detailed. They are, rather, the
14 interrogatory form of questions that the State Defendants hoped to ask the ADP's
15 deponents, but were prevented from doing so by the deponents' lack of preparation and
16 knowledge. (Ex. 13, First Decl. of Kara Karlson, ¶¶ 8-16; Ex. 12, Fourth Decl. of Karen
17 Hartman-Tellez, ¶¶ 3-13.) Accordingly, the Revised Interrogatories do not go beyond the
18 scope of a 30(b)(6) deposition.

19 Nor do the Revised Interrogatories seek to inappropriately re-open fact discovery.
20 Both of ADP's 30(b)(6) depositions were noticed to take place while fact discovery was
21 still ongoing. (Ex. 13, ¶¶ 6-7; Ex. 14, ¶ 3.) Had the ADP produced properly-prepared
22 witnesses when the depositions were noticed, the questions contained in the Revised
23 Interrogatories would have been asked before the close of fact discovery.

24 **IV. This Court Should Reconsider Its July 25, 2017 Order (Doc. 329).**

25 In its July 25, 2017 Order, the Court denied the State Defendants' motion to
26 compel disclosure of documents that Plaintiffs claimed were privileged. (Doc. 329.)
27 The State Defendants respectfully alert the Court that they believe that the Court made
28 two errors of law, which led to this decision.

11

### A. The Court Based Its Decision On Plaintiffs' Assurances, Instead of Defendants' Need.

The Court based its Order in part on Plaintiffs' assurance that they would not rely on the privileged information to support their claims. (Doc. 329 at 7-8.) It is not clear from the Court's Order, however, that the Court properly considered the need that the State Defendants have for this information in order to make their defense. As already explained, the First Amendment privilege is qualified, not absolute. *Shoen I*, 5 F.3d at 1292. It must yield when justice requires, *Carey*, 492 F.2d at 634-39, including when the information at issue "goes to the heart of the defense," *Anderson*, 444 F. Supp. at 1200.

The Plaintiffs may not intend to rely on their own demographic information, but that should not prevent the State Defendants from relying on it to present their defense. This is especially true here, where the State Defendants have reason to believe that the ADP's data contradicts Plaintiffs' claims.

The *Arizona Republic* published an article, purportedly based on the ADP's data, which largely contradicts Plaintiffs' claims in this lawsuit concerning HB 2023. Specifically, Plaintiffs claim that Arizona's new ban on ballot harvesting prevented Hispanic voters from being able to cast their ballots. But the *Republic*'s article claims that in 2016 "the share of early balloting from voters with Hispanic surnames was nearly double" the share in 2012. (Ex. 7 at Chart 4.) In short, the data in the *Republic* article significantly undermines Plaintiffs' allegations that HB 2023 made it more difficult for Hispanic voters to vote by mail because it shows an increase in Hispanic voters' use of vote by mail from the Presidential elections immediately prior to the passage of HB 2023 and immediately after the law's enactment.

Additionally, in response to a question whether the ADP "ha[d] information about minority voter turnout in Arizona," Ms. Tameron testified at her 30(b)(6) deposition that "we [i.e., the ADP] know" that the Latino vote grew in 2016 over previous years. (Ex. 9, at 73:12-21.) Ms. Tameron was then asked whether, "from 2006 forward, Latino participation in the election has increased?" (*Id*. at 73:22-24.) She answered "Yes." (*Id*.

12

1 at 73:25.) Ms. Tameron was then asked whether "it's your belief that Latino participation in the 2016 election," at which point she interrupted and gave her answer: "[i]ncreased." (*Id*. at 74:1-3.) Ms. Tameron was then asked whether "Latino participation in the 2016 election was greater than the Latino participation in the 2012 election?" She answered, "Yes." (*Id*. at 74:18-21.) These answers were given in the context of a 30(b)(6) deposition, and provided responses based on Ms. Tameron's understanding of the ADP's demographic data related to Arizona's voters.

It is understandable that "Plaintiffs assure the Court that they have not relied upon any of the privileged information, nor do they intend to do so." (Doc. 329 at 7 (*citing* Doc. 321-2 ¶¶ 4, 7).) This data directly contradicts their central claims, that H.B. 2023 and Arizona's ban on counting out of precinct votes makes it more difficult for Hispanic voters to cast their ballots. The fact that *Plaintiffs* do not want to use this data should not preclude the State Defendants from being able to do so, when it is central to their defense and unavailable from other sources.[7]

**B.     The Reporter's Privilege Is Invoked by the Reporter, Not the Source.**

The Court relied upon *Shoen I* to conclude that the reporter's privilege afforded First Amendment protection *to the ADP* for information it provided to the news media. (Doc. 329, at 9.) But that misstates the holding of *Shoen I*, which held that *journalists* may assert the reporter's privilege to protect their materials from disclosure. *Shoen I*, 5 F.3d at 1295. Thus, journalists own the privilege and they are the only ones who may invoke it. In fact, "it is ubiquitous among courts that only a journalist has standing to invoke a journalist's privilege." *Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2014 WL 5474048, at *9 n.6 (S.D. Fla. Apr. 10, 2014).[8] To the extent that the Court's

---

[7] Ms. Tameron attempted to change her testimony regarding Hispanic voter turnout weeks after her deposition, based on information included in one of Plaintiffs' expert reports. (Ex. 15, June 22, 2017 email from A. Callais re "A. Tameron Errata"). This fact alone demonstrates the importance of ADP's demographic data to the State Defendants' defenses.

[8] Numerous courts have so concluded. *See, e.g.*, *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1177 (D.C. Cir. 2006) (Tatel, J., concurring) (noting that

13

1 decision rests on the reporter's privilege, the decision is in error.

2     It may be that the reporter's privilege is no longer at issue in this lawsuit, now that
3 Plaintiffs' counsel have represented their present understanding that the ADP did not
4 supply the documents relied upon by the *Republic*. But, to the extent that the ADP seeks
5 to rely upon the reporter's privilege to withhold any information the Defendants request
6 from them, it should not be permitted to do so. The privilege does not belong to them,
7 and they cannot assert it.

8 ## CONCLUSION

9     For these reasons, the State Defendants respectfully ask the Court to grant this
10 motion to compel and require the ADP to provide substantive responses to the Revised
11 Interrogatories. The State Defendants also ask this Court to reconsider its Order, Doc.
12 329, and grant the State Defendants' first motion to compel, Doc. 317, or, in the
13 alternative, conduct an in camera review of the disputed documents, to determine
14 whether they are relevant to the State Defendants' defense.

15     Respectfully submitted this 4th day of August, 2017.

16                               Mark Brnovich
                                Attorney General

18                               <u>s/ Joseph E. La Rue</u>
                              Kara M. Karlson
19                               Karen J. Hartman-Tellez
                              Joseph E. La Rue
20                               Assistant Attorneys General
                              *Attorneys for State Defendants*

---

the First Amendment reporter's privilege belongs solely to the reporter); *Jimenez v. City of Chicago*, 733 F. Supp. 2d 1268, 1272 (W.D. Wash. 2010) ("the privilege belongs to the journalist, not [to] the information"); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 494 (C.D. Cal. 1981) ("[t]he journalist's privilege belongs to the journalist alone"). *See also* Kurt Wimmer, Stephen Kiehl, *Who Owns the Journalist's Privilege-the Journalist or the Source?*, Comm. Law., August 2011, at 9 (noting that "[t]he weight of state and federal case law and the plain language of shield laws passed by a majority of the states demonstrate that the journalist, not the source, owns the privilege.").

14

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2017, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a notice of electronic filing to the EM/ECF registrants.

  s/Joseph E. La Rue


#6115724-v8