1 │ Daniel C. Barr (# 010149)
   │ Sarah R. Gonski (# 032567)
2 │ PERKINS COIE LLP
   │ 2901 North Central Avenue, Suite 2000
3 │ Phoenix, Arizona 85012-2788
   │ Telephone: (602) 351-8000
4 │ Facsimile: (602) 648-7000
   │ DBarr@perkinscoie.com
5 │ SGonski@perkinscoie.com

6 │ Marc E. Elias (WDC# 442007)*
   │ Bruce V. Spiva (WDC# 443754)*
7 │ Elisabeth C. Frost (WDC# 1007632)*
   │ Amanda R. Callais (WDC# 1021944)*
8 │ Alexander G. Tischenko (CA# 304743)†
   │ PERKINS COIE LLP
9 │ 700 Thirteenth Street NW, Suite 600
   │ Washington, D.C. 20005-3960
10 │ Telephone: (202) 654-6200
   │ Facsimile: (202) 654-6211
11 │ MElias@perkinscoie.com
   │ BSpiva@perkinscoie.com
12 │ EFrost@perkinscoie.com
   │ ACallais@perkinscoie.com
13 │ ATischenko@perkinscoie.com

14 │ Joshua L. Kaul (WI# 1067529)*
   │ PERKINS COIE LLP
15 │ One East Main Street, Suite 201
   │ Madison, Wisconsin  53703
16 │ Telephone:  (608) 663-7460
   │ Facsimile:  (608) 663-7499
17 │ JKaul@perkinscoie.com

18 │ *Attorneys for Plaintiffs*

19 │ *Admitted pro hac vice*
20 │ † *Not yet admitted in Washington, D.C.*

21 │                     UNITED STATES DISTRICT COURT

22 │                          DISTRICT OF ARIZONA

23 │ Arizona Democratic Party, et al.,              No. CV-16-01065-PHX-DLR

24 │                    Plaintiffs,

25 │        v.                                      **STATEMENT OF UNDISPUTED**
                                                    **FACTS**
26 │ Michele Reagan, et al.,

27 │                    Defendants.

28 │

1.     Native Americans were the first Arizonans. Small numbers of Hispanic settlers arrived in the sixteenth century. Anglo Americans began moving to Arizona in the 1850s, with the influx of Anglos increasing after the Civil War. African Americans began arriving in small numbers in the early 1860s. The Hispanic population also increased after the Civil War.

2.     The Arizona territorial legislature in 1909 passed the Hampton Education Qualification Bill, which required racial segregation when "a majority of a school district's residents desire such separation."

3.     Arizona convened its constitutional convention on October 10, 1910 in Phoenix. The delegates to the state's constitutional convention came close, but ultimately declined to approve, a provision requiring racial segregation in the schools.

4.     By 1900, 29% of the total population in Arizona was of Hispanic origin, and the Hispanic population increased until the Great Depression.

5.     In the late 1940s, civil rights advocates and others began to challenge legal school segregation in Arizona. World War II and the postwar era increased political activism among Hispanics. The war for democracy against fascism inspired Hispanics to demand their democratic rights at home. In 1941, the League of United Latin American Citizens ("LULAC") in Arizona held its first state convention, hosting chapters throughout the state at a convention in Phoenix. LULAC chapters became involved in local and state efforts to oppose discrimination toward Hispanics. Returning Hispanic veterans joined in organizing efforts to oppose employment discrimination in Arizona.

6.     In 1951, the state Legislature enacted legislation providing school districts the option of integrating schools at all levels.

7.     In 1952, eighteen months before *Brown v. Board of Education of Topeka*, segregation at the Carver High School in Phoenix was ruled illegal. In Tucson, Dunbar Middle School, a segregated African-American school, was integrated. Prior to this ruling, African-American students graduating from Dunbar were allowed to attend the integrated Tucson High School. Phoenix College, a local community college, also did not segregate

1  its students.

2     8.      In 1953, in *Phillip v. Phoenix Union Unified School District*, the Arizona

3  Superior Court granted a permanent injunction restraining Phoenix Union High Schools

4  and Junior College Board from segregating African-American students.

5     9.      In 1973, the US Department of Health, Education, and Welfare reported that

6  the Tucson Unified School District was racially unbalanced. In 1974, the school district

7  was ordered to eliminate minority-identifiable schools—*i.e.*, schools with more than 50

8  percent minority students. Pursuant to a 1978 consent agreement, the school board set up a

9  three-phase program to address the racial unbalance. The state legislature allowed school

10  districts to raise property tax levies above their statutory limits to facilitate this integration

11  effort and help cover desegregation costs. Today, Arizona Hispanic students account for

12  44% of all K-12 students in Arizona, compared to white students who make up 40% of the

13  school-age population.

14     10.     Arizona State University is today the largest university in the country in

15  terms of student population.  In 1985, minority students, including African American and

16  Asian students accounted for only 10% of the student body. In 2005, about 18% of

17  Arizona State University's students were Hispanic. By 2015, Hispanic students accounted

18  for 20% of the entire student body.

19     11.     As of 1964, Arizona had no civil rights laws, except one prohibiting

20  discrimination in public employment. There were no public accommodations laws, no fair

21  employment practices laws, and no fair housing laws in Arizona at that time.

22     12.     The 1965 Arizona Civil Rights Act included a ban on voting discrimination

23  based on "race, color, religion, sex, ancestry or national origin," established a bi-partisan

24  civil rights commission with broad enforcement authority, and generally prohibited

25  discrimination on the basis of "race, sex, religious creed, national origin or ancestry" in

26  employment and public accommodations.  Laws 1965, Ch. 27.  In 1988, the state enacted

27  a fair housing law that prohibits discrimination in housing on the basis of race, color,

28  religion, sex, or national origin.  Laws 1988, Ch. 339.

1    13.    Since 1910, the Arizona Constitution has provided that "[a]ll elections by

2    the people shall be by ballot, or by such other method as may be prescribed by law;

3    Provided, that secrecy in voting shall be preserved." Ariz. Const. Art. 7, Sec. 1, and that

4    "[t]here shall be enacted registration and other laws to secure the purity of elections and

5    guard against abuses of the elective franchise." Ariz. Const. Art. 7, Sec. 12.

6    14.    Upon Arizona's becoming a state in 1912, the legislature adopted a

7    requirement that prevented those unable to "read the Constitution of the United States in

8    the English language in such manner as to show he is neither prompted nor reciting from

9    memory, and to write his name" from voting. This provision tracked language from the

10   1909 territorial Legislature with the same restriction.

11   15.    At the time of statehood, federal law did not regard Native Americans on

12   reservations as citizens of the United States, and they were prohibited from voting. In

13   1924, a Republican-controlled Congress changed the law and acknowledged Native

14   Americans as citizens.

15   16.    Despite the federal law recognizing Native American citizenship, the

16   Arizona Supreme Court upheld a state law disenfranchising Native Americans in 1928.

17   17.    In 1948, in *Harrison v. Laveen*, the Arizona Supreme Court expressly

18   overruled its 1928 decision *Porter v. Hall* and recognized the right of Native Americans to

19   vote in Arizona elections for state and federal office.

20   18.    In 1939, the Legislature enacted legislation providing that a person may

21   generally not vote unless his or her name appears in both the general county register and

22   in the precinct register. The original statute also provided that a voter who moved from

23   one precinct to another within thirty days preceding a primary or general election could

24   vote in the precinct in which registered. In 1953, the Legislature amended that provision

25   to require that a registered voter who moved from one precinct to another following a

26   primary or general election registration period would be considered a resident and voter of

27   the precinct where he or she lived during registration (until registration reopened). This

28   provision was removed in 1970. A.R.S. § 16-122.

19.     Under A.R.S. § 16-135, a voter must correct his or her residence address if it is no longer correct on the voter registration record by providing an approved form of identification at the polling place for his or new address. The voter shall then be permitted to vote a provisional ballot. This statute further provides that provisional ballots shall be compared with the signature roster for the precinct in which the voter was listed within ten calendar days after a general election. If the voter's signature does not appear on the signature roster and there is no record that the voter voted early, the provisional ballot shall be counted, and an elector may also request an address change on a written request for an early ballot if it contains the necessary information.

20.     Under A.R.S. § 16-584, a voter whose name does not appear on the county register may vote if he or she presents a certificate from the county recorder, or may vote by provisional ballot by showing verified identification, or by signing an affirmation stating that the elector is a registered voter in that jurisdiction.

21.     Under A.R.S. § 16-182, a person is guilty of a class 6 felony if he or she knowingly registers himself or another person to vote where he or she is not entitled to vote.

22.     Under A.R.S. § 16-446, Arizona law requires that an electronic voting system shall, among other things, "provide for secrecy when used with voting booths," reject votes if the voter makes more selections than allowed, prevent the voter from voting for the same person more than once for the same office, and "[w]hen properly operated, record correctly and count accurately every vote cast."

23.     Under A.R.S. § 16-461, election officers must prepare a sample ballot at least forty-five days before an election, which must be sent by mail at least eleven days before the election to every household containing a registered voter. Since 2009, the sample ballot must state: "This is a sample ballot and cannot be used as an official ballot under any circumstances."

24.     Under A.R.S. § 16-466, Arizona law provides specific requirements for ballots, ballot labels, and ballot screens, and further allows ballots to contain punched

1    holes for placing them in the correct reading position in the counting devices, so long as

2    the punched holes can "not be used in any way that will reveal the identity of the voters

3    voting on the ballot."

4         25.    Under A.R.S. § 16-515, the Legislature has prohibited a person from

5    remaining within 75 feet of the entrance to a polling place while polls are open (unless the

6    person is voting or an election officials or representative of a political party) and also

7    prohibited any electioneering within the 75-foot limit. Under this law, a violation results

8    in a class 2 misdemeanor. Polling places are also required to provide notices of the 75-foot

9    limit. The 75-foot limit is also applicable to elections held by Native American tribes. A

10   minor or other person of the voter's choice may accompany a voter with the voter's

11   permission. Further, since 2015, an election official or representative who is lawfully

12   within the 75-foot range may not wear, carry, or display materials that identify or express

13   support for or opposition to a candidate, political party or organization, ballot question or

14   any other political issue.

15        26.    Under A.R.S. § 16-535, an election marshal, appointed by the board of

16   supervisors, must preserve order at polls and permit no election law violations. Since

17   2006, the marshal must also periodically measure the length of waiting times; if the wait

18   exceeds thirty minutes, the marshal shall request additional voting machines, voting

19   booths and board workers, as appropriate.

20        27.    Under A.R.S. § 16-547, early ballots shall include an envelope that includes

21   the recorder's information on one side and on the other a printed affidavit substantially

22   stating: "I declare the following under penalty of perjury: I am a registered voter in

23   _____ county Arizona, I have not voted and will not vote in this election in any

24   other county or state, I understand that knowingly voting more than once in any election is

25   a class 5 felony and I voted the enclosed ballot and signed this affidavit personally unless

26   noted below." A specific affidavit is also required if the voter was assisted by another

27   person in marking the ballot.

28        28.    Under A.R.S. § 16-585, if a voter spoils a ballot or ballot card and obtains

1   another, officials must write "returned spoiled," string the unopened ballot upon a string,

2   and return it with the stubs of voted ballots.

3        29.     Under A.R.S. § 16-609, only ballots provided in accordance with Arizona's

4   election laws shall be counted. When a question arises as to a ballot's legality, the

5   decision of the election board regarding its legality will be endorsed on the ballot and

6   signed by a majority of the board.

7        30.     Under A.R.S. § 16-1002, a person is guilty of a class 5 felony if he or she

8   knowingly counterfeits a ballot or knowingly gives a counterfeit ballot to someone else.

9        31.     Under A.R.S. § 16-1003, a person is guilty of a class 3 misdemeanor if he or

10  she forges a ballot signature, knowingly destroys or defaces a ballot, or knowingly delays

11  a ballot delivery.

12       32.     Under A.R.S. § 16-1004, a person is guilty of a class 5 felony if he or she

13  knowingly interferes with or induces an election officer, or refuses to comply with the

14  officer's duty or an election law. A person is also guilty of a class 5 felony if he or she

15  knowingly and without permission modifies the software, hardware, or source code for

16  voting equipment.

17       33.     Under A.R.S. § 16-1005, a person is guilty of a class 5 felony who commits

18  any of the following: knowingly marks a ballot or ballot envelope with the intent to fix an

19  election; offers or provides consideration to acquire a voted or unvoted ballot or early

20  ballot; possesses a voted or unvoted ballot with the intent to sell it; knowingly solicits

21  ballot collection by misrepresenting him or herself as an election official; or knowingly

22  collects voted or unvoted ballots without turning them in to an election official or U.S.

23  post office.

24       34.     Under A.R.S. § 16-1006, a person is guilty of a class 5 felony if he or she

25  knowingly by "force, threats, menaces, bribery or any corrupt means," attempts to

26  influence an elector; attempts to "awe, restrain, hinder, or disturb an elector;" or causes an

27  elector to vote for a different person than intended through deception.

28       35.     Under A.R.S. § 16-1007, an election officer is guilty of a class 2

1    misdemeanor if he or she knowingly attempts to find out whom the elector voted for

2    before polls close; opens a ballot or permits it to be opened before placing it in the ballot

3    box; alters the ballot with the attempt to determine for whom an elector voted; or discloses

4    the person for whom the elector voted without permission.

5            36.     Under A.R.S. § 16-1008, an election officer is guilty of a class 2

6    misdemeanor if he or she knowingly induces an elector to vote other than the elector

7    intended or desired to vote.

8            37.     Under A.R.S. § 16-1016, a person is guilty of a class 5 felony who

9    knowingly: votes without being entitled; votes more than once at any election; gives an

10   election official two or more ballots folded together; changes or destroys a ballot after it

11   has been deposited in the ballot box; fraudulently adds a ballot to those legally cast at any

12   election; adds to or mixes other ballots with those lawfully cast with intent to affect the

13   result of the election; unlawfully carries away, conceals or removes a poll list, ballot or

14   ballot box from the polling place; destroys a polling list, ballot or ballot box with the

15   intent to interrupt or invalidate the election; or detains, alters, mutilates or destroys ballots

16   or election returns.

17           38.     Under A.R.S. § 16-1017, a voter is guilty of a class 2 misdemeanor if he or

18   she knowingly makes a false statement about the voter's inability to mark a ballot;

19   interferes with a voter within the 75-foot limit; defaces or destroys a sample ballot or

20   destroys an instruction card posted for voter instruction before an election closes; removes

21   or destroys supplies or conveniences furnished to enable a voter to prepare the ballot;

22   hinders the voting of others; or votes in a county in which the voter no longer resides

23   (barring exceptions).

24           39.     Under A.R.S. § 16-1018, a person who commits any of the following acts is

25   guilty of a class 2 misdemeanor:  knowingly electioneers on election day in a polling

26   place or within 75 feet of the entrance; intentionally disables or removes a voting machine

27   or voting record; knowingly removes an official ballot from a polling place before the poll

28   closes; shows another's ballot or machine to another in a way as to reveal the contents,

1    unless authorized; knowingly solicits a voter to show the voter's ballot, or receives

2    another's ballot, except as authorized; knowingly receives an official ballot from a person

3    other than an election official having charge of the ballots; knowingly delivers an official

4    ballot to a voter; knowingly places a mark on the voter's ballot by which it can be

5    identified; or fails to return a ballot to an election official after having received it.

6          40.    Under A.R.S. § 16-583, initially enacted in 1991, the county recorder must

7    provide a list of inactive voters to each precinct on or before election day. If an

8    unregistered voter appears on the inactive list, he or she may be permitted to vote after

9    providing information to the election official. Those on the inactive list who vote on

10   election day are removed from the inactive list.

11         41.    Under A.R.S. § 16-142, initially enacted in 1994, the Secretary of State

12   must "provide for a toll free telephone number for the use of the public to report incidents

13   of voter fraud." The State of Arizona may use funds from the U.S. government pursuant to

14   the Help America Vote Act of 2002 (P.L. 107-252) for the number and any investigations

15   arising from calls to the number.

16         42.    Arizona was a covered jurisdiction under Section 5 of the Voting Rights Act

17   from 1975 to 2013. Arizona is no longer subject to U.S. Department of Justice ("DOJ")

18   preclearance because in June 2013, the Supreme Court in *Shelby County v. Holder*, found

19   the formula used to determine which states were subject to preclearance requirements

20   unconstitutional. 133 S. Ct. 2612, 2629 (2013).

21         43.    From 1982 to 2002, the DOJ objected to four of Arizona's statewide

22   redistricting plans.  During the time that Arizona was under preclearance requirements,

23   the DOJ did not issue any objections to any of its statewide procedures for registration or

24   voting.

25         44.    In 2000, the Arizona Independent Redistricting Commission ("AIRC") was

26   formed pursuant to a voter initiative (Proposition 106). The AIRC is composed of two

27   Republicans, two Democrats, and one Independent, and it is tasked with redrawing of

28   legislative and congressional district lines following each decennial U.S. Census.

1    According to its enacting constitutional provisions, the AIRC is supposed to consider the

2    following six criteria when redistricting: (a) equal population; (b) compactness and

3    contiguousness; (c) compliance with the U.S. Constitution and the Voting Rights Act; (d)

4    respect for communities of interest; (e) incorporation of visible geographic features,

5    including city, town and county boundaries, as well as undivided census tracts; and (f)

6    creation of competitive districts where there is no significant detriment to other goals.

7          45.    On April 9, 2012, the DOJ did not object to Arizona's most recent statewide

8    redistricting plans.

9    **Out-of-Precinct Provisional Voting**

10          46.    Since at least 1970, Arizona has required voters to cast ballots in their

11    assigned precinct, and, for counties that elect to use a precinct-based system rather than

12    vote centers, has enforced this system by counting only those ballots cast in the correct

13    precinct for those voters who vote in-person on election day. Ariz. Rev. Stat. §§ 16-122,

14    16-135, 16-584 (codified in 1979); 1970 Ariz. Sess. Laws, ch. 151, § 64 (amending

15    A.R.S. § 16-895); A.R.S. § 16-102 (West Supp. 1974).

16          47.    Primary and general elections can involve many different overlapping

17    jurisdictions, which require multiple ballot styles.

18          48.    If a voter arrives at a precinct but does not appear on the precinct register,

19    the voter may cast a provisional ballot. A.R.S. §§ 16-122, 16-135, 16-584. After election

20    day, county election officials review all provisional ballots and count those votes cast by

21    voters confirmed to be eligible to vote. If the voter's current address is determined to be

22    within the precinct, the provisional ballot is counted. In counties that utilize precinct-

23    based voting, Arizona does not count provisional ballots cast outside of the precinct in

24    which the voter's residence is located.

25          49.    Since 2011, Arizona has allowed each county to choose whether to conduct

26    elections under the precinct model or a "vote center" system. 2011 Ariz. Legis. Serv. Ch.

27    331 (H.B. 2303) (April 29, 2011) (amending A.R.S. § 16-411). Under a vote center

28    system, voters may cast their ballots at any vote center in the county in which they reside

1    and receive the appropriate ballot. A.R.S. § 16-411(B)(4). Under the vote center model,

2    each vote center is equipped to provide a specific ballot depending on the voter's

3    particular district that includes all races in which that voter is eligible to vote. Precincts

4    must be created, and ballots printed, so that the residential address of every voter is

5    connected to the correct assortment of local elected officials.

6        50.    The following Arizona counties have adopted vote centers: Graham,

7    Greenlee, Cochise, Navajo, Yavapai, and Yuma. All of these counties are rural and

8    sparsely populated.

9        51.    Cochise County instituted vote centers during the 2016 election cycle.

10   However, during the 2016 General Election, Cochise County ran out of blank ballots at

11   some of its voting centers and Pima County sent down additional blank ballots to meet the

12   unexpected demand. Maricopa County also used a vote center system for the 2016

13   Presidential Preference Election ("PPE") and the 2016 Special Election. However, unlike

14   regular primary and general Maricopa County elections, the PPE used only three ballot

15   styles and the Special Election used only one. To date, neither Maricopa County, Pima

16   County, nor Pinal County have used a vote center system in any regular primary or

17   general election.

18       52.    State law requires that election officials send each household with a

19   registered voter who is not on the permanent early voting list a sample ballot at least

20   eleven days prior to election day, and these documents contain instructions for voters and

21   identify their polling location.

22   **Early Voting and Ballot Collection**

23       53.    Early voting in Arizona takes place during the twenty-seven days before an

24   election. A.R.S. § 16-541. For the 2016 General Election, early voting began on October

25   12, 2016.

26       54.    Arizona has long permitted early voting by mail.  Early voters in Arizona do

27   not need to provide an excuse.

28       55.    In 2007, Arizona created the Permanent Early Voter List ("PEVL").

1    Counties automatically send an early ballot to PEVL-enrolled voters approximately

2    twenty-seven days before election day. Arizonans may vote early by mail either by

3    requesting an early ballot on an election-by-election basis or by joining the PEVL.

4         56.    To join the PEVL, individuals can click a box during their online voter

5    registration, which results in being automatically enrolled in early voting by mail. Arizona

6    became the first state to make available an online voter registration option in 2002,

7    allowing voters to register online through Arizona's Motor Vehicle Division.

8         57.    To return an early ballot, a voter may return it, postage-free, via the mail;

9    deliver it to an election office or ballot collection site during the twenty-seven day early

10   voting period; or drop off the ballot at any voting site in their county on election day.

11        58.    Arizona's voters have increasingly used early voting by mail, which has

12   helped boost turnout. For example, in 2008, 35.6% of all registered voters submitted

13   absentee ballots; in 2012, that figure grew to 41.4%.

14        59.    All Arizona counties operate at least one in-person early voting location.

15   Some of these locations are open on Saturdays.

16        60.    To be counted, Arizona requires that early ballots be returned by 7:00 p.m.

17   on Election Day. A.R.S. § 16-548(A). The instructions on an early ballot inform Arizona

18   voters that the ballot must returned by 7:00 p.m. on Election Day. Voters may return their

19   early ballot by mail at no cost, but they must mail it early enough or drop it off at any

20   precinct, voter center, or election office to ensure that it is received by this deadline.

21        61.    Some Arizona counties provide special drop boxes for early ballots.

22        62.    All counties must provide special election boards for voters who cannot

23   travel to a polling location because of an illness or disability. A.R.S. § 16-549. If an ill or

24   disabled voter timely requests an accommodation, the county recorder must arrange for a

25   special election board to deliver a ballot to the voter in person.

26        63.    For working voters, Arizona law requires employers to give an employee

27   time off to vote if the employee is scheduled to work a shift on election day that provides

28   fewer than three consecutive hours between either the opening of the polls and the

1    beginning of the shift, or the end of the shift and the closing of the polls. An employer is

2    prohibited from penalizing an employee for exercising this right. A.R.S. § 16-402.

3         64.    Arizona law also provides for curbside voting at polling places.

4         65.    Under A.R.S. § 16-579, electors must present a valid form of identification

5    bearing a photograph, name, and address of the elector or two different items that contain

6    the name and address of the elector. If the elector does not possess such identification, he

7    or she is eligible to vote only a conditional provisional ballot.

8         66.    Since 1992, Arizona has prohibited any person other than the elector from

9    having "possession of that elector's unvoted absentee ballot." *See* 1991 Ariz. Legis. Serv.

10   Ch. 310, § 22 (S.B. 1390) (West). In 1997, the Arizona legislature expanded that

11   prohibition to prevent any person other than the elector from having possession of any

12   type of unvoted early ballot. *See* 1997 Ariz. Legis. Serv. Ch. 5, § 18 (S.B. 1003) (West)

13   (codified at A.R.S. § 16-542(D)).

14        67.    Since 1999 it has been a class 5 felony for a person knowingly to mark or to

15   punch an early ballot with the intent to fix an election. *See* 1999 Ariz. Legis. Serv. Ch. 32,

16   § 12 (S.B. 1227) (codified as amended at A.R.S. § 16-1005(A)).

17        68.    Early ballots have been collected from voters by individuals and groups in

18   Arizona since at least 2002.

19        69.    In 2011, Arizona enacted S.B. 1412, which required people engaged in

20   collecting ten or more early ballots to provide identification to the elections official those

21   ballots were provided to, and also created the following class 5 felonies: "knowingly

22   mark[ing] a voted or unvoted ballot or ballot envelope with the intent to fix an election";

23   "receiv[ing] or agree[ing] to receive any consideration in exchange for a voted or unvoted

24   ballot"; possessing another's voted or unvoted ballot with intent to sell; "knowingly

25   solicit[ing] the collection of voted or unvoted ballots by misrepresenting itself [sic] as an

26   election official or as an official ballot repository or . . . serv[ing] as a ballot drop off site,

27   other than those established and staffed by election officials;" "knowingly collect[ing]

28   voted or unvoted ballots and . . . not turn[ing] those ballots in to an election official…or

1   any…entity permitted by law to transmit post." A.R.S. §§ 16-1005(A)-(F). In addition,

2   ballot return envelopes must be "tamper evident when properly sealed." A.R.S. § 16-545.

3       70.    At the time of S.B. 1412's enactment, Arizona was still subject to VRA

4   Section 5 preclearance requirements and the DOJ requested additional information about

5   S.B. 1412's ballot collection restrictions, including a specific inquiry about the

6   requirement that collectors show photo identification. The Arizona Legislature later

7   repealed the provisions in S.B. 1412 relating to ballot collection, including the photo

8   identification requirement, as a part of a 2012 omnibus bill. The remainder of S.B. 1412

9   was precleared by the DOJ.

10       71.    In 2013, the legislature enacted H.B. 2305, an omnibus election bill, which

11   included provisions that changed signature requirements for candidates to qualify for the

12   ballots, a process to allow filing officers to refer enforcement matters to other jurisdictions

13   when the enforcement officer was the alleged violator, requiring strict compliance for

14   initiative and referenda petitions, and minor changes to how political committees should

15   organize petitions for submission to the filing officer. The also included a ban on partisan

16   ballot collection, with the requirement that any other person who collected a ballot was to

17   complete an affidavit stating they had returned the ballot for the voter. Violation was a

18   class 1 misdemeanor.

19       72.    Shortly after H.B. 2305's enactment, a ballot referendum for its repeal was

20   organized. There was concern that if H.B. 2305 was repealed by referendum, the

21   legislature would be restricted from enacting related legislation, except on a supermajority

22   vote and to "further[] the purposes" of the referendum. Ariz. Const. art. 4, pt. 1, § 1(6)(C),

23   (14). Some legislators, including the current Secretary of State Michele Reagan, stated

24   that she hoped a referendum could be avoided and that her preference was to re-introduce

25   the bills using "the a la carte method, which is the way I introduced them last year." H.B.

26   2305 was repealed by the legislature.

27       73.    In 2016, Rep. Ugenti-Rita introduced H.B. 2023.

28

1    74.    The Arizona House of Representatives voted to approve H.B. 2023 on

2  February 4, 2016, and the Arizona Senate voted in favor of the bill on March 9, 2016. The

3  Governor also signed the bill on March 9, 2016.

4    75.    H.B. 2023 added the following subsections H and I to A.R.S. § 16-1005:

5    H.    A person who knowingly collects voted or unvoted
early ballots from another person is guilty of a Class 6 felony.
6    An election official, a United States Postal Service worker or
any other person who is allowed by law to transmit United
7    States mail is deemed not to have collected an early ballot if
the official, worker or other person is engaged in official
8    duties.

9    I.    Subsection H of this section does not apply to:

10    1.    An election held by a special taxing district formed
pursuant to Title 48 for the purpose of protecting or providing
11    services to agricultural lands or crops and that is authorized to
conduct elections pursuant to Title 48.
12

13    2.    A family member, household member or caregiver of
the voter. For the purposes of this paragraph:

14    (a)    "Caregiver" means a person who provides medical or
health care assistance to the voter in a residence, nursing care
15    institution, hospice facility, assisted living center, assisted
living facility, assisted living home, residential care
16    institution, adult day health care facility or adult foster care
home.
17

18    (b)    "Collects" means to gain possession or control of an
early ballot.

19    (c)    "Family member" means a person who is related to the
voter by blood, marriage, adoption or legal guardianship.
20

21    (d)    "Household member" means a person who resides at
the same residence as the voter.

22    76.    H.B. 2023 went into effect on August 6, 2016.

23    77.    During discovery, Plaintiffs issued a Subpoena Duces Tecum to the

24  Maricopa County Recorder, which sought, among other items, "all documents regarding

25  reports, investigations, and/or prosecutions of fraud in connection to ballot collection in

26  the County and/or statewide since January 1, 2008."  On or about February 13, 2017, the

27  Maricopa County Attorney's Office sent Plaintiffs a thumb drive that contained

28  "documents requested in the January 4, 2017 subpoena for the following categories [ . . . ]

13. All documents, regarding reports, investigations, and/or prosecutions of fraud in connection to ballot collection in the County and/or statewide since January 1, 2008." The thumb drive contained a folder labeled "Item 13 Ballot Collection Fraud Documentation," which contained no documents.

Dated: September 25, 2017          s/ Alex G. Tischenko
                                     Daniel C. Barr (# 010149)
                                     Sarah R. Gonski (# 032567)
                                     PERKINS COIE LLP
                                     2901 North Central Avenue, Suite 2000
                                     Phoenix, Arizona  85012-2788

                                     Marc E. Elias (WDC# 442007)*
                                     Bruce V. Spiva (WDC# 443754)*
                                     Elisabeth C. Frost (WDC# 1007632)*
                                     Amanda R. Callais (WDC# 1021944)*
                                     Alexander G. Tischenko (CA# 304743)†
                                     PERKINS COIE LLP
                                     700 Thirteenth Street N.W., Suite 600
                                     Washington, D.C.  20005-3960

1

Joshua L. Kaul (WI# 1067529)*
PERKINS COIE LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703

2

3

4

*Attorneys for Plaintiffs the Arizona
Democratic Party, the DSCC, and the
Democratic National Committee*

5

6

s/ Karen J. Hartman-Tellez

7

Kara M. Karlson (#29407)
Karen J. Hartman-Tellez (#021121)
Joseph E. La Rue (#031348)
Arizona Attorney General's Office
1275 W. Washington Street
Phoenix, Arizona 85007
Telephone: (602) 542-4951
Facsimile: (602) 542-4385
Kara.Karlson@azag.gov
Karen.Hartman@azag.gov
Joseph.LaRue@azag.gov

8

9

10

11

12

13

14

*Attorneys for State Defendants*

15

16

s/ Sara J. Agne

17

Brett W. Johnson (#21527)
Sara J. Agne (#026950)
Colin P. Ahler (#023879)
Joy L. Isaacs (#030693)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85007
Telephone: (602) 382-6000
Facsimile: (602) 382-6070
bwjohnson@swlaw.com
sagne@swlaw.com
cahler@swlaw.com
jisaacs@swlaw.com

18

19

20

21

22

23

24

25

*Attorneys for Intervenor-Defendants*

26

27

28

-17-

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and a Notice of Electronic Filing was transmitted to counsel of record.

s/ Alex G. Tischenko

-18-