Daniel C. Barr (# 010149)
Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone:  (602) 351-8000
Facsimile:  (602) 648-7000
DBarr@perkinscoie.com
SGonski@perkinscoie.com

Marc E. Elias (WDC# 442007)*
Bruce V. Spiva (WDC# 443754)*
Elisabeth C. Frost (WDC# 1007632)*
Amanda R. Callais (WDC# 1021944)*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone:  (202) 654-6200
Facsimile:  (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ACallais@perkinscoie.com
ATischenko@perkinscoie.com

Joshua L. Kaul (WI# 1067529)*
PERKINS COIE LLP
One East Main Street, Suite 201
Madison, Wisconsin  53703
Telephone:  (608) 663-7460
Facsimile:  (608) 663-7499
JKaul@perkinscoie.com

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

† *Not yet admitted in Washington, D.C.*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party, et al., | No. CV-16-01065-PHX-DLR |
| Plaintiffs, | |
| v. | **[PROPOSED] FINDINGS OF FACT** |
| Michele Reagan, et al., | |
| Defendants, | |

# Table of Contents

PROPOSED FINDINGS OF FACT .................................................................... 1

I.     INTRODUCTION ....................................................................... 1

II.    Arizona's History of Discrimination and Ongoing Effects ........................ 3

        B.    Early Restrictions on Voting and the Literacy Test .................... 3

        C.    Historical and Ongoing Discrimination in Education ...................... 5

        D.    Ongoing Examples of Discrimination in Arizona ............................ 6

        E.    On Going Effects of Arizona's History of Discrimination ............... 9

III.    The Instant Litigation ................................................................ 14

IV.    The Effects of the Challenged Provisions .................................... 25

        A.    Arizona's Rejection of Out of Precinct Provisional Ballots
            Severely Burdens Arizona Voters .......................................... 25

        B.    Arizona's Ban on Ballot Collection Severely Burden's
            Arizona Voters ................................................................. 34

V.     Arizona's Ban on Ballot Collection Was Enacted With
       Discriminatory Intent ............................................................... 39

        A.    Historical Attempts to Restrict Ballot Collection ........................ 39

        B.    The Passage of H.B. 2023 ................................................... 44

        C.    Ballot Collection Fraud Is An Insufficient Justification .................. 49

        D.    Chain of Custody Is An Insufficient Justification       51

        E.    Voter Confidence Is Also Insufficient To Justify H.B. 2023    52

PROPOSED CONCLUSIONS OF LAW ....................................................... 53

I.     The Voting Rights Act ............................................................. 53

        A.    Legal Standard ................................................................. 53

        B.    Application to Case .......................................................... 56

II.    Anderson-Burdick Test ............................................................. 60

        A.    Legal Standard ................................................................. 60

        B.    Application to Case .......................................................... 61

III.    Intentional Racial Discrimination .............................................. 63

        A.    Legal Standard ................................................................. 63

        B.    Application to Case .......................................................... 65

**PROPOSED FINDINGS OF FACT**

## I.     INTRODUCTION

1.     Arizona's history has been shaped by a pattern of abuse and neglect under which its Hispanic, Native American, and African American voters have repeatedly been denied access to the franchise. *See generally* Ex. 89 (Berman Rpt.). As a result, historically, minority voters in Arizona have lagged well behind whites in terms of electoral participation, Ex. 95 (Rodden Rpt. 95-018-22), and through much of Arizona's history it has boasted some of the lowest minority participation rates in the country. *See Oregon v. Mitchell*, 400 U.S. 112, 132-33 272 (1970); *see also* Ex. 89 (Berman Rpt. at 89-015).

2.     In 1975, as a remedy to these problems, Arizona became one of just a handful of states to be considered a "covered jurisdiction" under Section 5 of the Voting Rights Act. Ex. 89 (Berman Rpt. at 89-022-23). Section 5 prohibited covered jurisdictions from making any changes to their election practices or procedures until either the U.S. Department of Justice ("DOJ") or a federal court determined that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or [membership in a language minority group]." 42 U.S.C. § 1973(c). For the next thirty-eight years, independent federal oversight helped ensure that Arizona's minority citizens would not be overtly discriminated against and, moreover, that their unique needs as a result of the long history of discrimination would not be disregarded.

3.     On June 25, 2013, the United States Supreme Court issued its opinion in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), in which it invalidated the coverage formula contained in Section 4 of the Voting Rights Act (used to identify covered jurisdictions under Section 5), thereby stripping Arizona's voters of the protection that Section 5 had provided. *Id.* at 2631. Arizona's elections officials became free to make changes to their election laws and procedures without first demonstrating to DOJ or a

1   federal court that those changes were not meant to deny or abridge, and would not result

2   in denial or abridgement of, the right to vote of minority voters.

3       4.      In the four years that have passed since *Shelby County* was decided,

4   Arizona's minority citizens have not fared well. Just three years after preclearance was no

5   longer required, Arizona's Republican legislature—motivated by partisan gain—enacted

6   H.B. 2023, banning the possession and collection of early voted ballots. *See* discussion

7   *infra* at Section V. The law was enacted in complete disregard for the well-known needs

8   of minority voters who disparately utilized the practice. *Id.*; *see also* discussion *infra* at

9   Section IV, B; Section V. And, most notably, H.B. 2023 was enacted even after a "softer"

10  precursor bill had been repealed by the legislature when DOJ questioned its impact on

11  minority voters when preclearance was still in place. *See* discussion *infra* at Section V, A.

12      5.      Further, Arizona remains at the top of the list with regard the casting of

13  provisional ballots. Between 2006 and 2015, Arizona rejected over 121,000 provisional

14  ballots statewide Ex. 95 (Rodden Rpt. at 95-023-25). Unfailingly, one of the top reasons

15  that ballots are rejected is because they are cast out-of-precinct ("OOP"). *See, e.g.*, Ex. 95

16  (Rodden Rpt. at 95-026-29). In 2016, the rate of rejected OOP ballots went down in

17  Arizona; yet it *still* was the national leader in the rate of rejected OOP ballots. Ex. 95

18  (Rodden Second Reply Rpt. at 95-027). Not only does Arizona remain a leader in rejected

19  OOP ballots, but the impact on Arizona voters is not even. Rather, Arizona's minority

20  voters are disenfranchised at far greater rates as a result of this rule. In 2016, among all

21  counties that reported out-of-precinct ballots in the general election, a little over 1 in every

22  100 Hispanic voters, 1 in every 100 African-American voters, and 1 in every 100 Native-

23  American voters cast an out-of-precinct ballot and, as a result, was wholly disenfranchised.

24  For whites, the figure was around 1 in every 200 voters. Ex. 98 (Rodden Second Rpt. at

25  97-019-20). This is consistent with previous years. And yet the State, ignoring the plain

26  and disparate disenfranchisement of its minority citizens, has left this rule in place.

27      6.      Individually and together, these challenged provisions impose onerous and

28  disparate burdens on Arizona voters. They should be enjoined.

## II.    ARIZONA'S HISTORY OF DISCRIMINATION AND ONGOING EFFECTS

7.    Arizona has a lengthy history of discrimination against Native Americans, Hispanics, and African Americans, which has permeated every aspect of social, political, and economic life for its minority citizens and has directly hindered their ability to participate in the political process. Ex. 89 (Berman Rpt. at 89-005-24); Ex. 91 (Lichtman Rpt. at 91-002); 9/15/17 Critchlow Dep. 75:23-76:-8. Such discrimination began as early as 1912 when Arizona became a state—excluding Native Americans from voting and enacting a literacy test—and has continued well into the modern era, where it has been reflected in legislation related to voting requirements, election administration, racial profiling and appeals, and efforts to intimidate voters, as well as in areas such as school segregation, educational funding, housing, and equal pay. Ex. 89 (Berman Rpt. at 89-005-24); Ex. 91 (Lichtman Rpt. at 91-024-30); Ex. 521 (Critchlow Rpt. at 521-043-45). In 1975, Arizona's history of discrimination resulted in it becoming one of only nine states to be brought wholly under Section 5 of the VRA as a "covered jurisdiction." Statement of Undisputed Facts ("SOUF") ¶ 56; Ex. 89 (Berman Rpt. at 89-022-23); Ex. 91 (Lichtman Rpt. at 91-024); 9/15/17 Critchlow Dep. 161:11-17. In addition to being covered under Section 5, it was one of only three states to be covered under Section 4(f)(4) of the Act for Spanish Heritage. Ex. 89 (Berman Rpt. at 89-022-23).

### B.    Early Restrictions on Voting and the Literacy Test

8.    When Arizona became a state in 1912, Native Americans were excluded from voting. Ex. 89 (Berman Rpt. at 89-017); Ex. 521 (Critchlow Rpt. at 521-043); 9/15/17 Critchlow Dep. 81:6-10. Even after the United States Congress acknowledged that Native Americans were citizens in 1924, thereby affording them the right to vote, Arizona's Constitution continued to deny Native Americans that right. Ex. 89 (Berman Rpt. at 89-017); 9/15/17 Critchlow Dep. 77:15-21. It was not until 1948—a full 24 years after federal law allowed Native Americans to vote—that the Arizona Supreme Court found the State's disenfranchisement of Native Americans was unconstitutional and, finally, granted the right to vote to Native Americans in Arizona. SOUF ¶ 27; Ex. 89

1   (Berman Rpt. at 89-017) (citing *Harrison v. Laveen*, 196 P.2d 456, 463 (Ariz. 1948)); Ex.

2   521 (Critchlow Rpt. at 521-045); 9/15/17 Critchlow Dep. 77:22-78:4. Despite this ruling,

3   however, Native Americans, as well as Hispanics and African Americans, continued to

4   face barriers to participation in the franchise. Ex. 89 (Berman Rpt. at 89-014-017).

5       9.      In particular, in 1912 Arizona enacted an English literacy test for voting.

6   SOUF ¶ 23; Ex. 89 (Berman Rpt. at 89-014); Ex. 521 (Critchlow Rpt. at 521-044-45);

7   9/15/17 Critchlow Dep. 88:11-89:1. The test was enacted specifically to limit "the

8   ignorant Mexican vote," but it also had the effect of reducing the ability of African

9   Americans and Native Americans to register and vote, as registrars applied the test to

10  these communities as well. Ex. 89 (Berman Rpt. at 89-014, 89-017). Well into the 1960s,

11  white Arizonans challenged minority voters at the polls by asking them to read and

12  explain literacy cards. SOUF ¶ 28; Ex. 89 (Berman Rpt. at 89-014-16).

13      10.     In 1970, Congress amended the VRA to enact a nationwide ban on literacy

14  tests after finding that they were used to discriminate against voters on account of their

15  race or ethnicity. Ex. 89 (Berman Rpt. at 89-014-15) (citing *Oregon v. Mitchell*, 400 U.S.

16  112, 118 (1970)). As Dr. Berman explains, in reaching that finding, Congress cited

17  evidence which showed that the application of the literacy test had significantly lowered

18  the participation rates of minorities. Ex. 89 (Berman Rpt. at 89-015). It specifically found

19  that, in Arizona "only two counties out of eight with Spanish surname populations in

20  excess of 15% showed a voter registration equal to the state-wide average." Ex. 89

21  (Berman Rpt. at 89-015). It also noted that Arizona had a serious deficiency in Native

22  American voter registrations. Ex. 89 (Berman Rpt. at 89-017).

23      11.     Rather than comply with the VRA and repeal its literacy test, Arizona

24  challenged the ban, arguing that it could not be enforced to the extent that it was

25  inconsistent with the State's literacy requirement. Ex. 89 (Berman Rpt. at 89-015);

26  9/15/17 Critchlow Dep. 91:24-92:4. The United States Supreme Court upheld Congress's

27  ban. Ex. 89 (Berman Rpt. at 89-015); 9/15/17 Critchlow Dep. 92:5-92:11. Nevertheless,

28

Arizona waited until 1972, two years after the Court's decision, to repeal its literacy test. Ex. 89 (Berman Rpt. at 89-014-015); Ex. 91 (Lichtman Rpt. at 91-024).

## C.   Historical and Ongoing Discrimination in Education

12.   The effects of Arizona's literacy test were also compounded by the State's long history of discrimination in the education of its Hispanic, Native-American, and African-American citizens. SOUF ¶¶ 2-4; Ex. 89 (Berman Rpt. at 89-009-10); Ex. 91 (Lichtman Rpt. at 91-005). From 1912 until the Supreme Court's decision in *Brown v. Board of Education*, segregated education was widespread throughout Arizona, and sanctioned by both the courts and the state legislature. Ex. 521 (Critchlow Rpt. at 521-036, 521-038-39); 9/15/17 Critchlow Dep. 69:24-70:4, 113:9-17; Ex. 89 (Berman Rpt. at 89-009-10); *see* also *Dameron v. Bayless*, 126 P. 273 (Ariz. 1912); *Ortiz v. Jack*, No. Civ-1723 (D. Ariz. 1955) (discontinuing segregation of Mexican children at schools); *Gonzales v. Sheely*, 96 F. Supp. 1004, 1008-09 (D. Ariz. 1951) (enjoining segregation of Mexican school children in Maricopa County). In fact, the Tucson Public Schools only reached a consent decree with the U.S. Department of Justice over its desegregation plan in 2013. Ex. 91 (Lichtman Rpt. at 91-027); Ex. 521 (Critchlow Rpt. at 521-040). Further, even Defendants' Expert, Dr. Critchlow, has admitted that de facto segregation still exists in Arizona schools. 9/15/17 Critchlow Dep. 119:20-120:3. The practice of segregation also extended well beyond schools, with it being common place to have segregated public spaces such as restaurants, swimming pools, and theaters. Ex. 89 (Berman Rpt. at 89-015); Ex. 521 (Critchlow Rpt. at 521-034); 9/15/17 Critchlow Dep. 98:11-99:5.

13.   Even where schools were not segregated, Arizona enacted restrictions on bilingual education. As recently as 2000, Arizona banned bilingual education with the passage of Proposition 203. Ex. 89 (Berman Rpt. at 89-020); Ex. 91 (Lichtman Rpt. at 91-047). And "Arizona's English immersion approach to English Learning Students 'exacerbates the existing segregation of these students, not just by school, but by classroom as well, and as other studies recently conducted in Arizona have shown, it is

stigmatizing, marginalizing, and putting these students at high risk for school failure and drop out.'" Ex. 91 (Lichtman Rpt. at 91-047).

14.     In addition to Arizona's formal prohibitions on bilingual education, the State has a long record of failing to provide adequate funding to teach its non-English speaking students. Ex. 91 (Lichtman Rpt. at 91-046-47). Remarkably, this under-funding has taken place despite multiple court orders instructing Arizona to develop an adequate funding formula for its programs. Ex. 91 (Lichtman Rpt. at 91-046-047). And it includes a 2005 order in which Arizona was held in contempt of court for refusing to provide adequate funding for its educational programs. *Flores v. Arizona*, 405 F. Supp. 2d 1112 (D. Ariz. 2005), *vacated*, 204 Fed. App'x 580 (9th Cir. 2006). "According to the Education Law Center's latest National Report Card that provided data for 2013, Arizona ranked 47th among the states in per-student funding for elementary and secondary education." Ex. 91 (Lichtman Rpt. at 91-047). Arizona's failure to fund its educational program as well as its history of educational segregation directly relates to the access that its minority citizens have to the franchise as it makes it significantly more difficult for them to gain the literacy skills that facilitate voting.

### D.     Ongoing Examples of Discrimination in Arizona

15.     Arizona's discriminatory practices have continued in recent decades. While Arizona was subject to preclearance, DOJ vetoed at least four statewide redistricting plans and more than 80% of its objections to Arizona's voting practices "since 1982 have involved voting changes that appeared to threaten the turnout of Hispanic and Native American voters with limited English proficiency." SOUF ¶ 35; Ex. 89 (Berman Rpt. at 89-023); *see also* Ex. 92 (Lichtman Reply Rpt. at 92-023).

16.     In 2004, Arizona passed Proposition 200—the Arizona Taxpayer and Citizen Protection Act—which prohibits people from voting and receiving access to state and local public benefits unless they can prove their citizenship through documentation. Ex. 89 (Berman Rpt. at 89-021); Ex. 91 (Lichtman Rpt. at 91-025). In its original form, Proposition 200 required Arizona voters to provide proof of citizenship by presenting at

least one of a limited set of documents at the time they registered to vote. A.R.S. §§ 16-152, 16-166. Between "2005 and 2007, approximately 31,000 people in Arizona had their registration forms rejected because they could not provide sufficient documentation of citizenship." Ex. 89 (Berman Rpt. at 89-021). In 2013, the Supreme Court found that Proposition 200's proof of citizenship requirement for voter registration was preempted by the National Voter Registration Act. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2260 (2013). In response, rather than end the practice of requiring proof of citizenship for registration, Arizona implemented a two track registration system under which individuals may register for federal elections without providing proof of citizenship, but to vote in state and local elections they must provide proof of citizenship. *See* 2017-2018 Election Procedures Manual Draft, 1.4.1.2, 1.8.2, 1.8.3, *available at*: https://www.azsos.gov/sites/azsos.gov/files/2017-2018_arizona_election_procedures _manual_chapter_1_public_draft.pdf (discussing federal only and state forms).

17.     In 2007, Maricopa County Sheriff Joseph Arpaio was sued in a class action seeking to stop the Maricopa County Sheriff Office's ("MCSO") policies and practices of intentional and systematic discrimination by conducting illegal stops and detentions of Hispanics and mistreating Hispanic detainees with limited English proficiency. Ex. 89 (Berman Rpt. at 89-020). In May 2013, U.S. District Court Judge Murray Snow issued lengthy findings of fact and conclusions of law, finding, among other things, that the MCSO intentionally discriminated against Hispanics. Ex. 91 (Lichtman Rpt. at 91-027). Judge Snow enjoined MCSO from using "Hispanic ancestry or race as a[ny] factor" in making law enforcement decisions. Ex. 91 (Lichtman Rpt. at 91-027). In 2016, Sherriff Arpaio was held in civil contempt of court for continuing racially discriminatory law enforcement practices in violation of Judge Snow's order. Ex. 91 (Lichtman Rpt. at 91-027). And in that same year, DOJ launched a federal criminal contempt investigation against Sheriff Arpaio. *United States v. Arpaio*, No. CR1601012001PHXSRB, 2017 WL 3268180, at *1 (D. Ariz. July 31, 2017). Arpaio was eventually convicted for contempt,

and then subsequently pardoned by President Trump. *United States v. Arpaio*, No. CR1601012001PHXSRB, 2017 WL 3773012, at *1 (D. Ariz. Aug. 29, 2017).

18.     In 2010, the Arizona State Legislature passed S.B. 1070, which authorized local police to check the immigration status of individuals whom they suspected to be in the country illegally. Ex. 89 (Berman Rpt. at 89-021); Ex. 91 (Lichtman Rpt. at 91-027); A.R.S. § 11-1051. U.S. District Court Judge Susan Bolton enjoined most of the law from taking effect. *United States v. Arizona*, 703 F. Supp. 2d 980, 1008 (D. Ariz. 2010), *aff'd in part, rev'd in part*, *Arizona v. United States*, 132 S. Ct. 2492, 2510 (2012). This injunction was mostly upheld in subsequent stages of the litigation. *See Arizona v. United States*, 132 S. Ct. 2492, 2510 (2012); Ex. 91 (Lichtman Rpt. at 91-027).

19.     In recent years Maricopa County has repeatedly failed to send properly translated education materials to its Spanish speaking residents, resulting in confusion and distrust from Hispanic voters. Ex. 89 (Berman Rpt. at 89-022); Ex. 91 (Lichtman Rpt. at 91-051); Quezada Decl. ¶ 27; K. Gallego Decl. ¶17; R. Gallego Decl. ¶ 17; 7/14/16 Healy Dep. 114:1-22; Ex. 111. For example, in 2012, Maricopa County misprinted the date of the election on over 2,000 Spanish language information cards and bookmarks, some of which were distributed into the community. Ex. 89 (Berman Rpt. at 89-022); Ex. 91 (Lichtman Rpt. at 91-051); Quezada Decl. ¶ 27; R. Gallego Decl. ¶ 17; Ex. 124. More recently, in 2016, it made national headlines when, due to the County's decision to drastically reduce the number of voting locations for the March 22 presidential preference election ("PPE"), it forced thousands of voters to wait in line for upwards of five hours to vote. Ex. 89 (Berman Rpt. at 89-022); Ex. 91 (Lichtman Rpt. at 91-025, 91-048-51); Ex. 95 (Rodden Rpt. at 95-014); Quezada Decl. ¶ 7; K. Gallego Decl. ¶ 6; R. Gallego Decl. ¶ 7. In many cases, voters were unable to wait in the arduous lines and were wholly disenfranchised. Ex. 89 (Berman Rpt. at 89-022); Quezada Decl. ¶ 7; K. Gallego Decl. ¶ 6; R. Gallego Decl. ¶ 7; Healy Decl. ¶¶ 6, 9-11. The reduction of voting locations was particularly burdensome on Maricopa County's Hispanic and African-American communities, many of which had fewer polling locations than Anglo communities and, in

1   some instances, no voting locations at all. Ex. 91 (Lichtman Rpt. at 91-048-91-049);
2   Quezada Decl. ¶¶ 4-5; K. Gallego Decl. ¶ 4; R. Gallego Decl. ¶ 4; 5/15/17 Pstross Dep.
3   63:14-19; Healy Decl. ¶ 12. For example, Arizona State Senator Martin Quezada's
4   predominately Hispanic district had only one polling location. Quezada Dec. ¶ 4. As a
5   result, in this and in other predominately Hispanic parts of the city, not only did people
6   wait well into the night to vote (with some waiting as long as six hours to cast their
7   ballots), but Plaintiffs anticipate that Maricopa County Board member Steve Gallardo will
8   testify that "minorities and low income families may have had to drive a lot further, and
9   had less overall access to voting centers." When Helen Purcell, the Maricopa County
10  Recorder, was asked if she made any effort to determine how her plan to allocate vote
11  centers would impact minority populations, she stated that she looked at the County as a
12  whole and did not pay any attention to "specific areas." Ex. 91 (Lichtman Rpt. at 91-050).

13          **E.      On Going Effects of Arizona's History of Discrimination**

14          20.      The effects of this history of discrimination are plain. Major racial
15  disparities between minorities and whites in socio-economic standing, income,
16  employment, education, health, housing, transportation, criminal justice, and electoral
17  representation have persisted in Arizona. Ex. 93 (Second Lichtman Rpt. at 93-012-18, 93-
18  021, 93-024); Ex. 89 (Berman Rpt. at 89-023); 9/15/17 Critchlow Dep. 119:20-120:3.

19          21.      Relative to whites, Hispanics and African Americans are nearly two times
20  more likely to live in poverty, and the poverty rate for Native Americans is over three
21  times higher than that of whites. Ex. 93 (Second Lichtman Rpt. at 93-015) (23.4% of
22  African Americans, 26.3% of Hispanics, 35.5% of Native Americans and only 11.0% of
23  whites live below the federal poverty line). Unemployment rates for Hispanics, African
24  Americans, and Native Americans have consistently exceeded white unemployment rates
25  for the period of 2010 to 2015. Ex. 91 (Lichtman Rpt. at 91-040); Ex. 93 (Second
26  Lichtman Rpt. at 93-015) (per the 2015 American Community Survey 1-year estimates,
27  unemployment rates were 10.5% for African Americans, 7.7% for Hispanics, 16.8% for
28  Native Americans, and only 5.6% for whites); *see also* Ex. 89 (Berman Rpt. at 89-007-8,

89-012) (Hispanics, African Americans, and Native Americans have received lower wages than whites for the same work throughout Arizona's history).

22. As one would expect given Arizona's long history of educational discrimination, whites remain more likely than Hispanics, Native Americans, and African Americans to graduate from high school. Ex. 93 (Second Lichtman Rpt. at 93-016). They are nearly three times more likely to have a bachelor's degree (33.9%) than Hispanics (11.2%) and Native Americans (10.0%). Ex. 93 (Second Lichtman Rpt. at 93-016). And in a recent survey, over 22.4% of Hispanics and 11.2% of Native Americans rated themselves as speaking English less than "very well," as compared to only 1.2% of whites. Ex. 93 (Second Lichtman Rpt. at 93-016).

23. These disparities also persist in the areas of housing and transportation. While 68.9% of whites own a home in Arizona, only 32.3% of African Americans, 49.0% of Hispanics, and 56.1% of Native Americans do, making Hispanics, African Americans, and Native Americans far more likely to move than whites and contributing to higher transiency rates for these populations. Ex. 93 (Second Lichtman Rpt. at 93-017); *see also* Ex. 97 (Second Rodden Rpt. at 97-046); Ex. 98 (Second Rodden Reply Rpt. at 98-033); Shapiro Decl. ¶ 7. Further, as compared to whites, Hispanics, Native Americans, and African Americans are significantly less likely to own a vehicle. Ex. 93 (Second Lichtman Rpt. at 93-017); *see also* Quezada Decl. at ¶ 3; K. Gallego Decl., at ¶ 3. Between one quarter and one half of all households on Native American reservations lack access to a vehicle. Ex. 98 (Second Rodden Reply Rpt. at. 98-016).

24. As of 2015, Hispanics, Native Americans, and African Americans fared far worse than whites on a number of key health indicators. Ex. 93 (Second Lichtman Rpt. at 93-018). Native Americans in particular have much higher rates of disabilities than whites, and Arizona counties with large Native-American populations have much higher rates of residents with ambulatory disabilities. Ex. 97 (Second Rodden Rpt. at 97-060). All three minority groups have higher infant mortality rates than whites, with African Americans

experiencing an infant mortality rate more than double the rates for whites. Ex. 93 (Second Lichtman Rpt. at 93-018).

25.     Decades of research have demonstrated that socio-economic disadvantages, such as those described above, directly impact voting. Ex. 91 (Lichtman Rpt. at 91-039); Ex. 95 (Rodden Rpt. at 95-009). In particular, Arizona's history of language-based discrimination, including educational discrimination and disparities—as well as a recent history of errors in Spanish-language voting materials—makes it far more likely for Spanish-speaking voters to be misinformed about voting rules, such as the need to keep their voter registration current, the location of their precinct's voting location, and the necessity of voting only in their assigned precinct. Ex. 91 (Lichtman Rpt. at 91-039); Ex. 93 (Second Lichtman Rpt. at 93-013); Ex. 95 (Rodden Rpt. at 95-008-12). As a direct result of a history of and ongoing discrimination, minority voters in Arizona have disproportionately higher rates of residential mobility, and thus must continuously renew their voter registration forms and reeducate themselves about their new voting location, making it more likely that they unknowingly present at the wrong precinct in any given election. Ex. 95 (Rodden Rpt. at 95-004, 95-009-11).

26.     For these same reasons, when Arizona's minority voters arrive at the wrong precinct, they are less likely to be able to remedy the error (assuming they are even informed of it) because they are significantly less likely to have reliable access to vehicles and are more likely to hold less flexible, working-class jobs than their white counterparts, making it more difficult for them to travel to a second polling location if needed. Ex. 95 (Rodden Rpt. at 95-009, 95-065); Ex. 97 (Second Rodden Rpt. at 97-057-59); Ex. 98 (Second Rodden Reply Rpt. at 98-016); Ex. 91 (Lichtman Rpt. at 91-039). Likewise, substantial disparities in homeownership and increased transience, both linked to systemic, historical racial and language-based discrimination in Arizona, mean that minority voters are more likely to experience frequent changes in polling locations and are more likely to be disenfranchised as a result of the State's OOP policy. Ex. 95 (Rodden Rpt. at 95-018 n.17); Ex. 91 (Lichtman Rpt at 91-039).

27.     Arizona's long history of discrimination is also tied to the factors that lead minority voters to disproportionately rely on ballot collection to vote. As a result of discrimination, minority voters are more likely to live in lower-income and tribal communities, many of which lack secure outgoing mailboxes, which make it more difficult to return a voted early ballot. Ex. 97 (Second Rodden Rpt. at 97-057) (finding that 86% of non-Hispanic white registered voters but only 80% of Hispanic and 18% of Native American registered voters have home mail service); Ex. 98 (Second Rodden Reply Rpt. at 98-018) (87% of whites on the PEVL has mail delivery compared to 26% of Native Americans); *see also* Ex. 91 (Lichtman Rpt. at 91-034). Disparate access to reliable transportation also makes minority voters less able than whites to get to a sometimes far-flung post office or outgoing mail box. *See* Ex. 95 (Rodden Rpt. at 95-065); Ex. 97 (Second Rodden Rpt. at 97-058); Ex. 98 (Second Rodden Reply Rpt. at 98-016). Language barriers, and lower levels of literacy and educational attainment resulting from historical discrimination, also make minority voters more likely than whites to be unaware of certain technical rules, like the rule that a ballot must be *received* (not postmarked) by Election Day to be valid—and thus more likely to be disenfranchised if they wait to choose a candidate until the final days of the election, after the mail-in deadline has already passed. *See* Ex. 91 (Lichtman Rpt. at 91-022, 91-034); Healy Decl. ¶ 21. Additionally, the evidence shows that some voters in the Hispanic community in particular distrust returning their voted ballot via mail, particularly in low-income communities where mail theft is common. 7/14/16 Healy Dep. 97:18-24; Healy Decl. ¶ 23; R. Gallego Decl. ¶ 8; 6/6/17 Scharff Dep. 92:8-17.

28.     In addition to the socioeconomic effects of Arizona's history of discrimination, Arizona also has a recognized history of racially polarized voting, which continues today. Ex. 91 (Lichtman Rpt. at 91-030-033, 91-044-045); *see also Gonzalez v. Arizona*, 677 F.3d 383, 407 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013). In the most recent redistricting cycle, experts for the Arizona Independent Redistricting Commission found that at least one congressional

district and five legislative districts clearly exhibited racially polarized voting. Ex. 91 (Lichtman Rpt. at 29-33). Moreover, exit polls for the 2016 election demonstrate that voting between whites and Hispanics continues to be polarized along racial lines. Ex. 92 (Lichtman Reply Rpt. at 92-012, 92-014); Ex. 94 (Second Lichtman Reply Rpt. at 94-004); *see also* Ex. 91 (Lichtman Rpt. at 91-030-33).

29.     Arizona's racially polarized voting and history of discrimination have also resulted in a corresponding racial appeals in campaigns in Arizona—both historically and recently. For example, when Raul Castro, Arizona's only Hispanic person ever elected to a statewide office, ran for governor in the 1970s, his opponents urged support for the white candidate because "he looked like a governor." Ex. 89 (Berman Rpt. at 89-019). In that same election, a newspaper published a picture of Fidel Castro with a headline that read "Running for governor of Arizona." Ex. 89 (Berman Rpt. at 89-019). In a 2010 bid for State Superintendent of Public Education, John Huppenthal "ran an advertisement in which the announcer said that Huppenthal was 'one of us.' The announcer noted that Huppenthal voted against bilingual education and 'will stop La Raza.'" Ex. 91 (Lichtman Rpt. at 91-044). Similarly, when running for governor in 2014, Maricopa County Attorney Andrew Thomas ran an ad describing himself as "the only candidate who has stopped illegal immigration" while "simultaneously show[ing] a Mexican flag with a red strikeout line through it superimposed over the outline of Arizona." Ex. 91 (Lichtman Rpt. at 91-044). At a recent Arizona rally, then presumptive presidential nominee Donald Trump made negative statements about Hispanics. Ex. 91 (Lichtman Rpt. at 91-044).

30.     Together, these ongoing effects of discrimination, racially polarized voting, and racial appeals have ultimately resulted in a marked disparity in the number of minority elected officials. As noted, due to its history of discrimination, Arizona became a covered jurisdiction under Sections 5, 4(f)(4), and 203 of the VRA. As a result of its inclusion under the VRA, Arizona achieved recognized improvements in the numbers of Hispanics and Native Americans registering and voting as well as in the overall representation of minority elected officials in the State. Nevertheless, only one Hispanic

1   and African American have ever been elected to statewide office, and Arizona has never

2   elected a Native American to statewide office.  Ex. 91 (Lichtman Rpt. at 91-045); Ex. 93

3   (Second Lichtman Rpt. at 93-020); *see* Ex. 89 (Berman Rpt. at 89-019, 89-022). No

4   Native American or African American has ever been elected to the U.S. House of

5   Representatives. *See* Ex. 93(Second Lichtman Rpt. at 19).Further, no Hispanic, Native

6   American, or African American has ever served as a U.S. Senator representing Arizona,

7   as Attorney General for the State of Arizona, or on the Arizona Supreme Court. *See id.*

8   **III.    THE INSTANT LITIGATION**

9           31.    In this suit, Plaintiffs challenge two provisions of Arizona's voting laws: 1)

10  HB2023, which criminalizes the possession and collection of early ballots by third parties,

11  and 2) the complete rejection of out-of-precinct ("OOP") provisional ballots, including for

12  races in which voters are otherwise qualified to vote. This suit was originally filed on

13  April 15, 2016. Trial is scheduled to begin on October 3, 2017.

14          32.    **Plaintiffs.** The Plaintiffs in this case are the Democratic National

15  Committee ("DNC"), the Democratic Senatorial Campaign Committee ("DSCC"), and the

16  Arizona Democratic Party ("ADP") (collectively, the "Plaintiffs").

17          33.    The Plaintiffs and their members have been directly harmed by HB2023 and

18  Arizona's policy of not counting OOP provisional ballots. Among the voters most harmed

19  by these provisions are some of Plaintiffs' core constituencies, including Hispanic,

20  Native-American, and African-American voters. 5/10/2017 Tameron Dep. Tr. 33:9-34:5;

21  Healy Decl. ¶4; Scharff Dep. Tr. 45:11-46:22; Ex. 91 (Lichtman Rpt. 29-32); Ex. 92

22  (Second Lichtman Rpt. 11). As a result, to accomplish their mission, Plaintiffs will be

23  forced to divert resources to help its members overcome the barriers to voting imposed by

24  these laws. 5/10/2017 Tameron Dep. Tr. 45:11-46:22; *id.* at 80:20-81:14; Healy Decl. ¶¶

25  17-27 (impact of H.B. 2023 on ADP and its members); *id.* at 18-34 (impact of rejection of

26  OOP ballots).  In particular, the evidence will show that ballot collection historically has

27  been a key part of ADP's get out the vote operations (and, as a result, the DNC and

28  DSCC's ground operations in years with coordinated campaigns), and a key way in which

ADP engaged with its voters to assist them in participating in elections. Healy Decl. ¶¶ 17-27; Healy Dep. Tr. 28:15-29:13; *id.* at 36:24-41:16; *id.* at 41:22-42:11; *id.* at 43:19-45:11; *id.* at 47:5-48:8; Tameron Dep. Tr. 17:8-22:4; Scharff Dep. Tr. 49:16-50:2. H.B. 2023's passage has forced ADP to divert resources to help its members overcome the barriers to voting imposed by these laws, and ADP will have to continue to expend these resources as it plans to continue to engage in similar efforts and activities in the future. Scharff Dep. Tr. 60:2-18 (describing training to staff members and volunteers on how to comply with H.B. 2023 in 2016); Tameron Dep. 45:11-46:22; *id.* at 80:20-81:14; Scharff Dep. Tr. 98:11-20; Healy Decl. ¶27; Healy Dep. Tr. 64:1-18.

34.     **Expert Witnesses**.  At trial, Plaintiffs intend to introduce expert reports and testimony for three expert witnesses and Defendants intend to introduce expert reports and/or testimony for four experts. As highlighted below, the Court should give significant weight to Plaintiffs' experts, but little weight to Defendants' experts.

35.     **Dr. Jonathan Rodden.** Plaintiffs' expert Dr. Rodden is a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab—a center for research and teaching with a focus on the analysis of geo-spatial data in the social sciences. Ex. 95 (Rodden Rep. 95-005-6). Students and faculty members affiliated with the Lab are engaged in a variety of research projects involving large, fine-grained geo-spatial data sets including individual records of registered voters, Census data, survey responses, and election results at the level of polling. Ex. 95 (Rodden Rep. 95-005-6). Prior to joining the Stanford faculty, Dr. Rodden was the Ford Professor of Political Science at the Massachusetts Institute of Technology. Ex. 95 (Rodden Rep. 95-005-6). He received his Ph.D. from Yale University and his B.A. from the University of Michigan, Ann Arbor, both in political science. Ex. 95 (Rodden Rep. 95-005-6).

36.     Dr. Rodden has expertise in the use of large data sets and geographic information systems (GIS) to analyze aspects of political representation. Ex. 95 (Rodden Rep. 95-006).  He has developed a national data set of geo-coded precinct-level election

results that has been used extensively in policy-oriented research related to redistricting and representation. Ex. 95 (Rodden Rep. 95-006). He has also worked extensively with Census data from the United States and other countries. Ex. 95 (Rodden Rep. 95-006). Dr. Rodden has published papers on political geography and representation in a variety of academic journals and has also been featured in more popular publications like the Wall Street Journal, the New York Times, and Boston Review. Ex. 95 (Rodden Rep. 95-006). Dr. Rodden has testified as an expert witness in three recent election law cases. Ex. 95 (Rodden Rep. 95-005-6).

37.    Using a combination of individual-level and aggregate data analysis, both of which have been accepted in previous cases analyzing questions under the VRA, *see* Ex. 97 (Second Rodden Rpt. at 7-9), Dr. Rodden analyzed the rates of and causes for casting OOP provisional ballots in Arizona in the 2012, 2014, and 2016 general elections. As an initial matter, in his First Report, among other things, Dr. Rodden concludes that "22 percent of voters visiting a polling place in Arizona in the 2012 general election were asked to cast a provisional ballot, and over 33,000 of these—more than 5 percent of all in-person ballots cast—were rejected." Ex. 95 (Rodden Rpt. 95-003-4). "The provisional voting rate was 18 percent in 2014. [And n]o other state rejects a larger share of its in-person ballots." *Id.* Indeed, in 2012, Arizona rejected 11,000 ballots that it classified as OOP, and 3,500 in 2014. No other state came close to this rate of rejected out-of-precinct ballots. *Id.*

38.    Further, he finds that the rates of OOP are disparate. Specifically, Dr. Rodden's analysis concludes that Hispanic, Native American, and African American voters cast OOP provisional rates at a statistically higher rate than white voters. Ex. 95 (Rodden Rpt. 95-003-4); Ex. 97 (Second Rodden Rpt. 97-002-4). Focusing on Maricopa County in the 2012 election, Dr. Rodden found that the rate of casting OOP votes was "131 percent higher for Hispanics, 74 percent higher for African Americans, and 39 percent higher for Native Americans than whites." Ex. 95 (Rodden Rpt. 95-003-4). OOP votes were substantially more likely to be cast by young voters; in neighborhoods

characterized by large numbers of renters and with high rates of transience; and that the 65 percent higher for Democrats than Republicans in Maricopa County, and 56 percent higher in Pima County. Ex. 95 (Rodden Rpt. 95-003-4). Dr. Rodden's analysis found that "changes in polling place locations are associated with higher rates of out-of-precinct voting." And that "African Americans and Hispanics are substantially more affected by this than whites. In particular, the impact of precinct consolidation, while statistically significant for all groups, is more than twice as large for Hispanics and African Americans as for non-Hispanic whites." Ex. 95 (Rodden Rpt. 95-003-4). When analyzing the non-metropolitan counties of Arizona, Dr. Rodden found that OOP voting is "negligible in majority-white precincts, but increases dramatically in precincts where Hispanics and Native Americans make up majorities." Ex. 96 (Rodden Reply Rpt. at 96-058).

39.     After the 2016 General Election, Dr. Rodden again examined the rates and causes of OOP voting in Arizona and his findings remained consistent—"rates of out-of-precinct voting were significantly higher for minorities than for whites." Ex. 97 (Second Rodden Rpt. 2-4). Summing over counties, he found that "on Election Day on November 8, 2016, around one in every 100 Hispanic voters, one in every 100 African American voters, and one in every 100 Native-American voters cast an [OOP] ballot. Among non-Hispanic whites, the rate was around one in every 200 voters." *Id.* Further, Dr. Rodden found that with the exception of only one county, "in 2016 in all counties where [OOP] voting takes place, at least one minority group—African Americans, Hispanics, or Native Americans—displayed a higher rate of [OOP] voting than the rate for non-Hispanic whites. In Pinal County, rates of [OOP] voting were higher for both African Americans and Hispanics. And in the large metropolitan counties of Maricopa and Pima, rates of [OOP] voting were much higher for all three minority groups." *Id.* Indeed, in Maricopa County this was true even where the overall rate of OOP voting fell, as OOP voting remained "twice as high for Hispanics as for whites, 86 percent higher for African Americans, and 73 percent higher for Native Americans." *Id.* In Pima County, racial

1    disparities grew from 2014. *Id.* OOP voting remained concentrated in areas with high

2    rates of transience and environments with confusing polling locations. *Id.*

3        40.    In addition to his analysis of OOP voting, using standard and accepted

4    methods in his field, Dr. Rodden also conducted an analysis of the mailability of the non-

5    metropolitan counties in Arizona in order to assess the burdens imposed by HB 2023's

6    prohibition on ballot collection. The results of his analysis were striking. Dr. Rodden

7    found that "[o]utside of Maricopa and Pima counties" "around 86 percent of non-Hispanic

8    whites have home mail service," but "only 80 percent of Hispanics do, and only 18

9    percent of Native Americans have such access." Ex. 97 (Second Rodden. Rpt. at 97-004).

10       41.    **Dr. Allan J. Lichtman.** Plaintiffs' expert Dr. Lichtman is a Distinguished

11   Professor of History at American University in Washington, D.C., where he has been

12   employed for 42 years. Ex. 91 (Lichtman Rpt. 91-003-4). Dr. Lichtman formerly served as

13   Chair of the History Department and Associate Dean of the College of Arts and Sciences

14   at American University. *Id.* He received his B.A. in History from Brandeis University in

15   1967 and his Ph.D. in History from Harvard University in 1973, with a specialty in the

16   mathematical analysis of historical data. *Id.* Dr. Lichtman's areas of expertise include

17   political history, electoral analysis, and historical and quantitative methodology. *Id.*

18       42.    Dr. Lichtman has authored numerous scholarly works on quantitative and

19   qualitative methodology in social science. Ex. 95 (Lichtman Rpt. 95-003). His scholarship

20   includes articles in academic journals such as Political Methodology, Journal of

21   Interdisciplinary History, International Journal of Forecasting, Journal of Applied

22   Forecasting, and Social Science History, as well as a co-authored book, Historians and the

23   Living Past. *Id.* In addition, Dr. Lichtman coauthored Ecological Inference with Dr. Laura

24   Langbein, a standard text on the analysis of social science data, including political

25   information. *Id.* Dr. Lichtman has also published academic articles on the application of

26   social science analysis to civil rights issues as well as the use of quantitative and

27   qualitative techniques to conduct contemporary and historical studies. *Id.*  He has also

28   published multiple books using quantitative and historical analyses. *Id.*

43.     Dr. Lichtman has worked as a consultant or expert witness for both plaintiffs and defendants in more than eighty voting and civil rights cases. PX91 (Lichtman Rpt. 91-004). These include the U. S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), where Justice Kennedy's majority opinion authoritatively cited Dr. Lichtman's statistical work. *Id.* Dr. Lichtman has testified several times for plaintiffs and defendants on the issues of intentional discrimination as well as the Senate Factors. *Id.*

44.     Following the *Arlington Heights* methodological guidelines, considering the Section 2 Senate Factors, and applying the standard and accepted practices in his field of expertise, Dr. Lichtman's major conclusions in this case are that eight out of nine Senate Factors are present in Arizona. Specifically, he finds that Arizona has a long and ongoing history of official discrimination against minorities that has substantially affected the ability of minority group members to participate fully in the political process and elect candidates of their choice. Ex. 91 (Lichtman Rpt. 91-003-4). Further, Arizona has lagged behind most other American states in providing access to voting and in the turnout of its citizens in elections, and its history of discrimination is reflected in major socio-economic disparities between whites and minorities, including income, poverty, unemployment, educational attainment, educational proficiency, housing, access to vehicles and telephones, and health measures—all of which diminish the opportunities for minorities as compared to whites in Arizona to participate fully in the political process and elect candidates of their choice. *Id.* His report also finds that Arizona exhibits racially polarized voting and also has a history of racial appeals in campaigns that continue to this day. *Id.* at 29, 43-44.

45.     With respect to the intent behind HB 2023's passage, Dr. Lichtman finds that "the sequence of events leading to the adoption of HB 2023 in 2016 shows repeated attempts by the Republican legislative majority to restrict opportunities to collect and deliver early-voted ballots as well as to adopt other measures that made it more difficult for minority voters to vote and elect candidates of their choice in Arizona." Ex. 91

1  (Lichtman Rpt. 91-003-4). He concludes that "the path to enactment of HB 2023 was

2  marked by significant procedural and substantive deviations," and that "[o]ther

3  justifications presented by decision-makers for the enactment of HB 2023 are misleading

4  and pretextual." *Id.* Dr. Lichtman further concludes that "[g]iven the close connection

5  between party and racial identity in Arizona, the analysis [and the partisan motivations

6  behind HB 2023], the state adopted HB 2023 with the intent to restrict voting

7  opportunities for minorities in Arizona." Ex. 93 (Second Lichtman Rpt. 93). He finds that,

8  racial polarization; a lack of responsiveness to the needs of minority groups; and racial

9  appeals in campaigns continued into 2016 and 2017. *Id.*

10      46.   **Dr. David R. Berman.** Plaintiffs' expert Dr. Berman is a Professor

11  Emeritus of Political Science and a Senior Research Fellow at the Morrison Institute for

12  Public Policy at Arizona State University. Ex. 89 (Berman Rpt. at 89-003). As a political

13  science professor he has taught undergraduate survey courses in American Government

14  and Politics, State and Local politics, and Arizona government and politics as well as

15  more specialized courses, including undergraduate seminars on Arizona politics where

16  students interacted with state and local office holders and political participants. *Id.* He has

17  also taught advanced graduate courses focusing on research methods in these areas. *Id*

18      47.   As a Senior Research fellow with the Morrison Institute, he specializes in

19  research and writing on governance and election issues in the State, including redistricting,

20  direct democracy and campaign finance. *Id* He has been a professor at Arizona State

21  University since 1966, and his previous work experience was as a Research Associate at

22  the National League of Cities in Washington, D.C. from1964-66. *Id.* at 89-003-4.

23      48.   Dr. Berman has authored ten books and over 70 published papers, book

24  chapters, or refereed articles dealing with state and local government, politics, and public

25  policy. *Id.* at 89-004.  His work includes several political history books and refereed

26  journal articles on Mountain States and Arizona in particular, many of which discuss the

27  history of racial discrimination, access to the ballot, and the development of democracy in

28  these states. *Id.*  These books include, among others: Reformers, Corporations and the

Electorate: An Analysis of Arizona's Age of Reform (University Press of Colorado, 1992); Arizona Politics and Government: The Quest for Autonomy, Democracy, and Development (University of Nebraska Press, 1998); Politics, Labor, and the War on Big Business, The Path of Reform in Arizona, 1890-1920 (University Press of Colorado, 2012); and George Hunt, Arizona's Crusading Seven-Term Governor, (University of Arizona Press, 2015). *Id.*

49.     He holds a bachelor's degree from Rockford College (now Rockford University) in Rockford, Illinois, and a master's degree and a doctorate in government from American University in Washington, D.C. *Id.* His work has been funded by contracts with the International City/County Management Association, the National Conference of State Legislatures, and by several research grants, including grants from the United States Information Agency, the Kellogg Foundation, Salt River Pima-Maricopa Indian Community, and the National Endowment for the Humanities. *Id.* Dr. Berman serves on the executive committee of the Federalism and Intergovernmental Relations Section of the American Political Science Association and the Intergovernmental Administration and Management section of the American Society for Public Administration. *Id.* at 89-001-2.

50.     Dr. Berman, applying the standard sources and methodologies in his field of expertise, concluded that Arizona has a long history of discrimination when it comes to the voting rights of Native Americans, Hispanics, and African Americans. *Id.* at 89-003. He found that Arizona's history of discrimination has been reflected in voting requirements, the management of elections, efforts to intimidate voters, and racial appeals, both subtle and overt, during campaigns. *Id.*  And that discrimination in the context of voting has also been part of a more general pattern of political, social, and economic discrimination against minority groups which has been reflected in other policy areas such as school segregation, educational funding and programming, equal pay and the right to work, as well as immigration. *Id.*

51.     **Dr. Janet Thornton.** Dr. Thornton is a Managing Director at Berkeley Research Group. She provided a rebuttal to Dr. Rodden's reports on behalf of Defendants.

Although Dr. Thornton is an economist with a background in statistical analysis, her primary area of work is employment and labor economics. Dr. Thornton is not a political scientist and she has little to no background evaluating the effects of changes in voting laws have on voter behavior. 8/9/2017 Thornton Dep. 18:8-11 (no formal education in election law or voting since undergraduate degree and work with elections solely in context of litigation). Moreover, Dr. Thornton's response to Dr. Rodden's analysis is flawed. Although Dr. Thornton had access to Dr. Rodden's data, she failed to conduct an adequate analysis of her own despite having Dr. Rodden's data. Ex. 96 (Rodden Rebuttal Rpt. 96-006-48). Further, Dr. Thornton's critique relies on a number of statistical fallacies and, in any event, even her suggested alternatives confirm Dr. Rodden's key conclusions: that Arizona's practice of rejecting out-of-precinct ballots disproportionately affects African Americans, Hispanics, and Native Americans. Ex. 96 (Rodden Rebuttal Rpt. 96-006-48).

52. **Dr. M.V. Hood.** Dr. Hood, another defense expert, is a Professor of Political Science at the University of Georgia. Dr. Hood was retained to respond to the reports of Drs. Lichtman, Rodden, and Berman. His conclusions should be viewed with skepticism. First, regarding Dr. Lichtman's intentional discrimination analysis, Dr. Hood conceded that he was not very familiar with the *Arlington Heights* framework or how it was implemented by courts. 8/7/2017 Hood Dep. Tr. 49:2-50:19. Moreover, his cross state analysis of ballot collection laws and related critique of Dr. Licthman's report reflected an incomplete understanding of the laws he categorized, as well as an overall misrepresentation of their scope. Ex. 92 (Lichtman Reply Rpt. at 50-52). With respect to Dr. Rodden's analysis, Dr. Hood claims that H.B. 2023 could not have harmed minorities because early voting and overall turnout may have been somewhat higher in 2016 than in 2012 in non-metro counties with substantial numbers of minorities, but failed to point out that the turnout increase was larger in counties *without* substantial minority populations and did not provide any quantitative analysis of turnout trends by race or ethnicity. Ex. 94 (Second Rodden Rebuttal Rpt. 94-004). And, Dr. Hood's criticism of Dr. Berman's use of

older historical information is not only contradicted by another defense expert, Dr. Critchlow.Ex. 521(Critchlow Rpt. 9), but Dr. Hood admitted in his own deposition that in his own "historical political work" he "reach[es] further back in time, 50 years, a hundred years, even going back 200 years." 08/07/2017 Hood Dep. 33:16-32:2.

53.     Moreover, Dr. Hood's testimony has either been rejected or given little weight in numerous court cases. *See Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *24 (S.D. Ohio June 7, 2016), *aff'd in part, rev'd in part*, 837 F.3d 612 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2265 (2017) ("In sum, Dr. Hood's testimony and report were in large part irrelevant to the issues before the Court and also reflected methodological errors that undermine his conclusions. Other courts have found likewise. As such, the Court finds his contribution of limited value."); *Veasey v. Perry*, 71 F. Supp. 3d 627, 663 (S.D. Tex. 2014) ("On cross-examination, Plaintiffs pointed out a multitude of errors, omissions, and inconsistencies in Dr. Hood's methodology, report, and rebuttal testimony, which Dr. Hood failed to adequately respond to or explain. The Court thus finds Dr. Hood's testimony and analysis unconvincing and gives it little weight.") (footnotes omitted); *Frank v. Walker*, 17 F. Supp. 3d 837, 881-84 (E.D. Wis. 2014) (discounting Dr. Hood's findings), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Florida v. United States*, 885 F. Supp. 2d 299, 324 (D.D.C. 2012) ("In finding that African-American voters in the covered counties will be disproportionately affected by the reduction in early voting days under the new law, we reject the contrary opinions of Florida's expert witness, Professor Hood. We do so because the analysis underlying his conclusions suffers from a number of methodological flaws.") (footnotes omitted); *Common Cause/Georgia v. Billups*, No. 4:05-cv-0201, 2007 WL 7600409, at *14 (N.D. Ga. Sept. 6, 2007) (excluding Dr. Hood as an expert witness as to absentee voting analysis because his testimony was either unreliable or not relevant). And, with one exception, Dr. Hood has exclusively served as an expert on behalf of states defending against allegations that their laws violated the Constitution and/or the VRA. 8/7/2017 Hood Dep. 14:1-15:19.

54. **Sean Trende**. Defense expert Sean Trende does not have a Ph.D and has never written a peer-reviewed article. 8/8/2017 Trende Dep. Tr. 57:7-8; *id.* at 166:6-10. Mr. Trende has spent most of his professional career working as a lawyer or political commentator. He is not a historian and says nothing about the historical methods Dr. Lichtman utilized to reach his opinion. 8/8/2017 Trende Dep. Tr. 57:12-15. And, he has never offered an opinion on either Section 2 of the VRA or discriminatory intent in passing a voting law. 8/8/2017 Trende Dep. Tr. 57:22-58:5. Moreover, his criticisms of Dr. Lichtman's report rely on numerous statistical fallacies that are not only easily rebutted, but belie his lack of expertise in this field. Ex. 92 (Lichtman Reply Rpt. at 23-33); Ex. 94 (Second Lichtman Reply Rpt. 94-014 n. 27). Accordingly, the Court should give his opinion little weight.

55. **Dr. Donald T. Critchlow.** Defense expert Dr. Critchlow was retained to offer an opinion about the relationship between racial discrimination and voting in Arizona. Unlike Dr. Berman, however, Dr. Critchlow has never published any books or articles specifically focused on Arizona history. 9/15/2017 Critchlow Dep. 22:22 -23:3. He has never taught any coursed in Arizona history or politics. *Id.* at 28:16-18. And, moreover, Dr. Critchlow is the Director of the Center for Political Though and Leadership, an organization funded by the right-wing Koch Foundation. *Id.* at 46:24-47:1, 48: 11-14. His conservative bias is reflected in his report which, Dr. Berman explains "appears to be more reflective of intense partisanship than objective scholarship or the views of an event-handed professional historian." Ex. 90 (Berman Reply Rpt. at 90-008). Further, Dr. Critchlow's report—which agrees with Dr. Berman's that older historical information is relevant in understanding patterns—directly contradicts Defense expert Dr. Hood's report, Ex. 92 (Berman Rebuttal Rpt. 92).

IV.     **THE EFFECTS OF THE CHALLENGED PROVISIONS**

A.      **Arizona's Rejection of Out of Precinct Provisional Ballots Severely Burdens Arizona Voters**

56.     Under Arizona law, County Boards may choose to run each election in their jurisdiction using a precinct-based system, a vote center system, or some combination of the two. A.R.S. § 16-411(B)(4). In a precinct-based polling system, voters may only cast their votes at their assigned polling location. See A.R.S. § 16-583 (voters whose names are not listed on the precinct register are supposed to be redirected to another polling location). In contrast, under a vote center system, any voter in the county—regardless of the precinct in which they live—may vote at any of the available vote centers. A.R.S. § 16-411(B)(4).

57.     If a voter arrives at a precinct but does not appear on the precinct register, the voter may cast a provisional ballot. A.R.S. §§ 16-122, 16-135, 16-584. After Election Day, county election officials review all provisional ballots and count those votes cast by voters confirmed to be eligible to vote. SOUF ¶ 39. If the voter's current address is determined to be within the precinct, the provisional ballot is counted. In counties that utilize precinct-based voting, Arizona does not count any portion of a provisional ballot cast outside of the voter's assigned precinct—even in races in which the voter was eligible to vote. *Id.*

58.     Between 2006 and 2015, Arizona rejected over 121,000 provisional ballots statewide, consistently finding itself at or near the top of the list of states that collect and reject the largest number of provisional ballots each election. Ex. 95 (Rodden Rpt. at 95-023-25); Healey Decl. ¶ 28. In 2012 alone, "[m]ore than one in every five [in person] voters … was asked to cast a provisional ballot, and over 33,000 of these—more than 5 percent of all in-person ballots cast—were rejected. No other state rejected a larger share of its in-person ballots in 2012." Ex. 95 (Rodden Rpt. at 95-026-29).

59.     Unfailingly, one of the top reasons that ballots are rejected is because they are cast OOP. *See, e.g.*, Ex. 95 (Rodden Rpt. at 95-026-29); *see also* Ex. 120 at 120-005.

In this particular area, Arizona is in a class by itself, with almost 11,000 rejected out-of-precinct provisional ballots in 2012 and 3,500 in 2014. No other state comes close. Ex. 95 (Rodden Rpt. at 95-026). In 2016, the rate of rejected OOP ballots went down in Arizona; yet it *still* was the national leader in the rate of rejected OOP ballots. Ex. 95 (Rodden Second Reply Rpt. at 95-027).

60. Maricopa and Pima Counties accounted for 84 percent of all OOP ballots in the 2016 general election. Those counties, combined with Coconino, Pinal, and Apache counties, account for 95 percent of all OOP ballots. Ex. 97 (Rodden Second Rpt., at 97-016-20). Pima County has demonstrated a pattern of relatively high OOP voting in general election years, and lower levels in midterm years. This pattern returned in 2016, when Pima County once again experienced one of the highest OOP voting rates in the state (1,151 ballots, or 1.4 percent of Election-Day voters). Ex. 97 (Rodden Second Rpt., at 97-016-20). The rate of OOP voting in Maricopa County—which adopted e-pollbooks—fell from 2014 to 2016, but it is still high relative to non-metropolitan counties, and the raw number—2,197—is still substantial. Ex. 97 (Rodden Second Rpt., at 97-016-20). In Coconino County, the rate of OOP voting has been rather stable at around one percent of Election Day voters, with small spikes in general election years. Ex. 97 (Rodden Second Rpt., at 97-016-20). The rate of OOP voting has increased in Apache County and held steady in Pinal County. Ex. 98 (Rodden Second Reply Rpt. at 98-027).

61. There are two primary reasons that so many Arizonans are disenfranchised for casting OOP ballots. First, Arizona voters cast OOP ballots due to their high rates of residential mobility. Almost 70 percent of Arizonans have changed their residential address in the decade between 2000 and 2010, the second highest rate of any state. Ex. 98 (Rodden Second Reply Rpt. at 98-011); *cf.* Ex. 91 (Lichtman Rpt. 91-39, 91-42); Quezada Decl. ¶ 25; Healy Decl. ¶ 33; Danley Decl. ¶ 10; Gillespie Decl. ¶¶ 15-16. The vast majority of Arizonans who moved in the last year were actually moving within their current city of residence, and Arizona again has the second highest rate of such within-city moves of any state. Ex. 98 (Rodden Second Reply Rpt. at 98-012). Most of these

within-city moves took place in Maricopa and Pima Counties. Ex. 98 (Rodden Second Reply Rpt. at 98-012).

62.     Rates of out-of-precinct voting are higher in neighborhoods where renters make up a larger share of householders. Ex. 96 (Rodden Reply Rpt. at 98-041). An individual who faces a rent increase in one apartment complex and moves to another less than a mile away might not be aware that she has moved into an entirely new precinct. In many cases, she may still live closest to her old precinct, but may now be required to travel further in order to vote in her new assigned precinct. *See, e.g.*, Ex. 95 (Rodden Rpt. at 95-049-50) (noting patterns of OOP voting among voters who live on the side of the precinct farthest from the polling place); Noonan Decl. ¶ 5. Not only must movers take the time to negotiate the procedure for changing their registration address, but it is anticipated that witnesses will testify that they must constantly reeducate themselves about whether a vote center or precinct-based system will be used for the election at hand, and in the event of the latter, the location of their correct polling place. Noonan Decl. ¶¶ 4-7.

63.     Second, voters cast OOP ballots due to systemic problems in Arizona's administration of elections: specifically, voter confusion caused by the large number of changes in polling locations from election to election; the inconsistent election regimes used by and within counties; poor placement of polling locations; and other faulty election administration procedures. Ex. 95 (Rodden Rpt. at 95-012-15, 95-026-27, 95-044-52, 95-054-58); *see also* Fernandez Decl. ¶ 19; R. Gallego Decl. ¶ 17; Quezada Decl. ¶ 25; Healy Decl. ¶ 31; Danley Decl. ¶ 10; Gillespie Decl. ¶¶ 15-16; Chapman Decl. ¶ 13; Clark Decl. ¶ 17.

64.     Changes in polling location and inconsistent election regimes used by and within counties are contributing causes to OOP voting. Indeed, the rate of OOP voting was 40 percent higher for voters that had experienced a change in polling place. Ex. 95 (Rodden Rpt. at 95-056-57); *See also* PI Ex. 29 at 8; Quezada Decl. ¶ 25; Clark Decl. ¶ 17; Danley Decl. ¶ 10; Healy Decl. ¶ 31. And in Maricopa County, between 2006 and 2008, at least 43% of polling locations changed from one year to the next. Ex. 120 at 120-005.

1   Likewise, approximately 40% of Maricopa County's active registered voters' polling
2   locations changed between 2010 and 2012.  Ex. 95 (Rodden Rpt. at 95-056-57. Changes
3   in Maricopa County polling locations and election regimes continued to occur in 2016,
4   when  Maricopa County implemented 60 vote centers for the Presidential Primary
5   Election, then reverted to a precinct-based system with 122 polling locations for the May
6   special election, and then implemented over 700 assigned polling places in the August
7   primary and November general elections. Ex. 95 (Rodden Rpt. at 95-015).  Furthermore,
8   in Maricopa County, voters are often confused and need assistance to navigate the
9   differences between the City of Phoenix's elections (which are vote-center based) and the
10  County's (usually) precinct-based elections. 5/8/17 K. Gallego Dep. 104:24-105:12  ;
11  Danley Decl. ¶ 10. As a result, residents of Phoenix are more likely than other residents of
12  Maricopa County to cast OOP ballots. Ex. 95 (Rodden Rpt. at 95-055).

13      65.    Polling location placement and procedural errors are also contributing
14  causes of OOP voting. Ex. 95 (Rodden Rpt. at 95-012-15, 95-026-27, 95-044-52, 95-054-
15  58); Fernandez Decl. ¶¶ 19-20; Healy Decl. ¶ 30. Voters who vote out of precinct often
16  show up to a polling place in their neighborhood. In 2012 in Maricopa County, the median
17  distance between the wrong polling place and the voter's home was only two miles, and
18  only a small minority cast an OOP ballot in a polling place more than 10 miles away. Ex.
19  95 (Rodden Rpt. at 95-053). Many polling places in Maricopa and Pima County are
20  located on the borders of precincts, rather than the geographic centers of precincts. Ex. 95
21  (Rodden Rpt. at 95-050). As a result, voters living on the opposite side of a precinct may
22  live very near a polling place to which they are not assigned and far from their assigned
23  polling place. Ex. 95 (Rodden Rpt. at 95-046-52) (examples of precincts in Goodyear and
24  airport neighborhoods in Maricopa); Ex. 97 (Rodden Second Rpt. at 97-044-50)
25  (examples of precincts in near Glendale in Maricopa and South Tucson in Pima). Indeed,
26  in 2012, around 25% of individuals casting OOP ballots actually voted at a location closer
27  to their address than the assigned polling place. Ex. 95 (Rodden Rpt. at 95-004, 95-053);
28  *see also* Kelso Decl. ¶ 5; Noonan Decl. ¶ 5. In addition, some neighborhoods contain

multiple polling locations that are located very close to each other. Voters who live in a neighborhood where multiple polling places are located close to each other may understandably be confused about where they are supposed to vote—particularly where multiple polling places are consolidated in the same building, or are located across the street from each other, and voters are not directed to the proper location. Ex. 95 (Rodden Rpt. at 95-052) (example of numerous voters disenfranchised at the consolidated St. Agnes Parish polling place because they went to the incorrect table and were not directed to the correct table and/or handed the proper ballot). Indeed, voters assigned to a polling place that is within a mile of two or more other polling places cast out-of-precinct ballots at a rate 13 percent higher than those whose assigned polling place is not in close proximity to other polling places. Ex. 95 (Rodden Rpt. at 95-004, 95-055).

66.     Errors by pollworkers and election administrators also contribute to OOP voting. The testimony at trial will show that some poll workers are not informing voters that they are in the wrong polling place, are not providing the correct polling location information to such voters, and/or are not explaining that the provisional vote cast at the incorrect location will not be counted. As a result, many voters cast an OOP ballot believing that it will count, and are not afforded an opportunity to attempt to locate and travel to their correct polling. Noonan Decl. ¶ 5; Kelso Decl. ¶ 5.

67.     Pollworker error persists even in Maricopa County, despite its implementation of an electronic pollbook system that allows election workers to print a receipt listing a voter's correct polling location and providing directions to that location for voters who arrive at the wrong polling location. Even with this new system, over 2,800 voters in Maricopa County still cast out-of-precinct provisional ballots in 2014, and almost 2,200 did so in the general election in 2016. Yet the testimony at trial will show that some Maricopa County poll workers continue to provide incorrect or incomplete information to OOP voters, who cast an OOP provisional ballot under the mistaken impression that it will be counted. Noonan Decl. ¶ 6.  Poll worker error thus remains a significant cause of voter disenfranchisement.

68.     Testimony at trial will also show that even when voters are made aware that they are in the wrong polling place, and that their vote will not count, it may be too late for the voter to travel to the correct precinct before the close of the polls. Similarly, voters who are informed that they are in the wrong polling place who rely upon public transportation or have mobility impairments may be unable to travel to their correct polling place, or face severe burdens in doing so. 5/15/2017 Pstross Dep. 37:16-5.

69.     Minorities are "vastly over-represented among those casting out-of-precinct ballots" and, as a consequence, far more likely to be disenfranchised as a result. Ex. 95 (Rodden Rpt. 95-037); 8/11/2016 Rodden Dep. 134:21-136:9; Ex. 91 (Lichtman Rpt. 91-052) ("in Maricopa County voters with Hispanic surnames were disparately impacted by the problem of not counting votes cast in the wrong precinct[,]" and "voters with Hispanic surnames comprised 10 percent of all others in the 2012 general election, but 24 percent of those casting out-of-precinct provisional ballots."); Healy Decl. ¶33; Gallego Decl. ¶17; Quezada Decl. ¶¶25-32. In 2012 in Maricopa County, while 70% of voters who voted in person were white, only 56 percent of those casting ballots classified out-of-precinct were. Ex. 95 (Rodden Rpt. 95-037).Id. In contrast, while 10 percent of those casting ballots classified out-of-precinct were African American, 13 percent of the ballots invalidated due to OOP voting were cast by African Americans. Ex. 95 (Rodden Rpt. 95-037)Id.; see also id. at 38-40. Similarly, while only 15% of all in-person voters were Hispanic, 26 percent of the invalid [OOP ballots] were cast by Hispanics. Ex. 95 (Rodden Rpt. 95-037-40)Id.; see also id. at 38-40; Further, of all provisional ballots cast in 2012 the rate of OOP voting was 37 percent higher for Native Americans than for whites. Ex. 95 (Rodden Rpt. 95-038-40); These disparities "have been quite persistent over time. Ex. 95 (Rodden Rpt. 95-037-38).

70.     In the 2016 election, the practice of not counting out-of-precinct ballots once again disparately impacted minorities in Arizona. Among all counties that reported out-of-precinct ballots in the general election, a little over 1 in every 100 Hispanic voters, 1 in every 100 African-American voters, and 1 in every 100 Native -American voters cast

an out-of-precinct ballot and, as a result, was wholly disenfranchised. For whites, the figure was around 1 in every 200 voters. Ex. 97 (Rodden Second Rpt. at 97-019-20). With the exception of tiny La Paz County, which has a small minority population, racial disparities in out-of-precinct voting were found in every county. Ex. 97 (Rodden Second Rpt. at 97-019).

71.    In Maricopa County, for instance, estimated rates of out-of-precinct voting were twice as high for Hispanics as for whites, 86 percent higher for African Americans, and 73 percent higher for Native Americans. Ex. 97 (Rodden Second Rpt. at 97-003, 97-028-30). Rates of out-of-precinct voting among election-day voters were higher in Pima County than in 2014, and racial disparities were larger than in 2014. In 2016, rates of out-of-precinct voting were 150 percent higher for Hispanics than for whites, 80 percent higher for African Americans, and 74 percent higher for Native Americans. Ex. 97 (Rodden Second Rpt. at 97-003, 97-031-34).

72.    The disparate burdens of Arizona's OOP practice are linked to the ongoing effects of Arizona's history of discrimination. As in previous years, out-of-precinct voting in 2016 was concentrated in relatively dense precincts that are disproportionately populated with renters and those who change residential locations frequently. These groups are disproportionately composed of minorities. Ex. 97 (Rodden Second Rpt. at 97-016); Ex. 91 (Lichtman Rpt. 91-028). Minorities, as a result of Arizona's discriminatory history, are far more likely to rent than own a home. Ex. 91 (Lichtman Rpt. 91-039, 91-042); Ex. 95 (Rodden Rpt. 95-031-32); see also Ex. 120-004;Ex. 120 at 120-004; Danley Decl.¶¶ 5, 10; Healy Decl. ¶ 33; Quezada Decl. ¶ 25. Minority voters, therefore, are more likely bear higher costs than white voters to have their vote counted in a precinct-based voting system that rejects OOP votes—reregistering with each move (even short, across town moves), and continuously reeducating themselves about their new voting location. See Ex. 91 (Lichtman Rpt. 91-039); Ex. 95 (Rodden Rpt. 95-007-12) (discussing, among other things, increased problems for minorities overcoming search costs). As a result of ongoing effects of Arizona's history of discrimination in access to education, it is (on

average) more difficult for minority voters than white voters to fully educate and reeducate themselves on the voting process, including identifying the location at which they must vote or restrictions on where they can vote. Ex. 91 (Lichtman Rpt. 91-027, 91-038); Clark Decl. ¶¶ 17-21; Danley Decl. ¶¶10-12. Many minority voters are therefore at a significant disadvantage in trying to navigate a strict location-based voting system and confusing and changing polling place locations. Ex. 97 (Rodden Second Rpt. at 97-045-50) (discussing examples of OOP voting patterns in high poverty, highly mobile Hispanic neighborhoods in Maricopa and Pima Counties characterized by confusing polling place locations).

73. Likewise, minority voters are less likely to have access to reliable transportation, are more likely to rely upon public transportation, are more likely to have inflexible work schedules, and are more likely to rely on income from hourly wage jobs. *See* discussion *supra* Section II, D; Ex. 91 (Lichtman Rpt. 91-039-43); Ex. 93 (Lichtman Second Rpt. 91-011-17); Ex. 97 (Second Rodden Rpt. 97-047-52); 5/10/2017 Tameron Dep. Tr. 155:5-20); 7/27/2017 Lichtman Dep. Tr. 88:9-18; 5/15/2017 Pstross Dep. Tr. 34:11-22. Accordingly, where these voters arrive at the wrong polling location, they are more likely to have difficulty traveling to the correct polling location or taking additional time away from their jobs to cast their ballot. This problem is particularly acute in Arizona's Native American communities, in which vehicle ownership is significantly lower than white Arizonans. Ex. 91 (Lichtman Rpt. at 91-042) (16% of African Americans, 8.4% of Hispanics and 17.1% of Native Americans in Arizona lack access to a vehicle compared to 5.5% of whites); Ex. 97 (Rodden Second Rpt at 97-058) ("on the largest reservations, more than one in every five households does not have access to a vehicle. In some Census tracts, one in every four households lacks access to an automobile"). As a result, the testimony will show that Native American voters are particularly likely to have difficulty traveling to a correct polling place, particularly in rural communities without access to public transportation. For example, polling places in the Navajo Nation in Northern Apache County serve voters scattered throughout vast

precincts, and a voter who shows up at the wrong polling place may be an hour's drive away from their correct polling place. Ex. 97 (Rodden Second Rpt. at 97-051-52)

74.     Transportation challenges are compounded by other unique barriers faced by many Native American voters. For example, testimony at trial will show that many Navajo voters in Northern Apache County lack standard addresses, and their precinct assignments for state and county elections are based upon guesswork, leading to confusion about the voter's correct polling place. Ex. 97 (Rodden Second Rpt at 97-052-54)  In addition, boundaries for purposes of tribal elections and Apache County precincts are not the same, and as a result, a voter's polling place for tribal elections often differ from the voter's polling place for state and county elections. Ex. 97 (Rodden Second Rpt at 97-052-54). Testimony at trial will show that this may be the case even when the voter's polling place for tribal elections is also serving as a polling place for state and federal elections the very same day, causing further confusion as to the voter's correct polling place. Gorman Testimony.

75.     Counting ballots cast OOP is administratively feasible. Indeed, twenty states partially count ballots that are cast OOP. Ex. 94 (Lichtman Second Reply Rpt., at 94-033-34). These include the neighboring states of California, Utah, and New Mexico.  Cal. Elec. Code §§ 14310(a)(3), 14310 (c)(3), 15350; Utah Code Ann. § 20A-4-107(1)(b)(iii), 2(a)(ii), 2(c); N.M. Stat. Ann § 1-12-25.4(F); NMAC 1.10.22.9(N). Elections administrators in these and other states have established processes for counting only the offices for which the OOP voter is eligible to vote. Some states, such as New Mexico, use a hand tally procedure, whereby a team of elections workers reviews each OOP ballot, determines the precinct in which the voter was qualified to vote, and marks on a tally sheet for that precinct the votes cast for each eligible office. See NMAC 1.10.22.9(H)-(N). Testimony at trial will show that other states, such as California, use a duplication method, whereby a team of elections workers reviews each OOP ballot, determines the precinct in which the voter was qualified to vote, obtains a new paper ballot for the correct precinct, and duplicates the votes cast on the OOP ballot onto the ballot for the correct precinct.

Only the offices that appeared on both the OOP ballot and the ballot for the correct precinct are copied. The duplicated ballot is then scanned through the optical scan voting machine, and electronically tallied.

76.     Indeed, Arizona already has a similar duplication procedure that it uses to process certain types of ballots that cannot be read by an optical scan voting machine, such as ballots that are damaged, marked with the wrong color pen, or are voted ballots submitted to the Recorder by a military or overseas voter via facsimile. Ex. 455 (2014 Revised Arizona Elections Procedures Manual at 455-185).   Arizona also uses the duplication procedure to process some provisional ballots cast by voters who are eligible to vote in federal elections but whom Arizona does not permit to vote in state elections. Ex. 455 (2014 Revised Arizona Elections Procedures Manual at 455-187).

**B.     Arizona's Ban on Ballot Collection Severely Burden's Arizona Voters**

77.     Collection and delivery of early ballots has long been a common practice in Arizona upon which voters rely. Gallardo Decl. ¶¶ 5, 16-17, 21 (ballot collection "enormously beneficial to many voters" including in particular minority voters); Parraz Decl. ¶¶ 2-5 (Latino organization collected 9,000 ballots during 2012 sheriff election); Danley Decl. ¶¶ 3-4, 6, 8-9 (nonpartisan organization's GOTV efforts aimed at Latinos, young people, and women typically collected several thousand ballots); Friend Decl. ¶¶ 3-6, 12 (collected in personal and professional capacity with AFL-CIO through GOTV efforts to increase minority and elderly turnout); Anderson Decl. ¶¶ 3-5, 11 (collected in personal and professional capacity with Alliance of Retired Americans for members who "would… not have been able to vote without our assistance"); Danley Decl. ¶¶ 4, 6 (Latino organization delivers several thousand ballots per election); Chapman Decl. ¶¶ 2-11 (typically collects several thousand ballots in low-income African-American and Latino neighborhoods); 5/10/17 Tameron Dep. 52:12-17 (Arizona Democratic Party collected "a couple thousand" ballots in 2014). *See also* Gillespie Decl. ¶¶ 5, 10; Fernandez Decl. ¶ 8; 5/16/17 Fernandez Dep. 74:7-9; Healy Decl. ¶ 18, 22; 7/14/16 Healy

Dep. 61:15-22; K. Gallego Decl. ¶¶ 8-9, R. Gallego Decl. ¶ 10; Larios Decl. ¶¶ 9-12; Quezada Decl. ¶ 10; Pstross Decl. ¶¶ 3, 4, 6, 8; 5/15/17 Pstross Dep. 27:17-28:15. In particular, it has been the practice of individuals, political parties, and other community organizers in Arizona to maximize voter turnout by assisting voters with casting their mail-in absentee ballots by collecting those ballots and hand delivering them to the appropriate elections officials to be counted. Healy Dec. ¶ 4; 7/14/16 Healy Dep. 28:15-29:13; 5/10/17 Tameron Dep. 33:9-34:3; 7/7/16 Parraz Dep. 29:22-30:2; 5/8/17 Gallego Dep. 77:14-78:1, 89:15-90:20. As such, ballot collection efforts are often part of the formal get-out-the-vote efforts of Arizona's advocacy organizations, but ballot collection also occurs on an ad-hoc, individual basis. K. Gallego Dec. ¶ 12; Clark Dec. ¶ 14; Quezada Dec. ¶ 20; 5/16/17 Fernandez Dep. 128:1-6.

78.     And it is no wonder that advocates and voters alike have utilized ballot collection. Arizona law provides that all elections must allow for early voting and that any qualified elector may vote by early ballot. A.R.S. § 16-541. In recent years, Arizona has strongly encouraged voting by early mail-in ballot, including by establishing a Permanent Early Voting List ("PEVL") in 2007, which voters may join to have an early ballot automatically sent to them 27 days before any election in which they are eligible to vote. A.R.S. §§ 16-541, 16-544, 16-542. As a result, Arizona's voters have become increasingly reliant on early voting by mail, which has helped boost the State's historically low turnout. *See* Ex. 91 (Lichtman Rpt. at 91-007-91-008). In the last presidential election, nearly 1.3 million voters in Maricopa County alone requested early ballots, and 82% of all voted early by mail. Thus, it is no surprise that these voters have also come to rely on the collection and delivery of their early ballots.

79.     Ballot collection is not only common in Arizona, but it has also guarded against the disenfranchisement of voters who do not or cannot mail their ballot in time, whatever the reason. In particular, the evidence will show that ballot collection has benefited voters in the Hispanic, Native-American, and African-American communities in Arizona. *See* Gillespie Decl. ¶ 9 (neighborhoods relying "most heavily on ballot

collection . . . [have] high population of Latino residents"); Clark Decl. ¶ 11 ("Constituencies that…. support [Democrats, including Latino voters] rely disproportionately on [ballot collection]"); Fernandez Decl. ¶¶ 9, 10 (in district next to Mexican border ballot collection important to safeguard right to vote); Quezada Decl. ¶¶ 3, 15, 22, 23 (in 80% minority district many lack secure outgoing mailbox); R. Gallego Decl. ¶ 14 ("Latino and African-American neighborhoods . . . rely heavily on" ballot collection); Ex. 19 at 29:11-30:5, 14:18-16:2 (bill problematic for Navajo Nation where mail delivery can be 45 miles away); Ex. 23 at 89:1-91:3 (collection "take[s] place in largely minority Latino, African American neighborhoods" where many lack outgoing mail); Ex. 25 at 28:1-29:10 (there are "over 30,000 people in San Luis" and "over 15,000 people in the city of Somerton, and not one . . . has a mailbox where the mail is delivered to their homes"). *See also* Gallardo Decl. ¶¶ 5, 16-18, 21; Parraz Decl. ¶¶ 6, 8; Friend Decl. ¶ 7; Pstross Decl. ¶ 5; Clark Decl. ¶¶ 14, 15; Chapman Decl. ¶¶ 2-8; Larios Decl. ¶¶ 9-11; Gillespie Decl. ¶ 5; K. Gallego Decl. ¶¶ 3, 10; Quezada Decl. ¶ 20; R. Gallego Decl. ¶ 12; Ex. 17 at 74:1-16, 51:7-17, 60:18-61:14; Ex. 21 at 39:2-41:15. Indeed, it is precisely because of the on-going socioeconomic disparities and circumstances resulting from Arizona's long history of discrimination, *see* discussion *supra*, that these minority groups both benefit from and disparately use ballot collection.

80. For example, the evidence in this case will show that many minority voters live in communities without secure mailboxes, or without outgoing mail service at all; and lack reliable transportation to vote in person or deliver the ballots themselves; or have economic or personal circumstances—including limited flexibility in taking off of work— that make ballot collection particularly important to their exercise of the franchise. Ex. 97 (Rodden Second Rpt. at 97-057 ) (finding that 86% of non-Hispanic white registered voters but only 80% of Hispanic and 18% of Native American registered voters have home mail service); Ex. 98 (Rodden Second Reply Rpt. at 98-018) (87% of whites on the PEVL has mail delivery compared to 26% of Native Americans); *see also* Ex. 91 (Lichtman Rpt. at 91-042)(16% of African Americans, 8.4% of Hispanics and 17.1% of

Native Americans in Arizona lack access to a vehicle compared to 5.5% of whites); Ex. 95 (Rodden Rpt. at 95-065)(4.7% of non-Hispanic white households, 9.1% of Hispanic households, and 13.8% of African-American households do not have access to an automobile); Ex. 97 (Rodden Second Rpt at 97-058)("on the largest reservations, more than one in every five households does not have access to a vehicle. In some Census tracts, one in every four households lacks access to an automobile"); Ex. 98 (Rodden Second Reply Rpt. at 98-016)("Lack of mail access and lack of vehicle access conspire to make voting difficult on Native American reservations."); Quezada Dec. ¶ 20; Clark Dec. ¶ 14. In particular, in Yuma County the predominantly Hispanic areas of San Luis, Somerton, and Wellton all lack home delivery and residents must rely on delivery to post office boxes to receive their mail. 6/13/17 Pouquette Dep. 18:23-20:4; Fernandez Dec. ¶ 9. *See also* Ex. 19 8:21-10:22 ("tens of thousands" of residents without home mail delivery). In San Luis, for example, there are 12,498 post office boxes, but no home mail delivery, and in Somerton, 2,500 residents only receive mail via a post office box. Fernandez Decl.¶¶ 15, 17; Ex. 19 23:1-24:9. In both of these areas residents require transportation to access their mail and, as a result, often can only go once a week—many times sending friends or family members to retrieve their mail for them. 5/16/17 Fernandez Dep. 31:6-7; 81:6-9, 127:5-11; Clark Dec. ¶ 14; Ex. 21 35:15-36:6. Likewise, as Senator Quezada will testify, while a lack of outgoing mail is a clear problem for rural minority voters, unsecure mailboxes remain an impediment for urban minorities. Quezada Dec. ¶ 22; 5/19/17 Quezada Dep. 76:17-77:15. And, moreover, many minority voters distrust the mail service, and would prefer to give their ballot to a trusted volunteer. 7/14/16 Healy Dep. 97:18-24; Healy Dec. ¶ 23; R. Gallego Dec. ¶ 8; 6/21/17 Scharff Dep. 92:8-17; K. Gallego Dec. ¶ 10.

81. With respect to the Native American community in particular, Dr. Rodden has explained, "[t]he extent to which rural Native American lack mail service is quite striking." Ex. 97 (Second Rodden Rpt. at 97-057). "[T]he majority of Native American in non-metropolitan Arizona do not have residential mail service." *Id.* Indeed, "[o]nly 10 percent of Native American registered voters have home mail delivery. . . . [t]he rate at

which registered voters have home mail service is over 350 percent higher for non-Hispanic whites and for Native Americans." *Id.* As such, most Native American registered voters must travel to a town to retrieve their mail, "[y]et the rates of vehicle access are quite low." "[M]ore than one in every five households does not have access to a vehicle [, and i]n some Census tracts, one in every four households lacks access to an automobile." *Id.* at 58. Moreover, Dr. Rodden reports that rates of disability are high, with "17 percent of Native Americans [] disabled in Apache County, 22 percent in Navajo County, and 30 percent in Coconino County." *Id.* at 60. Further, "11 percent[of individuals] have ambulatory difficulties in Apache County, 13 percent in Navajo County, and 12 percent in Coconino County, all of which contain significant Native American populations and reservations." *Id.* Dr. Rodden concludes that, as a result, the loss of ballot collection (and here, the simple ad hoc means of allowing your neighbor to turn in your ballots) burdens Native American voters. Ex. 97 (Second Rodden Rpt. at 97-060)("for many Native Americans living in rural locations, especially on reservations, voting is an activity that requires the active assistance of friends and neighbors.")

82.     Similarly, the record reflects that a lack of mail access and transportation is not limited to Apache County or the Navajo Nation. Approximately 1,900 member of the Tohono O'odham Nation cannot receive home mail delivery. Fernandez Decl. ¶ 17; 5/16/17 Fernandez Dep. 126:10-127:11. Indeed, "[the Tohono O'odham postmaster] said that [banning ballot collection via H.B. 2023] would probably hurt a lot of people because they don't check their boxes on a daily basis because they live miles and miles away from the post office." Fernandez Decl. ¶ 17; *see also* 5/16/17 Fernandez Dep. 127:5-11; Ex. 21 35:15-36:6 (voters may be 40 miles away from nearest post office and check mail infrequently). Further, "they don't have mass transit. There isn't a taxi service there." Fernandez Decl. ¶ 17. This is also true of the Cocopah Indian Nation as well as Gila Bend (1150 post office boxes). Fernandez Decl. ¶ 17. *See also* 5/16/17 Fernandez Dep. 127:20-25 (Cocopah Reservation is 11 miles from Post Office). Thus, the prohibition on ballot

1   collection makes it more difficult for members of these communities to personally return

2   their voted early ballots in time to be counted.

3          83.    To cast an early ballot, the ballot, together with a signed affidavit, may be

4   deposited in the mail or at any polling place in the county. The ballot must be *received* by

5   7:00 p.m. on Election Day to be valid; a postmark is not sufficient to render a mailed

6   ballot timely. A.R.S. § 16-548. As the evidence demonstrates, while all voters have

7   difficulty understanding this deadline and ensuring that their ballots are received on time;

8   6/13/17 Pouquette Dep. 24:56-22; 5/15/17 Pstross Dep. 41:24-42:17, minority and low-

9   income voters are more likely to lack familiarity with the voting process, and thus be

10  unaware of the deadline, or how to complete or submit an early ballot. Parraz Decl. ¶ 6;

11  Gillespie Decl. ¶ 5; Pstross Decl. ¶ 5; Friend Decl. ¶ 7; Chapman Decl. ¶¶ 2-8; Danley

12  Decl. ¶ 5; Ex. 14 at 48:14-18. *See also* 6/13/17 Pouquette Dep. 26:18-27:1 (all mail from

13  Yuma is sent to Phoenix before it reaches its destination which causes delays). Ballot

14  collection has also helped protect elderly and disabled voters. Gillespie Decl. ¶ 5; Pstross

15  Decl. ¶ 5; Friend Decl. ¶ 11; Anderson Decl. ¶¶ 6, 11; K. Gallego Decl. ¶¶ 11, 12, 14;

16  Quezada Decl. ¶ 12; Ex. 17 at 51:14-17; Ex. 23 at 91:4-21; Ex. 27 at 2:21-3:19; *see also*

17  Ex. 97 (Second Rodden Rpt. at 97-060)(discussing rates of disability among Native

18  Americans).

19  **V.    ARIZONA'S BAN ON BALLOT COLLECTION WAS ENACTED WITH**

20         **DISCRIMINATORY INTENT**

21        **A.    Historical Attempts to Restrict Ballot Collection**

22         84.    As ballot collection and delivery has become increasingly popular among

23  and necessary for Arizona's minority—and predominantly Democratic—voters,

24  Republican legislators have had a powerful incentive to repeatedly try to restrict the

25  practice and, indeed, they have done so. Ex. 91 (Lichtman Rpt. at 91-052-53); Ex. 92

26  (Lichtman Rebuttal Rpt. at 92-002-10); Ex. 93 (Second Lichtman Rpt. at 93-002-41-3);

27  *see also* Ex. 89 (Berman Rpt. at 89-024).

28

85.     **_S.B. 1412_**. The first attempt to restrict ballot collection was in 2011, when the Arizona Legislature passed Senate Bill 1412 ("S.B. 1412"). Ex. 2 at 2-2-002; 2-083-86 Ex. 91 (Lichtman Rpt. at 91-005-6); Gallardo Decl. ¶¶ 6-12.  S.B. 1412 was sponsored by Senator Don Shooter, a Republican from Yuma County, and the bill attempted to criminalize the personal delivery of another voter's ballot. Ex. 2-006-7; 2-009-11; 2-013-15; 2-017-20; 2-024; 2-028; Ex. 91 (Lichtman Rpt. at 91-006). During legislative hearings at the Judiciary Committee on February 14, 2011, Senator Shooter stated that he had proposed the bill in the aftermath of his narrow reelection victory in the 2010 general election, when he was upset to learn that his opponent had deployed union volunteers to help voters sign up for the PEVL in the heavily Hispanic, Democratic-leaning towns of San Luis and Somerton. Gallardo Decl. ¶ 6. Senator Shooter claimed that union members delivered "six or seven thousand early ballot requests [PEVL sign-up forms]" during the 2010 general election. *Id*. Although he offered no link between PEVL sign-up forms and ballots themselves—and indeed a representative from the Arizona Association of Counties confirmed that there was no link between the targeted behavior and the law at all—Sen. Shooter declared that ballot collection should be prohibited to stop "people from Pittsburgh" flying in to stuff "six thousand ballots in [their] trunks." *Id*. ¶¶ 6-8. Nonetheless, the Senate Judiciary Committee gave S.B. 1412 a "do pass" recommendation to the Committee of the Whole (the entire legislative body), by a vote of 6-2, with all six Republicans voting for the bill and the only two Democrats voting against. *Id.* ¶ 11; Ex. 2 at 2-029-40.

86.     Importantly, outside of these examples Sen. Shooter offered no other examples of actual incidents of voter fraud in connection with ballot collection to the legislature at all as S.B. 1412 proceeded through the committee process. The transcript of the March 17, 2011 House Committee on the Judiciary meeting in which Sen. Shooter spoke about the bill reveals that he spoke in detail only of the "SEIU members"; while he did state that there were other "shenanigans" taking place in Yuma County, he provided no examples thereof. Ex. 3 at 6:8-7:6. And Sen. Shooter has confirmed since then that the

reference to "shenanigans" did not refer to confirmed incidents of voter fraud—and, indeed, there are none in connection with ballot collection—rather, the reference was to anecdotal stories of ballot tampering that were not only never confirmed but were *already* prohibited by law prior to SB1412's passage. Shooter Dep. 20:17-19, 56:6-15; *see also* A.R.S. §§ 16-1005(A)-(F); Gallardo Decl. ¶ 9 (describing former Maricopa County Elections Director's testimony that bill was "unnecessary," fraud was "very, very rare" and explaining that Recorder's office takes numerous precautions against ballot fraud such as signature matching, visual inspection, and contacting the voter if a ballot appears to have been tampered with). Indeed, in that same meeting even the Secretary of State conceded when asked if there had ever been any problems associated with ballot collection that he could speak only to "perceived problem[s]," and could provide no examples of confirmed voter fraud in connection with ballot collection. Ex. 3 at 20:10.

87.     Despite the lack of evidence of voter fraud of any kind provided in support of the bill, S.B. 1412 was enacted and subsequently became law on April 13, 2011, after which it was codified as A.R.S. § 16-1005(D). In its final form, S.B. 1412 required any person who delivered more than ten early ballots to provide a copy of his or her photo identification to the elections official. Ex. 2 at 2-016-19. If a person could not produce a copy of his or her photo identification, the elections official was directed to record the information directly from the identification that the voter had on his or her person. *Id.* Within 60 days of each election, the amendment required the Secretary of State to compile a public statewide report listing the identities and personal information of ballot collectors. *Id.* This later provision replaced the criminal penalties that had initially been proposed with the bill. *Id.*; *see also* Ex. 91 (Lichtman Rpt. at 91-006-7); Gallardo Decl. ¶ 13.

88.     Although no evidence of actual incidents of voter fraud in connection with ballot collection was presented to the legislature at the time of S.B. 1412's proposal and passage, Sen. Shooter and representatives of the Secretary of State's Office have since asserted that S.B. 1412 was motived by allegations of ballot tampering and fraud that were published in a newspaper in Yuma County, as well as by anomalies that the Secretary of

State's Office discovered in absentee ballot signature matches in connection with the 2010 election. *See* Ex. 354; Ex. 356; Exs. 333-337; *see also* Ex. 81. These explanations, however, are reflected nowhere in the contemporaneous legislative record and appear to be post hoc rationalizations.

89.    In 2011, when A.R.S. § 16-1005(D) became law, Arizona was still subject to preclearance under Section 5 of the Voting Rights Act. Ex. 91 (Lichtman Rpt. at 91-006-7); Gallardo Decl. ¶ 14.  Accordingly, the provisions of A.R.S. § 16-1005(D) could not go into effect until the law had been precleared by DOJ or a federal court. Ex. 91 (Lichtman Rpt. at 91-006-7); Gallardo Decl. ¶ 14. The Arizona Attorney General submitted A.R.S. § 16-1005 for preclearance on April 26, 2011. Ex. 41. On June 27, 2011, DOJ precleared all provisions of A.R.S. § 16-1005 *except* for the provision regulating ballot collection in subsection (D). Ex. 91 (Lichtman Rpt. at 91-006-7); Gallardo Decl. ¶ 15. As to that provision, DOJ stated that "the information sent [wa]s insufficient to enable us to determine that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group." Ex. 41 at 41-002. The letter then asked for information and stated that "if no response is received within sixty days of this request, the Attorney General may object to the proposed changes." *Id.* at 41-002.

90.    Rather than respond to DOJ's request for more information, the Attorney General chose to voluntarily withdraw the submission regarding ballot collection on July 28, 2011, Ex. 42; Ex. 91 (Lichtman Rpt. at 91-006-7); Gallardo Decl. ¶ 15, rendering the law unenforceable. Ex. 91 (Lichtman Rpt. at 91-006-7); Gallardo Decl. ¶ 16. In 2012, Republican Representative Kimberly Yee introduced H.B. 2033, an omnibus bill that included a quiet repeal of A.R.S. § 16-1005(D). Ex. 5; Gallardo Decl. ¶ 16. The repeal passed in the waning days of the legislative session, on April 30, 2012. Ex. 5; Gallardo Decl. ¶ 16. It was signed into law by Governor Brewer on May 15, 2012. Ex. 5; Gallardo Decl. ¶ 16. "Of 773 preclearance submissions this was one of only 6 that were fully or partially withdrawn in Arizona." Ex. 91 (Lichtman Rpt. 91-7).

91.     And, indeed, there is little question as to why Arizona withdrew its preclearance submission. While the State will argue that the submission was withdrawn in an effort to ensure that Arizona would be able to petition for a bailout from the entire preclearance process, DOJ's preclearance file, which will be supported by the testimony of John Powers, the attorney who created the file, demonstrates that State Elections Director Amy Bjelland (who worked with Secretary of State ("SOS") staff and the bill sponsor, Sen. Don Shooter, to draft S.B. 1412) admitted to DOJ that S.B. 1412's ballot collection restrictions would burden voters and that the SOS's office was worried about how such burdens would be viewed by DOJ. 4/28/2017 Chan Dep. at 73:18-74; *see also* Ex. 82.

92.     Rep. Ruben Gallego further explained to DOJ that "[t]he percentage of Latinos who vote by mail exploded" in 2010 because "municipalities . . . reduced their number of polling places and physical early voting locations" and "[t]his sudden increase in the Hispanic community's use" of vote by mail "caused Republicans to raise accusations of voter fraud," though the claims were revealed to be "baseless." Ex. 82 at 82-002. He also explained that S.B. 1412 was "meant to target Hispanic voters who are less familiar with the vote by mail process and are more easily intimidated due to the anti-Latino climate in the state." *Id.* Rep. Gallego described "the atmosphere in Arizona [as] scary" and advised that "[a]nti-immigrant and anti-Latino sentiment is stronger than ever." *Id.* He explained, "since Hispanics have come to voting by mail later . . . they are less comfortable with the process and more likely to be dissuaded from using it than others," and "[g]iven that Latinos often do not have as easy access to transportation . . .  minority voters who are negative[ly] affected by this law will not be able to mitigate its effects as easily [as] others." *Id.* He also advised S.B. 1412 could hurt Native American voters. *Id.* His report to DOJ and testimony is consistent with the testimony of numerous witnesses who will be presented at trial. *See* discussion *supra* at Section IV, B.

93.     **_H.B. 2305_**. In 2013, Republican legislators again tried to restrict ballot collection with the enactment of H.B. 2305, which banned partisan ballot collection and

required other ballot collectors to complete an affidavit stating that they had returned the ballot. Ex. 7; Ex. 91 (Lichtman Rpt. at 91-007-10); Gallardo Decl. ¶ 19. Violation of the law was a misdemeanor. Ex. 7; Ex. 91 (Lichtman Rpt. at 91-10); Gallardo ¶ 19. Councilman Gallardo recalls that the ban would have had an extensive impact on low-income and minority voters in the state and that discussion of the ban was occasionally tinged with racial appeals, with at least one of his colleagues speaking out against a "well-known Latino advocacy organizations" and "saying that they 'hire illegals' to 'harvest ballots.'" Gallardo Decl. ¶ 19; *see also* R. Gallego Decl. ¶ 14 (discussing impact of bill on minority voters). HB 2305 was passed along nearly straight party lines in the waning hours of the legislative session. Ex. 7; Ex. 91 (Lichtman Rpt. at 91-10); Gallardo Decl. ¶ 19; R. Gallego Decl. ¶ 15 (discussing partisan motivations behind HB 2305 and targeting of minority voters).

94.    Shortly after its enactment, citizen groups organized a referendum effort and collected more than 140,000 signatures to place H.B. 2305 on the ballot for a straight up-or-down vote. Ex. 91 (Lichtman Rpt. at 91-011); Gallardo Decl. ¶ 20. Had H.B. 2305 been repealed by referendum, the Legislature could not have enacted related legislation, except on a supermajority vote and to "further[] the purposes" of the referendum. ARIZ. CONST. art. 4, pt. 1, § 1(6)(C), (14). To avoid that outcome, Republican legislators again repealed their own legislation along party lines. Ex. 91 (Lichtman Rpt. at 91-011); Clark Decl. ¶ 8; Fernandez Decl. ¶ 11; Quezada Decl. ¶ 13; Gallardo Decl. ¶ 19.  The bill's primary sponsor, then-Senator and now Secretary of State Michele Reagan, admitted publicly that their goal was to break the bill into smaller pieces and reintroduce individual provisions "a la carte." Ex. 91 (Lichtman Rpt. at 91-011); Ex. 106; 5/22/2017 Reagan Dep. at 67:25 – 68:13. This they did in the 2015 legislative session, although that effort to restrict ballot collection died in committee. *Id.*

**B.    The Passage of H.B. 2023**

95.    In 2016, Republicans made a final—and this time successful—attempt to ban ballot collection, when Representative Michele Ugenti-Rita introduced H.B. 2023 to

the Arizona House of Representatives on January 11, 2016. Ex. 16 at 16-050; Ex. 91 (Lichtman Rpt. at 91-011). H.B. 2023 imposes harsher penalties than its predecessors, making the "knowing[] collect[ion] of voted or unvoted early ballots from another person … a class 6 felony," punishable by up to a year in jail and $150,000 fines. Ex. 16 at 16-043; Ex. 91 (Lichtman Rpt. at 91-012). H.B. 2023 provides only limited exceptions for individuals collecting the ballots of family and household members, caregivers, and the election and mail workers who handle ballots by trade, but the activists, friends, and neighbors who have provided this assistance to voters for years, as well as political parties and campaigns, face criminal penalties if they attempt to assist voters in this way. *See* Ex. 16 at 16-006-8.

96.     On January 25, 2016, H.B. 2023 was heard by the House Elections Committee. Ex. 16 at 16-048. The Committee heard over two hours of public testimony on the bill, none of which indicated that there was any evidence of fraud in the ballot collection process and much of which indicated that this practice was used heavily by Arizona's minority communities. *See generally* Exs. 17, 18. Despite the lack of evidence that criminalizing ballot collection was necessary or even rational, the Committee voted to allow H.B. 2023 to move to the floor for a vote. Ex. 16 at 16-002. The vote was 4-2 along party lines, with Republicans in favor of the bill. *Id.* at 16-002. On February 4, 2016, the Arizona House of Representatives passed H.B. 2023 with thirty-four voting for the measure and twenty-three voting against. Ex. 16 at 16-038. The vote was split along party lines; every Republican supported the bill with one exception, and all Democrats opposed. Ex. 16 at 16-038.

97.     Upon reaching the Senate, H.B. 2023 was referred to the Senate Government Committee. Ex. 16.   On February 24, 2016, the Senate Government Committee voted to allow the bill to proceed to a floor vote. Ex. 16. They gave the bill a "do pass" recommendation, with four members voting for the recommendation and three members voting against. Ex. 16. Committee Members Martin Quezada-D, Lupe Chavira Contreras-D, and Robert Meza-D voted against the measure. Ex. 16. All three are

Hispanic. Once the bill reached the Senate Floor, Senator Andrew Sherwood-D moved to reduce the penalty to a misdemeanor, but could not garner sufficient votes. Ex. 16 at 16-022-23.

98.     Throughout the entire legislative process, Democratic members of both the Senate and the House repeatedly spoke against the bill, arguing that it "disproportionately affects certain populations and makes it more difficult for those citizens to vote." Clark Decl. ¶¶ 9, 14. In the House, Rep. Fernandez emphasized the impacts on rural minority communities, urging legislators "to consider voters in places like San Luis," who do not have mail delivery. Fernandez Decl. ¶ 14; *see also id.* ¶¶ 4, 9, 13. She reported that in San Luis there are 12,498 post office boxes, but no home mail delivery, and 1,900 of the Tohono O'odham Nation's members cannot receive home delivery. Fernandez Decl. ¶ 15; *see also id.* at ¶ 17; Ex. 19 at 20:6-19. She further stated H.B. 2023 would hurt voters "miles and miles away from the post office" who check their boxes "weekly or . . . biweekly." Fernandez Decl. ¶ 15; Ex. 19 at 17:1-22. "[T]hey don't have mass transit [and] [t]here isn't a taxi service. There aren't . . . blue boxes . . . where you can drop your mail." Fernandez Decl. ¶ 15; Ex. 19 at 18:1-6.

99.     Rep. Larkin-D testified that his "district is 55 percent Latino" and it has "families that actually hold two, three jobs just to make ends meet. And so a lot of times what I have found is that those ballots often get left on the kitchen table or they don't get it in the mail fast enough and they're very gracious that, you know, I would go out there and pick up their ballot for them." Ex. 17 at 74:1-14.  Representative Mark Cardenas-D explained that the "people in [his] district who ha[d] recently received -- or have been educated about how to vote and the process" were "going to [be left] out in the cold" if H.B. 2023 passed. Ex. 21 at 48:10-18. And Rep. Montenegro stated that he thought "the Latino vote [was] being oppressed" by the bill.  Ex. 17 at 80:9-15.

100.   In the Senate, Sen. Quezada explained that ballot collection "take[s] place in largely minority Latino, African American neighborhoods. These are the people that need this assistance the most." Ex. 23 at 89:1-91-3; *see also* Quezada Decl. ¶¶ 2, 15, 19, 20.

And Senator Lynn Pancrazi-D also spoke out against the bill, stating that some rural residents of her district do not receive home delivery of their mail and are therefore unable to rely on mail services to transmit their ballot to and from their home. Ex. 25 at 27:21-28:7.

101.   In response to such evidence of burdens on Arizona voters generally, and Arizona minority voters in particular, Rep. Ugenti-Rita dismissed these concerns as "not my problem." Ex. 19 at 32:6-7. When Rep. Fernandez, a representative of Native-American communities, described "what it's like to live … sometimes 40 miles away from the nearest post office box," and advised that "over 10,000" voters could be disenfranchised, many legislators *laughed*. Ex. 19 at 35:15-37:18; *see also id.* at 37:6-15 ("The convenience of having a car and taking your kids to school is not afforded to everybody, Ms. Ugenti-Rita…. The convenience of walking to a post office is not afforded to everybody. The fact that you can open your front door … and … leave … mail there and somebody will pick it up is not afforded to everybody. Please understand that it's so different.") (Rep. Fernandez). H.B. 2023 proponents repeatedly characterized these voters as lazy, desiring "special treatment," or not taking "responsibility": Rep. Ugenti-Rita stated that "[t]hey certainly take care of themselves in other situations, so I don't know why we have to spoon-feed and baby them over their vote." Ex. 23 at 81:21-82:1.

102.   Moreover, despite the fact that the bill purported to address voter fraud, its backers could not identify a single, concrete example of fraud that it could have prevented. *See* Clark Decl. ¶ 12; Anderson Decl. ¶ 10; Quezada Decl. ¶¶ 14, 15, 19; Ex. 19 at 69:1-7, 69:14-70:11, 74:7-12; Ex. 21 at 21:2-15, 27:5-7, 30:13-22, 37:8-38:7, 43:3-13; Ex. 27 at 35:7-15, 37:5-39:1, 43:3-8; *see also* Ex. 91 (Lichtman Rpt. 91-016-91-20). For example, Representative J.D. Mesnard stated that it was irrelevant whether fraud was actually occurring because "what is indisputable is that many people believe it is happening." Ex. 17 at 125:16-18 (Rep. Mesnard). Bill sponsor Rep. Ugenti-Rita stated in response to the question of what problem H.B. 2023 was meant to address that "[t]his bill doesn't reference fraud. This bill doesn't tackle that. This is about -- this is about an activity that

could potentially lead to that" Ex. 17 at 83:15-18; *see also* Ex. 23 at 36:11-14 ("Again, this doesn't -- there's not fraud in this bill. It doesn't directly address fraud. It almost indirectly addresses it."). Sen. Steve Farley-D stated that there had never been a documented case of anyone actually picking up someone else's ballot and then failing to deliver it to elections officials, explaining that "[t]he problem we're solving is that one party is better at collecting ballots than the other one." Ex. 25 at 35:17-18. Indeed, the only examples of fraud provided were references to hypothetical situations and conjecture, with two most concrete examples referenced—a video of a man of Hispanic decent delivering ballots and allegations by Sen. Shooter that "fraudsters" used microwaves to open ballots—being either wholly legal or completely disproven. Ex. 91 (Lichtman Rpt. at 91-017-20); *see also* Ex. 121; Quezada Decl. ¶ 19.

103.   Moreover, when Rep. Clark proposed an amendment which would have addressed concerns of fraud, but reduced burdens placed on voters by permitting ballot collection if the voter and collector signed an affidavit affirming the ballot was collected with the voter's permission, it was voted and sealed when collected, and the collector will deliver it on or before Election Day, it was rejected by the Republican majority. *See* Ex.16 at 16-037; Ex. 19 at 7:6-25:10; Clark Decl. ¶ 15; Fernandez Decl. ¶ 16; *see also* Ex. 91 (Lichtman Rpt. at 91-012). Similarly, the Republican majority also rejected an amendment by Senator Quezada that would have allowed collection if there was a tracking receipt. Quezada Decl. ¶ 16; Anderson Decl. ¶ 10; Ex. 16 at 16-054; *see also* Ex. 91 (Lichtman Rpt. at 91-012). During the discussion about that amendment, Sen. Quezada asked Rep. Ugenti-Rita whether the bill addressed specific cases of fraud.  She failed to respond specifically, and he pressed: "[T]he answer then is no, there are not any substantive situations that we can point to and say this has happened. You're saying it's a preventative measure to prevent it from happening because there's a possibility that it might happen?" Ex. 23 at 34:12-35:8, 36:3-8. Rep. Ugenti-Rita responded: "Right … being in possession of another person's ballot can lead to fraud…. [HB2023] doesn't directly address fraud…. [B]allot fraud, electoral fraud, is already addressed all over this … statute." *Id.* at 36:9-17.

1    Amendments reducing the penalty for ballot collection to a misdemeanor, and allowing

2    for early ballots to be counted if they were postmarked on or before Election Day were

3    also rejected. Quezada Decl. ¶¶ 16, 21; Ex. 25 at 14:11-20:14, 21:4-34:15.

4        104.   On February 4, 2016, the House passed HB2023 with 34 voting for, 23

5    against. Ex. 16 at 16-033. The vote was split along party lines; all Republicans save one

6    supported, all Democrats opposed. *Id.* On March 9, it passed the Senate on a party line

7    vote and was signed into law by the Governor hours later. *See* Clark Decl. ¶ 9; Fernandez

8    Decl. ¶ 18; Quezada Decl. ¶ 17.

9        **C.    Ballot Collection Fraud Is An Insufficient Justification**

10       105.   H.B. 2023's supporters and the supporters of its predecessor bills purport

11   that a ban on ballot collection is justified because it prevents voter fraud. Nevertheless, as

12   demonstrated above, not one concrete example of voter fraud was provided by or to the

13   legislature in support of any of the ballot collection ban bills. *See* discussion *supra* at

14   Section V, B. Further, no Arizona county has produced any evidence of confirmed ballot

15   collection fraud in response to subpoenas and the Attorney General's Office has not

16   produced such information. Ex. 44; Ex. 65. Rather, the only information regarding voter

17   fraud that has been produced in this case, *see* Exs. 372 and 333-37,  shows that after

18   investigation by the county attorney, in one instance, and the FBI in another, no

19   prosecution could result. Ex.372-0001 ("Subsequent investigation has failed to uncover

20   sufficient evidence to support bringing any enforcement actions regarding" complaints of

21   fraud in Pima County); Ex. 81 (FBI document concluding that allegations of fraud in

22   Yuma County did not warrant further investigation); 5/9/2017 Nelson Dep. Tr. 113:7-

23   155:16 (no complaints of voter fraud in Pima County); 5/4/2017 Spencer Dep. Tr. 31:21-

24   15 (no fraud in connection with ballot collection); 6/8/2017 Ugenti-Rita Dep. Tr. 114:23-

25   115:20 (no documented cases of fraud in connection with ballot collection); 5/22/2017

26   Reagan Dep. Tr. 33:13-34:6 (no instances of fraud related to ballot collection); 4/28/2017

27   Chan Dep. Tr. 52:25-53:20 (no evidence of fraud in N. Riedel case); 6/13/2017 Pouquette

28   Dep Tr. 53:16-54:21 (accuser in N. Riedel complaint withdrew accusation). Further, as

discussed *supra*, none of these alleged instances of voter fraud are discussed in the legislative record for H.B. 2023 or its predecessor bills—and indeed, it is clear that in the case of H.B. 2023 the primary sponsor of the bill did not even know they existed—demonstrating that at most these are post-hoc rationalizations that are entitled to little weight.

106.    Further, Dr. Lichtman explains that in 2011 the Republican National Lawyer's Association ("RNLA") published a national study aimed specifically to dispel the notion that there was no fraud in the American electoral system. Ex. 91 (Lichtman Rep. at 18). Despite the goal of the study, the RNLA was unable to uncover even a single incident of voter fraud in connection with ballot collection and delivery in Arizona during the ten year period studied. *Id.* A follow up study in May 2015 also failed to uncover any fraud. *Id.* Moreover, a similar study by *The Arizona Republic* found that, out of millions of ballots cast in Maricopa County from 2005 to 2013, there were only 34 cases of fraud prosecution. *Id.* Of these, 18 involved allegations of felon voting and another 14 involved allegations of non-citizen voting. None of these cases resulted in a felony conviction. *Id.* None were reported to have involved the collection of ballots. *Id.*

107.    Moreover, all of the examples of voter fraud that the State purports to prevent with the passage of H.B. 2023—e.g., ballot tampering, vote buying, or discarding someone else's vote—were illegal prior to the passage of H.B. 2023. 6/1/2017 Shooter Dep. Tr. 51:16-52:5; 5/9/2017 Nelson Dep. Tr. 115:23-116:11. Specifically, to protect against voter fraud, Arizona law has long provided that any person who knowingly collects voted or unvoted ballots and does not turn those ballots in to an election official is guilty of a Class 5 felony, which carries a presumptive 1½ years of incarceration and a fine up to $150,000 plus surcharges. A.R.S. § 16-1005. And Arizona has long made all of the following class 5 felonies: "knowingly mark[ing] a voted or unvoted ballot or ballot envelope with the intent to fix an election"; "receiv[ing] or agree[ing] to receive any consideration in exchange for a voted or unvoted ballot"; possessing another's voted or unvoted ballot with intent to sell; "knowingly solicit[ing] the collection of voted or

1    unvoted ballots by misrepresenting itself [sic] as an election official or as an official ballot

2    repository or . . . serv[ing] as a ballot drop off site, other than those established and staffed

3    by election officials"; "knowingly collect[ing] voted or unvoted ballots and . . . not

4    turn[ing] those ballots in to an election official…or any…entity permitted by law to

5    transmit post," A.R.S. §§ 16-1005(a)-(f). In addition, ballot return envelopes must be

6    "tamper evident when properly sealed." A.R.S. § 16-545. Thus, voter fraud is simply not

7    adequate to justify the implementation of H.B. 2023, particularly where the record is

8    replete with examples of concrete, severe burdens that the loss of ballot collection places

9    on voters. *See* discussion *supra* at Section IV, B.

10    **D.    Chain of Custody Is An Insufficient Justification**

11    108.    Somewhat related to its voter fraud argument, the State argues that H.B.

12    2023 was justified by the desire to create a chain of custody for early ballots, again,

13    protecting them from potential voter fraud and addressing the perception that such voter

14    fraud exists. *See, e.g.*, Shooter Dep. at 38:17-35; Ex. 17-083:15-18 (Ugenti-Rita statement

15    that "[t]his bill addresses the collection of ballots. You keep referencing fraud. This bill

16    doesn't reference fraud. This bill doesn't tackle that. This is about - this about an activity

17    that could potentially lead to that."); Ex. 17-125:16-18 (Rep. Mesnard statement that "[t]o

18    me, this comes down to integrity. You can believe there's fraud happening or not, but

19    what is indisputable is that many people believe it's happening."); Ex. 23-036:11-14

20    (Ugenti-Rita statement that "Again, this doesn't -- there's not fraud in this bill. It doesn't

21    directly address fraud. It almost indirectly addresses it.").  Nevertheless, not only is this

22    justification absent from the legislative history for H.B. 2023 and its precursor bills, but if

23    it had been a concern, it would have been directly addressed by the amendments posed to

24    H.B. 2023 by Rep. Clark and Sen. Quezada. Shooter Dep. at 50:21-23; Ex. 91 (Lichtman

25    Rpt. 91-012); 5/16/2017 Clark Dep. Tr. 95:9-96:6. In contrast, in its current form, H.B.

26    2023 does not require that any record of ballot of collection is kept at all, failing to create

27    any chain of custody. 5/22/2017 Reagan Dep. Tr. 83:24-85:20., *see also* Hood Dep. at

28    309:7-10, 15-20; 312:7-9 (discussing lack of written record for collected ballots), and,

moreover, it is not being enforced by county recorders at all. Ex. 526 (Hood Rpt. at 5, n. 15); 8/7/2017 Hood Dep. Tr. 309:21-310:7; 5/9/2017 Nelson Dep. Tr. 103:22-23("[T]here was no enforcement of [H.B. 2023" in 2016.); Ex. 75 (email from Pinal County Elections Director stating "we have come to the consensus that this law does not apply to election officials and therefore we are taking no action at all"). And given that county recorders will accept all ballots, not only is no chain of custody created, but no fraud is prevented at all. *See* Shooter Dep. 73:21- 75:9 (noting that persons listed in H.B. 2023 exceptions could still tamper with ballots); 5/5/2017 Spencer Dep. Tr. 41:4-41:7).

### E.    Voter Confidence Is Also Insufficient To Justify H.B. 2023

109.    Supporters of H.B. 2023 as well as its precursor bills—when faced with no evidence of voter fraud in connection with ballot collection—then justified H.B. 2023 based on the perception of fraud. However, this justification is also inadequate, as the legislative record cites no evidence that this concern existed in any widespread way. Ex. 91 (Lichtman Rpt. at 19). Moreover, given that the current law does not prevent such fraud from occurring and is openly not being enforced, it is difficult to see how H.B. 2023 even purports to address those perceptions should they exist.

110.    Further, as Dr. Lichtman explains, social science research shows "that the implementation of restrictive voting laws may lead to *decreases* in voter confidence." Ex. 93 (Second Lichtman Rpt. at 7) (emphasis added). In research conducted on measures such as photo voter ID law, which, similar to H.B. 2023 are justified as a means of increasing voter confidence by combating fraud or the perception thereof, such laws do not increase voter confidence but, rather, have a negative relationship with voter confidence. *Id.* Of 8 states that have adopted and implemented such laws by 2014, voters in 7 states had *less confidence* than the national average that votes in their city or county would be fairly counted." *Id.*

# PROPOSED CONCLUSIONS OF LAW

## I.    THE VOTING RIGHTS ACT

### A.    Legal Standard

111.   "Section 2(a) of the VRA prohibits states from imposing any voting qualification that 'results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.'" *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (quoting 42 U.S.C. § 1973(a)). "A violation of section 2 is established 'if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation' by members of a protected class, 'in that its members have less opportunity than other members of the electorate [1] to participate in the political process and [2] to elect representatives of their choice.'" *Id.* (quoting § 1973(b)).   Thus, a plaintiff will prevail on a Section 2 by showing that "based on the totality of the circumstances . . . the challenged voting practice results in discrimination on account of race." *Farrakhan v. Washington*, 338 F.3d 1009, 1017 (9th Cir. 2003) (emphasis omitted); *see also United States v. Blaine Cnty.*, 363 F.3d 897, 903 (9th Cir. 2004).   "[P]roving a violation of Section 2 does not require a showing of discriminatory intent, only discriminatory results[.]" *Gonzalez*, 677 F.3d at 405 (quoting *Chisom v. Roemer*, 501 U.S. 380, 383–84 (1991); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 557 (9th Cir. 1998) (per curiam)).

112.   "In applying the totality of the circumstances test, 'a court must assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors.'" *Gonzalez*, 677 F.3d at 405 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986)). "In *Gingles*, the Supreme Court cited a non-exhaustive list of nine factors (generally referred to as the 'Senate Factors' because they were discussed in the Senate Report on the 1982 amendments to the VRA) that courts should consider in making this totality of the circumstances assessment." *Id*. (quoting *Gingles*, 478 U.S. at 44–45). These so-called "Senate Factors" are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 44-45. "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other," *id.* at 45 (citation and quotation marks omitted), and this list is "neither exclusive nor controlling," *Wesley v. Collins*, 791 F.2d 1255, 1260 (6th Cir. 1986). However, these factors "may shed light on whether the two elements of a Section 2 claim are met." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 24,  240; *see also Gonzalez*, 677 F.3d at 405; *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1227 n.26 (11th Cir. 2005) (explaining that, in a vote denial claim, "courts consider a non-exclusive list of objective factors (the 'Senate factors') detailed in a Senate Report accompanying the 1982 amendments" as part of

evaluating whether, under the "totality of the circumstances," "the political processes . . . are not equally open to participation by [members of a protected class]") (alterations in original); *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 596 n.8 (9th Cir.1997) ("[T]he 'totality of the circumstances' test established in § 2(b) was initially applied *only* in 'vote denial' claims such as this.").

113.   Courts have identified several principles for Section 2 cases that are significant here.  *First*, "Section 2 applies to any 'standard, practice, or procedure' that makes it harder for an eligible voter to cast a ballot, not just those that actually prevent individuals from voting."  *Ohio State Conference of N.A.A.C.P. v. Husted*, 768 F.3d 524, 552 (6th Cir. 2014), *vacated sub nom. Ohio State Conference of The Nat. Ass'n For The Advancement of Colored People v. Husted,* No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014); *accord League of Women Voters*, 769 F.3d at 243 ("[N]othing in Section 2 requires a showing that voters cannot register or vote under any circumstance.").  This is clear from the text of the statute, which refers not only to the "denial" but also the "abridgement" of the right to vote.  52 U.S.C. § 10301(a); *see also abridge, Black's Law Dictionary 7* (9th ed. 2009) (defined as "[t]o reduce or diminish"); *Gray v. Johnson*, 234 F. Supp. 743, 746 (S.D. Miss. 1964) ("When the word [abridge] is used in connection with . . . the word 'deny', it means to circumscribe or burden.") (15th Amendment case); *Lane v. Wilson*, 307 U.S. 268, 275 (1939) (prohibition on "abridgement" of the right to vote reaches any "onerous procedural requirements which effectively handicap exercise of the franchise by [voters of color]") (15th Amendment case).

114.   *Second*, a state's previous voting practices are "centrally relevant" and "a critical piece of the totality-of-the-circumstances analysis Section 2 requires."  *League of Women Voters*, 769 F.3d at 242.  The Supreme Court has explained that Section 2 requires a "searching practical evaluation of the 'past and present reality,'" with a "'functional' view of the political process."  *Gingles*, 478 U.S. at 45 (citations omitted).   This

"searching practical evaluation" requires an examination of past practices, including whether the new law "eliminates a voting opportunity that used to exist under prior law that African Americans disproportionately used." *League of Women Voters*, 769 F.3d at 241-42 (citation and quotation marks omitted).  And, "'[t]he fact that a practice or law eliminates voting opportunities that used to exist under prior law that [minorities] disproportionately used is . . . relevant to an assessment of whether, under the current system, [minorities] have an equal opportunity to participate in the political process as compared to other voters.'"  *Id.* at 241-42 (quoting *NAACP*, 768 F.3d at 558).

115.   *Finally*, facially neutral laws can violate Section 2. As Justice Scalia has written, "[i]f, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, . . . Section 2 would . . . be violated," even though the law on its face treated all races equally.  *Chisom*, 501 U.S. at 408 (Scalia, J., dissenting).  Consistent with this principle, courts have found that several facially neutral voting practices violate or could violate Section 2.  *Stewart v. Blackwell*, 444 F.3d 843,  877-79 (use of old voting technology in predominantly minority communities); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam) (same); *Operation Push v. Allain*, 674 F. Supp. 1245, 1262-68 (N.D. Miss. 1987) (restrictions on registration), *aff'd*, *Operation Push v. Mabus*, 932 F. 2d 400 (5th Cir. 1991); *Brooks v. Gant*, No. CIV. 12-5003-KES, 2012 WL 4482984, at *7 (D.S.D. Sept. 27, 2012) (limits on early voting); *Spirit Lake Tribe v. Benson Cty.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010) (polling place closures); *Brown v. Dean*, 555 F. Supp. 502, 504-05 (D.R.I. 1982) (relocation of polling place).

**B.    Application to Case**

116.   **Senate Factors.**  At least eight of the Senate factors are present here.

117.   *First*, Arizona has a long history of official discrimination against minorities, beginning in 1912 with the exclusion Native Americans from the franchise and the enactment of literacy tests (Factor 1). This discrimination has continued since then to today in areas related to voting and the administration of elections, school segregation,

educational funding, and housing. *See generally* PFOF Section II; Ex. 89 (Berman Rpt. 89-005 – 89-024); Ex. 91 (Lichtman Rpt. 91-024-91-030).

118.   *Second*, elections in Arizona are highly racially polarized (Factor 2). From 2004 to 2014, whites on average voted 59 percent for Republican candidates, whereas Hispanics voted only 35 percent for Republicans. PFOF Section II, D; Ex. 91 (Lichtman Rpt. 91-030). The numbers are roughly the same for the 2016 elections. Ex. 93 (Second Lichtman Rpt. 93-014).

119.   *Third*, Arizona has a number of voting practices and procedures that have enhanced the opportunity for discrimination against minorities (Factor 3). These include disproportionately long lines at the polls for minorities, a citizenship requirement for persons registering through the state, and poor election administration practices by officials such as Secretary of State Michele Reagan, all of which have disproportionately impacted minorities. PFOF Section II, C; Ex. 91 (Lichtman Rpt. 91-034-91038); Ex. 93 (Second Lichtman Rpt. 93-012).

120.   *Fourth*, minorities in Arizona bear the effects of discrimination in areas such as education, employment, and health, all of which hinder their ability to participate effectively in the political process (Factor 5). The poverty rate for Hispanics and African Americans is almost twice as high compared to whites, and for Native Americans it is more than three times greater. PFOF Section II, D; Ex. 93 (Second Lichtman Rpt. 93-015) (23.4 percent of African Americans, 26.3 percent of Hispanics, and 35.5 percent of Native Americans live in poverty, compared to 11 percent of whites). Hispanics, African Americans, and Native Americans all suffer from higher rates of unemployment, and receive lower wages than whites. PFOF Section II, D; Ex. 91 Lichtman Rpt. 91-026, 91-040); Ex. 93 (Second Lichtman Rpt. 93-015); Ex. 89 (Berman Rpt. 89-007-89-008, 89-012). Whites are more likely to graduate from high school than these groups, and are almost three times more likely to graduate from college.  PFOF Section II, D; Ex. 93 (Second Lichtman Rpt. 93-016). These disparities persist throughout other key areas that

impact voting such housing and transportation, and health. PFOF Section II, D; Ex. 93 (Second Lichtman Rpt. 93-018); Ex. 97 (Second Rodden Rpt. 97-060).

121. *Fifth*, political campaigns in Arizona have been marked in recent years by racial appeals (Factor 6), such as overt racial animus aimed at gubernatorial candidate Raul Castro in the 1970's, anti-Hispanic rhetoric by Superintendent of Public Education John Huppenthal, and statements by Donald Trump in the 2016 election. PFOF Section II, D; Ex. 91 (Lichtman Rpt. 91-044-91-045); Ex. 93 (Second Lichtman Rpt. 93-019-93-020); Ex. 89 (Berman Rpt. 89-019).

122. *Sixth*, minorities are under-represented in Arizona (Factor 7). No minority holds statewide office, and only two have done so in the past 50 years (Hispanic Governor Raul Castro and African-American Sandra Kennedy, who was elected to the Corporation Commission in 2008). And, minorities comprise only 22.2 percent of Arizona's congressional delegation, compared to comprising 32.3 percent of the voting age population. Ex. 91 (Lichtman Rpt. 91-045-91-046); Ex. 93 (Second Lichtman Rpt. 93-020-93-021).

123. *Seventh*, Arizona has failed to respond to the needs of minorities (Factor 8). It has repeatedly failed adequately to fund public schools, a failure that disproportionately impacts economically disadvantaged students—who, again, tend disproportionately to be Native American, Hispanic, and African American due to the ongoing effects of discrimination. PFOF Section II, B; Ex. 91 (Lichtman Rpt. 91-046-91-047) (In 2013, "Arizona ranked 47th among the states in per-student funding for elementary and secondary education. The state provided no greater funding for high as compared to low poverty districts."). Similarly, it banned bilingual education through Proposition 203 in 2000, disadvantaging Spanish-speaking students. Ex. 91 (Lichtman Rpt. 91-047). These and others failures have manifested themselves in vast socio-economic inequalities explained above. PFOF Section II, D; *see generally* Ex. 89 (Berman Rpt. 89-005-89-021).

124.   *Eighth*, the policies underlying the challenged provisions are tenuous (Factor 9). PFOF Section V, C; Ex. 91 (Lichtman Rpt. 91-016-91-023); Ex. 93 (Second Lichtman Rpt. 93-024).

125.   **Challenged Provisions**. This evidence will establish that both elements of Plaintiffs' Section 2 vote-denial claims have been established for both HB2023 and the refusal to count OOP provisional ballots. With respect to the first element, the evidence will show that both HB2023's prohibition on early ballot collection and the complete rejection of OOP provisional ballots disproportionately [affect] Native Americans, Hispanics, and African Americans. PFOF IV, A; *See generally League of Women Voters*, 769 F.3d at 241-42 ("The fact that a practice or law eliminates voting opportunities that used to exist under prior law that [minorities] disproportionately used is . . . relevant to an assessment of whether, under the current system, African Americans have an equal opportunity to participate in the political process as compared to other voters."); *Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 906 (S.D. Ohio 2012) ("[M]inority and working class voters will be disproportionately affected by the restrictions on in-person early voting."), *aff'd*, 697 F.3d 423 (6th Cir. 2012).

126.   The second element of a vote-denial claim under the VRA is also met for each of the provisions at issue—that is, the disproportionate burdens described above are "in part . . . caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class," *League of Women Voters*, 769 F.3d at 240 (citation and quotation marks omitted). Native Americans, Hispanics, and African Americans in Arizona face severe and persistent racial disparities in socioeconomic status, PFOF Section II, D, and, as set forth above, an overwhelming number of the Senate Factors applies here. *See* COL Section I, A. This showing as to the Senate Factors is conclusive evidence that the disproportionate burdens the challenged provisions impose on Native Americans, Hispanics, and African Americans are caused by or linked to the ongoing effects of discrimination.

127.   Furthermore, the connections between the burdens imposed by the challenged provisions and the ongoing effects of Arizona's history of discrimination are clear. Minorities are less likely to have access to a vehicle or accessible mail service and more likely to work in jobs with inflexible schedules, with the result that the criminalization of ballot collection disproportionately burdens their ability to vote. PFOF Section IV, B. Similarly, due to minorities' less familiarity with the voting process and higher costs of voting, they are more likely to fail to navigate Arizona's confusing precinct-allocation system and, as a result, cast an OOP provisional ballot.

128.   For these reasons, the evidence will show conclusively that the challenged provisions are caused by or linked to the ongoing effects of the history of discrimination against Native Americans, Hispanics, and African Americans in Arizona. This evidence will therefore satisfy both elements required for a showing of a Section 2 violation.

## II.   ANDERSON-BURDICK TEST

### A.   Legal Standard

129.   In assessing whether a law unduly burdens the right to vote, courts apply a "flexible standard"—the *Anderson-Burdick* standard—pursuant to which they "must weigh: 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments …' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016), *cert. denied sub nom. Pub. Integrity All., Inc. v. City of Tucson, Ariz.*, 137 S. Ct. 1331 (2017) [check this citation – this is Gayton v. WI] (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Under this test, "the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which [the law] burdens [voting rights]," *Burdick*, 504 U.S. at 434, focusing specifically upon the voters for whom the law poses the greatest challenges. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 186, 191, 198, 201 (2008); *Pub. Integrity All.,* 836 F.3d  at 1024 n.2 ("[C]ourts may consider not only a given

law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe.").

130.   In weighing competing interests, courts cannot accept at face value vague or speculative state interests. *See Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012). Federal courts "retain[] an independent constitutional duty to review [legislative] factual findings where constitutional rights are at stake." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310 (2016). Further, the *Anderson-Burdick* test does not permit rational-basis review or burden shifting. *Pub. Integrity All.*, 836 F.3d at 1025. "However slight [a] burden [on voting] may appear, … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (quotation marks omitted).  Under these principles, both HB2023 and Arizona's complete rejection of OOP ballots are unconstitutional.

### B.   Application to Case

131.   **<u>HB2023 — Prohibition on the Collection of Early Vote Ballots</u>**. HB2023's prohibition on the collection of early vote ballots severely burdens the right to vote. Voters have long relied on the collection and delivery of early ballots in Arizona. PFOF Section IV, B.  And, this practice has been essential to enabling voters in the Hispanic, Native-American, and African-American communities to vote, voters who rely on ballot collection at disproportionately high rates due to the on-going socioeconomic disparities and circumstances resulting from Arizona's long history of discrimination. PFOF Section IV, B. For example, many minority members live in communities without viable mail service, and many others lack reliable transportation or work inflexible schedules that make ballot collection a necessary component of their means to vote. PFOF Section IV, B; *see also* Fernandez Decl.¶¶ 15, 17 (12,498 post office boxes, but no home mail delivery in Luis, and in Somerton, 2,500 residents only receive mail via a post office box); Ex. 97 (Second Rodden Rpt. 97-057-97-60) (detailing minority of lack of access to mail delivery and mail service). And, even where there is mail service, many minority voters distrust it, and would prefer to give their ballot to a trusted volunteer.

PFOF Section IV, B.  Furthermore, minority and low-income voters are more likely to lack familiarity with the voting process and the applicable deadlines or process for submitting an early ballot. PFOF Section IV, B; see also Section V, B.  Thus, the prohibition on ballot collection imposes a unique burden on members of these communities to personally return their voted early ballots in time to be counted.

132.  These burdens outweigh any benefit Arizona might have in HB2023. Defendants have no credible evidence of fraud being committed through ballot collection. Ex. 91 (Lichtman Rpt. 91-016-91-020). Nor can they show that it increases voter confidence. Ex. 91 (Lichtman Rpt. 91-020).  As a result, "the precise interests put forward by the State as justifications for the burden imposed by" HB2023 fail to justify the burdens the elimination of ballot collection imposes on thousands of its citizens. *Burdick*, 504 U.S. at 434.

133.  **OOP Ballots.** The State's practice of completely rejecting OOP ballots likewise severely burdens the right to vote. In 2012, Arizona rejected 11,000 OOP ballots. In 2014, it rejected 3,500.  PFOF Section IV, A; Ex. 95 (Rodden Rpt. 95-003). In 2016, the rate of rejected OOP ballots went down in Arizona; yet it *still* was the national leader in the rate of rejected OOP ballots. PFOF Section IV, A; Ex. 98 (Rodden Second Reply Rpt. at 98-027). "No other state comes close to this rate of rejected out-of-precinct ballots." PFOF Section IV, A; Ex. 95 (Rodden Rpt. 95-003).

134.  Furthermore, these burdens fall disproportionately on minorities. PFOF Section IV, A. As explained above, the reason for this disparity is clear. Minorities in Arizona suffer disproportionately from the socioeconomic inequalities resulting from a history of discrimination that increase their costs of voting. PFOF Section II, D; Ex. 95 (Rodden Rpt. 95-007-95-017).

135.  Furthermore, the justifications the Defendants have previously provided for this law—1) to preserve precinct based election administration, 2) avoid the partial disenfranchisement of voters, and 3) minimize the incentive for misdirection from third parties—are without merit.  As for the first of these alleged interests, Plaintiffs' evidence

1  will show that partially counting OOP ballots is entirely feasible and does not

2  meaningfully burden election administrators. PFOF Section IV, A. Twenty states plus the

3  District of Columbia authorize the partial counting of OOP provisional ballots,

4  demonstrating that there is no real administrative impediment to this practice. PFOF

5  Section IV, A; Ex. 93 (Second Lichtman Rpt. 93-024); Second, Defendants' claims that

6  *completely* disenfranchising OOP voters is better than *partially* disenfranchising them is

7  nonsensical on its face. Finally, Defendants' alleged interest in minimizing the incentives

8  for misdirection is contradicted by the fact that partial counting of OOP ballots would

9  reduce the interest third parties have in misdirecting voters. For these reasons, the

10  prohibition on counting OOP provisional ballots cannot survive scrutiny under *Anderson-*

11  *Burdick*.

12  **III.  INTENTIONAL RACIAL DISCRIMINATION**

13      **A.  Legal Standard**

14      136.  Legislation enacted with the intent to discriminate on the basis of race in the

15  voting context violates the Fourteenth and Fifteenth Amendments. *City of Mobile v.*

16  *Bolden*, 446 U.S. 55, 62, 66 (1980) (plurality opinion); *Vill. of Arlington Heights v. Metro.*

17  *Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). To establish that an action violated these

18  amendments, Plaintiffs are not required "to prove that the challenged action rested *solely*

19  on racially discriminatory purposes." *Id.* at 429 U.S. at 265 (emphasis added). "Rather,

20  Plaintiffs need only establish that racial animus was one of several factors that, taken

21  together, moved [the decision-maker] to act as he did." *Orgain v. City of Salisbury*, 305 F.

22  App'x 90, 98 (4th Cir. 2008) (citation omitted).[1]

23

---

24      [1]The Court noted in *Village of Arlington Heights* that "[r]arely can it be said that a

25  legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one," and that "it is because legislators and administrators are properly

26  concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality."

27  429 U.S. at 265. "But," the Court wrote, "racial discrimination is not just another competing consideration," and judicial deference is not justified "[w]hen there is a proof

28  that a discriminatory purpose has been a motivating factor in the decision." *Id.* at 265-66.

137.   "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights*, 429 U.S. at 266; *see also Rogers v. Lodge*, 458 U.S. 613, 618 (1982) ("[D]iscriminatory intent need not be proved by direct evidence."). *See generally Lane*, 307 U.S. at 275 (The Fifteenth Amendment "nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race."). The Supreme Court has explained that "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," and that "[t]he specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes." *Vill. of Arlington Heights*, 429 U.S. at 267 (citation omitted). "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.*   In addition, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268. And "the fact, if it is true, that the law bears more heavily on one race than another" is relevant to determination whether there was an "invidious discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 242 (1976); *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) (disproportionate impact of legislation "is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions"). Moreover, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Washington*, 426 U.S. at 242.

### B.      Application to Case

138.    First, Arizona has a long history of discriminatory measures that have made it more difficult for Native Americans, Hispanics, and African Americans to vote. From 1912, when it excluded Native Americans from the franchise and imposed literacy tests, through today, the State's history has been permeated by racial discrimination. PFOF Section II, A-C; Ex.89 (Berman Rpt. 89-005-89-024); Ex. 91 (Lichtman Rpt. 91-024-91-030). Second, the context and legislative history of the bill's enactment evinces a strong motivation for Republicans to seek partisan advantage by enacting the bill. PFOF Section V; Ex. 91 (Lichtman Rpt. 91-010-91-012).  Indeed, this motivation was confirmed by the contemporaneous statements of officials such as Arizona Secretary of State Michele Reagan and Representative Ugenti-Rita.  Ex. 91 (Lichtman Rpt. 91-013015). Moreover, this interest in gaining partisan advantage was to be achieved by suppressing the minority vote, which overwhelmingly votes Democratic. PFOF Section V; Ex. 93 (Second Lichtman Rpt. 93-004-93-011). Third, its passage was marked by a number of procedural and substantive deviations. PFOF Section V; Ex. 91 (Lichtman Rpt. 91-012-91-013). Finally, the evidence also establishes that HB2023 disproportionately impacts minority voters, who, because of the ongoing socioeconomic disparities they face, disproportionately rely on ballot collection. PFOF Section IV, B; Ex. 93 (Second Lichtman Rpt. 93-012-93-018, 93-021, 93-024); Ex. 89 (Berman Rpt. 89-023).

139.    Taken together, this evidence demonstrates that HB2023 was enacted for the purpose, at least in part, of suppressing the vote of Native Americans, Hispanics, and African Americans. *See generally Vill. of Arlington Heights*, 429 U.S. at 265 (Plaintiffs are not required "to prove that the challenged action rested *solely* on racially discriminatory purposes.") (emphasis added). They are accordingly unconstitutional under the 15th Amendment.

1

2     Dated:  September 25, 2017              *s/ Amanda Callais*

3                                            Daniel C. Barr (# 010149)
                                             Sarah R. Gonski (# 032567)
                                             PERKINS COIE LLP
4                                            2901 North Central Avenue, Suite 2000
                                             Phoenix, Arizona  85012-2788

5                                            Marc E. Elias (WDC# 442007)*
                                             Bruce V. Spiva (WDC# 443754)*
6                                            Elisabeth C. Frost (WDC# 1007632)*
                                             Amanda R. Callais (WDC# 1021944)*
7                                            Alexander G. Tischenko (CA# 304743)†
                                             PERKINS COIE LLP
8                                            700 Thirteenth Street N.W., Suite 600
                                             Washington, D.C.  20005-3960

9                                            Joshua L. Kaul (WI# 1067529)*
10                                           PERKINS COIE LLP
                                             One East Main Street, Suite 201
11                                           Madison, Wisconsin  53703

12                                           *Attorneys for Plaintiffs the Arizona
                                             Democratic Party, the DSCC, and the
13                                           Democratic National Committee*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

The undersigned hereby certifies that on September 25, 2017 a true copy of the

3

foregoing document was served via electronic mail.

4

***Attorneys for State Defendants:***

5

6

Karen J. Hartman-Tellez (#021121)
Joseph E. La Rue (#031348)

7

Kara Karlson (#029407)
Assistant Attorneys General

8

1275 W. Washington Street
Phoenix, AZ 85007

9

Telephone (602) 542-4951

10

Facsimile (602) 542-4385
karen.hartman@azag.gov

11

joseph.larue@azag.gov
kara.karlson@azag.gov

12

13

***Attorneys for Intervenor-Defendants:***

14

Brett W. Johnson (#021527)           Timothy A. La Sota (#020539)

15

Sara J. Agne (#026950)                 TIMOTHY A. LA SOTA, PLC
Colin P. Ahler (#023879)               2198 E. Camelback Road, Suite 305

16

Joy L. Isaacs (#030693)                Phoenix, Arizona 85016

17

SNELL & WILMER                         Telephone: 602.515.2649
One Arizona Center                     E-Mail: tim@timlasota.com

18

400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

19

Telephone: 602.382.6312

20

Facsimile: 602.382.6070
bwjohnson@swlaw.com

21

sagne@swlaw.com
cahler@swlaw.com

22

jisaacs@swlaw.com

23

24                                                    *s/*            *Amanda Callais*

25

26

27

28