1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Democratic National Committee, DSCC, and
   Arizona Democratic Party,                      No. CV-16-01065-PHX-DLR

10                                                **FINDINGS OF FACT**
                Plaintiffs,                       **AND CONCLUSIONS OF LAW**
11

12 v.

13 Michele Reagan and Mark Brnovich,

14             Defendants.

15

16         Plaintiffs challenge two aspects of Arizona's election system: (1) Arizona's policy

17 to not count provisional ballots cast in the wrong precinct, which derives from the

18 collective effect of A.R.S. §§ 16-122, -135, -584, and related rules in the Arizona

19 Election Procedures Manual; and (2) Arizona House Bill 2023 ("H.B. 2023"), codified at

20 A.R.S. § 16-1005(H)-(I), which makes it a felony for anyone other than the voter to

21 possess that voter's early mail ballot, unless the possessor falls within a statutorily

22 enumerated exception.  Plaintiffs allege that the challenged laws violate § 2 of the Voting

23 Rights Act of 1965 ("VRA") by adversely and disparately impacting the electoral

24 opportunities of Hispanic, African American, and Native American Arizonans, who

25 Plaintiffs claim are among their core constituencies.  Plaintiffs also contend that these

26 provisions violate the First and Fourteenth Amendments to the United States Constitution

27 by severely and unjustifiably burdening voting and associational rights.  Lastly, Plaintiffs

28 claim that H.B. 2023 violates § 2 of the VRA and the Fifteenth Amendment to the United

States Constitution because it was enacted with the intent to suppress voting by Hispanic and Native American voters.  (Doc. 360 at 4-7.)[1]  Plaintiffs seek (1) a declaration that the challenged election practices are unlawful and (2) a permanent injunction requiring Defendants to partially count out-of-precinct ("OOP") provisional ballots for races for which the voter otherwise was eligible to cast a vote and enjoining Defendants from implementing, enforcing, or giving any effect to H.B. 2023.  (Doc. 233 at 41-42.)

The Court presided over a ten-day bench trial beginning October 3, 2017 and ending October 18, 2017.  Pursuant to Federal Rule of Civil Procedure 52, and for the following reasons, the Court finds against Plaintiffs and in favor of Defendants on all claims.[2]

## I. PARTIES

Plaintiffs are the Democratic National Committee ("DNC"), the Democratic Senatorial Campaign Committee ("DSCC"), and the Arizona Democratic Party ("ADP").  The DNC is a national committee dedicated to electing local, state, and national candidates of the Democratic Party to public office.  The DSCC is a Democratic political committee dedicated to encouraging the election of Democratic Senate candidates to office and is comprised of sitting Democratic members of the United States Senate.  The ADP is a state committee dedicated to electing candidates of the Democratic Party to public office throughout Arizona.

Defendants are Arizona Secretary of State Michele Reagan and Arizona Attorney General Mark Brnovich.  Secretary Reagan is Arizona's chief elections officer.  Attorney General Brnovich is Arizona's chief legal officer, charged with enforcing state criminal statutes, including H.B. 2023 and other election-related offenses.  Secretary Reagan drafts, and Attorney General Brnovich (in conjunction with the Governor of Arizona)

---

[1] For purposes of this order, "Doc." refers to documents on the Court's electronic docket, "Ex." to trial exhibits, "Tr." to the official trial transcript, and "Dep." to designated deposition transcripts.  Record citations offer examples of supporting evidence, but are not intended to be exhaustive of all evidence supporting a proposition.

[2] Defendants' oral motion, made during trial, for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) is denied as moot.  (Doc. 384.)

approves, the Election Procedures Manual.  A.R.S. §§ 41-191 et seq, 16-1021, -452.

The Court also permitted the following parties to intervene as defendants: (1) the Arizona Republican Party ("ARP"), a state committee dedicated to electing candidates of the Republican Party to public office; (2) Debbie Lesko, who at the time of intervention was an Arizona State Senator representing Arizona's 21st legislative district and Precinct Committeewoman for Arizona's 21st legislative district, and who recently was elected to represent Arizona's 8th congressional district in the United States House of Representatives; (3) Tony Rivero, a member of the Arizona House of Representatives representing Arizona's 21st legislative district; (3) Bill Gates, who at the time of intervention served as a City of Phoenix Councilman and Precinct Committeeman for Arizona's 28th legislative district, and who now serves as a member of the Maricopa County Board of Supervisors representing district 3; and (4) Suzanne Klapp, a City of Scottsdale Councilwoman and Precinct Committeewoman for Arizona's 23rd legislative district.  (Docs. 39, 44, 56, 126.)

## II. OVERVIEW OF TRIAL TESTIMONY

### A.  Plaintiffs' Expert Witnesses

#### 1.  Dr. Allan Lichtman

Dr. Allan Lichtman is a Distinguished Professor of History at American University in Washington, D.C., where he has been employed for 42 years.  Dr. Lichtman formerly served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University.  He received his B.A. in History from Brandeis University in 1967 and his Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.  Dr. Lichtman's areas of expertise include political history, electoral analysis, and historical and quantitative methodology.  (Ex. 91 at 3-4.)

Dr. Lichtman has worked as a consultant or expert witness for plaintiffs and defendants in more than 80 voting and civil rights cases, including *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), in which Justice

Kennedy's majority opinion authoritatively cited Dr. Lichtman's statistical work.  Dr. Lichtman also has testified several times for plaintiffs and defendants on issues of intentional discrimination and application of Section 2 in VRA cases.  (Ex. 91 at 4.)

Dr. Lichtman opined, generally, that under the totality of the circumstances H.B. 2023 causes minority voters to have less opportunity to participate in the political process than non-minority voters, and that the law was passed with the intent to suppress minority voters.[3]  He supported his opinions with the standard sources used in political and historical analysis, including scholarly books, articles, reports, newspapers, voter registration and turnout data, and scientific surveys.

Dr. Lichtman's underlying sources, research, and statistical information are useful.  The surveys and data he supplied reveal significant socioeconomic disparities between non-minorities and minorities, including in areas of poverty, unemployment, education, transportation, and health.  (Ex. 91 at 3-4.)  His report also contains evidence that Arizona exhibits racially polarized voting and has a history of racial appeals in political campaigns that continue to this day.  (Ex. 91 at 30, 44-45.)  Dr. Lichtman opined that the strong ties between race and partisanship in Arizona make targeting minorities the most effective and efficient way for Republicans to advance their political prospects.  (Ex. 93 at 4-5.)

Although the Court finds Dr. Lichtman's curation of material facts surrounding the legislative history and his underlying research to be helpful and reliable, the Court did not find Dr. Lichtman's ultimate opinions useful.  Dr. Lichtman applied the law as he interpreted it to the data he assembled.  In this respect, his opinions presented more like an attorney's closing argument than an objective analysis of data, and the credibility of his trial testimony was undermined by his seeming effort to advocate a position rather than answer a question.  Moreover, applying law to facts is this Court's duty, and it is one

---

[3] For ease, the Court uses the terms "minority" to refer to the racial minorities alleged to be adversely impacted by the challenge laws, and "non-minority" to refer to non-Hispanic white voters.

the Court can do without the assistance of an expert opining on how he interprets the law and thinks it should be applied.  The Court also has not considered Dr. Lichtman's opinions on the ultimate issue of legislative intent, both because this issue is not the proper subject of expert testimony and because it invades the province of the Court.

### 2.  Dr. David Berman

Dr. David Berman is a Professor Emeritus of Political Science and a Senior Research Fellow at the Morrison Institute for Public Policy at Arizona State University. As a political science professor, he has taught undergraduate survey courses in American government and politics, state and local politics, and Arizona government and politics, as well as more specialized courses, including undergraduate seminars on Arizona politics during which students interacted with state and local office holders and political participants.  He has also taught advanced graduate courses focusing on research methods in these areas.  (Ex. 89 at 3.)

As a Senior Research fellow with the Morrison Institute, Dr. Berman specializes in research and writing on governance and election issues in Arizona, including redistricting, direct democracy, and campaign finance. He has been a professor at Arizona State University since 1966, and his previous work experience was as a Research Associate at the National League of Cities in Washington, D.C. from 1964 to 1966.  (Ex. 89 at 3-4.)

Dr. Berman opined that Arizona has a long history of discrimination against the voting rights of Native Americans, Hispanics, and African Americans, and that this discrimination is part of a more general pattern of political, social, and economic discrimination against minority groups in areas such as school segregation, educational funding and programming, equal pay and the right to work, and immigration.

The Court finds Dr. Berman credible.  His opinions were well-researched and rendered using standard sources and methodologies in his field of expertise, and his sources were well-identified.  Dr. Berman has authored ten books and over 70 published papers, book chapters, or refereed articles dealing with state and local government,

politics, and public policy, and his opinions were based substantially on these prior works.  In particular, Dr. Berman drew heavily upon his book *Arizona Politics and Government: The Quest for Autonomy, Democracy, and Development* (University of Nebraska Press, 1998) and his review of archival papers and collections.  (Ex. 89 at 3-4.) The Court affords great weight to Dr. Berman's opinions.

### 3.  Dr. Jonathan Rodden

Dr. Jonathan Rodden is a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab, a center for research and teaching with a focus on the analysis of geo-spatial data in the social sciences.  Students and faculty members affiliated with the lab are engaged in a variety of research projects involving large, fine-grained, geo-spatial data sets, including individual records of registered voters, Census data, survey responses, and election results at the level of polling.  Prior to joining the Stanford faculty, Dr. Rodden was the Ford Professor of Political Science at the Massachusetts Institute of Technology.  He received his Ph.D. from Yale University and his B.A. from the University of Michigan, Ann Arbor, both in political science.  (Ex. 95 at 5-6.)

Dr. Rodden has expertise in the use of large data sets and geographic information systems to analyze aspects of political representation.  He has developed a national data set of geo-coded precinct-level election results that has been used extensively in policy-oriented research related to redistricting and representation.  He also has worked extensively with Census data from the United States and other countries.

Dr. Rodden has published papers on political geography and representation in a variety of academic journals and has been featured in popular publications like the Wall Street Journal, the New York Times, and Boston Review.  Dr. Rodden has testified as an expert witness in three recent election law cases.  (Ex. 95 at 6.)

Here, Dr. Rodden analyzed the rates and causes of OOP voting in Arizona during the 2012, 2014, and 2016 general elections.  The Court finds his use of a combination of individual-level and aggregate data analyses, both of which have been accepted in

previous cases analyzing questions under the VRA, to be valid and generally trustworthy, and affords them great weight.  (Ex. 97 at 7-9.)

Dr. Rodden found that Hispanic, Native American, and African American voters cast OOP ballots at statistically higher rates than their non-minority counterparts.  (Ex. 95 at 3-4; Ex. 97 at 2-4.)  Focusing on Maricopa County in the 2012 election, Dr. Rodden found that the rate of OOP voting was "131 percent higher for Hispanics, 74 percent higher for African Americans, and 39 percent higher for Native Americans than whites."  (Ex. 95 at 3-4.)

Further, Dr. Rodden found that OOP voters are substantially more likely to be young and to live in neighborhoods characterized by large numbers of renters and with high rates of transience, and that the rate of OOP voting was 65 percent higher for Democratic voters than for Republican voters in Maricopa County, and 56 percent higher in Pima County.   Dr. Rodden found that "changes in polling place locations are associated with higher rates of out-of-precinct voting," and that "African Americans and Hispanics are substantially more affected by this than whites.  In particular, the impact of precinct consolidation, while statistically significant for all groups, is more than twice as large for Hispanics and African Americans as for non-Hispanic whites."  (Ex. 95 at 3-4.)  When analyzing Arizona's non-metropolitan counties, Dr. Rodden found that OOP voting is "negligible in majority-white precincts, but increases dramatically in precincts where Hispanics and Native Americans make up majorities."  (Ex. 96 at 58.)

In addition to his analysis of OOP voting, Dr. Rodden employed standard and accepted methods in his field to analyze the "mailability" of Arizona's non-metropolitan counties in order to estimate the populations that likely would be most affected by H.B. 2023's ballot collection restrictions.  Though somewhat imprecise, the Court finds his method of analysis to be creative given the lack of direct data available on the subject, generally reliable, and based on sufficient data given the circumstances.  Dr. Rodden found that "[o]utside of Maricopa and Pima counties" "around 86 percent of non-Hispanic whites have home mail service," but "only 80 percent of Hispanics do, and only

18 percent of Native Americans have such access." (Ex. 97 at 4.)

Dr. Rodden's error rate is unknown, however, due to the lack of direct data. Also, his analysis did not include Arizona's metropolitan counties and therefore does not reveal whether, on a statewide basis, minorities have disparate access to home mail service as compared to non-minorities. Further, mail access is an imprecise proxy for determining the number and demographics of voters who use or rely on ballot collection services. Simply because a voter lacks home mail access does not necessarily mean that she uses or relies on a ballot collector to vote, let alone a ballot collector who does not fall into one of H.B. 2023's exceptions. Accordingly, although Dr. Rodden's analysis provided useful insight into home mail access in non-metropolitan counties, the Court is mindful of its limitations and affords these opinions moderate weight.

### B.  Plaintiffs' Lay Witnesses

Plaintiffs called the following lay witnesses to testify at trial: Carmen Arias, Michael Blair, Delilah Correa, Charlene Fernandez, LeNora Fulton, Steve Gallardo, Kate Gallego, Kathleen Giebelhausen, Marva Gilbreath, Leah Gillespie, Carolyn Glover, Leonard Gorman, Shari Kelso, Scott Konopasek, Joeseph Larios, Daniel Magos, Lori Noonan, Patrick O'Connor, Martin Quezada, Nellie Ruiz, Spencer Scharff, Sam Shaprio, Ken Clark, and John Powers. These witnesses include individual voters, representatives from state, county, and municipal governments, community advocates who have collected ballots as part of get-out-the-vote ("GOTV") efforts, community advocates focusing of Native American issues, Democratic Party operatives, a California state elections official, and a former United States Department of Justice ("DOJ") official.

### C.  Defendants' Expert Witnesses

#### 1.  Dr. Donald Critchlow

Dr. Donald Critchlow works at Arizona State University as the Director of the Center for Political Thought and Leadership, an organization funded by a grant from the Charles Koch Foundation. (Tr. 1533-37.) He opined on the relationship between racial discrimination and voting in Arizona. Dr. Critchlow made credible observations that

discrimination in Arizona has not been linear and that Arizona has taken effective action to combat discrimination and encourage participation in voting.

With that said, Dr. Critchlow has never published a book or article focused specifically on Arizona history, nor has he taught courses in Arizona history or politics. (Tr. 1531-32.)   Further, in many respects he offered one-sided opinions of Arizona's history, ignored incidents of discrimination, and failed to address the key political shift between the Democratic and Republican parties during the Civil Rights Movement.   For example, he either was unfamiliar with or totally discounted the Republican strategy of confrontation of minority voters at the polls during "Operation Eagle Eye" in the 1960s. (Ex. 89 at 16; Tr. 1549.)   Additionally, although Dr. Critchlow acknowledged that Arizona has a history of discrimination, his report appears to attribute past racial discrimination in Arizona only to the Democratic Party and claims that discrimination has not existed since the 1960s (in the Republican era).   (Ex. 521 at 4.)   For these reasons, the Court affords little weight to Dr. Critchlow's opinions

## 2. Sean Trende

Sean Trende critiqued Dr. Lichtman's analysis of Arizona's voting patterns and history of racial discrimination, but offered no new information or analysis.   Though the Court found some of his criticisms worth considering, overall they were insignificant. For example, although Trende generally agreed with Dr. Lichtman that Arizona experiences racially polarized voting, he made much of the irrelevant fact that Arizona voting is not as racially polarized as voting in Alabama.   (Tr. 1837.)   Additionally, Trende's opinions on the weight to give certain evidence and on the proper interpretation and application of the law and evidence—like those of Dr. Lichtman's—were not helpful and invade the province of the Court.   Moreover, Trende does not have a Ph.D and has never written a peer-reviewed article.   He has spent most of his professional career working as a lawyer or political commentator. He is not a historian and says nothing about the historical methods Dr. Lichtman utilized.   (Tr. 1861-62.)   For these reasons, the Court affords Trende's opinions little weight.

1

### 3. Dr. M.V. Hood

2          Dr. M.V. Hood is a Professor of Political Science at the University of Georgia.

3   Dr. Hood responded to the reports of Drs. Lichtman, Rodden, and Berman.  (Ex. 522 at 2-

4   3.)  For a number of reasons, the Court affords little weight to Dr. Hood's opinions.

5          Dr. Hood criticizes Dr. Berman's use of older historical information.  Yet Dr.

6   Critchlow, another expert retained by Defendants, agrees with Dr. Berman that older

7   historical information is relevant to understanding patterns.  (Ex. 521 at 8-10; Ex. 522 at

8   11.)  Moreover, Dr. Hood admitted at trial that he examines historical information going

9   back 50 to 200 years.  (Tr. 2122-23.)

10          Dr. Hood opined that H.B. 2023 does not hinder Native American voting because

11   the rates of early voting on the Navajo Nation increased from 2012 to 2016.  He based

12   that opinion on early votes cast in three counties.  This opinion is not reliable.  Dr.

13   Hood's analysis did not include an assessment of racial disparities and turnout.  He also

14   conceded that myriad factors could affect turnout.  (Tr. 2111-14.)

15          Dr. Hood prepared a cross-state comparative analysis of ballot collection laws and

16   policies related to counting OOP ballots.  Although his analysis offered some insight, it

17   overall was not useful because he did not address statutory differences and nuances, and

18   his analysis reflected an incomplete understanding of the laws he categorized.  For

19   example, some of the states he labeled as prohibiting ballot collection do not have laws

20   comparable to H.B. 2023 because they prohibit only the delivery of the ballot, not the

21   collection and mailing of the ballot on someone else's behalf.  (Ex. 92 at 52-53.)

22          The Court also notes that Dr. Hood's testimony either has been rejected or given

23   little weight in numerous other cases due to concerns over its reliability.  *See Ne. Ohio*

24   *Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *24 (S.D.

25   Ohio June 7, 2016), *aff'd in part, rev'd in part*, 837 F.3d 612 (6th Cir. 2016); *Veasey v.*

26   *Perry*, 71 F. Supp. 3d 627, 663 (S.D. Tex. 2014); *Frank v. Walker*, 17 F. Supp. 3d 837,

27   881-84 (E.D. Wis. 2014), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Fla. v.*

28   *United States*, 885 F. Supp. 2d 299, 324 (D.D.C. 2012); *Common Cause/Ga. v. Billups*,

No. 4:05-cv-0201, 2007 WL 7600409, at *14 (N.D. Ga. Sept. 6, 2007). Additionally, most of Dr. Hood's work has been as an expert on behalf of states defending against allegations that their laws violated the Constitution or the VRA. (Tr. 2123-25.)

### 4. Dr. Janet Thornton

Dr. Janet Thornton is a Managing Director at Berkeley Research Group. Dr. Thornton did not conduct her own analysis, but instead offered her opinion that Dr. Rodden's statistical work is flawed. (Ex. 525 at 1.) For example, she challenged Dr. Rodden's approaches to measuring racial disparities in OOP voting. One approach uses individual surname data and geographic coordinates to infer race. Among Dr. Thornton's critiques was the presence of measurement error, which is well-taken. Indeed, even Dr. Rodden concedes measurement error exists, especially as it pertains to African American probabilities. Dr. Thornton did not critique the Hispanic probabilities assessed by Dr. Rodden, however, and Dr. Rodden credibly explained that the measurement error for Hispanic probabilities leads only to the under-estimation of racial disparities.

The second approach that Dr. Rodden employed relied on data collected by the Census Department on race and ethnicity at the lowest possible level of geographic aggregation. Dr. Thornton's challenge to the aggregate approach was neither about the data nor the presence of racial disparities in OOP voting, but rather the statistical model employed by Dr. Rodden. Dr. Rodden, however, credibly showed that results similar to those reported by his analysis are obtained using the alternative model specification or measurement strategies recommended by Dr. Thornton.

Dr. Thornton's opinion that there should have been a systematic decline in the number of ballots cast in Arizona's 13 non-metropolitan counties during 2016 if the limits on ballot collection impacted the ability of rural and minority persons to vote is simplistic and not credible. The statistical evidence suggests that increased turnout in rural counties for the 2016 election was driven by non-minority voters, not Native American and Hispanic voters. (Ex. 98 at 21-26.) Moreover, many factors impact voter turnout, including controversial candidates and partisan mobilization efforts, all of which

might drown out the potentially deleterious effects of H.B. 2023.  Overall, the Court finds that Dr. Thornton's critiques do not significantly undermine Dr. Rodden's opinions and therefore affords them less weight.

### D.  Defendants' Lay Witnesses

Defendants called the following lay witnesses to testify at trial: Brad Nelson, Eric Spencer, Helen Purcell, James Drake, Michael Johnson, Michelle Ugenti-Rita, Amy Chan (formerly Amy Bjelland), Tony Rivero, and Scott Freeman.  These witnesses include current and former lawmakers, elections officials, and law enforcement officials.

### E.  Witnesses Testifying By Deposition

In addition to the live testimony, the following witnesses testified by deposition: Sheila Healy, Randy Parraz, Samantha Pstross, Secretary Reagan, Spencer Scharff, Donald Shooter, Eric Spencer, Robyn Stallworth-Pouquette, Alexis Tameron, Victor Vasquez, and Dr. Muer Yang.  The parties each raised admissibility objections to certain of these deposition designations.  The Court addresses these objections, along with other outstanding evidentiary matters, in a separate order.

## III.  OVERVIEW OF CHALLENGED ELECTIONS PRACTICES

### A.  H.B. 2023

Voting in Arizona involves a flexible mixture of early in-person voting, early voting by mail, and traditional, in-person voting at polling places on Election Day. Arizona voters do not need an excuse to vote early and Arizona permits early voting both in person and by mail during the 27 days before an election.  A.R.S. § 16-541.  For those voters who prefer to vote early and in-person, all Arizona counties operate at least one in-person early voting location.  Some of these locations are open on Saturdays.  (Doc. 361 ¶ 59.)

Arizona has allowed early voting by mail for over 25 years, and it has since become the most popular method of voting, accounting for approximately 80 percent of all ballots cast in the 2016 election.  In 2007, Arizona implemented permanent no-excuse early voting by mail, known as the Permanent Early Voter List ("PEVL").  Arizonans

now may vote early by mail either by requesting an early ballot on an election-by-election basis, or by joining the PEVL, in which case they will be sent an early ballot as a matter of course no later than the first day of the 27-day early voting period.  A.R.S. §§ 16-542, -544.  In 2002, Arizona also became the first state to make available an online voter registration option, allowing voters to register online through Arizona's Motor Vehicle Division ("MVD") website, www.servicearizona.com.  When registering online through the MVD, voters can enroll in the PEVL by clicking a box.  (Doc. 361 ¶ 56.)

To be counted, an early ballot must be received by the county recorder by 7:00 p.m. on Election Day.  A.R.S. § 16-548(A).  Early ballots contain instructions that inform voters of the 7:00 p.m. deadline.  Voters may return their early ballots by mail postage-free, but they must mail them early enough to ensure that they are received by this deadline.  Additionally, some Arizona counties provide special drop boxes for early ballots, and voters in all counties may return their early ballots in person at any polling place, vote center, or authorized election official's office without waiting in line.  (Doc. 361 ¶¶ 57, 61.)

Since 1997, it has been the law in Arizona that "[o]nly the elector may be in possession of that elector's unvoted early ballot."  A.R.S. § 16-542(D).  In 2016, Arizona amended A.R.S. § 16-1005 by enacting H.B. 2023, which limits who may collect a voter's voted or unvoted early ballot:

> H.  A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony.  An election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties.
>
> I.  Subsection H of this section does not apply to:
>
> 1.  An election held by a special taxing district formed pursuant to title 48 for the purpose of protecting or providing services to agricultural lands or crops and that is authorized to conduct elections pursuant to title 48.
>
> 2.  A family member, household member or caregiver of the voter.  For the purposes of this paragraph:
>
> (a) "Caregiver" means a person who provides medical or

health care assistance to the voter in a residence, nursing care institution, hospice facility, assisted living center, assisted living facility, assisted living home, residential care institution, adult day health care facility or adult foster care home.

(b) "Collects" means to gain possession or control of an early ballot.

(c) "Family member" means a person who is related to the voter by blood, marriage, adoption or legal guardianship.

(d) "Household member" means a person who resides at the same residence as the voter.

A.R.S. § 16-1005(H)-(I).   Voters therefore may entrust a caregiver, family member, household member, mail carrier, or elections official to return their early ballots, but may not entrust other, unauthorized third parties to do so.

**B. Rejection of OOP Ballots**

Since at least 1970, Arizona has required voters who choose to vote in person on Election Day to cast their ballots in their assigned precinct and has enforced this system by counting only those ballots cast in the correct precinct.  (Doc. 361 ¶ 46.)  Because elections involve many different overlapping jurisdictions, the precinct-based system ensures that each voter receives a ballot reflecting only the races for which that person is entitled to vote.  (Ex. 95 at 10.)  If a voter arrives at a precinct but does not appear on the precinct register, Arizona allows the voter to cast a provisional ballot.  A.R.S. §§ 16-122, -135, -584.  After Election Day, county elections officials review all provisional ballots.  If a voter's address is determined to be within the precinct, the provisional ballot is counted.  Arizona does not count any portion of a provisional ballot cast outside of a voter's correct precinct.  A majority of states do not count OOP ballots, putting Arizona well within the mainstream on this issue.[4]  Indeed, at no point has the DOJ objected to

---

[4] *See* Ala. Code §§ 17-9-10, -10-2, -10-3; Ark. Code Ann. §§ 7-5-306(b), -308(d)(2); Conn. Gen. Stat. §§ 9-19j, -232n; Del. Code Ann. tit. 15, § 4948(b), h(7); Fla. Stat. § 101.048(1),(2); Haw. Admin. Rules § 3-172-140; Ind. Code §§ 3-11.7-2-1, -11-8-2, and -11.7-5-3; Iowa Code §§ 49.9, 49.79(2)(c), 49.80, 49.81, 53.23; Tit. 31 Ky. Admin. Regs. § 6:020(1),(14); Mich. Comp. Laws §§ 168.523a1,(5),(7), 168.813(1); Miss. Code, Ann. § 23-15- 573(1),(3)(b); Mo. Rev. Stat. § 115.430(2),(3),(6); Mont. Code §§ 13-15-107(1),(3), 13-2-512, 13-13-114(1)(a),(2); Neb. Rev. Stat. §§ 32-915(1), -

this practice, and Plaintiffs object to it for the first time in this case.

In 2011, Arizona amended its elections code to allow counties to choose whether to conduct elections under the traditional precinct model or to use a "vote center" system. 2011 Ariz. Legis. Serv. Ch. 331 (H.B. 2303) (April 29, 2011) (amending A.R.S. § 16-411). Unlike the precinct-based system, the vote center model requires each vote center to be equipped to print a specific ballot, depending on each voter's particular district, that includes all races for which that voter is eligible to vote. Thus, under a vote center system, voters may cast their ballots at any vote center in the county in which they reside and receive the appropriate ballot. A.R.S. § 16-411(B)(4). Graham, Greenlee, Cochise, Navajo, Yavapai, and Yuma counties have adopted the vote center model. These counties are mostly rural and sparsely populated. Precinct-based voting requirements, such as Arizona's policy to not count OOP ballots, have no impact on voters in these counties. By comparison, the most populous counties in Arizona, such as Maricopa, Pima, and Pinal, currently adhere to the traditional precinct-based model.

## IV. PRELIMINARY ISSUES

### A. Standing

Article III of the United States Constitution limits federal courts to resolving "Cases" and "Controversies," one element of which is standing. To have standing to litigate in federal court, a plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* -- U.S. --, 134 S. Ct. 1377, 1386 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Only one plaintiff needs to have standing when only injunctive relief is sought. *Crawford v.*

1002(5)(b),(e); Nev. Rev. Stat. § 293.3081(1), 293.3085(4); N.Y. U.C.C. Law §§ 8-302(3)(e), § 9-209; Ohio Rev. Stat. §§ 3505.181(A)(1), 3505.183(B)(1), (4)(a); S.C. Code Ann. §§ 7-13-820, 7-13-830; S.D. Sess. Laws § 12-18-39, 12-20-5.1; Tenn. Code Ann. § 2-7-112(a)(3)(A),(B); Tex. Elec. Code Ann. §§ 63.001(c),(g), 63.011(a),(b); Tex. Admin. Code § 81.172.

1   *Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7

2   (2008).

3         Plaintiffs have organizational standing to challenge the election regulations at

4   issue.  Ballot collection was a GOTV strategy used primarily by the Democratic Party to

5   increase electoral participation by otherwise low-efficacy voters.  (Tr. 416-26, 632-33,

6   659, 902, 930; Healy Dep. 28:15-29:13.)  H.B. 2023's limitations will require Democratic

7   organizations, such as the ADP, to retool their GOTV strategies and divert more

8   resources to ensure that low-efficacy voters are returning their early mail ballots.

9   Additionally, credible expert testimony shows that minority voters, who tend to vote

10   disproportionately for Democratic candidates, vote OOP at higher rates than non-

11   minority voters.  Thus, Arizona's policy to not count OOP ballots places a greater

12   imperative on organizations like the ADP to educate their voters.  These are sufficiently

13   concrete and particularized injuries that are fairly traceable to the challenged provisions.

14   *See Crawford*, 472 F.3d at 951 ("Thus the new law injures the Democratic Party by

15   compelling the party to devote resources to getting to the polls those of its supporters

16   who would otherwise be discouraged by the new law from bothering to vote."); *One Wis.*

17   *Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 967 (W.D. Wis. 2016) (finding expenditure of

18   resources for educating voters about how to comply with new state voter registration

19   requirements sufficient to establish standing).

20         Plaintiffs also have associational standing to challenge these provisions on behalf

21   of their members.

22         [A]n association has standing to bring suit on behalf of its
           members when: (a) its members would otherwise have
23         standing to sue in their own right; (b) the interests it seeks to
           protect are germane to the organization's purpose; and (c)
24         neither the claim asserted nor the relief requested requires the
           participation of individual members in the lawsuit.
25

26   *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  A number of self-

27   identified Democratic voters testified either that they have used ballot collection services

28   in the past, or that they have voted OOP.  The voting rights of such individuals are

germane to Plaintiffs' goal of electing Democratic candidates to local, state, and federal offices.  Further, neither the claims asserted nor the relief requested requires individual members to participate in this lawsuit.

Finally, Plaintiffs' asserted injuries can be redressed by a favorable decision of this Court.  "[W]hen a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant[.]"  *Am. Civil Liberties Union v. The Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993).  Here, county officials are responsible for counting ballots and verifying proper voter registration, *see* A.R.S. §§ 16-621(A), -584(E), but Secretary Reagan and Attorney General Brnovich also play a role in determining how OOP ballots are counted.  Arizona law requires Secretary Reagan, after consulting with county officials, to "prescribe rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots."  A.R.S. § 16-452(A).  These rules are prescribed in the Election Procedures Manual and have the force of law.  A.R.S. § 16-452(B)-(C).  "Any person who does not abide by the Secretary of State's rules is subject to criminal penalties," *Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1280 (9th Cir. 2003) (citing A.R.S. § 16-452(C)), and Attorney General Brnovich is authorized to prosecute such violations, A.R.S. § 16-1021.  Although county officials are responsible for physically counting ballots, they are not empowered to count or reject ballots at their discretion.  Rather, "[a]ll proceedings at the counting center shall be under the direction of the board of supervisors or other officer in charge of elections and shall be conducted in accordance with the approved instructions and procedures manual[.]"  A.R.S. § 16-621(A).

Though the Court cannot require Secretary Reagan and Attorney General Brnovich to physically count OOP ballots for races for which the voter was otherwise eligible to cast a vote, it can require them to prescribe such a procedure in the Election Procedures Manual, which county election officials then would be bound by law to

follow.  Further, Attorney General Brnovich can ensure compliance with such a directive because he is authorized to prosecute county officials who violate it.

Likewise, Attorney General Brnovich is empowered to enforce state election laws like H.B. 2023.  He is not the only official with such authority; Attorney General Brnovich is authorized to enforce Arizona's election laws "[i]n any election for state office, members of the legislature, justices of the supreme court, judges of the court of appeals or statewide initiative or referendum," but in elections for "county, city or town office, community college district governing board, judge or a county, city, or town initiative or referendum," that authority resides with "the appropriate county, city or town attorney[.]" A.R.S. § 16-1021.  But most elections will include statewide races and therefore Attorney General Brnovich likely will share enforcement authority in most circumstances.  Moreover, although Attorney General Brnovich might lack authority to direct the enforcement activities of county and municipal prosecutors, there is no reason to believe that these local law enforcement officials will attempt to enforce H.B. 2023 should the Court declare it unconstitutional or unlawful under the VRA.

Lastly, although there is no evidence that Secretary Reagan or other state or local elections officials play a direct role in the enforcement of H.B. 2023, Secretary Reagan has some indirect involvement in the law's implementation by virtue of her responsibility for drafting the Election Procedures Manual.  If the Court were to enjoin H.B. 2023's implementation and enforcement, the Election Procedures Manual would need to reflect as much.

**B.  Effect of Preliminary Appellate Proceedings**

On September 23, 2016, the Court denied Plaintiffs' motion to preliminarily enjoin enforcement of H.B. 2023.  (Doc. 204.)  On October 4, 2016, the Court also denied Plaintiffs' motion to preliminary enjoin enforcement of H.B. 2023 pending Plaintiffs' appeal of the Court's September 23 order.  (Doc. 213.)  Plaintiffs thereafter moved the Ninth Circuit Court of Appeals for an injunction pending appeal, which was denied by a three-judge motions panel.  Later, on October 28, 2016, a divided three-judge

merits panel affirmed the Court's order denying Plaintiffs' preliminary injunction motion. Chief Judge Thomas dissented.

On November 2, 2016, a majority the Ninth Circuit's non-recused active judges voted to rehear the case en banc. Two days later, a majority of the en banc panel voted to preliminarily enjoin enforcement of H.B. 2023 pending the panel's rehearing, essentially for the reasons provided in Chief Judge Thomas' dissent.[5] This preliminary injunction was short-lived, however, as the United States Supreme Court stayed the order on November 5, 2016, pending the Ninth Circuit's final disposition of the appeal.

In light of this history, the parties disagree over the effect that Chief Judge Thomas' dissent should have on the Court's post-trial analysis. As explained during the final pretrial conference, although the Court has considered Chief Judge Thomas' dissent, the Court is not bound by its factual analysis. To date, all appellate proceedings have occurred at the preliminary injunction stage on a less developed factual record. Findings and conclusions rendered at the preliminary injunction stage are just that—preliminary. They do not necessarily preclude the Court from making different findings or conclusions after thorough factual development and a full trial on the merits. Accordingly, although the Court is mindful of Chief Judge Thomas' critiques and their preliminary adoption by a majority of the en banc panel, the Court is not bound to make identical findings and conclusions as those made at a preliminary phase of the litigation.

And with that, the Court proceeds to the merits.

## V.  FIRST AND FOURTEENTH AMENDMENTS[6]

"[T]he Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554

---

[5]  The en banc panel technically issued a stay of the Court's order denying Plaintiffs' preliminary injunction motion, but the stay had the practical effect of an injunction pending appeal.

[6]  Because Plaintiffs challenge state election laws, their claims technically arise under the Fourteenth Amendment, which applies the First Amendment's protections against states and their political subdivisions. *See City of Ladue v. Gilleo*, 512 U.S. 43, 45 n.1 (1994).

(1964).  Relatedly, the First and Fourteenth Amendments protect the right of the people to associate for political purposes.  *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986).  "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes . . . are absolute."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  Rather, the Constitution empowers states to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, and states retain "control over the election process for state offices," *Tashjian*, 479 U.S. at 217.  "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections."  *Burdick*, 504 U.S. at 433.  "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Storer v. Brown,* 415 U.S. 724, 730 (1974).

Like an individual's voting and associational rights, however, a state's power to regulate elections is not absolute; it is "subject to the limitation that [it] may not be exercised in a way that violates other . . .  provisions of the Constitution."  *Williams v. Rhodes*, 393 U.S. 23, 29 (1968); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).  But because all election regulations "invariably impose some burden upon individual voters," *Burdick*, 504 U.S. at 433, "not every voting regulation is subject to strict scrutiny," *Pub. Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016).

> Instead, . . . a more flexible standard applies.  A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  This framework commonly is referred to as the *Anderson/Burdick* test, after the two Supreme Court decisions from which it derives.

Under this framework, the degree to which the Court scrutinizes "the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.*  A law that imposes severe burdens is subject to strict scrutiny, meaning it must be narrowly tailored to serve a compelling state interest.  *Id*.  "Regulations imposing . . . [l]esser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434); *see also Pub. Integrity Alliance*, 836 F.3d at 1024 ("Applying these precepts, '[w]e have repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process.'" (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011)).  Additionally, when applying *Anderson/Burdick*, the Court considers the state's election regime as a whole, including aspects that mitigate the hardships that might be imposed by the challenged provisions.  *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199 (2008) (considering mitigating aspects of Indiana's election laws).

### A.  Application to H.B. 2023

#### 1.  Burden on Voting Rights

At most, H.B. 2023 minimally burdens Arizona voters as a whole.  In fact, the vast majority of Arizona voters are unaffected by the law.  Although voting by early mail ballot has steadily increased in Arizona, in any given election there remains a subset of voters who choose to vote in person, either early at a designated early voting site or on Election Day.  In-person voters are not impacted by limitations on who may collect early mail ballots.  For example, 2,323,579 registered voters cast ballots during the 2012 general election.  (Ex. 543 at 2.)  Of these, 1,542,855 submitted early mail ballots, over 99 percent of which were counted.  (Ex. 95 at 17.)  Thus, roughly a third of all Arizonans voted in person during the 2012 general election.  Similarly, approximately 80 percent of

the 2,661,497 Arizonans who voted during the 2016 general election cast an early ballot, meaning about 20 percent voted in person on Election Day.  (Tr. 1925; Ex. 543.)  H.B. 2023 has no impact on these voters.

Further, even under a generous interpretation of the evidence, the vast majority of voters who choose to vote early by mail do not return their ballots with the assistance of a third-party collector who does not fall within H.B. 2023's exceptions.  There are no records of the numbers of voters who, in any given election, return their ballots with the assistance of third parties.  The ADP collected "a couple thousand" ballots in 2014. (Tameron Dep. 52:12-17.)  According to Secretary Reagan, community advocate Randy Parraz testified before the Arizona Senate Elections Committee that he had once collected 4,000 ballots.  (Regan Dep. 101:12-21.)  During closing argument, the Court asked Plaintiffs' counsel for his best estimate of the number of voters affected by H.B. 2023 based on the evidence at trial, to which he responded: "Thousands . . . but I don't have a precise number of that."  (Tr. 2268.)  An estimate of "thousands" offers little guidance for determining where, on the scale of 1,000 to 999,999, the number falls, but the evidence and Counsel's response suggests that possibly fewer than 10,000 voters are impacted.

Purely as a hypothetical, if the Court were to draw the unjustified inference that 100,000 early mail ballots were collected and returned by third parties during the 2012 general election, that estimate would leave over 1.4 million early mail ballots that were returned without such assistance.  The point, of course, is that H.B. 2023's limitations have no effect on the vast majority of voters who vote by early mail ballot because, even under generous assumptions, relatively few early voters give their ballots to individuals who would be prohibited by H.B. 2023 from possessing them.

On its face, H.B. 2023 is generally applicable and does not increase the ordinary burdens traditionally associated with voting.  The law merely limits who may possess, and therefore return, a voter's early mail ballot.  Early voters may return their own ballots, either in person or by mail, or they may entrust a family member, household member, or caregiver to do the same.  Thus, the burden H.B. 2023 imposes is the burden

of traveling to a mail box, post office, early ballot drop box, any polling place or vote center (without waiting in line), or an authorized election official's office, either personally or with the assistance of a statutorily authorized proxy, during a 27-day early voting period.[7]

Even with H.B. 2023's limitations, the burden on early voters to return their early mail ballots is less severe than the burden on in-person voters, who must travel to a designated polling place or vote center on Election Day, often necessitating taking time off work and waiting in line. Indeed, the burden on early mail voters is less severe even than the burden on early in-person voters, who must travel to a designated early voting location during the 27-day early voting period. Plaintiffs do not contend that the more onerous travel required of in-person voters is unconstitutionally burdensome, nor would the law support such an argument.

For example, in *Crawford* the Supreme Court considered whether Indiana's voter identification law, which required in-person voters to present photo identification, unconstitutionally burdened the right to vote. 553 U.S. at 185. A voter who had photo identification but was unable to present it on Election Day, or a voter who was indigent or had a religious objection to being photographed, could cast a provisional ballot, which then would be counted if the voter traveled to the circuit court clerk within ten days after the election and either presented photo identification or executed an affidavit. *Id.* at 185-86.

---

[7] Throughout this case, Plaintiffs have conflated the burden imposed by H.B. 2023 with the circumstances that might make that burden harder to surmount for certain voters. That is, Plaintiffs conflate the burden with its severity. For example, during closing argument the Court asked Plaintiffs' counsel to summarize the precise burdens that H.B. 2023 imposes. (Tr. 2262.) Counsel responded that the burdens include lack of mail access, inadequate transportation, disabilities, low education attainment, and residential instability. (Tr. 2263.) But H.B. 2023 does not impose these conditions on any voter. The sole burden H.B. 2023 imposes is the burden of traveling to a mail box, post office, early ballot drop box, polling place or vote center, or authorized election official's office, either personally or with authorized assistance, during a 27-day early voting period. The socioeconomic circumstances cited by Plaintiffs might explain why this process is more difficult for some voters than others, but those circumstances are not themselves the burden imposed by the challenged law.

In his controlling opinion upholding the constitutionality of the challenged law, Justice Stevens explained "[t]he burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of" the challenged law.  *Id.* at 198. The Court characterized these burdens as "the inconvenience of making a trip to the [Indiana Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph," to obtain the required identification, and concluded that this process "does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."[8]  *Id.*  The Court also reasoned that "[t]he severity of that burden is . . . mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted," although to do so voters would need to make two trips: one to vote in the first instance and another to the circuit court clerk's office.  *Id.* at 199.

At most, H.B. 2023 requires only that early mail voters make the first trip described in *Crawford*—the trip to vote.  Further, the trip H.B. 2023 requires voters to make is less burdensome because an Arizona early mail voter has 27 days in which to make it, can choose between traveling to the nearer and most convenient of either a personal mailbox, post office, early ballot drop box, polling place or vote center, or authorized election official's office, and can have a family member, household member, or caregiver make the trip on her behalf.  Voting early by mail in Arizona is far easier than traditional, in-person voting on Election Day, and if laws that do not "represent a significant increase over the usual burdens of voting" do not severely burden the franchise, *id.* at 198, it is illogical to conclude that H.B. 2023 imposes a severe burden on Arizona voters.

For these reasons, Plaintiffs' Fourteenth Amendment challenge is best understood

---

[8] The Supreme Court did not characterize the burdens imposed by Indiana's photo identification law as the circumstances of particular voters that made it harder to obtain the required identification.  Rather, those conditions informed the analysis of the severity of the burden on discrete subgroups.

as follows: H.B. 2023 has no impact on the vast majority of Arizona voters, but its limitations on who may return a voter's early mail ballot present special difficulties for a small subset of socioeconomically disadvantaged voters.  When evaluating the severity of burdens imposed by a challenged law, "courts may consider not only a given law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe."  *Pub. Integrity Alliance*, 836 F.3d at 1024 n.2 (citing *Crawford*, 553 U.S. at 199-203, 212-17 (Souter, J., dissenting)).  But to do so, the challengers must present sufficient evidence to enable the court to quantify the magnitude of the burden imposed on the subgroup.  *Id.*; *see also Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631-32 (6th Cir. 2016) (explaining that, even under this "more liberal approach to burden measuring," the record must contain "quantifiable evidence from which an arbiter could gauge the frequency with which this narrow class of voters has been or will become disenfranchised as a result of" the challenged law).

Thus, in *Crawford* the Supreme Court acknowledged that Indiana's voter identification law might place "a somewhat heavier burden . . . on a limited number of persons," such as "elderly persons born out of State, who may have difficulty obtaining a birth certificate; persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification; homeless persons; and persons with a religious objection to being photographed."  553 U.S. at 199.  But the Court declined to consider these burdens because "on the basis of the evidence in the record it [was] not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that [was] fully justified."  *Id.* at 200.

Like in *Crawford*, this Court has insufficient evidence from which to measure the burdens on discrete subsets of voters.  The Court cannot quantify with any degree of certainty "the number of registered voters" who, in past elections, returned early mail

ballots with the assistance of ballot collectors who do not fall within H.B. 2023's exceptions. *Id.* at 200. The Court therefore cannot determine how frequently voters will be impacted by H.B. 2023's limitations. And of the nebulous "thousands" who, in past elections, have entrusted their ballots to third parties, there is insufficient "concrete evidence" for the Court to gauge the magnitude of that burden or the portion of it that is justified. *Id.* at 201. Stated differently, it is not enough to know roughly how many voters have used ballot collection services—which, in any event, the Court cannot determine on this record. The Court also needs to know *why* voters used these services so that it may determine whether those voters did so out of convenience or personal preference, as opposed to meaningful hardship, and whether other aspects of Arizona's election system adequately mitigate those burdens.

The evidence available largely shows that voters who have used ballot collection services in the past have done so out of convenience or personal preference, or because of circumstances that Arizona law adequately accommodates in other ways. Joseph Larios, a community advocate who has collected ballots in past elections, testified that in his experience returning early mail ballots presents special challenges for communities that lack easy access to outgoing mail services; the elderly, homebound, and disabled voters; socioeconomically disadvantaged voters who lack reliable transportation; voters who have trouble finding time to return mail because they work multiple jobs or lack childcare services; and voters who are unfamiliar with the voting process and therefore do not vote without assistance or tend to miss critical deadlines. (Tr. 416-26, 432-39.)

As to this latter category of voters who, due either to forgetfulness or unfamiliarity with the voting process, choose not to vote or neglect to mail their ballots in time for them to reach the county recorder by 7:00 p.m. on Election Day, H.B. 2023 does not impose a severe burden. Remembering relevant election deadlines "does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198. Moreover, nothing in H.B. 2023 prohibits Plaintiffs or other organizations from educating voters and offering assistance in

understanding and completing a ballot.

As for the other types of voters Larios identified, Arizona accommodates many of the circumstances that tend to make voting in general (and not just early mail voting) more difficult for them.  For example, all counties must provide special election boards for voters who cannot travel to a polling location because of an illness or disability.  A.R.S. § 16-549.  If an ill or disabled voter timely requests an accommodation, the county recorder must arrange for a special election board to deliver a ballot to the voter in person.  Although relatively few voters are aware of this service (Tr. 864-65), nothing in H.B. 2023 prevents Plaintiffs from educating voters about the special election board option and assisting them in making those arrangements.  Arizona also allows curbside voting at polling places, where election officials will go out to a vehicle to assist voters as necessary.[9]

For working voters, Arizona law requires employers to give an employee time off to vote if the employee is scheduled to work a shift on Election Day that provides fewer than three consecutive hours between either the opening of the polls and the beginning of the shift, or the end of the shift and the closing of the polls.  A.R.S. § 16-402.  An employer is prohibited from penalizing an employee for exercising this right.  If voters nonetheless feel uncomfortable requesting time off, they have a 27-day window to vote in person at an on-site early voting location.  Additionally, even under H.B. 2023 voters with transportation difficulties or time limitations may entrust their early ballots to family members, household members, caregivers, or elections officials.

The testimony of individual voters who have used ballot collection services in past elections largely confirms that H.B. 2023 does not impose significant burdens.  Five voters testified at trial about their personal experiences with ballot collectors: Nellie Ruiz,

---

[9] It is of no moment that entrusting a ballot to a volunteer is relatively more convenient than arranging a special election board.  In *Crawford*, voting without the required identification certainly would have been easier than voting provisionally and then travelling to the circuit court clerk's office within ten days.  Nonetheless, the controlling opinion found this option to be an adequate mitigating alternative.

Carolyn Glover, Daniel Magos, Carmen Arias, and Marva Gilbreath.   None of these voters would be severely burdened by H.B. 2023's limitations.

Ruiz, a 71-year-old early mail voter in Phoenix, testified that she typically asks her neighbor to return her ballot because her rheumatoid arthritis and deteriorating eyesight make it difficult for her to return it personally.   Ruiz lives with her adult son and daughter-in-law.   Although Ruiz has a personal mailbox, she prefers not to mail important documents, like bill payments and ballots.   Instead, her son delivers her bill payments whenever he delivers his own mail.   Ruiz testified that she preferred to give her ballot to her neighbor because she "didn't want to impose on [her] children," but could not explain why her son could not return her ballot the same way he returns her bills, or why asking him to deliver a ballot was any more of an imposition than asking him to deliver her bills.   Ruiz also was not aware that her son could drop off her ballot when he goes to the polls to vote in person.   Ruiz testified that she was not able to give her early mail ballot to her neighbor during the 2016 general election because of H.B. 2023.   Nonetheless, Ruiz successfully returned her ballot by mailing it from her home mailbox.   (Tr. 93-96, 98-100, 102-103, 111.)

H.B. 2023 does not burden voters like Ruiz.   She admittedly was able to mail her ballot in 2016 without relying on her neighbor and lives with her adult son who is capable of returning her ballots, either by mail the same way he returns her bill payments, or at a polling place when he votes in person.

Glover, a retired voter with mobility issues who resides in a senior citizens apartment complex in Phoenix, testified that prior to the 2016 general election persons affiliated with the Democratic Party would collet her early mail ballot.   Glover initially testified that her sister returned her ballot for her during the 2016 election, but on cross-examination Glover claimed her ballot was returned by her "sister from church," rather than a family member.   Glover testified that her apartment building has outgoing mail, but the slots are too small for the ballot.   Although a postal worker collects mail at the building, Glover sometimes forgets to give the postal worker her outgoing mail.   Glover

testified that others in the community have caregivers, but that she would not feel comfortable giving her ballot to a caregiver.  Glover also testified that she was unaware she could request to vote via a special election board.  (Tr. 222-25, 228-230, 232-33.)

H.B. 2023 does not severely burden voters like Glover, who admittedly can hand her ballot to a postal worker, provided she remembers to do so.  Further, if Glover's mobility issues make it difficult for her to travel to a post office, she can request to vote via a special election board.  Nothing in H.B. 2023 prevents volunteers from the Democratic Party from assisting her with making those arrangements.

Magos is a 72-year-old Phoenix resident who prefers to vote by mail.  He has a home mailbox but prefers not to use it to send important items because his mailbox has been tampered with in the past.  Magos once gave his ballot to a collector because a flood impacted his home and he did not want to leave his wife alone.  But in most elections, he either takes his ballot to the post office or drops it off at a polling place.  Magos is capable of driving to a polling place and voting in person, and he has family members who could return his ballot if he found himself in need of such a service, though he testified that he "would hate to burden them with one more duty" because "they already do enough for" him.  Magos successfully voted in 2016, even though H.B. 2023 was in effect.  (Tr. 235, 238-40, 242, 247, 250.)

Arias is a registered voter in Phoenix who testified that she once gave her ballot to a collector because her vehicle had broken down.  Additionally, Arias voted by early ballot in the 2016 presidential preference and general elections by driving to Democratic Party headquarters and dropping her voted early ballots off there, presumably so volunteers could later deliver those ballots to an appropriate destination.  Although Arias testified that the postal service in her neighborhood is unreliable, she did not explain why she could drive her ballots to Democratic Party headquarters but not to a post office, early ballot drop box, polling location, or elections office.  (Tr. 1166-68, 1173.)

The only early mail voter who testified that she did not vote during the 2016 general election was Gilbreath, a 72-year-old Laveen resident.  Gilbreath testified that she

has mobility issues due to her arthritis.  During the 2014 election, Gilbreath gave her early mail ballot to a friend because she waited too long to mail it.  Gilbreath voted in the 2016 presidential preference election by mailing her early ballot herself.  She received an early mail ballot for the general election but did not return it because she waited too long to mail it and was not sure where to go to deliver it in person.  Thus, Gilbreath has access to a mailbox; she simply must remember to timely mail her ballot.[10]  (Tr. 128, 130, 133, 135, 142.)

In addition to these voters, Plaintiffs designated for admission portions of the deposition testimony of Victor Vasquez, who said that he suffered a heart attack during the 2014 general election and asked a hospital nurse to return his early ballot for him, but she refused.  Accordingly, he checked himself out of the hospital on Election Day and had a friend drive him to a polling place, where he cast a provisional ballot that ultimately was not counted because Vasquez was not in his assigned precinct.  (Vasquez Dep. 15:18-18:13; 25:7-25.)  The Court has concerns about the credibility of Vasquez's account.  If Vasquez had already completed an early mail ballot, it is not clear why he completed an entirely new, provisional ballot at the polling place rather than simply drop off the early ballot he previously completed.  Vasquez also stated that in a prior election he gave his ballot to a friend to mail at the post office because he does not trust the outgoing mail service where he lives, but he did not explain whether he easily can go to the post office on his own.

In sum, though for voters like those who testified at trial H.B. 2023 might have eliminated a preferred or convenient way of returning an early mail ballot, it does not follow that what H.B. 2023 expects them to do instead is burdensome. The Constitution does not demand "recognition and accommodation of such variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain

---

[10] Plaintiffs do not challenge Arizona's requirement that early mail ballots be received by the county recorder by 7:00 p.m. on Election Day, which appears to cause more problems for voters than H.B. 2023's limitations on ballot collection.

identifiable segments of the voting public."   *Ohio Democratic Party*, 834 F.3d at 630. Nor does it require states to prioritize voter convenience above all other regulatory considerations.   *Id.* at 629.   H.B. 2023 has no impact on the vast majority of Arizona voters, and the Court lacks sufficient evidence to assess whether the law imposes a more severe burden for discrete subsets of voters.   The evidence that was adduced at trial, however, indicates that, for many, ballot collection is used out of convenience and not because the alternatives are particularly difficult.

### 2.  Burden on Associational Rights

In Count V of their Second Amended Complaint, Plaintiffs alleged that H.B. 2023 unjustifiably infringes upon Plaintiffs' associational rights, as distinct from voting rights. (Doc. 233 ¶¶ 112-115.)   The parties' joint proposed pretrial order, however, does not include this claim as a contested issue of fact and law.   Instead, the proposed pretrial order states that Plaintiffs challenge H.B. 2023 under the Fourteenth Amendment only "because it imposes burdens on voters that outweigh the state's interest in this policy." (Doc. 360 at 7.)   Although Plaintiffs' pretrial brief asserts that H.B. 2023 "infringes on the right to associate," it does not elaborate further on the issue.   (Doc. 359 at 6.) Moreover, Plaintiffs' proposed findings of fact and conclusions of law contain no proposed factual findings or legal conclusions regarding H.B. 2023's impact on associational rights.  (Doc. 362 ¶ 131.)  Defendants did not brief the associational rights issue because, based on the parties' joint description of contested issues in the joint proposed pretrial order, they understood that Plaintiffs would not be seeking to prove that claim at trial. (Doc. 356 at 11 n.6.)  Plaintiffs did not seriously advance this issue at trial, though when asked whether the claim still is at issue, Plaintiffs' responded affirmatively and explained that the claim is "part and parcel of our *Anderson/Burdick* claim."  (Tr. 1500.)

To the extent this claim has not been abandoned, Plaintiffs have offered no evidence or argument that would lead the Court to deviate from the conclusion it reached at the preliminary injunction stage, where Plaintiffs argued that H.B. 2023 burdens the

associational rights of groups that encourage and facilitate voting through ballot collection. (Doc. 85 at 16-18.) The *Anderson/Burdick* framework applies to Plaintiff's First Amendment claim. *Timmons*, 520 U.S. at 358. As the party invoking the First Amendment's protection, however, Plaintiffs bear the additional, threshold burden of proving that it applies. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

Conduct, such as collecting a ballot, is not "speech" for purposes of the First Amendment simply because "the person engaging in the conduct intends thereby to express an idea." *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968). Rather, the First Amendment extends "only to conduct that is inherently expressive." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). The Court continues to find persuasive the Fifth Circuit's opinion in *Voting for Am. v. Steen*, 732 F.3d 382 (5th Cir. 2013), which considered a challenge to various Texas laws that regulated the receipt and delivery of completed voter registration applications. The Fifth Circuit rejected the argument that collecting and delivering voter registration applications were inherently expressive activities protected by the First Amendment. *Id.* at 392. In doing so, the court agreed that "some voter registration activities involve speech—'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters fill out their forms; and 'asking' for information to verify registrations were processed successfully." *Id.* at 389. It determined, however, that "there is nothing inherently expressive about receiving a person's completed [voter registration] application and being charged with getting that application to the proper place." *Id.* at 392 (internal quotation and citation omitted). Likewise, though many GOTV activities involve First Amendment protected activity, there is nothing inherently expressive or communicative about collecting a voter's completed early ballot and delivering it to the proper place.

Moreover, assuming that H.B. 2023 implicates protected associational rights, it does not impose severe burdens. Nothing in H.B. 2023 prevents Plaintiffs from encouraging, urging, or reminding people to vote, informing and reminding them of

relevant election deadlines, helping them fill out early ballots or request special election boards, or arranging transportation to on-site early voting locations, post offices, county recorder's offices, or polling places.  *See id.* at 393 (noting that voter registration volunteers remained "free to organize and run the registration drive, persuade others to register to vote, distribute registration forms, and assist others in filling them out"); *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1322 (S.D. Fla. 2008) ("[The challenged law] does not place any restrictions on who is eligible to participate in voter registration drives or what methods or means third-party voter registration organizations may use to solicit new voters and distribute registration applications.  Instead, [it] simply regulates an administrative aspect of the electoral process—the handling of voter registration applications by third-party voter registration organizations after they have been collected from applications.").  H.B. 2023 merely regulates who may possess, and therefore return, another's early ballot.  Accordingly, H.B. 2023 no more than minimally burdens Plaintiffs' associational rights.

### 3.  Justifications

Because H.B. 2023 no more than minimally burdens Plaintiffs' First and Fourteenth Amendment rights, Defendants must show only that it serves important regulatory interests.  *Wash. State Grange*, 552 U.S. at 452.  Defendants advance two justifications for H.B. 2023.  First, they claim that H.B. 2023 is a prophylactic measure intended to prevent absentee voter fraud by creating a chain of custody for early ballots and minimizing the opportunities for ballot tampering, loss, and destruction.  Second, Defendants argue that H.B. 2023 improves and maintains public confidence in election integrity.

Fraud prevention and preserving public confidence in election integrity are facially important state regulatory interests.  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Confidence in the integrity of our electoral process is essential to the functioning of our participatory democracy.  Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government."); *Eu v. S.F. Cty. Democratic Cent.*

*Comm.*, 489 U.S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); *see also Crawford*, 553 U.S. at 195 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. . . . While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.").   Plaintiffs do not argue otherwise.   Instead, they argue that H.B. 2023 is unjustified because (1) there is no evidence of absentee voter fraud perpetrated by ballot collectors or of widespread public perception that ballot collection leads to fraud and (2) H.B. 2023 is not an appropriately tailored means of accomplishing Arizona's objectives.

On the first point, there has never been a case of voter fraud associated with ballot collection charged in Arizona.   (Tr. 1682, 1981, 2198.)   Although three specific allegations of ballot collection voter fraud have been investigated in Arizona, none of the incidents resulted in a criminal prosecution.   (Tr. 834-37 1659, 1680-81, 2163-68, 2185-87, 2202-05; Exs. 81, 372, 400.)   No specific, concrete example of voter fraud perpetrated through ballot collection was presented by or to the Arizona legislature during the debates on H.B. 2023 or its predecessor bills.   No Arizona county produced evidence of confirmed ballot collection fraud in response to subpoenas issued in this case, nor has the Attorney General's Office produced such information.   (Ex. 44, 65.)

The Republican National Lawyers Association ("RNLA") performed a study dedicated to uncovering cases of voter fraud between 2000 and 2011.   (Tr. 1868.)   The study found no evidence of ballot collection or delivery fraud, nor did a follow-up study through May 2015.   (Ex. 91 at 19-20.)   Although the RNLA reported instances of absentee ballot fraud, none were tied to ballot collection and delivery.   (Tr. 1368-69.) Likewise, the Arizona Republic conducted a study of voter fraud in Maricopa County and determined that, out of millions of ballots cast in Maricopa County from 2005 to 2013, a total of 34 cases of fraud were prosecuted.   Of these, 18 involved a felon voting without her rights first being restored.   Fourteen involved non-Arizona citizens voting.   The study uncovered no cases of fraud perpetrated though ballot collection.   (Ex. 91 at 19.)

As for public perception of fraud, the legislative record contains no evidence of widespread public concern that ballot collectors were engaging in voter fraud.  (Ex. 91 at 19.)  H.B. 2023's sponsor, Representative Michelle Ugenti-Rita, was not aware of any polling data indicating that Arizonans lacked confidence in the State's election system at the time she introduced the bill.  (Tr. 1805.)

Although there is no direct evidence of ballot collection fraud or of widespread public perception that ballot collection undermined election integrity, Arizona's legislature is not limited to reacting to problems as they occur, nor is it required to base the laws it passes on evidence that would be admissible in court.  *See Voting for Am.*, 732 F.3d at 394 (explaining that states "need not show specific local evidence of fraud in order to justify preventative measures").  A more exacting review of the evidence supporting Arizona's concerns might be appropriate if H.B. 2023 severely burdened the franchise.  But because H.B. 2023's burdens are at most minimal, the Court's review is less exacting.  *Timmons*, 520 U.S. at 358.

For example, in *Crawford* the Supreme Court upheld Indiana's voter identification requirement as a measure designed to prevent in-person voter fraud even though "[t]he record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history."  553 U.S. at 195.  Similarly, in *Munro v. Socialist Workers Party*, the Supreme Court upheld a Washington law requiring all minor party candidates for partisan office to receive at least one percent of all votes cast during the primary election in order to appear on the general election ballot.  479 U.S. 189 (1986).  Washington argued that the law prevented voter confusion from ballot overcrowding by ensuring candidates appearing on the general election ballot had sufficient community support.  *Id.* at 194.  In upholding the law, the Supreme Court explained: "We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidates prior to the imposition of reasonable restrictions on ballot access."  *Id.* at 194-95.  Rather, "[l]egislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than

reactively[.]"  *Id.* at 195; s*ee also Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 609 (E.D. Va. 2016) ("Outlawing criminal activity before it occurs is not only a wise deterrent, but also sound public policy."), *aff'd*, 843 F.3d 592 (4th Cir. 2016).

Furthermore, many courts have recognized that absentee voting presents a greater opportunity for fraud.  *See Crawford*, 553 U.S. at 225 (Souter, J. dissenting) (noting that "absentee-ballot fraud . . . is a documented problem in Indiana"); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("Voting fraud . . . is facilitated by absentee voting."); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1197 (Ill. App. Ct. 2004) ("It is evident that the integrity of the vote is even more susceptible to influence and manipulation when done by absentee ballot.").  Indeed, mail-in ballots by their very nature are less secure than ballots cast in person at polling locations.  Accordingly, the Court finds that the regulatory interests Arizona seeks to advance are important.

The question then becomes one of means-end tailoring.  Because H.B. 2023 does not impose severe burdens, it need not be narrowly tailored to achieve the State's goals.  Nevertheless, the Court still must take into consideration the extent to which Arizona's important regulatory interests make it necessary to impose those minimal burdens.  *Burdick*, 504 U.S. at 434

Plaintiffs contend that H.B. 2023 is not necessary because Arizona law already includes measures designed to ensure the security of early mail ballots, and because H.B. 2023 is unlikely to be a useful tool to prevent or deter voter fraud or to preserve public confidence in election integrity.   For example, ballot tampering, vote buying, or discarding someone else's ballot all were illegal prior to the passage of H.B. 2023. (Shooter Dep. 51:16-52:5.)   Arizona law has long provided that any person who knowingly collects voted or unvoted ballots and does not turn those ballots in to an elections official is guilty of a class 5 felony.  A.R.S. § 16-1005.  Further, Arizona has long made all of the following class 5 felonies: "knowingly mark[ing] a voted or unvoted ballot or ballot envelope with the intent to fix an election;" "receiv[ing] or agree[ing] to receive any consideration in exchange for a voted or unvoted ballot;" possessing

another's voted or unvoted ballot with intent to sell; "knowingly solicit[ing] the collection of voted or unvoted ballots by misrepresenting [one's self] as an election official or as an official ballot repository or . . . serv[ing] as a ballot drop off site, other than those established and staffed by election officials;" and "knowingly collect[ing] voted or unvoted ballots and . . . not turn[ing] those ballots in to an election official . . . or any . . . entity permitted by law to transmit post." A.R.S. §§ 16-1005(a)-(f).  The early voting process also includes a number of other safeguards, such as tamper evident envelopes and a rigorous voter signature verification procedure.  (Tr. 834-35, 1563-66, 1752, 1878, 2209.)

Plaintiffs also note that, to the extent Arizona wanted to create a chain of custody for early ballots, the legislature rejected a less restrictive amendment to H.B. 2023 proposed by Representative Ken Clark and Senator Martin Quezada, which would have allowed ballot collection if the collector issued a tracking receipt.  (Shooter Dep. at 50:21-23; Ex. 91 at 12; Ex. 16 at 54.)  As enacted, H.B. 2023 is less effective at creating a chain of custody because it allows certain individuals to possess another's voted early ballot but does not require a record of that collection.  (Reagan Dep. 83:25-85:20.)  H.B. 2023 also is not enforced by county recorders. (Ex. 526 at 5 n.15; Ex. 75.)  Instead, county recorders will accept all ballots, even those returned by prohibited possessors under H.B. 2023.

Plaintiffs raise fair concerns about whether, as a matter of public policy, H.B. 2023 is the best way to achieve Arizona's stated goals.  If H.B. 2023 severely burdened the franchise, and Arizona consequently was required to narrowly tailor the law to achieve compelling ends, Plaintiffs' arguments would carry more weight.  But because H.B. 2023's burdens are minimal, and the Court's review consequently less exacting, H.B. 2023's means-end fit can be less precise.

Defendants contend that one of H.B. 2023's purposes is to reduce the opportunity for early mail ballot fraud by limiting who may possess a voter's early ballot.  They also use the term "fraud" broadly to encompass not just vote tampering, which is amply

addressed by other provisions of Arizona law, but also early ballot loss or destruction. By limiting who may possess another's early ballot, H.B. 2023 reasonably reduces opportunities for early ballots to be lost or destroyed.

Although Arizona's legislature arguably could have addressed this concern through a more narrowly tailored, but also more complex, system of training and registering ballot collectors and requiring tracking receipts or other proof of delivery, the Constitution does not require Arizona to erect such a bureaucracy if the alternative it has chosen is not particularly burdensome.  Arizona reasonably chose to limit possession of early ballots to the voter herself, and to a handful of presumptively trustworthy proxies, such as family and household members.   Indeed, H.B. 2023 closely follows the recommendation of the bipartisan Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which in 2005 wrote:

> Fraud occurs in several ways.  Absentee ballots remain the largest source of potential voter fraud. . . . Absentee balloting is vulnerable to abuse in several ways: . . . Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation.  Vote buying schemes are far more difficult to detect when citizens vote by mail.  States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting "third-party" organizations, candidates, and political party activists from handling absentee ballots.

*Building Confidence in U.S. Elections* § 5.2 (Sept. 2005) ("Carter-Baker Report"), *available at* https://www.eac.gov/assets/1/6/Exhibit%20M.PDF.[11]  Though it might not

---

[11] The Carter-Baker Report was not offered into evidence by either party.  It was part of the record in *Crawford*, however, and the Supreme Court cited it favorably.  553 U.S. at 193.  It also was cited favorably by Judge Bybee in his dissent from the en banc Ninth Circuit panel's November 4, 2016 order temporarily enjoining enforcement of H.B. 2023 pending en banc review of this Court's order denying a preliminary injunction. *See Feldman v. Ariz. Sec. of State's Office*, 843 F.3d 366, 414 (9th Cir. 2016) (Bybee, J. dissenting).   The Court may take judicial notice of the Carter-Baker Report's recommendations pursuant to Federal Rule of Evidence 201.  The Carter-Baker Report is a government document publicly available on the United States Election Assistance Commission's website.  Though Plaintiffs might disagree with the Carter-Baker Report's recommendations, their continued validity, or their relevance to this case, there is no question that this recommendation was made and is authentic.

be the most narrowly tailored provision, H.B. 2023 is one reasonable way to advance what are otherwise important state regulatory interests.  Accordingly, H.B. 2023 does not violate the First and Fourteenth Amendments.

### B.  Application to OOP Ballot Policy

#### 1.  Burden on Voting Rights

Arizona consistently is at or near the top of the list of states that collect and reject the largest number of provisional ballots each election.  (Ex. 95 at 23-25.)  In 2012 alone "[m]ore than one in every five [Arizona in-person] voters . . . was asked to cast a provisional ballot, and over 33,000 of these—more than 5 percent of all in-person ballots cast—were rejected.  No other state rejected a larger share of its in-person ballots in 2012."  (Ex. 95 at 24-25.)  Interstate comparisons of provisional voting are complicated, however, because states use provisional ballots in different ways, and some states do not utilize provisional voting in any form.  For example, nationwide a much higher proportion of provisional votes are rejected for reasons not specified or because the voter voted in an incorrect jurisdiction, as compared to Arizona.  Moreover, the overall number of provisional ballots in Arizona, both as a percentage of the registered voters and as a percentage of the number of ballots cast, has consistently declined.

One of the most frequent reasons that provisional ballots are rejected in Arizona is because they are cast OOP.  (Ex. 95 at 22-29.)  Arizona's rejection of OOP ballots, however, has no impact on the vast majority of Arizona voters.  Early mail voting is the most popular method of voting in Arizona, accounting for approximately 80 percent of all ballots cast in the 2016 election.  Voters who cast early mail ballots are unaffected by Arizona's policy to not count OOP ballots.  Likewise, this policy has no impact on voters in Graham, Greenlee, Cochise, Navajo, Yavapai, and Yuma counties, which have adopted the vote center model.

Moreover, the vast majority of in-person voters successfully vote in their assigned precincts, and OOP voting has consistently declined as a percentage of the total ballots cast in Arizona.  In the 2008 general election, Arizona voters cast 14,885 OOP ballots out

of the 2,320,851 ballots cast statewide, meaning OOP ballots constituted 0.64 percent of all votes cast in that election.  In the 2012 general election, Arizona voters cast 10,979 OOP ballots out of the 2,323,579 ballots cast statewide, accounting for 0.47 percent of all votes cast.  In that same election, 1,542,855 Arizona voters submitted early ballots, and more than 99 percent were counted.  In the 2016 general election, Arizona voters cast 3,970 OOP ballots out of the 2,661,497 ballots cast statewide, representing 0.15 percent of all votes cast.  Since 2008, OOP voting during general presidential elections has declined 73 percent statewide, dropping from 14,885 in 2008 to 3,970 in the 2016 election.  (Tr. 1927-32; Exs. 578, 581.)

OOP voting has declined in midterm elections, as well.  In the 2010 general election, Arizona voters cast 4,919 OOP ballots out of the 1,750,840 ballots cast statewide, constituting 0.28 percent of all votes cast.  By comparison, in the 2014 general election, Arizona voters cast 3,582 OOP ballots out of the 1,537,671 ballots cast statewide, constituting 0.23 percent of all votes cast.  During this same period, the number of registered voters in Arizona increased as follows: 2,987,451 in 2008; 3,146,418 in 2010; 3,124,712 in 2012; 3,235,963 in 2014; and 3,588,466 in 2016.  (Exs. 577, 578.)

These trends also hold true at the county level.  For example, Maricopa County (Arizona's most populous) has experienced a consistent decline in the number of OOP ballots, both in terms of raw numbers and as a percentage of the total ballots cast.  In the 2008 general election, Maricopa County voters cast 9,159 OOP ballots out of the 1,380,571 ballots cast countywide, accounting for 0.66 percent of the all votes cast.  In the 2012 general election, Maricopa County voters cast 7,529 OOP ballots out of the 1,390,836 ballots cast countywide, representing 0.54 percent of all votes.  In the 2016 general election, Maricopa County voters cast 2,197 OOP ballots out of the 1,608,875 ballots cast countywide, representing 0.14 percent of all votes cast.  Likewise, in the 2010 general midterm election, Maricopa County voters cast 3,527 OOP ballots out of the 1,004,125 ballots cast countywide, accounting for 0.35 percent of all votes.  In the 2014

general election, Maricopa County voters cast 2,781 OOP ballots out of the 877,187 ballots cast countywide, constituting 0.32 percent of all votes.  Between 2008 and 2016, Maricopa County had a staggering decrease of 76 percent in the raw number of OOP ballots.  During this same period, the number of registered voters in Maricopa County increased as follows: 1,730,886 in 2008; 1,851,956 in 2010; 1,817,832 in 2012; 1,935,729 in 2014; and 2,161,716 in 2016.  (Exs. 579, 582.)

Pima County (Arizona's second most populous) also has experienced a consistent decline in OOP voting.  In the 2008 general election, Pima County voters cast 3,227 OOP ballots out of the 397,503 ballots cast countywide, accounting for 0.81 percent of all votes.  In the 2012 general election, Pima County voters cast 2,212 OOP ballots out of the 385,725 ballots cast countywide, accounting for 0.57 percent of all votes.  In the 2016 general election, Pima County voters cast 1,150 OOP ballots out of the 427,102 ballots cast countywide, representing 0.27 percent of all votes.  As for Pima County midterm elections, in the 2010 general election Pima County voters cast 641 OOP ballots out of the 318,995 ballots cast countywide, or 0.20 percent of all votes. By comparison, in the 2014 general election, Pima County voters cast just 371 OOP ballots out of the 274,449 ballots cast countywide, constituting 0.14 percent of the total ballots.  The raw number of OOP ballots thus dropped by 64 percent in Pima County between 2008 and 2016.  During this same period, the number of registered voters in Pima County increased as follows: 498,777 in 2008; 486,697 in 2010; 494,630 in 2012; 497,542 in 2014; and 544,270 in 2016.  (Exs. 580, 583.)

In light of these figures, and much like their H.B. 2023 claim, Plaintiffs' challenge to Arizona's treatment of OOP ballots is best described as follows:  Arizona's rejection of OOP ballots has no impact on the vast majority of Arizona voters, though a small subset of voters is affected more often because of their special circumstances.  But Plaintiffs' contention that Arizona's rejection of OOP ballots severely burdens this small subset of voters is unavailing for two independent reasons.

First, Plaintiffs do not directly challenge the electoral practices actually

responsible for higher rates of OOP voting.  For example, high rates of residential mobility are associated with higher rates of OOP voting.  Almost 70 percent of Arizonans have changed their residential address in the decade between 2000 and 2010, the second highest rate of any state.  The vast majority of Arizonans who moved in the last year moved to another address within their current city of residence and, compared with other states, Arizona has the second highest rate of within-city moves.  Most of these within-city moves took place in Maricopa and Pima Counties.  (Ex. 95 at 11-12.)  Relatedly, rates of OOP voting are higher in neighborhoods where renters make up a larger share of householders.  (Ex. 96 at 41.)  One significant reason residential mobility tends to result in higher rates of OOP voting is because voters who move sometimes neglect to timely update their voter registration.  (*See, e.g.*, Tr. 602-06.)  Relatedly, voters registered for PEVL who move and do not update their address information will not have their early ballot forwarded to their new address.  Arizona in-person voters are more likely to vote OOP if they have signed up for the PEVL and have moved.  (*See, e.g.*, Tr. 124, 987-89.)

Additionally, changes in polling locations from election to election, inconsistent election regimes used by and within counties, and placement of polling locations all tend to increase OOP voting rates.  (Ex. 95 at 12-15, 26-27, 44-52, 54-58.)  In Maricopa County, between 2006 and 2008 at least 43 percent of polling locations changed from one year to the next.  Likewise, approximately 40 percent of Maricopa County's active registered voters' polling locations changed between 2010 and 2012.  Changes in Maricopa County polling locations and election regimes continued to occur in 2016, when Maricopa County experimented with 60 vote centers for the presidential preference election, then reverted to a precinct-based system with 122 polling locations for the May special election, and then implemented over 700 assigned polling places in the August primary and November general elections.  The OOP voting rate was 40 percent higher for voters who had experienced such polling place changes.  (Ex. 95 at 14-15, 56-57.)  Further, some individual voters testified that they arrived at an incorrect polling place but were not redirected by poll workers to the correct location, nor were the implications of

casting a provisional ballot explained.  These voters stated that they would have gone to the correct polling location had they been so advised.  (Tr. 120, 265-66, 352-54, 493, 935-36.)

Plaintiffs do not challenge as unconstitutional the manner in which Arizona and its counties allocate or relocate polling places, inform voters of their assigned precincts, or train poll workers. They do not challenge Arizona's requirement that voters update their voter registrations after moving to a new address.  Nor do Plaintiffs challenge Arizona's use of the precinct-based system, though the logical implication of their argument is that Arizona may utilize a precinct-based system but cannot enforce it as to races for which an OOP voter otherwise would be eligible to vote (usually so-called "top of the ticket" races).  (Tr. 1495-96.)  Instead, Plaintiffs challenge what Arizona does with OOP ballots after they have been cast.  But there is no evidence that it will be easier for voters to identify their correct precincts if Arizona eliminated its prohibition on counting OOP ballots.  Though the consequence of voting OOP might make it more imperative for voters to correctly identify their precincts, it does not increase the burdens associated with doing so.

Second, the burdens imposed by precinct-based voting—a system which, again, Plaintiffs do not directly challenge—are not severe.  Precinct-based voting merely requires voters to locate and travel to their assigned precincts, which are ordinary burdens traditionally associated with voting.[12]  *See Colo. Common Cause v. Davidson*, No. 04CV7709, 2004 WL 2360485, at *14 (Colo. Dist. Ct. Oct. 18, 2004) ("[I]t does not seem to be much of an intrusion into the right to vote to expect citizens, whose judgment we trust to elect our government leaders, to be able to figure out their polling place."); *see*

---

[12] Plaintiffs again conflate the burdens imposed by the (indirectly) challenged practice with the socioeconomic circumstances that can make those burdens more difficult for certain subsets of voters to surmount.  Arizona's precinct-based system does not impose residential instability, transportation difficulties, or informational deficits on any voter.  These circumstances exist independent of the precinct-based system.  Instead, the precinct-based system imposes on voters the burden of locating and travelling to an assigned precinct, which might be more difficult for some voters to do because of their circumstances.

*also Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 344 (6th Cir. 2012) (explaining that voters cannot be absolved "of all responsibility for voting in the correct precinct or correct polling place by assessing voter burden solely on the basis of the outcome—i.e., the state's ballot validity determination").

Moreover, Arizona does not make it needlessly difficult for voters to find their assigned precincts. Indeed, a 2016 Survey of Performance of American Elections ("SPAE") found that none of the survey respondents for Arizona reported that it was "very difficult" to find their polling places. By comparison, several other states had respondents who reported that it was very difficult to find their polling places. The 2016 SPAE also reported that approximately 94 percent of the Arizona respondents thought it was very easy or somewhat easy to find their polling places. (Tr. 1350-51.)

In Arizona counties with precinct-based systems, voters generally are assigned to precincts near where they live, and county officials consider access to public transportation when assigning polling places. (Tr. 1570-73.) Arizona voters also can learn of their assigned precincts in a variety of ways. (*See* Ex. 526 at 11-18.)

If precincts or polling places have been altered since the previous election, registered voters are sent a mailing informing them of this fact and of where their new polling places are located. (Tr. 1575-76.) State law requires that election officials send each household with a registered voter who is not on the PEVL a sample ballot at least eleven days prior to election day, A.R.S. § 16-510(C), which contains instructions and identifies their polling location. (Doc. 361 ¶ 52.) The Secretary of State's Office operates several websites that make voter-specific polling place information available and allow the Secretary's staff to respond directly to voter inquiries. The Secretary of State's Office also mails a publicity pamphlet to voters, which includes information on how to locate their correct precincts. This information is provided in English and Spanish. The Secretary also uses social media, town halls, and live events (such as county and state fairs) to register voters and answer questions.

In addition, several Arizona counties, including Maricopa and Pima Counties,

operate online polling place locators that are available in English and Spanish. Voters also can learn their assigned polling locations by calling the office of the county recorder for the county in which they reside. Counties spread awareness about polling place locations and the consequences of OOP voting through news and social media. This information is communicated in both English and Spanish. Some counties—including the state's most populous, Maricopa and Pima—post signs at polling places informing voters that OOP ballots will not be counted. (Tr. 1586-88; Ex. 368.) Poll workers also are trained to direct voters who appear at an incorrect polling location to their correct polling location and to notify such voters that their votes will not be counted if they vote with a provisional ballot at the wrong location.

The Arizona Citizens Clean Elections Commission ("CCEC") operates a website in English and Spanish that provides a tool for voters to determine their polling place. The CCEC also engages in advertising to help educate voters on where to vote. Partisan groups, such as the ADP and political campaigns, also help educate voters on how to find their assigned polling places. (Tr. 1575-76.)

In sum, Arizona's rejection of OOP ballots has no impact on the vast majority of voters. Although a small and ever-dwindling subset of voters still vote OOP, how Arizona treats OOP ballots after they have been cast does not make it difficult for these voters to find and travel to their correct precincts. To the extent Plaintiffs' claim may properly be considered as an indirect challenge to Arizona's strictly enforced precinct-based system, the burdens imposed on voters to find and travel to their assigned precincts are minimal and do not represent significant increases in the ordinary burdens traditionally associated with voting. Moreover, for those who find it too difficult to locate their assigned precinct, Arizona offers generous early mail voting alternatives.[13]

## 2. Justifications

---

[13] If a voter is capable of travelling to an incorrect precinct, she certainly is capable of mailing an early ballot. Moreover, early mail voters may drop their ballots off at any polling place, even one to which they are not assigned.

Weighing against the minimal burdens imposed by precinct-based voting are numerous important state regulatory interests. Precinct-based voting serves an important planning function for Arizona counties by helping them estimate the number of voters who may be expected at any particular precinct, which allows for better allocation of resources and personnel. In turn, orderly administration of elections helps to increase voter confidence in the election system and reduces wait times. (Tr. 1608-10, 1896-913.) Because elections involve many different overlapping jurisdictions, the precinct-based system also ensures that each voter receives a ballot reflecting only the races for which that person is entitled to vote. Precincts must be created, and ballots printed, so that the residential address of every voter is connected to the correct assortment of local elected officials. The system thus promotes voting for local candidates and issues and helps make ballots less confusing by not providing voters with ballots that include races for which they are not eligible to vote. (Ex. 95 at 10; Doc. 361 ¶ 47.)

Indeed, other courts have recognized these numerous and significant advantages:

> [Precinct-based voting] caps the number of voters attempting to vote in the same place on election day; it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies; it allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing; it makes it easier for election officials to monitor votes and prevent election fraud; and it generally puts polling places in closer proximity to voter residences.

*Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004).

Plaintiffs do not quarrel with the importance or legitimacy of these interests or contest that precinct-based voting brings significant advantages. Instead, they argue that Arizona need not reject OOP ballots in their entirety to accomplish these goals. Plaintiffs contend that Arizona can just as easily accomplish these goals and reap these benefits by partially counting OOP ballots, accepting votes in races for which the voter is eligible to vote and rejecting votes in races for which the voter is not.

Counting OOP ballots is administratively feasible. Twenty states partially count OOP ballots. (Ex. 94 at 32-33.) These include the neighboring states of California, Utah,

and New Mexico.  Cal. Elec. Code §§ 14310(a)(3), 14310 (c)(3), 15350; Utah Code Ann. § 20A-4-107(1)(b)(iii), 2(a)(ii), 2(c); N.M. Stat. Ann § 1-12-25.4(F); N.M. Admin. Code 1.10.22.9(N).   Elections administrators in these and other states have established processes for counting only the offices for which the OOP voter is eligible to vote.  Some states, such as New Mexico, use a hand tally procedure, whereby a team of elections workers reviews each OOP ballot, determines the precinct in which the voter was qualified to vote, and marks on a tally sheet for that precinct the votes cast for each eligible office.  *See* N.M. Admin Code 1.10.22.9(H)-(N).   Other states, such as California, use a duplication method, whereby a team of elections workers reviews each OOP ballot, determines the precinct in which the voter was qualified to vote, obtains a new paper ballot for the correct precinct, and duplicates the votes cast on the OOP ballot onto the ballot for the correct precinct.  Only the offices that appear on both the OOP ballot and the ballot for the correct precinct are copied.  The duplicated ballot then is scanned through the optical scan voting machine and electronically tallied.  (Tr. 777-81.)

Arizona has a similar duplication procedure that it uses to process certain types of ballots that cannot be read by an optical scan voting machine, such as ballots that are damaged, marked with the wrong color pen, or submitted to the county recorder by a military or overseas voter via facsimile.  (Tr. 1564-66; Ex. 455 at 177-78.)  Arizona also uses the duplication procedure to process some provisional ballots cast by voters who are eligible to vote in federal elections, but whom Arizona does not permit to vote in state elections.  (Ex. 455 at 187.)  This duplication procedure takes about twenty minutes per ballot.  (Tr. 1604-606.)

If strict scrutiny applied and Arizona were required to narrowly tailor its precinct enforcement to achieve compelling state interests, Plaintiffs' critiques might carry more weight.  But in light of the minimal burdens associated with the precinct-based system, Arizona's policy need not be the narrowest means of enforcement.

Moreover, Plaintiffs are incorrect that Arizona can accomplish all of its goals without its strict enforcement regime.  If voters in precinct-based counties can have their

ballots counted for statewide and countywide races even if they vote in the wrong precinct, they will have far less incentive to vote in their assigned precincts and might decide to vote elsewhere. Other voters might incorrectly believe that that they can vote at any location and receive the correct ballot.  Voters might also be nefariously directed to vote elsewhere.  North Carolina, for example, has experienced a problem with "political organizations intentionally transporting voters to the wrong precinct." *See N.C. State Conf. of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 461 (M.D.N.C. 2016) *rev'd on other grounds*, 831 F.3d 204 (4th Cir. 2016).  This, in turn, would undermine both the ability of Arizona counties to accurately estimate the number of voters who may be expected at any particular precinct and allocate appropriate resources and personnel, and Arizona's goal of promoting voting for local candidates.  Consequently, if OOP ballots are partially counted in Arizona, candidates for local office will have to expend resources to educate voters on why it nevertheless is important to vote within their assigned precincts.  Moreover, requiring counties to review all OOP ballots for any given election and determine the specific contests in which each voter was eligible to vote would impose a significant financial and administrative burden on Maricopa and Pima Counties because of their high populations.

Plaintiffs' requested relief essentially would transform Arizona's precinct-based counties, including its two most populous, into quasi-vote-center counties.  But the vote-center model is not appropriate for every jurisdiction.  Compared to precinct-based polling places, it can be difficult for counties to predict the number of voters at each vote center.  Consequently, vote centers can cause voter wait times to increase, with corresponding decreases in turnout, due to the potential for uneven distribution of voters. (Tr. 1607-611, 1896-913.)  Plaintiffs' requested relief therefore would deprive precinct-based counties of the full range of benefits that correspond with the precinct-based system.

Precinct-based voting is a quintessential time, place, and manner election regulation.  Arizona's policy to not count OOP ballots is one mechanism by which it

1    enforces and administers this precinct-based system to ensure that it reaps the full extent

2    of its benefits.   This policy is sufficiently justified in light of the minimal burdens it

3    imposes.     Accordingly, Arizona's rejection of OOP ballots does not violate the

4    Fourteenth Amendment.

5    **VI.  SECTION 2 OF THE VOTING RIGHTS ACT (RESULTS TEST)**

6         "Inspired to action by the civil rights movement, Congress responded in 1965 with

7    the Voting Rights Act." *Shelby Cty. v. Holder*, 570 U.S. 529, 536 (2013).   In its original

8    form, § 2 of the VRA prohibited all states from enacting any "standard, practice, or

9    procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the

10   United States to vote on account of race or color." *Id.* (quoting § 2, 79 Stat. 437).

11        "At the time of passage of the Voting Rights Act of 1965, § 2, unlike other

12   provisions of the Act, did not provoke significant debate in Congress because it was

13   viewed largely as a restatement of the Fifteenth Amendment." *Chisom v. Roemer*, 501

14   U.S. 380, 392 (1991).   The Supreme Court took a similar view, holding in a 1980

15   plurality opinion that "the language of § 2 no more than elaborates upon that of the

16   Fifteenth Amendment," and therefore § 2 is violated only if a state enacted the challenged

17   law with the intent to discriminate on account of race or color. *City of Mobile v. Bolden*,

18   446 U.S. 55, 60-62 (1980) (plurality opinion).

19        In 1982, in response to the Supreme Court's opinion in *Bolden*, "Congress

20   substantially revised § 2 to make clear that a violation could be proved by showing

21   discriminatory effect alone[.]" *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).   In its

22   current form, § 2 provides:

23            (a)  No voting qualification or prerequisite to voting or
              standard, practice, or procedure shall be imposed or applied
24            by any State or political subdivision in a manner which
              results in a denial or abridgement of the right of any citizen of
25            the United States to vote on account of race or color, or in
              contravention of the guarantees set forth in section
26            10303(f)(2) of this title, as provided in subsection (b).

27            (b) A violation of subsection (a) is established if, based on the
              totality of circumstances, it is shown that the political
28            processes leading to nomination or election in the State or
              political subdivision are not equally open to participation by

1
2
3

> members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

4   52 U.S.C. § 10301.  To succeed on a § 2 claim, a plaintiff now may show either that the

5   challenge law was enacted with the intent to discriminate on account of race or color, or

6   that "under the totality of the circumstances, a challenged election law or procedure ha[s]

7   the effect of denying a protected minority equal chance to participate in the electoral

8   process." *Gingles*, 478 U.S. at 44 n.8.  "The essence of a § 2 claim" brought under the

9   so-called "effects" or "results test" "is that a certain electoral law, practice, or structure

10  interacts with social and historical conditions to cause an inequality in the opportunities

11  enjoyed by [minority and non-minority] voters to elect their preferred representatives."

12  *Id.* at 47.

13          When determining whether, under the totality of the circumstances, a challenged

14  voting practice interacts with social and historical conditions to cause inequality in the

15  electoral opportunities of minority and non-minority voters, courts may consider, as

16  relevant, the following factors derived from the Senate Report accompanying the 1982

17  amendments to the VRA ("Senate Factors"):

18
19

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

20
21

> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

22
23
24

> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

25
26

> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

27
28

> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 36-37 (quoting S. Rep. No. 97-417, at 28-29 (1982)).  Courts also may consider "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group," and "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."  *Id.*; *see also Houston Lawyers' Ass'n v. Attorney Gen. of Tex.*, 501 U.S. 419, 426-27 (1991) (explaining that courts may consider a state's "justification for its electoral system").  "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *Gingles*, 478 U.S. at 45.

Until relatively recently, "Section 2's use . . . has primarily been in the context of vote-dilution cases," which "'involve challenges to methods of electing representatives— like redistricting or at-large districts—as having the effect of diminishing minorities voting strength.'"  *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 239 (4th Cir. 2014) (quoting *Ohio State Conference of N.A.A.C.P. v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds by* 2014 WL 10384647 (6th Cir. 2014)).  *Gingles* itself was a vote dilution case.  "While vote-dilution jurisprudence is well-developed, numerous courts and commentators have noted that applying Section 2's 'results test' to vote-denial claims is challenging, and a clear standard for its application has not been conclusively established."[14]  *Ohio Democratic Party*, 834 F.3d at 636; *see also Veasey v. Abbott*, 830 F.3d 216, 243-44 (5th Cir. 2016) ("Although courts have often applied the *Gingles* factors to analyze claims of vote dilution . . . there is little authority on the proper test to determine whether the right to vote has been *denied* or *abridged* on account of race."); *League of Women Voters*, 769 F.3d at 239 ("[T]here is a paucity of appellate case

_____

[14]  A "vote denial" claim generally refers "to any claim that is not a vote dilution claim."  *Ohio State Conference*, 768 F.3d at 554

law evaluating the merits of Section 2 claims in the vote-denial context."); *Ohio State Conference*, 768 F.3d at 554 ("A clear test for Section 2 vote denial claims . . . has yet to emerge."); *Simmons v. Galvin*, 575 F.3d 24, 41-42 n.24 (1st Cir. 2009) ("'While *Gingles* and its progeny have generated a well-established standard for vote dilution, a satisfactory test for vote denial cases under Section 2 has yet to emerge . . . [and] the Supreme Court's seminal opinion in *Gingles* . . . is of little use in vote denial cases.'" (quoting Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights A*ct, 57 S.C. L. Rev. 689, 709 (2006))); Janai S. Nelson, *The Causal Context of Disparate Vote Denial*, 54 B.C. L. Rev. 579, 595 (2013) ("[T]he legal contours of vote denial claims remain woefully underdeveloped as compared to vote dilution claims.").  Indeed, some of the Senate Factors cited by the *Gingles* Court as relevant to the totality of the circumstances inquiry do not seem particularly germane to vote denial claims.  *Cf. Gingles*, 478 U.S. at 45 ("While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and considered."); *see Frank v. Walker*, 768 F.3d 744, 752-55 (7th Cir. 2014) (questioning usefulness of Senate Factors in vote denial claims); *Ohio Democratic Party*, 834 F.3d at 638 (explaining that totality of circumstances inquiry in vote denial cases is "*potentially* informed by the 'Senate Factors' discussed in *Gingles*" (emphasis added)).

Several circuit courts that recently have analyzed vote denial claims have adopted the following two-part framework based on the text of § 2 and the Supreme Court's guidance in *Gingles*:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
>
> Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*League of Women Voters*, 769 F.3d at 240 (internal quotations and citations omitted); *see also Veasey*, 830 F.3d at 244; *Ohio Democratic Party*, 834 F.3d at 636; *Frank*, 768 F.3d at 754-55 (adopting two-park framework for sake of argument but expressing skepticism of the second step "because it does not distinguish between discrimination by [the state] from other persons' discrimination").  The Ninth Circuit likewise endorsed this two-part framework in the context of this case.  *Feldman v. Ariz. Sec. of State's Office*, 840 F.3d 1057, 1070 (9th Cir. 2016); *id.* at 1091 (Thomas, C.J. dissenting); *Feldman*, 843 F.3d at 367.

"The first part of this two-prong framework inquires about the nature of the burden imposed and whether it creates a disparate effect[.]"  *Veasey*, 830 F.3d at 244. Drawing on the Supreme Court's guidance in *Gingles*, "[t]he second part . . . provides the requisite causal link between the burden on voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both."  *Id.*  That is, "the second step asks not just whether social and historical conditions 'result in' a disparate impact, but whether the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions."  *Ohio Democratic Party*, 834 F.3d at 638 (emphasis in original).

> Although proving a violation of § 2 does not require a showing of discriminatory intent, only discriminatory results, proof of a causal connection between the challenged voting practice and a prohibited result is crucial.  Said otherwise, a § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected.

*Gonzales v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (internal quotations and citations omitted); *see also Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997).

A close reading of the decisions of courts that recently have grappled with vote denial claims reveals two important nuances of the results test.  The first bears on the

meaning of "disparity" as it has been used in vote denial cases.  "No state has exactly equal registration rates, exactly equal turnout rates, and so on, at every stage of its voting system."  *Frank*, 768 F.3d at 754.  Perfect racial parity is unlikely to exist in any aspect of a state's election system, which is to say it is unlikely that minorities and non-minorities will be impacted by laws in perfect proportion to their representation in the overall voting population.  Unless the VRA is to be interpreted to sweep away all elections regulations, some degree of disproportionality must be tolerable.

Therefore, not every disparity between minority and non-minority voters is cognizable under the VRA.  Rather, to be cognizable the disparity must be meaningful enough to work "an inequality in the opportunities enjoyed by [minority as compared to non-minority] voters to elect their preferred representatives."  *Gingles*, 478 U.S. at 47; *see Gonzales*, 677 F.3d at 405 (suggesting that disparity must be "relevant").  For example, the Seventh Circuit rejected the notion that:

> if whites are 2% more likely to register than blacks, then the registration system top to bottom violates § 2; and if white turnout on election day is 2% higher, then the requirement of in-person voting violates § 2.  Motor-voter registration, which makes it simple for people to register by checking a box when they get drivers' licenses, would be invalid, because black and Latino citizens are less likely to own cars and therefore less likely to get drivers' licenses. . . . Yet it would be implausible to read § 2 as sweeping away almost all registration and voting rules.  It is better to understand § 2(b) as an equal-treatment requirement (which is how it reads) than as an equal-outcome command[.]

*Frank*, 768 F.3d at 754.

The second nuance bears on the definition of "impact" or "effect."  To be cognizable, the challenged voting practice must "impose a discriminatory burden," *League of Women Voters*, 769 F.3d at 240, and not merely result in a "disproportionate impact," *Salt River Project*, 109 F.3d at 595.  Section 2 "does not sweep away all election rules that result in a disparity in the convenience of voting."  *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016).  A contrary interpretation would require the Court to accept:

1
2
3
4
5
6
7
8

> an unjustified leap from the disparate inconveniences that voters face when voting to the denial or abridgment of the right to vote. Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others. For example, every polling place will, by necessity, be located closer to some voters than to others. To interpret § 2 as prohibiting any regulation that imposes a disparate inconvenience would mean that every polling place would need to be precisely located such that no group had to spend more time traveling to vote than did any other. Similarly, motor-voter registration would be found to be invalid [if] members of [a] protected class were less likely to possess a driver's license. Yet, courts have also correctly rejected that hypothetical.

9   *Id.*; *see also N.E. Ohio Coal. for the Homeless*, 837 F.3d at 628 ("A law cannot

10  disparately impact minority voters if its impact is insignificant to begin with."); *Ohio*

11  *Democratic Party*, 834 F.3d at 623 ("[W]hile the challenged regulation may slightly

12  diminish the convenience of registration and voting, it applies even-handedly to all

13  voters, and, despite the change, Ohio continues to provide generous, reasonable, and

14  accessible voting options to all Ohioans. The issue is not whether some voter somewhere

15  would benefit from six additional days of early voting or from the opportunity to register

16  and vote at the same time. Rather, the issue is whether the challenged law results in a

17  cognizable injury under the Constitution or the Voting Rights Act."); *Frank*, 843 F.3d at

18  753 ("[U]nless the State of Wisconsin made it 'needlessly hard' to obtain the requisite

19  photo identification for voting, this requirement did not result in a 'denial' of anything by

20  Wisconsin, as § 2(a) requires."); *Jacksonville Coal. for Voter Prot. v. Hood*, 351 F. Supp.

21  2d 1326, 1335 (M.D. Fla. 2004) ("While it may be true that having to drive to an early

22  voting site and having to wait in line may cause people to be inconvenienced,

23  inconvenience does not result in a denial of 'meaningful access to the political process.'"

24  (quoting *Osburn v. Cox*, 369 F.2d 1283, 1289 (11th Cir. 2004)); *Glover v. S.C.*

25  *Democratic Party*, No. C/A 4-04-CV-2171-25, 2004 WL 3262756, at *6 (D.S.C. Sept. 3,

26  2004) ("[T]he Court does not find that difficulty voting equates with a 'denial or

27  abridgment' of the right to vote.").

28          With these principles in mind, the Court first will apply step one of the two-part

1   vote denial framework to each of the challenged voting practices to determine whether

2   either disparately burdens minority voters.  The Court then will discuss step two and the

3   Senate Factors.

4   **A.  Step One (Disparate Impact)**

5   **1.  H.B. 2023**

6   H.B. 2023 is facially neutral.  It applies to all Arizonans regardless of race or

7   color.  Plaintiffs nonetheless allege that H.B. 2023 disparately burdens Hispanic, Native

8   American, and African American voters as compared to non-minority voters because

9   these groups disproportionately rely on others to collect and return their early ballots.

10   But there are no records of the numbers of people who, in past elections, have relied on

11   now-prohibited third parties to collect and return their early mail ballots, and of this

12   unknown number Plaintiffs have provided no quantitative or statistical evidence

13   comparing the proportion that is minority versus non-minority.

14   This evidentiary hole presents a practical problem.  Disparate impact analysis is a

15   comparative exercise.  To determine whether a practice disparately impacts minorities,

16   the Court generally must know approximately: (1) how many people will be affected by

17   the practice, and (2) their racial composition.  Without this information, it becomes

18   difficult to compare the law's impact on different demographic populations and to

19   determine whether the disparities, if any, are meaningful.  That is, it might be true that

20   minorities qualitatively have used ballot collection services more often than non-

21   minorities, but the discrepancy might be slight enough that it does not meaningfully deny

22   minorities an equal opportunity to participate in the political process and elect their

23   preferred representatives.  *See Frank*, 768 F.3d at 754.

24   Indeed, the Court is aware of no vote denial case in which a § 2 violation has been

25   found without quantitative evidence measuring the alleged disparate impact of a

26   challenged law on minority voters.  Rather, the standards developed for analyzing § 2

27   vote denial cases suggest that proof of a relevant statistical disparity might be necessary

28   at step one, even though it is not alone sufficient to prove a § 2 violation because of the

causation requirement at step two.[15]  *See Gonzales*, 677 F.3d at 405; *Veasey*, 830 F.3d at 244 (noting that "courts regularly utilize statistical analyses to discern whether a law has a discriminatory impact").   Further, in other contexts courts have "recognized the necessity of statistical evidence in disparate impact cases."  *Budnick v. Town of Carefree*, 518 F.3d 1109, 1118 (9th Cir. 2008) (Fair Housing Act); *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003) (Age Discrimination in Employment Act); *Cooper v. S. Co.*, 390 F.3d 695, 716 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) (Title VII); *Rollins v. Alabama Cmty. Coll. Sys.*, No. 2:09-CV-636-WHA, 2010 WL 4269133, at *9 (M.D. Ala. Oct. 25, 2010) (Equal Pay Act); *Davis v. City of Panama City, Fla.*, 510 F. Supp. 2d 671, 689 (N.D. Fla. 2007) (Title VII and 42 U.S.C. § 1983).

The Court is not suggesting that quantitative evidence of a challenged voting practice's actual effect is needed in vote denial cases.  As Chief Judge Thomas noted in his dissent during the preliminary appellate phase of this case, "quantitative evidence of the effect of a rule on voting behavior is only available after an election has occurred, at which point the remedial purpose of the Voting Rights Act is no longer served." *Feldman*, 840 F.3d at 1092 n.5 (Thomas, C.J. dissenting).  But quantitative evidence of the number of voters who used ballot collection *before* H.B. 2023's enactment, together with similar evidence of those voters' demographics, would permit the Court to reasonably infer how many voters would be affected by H.B. 2023's limitations in future elections, and whether those voters disproportionately would be minorities.[16]  As one

---

[15] In vote dilution cases the Senate Factors "are sometimes used as a non-statistical proxy . . . to link disparate impacts to current or historical conditions of discrimination." *Ohio Democratic Party*, 834 F.3d at 637 n.11.  But to use the *Gingles* factors to prove the existence of a disparity essentially would collapse the step one and step two inquiries. That is, a plaintiff could simply assume that the challenged law causes a meaningful disparity between minorities and non-minorities because of social and historical discrimination in the state.  This perhaps is another illustration of how the *Gingles* vote-dilution framework is an imperfect fit for vote denial claims.

[16] Notably, the trial in this matter occurred after H.B. 2023 had been in effect for two major elections—the 2016 presidential preference election and the 2016 general election—yet Plaintiffs still were unable to produce data on the law's impact.

1  commentator has argued:

2
3

> It can be difficult to document the racial composition of those
> who use a voting opportunity . . . , given that election and
> other public records often do not include racial or ethnic data.
> There is no getting around this problem.  But given that § 2
> forbids the denial or abridgement of the vote on account of
> race, it is reasonable that plaintiffs be required to make a
> threshold showing they are disproportionately burdened by
> the challenged practice, in the sense that it eliminates an
> opportunity they are more likely to use or imposes a
> requirement they are less likely to satisfy.

4
5
6
7

8  Daniel P. Tokaji, *Applying Section 2 to the New Vote Denial*, 50 Harv. C.R.-C.L. L. Rev.

9  439, 476 (2015).

10      The Court is mindful, however, that no court has explicitly required quantitative

11  evidence to prove a vote denial claim, and a majority of the en banc Ninth Circuit panel

12  reviewing the preliminary phase of this case appears to have rejected such a rule.  The

13  Court therefore does not find against Plaintiffs on this basis.  Rather, the Court finds that

14  Plaintiffs' circumstantial, qualitative evidence is insufficient to establish a cognizable

15  disparity under § 2.

16      To overcome the lack of quantification, Plaintiffs attempt to prove the existence of

17  a meaningful disparity through two general categories of circumstantial evidence.  First,

18  lawmakers, elections officials, and community advocates testified that ballot collection

19  tends to be used more by communities that lack easy access to secure, outgoing mail

20  services; the elderly, homebound, and disabled; the poor; those who lack reliable

21  transportation; those who work multiple jobs or lack childcare; and less educated voters

22  who are unfamiliar with or more intimidated by the voting process.  In turn, data shows

23  that these socioeconomic circumstances are disproportionately reflected in minority

24  communities.  (*See* Ex. 97 at 57; Tr. 59-60, 416-26, 432-39, 629-35, 895-900.)  It stands

25  to reason, then, that prior to H.B. 2023's enactment minorities qualitatively were more

26  likely than non-minorities to give their early ballots to third parties.

27      For example, relative to non-minorities, Hispanics and African Americans are

28  nearly two times more likely to live in poverty, and the poverty rate for Native Americans

is over three times higher.  (Ex. 93 at 15.)  Wages and unemployment rates for Hispanics, African Americans, and Native Americans consistently have exceeded non-minority unemployment rates for the period of 2010 to 2015.   (Ex. 91 at 40; Ex. 93 at 15.) According to the 2015 American Community Survey 1-year estimates, unemployment rates were 10.5 percent for African Americans, 7.7 percent for Hispanics, 16.8 percent for Native Americans, and only 5.6 percent for non-minorities.  In Arizona, 68.9 percent of non-minorities own a home, whereas only 32.3 percent of African Americans, 49 percent of Hispanics, and 56.1 percent of Native Americans do so.  (Ex. 93 at 15, 17; Ex. 98 at 33.)

Non-minorities remain more likely than Hispanics, Native Americans, and African Americans to graduate from high school, and are nearly three times more likely to have a bachelor's degree than Hispanics and Native Americans.   Additionally, in a recent survey, over 22.4 percent of Hispanics and 11.2 percent of Native Americans rated themselves as speaking English less than "very well," as compared to only 1.2 percent of non-minorities.  (Ex. 93 at 16.)  Due to their lower levels of literacy and education, minority voters are more likely to be unaware of certain technical rules, such as the requirement that early ballots be received by the county recorder, rather than merely postmarked, by 7:00 p.m. on Election Day.  (Ex. 91 at 38.)

As of 2015, Hispanics, Native Americans, and African Americans fared worse than non-minorities on a number of key health indicators. (Ex. 93 at 18.)   Native Americans in particular have much higher rates of disability than non-minorities, and Arizona counties with large Native American populations have much higher rates of residents with ambulatory disabilities.  For example, "17 percent of Native Americans are disabled in Apache County, 22 percent in Navajo County, and 30 percent in Coconino County."   Further, "11 percent [of individuals] have ambulatory difficulties in Apache County, 13 percent in Navajo County, and 12 percent in Coconino County, all of which contain significant Native American populations and reservations."  (Ex. 97 at 60.)

Hispanics, Native Americans, and African Americans also are significantly less

likely than non-minorities to own a vehicle, more likely to rely upon public transportation, more likely to have inflexible work schedules, and more likely to rely on income from hourly wage jobs.  (Ex. 93 at 12-18; Ex. 97 at 51-52; Tameron Dep. 155:5-20; Pstross Dep. 34:11-22.)   Ready access to reliable and secure mail service is nonexistent in some minority communities.  (Ex. 97 at 57; Ex. 98 at 18; Tr. 506.)

These disparities exist in both urban and rural areas.  For example, Representative Charlene Fernandez described a lack of home mail service in rural San Luis, a city that is 98 percent Hispanic.  Almost 13,000 residents rely on a post office located across a major highway.  With no mass transit, a median income of $22,000, and many people not owning cars, receiving and sending mail in San Luis can be more difficult than in other communities.  (Tr. 40-46.)  A surprising number of voters in the Hispanic community also distrust returning their voted ballot via mail, particularly in low-income communities where mail theft is common.  Although a lack of outgoing mail presents a problem for rural minority voters, unsecure mailboxes are an impediment for urban minorities who distrust the mail service and prefer instead to give their ballots to a volunteer.  (Tr. 98, 238-39, 896-97, 1170; Healy Dep. 97:18-24; Scharff Dep. 92:5-17.)

These problems are particularly acute in Arizona's Native American communities, in which vehicle ownership is significantly lower than non-minority Arizonans.  (Ex. 91 at 42.)   Between one quarter and one half of all households on Native American reservations lack access to a vehicle.  (Ex. 98 at 16.)  Moreover, according to Dr. Rodden, "the extent to which rural Native Americans lack mail service is quite striking."  "[T]he majority of Native Americans in non-metropolitan Arizona do not have residential mail service."  "Only 18 percent of Native American registered voters have home mail delivery. . . . The rate at which registered voters have home mail service is over 350 percent higher for non-Hispanic whites than for Native Americans."   As such, most Native American registered voters must travel to a town to retrieve their mail, "[y]et rates of vehicle access are quite low."  (Ex. 97 at 57.)  On the Navajo Reservation, most people live in remote communities, many communities have little to no vehicle access, and there

is no home incoming or outgoing mail, only post office boxes, sometimes shared by multiple families.  (Tr. 172-75, 297-98.)

There is no home delivery in the Tohono O'odham Nation, where there are 1,900 post office boxes and some cluster mail boxes.  The postmaster for the Tohono O'odham Nation anecdotally related to Representative Fernandez that she observes residents come to the post office every two or three weeks to get their mail.  Due to the lack of transportation, the condition of the roads, and health issues, some go to post office only once per month.  (Tr. 52-58, 315-17.)

Thus, "for many Native Americans living in rural locations, especially on reservations, voting is an activity that requires the active assistance of friends and neighbors."  (Ex. 97 at 60.)  LeNora Fulton—a member of the Navajo Nation, former representative of the Fort Defiance Chapter of the Navajo National Council, member of the Navajo Election Board of Supervisors, and the Apache County Recorder from 2004 through 2016, where her responsibilities included overseeing voter registration, early voting and voter outreach—explained that people in the Navajo Nation trust non-family members to deliver their early ballots because "[i]t's part of the culture. . . .  [T]here is a clan system.  They may not be related by blood, but they are related by clan.  Everyone on the Navajo Nation is related on way or another through the clan system."  Ballot collection and delivery by those with the means to travel "was the standard practice with the Apache County . . . but also with the Nation[.]"  "We have many people that would come into our office in St. Johns that help individuals that not are not able to get a ballot, you know, to the office.  They would bring it in.  And so it was just a standard practice . . . It was a norm for us."  According to Fulton, limiting who may collection and deliver early ballots "would be a huge devastation . . . .  The laws are supposed to be helpful to people, but in this instance, it's harmful."  (Tr. 283-85, 300, 322-324.)

The second category of circumstantial evidence concerns those who tend to offer ballot collection services.  Within the last decade, ballot collection has become a larger part of the Democratic Party's GOTV strategy.  The Democratic Party and community

advocacy organizations have focused their ballot collection efforts on low-efficacy voters, who trend disproportionately minority.  In turn, minorities in Arizona tend to vote for Democratic candidates.  (Ex. 93 at 4-6, 11; Tr. 92, 283, 309, 416-26, 632-33, 659, 902-03, 1143, 1191-96, 1200, 1407, 1770-71, 1843-44; Healy Dep. 28:15-29:13.)  Individuals who have collected ballots in past elections observed that minority voters, especially Hispanics, were more interested in utilizing their services.  Indeed, Helen Purcell, who served as the Maricopa County Recorder for 28 years from 1988 to 2016, observed that ballot collection was disproportionately used by Hispanic voters.  (Tr. 417-19, 635, 642, 866, 895-900, 931-32, 1039-40, 1071, 1170.)

In contrast, the Republican Party has not significantly engaged in ballot collection as a GOTV strategy.  The base of the Republican Party in Arizona trends non-minority.  On average, non-minorities in Arizona vote 59 percent for Republican candidates, as compared with 35 percent of Hispanic voters.  Individuals who have collected ballots in past elections have observed that voters in predominately non-minority areas were not as interested in ballot collection services.  (Tr. 430-31, 898, 1170, 1192, 1408; Ex. 91 at 31.)

Based on this evidence, the Court finds that prior to H.B. 2023's enactment minorities qualitatively were more likely than non-minorities to return their early ballots with the assistance of third parties.  The Court, however, cannot speak in more specific or precise terms than "more" or "less."  Although there are significant socioeconomic disparities between minorities and non-minorities in Arizona, these disparities are an imprecise proxy for disparities in ballot collection use.  Plaintiffs do not argue that all or even most socioeconomically disadvantaged voters use ballot collection services, nor does the evidence support such a finding.  Rather, the anecdotal estimates from individual ballot collectors indicate that a relatively small number of voters have used ballot collection services in past elections.  It reasonably follows, then, that even among socioeconomically disadvantaged voters, most do not use ballot collection services to vote.  Considering the vast majority of Arizonans, minority and non-minority alike, vote without the assistance of third-parties who would not fall within H.B. 2023's exceptions,

it is unlikely that H.B. 2023's limitations on who may collect an early ballot cause a meaningful inequality in the electoral opportunities of minorities as compared to non-minorities.

Moreover, H.B. 2023 does not impose burdens beyond those traditionally associated with voting. Although, for some voters, ballot collection is a preferred and more convenient method of voting, H.B. 2023 does not deny minority voters meaningful access to the political process simply because the law makes it slightly more difficult or inconvenient for a small, yet unquantified subset of voters to return their early ballots. In fact, no individual voter testified that H.B. 2023's limitations on who may collect an early ballot would make it significantly more difficult to vote. The Court therefore finds that Plaintiffs have not carried their burden at step one of the vote denial framework.

## 2.  OOP Voting

Unlike their H.B. 2023 challenge, Plaintiffs provided quantitative and statistical evidence of disparities in OOP voting through the expert testimony of Dr. Rodden. Because Arizona does not track the racial demographics of its voters, Dr. Rodden used an open-source software algorithm that he found online to predict each voter's race. (Tr. 378-414, 520-24.) Specifically, Dr. Rodden placed the names of individuals who cast ballots in particular elections into Census blocks and tracts, for which racial data is available from the Census, and then combined that information with surname data to estimate the race of each voter. This approach has become common in academic studies, as well as VRA litigation. Dr. Rodden added further precision to his estimates by conditioning them on not just surnames and neighborhood race statistics, but also on additional information found in the voter file, such as the individual's age and party.[17]

---

[17]  Dr. Thornton criticized Dr. Rodden's analysis of racial disparities in OOP voting among the smallest minority groups in Arizona's smaller counties, but when Dr. Rodden conducted an analysis addressing Dr. Thornton's criticisms he reached the same results. Dr. Thornton also was critical of Dr. Rodden's analysis because the application of the algorithm to Arizona voters includes unidentifiable measurement error. But because there is no concrete racial data for individual voters, Dr. Rodden has no means to compare his estimates. Indeed, if such concrete data existed, there would have been no need for Dr. Rodden's estimates. Moreover, as Dr. Rodden explains in his Second Expert

(Ex. 97 at 10-15.)

Dr. Rodden's analysis is credible and shows that minorities are over-represented among the small number of voters casting OOP ballots.  For example, in Maricopa County—which accounts for 61 percent of Arizona's population—non-minority voters accounted for only 56 percent of OOP ballots cast during the 2012 general election, despite casting 70 percent of all in-person voters.  In contrast, African American and Hispanic voters made up 10 percent and 15 percent of in-person voters, but accounted for 13 percent and 26 percent of OOP ballots, respectively.  Native American voters accounted for 1.1 percent of in-person voters, and 1.3 percent of OOP ballots.  Dr. Rodden observed similar results for Pima County.  (Ex. 91 at 52; Ex. 95 at 31-33, 37, 43.)

Similarly, minority voters cast a disproportionate share of OOP ballots during the 2016 general election.  In Maricopa County, estimated rates of OOP voting were twice as high for Hispanics, 86 percent higher for African Americans, and 73 percent higher for Native Americans than for their non-minority counterparts.  In Pima County, rates of OOP voting were 150 percent higher for Hispanics, 80 percent higher for African Americans, and 74 percent higher for Native Americans than for non-minorities.  Moreover, in Pima County the overall rate of OOP voting was higher, and the racial disparities larger, in 2016 than in 2014.  Among all counties that reported OOP ballots in the 2016 general election, a little over 1 in every 100 Hispanic voters, 1 in every 100 African-American voters, and 1 in every 100 Native American voters cast an OOP ballot.  For non-minority voters, the figure was around 1 in every 200 voters.  Racial disparities in OOP voting were found in all counties except La Paz County, which has a small minority population.  (Ex. 97 at 3, 19-21, 28-34.)

Although Dr. Rodden's race estimation is credible, his analysis paints an incomplete picture of the practical impact of OOP voting because the majority of Arizonans successfully vote by mail and therefore are unaffected by precinct

Report, his methods lead to more conservative estimates of disparities, a fact not challenged by Dr. Thornton.  (Ex. 98 at 3, 8-11.)

requirements.  For example, in the 2012 general election Arizona voters cast 10,979 OOP ballots out of the 2,323,579 ballots cast statewide, accounting for 0.47 percent of all votes cast.  In Maricopa County, 1,390,836 total ballots were cast, of which 7,529 (or 0.54 percent) were rejected for being cast out of the voter's assigned precinct.  OOP ballots cast by non-minority voters therefore accounted for only 0.3 percent of all votes cast in Maricopa County during the 2012 election, whereas OOP ballots cast by Hispanic and African American voters accounted only for approximately 0.14 percent and 0.07 percent, respectively.  These figures dropped substantially in the 2016 general election, during which only 3,970 Arizonans voted OOP out of the 2,661,497 ballots cast statewide, representing only 0.15 percent of all votes cast.   In Maricopa County, 1,608,875 total ballots were cast, of which only 2,197 (or 0.14 percent) were cast OOP. (Tr. 1927-32; Exs. 578-79, 581.)

Considering OOP ballots represent such a small and ever-decreasing fraction of the overall votes cast in any given election, OOP ballot rejection has no meaningfully disparate impact on the opportunities of minority voters to elect their preferred representatives.  To be clear, the Court is not suggesting that the votes of individuals who show up at the wrong precinct are unimportant.  But, as a practical matter, the disparity between the proportion of minorities who vote at the wrong precinct and the proportion of non-minorities who vote at the wrong precinct does not result in minorities having unequal access to the political process.  *See* Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 252 (3d ed. 2011) (discussing difference between statistical significance and practical significance).  No state has exactly equal rates at every stage of its voting system, and in the end the vast majority of all votes in Arizona—cast by minority and non-minority voters alike—are counted.  *See Frank*, 768 F.3d at 754.

Moreover, Arizona's policy to not count OOP ballots is not the cause of the disparities in OOP voting.   Dr. Rodden's analysis confirms that OOP voting is concentrated in relatively dense precincts that are disproportionately populated with renters and those who move frequently.  These groups, in turn, are disproportionately

1    composed of minorities.  (Ex. 97 at 16-18.)  Because minority voters in Arizona have

2    disproportionately higher rates of residential mobility, they are more likely to need to

3    renew their voter registration and reeducate themselves about their new voting locations.

4    (Ex. 91 at 39; Ex. 93 at 17; Ex. 95 at 4, 7-12; Ex. 98 at 33.)

5         Polling place locations present additional challenges for Native American voters.

6    For example, Navajo voters in Northern Apache County lack standard addresses, and

7    their precinct assignments for state and county elections are based upon guesswork,

8    leading to confusion about the voter's correct polling place.  Additionally, boundaries for

9    purposes of tribal elections and Apache County precincts are not the same.  As a result, a

10   voter's polling place for tribal elections often differs from the voter's polling place for

11   state and county elections.  Inadequate transportation access also can make travelling to

12   an assigned polling place difficult.  (Ex. 97 at 51-54; Tr. 299-301.)

13        Plaintiffs, however, do not challenge the manner in which Arizona counties

14   allocate and assign polling places or Arizona's requirement that voters re-register to vote

15   when they move.  Plaintiffs also offered no evidence of a systemic or pervasive history of

16   minority voters being given misinformation regarding the locations of their assigned

17   precincts, while non-minority voters were given correct information.  Nor have they

18   shown that precincts tend to be located in areas where it would be more difficult for

19   minority voters to find them, as compared to non-minority voters.  To the contrary, there

20   are many ways for voters in Arizona to locate their assigned precincts, and state, county,

21   and local elections officials engage in substantial informational campaigns and voter

22   outreach.  Plaintiffs, instead, have challenged what Arizona does with OOP ballots after

23   they have been cast, which does not cause the observed disparities in OOP voting.

24        In sum, Plaintiffs have not carried their burden at step one of the vote denial

25   framework for two independent reasons.  First, they have not shown that Arizona's policy

26   to not count OOP ballots causes minorities to show up to vote at the wrong precinct at

27   rates higher than their non-minority counterparts.  Second, given that OOP ballots

28   account for such a small fraction of votes cast statewide, Plaintiffs have not shown that

the racial disparities in OOP voting are practically significant enough to work a meaningful inequality in the opportunities of minority voters as compared to non-minority voters to participate in the political process and elect their preferred representatives.

### B.  Step Two (Senate Factors)

Step two of the results test is informed by the Senate Factors and asks whether the disparate burdens imposed by the challenged voting practices are in part caused by or linked to social and historical conditions within the state that have or currently produce discrimination against the affected minorities.  The Court does not need to reach this step because Plaintiffs have not shown at step one that the challenged voting practices impose meaningfully disparate burdens on minority voters as compared to non-minority voters. *Cf. Ohio Democratic Party*, 834 F.3d at 638 ("If this first element is met, the second step comes into play, triggering consideration of the 'totality of the circumstances,' potentially informed by the 'Senate Factors' discussed in '*Gingles*.'").  Nonetheless, to ensure that the record is fully developed, the Court will address below the evidence pertinent to the Senate Factors.  The Court will not discuss factors three and four, however, because they are not germane to the challenged voting practices and there is insufficient evidence to warrant discussion.

### 1.  Relevant History of Official Discrimination

Arizona has a history of discrimination against Native Americans, Hispanics, and African Americans.  Such discrimination began as early as 1912, when Arizona became a state, and continued into the modern era.  In 1975, Arizona's history of discrimination resulted in it becoming one of only nine states to be brought wholly under § 5 of the VRA as a "covered jurisdiction."  In addition to being covered under § 5, it was one of only three states to be covered under § 4(f)(4) of the Act for Spanish Heritage.  (Ex. 89 at 5-24; Ex. 91 at 2, 24-30; Ex. 521 at 43-45; Doc. 361 ¶ 42.)

When Arizona became a state in 1912, Native Americans were excluded from voting. Even after Congress acknowledged that Native Americans were citizens in 1924,

thereby affording them the right to vote, Arizona's Constitution continued to deny Native Americans that right.  (Ex. 89 at 17; Ex. 521 at 43.)  It was not until 1948—24 years after federal law allowed Native Americans to vote—that the Arizona Supreme Court found the State's disenfranchisement of Native Americans was unconstitutional and finally granted Native Americans the right to vote.  (Doc. 361 ¶ 17; Ex. 89 at 17; Ex. 521 at 45.); *Harrison v. Laveen*, 196 P.2d 456, 463 (Ariz. 1948).

Despite this ruling, Native Americans, as well as Hispanics and African Americans, continued to face barriers to participation in the franchise.  For example, in 1912 Arizona enacted an English literacy test for voting.  The test was enacted specifically to limit "the ignorant Mexican vote," but it also had the effect of reducing the ability of African Americans and Native Americans to register and vote, as registrars applied the test to these communities as well.  Well into the 1960s, white Arizonans challenged minority voters at the polls by asking them to read and explain literacy cards. (Doc. 361 ¶ 14; Ex. 89 at 14-17; Ex. 521 at 44-45.)

In 1970, Congress amended the VRA to enact a nationwide ban on literacy tests after finding that they were used to discriminate against voters on account of their race or ethnicity.  In reaching that finding, Congress cited evidence that showed application of the literacy test had significantly lowered the participation rates of minorities.  It specifically found that in Arizona "only two counties out of eight with Spanish surname populations in excess of 15% showed a voter registration equal to the state-wide average."  It also noted that Arizona had a serious deficiency in Native American voter registrations.  Rather than comply with the VRA and repeal its literacy test, Arizona challenged the ban, arguing that it could not be enforced to the extent that it was inconsistent with the State's literacy requirement.  Even after the Supreme Court upheld Congress's ban, Arizona waited an additional two years to formally repeal its literacy test.  (Ex. 89 at 14-18; Ex. 91 at 24); *see Or. v. Mitchell*, 400 U.S. 112, 118 (1970).

The effects of Arizona's literacy test were compounded by the State's history of discrimination in the education of its Hispanic, Native American, and African American

citizens. (Doc. 361 ¶¶ 2-4; Ex. 89 at 9-10; Ex. 91 at 5.)  From 1912 until the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), segregated education was widespread throughout Arizona and sanctioned by both the courts and the state legislature.  (Ex. 521 at 35-39; Ex. 89 at 9-12); *see also Dameron v. Bayless*, 126 P. 273 (Ariz. 1912); *Gonzales v. Sheely*, 96 F. Supp. 1004, 1008-09 (D. Ariz. 1951) (enjoining segregation of Mexican school children in Maricopa County).  In fact, the Tucson Public Schools only recently reached a consent decree with the DOJ over its desegregation plan in 2013.  (Ex. 91 at 27.)  The practice of segregation also extended beyond schools; it was common place to have segregated public spaces such as restaurants, swimming pools, and theaters.  (Ex. 89 at 15; Ex. 521 at 34).  Even where schools were not segregated, Arizona enacted restrictions on bilingual education.  As recently as 2000, Arizona banned bilingual education with the passage of Proposition 203.  (Ex. 89 at 20; Ex. 91 at 47.)

Arizona has a record of failing to provide adequate funding to teach its non-English speaking students.  This under-funding has taken place despite multiple court orders instructing Arizona to develop an adequate funding formula for its programs, including a 2005 order in which Arizona was held in contempt of court for refusing to provide adequate funding for its educational programs.  (Ex. 91 at 46-47); *Flores v. Arizona*, 405 F. Supp. 2d 1112 (D. Ariz. 2005), *vacated*, 204 Fed. App'x 580 (9th Cir. 2006).  "According to the Education Law Center's latest National Report Card that provided data for 2013, Arizona ranked 47th among the states in per-student funding for elementary and secondary education."  (Ex. 91 at 47.)

Along with the State's hostility to bilingual education, Maricopa County has sometimes failed to send properly translated education materials to its Spanish speaking residents, resulting in confusion and distrust from Hispanic voters.  For example, in 2012, Maricopa County misprinted the date of the election on over 2,000 Spanish language information cards and bookmarks, some of which were distributed into the community. (Ex. 89 at 22; Ex. 91 at 51; Healy Dep. 114:1-22.)

1       With that said, discrimination against minorities in Arizona has not been linear.

2   (Ex. 521 at 4.)  For example, Arizona was subject to § 5 preclearance requirements until

3   2013.   In *Shelby*, however, the Supreme Court found the formula used to determine

4   which states were subject to preclearance requirements unconstitutional because it was

5   "based on 40–year–old facts having no logical relation to the present day."  570 U.S. at

6   553-54.   Moreover, during the time that Arizona was under preclearance requirements

7   (1975-2013), the DOJ did not issue any objections to any of its statewide procedures for

8   registration or voting.

9       From 1982 to 2002, the DOJ objected to four of Arizona's statewide redistricting

10  plans.  Arizona acted to avoid the politics of racially discriminatory redistricting when, in

11  2000, the Arizona Independent Redistricting Commission ("AIRC") was formed pursuant

12  to a voter initiative (Proposition 106).  The AIRC is composed of two Republicans, two

13  Democrats, and an Independent, and it is tasked with redrawing of legislative and

14  congressional district lines following each decennial Census.  According to its enacting

15  constitutional provisions, the AIRC considers the following six criteria when

16  redistricting: (a) equal population; (b) compactness and contiguousness; (c) compliance

17  with the Constitution and the VRA; (d) respect for communities of interest; (e)

18  incorporation of visible geographic features, including city, town and county boundaries,

19  as well as undivided census tracts; and (f) creation of competitive districts where there is

20  no significant detriment to other goals.  (Doc. 361 ¶ 44.)  The most recent AIRC set a

21  goal to pass preclearance with its first submittal to DOJ.  The AIRC did this by ensuring

22  the competitiveness of legislative and congressional districts and ensuring that minorities

23  have the opportunity to elect candidates of their choice.  *See Harris v. Ariz. Indep.*

24  *Redistricting Comm'n*, -- U.S. --, 136 S. Ct. 1301, 1308 (2016).   The Commission

25  succeeded, and the DOJ approved Arizona's new maps on April 9, 2012 without

26  objection.

27      In sum, "[d]iscriminatory action has been more pronounced in some periods of

28  state history than others . . . [and] each party (not just one party) has led the charge in

discriminating against minorities over the years."   Sometimes, however, partisan objectives are the motivating factor in decisions to take actions detrimental to the voting rights of minorities.  "[M]uch of the discrimination that has been evidenced may well have in fact been the unintended consequence of a political culture that simply ignores the needs of minorities."  (Ex. 90 at 8.)  Arizona's recent history is a mixed bag of advancements and discriminatory actions.

### 2.  Racially Polarized Voting

Arizona has a history of racially polarized voting, which continues today.  (Ex. 91 at 30-33, 44-45.)  In the most recent redistricting cycle, experts for the AIRC found that at least one congressional district and five legislative districts clearly exhibited racially polarized voting.  (Ex. 91 at 29-33.)  Exit polls for the 2016 general election demonstrate that voting between non-minorities and Hispanics continues to be polarized along racial lines.  (Ex. 91 at 29-33, 44-45; Ex. 92 at 12, 14; Ex. 94 at 4); *see also Gonzalez*, 677 F.3d at 407.

### 3.  Socioeconomic Effects of Discrimination

Racial disparities between minorities and non-minorities in socioeconomic standing, income, employment, education, health, housing, transportation, criminal justice, and electoral representation have persisted in Arizona.  (Ex. 89 at 7-8, 12, 23; Ex. 91 at 39-43; Ex. 93 at 12-18, 21, 24; Ex. 95 at 4, 9-11; Ex. 97 at 46-52, 56-58; Ex. 98 at 16, 18, 33; Tameron Dep. 155:5-20; Pstross Dep. 34:11-22; Tr. 506.)   Of these, disparities in transportation, housing, and education are most pertinent to the specific burdens imposed by the challenged laws.

### 4.  Racial Appeals in Political Campaigns

Arizona's racially polarized voting has resulted in racial appeals in campaigns. For example, when Raul Castro ran for governor in the 1970s, his opponents urged support for the white candidate because "he looked like a governor."  In that same election, a newspaper published a picture of Fidel Castro with a headline that read "Running for governor of Arizona."  (Ex. 89 at 19.)  In a 2010 bid for State

Superintendent of Public Education, John Huppenthal "ran an advertisement in which the announcer said that Huppenthal was 'one of us.'  The announcer noted that Huppenthal voted against bilingual education and 'will stop La Raza.'"  Similarly, when running for governor in 2014, Maricopa County Attorney Andrew Thomas ran an ad describing himself as "the only candidate who has stopped illegal immigration" while "simultaneously show[ing] a Mexican flag with a red strikeout line through it superimposed over the outline of Arizona."  (Ex. 91 at 44.)

Moreover, racial appeals have been made in the specific context of legislative efforts to limit ballot collection.  During the legislative hearings on earlier bills to criminalize ballot collection, Republican sponsors and proponents expressed beliefs that ballot collection fraud regularly was occurring but struggled with the lack of direct evidence substantiating those beliefs.  In 2014, the perceived "evidence" arrived in the form of a racially charged video created by Maricopa County Republican Chair A.J. LaFaro (the "LaFaro Video") and posted on a blog.  (Ex. 121.)  The LaFaro Video showed surveillance footage of a man of apparent Hispanic heritage appearing to deliver early ballots.  It also contained a narration of "Innuendos of illegality . . .  [and] racially tinged and inaccurate commentary by . . . LaFaro."  (Ex. 91 at 18 n.40; Ex. 524 at 23-24.)  LaFaro's commentary included statements that the man was acting to stuff the ballot box; that LaFaro did not know if the person was an illegal alien, a dreamer, or citizen, but knew that he was a thug; and that LaFaro did not follow him out to the parking lot to take down his tag number because he feared for his life.  The LaFaro Video goes on to tell about ballot parties where people gather en mass and give their un-voted ballots to operatives of organizations so they can not only collect them, but also vote them illegally.  (Ex. 91 at 18; Ex. 121.)

The LaFaro Video did not show any obviously illegal activity and there is no evidence that the allegations in the narration were true.  Nonetheless, it "became quite prominent in the debates over H.B. 2023."  (Tr. 1154.)  The LaFaro video also was posted on Facebook and YouTube, shown at Republican district meetings, and was

incorporated into a television advertisement—entitled "Do You Need Evidence Terry?"—for Secretary Reagan when she ran for Secretary of State.  (Ex. 91 at 18; Ex. 107.)  In the ad, the LaFaro Video plays after a clip of then-Arizona Attorney General Terry Goddard stating he would like to see evidence that there has been ballot collection fraud.  While the video is playing, Secretary Reagan's narration indicates that the LaFaro Video answers Goddard's request for evidence of fraud.  The LaFaro Video, however, merely shows a man of apparent Hispanic heritage dropping off ballots and not obviously violating any law.[18]  (Ex. 107.)

### 5.  Minority Representation in Public Offices

Notwithstanding racially polarized voting and racial appeals, the disparity in the number of minority elected officials in Arizona has declined.  Arizona has been recognized for improvements in the number of Hispanics and Native Americans registering and voting, as well as in the overall representation of minority elected officials in the State.  (Ex. 521 at 27-28.)  "Nonwhites make up 25 percent of Arizona's elected office holders, compared to 44 percent of the total population.  This gives [Arizona] the 16th best representation ratio in the country."  (Ex. 524 at 44.)

Nevertheless, Arizona has seen only one Hispanic and one African American elected to statewide office, and Arizona has never elected a Native American to statewide office.  No Native American or African American has been elected to represent Arizona in the United States House of Representatives.  Further, no Hispanic, Native American, or African American has ever served as a United States Senator representing Arizona or as Arizona Attorney General.  (Ex. 91 at 45; Ex. 93 at 19-20; Ex. 89 at 19, 22.)

### 6.  Lack of Responsiveness to Minority Needs

Plaintiffs' evidence on this factor, presented through the analysis and opinions of Dr. Lichtman, is insufficient to establish a lack of responsiveness on the part of elected

---

[18] Notably, LaFaro was not called as a witness in this case, Defendants do not rely on the LaFaro Video as evidence of fraud, and, despite the implications of her campaign advertisement, Secretary Reagan testified in deposition that "I have never accused anyone collecting ballots as doing fraudulent activities[.]"  (Reagan Dep. 91:2-3.)

officials to particularized needs of minority groups.  Dr. Lichtman ignored various topics that are relevant to whether elected officials have shown responsiveness, and he did not conduct research on the issues in Arizona when considering this factor.

Notably, the CCEC engages in outreach to various communities, including the Hispanic and Native American communities, to increase voter participation.  The CCEC develops an annual voter education plan in consultation with elections officials and stakeholders, and the current Chairman of the CCEC is Steve Titla, an enrolled member of the San Carlos Apache Tribe, who has been particularly vocal in supporting CCEC outreach to Native Americans.

### 7.  Justifications for Challenged Provisions

Precinct-based voting helps Arizona counties estimate the number of voters who may be expected at any particular precinct, allows for better allocation of resources and personnel, improves orderly administration of elections, and reduces wait times.  The precinct-based system also ensures that each voter receives a ballot reflecting only the races for which that person is entitled to vote, thereby promoting voting for local candidates and issues and making ballots less confusing.  Arizona's policy to not count OOP ballots is one mechanism by which it strictly enforces this system to ensure that precinct-based counties maximize the system's benefits.  This justification is not tenuous.

As for H.B. 2023, there is no direct evidence that the type of ballot collection fraud the law is intended to prevent or deter has occurred.  Although the justifications for H.B. 2023 are weaker than the justifications for the State's OOP ballot policy, Arizona nonetheless has a constitutionally adequate justification for the law: to reduce opportunities for early ballot loss or destruction.

### 8.  Overall Assessment

In sum, of the germane Senate Factors, the Court finds that some are present in Arizona and others are not.  Plaintiffs have shown that past discrimination in Arizona has had lingering effects on the socioeconomic status of racial minorities.  But Plaintiffs' causation theory is too tenuous to support their VRA claim because, taken to its logical

conclusion, virtually any aspect of a state's election regime would be suspect as nearly all costs of voting fall heavier on socioeconomically disadvantaged voters. Such a loose approach to causation, which potentially would sweep away any aspect of a state's election regime in which there is not perfect racial parity, is inconsistent with the Ninth Circuit's repeated emphasis on the importance of a "causal connection between the challenged voting practice and a prohibited discriminatory result." *Salt River Project*, 109 F.3d at 595. For these reasons, the Court concludes that Plaintiffs have not carried their burden at either step of the § 2 results test.

## VII.   FIFTEENTH AMENDMENT/§ 2 (INTENTIONAL DISCRIMINATION)

Lastly, Plaintiffs contend that H.B. 2023 violates § 2 and the Fifteenth Amendment because it was enacted with the intent to suppress minority votes. The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," and authorizes Congress to enforce this mandate "by appropriate legislation." Section 2 is such legislation. Although Congress amended the VRA in 1982 to add the results test, § 2 continues to prohibit intentional discrimination in a manner coextensive with the Fifteenth Amendment. Consequently, the standards for both the statutory and the constitutional claim overlap.

The parties agree that the standard for finding unconstitutional, intentional racial discrimination is governed by the Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). There, the Supreme Court explained that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Id.* at 264-65. Rather, "[p]roof of racially discriminatory intent or purpose is required to show a violation" of the Constitution. *Id.* at 265.

Discriminatory purpose must be "a motivating factor in the decision," but it need not be the only factor. *Id.* at 265-66. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and

direct evidence of intent as may be available." *Id.* at 266.  "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Wash. v. Davis*, 426 U.S. 229, 242 (1976).  "But the ultimate question remains: did the legislature enact a law 'because of,' and not just 'in spite of,' its discriminatory effect." *N.C. St. Conf. of NAACP v. McCrory*, 831 F.3d 204, 200 (4th Cir. 2016) (quoting *Pers. Adm'r of Mass. v. Fenney*, 442 U.S. 256, 279 (1979)).

To guide this inquiry, the *Arlington Heights* Court articulated a non-exhaustive list of factors courts should consider.  These so-called "*Arlington Heights* Factors" include: (1) the historical background and sequence of events leading to enactment; (2) substantive or procedural departures from the normal legislative process; (3) relevant legislative history; and (4) whether the law has a disparate impact on a particular racial group.  *Arlington Heights*, 429 U.S. at 266-68.  If "racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).  This same framework applies to § 2 claims based on allegations of discriminatory purpose.  *See Garza v. Cty. of L.A.*, 918 F.2d 763, 766 (9th Cir. 1990).

Having considered these factors, the Court finds that H.B. 2023 was not enacted with a racially discriminatory purpose.  Though some individual legislators and proponents of limitations on ballot collection harbored partisan motives—perhaps implicitly informed by racial biases about the propensity of GOTV volunteers in minority communities to engage in nefarious activities—the legislature as a whole enacted H.B. 2023 in spite of opponents' concerns about its potential effect on GOTV efforts in minority communities, not because of that effect.  Despite the lack of direct evidence supporting their concerns, the majority of H.B. 2023's proponents were sincere in their belief that ballot collection increased the risk of early voting fraud, and that H.B. 2023 was a necessary prophylactic measure to bring early mail ballot security in line with in-

person voting.

Beginning with the historical background, H.B. 2023 emerged in the context of racially polarized voting, increased use of ballot collection as a Democratic GOTV strategy in low-efficacy minority communities, and on the heels of several prior efforts to restrict ballot collection, some of which were spearheaded by former Arizona State Senator Don Shooter.[19]   Due to the high degree of racial polarization in his district, Shooter was in part motivated by a desire to eliminate what had become an effective Democratic GOTV strategy.  (Tr. 1061-63, 1200, 1687-88, 2158-62; Ex. 89 at 24; Ex. 91 at 52-55; Ex. 92 at 2-10; Ex. 93 at 2; Shooter Dep. at 117:5-16.)  Indeed, Shooter's 2010 election was close: he won with 53 percent of the total vote, receiving 83 percent of the non-minority vote but only 20 percent of the Hispanic vote.  (Ex. 94 at 4.)

Shooter's efforts to limit ballot collection were marked by unfounded and often farfetched allegations of ballot collection fraud.  (Tr. 1064, 2162, 2194, 2205; Ex. 3 at 7-8; Ex. 10 at 3-9; Ex. 25 at 22-23; Ex. 91 at 19-20; Ex. 123.)  Though his allegations were demonstrably false, they—along with the racially-tinged LaFaro Video—spurred a larger debate in the legislature about the security of early mail voting as compared to in-person voting.[20]  (Tr. 1644, 1687, 2158-59, 2161-62; Ex. 10 at 49-53; Ex. 17 at 15-16; Ex. 23 at 83-84.)

Turning to the relevant legislative history, proponents of H.B. 2023 repeatedly voiced concerns that mail-in ballots were less secure than in-person voting, and that ballot collection created opportunities for fraud.  Although no direct evidence of ballot collection fraud was presented to the legislature or at trial, Shooter's allegations and the LaFaro Video were successful in convincing H.B. 2023's proponents that ballot collection presented opportunities for fraud that did not exist for in-person voting, and

---

[19] Shooter most recently was a member of the Arizona House of Representatives but served as a state senator during the relevant time period.

[20] Although the video referenced by various proponents of ballot collection limitations was not always identified as such, it is plain from their descriptions that they were describing the LaFaro video.

these proponents appear to have been sincere in their beliefs that this was a potential problem that needed to be addressed.  (Ex. 17 at 11-13, 17-75, 83-84; Ex. 19 at 56-57; Ex. 21 at 11; Ex. 23 at 36; Tr. 1450, 1805, 1822-23.)  Notably, H.B. 2023 found support among some minority officials and organizations.   For example, the measure was supported by the Arizona Latino Republican Association for the Tucson Chapter, which expressed concerns that elderly people in the Latino community were being taken advantage of by ballot collectors.  (Ex. 17 at 71-75.)  Likewise, Michael Johnson, an African American who had served on the Phoenix City Council, strongly favored H.B 2023 and expressed concern about stories of ballot collectors misrepresenting themselves as election workers.  (Ex. 17 at 45-50.)  Further, although some Democratic lawmakers accused their Republican counterparts of harboring partisan or racially discriminatory motives, this view was not shared by all of H.B. 2023's opponents.  (Tr. 697.)  For example, Representative Fernandez testified that she has no reason to believe H.B. 2023 was enacted with the intent to suppress Hispanic voting.  (Tr. 83.)

As for departures from the normal legislative process, Plaintiffs cite two prior efforts to limit ballot collection as examples of procedural discrepancies.  First, in 2011 Arizona enacted S.B. 1412, which required any person who delivered more than ten early ballots to provide a copy of her photo identification to the receiving elections official.  If a ballot collector could not produce a copy of her photo identification, the elections official was directed to record the information from whatever identification that the ballot collector had available.  Within 60 days of each election, the Secretary of State was to compile a public statewide report listing the identities and personal information of all ballot collectors.  (Ex. 2 at 16-19; Ex. 91 at 6-7.)

When S.B. 1412 became law, Arizona still was subject to § 5 preclearance. Accordingly, S.B. 1412 could not go into effect until the law had been precleared by the DOJ or a federal court.   The Arizona Attorney General submitted the law for preclearance on April 26, 2011, and on June 27, 2011 the DOJ precleared all provisions except for the provision regulating ballot collection.  (Ex. 41; Ex. 91 at 6-7.)  As to that

provision, the DOJ stated that "the information sent [wa]s insufficient to enable us to determine that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group." The DOJ asked for more information and stated that "if no response is received within sixty days of this request, the Attorney General may object to the proposed changes." (Ex. 41.) Rather than respond to the DOJ's request for more information, the Attorney General chose to voluntarily withdraw the ballot collection provision on July 28, 2011, rendering the law unenforceable. (Ex. 91 at 6-7; Ex. 42.) "Of 773 preclearance submissions this was one of only 6 that were fully or partially withdrawn in Arizona." (Ex. 91 at 7.) Arizona formally repealed the law shortly thereafter. (Ex. 5.)

Second, Republican legislators again tried to restrict ballot collection in 2013 with the enactment of H.B. 2305, which banned partisan ballot collection and required other ballot collectors to complete an affidavit stating that they had returned the ballot. Violation of the law was a misdemeanor. H.B. 2305 was passed along nearly straight party lines in the waning hours of the legislative session. (Ex. 7; Ex. 91 at 7-10.) Shortly after its enactment, citizen groups organized a referendum effort and collected more than 140,000 signatures to place H.B. 2305 on the ballot for a straight up-or-down vote. (Tr. 1071-72; Ex. 91 at 11.) Had H.B. 2305 been repealed by referendum, the legislature could not have enacted related legislation except on a supermajority vote, and only to "further[] the purposes" of the referendum. Ariz. Const. art. 4, pt. 1, § 1(6)(C), (14). Rather than face a referendum, Republican legislators again repealed their own legislation along party lines. The bill's primary sponsor, Secretary Reagan (who, at the time, was a State Senator), admitted that the legislature's goal was to break the bill into smaller pieces and reintroduce individual provisions "a la carte." (Ex. 91 at 11.)

Although the circumstances surrounding these prior bills are somewhat suspicious, these departures have less probative value because they involve different bills passed during different legislative sessions by a substantially different composition of

1    legislators.  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1195 (11th Cir. 1999)

2    ("[W]e fail to see how evidence of . . . a [city's] prior refusal to annex [a housing

3    project] standing alone establishes any intent, let alone a discriminatory one" for later

4    annexation decision); *Kansas City, Mo. v. Fed. Pac. Elec. Co*., 310 F.2d 271, 278 (8th

5    Cir. 1962) (noting the "questionable import that the rejection of prior bills may have in

6    determining congressional intent as to subsequently enacted legislation").

7            Plaintiffs also claim that H.B. 2023 represents a substantive deviation from normal

8    legislative processes because it differs from these prior bills.  But the fact that different

9    bills from different sponsors and different legislative sessions did not have the same

10   substance is not alone surprising, nor is it particularly probative of discriminatory intent.

11   Moreover, although Plaintiffs argue that the legislature made H.B. 2023 harsher than

12   previous ballot collection bills by imposing felony penalties, they ignore that H.B. 2023

13   in other respects is more lenient than its predecessors given its broad exceptions for

14   family members, household members, and caregivers.

15           Finally, Plaintiffs highlight the law's impact on minority voters.  As previously

16   noted, ballot collection was used as a GOTV strategy in mostly low-efficacy minority

17   communities, though the Court cannot say how often voters used ballot collection, nor

18   can it measure the degree or significance of any disparities in its usage.  The legislature

19   was aware that the law could impact GOTV efforts in low-efficacy minority

20   communities; numerous democratic lawmakers speaking in opposition to the bill

21   expressed concerns that it would adversely impact minority GOTV efforts.  (Ex. 17 at 74;

22   Ex. 19 at 17-18, 20, 35-37; Ex. 23 at 89-91; Ex. 25 at 27-28.)  But this evidence shows

23   only that the legislature enacted H.B. 2023 in spite of its impact on minority GOTV

24   efforts, not because of that impact.  Indeed, proponents of the bill seemed to view these

25   concerns as less significant because of the minimal burdens associated with returning a

26   mail ballot.  (*See, e.g.*, Ex. 23 at 81-82.)

27           Based on the totality of the circumstances, Plaintiffs have not shown that the

28   legislature enacted H.B. 2023 with the intent to suppress minority votes.  Rather, some

1    individual legislators and proponents were motivated in part by partisan interests.
2    Shooter, for example, first raised concerns about ballot collection after winning a close
3    election.   In addition to raising concerns about ballot collectors impersonating election
4    workers, Johnson complained that ballot collection put candidates "who don't have
5    accessibility to large groups to go out and collect those ballots" at a disadvantage.
6    Likewise, Richard Hopkins, a proponent of the bill and a 2014 Republican candidate for
7    the Arizona House of Representatives, claimed that he lost his election because of "ballot
8    harvesting." (Ex. 17 at 17, 45-49.)   In opposing ballot collection restrictions, Democratic
9    Senator Steve Farley stated "[t]he problem we're solving is that one party is better at
10   collecting ballots than the other one." (Ex. 25 at 35.)

11         But partisan motives are not necessarily racial in nature, even though racially
12   polarized voting can sometimes blur the lines.   Importantly, both the Fifteenth
13   Amendment and § 2 of the VRA—upon which Plaintiffs' intentional discrimination
14   claims are based—address racial discrimination, not partisan discrimination.   That some
15   legislators and proponents harbored partisan interests, rather than racially discriminatory
16   motives, is consistent with Arizona's history of advancing partisan objectives with the
17   unintended consequence of ignoring minority interests. (Ex. 90 at 8.)

18         Moreover, partisan motives did not permeate the entire legislative process.
19   Instead, many proponents acted to advance facially important interests in bringing early
20   mail ballot security in line with in-person voting security, notwithstanding the lack of
21   direct evidence that ballot collection fraud was occurring.   Though Plaintiffs might
22   disagree with the manner in which the legislature chose to address its concerns about
23   early ballot security, "the propriety of doing so is perfectly clear," and the legislature
24   need not wait until a problem occurs to take proactive steps it deems appropriate.
25   *Crawford*, 553 U.S. at 196; *see also Lee*, 188 F. Supp. 3d at 609.

26         The Court therefore finds that the legislature that enacted H.B. 2023 was not
27   motivated by a desire to suppress minority voters.   The legislature was motivated by a
28   misinformed belief that ballot collection fraud was occurring, but a sincere belief that

mail-in ballots lacked adequate prophylactic safeguards as compared to in-person voting. Some proponents also harbored partisan motives.  But, in the end, the legislature acted in spite of opponents' concerns that the law would prohibit an effective GOTV strategy in low-efficacy minority communities, not because it intended to suppress those votes.

## VIII.  CONCLUSION

Plaintiffs have not carried their burden to show that the challenged election practices severely and unjustifiably burden voting and associational rights, disparately impact minority voters such that they have less opportunity than their non-minority counterparts to meaningfully participate in the political process, or that Arizona was motivated by a desire to suppress minority turnout when it placed limits on who may collect early mail ballots.  Plaintiffs have raised fair concerns about the wisdom of H.B. 2023 and Arizona's treatment of OOP ballots as matters of public policy.  The Court, however, is not charged with second-guessing the prudence of Arizona's laws.  The Court's authority extends only to determining whether, in exercising its constitutional authority to regulate the times, places, and manner of elections, Arizona has acted within permissible constitutional and statutory bounds.  In exercising this duty, the Court also is constrained by decisions of the Supreme Court, including those standing for the proposition that legislatures may act prophylactically rather than upon specific evidence of a documented problem, and those finding that prevention of voter fraud and preservation of public confidence in election integrity are important state interests.  *See Purcell*, 549 U.S. at 4; *Crawford*, 553 U.S. at 195; *Munro*, 479 U.S. at 194-95; *Eu*, 489 U.S. at 231.  Based on a careful review of the evidence and governing case law, the Court concludes that the challenged provisions contravene neither the Constitution nor the VRA.  Therefore,

**IT IS ORDERED** as follows:

1.  Defendants' oral motion for judgment on partial findings (Doc. 384) is **DENIED** as moot.

2.  The Court finds in favor of Defendants and against Plaintiffs on all claims.

3.   The Clerk of the Court shall enter judgment accordingly and terminate this case.

Dated this 8th day of May, 2018.


Douglas L. Rayes
United States District Judge